IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* [UNDER SEAL], | ) ) ) | No. |
| Plaintiff, | ) ) | **COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT** |
| v. | ) ) | |
| [UNDER SEAL], | ) ) ) | **FILED UNDER SEAL (31 U.S.C. § 3729 *et seq.*)** |
| Defendants. | ) ) ) | **JURY TRIAL DEMANDED** |
| _____ | ) | |

Dated: June ___, 2010

Respectfully submitted,

Jon L. Praed, DC Bar No. 51665
jon.praed@i-lawgroup.com
INTERNET LAW GROUP, PLLC
4121 Wilson Boulevard, Suite 101
Arlington, Virginia 22203
703.243.8100 main
703.243.8162 facsimile
703.243.8102 direct dial

Paul D. Scott (*pro hac vice* pending)
pdscott@lopds.com
California State Bar No. 145975
Lani Anne Remick (*pro hac vice* pending)
California State Bar No. 189889
laremick@lopds.com
LAW OFFICES OF PAUL D. SCOTT, P.C.
505 Sansome Street, Sixth Floor
San Francisco, California 94111
415.981.1212 main
415.981.1215 facsimile

Attorneys for Relator

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. |
| *ex rel.* | ) | |
| FLOYD LANDIS, | ) | **COMPLAINT FOR VIOLATIONS OF** |
| 25350 Eagle's Nest | ) | **FEDERAL FALSE CLAIMS  ACT** |
| Idyllwild, CA  92549 | ) | |
| | ) | **FILED UNDER SEAL** |
| Plaintiff, | ) | **(31 U.S.C. § 3729 *et seq.*)** |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Tailwind Sports Corporation | ) | |
| 98 San Jacinto Blvd. | ) | |
| Suite 430 | ) | |
| Austin, TX  78701 | ) | |
| | ) | |
| Tailwind Sports, LLC | ) | |
| 5515 Security Lane, #1103 | ) | |
| Rockville, Maryland | ) | |
| | ) | |
| Montgomery Sports, Inc., | ) | |
| 600 Montgomery St. | ) | |
| San Francisco, CA 94111 | ) | |
| | ) | |
| Capital Sports & Entertainment | ) | |
| Holdings, Inc. | ) | |
| 98 San Jacinto Blvd. | ) | |
| Suite 430 | ) | |
| Austin, TX  78701 | ) | |
| | ) | |
| Thomas W. Weisel | ) | |
| 7 Upper Road | ) | |
| Ross, CA  94957 | ) | |
| | ) | |
| Lance Armstrong | ) | |
| c/o Capital Sports and Entertainment | ) | |
| Holdings, Inc. | ) | |
| 98 San Jacinto Blvd. | ) | |
| Suite 430 | ) | |
| Austin, TX  78701 | ) | |
| | ) | |
| | ) | |
| | ) | |

1

Johan Bruyleen                                    )
c/o Team Radio Shack                              )
98 San Jacinto Blvd.                             )
Suite 430                                         )
Austin, TX  78701                                 )
                                                  )
William J. Stapleton                             )
2406 Pemberton Place                             )
Austin, TX  78703-2548                           )
                                                  )
Barton B. Knaggs                                 )
4200 Hills Drive                                  )
Austin, TX  78731                                 )
                                                  )
and Does 1 – 50,                                  )
                                                  )
    Defendants.                                   )

_____

## JURISDICTION, VENUE AND PRELIMINARY MATTERS

1.      This is an action to recover damages and penalties on behalf of the United

States arising from false claims, false statements, and other conduct by the defendants in

violation of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, both pre-amendment

and as amended by the Fraud Enforcement and Recovery Act of 2009, Pub. L. 111-21, 123

Stat. 1617 (2009) ("FERA").  This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 &

1345 and 31 U.S.C. § 3732.

2.      Venue is proper in the District of Columbia under 31 U.S.C. § 3732(a) and 28

U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the

claim occurred in this district or a defendant may be found here, and acts proscribed by 31

U.S.C. § 3729 occurred in this district.

3.      Statements by relator Floyd Landis ("relator" or "Mr. Landis") concerning

certain of the facts alleged in the complaint have appeared in the news media.  The

allegations herein are not based upon any public disclosure.  Unless otherwise stated herein,

Mr. Landis is the original source of the information in the news media and the original

source of the information upon which this complaint is based.  Unless otherwise stated

herein, Mr. Landis has direct and independent knowledge of the information on which the allegations herein are based and has voluntarily provided the information to the United States before filing this action.

4.      As required by 31 U.S.C. § 3730(b)(2), relator will be serving the United States Attorney General and the United States Attorney for the District of Columbia with copies of this complaint along with a written disclosure of material evidence related to the complaint.  The disclosure statement supports the allegations herein of false claims against the United States by the defendants.

5.      As required by the False Claims Act, this complaint is being filed under seal and shall not be served on the defendants until the court so orders.

## PARTIES

6.      Relator Floyd Landis is a resident of Idyllwild, California and a United States citizen.  Mr. Landis is bringing this civil action for violations of 31 U.S.C. § 3729, *et seq.* for himself and on behalf of the United States Government, pursuant to 31 U.S.C. §§ 3730(b)(1) and (b)(2).  Relator Landis was a member of the United States Postal Service Pro Cycling Team ("USPS Team") from 2002 through 2004.

7.      Defendant Montgomery Sports, Inc. ("Montgomery Sports") is a business entity of unknown type which was headquartered in San Francisco, California and which, relator is informed and believes, based on California Secretary of State records and published reports, is no longer in operation.  The last known address of Montgomery Sports' parent corporation, Montgomery Securities, is stated in the caption.  Relator is informed and believes, based on published reports and public records, that in 1989, Thomas W. Weisel founded Montgomery Sports as a Division of Montgomery Securities, which he also founded, dominated and controlled.  In or around 1997, Montgomery Securities was sold to Nationsbanc (now, Bank of America), but defendant Weisel subsequently left the company in or around September 1998.  After his departure, Weisel arranged a buyout of Montgomery Sports and thereafter remained in control of the business.

8.      Defendant Tailwind Sports Corporation is an entity of unknown type,

organized under the laws of the State of Delaware.  Tailwind Sports Corporation's last known address is stated in the caption.

9.      Defendant Tailwind Sports LLC (formerly Disson Furst & Partners) is an entity of unknown type, organized under the laws of the State of Delaware.   Relator is informed and believes, based on public records, that Tailwind Sports LLC maintained offices in Washington, D.C. at 5301 Wisconsin Avenue, Suite #325, Washington, D.C. 20015 during the time period relevant to the allegations herein.  Tailwind Sports, LLC's last known address is stated in the caption.

10.     Relator is informed and believes that the operations of the two different Tailwind entities referenced above were conducted under different business forms during the period relevant to the complaint, including corporate and partnership forms, but involved the same essential business operations, and were dominated and controlled by Thomas Weisel. Accordingly, Tailwind Sports LLC and Tailwind Sports Corporation are collectively referred to herein as "Tailwind."

11.     Relator is informed and believes, based on published reports and his experiences as a member of the USPS Team, that Thomas W. Weisel was a founder of Tailwind, chairman of its board, and its largest investor.  Relator is informed and believes, based on published reports and his experiences as a member of the USPS Team, that Tailwind's ownership grew to include defendants William J. Stapleton, Lance Armstrong, Johan Bruyneel and others.  Relator is informed and believes, based on published reports and public records, that Tailwind has ceased operations.  Relator is further informed and believes, based on published reports, that Tailwind's capital and its assets have been distributed to its owners.

12.     Defendant Capital Sports and Entertainment Holdings, Inc. (formerly Capital Sports Ventures, then later Capital Sports & Entertainment, Inc.) (hereinafter "CSE") is a corporation organized under the laws of the state of Texas, with headquarters in Austin, Texas.  Relator is informed and believes, based on public records, published reports, and his experiences as a member of the USPS Team, that during the period relevant to the complaint

CSE has been owned and controlled, directly or indirectly, by the following defendants, among other individuals, during the period relevant to the complaint:  William J. Stapleton, Barton B. Knaggs, and Lance Armstrong.

13.     Defendant Thomas W. Weisel is an individual and a citizen of the United States.  Relator is informed and believes, based on public records, that defendant Weisel resides in Ross, Marin County, California.

14.     Defendant Lance Armstrong is an individual and a citizen of the United States whose place of residence is unknown to relator.  Relator is informed and believes that defendant Armstrong lives in Austin, Texas, and can be contacted at the business address of his agent, defendant William J. Stapleton, as listed in the caption.  Relator is informed and believes, based on published reports and his experiences as a member of the USPS Team, that Lance Armstrong held ownership interests in Tailwind and CSE, among other entities, during the time period relevant to the allegations in this complaint.

15.     Defendant Johan Bruyneel is an individual whose place of residence is unknown to relator.  Relator is informed and believes, based on statements on defendant Bruyneel's website, that he lives in Madrid, Spain and can be contacted at the business address of defendant CSE, as listed in the caption.  Defendant Bruyneel was the managing director (aka "Director Sportif") of the USPS Team from 1998 through 2004.  Relator is informed and believes, based on published reports and his experiences as a member of the USPS Team, that defendant Bruyneel became a part-owner of Tailwind in or around 2002, and held such ownership interest during the period relevant to this complaint.

16.     Defendant William J. ("Bill") Stapleton is an individual whose place of residence is unknown to relator.  Relator is informed and believes, based on published information, that defendant Stapleton resides in Austin, Texas, and his last known address is listed in the caption.  Defendant Stapleton is Lance Armstrong's agent and has represented him since 1995.  Defendant Stapleton founded CSE in the latter half of the 1990s and is its President.  Relator is informed and believes, based on public records, that defendant Stapleton is currently a Director and CEO of Tailwind, and has also acted as Tailwind's

President.  Upon information and belief, during the time period relevant to the complaint, defendant Stapleton acted as an officer and or director of Tailwind.

17.     Defendant Barton B. Knaggs is an individual whose place of residence is unknown to relator.  Relator is informed and believes, based on published information, that defendant Knaggs resides in Austin, Texas at the address listed in the caption.  During the time period relevant to this complaint, defendant Knaggs served as President and as a Director of Tailwind and also as a Vice-president of CSE from 2001 through the present.  He is currently a part owner of CSE.

18.     The true names and capacities of the defendants named above as DOES 1 through 50, inclusive, are unknown to relator, who will seek leave of court to amend the complaint to allege the names and capacities of such defendants, together with any additional charging allegations, at such time as they are ascertained.

## UNITED STATES POSTAL SERVICE

19.     At all times relevant to this matter, the United States Postal Service ("USPS") has been an "independent establishment" of the United States government, responsible for providing postal service in the United States.  Postal Reorganization Act of 1970, Pub.L. 91-375, August 12, 1970.  The USPS is headquartered in Washington, D.C.

20.     In or around 1996, the USPS entered into an agreement with Montgomery Sports, a business entity dominated and controlled by defendant Weisel, for the sponsorship of a bicycle racing team owned by Montgomery Sports.  It was a national sponsorship agreement, and as such was funded and managed at the headquarters level in Washington, D.C.  The name given the team was the US Postal Service Pro Cycling Team ("the USPS Team").  Based on published reports, the agreement initially called for the USPS to pay $1 million a year for three years for the rights to sponsor the USPS Team.

21.     In or around 1999 or 2000, ownership of the USPS Team was transferred to Tailwind by Weisel.

22.     Relator is informed and believes, based on published reports, that the USPS contract was extended from 1999 through 2001.  In or around April 2001, the USPS

extended its contract with Tailwind for three years.

23.     In or around 2002, CSE began providing management services on behalf of Tailwind with respect to the USPS Team.  Based on information and belief, in or around mid-2004, CSE became joint owner of the USPS team along with Tailwind.

24.     The USPS ended its sponsorship of the USPS Team by not renewing the sponsorship contract in 2004.  Based on comments made to him by individuals described herein and public reports regarding the contract, relator is informed and believes that over the last several years of the sponsorship agreement, the USPS sponsorship contract provided for payments of approximately $9 million per year by the USPS to Tailwind, and later to Tailwind and CSE, for sponsorship rights.

25.     At all times relevant hereto, USPS contracting policy, as reflected in the applicable USPS Purchasing Manual, provided, among other things, that "persons known to engage in the illegal use, possession, sale, or transfer of narcotics or other drugs" and "persons who knowingly submit false data or conceal data for the purpose of gaining employment" were ineligible to perform services under a USPS contract.

26.     At all times relevant hereto, USPS contracting policy, as reflected in the applicable USPS Purchasing Manual, provided, among other things, that a USPS contractor could be debarred from further contracting with the USPS based on "violations of a Postal Service contract so serious as to justify debarment," such as "willful failure to perform a Postal Service contract in accordance with the specifications."  USPS contracting policy further provided that a contractor could be debarred for "any other cause of such serious and compelling nature, affecting responsibility as a supplier."  At certain times relevant hereto, the USPS Purchasing Manual specifically listed "violation of a contract clause concerning the maintenance of a drug-free workplace" and "commission of . . . falsification of or destruction of records, [or] making false statements" as bases for debarment.  At all times relevant hereto, USPS contracting policy further provided that, for purposes of debarment, "the criminal, fraudulent or seriously improper conduct of an individual may be imputed to the firm with which he or she has been connected when a grave impropriety . . . was

effected by him or her with the knowledge or approval of the firm."

27.     At all times relevant hereto, USPS contracting policy, as reflected in the applicable USPS Purchasing Manual, provided, among other things, that a USPS contractor could be suspended upon indictment or conviction for any offense "indicating a lack of business integrity or business honesty that seriously and directly affects present responsibility as a supplier." USPS contracting policy further provided that a USPS contractor could be suspended for any "cause of such serious and compelling nature, affecting responsibility as a supplier, as may be determined [by the USPS] to warrant suspension."

28.     USPS policy with respect to its own employees, as reflected in USPS regulations, provides that "No employee shall engage in criminal, dishonest, notoriously disgraceful or immoral conduct, or other conduct prejudicial to the Postal Service." USPS regulations further prohibit employees from drinking intoxicating beverages in a public place while in uniform, and provide that use of illegal drugs is grounds for dismissal. 39 C.F.R. § 447.21.

29.     Relator Landis is informed and believes, based on the USPS policies described above, as well as his own experience with sponsorships involving cycling, that the contracts between the USPS, on the one hand, and Montgomery Sports, Tailwind, and CSE, on the other, contained a form of "morals" clause that prohibited the defendants from engaging in the doping of team athletes as described herein. The defendants' failure to comply with such provisions would have been a material consideration by the USPS in determining whether to pay funds otherwise owing under the relevant contracts, with the natural tendency of the USPS being not to pay the funds if it were known that the team was engaged in doping activities.

30.     Relator Landis is informed and believes, based on the USPS policies described above, as well as his own experience with sponsorships involving cycling, that the contracts between the USPS, on the one hand, and Montgomery Sports, Tailwind, and CSE, on the other, contained provisions prohibiting the defendants from engaging in unlawful conduct,

such as the distribution of Class III drugs like Testosterone (*e.g.,* Andriol), or other anabolic steroids or corticosteroids, or other prescription drugs, to team athletes without a lawful prescription or medical necessity.  The defendants' failure to comply with such provisions, if it had been known to the USPS, would have been a material consideration by the USPS in determining whether to pay funds otherwise owing under the relevant contracts, with the natural tendency of the USPS being not to pay the funds if it were known that the team was engaged in unlawful conduct.

31.     Relator Landis is informed and believes, based on the USPS policies described above, as well as his own experience with sponsorship contracts involving cycling, that the contracts between the USPS, on the one hand, and Montgomery Sports, Tailwind and CSE, on the other, contained provisions requiring compliance by the defendants with the anti-doping rules promulgated by the relevant bodies whose rules govern professional cycling, including, but not limited to, International Union of Cyclists (or Union Cycliste Internationale) ("UCI"), USA Cycling (or one of its subsidiary entities), the International Olympic Committee, and the World Anti-Doping Agency ("WADA").  The defendants' failure to comply with such provisions, if it had been known to the USPS, would have been a material consideration by the USPS in determining whether to pay funds otherwise owing under the relevant contracts, with the natural tendency of the USPS being not to pay the funds if it were known that the team was engaged in doping activities.

32.     The USPS specifically stated in 2000 that the reason it was sponsoring the USPS team and its purpose in doing so was to "positively impact customer perceptions of the Postal Service" and improve its own employees' "sense of pride."  Doping of athletes and cheating to win athletic events is plainly inconsistent with these objectives.

33.     At all times relevant hereto, USPS contracting policy, as reflected in the applicable USPS Purchasing Manual, provided that submission of an invoice to the USPS for payment was a certification that, among other things, "any services being billed for have been performed in accordance with the contract requirements."  USPS contracting policy further provided that any supplier "shall, promptly upon discovery, refund (i) any

overpayment made by the Postal Service for service performed, or (ii) any payment made by the Postal Service for service not rendered."

34.     The defendants submitted or caused to be submitted claims for payment to the USPS with knowledge that the USPS Team was engaged in doping and other wrongful conduct in violation of the terms of the sponsorship contracts.  Such claims were submitted during the period that each of the entities referenced above had its respective sponsorship contract with the USPS or was involved with management of the same.  When the defendants submitted or caused to be submitted claims for payment and/or accepted payments by the USPS, they represented explicitly and/or implicitly to the USPS that the USPS Team was not involved in the doping of its team members or other wrongful conduct, but that representation was not true.  Such express or implied certification was a condition of and a prerequisite to the USPS' payments and to its continuation and renewals of the sponsorship contract.  Although defendants knew they had obtained payments to which they were not entitled, defendants failed to return the funds to the USPS.

35.     Relator is informed and believes that the understanding that the USPS Team was free of doping and other wrongful conduct was integral to the sponsorship agreements between the USPS and the defendants.  That understanding perpetuated by the defendants was false and fraudulent, which thus fraudulently induced the USPS to enter into the sponsorship contracts described herein and then extend the same for increasingly larger sums of money.

## DEFENDANTS' CONTACTS WITH WASHINGTON, D.C.

36.     The contracts between the USPS and defendants Montgomery Sports, Tailwind, and CSE were all national sponsorship contracts.  As such, the contracts were managed and funded at a national level by the US Postal Service, which has its headquarters in Washington, D.C.

37.     Relator is informed and believes, based on his knowledge that the sponsorship contract was with the USPS and that the USPS is headquartered in Washington, D.C., that defendants submitted their claims for payments under their sponsorship contracts with the

USPS in Washington, D.C.

38.     Relator is informed and believes, based on his knowledge that the sponsorship contract was with the USPS, which is headquartered in Washington, D.C., that the USPS generated its payments in Washington, D.C. to defendants Montgomery Sports, Tailwind, and CSE under the sponsorship contracts referenced herein.

39.     Defendants Montgomery Sports, Tailwind, and CSE, and their representatives, including some or all of the individual defendants, must necessarily have met with and or communicated with USPS executives in Washington, D.C. in connection with their negotiations, agreements, implementation, and payment upon the sponsorship contracts referenced herein.

40.     During the time period relevant to this complaint, relator is informed and believes based on the allegations herein, that defendants Montgomery Sports, Tailwind, and CSE, and their representatives, including Thomas Weisel and William Stapleton, attended meetings in Washington, D.C., at which they failed to disclose and otherwise knowingly concealed from the USPS the highly material fact that defendants were engaged in a systematic program of doping USPS Team athletes to achieve success in professional cycling.  Relator is further informed and believes, based on public records, that Tailwind had an office in D.C. during the period relevant to this complaint.

41.     During the time period relevant to this complaint, relator is informed and believes, based on the allegations herein, that defendants Montgomery Sports, Tailwind, and CSE, and their representatives, including Thomas Weisel and William Stapleton, when calling by telephone, corresponding by mail, and emailing USPS executives in Washington, D.C., failed to disclose and otherwise knowingly concealed from the USPS the highly material fact that defendants were engaged in a systematic program of doping USPS Team athletes to achieve success in professional cycling.

42.     On or about June 1, 2001, the USPS held a special rally and flag presentation in Washington, D.C. for members of the USPS Team.  A giant US Postal Service jersey was also unveiled at the event and later taken on a tour of other cities in the United States.  At no

point in Washington, D.C. or elsewhere did the defendants disclose to the USPS that they were engaged in doping USPS Team athletes. To the contrary, the defendants, including Lance Armstrong, misled the USPS at the event in Washington, D.C. and elsewhere about the doping of the team and the reasons for its success.

## PERFORMANCE ENHANCING DRUGS AND BLOOD DOPING

43.     The term "doping" is used broadly to refer to any use of prohibited substances or prohibited methods to increase athletic performance.

44.     The practice of "blood doping" involves the use of artificial means to increase an individual's red blood cell count, which increases the oxygen carrying capacity of the person's blood and thus improves their endurance. Until the 1980s, the practice of blood doping generally involved removing and storing a person's own blood, waiting a few weeks until the red blood cell count in the individual had been restored, then re-injecting the stored red blood cells. An alternative approach used was to add a donor's red blood cells.

45.     In the 1990s, the use of Erythropoietin ("EPO") became more common in blood doping. EPO is a protein hormone responsible for stimulating the production of red blood cells in the human body. It is a naturally occurring hormone, produced by the kidneys, but can also be produced in the lab. The human recombinant (*i.e.,* lab) version of EPO was developed for treating the reduction in red blood cells associated with certain diseases or surgery. When an athlete uses EPO, it can stimulate their body to produce red blood cells to increase the flow of oxygen to their muscles and thus increase their endurance during sporting events.

46.     Anabolic steroids are synthetic steroids that have the effect of human steroids, like testosterone. If taken by an athlete, anabolic steroids can increase athletic performance, by increasing the pace of muscle development, strength, and endurance. Testosterone can be taken by a variety of methods, including intramuscular injection, patches and gels. It is categorized as a Schedule III controlled substance under the Anabolic Steroid Control Act, Pub. L. No. 101-647, title XIX, §§ 1901-05.

47.     Corticosteroids are synthetic drugs that rapidly reduce inflammation and pain.

While they can be used for certain legitimate uses, like intra-articular hip injections to reduce inflammation in a damaged joint, they can also be used as performance enhancing drugs if used intramuscularly.  Relator's understanding is that corticosteroids are available by prescription only.

48.     Human Growth Hormone (HGH) is produced naturally by the human body and can also be produced synthetically.  Recombinant (*i.e.,* synthetic) HGH is sometimes administered to athletes in order to reduce the level of subcutaneous fat.  It also has the effect of increasing the size and strength of an athlete's muscles and can aid in recovery from strenuous exercise and injuries.  HGH is also categorized as a Schedule III controlled substance under the Anabolic Steroid Control Act, Pub. L. No. 101-647, title XIX, §§ 1901-05.

49.     It is illegal under federal law to distribute Class III substances without a prescription and medical necessity.

50.     USA Cycling describes itself as "the official governing body for all disciplines of competitive cycling in the United States."   To become licensed by USA Cycling, current members must agree to a code of conduct that includes compliance with the anti-doping rules promulgated by the World Anti Doping Agency ("WADA").

51.     According to its website, WADA was "established in 1999 as an international independent agency composed and funded equally by the sport movement and governments of the world."

52.     Prior to the establishment of WADA, the principal international authority addressing doping was the International Olympic Committee ("IOC").

53.     The IOC promulgated the Olympic Movement Anti-Doping Code ("OMAC"), a version of which was entered into force on January 1, 2000.  The OMAC referenced anabolic steroids like testosterone, HGH, and EPO in the list of prohibited substances and also listed blood doping as a prohibited method.

54.     On May 15, 2001, the Executive Board of the IOC, upon recommendation of the Board of the WADA agreed on a list of prohibited classes of substances and prohibited

methods, which substituted Appendix A of the OMAC with the new list.  Anabolic steroids (*e.g.*, testosterone), along with HGH and EPO, were included in the revised list of prohibited substances, and blood doping was included as a prohibited method.

55.     In 2003, WADA promulgated the World Anti-Doping Code ("WADC"), which was ratified by various national sports organizations in Copenhagen.  The WADC provided for the publication of a list of Prohibited Substances and Prohibited Methods each year.  To relator's knowledge, the list of Prohibited Substances and Prohibited Methods promulgated pursuant to the WADC has never permitted the use of anabolic steroids (*e.g.*, testosterone), HGH, EPO or blood doping as described herein.

56.     In 2000, the US Anti-Doping Agency ("USADA") was formed as the national anti-doping organization for the Olympic Movement in the United States.  It is a non-profit, non-government entity, which provides information to American athletes on the Prohibited List promulgated by WADA.   To relator's knowledge, the USADA, at all times relevant herein, has always prohibited the use of anabolic steroids (*e.g.,* testosterone), HGH, EPO or blood doping as described herein.

57.     In July 2004, the International Union of Cyclists (or Union Cycliste Internationale) ("UCI") elected to accept the World Anti-Doping Code, effective August 13, 2004.   Prior to that time, the UCI had its own rules prohibiting the use of anabolic steroids (*e.g.*, testosterone), HGH, EPO or blood doping as described herein.

58.     Despite the clear prohibitions on doping set forth by the above organizations, the USPS team systematically and knowingly evaded testing protocols and sought to enhance USPS Team members' performances with prohibited substances and prohibited methods.

### THE US POSTAL SERVICE PRO CYCLING TEAM

59.     Mr. Landis signed a contract with Tailwind in 2001 to become a member of the USPS Team and to race with the team throughout the 2002 season.  Relator Landis was a member of the USPS Team from 2002 through 2004.

60.     In or around late 2001 (after the 2001 racing season had ended), Mr. Landis

had a discussion with defendant Bruyneel, the managing director of the team, at a team training camp in Austin, Texas regarding what would be expected of Mr. Landis as a team member with regard to the use of performance enhancing drugs.  When Mr. Landis inquired explicitly about the topic, he was advised by Mr. Bruyneel that when the time came and he needed a little "help," Mr. Bruyneel would tell him what to do and how to do it.

61.     On or about June 2002, at the end of the 2002 Dauphine Libere cycling road race and prior to start of the 2002 Tour de France, Mr. Landis was approached by Mr. Bruyneel in his hotel room in Grenoble, France.  In that meeting, Mr. Bruyneel told Mr. Landis that, when Mr. Landis arrived in St. Moritz, Switzerland, defendant Lance Armstrong would give him some testosterone patches and that team adviser and Italian physician Dr. Michele Ferrari ("Dr. Ferrari") would help him extract a half liter of blood to be re-infused during the Tour de France.  (It has been widely reported that Dr. Ferrari worked with the USPS Team until October 2004, when he was convicted in Italy of charges involving doping athletes.  The conviction was later reversed on appeal in 2006).

62.     In the same meeting, Mr. Bruyneel told Mr. Landis at that time that the testosterone patches should be worn two out of three days after hard training for eight to ten hours at night, which would be relatively free of risk of detection.  He also explained that Dr. Ferrari would tell Mr. Landis about how the blood transfusion would work.

63.     Following his conversation with Mr. Bruyneel, Mr. Landis flew on a helicopter with defendant Armstrong from the finish of the Dauphine Libere to St Moritz, Switzerland.  Upon his arrival there, Mr. Landis went to defendant Armstrong's apartment, where Mr. Armstrong gave him a package of 2.5 ml testosterone patches in front of Mr. Armstrong's wife at the time, Kirsten Armstrong.

64.     Several days later, Dr Ferrari discussed with Mr. Landis how the blood transfusion process would work.  Mr. Landis subsequently met with Dr. Ferrari at defendant Armstrong's apartment, where Dr. Ferrari performed an extraction of half a liter of Mr. Landis' blood, which he explained at the time to Mr. Landis would be transfused back into Mr. Landis during the Tour de France.  This was the first occasion on which Mr. Landis had

participated in blood manipulation of any kind and did so at the explicit initiation of individuals charged with authority and acting on behalf of Tailwind and its principals, including Bruyneel.

65.     Defendant Armstrong did not witness the blood extraction in his apartment, but he was aware that it had taken place and was present in the apartment at the time.  Mr. Landis and defendant Armstrong had lengthy discussions about the extraction on training rides in St. Moritz in or around June of 2002, during which time defendant Armstrong also explained to Mr. Landis the evolution of EPO testing and how transfusions were now necessary due to the new test, *i.e.,* EPO could no longer be used during races in large quantities (subcutaneously) without detection.

66.     Defendant Armstrong also divulged to Mr. Landis during the same rides in or around June 2002 that he had used EPO himself since early in his professional bicycle racing career.  Specifically, defendant Armstrong stated to Mr. Landis that in 2001, the first year the EPO test was used, he had been told by Dr. Ferrari, who had access to the new test, that he should not use EPO anymore subcutaneously, but he did not believe Dr. Ferrari and continued to use it.  Defendant Armstrong further stated that he subsequently tested positive for EPO while winning the Tour de Suisse, the month before the Tour de France in 2001, at which point he and Mr. Bruyneel flew to the UCI headquarters and made a financial agreement with Mr. Hein Verbruggen, head of UCI at the time, to keep the positive test hidden.

67.     Pat McQuaid, the current head of the UCI, has recently reportedly confirmed that defendant Armstrong gave the UCI $100,000.  He is further reported to have stated that the funds were promised in 2002, when Hein Verbruggen was head of the federation, but not actually paid until 2005, when Verbruggen resigned from his position.

68.     During the 2002 Tour de France, Mr. Landis was transfused with the half liter of his blood that had been previously extracted.  The transfusion took place during stage 8 of the Tour de France, the evening before the individual time trial.  The USPS team doctor, Jose Louise Gonzales del Moral asked Mr. Landis to come to his room where Mr. Landis

met defendant Armstrong.  Mr. Landis and defendant Armstrong then lay on opposite sides of the bed and received re-infusions of a half-liter of blood each while defendant Bruyneel sat in a chair watching and commented on how well the two were going to race the following day in the time trial.

69.     Defendant Armstrong placed second and Mr. Landis placed fifteenth in the subsequent time trial.  After the time trial, defendant Armstrong commented to Mr. Landis that he was disappointed with the result and believed a potential cause may have been that the blood infused into them had not been stored properly.  Defendant Armstrong further commented that he expected to do well in the final week of the tour as he had a second half liter of blood stored that had been stored differently than the first bag.  This prediction turned out to be accurate, as defendant Armstrong went on to win the 2002 Tour de France.

70.     In approximately October 2002, Mr. Landis met with defendant Stapleton of CSE in his office next to the Four Seasons Hotel in Austin, Texas to discuss a renewal of his contract for the next two years.  In the meeting, Mr. Stapleton specifically referenced the fact that he was aware of the extent to which Mr. Landis had been doping, and commented on the fact that the team could help him with further doping to help improve his performance further.

71.     Mr. Landis is informed and believes, based on the facts detailed herein, that at all times relevant to this complaint, Mr. Stapleton was knowledgeable about, and approved of, the doping program involving the USPS Team and the other misconduct described herein.

72.     In or around January 2003, Mr. Landis crashed during training and broke his right hip, requiring surgery.   Following a second surgery on his hip in or around May 2003, Mr. Landis flew to Valencia to meet defendant Bruyneel and the team Doctor to inspect his hip, then flew to Gerona, Spain .  Once there, pursuant to prior instructions given to him by defendant Bruyneel, Mr. Landis went to defendant Armstrong's apartment, where he met Dr. Ferrari, who drew half a liter of blood and placed it in a refrigerator hidden in the closet of the master bedroom.  The bag was stored in the refrigerator along with several other bags of

blood that were already inside.

73.     Shortly thereafter, defendant Armstrong asked Mr. Landis to stay in the apartment to take care of the blood being stored in the refrigerator there.   Defendant Armstrong explained to Mr. Landis at the time that he would be gone for a few weeks to train, so he wanted Mr. Landis to check the temperature of the blood each day and make sure there were no problems with the electricity or the refrigerator.  Mr. Landis agreed to this request and stayed in the apartment.

74.     Approximately three weeks after the first blood draw in defendant Armstrong's Gerona apartment, Mr. Landis then had an additional half liter of blood removed by Dr. Ferrari.  More specifically, Dr. Ferrari removed two half liters of blood but also re-infused the half liter he had previously withdrawn.  This was done, according to Dr. Ferrari, to ensure that the blood was fresh.  This same technique was then used shortly before the beginning of the 2003 Tour de France, once again to ensure the freshness of the blood.  Defendant Bruyneel arranged schedules for these sessions by calling Mr. Landis and arranging Dr. Ferrari's visits.

75.     During the same period while Mr. Landis was staying at defendant Armstrong's apartment, USPS Team member George Hincapie also had blood drawn from him by Dr. Ferrari in the presence of Mr. Landis.  That blood, like Mr. Landis' blood, was placed in the same refrigerator in defendant Armstrong's apartment.

76.     In July 2003, during the 2003 Tour de France, Mr. Landis witnessed many members of the USPS team (in addition to himself) receiving transfusions of their previously extracted blood.   Mr. Landis witnessed these transfusions on two separate occasions.

77.     On the first occasion, on or about July 11, 2003, before Stage 7, Mr. Landis was contacted by defendant Bruyneel and told to go to the team doctor's room to have his transfusion done.  Dr. Luis del Moral Garcia (aka "El Gato") met Mr. Landis there to do the transfusion.  Mr. Landis recalls defendant Armstrong, and additional USPS Team cyclists George Hincapie, Joe Luis Rubiera, and Roberto Heras were all there and had their transfusions done by the doctor at the same time.

78.     On the second occasion, on or about July 17th, after Stage 11, Mr. Landis was contacted by Mr. Bruyneel and again told to go to the team doctor's room for his transfusion. Dr. Luis del Moral Garcia met Mr. Landis there to do the transfusion.  Mr. Landis recalls that USPS Team cyclists Jose Luis Rubiera , Roberto Heras, Manuel Beltran, Victor Hugo Pena, George Hincapie (Mr. Landis' roommate at the time) and defendant Armstrong were all there and had their transfusions done by the doctor at the same time.

79.     During the same Tour de France in 2003, the team doctor Dr. Luis del Moral Garcia gave Mr. Landis and his room-mate and fellow USPS cyclist George Hincapie a small syringe of olive oil in which was dissolved Andriol, a form of ingestible testosterone, on two out of every three nights, throughout the duration.  Mr. Landis inquired as to the contents of the syringe before it was ingested.  The doctor confirmed it was an olive oil and Andriol mixture.

80.     After the Tour De France, in approximately August 2003, Mr. Landis was asked by defendant Bruyneel, on behalf of Tailwind, to ride in the Vuelta a Espana cycling road race in Spain in September 2003.  Defendant Bruyneel asked that Mr. Landis have blood drawn so that it could be transfused during the race.  Per these directions, Mr. Landis borrowed Mr. Armstrong's car and drove from Gerona to Valencia, Spain where he met defendant Bruyneel and Dr. Luis del Moral Garcia.  Because time was short, two half liters of blood were drawn, and Mr. Landis returned to Gerona.

81.     Because the withdrawal of two units of blood had left Mr. Landis' hematocrit levels quite low, defendant Bruyneel instructed Mr. Landis to meet defendant Armstrong at his apartment to get some EPO from him.

82.     Mr. Landis subsequently went to defendant Armstrong's Gerona apartment and happened to encounter Mr. Armstrong along with his wife and children in the entryway of the building.  Mr. Armstrong then handed Mr. Landis a box of EPO in full view of his then wife and three children.  The EPO was Eprex by brand and came in six pre-measured syringes.  Per the instructions of Mr. Bruyneel, Mr. Landis used the EPO intravenously for several weeks during training.  Then, shortly before the Vuelta a Espana race, Dr. Luis del

Moral Garcia transfused the two half liters previously withdrawn and extracted another two

83.     During this same period of training prior to the 2003 Vuelta, defendant Bruyneel initiated a separate conversation over the phone with Mr. Landis on how to use Human Growth Hormone (HGH).  At the direction of Mr. Bruyneel, Mr. Landis subsequently bought the HGH and Andriol that he needed from the team "trainer" Jose Marti (aka Pepe), who lived in Valencia, Spain at the time along with the team doctor Luis del Moral Garcia. Mr. Landis then spent substantial time training with fellow USPS Team members Matthew White and Michael Barry and shared, and discussed the use of, HGH, testosterone and EPO with them while training.

84.     During the 2003 Vuelta, at the direction of Mr. Bruyneel, Mr. Landis was given Andriol and blood transfusions by the team doctor Dr. Luis del Moral Garcia and did not have problems with any testing, *i.e.,* tests taken were negative.   Fellow USPS Team cyclist Roberto Heras was present for one session where Mr. Landis received a transfusion.

85.     In 2004, USPS Team personnel performed two separate blood extractions and two transfusions on Mr. Landis under the direction of defendant Bruyneel.  In or around May 2004, Mr. Landis flew to Belgium.  Upon his arrival, he was picked up and driven by Dr. Dag Van Elsland to an unknown person's apartment, where blood was drawn from Mr. Landis.

86.     In or around June 2004, Mr. Landis flew to Belgium again, to have blood drawn again by Dr. Dag Van Elsland following the same procedure as the prior visit.

87.     In preparation for the 2004 Tour de France, the team went to Puigcerda, Spain to train.  At that location, defendant Bruyneel and Dr. Ferrari closely monitored the team members' blood values and administered EPO and Testosterone as needed to ensure the team was ready for the Tour de France.  A Hemocue machine (hemoglobin monitor) and centrifuge (to determine/test hematocrit) were employed to determine blood parameter status.  These were Dr. Ferrari's devices.

88.     The blood drawn in Belgium was later transfused back into Mr. Landis on two occasions during the 2004 Tour de France.

89.     On or about July 12, 2004, blood was transfused into Mr. Landis and a few other members of the team, including defendant Armstrong, George Hincapie, and Jose Acevedo.  Mr. Bruyneel's assistant Geert Duffelaar (aka Duffy) brought the blood to a hotel room where the team was staying, and the team doctor Dr. Pedro Celaya did the re-infusions.

90.     On the second occasion, the transfusion was performed on the team bus on the ride from the finish of a stage to the hotel during which time the driver pretended to have engine trouble and stopped on a remote mountain road for approximately an hour, so the entire team could have half a liter of blood transfused.  This was the only time that Mr. Landis ever saw the entire team being transfused in plain view of all the other riders and bus driver.  That team included defendant Armstrong, George Hincapie and Mr. Landis as the only Americans.  The other USPS riders receiving transfusions included Jose Acevedo, Manuel Beltran, Viatcheslav Ekimov, Benjamin Noval, Pavel Padrnos and Jose Luis Rubiera.

91.     Defendant Armstrong, with the support of the USPS Team, won the Tour de France in 1999-2004.  Mr. Landis personally witnessed defendant Armstrong's use of prohibited substances and prohibited methods to accomplish this feat during the period of 2002-2004.  Mr. Landis also has direct knowledge, based on comments made by defendant Armstrong, and Mr. Landis' own experience with the general practices of the USPS Team during the time he was a member of the team, that defendant Armstrong's prior victories on behalf of the USPS Team were accomplished while doping as well.

92.     Defendant Armstrong was and is also knowledgeable about doping by other members of the USPS Team during the period relevant to this complaint, but has concealed those practices, along with his own, from the USPS.

93.     In approximately April 2004, after the Paris-Roubaix race, Mr. Landis attended dinner at a restaurant in France, with defendant Bart Knaggs, Geert Dueffler, and others.  During the meal, Mr. Landis expressed concern about a shortage of equipment that was resulting from team management selling the bikes that were being provided by sponsors

for the riders.  In the heated conversation that ensued, Mr. Landis commented to the effect that, while Mr. Armstrong was flying around in his own jet, the other riders should not be facing problems just obtaining the proper bike.

94.     In response to Mr. Landis' complaint, Mr. Dueffler explained that the team management needed to sell the bikes to finance the doping program, as they needed cash for the doping program, and the team could not just list doping as a cost item on standard expense reports.

95.     Defendant Knaggs was present during the foregoing conversation and indicated his agreement with what was being expressed by defendant Duffy.  In an effort to defuse the situation, Mr. Knaggs thereafter indicated that he would talk to Bill Stapleton about the situation and try to get a replacement bike for Mr. Landis.

96.     Mr. Landis is informed and believes, based on the facts detailed herein, that at all times relevant to this complaint, defendant Knaggs was knowledgeable about, and approved of, the doping program involving the USPS Team and the other misconduct described herein.

97.     On or about the next day after the foregoing discussion in the restaurant, defendant Bruyneel called to reprimand Mr. Landis for creating an issue, indicating that the sponsors would be upset if they learned their bikes were being sold for cash, and that he would need to create a story about why the bikes were being sold.

98.     The 2004 Tour de France was the last race that Mr. Landis raced on the same team in the same race with Lance Armstrong.

99.     In 2006, Mr. Landis won the Tour de France while riding for team Phonak. He later lost his title following a drug test that showed a skewed testosterone/epitestosterone ratio during stage 17 of the race.

100.     Shortly after it was reported that he tested positive, Mr. Landis received a call on his cell phone from defendant Armstrong, who instructed Mr. Landis, if he was ever asked if he (Landis) had ever used any performance enhancing drugs, to answer "absolutely not."

### THOMAS WEISEL

101.    As described in *Capital Instincts*, the biography he authorized and co-authored, defendant Thomas Weisel is a former cyclist and longtime patron, investment manager and friend of Lance Armstrong, as well as an owner of the USPS Team, who was extensively involved in the team's management.

102.    Defendants Armstrong and Weisel have known one another since 1990, when Armstrong first rode for Weisel's cycling team.  In a foreword he wrote for the book, Armstrong described Weisel as "something of a father figure to me."

103.    As described in the book, as early as 1995, defendant Weisel and former cyclist Mark Gorski formed a plan to develop a US cycling team that could win the Tour de France.  In May 1995, Weisel hired Gorski to work at Montgomery Sports.  In 1996, the team secured the USPS sponsorship.

104.    Per the biography, in 1998, Weisel was instrumental in hiring defendant Armstrong onto the USPS Team and personally paid the "bonus" portion of Armstrong's salary, which ended up totaling more than $1 million.  In 1999, defendant Weisel also personally paid the salary of USPS Team cyclist Viatcheslav Ekimov, including a $100,000 bonus.  Mr. Gorski has been quoted as saying that in the time period up to 1999, defendant Weisel spent "several million dollars" of his own money on the USPS Team.  He also contributed $50,000 to Mr. Landis' defense against doping charges.

105.    When defendant Armstrong won the Tour de France in 1999, defendant Weisel was in the "follow car."  In 2000, defendant Weisel biked alongside defendant Armstrong with his arm on his shoulder during his Tour de France "victory lap" on the Champs d'Elysees.  Defendant Weisel also rode in the pace car for all of Mr. Armstrong's other Tour de France wins as a member of the USPS Team.  According to his book, defendant Weisel and Mr. Gorski "built the team specifically for the [Tour de France] . . . Weisel sought out and hired riders with all the different skills necessary to support Armstrong and help him win the Tour."  Weisel also brought a new annual street cycling

race to San Francisco, called the SF Grand Prix.  Armstrong and the USPS Team competed in the race in 2001, with USPS Team cyclist George Hincapie winning the race.  Mr. Weisel's book contains a chapter authored by him in which he explains "how I've applied these points [about creating a successful business] to the creation of a great sports team," *i.e.*, the USPS Team.

106.   During the period relevant to this complaint, key individuals in positions of authority at USA Cycling had financial ties at various points in time with Tailwind, defendant Weisel's investment bank Thomas Weisel Partners (or subsidiaries), or CSE, including, but not limited to, Steve Johnson, CEO of USA Cycling, and Jim Ochowicz former president of USA Cycling.

107.   According to the biography authorized and co-authored by defendant Weisel, in or around 1999, the U.S. Cycling Federation was the governing body for the sport of cycling in the U.S.  The Federation's parent organization, USA Cycling, was suffering financial difficulties.  Over the next three years, Weisel re-organized USA Cycling, and set up a non-profit organization called USA Cycling Development Foundation to help fund USA Cycling.

108.   Mr. Weisel's book, published in 2003, stated:  "Weisel has spent over three years reorganizing USA Cycling, and his team is largely in charge."

109.   According to Form 990s filed with the IRS in 2000 through 2003 and published reports regarding 2004, Weisel served as President or Chairman, and Weisel's "old cycling buddy" Steve Johnson served as Executive Director, of USA Cycling Development Foundation, and the Foundation provided contributions to USA Cycling of approximately $500,000 to $725,000 each year, a substantial portion of USA Cycling's annual budget.

110.   During the same time period, Steve Johnson was also Chief Operating Officer of USA Cycling.  The President of the Board of Directors of USA Cycling from 2002 to 2008, Jim Ochowicz, was also a broker at Weisel's investment bank.

111.   According to Form 990s filed with the IRS, the Foundation also paid Tailwind

$80,000 in 2002, 2003 and 2004 for "marketing and logistical services,"

112.    Mr. Landis is informed and believes that these conflicts of interest and overlapping relationships between USA Cycling, the USA Cycling Foundation, and Thomas Weisel helped make it possible for the USPS Team to carry on the extensive program of systematically doping team athletes during the period relevant to this complaint.

113.    When discussing the cover-ups involving doping and defendant Armstrong's involvement in doping, another individual familiar with Steve Johnson told Mr. Landis that he had asked Steve Johnson why they do it, and Steve Johnson's response was "we can't lose the sponsors like the Postal Service so we have no choice."  This quote was told to Mr. Landis by Mr. Holowesko, in New York City, New York, in 2007, before Mr. Landis' anti-doping hearing with the USADA.

114.    Relator is informed and believes, based on the degree of control that defendant Weisel exercised over the USPS Team and his close relationship with defendant Armstrong, that defendant Weisel was at all relevant times knowledgeable about, and approved of, the doping program involving the USPS Team and the other misconduct described herein.

115.    A reasonable opportunity for further investigation or discovery likely will show additional evidence of defendant Weisel's knowledge of the wrongful conduct of defendant Armstrong and the USPS Team, including doping and the other activities described herein, as well as defendant Weisel's domination and control of Montgomery Sports and Tailwind, and his knowledge of false statements and claims being made to the USPS.

## ALL DEFENDANTS

116.    Relator is informed and believes, based on the allegations stated herein, that at all times relevant to this complaint and through the present, defendants have knowingly concealed and continue to conceal from the USPS the fact that defendants engaged in a systematic program of doping USPS Team members in the manner described herein.

117.    Relator is informed and believes, based on the allegations stated herein, that at all times relevant to this complaint and through the present, each of the defendants agreed

with the others on the doping scheme and other wrongful conduct in violation of the sponsorship agreements with the USPS as described herein, and agreed to conceal from the USPS that such doping and other wrongful conduct was occurring and had occurred, for the purpose of obtaining funds from the USPS and for the purpose of not having to return funds paid by the USPS in connection with the sponsorship contracts, despite the fact that it was known such funds were not due and were improperly paid.  As described herein, each of the individual defendants took an active part in furtherance of said conspiracy.

118.    At all times relevant to this complaint, the defendants submitted or caused to be submitted claims for payment to the USPS while aware of the fact that the USPS Team was doping and engaging in other wrongful conduct and its owners were in violation of their contract with the USPS.  The defendants were paid millions of dollars through this scheme.

119.    At various points between 1996 and 2004, and also between 2004 and the present, the defendants knew and/or had reason to know that the USPS Team was engaged in doping and other wrongful conduct in violation of the sponsorship agreements with the USPS and that the funds being paid to Tailwind and CSE should therefore be returned to the USPS, but the defendants nonetheless failed to return the funds paid to them by the USPS.

## CONTACTS WITH THE PRESS

120.    Prior to the filing of this case, Mr. Landis had conversations with media outlets regarding the allegations made herein.

121.    Prior to the filing of this case, Mr. Landis had conversations on or about May 19, 2010 with Bonnie Ford of ESPN.com, which have been published, although not in their entirety, in subsequent articles.

122.    On or about May 20, 2010, an article detailing the substance of several emails written by Mr. Landis concerning certain of the facts set forth herein and other matters was published in the Wall Street Journal.

123.    On or about May 24, 2010, and thereafter, Mr. Landis had extensive conversations with Reed Albergotti of the Wall Street Journal and detailed more of the facts surrounding the incidents described in the emails and certain other facts described herein. It

is anticipated that the Wall Street Journal will publish an article based on the foregoing interview.

### DISCLOSURES TO THE UNITED STATES AND THE USADA

124.    In April 2010, Mr. Landis contacted Travis Tygart with the US Anti-Doping Agency and met with him to share information regarding doping by the USPS Team and other facts relating to the same.

125.    On or about April 30, 2010, Mr. Landis sent a detailed email to Steve Johnson of USA Cycling regarding his allegations of doping by the USPS Team.

126.    On or about May 6 or 7, 2010, Mr. Landis was contacted by Jeff Novitzky of the U.S. Food and Drug Administration concerning the allegations he had been making to USA Cycling and the USADA.   Mr. Landis had previously agreed to speak with Mr. Novitsky and voluntarily followed up with Mr. Novistsky when he called.

127.    On or about May 12 and 13, 2010, Mr. Landis voluntarily met with and was interviewed by Mr. Novitsky and Travis Tygart.   At that meeting, Mr. Landis volunteered information to Mr. Novitsky concerning the allegations he had been making previously to USA Cycling and the USADA.

128.    Between the date of his first call to Mr. Landis and May 28, 2010, Mr. Novitzky interviewed Mr. Landis in person and telephonically on numerous occasions to discuss essential aspects of the allegations that are made herein, including the fact that the USPS was the victim of a fraud perpetrated by the defendants identified in this complaint. Mr. Landis also provided to Mr. Novitzky copies of emails he had previously sent to USA Cycling officials, including his April 30, 2010 email to Steve Johnson at USA Cycling, among numerous others.

### DISREGARD OF CORPORATE ENTITIES

129.    Based on the information stated herein, Mr. Landis is informed and believes that Tailwind and Montgomery Sports were each dominated and controlled by defendant Thomas Weisel and were the alter egos or business conduits of Mr. Weisel.  A reasonable opportunity for further discovery likely will develop further evidence of the same, along

with evidence of Mr. Weisel's knowledge of doping by the USPS team and the other fraudulent conduct described herein.

130.     Tailwind and Montgomery Sports each engaged in fraud against the USPS as described herein.

131.     Montgomery Sports is no longer in existence.  Likewise, Tailwind has ceased operations and its capital and assets have been distributed to its owners, leaving it undercapitalized to satisfy its obligations to the USPS.

132.     Relator is informed and believes that the primary asset of Montgomery Sports – the USPS contract - was transferred to Tailwind by Weisel.  In his biography, Weisel refers to the two companies as effectively the same:   "We started Montgomery Sports – now Tailwind Sports - . . . to create the finest professional cycling team in the world."

133.     As detailed above, Weisel also used his personal funds to make payments on behalf of Tailwind.

134.     Based on the information stated herein, Mr. Landis is informed and believes that CSE was and is dominated and controlled, directly and indirectly, by defendants Bill Stapleton, Lance Armstrong, and Bart Knaggs, and CSE was the alter ego or business conduit of some or all of these individuals.  A reasonable opportunity for further discovery likely will develop further evidence of the same.

135.     CSE engaged in fraud against the USPS as described herein.


## COUNT ONE

### False Claims Act, 31 U.S.C. § 3729(a)(1) (pre FERA)

### All Defendants

136.     Plaintiff realleges and incorporates paragraphs 1 to 135 above as if fully set forth herein.

137.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.,* as amended.

138.     By virtue of the acts described above, defendants knowingly submitted, or

caused to be submitted, false or fraudulent claims for payment to the United States government.

139.    The United States, unaware of the falsity of defendants' claims, and in reliance on the accuracy thereof, paid the defendants amounts in excess of what would have been paid had the claims not been false.

140.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT TWO

### False Claims Act, 31 U.S.C. § 3729(a)(2) (pre FERA)

### All Defendants

141.    Plaintiff realleges and incorporates paragraphs 1 to 135 above as if fully set forth herein.

142.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

143.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid or approved by the government.

144.    The United States, unaware of the falsity of defendants' records and statements, and in reliance on the accuracy thereof, paid the defendants amounts in excess of what would have been paid had the records and statements not been false.

145.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT THREE

### False Claims Act, 31 U.S.C. § 3729(a)(3) (pre FERA)

### All Defendants

146.    Plaintiff realleges and incorporates paragraphs 1 to 135 above as if fully set

forth herein.

147.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

148.    By virtue of the acts described above, defendants conspired among themselves to defraud the United States by getting false or fraudulent claims allowed or paid.

149.    The United States, unaware of the falsity of defendants' records and statements, and in reliance on the accuracy thereof, paid the defendants amounts in excess of what would have been paid had the records and statements not been false.

150.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT FOUR

### False Claims Act, 31 U.S.C. § 3729(a)(7) (pre FERA)

### All Defendants

151.    Plaintiff realleges and incorporates paragraphs 1 to 135 above as if fully set forth herein.

152.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

153.    By engaging in the acts described above, defendants avoided or reduced obligations owed to the United States Government.

154.    Specifically, defendants avoided the obligation to return funds paid by the United States, by concealing and failing to disclose the doping of USPS Team athletes.

155.    By reason of defendants' conduct, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT FIVE

### False Claims Act as amended by FERA, 31 U.S.C. § 3729(a)(1)(A)
### All Defendants

156.    Plaintiff realleges and incorporates paragraphs 1 to 135 above as if fully set forth herein.

157.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended by FERA.

158.     By virtue of the acts described above, defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval.

159.     The United States, unaware of the falsity of defendants' claims, and in reliance on the accuracy thereof, paid the defendants amounts in excess of what would have been paid had the claims not been false.

160.     By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

<u>**COUNT SIX**</u>

**False Claims Act as amended by FERA, 31 U.S.C. § 3729(a)(1)(B)**<br>**All Defendants**

161.     Plaintiff realleges and incorporates paragraphs 1 to 135 above as if fully set forth herein.

162.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended by FERA.

163.     By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

164.     The United States, unaware of the falsity of defendants' records and statements, and in reliance on the accuracy thereof, paid the defendants amounts in excess of what would have been paid had the records and statements not been false.

165.     By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

<u>**COUNT SEVEN**</u>

**False Claims Act as amended by FERA, 31 U.S.C. § 3729(a)(1)(C)**<br>**All Defendants**

166.     Plaintiff realleges and incorporates paragraphs 1 to 135 above as if fully set forth herein.

167.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended by FERA.

168.     By virtue of the acts described above, defendants conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A), (B), and (G).

169.     The United States, unaware of the falsity of the claims made by defendants and in reliance on the accuracy thereof, paid and continues to pay claims in amounts in excess of what would have been paid had the claims not been false.

170.     By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT EIGHT

### False Claims Act as amended by FERA, 31 U.S.C. § 3729(a)(1)(G)
### All Defendants

171.     Plaintiff realleges and incorporates paragraphs 1 to 135 above as if fully set forth herein.

172.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended by FERA.

173.     By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used, a false records and statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

174.     By reason of these actions, the United States has been damaged, and continues to be damaged, in substantial amount.

WHEREFORE, relator, on his own behalf and on behalf of the United States, prays for judgment in plaintiffs' favor and against defendants, as follows:

a.     Ordering defendants to pay an amount equal to three times the amount of damages the United States has sustained because of defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each action in violation of 31 U.S.C.

§ 3729, both pre-FERA and as amended, and the costs and expenses of this action, with interest, including the costs and expenses to the United States;

      b.      Awarding relator the maximum amounts allowed pursuant to 31 U.S.C. § 3730(d);

      c.      Awarding relator all fees, costs, and expenses incurred in initiating and sustaining this action, including reasonable attorneys' fees;

      d.      Piercing of the corporate veils of the business entities named herein and treatment of their owners named herein as their alter egos.

      e.      Granting relator and the United States all other such relief as the Court deems just and proper.

<u>**REQUEST FOR TRIAL BY JURY**</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff hereby demands trial by jury.

Dated: June __, 2010

                                 Respectfully submitted,

                                 _____

                                 Jon L. Praed
                                 USDC #450764
                                 DC Bar #51665
                                 Internet Law Group
                                 4121 Wilson Boulevard, Suite 101
                                 Arlington, VA 22203
                                 Tel; 703-243-8100
                                 Fax: 703-243-8162
                                 jon.praed@i-lawgroup.com

                                 Paul D. Scott
                                 pdscott@lopds.com
                                 Lani Anne Remick
                                 laremick@lopds.com
                                 LAW OFFICES OF PAUL D. SCOTT, P.C.
                                 505 Sansome Street, Sixth Floor
                                 San Francisco, California 94111
                                 Tel: (415) 981-1212
                                 Fax: (415) 981-1215
                                 [Pending Admission *Pro Hac Vice*]

                                 Attorneys for Relator Floyd Landis