IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* [UNDER SEAL],<br><br>    Plaintiff,<br>v.<br><br>[UNDER SEAL],<br><br>    Defendants. | No. 1:10-cv-00976-CKK<br><br>**FIRST AMENDED COMPLAINT<br>FOR VIOLATIONS OF FEDERAL<br>FALSE CLAIMS ACT**<br><br>**FILED UNDER SEAL<br>(31 U.S.C. § 3729 *et seq.*)**<br><br>**JURY TRIAL DEMANDED** |

Dated: December 23, 2010

Respectfully submitted,

Jon L. Praed, DC Bar No. 51665
jon.praed@i-lawgroup.com
INTERNET LAW GROUP, PLLC
4121 Wilson Boulevard, Suite 101
Arlington, Virginia 22203
703.243.8100 main
703.243.8162 facsimile
703.243.8102 direct dial

Paul D. Scott
pdscott@lopds.com
California State Bar No. 145975
Lani Anne Remick
California State Bar No. 189889
laremick@lopds.com
LAW OFFICES OF PAUL D. SCOTT, P.C.
505 Sansome Street, Sixth Floor
San Francisco, California 94111
415.981.1212 main
415.981.1215 facsimile

Attorneys for Relator

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.*<br>FLOYD LANDIS,<br>25350 Eagle's Nest<br>Idyllwild, CA  92549<br><br>    Plaintiff,<br>v.<br><br>Tailwind Sports Corporation<br>98 San Jacinto Blvd.<br>Suite 430<br>Austin, TX  78701<br><br>Tailwind Sports, LLC<br>5515 Security Lane, #1103<br>Rockville, Maryland<br><br>Montgomery Sports, Inc.,<br>600 Montgomery St.<br>San Francisco, CA 94111<br><br>Capital Sports & Entertainment<br>Holdings, Inc.<br>98 San Jacinto Blvd.<br>Suite 430<br>Austin, TX  78701<br><br>Thomas W. Weisel<br>7 Upper Road<br>Ross, CA  94957<br><br>Lance Armstrong<br>c/o Capital Sports and Entertainment<br>Holdings, Inc.<br>98 San Jacinto Blvd.<br>Suite 430<br>Austin, TX  78701 | No. 1:10-cv-00976-CKK<br><br>**FIRST AMENDED COMPLAINT**<br>**FOR VIOLATIONS OF FEDERAL**<br>**FALSE CLAIMS  ACT**<br><br>**FILED UNDER SEAL**<br>**(31 U.S.C. § 3729 *et seq.*)**<br><br>**JURY TRIAL DEMANDED** |

1

Johan Bruyneel                          )
c/o Team Radio Shack                    )
98 San Jacinto Blvd.                    )
Suite 430                               )
Austin, TX 78701                        )
                                        )
William J. Stapleton                    )
2406 Pemberton Place                    )
Austin, TX 78703-2548                   )
                                        )
Barton B. Knaggs                        )
4200 Hills Drive                        )
Austin, TX 78731                        )
                                        )
and Does 1 – 50,                        )
                                        )
    Defendants.                         )
                                        )

## JURISDICTION, VENUE AND PRELIMINARY MATTERS

1.      This is an action to recover damages and penalties on behalf of the United

States arising from false claims, false statements, and other conduct by the defendants in

violation of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, both pre-amendment

and as amended by the Fraud Enforcement and Recovery Act of 2009, Pub. L. 111-21, 123

Stat. 1617 (2009) ("FERA"), the Patient Protection and Affordable Care Act, Pub. L. 111-

148, 124 Stat. 119 ("PPACA") (2010), and the Dodd-Frank Wall Street Reform and

Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010).  This court has

jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1345 and 31 U.S.C. § 3732.

2.      Venue is proper in the District of Columbia under 31 U.S.C. § 3732(a) and 28

U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the

claim occurred in this district or a defendant may be found here, and acts proscribed by 31

U.S.C. § 3729 occurred in this district.

3.      Statements by relator Floyd Landis ("relator" or "Mr. Landis") concerning

certain of the facts alleged in the complaint have appeared in the news media.  Unless

otherwise stated, the allegations herein are not based upon any public disclosure.  Unless

otherwise stated herein, Mr. Landis is the original source of the information in the news media and the original source of the information upon which this complaint is based. Unless otherwise stated herein, Mr. Landis has direct and independent knowledge of the information on which the allegations herein are based and has voluntarily provided the information to the United States before filing this action.

4.      As required by 31 U.S.C. § 3730(b)(2), relator has served the United States Attorney General and the United States Attorney for the District of Columbia with copies of the original complaint in this matter along with a written disclosure of material evidence related to the complaint. The disclosure statement supports the allegations herein of false claims against the United States by the defendants.

5.      As required by the False Claims Act, this complaint is being filed under seal and shall not be served on the defendants until the court so orders.

## PARTIES

6.      Relator Floyd Landis is a resident of Idyllwild, California and a United States citizen. Mr. Landis is bringing this civil action for violations of 31 U.S.C. § 3729, et seq. for himself and on behalf of the United States Government, pursuant to 31 U.S.C. §§ 3730(b)(1) and (b)(2). Relator Landis was a member of the United States Postal Service Cycling Team (aka the "United States Postal Service Pro Cycling Team") ("the USPS Team") from 2002 through 2004.

7.      Defendant Montgomery Sports, Inc. ("Montgomery Sports") is a business entity of unknown type which was headquartered in San Francisco, California and which, relator is informed and believes, based on California Secretary of State records and published reports, is no longer in operation. The last known address of Montgomery Sports' parent corporation, Montgomery Securities, is stated in the caption. Relator is informed and believes, based on published reports and public records, that in 1989, Thomas W. Weisel founded Montgomery Sports as part of Montgomery Securities. Weisel served as the company's President and dominated and controlled the company. Weisel also founded and was CEO of Montgomery Securities, which he similarly dominated and controlled. In or

3

around 1997, Montgomery Securities was sold to Nationsbanc (now, Bank of America), but defendant Weisel subsequently left the company in or around September 1998. After his departure, Weisel arranged a buyout of Montgomery Sports and thereafter remained in control of the business. In or around 1997, the name of Montgomery Sports, Inc. was changed to TWP Sports, Inc.

8.     Defendant Tailwind Sports, LLC is a limited liability company, organized under the laws of the State of Delaware on or about April 5, 1999. Tailwind Sports, LLC maintained offices in Washington, D.C. at 5301 Wisconsin Avenue, Suite #325, Washington, D.C. 20015 during the time period relevant to the allegations herein. Tailwind Sports, LLC's last known address is stated in the caption. Tailwind Sports, LLC has also conducted business under the names Disson Furst & Partners, DFP Cycling, LLC, and Tailwind Cycling, LLC. All have the same Federal Employee Identification Number. On or about June 15, 1999, TWP Sports, Inc. (formerly Montgomery Sports, Inc.) transferred all of its assets to DFP Cycling, pursuant to a stock sale by TWP Sports, Inc. to DFP Cycling, LLC. The company name was changed to Tailwind Sports, LLC in or around March 5, 2001 Thomas Weisel continued to dominate and control the subject business operations both before and after they were transferred from TWP Sports to DFP Cycling, serving as Chairman of the Board of DFP Cycling.

9.     Defendant Tailwind Sports Corporation (aka Tailwind Sports Corp.) is a corporation, organized under the laws of the State of Delaware. Tailwind Sports Corporation was incorporated on or about June 25, 2002. Tailwind Sports Corporation's last known address is stated in the caption.

10.     The operations of the two different Tailwind entities referenced above were conducted under different business names and forms during the period relevant to the complaint, including corporate and partnership forms, but involved the same essential business operations, and were dominated and controlled by Thomas Weisel. In addition, on or about July 16, 2002, Tailwind Sports, LLC was merged into Tailwind Sports Corporation. Accordingly, Tailwind Sports, LLC and Tailwind Sports Corporation are collectively

referred to herein as "Tailwind."

      11.     Defendant Thomas W. Weisel is an individual and a citizen of the United States. Relator is informed and believes, based on public records, that defendant Weisel resides in Ross, Marin County, California. Relator is informed and believes, based on published reports and his experiences as a member of the USPS Team, that Thomas W. Weisel was a founder of Tailwind, chairman of its board, and its largest investor. Relator is informed and believes, based on published reports and his experiences as a member of the USPS Team, that Tailwind's ownership grew to include defendants William J. Stapleton, Lance Armstrong, Johan Bruyneel and others. Relator is informed and believes, based on published reports and public records, that Tailwind has ceased operations. Relator is further informed and believes, based on published reports, that Tailwind's capital and its assets have been distributed to its owners.

      12.     Defendant Capital Sports and Entertainment Holdings, Inc. (formerly Capital Sports Ventures, then later Capital Sports & Entertainment, Inc.) (hereinafter "CSE") is a corporation organized under the laws of the state of Texas, with headquarters in Austin, Texas. Relator is informed and believes, based on public records, published reports, and his experiences as a member of the USPS Team, that during the period relevant to the complaint CSE has been owned and controlled, directly or indirectly, by the following defendants, among other individuals: William J. Stapleton, Barton B. Knaggs, and Lance Armstrong. In approximately 2002, CSE began providing management services on behalf of Tailwind with respect to the USPS Team. Based on information and belief, in or around mid-2004, CSE became a part owner of Tailwind.

      13.     Defendant Lance Armstrong is an individual and a citizen of the United States whose place of residence is unknown to relator. Relator is informed and believes that defendant Armstrong lives in Austin, Texas, and can be contacted at the business address of his agent, defendant William J. Stapleton, as listed in the caption. Relator is informed and believes, based on published reports and his experiences as a member of the USPS Team, that Lance Armstrong held ownership interests in Tailwind and CSE, among other entities, during the time period relevant to the allegations in this complaint.

14. Defendant Johan Bruyneel is an individual whose place of residence is unknown to relator. Relator is informed and believes, based on statements on defendant Bruyneel's website, that he has moved to London, England. His last known business address in the United States is that of defendant CSE, as listed in the caption. Defendant Bruyneel was the managing director (aka "Director Sportif") of the USPS Team from 1998 through 2004. Relator is informed and believes, based on published reports and his experiences as a member of the USPS Team, that defendant Bruyneel became a part-owner of Tailwind in or around 2002, and held such ownership interest during the period relevant to this complaint.

15. Defendant William J. ("Bill") Stapleton is an individual whose place of residence is unknown to relator. Relator is informed and believes, based on published information, that defendant Stapleton resides in Austin, Texas, and his last known address is listed in the caption. Defendant Stapleton is Lance Armstrong's agent and has represented him since 1995. Defendant Stapleton founded CSE in the latter half of the 1990s and is its President. Relator is informed and believes, based on public records, that during part of the period relevant to this complaint defendant Stapleton served as a Director and CEO of Tailwind, and also acted as Tailwind's President.

16. Defendant Barton B. Knaggs is an individual whose place of residence is unknown to relator. Relator is informed and believes, based on published information, that defendant Knaggs resides in Austin, Texas at the address listed in the caption. During the time period relevant to this complaint, defendant Knaggs served as President and as a Director of Tailwind and also as a Vice President of CSE from 2001 through the present. He is currently a part owner of CSE.

17. The true names and capacities of the defendants named above as DOES 1 through 50, inclusive, are unknown to relator, who will seek leave of court to amend the complaint to allege the names and capacities of such defendants, together with any additional charging allegations, at such time as they are ascertained.

## UNITED STATES POSTAL SERVICE

18. At all times relevant to this matter, the United States Postal Service ("USPS")

has been an "independent establishment" of the United States government, responsible for providing postal service in the United States. Postal Reorganization Act of 1970, Pub.L. 91-375, August 12, 1970. The USPS is headquartered in Washington, D.C.

19.     On October 1, 1995, the USPS entered into an agreement with Montgomery Sports, a business entity dominated and controlled by defendant Weisel, for the sponsorship of a bicycle racing team owned by Montgomery Sports ("the 1995 Sponsorship Agreement"). It was a national sponsorship agreement, and as such was funded and managed at the headquarters level in Washington, D.C. The name given the team was the U.S. Postal Service Cycling Team ("the USPS Team").

<u>Payment Terms Of Sponsorship Agreements And Claims Thereunder</u>

20.     The 1995 Sponsorship Agreement was initially effective through December 31, 1996 and thereafter subject to automatic single, calendar-year extensions, unless the Postal Service elected otherwise by July 1 of the preceding year. The sponsorship agreement called for the USPS to pay Montgomery Sports a net sponsorship fee of $1 million in 1996, $1.5 million in 1997, and $2 million in 1998. For subsequent years, the agreement called for the parties to agree upon the net sponsorship fee on or before July 1 of the preceding year. The 1995 Sponsorship Agreement was modified on October 11, 1996 to increase the payment for 1997 from $1,500,000 to $2,000,000. The additional funding provided for in the modification was to be used as "a pass-through to riders for salaries." An additional $60,000 was added in 1996 to pay additional services and expenses. The new total due under the contract was thus $3,094,125 for 1996 and 1997.

21.     On or about December 30, 1997, the contract was modified to add funds in the amount of $500,000, bringing the total to $3,594,125.

22.     On March 3, 1998, the contract was modified again to add an additional $1,500,000 for sponsorship fees in 1998, bringing the total to $5,094,125. On or about July 21, 1998, the contract was modified, pursuant to a USPS letter dated May 25, 1998, to extend the 1995 Sponsorship Agreement for the calendar year 1999 for a sponsorship fee of $2,500,000. An additional payment of $100,000 was also agreed upon in the same

modification "for the retention of the services of Lance Armstrong for the USPS 1998 cycling season." A modification to provide the funding for these payments was executed on or about December 3, 1998. The total after these modifications was $7,694,125.

23.      On or about September 3, 1999, the 1995 Sponsorship Agreement was extended for the calendar year 2000 for the amount of $3,300,000. The contract called for quarterly payments of $825,000 on January 4, 2000, March 1, 2000, September 1, 2000, and December 1, 2000, bringing the total to $10,994,125.

24.      On December 9, 1999, the 1995 Sponsorship Agreement was modified to recognize DFP Cycling as a successor party to TWP Sports (formerly Montgomery Sports, Inc.) under the sponsorship agreement.

25.      On or about December 26, 2000, the USPS and DFP Cycling entered into a new sponsorship contract commencing on January 1, 2001 and continuing through December 31, 2004, unless terminated earlier as provided for in the agreement. (Contract No. 102592-01-F0858)   (Hereinafter, the "2000 Sponsorship Agreement").

26.      The 2000 Sponsorship Agreement set forth the following terms for payments by the USPS to DFP Cycling (aka Tailwind) in paragraph 3 of Exhibit A to the Sponsorship Agreement:

> 3.  Unless the Agreement has terminated earlier in accordance with its terms, the Sponsor shall pay the Company as follows:
>
> $1,534,500 as soon as possible after execution of Agreement
> $1,534,500 January 1, 2001
> $1,534,500 March 1, 2001
> $1,534,500 June 1, 2001
>
> A bonus pool not to exceed $100,000 in FYO1 is in effect for the riders, The supplier may invoice for bonuses after they are earned per the rider's contracts.
>
> Payment of $100,000 for the Junior Cycling team will be payable on January 1, 2001
>
> $1,902,500 October 1, 2001
> $1,902,500 January 1, 2002
> $1,902,500 March 1, 2002
> $1,902,500 June 1, 2002

A bonus pool not to exceed $150,000 in FY02 is in effect for the riders.
The supplier may invoice for bonuses after they are earned per the rider's
contracts,

Payment of $100,000, for the Junior Cycling team will be payable on
January 1, 2002

$2,058,750 October 1, 2002
$2,058,750 January 1, 2003
$2,058,750 March 1, 2003
S2,058,750 June 1, 2003

A bonus pool not to exceed $150,000 in FY03 is in effect for the riders,
The supplier may invoice for bonuses after they are earned per the rider's
contracts.

Payment of $100,000, for the Junior Cycling team will be payable on
January 1, 2003

$2,165,000 October 1, 2003
$2,165,000 January 1, 2004
$2,165,000 March 1, 2004
$2,165,000 June 1, 2004

A bonus pool not to exceed $150,000 in FY04 is in effect for the riders.
The supplier may invoice for bonuses after they are earned per the rider's
contracts.

27.    On or about March 24, 2003, the 2000 Sponsorship Agreement was modified
to correct the contractor's name and address and tax ID "due to incorporation of the firm."
The modification specified that "[a]ll references in the Sponsorship Agreement to Company
shall now mean Tailwind Sports Corporation."

28.    On or about June 29, 2004, the USPS ended its sponsorship of the USPS Team
by not renewing the 2000 Sponsorship Agreement past December 31, 2004.

29.    Between January 1, 2001 and October 20, 2004, at least $31,442,262.57 was
paid by the USPS to DFP Cycling (aka Tailwind), pursuant to requests for payment that the
defendants caused to be presented to the USPS on or about the dates set forth in, and
pursuant to the payment terms of, the 2000 Sponsorship Agreement and the modifications
thereto.

30. Attached as Exhibit 1 is a listing of payments to the defendants by the USPS, pursuant to the 2000 Sponsorship Agreement.

31. Included in these amounts were payments on claims for the bonus pool amounts referenced in the agreement (i.e., claims for amounts beyond the specified quarterly payments). The bonus pool claims by defendants were based on bonus payments being made by DFP Cycling (aka Tailwind) to riders, including Lance Armstrong, during the period of the contract. For example, Armstrong received a $1,147,000 bonus in connection with his Tour De France win in 2001, and Tyler Hamilton received a $150,000 bonus the same year. DFP Cycling (aka Tailwind) relied on these payments to claim and receive a bonus pool amount from the USPS of $100,000 (the maximum amount) on or about August 7, 2001 per the 2000 Sponsorship Agreement. Defendants were also paid more than $10.9 million in 2000 and earlier, pursuant to the payment terms of the 1995 Sponsorship Agreement, including $825,000 that, relator is informed and believes, was paid to and accepted by defendants on or about August 25, 2000, per the terms of that agreement.

Clauses in Sponsorship Agreements Relating to Doping

32. The 1995 Sponsorship Agreement included the following clauses relating to doping (i.e., the use of prohibited substances or prohibited methods to increase athletic performance):

**9. Default; Remedies; Changed Circumstances.**

(a) The following events shall constitute an event of default ("Event of Default") under this agreement regardless of whether any such event shall be voluntary or involuntary or shall result from the operation of applicable laws, rules or regulations or shall be pursuant to or in compliance with any judgment, decree or order of any court of competent jurisdiction:

(i) Either party shall make any material misrepresentation or shall materially breach any warranty made herein;

\*\*\*

**13. Governing Law and Rules.**

The validity, interpretation and construction of this Agreement, and all other matters related to this Agreement, shall be interpreted and governed by the federal laws of the United States of America. The performance of the obligations of the

parties under this Agreement shall at all times and in all events be subject to compliance with all applicable rules of the *Union Cycliste Intemationale,* the *Federation Internationale du Cyclisme Professionel;* the United States Professional Cycling Federation, Inc., the International Olympic Committee, the United States Olympic Committee, the International Amateur Cycling Federation, the United States Cycling Federation and all other governing organizations.

33.    The 2000 Sponsorship Contract included the following clauses relating to doping:

### 8. Default; Remedies; Changed Circumstances.

(a) The following events shall constitute an event of default ("Event of Default") under this agreement regardless of whether any such event shall be voluntary or involuntary or shall result from the operation of applicable laws, rules or regulations or shall be pursuant to or in compliance with any judgment, decree or order of any court of competent jurisdiction:

      (i)    Either party shall make any material misrepresentation or shall materially breach any warranty made herein;

***

      (iv)    The Company fails to take immediate action without notification by the Sponsor in a case of a rider or Team offense related to a morals or drug clause violation.

      (v)    There is negative publicity associated with an individual rider or team support personnel, either permanent or temporary, due to misconduct such as but not limited to, failed drug or medical tests, alleged possession, use or sale of banned substances, or a conviction of a crime.

### 9. Promotional Rights and Activities

***

Company represents that each rider on the Team has a morals turpitude and drug clause that allows the Company to suspend or terminate the rider for cause which shall include items such as (1) conviction of a felony; (2) acts that require the Team to suspend or terminate the rider under the applicable rules of the Union Cycliste Internationale, the Federation Internationale du Cyclisme Professionel; the United States Professional Cycling Federation, Inc.; the International Olympic Committee; the International Amateur Cycling Federation; the United States Cycling Federation and all other applicable governing organizations; (3) failure to pass drug or medical tests; (4) inappropriate drug conduct prejudicial to the Team, or the Postal Service,

which is in violation of the Team rules or commonly accepted standards of morality; and (5) gross neglect of the rider's duty.

If any rider on the Team is found guilty of such offense, the Company agrees to take appropriate action within thirty (30) days.

***

**12. Governing Law and Rules.** The validity, interpretation and construction of this Agreement, and all other matters related to this Agreement, shall be interpreted and governed by the federal laws of the United States of America. The performance of the obligations of the parties under this Agreement shall at all times and in all events be subject to compliance with all applicable rules of the Union Cycliste Internationale, the Federation Internationale du Cyclisme Professionel; the United States Professional Cycling Federation, Inc., the International Olympic Committee, the United States Olympic Committee, the International Amateur Cycling Federation, the United States Cycling Federation and all other governing organizations.

Sample USPS Rider Agreement

34.    A draft rider agreement provided to relator Floyd Landis by Tailwind Sports Corporation included the following language:

**2. Riders Conduct**

Rider will abide by the rules and regulations of Union Cycliste Internationale ("UCI"), the Federation Internationale du Cyclisme Professionnel ("FICP"), the United States Professional Cycling Federation, Inc. ("USPRO"), and any other governing bodies (collectively referred to as "Governing Bodies"). Rider will: (i) fully cooperate with the Company and the Team; (ii) conduct himself on and off the road according to the highest standards of honesty, citizenship, and sportsmanship; (iii) not do anything that is detrimental or prejudicial to the Team's best interests; and (iv) behave in an exemplary manner as a professional racing cyclist to the Company's satisfaction.

***

**5. Rider's Condition and Drug or Medical Tests.**

Rider must refrain from the use of drugs, intoxicants, alcohol, narcotics, or any other controlled substance or stimulant while training, traveling, or competing for the Team. Rider represents to the Company that he is not currently using drugs, intoxicants, alcohol, narcotics or any other controlled substance or performance enhancing substance. Rider may be disciplined up to and including termination for possession, consumption, not being free of, or using any drugs, drug

paraphernalia, intoxicants, alcohol, narcotics, or any other controlled substance or performance enhancing substance while training, traveling, or performing for the Team.

(b) Because prescription medication could be deemed to be a prohibited drug by the UCI, FICP, USPRO or other Governing Bodies, Rider must ensure that he is aware of which prescription medications are prohibited drugs by UCI, FICP, USPRO or other Governing Bodies and to notify the Company and the Team if he is taking such prohibited drug so that the Company and the Team may monitor compliance with the applicable rules of UCI, FICP, USPRO and other Governing Bodies. Rider may take prescription medication only under medical supervision.

(c) Under certain circumstances, the Company and the Team may require Rider to undergo drug and/or alcohol testing. When the Company and the Team have reasonable suspicion that Rider is using drugs, intoxicants, alcohol, narcotics, or any other controlled substance or performance enhancing substance, Rider may be referred to a certified testing laboratory for completion of the tests. The UCI, FICP, USPRO and other Governing Bodies may conduct drug or medical control tests for prohibited or controlled substances from time to time. Rider will be available for and cooperate with all such tests. If Rider unreasonably refuses to take any such test or Rider fails any such test for any reason, then the Company may terminate this Agreement in accordance with the Termination provision in this Agreement or suspend Rider under the terms of the UCI Regulations or those of its affiliated Federations, by providing Rider with proper notice in writing.

35.     Relator is informed and believes, based on the language in the rider agreement provided to him by Tailwind, and based on his familiarity with rider agreements executed by him and Tailwind, that the rider agreements executed by Tailwind with other USPS Team members included substantively the same language as that set forth above on the topic of performance enhancing drugs and doping.

USPS Contracting Policy

36.     At all times relevant hereto, USPS contracting policy, as reflected in the applicable USPS Purchasing Manual, provided, among other things, that "persons known to engage in the illegal use, possession, sale, or transfer of narcotics or other drugs" and "persons who knowingly submit false data or conceal data for the purpose of gaining employment" were ineligible to perform services under a USPS contract.

37.     At all times relevant hereto, USPS contracting policy, as reflected in the applicable USPS Purchasing Manual, provided, among other things, that a USPS contractor

could be debarred from further contracting with the USPS based on "violations of a Postal Service contract so serious as to justify debarment," such as "willful failure to perform a Postal Service contract in accordance with the specifications." USPS contracting policy further provided that a contractor could be debarred for "any other cause of such serious and compelling nature, affecting responsibility as a supplier." At certain times relevant hereto, the USPS Purchasing Manual specifically listed "violation of a contract clause concerning the maintenance of a drug-free workplace" and "commission of . . . falsification of or destruction of records, [or] making false statements" as bases for debarment. At all times relevant hereto, USPS contracting policy further provided that, for purposes of debarment, "the criminal, fraudulent or seriously improper conduct of an individual may be imputed to the firm with which he or she has been connected when a grave impropriety . . . was effected by him or her with the knowledge or approval of the firm."

      38.    At all times relevant hereto, USPS contracting policy, as reflected in the applicable USPS Purchasing Manual, provided, among other things, that a USPS contractor could be suspended upon indictment or conviction for any offense "indicating a lack of business integrity or business honesty that seriously and directly affects present responsibility as a supplier." USPS contracting policy further provided that a USPS contractor could be suspended for any "cause of such serious and compelling nature, affecting responsibility as a supplier, as may be determined [by the USPS] to warrant suspension."

      39.    At all times relevant hereto, USPS contracting policy, as reflected in the applicable USPS Purchasing Manual, provided that submission of an invoice to the USPS for payment was a certification that, among other things, "any services being billed for have been performed in accordance with the contract requirements." USPS contracting policy further provided that any supplier "shall, promptly upon discovery, refund (i) any overpayment made by the Postal Service for service performed, or (ii) any payment made by the Postal Service for service not rendered."

## DEFENDANTS' CONTACTS WITH WASHINGTON, D.C.

40.     The 1995 and 2000 Sponsorship contracts between the USPS and defendants Montgomery Sports, Tailwind, and CSE were all national sponsorship contracts. As such, the contracts were managed and funded at a national level by the U.S. Postal Service, which has its headquarters in Washington, D.C. The 1995 Sponsorship Agreement was signed by Susan M. Brownell, a Contracting Officer located at USPS Headquarters, 475 L'Enfant Plaza, Washington, D.C. Numerous modifications to each of the Sponsorship Agreements were also issued during the time period relevant to this complaint by the USPS at its headquarters in Washington, D.C.

41.     Defendant Tailwind maintained an office in Washington, D.C. during the time period relevant to this complaint. On or about December 9, 1999, when the 1995 Sponsorship Contract was modified to recognize DFP Cycling, LLP (aka Tailwind Sports, LLC) as the successor in interest to TWP Sports, the address listed for DFP Cycling, LLP on the modification was 5301 Wisconsin Avenue, N.W., Washington, D.C.

42.     Tailwind submitted claims for payments under the 2000 Sponsorship Agreement to the USPS in Washington, D.C., and was paid. For example, on or about December 26, 2000, DFP Cycling (aka Tailwind) submitted two invoices for $1,534,500 each, along with another invoice for $100,000, to the USPS at 475 L'Enfant Plaza, Room 4541, Washington, D.C. The claims were all subsequently paid and approved by USPS headquarters in Washington, D.C. on or about January 10, 2001. Similarly, on January 29, 2001 and April 26, 2001, claims for $1,534,500 each were submitted by DFP Cycling (aka Tailwind) to the USPS at the same location and those claims were processed and paid by USPS. The January 29, 2001 invoice was paid in full by the USPS on or about March 1, 2001, and $1,529,500 was paid to the defendants by the USPS on the April 26, 2001 invoice on or about June 6, 2001. On August 20, 2001, an additional claim for $1,902,500 was submitted by Tailwind to the USPS in Washington, D.C., and that claim was paid by the USPS on or about October 1, 2001.

43.     Defendants Montgomery Sports, Tailwind, and CSE, and their representatives,

including some or all of the individual defendants, must necessarily have met with and or communicated with USPS executives in Washington, D.C. in connection with their negotiations, agreements, implementation, and payment upon the sponsorship contracts referenced herein.

44.     During the time period relevant to this complaint, relator is informed and believes based on the allegations herein, that defendants Montgomery Sports, Tailwind, and CSE, and their representatives, including Thomas Weisel and William Stapleton, attended meetings in Washington, D.C., at which they failed to disclose and otherwise knowingly concealed from the USPS the highly material fact that defendants were engaged in a systematic program of doping USPS Team athletes to achieve success in professional cycling.

45.     During the time period relevant to this complaint, relator is informed and believes, based on the allegations herein, that defendants Montgomery Sports, Tailwind, and CSE, and their representatives, including Thomas Weisel and William Stapleton, when calling by telephone, corresponding by mail, and emailing USPS executives in Washington, D.C., failed to disclose and otherwise knowingly concealed from the USPS the highly material fact that defendants were engaged in a systematic program of doping USPS Team athletes to achieve success in professional cycling.

46.     On or about June 1, 2001, the USPS held a special rally and flag presentation in Washington, D.C. for members of the USPS Team. A giant U.S. Postal Service jersey was also unveiled at the event and later taken on a tour of other cities in the United States. At no point in Washington, D.C. or elsewhere did the defendants disclose to the USPS that they were engaged in doping USPS Team athletes. To the contrary, the defendants, including Lance Armstrong, misled the USPS at the event in Washington, D.C. and elsewhere about the doping of the team and the reasons for its success.

## PERFORMANCE ENHANCING DRUGS AND BLOOD DOPING

47.     The term "doping" is used broadly to refer to any use of prohibited substances or prohibited methods to increase athletic performance.

48.     The practice of "blood doping" involves the use of artificial means to increase an individual's red blood cell count, which increases the oxygen carrying capacity of the person's blood and thus improves their endurance. Until the 1980s, the practice of blood doping generally involved removing and storing a person's own blood, waiting a few weeks until the red blood cell count in the individual had been restored, then re-injecting the stored red blood cells. An alternative approach used was to add a donor's red blood cells.

49.     In the 1990s, the use of Erythropoietin ("EPO") became more common in blood doping. EPO is a protein hormone responsible for stimulating the production of red blood cells in the human body. It is a naturally occurring hormone, produced by the kidneys, but can also be produced in the lab. The human recombinant (*i.e.,* lab) version of EPO was developed for treating the reduction in red blood cells associated with certain diseases or surgery. When an athlete uses EPO, it can stimulate their body to produce red blood cells to increase the flow of oxygen to their muscles and thus increase their endurance during sporting events.

50.     Anabolic steroids are synthetic steroids that have the effect of human steroids, like testosterone. If taken by an athlete, anabolic steroids can increase athletic performance, by increasing the pace of muscle development, strength, and endurance. Testosterone can be taken by a variety of methods, including intramuscular injection, patches and gels. It is categorized as a Schedule III controlled substance under the Anabolic Steroid Control Act, Pub. L. No. 101-647, title XIX, §§ 1901-05.

51.     Corticosteroids are synthetic drugs that rapidly reduce inflammation and pain. While they can be used for certain legitimate uses, like intra-articular hip injections to reduce inflammation in a damaged joint, they can also be used as performance enhancing drugs if used intramuscularly. Relator's understanding is that injectable corticosteroids are available by prescription only.

52.     Human Growth Hormone (HGH) is produced naturally by the human body and can also be produced synthetically. Recombinant (*i.e.,* synthetic) HGH is sometimes administered to athletes in order to reduce the level of subcutaneous fat. It also has the

effect of increasing the size and strength of an athlete's muscles and can aid in recovery from strenuous exercise and injuries. HGH is also categorized as a Schedule III controlled substance under the Anabolic Steroid Control Act, Pub. L. No. 101-647, title XIX, §§ 1901-05.

53.     It is illegal under federal law to distribute Schedule III substances without a prescription and medical necessity.

54.     USA Cycling describes itself as "the official governing body for all disciplines of competitive cycling in the United States." To become licensed by USA Cycling, current members must agree to a code of conduct that includes compliance with the anti-doping rules promulgated by the World Anti Doping Agency ("WADA").

55.     According to its website, WADA was "established in 1999 as an international independent agency composed and funded equally by the sport movement and governments of the world."

56.     Prior to the establishment of WADA, the principal international authority addressing doping was the International Olympic Committee ("IOC").

57.     The IOC promulgated the Olympic Movement Anti-Doping Code ("OMAC"), a version of which was entered into force on January 1, 2000. The OMAC referenced anabolic steroids like testosterone, HGH, and EPO in the list of prohibited substances and also listed blood doping as a prohibited method.

58.     On May 15, 2001, the Executive Board of the IOC, upon recommendation of the Board of the WADA agreed on a list of prohibited classes of substances and prohibited methods, which substituted Appendix A of the OMAC with the new list. Anabolic steroids (*e.g.*, testosterone), along with HGH and EPO, were included in the revised list of prohibited substances, and blood doping was included as a prohibited method.

59.     In 2003, WADA promulgated the World Anti-Doping Code ("WADC"), which was ratified by various national sports organizations in Copenhagen. The WADC provided for the publication of a list of Prohibited Substances and Prohibited Methods each year. To relator's knowledge, the list of Prohibited Substances and Prohibited Methods

promulgated pursuant to the WADC has never permitted the use of anabolic steroids (*e.g.*, testosterone), HGH, EPO or blood doping as described herein.

60.     In 2000, the U.S. Anti-Doping Agency ("USADA") was formed as the national anti-doping organization for the Olympic Movement in the United States.  It is a non-profit, non-government entity, which provides information to American athletes on the Prohibited List promulgated by WADA.  To relator's knowledge, the USADA, at all times relevant herein, has always prohibited the use of anabolic steroids (*e.g.,* testosterone), HGH, EPO or blood doping as described herein.

61.     In July 2004, the International Union of Cyclists (or Union Cycliste Internationale) ("UCI") elected to accept the World Anti-Doping Code, effective August 13, 2004.  Prior to that time, the UCI had its own rules prohibiting the use of anabolic steroids (*e.g.*, testosterone), HGH, EPO or blood doping as described herein.  Such rules were in effect at UCI at the time the 2000 Sponsorship Agreement was signed and while it was in effect.  Such rules were also in effect at UCI in years governed by the 1995 Sponsorship Agreement.

62.     Despite the clear prohibitions on doping set forth by the above organizations, and the clear incorporation of the rules of these organizations in the 1995 and 2000 Sponsorship Agreements, the USPS team systematically and knowingly evaded testing protocols and sought to enhance USPS Team members' performances with prohibited substances and prohibited methods.

**THE U.S. POSTAL SERVICE PRO CYCLING TEAM**

63.     Mr. Landis signed a contract with Tailwind in 2001 to become a member of the USPS Team and to race with the team throughout the 2002 season.  Relator Landis was a member of the USPS Team from 2002 through 2004.

64.     In or around late 2001 (after the 2001 racing season had ended), Mr. Landis had a discussion with defendant Bruyneel, the managing director of the team, at a team training camp in Austin, Texas regarding what would be expected of Mr. Landis as a team member with regard to the use of performance enhancing drugs.  When Mr. Landis inquired

explicitly about the topic, he was advised by Mr. Bruyneel that when the time came and he needed a little "help," Mr. Bruyneel would tell him what to do and how to do it.

65.     On or about June 2002, at the end of the 2002 Dauphine Libere cycling road race and prior to start of the 2002 Tour de France, Mr. Landis was approached by Mr. Bruyneel in his hotel room in Grenoble, France. In that meeting, Mr. Bruyneel told Mr. Landis that, when Mr. Landis arrived in St. Moritz, Switzerland, defendant Lance Armstrong would give him some testosterone patches and that team adviser and Italian physician Dr. Michele Ferrari ("Dr. Ferrari") would help him extract a half liter of blood to be re-infused during the Tour de France. (It has been widely reported that Dr. Ferrari worked with the USPS Team until October 2004, when he was convicted in Italy of charges involving doping athletes. The conviction was later reversed on appeal in 2006).

66.     In the same meeting, Mr. Bruyneel told Mr. Landis at that time that the testosterone patches should be worn two out of three days after hard training for eight to ten hours at night, which would be relatively free of risk of detection. He also explained that Dr. Ferrari would tell Mr. Landis about how the blood transfusion would work.

67.     Following his conversation with Mr. Bruyneel, Mr. Landis flew on a helicopter with defendant Armstrong from the finish of the Dauphine Libere to St Moritz, Switzerland. Upon his arrival there, Mr. Landis went to defendant Armstrong's apartment, where Mr. Armstrong gave him a package of 2.5 ml testosterone patches in front of Mr. Armstrong's wife at the time, Kirsten Armstrong.

68.     Several days later, Dr. Ferrari discussed with Mr. Landis how the blood transfusion process would work. Mr. Landis subsequently met with Dr. Ferrari at defendant Armstrong's apartment, where Dr. Ferrari performed an extraction of half a liter of Mr. Landis' blood, which he explained at the time to Mr. Landis would be transfused back into Mr. Landis during the Tour de France. This was the first occasion on which Mr. Landis had participated in blood manipulation of any kind and did so at the explicit initiation of individuals charged with authority and acting on behalf of Tailwind and its principals, including Bruyneel.

69.     Defendant Armstrong did not witness the blood extraction in his apartment, but he was aware that it had taken place and was present in the apartment at the time.  Mr. Landis and defendant Armstrong had lengthy discussions about the extraction on training rides in St. Moritz in or around June of 2002, during which time defendant Armstrong also explained to Mr. Landis the evolution of EPO testing and how transfusions were now necessary due to the new test, *i.e.,* EPO could no longer be used during races in large quantities (subcutaneously) without detection.

70.     Defendant Armstrong also divulged to Mr. Landis during the same rides in or around June 2002 that he had used EPO himself since early in his professional bicycle racing career.  Specifically, defendant Armstrong stated to Mr. Landis that in 2001, the first year the EPO test was used, he had been told by Dr. Ferrari, who had access to the new test, that he should not use EPO anymore subcutaneously, but he did not believe Dr. Ferrari and continued to use it.  Defendant Armstrong further stated that he subsequently tested positive for EPO while winning the Tour de Suisse, the month before the Tour de France in 2001, at which point he and Mr. Bruyneel flew to the UCI headquarters and made a financial agreement with Mr. Hein Verbruggen, head of UCI at the time, to keep the positive test hidden.

71.     Pat McQuaid, the current head of the UCI, has recently reportedly confirmed that defendant Armstrong gave the UCI $100,000.  He is further reported to have stated that the funds were promised in 2002, when Hein Verbruggen was head of the federation, but not actually paid until 2005, when Verbruggen resigned from his position.

72.     During the 2002 Tour de France, Mr. Landis was transfused with the half liter of his blood that had been previously extracted.  The transfusion took place during stage 8 of the Tour de France, the evening before the individual time trial.  The USPS team doctor, Jose Louise Gonzales del Moral asked Mr. Landis to come to his room where Mr. Landis met defendant Armstrong.  Mr. Landis and defendant Armstrong then lay on opposite sides of the bed and received re-infusions of a half-liter of blood each while defendant Bruyneel sat in a chair watching and commented on how well the two were going to race the

following day in the time trial.

73.     Defendant Armstrong placed second and Mr. Landis placed fifteenth in the subsequent time trial. After the time trial, defendant Armstrong commented to Mr. Landis that he was disappointed with the result and believed a potential cause may have been that the blood infused into them had not been stored properly. Defendant Armstrong further commented that he expected to do well in the final week of the tour as he had a second half liter of blood stored that had been stored differently than the first bag. This prediction turned out to be accurate, as defendant Armstrong went on to win the 2002 Tour de France.

74.     In approximately October 2002, Mr. Landis met with defendant Stapleton of CSE in his office next to the Four Seasons Hotel in Austin, Texas to discuss a renewal of his contract for the next two years. In the meeting, Mr. Stapleton specifically referenced the fact that he was aware of the extent to which Mr. Landis had been doping, and commented on the fact that the team could help him with further doping to help improve his performance further.

75.     Mr. Landis is informed and believes, based on the facts detailed herein, that at all times relevant to this complaint, Mr. Stapleton was knowledgeable about, and approved of, the doping program involving the USPS Team and the other misconduct described herein.

76.     In or around January 2003, Mr. Landis crashed during training and broke his right hip, requiring surgery. Following a second surgery on his hip in or around May 2003, Mr. Landis flew to Valencia to meet defendant Bruyneel and the team Doctor to inspect his hip. After training for a period of time at that location, he flew to Gerona, Spain. Once there, pursuant to prior instructions given to him by defendant Bruyneel, Mr. Landis went to defendant Armstrong's apartment, where he met Dr. Ferrari, who drew half a liter of blood and placed it in a refrigerator hidden in the closet of the master bedroom. The bag was stored in the refrigerator along with several other bags of blood that were already inside.

77.     Shortly thereafter, defendant Armstrong asked Mr. Landis to stay in the apartment to take care of the blood being stored in the refrigerator there. Defendant

Armstrong explained to Mr. Landis at the time that he would be gone for a few weeks to train, so he wanted Mr. Landis to check the temperature of the blood each day and make sure there were no problems with the electricity or the refrigerator. Mr. Landis agreed to this request and stayed in the apartment.

78.     Approximately three weeks after the first blood draw in defendant Armstrong's Gerona apartment, Mr. Landis then had an additional half liter of blood removed by Dr. Ferrari. More specifically, Dr. Ferrari removed two half liters of blood but also re-infused the half liter he had previously withdrawn. This was done, according to Dr. Ferrari, to ensure that the blood was fresh. This same technique was then used shortly before the beginning of the 2003 Tour de France, once again to ensure the freshness of the blood. Defendant Bruyneel arranged schedules for these sessions by calling Mr. Landis and arranging Dr. Ferrari's visits.

79.     During the same period while Mr. Landis was staying at defendant Armstrong's apartment, USPS Team member George Hincapie also had blood drawn from him by Dr. Ferrari in the presence of Mr. Landis. That blood, like Mr. Landis' blood, was placed in the same refrigerator in defendant Armstrong's apartment.

80.     In July 2003, during the 2003 Tour de France, Mr. Landis witnessed many members of the USPS team (in addition to himself) receiving transfusions of their previously extracted blood. Mr. Landis witnessed these transfusions on two separate occasions.

81.     On the first occasion, on or about July 11, 2003, before Stage 7, Mr. Landis was contacted by defendant Bruyneel and told to go to the team doctor's room to have his transfusion done. Dr. Luis del Moral Garcia (aka "El Gato") met Mr. Landis there to do the transfusion. Mr. Landis recalls defendant Armstrong, and additional USPS Team cyclists George Hincapie, Joe Luis Rubiera, and Roberto Heras were all there and had their transfusions done by the doctor at the same time.

82.     On the second occasion, on or about July 17th, after Stage 11, Mr. Landis was contacted by Mr. Bruyneel and again told to go to the team doctor's room for his transfusion. Dr. Luis del Moral Garcia met Mr. Landis there to do the transfusion. Mr. Landis recalls

that USPS Team cyclists Jose Luis Rubiera, Roberto Heras, Manuel Beltran, Victor Hugo Pena, George Hincapie (Mr. Landis' roommate at the time) and defendant Armstrong were all there and had their transfusions done by the doctor at the same time.

83.     During the same Tour de France in 2003, the team doctor Dr. Luis del Moral Garcia gave Mr. Landis and his roommate and fellow USPS cyclist George Hincapie a small syringe of olive oil in which was dissolved Andriol, a form of ingestible testosterone, on two out of every three nights, throughout the duration. Mr. Landis inquired as to the contents of the syringe before it was ingested. The doctor confirmed it was an olive oil and Andriol mixture.

84.     After the Tour De France, in approximately August 2003, Mr. Landis was asked by defendant Bruyneel, on behalf of Tailwind, to ride in the Vuelta a Espana cycling road race in Spain in September 2003. Defendant Bruyneel asked that Mr. Landis have blood drawn so that it could be transfused during the race. Per these directions, Mr. Landis borrowed Mr. Armstrong's car and drove from Gerona to Valencia, Spain where he met defendant Bruyneel and Dr. Luis del Moral Garcia. Because time was short, two half liters of blood were drawn, and Mr. Landis returned to Gerona.

85.     Because the withdrawal of two units of blood had left Mr. Landis' hematocrit levels quite low, defendant Bruyneel instructed Mr. Landis to meet defendant Armstrong at his apartment to get some EPO from him.

86.     Mr. Landis subsequently went to defendant Armstrong's Gerona apartment and happened to encounter Mr. Armstrong along with his wife and children in the entryway of the building. Mr. Armstrong then handed Mr. Landis a box of EPO in full view of his then wife and three children. The EPO was Eprex by brand and came in six pre-measured syringes. Per the instructions of Mr. Bruyneel, Mr. Landis used the EPO intravenously for several weeks during training. Then, shortly before the Vuelta a Espana race, Dr. Luis del Moral Garcia transfused the two half liters previously withdrawn and extracted another two.

87.     During this same period of training prior to the 2003 Vuelta, defendant Bruyneel initiated a separate conversation over the phone with Mr. Landis on how to use

Human Growth Hormone (HGH). At the direction of Mr. Bruyneel, Mr. Landis subsequently bought the HGH and Andriol that he needed from the team "trainer" Jose Marti (aka Pepe), who lived in Valencia, Spain at the time along with the team doctor Dr. Luis del Moral Garcia. Mr. Landis then spent substantial time training with fellow USPS Team members Matthew White and Michael Barry and shared, and discussed the use of, HGH, testosterone and EPO with them while training.

88.     During the 2003 Vuelta, at the direction of Mr. Bruyneel, Mr. Landis was given Andriol and blood transfusions by the team doctor Dr. Luis del Moral Garcia and did not have problems with any testing, *i.e.,* tests taken were negative. Fellow USPS Team cyclist Roberto Heras was present for one session where Mr. Landis received a transfusion.

89.     In 2004, USPS Team personnel performed two separate blood extractions and two transfusions on Mr. Landis under the direction of defendant Bruyneel. In or around May 2004, Mr. Landis flew to Belgium. Upon his arrival, he was picked up and driven by Dr. Dag Van Elsland to an unknown person's apartment, where blood was drawn from Mr. Landis.

90.     In or around June 2004, Mr. Landis flew to Belgium again, to have blood drawn again by Dr. Dag Van Elsland following the same procedure as the prior visit.

91.     In preparation for the 2004 Tour de France, the team went to Puigcerda, Spain to train. At that location, defendant Bruyneel and Dr. Ferrari closely monitored the team members' blood values and administered EPO and testosterone as needed to ensure the team was ready for the Tour de France. A Hemocue machine (hemoglobin monitor) and centrifuge (to determine/test hematocrit) were employed to determine blood parameter status. These were Dr. Ferrari's devices. The blood drawn in Belgium was later transfused back into Mr. Landis on two occasions during the 2004 Tour de France.

92.     On or about July 12, 2004, blood was transfused into Mr. Landis and a few other members of the team, including defendant Armstrong, George Hincapie, and Jose Acevedo. Mr. Bruyneel's assistant Gert Duffeleer (aka Duffy) brought the blood to a hotel room where the team was staying, and the team doctor Dr. Pedro Celaya did the re-

infusions.

93.     On the second occasion, the transfusion was performed on the team bus on the ride from the finish of a stage to the hotel during which time the driver pretended to have engine trouble and stopped on a remote mountain road for approximately an hour, so the entire team could have half a liter of blood transfused. This was the only time that Mr. Landis ever saw the entire team being transfused in plain view of all the other riders and bus driver. That team included defendant Armstrong, George Hincapie and Mr. Landis as the only Americans. The other USPS riders receiving transfusions included Jose Acevedo, Manuel Beltran, Viatcheslav Ekimov, Benjamin Noval, Pavel Padrnos and Jose Luis Rubiera.

94.     Defendant Armstrong, with the support of the USPS Team, won the Tour de France in 1999-2004. Mr. Landis personally witnessed defendant Armstrong's use of prohibited substances and prohibited methods to accomplish this feat during the period of 2002-2004. Instances of Armstrong's blood doping are described above. Mr. Landis also witnessed Lance Armstrong lying on a massage table wearing a transdermal testosterone patch on his shoulder at the 2004 training camp in Puigcerda, Spain. In addition, during blood transfusions where both he and Mr. Armstrong were present during the Tour de France in 2003 and 2004, Mr. Landis witnessed EPO being administered to Mr. Armstrong in small doses to counter the negative impact on reticulocytes from the blood transfusions.

95.     Mr. Landis also has direct knowledge, based on comments made by defendant Armstrong and others, and Mr. Landis' own experience with the general practices of the USPS Team during the time he was a member of the team, that defendant Armstrong's prior victories on behalf of the USPS Team, including those in the Tour de France and other races in 2000 and 2001, were accomplished while doping, and that other members of the USPS team were participating in doping as well during that same period. The aforementioned activities were knowingly facilitated by team doctors and team management, including defendant Johan Bruyneel.

96.     Defendant Armstrong was and is also knowledgeable about doping by other

members of the USPS Team during the period relevant to this complaint, but has concealed those practices, along with his own, from the USPS.

97.     In approximately April 2004, after the Paris-Roubaix race, Mr. Landis attended dinner at a restaurant in France, with defendant Bart Knaggs, Geert Dueffler, and others.  During the meal, Mr. Landis expressed concern about a shortage of equipment that was resulting from team management selling the bikes that were being provided by sponsors for the riders.  In the heated conversation that ensued, Mr. Landis commented to the effect that, while Mr. Armstrong was flying around in his own jet, the other riders should not be facing problems just obtaining the proper bike.

98.     In response to Mr. Landis' complaint, Mr. Duffeleer explained that the team management needed to sell the bikes to finance the doping program, as they needed cash for the doping program, and the team could not just list doping as a cost item on standard expense reports.

99.     Defendant Knaggs was present during the foregoing conversation and indicated his agreement with what was being expressed by Mr. Duffeleer.  In an effort to defuse the situation, Mr. Knaggs thereafter indicated that he would talk to defendant Bill Stapleton about the situation and try to get a replacement bike for Mr. Landis.

100.     Mr. Landis is informed and believes, based on the facts detailed herein, that at all times relevant to this complaint, defendant Knaggs was knowledgeable about, and approved of, the doping program involving the USPS Team and the other misconduct described herein.

101.     On or about the next day after the foregoing discussion in the restaurant, defendant Bruyneel called to reprimand Mr. Landis for creating an issue, indicating that the sponsors would be upset if they learned their bikes were being sold for cash, and that he would need to create a story about why the bikes were being sold.

102.     The 2004 Tour de France was the last race that Mr. Landis raced on the same team in the same race with Lance Armstrong.

103.     In 2006, Mr. Landis won the Tour de France while riding for team Phonak.

He later lost his title following a drug test that showed a skewed testosterone/epitestosterone ratio during stage 17 of the race.

104.    Shortly after it was reported that he tested positive, Mr. Landis received a call on his cell phone from defendant Armstrong, who instructed Mr. Landis, if he was ever asked if he (Landis) had ever used any performance enhancing drugs, to answer "absolutely not."

## PUBLIC DENIALS/FALSE STATEMENTS

105.    Numerous false public statements were made by defendant Armstrong and other representatives of the USPS team during the period relevant to this complaint, in order to conceal the defendants' involvement in doping from the USPS and to deceive the USPS. These false public statements include, but are not limited to, the following:

106.    On or about July 19, 1999, Mr. Armstrong publicly denied allegations that he had taken corticosteroids in connection with the 1999 Tour de France.

107.    On or about November 9, 2000, in statements published in the Austin Statesman regarding a French doping investigation relating to the USPS Team, defendant Armstrong stated, "We are absolutely innocent. Our team will stand on its morals and record of being an anti-doping team."

108.    In the same article, Mark Gorski, the USPS team manager at the time, stated the following: ``I have discussed this matter with our team's director, Johan Bruyneel, and the team's medical staff and am absolutely convinced that there were no improprieties. . . . If there is an official inquiry, we are confident that it will find that the team was in full compliance with the strict guidelines set forth by the Union Cycliste Internationale. We continue to adhere to a zero-tolerance policy concerning the use of substances banned by the UCI."

109.    In an interview with ABC News published on November 7, 2000 regarding the same topic, defendant Johan Bruyneel said "I continue to deny all doping allegations."

110.    On or about June 15, 2004, defendant Armstrong held another press conference regarding doping allegations, making the following statements: "I can absolutely

confirm that we don't use doping products." "This is not the first time I've lived through this. I heard it in 1999. I heard it in 2002, again in 2003. It happens all the time." "We don't use doping products and we will sue those who suggest we do."

111.    On or about August 25, 2005, in response to doping allegations pertaining to the 1999 Tour de France, Mr. Armstrong stated the following during an interview on the Larry King Live show: ""I've said it for longer than seven years:  I have never doped. I can say it again. But I've said it for seven years; it doesn't help. But the fact of the matter is I haven't [doped]."

112.    When the relator's allegations regarding Mr. Armstrong were published in May 2010, defendant Armstrong once again publicly denied any involvement in doping.

### THOMAS WEISEL

113.    In its 1995 sponsorship proposal to the USPS, the section entitled "Background on Montgomery Sports" begins as follows: "The guiding force behind Montgomery Sports is its President, Thomas Weisel."

114.    As described in *Capital Instincts*, the biography he authorized and co-authored, defendant Thomas Weisel is a former cyclist and longtime patron, investment manager and friend of Lance Armstrong, as well as an owner of the USPS Team, who was extensively involved in the team's management.

115.    Defendants Armstrong and Weisel have known one another since 1990, when Armstrong first rode for Weisel's cycling team. In a foreword he wrote for the book, Armstrong described Weisel as "something of a father figure to me."

116.    As described in the book, as early as 1995, defendant Weisel and former cyclist Mark Gorski formed a plan to develop a U.S. cycling team that could win the Tour de France. In May 1995, Weisel hired Gorski to work at Montgomery Sports. In 1995, the team secured the USPS sponsorship.

117.    Per the biography, in 1998, Weisel was instrumental in hiring defendant Armstrong onto the USPS Team and personally paid the "bonus" portion of Armstrong's salary, which ended up totaling more than $1 million. In 1999, defendant Weisel also

personally paid the salary of USPS Team cyclist Viatcheslav Ekimov, including a $100,000

bonus. Mr. Gorski has been quoted as saying that in the time period up to 1999, defendant

Weisel spent "several million dollars" of his own money on the USPS Team. Weisel also

contributed $50,000 to Mr. Landis' defense against doping charges.

118.    When defendant Armstrong won the Tour de France in 1999, defendant

Weisel was in the "follow car." In 2000, defendant Weisel biked alongside defendant

Armstrong with his arm on his shoulder during his Tour de France "victory lap" on the

Champs d'Elysees. Defendant Weisel also rode in the pace car for all of Mr. Armstrong's

other Tour de France wins as a member of the USPS Team. According to his book,

defendant Weisel and Mr. Gorski "built the team specifically for the [Tour de France] . . .

Weisel sought out and hired riders with all the different skills necessary to support

Armstrong and help him win the Tour." Weisel also brought a new annual street cycling

race to San Francisco, called the SF Grand Prix. Armstrong and the USPS Team competed

in the race in 2001, with USPS Team cyclist George Hincapie winning the race. Mr.

Weisel's book contains a chapter authored by him in which he explains "how I've applied

these points [about creating a successful business] to the creation of a great sports team," *i.e.*,

the USPS Team.

119.    During the period relevant to this complaint, key individuals in positions of

authority at USA Cycling had financial ties at various points in time with Tailwind,

defendant Weisel's investment bank Thomas Weisel Partners (or subsidiaries), or CSE,

including, but not limited to, Steve Johnson, CEO of USA Cycling, and Jim Ochowicz

former president of USA Cycling.

120.    According to the biography authorized and co-authored by defendant Weisel,

in or around 1999, the U.S. Cycling Federation was the governing body for the sport of

cycling in the U.S. The Federation's parent organization, USA Cycling, was suffering

financial difficulties. Over the next three years, Weisel re-organized USA Cycling, and set

up a non-profit organization called USA Cycling Development Foundation to help fund

USA Cycling.

121.    Mr. Weisel's book, published in 2003, stated: "Weisel has spent over three years reorganizing USA Cycling, and his team is largely in charge."

122.    According to Form 990s filed with the IRS in 2000 through 2003 and published reports regarding 2004, Weisel served as President or Chairman, and Weisel's "old cycling buddy" Steve Johnson served as Executive Director, of USA Cycling Development Foundation, and the Foundation provided contributions to USA Cycling of approximately $500,000 to $725,000 each year, a substantial portion of USA Cycling's annual budget.

123.    During the same time period, Steve Johnson was also Chief Operating Officer of USA Cycling.  The President of the Board of Directors of USA Cycling from 2002 to 2008, Jim Ochowicz, was also a broker at Weisel's investment bank.

124.    According to Form 990s filed with the IRS, the Foundation also paid Tailwind $80,000 in 2002, 2003 and 2004 for "marketing and logistical services."

125.    Mr. Landis is informed and believes that these conflicts of interest and overlapping relationships between USA Cycling, the USA Cycling Foundation, and Thomas Weisel helped make it possible for the USPS Team to carry on the extensive program of systematically doping team athletes during the period relevant to this complaint.

126.    When discussing the cover-ups involving doping and defendant Armstrong's involvement in doping, another individual familiar with Steve Johnson told Mr. Landis that he had asked Steve Johnson why they do it, and Steve Johnson's response was "we can't lose the sponsors like the Postal Service so we have no choice."  This quote was told to Mr. Landis by Mr. Holowesko, in New York City, New York, in 2007, before Mr. Landis' anti-doping hearing with the USADA.

127.    Relator is informed and believes, based on the degree of control that defendant Weisel exercised over the USPS Team and his close relationship with defendant Armstrong, that defendant Weisel was at all relevant times knowledgeable about, and approved of, the doping program involving the USPS Team and the other misconduct described herein.

128.    A reasonable opportunity for further investigation or discovery likely will

show additional evidence of defendant Weisel's knowledge of the wrongful conduct of defendant Armstrong and the USPS Team, including doping and the other activities described herein, as well as defendant Weisel's domination and control of Montgomery Sports and Tailwind, and his knowledge of false statements and claims being made to the USPS.

129.    In an interview with the Wall Street Journal in 2008, defendant Weisel described how he thought doping issues should be dealt with: "Handle the problem below the surface and keep the image of the sport clean," he said. "In the U.S. sports—baseball, basketball, football—most fans couldn't care less."

130.    In late 2000, following public allegations regarding the possibility of doping by the USPS Team, Mr. Weisel reportedly made repeated representations to Gail Sonnenberg, Senior VP of Sales at the USPS, that the team was not involved in doping. These representations were knowingly false, were made with reckless disregard for their truth or falsity, and were made to persuade the USPS to enter into the 2000 Sponsorship Agreement with Tailwind, and to have the USPS continue to make payments to Tailwind. Team officials Mark Gorski and Dan Osipow are reported to have made similar representations on behalf of Tailwind to the USPS during the same time frame.

131.    The foregoing representations by Weisel, Gorski, and Osipow, along with the public denials by Armstrong and other representatives of Tailwind referenced above, were knowingly false, were made with reckless disregard for their truth or falsity, and were made to persuade the USPS to make payments under the 1995 Sponsorship Agreement, to persuade the USPS to enter into the 2000 Sponsorship Agreement, to have the USPS make payments to Tailwind under the 2000 Sponsorship Agreement, and to have the USPS not seek repayment of funds previously paid under either sponsorship agreement. The representations had the desired effect of persuading the USPS that the USPS Team was not involved in doping. The USPS reasonably believed defendants' denials to be true, while they were, in fact, knowingly false.

**ALL DEFENDANTS**

132.    During the period relevant to this complaint and through the present, defendants have knowingly concealed and continue to conceal from the USPS the fact that defendants engaged in a systematic program of doping USPS Team members in the manner described herein.

133.    The understanding that the USPS Team was not using performance enhancing drugs or blood doping, or engaged in other wrongful conduct, was integral to the sponsorship agreements between the USPS and the defendants. That understanding perpetuated by the defendants was false and fraudulent, which thus fraudulently induced the USPS to enter into the sponsorship contracts described herein and then extend and renew such contracts for increasingly larger sums of money.

134.    The defendants presented or caused to be presented claims for payment to the USPS with knowledge that the USPS Team was engaged in doping and other wrongful conduct in violation of the terms of the sponsorship contracts and USPS policy. Such claims were submitted during the period that each of the defendant entities referenced above had their respective sponsorship agreements with the USPS or were involved with management of the same. When the defendants submitted or caused to be submitted claims for payment and/or accepted payments by the USPS, they represented explicitly and/or implicitly to the USPS that the USPS Team was not involved in the doping of its team members or other wrongful conduct, but that representation was not true. Such express and/or implied certification was a condition of and a prerequisite to the USPS' payments and to its continuation and renewals of the sponsorship agreements.

135.    Both the 1995 and 2000 Sponsorship Agreements made it an event of default if "[e]ither party shall make any material misrepresentation or shall materially breach any warranty made herein." Defendants knowingly violated this provision by concealing from the USPS during the effective period of both contracts their involvement in the use of performance enhancing drugs and blood doping and by publicly making false representations that they were not involved in such conduct. The defendants' failure to

33

comply with these provisions would have been a material consideration to the USPS in determining whether to renew the contracts or pay funds otherwise owing under the relevant contracts, with the natural tendency of the USPS being not to pay the funds if it were known that the team or any of its members were engaged in doping activities. Both Sponsorship Agreements permitted the USPS to terminate the agreements "without any liability whatsoever" upon the occurrence of an Event of Default.

136.    Both the 1995 and 2000 Sponsorship Agreements required that the defendants comply with "all applicable rules" of the organizations governing cycling. As detailed above, the rules of the referenced organizations prohibited the use of doping products like Testosterone, EPO, and HGH, and also prohibited the practice of blood doping. The defendants' failure to comply with these provisions would have been a material consideration to the USPS in determining whether to pay funds otherwise owing under the relevant contracts, with the natural tendency of the USPS being not to pay the funds if it were known that the team or any of its members were engaged in doping activities. Both Sponsorship Agreements permitted the USPS to terminate the agreements "without any liability whatsoever" upon the occurrence of an Event in Default.

137.    The 2000 Sponsorship Agreement contained a morals and turpitude clause in Section 9 which required USPS team management to take appropriate action within 30 days in the event of doping by team athletes. In addition, the defendants represented in the same Agreement that "each rider on the Team has a morals turpitude and drug clause" and that the company was required "to take immediate action without notification by the Sponsor in a case of a rider or Team offense related to a morals or drug clause violation." Relator is informed and believes, based on his own personal experience as a member of the USPS Team, that from at least 2000 onward, the agreements between the USPS Team and its riders included moral turpitude and drug clauses which required riders not to use any drugs, controlled substances, or other performance enhancing substances, and also required them to comply with the rules of the various organizations governing professional cycling, which similarly prohibited the use of performance enhancing drugs or blood doping.

138.    Defendants were knowledgeable about repeated and pervasive violations of the foregoing clauses in the 1995 Sponsorship Agreement, the 2000 Sponsorship Agreement, and the rider agreements, but they systematically failed to discipline riders as a result of such violations. The defendants also concealed such violations from the USPS, and failed to disclose the violations by riders to the USPS, as the team's management was orchestrating the riders' use of banned substances and methods during the period relevant to this complaint, and they were conspiring with the riders to keep that conduct secret from the USPS. The defendants thereby knowingly failed to comply with the provisions in the 2000 Sponsorship Agreement pertaining to enforcement of the moral turpitude and drug clauses in the rider agreements. If it had been known to the USPS that defendants had failed to comply with these provisions, it would have been a material consideration by the USPS in determining whether to renew the contracts or pay funds otherwise owing under the relevant contracts, with the natural tendency of the USPS being not to pay the funds if it were known that the team was engaged in doping activities.

139.    The 2000 Sponsorship Agreement listed as an event of default "negative publicity associated with an individual rider or team support personnel, either permanent or temporary, due to misconduct such as but not limited to, failed drug or medical tests, alleged possession, use or sale of banned substances . . ." As detailed above, under the heading Public Allegations and Denials, at numerous times during the period of the 2000 Sponsorship Agreement and afterward, there was potentially negative publicity associated with allegations of "misconduct such as but not limited to, failed drug or medical tests, alleged possession, use or sale of banned substances" by USPS team members. While the team's management and riders were, in fact, engaged in the use of banned substances and other doping activities, the defendants' response to the allegations was to publicly deny their veracity.

140.    If it had been known to the USPS that the public doping allegations regarding the USPS Cycling Team were, in fact, true, it would have been a material consideration by the USPS in determining whether to pay funds otherwise owing under the 2000 Sponsorship

Agreement, with the natural tendency of the USPS being not to pay the funds if it were known that the team was engaged in doping activities that would result in negative publicity.

141.    The USPS specifically stated in 2000 that the reason it was sponsoring the USPS team and its purpose in doing so was to "positively impact customer perceptions of the Postal Service" and improve its own employees' "sense of pride." Doping of athletes and cheating to win athletic events is plainly inconsistent with these objectives.

142.    Relator is informed and believes, based on the allegations stated herein, that at all times relevant to this complaint and through the present, each of the defendants agreed with the others on the doping scheme and other wrongful conduct in violation of the sponsorship agreements with the USPS as described herein, and agreed to conceal from the USPS that such doping and other wrongful conduct was occurring and had occurred, for the purpose of obtaining funds from the USPS and for the purpose of not having to return funds paid by the USPS in connection with the sponsorship contracts, despite the fact that it was known such funds were not due and were improperly paid. As described herein, each of the individual defendants took an active part in furtherance of said conspiracy.

143.    As detailed above, as a result of the foregoing wrongful conduct, claims, and conspiracy on the part of defendants, the USPS paid the defendants in excess of $10.9 million in connection with the 1995 Sponsorship Agreement and $31.4 million in connection with the 2000 Sponsorship Agreement.

144.    At various points between 1996 and 2004, and also between 2004 and the present, the defendants knew and/or had reason to know that the USPS Team was engaged in doping and other wrongful conduct in violation of the sponsorship agreements with the USPS and that the funds being paid to Tailwind and CSE should therefore be returned to the USPS, but the defendants nonetheless failed to return the funds paid to them by the USPS.

### RELATOR CONTACTS WITH THE PRESS

145.    Prior to the filing of this case, Mr. Landis had conversations with media outlets regarding the allegations made herein.

146.    Prior to the filing of this case, Mr. Landis had conversations on or about May

19, 2010 with Bonnie Ford of ESPN.com, which have been published, although not in their entirety, in subsequent articles.

147.    On or about May 20, 2010, an article detailing the substance of several emails written by Mr. Landis concerning certain of the facts set forth herein and other matters was published in the Wall Street Journal.

148.    On or about May 24, 2010, and thereafter, Mr. Landis had extensive conversations with Reed Albergotti of the Wall Street Journal and detailed more of the facts surrounding the incidents described in the emails and certain other facts described herein. An article containing additional information provided by Mr. Landis was subsequently published by the Wall Street Journal after the filing of the original complaint in this matter.

### DISCLOSURES TO THE UNITED STATES AND THE USADA

149.    In April 2010, Mr. Landis contacted Travis Tygart with the U.S. Anti-Doping Agency and met with him to share information regarding doping by the USPS Team and other facts relating to the same.

150.    On or about April 30, 2010, Mr. Landis sent a detailed email to Steve Johnson of USA Cycling regarding his allegations of doping by the USPS Team.

151.    On or about May 6 or 7, 2010, Mr. Landis was contacted by Jeff Novitzky of the U.S. Food and Drug Administration concerning the allegations he had been making to USA Cycling and the USADA.   Mr. Landis had previously agreed to speak with Mr. Novitzky and voluntarily followed up with Mr. Novitzky when he called.

152.    On or about May 12 and 13, 2010, Mr. Landis voluntarily met with and was interviewed by Mr. Novitzky and Travis Tygart.  At that meeting, Mr. Landis volunteered information to Mr. Novitzky concerning the allegations he had been making previously to USA Cycling and the USADA.

153.    Between the date of his first call to Mr. Landis and May 28, 2010, Mr. Novitzky interviewed Mr. Landis in person and telephonically on numerous occasions to discuss essential aspects of the allegations that are made herein, including the fact that the USPS was the victim of a fraud perpetrated by the defendants identified in this complaint.

Mr. Landis also provided to Mr. Novitzky copies of emails he had previously sent to USA
Cycling officials, including his April 30, 2010 email to Steve Johnson at USA Cycling,
among numerous others.

154.    Through these disclosures and others, Mr. Landis disclosed the substance of
the allegations in this complaint to the United States prior to its filing.  Mr. Landis'
allegations have been the impetus for a federal investigation into doping by the USPS Team
and entities and individuals associated with the team.

## DISREGARD OF CORPORATE ENTITIES

155.    Based on the information stated herein, Mr. Landis is informed and believes
that Tailwind and Montgomery Sports were each dominated and controlled by defendant
Thomas Weisel and were the alter egos or business conduits of Mr. Weisel.  A reasonable
opportunity for further discovery likely will develop further evidence of the same, along
with further evidence of Mr. Weisel's knowledge of doping by the USPS team and the other
fraudulent conduct described herein.

156.    Tailwind and Montgomery Sports each engaged in fraud against the USPS as
described herein.

157.    Montgomery Sports is no longer in existence.  Likewise, Tailwind has ceased
operations and its capital and assets have been distributed to its owners, leaving it
undercapitalized to satisfy its obligations to the USPS.

158.    Relator is informed and believes that the primary asset of Montgomery Sports
– the USPS contract - was transferred to Tailwind by Weisel.  In his biography, Weisel
refers to the two companies as effectively the same:  "We started Montgomery Sports – now
Tailwind Sports - . . . to create the finest professional cycling team in the world."

159.    As detailed above, Weisel also used his personal funds to make payments on
behalf of Tailwind.

160.    Based on the information stated herein, Mr. Landis is informed and believes
that CSE was and is dominated and controlled, directly and indirectly, by defendants Bill
Stapleton, Lance Armstrong, and Bart Knaggs, and that CSE was the alter ego or business

conduit of some or all of these individuals. A reasonable opportunity for further discovery likely will develop further evidence of the same.

161.    CSE engaged in fraud against the USPS as described herein.

## COUNT ONE

### False Claims Act, 31 U.S.C. § 3729(a)(1) (pre FERA)

### All Defendants

162.    Plaintiff realleges and incorporates paragraphs 1 to 161 above as if fully set forth herein.

163.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.,* as amended.

164.    By virtue of the acts described above, defendants knowingly submitted, or caused to be submitted, false or fraudulent claims for payment to the United States government.

165.    The United States, unaware of the falsity of defendants' claims, and in reliance on the accuracy thereof, paid the defendants amounts in excess of what would have been paid had the claims not been false.

166.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT TWO

### False Claims Act, 31 U.S.C. § 3729(a)(2) (pre FERA)

### All Defendants

167.    Plaintiff realleges and incorporates paragraphs 1 to 161 above as if fully set forth herein.

168.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.,* as amended.

169.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid or approved by the government.

170.    The United States, unaware of the falsity of defendants' records and statements, and in reliance on the accuracy thereof, paid the defendants amounts in excess of what would have been paid had the records and statements not been false.

171.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT THREE

### False Claims Act, 31 U.S.C. § 3729(a)(3) (pre FERA)

### All Defendants

172.    Plaintiff realleges and incorporates paragraphs 1 to 161 above as if fully set forth herein.

173.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

174.    By virtue of the acts described above, defendants conspired among themselves to defraud the United States by getting false or fraudulent claims allowed or paid.

175.    The United States, unaware of the falsity of defendants' records and statements, and in reliance on the accuracy thereof, paid the defendants amounts in excess of what would have been paid had the records and statements not been false.

176.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT FOUR

### False Claims Act, 31 U.S.C. § 3729(a)(7) (pre FERA)

### All Defendants

177.    Plaintiff realleges and incorporates paragraphs 1 to 161 above as if fully set forth herein.

178.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

179.    By engaging in the acts described above, defendants avoided or reduced obligations owed to the United States Government.

180.    Specifically, defendants avoided the obligation to return funds paid by the United States, by concealing and failing to disclose the doping of USPS Team athletes.

181.    By reason of defendants' conduct, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT FIVE

### False Claims Act as amended by FERA, 31 U.S.C. § 3729(a)(1)(A)
### All Defendants

182.    Plaintiff realleges and incorporates paragraphs 1 to 161 above as if fully set forth herein.

183.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended by FERA.

184.    By virtue of the acts described above, defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval.

185.    The United States, unaware of the falsity of defendants' claims, and in reliance on the accuracy thereof, paid the defendants amounts in excess of what would have been paid had the claims not been false.

186.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT SIX

### False Claims Act as amended by FERA, 31 U.S.C. § 3729(a)(1)(B)
### All Defendants

187.    Plaintiff realleges and incorporates paragraphs 1 to 161 above as if fully set forth herein.

188.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended by FERA.

189.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

190.    The United States, unaware of the falsity of defendants' records and statements, and in reliance on the accuracy thereof, paid the defendants amounts in excess of what would have been paid had the records and statements not been false.

191.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT SEVEN

### False Claims Act as amended by FERA, 31 U.S.C. § 3729(a)(1)(C)
### All Defendants

192.    Plaintiff realleges and incorporates paragraphs 1 to 161 above as if fully set forth herein.

193.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended by FERA.

194.    By virtue of the acts described above, defendants conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A), (B), and (G).

195.    The United States, unaware of the falsity of the claims made by defendants and in reliance on the accuracy thereof, paid and continues to pay claims in amounts in excess of what would have been paid had the claims not been false.

196.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT EIGHT

### False Claims Act as amended by FERA, 31 U.S.C. § 3729(a)(1)(G)
### All Defendants

197.    Plaintiff realleges and incorporates paragraphs 1 to 161 above as if fully set forth herein.

198.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended by FERA.

199.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used, a false records and statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and

improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

      200.    By reason of these actions, the United States has been damaged, and continues to be damaged, in substantial amount.

      WHEREFORE, relator, on his own behalf and on behalf of the United States, prays for judgment in plaintiffs' favor and against defendants, as follows:

      a.    Ordering defendants to pay an amount equal to three times the amount of damages the United States has sustained because of defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each action in violation of 31 U.S.C. § 3729, both pre-FERA and as amended, and the costs and expenses of this action, with interest, including the costs and expenses to the United States;

      b.    Awarding relator the maximum amounts allowed pursuant to 31 U.S.C. § 3730(d);

      c.    Awarding relator all fees, costs, and expenses incurred in initiating and sustaining this action, including reasonable attorneys' fees;

      d.    Piercing of the corporate veils of the business entities named herein and treatment of their owners named herein as their alter egos.

      e.    Granting relator and the United States all other such relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

      Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff hereby demands trial by jury.

Dated: December 23, 2010

Respectfully submitted,

Jon L. Praed
USDC #450764
DC Bar #51665
Internet Law Group
4121 Wilson Boulevard, Suite 101
Arlington, VA 22203
Tel; 703-243-8100
Fax: 703-243-8162
jon.praed@i-lawgroup.com

Paul D. Scott
pdscott@lopds.com
Lani Anne Remick
laremick@lopds.com
LAW OFFICES OF PAUL D. SCOTT, P.C.
505 Sansome Street, Sixth Floor
San Francisco, California 94111
Tel: (415) 981-1212
Fax: (415) 981-1215

Attorneys for Relator Floyd Landis

# EXHIBIT 1

FDM - Account Payable Detail Data: 660418

# Financial Data Mart

**UNITED STATES POSTAL SERVICE**

ONLINE QUERY   REPORTS   UTILITIES

**Reports**

Accounts Payable Detail ( Data prior to August 11, 2005 is not audited )
Finance Number:    CUSTOMER EVENTS

Options:   Printable Format   Excel Format

**Data Areas**

Financial Summary
Financial Line Recast
Accounts Payable
Depreciation Expense
Commitment Detail
Credit Card

| PSFR LINE NUMBER | ACCOUNT NUMBER | CONTRACT NUMBER | SEQ. NO. /PO LINE NO. | TRAVELER/VENDOR | PENDING/PAID AMOUNT | DATE PAID | INVOICE NUMBER | CHE NC /EI NC |
|---|---|---|---|---|---|---|---|---|
| 34 | | 1025920IF0858 | 00000000001 | **TAILWIND CYCLING LLC | $15,977.62 | 10/20/2004 | 091704 | 000010: |
| 34 | | 1025920IF0858 | 00000000001 | **TAILWIND CYCLING LLC | $34,000.00 | 10/04/2004 | SF GRAND PRIX | 000010- |
| 34 | | 1025920IF0858 | 00000000001 | **TAILWIND CYCLING LLC | $10,000.00 | 10/04/2004 | VICTORY #6 | 000010- |
| 34 | | 1025920IF0858 | 00000000001 | **TAILWIND CYCLING LLC | $29,192.83 | 08/11/2004 | 063004 | 000009: |
| 34 | | 1025920IF0858 | 00000000001 | **TAILWIND CYCLING LLC | $1,877,000.00 | 05/24/2004 | 050104 | 000008: |
| 34 | | 1025920IF0858 | 00000000001 | **TAILWIND CYCLING LLC | $65,000.00 | 03/31/2004 | 022604 | 000008: |
| 34 | | 1025920IF0858 | 00000000001 | **TAILWIND CYCLING LLC | $2,165,000.00 | 03/01/2004 | 013104 | 000008: |
| 34 | | 1025920IF0858 | 00000000001 | **TAILWIND CYCLING LLC | $100,000.00 | 12/05/2003 | 112903 | 000007 |
| 34 | | 1025920IF0858 | 00000000001 | **TAILWIND CYCLING LLC | $2,165,000.00 | 12/05/2003 | 112903. | 000007 |
| 34 | | 1025920IF0858 | 00000000001 | **TAILWIND CYCLING LLC | $701.84 | 12/09/2003 | KC FORUM 03 103003 | 000007 |
| 34 | | 1025920IF0858 | 00000000001 | **TAILWIND CYCLING LLC | $2,236.08 | 12/09/2003 | TDF 03 11/03/03 | 000007 |
| 34 | | 1025920IF0858 | 00000000001 | **TAILWIND CYCLING LLC | $5,000.00 | 11/21/2003 | 102203 | 000006: |
| 34 | | 1025920IF0858 | 00000000001 | **TAILWIND CYCLING LLC | $10,000.00 | 11/21/2003 | 102303 | 000006: |
| 34 | | 1025920IF0858 | 00000000001 | **TAILWIND CYCLING LLC | $1,265,000.00 | 10/10/2003 | 080103. | 000006: |
| 34 | | 1025920IF0858 | 00000000001 | **TAILWIND CYCLING LLC | $35,150.83 | 09/24/2003 | 082503 | 000006: |
| 34 | | 1025920IF0858 | 00000000001 | **TAILWIND CYCLING LLC | $900,000.00 | 09/04/2003 | 080103 | 000006: |
| 34 | | 1025920IF0858 | 00000000001 | **TAILWIND CYCLING LLC | $150,000.00 | 07/01/2003 | LA903 | 000005: |
| 34 | | 1025920IF0858 | 00000000001 | **TAILWIND CYCLING LLC | $32,675.00 | 06/13/2003 | 051503 | 000005: |
| 34 | | 1025920IF0858 | 00000000001 | **TAILWIND CYCLING LLC | $42,115.90 | 05/20/2003 | 042103 | 000004: |
| 34 | | 1025920IF0858 | 00000000001 | **TAILWIND CYCLING LLC | $2,058,750.00 | 05/14/2003 | 022503 | 000004: |
| 34 | | 1025920IF0858 | 00000000001 | **TAILWIND CYCLING LLC | $2,058,750.00 | 02/10/2003 | 65090 | 000004: |

FDM - Account Payable Detail Date: 00U410

| | | | | Amount | Date | | |
|---|---|---|---|---|---|---|---|
| 34 | 10259201F0858 | 00000000001 | **TAILWIND CYCLING LLC | $4,008.10 | 01/14/2003 | 123102 | 000003: |
| 34 | 10259201F0858 | 00000000001 | **TAILWIND CYCLING LLC | $58,750.00 | 11/22/2002 | 65040 | 000003: |
| 34 | 10259201F0858 | 00000000001 | **TAILWIND CYCLING LLC | $2,058,750.00 | 11/22/2002 | 65050 | 000003: |
| 34 | 10259201F0858 | 00000000001 | **TAILWIND CYCLING LLC | $100,000.00 | 11/22/2002 | 65051 | 000003: |
| 34 | 10259201F0858 | 00000000001 | **TAILWIND CYCLING LLC | $81,250.00 | 09/10/2002 | 65031 | 000003: |
| 34 | 10259201F0858 | 00000000001 | **TAILWIND CYCLING LLC | $10,000.00 | 09/10/2002 | 65032 | 000003: |
| 34 | 10259201F0858 | 00000000001 | **TAILWIND CYCLING LLC | $27,204.37 | 09/10/2002 | 65033 | 000003: |
| 34 | 10259201F0858 | 00000000001 | **TAILWIND CYCLING LLC | $2,058,750.00 | 08/21/2002 | 65029 | 000002: |
| 34 | 10259201F0858 | 00000000001 | **TAILWIND CYCLING LLC | $1,902,500.00 | 06/04/2002 | 65028 | 000002: |
| 34 | 10259201F0858 | 00000000001 | **TAILWIND CYCLING LLC | $1,902,500.00 | 02/22/2002 | 65027 | 000001: |
| 34 | 10259201F0858 | 00000000001 | **TAILWIND CYCLING LLC | $1,902,500.00 | 01/24/2002 | 65025 | 000001: |
| 34 | 10259201F0858 | 00000000001 | **TAILWIND CYCLING LLC | $100,000.00 | 01/24/2002 | 65026 | 000001: |
| 34 | 10259201F0858 | 00000000001 | **TAILWIND CYCLING LLC | $1,902,500.00 | 10/01/2001 | 65020 | 000001: |
| 34 | 10259201F0858 | 00000000001 | **TAILWIND CYCLING LLC | $100,000.00 | 09/07/2001 | 65011 | 002519: |
| 34 | 10259201F0858 | 00000000001 | **DFP CYCLING LLC | $1,529,500.00 | 06/06/2001 | 65010 | 002516: |
| 34 | 10259201F0858 | 00000000001 | **DFP CYCLING LLC | $1,534,500.00 | 03/01/2001 | 65004 | 002513: |
| 34 | 10259201F0858 | 00000000001 | **DFP CYCLING LLC | $1,534,500.00 | 01/10/2001 | 65000 | 002512: |
| 34 | 10259201F0858 | 00000000001 | **DFP CYCLING LLC | $1,534,500.00 | 01/10/2001 | 65001 | 002512: |
| 34 | 10259201F0858 | 00000000001 | **DFP CYCLING LLC | $100,000.00 | 01/10/2001 | 65002 | 002512: |
| | | | Account Total: | $31,442,262.57 | | | |
| | | | Line Total: | $31,442,262.57 | | | |
| 44 | 10259201F0858 | 00000000001 | **TAILWIND CYCLING LLC | $11.85 | PENDING | 65031 | |
| 44 | 10259201F0858 | 00000000001 | **TAILWIND CYCLING LLC | $3.97 | PENDING | 65033 | |
| 44 | 10259201F0858 | 00000000001 | **TAILWIND CYCLING LLC | $1.46 | PENDING | 65032 | |
| | | | Account Total: | $17.28 | | | |
| | | | Line Total: | $17.28 | | | |

*For additional help, please contact **RMS-HELP-DESK** on CC:Mail or call the help desk at 202-268-5405.*

**PROOF OF SERVICE**

I, the undersigned, declare:

I am over the age of 18 and not a party to this cause.  My business address is

4121 Wilson Boulevard, # 101, Arlington, Virginia 22203.  On the date set forth below, I

caused to be served a copy of the following documents filed in or relating to United

States ex rel. Landis v. Tailwind Sports Corporation, et al., Case: #1:10-cv-00976-CKK

(D.D.C. 2010):  *First Amended Complaint for Violations of the Federal False Claims*

*Act (filed under seal).*

The above documents were served on December 23, 2010, on the interested

parties in said action, by placing a true and correct copy thereof in an envelope and

causing same to be delivered to the following address(es) in the manner indicated:

| | |
|---|---|
| By Certified Mail & Email:<br>Darrell Valdez, Esq.<br>Assistant United States Attorney<br>United States Attorney's Office<br>Suite #4222<br>555 4th Street, NW<br>Washington, DC 20530<br>darrell.valdez@usdoj.gov | By Certified Mail & Email:<br>Robert E. Chandler<br>United States Department of Justice<br>Civil Division<br>Fraud Section<br>601 D Street NW<br>Washington, DC 20004<br>(202)514-4678<br>robert.chandler@usdoj.gov |

I declare under penalty of perjury of the laws of the United States that the

foregoing is true and correct.

Executed on ___Dec  23, 2010___ at Arlington, Virginia.

Jon L. Praed
USDC #450764; DC Bar #51665
Internet Law Group
4121 Wilson Blvd. Suite 101
Arlington, VA 22203