## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* [UNDER SEAL], <br><br>     Plaintiff,<br>v.<br><br>[UNDER SEAL],<br><br>     Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. 1:10-cv-00976-RLW

**SECOND AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL
FALSE CLAIMS ACT**

**FILED UNDER SEAL
(31 U.S.C. § 3729 *et seq.*)**

**JURY TRIAL DEMANDED**

Dated: February ___, 2013

Respectfully submitted,

_____
Paul D. Scott
pdscott@lopds.com
California State Bar No. 145975
Admitted *Pro Hac Vice*
Lani Anne Remick
laremick@lopds.com
California State Bar No. 189889
USDC D.C. Bar No. PA0045
LAW OFFICES OF PAUL D. SCOTT, P.C.
Pier 9, Suite 100
San Francisco, California 94111
Tel:  (415) 981-1212
Fax:  (415) 981-1215

_____
JON L. PRAED, Of Counsel
jlpraed@lopds.com
D.C. Bar No. 51665
LAW OFFICES OF PAUL D. SCOTT, P.C.
Pier 9, Suite 100
San Francisco, California 94111
Tel:  (415) 981-1212
Fax:  (415) 981-1215
Attorneys for Relator

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.*<br>FLOYD LANDIS,<br>40 Shorehaven Road<br>Norwalk, CT 06850<br><br>   Plaintiff,<br>v.<br><br>Tailwind Sports Corporation<br>98 San Jacinto Blvd.<br>Suite 430<br>Austin, TX  78701<br><br>Tailwind Sports, LLC<br>5515 Security Lane, #1103<br>Rockville, Maryland<br><br>Montgomery Sports, Inc.,<br>600 Montgomery St.<br>San Francisco, CA 94111<br><br>Capital Sports & Entertainment<br>Holdings, Inc.<br>98 San Jacinto Blvd.<br>Suite 430<br>Austin, TX  78701<br><br>Thomas W. Weisel<br>7 Upper Road<br>Ross, CA  94957<br><br>Lance Armstrong<br>c/o Capital Sports and Entertainment<br>Holdings, Inc.<br>98 San Jacinto Blvd.<br>Suite 430<br>Austin, TX  78701 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 1:10-cv-00976-RLW<br><br>**SECOND AMENDED COMPLAINT**<br>**FOR VIOLATIONS OF FEDERAL**<br>**FALSE CLAIMS  ACT**<br><br>**FILED UNDER SEAL**<br>**(31 U.S.C. § 3729 *et seq.*)**<br><br>**JURY TRIAL DEMANDED** |

Johan Bruyneel )
c/o Capital Sports and Entertainment )
Holdings, Inc. )
98 San Jacinto Blvd. )
Suite 430 )
Austin, TX  78701 )
)
William J. Stapleton )
2406 Pemberton Place )
Austin, TX  78703-2548 )
)
Barton B. Knaggs )
4200 Hills Drive )
Austin, TX  78731 )
)
Ross Investments, Inc. )
One Montgomery Street, Suite 3700 )
San Francisco, California 94111 )
)
and Does 2 – 50, )
)
   Defendants. )
)
_____

## JURISDICTION, VENUE AND PRELIMINARY MATTERS

1.      This is an action to recover damages and penalties on behalf of the United
States arising from false claims, false statements, and other conduct by the defendants in
violation of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, both pre-amendment
and as amended by the Fraud Enforcement and Recovery Act of 2009, Pub. L. 111-21, 123
Stat. 1617 (2009) ("FERA"), the Patient Protection and Affordable Care Act, Pub. L. 111-
148, 124 Stat. 119 ("PPACA") (2010), and the Dodd-Frank Wall Street Reform and
Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010).  This court has
jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1345 and 31 U.S.C. § 3732.

2.      Venue is proper in the District of Columbia under 31 U.S.C. § 3732(a) and
28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the
claim occurred in this district or a defendant may be found here, and acts proscribed by
31 U.S.C. § 3729 occurred in this district.

3.      Statements by relator Floyd Landis ("relator" or "Mr. Landis") concerning

certain of the facts alleged in this second amended complaint (aka "complaint") have appeared in the news media.  This action is not based upon the public disclosure of the allegations or transactions described herein.  Mr. Landis is the original source of the information upon which the False Claims Act allegations in this complaint are based.  Mr. Landis has direct and independent knowledge of the information on which the False Claims Act allegations herein are based and he voluntarily provided the information to the United States before filing this second amended complaint.  Mr. Landis gained direct and independent knowledge through, *inter alia*, his personal experiences and communications described herein, as well as through his review of internal financial, organizational, corporate and other non-public records pertaining to the defendants and/or the allegations in the case.  Unless otherwise stated, when allegations are made based on information and belief herein, the defendants are in possession of information necessary to confirm the allegations.

4.        As required by 31 U.S.C. § 3730(b)(2), relator has served the United States Attorney General and the United States Attorney for the District of Columbia with copies of the original and first amended complaints in this matter along with written disclosures of material evidence related to the same.

## PARTIES

5.        Relator Floyd Landis is a resident of Norwalk, Connecticut and a United States citizen.  Mr. Landis is bringing this civil action for violations of 31 U.S.C. § 3729, *et seq.* for himself and on behalf of the United States Government, pursuant to 31 U.S.C. §§ 3730(b)(1) and (b)(2).  Relator Landis was a member of the United States Postal Service Cycling Team (aka the "United States Postal Service Pro Cycling Team" or "the USPS Team") from 2002 through 2004.

6.        Defendant Montgomery Sports, Inc. ("Montgomery Sports") is a business entity of unknown type which was headquartered in San Francisco, California and which is no longer in operation.  The last known address of Montgomery Sports' parent corporation, Montgomery Securities, is stated in the caption.  Thomas W. Weisel founded Montgomery Sports as part of Montgomery Securities.  Weisel served as the company's President and dominated and controlled the company.  Montgomery Sports was founded in or around 1989.  Weisel also founded and was CEO of Montgomery Securities, which he similarly

dominated and controlled.  In or around 1997, Montgomery Securities was sold to Nationsbanc (now, Bank of America), but defendant Weisel subsequently left the company in or around September 1998.  After his departure, Weisel arranged a buyout of Montgomery Sports and thereafter remained in control of the business.  In or around 1997, the name of Montgomery Sports, Inc. was changed to TWP Sports, Inc.

7.      Defendant Tailwind Sports, LLC is a limited liability company, which was organized under the laws of the State of Delaware on or about April 5, 1999 (under its former name Disson Furst and Partners, LLC).  Tailwind Sports, LLC maintained offices in Washington, D.C. at 5301 Wisconsin Avenue, Suite #325, Washington, D.C. 20015 during the time period relevant to the allegations herein.  Tailwind Sports, LLC's last known address is stated in the caption.   Tailwind Sports, LLC has also conducted business under the names Disson Furst and Partners, LLC, Disson Furst & Partners, LLC, DFP Cycling, LLC, and Tailwind Cycling, LLC and thus references to Tailwind Sports, LLC include these entities.  All have the same Federal Employee Identification Number.  On or about June 15, 1999, TWP Sports, Inc. (formerly Montgomery Sports, Inc.) transferred all of its assets to Tailwind Sports, LLC (then DFP Cycling, LLC) pursuant to a stock sale by TWP Sports, Inc. to Tailwind Sports, LLC (then DFP Cycling, LLC).  The company name was changed to Tailwind Sports, LLC in or around March 5, 2001.  Relator is informed and believes that the name Tailwind was chosen in part to reflect the initials of Thomas Weisel, who continued to dominate and control the subject business operations both before and after they were transferred from TWP Sports to Tailwind Sports, LLC (then DFP Cycling, LLC), serving as Chairman of the Board of Tailwind Sports, LLC.

8.      Defendant Tailwind Sports Corporation (aka Tailwind Sports Corp. or Tailwind Sports, Inc.) is a corporation, organized under the laws of the State of Delaware. Tailwind Sports Corporation was incorporated on or about June 25, 2002.  Tailwind Sports Corporation's last known address is stated in the caption.

9.      The operations of the two different Tailwind entities referenced above were conducted under different business names and forms during part of the period relevant to the complaint, including corporate and partnership forms, but involved the same essential business operations, and were dominated and controlled by Thomas Weisel.  In addition, on or about July 16, 2002, pursuant to a merger agreement dated July 1, 2002, Tailwind Sports,

LLC was merged into Tailwind Sports Corporation.  Accordingly, Tailwind Sports, LLC (including its predecessor names) and Tailwind Sports Corporation are collectively referred to herein as "Tailwind."  Per Delaware Secretary of State records, Tailwind Sports Corporation was dissolved on December 31, 2007.  The assets of the company were thereafter distributed to its shareholders.

10.     Defendant Thomas W. Weisel is an individual and a citizen of the United States who resides in Ross, Marin County, California.  Thomas W. Weisel was a founder of both Tailwind Sports, LLC and of Tailwind Sports, Inc., chairman of the board, and the largest shareholder.

11.     Defendant Capital Sports and Entertainment Holdings, Inc. (formerly Capital Sports Ventures, then later Capital Sports & Entertainment, Inc.) (hereinafter "CSE") is a corporation organized under the laws of the state of Texas, with headquarters in Austin, Texas.  During the period relevant to the complaint CSE has been owned and controlled, directly or indirectly, by the following defendants:  William J. Stapleton and Barton B. Knaggs.  In or around May 2004, CSE became a part owner of Tailwind with approximately a 12 percent stake in the company.

12.     Defendant Lance Armstrong is an individual and a citizen of the United States whose place of residence is unknown to relator.  Defendant Armstrong lives in Austin, Texas, and can be contacted at the business address of his agent, defendant William J. Stapleton, as listed in the caption.  In or around May 2004, Lance Armstrong obtained approximately a 12 percent interest in Tailwind.

13.     Defendant Johan Bruyneel is an individual whose place of residence is unknown to relator.  Bruyneel is a Belgian national.  Relator is informed and believes, based on statements on defendant Bruyneel's website, that he primarily resides in London, England.  His last known business address in the United States is that of defendant CSE, as listed in the caption.  Defendant Bruyneel was the managing director (aka "Director Sportif") of the USPS Team from 1998 through 2004.  In or around May 2004, Johan Bruyneel became a part owner of Tailwind with approximately a 12 percent stake in the company.

14.     Defendant William J. ("Bill") Stapleton is an individual whose place of residence is unknown to relator.  Defendant Stapleton resides in Austin, Texas, and his last known address is listed in the caption.  Defendant Stapleton is Lance Armstrong's agent and has represented him since 1995.  Defendant Stapleton founded CSE in the latter half of the 1990s and is its President.  Stapleton is the principal owner of CSE.  In or around May 2004, he became a part owner of Tailwind with approximately a 12 percent stake in the company.  He also became a board member, President and CEO of Tailwind in approximately late 2003 or early 2004 and thus, along with others, formally authorized the submission of claims to the Postal Service by Tailwind for payment during the period relevant to this complaint.

15.     Defendant Barton B. Knaggs is an individual whose place of residence is unknown to relator.  Defendant Knaggs resides in Austin, Texas at the address listed in the caption.  In approximately late 2003 or early 2004, defendant Knaggs began serving as a Director, Chief Operating Officer, and later President of Tailwind and thus, along with others, formally authorized submission of claims to the Postal Service by Tailwind for payment during the period relevant to this complaint.  He was also a Vice President of CSE from at least 2001 through the end of the USPS Contract as well as a part owner of CSE.

16.     Defendant Ross Investments, Inc. (formerly called Doe 1) is a corporation, organized under the laws of the State of Delaware.  Ross Investments was wholly owned by Thomas Weisel during the period relevant to this complaint, and he was its president.  Weisel used the corporation to hold investments, including his investment in Tailwind.  Ross Investments' last known address is stated in the caption.

17.     The true names and capacities of the defendants named above as DOES 2 through 50, inclusive, are unknown to relator, who will seek leave of court to amend the complaint to allege the names and capacities of such defendants, together with any additional charging allegations, at such time as they are ascertained.

## OWNERSHIP HISTORY OF TAILWIND CORPORATION

18.     Tailwind Sports LLC was created in April 1999.  Tailwind Sports Corporation was incorporated in June 2002.  In July 2002, Tailwind Sports Corporation merged with

Tailwind Sports LLC through the issuance of 518,200 shares of its convertible Series A preferred stock at an issue price of $5.50 and a par value of $0.001 per share. Thomas Weisel held an ownership interest in Tailwind (via his company Ross Investments) of approximately 30.1% following the merger. While the company had twelve shareholders at the time, Weisel was by far the largest shareholder of the company, and he was Chairman of the Board.

19.     Pursuant to a stock purchase agreement dated October 18, 2002, Tailwind raised $2,500,000 by issuing 454,545 shares of its convertible Series B preferred Stock at a purchase price of $5.50 and a par value of $0.001 per share. This transaction resulted in Weisel's ownership interest decreasing to 25.7% but he remained the largest shareholder of the company and Chairman of its Board.

20.     In May 2004, Tailwind raised $2,000,000 by issuing 1,250,000 shares of its convertible Series C preferred stock at a purchase price of $1.60 and a par value of $0.001 per share. This transaction resulted in Lance Armstrong, CSE and Johan Bruyneel becoming shareholders, with approximately 12 percent shares each in the company. Weisel still remained Chairman of the Board.

21.     Tailwind formally dissolved on December 31, 2007. Per the figures set forth in Tailwind financial documents, as of December 15, 2007, Weisel owned 211,474 shares of Series A preferred stock, 90,909 shares of Series B Preferred Stock, and 937,500 shares of Series C preferred stock, for a total of 1,239,883 shares out of the total 3,861,371 shares (including common shares) issued by the company (*i.e.,* approximately 32% of the outstanding shares), and he remained Chairman of the Board. According to the same documents, Lance Armstrong, Johan Bruyneel, and CSE each held 471,814 common shares or about 12.2% of the shares of the company each.

### UNITED STATES POSTAL SERVICE

22.     At all times relevant to this matter, the United States Postal Service ("USPS") has been an "independent establishment" of the United States government, responsible for providing postal service in the United States. Postal Reorganization Act of 1970, <u>Pub.L.</u> 91-

375, August 12, 1970.  The USPS is headquartered in Washington, D.C.

23.     On October 1, 1995, the USPS entered into an agreement with Montgomery Sports, a business entity dominated and controlled by defendant Weisel, for the sponsorship of a bicycle racing team owned by Montgomery Sports ("the 1995 Sponsorship Agreement").  The agreement was signed by defendant Weisel.  It was a national sponsorship agreement, and as such was funded and managed at the headquarters level in Washington, D.C.  The name given the team was the U.S. Postal Service Cycling Team ("the USPS Team" or "the Team").

<u>Payment Terms Of Sponsorship Agreements And Claims Thereunder</u>

24.     The 1995 Sponsorship Agreement was initially effective through December 31, 1996 and thereafter subject to automatic single, calendar-year extensions, unless the Postal Service elected otherwise by July 1 of the preceding year**.**  The sponsorship agreement called for the USPS to pay Montgomery Sports a net sponsorship fee of $1 million in 1996, $1.5 million in 1997, and $2 million in 1998.  For subsequent years, the agreement called for the parties to agree upon the net sponsorship fee on or before July 1 of the preceding year**.**  The 1995 Sponsorship Agreement was modified on October 11, 1996 to increase the payment for 1997 from $1,500,000 to $2,000,000.  The additional funding provided for in the modification was to be used as "a pass-through to riders for salaries." An additional $60,000 was added in 1996 to pay additional services and expenses.  The new total due under the contract was thus $3,094,125 for 1996 and 1997.

25.     On or about December 30, 1997, the contract was modified to add funds in the amount of $500,000, bringing the total to $3,594,125.

26.     On March 3, 1998, the contract was modified again to add an additional $1,500,000 for sponsorship fees in 1998, bringing the total to $5,094,125.  On or about July 21, 1998, the contract was modified, pursuant to a USPS letter dated May 25, 1998, to extend the 1995 Sponsorship Agreement for the calendar year 1999 for a sponsorship fee of $2,500,000.  An additional payment of $100,000 was also agreed upon in the same modification "for the retention of the services of Lance Armstrong for the USPS 1998

cycling season." A modification to provide the funding for these payments was executed on or about December 3, 1998. The total after these modifications was $7,694,125.

27.     On or about September 3, 1999, the 1995 Sponsorship Agreement was extended for the calendar year 2000 for the amount of $3,300,000**.** The contract called for quarterly payments of $825,000 on January 4, 2000, March 1, 2000, September 1, 2000, and December 1, 2000, bringing the total to $10,994,125.

28.     On December 9, 1999, the 1995 Sponsorship Agreement was modified to recognize DFP Cycling as a successor party to TWP Sports (formerly Montgomery Sports, Inc.) under the sponsorship agreement.

29.     On or about December 26, 2000, the USPS and DFP Cycling (later Tailwind Sports LLC) entered into a new sponsorship contract commencing on January 1, 2001 and continuing through December 31, 2004, unless terminated earlier as provided for in the agreement. (Contract No. 102592-01-F0858)   (Hereinafter, the "2000 Sponsorship Agreement").

30.     The 2000 Sponsorship Agreement set forth the following terms for payments by the USPS to DFP Cycling (aka Tailwind) in paragraph 3 of Exhibit A to the Sponsorship Agreement:

> 3.   Unless the Agreement has terminated earlier in accordance with its terms, the Sponsor shall pay the Company as follows:
>
> $1,534,500 as soon as possible after execution of Agreement
> $1,534,500 January 1, 2001
> $1,534,500 March 1, 2001
> $1,534,500 June 1, 2001
>
> A bonus pool not to exceed $100,000 in FY01 is in effect for the riders, The supplier may invoice for bonuses after they are earned per the rider's contracts.
>
> Payment of $100,000 for the Junior Cycling team will be payable on January 1, 2001
>
> $1,902,500 October 1, 2001
> $1,902,500 January 1, 2002
> $1,902,500 March 1, 2002
> $1,902,500 June 1, 2002

A bonus pool not to exceed $150,000 in FY02 is in effect for the riders. The supplier may invoice for bonuses after they are earned per the rider's contracts,

Payment of $100,000, for the Junior Cycling team will be payable on January 1, 2002

$2,058,750 October 1, 2002
$2,058,750 January 1, 2003
$2,058,750 March 1, 2003
S2,058,750 June 1, 2003

A bonus pool not to exceed $150,000 in FY03 is in effect for the riders, The supplier may invoice for bonuses after they are earned per the rider's contracts.

Payment of $100,000, for the Junior Cycling team will be payable on January 1, 2003

$2,165,000 October 1, 2003
$2,165,000 January 1, 2004
$2,165,000 March 1, 2004
$2,165,000 June 1, 2004

A bonus pool not to exceed $150,000 in FY04 is in effect for the riders. The supplier may invoice for bonuses after they are earned per the rider's contracts.

31.     On or about March 24, 2003, the 2000 Sponsorship Agreement was modified to correct the contractor's name and address and tax ID "due to incorporation of the firm." The modification specified that "[a]ll references in the Sponsorship Agreement to Company shall now mean Tailwind Sports Corporation."

32.     On or about June 29, 2004, the USPS ended its sponsorship of the USPS Team by not renewing the 2000 Sponsorship Agreement past December 31, 2004.

33.     Between January 1, 2001 and October 20, 2004, at least $31,442,262.57 was paid by the USPS to Tailwind, pursuant to requests for payment that the defendants caused to be presented to the USPS on or about the dates set forth in, and pursuant to the payment terms of, the 2000 Sponsorship Agreement and the modifications thereto.

34.     Attached as Exhibit 1 is a listing of payments to Tailwind by the USPS,

pursuant to the 2000 Sponsorship Agreement.

35.     Included in these amounts were payments on claims for the bonus pool
amounts referenced in the agreement (i.e., claims for amounts beyond the specified quarterly
payments).  The bonus pool claims by defendants were based on bonus payments being
made by Tailwind (aka DFP Cycling) to riders, including Lance Armstrong, during the
period of the contract.  For example, Armstrong received a $1,147,000 bonus in connection
with his Tour De France win in 2001, and Tyler Hamilton received a $150,000 bonus the
same year.  Tailwind (aka DFP Cycling) relied on these payments to claim and receive a
bonus pool amount from the USPS of $100,000 (the maximum amount) on or about August
7, 2001 per the 2000 Sponsorship Agreement.  Defendants were also paid more than $10.9
million in 2000 and earlier, pursuant to the payment terms of the 1995 Sponsorship
Agreement, including $825,000 that, relator is informed and believes, was paid to and
accepted by defendants on or about August 25, 2000, per the terms of that agreement.

<u>Clauses in Sponsorship Agreements Relating to Doping</u>

36.     The 1995 Sponsorship Agreement included the following clauses relating to
doping (i.e., the use of prohibited substances or prohibited methods to increase athletic
performance):

**9. Default; Remedies; Changed Circumstances.**

(a) The following events shall constitute an event of default ("Event of Default")
under this agreement regardless of whether any such event shall be voluntary or
involuntary or shall result from the operation of applicable laws, rules or
regulations or shall be pursuant to or in compliance with any judgment, decree or
order of any court of competent jurisdiction:

(i) Either party shall make any material misrepresentation or shall materially
        breach any warranty made herein;

                                    ***

**13. Governing Law and Rules**.

The validity, interpretation and construction of this Agreement, and all other
matters related to this Agreement, shall be interpreted and governed by the federal
laws of the United States of America. The performance of the obligations of the
parties under this Agreement shall at all times and in all events be subject to
compliance with all applicable rules of the *Union Cycliste lnternationale,* the
*Federation Internationale du Cyclisme Professionel;* the United States

Professional Cycling Federation, Inc., the International Olympic Committee, the United States Olympic Committee, the International Amateur Cycling Federation, the United States Cycling Federation and all other governing organizations.

37.     The 2000 Sponsorship Contract included the following clauses relating to doping:

**8. Default; Remedies; Changed Circumstances.**

(a) The following events shall constitute an event of default ("Event of Default") under this agreement regardless of whether any such event shall be voluntary or involuntary or shall result from the operation of applicable laws, rules or regulations or shall be pursuant to or in compliance with any judgment, decree or order of any court of competent jurisdiction:

(i)     Either party shall make any material misrepresentation or shall materially breach any warranty made herein;

\*\*\*

(iv)     The Company fails to take immediate action without notification by the Sponsor in a case of a rider or Team offense related to a morals or drug clause violation.

(v)     There is negative publicity associated with an individual rider or team support personnel, either permanent or temporary, due to misconduct such as but not limited to, failed drug or medical tests, alleged possession, use or sale of banned substances, or a conviction of a crime.

**9. Promotional Rights and Activities**

\*\*\*

Company represents that each rider on the Team has a morals turpitude and drug clause that allows the Company to suspend or terminate the rider for cause which shall include items such as (1) conviction of a felony; (2) acts that require the Team to suspend or terminate the rider under the applicable rules of the Union Cycliste Internationale, the Federation Internationale du Cyc1isme Professionel; the United States Professional Cycling Federation, Inc.; the International Olympic Committee; the International Amateur Cycling Federation; the United States Cycling Federation and all other applicable governing organizations; (3) failure to pass drug or medical tests; (4) inappropriate drug conduct prejudicial to the Team, or the Postal Service, which is in violation of the Team rules or commonly accepted standards of morality; and (5) gross neglect of the rider's duty.

If any rider on the Team is found guilty of such offense, the Company agrees to take appropriate action within thirty (30) days**.**

\*\*\*

**12. Governing Law and Rules.** The validity, interpretation and construction of this Agreement, and all other matters related to this Agreement, shall be interpreted and governed by the federal laws of the United States of America. The performance of the obligations of the parties under this Agreement shall at all times and in all events be subject to compliance with all applicable rules of the Union Cycliste Internationale, the Federation Internationale du Cyclisme Professionel; the United States Professional Cycling Federation, Inc., the International Olympic Committee, the United States Olympic Committee, the International Amateur Cycling Federation, the United States Cycling Federation and all other governing organizations.

\* \* \*

**4.  Indemnification.**  The Company agrees to indemnify, defend and hold the Sponsor, its subsidiaries and the affiliates of each entity, as well as each officer, agent, distributor, employee, attorney, dealer, consultant, representative, contractor, successor and assignee of any of the above, harmless from and against any and all expenses, damages, claims, suits, losses, action, judgments, liabilities and costs whatsoever (including, without limitation, attorneys fees) arising out of:  (i)  the Company's breach, misrepresentation or nonperformance under this Agreement; and (ii) any claim or action for personal injury, death, bodily injury, property damage or otherwise, suffered by participants, patrons or others at the Company; other than as a result of the Sponsor's actions or negligence,

        USPS Contracting Policy

38.     At all times relevant hereto, USPS contracting policy, as reflected in the applicable USPS Purchasing Manual, provided, among other things, that "persons known to engage in the illegal use, possession, sale, or transfer of narcotics or other drugs" and "persons who knowingly submit false data or conceal data for the purpose of gaining employment" were ineligible to perform services under a USPS contract.

39.     At all times relevant hereto, USPS contracting policy, as reflected in the applicable USPS Purchasing Manual, provided, among other things, that a USPS contractor could be debarred from further contracting with the USPS based on "violations of a Postal Service contract so serious as to justify debarment," such as "willful failure to perform a

Postal Service contract in accordance with the specifications."  USPS contracting policy further provided that a contractor could be debarred for "any other cause of such serious and compelling nature, affecting responsibility as a supplier."  At certain times relevant hereto, the USPS Purchasing Manual specifically listed "violation of a contract clause concerning the maintenance of a drug-free workplace" and "commission of . . . falsification of or destruction of records, [or] making false statements" as bases for debarment.  At all times relevant hereto, USPS contracting policy further provided that, for purposes of debarment, "the criminal, fraudulent or seriously improper conduct of an individual may be imputed to the firm with which he or she has been connected when a grave impropriety . . . was effected by him or her with the knowledge or approval of the firm."

40.     At all times relevant hereto, USPS contracting policy, as reflected in the applicable USPS Purchasing Manual, provided, among other things, that a USPS contractor could be suspended upon indictment or conviction for any offense "indicating a lack of business integrity or business honesty that seriously and directly affects present responsibility as a supplier."  USPS contracting policy further provided that a USPS contractor could be suspended for any "cause of such serious and compelling nature, affecting responsibility as a supplier, as may be determined [by the USPS] to warrant suspension."

41.     At all times relevant hereto, USPS contracting policy, as reflected in the applicable USPS Purchasing Manual, provided that submission of an invoice to the USPS for payment was a certification that, among other things, "any services being billed for have been performed in accordance with the contract requirements."  USPS contracting policy further provided that any supplier "shall, promptly upon discovery, refund (i) any overpayment made by the Postal Service for service performed, or (ii) any payment made by the Postal Service for service not rendered."

## USPS RIDER AGREEMENTS

<u>USPS Rider Contracts</u>

42.     The October 8, 2001 Professional Rider Agreement executed by Floyd Landis
with Tailwind for the 2002 season included the following language:

3.  **Conduct of Rider**

Rider shall perform Racing Services under this Agreement at such times as shall be
necessary, unless he is physically impeded (i.e. injury, or other). Such Racing
Services shall be coordinated through the President of the Company or his designee,
provided, however, that Rider shall be given reasonable notice of the said events;
Rider agrees to abide by the rules and regulations of Union Cycliste Internationale
("UCI"), the Federation Internationale du Cyclisme Professionnel ("FICP"), the
United States Professional Cycling Federation, Inc. ("USPRO"), and any other
governing bodies (collectively referred to hereunder as "Governing Bodies"). Rider
is expected to fully cooperate with the Company and the Team; conduct himself on
and off the road according to the highest standards of honesty, citizenship, and
sportsmanship; not do anything that is materially detrimental or materially
prejudicial to the best interests of the Team; and behave in an exemplary manner as
a professional racing cyclist to the satisfaction of the Company.

Rider agrees to make no public statements which are intentionally inaccurate and
damaging to the reputation of the Company, the Team, Team personnel or members, any
organizations affiliated with the Company or the Company's
sponsors and/or sponsor's events. That obligation will survive any termination of
this Agreement.

In case of complaints, Rider shall submit such complaints first to the Company and
discuss such complaints with the Company before making them public.
For violation of the Constitution and Regulations of the UCI and applicable
National Federations, Team Rules and Code of Conduct if one is provided to the
Rider, any breach of any provision of this Agreement, or for any conduct impairing
the faithful and thorough discharge of the duties incumbent upon the Rider, the
Company may reasonably impose fines and/or suspensions with or without
compensation of the Rider, under the terms of the Constitution and Regulations of
the UCI and applicable National Federations, by providing Rider with proper notice
in writing.

* * *

6.  **Rider's Condition and Drug or Medical Tests.**

Rider understands it is imperative he refrains from the use of drugs, intoxicants,
alcohol, narcotics or any other controlled substance or stimulant while training,
traveling or competing for the Team. Rider represents to the Company that he is

not currently using drugs, intoxicants, alcohol, narcotics or any other controlled substance or performance enhancing substance. Rider may be disciplined up to and including termination for possession, consumption, not being free of or using any drugs, drug paraphernalia, intoxicants, alcohol, narcotics or any other controlled substance or performance enhancing substance while training, traveling or performing for the Team.

Because prescription medication could be deemed to be a prohibited drug by the UCI, FICP, USPRO or other Governing Bodies, it is the Rider's responsibility to ensure that he is aware of which prescription medications are prohibited drugs by UCI, FICP, USPRO or other Governing Bodies and to notify the Company and the Team if he is taking such prohibited drug so that the Company and the Team may monitor compliance with the applicable rules of UCI, FICP, USPRO and other Governing Bodies. Rider understands that any prescription medication may be taken only under medical supervision.

Under certain circumstances, the Company and the Team may require Rider to undergo drug and/or alcohol testing. When the Company and the Team have reasonable suspicion that Rider is using drugs, intoxicants, alcohol, narcotics, or any other controlled substance or performance enhancing substance, Rider may be referred to a certified testing laboratory for completion of the tests. Rider also understands that the UCI, FICP, USPRO and other Governing Bodies may conduct drug or medical control tests for prohibited or controlled substances from time to time. Rider shall be available for and cooperate with all such tests. In the event that Rider unreasonably refuses to take any such test or Rider fails any such test for any reason, then the Company shall have the right to terminate this Agreement in accordance with the Termination provision in this Agreement or suspend Rider under the terms of the UCI Regulations or those of its affiliated Federations, by providing Rider with proper notice in writing.

43.     The rider agreements executed by Tailwind with most other USPS Team members during the relevant period included substantively the same language as that set forth above on the topic of performance enhancing drugs and doping.  One notable exception, however, was Lance Armstrong's contract with Tailwind.

Lance Armstrong's Contract with Tailwind

44.     Lance Armstrong entered into a letter agreement on or about October 10, 2000 with Tailwind (then Disson Furst & Partners) with regard to his services on behalf of the Team between 2001 and 2004.  The agreement provided it was to become effective "upon the execution of the new sponsorship agreement between DF&P [now Tailwind] and the

United States Postal Service."

45.     The October 10, 2000 letter agreement indicates that Armstrong was to receive at least $15 million in base salary for the 2001-2004 period, plus at least $7 million in bonuses if he won the Tour de France ("TDF") in those years.  He was also promised numerous other potential bonuses for winning smaller races and meeting other goals.

46.     The October 10, 2000 agreement also provided as follows:  "Under no circumstance will the salaries of Armstrong, Roberto Heras, or Johan Bruyneel be decreased should the team's annual budget fall below $12,500,000.  However, should the budget fall below $12,500,000, other rider and staff salaries may need to be decreased in order for the team to enjoy an acceptable level of profitability."

47.     As Armstrong "won" the Tour de France in each of 2001-2004, relator is informed and believes Armstrong would have received at least the amounts set forth in his Agreement with Tailwind.

48.     An Addendum to the letter agreement ("Addendum") was later executed by Armstrong and Tailwind in or around January 2001.  The addendum promised Armstrong additional millions of dollars in bonuses between 2001 and 2004 if his string of consecutive Tour de France wins continued into those years as well, with the understanding being that Tailwind would acquire insurance from SCA Promotions to cover the additional amounts.

49.     Notably, neither the agreement nor the addendum contained language prohibiting Armstrong from doping.  The October 10, 2000 agreement contained language providing for the possibility of Armstrong getting injured or retiring, but it was silent on the subject of doping.  It also made no reference to compliance with the rules of the World Anti-Doping Agency, Union Cycliste Internationale, U.S. Anti-Doping Agency, or USA Cycling. The agreement stated it "contains the entire agreement of the parties relative to this subject matter and supercedes any other prior understandings, written or oral, between the parties until they execute a more detailed agreement mutually agreeable to both parties."  Relator is informed and believes that "a more detailed agreement" was never written.

50.     Relator is informed and believes that the absence of any language regarding

doping in the October 10, 2000 agreement reflected the parties' implicit understanding that Armstrong was, in fact, doping and would continue to do so during the period of the agreement.

51.      The absence of such language in Armstrong's contract also contradicted the following material representation, *inter alia*, by Tailwind in the 2000 Sponsorship Agreement:  "Company represents that each rider on the Team has a morals turpitude and drug clause that allows the Company to suspend or terminate the rider for cause  . . ."

52.      Notwithstanding the absence of provisions regarding doping in Armstrong's October 10, 2000 contract with Tailwind, Armstrong was aware that doping was prohibited and, despite his knowledge of his own and other team members' doping, he agreed with the other defendants on, and also caused, along with others, Tailwind's submission of false claims to the Postal Service to get claims paid by the United States under the 1995 and 2000 Sponsorship Agreements.

## DEFENDANTS' CONTACTS WITH WASHINGTON, D.C.

53.      The 1995 and 2000 Sponsorship contracts between the USPS and defendants Montgomery Sports and Tailwind were all national sponsorship contracts.  As such, the contracts were managed and funded at a national level by the U.S. Postal Service, which has its headquarters in Washington, D.C.  The 1995 Sponsorship Agreement was signed by Susan M. Brownell, a Contracting Officer located at USPS Headquarters, 475 L'Enfant Plaza, Washington, D.C.  Numerous modifications to each of the Sponsorship Agreements were also issued during the time period relevant to this complaint by the USPS at its headquarters in Washington, D.C.

54.      Defendant Tailwind maintained an office in Washington, D.C. during the time period relevant to this complaint.  On or about December 9, 1999, when the 1995 Sponsorship Contract was modified to recognize DFP Cycling, LLP (aka Tailwind Sports, LLC) as the successor in interest to TWP Sports, the address listed for DFP Cycling, LLP on the modification was 5301 Wisconsin Avenue, N.W., Washington, D.C.

55.      Tailwind submitted claims for payments under the 2000 Sponsorship

Agreement to the USPS in Washington, D.C., and was paid.  For example, on or about December 26, 2000, DFP Cycling (aka Tailwind) submitted two invoices for $1,534,500 each, along with another invoice for $100,000, to the USPS at 475 L'Enfant Plaza, Room 4541, Washington, D.C.  The claims were all subsequently paid and approved by USPS headquarters in Washington, D.C. on or about January 10, 2001.  Similarly, on January 29, 2001 and April 26, 2001, claims for $1,534,500 each were submitted by DFP Cycling (aka Tailwind) to the USPS at the same location and those claims were processed and paid by USPS.  The January 29, 2001 invoice was paid in full by the USPS on or about March 1, 2001, and $1,529,500 was paid to the defendants by the USPS on the April 26, 2001 invoice on or about June 6, 2001.   On August 20, 2001, an additional claim for $1,902,500 was submitted by Tailwind to the USPS in Washington, D.C., and that claim was paid by the USPS on or about October 1, 2001.

56.    Defendants Montgomery Sports, Tailwind, and CSE, and their representatives, including some or all of the individual defendants, must necessarily have met with and or communicated with USPS executives in Washington, D.C. in connection with their negotiations, agreements, implementation, and payment upon the sponsorship contracts referenced herein.

57.    During the time period relevant to this complaint, relator is informed and believes based on the allegations herein, that defendants Montgomery Sports, Tailwind, and CSE, and their representatives, including Thomas Weisel and William Stapleton, attended meetings in Washington, D.C., at which they failed to disclose and otherwise knowingly concealed from the USPS the highly material fact that defendants were engaged in a systematic program of doping USPS Team athletes to achieve success in professional cycling.  Further information regarding defendants' activities in Washington, D.C. is within defendants' control, and relator believes a reasonable opportunity for discovery will provide additional evidentiary support for relator's allegations.

58.    During the time period relevant to this complaint, relator is informed and believes, based on the allegations herein, that defendants Montgomery Sports, Tailwind, and

CSE, and their representatives, including Thomas Weisel and William Stapleton, when calling by telephone, corresponding by mail, and emailing USPS executives in Washington, D.C., failed to disclose and otherwise knowingly concealed from the USPS the highly material fact that defendants were engaged in a systematic program of doping USPS Team athletes to achieve success in professional cycling.  Further information regarding defendants' activities in Washington, D.C. is within defendants' control and relator believes a reasonable opportunity for discovery will provide evidentiary support for relator's allegations.

59.    On or about June 1, 2001, the USPS held a special rally and flag presentation in Washington, D.C. for members of the USPS Team.  A giant U.S. Postal Service jersey was also unveiled at the event and later taken on a tour of other cities in the United States. At no point in Washington, D.C. or elsewhere did the defendants disclose to the USPS that they were engaged in doping USPS Team athletes.  To the contrary, the defendants, including Lance Armstrong, misled the USPS at the event in Washington, D.C. and elsewhere about the doping of the team and the reasons for its success.

### PERFORMANCE ENHANCING DRUGS AND BLOOD DOPING

60.    The term "doping" is used broadly to refer to any use of prohibited substances or prohibited methods to increase athletic performance.

61.    The practice of "blood doping" involves the use of artificial means to increase an individual's red blood cell count, which increases the oxygen carrying capacity of the person's blood and thus improves their endurance.  Until the 1980s, the practice of blood doping generally involved removing and storing a person's own blood, waiting a few weeks until the red blood cell count in the individual had been restored, then re-injecting the stored red blood cells.  An alternative approach used was to add a donor's red blood cells.

62.    In the 1990s, the use of Erythropoietin ("EPO") became more common in blood doping.  EPO is a protein hormone responsible for stimulating the production of red blood cells in the human body.  It is a naturally occurring hormone, produced by the kidneys, but can also be produced in the lab.  The human recombinant (*i.e.,* lab) version of

EPO was developed for treating the reduction in red blood cells associated with certain diseases or surgery.  When an athlete uses EPO, it can stimulate their body to produce red blood cells to increase the flow of oxygen to their muscles and thus increase their endurance during sporting events.

63.     Anabolic steroids are synthetic steroids that have the effect of human steroids, like testosterone.  If taken by an athlete, anabolic steroids can increase athletic performance, by increasing the pace of muscle development, strength, and endurance.  Testosterone can be taken by a variety of methods, including intramuscular injection, patches and gels.   It is categorized as a Schedule III controlled substance under the Anabolic Steroid Control Act, Pub. L. No. 101-647, title XIX, §§ 1901-05.

64.     Corticosteroids are synthetic drugs that rapidly reduce inflammation and pain. While they can be used for certain legitimate uses, like intra-articular hip injections to reduce inflammation in a damaged joint, they can also be used as performance enhancing drugs if used intramuscularly.  Relator's understanding is that injectable corticosteroids are available by prescription only.

65.     Human Growth Hormone (HGH) is produced naturally by the human body and can also be produced synthetically.  Recombinant (*i.e.,* synthetic) HGH is sometimes administered to athletes in order to reduce the level of subcutaneous fat.  It also has the effect of increasing the size and strength of an athlete's muscles and can aid in recovery from strenuous exercise and injuries.  HGH is also categorized as a Schedule III controlled substance under the Anabolic Steroid Control Act, Pub. L. No. 101-647, title XIX, §§ 1901-05.

66.     It is illegal under federal law to distribute Schedule III substances without a prescription and medical necessity.

## GOVERNING BODIES OVER CYCLING

67.     In addition to being subject to federal laws relating to controlled substances, the sport of cycling is also governed by various international and national bodies.

68.     The International Olympic Committee ("IOC"), which governs all Olympic

sports including cycling and all participating nations including the United States, and describes itself as the "supreme authority of the Olympic movement."  The role of the IOC includes "lead[ing] the fight against doping in sport."

69.     In furtherance of its fight against doping, the IOC currently recognizes the World Anti-Doping Agency ("WADA"), which is a private law foundation based in Lauserne, Switzerland, with its headquarters in Montreal, Canada.  According to its website, WADA was "established in 1999 as an international independent agency composed and funded equally by the sport movement and governments of the world."

70.     Prior to WADA's establishment of the World Anti-Doping Code ("WADC") as described below, the IOC was the principal international authority addressing doping.

71.     The IOC promulgated the Olympic Movement Anti-Doping Code ("OMAC"), a version of which was entered into force on January 1, 2000.  In Appendix A, the OMAC referenced anabolic steroids like testosterone, HGH, and EPO in the list of prohibited substances and also listed blood doping as a prohibited method.

72.     On May 15, 2001, the Executive Board of the IOC, upon recommendation of the Board of the WADA agreed on a list of prohibited classes of substances and prohibited methods, which substituted Appendix A of the OMAC with the new list.  Anabolic steroids (*e.g.*, testosterone), along with HGH and EPO, were included in the revised list of prohibited substances, and blood doping was included as a prohibited method.

73.     In 2003, WADA promulgated the World Anti-Doping Code ("WADC"), which was ratified by various national sports organizations in Copenhagen and went into effect on January 1, 2004.  The WADC requires international and national Olympic sports organizations to incorporate most of its anti-doping provisions by reference.  The WADC provided for the publication of a list of Prohibited Substances and Prohibited Methods each year.  To relator's knowledge, the list of Prohibited Substances and Prohibited Methods promulgated pursuant to the WADC has never permitted the use of anabolic steroids (*e.g.*, testosterone), HGH, EPO or blood doping as described herein.

74.     Also on the international level of Olympic sports organization, each

participating sport has its own International Sports Federation (IF).  The IF for cycling is the International Union of Cyclists (or Union Cycliste Internationale) ("UCI").  In July 2004, the UCI elected to accept the World Anti-Doping Code, incorporating the WADC into the UCI's Anti-Doping Rules ("UCI ADR") effective August 13, 2004.  Prior to that time, the UCI had its own rules prohibiting the use of anabolic steroids (*e.g.*, testosterone), HGH, EPO or blood doping as described herein.  Such rules were in effect at UCI at the time the 2000 Sponsorship Agreement was signed and while it was in effect.  Such rules were also in effect at UCI during the period governed by the 1995 Sponsorship Agreement and relevant to this case.

75.     At the national level of sports organization, each country has its own National Olympic Committee (NOC) and each sport has its own National Governing Body (NGB). The NOC for the United States is the United States Olympic Committee (USOC), and the NGB for cycling in the United States is USA Cycling (which is the successor of two former entities known as the United States Professional Cycling Federation (USPRO) and the United States Cycling Federation).

76.     In 2000, the U.S. Anti-Doping Agency ("USADA"), a non-profit, non-government entity, was formed as the national anti-doping organization for the Olympic Movement in the United States.  USADA has implemented a set of anti-doping rules, called the USADA Protocol for Olympic Movement Testing (the USADA Protocol), which has been incorporated into the USOC national anti-doping policies, and which USADA is responsible for implementing.  In addition to anti-doping rules imposed by the IFs (such as the UCI ADR for cycling discussed above), the USOC requires NGBs such as USA Cycling to adhere to both the USADA Protocol and to the USOC National Anti-Doping Policies.  To relator's knowledge, USADA, at all times relevant herein, has always prohibited the use of anabolic steroids (*e.g.,* testosterone), HGH, EPO or blood doping as described herein.

77.     USA Cycling describes itself as "the official governing body for all disciplines of competitive cycling in the United States."  To become licensed by USA Cycling, current members must agree to a code of conduct that includes compliance with the anti-doping

rules promulgated by WADA.

78.     USA Cycling's Bylaws require that "[a]ll Directors, Sport Committee members, employees, and other agents of USA Cycling" to "[e]nsure that USA Cycling adheres to the applicable rules, regulations, and policies of. . . international sport governing bodies with which  USA Cycling are affiliated," which includes the UCI.

79.     Despite the clear prohibitions on doping set forth by the above organizations, and the clear incorporation of the rules of these organizations in the 1995 and 2000 Sponsorship Agreements, the USPS team systematically and knowingly evaded testing protocols and sought to enhance USPS Team members' performances with prohibited substances and prohibited methods.

### THE U.S. POSTAL SERVICE PRO CYCLING TEAM

80.     Mr. Landis signed a contract with Tailwind in 2001 to become a member of the USPS Team and to race with the team throughout the 2002 season.  Relator Landis was a member of the USPS Team from 2002 through 2004.

81.     In or around late 2001 (after the 2001 racing season had ended), Mr. Landis had a discussion with defendant Bruyneel, the managing director of the team, at a team training camp in Austin, Texas regarding what would be expected of Mr. Landis as a team member with regard to the use of performance enhancing drugs.  When Mr. Landis inquired explicitly about the topic, he was advised by Mr. Bruyneel that when the time came and he needed a little "help," Mr. Bruyneel would tell him what to do and how to do it.

82.     On or about June 2002, at the end of the 2002 Dauphine Libere cycling road race and prior to start of the 2002 Tour de France, Mr. Landis was approached by Mr. Bruyneel in his hotel room in Grenoble, France.  In that meeting, Mr. Bruyneel told Mr. Landis that, when Mr. Landis arrived in St. Moritz, Switzerland, defendant Lance Armstrong would give him some testosterone patches and that team adviser and Italian physician Dr. Michele Ferrari ("Dr. Ferrari") would help him extract a half liter of blood to be re-infused during the Tour de France.  (It has been widely reported that Dr. Ferrari worked with the USPS Team until October 2004, when he was convicted in Italy of charges involving doping

athletes.  The conviction was later reversed on appeal in 2006).

83.     In the same meeting, Mr. Bruyneel told Mr. Landis at that time that the testosterone patches should be worn two out of three days after hard training for eight to ten hours at night, which would be relatively free of risk of detection.  He also explained that Dr. Ferrari would tell Mr. Landis about how the blood transfusion would work.

84.     Following his conversation with Mr. Bruyneel, Mr. Landis flew on a helicopter with defendant Armstrong from the finish of the Dauphine Libere to St Moritz, Switzerland.  Upon his arrival there, Mr. Landis went to defendant Armstrong's apartment, where Mr. Armstrong gave him a package of 2.5 ml testosterone patches in front of Mr. Armstrong's wife at the time, Kirsten Armstrong.

85.     Several days later, Dr. Ferrari discussed with Mr. Landis how the blood transfusion process would work.  Mr. Landis subsequently met with Dr. Ferrari at defendant Armstrong's apartment, where Dr. Ferrari performed an extraction of half a liter of Mr. Landis' blood, which he explained at the time to Mr. Landis would be transfused back into Mr. Landis during the Tour de France.  This was the first occasion on which Mr. Landis had participated in blood manipulation of any kind and did so at the explicit initiation of individuals charged with authority and acting on behalf of Tailwind and its principals, including Bruyneel.

86.     Defendant Armstrong did not witness the blood extraction in his apartment, but he was aware that it had taken place and was present in the apartment at the time.  Mr. Landis and defendant Armstrong had lengthy discussions about the extraction on training rides in St. Moritz in or around June of 2002, during which time defendant Armstrong also explained to Mr. Landis the evolution of EPO testing and how transfusions were now necessary due to the new test, *i.e.,* EPO could no longer be used during races in large quantities (subcutaneously) without detection.

87.     Defendant Armstrong also divulged to Mr. Landis during the same rides in or around June 2002 that he had used EPO himself since early in his professional bicycle racing career.  Specifically, defendant Armstrong stated to Mr. Landis that in 2001, the first year

the EPO test was used, he had been told by Dr. Ferrari, who had access to the new test, that he should not use EPO anymore subcutaneously, but he did not believe Dr. Ferrari and continued to use it.  Defendant Armstrong further stated that he subsequently tested positive for EPO while winning the Tour de Suisse, the month before the Tour de France in 2001, at which point he and Mr. Bruyneel flew to the UCI headquarters and made a financial agreement with Mr. Hein Verbruggen, head of UCI at the time, to keep the positive test hidden.

88.      During the 2002 Tour de France, Mr. Landis was transfused with the half liter of his blood that had been previously extracted.  The transfusion took place during stage 8 of the Tour de France, the evening before the individual time trial.  The USPS team doctor, Jose Louise Gonzales del Moral asked Mr. Landis to come to his room where Mr. Landis met defendant Armstrong.  Mr. Landis and defendant Armstrong then lay on opposite sides of the bed and received re-infusions of a half-liter of blood each while defendant Bruyneel sat in a chair watching and commented on how well the two were going to race the following day in the time trial.

89.      Defendant Armstrong placed second and Mr. Landis placed fifteenth in the subsequent time trial.  After the time trial, defendant Armstrong commented to Mr. Landis that he was disappointed with the result and believed a potential cause may have been that the blood infused into them had not been stored properly.  Defendant Armstrong further commented that he expected to do well in the final week of the tour as he had a second half liter of blood stored that had been stored differently than the first bag.  This prediction turned out to be accurate, as defendant Armstrong went on to win the 2002 Tour de France.

90.      In approximately October 2002, Mr. Landis met with defendant Stapleton of CSE in his office next to the Four Seasons Hotel in Austin, Texas to discuss a renewal of his contract for the next two years.  In the meeting, Mr. Stapleton specifically referenced the fact that he was aware of the extent to which Mr. Landis had been doping, and commented on the fact that the Team could help him with further doping to help improve his performance further.

91.     Mr. Landis is informed and believes, based on the facts detailed herein, that at all times relevant to this complaint, Mr. Stapleton was knowledgeable about, and approved of, the doping program involving the USPS Team and the other misconduct described herein throughout the period of the 2000 Sponsorship Agreement, including the submission of false claims for payment to the United States.   Additional facts concerning Mr. Stapleton's knowledge are within defendants' control and relator believes a reasonable opportunity for discovery will provide evidentiary support for relator's allegations.

92.     In or around January 2003, Mr. Landis crashed during training and broke his right hip, requiring surgery.  Following a second surgery on his hip in or around May 2003, Mr. Landis flew to Valencia to meet defendant Bruyneel and the team Doctor to inspect his hip.  After training for a period of time at that location, he flew to Gerona, Spain.  Once there, pursuant to prior instructions given to him by defendant Bruyneel, Mr. Landis went to defendant Armstrong's apartment, where he met Dr. Ferrari, who drew half a liter of blood and placed it in a refrigerator hidden in the closet of the master bedroom.  The bag was stored in the refrigerator along with several other bags of blood that were already inside.

93.     Shortly thereafter, defendant Armstrong asked Mr. Landis to stay in the apartment to take care of the blood being stored in the refrigerator there.  Defendant Armstrong explained to Mr. Landis at the time that he would be gone for a few weeks to train, so he wanted Mr. Landis to check the temperature of the blood each day and make sure there were no problems with the electricity or the refrigerator.  Mr. Landis agreed to this request and stayed in the apartment.

94.     Approximately three weeks after the first blood draw in defendant Armstrong's Gerona apartment, Mr. Landis then had an additional half liter of blood removed by Dr. Ferrari.  More specifically, Dr. Ferrari removed two half liters of blood but also re-infused the half liter he had previously withdrawn.  This was done, according to Dr. Ferrari, to ensure that the blood was fresh.  This same technique was then used shortly before the beginning of the 2003 Tour de France, once again to ensure the freshness of the blood.  Defendant Bruyneel arranged schedules for these sessions by calling Mr. Landis and

arranging Dr. Ferrari's visits.

95.     During the same period while Mr. Landis was staying at defendant Armstrong's apartment, USPS Team member George Hincapie also had blood drawn from him by Dr. Ferrari in the presence of Mr. Landis.  That blood, like Mr. Landis' blood, was placed in the same refrigerator in defendant Armstrong's apartment.

96.     In July 2003, during the 2003 Tour de France, Mr. Landis witnessed many members of the USPS team (in addition to himself) receiving transfusions of their previously extracted blood.  Mr. Landis witnessed these transfusions on two separate occasions.

97.     On the first occasion, on or about July 11, 2003, before Stage 7, Mr. Landis was contacted by defendant Bruyneel and told to go to the team doctor's room to have his transfusion done.  Dr. Luis del Moral Garcia (aka "El Gato") met Mr. Landis there to do the transfusion.  Mr. Landis recalls defendant Armstrong, and additional USPS Team cyclists George Hincapie, Joe Luis Rubiera, and Roberto Heras were all there and had their transfusions done by the doctor at the same time.

98.     On the second occasion, on or about July 17th, after Stage 11, Mr. Landis was contacted by Mr. Bruyneel and again told to go to the team doctor's room for his transfusion. Dr. Luis del Moral Garcia met Mr. Landis there to do the transfusion.  Mr. Landis recalls that USPS Team cyclists Jose Luis Rubiera, Roberto Heras, Manuel Beltran, Victor Hugo Pena, George Hincapie (Mr. Landis' roommate at the time) and defendant Armstrong were all there and had their transfusions done by the doctor at the same time.

99.     During the same Tour de France in 2003, the team doctor Dr. Luis del Moral Garcia gave Mr. Landis and his roommate and fellow USPS cyclist George Hincapie a small syringe of olive oil in which was dissolved Andriol, a form of ingestible testosterone, on two out of every three nights, throughout the duration.  Mr. Landis inquired as to the contents of the syringe before it was ingested.  The doctor confirmed it was an olive oil and Andriol mixture.

100.    After the Tour De France, in approximately August 2003, Mr. Landis was asked by defendant Bruyneel, on behalf of Tailwind, to ride in the Vuelta a Espana cycling

road race in Spain in September 2003.  Defendant Bruyneel asked that Mr. Landis have blood drawn so that it could be transfused during the race.  Per these directions, Mr. Landis borrowed Mr. Armstrong's car and drove from Gerona to Valencia, Spain where he met defendant Bruyneel and Dr. Luis del Moral Garcia.  Because time was short, two half liters of blood were drawn, and Mr. Landis returned to Gerona.

101.    Because the withdrawal of two units of blood had left Mr. Landis' hematocrit levels quite low, defendant Bruyneel instructed Mr. Landis to meet defendant Armstrong at his apartment to get some EPO from him.

102.    Mr. Landis subsequently went to defendant Armstrong's Gerona apartment and happened to encounter Mr. Armstrong along with his wife and children in the entryway of the building.  Mr. Armstrong then handed Mr. Landis a box of EPO in full view of his then wife and three children.  The EPO was Eprex by brand and came in six pre-measured syringes.  Per the instructions of Mr. Bruyneel, Mr. Landis used the EPO intravenously for several weeks during training.  Then, shortly before the Vuelta a Espana race, Dr. Luis del Moral Garcia transfused the two half liters previously withdrawn and extracted another two.

103.    During this same period of training prior to the 2003 Vuelta, defendant Bruyneel initiated a separate conversation over the phone with Mr. Landis on how to use Human Growth Hormone (HGH).  At the direction of Mr. Bruyneel, Mr. Landis subsequently bought the HGH and Andriol that he needed from the team "trainer" Jose Marti (aka Pepe), who lived in Valencia, Spain at the time along with the team doctor Dr. Luis del Moral Garcia. Mr. Landis then spent substantial time training with fellow USPS Team members Matthew White and Michael Barry and shared, and discussed the use of, HGH, testosterone and EPO with them while training.

104.    During the 2003 Vuelta, at the direction of Mr. Bruyneel, Mr. Landis was given Andriol and blood transfusions by the team doctor Dr. Luis del Moral Garcia and did not have problems with any testing, *i.e.,* tests taken were negative.  Fellow USPS Team cyclist Roberto Heras was present for one session where Mr. Landis received a transfusion.

105.    In 2004, USPS Team personnel performed two separate blood extractions and

two transfusions on Mr. Landis under the direction of defendant Bruyneel.  In or around
May 2004, Mr. Landis flew to Belgium.  Upon his arrival, he was picked up and driven by
Dr. Dag Van Elsland to an unknown person's apartment, where blood was drawn from Mr.
Landis.

106.    In or around June 2004, Mr. Landis flew to Belgium again, to have blood
drawn again by Dr. Dag Van Elsland following the same procedure as the prior visit.

107.    In preparation for the 2004 Tour de France, the team went to Puigcerda, Spain
to train.  At that location, defendant Bruyneel and Dr. Ferrari closely monitored the team
members' blood values and administered EPO and testosterone as needed to ensure the team
was ready for the Tour de France.  A Hemocue machine (hemoglobin monitor) and
centrifuge (to determine/test hematocrit) were employed to determine blood parameter
status.  These were Dr. Ferrari's devices.  The blood drawn in Belgium was later transfused
back into Mr. Landis on two occasions during the 2004 Tour de France.

108.    On or about July 12, 2004, blood was transfused into Mr. Landis and a few
other members of the team, including defendant Armstrong, George Hincapie, and Jose
Acevedo.  Mr. Bruyneel's assistant Gert Duffeleer (aka Duffy) brought the blood to a hotel
room where the team was staying, and the team doctor Dr. Pedro Celaya did the re-
infusions.

109.    On the second occasion, the transfusion was performed on the team bus on the
ride from the finish of a stage to the hotel during which time the driver pretended to have
engine trouble and stopped on a remote mountain road for approximately an hour, so the
entire team could have half a liter of blood transfused.  This was the only time that Mr.
Landis ever saw the entire team being transfused in plain view of all the other riders and bus
driver.  That team included defendant Armstrong, George Hincapie and Mr. Landis as the
only Americans.  The other USPS riders receiving transfusions included Jose Acevedo,
Manuel Beltran, Viatcheslav Ekimov, Benjamin Noval, Pavel Padrnos and Jose Luis
Rubiera.

110.    Defendant Armstrong, with the support of the USPS Team, won the Tour de

France in 1999-2004.  Mr. Landis personally witnessed defendant Armstrong's use of prohibited substances and prohibited methods to accomplish this feat during the period of 2002-2004.  Instances of Armstrong's blood doping are described above.  Mr. Landis also witnessed Lance Armstrong lying on a massage table wearing a transdermal testosterone patch on his shoulder at the 2004 training camp in Puigcerda, Spain.  In addition, during blood transfusions where both he and Mr. Armstrong were present during the Tour de France in 2003 and 2004, Mr. Landis witnessed EPO being administered to Mr. Armstrong in small doses to counter the negative impact on reticulocytes from the blood transfusions.

111.    Mr. Landis also has direct knowledge, based on comments made by defendant Armstrong and others, and Mr. Landis' own experience with the general practices of the USPS Team during the time he was a member of the team, that defendant Armstrong's prior victories on behalf of the USPS Team, including those in the Tour de France and other races in 2000 and 2001, were accomplished while doping, and that other members of the USPS team were participating in doping as well during that same period.  The aforementioned activities were knowingly facilitated by team doctors and team management, including defendant Johan Bruyneel.

112.    Defendant Armstrong was and is also knowledgeable about doping by other members of the USPS Team during the period relevant to this complaint, but has concealed those practices, along with his own, from the USPS.

113.    In approximately April 2004, after the Paris-Roubaix race, Mr. Landis attended dinner at a restaurant in France, with defendant Bart Knaggs, Geert Dueffler, and others.  During the meal, Mr. Landis expressed concern about a shortage of equipment that was resulting from team management selling the bikes that were being provided by sponsors for the riders.  In the heated conversation that ensued, Mr. Landis commented to the effect that, while Mr. Armstrong was flying around in his own jet, the other riders should not be facing problems just obtaining the proper bike.

114.    In response to Mr. Landis' complaint, Mr. Duffeleer explained that the team management needed to sell the bikes to finance the doping program, as they needed cash for

the doping program, and the team could not just list doping as a cost item on standard expense reports.

115.    Defendant Knaggs was present during the foregoing conversation and indicated his agreement with what was being expressed by Mr. Duffeleer.  In an effort to defuse the situation, Mr. Knaggs thereafter indicated that he would talk to defendant Bill Stapleton about the situation and try to get a replacement bike for Mr. Landis.

116.    Mr. Landis is informed and believes, based on the facts detailed herein, that at all times relevant to this complaint, defendant Knaggs was knowledgeable about, and approved of, the doping program involving the USPS Team and the other misconduct described herein, including the submission of false claims for payment to the United States. Additional facts concerning Mr. Knaggs' knowledge are within defendants' control and relator believes a reasonable opportunity for discovery will provide further evidentiary support for relator's allegations.

117.    On or about the next day after the foregoing discussion in the restaurant, defendant Bruyneel called to reprimand Mr. Landis for creating an issue, indicating that the sponsors would be upset if they learned their bikes were being sold for cash, and that he would need to create a story about why the bikes were being sold.

118.    The 2004 Tour de France was the last race that Mr. Landis raced on the same team in the same race with Lance Armstrong.

119.    In 2006, Mr. Landis won the Tour de France while riding for team Phonak. He later lost his title following a drug test that showed a skewed testosterone/epitestosterone ratio during stage 17 of the race.

120.    Shortly after it was reported that he tested positive, Mr. Landis received a call on his cell phone from defendant Armstrong, who instructed Mr. Landis, if he was ever asked if he (Landis) had ever used any performance enhancing drugs, to answer "absolutely not."

### PRIVATE AND PUBLIC DENIALS/FALSE STATEMENTS

121.    Numerous false public statements were made by defendant Armstrong and

other representatives of the USPS team during the period relevant to this complaint, in order to conceal the defendants' involvement in doping from the USPS and to deceive the USPS. These false public statements include, but are not limited to, the following:

122.    On or about July 19, 1999, Mr. Armstrong publicly denied allegations that he had taken corticosteroids in connection with the 1999 Tour de France.

123.    On or about November 9, 2000, in statements published in the Austin Statesman regarding a French doping investigation relating to the USPS Team, defendant Armstrong stated, "We are absolutely innocent.  Our team will stand on its morals and record of being an anti-doping team."

124.    In the same article, Mark Gorski, the USPS team manager at the time, stated the following: ``I have discussed this matter with our team's director, Johan Bruyneel, and the team's medical staff and am absolutely convinced that there were no improprieties. . . . If there is an official inquiry, we are confident that it will find that the team was in full compliance with the strict guidelines set forth by the Union Cycliste Internationale.  We continue to adhere to a zero-tolerance policy concerning the use of substances banned by the UCI."

125.    In an interview with ABC News published on November 7, 2000 regarding the same topic, defendant Johan Bruyneel said "I continue to deny all doping allegations."

126.    In late 2000, following public allegations regarding the possibility of doping by the USPS Team, official Tailwind representatives, including Mark Gorski and Dan Osipow, reportedly made repeated representations to Gail Sonnenberg, Senior VP of Sales at the USPS, that the team was not involved in doping.  These representations were knowingly false, were made with reckless disregard for their truth or falsity, and were made to persuade the USPS to enter into the 2000 Sponsorship Agreement with Tailwind, and to have the USPS continue to make payments to Tailwind.  Relator is informed and believes, based on Weisel's degree of control over Tailwind as described herein, that Gorski and Osipow's representations to the Postal Service were authorized and approved by Weisel**.**

127.    On or about June 15, 2004, defendant Armstrong held another press

conference regarding doping allegations, making the following statements:  "I can absolutely confirm that we don't use doping products."  "This is not the first time I've lived through this.  I heard it in 1999.  I heard it in 2002, again in 2003.  It happens all the time."  "We don't use doping products and we will sue those who suggest we do."

128.    On or about August 25, 2005, in response to doping allegations pertaining to the 1999 Tour de France, Mr. Armstrong stated the following during an interview on the Larry King Live show:  "I've said it for longer than seven years:  I have never doped.  I can say it again.  But I've said it for seven years; it doesn't help.  But the fact of the matter is I haven't [doped]."

129.    When the relator's allegations regarding Mr. Armstrong were published in May 2010, defendant Armstrong once again publicly denied any involvement in doping.

130.    The foregoing representations and others by Armstrong and Tailwind officials were knowingly false, were made with reckless disregard for their truth or falsity, and were made to persuade the USPS to make payments under the 1995 Sponsorship Agreement, to persuade the USPS to enter into the 2000 Sponsorship Agreement, to have the USPS make payments to Tailwind under the 2000 Sponsorship Agreement, and to have the USPS not seek repayment of funds previously paid under either sponsorship agreement.  The representations had the desired effect of persuading the USPS that the USPS Team was not involved in doping.  The USPS reasonably believed defendants' denials to be true, while they were, in fact, knowingly false.

## THOMAS WEISEL

Background

131.    In its 1995 sponsorship proposal to the USPS, the section entitled "Background on Montgomery Sports" begins as follows:  "The guiding force behind Montgomery Sports is its President, Thomas Weisel."

132.    As described in *Capital Instincts*, the biography he authorized and co-authored, defendant Thomas Weisel is a former cyclist and longtime patron, investment manager and friend of Lance Armstrong, as well as an owner of the USPS Team, who was extensively involved in the team's management.

133.    Per the book, defendants Armstrong and Weisel have known one another since 1990, when Armstrong first rode for Weisel's cycling team.  In a foreword he wrote for the book, Armstrong described Weisel as "something of a father figure to me."

134.    As described in the book, as early as 1995, defendant Weisel and former cyclist Mark Gorski formed a plan to develop a U.S. cycling team that could win the Tour de France.  In May 1995, Weisel hired Gorski to work at Montgomery Sports.  In 1995, the team secured the USPS sponsorship.

135.    Per the biography, in 1998, Weisel was instrumental in hiring defendant Armstrong onto the USPS Team and personally paid the "bonus" portion of Armstrong's salary, which ended up totaling more than $1 million.  In 1999, defendant Weisel also personally paid the salary of USPS Team cyclist Viatcheslav Ekimov, including a $100,000 bonus.  Mr. Gorski has been quoted as saying that in the time period up to 1999, defendant Weisel spent "several million dollars" of his own money on the USPS Team.  Weisel also contributed $50,000 to Mr. Landis' defense against doping charges.

136.    When defendant Armstrong won the Tour de France in 1999, defendant Weisel was in the "follow car."  In 2000, defendant Weisel biked alongside defendant Armstrong with his arm on his shoulder during his Tour de France "victory lap" on the Champs d'Elysees.  Defendant Weisel also rode in the pace car for all of Mr. Armstrong's other Tour de France wins as a member of the USPS Team.  According to his book, defendant Weisel and Mr. Gorski "built the team specifically for the [Tour de France] . . . Weisel sought out and hired riders with all the different skills necessary to support Armstrong and help him win the Tour."  Mr. Weisel also took full credit for the success of the Team.   Mr. Weisel's book contains a chapter authored by him in which he explains "how I've applied these points [about creating a successful business] to the creation of a great sports team," *i.e.*, the USPS Team.  Photographs of Weisel's office show Armstrong's yellow jerseys hanging above his desk.

137.    Mr. Weisel's book, published in 2003, stated:  "Weisel has spent over three years reorganizing USA Cycling, and his team is largely in charge."

138.    Jim Ochowicz was part of that "team."  Thomas Weisel Partners employed Jim Ochowicz, the President of the Board of USA Cycling, during the period relevant to this complaint.  Jim Ochowicz was the President of the Board of Directors of USA Cycling from

2002 to 2008.  Ochowicz was also a broker at Weisel's investment bank between 2001 and approximately 2011.  After Thomas Weisel Partners was acquired by Stifel Financial in or around 2010, Ochowicz moved to work for Stifel, Nicolaus and Company, a subsidiary of Stifel Financial.

139.     In or around late 2006 or early 2007, Mr. Landis had a conversation with Jim Ochowicz about how Mr. Landis should respond to the adverse analytical finding he had received in the 2006 Tour de France.  The two met at Sheryl Crow's house in California but Armstrong was not present.  At the meeting, Mr. Landis openly referenced the doping program of the U.S. Postal Service team and the fact that he needed help to fight the pending doping charges against him.  Mr. Ochowicz did not express any surprise regarding Mr. Landis' references to doping on the USPS Team, implicitly indicating he already was aware of the fact, nor did he give any indication in the conversation that he planned to refer the matter to USADA, WADA or UCI for further inquiry.  To Mr. Landis' knowledge, Mr. Ochowicz took no such action to inform USADA, WADA, or UCI regarding his conversation with Mr. Landis.  Mr. Ochowicz just indicated to Mr. Landis that he would have Lance Armstrong call Mr. Landis.

140.     Mr. Weisel's "team" also included the President of UCI.

141.      Thomas Weisel Partners managed funds for Hein Verbruggen between 2001-2004 when Verbruggen was President of UCI.  Jim Ochowicz was the employee at Thomas Weisel Partners who handled the account.

142.     Hein Verbruggen and UCI failed to enforce anti-doping rules against Armstrong during the period relevant to this complaint, including 2001-2004.

143.     Hein Verbruggen and UCI also exhibited strong bias against Mr. Landis in reaction to his allegations of doping by Armstrong and the involvement of UCI.  When Mr. Landis came forward in 2010 with his allegations regarding doping in professional cycling, neither Verbruggen nor anyone associated with UCI asked Mr. Landis to meet with them to provide further details underlying his allegations.  To the contrary, since Mr. Landis came forward with his allegations, Mr. Verbruggen and UCI have engaged in a series of retaliatory personal attacks on Mr. Landis in private correspondence to Mr. Landis, in public statements to the press, and in a defamation lawsuit against Mr. Landis in Switzerland.

<u>Weisel's Knowledge</u>

144.    During the period relevant to this case, the False Claims Act provided for liability for, *inter alia*, "Any person who– (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval."  The term "knowingly" is defined to "mean that a person, with respect to information, -- (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required."

145.    Relator is informed and believes, based on the facts alleged herein, that defendant Weisel was at all relevant times knowledgeable about, and approved of, the doping program of the USPS Team and the falsity of the claims being submitted to the US Postal Service under the 1995 and 2000 Sponsorship Agreements, and that he authorized the submission of such claims by Tailwind, and agreed on their submission with the other defendants to get the claims paid by the U.S. Postal Service.  Additional facts concerning Mr. Weisel's knowledge are within defendants' control and relator believes a reasonable opportunity for discovery will provide further evidentiary support for relator's allegations.

146.    The facts also demonstrate at a minimum, however, that Weisel acted with at least reckless disregard and deliberate ignorance of the truth.

147.    During the period relevant to this complaint, the principal business of Tailwind was the operation of its pro cycling team with the majority of its funding coming from the U.S. Postal Service.

148.    As Chairman of Tailwind's board during the period relevant to this case, Mr. Weisel was aware of the company's sponsorship contracts with the U.S. Postal Service; he was aware that the Postal Service was the main sponsor of the company's pro cycling team and also its main source of revenue; he was aware or should have been aware that multiple doping allegations had been made against Lance Armstrong and medical personnel associated with the team, including, but not limited to Dr. Michelle Ferrari, from at least 1999 and later; and he was aware that the 2000 Sponsorship Agreement with the Postal

Service explicitly prohibited doping by the USPS Team.

149.    Between 1999 and 2004, public doping allegations were made against Armstrong and the USPS Team.  While none of the doping allegations ultimately succeeded in proving that Armstrong was doping or led to disciplinary action by responsible authorities, the allegations did provide a sufficient basis for Weisel to take concrete steps to investigate and prevent any doping by the USPS Team consistent with the team's obligations under its contract with the Postal Service.  This, however, did not occur.

150.    During the period relevant to this complaint, Weisel knowingly authorized claims for payment to be submitted to the Postal Service by Tailwind without taking any kind of reasonable measures to prevent doping by Armstrong or the Team.

151.    Mr. Landis has personal knowledge that during his tenure on the team no *bona fide* effort was undertaken by Tailwind to test the riders for banned substances or otherwise investigate doping by the Team.   Indeed, as described herein, Mr. Landis has personal knowledge that official representatives of the Team actively facilitated doping by riders, including instructing riders as to how and when to dope, assisting riders in evading tests, or ensuring that doping would be timed in a way so as to not be detected.  Moreover, Landis is aware from his conversations with other riders that the Team also was not testing riders for doping in 2001, prior to his arrival on the team.

152.    Tailwind's contract with its most important rider Lance Armstrong did not even mention the topic of doping or compliance with the rules that prohibited doping.  While Mr. Landis' contract, like many of Tailwind's contracts with riders other than Armstrong, contained some language technically prohibiting doping and requiring compliance with the rules, individuals acting on behalf of the team (as detailed herein) led the riders to understand that those provisions pertaining to doping were to be disregarded.

153.    Meanwhile, Armstrong's infamous doping doctor Michele Ferrari was treated as a welcome guest of the team.  In 2004, for example, Ferrari was invited to a gala held by the U.S. Postal Service Team on the night of the last stage of the Tour de France where Mr. Landis was also present.  Ferrari had been the subject of a criminal investigation in Italy since 2002 for sporting fraud and abusive exercise of the profession of pharmacist.  Weisel was in attendance at the gala event – indeed, he gave opening remarks – but to Mr. Landis' knowledge Weisel did not object to Ferrari being present and/or require him to leave.

154.    Weisel thus engaged in exactly the opposite conduct than would be expected from a board chairman who was genuinely interested in ensuring his company was engaged in square dealings with the United States Government.

<u>Personal Use of Corporate Assets</u>

155.    Mr. Weisel personally benefited from the U.S. Postal Service's sponsorship of the USPS Team in many different respects.  As discussed in more detail above, Mr. Weisel was Chairman of the Board and the largest shareholder of Tailwind during all periods relevant to this complaint and thus benefited financially from USPS funds being paid to the company by the Postal Service.

156.    Mr. Weisel also benefited financially, however, from his personal use of the company's assets, including preferential treatment by Tailwind of sponsors related to Mr. Weisel.

157.    For example, Mr. Weisel's investment banking firm Thomas Weisel Partners LLP was given preferential treatment as a sponsor of the USPS Team.  Weisel is informed and believes that Weisel was the principal shareholder of Thomas Weisel Partners LLP during the period relevant to this case.

158.    In 2002, Thomas Weisel Partners was given prominent treatment as a sponsor of the USPS Team, but it did not pay cash like other sponsors had for such privileges.  Instead, the valuable sponsorship was explained in Tailwind corporate documents as "partial in-kind for services."  Relator is informed and believes, based on his review of Tailwind corporate documents, that while other firms entered into written contracts with Tailwind in exchange for sponsorship benefits, no contract was written between Tailwind and Thomas Weisel Partners for the sponsorship benefits afforded Weisel's firm.  Nonetheless, Weisel's firm name appeared on the front and back of the team jersey and on the team shorts as well.   Additional facts concerning the terms of Thomas Weisel Partners' sponsorship of the USPS Team are within defendants' control and relator believes a reasonable opportunity for discovery will provide further evidentiary support for relator's allegations.

159.    Similarly, in 2003, plans were made for Weisel's firm again to receive the benefits of sponsorship without paying for it, with the justification being that Weisel's firm would provide some "Office rent (60k)," "Financial infrastructure/support (80k)," and "Legal

support/as needed." As Tailwind used the same office location as Thomas Weisel Partners in San Francisco (among others) during the period relevant to this case, and Thomas Weisel Partners was in the financial services business, Weisel's firm thus received sponsorship benefits for minimal out of pocket cost, while Tailwind continued to struggle financially in need of cash.

160.    Notwithstanding its failure to pay Tailwind cash for being a sponsor in 2003, Weisel's firm received generous sponsorship benefits, which included having the name Thomas Weisel Partners appear prominently in two places on the 2003 USPS Pro Team Jersey and in seven places on the 2003 Masters USPS Team Jersey.

161.    In 2004, Thomas Weisel Partners appeared at least twice on the rear of the jersey.

162.    Relator is informed and believes that in 2000-2001, Thomas Weisel Partners' name also appeared on the Team jersey, just as Weisel's prior firm name Montgomery had appeared previously on the jersey and as Thomas Weisel Partners appeared later. Relator is informed and believes, based on practices in other years, that these sponsorship benefits, along with others, were given to Weisel's firm without it executing a written contract or paying cash for the privilege. Additional facts concerning the terms of Thomas Weisel Partners' sponsorship of the USPS Team are within defendants' control and relator believes a reasonable opportunity for discovery will provide further evidentiary support for relator's allegations.

163.    Meanwhile, certain other sponsors were being asked to pay far more for sponsorship rights. Examples include Monarch Beverage Company, which produced Allsport and agreed to pay $250,000 in 2002, $350,000 in 2003, and $400,000 in 2004, plus provide 12,000 water bottles and other products, to sponsor the team. Nike paid $150,000 in cash and provided $165,000 in product at Nike's landed cost each year between 2001 and 2004. In 2003, discussions were underway with Subaru, which was being asked to pay $400,000 per year ("To Tailwind:  $350k"  "To CSE (Lance Armstrong): $50k").

164.    Based on the foregoing, Weisel's firm Thomas Weisel Partners did not pay adequate consideration for its sponsorship benefits during the period that it was a sponsor of the USPS Team.

165.    Relator is also informed and believes that Weisel engaged in less than arms-length transactions with other sponsors of the USPS Team. According to Tailwind's Financial records in 2002, the Team's sponsors, other than the Postal Service, included Yahoo!, Volkswagen, Visa, Nike, Shimano, Giro, Trek, Clif, Berry Floor, Coca Cola, and Interwoven. Relator is

informed and believes that with further discovery relator will be able to identify additional examples of preferential treatment by Tailwind of its sponsors with connections to Mr. Weisel.

166.    Mr. Weisel also benefited by his association with the fraudulent successes of the USPS Team through his business relationships with other sponsors.  For example, lavish hospitality events hosted by the Team, including events at the Tour de France during the period of the 2000 Sponsorship Agreement, were also attended by team sponsors or others with whom Mr. Weisel had or could potentially have business relationships.  Mr. Landis personally attended these events during his tenure on the team and witnessed the attendance of Weisel and of prominent business people and prospective clients of Mr. Weisel's investment banking firm at these events.

167.    Mr. Weisel also benefited from his coordination of Champions Club events.  The Champions Club was made up of individuals who had made large donations to the USA Cycling Foundation, whose board was also chaired by Weisel.  During Mr. Landis' tenure on the team, there were events during spring training camp each year where Champions Club members joined the team for a few days and rode with the team.  There were also week-long trips for the Champions Club during the Tour de France after which the members of the Club would attend a gala event with the team.  These events included individuals who were not part of the Champions Club but were, relator is informed and believes, associates or business relations of Thomas Weisel.

168.    The following relationships, among others, existed between Weisel's investment banking business and his ownership of Tailwind:  Yahoo!, a company that Weisel previously helped take public in approximately 1996 and continued to represent until at least 1999, was a co-sponsor of the USPS Team during at least 2000, 2001, and 2002.  Interwoven obtained a sponsorship of the USPS Team in 2002 for only $10,000 cash, plus stock options that ultimately proved to be worthless.  In 2003, Weisel's firm acted as the advisor for iManage in connection with its merger with Interwoven.  Amgen, which produced the Epogen brand of EPO and was a sponsor of Livestrong and the Tour of California, used Montgomery Securities to underwrite part of its initial public offering.  Montgomery Securities had holdings in 5am Ventures whose CEO was the former CEO of Nycomed Salutar, which manufactured Actovegin, a drug allegedly used by the Team during the 2000 Tour de France.  Information regarding the details of sponsors' agreements with Tailwind as well as sponsors' other business relationships and

dealings with Mr. Weisel and related entities are within the control of defendants.  Relator is informed and believes that these overlapping relationships resulted in additional instances of less than arms-length dealings by Tailwind to the benefit of Mr. Weisel.

Undercapitalization of Tailwind

169.    During the period of the 2000 Sponsorship Agreement, Weisel enjoyed the foregoing benefits as an owner of Tailwind, but he meanwhile kept the company undercapitalized to meet its foreseeable liabilities, primarily depending on the stream of income from the Postal Service to operate the company, and only providing occasional infusions of cash and/or comingling some of his own funds as necessary to keep the operation running.

170.    The company was capitalized with an initial $2.5 million contribution of equity in 1999 and through borrowings under credit facilities.  The company then lost approximately $2.425 million in 1999, $1 million in 2000, $3.86 million in 2001, and $2.9 million in 2002.  According to Tailwind's financial records from late 2003, the company was also predicted to lose approximately $425,719 in 2003, but that estimate, based on Tailwind's other predictions on its future financial performance, was likely optimistic.

171.    As of December 30, 2001, Tailwind had cash and cash equivalents of $336,616 and bank debt of $1,500,000, with negative total stockholder's equity of minus $4,681,777.

172.    As of April 2002, Tailwind had twelve owners.  Weisel remained the largest shareholder of Tailwind, with a 30.1 % ownership stake in the company via Ross Investments, a company wholly owned by Weisel.

173.    Through a private placement in 2002, Weisel further limited his own financial exposure from Tailwind, while not materially reducing his ability as Chairman to control the company, by soliciting a group of investors to contribute approximately $2.5 million dollars in return for small fractional ownership percentages in the team.  Investors received approximately a 1.55% stake in the company at the time in return for each $100,000 invested.

174.    After the private placement in 2002, the number of owners of Tailwind increased to 20 people, with Weisel remaining by far the largest shareholder, owning 25.7% of the company, a stake three times greater than any other shareholder.  John Bucksbaum and Nebris Corp (Ward Woods) were notable new shareholders, who joined the company's board after the 2002 private placement, each holding a 7.7% stake in the company.

175.    Even after the funds were raised in 2002, Tailwind was projected to have negative stockholder's equity of $2,181,777.   As of the end of 2002, the company had an accumulated deficit of $4.1 million (including consideration of the money raised through the private placement).   Per Tailwind's financial records, the company also estimated that it would have negative shareholder's equity of $5,682,412 million by the end of December 2003.

176.    As of February 2003, Tailwind corporate documents admitted that "Tailwind has managed this deficit and cash flow requirements only due to the timing of USPS advance sponsorship payments and through the use of a credit facility with First Republic Bank." "Tailwind cannot continue to operate without credit facility and/or new equity investments."

177.    When seeking approval of the 2000 Sponsorship Agreement, Tailwind represented in its proposal to the Postal Service that the proposed sponsorship payments by the government agency would constitute approximately 60-65% of Team's budget.  The reality, however, is that the Team was even more dependent on Postal Service funds.  In 2002, for example, Tailwind had total revenues of $10.239 million (excluding a sideline called the Tailwind Club) of which the Postal Service contributed $7.7 million.  Thus the Postal Service was the source of over 75% of Tailwind's revenues in 2002.

178.    In its 2002 Private Placement Memorandum, Tailwind described some of the potential liabilities Tailwind might face if the Team were found to be doping (emphasis added):

> There is a Risk of Injury or Scandal Involving our Key Riders. Professional bicycle racing is inherently a dangerous sport, and as such there is a significant risk of injury to riders. In the event that Lance Armstrong is injured and unable to race or our riders are involved in a drug scandal, certain of our key sponsorship contracts provide for a refund of a potentially large percentage of the contractual sponsorship revenue upon which we have based our projections. In addition, there has been considerable publicity since late 2000 regarding the French judicial investigation into alleged use of prohibited substances among individuals and teams competing in the Tour de France, including Lance Armstrong and the Team. To our knowledge no evidence of any use of prohibited substances by Lance Armstrong and the Team has been discovered.  In the event that Lance Armstrong or any of the Team's riders or support personnel are involved in a drug scandal that creates negative publicity for the U.S. Postal Service, the sponsorship contract can be terminated by the U.S. Postal Service. Certain of our other sponsorship contracts also contain this provision."

179.    In its 2003 Private Placement Memorandum, Tailwind warned of the same potential liabilities while eliminating the carefully worded phrase about doping not having been "discovered" (emphasis added):

There is a Risk of Injury or Scandal Involving our Key Riders. Professional bicycle racing is inherently a dangerous sport, and as such there is a significant risk of injury to riders. In the event that Lance Armstrong or Roberto Heras are injured and unable to race or our riders are involved in a drug scandal, certain of our key sponsorship contracts provide for a refund of a potentially large percentage of the contractual sponsorship revenue upon which we have based our projections. <u>In the event that Lance Armstrong or any of the Team's riders or support personnel is involved in a drug scandal that creates negative publicity for the U.S. Postal Service, the sponsorship contract can be terminated by the U.S. Postal Service. Certain of our other sponsorship contracts also contain this provision.</u>

180.    Despite its stated awareness of its potential liabilities, Tailwind did not have the financial ability to cover those liabilities, between 2000-2004 or after, nor did Tailwind have the ability to cover its very real and easily anticipated potential liability that it would have exposure for treble damages plus penalties if it were found to have knowingly submitted false claims for payment to the United States Postal Service as a result of doping by the Team.

181.    Similarly, Tailwind did not have the financial ability to satisfy the requirements of the indemnification clause set forth in its 2000 Sponsorship Agreement contract with the U.S. Postal Service during the period of the contract.

182.    Nonetheless, Tailwind claimed and accepted payments from the Postal Service from 2000-2004 under Tailwind's sponsorship agreements with the Postal Service, then went ahead and distributed those funds.

183.    Tailwind's board voted on August 9, 2007 to cease the company's operations at the end of the year.  An Action by Written Consent of the Stockholders of Tailwind, dated on or about December 15, 2007, explained that "the Board has determined that the assets of the Corporation are not easily liquidated before December 31, 2007 and, therefore, all of the Corporation's assets and liabilities should be transferred, prior to December 31, 2007, to a liquidating trust created for the benefit of the Stockholders of the Corporation."   The document further provided that "following the Transfer the Corporation will have no further assets, liabilities or operations . . . ."

184.    The dissolution of Tailwind was made effective on December 31, 2007. Based on the corporate documents cited above, relator is informed and believes that the liquidation of the corporation and the distribution of its assets to shareholders, including Mr. Weisel, occurred thereafter, leaving the corporation without funds to satisfy a judgment. Additional facts concerning the distribution of Tailwind's assets are within defendants'

control, and relator believes a reasonable opportunity for discovery will provide further evidentiary support for relator's allegations.

Tailwind Board Members' Financial Ties to Weisel

185.    As of 2002, the members of Tailwind's board included the following individuals: Thomas Weisel, Boyd Fellow, Jody Gessow, Mark Gorski, Terry Lee, Joe Vittoria, Cindy Disson, and Harvey Schiller.

186.    Boyd Fellow is described in Tailwind financial documents as "most recently a partner on the operating committee at Thomas Weisel Partners."

187.    Jody Gessow's bio in Tailwind's financial documents notes that he was "the co-founder[], President and CEO of Signature Resorts."  Signature Resorts was a client of Montgomery Securities, which helped underwrite a $100,000,000 public offering for Signature Resorts in or around December 1996.   After the public offering, per public reports, the stock price subsequently collapsed and the company went into bankruptcy in May 2000.  Gessow's firm Sunterra (whose predecessor name was Signature Resorts) held a 4% interest in Tailwind after the Series B Financing.

188.    Mark Gorski is described in Tailwind financial documents as the former General Manager of Montgomery Sports.  According to his book Capital Instincts, Weisel hired Gorski for that job to run the company's cycling Team.  Gorski also had a 13.7% ownership interest in Tailwind as of December 31, 2001 and, relator is informed and believes, had the same interest from the date that Weisel first invested into Tailwind (then Disson Furst Partners) in 1999.

189.    Terry Lee is described in Tailwind financial documents as having acquired Bell Sports in 1984 and having completed a successful public offering of the company in 1992.  Per public reports, Montgomery Securities co-managed the initial public offering of the company's stock in or around February 1992, and Montgomery Securities also arranged the sale of the company for $200,000,000 in August 1998.   Terry Lee had a 4.1% stake in the company as of December 31, 2001 and, relator is informed and believes, had the same interest from the date that Weisel first invested into Tailwind (then Disson Furst Partners) in 1999.

190.    Joe Vittoria is listed in Tailwind financial documents as the former Chairman and CEO of Avis, Inc.  Montgomery Securities did a $331 million initial public offering for Avis in or around 1997, the year that Mr. Vittoria left the company.  Joe Vittoria had a 8.2% stake in

Tailwind as of December 31, 2001 and, relator is informed and believes, had the same interest from the date that Weisel first invested into Tailwind (then Disson Furst Partners) in 1999.

191.    Cindy Disson is described in Tailwind financial documents as one of the company's founders. Ms. Disson was associated with Disson Furst & Partners, the firm in which Thomas Weisel and another investor invested $2.5 million then changed the name to Tailwind Sports and installed Weisel as Chairman of the Board.  According to Tailwind financial documents, Ms. Disson had a 13.7% interest in Tailwind via her company Agency Won as of December 31, 2001 and, relator is informed and believes, had the same interest from the date that Weisel first invested into Tailwind (then Disson Furst and Partners) in 1999.

192.    Harvey Schiller's wife Erika held a 1.5% interest in Tailwind.

193.    Relator is informed and believes that all of the foregoing individuals, with the exception of Schiller, were also board members of the company from on or about the time that Weisel made his initial investment in Tailwind (then Disson Furst and Partners).

194.    Based on the nature of the foregoing financial relationships between Weisel and his fellow board members, which in many instances involved fiduciary relationships, relator is informed and believes that the other board members' inclination to accept Weisel's recommendations and judgments as Chairman of the Board of Tailwind was increased, and that these relationships permitted him to dominate and control the company's board.

195.    Some of the referenced board members left Tailwind's board in subsequent years and new members joined.   Additional facts concerning the identity and tenure of the board members of Tailwind and their outside relationships with Weisel are within defendants' control. Relator believes a reasonable opportunity for discovery will provide evidentiary support for relator's allegations of financial interrelationships between Weisel and his other board members and his degree of influence over them.

Additional Discovery

196.    A reasonable opportunity for further investigation or discovery likely will show additional evidence of defendant Weisel's knowledge of the wrongful conduct of defendant Armstrong and the USPS Team, including doping and the other activities described herein, as well as defendant Weisel's domination and control of Montgomery Sports and Tailwind, personal use of corporate assets, and his knowledge and authorization of the false statements and claims being made to the USPS under the 1995 and 2000 Sponsorship Agreements.

**ALL DEFENDANTS**

197.    During the period relevant to this complaint and through the present, defendants have knowingly concealed and continue to conceal from the USPS the fact that defendants engaged in a systematic program of doping USPS Team members in the manner described herein.

198.    The understanding that the USPS Team was not using performance enhancing drugs or blood doping, or engaged in other wrongful conduct, was integral to the sponsorship agreements between the USPS and the defendants.  That understanding perpetuated by the defendants was false and fraudulent, which thus fraudulently induced the USPS to enter into the sponsorship contracts described herein and then extend and renew such contracts for increasingly larger sums of money.

199.    The defendants presented or caused to be presented claims for payment to the USPS with knowledge that the USPS Team was engaged in doping and other wrongful conduct in violation of the terms of the sponsorship contracts and USPS policy.  Such claims were submitted during the period that each of the entity defendants referenced above had their respective sponsorship agreements with the USPS or were involved with management of the same.  When the defendants submitted or caused to be submitted claims for payment and/or accepted payments by the USPS, they represented explicitly and/or implicitly to the USPS that the USPS Team was not involved in the doping of its team members or other wrongful conduct, but that representation was not true.  Such express and/or implied certification was a condition of and a prerequisite to the USPS' payments and to its continuation and renewals of the sponsorship agreements.

200.    Both the 1995 and 2000 Sponsorship Agreements made it an event of default if "[e]ither party shall make any material misrepresentation or shall materially breach any warranty made herein."  Defendants knowingly violated this provision by concealing from the USPS during the effective period of both contracts their involvement in the use of performance enhancing drugs and blood doping and by publicly making false representations that they were not involved in such conduct.  The defendants' failure to comply with these provisions would have been a material consideration to the USPS in

determining whether to renew the contracts or pay funds otherwise owing under the relevant contracts, with the natural tendency of the USPS being not to pay the funds if it were known that the team or any of its members were engaged in doping activities.  Both Sponsorship Agreements permitted the USPS to terminate the agreements "without any liability whatsoever" upon the occurrence of an Event of Default.

201.     Both the 1995 and 2000 Sponsorship Agreements required that the defendants comply with "all applicable rules" of the organizations governing cycling.   As detailed above, the rules of the referenced organizations prohibited the use of doping products like Testosterone, EPO, and HGH, and also prohibited the practice of blood doping.  The defendants' failure to comply with these provisions would have been a material consideration to the USPS in determining whether to pay funds otherwise owing under the relevant contracts, with the natural tendency of the USPS being not to pay the funds if it were known that the team or any of its members were engaged in doping activities.   Both Sponsorship Agreements permitted the USPS to terminate the agreements "without any liability whatsoever" upon the occurrence of an Event in Default.

202.     The 2000 Sponsorship Agreement contained a morals and turpitude clause in Section 9 which required USPS team management to take appropriate action within 30 days in the event of doping by team athletes.  In addition, the defendants represented in the same Agreement that "each rider on the Team has a morals turpitude and drug clause" and that the company was required "to take immediate action without notification by the Sponsor in a case of a rider or Team offense related to a morals or drug clause violation."  As noted above, most of the agreements between the USPS Team and its riders included moral turpitude and drug clauses which required riders not to use any drugs, controlled substances, or other performance enhancing substances, and also required them to comply with the rules of the various organizations governing professional cycling, which similarly prohibited the use of performance enhancing drugs or blood doping.  One exception was Armstrong's contract with Tailwind (then Disson Furst and Partners).

203.     Defendants were knowledgeable about repeated and pervasive violations of

the foregoing clauses in the 1995 Sponsorship Agreement, the 2000 Sponsorship Agreement, and the rider agreements, but they systematically failed to discipline riders as a result of such violations.  The defendants also concealed such violations from the USPS, and failed to disclose the violations by riders to the USPS, as the team's management was orchestrating the riders' use of banned substances and methods during the period relevant to this complaint, and they were conspiring with the riders to keep that conduct secret from the Postal Service.  The defendants thereby knowingly failed to comply with the provisions in the 2000 Sponsorship Agreement pertaining to enforcement of the moral turpitude and drug clauses in the rider agreements.  If it had been known to the USPS that defendants had failed to comply with these provisions, it would have been a material consideration by the USPS in determining whether to renew the contracts or pay funds otherwise owing under the relevant contracts, with the natural tendency of the USPS being not to pay the funds if it were known that the team was engaged in doping activities.

204.   The 2000 Sponsorship Agreement listed as an event of default "negative publicity associated with an individual rider or team support personnel, either permanent or temporary, due to misconduct such as but not limited to, failed drug or medical tests, alleged possession, use or sale of banned substances . . ."  As detailed above, under the heading Public Allegations and Denials, at numerous times during the period of the 2000 Sponsorship Agreement and afterward, there was potentially negative publicity associated with allegations of "misconduct such as but not limited to, failed drug or medical tests, alleged possession, use or sale of banned substances" by USPS team members.  While the team's management and riders were, in fact, engaged in the use of banned substances and other doping activities, the defendants' response to the allegations was to publicly deny their veracity.

205.   If it had been known to the USPS that the public doping allegations regarding the USPS Cycling Team were, in fact, true, it would have been a material consideration by the USPS in determining whether to pay funds otherwise owing under the 2000 Sponsorship Agreement, with the natural tendency of the USPS being not to pay the funds if it were known that the team was engaged in doping activities that would result in negative publicity.

206.     The USPS specifically stated in 2000 that the reason it was sponsoring the USPS team and its purpose in doing so was to "positively impact customer perceptions of the Postal Service" and improve its own employees' "sense of pride."  Doping of athletes and cheating to win athletic events is plainly inconsistent with these objectives.

207.     Relator is informed and believes, based on the allegations stated herein, that at all times relevant to this complaint and through the present, each of the defendants agreed with the others on the doping scheme and other wrongful conduct in violation of the sponsorship agreements with the USPS as described herein, and agreed to conceal from the USPS that such doping and other wrongful conduct was occurring and had occurred, for the purpose of getting claims for money paid by the USPS and for the purpose of not having to return funds paid by the USPS in connection with the sponsorship contracts, despite the fact that it was known such funds were not due and were improperly paid.  As described herein, each of the individual defendants took an active part in furtherance of said conspiracy. Additional facts concerning defendants' agreements are within defendants' control and relator believes a reasonable opportunity for discovery will provide additional evidentiary support for relator's allegations.

208.     As detailed above, as a result of the foregoing wrongful conduct, claims, and conspiracy on the part of defendants, the USPS paid the defendants in excess of $10.9 million in connection with the 1995 Sponsorship Agreement and $31.4 million in connection with the 2000 Sponsorship Agreement.

209.     At various points between 1996 and 2004, and also between 2004 and the present, the defendants knew and/or had reason to know that the USPS Team was engaged in doping and other wrongful conduct in violation of the sponsorship agreements with the USPS and that the funds being paid to Tailwind and CSE should therefore be returned to the USPS, but the defendants nonetheless failed to return the funds paid to them by the USPS.

210.     During the period relevant to this complaint, each and all of the defendants was aware that the U.S. Postal Service Team was receiving sponsorship payments from the U.S. Postal Service under the 1995 and 2000 Sponsorship Agreements and that the U.S. Postal Service would not make such sponsorship payments if it became aware of the fact that the U.S. Postal Service team was engaged in a doping program.   Notwithstanding this knowledge, the defendants actively concealed and failed to disclose the USPS Team doping program while

claims for payment were being made to the Postal Service for payment under the sponsorship agreements.  The actions or omissions to act described herein by individual defendants constituted overt acts by each of them in furtherance of the conspiracy described herein.

## RELATOR CONTACTS WITH THE PRESS

211.    Prior to the filing of this case, Mr. Landis had conversations with media outlets regarding the allegations made herein.

212.    Prior to the filing of this case, Mr. Landis had conversations on or about May 19, 2010 with Bonnie Ford of ESPN.com, which have been published, although not in their entirety, in subsequent articles.

213.    On or about May 20, 2010, an article detailing the substance of several emails written by Mr. Landis concerning certain of the facts set forth herein and other matters was published in the Wall Street Journal.

214.    On or about May 24, 2010, and thereafter, Mr. Landis had extensive conversations with Reed Albergotti of the Wall Street Journal and detailed more of the facts surrounding the incidents described in the emails and certain other facts described herein. An article containing additional information provided by Mr. Landis was subsequently published by the Wall Street Journal after the filing of the original complaint in this matter.

215.    Relator has made additional statements to the press regarding the underlying subject matter of this case following the foregoing interviews, but he has declined comment on inquiries regarding this case.

## DISCLOSURES TO THE UNITED STATES AND THE USADA

216.    In early April 2010, Mr. Landis conveyed to certain individuals his plans to disclose the details of his knowledge regarding doping on the USPS Team.  These individuals included Paul Scott, an attorney acquaintance of Mr. Landis who is President and Chief Science Officer of Scott Analytics, Inc. (i.e., not the same as and no relation to counsel for Mr. Landis in the present case).  At Mr. Landis' request, Mr. Scott contacted USADA on behalf of Mr. Landis and conveyed some information to Daniel Eichner, the Science Director for USADA, regarding the details of Mr. Landis's knowledge of doping by the USPS Team.  Later in April 2010, Mr.

Landis met with Travis Tygart in person to share information regarding doping by the USPS Team and other facts relating to the same.

217.     On or about April 30, 2010, Mr. Landis sent a detailed email to Steve Johnson of USA Cycling regarding his allegations of doping by the USPS Team.

218.     On or about May 6 or 7, 2010, Mr. Landis was contacted by Jeff Novitzky of the U.S. Food and Drug Administration concerning the allegations he had been making to USA Cycling and USADA.  Mr. Landis had previously agreed to speak with Mr. Novitzky and voluntarily followed up with Mr. Novitzky when he called.

219.     On or about May 12 and 13, 2010, Mr. Landis voluntarily met with and was interviewed by Mr. Novitzky and Mr. Tygart.  At that meeting, Mr. Landis volunteered information to Mr. Novitzky concerning the allegations he had been making previously to USA Cycling and USADA.

220.     Between the date of his first call to Mr. Landis and May 28, 2010, Mr. Novitzky interviewed Mr. Landis in person and telephonically on numerous occasions to discuss essential aspects of the allegations that are made herein, including the allegations that the USPS was the victim of a fraud perpetrated by the defendants identified in this complaint.  Mr. Landis also provided to Mr. Novitzky copies of emails he had previously sent to USA Cycling officials, including his April 30, 2010 email to Steve Johnson at USA Cycling, among numerous others.

221.     Through these disclosures and others, Mr. Landis disclosed to the United States the substance of the allegations in this complaint regarding doping by the USPS Team prior to its filing.

### EVENTS SUBSEQUENT TO MR. LANDIS' PUBLIC ALLEGATIONS

222.     Mr. Landis' allegations have been the impetus for a federal investigation into doping by the USPS Team and entities and individuals associated with the team, including defendants.

223.     Prompted by and relying upon Mr. Landis' allegations, USADA also conducted a broad investigation which led to USADA opening formal actions against Lance Armstrong,

Johan Bruyneel, Michele Ferrari, and others associated with the U.S. Postal Service Team.   On or about August 24, 2012, after losing a legal challenge in the United States District Court for the Western District of Texas to the pending USADA proceedings against him, Lance Armstrong publicly announced that he would not contest USADA's action against him but continued to deny the doping allegations against him, referring to them as "heinous and outlandish claims."

224.   On or about October 10, 2012, USADA issued a comprehensive Reasoned Decision, including numerous affidavits and exhibits in support thereof, which concluded that "the US Postal Service Pro Cycling Team ran the most sophisticated, professionalized and successful doping program that sport has ever seen."  On or about October 22, 2012, the UCI announced it was accepting USADA's findings (notwithstanding its prior support for Armstrong's assertion that UCI and not USADA should have jurisdiction over the matters in USADA's charging letter).

225.   On or about January 14, 2013, Lance Armstrong was interviewed by Oprah Winfrey on a cable television show that was later broadcast on January 17 and January 18, 2013.   Mr. Armstrong's interview was lacking in detail and inaccurate in substantial respects, but in the interview Mr. Armstrong finally admitted to blood doping and the use of performance enhancing drugs, including EPO, and testosterone.  In the same interview, Mr. Armstrong acknowledged that it was Mr. Landis coming forward with his inside knowledge that was the tipping point that ultimately led to Mr. Armstrong's confession.

226.   This comment echoed Armstrong's contention in the Texas proceeding that "UCI 'discovered' evidence of the alleged violation when Floyd Landis, a former teammate of Mr. Armstrong's, sent an e-mail to the USA Cycling CEO accusing Mr. Armstrong and others of violating anti-doping rules."

227.   In Tyler Hamilton's 2011 book The Secret Race, co-authored with Daniel Coyle, Hamilton commented on Landis' disclosures in the context of his own story about his involvement with doping on the USPS Team.  Mr. Hamilton described the events preceding his first contact with federal investigators as follows:  "It had started a few weeks earlier, when Floyd Landis dropped a bomb:  an emailed confession to USA Cycling Authorities, complete with dates, names and highly specific details about Lance and the Postal team."

228.     David Walsh, an investigative reporter and author of three books regarding doping and Lance Armstrong, made similar comments in an interview on or about January 8, 2013 regarding the significance of Mr. Landis coming forward:  "I always felt [Lance] was too big to be toppled. . . . If you said to me, 'did you see the end coming, as it came?' The answer is no, I didn't. . . . Floyd's allegations were the turning point of this story, and from that moment on, we had entered the end game . . . And it was going to end very good for the truth, and very badly for Lance Armstrong."

## DISREGARD OF CORPORATE ENTITIES

229.     Based on the information stated herein, Mr. Landis alleges that Tailwind and Montgomery Sports were each dominated and controlled by defendant Thomas Weisel and were the alter egos or business conduits of Mr. Weisel.  Additional facts regarding Mr. Weisel's activities with respect to Tailwind and Montgomery Sports are within defendants' control and relator believes that a reasonable opportunity for further discovery likely will develop further evidence of the same, along with further evidence of Mr. Weisel's knowledge of doping by the USPS team and the other fraudulent conduct described herein.

230.     Tailwind and Montgomery Sports each engaged in fraud against the USPS as described herein.

231.     Montgomery Sports is no longer in existence.  Likewise, Tailwind has ceased operations and its capital and assets have been distributed to its owners, including Mr. Weisel, leaving the company undercapitalized to satisfy its obligations to the USPS, including any judgment in this case.

232.     Relator is informed and believes that the primary asset of Montgomery Sports – the USPS contract - was transferred to Tailwind by Weisel.  In his biography, Weisel refers to the two companies as effectively the same:   "We started Montgomery Sports – now Tailwind Sports - . . . to create the finest professional cycling team in the world."

233.     As detailed above, Weisel also used his personal funds to make payments on behalf of Tailwind.

234.     Weisel, Armstrong, Bruyneel and CSE were all involved in the wrongful conduct by Tailwind alleged herein, and all four were also shareholders of Tailwind during

all or part of the period covered by the 2000 Sponsorship Agreement, and they agreed upon and caused the submission of false claims for payment to the U.S. Postal Service by Tailwind.

235.    Based on the information stated herein, Mr. Landis is informed and believes that CSE was and is dominated and controlled, directly and indirectly, by defendants Bill Stapleton and Bart Knaggs, and that CSE was the alter ego or business conduit of these individuals.

236.    Starting in at least approximately 2002, CSE began providing some management services on behalf of Tailwind with respect to the USPS Team. In approximately late 2003 or early 2004, CSE formally began providing management services for Tailwind, with officers Stapleton and Knaggs taking over positions with Tailwind and, along with Weisel, authorizing Tailwind's claims for payment to the Postal Service.  In 2001 and 2002 and 2003, however, even prior to CSE taking over as manager of Tailwind, CSE, Stapleton and Knaggs represented Lance Armstrong and were aware of and concealed the doping scheme on the USPS Team in those years as well.  CSE thus engaged in the fraud against the USPS described herein with the consent, participation and approval of Stapleton and Knaggs as also described herein.

237.    Additional facts regarding the individual defendants' activities with respect to CSE are within defendants' control and relator believes that a reasonable opportunity for further discovery likely will develop further evidence of the same.

238.    Ross Investments was owned by Weisel at all times relevant to this complaint and was his alter ego with regard to the conduct alleged herein.  Additional facts regarding Weisel's ownership, domination and control of Ross Investments, and the involvement of that entity in the fraud described herein, are within defendants' control, and relator believes that a reasonable opportunity for further discovery likely will develop further evidence of the same.

## COUNT ONE

### False Claims Act, 31 U.S.C. § 3729(a)(1) (pre FERA)

### All Defendants

239.    Plaintiff realleges and incorporates paragraphs 1 to 238 above as if fully set forth herein.

240.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.,* as amended.

241.    By virtue of the acts described above, defendants knowingly submitted, or caused to be submitted, false or fraudulent claims for payment to the United States government.

242.    The United States, unaware of the falsity of defendants' claims, and in reliance on the accuracy thereof, paid the defendants amounts in excess of what would have been paid had the claims not been false.

243.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT TWO

### False Claims Act, 31 U.S.C. § 3729(a)(2) (pre FERA)

### All Defendants

244.    Plaintiff realleges and incorporates paragraphs 1 to 238 above as if fully set forth herein.

245.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

246.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid or approved by the government.

247.    The United States, unaware of the falsity of defendants' records and statements, and in reliance on the accuracy thereof, paid the defendants amounts in excess of what would have been paid had the records and statements not been false.

248.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT THREE

### False Claims Act, 31 U.S.C. § 3729(a)(3) (pre FERA)

### All Defendants

249.    Plaintiff realleges and incorporates paragraphs 1 to 238 above as if fully set forth herein.

250.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

251.    By virtue of the acts described above, defendants conspired among themselves to defraud the United States by getting false or fraudulent claims allowed or paid.

252.    The United States, unaware of the falsity of defendants' records and statements, and in reliance on the accuracy thereof, paid the defendants amounts in excess of what would have been paid had the records and statements not been false.

253.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT FOUR

### False Claims Act, 31 U.S.C. § 3729(a)(7) (pre FERA)

### All Defendants

254.    Plaintiff realleges and incorporates paragraphs 1 to 238 above as if fully set forth herein.

255.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

256.    By engaging in the acts described above, defendants avoided or reduced obligations owed to the United States Government.

257.    Specifically, defendants avoided the obligation to return funds paid by the United States, by concealing and failing to disclose the doping of USPS Team athletes.

258.    By reason of defendants' conduct, the United States has been damaged, and

continues to be damaged, in substantial amount.

## COUNT FIVE
### False Claims Act as amended by FERA, 31 U.S.C. § 3729(a)(1)(A)
### All Defendants

259.    Plaintiff realleges and incorporates paragraphs 1 to 238 above as if fully set forth herein.

260.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended by FERA.

261.    By virtue of the acts described above, defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval.

262.    The United States, unaware of the falsity of defendants' claims, and in reliance on the accuracy thereof, paid the defendants amounts in excess of what would have been paid had the claims not been false.

263.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT SIX
### False Claims Act as amended by FERA, 31 U.S.C. § 3729(a)(1)(B)
### All Defendants

264.    Plaintiff realleges and incorporates paragraphs 1 to 238 above as if fully set forth herein.

265.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended by FERA.

266.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

267.    The United States, unaware of the falsity of defendants' records and statements, and in reliance on the accuracy thereof, paid the defendants amounts in excess of what would have been paid had the records and statements not been false.

268.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT SEVEN
### False Claims Act as amended by FERA, 31 U.S.C. § 3729(a)(1)(C)
### All Defendants

269.    Plaintiff realleges and incorporates paragraphs 1 to 238 above as if fully set forth herein.

270.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended by FERA.

271.    By virtue of the acts described above, defendants conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A), (B), and (G).

272.    The United States, unaware of the falsity of the claims made by defendants and in reliance on the accuracy thereof, paid and continues to pay claims in amounts in excess of what would have been paid had the claims not been false.

273.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT EIGHT

### False Claims Act as amended by FERA, 31 U.S.C. § 3729(a)(1)(G)
### All Defendants

274.    Plaintiff realleges and incorporates paragraphs 1 to 238 above as if fully set forth herein.

275.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended by FERA.

276.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used, a false records and statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

277.    By reason of these actions, the United States has been damaged, and continues to be damaged, in substantial amount.

WHEREFORE, relator, on his own behalf and on behalf of the United States, prays for judgment in plaintiffs' favor and against defendants, as follows:

a.      Ordering defendants to pay an amount equal to three times the amount of damages the United States has sustained because of defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each action in violation of 31 U.S.C. § 3729, both pre-FERA and as amended, and the costs and expenses of this action, with interest, including the costs and expenses to the United States;

b.      Awarding relator the maximum amounts allowed pursuant to 31 U.S.C. § 3730(d);

c.      Awarding relator all fees, costs, and expenses incurred in initiating and sustaining this action, including reasonable attorneys' fees;

d.      Piercing of the corporate veils of the business entities named herein and treatment of their owners named herein as their alter egos.

e.      Granting relator and the United States all other such relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff hereby demands trial by jury.

Dated: February ___, 2013

Respectfully submitted,

_____

Paul D. Scott
pdscott@lopds.com
California State Bar No. 145975
Admitted *Pro Hac Vice*
Lani Anne Remick
laremick@lopds.com
California State Bar No. 189889
USDC D.C. Bar No. PA0045
LAW OFFICES OF PAUL D. SCOTT, P.C.
Pier 9, Suite 100
San Francisco, California 94111
Tel: (415) 981-1212
Fax: (415) 981-1215

_____

JON L. PRAED, Of Counsel
jlpraed@lopds.com
D.C. Bar No. 51665
LAW OFFICES OF PAUL D. SCOTT, P.C.
Pier 9, Suite 100
San Francisco, California 94111
Tel: (415) 981-1212
Fax: (415) 981-1215

Attorneys for Relator Floyd Landis

# EXHIBIT 1

FDM - Account Payable Detail Data: 660418

# Financial Data Mart
### Reports

ONLINE QUERY    REPORTS    UTILITIES

Accounts Payable Detail ( Data prior to August 11, 2005 is not audited )
Finance Number: CUSTOMER EVENTS

Options:   Printable Format    Excel Format

**Data Areas**
- Financial Summary
- Financial Line Recast
- Accounts Payable
  - Depreciation Expense
  - Commitment Detail
  - Credit Card

| PSFR LINE NUMBER | ACCOUNT CONTRACT NUMBER | SEQ. NO. /PO LINE NO. | TRAVELER/VENDOR | PENDING/PAID AMOUNT | DATE PAID | INVOICE NUMBER | CHE NC /EI NC |
|---|---|---|---|---|---|---|---|
| 34 | 102592011F0858 | 0000000001 | **TAILWIND CYCLING LLC | $15,977.62 | 10/20/2004 | 091704 | 000010. |
| 34 | 102592011F0858 | 0000000001 | **TAILWIND CYCLING LLC | $24,000.00 | 10/04/2004 | SF GRAND PRIX | 000010. |
| 34 | 102592011F0858 | 0000000001 | **TAILWIND CYCLING LLC | $10,000.00 | 10/04/2004 | VICTORY #6 | 000010. |
| 34 | 102592011F0858 | 0000000001 | **TAILWIND CYCLING LLC | $28,192.83 | 08/11/2004 | 063004 | 000009. |
| 34 | 102592011F0858 | 0000000001 | **TAILWIND CYCLING LLC | $1,877,000.00 | 05/04/2004 | 050104 | 000008: |
| 34 | 102592011F0858 | 0000000001 | **TAILWIND CYCLING LLC | $65,000.00 | 03/31/2004 | 022604 | 000008: |
| 34 | 102592011F0858 | 0000000001 | **TAILWIND CYCLING LLC | $2,165,000.00 | 03/01/2004 | 013104 | 000008: |
| 34 | 102592011F0858 | 0000000001 | **TAILWIND CYCLING LLC | $100,000.00 | 12/05/2003 | 112903 | 000007 |
| 34 | 102592011F0858 | 0000000001 | **TAILWIND CYCLING LLC | $2,165,000.00 | 12/05/2003 | 112903. | 000007 |
| 34 | 102592011F0858 | 0000000001 | **TAILWIND CYCLING LLC | $701.84 | 12/09/2003 | KC FORUM 03 103003 | 000007 |
| 34 | 102592011F0858 | 0000000001 | **TAILWIND CYCLING LLC | $2,236.08 | 12/09/2003 | TDF 03 11/03/03 | 000007 |
| 34 | 102592011F0858 | 0000000001 | **TAILWIND CYCLING LLC | $5,000.00 | 11/21/2003 | 102203 | 000006: |
| 34 | 102592011F0858 | 0000000001 | **TAILWIND CYCLING LLC | $10,000.00 | 11/21/2003 | 102303 | 000006: |
| 34 | 102592011F0858 | 0000000001 | **TAILWIND CYCLING LLC | $1,265,000.00 | 10/10/2003 | 080103. | 000006: |
| 34 | 102592011F0858 | 0000000001 | **TAILWIND CYCLING LLC | $35,150.83 | 09/24/2003 | 082503 | 000006: |
| 34 | 102592011F0858 | 0000000001 | **TAILWIND CYCLING LLC | $900,000.00 | 09/04/2003 | 080103 | 000006: |
| 34 | 102592011F0858 | 0000000001 | **TAILWIND CYCLING LLC | $150,000.00 | 07/01/2003 | LAN03 | 000005: |
| 34 | 102592011F0858 | 0000000001 | **TAILWIND CYCLING LLC | $32,675.00 | 06/13/2003 | 051503 | 000005: |
| 34 | 102592011F0858 | 0000000001 | **TAILWIND CYCLING LLC | $42,115.90 | 05/20/2003 | 042103 | 000004: |
| 34 | 102592011F0858 | 0000000001 | **TAILWIND CYCLING LLC | $2,058,750.00 | 05/14/2003 | 022503 | 000004: |
| 34 | 102592011F0858 | 0000000001 | **TAILWIND CYCLING LLC | $2,058,750.00 | 02/10/2003 | 65090 | 000004: |

FDM - Account Payable Detail Data: 000418

Page 2 of 2

| | | | | Vendor | Amount | Date | Check | Ref |
|---|---|---|---|---|---|---|---|---|
| 34 | [REDACTED] | 1025920IP0858 | 0000000000001 | **TAILWIND CYCLING LLC | $4,008.10 | 01/14/2003 | 123102 | 000003: |
| 34 | | 1025920IP0858 | 0000000000001 | **TAILWIND CYCLING LLC | $58,750.00 | 11/22/2002 | 65040 | 000003: |
| 34 | | 1025920IP0858 | 0000000000001 | **TAILWIND CYCLING LLC | $2,058,750.00 | 11/22/2002 | 65050 | 000003: |
| 34 | | 1025920IP0858 | 0000000000001 | **TAILWIND CYCLING LLC | $100,000.00 | 11/22/2002 | 65051 | 000003: |
| 34 | | 1025920IP0858 | 0000000000001 | **TAILWIND CYCLING LLC | $81,250.00 | 09/10/2002 | 65031 | 000003: |
| 34 | | 1025920IP0858 | 0000000000001 | **TAILWIND CYCLING LLC | $10,000.00 | 09/10/2002 | 65032 | 000003: |
| 34 | | 1025920IP0858 | 0000000000001 | **TAILWIND CYCLING LLC | $27,204.37 | 09/10/2002 | 65033 | 000003: |
| 34 | | 1025920IP0858 | 0000000000001 | **TAILWIND CYCLING LLC | $2,058,750.00 | 08/21/2002 | 65029 | 000002: |
| 34 | | 1025920IP0858 | 0000000000001 | **TAILWIND CYCLING LLC | $1,902,500.00 | 06/04/2002 | 65028 | 000002: |
| 34 | | 1025920IP0858 | 0000000000001 | **TAILWIND CYCLING LLC | $1,902,500.00 | 02/22/2002 | 65027 | 000001: |
| 34 | | 1025920IP0858 | 0000000000001 | **TAILWIND CYCLING LLC | $1,902,500.00 | 01/24/2002 | 65025 | 000001: |
| 34 | | 1025920IP0858 | 0000000000001 | **TAILWIND CYCLING LLC | $100,000.00 | 01/24/2002 | 65026 | 000001: |
| 34 | | 1025920IP0858 | 0000000000001 | **TAILWIND CYCLING LLC | $1,902,500.00 | 10/01/2001 | 65020 | 000001: |
| 34 | | 1025920IP0858 | 0000000000001 | **TAILWIND CYCLING LLC | $100,000.00 | 09/07/2001 | 65011 | 002519: |
| 34 | | 1025920IP0858 | 0000000000001 | **TAILWIND CYCLING LLC | $1,529,500.00 | 06/06/2001 | 65010 | 002516: |
| 34 | | 1025920IP0858 | 0000000000001 | **DFP CYCLING LLC | $1,534,500.00 | 03/01/2001 | 65004 | 002513' |
| 34 | | 1025920IP0858 | 0000000000001 | **DFP CYCLING LLC | $1,534,500.00 | 01/10/2001 | 65000 | 002512: |
| 34 | | 1025920IP0858 | 0000000000001 | **DFP CYCLING LLC | $1,534,500.00 | 01/10/2001 | 65001 | 002512: |
| 34 | | 1025920IP0858 | 0000000000001 | **DFP CYCLING LLC | $100,000.00 | 01/10/2001 | 65002 | 002512: |
| | | | | Account Total: | $31,442,262.57 | | | |
| | | | | Line Total: | $31,442,262.57 | | | |
| 44 | [REDACTED] | 1025920IP0858 | 0000000000001 | **TAILWIND CYCLING LLC | $11.85 | PENDING | 65031 | |
| 44 | | 1025920IP0858 | 0000000000001 | **TAILWIND CYCLING LLC | $3.97 | PENDING | 65033 | |
| 44 | | 1025920IP0858 | 0000000000001 | **TAILWIND CYCLING LLC | $1.46 | PENDING | 65032 | |
| | | | | Account Total: | $17.28 | | | |
| | | | | Line Total: | $17.28 | | | |

*For additional help, please contact **RMS-HELP-DESK** on CC:Mail or call the help desk at 202-268-5405.*