UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES *ex rel.* LANDIS,<br><br>Plaintiffs,<br><br>v.<br><br>TAILWIND SPORTS CORP., TAILWIND<br>SPORTS LLC, LANCE ARMSTRONG, and<br>JOHAN BRUYNEEL,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 10- 00976 (RLW)<br><br>**UNITED STATES' COMPLAINT**<br><br>**{JURY TRIAL DEMANDED}**<br><br>**ECF** |

The United States brings this action to recover treble damages and civil penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729-33 (the "FCA"), and to recover damages, restitution, and other monetary relief under the federal common law theories of fraud, breach of contract, payment by mistake and unjust enrichment.

## I.    NATURE OF ACTION

1.      The causes of action asserted by the United States arise from false or fraudulent claims that Defendants Tailwind Sports Corp., Tailwind Sports LLC (collectively, "Tailwind"), Lance Armstrong and Johan Bruyneel submitted or caused to be submitted to the United States Postal Service (the "USPS" or "Postal Service").

2.      From 1996 through 2004, the USPS sponsored a professional cycling team owned by Tailwind and its predecessors (the "USPS cycling team").  Lance Armstrong was the lead rider on the team, and Johan Bruyneel was its *directeur sportif*, or manager.

3.      The sponsorship agreements between the USPS and Tailwind gave the USPS certain promotional rights, including the right to prominent placement of the USPS logo on the cycling team's uniform.  Each of the agreements required the team to follow the rules of cycling's governing bodies, which prohibited the use of certain performance enhancing substances and methods.

4.      Riders on the USPS-sponsored team, including Armstrong, knowingly caused material violations of the sponsorship agreements by regularly and systematically employing banned substances and methods to enhance their performance.  Moreover, Bruyneel knew that team members were using performance enhancing substances and facilitated the practice.  As a result, the Defendants submitted or caused to be submitted to the United States false or fraudulent invoices for payment.  The Defendants also made false statements, both publicly and directly to the USPS, that were intended to hide the team's misconduct so that those invoices would be paid.

5.      The USPS paid approximately $40 million to sponsor the USPS cycling team from 1998 through 2004.  Because the Defendants' misconduct undermined the value of the sponsorship to the USPS, the United States suffered damage in that it did not receive the value of the services for which it bargained.  Moreover, because they knowingly provided services that materially failed to comply with the USPS sponsorship agreement, the Defendants were unjustly enriched to the extent of the payments and other benefits they received from the USPS, either directly or indirectly.

II.      **PARTIES**

6.      The United States, through the Postal Service, operates the nation's postal system. The Postal Service is an independent establishment of the executive branch of the Government of

the United States, with the statutory power to prescribe the amount of postage and how it is to be paid, to hold a legal or beneficial interest in property, and to enter into contracts. 39 U.S.C. §§ 201, 401, 404, 2601, and 2605.

7.    Relator Floyd Landis was a rider on the USPS team from 2002 through 2004. On June 10, 2010, Landis filed an action alleging violations of the FCA on behalf of himself and the United States Government pursuant to the *qui tam* provisions of the FCA, 31 U.S.C. § 3730(b)(1). At the time he filed, Landis was a resident of California. He currently resides in Connecticut.

8.    Defendant Tailwind Sports LLC is a limited liability company organized under the laws of the State of Delaware. It was formed on April 5, 1999, and, at that time, was known as DFP Cycling LLC. On January 19, 2001, it changed its name to Tailwind Sports LLC, and on July 16, 2002, it merged with and into Tailwind Sports Corporation. Tailwind Sports LLC owned and operated the USPS cycling team from 1999 until the merger in 2002.

9.    Defendant Tailwind Sports Corporation is a corporation organized and existing under the laws of the State of Delaware. It was formed on June 25, 2002, and dissolved by filing a certificate of dissolution with the Secretary of the State of Delaware on December 31, 2007. Delaware law provides for the continuation of corporations for a period of three years after their dissolution, however, for the purpose of prosecuting and defending lawsuits. 8 Del. C. § 278. The *qui tam* action filed by Landis was filed within this abatement period. Tailwind Sports Corporation owned and operated the USPS cycling team beginning with its merger with Tailwind Sports LLC in 2002.

10.    Defendant Lance Armstrong is a resident of Texas and a former professional cyclist. Armstrong was the lead rider for the USPS cycling team from 1999 through 2004. As a

3

result of his doping conduct, which forms a substantial part of the basis for the United States' claims in this action, Armstrong's results as a professional cyclist after August 1, 1998 have been disqualified and he is subject to a lifetime ban from competitive sports pursuant to the World Anti-Doping Code.

11.     On information and belief, defendant Bruyneel is a resident of the United Kingdom.  He was the *directeur sportif* of the USPS cycling team from 1999 through 2004 and an employee of Tailwind from 1999 through 2007.

## III.    JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345.

13.     This Court has personal jurisdiction over Tailwind, Armstrong and Bruyneel pursuant to 31 U.S.C. § 3732(a) because Tailwind regularly transacted business in connection with the sponsorship agreement in the District of Columbia and submitted the false claims for payment to the USPS in the District of Columbia.   Bruyneel's contacts with the United States are such that the exercise of this Court's jurisdiction over him in this matter does not offend due process.  Bruyneel was employed by Tailwind, a company incorporated in the State of Delaware whose principal place of business was in the United States.  The USPS made payments to Tailwind from a location within the United States and, as required by the agreement between Tailwind and the USPS, those payments were received at locations within the United States. Bruyneel was required to perform a substantial portion of his employment duties in the United States, and in each of his employment agreements with Tailwind, he agreed to submit to the jurisdiction of the courts of the State of Texas.

4

14.     Venue in the District of Columbia is proper as to all Defendants under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b)(2) and (3) because Tailwind regularly transacted business in connection with the sponsorship agreement in the District of Columbia and submitted the false claims for payment to the USPS in the District of Columbia.  In addition, venue is proper as to Bruyneel pursuant to 28 U.S.C. § 1391(c)(3).

## IV.     THE SPONSORSHIP AGREEMENT

15.     In 1995, the USPS entered an agreement with a predecessor to Tailwind, Montgomery Sports, LLC ("Montgomery Sports"), pursuant to which the USPS agreed to pay Montgomery Sports in exchange for certain promotional rights, including the prominent placement of the USPS logo on the cycling team's uniform and the provision of hospitality services in connection with team events (the "1995 Agreement").  The initial agreement expired on December 31, 1996, but was subject to automatic renewal on a year-to-year basis unless the Postal Service elected not to renew.  The Postal Service allowed the agreement to renew each year through 2000.

16.     The 1995 Agreement required that:

> The performance of the obligations of the parties under this Agreement shall at all times and in all events be subject to compliance with all applicable rules of the *Union Cycliste Internationale*, the *Federation Internationale du Cyclisme Professionel*; the United States Professional Cycling Federation, Inc., the International Olympic Committee, the United States Olympic Committee, the International Amateur Cycling Federation, the United States Cycling Federation and all other governing organizations.

17.     At the time the 1995 Agreement was executed, and at all times relevant to the United States' claims, the rules applicable to the Union Cycliste Internationale (UCI) and

5

International Olympic Committee (IOC) forbade the use of certain performance enhancing drugs and prohibited other practices known to enhance rider performance.

18.     In 2000, the Postal Service and Tailwind (then known as "DFP Cycling") entered a four-year agreement for the 2001 through 2004 cycling seasons (the "2000 Agreement").  The 2000 Agreement retained the requirement from the 1995 Agreement that the team adhere to the rules of the UCI, IOC, and the other bodies that govern international cycling.

19.     In November 2000, prior to execution of the 2000 Agreement, various media outlets reported that French authorities had begun an investigation into allegations that Armstrong and the USPS cycling team used banned substances in winning the 2000 Tour de France.  Although the Defendants vehemently denied the allegations, the Postal Service was concerned about them, and consequently inserted into the sponsorship agreement several additional provisions relating to the use of banned substances and methods.

20.     Specifically, the following provisions were included among the 2000 Agreement's events of default:

> (iv)     The Company fails to take immediate action without notification by the Sponsor in a case of a rider or Team offense related to a morals or drug clause violation.

> (v)     There is negative publicity associated with an individual rider or team support personnel, either permanent or temporary, due to misconduct such as, but not limited to, failed drug or medical tests, alleged possession, use or sale of banned substances, or conviction of a crime.

21.     In addition, the 2000 Agreement included the following paragraphs:

> The Company represents that each rider on the Team has a morals and drug clause that allows the Company to suspend or terminate the rider for cause which shall include items such as (1) conviction of a felony; (2) acts that require the Team to suspend or terminate a

6

rider under the applicable rules of the Union Cyclist Internationale; the Federation Internationale du Cyclisme Professionel; the United States Professional Cycling Federation, Inc.; the International Olympic Committee; the International Amateur Cycling Federation; the United States Cycling Federation and all other applicable governing organizations; (3) failure to pass drug or medical tests; (4) inappropriate drug conduct prejudicial to the Team, or the Postal Service, which is in violation of Team rules or commonly accepted standards of morality; and (5) gross neglect of the rider's duty.

If any rider on the Team is found guilty of such offense, the Company agrees to take appropriate action within thirty (30) days.

22.      At the time the agreement was executed, and for a period of more than two years thereafter, Armstrong's agreement with Tailwind did not contain a morals and drug clause as required by the above provision.

23.      The provision cited in paragraph 16 was a material term of both the 1995 Agreement and the 2000 Agreement.

24.      The provisions cited in paragraphs 20 and 21 were material terms of the 2000 Agreement and were added to that agreement specifically because the USPS did not wish to sponsor the cycling team if it was engaged in the use of banned substances or methods.

25.      The 2000 Agreement called for the Postal Service to pay Tailwind $31,593,000 over its four-year term.  In addition to quarterly sponsorship payments, the Postal Service was required to establish an annual bonus pool for riders and to sponsor a junior cycling team operated by Tailwind.

26.      From 1998 through 2004, the USPS paid Tailwind and its predecessors approximately $40 million.  That amount represented more than 50 percent of Tailwind's revenue during that time period.  Tailwind used the Postal Service sponsorship fees to, among other things, pay Armstrong's salary, which was $17,915,000.00 (not including bonuses) during

7

the period from 1998 through 2004. Tailwind paid Bruyneel at least $1,700,000 in salary and bonuses between 2000 and 2004, and also paid at least $1,000,000 to Cycling Services Corporation, a company owned and controlled by Bruyneel.

## V.   PROHIBITED CONDUCT BY THE USPS CYCLING TEAM

### The Team's Doping Conduct Generally

27.     From at least 1998 through 2004, the USPS cycling team routinely engaged in the use of performance-enhancing drugs and other conduct it knew to be prohibited under the rules of the IOC and UCI. The use of these banned substances and methods was itself a violation of Tailwind's agreements with the USPS, as was Tailwind's failure to take action against riders known to have engaged in such conduct. Notwithstanding Tailwind's knowing failure to comply with the material terms of its contract with the USPS, it submitted claims for payment to the USPS, which the USPS paid in reliance upon Defendants' express and implied denials of the prohibited conduct and the terms of Tailwind's contracts.

28.     Among the prohibited substances the USPS team used and methods it employed were:

A.     Erythropoietin, or "EPO," is a hormone that increases the production of oxygen-carrying red blood cells in the body, which enhances an athlete's ability to compete in endurance sports by increasing the oxygen carrying capacity of his or her blood. An athlete's use of EPO has the effect of elevating hemoglobin concentration and hematocrit levels (or packed cell volume), which is the proportion of blood volume that is occupied by red blood cells. The use of EPO by cyclists was prohibited by the IOC and UCI from 1998 to 2004, and is still prohibited.

8

B.     Human growth hormone, or "HGH," stimulates an athlete's muscle growth.  Typically, an athlete will inject HGH prior to training in order to aid muscle growth during training, but it can also be used during competition to speed up recovery from fatigue. The use of HGH by cyclists was prohibited by the IOC and UCI from 1998 to 2004, and is still prohibited.

C.     Anabolic steroids, including testosterone, can enhance athletic performance by aiding in muscle development and recovery. The use of anabolic steroids by cyclists was prohibited by the IOC and UCI from 1998 to 2004, and is still prohibited.

D.     Corticosteroids, such as cortisone, help to reduce inflammation and pain and can enhance athletic performance. The use of corticosteroids by cyclists was prohibited by the IOC and UCI from 1998 to 2004, and is still prohibited.

E.     "Blood doping" refers to the practice of extracting one's own blood for later re-infusion immediately before or during competition.  Like EPO, it has the effect of increasing the red blood cell and hemoglobin concentrations, which enhances the oxygen carrying capacity of an athlete's blood. Blood doping by cyclists was prohibited by the IOC and UCI from 1998 to 2004, and is still prohibited.

29.     The use of one or more of the methods or practices defined in paragraph 28 will be referred to herein as "doping."

30.     Each of the Defendants knew from 1998 through 2004 that doping was prohibited by the rules of the UCI and IOC.  Each of the Defendants also knew during the same period that the USPS could terminate the sponsorship agreement if the team engaged in material doping violations.

31.     Nevertheless, Armstrong and his fellow USPS team members engaged in doping

on a regular and consistent basis throughout the period from 1998 through 2004 with the

knowledge and assistance of each of the Defendants.  At least ten team riders engaged in

sustained doping practices during that period.

32.     The doping conduct alleged by the United States consists of more than the

isolated conduct of individual team riders.  Rather, it reflects a coordinated effort by the

Defendants to flout the rules of professional cycling throughout the period from 1998 to 2004,

and to hide their rule-breaking during that period and for years afterward.  Not only did

Armstrong personally engage in doping conduct, but he and Bruyneel both knew about and

facilitated doping by other members of the USPS team.  Moreover, team doctors Pedro Celaya

and Luis Garcia del Moral, team trainer Jose "Pepe" Marti, and other employees of the USPS

team provided banned substances to team riders and assisted riders in their use of banned

substances and practices.

33.     The USPS team members also received substantial doping advice and support

from sports doctor Michele Ferrari.  Specifically, Ferrari instructed team members about when

and how to dope in order to maximize performance enhancement while minimizing detection

risk, provided team members with EPO and other doping products, injected cyclists with those

products, and helped team members blood dope by extracting and re-injecting their blood.

Ferrari provided such services to at least six members of the USPS team.  He was invited to and

attended team training camps, and was reimbursed by Tailwind for some of his expenses.

34.     Notwithstanding its obligation pursuant to the sponsorship agreement to ensure

that the team performed according to the rules of the IOC and UCI and to take immediate action

in response to violations of those rules, Tailwind did not suspend, terminate or otherwise discipline many riders it knew to be doping, or disclose their doping conduct to the USPS.

### Particular Instances of Fraudulent Conduct by Armstrong and Bruyneel

35.     Throughout his tenure on the team, from 1998 through 2004, Armstrong regularly employed prohibited substances and methods.  Specifically, Armstrong engaged in the use of EPO, HGH, anabolic steroids, corticosteroids, and blood doping.  He used at least one of these prohibited substances or methods in connection with each Tour de France from 1999 through 2005.  Moreover, he knew that his teammates were engaged in similar doping practices, and he actively encouraged and facilitated those practices.  In addition to supplying them with prohibited drugs, he provided a place where his teammates could receive illicit treatments by team doctors and store blood that had been extracted for the purpose of blood doping. Armstrong also introduced a number of his teammates to Ferrari and later pressured at least one of them to comply with Ferrari's doping instructions.  From 2002 through 2004, Armstrong paid Ferrari $735,000.

36.     Throughout the time that he was the director of the USPS team, from 1999 through 2004, Bruyneel had knowledge of the team's use of illicit performance enhancing drugs and practices, and he encouraged his riders' doping by providing doping products, informing riders about where they could obtain doping products, and instructing riders regarding when and where they should meet doctors for illicit treatments.

37.     Armstrong engaged in the use of banned substances and practices throughout 1998.  For example, during the Vuelta a Espana (the "Vuelta") race that year, Armstrong injected himself with EPO.  Armstrong also assisted his teammates in doping on at least one occasion

11

during 1998 by instructing his wife, Kristin Armstrong, to provide cortisone to at least two USPS riders.

38.     In May 1999, Armstrong gave EPO, which he had on supply in the refrigerator of his home in Nice, France, to Tyler Hamilton, another rider on the team.

39.     On one occasion in 1999, Bruyneel provided HGH directly to rider George Hincapie.

40.     In connection with the 1999 Tour de France, Armstrong and fellow riders Kevin Livingston, Frankie Andreu, and Tyler Hamilton all used EPO.  Armstrong facilitated the use of EPO by Livingston and Hamilton by conspiring with them to arrange for an associate to follow the team on a motorcycle that contained their supply of EPO.  From time to time throughout that year's Tour, the associate would deliver the drug to team personnel who would provide it to Armstrong, Livingston, and Hamilton.

41.     On Ferrari's advice, many team members frequently used a mixture that consisted of testosterone dissolved in olive oil; the mixture, referred to simply as "the oil" by some team members, was ingested by squirting it under the tongue.  On a number of occasions, including at least one occasion during the 1999 Tour de France, Armstrong provided "the oil" to Hamilton.

42.     Armstrong used a corticosteroid during or before the 1999 Tour de France. During that year's Tour, Armstrong produced one or more urine samples that tested positive for the presence of corticosteroids, and afterwards conspired with Tailwind personnel to obtain a false prescription that purported to justify his use of the drug.  Armstrong provided this false prescription to UCI in order to avoid sanctions for the use of banned substances and the consequent public exposure and loss of sponsors that would follow, including the loss of the USPS as a sponsor.

43.     In February 2000, del Moral advised rider Christian Vande Velde to begin using HGH and cortisone.  Bruyneel, knowing that Vande Velde was about to start taking cortisone, later explained to Vande Velde what he should expect by describing his (Bruyneel's) own experience using the drug as a rider.   Vande Velde started taking the drugs in April of that year with assistance from del Moral in procuring and, at least initially, administering the drugs.

44.     Several weeks prior to the start of the 2000 Tour de France, Armstrong, Livingston, and Hamilton traveled to Valencia, Spain.  As Bruyneel explained to them, each of the riders was to have blood extracted for the purpose of having it transfused back into their bodies during the 2000 Tour de France.  While there, del Moral extracted the blood of all three riders.

45.     During the Tour, on or about July 11, 2000, at a hotel near Mont Ventoux, Armstrong, Livingston, and Hamilton had their blood re-injected in order to enhance their performance during the remainder of the race.  Bruyneel was present and witnessed the re-infusion of their blood.

46.     In late 2000 or early 2001, Armstrong arranged for a delivery of EPO to Hamilton at his home in Marshfield, Massachusetts.

47.     At a training camp in Austin, Texas prior to the beginning of the 2001 racing season, rider George Hincapie began working with Ferrari.  During the camp, Hincapie told Bruyneel, Ferrari, and Marti that he wanted to try blood doping.  All three indicated their assent and agreed to assist in the planning for his blood doping.

48.     In connection with the 2001 Tour de France, Vande Velde, with Bruyneel's knowledge, injected himself with half a vial of cortisone in order to alleviate back problems he was experiencing as a result of crashes early in the race.

13

49.     In June 2002, Bruyneel instructed another rider, Floyd Landis, to travel with Armstrong to St. Moritz, Switzerland and informed him that upon their arrival Armstrong would give Landis testosterone patches.  Bruyneel further instructed Landis regarding when to wear the patches in order to avoid detection by anti-doping authorities.  He also told Landis that while in St. Moritz he would meet with Ferrari, who would help him extract his blood for later reinfusion during the 2002 Tour de France.

50.     As instructed by Bruyneel, Landis traveled with Armstrong to Armstrong's apartment in St. Moritz and, upon their arrival, Armstrong gave Landis a package of testosterone patches.

51.     Several days later, Landis met with Ferrari at Armstrong's apartment.  During their meeting, Ferrari extracted some of Landis' blood and explained that Landis would receive a reinfusion of his blood during the Tour de France.

52.     On the evening before the time trial of the 2002 Tour de France, Landis and Armstrong met in del Moral's hotel room and each had their blood re-injected into their bodies, with the assistance of del Moral and in full view of Bruyneel.

53.     In August 2002, Armstrong, whose contract with Tailwind gave him "extensive input into rider and staff composition," invited Vande Velde to meet with him at Armstrong's Girona, Spain apartment to discuss Vande Velde's role with the team.  When Vande Velde arrived, Ferrari was present.  During the meeting, Armstrong criticized Vande Velde for failing to "prepare," which Vande Velde understood to mean that he was not carefully following the doping program that Ferrari previously advised him to follow.  Armstrong told Vande Velde that he had to follow all of Ferrari's instructions.  A few days later, Bruyneel acknowledged to Vande Velde that he was aware of the meeting between Vande Velde, Armstrong, and Ferrari, and

Bruyneel told Vande Velde that he expected to see an improvement in Vande Velde's performance.

54.     In May 2003, riders David Zabriski and Michael Barry met with Bruyneel and del Moral at a café in Girona.  During the meeting, Bruyneel told Zabriski and Barry that Bruyneel and del Moral had brought EPO for the two riders, which was in the trunk of the car that Bruyneel and del Moral had driven to the meeting.  The four men went back to Barry's apartment and del Moral injected the riders with EPO.  Bruyneel also gave Zabriski and Barry testosterone patches, which Zabriski later used.

55.     In May or June of 2003, Bruyneel instructed Landis to go to Armstrong's apartment in Girona for the purpose of having a half-liter of his blood extracted by Ferrari. Following the extraction, Landis stayed in Armstrong's apartment, at Armstrong's request, in order to monitor the blood of several riders, which had been stored in a refrigerator in Armstrong's apartment in anticipation of being re-injected during the 2003 Tour de France.

56.     Approximately three weeks after the extraction of Landis's blood, he and Ferrari met at Armstrong's apartment again in order for Ferrari to re-infuse Landis with the earlier extracted blood and to extract another liter of blood from Landis.  Landis and Ferrari met once more before the 2003 Tour de France to perform a similar extraction and re-infusion of Landis's blood.  Landis was instructed by Bruyneel to attend each of these sessions with Ferrari.

57.     Landis received two infusions of his own blood during the 2003 Tour de France. The first occurred on or about July 11, 2003, and the second on or about July 17, 2003.  In each case, he was instructed to do so by Bruyneel, the re-infusion was administered by del Moral, and other riders, including Armstrong, received re-infusions of their own blood, as well.

58.     In August 2003, Bruyneel instructed Landis to have his blood extracted for later re-infusion in connection with that year's Vuelta. Following the extraction, Bruyneel further instructed Landis to obtain EPO from Armstrong. In compliance with Bruyneel's instructions, Landis went to Armstrong's Girona apartment building, and Armstrong gave him a package containing six pre-loaded syringes of EPO. Bruyneel also advised Landis to use HGH during his training for the Vuelta, and Landis received a blood transfusion during the Vuelta at Bruyneel's instruction.

59.     Prior to the 2004 Tour de France, Armstrong had blood extracted by Dr. Dag Van Elslande at a hotel in Kortrijk, Belgium, for later re-injection during that year's tour. Bruyneel witnessed the extraction of Armstrong's blood.

60.     On at least one occasion during the 2004 Tour de France, Armstrong and Landis received blood transfusions together.

61.     In an interview with Oprah Winfrey televised on January 17 and 18, 2013, Armstrong admitted that he used banned substances and methods, starting in the mid-1990s and continuing until his retirement in 2005. In particular, he admitted having engaged in banned practices during each of the seven Tour de France races in which he competed from 1999 to 2005, including the six in which he raced as a USPS rider. Armstrong explained that he avoided detection by anti-doping authorities by carefully timing his use of banned drugs so that they would leave his system prior to his undergoing cycling's required periodic drug testing.

## VI.    DEFENDANTS' FALSE DENIALS OF PROHIBITED CONDUCT

62.     Throughout the term of the USPS's sponsorship of the team, Defendants made numerous false statements denying that the team had engaged in any prohibited practices.  Some of these denials were made by way of press releases and other public statements that were designed, in part, to assure the team's sponsors, including the USPS, that the team was not involved in the use of banned substances or practices.  On other occasions, Defendants made false statements directly to USPS employees.

63.     In particular, Defendants made a number of these statements during November and December 2000, following reports that French authorities had begun a preliminary investigation into allegations that the USPS cycling team used performance enhancing drugs in connection with the 2000 Tour de France.  These statements were made in the weeks preceding the December 26, 2000 execution of the 2000 Agreement and were intended, in part, to induce the USPS to enter the 2000 Agreement.  Examples of such statements include:

A.     On or about November 7, 2000, Tailwind's operations director told the Associated Press, in part, "Our team continues to stand by its strict no tolerance policy when it comes to any doping allegations."

B.     On or about November 9, 2000, Bruyneel told the Associated Press, "Of course, I continue to deny all doping allegations."

C.     Also on or about November 9, 2000, Tailwind's president, Mark Gorski, released a statement that read, in part, "I am absolutely convinced that there were no improprieties[.]" Gorski continued, "If there is an official inquiry, we are confident that it will find that the team was in full compliance with the strict

17

guidelines" set by UCI.  Gorski further stated that the team adhered to a "zero-tolerance" policy concerning the use of banned substances.

D. On or about the same date, and continuing until at least December 26, 2000, Gorski also made private assurances to the USPS Vice President for Sales that the USPS cycling team was not engaged in the use of banned substances or practices.

E. On or about November 30, 2000, Armstrong met with the USPS Vice President for Sales in Austin, Texas to discuss Armstrong's response to media inquiries regarding the doping allegations.  During their conversation, they also discussed ways to clean up cycling.  In response to the suggestion by the USPS Vice President for Sales that teams sponsored by large, reputable institutions such as the USPS might lead the way in such an effort by serving as examples of success achieved without doping, and by exerting pressure on other teams to be more open, Armstrong misled the USPS Vice President for Sales by suggesting, through his words and his conduct, that the USPS team was among the clean teams that might lead by example.

F. On or about December 13, 2000, Armstrong said, in a statement on his website, "Here's the bottom line to everyone: I'll start by saying that we are completely innocent[.]  We run a very clean and professional team that has been singled out due to our success[.]  I can assure everyone we do everything in the highest moral standard."

64. Following the execution of the 2000 Agreement, Defendants continued to issue false statements denying the team's use of banned substances or methods throughout the term of the 2000 Agreement.  For example:

18

A.   On or about April 9, 2001, Armstrong stated during a press conference, "I did not use performance-enhancing drugs in winning my two Tours de France and that truth has now been borne out by science[.]  Some of you may be disappointed to learn that I am clean but it is the truth and it is what I have been saying since you first accused me in 1999."

B.   On or about July 9, 2001, Armstrong released a statement denying that he had ever taken EPO.  Armstrong further stated that he had consulted with Ferrari only regarding "natural methods of improvement[.]"

C.   In a press conference on or about June 15, 2004, at the Discovery Channel world headquarters in Silver Spring, Maryland, Armstrong stated "I can absolutely confirm that we don't use doping products."  He further stated, "This is not the first time I've lived through this[.]   And every time, we've chosen to sit back and let it pass.  But we've sort of reached a point where we really can't tolerate it any more and we're sick and tired of these allegations and we're going to do everything we can to fight them.  They're absolutely untrue."

D.   Throughout the period from 2001 through 2003, Gorksi gave several assurances to the USPS Chief Marketing Officer that the team was not doping.

65.   The Defendants made the foregoing false representations with knowledge of their falsity and with the intent that the United States and other sponsors would rely on the supposed accuracy of the representation.  As to each such false representation, the United States was ignorant of its falsity and believed it to be true.

66.   Furthermore, as Armstrong has acknowledged in sworn testimony, he knew that if he was guilty of a doping offense all of his sponsorships would be terminated.

19

67.     Even after the sponsorship agreement ended, Defendants obscured the fact that they had submitted false claims by falsely asserting that Armstrong and the USPS team were not engaged in doping.  For example:

A.     In a statement he released on January 22, 2005, Armstrong told the media "As I have said before, I do not use and have never used performance-enhancing drugs."

B.     During a press conference on or about May 21, 2010, in response to Landis's allegations that USPS riders were involved in doping with Bruyneel's participation, Bruyneel stated, "I absolutely deny everything [Landis] said."

C.     On or about July 14, 2010, Armstrong publicly denied in a statement to the media that he had encouraged his teammates to dope, telling the New York Times Magazine, "As long as I live, I will deny it. ... There was absolutely no way I forced people, encouraged people, told people, helped people, facilitated. Absolutely not.  One hundred percent."

D.     On or about May 19, 2011, Armstrong sent the following message to his followers on Twitter: "20+ year career.  500 drug controls worldwide, in and out of competition.  Never failed a test.  I rest my case."

E.     On June 13, 2012, Armstrong posted a statement on his website reading, in part, "I have never doped, and, unlike my accusers, I have competed as an endurance athlete for 25 years with no spike in performance, passed more than 500 drug tests and never failed one."

F.  On or about June 15, 2012, Bruyneel posted a statement on his website reading, in part, "I have never participated in any doping activity and I am innocent of all charges [made against him by the United States Anti-Doping Agency]."

68.  Armstrong further hid his doping conduct by initiating litigation against those who suggested he had doped.  For example:

A.  In 2004, Armstrong sued the Sunday Times of London for libel, claiming that the newspaper had printed false reports of his doping.  The Sunday Times of London paid Armstrong $500,000 to settle the lawsuit.

B.  In 2004, Armstrong sued SCA Promotions, Inc. ("SCA") over a dispute that involved allegations of Armstrong's doping.  SCA had agreed that, if Armstrong won the Tour de France in 2004, it would pay Tailwind $5 million, which was the amount of the bonus Tailwind would owe Armstrong for the victory.  When Armstrong was declared the winner of that year's Tour, SCA refused to pay Tailwind, arguing that it was not liable for Armstrong's bonus because Armstrong had cheated to win the Tour.  Armstrong sued SCA and, in support of his lawsuit, falsely testified under oath that he had not doped in 2004 or prior years.  SCA ultimately paid Armstrong and Tailwind a $7.5 million settlement.

C.  In 2004, Armstrong sued Emma O'Reilly, a soigneur for the USPS team, after she alleged that he had used performance enhancing drugs.  After nearly three years in litigation, Armstrong dropped the lawsuit.  Armstrong recently admitted the truth of some of O'Reilly's allegations.

69.  As a result of (i) the doping conduct by Armstrong, Bruyneel, and Tailwind, (ii) Tailwind's failure to take immediate action upon learning of any such doping conduct, and (iii)

Tailwind's and Armstrong's failure to include a morals and drug clause in Armstrong's rider agreement, Tailwind materially failed to perform under its sponsorship agreements with the USPS from at least 1998 through 2004.  Nevertheless, Tailwind submitted invoices for payment during those years knowing it was not entitled to payment.  As a result of their conduct and false statements, Armstrong, Bruyneel, and Tailwind knowingly caused the submission and payment of these false claims.

70.    In addition, Armstrong, Bruyneel, and Tailwind made false statements they knew were material to the USPS's decision to continue its sponsorship of the team, and intended those statements to influence the USPS's decision to pay Tailwind's false claims.  The natural, ordinary, and reasonable consequence of Defendants' false statements was that the USPS would rely upon them in deciding to pay Tailwind's false claims, and, indeed, the USPS justifiably relied upon Defendants' false statements in deciding to enter the 2000 Agreement and in deciding to pay invoices submitted pursuant to the 1995 and 2000 Agreements.  Had it known the truth, the USPS would not have entered the 2000 Agreement or paid invoices submitted by Tailwind pursuant to the 1995 or 2000 Agreements.

71.    The United States paid each of the false claims submitted by Tailwind, which total approximately $40 million from 1998 through 2004, even though the non-conforming services delivered by the Defendants were of no value to the USPS.

72.    In making the false statements set forth in paragraphs 63, 64, and 67 above, the Defendants intended to avoid Tailwind's obligation to repay the United States the amounts it had received as a result of its submission of false claims, and it was reasonably foreseeable that the Defendants' statements would enable Tailwind to avoid its obligation to repay those amounts.

22

73.     As a result of Defendants' failure to disclose their doping activity and their repeated denials of such activity, the United States official charged with responsibility to act in the circumstances did not know nor should have known the facts material to any right of action any earlier than the date on which Landis filed his *qui tam* complaint, June 10, 2010, and the United States believes it is probable that the date is later.

## COUNT I
**Against All Defendants**
False Claims Act: Presentation of False Claims
31 U.S.C. § 3729(a)(1)

74.     Plaintiff United States repeats and realleges each allegation in ¶¶ 1 through 73, as if fully set forth herein.

75.     Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) presented or caused to be presented false or fraudulent claims for payment or approval to the United States.  Specifically, Defendants submitted invoices pursuant to the 1995 and 2000 Agreements while in violation of material terms of those agreements, or knowingly caused these invoices to be submitted.

76.     By virtue of the said false or fraudulent claims, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

## COUNT II
**Against All Defendants**
False Claims Act: Making or Using False Record or Statement
31 U.S.C. § 3729 (a)(1)(B)(2009)

77.     Plaintiff United States repeats and realleges each allegation in ¶¶ 1 through 76, as if fully set forth herein.

78.     Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States.  Specifically, Defendants knowingly made false statements directly to the United States Postal Service, and knowingly made numerous public statements designed to deceive the Postal Service into believing the USPS cycling team was not using prohibited substances or methods.

79.     By virtue of the said false records or statements, the United States incurred damages.

**COUNT III**
**Against All Defendants**
False Claims Act: Conspiracy
31 U.S.C. § 3729(a)(3)

80.     Plaintiff United States repeats and realleges each allegation in ¶¶ 1 through 79, as if fully set forth herein.

81.     Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) conspired to present or cause the presentation of false or fraudulent claims, or to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims.

82.     By virtue of the said conspiracy, the United States incurred damages.

**COUNT IV**
**Against All Defendants**
False Claims Act: Reverse False Claims
31 U.S.C. § 3729(a)(7)

83.     Plaintiff United States repeats and realleges each allegation in ¶¶ 1 through 82, as if fully set forth herein.

84.     Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

85.     By virtue of the said false records or statements or other acts of concealment, the United States incurred damages.

**COUNT V**
**Against All Defendants**
(Common Law Fraud)

86.     Plaintiff United States repeats and realleges each allegation in ¶¶ 1 through 85, as if fully set forth herein.

87.     In committing the foregoing acts, Defendants acted with fraud, oppression, and malice.

88.     As a proximate result of the aforesaid false statements and the facts herein alleged, the United States has sustained damages.

**COUNT VI**
**Against Armstrong and Bruyneel**
(Unjust Enrichment)

89.     Plaintiff United States repeats and realleges each allegation in ¶¶ 1 through 88, as if fully set forth herein.

90.     By reason of the foregoing conduct, Defendants were unjustly enriched at the expense of the United States.

### COUNT VII
### Against Tailwind
(Breach of Contract)

91.     Plaintiff United States repeats and realleges each allegation in ¶¶ 1 through 90, as if fully set forth herein.

92.     By reason of the actions described above, Tailwind breached the 1995 Agreement and 2000 Agreements with the United States by engaging in the use of substances and methods prohibited by the 1995 and 2000 agreement and by failing to take action against riders who employed such prohibited substances and methods.

93.     As the result of this breach of contract, the United States has sustained damages.

### PRAYER FOR RELIEF

WHEREFORE, the United States requests that judgment be entered in its favor and against the Defendants, jointly and severally, as follows:

(a)   On Counts I, II, III, and IV (False Claims Act), in the amount of treble the amount of damages to be established at trial, together with the maximum civil penalties allowed by law, plus costs, post-judgment interest and such other and further relief as the Court may deem appropriate;

(b)   On Count V (Common Law Fraud), in the amount to be established at trial, plus punitive damages as allowed by law, costs, and pre- and post-judgment interest and such other and further relief as the Court may deem appropriate;

(c)   On Count VI (Unjust Enrichment), in the amount of the benefit by which the Defendants were unjustly enriched, plus costs, pre- and post-judgment interest and such other and further relief as the Court may deem appropriate;

(d)   On Count VII (Breach of Contract), in the amount which the United States paid under the 1995 and 2000 Agreements while Tailwind was in material breach of those agreements, plus costs, pre- and post-judgment interest and such other and further relief as the Court may deem appropriate; and

(e)   Such other relief as the Court may deem just and appropriate, plus costs, and pre- and post-judgment interest.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the United States demands a jury trial in this case.

Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General

RONALD C. MACHEN JR., D.C. Bar # 447889
United States Attorney

DANIEL F. VAN HORN, D.C. Bar # 924092
Assistant United States Attorney

DARRELL C. VALDEZ, D.C. Bar # 420232
MERCEDEH MOMENI
Assistant United States Attorneys
Judiciary Center Building
555 4th St., N.W., Civil Division
Washington, D.C.  20530
Tel: (202) 307-2843

MICHAEL D. GRANSTON
ROBERT E. CHANDLER
DAVID M. FINKELSTEIN
Attorneys, Department of Justice
Civil Division
Post Office Box 261
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 514-4678

DATED: April 23, 2013

28