## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* FLOYD LANDIS, <br><br> Plaintiff, <br><br> v. <br><br> TAILWIND SPORTS CORPORATION, *et al.* <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 1:10-cv-00976-RLW <br> ) <br> ) ***ORAL HEARING REQUESTED*** <br> ) <br> ) <br> ) <br> ) |

## DEFENDANTS THOMAS W. WEISEL AND ROSS INVESTMENTS, INC.'S MOTION TO DISMISS RELATOR'S SECOND AMENDED COMPLAINT

Pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and based upon the accompanying Memorandum of Points and Authorities, the Declaration of Robert A. Sacks, executed July 23, 2013, and the exhibits thereto, Defendants Thomas W. Weisel and Ross Investments, Inc., by their undersigned counsel, hereby move this Court, before the Honorable Robert L. Wilkins, United States District Judge, for an Order dismissing Relator Floyd Landis' Second Amended Complaint for Violations of Federal False Claims Act with prejudice, and granting such other and further relief as the Court deems just and proper.

Dated:  July 23, 2013

Respectfully submitted,

/s/ Robert A. Sacks
Robert A. Sacks (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067
Telephone:     (310) 712-6600
Facsimile:     (310) 712-8800

/s/ Brendan P. Cullen
Brendan P. Cullen (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
1870 Embarcadero Road
Palo Alto, California 94303
Telephone:     (650) 461-5600
Facsimile:     (650) 461-5700

/s/ Christopher M. Viapiano
Christopher M. Viapiano (D.C. Bar No. 500771)
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone:     (202) 956-7500
Facsimile:     (202) 956-7056

*Attorneys for Defendants Thomas W. Weisel*
*and Ross Investments, Inc.*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* FLOYD LANDIS,<br><br>Plaintiff,<br><br>v.<br><br>TAILWIND SPORTS CORPORATION, *et al.*<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 1:10-cv-00976-RLW |

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS THOMAS W. WEISEL AND ROSS INVESTMENTS, INC.'S MOTION TO DISMISS RELATOR'S SECOND AMENDED COMPLAINT

Robert A. Sacks (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067
Telephone:    (310) 712-6600
Facsimile:    (310) 712-8800

Brendan P. Cullen (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
1870 Embarcadero Road
Palo Alto, California 94303
Telephone:    (650) 461-5600
Facsimile:    (650) 461-5700

Christopher M. Viapiano (D.C. Bar No. 500771)
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone:    (202) 956-7500
Facsimile:    (202) 956-7056

*Attorneys for Defendants Thomas W. Weisel and Ross Investments, Inc.*

July 23, 2013

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................1

ALLEGATIONS OF THE COMPLAINT AND RELEVANT FACTS ......................................6

PLEADING STANDARD........................................................................9

ARGUMENT ..............................................................................10

I.    RELATOR FAILS TO PLEAD A PRE-AMENDMENT FCA CLAIM AGAINST MR. WEISEL WITH THE FACTUAL PARTICULARITY REQUIRED BY RULE 9(b) ........................................................................10

    A.    Relator Fails Adequately to Allege that Mr. Weisel Submitted a False Claim to the USPS in Violation of Section 3729(a)(1) (Count 1) ....................... 11

        1.    Relator Fails Adequately to Allege that Mr. Weisel Presented, or Caused to Be Presented, a Claim to the USPS...........................................11

        2.    Relator Fails Adequately to Allege that Any Claim Submitted to the USPS Was "False.".................................................................13

        3.    Relator Fails Adequately to Allege Scienter as to Mr. Weisel .................17

    B.    Relator Fails Adequately to Allege that Mr. Weisel Made a False Statement in Violation of Section 3729(a)(2) (Count 2) ...................................... 19

    C.    Relator Fails Adequately to Allege that Mr. Weisel Entered Into a Conspiracy to Violate the FCA in Violation of Section 3729(a)(3) (Count 3) ............................................................................ 21

    D.    Relator Fails to Allege that Mr. Weisel Made a Reverse False Claim in Violation of Section 3729(a)(7) (Count 4)........................................... 22

II.    RELATOR'S CLAIMS BASED ON THE FCA AS AMENDED BY FERA MUST BE DISMISSED BECAUSE FERA DOES NOT APPLY RETROACTIVELY TO ANY CONDUCT ALLEGED IN THE COMPLAINT ...........23

III.    RELATOR COMES NOWHERE CLOSE TO ALLEGING SUFFICIENT GROUNDS TO PIERCE TAILWIND'S CORPORATE VEIL AND HOLD MR. WEISEL OR ROSS INVESTMENTS LIABLE FOR ANY PURPORTED FCA VIOLATIONS BY TAILWIND ....................................................24

    A.    Relator's Allegations Demonstrate that Tailwind Observed Corporate Formalities ......................................................................... 26

        1.    Relator Fails to Allege that Mr. Weisel "Dominated" or "Controlled" Tailwind ...........................................................27

        2.    Tailwind Maintained Adequate Corporate Records ...............................29

# TABLE OF CONTENTS
## (Continued)

**Page**

      3.     Relator Fails to Allege Co-Mingling or Diversion of Assets ...................29

      4.     Tailwind's Board Was Independent...........................................................30

      5.     Mr. Weisel and Tailwind Maintained Separate Offices............................31

   B.   Relator Fails to Allege Equitable Grounds for Piercing the Corporate Veil ........ 31

IV.   RELATOR FAILS ADEQUATELY TO ALLEGE THAT ROSS INVESTMENTS VIOLATED THE FCA ..........................................................................33

V.    THE VAST MAJORITY OF RELATOR'S CLAIMS ARE BARRED BY THE FCA'S SIX-YEAR STATUTE OF LIMITATIONS........................................................33

VI.   RELATOR'S COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE AS AGAINST MR. WEISEL AND ROSS INVESTMENTS.................................................35

CONCLUSION...............................................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Albright* v. *Attorney's Title Ins. Fund*,
　504 F. Supp. 2d 1187 (D. Utah 2007)....................................................................30

*U.S. ex rel. Alexander* v. *Dyncorp, Inc.*,
　924 F. Supp. 292 (D.D.C. 1996)..........................................................................13

*Allison Engine Co., Inc.* v. *U.S. ex rel. Sanders*,
　553 U.S. 662 (2008)...........................................................................................21

*Ashcroft* v. *Iqbal*,
　556 U.S. 662 (2009)...........................................................................................12

*U.S. ex rel. Baggan* v. *DME Corp.*,
　No. 96-1983-LFO, 1997 WL 600569 (D.D.C. Sept. 22, 1997)........................2, 36

*U.S. ex rel. Barrett* v. *Columbia/HCA Healthcare Corp.*,
　251 F. Supp. 2d 28 (D.D.C. 2003)........................................................................11

*Bell Atl. Corp.* v. *Twombly*,
　550 U.S. 544 (2007)...........................................................................................12

* *U.S. ex rel. Bender* v. *N. Am. Telecomms., Inc.*,
　499 F. App'x 44 (D.C. Cir. 2013).....................................................................10, 13

*U.S. ex rel. Bender* v. *N. Am. Telecomms., Inc.*,
　686 F. Supp. 2d 46 (D.D.C. 2010)....................................................................11, 36

* *U.S. ex rel. Bender* v. *N. Am. Telecomms., Inc.*,
　750 F. Supp. 2d 1 (D.D.C. 2010)........................................................10, 13, 23, 36

*U.S. ex rel. Berge* v. *Bd. of Trs. of the Univ. of Ala.*,
　104 F.3d 1453 (4th Cir. 1997)............................................................................20

*Boone* v. *MountainMade Found.*,
　684 F. Supp. 2d 1 (D.D.C. 2010).........................................................................23

*Caraluzzi* v. *Prudential Sec., Inc.*,
　824 F. Supp. 1206 (N.D. Ill. 1993).......................................................................27

*In re Currency Conversion Fee Antitrust Litig.*,
　265 F. Supp. 2d 385 (S.D.N.Y. 2003)...................................................................25

## TABLE OF AUTHORITIES
### (continued)

*EEOC* v. *St. Francis Xavier Parochial Sch.*,
  117 F.3d 621 (D.C. Cir. 1997) ..................................................................3, 27

\* *U.S. ex rel. El Amin* v. *George Wash. Univ.*,
  26 F. Supp. 2d 162 (D.D.C. 1998) ..........................................................22, 34

*Amore ex rel. Estates of Amore* v. *Accor*,
  529 F. Supp. 2d 85 (D.D.C. 2008) ..........................................................24, 28

*U.S. ex rel. Fago* v. *M & T Mortg. Corp.*,
  518 F. Supp. 2d 108 (D.D.C. 2007) ...............................................................22

*In re Fed. Nat'l Mortg. Ass'n Sec., Deriv., ERISA Litig.*,
  503 F. Supp. 2d 9 (D.D.C. 2007) ...................................................................31

*U.S. ex rel. Fisher* v. *Network Software Assocs., Inc.*,
  180 F. Supp. 2d 192 (D.D.C. 2002) ...............................................................34

*Flynn* v. *Thibodeaux Masonry, Inc.*,
  311 F. Supp. 2d 30 (D.D.C. 2004) .................................................................32

*U.S. ex rel. Folliard* v. *Hewlett-Packard Co.*,
  272 F.R.D. 31 (D.D.C. 2011) .........................................................................36

*U.S. ex rel. Gagne* v. *City of Worcester*,
  565 F.3d 40 (1st Cir. 2009) ............................................................................21

*Hager* v. *Fed. Nat'l Mortg. Ass'n*,
  882 F. Supp. 2d 107 (D.D.C. 2012) ...............................................................35

*Halpert Enters., Inc.* v. *Harrison*,
  362 F. Supp. 2d 426 (S.D.N.Y. 2005) ............................................................31

*U.S. ex rel. Hockett* v. *Columbia/HCA Healthcare Corp.*,
  498 F. Supp. 2d 25 (D.D.C. 2007) ..........................................................24, 30

*Hoyte* v. *Am. Nat'l Red Cross*,
  518 F.3d 61 (D.C. Cir. 2008) .........................................................................22

*Ivanov* v. *Sunset Pools Mgmt., Inc.*,
  524 F. Supp. 2d 13 (D.D.C. 2007) .................................................................24

*James Madison Ltd.* v. *Ludwig*,
  82 F.3d 1085 (D.C. Cir. 1996) .......................................................................35

# TABLE OF AUTHORITIES
### (continued)

*Kelley* v. *District of Columbia*,
    893 F. Supp. 2d 115 (D.D.C. 2012) .......................................................................22

*U.S. ex rel. Kreindler & Kreindler* v. *United Techs. Corp.*,
    777 F. Supp. 195 (N.D.N.Y. 1991) .......................................................................35

\* *Labadie Coal Co.* v. *Black*,
    672 F.2d 92 (D.C. Cir. 1982) ......................................................................... *passim*

*U.S. ex rel. Laughlin* v. *Eicher*,
    56 F. Supp. 972 (D.D.C. 1944) ...............................................................................2

*In re Livent, Inc. Noteholders Sec. Litig.*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001) ..................................................................28

*Local Union No. 98 IBEW* v. *RGB Servs., LLC*,
    No. 10-3486, 2011 WL 292233 (E.D. Pa. Jan. 28, 2011) ....................................25

*Luckey* v. *Balboa Ins. Co.*,
    685 F. Supp. 2d 8 (D.D.C. 2010) .........................................................................33

*NLRB* v. *Greater Kan. City Roofing*,
    2 F.3d 1047 (10th Cir. 2001) ...............................................................................32

*Orman* v. *Cullman*,
    794 A.2d 5 (Del. Ch. 2002) ..................................................................................31

*Papa* v. *Katy Indus., Inc.*,
    166 F.3d 937 (7th Cir. 1999) (Posner, J.) ............................................................32

*U.S. ex rel. Piacentile* v. *Wolk*,
    No. 93-5771, 1995 WL 20833 (E.D. Pa. Jan. 17, 1995) ......................................12

*U.S. ex rel. Pilecki-Simko* v. *Chubb Inst.*,
    No. 06-3562, 2010 WL 1076228 (D.N.J. Mar. 22, 2010) ....................................32

*U.S. ex rel. Pogue* v. *Diabetes Treatment Ctrs. of Am., Inc.*,
    474 F. Supp. 2d 75 (D.D.C. 2007) (Lamberth, J.) ...............................................34

*U.S. ex rel. Sanders* v. *N. Am. Bus Indus., Inc.*,
    546 F.3d 288 (4th Cir. 2008) ...............................................................................34

*Seiko Epson Corp.* v. *Print-Rite Holdings, Ltd.*,
    No. CV 01-500-BR, 2002 WL 32513403 (D. Or. Apr. 30, 2002) .........................30

# TABLE OF AUTHORITIES
## (continued)

\* *U.S. ex rel. Siewick* v. *Jamieson Sci. & Eng'g, Inc.*,
   191 F. Supp. 2d 17 (D.D.C. 2002) ................................................................. *passim*

*Steury* v. *Cardinal Health, Inc.*,
   625 F.3d 262 (5th Cir. 2010) .......................................................................16

*U.S. ex rel. Totten* v. *Bombardier Corp.*,
   286 F.3d 542 (D.C. Cir. 2002) ...................................................................9, 10

*United States* v. *Bouchey*,
   860 F. Supp. 890 (D.D.C. 1994) .....................................................................21

*United States* v. *DRC, Inc.*,
   856 F. Supp. 2d 159 (D.D.C. 2012) ...........................................................13, 14

*United States* v. *First Choice Armor & Equip., Inc.*,
   808 F. Supp. 2d 68 (D.D.C. 2011) ..............................................................4, 11

*United States* v. *Honeywell Int'l Inc.*,
   798 F. Supp. 2d 12 (D.D.C. 2011) ..................................................................17

*United States* v. *Inc. Vill. of Island Park*,
   791 F. Supp. 354 (E.D.N.Y. 1992) .................................................................35

*United States* v. *Intrados/Int'l Mgmt. Grp.*,
   265 F. Supp. 2d 1 (D.D.C. 2002) ...................................................................35

*United States* v. *Kellogg Brown & Root Servs., Inc.*,
   800 F. Supp. 2d 143 (D.D.C. 2011) ................................................................13

\* *United States* v. *Sci. Applications Int'l Corp.*,
   626 F.3d 1257 (D.C. Cir. 2010) .................................................13, 14, 17, 18

*United States* v. *Toyobo Co.*,
   811 F. Supp. 2d 37 (D.D.C. 2011) ............................................................14, 21

*U.S. ex rel. Westrick* v. *Second Chance Body Armor, Inc.*,
   685 F. Supp. 2d 129 (D.D.C. 2010) ................................................................24

*U.S. ex rel. Westrick* v. *Second Chance Body Armor, Inc.*,
   709 F. Supp. 2d 52 (D.D.C. 2010) ..............................................................4, 23

*Wilkins* v. *United Health Grp., Inc.*,
   659 F.3d 295 (3d Cir. 2011) .......................................................................16

# TABLE OF AUTHORITIES
## (continued)

*U.S. ex rel. Williams* v. *Martin-Baker Aircraft Co., Ltd.*,
    389 F.3d 1251 (D.C. Cir. 2004) ..................................................................................12

### Statutes, Rules, and Regulations

31 U.S.C. § 3130(b)(1) ...............................................................................................36

31 U.S.C. § 3729(a)(1)................................................................................................. *passim*

31 U.S.C. § 3729(a)(1)(A) ...........................................................................................23

31 U.S.C. 3729(a)(1)(B) ...........................................................................................23, 24

31 U.S.C. § 3729(a)(2)...............................................................................10, 19, 20, 23

31 U.S.C. § 3729(a)(3)...............................................................................10, 21, 22, 23

31 U.S.C. § 3729(a)(7)...............................................................................10, 22, 23

31 U.S.C. § 3731(b)(1) ...............................................................................5, 33, 35

31 U.S.C. § 3731(b)(2) ...............................................................................19, 34, 35

F.R.C.P. Rule 8(a).....................................................................................4, 12, 33

F.R.C.P. Rule 9(b) ..................................................................................... *passim*

F.R.C.P. Rule 12(b)(6), ............................................................................1, 3, 36

Pub. L. No. 111-21, 123 Stat. 1617 (2009)................................................................4

Defendants Thomas W. Weisel and Ross Investments, Inc. ("Ross Investments") respectfully submit this memorandum of points and authorities in support of their motion, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Second Amended Complaint for Violations of Federal False Claims Act filed by Relator Floyd Landis for failure to state a claim.

## PRELIMINARY STATEMENT

For years, Floyd Landis ("Relator") denied using performance enhancing drugs – both when he won the Tour de France while riding for Team Phonak and previously when he raced for the United States Postal Service ("USPS") cycling team. He even denied doping when he solicited contributions from Mr. Weisel and others to a defense fund after testing positive for drug use following his Tour de France victory – criminal conduct for which he was later prosecuted by the United States and has since admitted guilt. That all changed in April 2010 when Relator admitted to having doped throughout his career and accused Lance Armstrong and other riders on the USPS team of doping along with him. In June 2010 – some six years after the conclusion of the USPS's sponsorship of the cycling team – Relator revealed the actual reason for his supposed journey to redemption by filing this *qui tam* action against Armstrong and other individuals and entities associated with the USPS cycling team. Relator contended that the defendants violated the False Claims Act, 31 U.S.C. § 3729 *et seq*. ("FCA"), by submitting invoices for payment under the terms of the sponsorship agreements between the USPS and the team that supposedly were rendered "false" by Armstrong's, his own and other riders' secret use of performance enhancing drugs.

One of the defendants named by Relator in his initial complaint was Mr. Weisel, a well-known San Francisco banker and philanthropist. Mr. Weisel, a long-time patron of under-supported sports like cycling, skiing and speed skating, was an indirect investor in the entity that owned the USPS cycling team, and Chairman of its Board of Directors. In his complaint, Relator described in detail his own doping, that of other riders on the USPS cycling team and the knowledge of team coaches. Notably absent from Relator's allegations, however, were any

actual *facts* that Mr. Weisel knew anything about that doping – something Relator would have been in a position to allege had there been any basis to do so given his personal knowledge of the doping and the cover-up.  There were no facts in the complaint even suggesting that Mr. Weisel ever submitted any invoice or claim for payment to the USPS or intended to defraud the USPS. (*See* Dkt. No. 1.)

       Prompted by the filing of Relator's complaint, the U.S. Department of Justice ("DOJ") conducted an extensive, two-and-a-half-year investigation into Relator's allegations that included a review of nearly 136,000 pages of documents produced by Mr. Weisel alone and an under-oath interview of Mr. Weisel.  Following that investigation, on February 22, 2013, the United States intervened in Relator's FCA action against Armstrong, Johan Bruyneel, the former coach of the USPS cycling team, and Tailwind Sports Corp. and Tailwind Sports LLC, entities that owned the team and submitted claims for payment to the USPS (collectively, "Tailwind"). (Dkt. No. 41.)  The United States ***declined*** to intervene against Mr. Weisel.  The United States' considered decision not to intervene against Mr. Weisel may be taken as "tantamount to [the] consent" of the United States to dismiss Relator's suit against him.  *See U.S. ex rel. Baggan* v. *DME Corp.*, No. 96-1983-LFO, 1997 WL 600569, at *3 n.6 (D.D.C. Sept. 22, 1997) (citing *U.S. ex rel. Laughlin* v. *Eicher*, 56 F. Supp. 972, 973 (D.D.C. 1944)).  Indeed, when the United States subsequently filed its 93-paragraph complaint detailing rampant doping by the riders on the USPS cycling team and the purportedly false claims for payment submitted to the USPS by Tailwind, it did not mention Mr. Weisel even once.  (*See* Dkt. No. 44.)

       The United States' Complaint is not the only recounting of the doping by the riders on the USPS cycling team that does not mention Mr. Weisel.  While the DOJ was conducting its investigation, the United States Anti-Doping Agency ("USADA"), the official anti-doping agency for Olympic sports in the United States, conducted its own multi-year investigation into the doping allegations.  USADA's investigation included the review of thousands of pages of documents and interviews of dozens of witnesses, including nine former riders on the USPS cycling team.  On October 10, 2012, USADA publicly issued a

comprehensive "Reasoned Decision" concluding that the USPS cycling team "'ran the most sophisticated, professionalized and successful doping program that sport has ever seen.'" (Compl. ¶ 224.)  Nowhere in that 164-page decision is Mr. Weisel mentioned.  In the 33 pages of addenda and 26 affidavits (totaling 318 pages) that support that decision, there is only one passing reference to Mr. Weisel.[1]

Undeterred by the United States' decision not to intervene against Mr. Weisel or the Reasoned Decision's failure even to mention him, on February 22, 2013, Relator filed a second amended complaint (Dkt. No. 42 (the "Complaint")), again naming Mr. Weisel as a defendant and adding as a defendant Ross Investments, a company wholly owned by Mr. Weisel. (Relator had previously filed a first amended complaint in December 2010.)  Relator's continued pursuit of FCA claims against Mr. Weisel is frivolous.  Despite these two investigations – and Relator's obviously extensive personal knowledge of the doping and the cover-up – the Complaint utterly lacks factual allegations demonstrating Mr. Weisel's knowledge of the doping. Instead, Relator's Complaint includes only wholly conclusory allegations that Mr. Weisel knew or should have known about the doping by the riders on the USPS cycling team.  To the extent Relator makes any allegations at all that Mr. Weisel submitted a claim for payment to the USPS or intended to defraud the USPS, these allegations are equally, if not more, conclusory.

After three years and two amendments, and the intervention of the United States to prosecute this action against other defendants, Relator's Complaint should be dismissed in its entirety and with prejudice as to Mr. Weisel and Ross Investments pursuant to Rules 9(b) and 12(b)(6) for at least the following reasons.

---

[1]     When deciding this motion, the Court may consider "any documents either attached to or incorporated in the complaint," *EEOC* v. *St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997), which would include the Reasoned Decision and its supporting documents. The Reasoned Decision and its addenda are attached as Exhibit 1 to the Declaration of Robert A. Sacks, dated July 23, 2013, and filed concurrently herewith ("Sacks Decl."), while the supporting affidavits are available at USADA's website, http://cyclinginvestigation.usada.org/.

*First*, and most fundamentally, Relator fails to plead a violation of the FCA by Mr. Weisel with the factual particularity required by Rule 9(b) – the pleading standard applicable to FCA claims – or even the more liberal standard of Rule 8(a).  Relator asserts four claims under the FCA as it stood prior to amendment by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617 (2009):  (i) submitting a false claim for payment to the USPS (Count 1); (ii) making a false statement to have a false claim paid by the USPS (Count 2); (iii) conspiring to have a false claim paid by the USPS (Count 3); and (iv) making a false statement to decrease an obligation owed to the USPS (a "reverse false claim") (Count 4).  Each of these claims fails.  Count 1 fails for at least three reasons – because Relator does not adequately allege (a) that Mr. Weisel made a claim to the USPS for payment, (b) that any such claim was "false" or (c) that Mr. Weisel knew that any such claim was false.  Count 2 fails for at least two reasons – because Relator does not adequately allege that Mr. Weisel (a) made a false statement (b) with the specific intent of inducing the USPS to pay a claim.  Count 3 also fails for at least two reasons – because Relator does not adequately allege (a) that Mr. Weisel entered into a conspiracy with anyone, much less (b) with the specific intent to defraud the USPS.  And Count 4 fails because Relator does not allege that Mr. Weisel or any of the other defendants owed any money to the USPS, as is required to plead a reverse false claim.

*Second*, Relator fails to allege a violation of the FCA as amended by FERA.  The changes FERA made to the FCA in May 2009 do not apply retroactively to conduct that occurred before the enactment date.  FERA, Pub. L. No. 111-21 § 4(f).  So the entirely pre-May 2009 conduct described in the Complaint cannot possibly give rise to a violation of the post-amendment provisions of the FCA.  Even if the post-amendment provisions of the FCA were relevant, Counts 5-8 would fail as to Mr. Weisel for many of the same reasons that Relator's pre-amendment FCA claims (Counts 1-4) fail.

*Third*, Relator's attempt to pierce Tailwind's corporate veil to hold Mr. Weisel (or Ross Investments) liable for Tailwind's purported FCA violations is completely unavailing.

Piercing the corporate veil is an extraordinary remedy used only when an entity is operating as a corporate fiction and piercing its veil is necessary to prevent fraud or injustice.  Relator does not begin to allege the facts necessary to satisfy that high bar.  The 60-plus paragraphs of the Complaint devoted to Mr. Weisel's ownership interest in Tailwind (through Ross Investments), his role as Chairman of Tailwind's Board of Directors, his financial contributions to Tailwind, his business ties with other Tailwind directors and Tailwind's business dealings with companies associated with Mr. Weisel do not even come close to demonstrating (1) that Tailwind so disregarded corporate formalities as to be Ross Investments' or Mr. Weisel's alter ego and (2) that fraud or injustice would result unless Tailwind's corporate veil is pierced.  *See, e.g.*, *U.S. ex rel. Siewick* v. *Jamieson Sci. & Eng'g, Inc.*, 191 F. Supp. 2d 17, 21 (D.D.C. 2002) (existence of even a *sole and controlling shareholder* does not alone justify invoking alter ego doctrine), *aff'd*, 322 F.3d 738 (D.C. Cir. 2003).  Instead, the Complaint's other allegations – and information incorporated by reference into the Complaint – demonstrate that Tailwind observed corporate formalities and that neither Mr. Weisel nor Ross Investments "dominated" or "controlled" Tailwind as Relator conclusorily asserts.

**Fourth**, Relator fails even more totally – if that even is possible – to state a claim against Ross Investments.  In the Complaint, Relator mentions Ross Investments only four times (Compl. ¶¶ 16, 18, 172, 238), and does not even attempt to plead facts that show that Ross Investments violated the FCA.  Instead, Relator conclusorily states that "Ross Investments was owned by Weisel at all times relevant to this complaint and was his alter ego with regard to the conduct alleged herein."  (*Id*. ¶ 238.)  That is precisely the type of statement routinely disregarded by courts when deciding a motion to dismiss for failure to state a claim.

**Finally**, even if Relator's claims were permitted to proceed against Mr. Weisel or Ross Investments (and there is no legitimate basis for them to proceed), the vast majority of the purportedly false claims are time-barred by the FCA's six-year statute of limitations.  *See* 31 U.S.C. § 3731(b)(1).  Of the $31,442,262.57 paid by the USPS under a Sponsorship Agreement

executed in 2000, the Complaint makes clear that *99.8%* ($31,374,092.12) was paid more than six years before Relator commenced this action in June 2010.  (*See* Compl. Ex. 1.)  At a minimum, the Court should dismiss these time-barred claims.

## ALLEGATIONS OF THE COMPLAINT AND RELEVANT FACTS

Mr. Weisel, a respected investment banker and philanthropist, has invested countless hours and millions of dollars of his own money advancing the sport of cycling in the United States.  In 1989, he joined with other investors to found Montgomery Sports, Inc. ("Montgomery Sports") to own and manage a professional cycling team.  (*Id.* ¶¶ 6, 134.)  Mr. Weisel served as President of Montgomery Sports, while the cycling team was managed day-to-day by a professional manager.  (*Id.* ¶¶ 6, 134, 188.)  In 1995, the USPS agreed to sponsor the team owned by Montgomery Sports, which became the USPS cycling team.  (*Id.* ¶ 23.)  Pursuant to the "1995 Sponsorship Agreement," the USPS sponsored the team from 1996 through 2000.  (*Id.* ¶¶ 24-28; Sacks Decl. Ex. 2 (Sponsorship Agreement between Montgomery Sports, Inc. and USPS, dated Oct. 1, 1995 ("1995 Sponsorship Agr.")).)

In 1999, Montgomery Sports (which had been renamed TWP Sports, Inc.) merged with Tailwind.[2]  (*Id.* ¶ 7.)  Mr. Weisel served as Chairman of the Board of Directors of Tailwind.  (*Id.* ¶ 10.)  Other directors of Tailwind included Joe Vittoria, the former Chairman and CEO of Avis, Inc., Jody Gessow, a founder and former CEO of Signature Resorts, and Harvey Schiller, Ph.D., a former head of the United States Olympic Committee and a former Vice President of Turner Broadcasting System, Inc. (TBS).  (*Id.* ¶¶ 187, 190; Sacks Decl. Ex. 3 at 25-26 (Tailwind Sports, LLC Private Placement Memorandum (March 2002) ("2002 Mem.")).)  The cycling team was managed by several former professional cyclists, including Mark Gorski, who was responsible for "the Team's sponsor relationships and the selection and development of the

---

[2]     The Complaint recounts the history of Tailwind:  Tailwind Sports LLC was founded in April 1999 under the name Disson Furst and Partners, LLC, merged with TWP Sports, Inc. (to which Montgomery Sports had changed its name) in June 1999, changed its name to Tailwind Sports LLC in March 2001, and merged into Tailwind Sports Corp. in July 2002.  (*See* Compl. ¶¶ 7-9.)

Team's riders," and Bruyneel, who also was responsible for "developing the Team's riders and selecting the Team roster." (Sacks Decl. Ex. 3 at 26 (2002 Mem.); *see also* Compl. ¶ 13 ("Bruyneel was the managing director (aka 'Director Sportif') of the USPS Team from 1998 through 2004").) Mr. Weisel owned roughly 30% of Tailwind through his ownership of Ross Investments, though his interest decreased over time as others – including Ward Woods, trustee of the Packard Foundation and former trustee of Stanford University, and John Bucksbaum, a prominent real estate investor – invested in Tailwind. (Compl. ¶¶ 16, 18-21, 172-74.)

In 2000, the USPS entered into a new sponsorship agreement with Tailwind that lasted from 2001 to 2004 (the "2000 Sponsorship Agreement"). (*Id.* ¶ 29; Sacks Decl. Ex. 4 (Sponsorship Agreement between DFP Cycling, LLC and USPS, dated Dec. 26, 2000 ("2000 Sponsorship Agr.")).) Armstrong had joined the USPS cycling team in 1998, while Relator joined in 2001; both rode with the team until 2004. (Compl. ¶¶ 44, 80, 135.) (Armstrong continued to ride for the team with its new title sponsor, Discovery Channel, while Relator joined the Phonak team for which he would ride in and win (at least temporarily) the 2006 Tour de France.) Armstrong, supported by the other riders on the USPS cycling team, including Relator, won the Tour de France every year from 1999 to 2004 (and an additional time with the Discovery Channel team in 2005). (*Id.* ¶ 110.) Pursuant to the 2000 Sponsorship Agreement, Tailwind submitted claims for payment to the USPS, including for the riders' salaries and bonuses for race victories, which the USPS paid. (*Id.* ¶¶ 30, 33, 35, 55.) The payments from the USPS did not cover all of Tailwind's expenses (*id.* ¶¶ 176-77) and Mr. Weisel also made significant financial contributions to Tailwind for the benefit of the USPS cycling team, totaling "'several million dollars'" (*id.* ¶ 135). The USPS ended its sponsorship of the USPS cycling team in June 2004 and made its final payment under the 2000 Sponsorship Agreement in October 2004. (*Id.* ¶ 32 & Ex. 1.)

As described in detail in the Complaint, throughout at least the 2001 to 2004 period when Relator was a member of the USPS cycling team, Armstrong, Relator, and other riders on the team used performance enhancing drugs and successfully concealed their doping.

(*Id.* ¶¶ 80-120.)  Indeed, Armstrong later bragged, "20+ year career.  500 drug controls worldwide, in and out of competition.  Never failed a test."  (U.S. Compl. ¶ 67D.)  "[T]eam doctors and team management, including defendant Johan Bruyneel" allegedly facilitated the doping.  (Compl. ¶ 111.)  The USPS cycling team was the subject of a number of contemporaneous rumors about its riders' doping, but team riders and management, including Armstrong, Relator and Bruyneel, repeatedly and forcefully denied them.  (*Id.* ¶¶ 121-27, 149.)  As Armstrong said during a press conference in June 2004, "I can absolutely confirm that we don't use doping products. . . . We don't use doping products and we will sue those who suggest we do."  (*Id.* ¶ 127; U.S. Compl. ¶ 64C.)  Armstrong made good on this threat.  (U.S. Compl. ¶ 68.)

The doping rumors persisted even after the USPS sponsorship ended in 2004.  (*See id.* ¶ 67.)  Rumor became fact – for Relator anyway – when he tested positive for performance enhancing drugs shortly after winning the 2006 Tour de France.  (Compl. ¶ 119.)  Relator denied that he had ever doped:  he wrote a book denying doping (the book's title, of all things:  *Positively False*), he made numerous public appearances saying that he had never doped and he repeatedly insisted that he had never doped during the USADA arbitration on whether his Tour victory should be nullified.  (*See* Sacks Decl. Ex. 5 (News Release, Office of the U.S. Attorney, Former Pro Cyclist Floyd Landis Admits Defrauding Donors and Agrees to Pay Hundreds of Thousands of Dollars in Restitution (Aug. 24, 2012) ("8/24/12 USAO Press Release")).)  He also said so in public and in-person solicitations of donations to the "Floyd Fairness Fund" to assist with his defense of the USADA arbitration – including a donation of $50,000 from Mr. Weisel.[3]  (*Id.*; Compl. ¶ 135.)  On April 30, 2010, Relator admitted that he had in fact doped throughout his cycling career.  (Compl. ¶ 217.)

---

[3]   On August 24, 2012, the U.S. Attorney for the Southern District of California announced that Floyd Landis had agreed to enter into a deferred prosecution agreement for fraud charges relating to his false statements in connection with his solicitation of donations to the Floyd Fairness Fund.  (Sacks Decl. Ex. 5 (8/24/12 USAO Press Release).)

Following Relator's admission to doping, USADA began an investigation into doping by riders on the USPS team.  More than two years later, USADA issued its Reasoned Decision, which attached 26 affidavits, 15 of which were from riders with personal knowledge of the USPS cycling team and its riders' doping activities.  (*Id.* ¶ 224.)  The decision itself contains several exhibits, including emails, scientific data and laboratory test results.  (*Id.*)  USADA observed that the "USPS Team doping conspiracy was professionally designed to groom and pressure athletes to use dangerous drugs, to evade detection, to ensure its secrecy and ultimately gain an unfair competitive advantage through superior doping practices."  (Sacks Decl. Ex. 6 (Press Release, USADA, Statement from USADA CEO Travis T. Tygart Regarding the U.S. Postal Service Pro Cycling Team Doping Conspiracy (Oct. 10, 2012)).)   Notwithstanding Relator's allegations that Mr. Weisel was "at all relevant times knowledgeable about, and approved of, the doping program of the USPS Team and the falsity of the claims being submitted to the US Postal Service under the [two] Sponsorship Agreements" (Compl. ¶ 145), Mr. Weisel is not mentioned even once in the 164-page Reasoned Decision.  In all of the materials supporting the Reasoned Decision, Mr. Weisel is mentioned only once in passing by a former team "soigneur" or assistant.  (Sacks Decl. Ex. 7 ¶ 84 (Affidavit of Emma O'Reilly, dated Oct. 9, 2012).)  He is not mentioned in any of the affidavits provided by former USPS cycling team riders.

Armstrong finally admitted to his own years of doping during a televised interview with Oprah Winfrey on January 14, 2013.  (Compl. ¶ 225.)

## PLEADING STANDARD

Because Relator's FCA claims sound in fraud, the heightened pleading standard of Rule 9(b) applies.  *U.S. ex rel. Totten* v. *Bombardier Corp.*, 286 F.3d 542, 551-52 (D.C. Cir. 2002) ("Every circuit to consider the issue has held that, because the False Claims Act is self-evidently an anti-fraud statute, complaints brought under it must comply with Rule 9(b).").  Under Rule 9(b), a relator must plead the "circumstances" of the submission of false claims "such as the time, place, and contents of the *false* representations" and "must set forth an

adequate factual basis for his allegations that [the defendant] submitted false claims (or false statements in order to get false claims paid), including a . . . detailed description of the specific falsehoods that are the basis for his suit." *Id.* at 552 (internal quotation marks omitted).  Where, as here, a relator asserts claims against multiple defendants, the relator "must specifically allege facts giving rise to liability for *each defendant individually*."  *U.S. ex rel. Bender* v. *N. Am. Telecomms., Inc.*, 750 F. Supp. 2d 1, 6 (D.D.C. 2010) ("*Bender II*") (emphasis added), *aff'd*, 499 F. App'x 44 (D.C. Cir. 2013).[4]

## ARGUMENT

## I.   RELATOR FAILS TO PLEAD A PRE-AMENDMENT FCA CLAIM AGAINST MR. WEISEL WITH THE FACTUAL PARTICULARITY REQUIRED BY RULE 9(b).

Relator asserts four pre-amendment FCA claims against Mr. Weisel: (i) submitting a false claim for payment to the USPS (Count 1, in violation of Section 3729(a)(1) of Title 31[5]); (ii) making a false statement to get a false claim paid by the USPS (Count 2, in violation of Section 3729(a)(2)); (iii) conspiring to have a false claim paid by the USPS (Count 3, in violation of Section 3729(a)(3)); and (iv) making a reverse false claim, or making a false statement to decrease an obligation owed to the USPS (Count 4, in violation of Section 3729(a)(7)).  These claims fail for two overarching reasons.  First, the FCA attaches liability only "to the claim for payment," not to "underlying fraudulent conduct."  *Bombardier Corp.*, 286 F.3d at 551 (internal quotation marks omitted).  Relator never alleges with sufficient

---

[4]     Throughout the Complaint, Relator pleads "on information and belief" and claims that purportedly relevant facts are within the defendants' control.  (*See*, *e.g.*, Compl. ¶ 3 ("Unless otherwise stated, when allegations are made based on information and belief herein, the defendants are in possession of information necessary to confirm the allegations.").)  But such a "vague allegation" will not relax the heightened pleading requirements of Rule 9(b).  *U.S. ex rel. Bender* v. *N. Am. Telecomms., Inc.*, 499 F. App'x 44, 45 (D.C. Cir. 2013) ("*Bender III*") (applying Rule 9(b) to FCA claims despite relator's "vague allegation" that "material facts and records pertaining to the false or fraudulent claims, statements and documents submitted to the Government lie within the possession of [defendants], including the specific certifications, billings, statements and records submitted to the Government").

[5]     All references to "Section __" are to sections of Title 31 the U.S. Code unless otherwise indicated.

particularity that Mr. Weisel made a claim for payment to the USPS (or a false statement to get a claim paid). Second, to state an FCA claim, Relator "need[s] to set out the details of the specific scheme and its falsehoods, as well as supply the time, place, and content of false representations, *and link that scheme to claims for payment made to the United States*." *U.S. ex rel. Barrett* v. *Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 35 (D.D.C. 2003) (emphasis added). Relator fails to establish that link for Mr. Weisel. All of his detailed allegations about doping by the riders on the USPS cycling team and efforts to conceal that doping are irrelevant for purposes of stating a claim against Mr. Weisel absent particularized factual allegations that show that Mr. Weisel knew of the doping and then knowingly made false claims or statements.

      **A.**      **Relator Fails Adequately to Allege that Mr. Weisel Submitted a False Claim to the USPS in Violation of Section 3729(a)(1) (Count 1).**

To state a claim under Section 3729(a)(1) (pre-FERA), Relator must allege: "(1) the defendant submitted a claim to the government, (2) the claim was false, and (3) the defendant knew the claim was false." *United States* v. *First Choice Armor & Equip., Inc.*, 808 F. Supp. 2d 68, 74 (D.D.C. 2011). Relator fails to allege even one element of the claim, let alone all three, with the specificity required by Rule 9(b).

      **1.**      **Relator Fails Adequately to Allege that Mr. Weisel Presented, or Caused to Be Presented, a Claim to the USPS.**

Despite Section 3729(a)(1)'s express requirement, Relator fails to allege that Mr. Weisel "present[ed], or cause[d] to be presented," "a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1). The Complaint alleges that *Tailwind* submitted claims to the USPS for payment (*see, e.g.*, Compl. ¶ 55), but nowhere alleges that Mr. Weisel personally made such a claim. *See U.S. ex rel. Bender* v. *N. Am. Telecomms., Inc.*, 686 F. Supp. 2d 46, 54 (D.D.C. 2010) ("*Bender I*") (dismissing FCA claims against individual defendant even though he allegedly wrote a memo describing company's scheme to "double dip the Government and make extra money," because "it does not mean that [defendant] himself submitted any false claims to USDA, and the Complaint makes no such allegation").

Instead, Relator rests on his repeated assertion that Mr. Weisel "authorized" the submission of the alleged claims. (*See, e.g.*, Compl. ¶¶ 145 ("[Mr. Weisel] authorized the submission of such claims by Tailwind, and agreed on their submission with the other defendants to get the claims paid by the [USPS]."), 150 ("Weisel knowingly authorized claims for payment to be submitted to the Postal Service by Tailwind").)  But such "labels and conclusions" and "'naked assertion[s]' devoid of 'further factual enhancement'" fail to satisfy even the minimal pleading requirements of Rule 8(a).  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007)).  These allegations come nowhere close to describing what *actions* Mr. Weisel allegedly took to "authorize" any claim to be submitted – or to "scheme" with anyone to present a claim – as required under Rule 9(b).  Relator never sets forth the what, when, how or where of any such authorization by Mr. Weisel, who is not alleged to have been (i) an employee of Tailwind, (ii) responsible for submitting claims to the USPS on behalf of Tailwind or (iii) a manager of the USPS cycling team.  Even if Relator adequately pleaded the other elements of his claim  under Section 3729(a)(1) – and, as set forth below, he has not – the failure adequately to plead that Mr. Weisel had any involvement in the making of claims to the USPS is fatal to Count 1.  *See U.S. ex rel. Piacentile* v. *Wolk*, No. 93-5773, 1995 WL 20833, at *4 (E.D. Pa. Jan. 17, 1995) (dismissing FCA claim against corporate officer even though he knew about underlying fraud and submission of false claims because plaintiff "has alleged *no actions* on the part of [defendant] that constitute 'presenting, or causing to be presented' a false or fraudulent claim" (emphasis added)); *see also U.S. ex rel. Williams* v. *Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1257 (D.C. Cir. 2004) (dismissing FCA claims where "complaint repeatedly refers generally to 'management' and provides a long list of names without ever explaining the role these individuals played in the alleged fraud").[6]

---

[6]     Relator also fails to provide sufficient details about the claims themselves, including, critically, *who* – what human being – submitted them.  The bulk of the Complaint is comprised of conclusory allegations that "claims" were made to the USPS.  (*See, e.g.*, Compl. ¶¶ 33, 35, 52, 91, 116, 145, 150, 182, 199, 210, 234, 236.)  But such allegations fail to satisfy Rule 9(b). *Bender II*, 750 F. Supp. 2d at 7-8 (dismissing *qui tam* complaint that, despite detailing "how the alleged scheme was carried out," "fail[ed] to identify what particular false claims were allegedly submitted by [defendant corporation], the content of any such false claims, and who precisely

### 2.      Relator Fails Adequately to Allege that Any
Claim Submitted to the USPS Was "False."

The "paradigmatic case" under the FCA involves a claim that is factually false due to an "incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *United States* v. *Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010) ("*SAIC*").  Relator does not contend that this is such a case.

Alternatively, a claim can legally be false when it "rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term." *Id.* Such a certification can be express or implied, and "[c]ourts infer implied certifications from silence 'where certification was a *prerequisite* to the government action sought.'" *Id.* (quoting *Siewick*, 214 F.3d at 1376) (emphasis added).  To plead that the absence of doping by the USPS cycling team riders was such a prerequisite to payment of claims by the USPS, Relator must allege that the "contractor withheld information about its noncompliance with material contractual requirements," which is "a difficult bar to clear." *United States* v. *Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 158 (D.D.C. 2011) (internal quotation marks omitted). Materiality "may be evident from . . . express contractual language specifically linking compliance to eligibility for payment," though "[i]f FCA liability is to be premised on an implied false certification of compliance with [a] contractual term, the term must be *clear and unambiguous*." *United States* v. *DRC, Inc.*, 856 F. Supp. 2d 159, 170 (D.D.C. 2012) (emphasis added).  In the absence of such an express contractual term, materiality "must rest" on facts showing that "'both parties to the contract understood that payment was conditional on compliance with the requirement at issue.'" *Id.* at 167, 171 (quoting *SAIC*, 626 F.3d at 1271);

---

was involved in the fraudulent activity") (internal quotation marks omitted).  Moreover, even where the Complaint alleges that "DFP Cycling (aka Tailwind)" and "Tailwind" submitted certain claims to the USPS (*see* Compl. ¶ 55), Relator fails to "identify the employees responsible for the submission[s]." *See U.S. ex rel. Alexander* v. *Dyncorp, Inc.*, 924 F. Supp. 292, 297, 303 (D.D.C. 1996) (dismissing *qui tam* complaint alleging that "[corporation] submitted false invoices to the DOJ"); *see also Bender III*, 499 F. App'x at 45 (affirming dismissal of *qui tam* action because relator failed to allege, *inter alia*, "who precisely was involved in making th[e] claims").

*see also United States* v. *Toyobo Co.*, 811 F. Supp. 2d 37, 46 (D.D.C. 2011) (dismissing FCA claim where "complaint does not allege facts that support an inference that either the government or [defendant] understood to be a condition of payment the requirement that [product at issue] satisfy a five-year warranty").

Relator contends that defendants "represented explicitly and/or implicitly to the USPS that the USPS Team was not involved in the doping of its team members or other wrongful conduct, but that representation was not true.  Such express and/or implied certification was a condition of and a prerequisite to the USPS' payments."  (Compl. ¶ 199.)  Relator's implied false certification theory of falsity fails, however, because he does not allege any facts that show that the absence of doping by the riders on the USPS cycling team was a prerequisite to payment under the 1995 or the 2000 Sponsorship Agreements.[7]

First, the 1995 Sponsorship Agreement does not address doping at all (*see id.* ¶ 36; Sacks Decl. Ex. 2 (1995 Sponsorship Agr.)), and Relator alleges absolutely no facts that show that both parties to that agreement understood that payment of claims was conditioned on riders on the team not doping.  (*See* Compl. ¶ 200 (conclusorily contending that the "natural tendency of the USPS" would have been not to pay claims "if it were known that the team or any of its members were engaged in doping activities").)  Thus, the absence of doping could not have been a prerequisite to payment of claims made pursuant to that agreement.

Second, the 2000 Sponsorship Agreement specifically addresses doping and lists as an event of default only "'*negative publicity* associated with an individual rider or team support personnel . . . due to misconduct such as but not limited to, failed drug or medical tests.'"

---

[7]     Relator's conclusory allegations that defendants "explicitly" represented and "express[ly]" certified to the USPS that the USPS cycling team was not doping (Compl. ¶ 199) should be disregarded.  Relator alleges not a single fact that shows that any claim submitted to the USPS contained such an explicit representation or express certification.  Nor would it make any sense for any claim to have included such a representation – neither the 1995 nor the 2000 Sponsorship Agreement required the riders on the USPS team not to dope, much less required anyone to certify that riders were not doping.  (*See* Sacks Decl. Exs. 2 (1995 Sponsorship Agr.), 4 (2000 Sponsorship Agr.).)

(Compl. ¶ 37 (emphasis added) (quoting 2000 Sponsorship Agr. § 8).)  The 2000 Sponsorship Agreement also required Tailwind "to take immediate action without notification by the Sponsor in a case of a rider or Team offense related to a morals or drug clause violation." (*Id.* (quoting 2000 Sponsorship Agr. § 8)[8].)  Only *knowledge* of such violations on the part of Tailwind would trigger an obligation to take "immediate action," and the failure to take such action (rather than the underlying doping) would constitute an event of default.  Undetected doping by riders of the USPS cycling team thus was not itself an event of default, and there was no requirement that anyone certify (even impliedly) that the riders were not doping.

The specific references to "failed drug or medical tests" and a "drug clause violation" in the 2000 Sponsorship Agreement (*id.*) make clear that when the USPS wished to address doping, it knew how to do so, and the omission of doping as an event of default strongly suggests that the USPS did not wish to make the absence of doping a prerequisite to payment. There certainly is no "clear and unambiguous" term in the 2000 Sponsorship Agreement linking the absence of doping to eligibility for payment.  And, as with the 1995 Sponsorship Agreement, Relator alleges no facts that show that both parties to the 2000 Sponsorship Agreement understood that payment of claims was conditioned on riders on the team not doping.  In fact, the

---

[8]     Section 8 of the 2000 Sponsorship Agreement provides, in relevant part:

> The following events shall constitute an event of default . . . under this agreement . . .:
>
> (iv) The Company fails to take immediate action without notification by the Sponsor in a case of a rider or Team offense related to a morals or drug clause violation.
>
> (v) There is negative publicity associated with an individual rider or team support personnel, either permanent or temporary, due to misconduct such as but not limited to, failed drug or medical tests, alleged possession, use or sale of banned substances, or a conviction of a crime.

(Compl. ¶ 37.)

USPS's course of performance – continued payment of claims in the face of numerous doping allegations – also suggests that the absence of doping was not a prerequisite to payment.[9]

   Further, even if the USPS had declared an event of default as a result of negative publicity arising from doping or Tailwind's failure to take "immediate action" upon learning of doping – which the USPS never did, despite the persistent rumors of doping by team riders – the 2000 Sponsorship Agreement provided a range of remedies in the event of default beyond termination of the contract or a reduction in or withholding of payment.  (*See* Sacks Decl. Ex. 4 ¶ 8(c) (2000 Sponsorship Agr.) ("Upon the occurrence of an Event of Default . . . the nondefaulting party may declare . . . this Agreement to be in default and; (1) may immediately terminate this Agreement without any liability whatsoever; by providing written notification to the defaulting party (2) may seek enforcement by appropriate court action of the terms hereof; (3) may exercise any other right or remedy available to it under law or in equity; or (4) may seek any permitted combination of such remedies.").)  As the USPS had other remedies in addition to termination of the agreement, the absence of doping was not a prerequisite to payment.  *See Steury* v. *Cardinal Health, Inc.*, 625 F.3d 262, 269-70 (5th Cir. 2010) (finding no basis for implying a false certification where contract provided government with three separate options: accept defective items, require a price reduction, or demand replacement of items); *see also Wilkins* v. *United Health Grp., Inc.*, 659 F.3d 295, 309-11 (3d Cir. 2011) (finding that because administrative mechanism for managing Medicare violations "includes remedies . . . other than the withholding of payment . . . it does not require perfect compliance as . . . [a] condition for . . . payments").  Accordingly, Relator fails to allege that any claim submitted – whether by

---

[9] Relator attempts to manufacture an explicit "no doping" clause in the 1995 and 2000 Sponsorship Agreements by citing the provisions requiring "compliance with all applicable rules of [various cycling organizations]."  (Compl. ¶¶ 36, 201; *see also* Sacks Decl. Ex. 2 § 13 (1995 Sponsorship Agr.); Sacks Decl. Ex. 4 § 12 (2000 Sponsorship Agr.).)  But if this language – which is essentially identical in the two agreements – were in fact intended to cover doping, then there would have been no reason for the parties to address doping explicitly in the 2000 Sponsorship Agreement.  And, having done so, they had no reason to retain this "compliance with cycling organization rules" language in the 2000 Sponsorship Agreement unless, as is apparent, it was not in fact intended to address doping.

Tailwind, Mr. Weisel or anyone else – was "false" based on an implied certification (or any other) theory of falsity.

### 3.      Relator Fails Adequately to Allege Scienter as to Mr. Weisel.

Even if Relator adequately alleged that Mr. Weisel made a claim for payment and that such claim was false, he would still fail to state a claim against Mr. Weisel under Section 3729(a)(1) because he fails to allege that any claim was made by Mr. Weisel with scienter.  Where, as here, an FCA claim is based on an implied certification of compliance with a contractual term, Relator must allege "that the defendant *knows* (1) that it violated a contractual obligation, and (2) that its compliance with that obligation was material to the government's decision to pay."  *SAIC*, 626 F.3d at 1271 (emphasis added).  This scienter requirement is strictly enforced by courts "to ensure that ordinary breaches of contract are not converted into FCA liability."  *Id.*  Even though Rule 9(b) "permits knowledge to be pled generally," "the practical difficulties of proving *scienter* do[] not absolve plaintiffs of their duty to plead *some* facts from which the court may reasonably infer knowledge."  *United States* v. *Honeywell Int'l Inc.*, 798 F. Supp. 2d 12, 22 (D.D.C. 2011) (emphasis in original).  Here, the Complaint utterly lacks factual allegations sufficient to provide a "reasonable inference" that Mr. Weisel submitted a false claim – pretending for the moment that he is alleged to have done so at all – knowing that Tailwind was violating a contractual obligation or that compliance with that obligation was material (*i.e.*, a prerequisite) to the USPS's decision to pay Tailwind's claims.

First, Relator fails to allege that Mr. Weisel had actual knowledge of doping by any member of the USPS cycling team.  The Complaint is riddled with conclusory and tenuous assertions of Mr. Weisel's purported knowledge of that doping, but not any actual facts.  (*See, e.g.*, Compl. ¶¶ 145 ("Weisel was at all relevant times knowledgeable about, and approved of, the doping program of the USPS Team"), 57 ("Weisel and William Stapleton . . . failed to disclose and otherwise knowingly concealed from the USPS the highly material fact that defendants were engaged in a systematic program of doping USPS Team athletes to achieve

-17-

success in professional cycling.").)  The few specific allegations in the Complaint about Mr. Weisel's personal involvement with the USPS cycling team, such as the allegation that he "biked alongside defendant Armstrong" after Armstrong won the 2000 Tour de France (Compl. ¶ 136), do not so much as suggest that Mr. Weisel knew about the doping.  Tellingly, Relator, who *himself was a rider on the USPS team who was doping*, cannot come up with allegations about Mr. Weisel's knowledge of the doping that go beyond the fact that "Armstrong's yellow jerseys hang[] above [Mr. Weisel's] desk."  (*Id*.)  These allegations fail to show how Mr. Weisel was involved or otherwise would have known of the doping.  Indeed, similar allegations – being near Lance Armstrong; owning Lance Armstrong memorabilia – could be made of any of hundreds or thousands of cycling fans and they would fail totally at establishing that those fans had any idea that Armstrong or any other USPS team rider was doping.  These allegations fail to satisfy Rule 9(b).

   Relator also fails to allege particularized facts demonstrating that Mr. Weisel had constructive knowledge of the doping.  "Although Congress defined 'knowingly' to include some forms of constructive knowledge, its definition of that term imposes liability for mistakenly false claims only when the defendant *deliberately avoided learning the truth* or engaged in *aggravated gross negligence*."  *SAIC*, 626 F.3d at 1274-75 (emphasis added).  The Complaint fails to allege *what* Mr. Weisel did to deliberately avoid learning the truth about the team's doping or *how* Tailwind was structured to purposefully insulate Mr. Weisel from learning about the doping.  *See id*. at 1275-76 (noting that plaintiff may establish "deliberate ignorance or reckless disregard" if "government contractor's structure prevented it from learning facts that made its claims for payment false").[10]  Absent knowledge of the doping by the USPS team

---

[10] Relator alleges that Mr. Weisel acted with reckless disregard by failing to undertake some sort of investigation into "public doping allegations . . . made against Armstrong and the USPS Team."  (*See* Compl. ¶ 149.)  Relator ignores his own allegations (and recorded history) that make clear that Armstrong and others (Relator included) steadfastly and forcefully denied those allegations and touted the doping tests that they routinely passed.  (*See, e.g.*, Compl. ¶¶ 121-29; U.S. Compl. ¶¶ 62-64, 67.)  Armstrong filed successful lawsuits against those making doping allegations.  (U.S. Compl. ¶ 68.)  If Mr. Weisel's alleged failure to conduct some additional investigation in the face of these denials were still unreasonable in some way, the same could be said of the USPS.  If Relator were able to establish Mr. Weisel's scienter on the basis of public

riders, Mr. Weisel could not have known of a violation of any contractual obligation, much less an implied one, as is required to plead scienter in an implied false certification case.

Second, Relator fails to allege that Mr. Weisel knew that compliance with some implied "no doping" obligation was material to the USPS's decision to pay claims made by Tailwind. Though the Complaint alleges in conclusory terms that doping was "material" to the USPS (see, e.g., Compl. ¶¶ 57, 58, 200, 201, 203, 205, 266, 276), it nowhere alleges that *Mr. Weisel* knew of that purported fact, let alone how he came to know this. Given the lack of provisions explicitly addressing doping in either the 1995 or the 2000 Sponsorship Agreement and the USPS's response to widespread rumors of doping by riders on the USPS cycling team – continued payment of claims made by Tailwind – it strains credulity to argue that Mr. Weisel somehow knew that the absence of doping was material to the USPS's decision to pay claims.

## B.    Relator Fails Adequately to Allege that Mr. Weisel Made a False Statement in Violation of Section 3729(a)(2) (Count 2).

To state a claim under Section 3729(a)(2) (pre-FERA), Relator must allege that Mr. Weisel "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government." 31 U.S.C. § 3729(a)(2). The Complaint lacks particularized factual allegations about any supposed false statement made by Mr. Weisel with the intent of having the USPS pay a false claim.

Relator fails to allege with particularity a single allegedly false statement made by Mr. Weisel. Instead, he makes vague allegations that lack the who, what, where and when that Rule 9(b) requires. Relator alleges, for example, that a group of defendants "including Thomas Weisel" – "[d]uring the time period relevant to this complaint" (whatever that is) – attended unspecified "meetings in Washington, D.C., at which they failed to disclose and otherwise

---

rumors of Armstrong's doping, the United States would likely be time-barred from pursuing its own claims under Section 3731(b)(2), which provides that the United States' claims under the FCA must be brought within three years of the date "the official of the United States charged with responsibility to act in the circumstances" knew or reasonably should have known of the underlying fraud.

knowingly concealed from the USPS the highly material fact that defendants were engaged in a systematic program of doping USPS Team athletes to achieve success in professional cycling." (Compl. ¶ 57.)[11]  That does not satisfy Rule 9(b).  Similarly insufficient are conclusory allegations that Mr. Weisel "authorized" allegedly false statements.  (*See id*. ¶¶ 126 (alleging that, "based on Weisel's degree of control over Tailwind," unspecified "representations" about the possibility of doping made by Tailwind executives Gorski and Osipow to the USPS "were authorized and approved by Weisel"), 196 (referring generally to Mr. Weisel's "knowledge and authorization of the false statements and claims being made to the USPS").)  It is simply not enough for Relator to allege in conclusory terms that Mr. Weisel "caused" false statements (which are themselves pleaded with no specificity) to be made.

Even if these vague allegations about allegedly false statements were somehow considered sufficient, as with his Section 3729(a)(1) claim, Relator fails to allege that any alleged false statement or representation was made or authorized by Mr. Weisel *with scienter*. Mr. Weisel could not have made a false statement with the intent to get a false claim paid when he knew nothing about the conduct that rendered the statement or the claim false.  (*See supra* Part I.A.3.)

Finally, to the extent that Relator alleges that Mr. Weisel violated Section 3729(a)(2) by failing to disclose the doping scheme, such claim fails for two reasons. First, Relator fails adequately to allege that Mr. Weisel *knew* about the doping, and Mr. Weisel could not, of course, knowingly conceal what he did not know.  Second, Relator never alleges that Mr. Weisel – a human being not alleged to have any contractual or fiduciary relationship to the USPS – had a duty to disclose such information to the USPS.  *See U.S. ex rel. Berge* v. *Bd. of*

---

[11]     (*See also* Compl. ¶ 58 ("[D]efendants Montgomery Sports, Tailwind, and CSE, and their representatives, including Thomas Weisel and William Stapleton, when calling by telephone, corresponding by mail, and emailing USPS executives in Washington, D.C., failed to disclose and otherwise knowingly concealed from the USPS the highly material fact that defendants were engaged in a systematic program of doping USPS Team athletes to achieve success in professional cycling.").)

*Trs. of the Univ. of Ala.*, 104 F.3d 1453, 1461 (4th Cir. 1997) ("There can only be liability under the False Claims Act [for an omission] where the defendant has an obligation to disclose omitted information.").

      **C.**      **Relator Fails Adequately to Allege that Mr. Weisel Entered Into a Conspiracy to Violate the FCA in Violation of Section 3729(a)(3) (Count 3).**

To state a claim under Section 3729(a)(3) (pre-FERA), Relator must allege that "(1) [Mr. Weisel] conspired with one or more persons to have a fraudulent claim paid by the United States, (2) that one or more of the conspirators performed any act to have such a claim paid by the United States, and (3) that the United States suffered damages as a result of the claim." *United States* v. *Bouchey*, 860 F. Supp. 890, 893 (D.D.C. 1994). Rule 9(b) also applies to Relator's conspiracy claim. *See Toyobo Co.*, 811 F. Supp. 2d at 51 (applying Rule 9(b) to conspiracy allegations under Section 3729(a)(3)); *see also U.S. ex rel. Gagne* v. *City of Worcester*, 565 F.3d 40, 44 (1st Cir. 2009) (same).

Like his other FCA claims, Relator's conclusory allegations of conspiracy fail to satisfy Rule 9(b). Relator fails to allege particularized facts demonstrating the existence of any conspiracy *to defraud the USPS.* "[I]t is not enough for a plaintiff to show that the alleged conspirators agreed upon a fraud scheme;" a relator must demonstrate that "the conspirators intended to defraud the Government." *Allison Engine Co., Inc.* v. *U.S. ex rel. Sanders*, 553 U.S. 662, 672 (2008) (internal quotation marks omitted). Allegations of a conspiracy among riders on the USPS cycling team to dope and conceal their doping are insufficient to state a claim under Section 3729(a)(3).

Though it would be insufficient to state a claim in any event, Relator also fails to allege facts that show that Mr. Weisel agreed to facilitate the doping or to conceal the doping. The Complaint includes conclusory allegations to this effect directed at "defendants." (*See* Compl. ¶¶ 207 ("[E]ach of the defendants agreed with the others on the doping scheme"), 203 ("[D]efendants also concealed such violations from the USPS, and failed to disclose the violations by riders to the USPS, as the team's management was orchestrating the riders' use of

banned substances and methods during the period relevant to this complaint, and they were conspiring with the riders to keep that conduct secret from the Postal Service.").) But allegations that "defendants" generally agreed to engage in the alleged doping scheme are not enough to allege that *Mr. Weisel* agreed with anyone to engage in such a scheme. *U.S. ex rel. El Amin* v. *George Wash. Univ.*, 26 F. Supp. 2d 162, 165 (D.D.C. 1998) (dismissing Section 3729(a)(3) conspiracy claim because "complaint fails to *identify any agreement* between the parties to defraud the government or *to engage in any act* that could constitute an attempt to defraud the government").

To the extent Relator alleges that Mr. Weisel "conspired" with employees of Tailwind Sports, or the members of the board on which he sat, such allegations are insufficient under well settled law. Under the "intra-corporate conspiracy doctrine," "a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *See U.S. ex rel. Fago* v. *M & T Mortg. Corp.*, 518 F. Supp. 2d 108, 117 (D.D.C. 2007) (dismissing Section 3729(a)(3) claim that alleged a conspiracy among employees); *see also Kelley* v. *District of Columbia*, 893 F. Supp. 2d 115, 119-20 (D.D.C. 2012) ("[T]here [can be] no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees" (internal quotation marks omitted)).

D.   **Relator Fails to Allege that Mr. Weisel Made a Reverse False Claim in Violation of Section 3729(a)(7) (Count 4).**

To state a claim under Section 3729(a)(7) (pre-FERA), Relator must allege that Mr. Weisel "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." To state such a "reverse false claim," Relator must allege that the defendant owed money to the USPS. *See Hoyte* v. *Am. Nat'l Red Cross*, 518 F.3d 61, 66 (D.C. Cir. 2008). But Relator does not even attempt to allege that Mr. Weisel – or any other defendant – had any pre-

existing obligation to pay the USPS any money and thus he fails to state a claim under Section 3729(a)(7).

## II. RELATOR'S CLAIMS BASED ON THE FCA AS AMENDED BY FERA MUST BE DISMISSED BECAUSE FERA DOES NOT APPLY RETROACTIVELY TO ANY CONDUCT ALLEGED IN THE COMPLAINT.

With one exception discussed immediately below, the FERA amendments to the FCA are expressly prospective and apply only to "conduct on or after the date of enactment," May 20, 2009.  FERA, Pub. L. No. 111-21 § 4(f); *accord Boone* v. *MountainMade Found.*, 684 F. Supp. 2d 1, 7 n.7 (D.D.C. 2010).  Since Relator alleges no conduct occurring after the May 2009 enactment of FERA, Relator's post-amendment FCA claims – under Section 3739(a)(1)(A) (Count 5, equivalent to Count 1), Section 3729(a)(3) (Count 7, equivalent to Count 3) and Section 3729(a)(7) (Count 8, equivalent to Count 4) – all must be dismissed. The FCA as amended by FERA simply does not apply here.  Even if the post-amendment provisions of the FCA were relevant, Relator's claims would fail for the same reasons as his pre-amendment FCA claims.  (*See supra* Part I.)

The only section of the FERA amendments that applies retroactively is amended Section 3729(a)(1)(B) (formerly Section 3729(a)(2)), which applies to "claims" "pending on or after [June 7, 2008]."  FERA, Pub. L. No. 111-21 § 4(f)(1).  "[P]ending claims" refers to pending requests for payment, not pending *qui tam* actions.  *Bender II*, 750 F. Supp. 2d at 5 n.3; *accord U.S. ex rel. Westrick* v. *Second Chance Body Armor, Inc.*, 709 F. Supp. 2d 52, 55-56 (D.D.C. 2010).  Relator does not allege any facts showing that any request for payment was pending on or after June 7, 2008.  (*See* Compl. ¶¶ 23-43, 198-210, Ex. 1.)[12]

---

[12]    Relator's conclusory allegation, contained only in his discussion of Count 7 (not Count 6), that the "United States . . . continues to pay claims" (Compl. ¶ 272) fails to allege with particularity that any claim at issue was pending on June 7, 2008 and, indeed, is belied by the other allegations in the Complaint, which demonstrate that all claims were paid long before the effective date of FERA.  (*See, e.g.*, *id.* ¶ 33.)  To the extent that Exhibit 1 to the Complaint shows "pending" claims, those claims total $17.28 (out of over $30 million paid pursuant to the 2000 Sponsorship Agreement alone).  (*Id.* Ex. 1 at 2.)

Even if FERA's change to Section 3729(a)(1)(B) were to apply here, it would not save Relator's claim against Mr. Weisel.  FERA amended that section of the FCA to remove the requirement that the defendant make a false statement with the specific intent to defraud the United States.  *U.S. ex rel. Westrick* v. *Second Chance Body Armor, Inc.*, 685 F. Supp. 2d 129, 140 (D.D.C. 2010).  But Relator  fails to allege that Mr. Weisel made any false statement, much less that he did so knowingly, both of which are essential elements of a claim under Section 3729(a)(1)(B).  (*See supra* Part I.B.)  Thus, even if the post-amendment FCA were to apply here, Relator's claim under Section 3729(a)(1)(B) would still fail as to Mr. Weisel.

### III.  RELATOR COMES NOWHERE CLOSE TO ALLEGING SUFFICIENT GROUNDS TO PIERCE TAILWIND'S CORPORATE VEIL AND HOLD MR. WEISEL OR ROSS INVESTMENTS LIABLE FOR ANY PURPORTED FCA VIOLATIONS BY TAILWIND.

Likely aware that he cannot state any direct claim against Mr. Weisel, Relator asks this Court to take the extraordinary step of piercing the corporate veil of Tailwind to hold Mr. Weisel personally liable for Tailwind's purported violations of the FCA.  (*See* Compl. at 60; *id.* ¶ 229.)  Holding Mr. Weisel personally liable would also require piercing the corporate veil of Ross Investments, the entity that actually held Mr. Weisel's stake in Tailwind.  *See U.S. ex rel. Hockett* v. *Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 61 (D.D.C. 2007) (noting that, where "several layers of corporate entities separated" two companies, "it would have to be the case that the veil between each layer could be pierced").

"Courts reserve piercing the corporate veil for the rare circumstances in which an individual or corporation abuses the corporate form or exerts undue influence over a corporate entity to accomplish an improper or unlawful purpose."  *Amore ex rel. Estates of Amore* v. *Accor*, 529 F. Supp. 2d 85, 93 (D.D.C. 2008); *accord Hockett*, 498 F. Supp. 2d at 60 ("Except in unusual circumstances, courts will not disregard the separate identities of a parent and its subsidiary, even a wholly-owned subsidiary." (internal quotation marks omitted)).  Courts frequently grant motions to dismiss claims that depend on piercing the corporate veil.  *See*, *e.g.*, *Ivanov* v. *Sunset Pools Mgmt., Inc.*, 524 F. Supp. 2d 13, 15 (D.D.C. 2007) (granting motion to

-24-

dismiss because "plaintiffs have not alleged that [individual defendant] failed to adequately capitalize Sunset, that he and Sunset commingled funds, nor that he personally made use of the company to perpetuate a fraud" and "plaintiffs have failed to offer *any* specific allegations of [the individual's] misuse of the corporate form" (emphasis in original)); *Local Union No. 98 IBEW* v. *RGB Servs., LLC*, No. 10-3486, 2011 WL 292233, at *4 (E.D. Pa. Jan. 28, 2011) (granting motion to dismiss where "Plaintiffs have not identified what corporate formalities were not observed, what funds were siphoned, what assets of [the corporation] were commingled, or when and how any of this alleged conduct occurred" and "have offered no factual support for their legal conclusions that [the corporation] was merely a facade and that [the corporation] was the alter ego"); *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 426 (S.D.N.Y. 2003) (rejecting attempted veil-piercing because "unadorned invocation of dominion and control is simply not enough" and "there is no allegation as to how or why the holding companies have dominion and control over the subsidiaries").  This Court should do the same.

Because Relator's FCA claims implicate a federal interest, the federal common law test for veil piercing applies.  *Siewick*, 191 F. Supp. 2d at 20-21.  Under that test, Relator must provide factual allegations sufficient to demonstrate that (1) there is "such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist" and (2) respecting the corporate form will produce an "inequitable result."  *Labadie Coal Co.* v. *Black*, 672 F.2d 92, 96 (D.C. Cir. 1982).  The first prong relates to "the degree to which formalities have been followed to maintain a separate corporate identity" (*i.e.*, whether the entity is a bona fide corporation or a mere alter ego), while the second prong "looks to the basic issue of fairness under the facts."  *Id.*

Relator fails to allege sufficient facts demonstrating plausible grounds for piercing Tailwind's corporate veil.  It is not for lack of trying.  Relator devotes over sixty paragraphs of the Complaint to Mr. Weisel's association with Tailwind, providing highly detailed – *and completely innocuous* – allegations about the history, management, business dealings and finances of that entity.  Relator attempts to extrapolate from these neutral facts the implausible

conclusion that because Mr. Weisel was a founder, chairman and largest shareholder (based on his alleged ownership of about 30% of Tailwind's shares through Ross Investments) of Tailwind, he must have dominated and controlled it and disregarded corporate formalities such that Tailwind was his alter ego rather than a legitimate corporate entity.  (Compl. ¶¶ 131-95.)  But "[i]t has long been the clearly stated rule in this circuit that the existence of a *sole and controlling shareholder* does not alone justify invoking the alter ego doctrine."  *Siewick*, 191 F. Supp. 2d at 21 (emphasis added and internal quotation mark omitted) (refusing to pierce corporate veil despite individual's ownership of 85% of entity's stock).

      A.     **Relator's Allegations Demonstrate that**
                   **Tailwind Observed Corporate Formalities.**

As the D.C. Circuit has observed, corporate formalities are "themselves an excellent litmus of the extent to which the individuals involved actually view the corporation as a separate being."  *Labadie*, 672 F.2d at 97.  In determining "whether the corporation and the individual have maintained separate personalities," courts examine (i) the individual's ownership and control of the corporation; (ii) the maintenance of corporate records; (iii) the corporation's formal issuance of stock; (iv) the commingling of corporate and individual assets; (v) the diversion of corporate funds for non-corporate use; and (vi) the use of the same office or business location.  *Id*. at 97-99.

Relator's scatter-shot allegations against Mr. Weisel are fundamentally defective: nothing in the Complaint undermines the strong presumption that the corporate form of Tailwind should be respected by the Court.  Even if Relator adequately alleges that "Tailwind and Montgomery Sports each engaged in fraud against the USPS" (*see* Compl. ¶ 230), that does "not amount to an allegation that the corporate form [itself] was a fraud."  *Siewick*, 322 F.3d at 741. Conclusory allegations aside, Relator simply does not "allege that [Tailwind's] corporate form was a sham."  *Id*.

### 1.    Relator Fails to Allege that Mr. Weisel "Dominated" or "Controlled" Tailwind.

Relator falls far short of alleging that Mr. Weisel "so dominate[d]" Tailwind as to render it an alter ego and "negate its separate personality." *Labadie*, 672 F.2d at 97 (internal quotation marks omitted). Although the Complaint is riddled with empty assertions that Mr. Weisel "dominated" or "controlled" Tailwind and that Mr. Weisel treated Tailwind as his "alter ego,"[13] nothing in the Complaint substantiates these "labels and conclusions" with *facts* demonstrating how Mr. Weisel dominated Tailwind. Notably, the United States' Complaint does not mention Mr. Weisel – not once – in describing the very same events at issue. (*See* Dkt. No. 44.) In fact, that complaint describes the actions of *other* Tailwind employees or contractors in connection with the doping, which is hardly consistent with Relator's allegation that Tailwind was Mr. Weisel's alter ego. (*See*, *e.g.*, U.S. Compl. ¶¶ 32-61 (discussing "particular instances" of doping involving, *inter alia*, Armstrong and Bruyneel without mentioning Mr. Weisel).) The absence of any allegation about Mr. Weisel in the United States' description of how Tailwind supposedly defrauded the USPS further suggests the implausibility of Relator's claim that Mr. Weisel somehow "dominated" or "controlled" Tailwind.

In attempting to allege grounds for veil piercing, the Relator relies upon – and selectively quotes in the Complaint – a 2002 Tailwind Private Placement Memorandum (the "2002 Memorandum") (*see*, *e.g.*, Compl. ¶¶ 173, 178), which discloses that other individuals had significantly more managerial responsibilities than Mr. Weisel, particularly Tailwind co-founder, Gorski, and team manager, Bruyneel:[14]

---

[13]     (*See*, *e.g.*, Compl. ¶¶ 7 (Weisel "continued to dominate and control the subject business operations"), 9 (the Tailwind entities "were dominated and controlled by Thomas Weisel"), 194 (Weisel's prior business dealings with Tailwind board members "permitted him to dominate and control the company's board"), 196 (referencing "Weisel's domination and control of Montgomery Sports and Tailwind"), 229 (alleging that "Tailwind and Montgomery Sports were . . . the alter egos or business conduits of Mr. Weisel.").)

[14]     The full text of the 2002 Memorandum is incorporated by reference into the Complaint and can be considered by the Court in deciding Mr. Weisel's motion to dismiss. *See EEOC*, 117 F.3d at 624-25. This is especially the case where Relator selectively quotes from it in an attempt to justify piercing the corporate veil. *See Caraluzzi* v. *Prudential Sec., Inc.*, 824 F. Supp. 1206,

- "Mark [Gorski] *is responsible for the general management of Tailwind Sports*, the Team's sponsor relationships and the selection and development of the Team's riders" and "[a]t Montgomery Sports Mark [Gorski] was responsible for recruiting top athletes and negotiating and managing *all corporate sponsorship relationships* (including *U.S. Postal Service*, Visa, Yahoo!, Coca-Cola, Volkswagen of America, Trek Bicycles and others)." (Sacks Decl. Ex. 3 at 2 (2002 Mem.) (emphases added).)

- In contrast to Gorski's "general management of Tailwind Sports," Mr. Weisel was merely "the founder and CEO of Thomas Weisel Partners and the founder and former CEO of Montgomery Securities" as well as "the founder of Montgomery Sports." (*Id.*)

- Elsewhere in the 2002 Memorandum, Gorski is identified as the first of five "key members of the cycling management team," along with Cindy Sisson, Dan Osipow, Bruyneel, and Frankie Andreu. (*Id.* at 6.) Mr. Weisel is not included in this list of "key members," an unlikely omission if Mr. Weisel dominated and controlled Tailwind.

- Further, the 2002 Memorandum states that Bruyneel "is responsible for strategy and tactics for the Team, and together with Mark Gorski, is responsible for developing the Team's riders and selecting the Team roster." (*Id.* at 2.)

- "Mark Gorski has been *the key manager* of the Team and its predecessor team (Montgomery/Bell Sports) since 1995." (*Id.* at 6 (emphasis added).)

These factual allegations – Relator's own factual allegations given that Relator incorporates the document in which they are found into his complaint – contradict Relator's conclusory allegations that Mr. Weisel purportedly dominated and controlled Tailwind, thus rendering those allegations implausible. *See Accor*, 529 F. Supp. 2d at 94-95 (denying motion to amend inconsistent veil-piercing allegations because "the court does not accept as true self-contradictory factual allegations"); *see also In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself *or by documents upon which the pleadings rely*, or by facts of which the court may take judicial notice." (emphasis added)).

---

1210 n.1 (N.D. Ill. 1993) ("This court may consider all such documents [submitted by defendant], without converting the motion to one for summary judgment, since they represent the *complete documents* incorporated by reference in plaintiffs' complaint." (emphasis added)).

2.      **Tailwind Maintained Adequate Corporate Records.**

The Complaint does not allege that Tailwind failed to maintain adequate corporate records.  In fact, it reveals quite the opposite.  Relator's repeated references to Tailwind's financial records and corporate documents in cataloguing Tailwind's history of business dealings, stock offerings, and management (*see, e.g.*, Compl. ¶¶ 158, 165, 170, 175, 176, 178, 179, 184) demonstrate that – far from being a sham – Tailwind maintained business records and observed corporate formalities.

Moreover, the 2002 Memorandum details, *inter alia*, the state of Tailwind's finances, the qualifications of its directors and officers, and the intended use of the proceeds of the offering, and describes how Tailwind employed "48 employees and full time independent contractors."  (*See, e.g.*, Sacks Decl. Ex. 3 at 23, 25-27, 36, 43 (2002 Mem.).)  Thus, the 2002 Memorandum reveals that Tailwind was a bona fide business.  *See Siewick*, 191 F. Supp. 2d at 21 (refusing to pierce corporate veil where "corporation's board of directors was duly elected, met regularly, maintained minutes, and was governed by a majority vote," involved "six directors, three of whom were outside directors," and "met its payroll for the company's eleven employees").

3.      **Relator Fails to Allege Co-Mingling or Diversion of Assets.**

Relator fails to allege that Mr. Weisel co-mingled Tailwind's assets with his own or otherwise diverted corporate assets for non-corporate uses.  Though the Complaint includes a section titled "Personal Use of Corporate Assets," that section does not contain a single allegation that Mr. Weisel used Tailwind assets for his personal use.  (*See* Compl. ¶¶ 155-68.)  Instead, Relator alleges that Tailwind entered into sponsorship agreements with various companies associated with Mr. Weisel purportedly without "adequate consideration."  (*Id.* ¶ 164.)

These allegations do not help Relator for at least two reasons.  In the first place, Relator's allegations concern a single entity that was the alleged beneficiary of these agreements – not Mr. Weisel, but the investment bank, Thomas Weisel Partners LLP.  (*Id.* ¶¶ 157-62.)  Other

than (meaninglessly) to allege that Mr. Weisel was Thomas Weisel Partners LLP's "principal shareholder" (*id*. ¶ 157), Relator provides not a single factual allegation substantiating that assertion or describing how this corporate entity, too, was the alter ego of Mr. Weisel. And, second, the Complaint alleges a flow of assets precisely backwards to what the piercing-the-veil analysis requires: rather than alleging that Mr. Weisel siphoned off the assets of Tailwind, Relator alleges that Mr. Weisel personally made "capital infusions" to Tailwind Sports "as necessary to keep the operation running." (*See id*. ¶ 169.) Mr. Weisel's efforts to keep Tailwind in the black are the opposite of stripping the company of assets for his own personal benefit. *Cf. Seiko Epson Corp.* v. *Print-Rite Holdings, Ltd.*, No. CV 01-500-BR, 2002 WL 32513403, at *12, 18 (D. Or. Apr. 30, 2002) ("In fact, [a parent company's] infusion of capital into [a subsidiary] actually defeats an alter ego finding because it is proof that [the parent] is not siphoning assets from [the subsidiary] and is not improperly or unjustly trying to shield its assets by undercapitalizing its subsidiary and hiding behind the corporate veil." (applying federal common law)); *Albright* v. *Attorney's Title Ins. Fund*, 504 F. Supp. 2d 1187, 1211 (D. Utah 2007) ("[P]laintiffs' assertion that ATGF was grossly under capitalized is unavailing. The plaintiffs attempt to argue this factor both ways. On the one hand, plaintiffs claim the Florida Fund infused too much cash by propping up the failing business of ATGF. On the other hand, plaintiffs claim that the Florida Fund did not infuse enough cash, leaving ATGF insolvent.").

### 4.    Tailwind's Board Was Independent.

Of the seven Tailwind directors other than Mr. Weisel identified in the Complaint, five were independent (*i.e.*, non-management) directors. (Sacks Decl. Ex. 3 at 25 (2002 Mem.) (identifying only Gorski and Sisson as directors and officers).) Unfazed, Relator claims that the Tailwind directors somehow lacked independence because they were "inclin[ed] to accept Weisel's recommendations" due to prior business dealings with companies associated with Mr. Weisel. (Compl. ¶ 194.) But such allegations fail to demonstrate that any of the directors lacked independence. *See Hockett*, 498 F. Supp. 2d at 61 (noting that, even where two

corporations share overlapping directors or officers, "an identity of officers or directors does not require a finding that separate corporate forms have been abandoned"); *In re Fed. Nat'l Mortg. Ass'n Sec., Deriv., ERISA Litig.*, 503 F. Supp. 2d 9, 21 (D.D.C. 2007) (noting courts "routinely" reject allegations regarding outside business relationships as insufficient to demonstrate a lack of director independence in the context of derivative litigation); *Halpert Enters., Inc.* v. *Harrison*, 362 F. Supp. 2d 426, 433 (S.D.N.Y. 2005) (allegations that directors "sit together, in various configurations on other boards do not call into question the ability of the board members to exercise proper business judgment"); *Orman* v. *Cullman*, 794 A.2d 5, 27 (Del. Ch. 2002) ("The naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence.").

### 5.     Mr. Weisel and Tailwind Maintained Separate Offices.

The D.C. Circuit has identified the "[u]se of the same office or business location by the corporation and its individual shareholders" as a factor to consider in determining whether a corporation is the alter ego of a shareholder.  *Labadie Coal Co.*, 672 F.2d at 99.  Here, Relator does not allege that Mr. Weisel and Tailwind shared the same office.  To the contrary, the caption of the Complaint lists different locations for Tailwind Sports Corporation (Austin, TX), Tailwind Sports, LLC (Rockville, MD), and Mr. Weisel (Ross, CA).  For this additional reason, Relator fails to allege that Mr. Weisel treated Tailwind as his alter ego.[15]

### B.     Relator Fails to Allege Equitable Grounds for Piercing the Corporate Veil.

In addition to his failure to allege that Tailwind was anything other than a bona fide business, Relator fails to demonstrate that an "injustice or fundamental unfairness" would

---

[15]     Relator also suggests that this Court should pierce the corporate veil of Montgomery Sports, but Relator's allegations about Mr. Weisel's purported domination and control of that entity are even more conclusory than his allegations about Tailwind (*see, e.g.*, Compl. ¶ 6 ("Weisel served as [Montgomery Sport's] President and dominated and controlled the company")), and thus are wholly insufficient to justify piercing its corporate veil.  Moreover, to the extent that Relator alleges that Tailwind is the successor in interest to Montgomery Sports (*see id.* ¶ 7) and that Montgomery Sports ceased to exist at the latest in 1999 (*id.*), it is not at all clear what his allegations about Montgomery Sports add to any attempt to hold Mr. Weisel liable for purported violations of the FCA by others.  Certainly nothing that matters.

follow if Tailwind's corporate veil were not pierced.  *Labadie*, 672 F.2d at 99.  Here, Relator has named as defendants other individuals, including Armstrong, who are demonstrably closer to the alleged doping and purportedly false claims for payment and can satisfy an eventual judgment – however unlikely – in this case.  *Cf. Flynn* v. *Thibodeaux Masonry, Inc.*, 311 F. Supp. 2d 30, 43 (D.D.C. 2004) (finding an inequitable result warranting veil piercing where defunct corporation would be unable to satisfy its debt for delinquent ERISA contributions).  The fact that Tailwind was dissolved in 2007 (Compl. ¶ 9) is insufficient to demonstrate that it was "undercapitalized" to warrant piercing the corporate veil.  *See NLRB* v. *Greater Kan. City Roofing*, 2 F.3d 1047, 1052-53 (10th Cir. 2001) ("In most cases the mere fact that a corporation is incapable of paying all its debts is insufficient for a finding of injustice.  That condition will exist in virtually all cases in which there is an attempt to pierce the corporate veil.").  Relator also makes no allegations that even suggest that the USPS thought it was contracting directly with Mr. Weisel, as opposed to Tailwind, or was confused as to the identity of the contracting party, further undermining any argument that an "injustice" would follow if Tailwind's veil is not pierced.  *Cf. Papa* v. *Katy Indus., Inc.*, 166 F.3d 937, 943 (7th Cir. 1999) (Posner, J.) ("The corporate veil is pierced . . . because [the corporation] has neglected forms intended to protect creditors from being confused about whom they can look to for the payment of their claims.").  Because Relator also fails to allege the existence of equitable grounds, the Court should reject his attempt to pierce Tailwind's corporate veil and hold Mr. Weisel or Ross Investments liable for any violation of the FCA by Tailwind.[16]

---

[16]    Relator's attempt to hold Mr. Weisel liable for purported FCA violations by Montgomery Sports and Tailwind fails for an additional reason – he fails adequately to allege a primary violation of the FCA by those entities (as explained in detail in the Memorandum of Points and Authorities submitted by Tailwind Sports Corp. and Tailwind Sports LLC).  *U.S. ex rel. Pilecki-Simko* v. *Chubb Inst.*, No. 06-3562, 2010 WL 1076228, at *1, 11 (D.N.J. Mar. 22, 2010) ("Because Relators have not sufficiently alleged that [defendant] violated the False Claims Act, and because Relators do not aver that [its corporate parents] themselves violated the False Claims Act, no claims remain for the imposition of liability upon [defendant's] corporate parents.").

## IV.    RELATOR FAILS ADEQUATELY TO ALLEGE
##        THAT ROSS INVESTMENTS VIOLATED THE FCA.

Relator's only allegations about Ross Investments are that it "was wholly owned by Thomas Weisel," that Mr. Weisel "was its president," that Mr. Weisel "used the corporation to hold investments, including his investment in Tailwind," and that Ross Investments "was [Mr. Weisel's] alter ego with regard to the conduct alleged herein."  (Compl. ¶¶ 16, 18, 172, 238.)  These allegations have absolutely nothing to do with Relator's allegations of violations of the FCA.  They would fail to state a claim even under Rule 8(a) and utterly lack the particularized factual allegations required by Rule 9(b) to state a claim against Ross Investments for any violation of the FCA.  *See Luckey* v. *Balboa Ins. Co.*, 685 F. Supp. 2d 8, 10 (D.D.C. 2010) ("Because plaintiff's complaint contains no allegations whatsoever against [certain defendants], plaintiff's complaint does not state a claim for relief that is plausible on its face against any of these defendants." (internal quotation marks omitted)).

In order to hold Ross Investments liable here, Relator would have to allege facts to pierce Tailwind's corporate veil, *i.e.*, to show that Ross Investments was the alter ego of Tailwind.  Relator fails even to attempt to do so, and Ross Investment's mere ownership interest in Tailwind provides no basis to pierce Tailwind's corporate veil as to it.  *See Siewick*, 191 F. Supp. 2d at 21.

## V.     THE VAST MAJORITY OF RELATOR'S CLAIMS ARE BARRED
##        BY THE FCA'S SIX-YEAR STATUTE OF LIMITATIONS.

Even if Relator's claims were pleaded adequately against Mr. Weisel or Ross Investments, the lion's share of the purportedly false claims were submitted more than six years before Relator commenced this litigation and, thus, fall outside of the FCA's six-year statute of limitations.  *See* 31 U.S.C. § 3731(b)(1).  Of the 40 payments identified in Exhibit 1 to the Complaint, only *four* were made within six years of the filing of Relator's *qui tam* action, reducing the amount in dispute from the approximately $31 million paid by the USPS under the 2000 Sponsorship Agreement to a mere $68,170.45.  (*See* Compl. Ex. 1.)  And Relator nowhere

alleges that the *claims* for those payments (as opposed to the payments themselves) were submitted within the six years preceding Relator's filing of this action.[17]

Section 3731(b) also contains a provision tolling the United States' FCA claims for three years "after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances," but no more than 10 years after the submission of the claim.  31 U.S.C. § 3731(b)(2).  Though the D.C. Circuit has not definitively addressed whether this tolling provision applies to private party relators like Landis, two courts in this District and the vast majority of Circuit Courts to consider the issue have limited Section 3731(b)(2) to FCA claims brought by the United States.  *See George Wash. Univ.*, 26 F. Supp. 2d at 172-73 (holding that, based on the "plain language of the statute," the three-year tolling provision of Section 3731(b)(2) applies only to United States and "was not intended to apply to a qui tam relator"); *Network Software Assocs.*, 180 F. Supp. 2d at 194 ("The statutory language and legislative history support the conclusion that Section 3731(b)(2), with its three-year tolling provision and 10-year limitations period, applies only to the government and not to a *qui tam* relator."); *see also U.S. ex rel. Sanders* v. *N. Am. Bus Indus. Inc.*, 546 F.3d 288, 296 (4th Cir. 2008) (joining Fifth, Sixth, Tenth and Eleventh Circuits in adopting majority rule limiting Section 3731(b)(2) to claims asserted by United States).

Bucking the clear trend of authority, one court in this District extended the tolling provision of Section 3731(b)(2) to private party relators.  *U.S. ex rel. Pogue* v. *Diabetes Treatment Ctrs. of Am., Inc.*, 474 F. Supp. 2d 75, 89 (D.D.C. 2007) (Lamberth, J.).  No Circuit

---

[17]    Relator cannot recover on any claims submitted prior to the commencement of the limitations period (June 10, 2004) even if they were submitted as part of the same purported conspiracy.  *See U.S. ex rel. Fisher* v. *Network Software Assocs., Inc.*, 180 F. Supp. 2d 192, 195 (D.D.C. 2002) ("[R]elator may attempt to prove the underlying conspiratorial agreement through those overt acts that occurred after [the date on which the limitations period began to run], but not those that occurred before that date; if successful, he may recover damages for all violations committed as part of the conspiracy *from that date forward*.  Thus, the [FCA's] statute of limitations bars recovery for some but not all of the acts committed as a part of the conspiracy . . . ." (emphasis added)).

Court has adopted this rule and this Court should follow the majority rule.  Nevertheless, even if the Court were to extend Section 3731(b)(2) to Relator's claims, the Complaint demonstrates that the USPS reasonably should have known of the underlying fraud long ago due to the alleged "public doping allegations made against Armstrong and the USPS Team" from 1999 to 2004. (Compl. ¶ 149.)[18]  Thus, the six-year statute of limitations of Section 3731(b)(1) would still govern the timeliness of Relator's claims.  For these reasons, the Court should, at a minimum, dismiss with prejudice Relator's claims against Mr. Weisel and Ross Investments to the extent they are time-barred.

## VI.    RELATOR'S COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE AS AGAINST MR. WEISEL AND ROSS INVESTMENTS.

Dismissal with prejudice is appropriate where, as here, amendment would be futile.  *See James Madison Ltd.* v. *Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996) (affirming denial of leave to amend complaint on futility grounds because "the proposed claim would not survive a motion to dismiss"); *Hager* v. *Fed. Nat'l Mortg. Ass'n*, 882 F. Supp. 2d 107, 111, 113 (D.D.C. 2012) (dismissing with prejudice plaintiff's claim under D.C. False Claims Act, which is "materially identical" to the federal FCA, because "amendment would be futile" as "no new allegations could cure the complaint's core deficiency").  Relator's Second Amended Complaint represents the culmination of years of investigation into the evidentiary basis of his claims

---

[18]    Under Section 3731(b)(2), the Court would examine what officials at the USPS knew or reasonably should have known, not officials at DOJ.  *See United States* v. *Intrados/Int'l Mgmt. Grp.*, 265 F. Supp. 2d 1, 12 n.8 (D.D.C. 2002) (suggesting that DOJ would not qualify as "responsible official" under Section 3731(b)(2)); *U.S. ex rel. Kreindler & Kreindler* v. *United Techs. Corp.*, 777 F. Supp. 195, 205 (N.D.N.Y. 1991) (holding that facts of relator's cause of action were known by "senior officials in charge of the Black Hawk project"), *aff'd*, 985 F.2d 1148 (2d Cir. 1993); *see also United States* v. *Inc. Vill. of Island Park*, 791 F. Supp. 354, 363-64 (E.D.N.Y. 1992) (holding that DOJ should have known of its cause of action in light of information obtained by Department of Housing and Urban Development ("HUD") because "HUD and DOJ are both subdivisions of the same branch of the same government" and, "for purposes of prosecuting violations of the False Claims Act, DOJ serves as the 'litigator' for the rest of the government").  Regardless, even if DOJ employees were considered "official[s] of the United States charged with the responsibility to act," Relator would be hard pressed to argue that officials at the DOJ were unaware of the USPS's sponsorship of the USPS cycling team and the doping rumors surrounding the team's riders.

(claims that he should have known all about before he asserted them, given his personal involvement in the wrongdoing that allegedly gave rise to them), and yet he still fails to come anywhere close to stating an FCA claim against Mr. Weisel or Ross Investments.[19]  The futility of amendment here is further demonstrated by the fact that Mr. Weisel is not mentioned even once in USADA's Reasoned Decision or in the United States' Complaint (both of which are the products of separate,  multi-year investigations).  As further amendment of Relator's Complaint would merely prolong the inevitable dismissal of his nearly three-year-old claims (based on conduct occurring more than nine years ago) against Mr. Weisel, the Court should dismiss Relator's claims against Mr. Weisel and Ross Investments with prejudice.  *See U.S. ex rel. Folliard* v. *Hewlett-Packard Co.*, 272 F.R.D. 31, 36 n.7 (D.D.C. 2011) ("This action will be dismissed with prejudice as to all parties.  Relator . . . had over two years to conduct additional discovery and amend the current complaint.  The United States also had over two years to elect to intervene or to prepare a complaint in this matter and declined.").[20]

---

[19]     The vast majority of the allegations about Mr. Weisel that were added to Relator's Second Amended Complaint (and not in his earlier complaints) consist of Relator's failed attempt to pierce Tailwind's corporate veil.  (*See, e.g.*, Compl. ¶¶ 18-21, 144-95.)  These new allegations – which, again, fail to state any FCA claim against Mr. Weisel or demonstrate any grounds for piercing Tailwind's corporate veil – strongly suggest that Relator obtained from DOJ documents and information that Mr. Weisel produced to DOJ as part of the latter's investigation into Relator's claims.  Even with the benefit of such information, Relator still cannot allege facts sufficient to state a claim against Mr. Weisel.  In fact, Relator *omitted* allegations against Mr. Weisel related to his FCA claims, presumably in response to information obtained during his investigation.  (*Compare* First Am. Compl. ¶ 130 (Dkt. No. 10) (alleging that "*Mr. Weisel* reportedly made repeated representations to Gail Sonnenberg, Senior VP of Sales at the USPS, that the team was not involved in doping" (emphasis added)), *with* Compl. ¶ 126 (alleging that "*official Tailwind representatives, including Mark Gorski and Dan Osipow*, reportedly made repeated representations to Gail Sonnenberg, Senior VP of Sales at the USPS, that the team was not involved in doping" (emphasis added)).)  There is simply nothing Relator could possibly *add* to a fourth (third amended) complaint that would state a viable claim against Mr. Weisel.

[20]     Though the FCA provides that an "action may be dismissed only if . . . the Attorney General give[s] written consent to the dismissal," 31 U.S.C. § 3130(b)(1); *accord* Feb. 22, 2013 Order ¶ 5 (Dkt. No. 43), this requirement "pertains only to voluntary dismissals."  *Baggan*, 1997 WL 600569, at *3 n.6.  Where, as here, a defendant moves for involuntary dismissal of an FCA complaint pursuant to Rule 12(b)(6), the Court is free to dismiss the action with prejudice without the consent of the United States.  *See Bender I*, 750 F. Supp. 2d at 4 n.2, 11 (noting that consent requirement of Section 3130(b)(1) applies only to proposed voluntary dismissals and dismissing relator's amended *qui tam* complaint with prejudice).

## CONCLUSION

For the foregoing reasons, the Court should dismiss Relator's Complaint as to Mr. Weisel and Ross Investments in its entirety and with prejudice.

Dated: July 23, 2013

/s/ Robert A. Sacks
Robert A. Sacks (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067
Telephone:     (310) 712-6600
Facsimile:     (310) 712-8800


/s/ Brendan P. Cullen
Brendan P. Cullen (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
1870 Embarcadero Road
Palo Alto, California 94303
Telephone:     (650) 461-5600
Facsimile:     (650) 461-5700


/s/ Christopher M. Viapiano
Christopher M. Viapiano (D.C. Bar No. 500771)
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone:     (202) 956-7500
Facsimile:     (202) 956-7056

*Attorneys for Defendants Thomas W. Weisel and Ross Investments, Inc.*