IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* FLOYD LANDIS , | ) ) ) | |
| Plaintiffs, | ) ) ) | No. 1:10-cv-00976-RLW |
| v. | ) ) | Oral Argument:  November 18, 2013 |
| TAILWIND SPORTS CORPORATION, *et al.,* | ) ) ) | |
| Defendants. _____ | ) ) ) | |

**RELATOR'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
MOTION TO DISMISS RELATOR'S SECOND AMENDED COMPLAINT
<u>BY DEFENDANTS THOMAS W. WEISEL AND ROSS INVESTMENTS, INC.</u>**

# TABLE OF CONTENTS

INTRODUCTION……………………………………………………………1

BACKGROUND ...........................................................................................2

ARGUMENT.................................................................................................3

I.    **Legal Standards Applicable to Motion to Dismiss**…………………….....3

    A.  **Rule 12(b)(6)**…...............................................................................3

    B.  **Rule 9(b)**…………………………………………………………..4

II.    **The Complaint Properly Pleads Pre-FERA FCA Claims Against Defendant Weisel with the Factual Particularity Required by Rule 9(b)**.....5

    A.  **The Pre-FERA "False Claims" Count (§ 3729(a)(1)) Is Adequately Pleaded**……………………………….……...………………5

        1.  **The Complaint Alleges Mr. Weisel "Caused" Claims to be Presented to the USPS**……………………………………5

        2.  **Relator Has Alleged "False" Claims**……………………….............10

            a.  **Relator Has Alleged Fraudulent Inducement**……………......………10

            b.  **Plaintiff Has Alleged False Implied Certification**……….……....11

                i.  **The Sponsorship Agreements Expressly Linked Compliance with Doping Rules to Payment by the USPS**…………………………………………12

                ii.  **The Availability of Alternate Remedies Does Not Establish a Lack of Materiality**………………...………………13

                ii.  **Additional Terms in the 2000 Sponsorship Agreement Indicate Compliance with Doping Rules Was Material**..15

        3.  **Relator Has Alleged "Knowing" false claims**……….……………...…17

    B.  **The Pre-FERA "False Statements" Count is Adequately Pleaded**…....19

    C.  **The Pre-FERA "Conspiracy" Count is Adequately Pleaded**….……20

      D.  Pre-FERA "Reverse False Claim" Are Adequately Pleaded…………..23

**III.   FERA APPLIES TO RELATOR'S ALLEGATIONS………..……………26**

      A.  FERA's "False Statements" Provision Applies to This Case….………26

      B.  FERA's "Reverse False Claims" Provision Applies to This Case….…..38

      C.  FERA's "Conspiracy" Provision Applies to This Case…....………...29

**IV.   RELATOR'S ALLEGATIONS PROVIDE SUFFICIENT
      BASIS TO PIERCE TAILWIND'S CORPORATE VEIL…………..……30**

      A.  Applicable Legal Standards Relevant to Piercing the
         Corporate Veil………………………………………………………30

      B.  Piercing Standard Governing FCA Cases……..………………………31

      C.  Application of Piercing Standard to the Facts of this Case…………...33

**V.    RELATOR HAS ADEQUATELY ALLEGED CLAIMS AGAINST
     ROSS INVESTMENTS…………………………………………….....36**

**VI.   RELATOR ALLEGES SUFFICENT GROUNDS
TO PIERCE THE OF VEIL MONTGOMERY SPORTS, INC…………..…....38**

**VII.  RELATOR'S CLAIMS ARE NOT BARRED BY THE
      SIX-YEAR STATUTE OF LIMITATIONS IN THE FCA………………..39**

      A.  The False Claims Act Statute of Limitations is Tolled by Section
         3731(b)(2)…………………………………………………………39

      B.  The FCA Statute of Limitations is Suspended
         by the Wartime Suspension of Limitations Act ("WSLA")………….....41

      C.  Relator has alleged false claims after June 1, 2004……………………42

**VIII. DOJ'S DECLINATION AND THE ABSENCE OF WEISEL'S
     NAME FROM USADA'S REASONED DECISION ARE IRRELEVANT…...43**

**CONCLUSION AND REQUEST FOR LEAVE TO AMEND………………...44**

# TABLE OF AUTHORITIES

## Cases

*Ab-Tech Constr., Inc. v. United States*, 31 Fed. Cl. 429 (Fed. Cl. 1994)......................................12

*Allen v. Beta Constr.*, 309 F. Supp. 2d 42 (D.D.C. 2004).............................................................4

*Allison Engine Co., Inc. v. U.S. ex rel. Sanders*, 553 U.S. 662 (2008)........................................21

*Amore ex rel. Estates of Amore v. Accor,* 529 F. Supp. 2d 85 (D.D.C. 2008)............................35

*\*Anderson v. Abbot*, 321 U.S. 349  (1944) .............................................................................32, 33

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)...................................................................................3, 30

*BCCI Holdings (Luxembourg), S.A. v. Clifford, 964 F. Supp. 468, 478 (D.D.C. 1997.* .............37

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)........................................................................3

*Bowie v. Maddox*, 642 F.3d 1122 (D.C. Cir. 2011) ...................................................................23

*Carpenters v. N.L.R.B.*, 481 F.3d 804 (D.C. Cir. 2007) ............................................................36

*Daniels v. District of Columbia*, 894 F. Supp. 2d 61 (D.D.C. 2012).............................................3

*Dvir Ungar v. The Islamic Republic of Iran*, 211 F. Supp. 2d 91, 100 (D.D.C. 2002) ...............21

*E.E.O.C. v. St. Francis Xavier Parochial Sch.*,

   117 F.3d 621 (D.C. Cir. 1997 ...................................................................................................4

*Earl O. Pickens v. Kanawha River Towing*, 916 F. Supp. 702 (S.D. Ohio 1996) .......................24

*Elemary v. Philipp Holzmann A.G.*,

   533 F. Supp. 2d 116 (D.D.C. 2008) ......................................................................................17

Fed. R. Civ. P. Rule 8(a)(2) .......................................................................................................30

*Firestone v. Firestone*, 76 F.3d 1205 (D.C. Cir. 1996)...............................................................44

*First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611 (1983)... 33

*Foster v. Savannah Commc'n*, 140 Fed.Appx. 905(11th Cir. 2005)...........................................41

*\*Founding Church of Scientology v. Webster*, 802 F.2d 1448 (D.C. Cir. 1986)...................31, 32

*Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470 (5th Cir. 2012)....................................28

*Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, (11th Cir. 2009) ..............................................28

*Hoyte v. American Nat. Red Cross*, 439 F. Supp. 2d 38 (D.D.C. 2006)......................................25

*In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385 (S.D.N.Y. 2003).............. 35

*In re United Mine Workers of Am. Employee Benefit Plans Litig.*,

   854 F. Supp. 914 (D.D.C. 1994) ............................................................................... 4

*Ivanov v. Sunset Pools Mgmt., Inc.*, 524 F. Supp. 2d 13 (D.D.C. 2007) ...................................... 35

*\*Labadie Coal v. Black*, 672 F.2d 92 (D.C. Cir. 1982) ........................................................ passim

*Local Union No. 98 IBEW v. RGB Servs., LLC*, No. 10-3486,

   2011 WL 292233 (E.D. Pa. Jan. 28, 2011) ............................................................... 35

*Material Supply Int'l v. Sunmatch Industrial*, 62 F. Supp.2d 13, 23 (D.D.C. 1999) ................... 38

*McCreary v. Offner*, 172 F.3d 76 (D.C. Cir. 1999) ...................................................................... 25

*\*Miller v. Holzmann*, 563 F. Supp. 2d 54 (D.D.C. 2008) ...................................................... passim

*NB ex rel. Peacock v. District of Columbia* ......................................................................... 13, 23

*Nilsson, Robbins, et al. v. Louisiana Hydroelec.*, 854 F.2d 1538 (9th Cir. 1988) ....................... 35

*Pacific Dev. Inc. v. United States*, No. 77-0690, 1979 WL 1283 (D.D.C. Jan. 3, 1979).............. 37

*Poindexter v. Wachovia Mortgage Corporation*, 851 F. Supp. 2d 121 (D.D.C. 2012) ................ 37

*\*Quinn v. Butz*, 510 F.2d 743 (D.C. Cir. 1975) ...................................................................... 32, 33

*\*Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969) .......................................................... 25

Sanders v. Allison Engine Co., Inc., 703 F.3d 930 (6th Cir. 2012)........................................ 27, 40

*Schattner v. Girard, Inc.*, 668 F.2d 1366 (D.C. Cir. 1981).......................................................... 30

*TAC–Critical Sys., Inc. v. Integrated Facility Sys., Inc.*, 808 F. Supp. 2d 60 (D.D.C. 2011) ...... 30

*U.S. ex rel. Alexander v. Dyncorp, Inc.*, 924 F. Supp. 292 (D.D.C. 1996).................................... 9

*U.S. ex rel. American Textile Mfrs. Inst., Inc. v. The Limited, Inc.*,

   190 F.3d 729 (6th Cir. 1999) ................................................................................... 25

*U.S. ex rel. Atkins v. McInteer*,

   470 F.3d 1350 (11th Cir. 2006) ............................................................................... 43

*U.S. ex rel. Atkinson v. Pennsylvania Shipbuilding*,

   255 F. Supp. 2d 351 (E.D. Pa. 2002) ............................................................... 8, 9, 21

*U.S. ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648 (5th Cir. 2004)........................................ 24

*U.S. ex rel. Bender v. N. Am. Telecommc'ns., Inc.*, 499 Fed.Appx. 44 (D.C. Cir. 2013)............. 10

*U.S. ex rel. Bender v. N. Am. Telecommc'ns., Inc.*, 686 F. Supp. 2d 46 (D.D.C. 2010)................ 9

*U.S. ex rel. Bender v. N. Am. Telecomms.*, 750 F. Supp. 2d 1, (D.C. Cir. 2010)........................ 27

*U.S. ex rel. Bender v. N. Am. Telecomms., Inc.*, 499 Fed.Appx. 44 (D.C. Cir. 2013) ............. 9, 27

*U.S. ex rel. Berger v. Board of Trustess of the University of Alabama*,

  104 F.3d 1453, 1461 (4th Cir. 1997) ................................................................... 20

*U.S. ex rel. Bettis v. Odebrecht Contractors*, 393 F.3d 1321 (D.C. Cir. 2005) ..................... 10, 11

*U.S. ex rel. Bledsoe v.Cmty. Health Sys., Inc.*,

  501 F.3d 493, (6th Cir. 2007) ................................................................................ 40

*U.S. ex rel. Cafasso v. General Dynamics C4 Sys., Inc.*, 637 F.3d 1047, (9th Cir. 2011)........... 28

*U.S. ex rel. Carter v. Halliburton*, 710 F.3d 171 (4th Cir. 2013) ................................................ 42

*U.S. ex rel. Conrad v. Blue Cross Blue Shield of Mississippi.*,

  No. 2:99cv72-LG-JMR, 2008 WL 341650 (S.D. Miss. Feb. 5, 2008) ....................................... 6

*U.S. ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542 (7th Cir. 1999) ................................................ 21

*U.S. ex rel. El Amin v. George Washington University*, 26 F. Supp. 2d 162 (D.D.C. 1998)........ 22

*U.S. ex rel. Erskine v. Baker*,

  No. 9950034, 2000 WL 554644, (5th Cir. Apr.13, 2000) ........................................................ 40

*U.S. ex rel. Fago v. M & T Mortg. Corp.*, 518 F. Supp. 2d 108 (D.D.C. 2007) ......................... 23

*U.S. ex rel. Fisher v. Network Software Assocs., Inc.*, 180 F. Supp. 2d 192 (D.D.C. 2002) ........ 40

*U.S. ex rel. Folliard v. CDW Technology Services*,

  722 F. Supp. 2d 20 (D.D.C. 2010). ............................................................................. 4

*U.S. ex rel. Head v. Kane*,

  798 F. Supp. 2d 186 (D.D.C. 2011) ................................................................... passim

*U.S. ex rel. Hyatt v. Northrop*, 91 F.3d 1211 (9th Cir. 1996). ..................................................... 40

*U.S. ex rel. Joseph v. Cannon*, 642 F.2d 1373 (D.C. Cir. 1981)...................................................... 4

*U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94 (2d Cir. 2010) ................................ 28

*U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 777 F. Supp. 195 (N.D.N.Y. 1991). 41

*U.S. ex rel. Lewis v. Walker*, No. 3:06-CV-16 (CDL) (M.D. Ga. September 14, 2007) ............. 41

*\*U.S. ex rel. Long v. SCS Bus. and Technical Inst.*, 999 F. Supp. 78 (D.D.C. 1998)............... 6, 20

*U.S. ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114 (D.D.C. 2003) 6

*U.S. ex rel. Miller v. Bill Harbert Int'l Constr.*, 505 F. Supp. 2d 1 (D.D.C. 2007)...................... 40

*U.S. ex rel. Piacentile v. Wolk*, No. 93-5773, 1995 WL 20833 (E.D. Pa. Jan. 17, 1995).............. 8

*U.S. ex rel. Pogue v. Diabetes Treatment Centers of America, Inc.*, 238 F. Supp. 2d 258 (D.D.C.
   2002) ........................................................................................................................ 4, 40, 41

*U.S. ex rel. Repko v. Guthrie Clinic, P.C.*,
   557 F. Supp. 2d 522 (M.D. Pa. 2008) ................................................................................... 41

*U.S. ex rel. Salmeron v. Enter. Recovery Sys. Inc.*,
   464 F. Supp. 2d 766 (N.D. Ill. 2006) .................................................................................... 41

*U.S. ex rel. Sanders v. N. Am. Bus. Indus., Inc.*, 546 F.3d 288 (4th Cir. 2008)............................ 40

*U.S. ex rel. Schmidt v. Zimmer*, 386 F.3d 235 (3d Cir. 2004)........................................................ 6

*U.S. ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196 (D.C. Cir. 1995) ........................ 11

*U.S. ex rel. Siewick v. Jamieson Science and Eng'g*, 191 F. Supp. 2d 17 (D.D.C. 2002) ........... 31

*U.S. ex rel. Sikkenga v. Regence Bluecross*, 472 F.3d 702 (10th Cir. 2006) ................................ 40

*U.S. ex rel. Steury v. Cardinal Health, Inc.*,
   625 F.3d 262 (5th Cir. 2010) ..................................................................................... 14, 15, 28

*U.S. ex rel. Totten v. Bombardier Corp.*,
   286 F.3d 542 (D.C. Cir. 2002). ............................................................................................... 4

*U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*,
   No. 02 C 6074, 2005 WL 3050610, at *5 (N.D. Ill. Nov. 8, 2005) .................................... 30, 38

*U.S. ex rel. Ven-a-Care  v. Actavis Mid Atlantic LLC*, 659 F. Supp. 2d 262 (D. Mass. 2009)..... 41

*U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, (3d Cir. 2011)..................... 14, 15

*U.S. ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251 (D.C. Cir. 2004) ........... 9

*U.S. ex rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818 (7th Cir. 2011) ........................ 27

*U.S. ex. rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372 (D.C. Cir. 2000)................. 11

*U.S. v. Andrews*, 146 F.3d 933 (D.C. Cir. 1998) ......................................................................... 37

*U.S. v. Childress*, 58 F.3d 693 (D.C. Cir. 1995) ......................................................................... 30

*U.S. v. Cripps*, 460 F. Supp. 969 (E.D. Mich. 1978) ................................................................... 30

*United States ex rel. Terry J. Wilkins v. State of Ohio, et al.*,

   885 F. Supp. 1055, 1064 (S.D. Ohio 1995) ............................................................... 24

*United States v. Bouchey*, 860 F. Supp. 890 (D.D.C. 1994) ........................................... 21

*United States v. Honeywell Int'l Inc.*, 798 F. Supp. 2d 12 (D.D.C. 2011).............................. 5, 17

*United States v. Q Int'l Courier, Inc.*, 131 F.3d 770 (8th Cir. 1997) ............................................ 25

*\*United States v. Science Applications Int'l Corp.*, 626 F.3d 1257 (D.C. Cir. 2010) ...... 11, 13, 27

*United States v. Science Applications Int'l Corp.*, 653 F. Supp. 2d 87 (D.D.C. 2009)................. 27

*United States v. TDC Mgmt. Corp., Inc.*, 288 F.3d 421 (D.C. Cir. 2002) .................................... 12

*\*Valley Finance, Inc. v. U.S.*, 629 F.2d 162 (D.C. Cir. 1980)................................................ 31, 33

*Westrick v. Second Chance Body Armor*, Inc., 709 F. Supp. 2d 52 (D.D.C. 2010)................. 9, 27

## Statutes

18 U.S.C. § 3287 .......................................................... 41, 42

31 U.S.C. § 3729(a)(1) ..................................................... 5, 26, 27

31 U.S.C. § 3729(a)(1)(C) .................................................... 30

31 U.S.C. § 3729(a)(1)(G) ................................................... 28, 29

31 U.S.C. § 3729(a)(2) ...................................................... 19, 20

31 U.S.C. § 3729(a)(3) ......................................................... 22

31 U.S.C. § 3729(a)(7) ...................................................... 23, 24

31 U.S.C. § 3729(b)(1) ........................................................ 17

31 U.S.C. § 3729(b)(3) ......................................................... 28

31 U.S.C. § 3729(d)(3) ......................................................... 25

31 U.S.C. § 3731(b)(1) ...................................................... 39, 40

31 U.S.C. § 3731(b)(2) .................................................. 18, 39, 40

50 U.S.C. 1544(b) ............................................................. 42

Pub. L. 107-40, 15 Stat. 224 (2001) ........................................... 42

Pub. L. No. 111-21, 123 Stat. 1617 (2009) ............................... 1, 5, 26

S. Rep. No. 111-10, 111th Cong., 1st Sess. (2009) .............................. 25

Wartime Suspension of Limitations Act, 18 U.S.C. § 3287 ("WSLA") ................. 1

**Rules**

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4

Fed. R. Civ. P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

**Regulations**

39 C.F.R. § 601.100-102 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

39 C.F.R. § 601.100-102 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

39 C.F.R. § 601.100-102 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## INTRODUCTION

Defendant Thomas Weisel was the "guiding force" behind the company that operated the U.S. Postal Service Pro Cycling Team ("USPS Team").  As has now been admitted, for years the USPS Team secretly doped, cheated and lied to win, all the while submitting false claims for tens of millions of dollars in sponsorship payments from the United States Postal Service.  In this action under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA"), plaintiffs seek to recover for the false claims submitted by Weisel's now-defunct company Tailwind Sports Corporation and its predecessor entities ("Tailwind").

Defendants Weisel and Ross Investments, Inc., which Weisel used to hold his shares in Tailwind, have moved to dismiss relator's Second Amended Complaint ("SAC" or "Complaint") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), claiming the following:  1) the allegations as to Mr. Weisel are not stated with sufficient particularity; 2) relator's counts under the FCA, as amended by the Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, 123 Stat. 1617 (2009) ("FERA"), fail because FERA does not apply retroactively; 3) relator's allegations are insufficient to pierce the corporate veil and hold defendants liable for Tailwind's false claims; and 4) relator is precluded from proceeding by the FCA's statute of limitations.

Each of these arguments is without merit.  Relator's allegations against Weisel and Ross Investments state causes of action under the False Claims Act, both pre and post FERA, and describe in detail the "who, what, when, where and how" of the fraudulent scheme.  In addition to direct liability under the FCA, the Complaint also sufficiently states claims to pierce the veil of both Tailwind and Ross Investments.  Lastly, relator's allegations are timely due to, among other reasons, defendants' fraudulent concealment of their doping and cheating, and also by operation of the Wartime Suspension of Limitations Act, 18 U.S.C. § 3287 ("WSLA").

Weisel was the single most powerful and dominant individual behind Tailwind.  Just as he reaped glory and benefit from the government-sponsored USPS Team, so also should he now be held to answer for his role in the Team's historic fraud on the United States.

**BACKGROUND**

Weisel founded defendant Montgomery Sports, Inc. in 1995.  He was the company's largest shareholder and president.  SAC ¶ 6.  Montgomery Sports has failed to appear in this action and default has been entered against it.  Docket Entry ("DE") 101.  In 1999, the shares of Montgomery Sports were transferred to Tailwind Sports, LLC (formerly named Disson Furst & Partners, LLC) which was subsequently merged into Tailwind Sports Corporation in 2002.  *Id.* ¶ 7.  These entities are collectively referred to herein as "Tailwind" or "the Company."

Tailwind entered into two sponsorship agreements with the U.S. Postal Service.  The first sponsorship agreement was signed October 1, 1995 and was initially effective through December 1996, then extended over successive years through the end of 2000 ("the 1995 Sponsorship Agreement").  *Id.* ¶¶ 23-28.  On or about December 26, 2000, the U.S. Postal Service and Tailwind entered into a new sponsorship contract, commencing on January 1, 2001 and continuing through December 31, 2004 ("the 2000 Sponsorship Agreement").  *Id.* ¶ 29.  As explained in greater detail *infra*, both Sponsorship Agreements prohibited doping.  *Id.* ¶¶ 36-37.

The United States paid Tailwind more than $40 million under the Sponsorship Agreements.  SAC ¶¶ 33-39.  Between 1999 and 2004, the USPS Team won the Tour de France six times.  *Id.* ¶ 110.  As has now been admitted by defendants, it was all a lie.  In April and May 2010, former USPS cyclist Floyd Landis came forward and disclosed the truth about the Team's doping to officials with the United States Anti-Doping Agency ("USADA"), the Food and Drug Administration, and USA Cycling, as well as to the media.  *Id.* ¶¶ 211-221.

In June 2010, Landis filed the instant *qui tam* action.  The Complaint alleges that Thomas Weisel was the dominant individual behind Tailwind and that he knew about doping by the USPS Team yet caused it to submit false claims for payment to the U.S. Postal Service.  The Complaint alleges, *inter alia*, that Weisel facilitated the doping violations by exerting undue financial influence over responsible cycling officials, by failing to have Tailwind take concrete steps to investigate or prevent doping (despite allegations regarding such conduct), and by failing to ensure that the contract of defendant Lance Armstrong, Tailwind's most prominent rider, contained anti-doping clauses as required by the Sponsorship Agreements.  *Id.* ¶¶ 144-152.  The

Complaint also alleges abuses of the corporate form, including Weisel's undercapitalization of Tailwind and his use of the company for his own personal benefit via sweetheart sponsorship deals with Thomas Weisel Partners, LLP.  *Id.* ¶¶ 155-184.  To facilitate all of these ends, the Complaint alleges, Weisel stacked the board of Tailwind with his employees and business associates.  *Id.* ¶¶ 185-195.

Most recently, in support of his motion to dismiss, defendant Weisel filed a variety of extrinsic evidence to which relator has filed an objection, including a redacted copy of Emma O'Reilly's affidavit.  *See* Declaration of Robert A. Sacks, DE 89-1 to 89-8.  Defendant cites to the redacted affidavit for the proposition that he was mentioned "only once in passing by a former team 'soigneur' or assistant [*i.e.,* Ms. O'Reilly]" in the Reasoned Decision prepared by the United States Anti-Doping Agency.  MTD at 9.  Relator was able to obtain an unredacted copy of this declaration, however, and the previously redacted portion reads far differently than what defendant Weisel claims.   It puts Mr. Weisel once again squarely in the middle of the fraud, describing in detail how Ms. O'Reilly witnessed him participate in the cover-up of Lance Armstrong's 1999 positive corticosteroid test through the use of a back-dated prescription.  Declaration of Paul D. Scott in Support of Opposition to Thomas Weisel's and Ross Investment's Motion to Dismiss Relator's Second Amended Complaint ("Scott Decl.") Ex. B, ¶¶ 101-107 (Unredacted Affidavit  of Emma O'Reilly dated October 9, 2012).  And so it continues.

## ARGUMENT

**I.**  **Legal Standards Applicable to Motion to Dismiss**

    **A.**  **Rule 12(b)(6)**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A court considering a Rule 12(b)(6) motion must construe the complaint in the light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations."  *Daniels v. District of Columbia*, 894 F. Supp. 2d 61, 65 (D.D.C. 2012)

(citing *In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994)).

"In deciding a Rule 12(b)(6) motion, the court may consider any documents attached to or incorporated into the complaint, matters of which the court may take judicial notice, and matters of public record." *U.S. ex rel. Head v. Kane*, 798 F. Supp. 2d 186, 193 (D.D.C. 2011) (citing *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)).[1]

## B.      Rule 9(b)

Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "[T]he 'circumstances' that must be pleaded with specificity are matters such as the 'time, place, and contents of the false representations,' such representations being the element of fraud about which the rule is chiefly concerned." *U.S. ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 552 (D.C. Cir. 2002) (citation omitted).  It is not necessary to plead with particularity those matters that are outside the circumstances of fraud. *U.S. ex rel. Folliard v. CDW Technology Services*, 722 F. Supp. 2d 20, 27 (D.D.C. 2010).  Nor is it necessary to plead the element of scienter with particularity. Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

Rule 9(b)'s particularity requirement "should be harmonized with the general directives of [Rule 8]" which only requires "a 'short and plain statement of the claim . . . .' " *U.S. ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1386 (D.C. Cir. 1981) (citation omitted).  In brief, the "main purpose of Rule 9(b) is to ensure that defendants have notice of the charges against them adequate to prepare a defense." *U.S. ex rel. Pogue v. Diabetes Treatment Centers of America, Inc.*, 238 F. Supp. 2d 258, 267 (D.D.C. 2002); *Allen v. Beta Constr.*, 309 F. Supp. 2d 42, 47 (D.D.C. 2004) ("central purpose of Rule 9(b), properly read in conjunction with Rule (8): 'the

---

[1]      Relator has filed an objection to defendants' references to extrinsic evidence and respectfully requests that the Court exclude those matters from its decision.  If the Court were to convert defendants' motion to a motion for summary judgment pursuant to Federal Rule of Civil Procedure 12(d), then relator would respectfully request an opportunity for discovery pursuant to Federal Rule of Civil Procedure 56(d).

requirements of Rule 9(b) guarantee all defendants sufficient information to allow for preparation of a response'") (citation omitted); *see also United States v. Honeywell Int'l Inc.*, 798 F. Supp. 2d 12, 22 (D.D.C. 2011)**.**

## II.     The Complaint Properly Pleads Pre-FERA FCA Claims Against Defendant Weisel with the Factual Particularity Required by Rule 9(b).[2]

### A.     The Pre-FERA "False Claims" Count (§ 3729(a)(1)) Is Adequately Pleaded.

#### 1.     The Complaint Alleges Mr. Weisel "Caused" Claims to be Presented to the USPS.

Defendant Weisel begins his argument by emphasizing that relator's Complaint "nowhere alleges that Mr. Weisel personally made" a claim for payment to the U.S. Postal Service.  MTD at 11.  It is well established however, that a defendant need not personally submit a false claim in order to be liable.  Rather, the False Claims Act imposes liability on any person who "(1) knowingly presents, *or causes to be presented*, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval . . . ."  31 U.S.C. § 3729(a)(1) (emphasis added).  Thus, under the explicit terms of the FCA, liability can attach to one who "causes to be presented" a false claim for payment to the United States.  *See Miller v. Holzmann*, 563 F. Supp. 2d 54, 119 n.95 (D.D.C. 2008) ("[T]he FCA clearly sets forth [the 'causes to be presented'] basis for liability" and "[v]arious authorities have explicitly recognized this theory as legitimate under the statute.") (citations omitted).

In addressing his liability for causing false claims to be submitted, defendant Weisel argues that he "is not alleged to have been (i) an employee of Tailwind, (ii) responsible for submitting claims to the USPS on behalf of Tailwind or (iii) a manager of the USPS cycling team."  MTD at 12.  Indeed, it is true that the Complaint does not allege that Weisel was an

---

[2]     The Complaint alleges violations of the False Claims Act as it existed both before and after the passage FERA.  It includes separate counts for violations of the pre-FERA (Counts One through Four) and post-FERA (Counts Five through Eight) FCA provisions pertaining to false claims, false statements, conspiracy and reverse false claims.  SAC ¶¶ 239-277.

employee, the team manager, nor the individual who physically submitted false claims to the U.S. Postal Service but, again, such allegations are not necessary to establish Weisel's liability under the FCA.

"The False Claims Act extends beyond the person making a false claim to one who engages in a fraudulent course of conduct that induces payment by the government." *U.S. ex rel. McCready v. Columbia/HCA Healthcare Corp.,* 251 F. Supp. 2d 114, 120 (D.D.C. 2003) (internal quotations and citations omitted).  It is sufficient to plead that "an alleged failure to act was a course of conduct that allowed fraudulent claims to be presented to the federal government." *U.S. ex rel. Long v. SCS Bus. and Technical Inst.*, 999 F. Supp. 78, 89 (D.D.C. 1998) (denying motion under Rule 9(b)), *rev'd on other grounds*, 173 F.3d 870, *opinion supplemented*, 173 F.3d 890 (D.C. Cir. 1999); *see also U.S. ex rel. Conrad v. Blue Cross Blue Shield*, No. 2:99cv72-LG-JMR, 2008 WL 341650, at ** 3-4 (S.D. Miss. Feb. 5, 2008) (causation deemed adequately alleged in case where complaint averred defendant failed to investigate illegal related-party transactions); *Miller v. Holzmann*, 563 F. Supp. 2d at 119 n.95 (enough to allege that conduct was "a substantial factor" in causing the submission of false claims) (citing *U.S. ex rel. Schmidt v. Zimmer*, 386 F.3d 235, 244 (3d Cir. 2004)).

In the instant case, the Complaint alleges myriad facts to show defendant Weisel's conduct caused payment of false claims by the U.S. Postal Service.  As described in the Complaint, defendant Weisel founded Tailwind, he served as President then Chairman of the Board of the Company, and he was at all times the company's largest shareholder.  SAC ¶¶ 6-10, 18-19.  The U.S. Postal Service was specifically induced to rely on Weisel by Tailwind's original proposal which characterized Weisel as the "guiding force" behind Tailwind (then Montgomery Sports).  *Id.* ¶ 131.  The proposal further described Weisel as "founder, Chairman and CEO of Montgomery Securities" and as a "former World Masters Cycling Champion," thus giving the U.S. Postal Service the impression that it would be benefiting from the involvement of someone with both substantial experience in the cycling world as well as someone with meaningful financial wherewithal.  *Id.*; Sacks Decl. Ex. 2 at 17.

Once the U.S. Postal Service was persuaded by Weisel's company to sponsor the cycling team, Weisel signed the 1995 Sponsorship Agreement on behalf of Montgomery Sports as its President.  Sacks Decl. Ex. 2 at 7.  In doing so, Weisel signed an agreement that promised the Team would abide by, *inter alia*, the rules of the *Union Cycliste lnternationale* ("UCI") and other cycling oversight bodies, which included anti-doping rules.  SAC ¶¶ 36, 67-79.[3]  Even when Weisel was on notice of potential drug use by his company's cycling team, though, defendant Weisel took no meaningful steps to prevent doping or the submission of false claims to the U.S. Postal Service.  *Id.* ¶¶ 147-154.  As noted in the Complaint, Weisel never called for the Team to test the riders for banned substances or otherwise investigate doping by the Team.  *Id.* ¶ 150.  Indeed, official representatives of the Team actively facilitated doping by riders.  *Id.* ¶¶ 151-152.  Meanwhile, Armstrong's infamous doping doctor Michele Ferrari was treated as a welcome guest of the Team, even when he was under criminal investigation in Italy, with Weisel's evident acceptance and consent.  *Id.* ¶ 153.

In addition to failing to take preventive action, Weisel also took affirmative steps to facilitate the doping scheme and the submission of false claims by undermining the impartial enforcement of doping rules.  As noted in Weisel's book, "his team" was "largely in charge" of USA Cycling during the period of the U.S. Postal Service contract.  *Id.* ¶ 137.  Jim Ochowicz, who worked as a broker at Weisel's investment bank from 2001 to approximately 2011, was the President of the Board of Directors of USA Cycling from 2002 to 2008.  *Id.* ¶ 138.  USA Cycling had responsibility for the enforcement of anti-doping rules.  *Id.* ¶ 78.  But when relator specifically talked with Ochowicz about the USPS Team doping program, Ochowicz did nothing, other than say he would talk with Lance.  *Id.* ¶ 139.

As part of his duties at Weisel's firm between at least 2001 to 2004, Ochowicz managed funds for Hein Verbruggen, a client of the firm.  At the time of this financial relationship, Verbruggen headed the UCI, the organization chiefly in charge of policing doping in cycling.

---

[3]      The 2000 Sponsorship Agreement was signed by another Tailwind officer, but Weisel was referred to in the Agreement as "company management" and was one of the key figures required to make public appearances on behalf of the Company.  Sacks Decl. Ex. 4 ¶ 9.

Not surprisingly, both Verbruggen and UCI failed to enforce anti-doping rules against Armstrong during the same period and later.  *Id.* ¶¶ 74, 76, 140-142.  Verbruggen and UCI also exhibited strong bias against Mr. Landis in reaction to his allegations of doping by Armstrong and the involvement of UCI.  *Id.* ¶ 143.

Finally, the Complaint also alleges that Tailwind's October 10, 2000 contract with Lance Armstrong, and the January 2001 addendum thereto, did not even mention the topic of doping or compliance with the rules that prohibited doping, notwithstanding the fact that the 2000 Sponsorship Agreement specifically required such provisions.  *Id.* ¶¶ 37, 49-51, 152.  As Weisel was the Chairman of Tailwind's board, it is only reasonable to infer that he would have been aware of these facts and approved the contract for the company's most important rider, whose bonus of more than $1 million he had paid for personally the prior year.  *Id.* ¶ 135; *see also id.* ¶ 133 (noting that Lance Armstrong wrote a foreword for Weisel's book in which he described Weisel as "something of a father figure to me").

The allegations in the Complaint thus more than sufficiently plead that Weisel caused the submission of false claims to the U.S. Postal Service.

The authorities cited by defendant from outside this district fail to suggest any different result.  In the first case cited by defendant - *U.S. ex rel. Piacentile v. Wolk*, No. 93-5773, 1995 WL 20833, at *4 (E.D. Pa. Jan. 17, 1995) -  the complaint alleged a shareholder was aware of fraud and did not prevent it from occurring.  In an unpublished decision, the district court dismissed the relator's complaint, observing that the plaintiff "has alleged no actions on the part of [defendant] that constitute 'presenting, or causing to be presented' a false or fraudulent claim."  *Id.* at *4.  As described above, however, relator has not merely alleged that Weisel was a shareholder, but rather has made numerous allegations of affirmative conduct by Weisel that both induced the United States' reliance upon him and facilitated the submission of false claims.

In all events, in *United States ex rel. Atkinson v. Pennsylvania Shipbuilding*, 255 F. Supp. 2d 351 (E.D. Pa. 2002), not cited by defendant, the same court explained in a published decision how the language quoted by defendant Weisel was part of a "misleading statement of the law," and distinguished *Piacentile* as involving a defendant who had "taken literally no affirmative

action on which FCA liability may be grounded . . . ." *Id.* at 406.  *See also Miller v. Holzmann*, 563 F. Supp. 2d at 119 n.95 (citing *Atkinson* approvingly in upholding defendant's "caused to be presented" theory of liability after trial).

Defendant Weisel also cites *United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251 (D.C. Cir. 2004).  In *Williams*, the Court of Appeal upheld the dismissal of a complaint that "alleges no start date, names a laundry list of individuals without specifying their relation to the fraudulent scheme, . . . alleges a place only twice, . . . and sets forth no facts that exemplify the purportedly fraudulent scheme . . . ." *Id.* at 1258.  The ruling is not on point, because it was not focused on the specific question of liability for causing a false claim to be presented.  *Id.*  In any event, the facts of the case are far different from the case at hand where the entire fraud scheme has been described in detail, including the role of Weisel and other relevant individuals.[4]

Finally, defendant's reliance on one decision from this district - *United States ex rel. Bender v. North American Telecommunications,* 686 F. Supp. 2d 46 (D.D.C. 2010) - is also unavailing.  *Bender* was a declined *qui tam* case against multiple corporate and individual defendants involved in the maintenance business, who were all ultimately dismissed under Rule 9(b).  As the Court of Appeals noted, the relator "failed to allege  the time, place, and content of

---

[4]      Defendant argues in a footnote that the Complaint is also deficient because it fails to identify the particular employee who submitted false claims.  MTD at 12 n.6 ("Relator . . . fails to provide sufficient details about . . . *who* – what human being – submitted [false claims].").  But there is no such requirement under the False Claims Act.  *See Head v. Kane*, 798 F. Supp. 2d at 203 ("[P]laintiffs are not required to  . . . specifically name which employees of a corporate defendant submitted the false claims.") (citing *U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*, 685 F. Supp. 2d 129, 139 (D.D.C. 2010)).  The two cases relied on by defendant for this argument both involved Rule 9(b) motions against complaints that were lacking in numerous respects, including failing to allege how particular individuals within corporations were engaged in the alleged fraud schemes.  *See U.S. ex rel. Bender v. N. Am. Telecommc'ns, Inc.*, 499 Fed. Appx. 44 (D.C. Cir. 2013); *U.S. ex rel. Alexander v. Dyncorp, Inc.*, 924 F. Supp. 292, 303 (D.D.C. 1996).  Such rulings, however, do not translate into a requirement that relator specifically identify which employee of Tailwind submitted the false claims.

particular false claims, whether those claims were actually submitted to the government, who precisely was involved in making those claims, and what was obtained as a result." *U.S. ex rel. Bender v. N. Am. Telecommc'ns., Inc.*, 499 F. App'x 44, 45 (D.C. Cir. 2013). Defendant references the district court's decision in *Bender,* where the court noted the absence of any allegation by the plaintiff against the lowest ranking individual defendant that he "himself had submitted any false claims" to the Government. MTD at 11. But there was also no reference in the decision to any allegation by the relator that the subject defendant had *caused* the submission of false claims. Here, by contrast, as explained above, the Complaint alleges that Weisel, the most powerful individual in the Tailwind operation, did cause the submission of false claims, and it provides detailed factual bases for that assertion.

### 2. Relator Has Alleged "False" Claims.

Defendant Weisel next argues that relator has failed to allege that the claims were "false." His argument on this point boils down to the contention that, even if the U.S. Postal Service had understood that virtually the entire USPS Team was engaged in illicit doping, it would not have mattered; the Postal Service still would have been obliged to pay and would have willingly done so. MTD at 13-17. This argument is meritless on its face. If it is not self-evident that a massive doping conspiracy would have been material to the U.S. Government's decision to pay the defendants, then our country is in trouble. As defendants have raised the issue, however, relator has briefed the legal question below.

### a. Relator Has Alleged Fraudulent Inducement.

The Court of Appeals in this Circuit has long recognized that claims submitted under a contract procured by fraud are false "even in the absence of evidence that the claims were fraudulent in themselves." *See U.S. ex rel. Bettis v. Odebrecht Contractors*, 393 F.3d 1321, 1326 (D.C. Cir. 2005) (noting Congress' intent that "'each and every claim submitted under a contract . . . or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct . . . constitutes a false claim'" under § 3729(a)) (quoting S. Rep. No. 99-345, at 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274); *U.S. ex rel. Schwedt v.*

*Planning Research Corp.*, 59 F.3d 196, 197, 199 (D.C. Cir. 1995) ("original misrepresentation [re: ability to perform] tainted every subsequent claim made in relation to the contract").

The Complaint in this action alleges specific facts showing the U.S. Postal Service was fraudulently induced into entering into the 2000 Sponsorship Agreement and into renewing the 1995 Sponsorship Agreement multiple times on an annual basis.  *See e.g.,* SAC ¶¶ 24-29, 121-130, 197-210.   The USPS Team was engaged in a wide-ranging doping conspiracy and concealed that fact from the U.S. Postal Service prior to entering into the referenced contract and contract extensions.  *Id.*  Accordingly, per *Bettis* and *Schwedt,* every claim submitted under the fraudulently-procured agreements is false, and it is not necessary for plaintiff also to allege falsity with regard to each of defendant's individual claims.

### b.       Plaintiff Has Alleged False Implied Certification.

While not required to do so, the Complaint does also allege the falsity of the individual claims submitted to the U.S. Postal Service under the Sponsorship Agreements.  A claim for payment by the United States is false for purposes of the False Claims Act when it "rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term."  *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010) ("SAIC").  "False certifications can be either express or implied.  Courts infer implied certifications from silence 'where certification was a prerequisite to the government action sought.'"  *Id.* (quoting *U.S. ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1376 (D.C. Cir. 2000)).

 "[T]o establish the existence of a 'false or fraudulent' claim on the basis of implied certification of a contractual condition, the FCA plaintiff . . . must show that the contractor withheld information about its noncompliance with material contractual requirements."  *Id.* "[E]xpress contractual language specifically linking compliance to eligibility for payment may well constitute dispositive evidence of materiality, but it is not . . . a necessary condition.  The plaintiff may establish materiality in other ways, such as through testimony demonstrating that both parties to the contract understood that payment was conditional on compliance with the requirement at issue."  *Id.*; *see also Head v. Kane*, 798 F. Supp. 2d at 200 ("false claim is

material if 'it has a natural tendency to influence agency action or is capable of influencing agency action'") (internal citations omitted); *United States v. TDC Mgmt. Corp., Inc.*, 288 F.3d 421, 426 (D.C. Cir. 2002) (noting that withholding "information critical to the decision to pay" is a false claim) (quoting *Ab-Tech Constr., Inc. v. United States*, 31 Fed. Cl. 429, 434 (Fed. Cl. 1994))**.**

### i. The Sponsorship Agreements Expressly Linked Compliance with Doping Rules to Payment by the USPS.

In the case before the Court, both the 1995 and 2000 Sponsorship Agreements made clear that "[t]he performance of the obligations of the parties under this Agreement," including payment to Tailwind by the U.S. Postal Service,[5] was dependent on Tailwind's compliance with the UCI's and other organizations' rules, including anti-doping rules.[6] The agreements thus contain dispositive evidence that compliance with anti-doping rules was a material requirement.

Defendant Weisel argues, in a footnote, that "if this language [regarding compliance with the anti-doping rules of cycling organizations] . . . were in fact intended to cover doping, then there would have been no reason for the parties to address doping explicitly in the 2000 Sponsorship Agreement." MTD at 16 n.9. But this argument is a *non sequitur*, for whatever additional terms were written into the 2000 Sponsorship Agreement, they could not change the express meaning of an agreement written five years earlier. Moreover, it is simply not credible to contend that when the U.S. Postal Service reinforced its doping provisions in 2000 that it

---

[5]   *See* Sacks Decl. Ex. 2 ¶ 1(b); Sacks Decl. Ex. 4. ¶ 1(b).

[6]   Both the 1995 and 2000 Sponsorship Agreements stated that "[t]he performance of the obligations of the parties under this Agreement shall at all times and in all events be subject to compliance with all applicable rules of the Union Cycliste Internationale, the Federation Internationale du Cyclisme Professionel; the United States Professional Cycling Federation, Inc., the International Olympic Committee, the United States Olympic Committee, the International Amateur Cycling Federation, the United States Cycling Federation and all other governing organizations." SAC ¶¶ 36-37; Sacks Decl. Ex. 2 ¶ 13; Sacks Decl. Ex. 4 ¶ 12. During the period of the 1995 Sponsorship Agreement, the "applicable rules of the Union Cycliste Internationale," among other organizations, included anti-doping rules that prohibited the doping conduct alleged in this case. SAC ¶ 74. During the period of the 2000 Sponsorship Agreement, the "applicable rules of the Union Cycliste Internationale," and "other governing organizations" such as WADA and USADA, included anti-doping rules that prohibited the doping conduct alleged in this case. *Id.* ¶¶ 67-78.

never intended to prohibit the same conduct earlier.  There was good reason to reinforce the doping provisions in the 2000 Sponsorship Agreement, in light of public allegations of doping by Armstrong in 1999.  But the U.S. Postal Service's reinforcement of the admonition against doping does not imply it was not meant in earnest the first time.  Indeed, any such conclusion would run directly contrary to the basic tenet governing motions to dismiss that all reasonable inferences be resolved in plaintiff's favor.  *See NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012).

Both the 1995 and the 2000 Sponsorship Agreements also made it an explicit event of default if "[e]ither party shall make any material misrepresentation or shall materially breach any warranty made herein."  SAC ¶ 200.  In an event of default, the Sponsorship Agreements both permitted the U.S. Postal Service to "terminate the Agreement."  Sacks Decl. Ex. 2 ¶ 9(b); Sacks. Decl. Ex. 4 ¶ 8(c).  The 1995 and 2000 Sponsorship Agreements thus made clear that material misrepresentations by Tailwind would be grounds for the U.S. Postal Service to discontinue paying funds under the Sponsorship Agreements, and it is difficult to conceive of a more material misrepresentation than lying about doping and cheating to win races.

### ii.      The Availability of Alternate Remedies Does Not Establish a Lack of Materiality.

Defendant contends that "[a]s the USPS had other remedies in addition to termination of the agreement, the absence of doping was not a prerequisite to payment."  MTD at 16.  From this, defendant concludes, based on authority from the Fifth and Third Circuits, that relator has failed to allege the submission of false claims under an implied certification theory.

The threshold flaw in defendant's argument is that the authorities upon which he relies articulate standards for pleading falsity that are not in accord with the standard set forth by the Court of Appeals in this Circuit.  As explained in detail *supra*, in the D.C. Circuit, it is only necessary to show "that the contractor withheld information about its noncompliance with material contractual requirements."  *SAIC*, 626 F.3d at 1269.  This standard, by its terms, does not restrict the court to determining falsity based on isolated details like whether the underlying contract happens to offer the Government more than one remedy.  All the plaintiffs "must do at

this early stage is plead the essential elements of their claim . . . Plaintiffs are not required to point to express contractual language to establish that compliance [with a particular term] was material to the Government's decision to pay in this case." *Head v. Kane*, 798 F. Supp. 2d at 200.

In any event, the instant case is fundamentally different on its facts from those relied on by defendants. In both *United States ex rel. Steury v. Cardinal Health*, 625 F.3d 262, 269-270 (5th Cir. 2010) and *United States ex rel. Wilkins v. United Health Group*, 659 F.3d 295, 309-11 (3d Cir. 2011), the relators did not rely on implied certification of compliance with a contractual provision; they relied on technical violations of regulations. *See Steury*, 625 F.3d at 269-70 (relator alleged defendant falsely certified intravenous pumps complied with the warranty of merchantability but defendant "not even necessarily subject to an implied warranty of merchantability under the FAR," nor was there any allegation the pumps were even defective); *Wilkins*, 659 F.3d at 309-11 (complaint alleged defendant violated Medicare marketing regulations, but Court described pertinent Medicare regulations as "so complicated that the best intentioned plan participant could make errors in attempting to comply with them"). Under these facts, both courts upheld the lower courts' dismissals, emphasizing they were not suitable material for an FCA case. *Steury*, 625 F.3d at 268 ("Not every breach of a federal contract is an FCA problem.").; *Wilkins*, 659 F.3d 295 at 310 ("[W]e question the wisdom of regarding every violation of a Medicare regulation as a basis for a *qui tam* suit.").

To defendant's point in particular, unlike the alternative remedies available to the Government in the cases relied on by defendants, the applicable provisions of the Sponsorship Agreements actually demonstrate, rather than negate, the materiality of the prohibitions against doping. In *Steury*, 625 F.3d at 269-270, the Federal Acquisition Regulations permitted acceptance of the allegedly defective pumps at a reduced rate, and in *Wilkins*, 659 F.3d at 309, Medicare regulations gave the government the option of giving the provider 30 days to come up with a corrective plan of action for its marketing guidelines. Here, in the event of a default arising from an endemic doping program or material misrepresentations, the 1995 and 2000 Sponsorship Agreements did not provide for an alternative remedy of the U.S. Postal Service

continuing to accept services at a reduced rate or continuing to accept services subject to Tailwind's establishment of a corrective plan of action.  Pertinent remedies in the event of such defaults included "termination" and legal action to recover damages.  Sacks Decl. Ex. 2 ¶ 9(b); Sacks Decl. Ex. 4 ¶ 8(c).[7]  Notably, by contrast, in the event of other shortcomings on the part of Tailwind unrelated to doping, the Sponsorship Agreements did provide for a remedy that involved a continuation of the contracts.[8] ¶

### iii.   Additional Terms in the 2000 Sponsorship Agreement Indicate Compliance with Doping Rules Was Material.

As noted by the defendants -- in the wake of various doping allegations against Lance Armstrong and defendants' vehement denials of and reassurances regarding the same -- the 2000 Sponsorship Agreement added language emphasizing that doping was prohibited.  The Agreement expressly made it an event of default if "[t]he Company fails to take immediate action without notification by the Sponsor in a case of a rider or Team offense related to a morals or drug clause violation."  Sacks Decl. Ex. 4 ¶ 8(a)(4).  It further provided that it would be an event of default if "[t]here is negative publicity associated with an individual rider or team support personnel, either permanent or temporary, due to misconduct such as but not limited to, failed drug or medical tests, alleged possession, use or sale of banned substances, or a conviction of a crime."  *Id.* ¶ 8(a)(5).

Defendant's response to these provisions is that doping was not prohibited under the 2000 contract so long as it was not detected.  *See* MTD at 15 ("Undetected doping by riders of the USPS cycling team thus was not itself an event of default . . . .").  But this argument – which

---

[7]    These remedies were cumulative and not just alternative like the remedies referenced in *Steury* and *Wilkins*.  Sacks Decl. Ex. 2 ¶ 9(b); Sacks Decl. Ex. 4 ¶ 8(c).

[8]    Both the 1995 and 2000 Sponsorship Agreements provided that in the event of "changed circumstances that do not constitute an Event of Default but which in the reasonable opinion of Sponsor materially reduce the anticipated benefits of the Team sponsorship to Sponsor . . . then Sponsor will have the right . . . to a reasonable proportionate reduction in the amount of the sponsorship fee to be paid by Sponsor . . . ."  Ex. 4 to Sacks Decl. ¶ 8(c); Ex. 2 to Sacks Decl. ¶ 9(c).  None of the examples of such changed circumstances listed in either agreement included doping violations or misrepresentations concerning such violations.  *Id.*

sounds remarkably like "it's not a crime if you don't get caught" -- plainly runs contrary to *SAIC*, as well as common sense, for it is manifest that, by adding the foregoing provisions as events of default to the 2000 Agreement, the U.S. Postal Service was emphasizing the materiality of its doping concerns relative to its obligation to pay the defendants.  Notably, the terms requiring compliance with the rules of applicable sporting bodies, including anti-doping rules, remained in effect unchanged.  In the context of a motion to dismiss – indeed, in any context – the reasonable inference is that a widespread doping scheme orchestrated by the defendants was a basis for suspension of payment under either of the agreements.

Not mentioned by defendant Weisel is the addition of a provision in the 2000 Sponsorship Agreement which required the Company to include drug clauses in the rider's contracts.[9]  Also not mentioned are the cloak and dagger schemes the defendants undertook to conceal their conduct.  These facts, in addition to those cited above, demonstrate clearly that doping was of significant concern to the U.S. Postal Service and knowledge of the same would have been material to its payment decisions.  *See* SAC ¶¶ 198, 199, 200, 201, 203, 206, 207, 208, 210, 242.[10]  Thus, even if the Complaint had not cited express contractual

---

[9]     "Company represents that each rider on the Team has a morals [sic] turpitude and drug clause that allows the Company to suspend or terminate the rider for cause which shall include . . .  (2) acts that require the Team to suspend or terminate the rider under the applicable rules of the Union Cycliste Internationale . . . and all other applicable governing organizations; (3) failure to pass drug or medical tests; (4) inappropriate drug conduct prejudicial to the Team, or the Postal Service, which is in violation of the Team rules or commonly accepted standards of morality . . ."  SAC ¶ 37; Ex. 4 to Sacks Decl. ¶ 9.

[10]     More generally, the Complaint also alleges that, under the U.S. Postal Service Purchasing Manual, conduct of the type at issue here would be sufficient to debar a contractor from even doing business with the Postal Service.  *See* SAC ¶¶ 39 (referencing debarment provisions for offenses like "willful failure to perform a Postal Service contract in accordance with the specifications," "violation of a contract clause concerning the maintenance of a drug-free workplace," or "making false statements").  *See also* USPS Purchasing Manual (1997) §§ 3.7.1.e & 3.7.1.f; USPS Purchasing Manual (2002) §§ 3.7.1.d & 3.7.1.e; USPS Purchasing Manual (2004) §§ 3.7.1.d.  http://about.usps.com/manuals/pm/welcome.htm . At all times relevant to this case, the U.S. Postal Service Purchasing Manuals (aka Procurement Manual) were incorporated by reference into the Postal Service's regulations and governed "all Postal Service procurements of property and services" except real estate and related services.  *See* 39 C.F.R. § 601.100-102 (1997); 39 C.F.R. § 601.100-102 (2003); 39 C.F.R. § 601.100-102 (2004).

provisions establishing dispositive evidence of materiality, the Complaint contains more than

sufficient additional allegations of materiality for purposes of pleading falsity under an

implied certification theory.  *See Honeywell,* 798 F. Supp. 2d at 20 (allegation that

government "would not have purchased" bulletproof vests if it had known they were

defective sufficient to support inference that compliance with five-year warranty was

material).

### 3.    Relator Has Alleged "Knowing" false claims.

The FCA knowledge standard only requires proof of "deliberate ignorance" or "reckless

disregard" of the truth or falsity of information.[11]  "Because Rule 9(b) permits knowledge to be

pled generally, there is no basis for dismissal for failure to plead knowledge with particularity."

*Honeywell*, 798 F. Supp. 2d at 22.  All that is necessary is for the relator to "plead some facts

from which the court may reasonably infer knowledge[.]"  *Elemary v. Philipp Holzmann A.G.*,

533 F. Supp. 2d 116, 132 (D.D.C. 2008).

Relator has alleged that Weisel had actual knowledge of defendants' doping.  SAC ¶ 145.

Relator has alleged numerous facts from which the Court could reasonably infer such

knowledge, or, at a minimum, reckless disregard or deliberate ignorance.  SAC ¶ 146.  For

example, the Complaint alleges numerous facts that show Weisel was on notice that doping was

prohibited by the U.S. Postal Service contract and that he was in a position to ensure compliance

with this material condition of payment, but as it was against his interests to do so, he took no

meaningful steps to prevent doping and instead took steps that actually facilitated the ongoing

submission of false claims.[12]  The Complaint thus states more than ample facts from which

reckless disregard for the truth (at a minimum) could be inferred.

---

[11]     Under the False Claims Act (both pre and post FERA), "the terms 'knowing' and 'knowingly' mean that a person, with respect to information - (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required."  31 U.S.C. § 3729(b)(1).

[12]     Relevant allegations include the following:  Defendant Weisel was the president then Chairman of the Board of Tailwind and always its largest shareholder, SAC ¶¶ 6-10, 131; Weisel knew the company's principal business was the operation of its cycling team, *id.* ¶ 148; Weisel

Defendant does not deny the Complaint alleges he failed to take action to prevent doping by the USPS Team.  Instead, he suggests that the denials of Armstrong and others, along with Armstrong's lawsuits, should have relieved him of any reason to investigate doping by the USPS Team.  MTD at 18 n.10.[13]  But that argument is without merit.  Armstrong's denials plainly did not establish his innocence, nor did they even give defendant Weisel reason to believe they were true in light of Weisel's own knowledge of and actions to facilitate Armstrong's doping.  *See e.g.* SAC ¶¶ 137-143 (reciting Weisel's undue influence over doping officials), ¶¶ 43-62 (referencing the absence of doping provisions in Armstrong's rider contract).

---

was aware that Tailwind was submitting claims for payment to the U.S. Postal Service, its chief source of revenue, *id.;* Weisel knew Tailwind had agreed to comply with anti-doping rules, *id.*; Weisel was aware or should have been aware that multiple doping allegations had been made against Lance Armstrong and medical personnel associated with the team, including, but not limited to Dr. Michelle Ferrari, from at least 1999 and later, *id.;* Weisel had a close personal relationship with Lance Armstrong, *id.* ¶ 133; Weisel personally benefited financially and in terms of his public stature from his association with the Team's success, *id.* ¶¶ 155-168; Weisel failed to take any meaningful steps to investigate allegations of doping that had been made against Lance Armstrong between 1999 and 2004, *id.* ¶¶ 148-152; Weisel did not require Lance Armstrong to have a doping clause in his rider contract with the team even though such a clause was required by the sponsorship agreement, *id.* ¶¶ 74, 76, 140-142; Weisel permitted Armstrong's notorious doping doctor Michelle Ferrari to be involved with the Team, even after it was publicly known he was under criminal investigation for doping activities, *id.* ¶ 153; Weisel undermined the impartial enforcement of anti-doping rules through improper conflictive financial relationships with anti-doping officials, *id.* ¶¶ 137-143; and other key people working with Tailwind like defendants Bruyneel, Stapleton and Knaggs, along with riders and medical personnel, were aware of doping by the team.  *Id.* ¶¶ 14-15, 80-117.

[13]   Defendant Weisel also argues that "[i]f Relator were able to establish Mr. Weisel's scienter on the basis of public rumors of Armstrong's doping, the United States would likely be time-barred from pursuing its own claims under Section 3731(b)(2), which provides that the United States' claims under the FCA must be brought within three years of the date 'the official of the United States charged with responsibility to act in the circumstances' knew or reasonably should have known of the underlying fraud.'  MTD at 18 n.10.  This argument, however, plainly has no relevance to the question of Mr. Weisel's knowledge.  Again, relator has also alleged that Weisel actually knew of the doping.  SAC ¶¶ 144-154.  In any event, as detailed *supra*, the U.S. Postal Service was in a far different position than Weisel, who was an insider with complete access to relevant information, and who was operating a company that had promised the United States it would abide by anti-doping rules.  SAC ¶¶ 6-8, 36, 37.  Meanwhile, the U.S. Postal Service, which was simply a sponsor of the Team, did take measures in response to public allegations of doping, including discussions with Tailwind officials and reinforcing anti-doping provisions in the 2000 Sponsorship Agreement.  SAC ¶¶ 37, 126.

Lastly, defendant Weisel argues that "it strains credulity to argue that Mr. Weisel somehow knew that the absence of doping was material to the USPS's decision to pay claims." MTD at 19.  What truly strains credulity, however, is this argument.  Even in the absence of any contractual provisions directly addressing doping, any reasonably informed citizen – let alone a highly sophisticated individual like Thomas Weisel -- would understand that the United States would not want to associate itself with, let alone pay for, a team that engaged in widespread doping and cheating to win.  The U.S. Postal Service specifically stated in 2000 that its purpose in sponsoring the USPS Team was to "positively impact customer perceptions of the Postal Service" and improve its own employees' "sense of pride."  SAC ¶ 206.  Doping of athletes and cheating to win is hardly consistent with these objectives.  In all events, the Sponsorship Agreements expressly prohibited doping, so that should have made the obvious yet more manifest for defendant Weisel.  *See* SAC ¶ 36-37.

**B.    The Pre-FERA "False Statements" Count is Adequately Pleaded.**

Defendant does not dispute that the Complaint alleges false statements.  The Complaint lists numerous public denials of doping by various representatives of Tailwind.  *See* SAC ¶¶ 121-130.  Instead, defendant contends that relator has failed to allege false statements made by defendant Weisel personally.  This argument, however, fails for essentially the same reasons as his similar argument regarding liability for the submission of false claims.

It is unnecessary for relator to allege that defendant Weisel personally made false statements to the United States.  Section 3729(a)(2) provides for liability when a defendant "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government . . . ."  It is thus sufficient for defendant Weisel to have caused a false statement to be made or used to have potential liability under 3729(a)(2).  As noted above, it is more than reasonable to infer that Mr. Weisel's conduct – including, but not limited to, his failure to implement *bona fide* procedures to investigate and prevent doping violations when he was on notice of the need to do the same, his failure to ensure the use of anti-doping clauses in Armstrong's contract, his financial influence undermining the enforcement of anti-doping rules, and his association with and retention of individuals under

investigation for doping violations – caused false statements denying doping to be made by officials representing Tailwind, during the period the company was collecting funds under the Sponsorship Agreements from the U.S. Postal Service.[14]

Defendant also argues that the Complaint does not allege defendant Weisel had a duty to disclose information relating to doping by the U.S. Postal Service.  While defendant Weisel did, in fact, induce the U.S. Postal Service to rely on him, his argument miscasts the question, for the issue is not whether he had a duty but simply whether he caused false representations to be made to the U.S. Postal Service.  31 U.S.C. § 3729(a)(2).  The one case cited by defendant in support of his argument is inapposite.  In *United States ex rel. Berger v. Board of Trustess of the University of Alabama*, 104 F.3d 1453, 1461 (4th Cir. 1997), the Court was addressing a relator's contention that the omission of her name from an abstract submitted as part of a progress report to NIH was somehow material.  In the course of its decision, the court noted that "NIH did not even require the inclusion of her name, or anyone's name." *Id.*  By contrast, in the instant case, the allegations in the Complaint clearly show how information regarding doping was highly relevant to the U.S. Postal Service.  *See, e.g.,* SAC ¶¶ 36-37; *see also Long*, 999 F. Supp. at 91 (court denied motion to dismiss 3729(a)(1) *and* (2) claims, characterizing the question of "cause" as whether the "alleged failure to act was a course of conduct that allowed fraudulent claims to be presented to the federal government").[15]

### C.      The Pre-FERA "Conspiracy" Count is Adequately Pleaded.

To state a pre-FERA FCA claim for conspiracy, the complaint must plead that the defendant "conspired with one or more persons to have a fraudulent claim paid by the . . . United States, that one or more of the conspirators performed any act to have such a claim paid by the

---

[14]      *See, e.g.,* SAC ¶ 124 (public denial of doping by Gorski in November 2000); *id.* ¶126 (describing representations to Postal Service by Gorski and Osipow denying doping in late 2000); *see also* U.S. Compl. ¶ 63(A) (Tailwind Operations Director denying doping in November 2000); *id.* ¶ 63(B) (Johan Bruyneel denying doping allegations in November 2000); *id.* ¶ 63(C)-(D) (Tailwind President Mark Gorski denying doping allegations in November and December 2000); *id.* ¶ 64(D) (Gorski denied doping allegations from 2001 through 2003).

[15]      Defendant's two sentence argument regarding *scienter* in this section has been addressed above in relator's discussion regarding defendant's knowing submission of false claims.

United States, and . . . that the United States suffered damages as a result of the claim." *United States v. Bouchey*, 860 F. Supp. 890, 893 (D.D.C. 1994). "Where the conduct that the conspirators are alleged to have agreed upon involved the making of a false record or statement, it must be shown that the conspirators had the purpose of 'getting' the false record or statement to bring about the Government's payment of a false or fraudulent claim." *Allison Engine Co., Inc. v. U.S. ex rel. Sanders*, 553 U.S. 662, 665 (2008).

"It is not necessary to show that the conspirators intended the false record or statement to be presented directly to the Government, but it must be established that they agreed that the false record or statement would have a material effect on the Government's decision to pay the false or fraudulent claim." *Id.*

Lastly, proof of a tacit agreement is enough. Plaintiff is "not required to show an express agreement; conspiracies by their very nature are not often susceptible to direct proof." *U.S. ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 546 (7th Cir. 1999); *Dvir Ungar v. The Islamic Republic of Iran*, 211 F. Supp. 2d 91, 100 (D.D.C. 2002) ("[C]onspiracies must generally be inferred from indirect evidence . . . ."); *see also Atkinson*, 255 F. Supp. 2d at 406 ("[A]n examination of the language of § 3729(a)(3) reveals nothing that requires that a conspiracy to defraud the government be comprised of affirmative acts only.").

In the case before the Court, the Complaint satisfies the foregoing standards. First, the Complaint alleges defendant Weisel conspired with one or more persons to have a fraudulent claim paid by the United States.[16] Second, the Complaint alleges numerous acts by the members

---

[16] *See* SAC ¶ 234 ("Weisel, Armstrong, Bruyneel and CSE were all involved in the wrongful conduct by Tailwind alleged herein, and all four were also shareholders of Tailwind during all or part of the period covered by the 2000 Sponsorship Agreement, and they agreed upon and caused the submission of false claims for payment to the U.S. Postal Service by Tailwind."); *id.* ¶ 145 ("Relator is informed and believes, based on the facts alleged herein, defendant Weisel was at all relevant times knowledgeable about, and approved of, the doping program of the USPS Team and the falsity of the claims being submitted to the US Postal Service under the 1995 and 2000 Sponsorship Agreements, and that he authorized the submission of such claims by Tailwind, and agreed on their submission with the other defendants to get the claims paid by the U.S. Postal Service"); *id.* ¶¶ 44-52 (describing the absence of any doping clause in Armstrong's October 10, 2000 contract with Tailwind and how Armstrong

of the conspiracy to conceal doping activity, submit false claims to the U.S. Postal Service and further lies to continue collecting and avoid returning funds.  *See, e.g.*, SAC ¶¶ 53-59, 81-154. Third, the Complaint alleges damages by the United States, for it alleges payments to the defendants resulting from the false claims.  *See, e.g.*, SAC ¶¶ 33-35 and SAC Ex. 1.  Lastly, as discussed in greater detail *supra*, the Complaint alleges more than sufficient facts to establish that the conspiracy concealing the doping scheme had a material effect on the Government's decision to pay the false claims.  *See, e.g.,* SAC ¶¶ 36, 37, 121-130.

Defendant cites *United States ex rel. El Amin v. George Washington University*, 26 F. Supp. 2d 162 (D.D.C. 1998) in arguing that the Complaint fails to allege that defendant Weisel agreed to engage in a scheme to defraud.  But the complaint in *El Amin* was fundamentally different:  "The complaint consist[ed] of nothing more than conclusory allegations that [George Washington University] conspired with [two medical] Associations to defraud the government." *Id.* at 164-165.  "Even if the relators were able to prove that the Associations and GWU agreed to commit the activities alleged in the third claim, these activities would not constitute a conspiracy to defraud.  Rather, the activities alleged consist of entirely lawful pursuits . . . ."  *Id.*  Here, by contrast, the Complaint has alleged the specific details of an illegal doping scheme in violation of contract terms.  SAC ¶¶ 81-154.  In support, the Complaint also alleges numerous facts showing Mr. Weisel's awareness of the issue and his facilitation of the conduct.  *See* SAC ¶¶ 131-154, 44-52.  The Complaint thus states the elements of a conspiracy claim under section 3729(a)(3).

As an alternative argument, defendant Weisel contends that the intra-corporate conspiracy doctrine requires dismissal of relator's conspiracy count, but this doctrine plainly does not apply.  As defendants correctly note, according to the intra-corporate conspiracy

---

"agreed with the other defendants on, and also caused, along with others, Tailwind's submission of false claims to the Postal Service to get claims paid by the United States"); *id.* ¶ 207 (alleging on information and belief that "each of the defendants agreed with the others on the doping scheme and other wrongful conduct in violation of the sponsorship agreements with the USPS as described herein, and agreed to conceal from the USPS that such doping and other wrongful conduct was occurring and had occurred, for the purpose of getting claims for money paid by the USPS . . .").

doctrine "a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves."  *See U.S. ex rel. Fago v. M & T Mortg. Corp.*, 518 F. Supp. 2d 108, 117 (D.D.C. 2007).  But in the present case, the Complaint specifically alleges that non-employees of Tailwind participated in the conspiracy, including contract riders, defendants CSE, Stapleton, and Knaggs.[17]  SAC ¶¶ 14-15.  There was thus unequivocally more than one legal entity involved in the conspiracy, rendering the intra-corporate conspiracy doctrine inapplicable here.  *Cf. Bowie v. Maddox*, 642 F.3d 1122, 1130 (D.C. Cir. 2011) (under intra-corporate conspiracy doctrine "a single corporate entity may not conspire with itself").[18]

### D.     Pre-FERA "Reverse False Claims" Have Been Adequately Pleaded.

Defendants assert that relator's reverse false claims count under section 3729(a)(7) should be dismissed, contending relator "does not even attempt to allege that Mr. Weisel – or any other defendant – had any preexisting obligation to pay the USPS any money and thus he fails to state a claim under Section 3729(a)(7)."  MTD at 22-23.  In fact, the Complaint alleges that Tailwind had a contractual obligation to indemnify the U.S. Postal Service in the event of damages arising from material misrepresentations.[19]  Indeed, Mr. Weisel signed the 1995 Sponsorship Agreement containing these terms.  Sacks Decl., Ex. 4.

---

[17]     Defendants Stapleton and Knaggs are only alleged to have been employees of Tailwind for a short part of the period during which false claims were being submitted to the Postal Service.  *Id.*

[18]     There are numerous additional conspirators named in the Complaint whose employment status is not specified.  SAC ¶¶ 81-154.  It cannot be presumed for purposes of defendant's argument (which is essentially an affirmative defense) that all conspirators are employees, as that would contravene the principle that all reasonable inferences should be made in favor of plaintiff.  *See NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012).

[19]     Both of Tailwind's contracts with the Postal Service contained, *inter alia*, an indemnification clause, pursuant to which Tailwind agreed to "indemnify, defend and hold the Sponsor . . . harmless from and against any and all expenses, damages, claims, suits, losses, action, judgments, liabilities and costs whatsoever (including, without limitation, attorneys fees) arising out of:  (i) the Company's breach, misrepresentation or nonperformance under this Agreement See 1995 Sponsorship Agreement, SAC ¶ 37; Sacks Decl. Ex. 2 ¶ 5(referencing indemnification obligation in sponsorship agreement); 2000 Sponsorship Agreement, Sacks Decl. Ex. 4 ¶ 4 (same).  Both agreements also gave the Postal Service the ability to collect its

As explained *supra*, defendant Weisel helped conceal the doping and caused false statements to be made by representatives of Tailwind to get false claims paid.  These same false statements, and others even after the Sponsorship Agreements were over, also had the effect of avoiding the company's responsibility to indemnify the U.S. Postal Service for funds which should not have been paid, *i.e.,* they were statements made in order both to keep the funds flowing, and, later, especially after the contracts were over, to avoid the obligation to re-pay the ill-gotten money.  Both pre and post FERA, the FCA imposes reverse false claims liability on those who "cause" such false statements to be made.  31 U.S.C. § 3729(a)(7).  The false statements thus give rise to actionable "reverse" false claims against defendants  *See United States v. Caremark, Inc.*, 634 F.3d 808, 817 (5th Cir. 2011) ("The statute does not require that the statement impair the defendant's obligation; instead, it requires that the statement impair 'an obligation to pay or transmit money or property to the Government.'"); *U.S. ex rel. Koch v. Koch Indus., Inc.*, 57 F. Supp. 2d 1122, 1128 (N.D. Okla. 1999) ("[G]iven the history and purpose of the Act, the term 'claim' as used in the FCA also 'includes' indirect reverse false claims.").

Prior to FERA, the focus of numerous cases was on the meaning of the term "obligation" under 31 U.S.C. § 3729(a)(7).  The District of Columbia Circuit has not ruled on the meaning of the term.  *Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 66 n.6 (D.C. Cir. 2008).  Some courts held pre-FERA that that the term could be construed to cover false statements to avoid contingent obligations like fines or penalties.  *See e.g.*, *United States ex rel. Terry J. Wilkins v. State of Ohio, et al.*, 885 F. Supp. 1055, 1064 (S.D. Ohio 1995); *Earl O. Pickens v. Kanawha River Towing*, 916 F. Supp. 702 (S.D. Ohio 1996).  Other courts ruling on the question, often dealing with alleged false statements to avoid fines or similar sanctions, held that the term "obligation" did not cover potential or contingent obligations.  *See, e.g., U.S. ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 658 (5th Cir. 2004) (fines and other assessments); *U.S. ex rel. American Textile Mfrs. Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729, 736 (6th Cir. 1999) (statutory fines,

---

damages from Tailwind in the event of specific forms of default such as misrepresentation or doping violations.  *See* 1995 Sponsorship Agreement, Sacks Decl. Ex. 2 ¶ 9; 2000 Sponsorship Agreement, Sacks Decl. Ex. 4 ¶ 8.

duties, etc.); *United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 774 (8th Cir. 1997) (postage mailed from Barbados); *see also Hoyte v. American Nat. Red Cross*, 439 F. Supp. 2d 38, 44 (D.D.C. 2006) (focusing on potential nature of fines).  As noted above, however, this case is distinct, because it involves a contractual duty that was and is clearly owed.  The contracts provided that under specified circumstances, an affirmative duty to pay the government's expenses, damages or losses would arise.  Those circumstances occurred.  The duty was therefore no longer contingent.

In any event, as detailed below, Congress has since clarified that prior court rulings narrowly construing the term "obligation" were not in accord with Congressional intent. The FCA, after FERA, explicitly states that "the term 'obligation' means "an established duty, *whether or not fixed*, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, *or from the retention of any overpayment* ." 31 U.S.C. § 3729(d)(3) (emphasis added).   The Senate Judiciary Committee explained that the definition of "obligation" added to the FCA "[r]eflects the Committee's view, held since the passage of the 1986 Amendments, that an 'obligation' arises across the spectrum of possibilities from the fixed amount debt obligation where all particulars are defined to the instance where there is a relationship between the Government and a person that 'results in a duty to pay the Government money, whether or not the amount owed is yet fixed.'"  S. Rep. No. 111-10, 111th Cong., 1st Sess. at 14 (2009).  The Senate Judiciary Report on FERA referenced "confusion among the courts" with respect to the term "obligation" and explained that the FCA therefore needed to be "corrected and clarified."  *Id*. at 4, 14.

"Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction."  *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380-81 (1969). Accordingly, based on Congress' express clarification of the term "obligation" in the FCA, this Court should interpret the term "obligation" under the pre-FERA False Claims Act to include a duty to pay, the amount of which did not have to be fixed at the time of the relevant false statements. S*ee also McCreary v. Offner*, 172 F.3d 76, 82 (D.C. Cir. 1999) ("Although post-enactment legislative history may or may not be a valid tool for ascertaining congressional intent

. . . , our task here is not to divine conclusively the meaning of [the code] section . . . , but rather to determine whether it is reasonably susceptible to more than one meaning.  With respect to this question, post-enactment legislative commentary offering a plausible interpretation is certainly relevant, much like plausible interpretations from litigants, other courts, law review articles, or any other source would be") (internal citation omitted).[20]

## III.   FERA APPLIES TO RELATOR'S ALLEGATIONS.

Defendants contend that "the FCA as amended by FERA simply does not apply here." MTD at 23.  They are incorrect.  The FERA amendments to the FCA's liability provisions were generally applicable to conduct after the date of FERA's enactment, May 20, 2009.  As plaintiffs' complaints include allegations regarding conduct by defendants after that date, defendants' liability for such conduct will be governed by FERA.  In addition, as detailed below, FERA's amendments to the "false statements" provision were specifically made applicable to cases filed after June 7, 2008 and thus the amendments to that section apply to all of plaintiffs' allegations regarding defendants' false statements.

### A.   FERA's "False Statements" Provision Applies to This Case.

FERA states that "[t]he amendments made by this section . . . shall apply to conduct on or after the date of enactment, except that [the amended version of the "false statements" provision at 31 U.S.C. § 3729(a)(1)(B) -- formerly 31 U.S.C. § 3729(a)(2) --] shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act . . . that are pending on or after that date."  123 Stat. at 1625.

Although this case was filed after June 7, 2008, defendants argue that section 3729(a)(1)(B) does not apply to this case, based on two cases from this district that summarily conclude that the term "claims" refers to pending requests for payment and not to pending actions under the False Claims Act.  *See U.S. ex rel. Bender v. N. Am. Telecomms.*, 750 F. Supp.

---

[20]   Relator also joins in the argument of the United States on this issue, and, for purposes of judicial economy, has not repeated those arguments in full here.

2d 1, 5 n.3 (D.C. Cir. 2010) (brief discussion in footnote); *U.S. ex rel. Westrick v. Second Chance Body Armor*, Inc., 709 F. Supp. 2d 52, 55 (D.D.C. 2010) (one paragraph analysis).

Both cases cited by defendant relied, in turn, on *United States v. Science Applications Int'l Corp.*, 653 F. Supp. 2d 87, 107 (D.D.C. 2009).[21]  In that case, the meaning of the phrase "claims under the False Claims Act" was raised in the context of SAIC's motion for a new trial or judgment as a matter of law following a jury verdict against SAIC.  *Id.* at 107.  The Government contended that section 3729(a)(1)(B) was intended to apply to pending cases under the False Claims Act, but SAIC argued, *inter alia*, that if section 3729(a)(1)(B) did apply to the case, then constitutional concerns required that SAIC be  "'entitled to a new trial in which the evidence and instructions would properly reflect the applicable law.'"  *Id.* (quoting SAIC's brief).  The court subsequently ruled against the Government on the application of section 3729(a)(1)(B), thus making it unnecessary to address the constitutional question raised by SAIC, but still upheld the verdict.  On appeal, the Government maintained that section 3729(a)(1)(B) applied to pending "cases" but advised the Court of Appeal that the issue had "'no bearing on the outcome of this case,'" so the Court of Appeal elected not to address the issue.  *SAIC*, 626 F.3d at 1266;  *see also U.S. ex rel. Bender v. N. Am. Telecomms., Inc.*, 499 F. App'x 44, 45 (D.C. Cir. 2013) (as it was unnecessary to address the issue, court did "not reach the question").

While the D.C. Circuit has not passed on the question, the majority of circuits to consider the question have reached the opposite conclusion to the district court cases relied on by defendants; that is, they have concluded that the phrase "claims under the False Claims Act" refers to cases or claims for relief and not claims for payment.  *See Sanders v. Allison Engine Co., Inc.*, 703 F.3d 930 (6th Cir. 2012); *U.S. ex rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818, 822 n.2 (7th Cir. 2011); *U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 113

---

[21]    *See also Head v. Kane*, 798 F. Supp. 2d at 194 n.10 (citing *Bender* for the same proposition in a footnote)

(2d Cir. 2010), *rev'd and remanded on other grounds*, 131 S. Ct. 1885 (2011); *Steury*, 625 F.3d at 267 n.1.[22]

Two circuits have ruled as defendants suggest, but both did so without any significant analysis of the issue.  The Eleventh Circuit cited to the district court decision in *SAIC*.  *See Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1327 n.3 (11th Cir. 2009), *cert. denied*, 130 S. Ct. 3465 (2010).  The Ninth Circuit subsequently cited the Eleventh Circuit's decision in *Hopper* without comment.  *U.S. ex rel. Cafasso v. General Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1051 n.1 (9th Cir. 2011).

Given the foregoing, section 3729(a)(1)(B) should be applied in this case.  For purposes of judicial economy, relator also joins in the arguments of the United States on this issue as set forth in its response to Defendant Armstrong's Motion to Dismiss the United States' Complaint.

### B.    FERA's "Reverse False Claims" Provision Applies to this Case

Section 3729(a)(1)(G) establishes liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  As described above, after FERA, the FCA states explicitly that "the term 'obligation' means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3).  Section 3729(a)(1)(G) applies to the instant case, because the complaints of the relator and the United States both allege that doping was further concealed and numerous additional false statements were made after FERA was passed to avoid repaying funds due to the

---

[22]    In *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 475 n.4 (5th Cir. 2012), decided after *Steury*, the Fifth Circuit noted that the district court applied the pre-amendment version of § 3729(a), but the court did not express any view on the correctness of that ruling.

United States.  *See, e.g.,* SAC ¶ 129, 207, 276; United States Complaint ("U.S. Compl.") [23] ¶¶ 67(B)-(F), 72; *see* discussion *supra* regarding pre-FERA "reverse false claims" provision.

With regard to defendant Weisel in particular, section 3729(a)(1)(G) establishes liability for any person who "knowingly conceals" an obligation to pay or transmit money or property to the Government.  The Complaint repeatedly alleges that defendant Weisel knowingly concealed the truth about doping by the USPS Team and the related obligation to pay both before and after FERA came into law on May 20, 2009.  SAC ¶¶ 57, 58. 197, 200, 203, 207, 210.  The Complaint thus alleges a cause of action under 31 U.S.C. § 3729(a)(1)(G).[24]

For purposes of judicial economy, relator incorporates by reference the United States' additional arguments regarding 3729(a)(1)(G) here.

### C.    FERA's "Conspiracy" Provision Applies to This Case

The post-FERA conspiracy provision of the False Claims Act creates liability for any person who "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)."  31 U.S.C. § 3729(a)(1)(C).  As explained *supra*, subparagraph (G) creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).  The relator's Complaint alleges that Armstrong falsely denied doping in 2010, after the foregoing provision was added to the False Claims Act.  SAC ¶ 129.  The Government's complaint alleges the same and also alleges false statements by Bruyneel after the enactment of FERA.  *Id.* ¶ 67(B)-(F).  The Complaints both allege that these denials were a continuation of the same fraud on the U.S. Postal Service which

---

[23]     In an abundance of caution, relator respectfully requests the Court to take judicial notice of the Government's complaint.

[24]     Though it was improper to do so in the context of a motion to dismiss, defendant Weisel represented in his motion that he has been questioned under oath about this matter by the United States.  *See* MTD at 2.  Assuming that is true, it is reasonable to infer he would have declared his innocence and ignorance in that testimony, which would provide an additional potential basis for the application of 31 U.S.C. § 3729(a)(1)(G) to his conduct.  *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 73 (D.D.C. 2002) (citation omitted), *aff'd*, 409 F.3d 414 (D.C. Cir. 2005).

involved lying about doping to get and keep U.S. Postal Service funds.  SAC ¶¶ 130, 197, 256, 257, 276;  U.S. Compl. ¶ 72.

     "Once the liability for a conspiracy under the [FCA] is established, each conspirator is liable for each of the overt acts committed pursuant to the conspiracy irrespective of the fact that he did not personally commit the act."  *U.S. v. Cripps*, 460 F. Supp. 969, 975 (E.D. Mich. 1978). "[T]here are two substantive limitations on a defendant's responsibility for acts undertaken by co-conspirators:  Those acts must be `in furtherance of' the same conspiracy to which the defendant has agreed, and they must be reasonably foreseeable to the defendant."  *U.S. v. Childress*, 58 F.3d 693, 722 (D.C. Cir. 1995).  In the instant case, the public lies of Armstrong and Bruyneel in 2009 and later were manifestly intended to further the same conspiracy to defraud the United States and avoid detection of the same.  Moreover, it was entirely foreseeable by the other defendants that Armstrong and Bruyneel would continue to lie about doping.  Accordingly, each of the alleged conspirators in this case has co-conspirator liability under 31 U.S.C. § 3729(a)(1)(C) for the overt acts of Lance Armstrong and Bruyneel after the passage of FERA.

## IV.   RELATOR'S ALLEGATIONS PROVIDE SUFFICIENT BASIS TO PIERCE TAILWIND'S CORPORATE VEIL.

### A.   Legal Standards Applicable to Piercing the Corporate Veil

     Veil piercing allegations do not constitute a separate cause of action.  "[A]ssertions concerning veil-piercing merely comprise a legal theory by which [the plaintiff] hopes to extend liability – on its underlying . . . claim – beyond [the] corporate entity to . . . an individual." *TAC–Critical Sys., Inc. v. Integrated Facility Sys., Inc.*, 808 F. Supp. 2d 60, 66 (D.D.C. 2011).

     Piercing allegations must only satisfy the general pleading requirements of Rule 8(a)(2), according to the plausibility standard articulated in *Iqbal*. 556 U.S. at 663; *see also Schattner v. Girard, Inc.*, 668 F.2d 1366, 1370 (D.C. Cir. 1981) ("not relevant that [plaintiff] has not alleged fraud with the requisite particularity in this case, however, because [f]raud or other wrongful purpose is not a necessary element [of a piercing claim]") (internal quotation and citations omitted); *U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*, No. 02 C 6074, 2005 WL 3050610, at *5 (N.D. Ill. Nov. 8, 2005) (in denying motion to dismiss FCA case, court held that

"[p]laintiffs are not required to allege the specific factual bases for their alter-ego claim" and noted that "the specificity sought by defendants" to justify piercing the corporate veil "is not required under the notice pleading standard").

The determination of whether to pierce the corporate veil is an issue of fact for the jury. *See, e.g., Miller v. Holzmann*, 563 F. Supp. 2d at102 n.57 ("In light of the fact specific nature of the determination, . . . alter ego analysis is a matter for the jury.") (internal citations omitted); *see also Valley Finance, Inc. v. U.S.*, 629 F.2d 162, 172 (D.C. Cir. 1980) ("The test is a practical one, based largely on a reading of the particular factual circumstances.  As a fact issue, its ultimate determination is dependent upon the sound discretion of the trial judge in his appraisal of the evidence.").

### B.  Piercing Standard Governing FCA Cases

"The government's interest in protecting itself from fraud, as embodied in the False Claims Act, makes it reasonable to apply the federal common law standard for piercing the corporate veil . . . ."  *U.S. ex rel. Siewick v. Jamieson Science and Eng'g*, 191 F. Supp. 2d 17, 20-21 (D.D.C. 2002), *aff'd,* 322 F.3d 738 (D.C. Cir. 2003).  The federal common law rule is the "familiar doctrine of law permitting courts, where the result would otherwise be unjust or inequitable, to pierce the corporate veil."  *Founding Church of Scientology v. Webster*, 802 F.2d 1448, 1452 (D.C. Cir. 1986).

In support of their motion, defendants cite *Labadie Coal v. Black*, 672 F.2d 92 (D.C. Cir. 1982).  In *Labadie*, the Court of Appeals for the D.C. Circuit held that "when particular circumstances merit — e.g., when the incentive value of limited liability is outweighed by the competing value of basic fairness to parties dealing with the corporation — courts may look past a corporation's formal existence to hold shareholders or other controlling individuals liable for 'corporate' obligations."  672 F.2d at 96.   In its "examination of the record as it stands," the Court referenced a number of factors and indicated "it is helpful to group them under a two-prong test: (1) is there such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist?; and (2) if the acts are treated as those of the corporation alone, will an inequitable result follow?"  *Id.*

But it is important to note that *Labadie*, as explicitly acknowledged by the Court, was simply a decision on the facts of the case before it, and did not adopt a strict two-prong test to be applied in every case in a formulaic fashion, as defendants would suggest.  *Id.*  Rather, as the D.C. Circuit has repeatedly made clear, the determination of whether to pierce the corporate veil is an equitable determination, based on the totality of facts, which should be left to the discretion of the fact-finder.  *See, e.g., Founding Church of Scientology*, 802 F.2d at 1452 n.5 ("'[T]he fiction of corporate entity may be and should be disregarded in the interests of and to promote justice in such cases as fraud, violation of law or contract, public wrong, or to work out the equities among members of the corporation internally and not involving rights of the public or third persons.'") (quoting Fletcher Cyclopedia Corporations Sec. 25, at 305, also citing W. Cary & M.E. Eisenberg, Cases and Materials on Corporations 80-103 (5th ed. 1980)); *Quinn v. Butz*, 510 F.2d 743, 757-59 (D.C. Cir. 1975) ("'[A] corporation can be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons' . . . [T]he ultimate principle is one permitting [piercing of the corporate veil] to avoid injustice." (quoting *Capital Tel. Co. v. FCC*, 498 F.2d 734, 738 (D.C. Cir. 1974) (citations omitted))).

While the two-pronged criteria specified in *Labadie* was relevant to an action involving private parties and their private interests, the criteria do not address key considerations in this case which involves claims being asserted on behalf of the United States and the important public policy concerns implicated by the False Claims Act.  Moreover, a formulaic application of the two prongs referenced in *Labadie* would be inconsistent with precedent from the Supreme Court and this Circuit citing undercapitalization and public policy concerns as separate, independent bases for piercing.  *See Anderson v. Abbot*, 321 U.S. 349, 362  (1944) ("An obvious inadequacy of capital, measured by the nature and magnitude of the corporate undertaking, has frequently been an important factor in cases denying stockholders their defense of limited liability . . . . [T]he interposition of a corporation will not be allowed to defeat a legislative policy, whether that was the aim or only the result of the arrangement.").  *See also Valley*

*Finance, Inc. v.U.S.*, 629 F. 2d at 172 ("Courts have not hesitated to ignore the fiction of separateness and approve a piercing of the corporate veil when the corporate device frustrates clear intendment of the law . . . .  The Government's inability otherwise to satisfy legitimate tax debts clearly may form a sound basis for such disregard of corporate form.") (citing *Quinn v. Butz*, 510 F.2d at 757-58 and cases cited therein).[25]

### C.    Application of Piercing Standard to the Facts of this Case

The "totality of facts" pleaded in this case include allegations that Tailwind was a purposefully undercapitalized corporation which defrauded the United States of tens of millions of dollars through an extensive doping conspiracy made possible by the active and tacit assistance the company's dominant shareholder.  *See, e.g.,* SAC ¶¶ 80-120, 131-154, 169-184. Such allegations alone provide ample grounds for a finder of fact to determine that respecting Tailwind's corporate veil would "defeat public convenience, justify wrong, protect fraud, or defend crime."  *Quinn v. Butz*, 510 F.2d at 757-59; *see also Anderson v. Abbot*, 321 U.S. at 362; *Valley Finance, Inc.,* 629 F.2d at 172.

In addition, although not necessary, the Complaint alleges more than sufficient specific facts to satisfy the specific two-prong test used in *Labadie*.  The first prong of *Labadie* refers to several factors pertinent in this case:  "(a) [t]he nature of the corporate ownership and control," "(d) [c]ommingling of funds and other assets of the corporation," "(e) [d]iversion of the corporation's funds or assets to non-corporate uses such as the personal uses of the corporation's shareholders," and "(f) [u]se of the same office or business location by the corporation and its individual shareholders."[26] *Labadie*, 672 F.2d at 97-99 (listing factors and stating that "[i]t is clearly not necessary that all of these factors be present in a given case to justify piercing the veil").

---

[25]    *See also First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 630 (1983) ("[T]he Court has consistently refused to give effect to the corporate form where it is interposed to defeat legislative policies.").

[26]    Relator  believes that discovery will uncover additional facts in support of these factors, and potentially uncover facts in support of the other considerations referenced in *Labadie*.

With respect to the nature of ownership and control, the Complaint alleges Weisel dominated and controlled Tailwind, referencing the fact that he created the company, was its largest shareholder, and served as its President and Chairman.  SAC ¶6-8.  Moreover, Tailwind's board largely consisted of individuals with other economic ties to Mr. Weisel.  *Id.* ¶¶ 185-95.  The Company described Weisel as "the guiding force" behind it, *id.* ¶ 131, and the company's chief asset – the USPS Team – literally had Weisel's name stamped prominently on their jerseys.  *Id.* at 157-162.

On the subject of commingling, the Complaint references Weisel's use of personal funds in select instances to pay corporate bills, such as Armstrong's bonus.  SAC ¶ 135..

Regarding the topic of diverting of funds or assets, the Complaint describes in detail how Tailwind gave Weisel's firm Thomas Weisel Partners, LLP substantially preferential treatment as a sponsor of the USPS Team. SAC ¶ 157-164.  Unlike other sponsors, Weisel's firm was not required to pay cash like other sponsors for the privilege of sponsorship, and the non-economic compensation purportedly given by Tailwind for sponsorship was lesser in value than the amounts charged other sponsors.  *Id.*  The Complaint further describes how Weisel used Tailwind to promote his separate business interests, through lavish social events hosted by Tailwind attended by Weisel's business colleagues.  *Id.* ¶ 165-168.

The Complaint thus cites numerous key facts relevant to the first prong of the analysis applied to the facts in *Labadie*.

Meanwhile, it is clear that either undercapitalization or fraud can satisfy the second prong of *Labadie,* see *Miller v. Holzmann*, 563 F. Supp. 2d 54 at 126-27 ("fraud and purposeful undercapitalization both satisfy this prong of Labadie"), and the Complaint provides extensive detail regarding fraud and the fact that Tailwind was grossly undercapitalized.  *See* SAC ¶¶ 169-184 (alleging Tailwind was dependent on U.S. Postal Service payments for the vast majority of its revenue, that it lost money each year, and that it had negative equity, while it simultaneously was promising to indemnify the U.S. Postal Service against damages arising from events of

default like doping violations).[27]  *Cf. Nilsson, Robbins, et al. v. Louisiana Hydroelec.*, 854 F.2d 1538, 1543-44 (9th Cir. 1988) (corporate president owning 30 percent of corporation's stock found alter ego under California law on ground of corporate under-capitalization).

By contrast, the cases cited by defendant in support of dismissal at this early stage are all inapposite.  *See Ivanov v. Sunset Pools Mgmt., Inc.*, 524 F. Supp. 2d 13, 15 (D.D.C. 2007)  (in case decided under District of Columbia law, plaintiffs did not allege undercapitalization, commingling, or use of the company to perpetuate a fraud); *Amore ex rel. Estates of Amore v. Accor*, 529 F. Supp. 2d 85, 93 (D.D.C. 2008) (plaintiffs "fail[ed] to allege that the defendants perpetuated a fraud or injustice . . . " and plaintiffs made contradictory allegations about who even owned the corporate entity at issue); *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 426 (S.D.N.Y. 2003) ("only allegations in the entire Complaint that support plaintiffs' veil-piercing theory are the allegations . . . that the bank holding company 'exercised such dominion and control over its subsidiaries . . . that it is liable according to the law for the acts of such subsidiaries under the facts alleged in this Complaint'"); *Local Union No. 98 IBEW v. RGB Servs., LLC*, No. 10-3486, 2011 WL 292233, at *4 (E.D. Pa. Jan. 28, 2011) (plaintiffs did not identify "what corporate formalities were not observed, what funds were siphoned, what assets of [the corporation] were commingled, or when and how any of this alleged conduct occurred.").   Indeed, the decision in *Labadie* was to reverse a dismissal.  672 F.2d. at 99 (reversing trial court's refusal to pierce veil and holding that "plaintiff should be allowed the fullest discovery into defendant Black's private financial records, as well as FAI's corporate records (such as they are), to determine facts bearing on whether FAI's corporate existence should be ignored").

Defendant Weisel's miscellaneous additional arguments are also unavailing.  Defendants assert that "other individuals had significantly more managerial responsibilities than Mr. Weisel,

---

[27]     Defendant Weisel misses the point with his contention that Tailwind's dissolution in 2007 "is insufficient to demonstrate that it was 'undercapitalized.'"  MTD at 32.  As explained in the Complaint, the company was not just undercapitalized in 2007.  It was undercapitalized during the period it was conducting business with the United States, and then was later dissolved. *See* SAC ¶¶ 169-184.

particularly Tailwind co-founder Gorski and team manager Bruyneel." MTD at 27. But the fact that others may have been involved in misconduct with Weisel is plainly not a defense. In any event, Weisel has specifically claimed credit for creating the USPS Team. SAC ¶ 136. The Complaint and exhibits cited by defendants indicate that Gorski was initially hired by Weisel in 1995 to serve as Tailwind's Director of Marketing, but then took on a larger public role after the U.S. Postal Service made inquiries regarding doping allegations, while Weisel simultaneously attempted to insulate himself by moving to the position of Chairman. *See* SAC ¶¶ 124, 134; Sacks Decl. Ex. 2 at 17.

Defendants argue that Weisel's personal payment of certain Tailwind obligations does not constitute commingling. *See* MTD at 30. They are wrong on this point. Comingling is not the same as diversion of corporate assets or a capital infusion into the company. The term refers to the act of mixing personal funds with corporate funds as did Weisel. SAC ¶ 135; *see, e.g., Carpenters v. N.L.R.B.*, 481 F.3d 804, 806 (D.C. Cir. 2007) (in piercing analysis, court noted defendants "commingled their personal funds and assets with those of the company").

Defendant Weisel states that "Relator does not allege that Mr. Weisel and Tailwind shared the same office." MTD at 31. In support, he references the caption of the complaint. But the Complaint clearly alleges that Weisel's firm Thomas Weisel Partners provided office space to Tailwind during the period relevant to the complaint. *See* SAC ¶ 159 (citing example from 2003).

Defendant Weisel has thus not advanced any arguments that undermine the adequacy of relator's piercing allegations regarding Tailwind.

## V.   RELATOR HAS ADEQUATELY ALLEGED CLAIMS AGAINST ROSS INVESTMENTS.

Defendant Weisel attempts to foreclose his potential personal liability for the acts of Tailwind, by seeking the dismissal of Ross Investments, Inc., which he interposed between himself and Tailwind. The Complaint alleges that "Ross Investments was wholly owned by Thomas Weisel during the period relevant to this complaint, and he was its president." SAC

¶ 16.  The Complaint further alleges that "Weisel used the corporation to hold investments, including his investment in Tailwind." *Id.*

If Tailwind's veil is pierced, then Ross Investments, in addition to Thomas Weisel, will have potential liability, for Ross Investments held the stock of Tailwind.  Moreover, Thomas Weisel's knowledge can be imputed to Ross Investments, Inc., which was the entity Weisel used to exercise control over Tailwind and cause it to submit false claims to the U.S. Postal Service.  *BCCI Holdings (Luxembourg), S.A. v. Clifford*, 964 F. Supp. 468, 478 (D.D.C. 1997).  Ross Investments thus has liability for the conduct of its President and owner.

There are also grounds to pierce the veil of Ross Investments, Inc. to get to defendant Weisel.  While not dispositive, the fact that Weisel was the sole shareholder and President of Ross Investments, Inc. is a significant consideration here.  *See United States v. Andrews*, 146 F.3d 933 (D.C. Cir. 1998) ("as the sole shareholder and chief executive officer . . ., he is not an unlikely target for liability through piercing of the corporate veil").  Also important are the Complaint's allegations that Weisel used the ownership and control he exercised via Ross over Tailwind's shares to cause Tailwind to engage in fraud and less than arms-length transactions with Weisel's investment banking firm.  SAC ¶¶ 157-164.  These allegations, combined with the detailed allegations in the Complaint regarding Tailwind and Weisel's involvement in an extensive scheme to submit false claims to the United States, clearly create a plausible basis for piercing the veils of Tailwind and Ross Investments, and make dismissal of Ross Investments inappropriate at this stage of the case.  *See Poindexter v. Wachovia Mortgage Corporation*, 851 F. Supp. 2d 121, 125 (D.D.C. 2012) (defendant bank holding company argued that it should be dismissed "inasmuch as Plaintiff fail[ed] to allege any viable claims against it" or that defendant "abused its corporate form," but Court held "[a]t this early stage of the litigation and prior to completion of discovery, the Court is not willing to dismiss [bank holding company] given its admitted relationship with [bank]"); *see also Pacific Dev. Inc. v. United States*, No. 77-0690, 1979 WL 1283 (D.D.C. Jan. 3, 1979) ("where justice so requires" and "the corporate form was used in violation of public policy" it is appropriate to "disregard[] the corporate form to reach assets of a corporation for debts of a shareholder.").

Given the simple fact that Ross Investments was closely held by Mr. Weisel, he is uniquely in possession and control of records and information that would allow relator to expand on these allegations.  SAC ¶ 238.  As the Supreme Court held in *Twombly*, a motion to dismiss does not "impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the necessary elements of plaintiff's claim]."  550 U.S. at 556.  Here, relator has alleged sufficient facts to "raise a reasonable expectation" that discovery will reveal evidence sufficient to pierce the veil of Tailwind and Ross Investments, and relator should be allowed to proceed.  *Cf. Material Supply Int'l v. Sunmatch Industrial*, 62 F. Supp.2d 13, 23 (D.D.C. 1999) (noting "the practice of courts in this Circuit" to order "discovery to illuminate alter ego disputes before deciding dispositive motions" in the jurisdictional context); *Labadie Coal Co.*, 672 F.2d at 98 (reversing dismissal of veil piercing action and holding that "plaintiff should be allowed the fullest discovery into defendant Black's private financial records, as well as FAI's corporate records (such as they are), to determine facts bearing on whether FAI's corporate existence should be ignored."); *U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*, 2005 WL 3050610 at *5 ("Further discovery may ultimately support or disprove Plaintiffs' allegations, but for present purposes they include the requisite elements to establish an alter-ego relationship. . . .").

## VI.   RELATOR ALLEGES SUFFICENT GROUNDS TO PIERCE THE VEIL OF MONTGOMERY SPORTS, INC.

Defendant argues briefly in a footnote that relator's allegations about Montgomery Sports, Inc. are "insufficient to justify piercing its corporate veil."  MTD at 31 n 15.  But the piercing allegations regarding Montgomery Sports are also sufficient for purposes of Rule 8. The Complaint includes the following allegations: "Thomas W. Weisel founded Montgomery Sports as part of Montgomery Securities," which he also founded and where he served as CEO. SAC ¶ 6.  "Weisel served as [Montgomery Sports'] President and dominated and controlled the company."  *Id.*  After Weisel left Montgomery Securities in or around 1998, he "arranged a buyout of Montgomery Sports and thereafter remained in control of the business."  *Id.*  The company was renamed TWP Sports, Inc., which was presumably an acronym to refer to Weisel

himself.  *Id.*  The plaintiffs' complaints allege in detail how the USPS Team engaged in fraud against the U.S. Postal Service from as far back as 1998, when Montgomery Sports was still in existence.  See, e.g., U.S. Compl. ¶¶ 10, 26, 27, 31, 35, 61; SAC ¶¶ 87, 110-111, 135.  The scheme was thereafter successfully hidden for many years, and now Montgomery Sports is gone.  Thus, once again, it would be premature to dismiss relator's piercing allegations against defendant Weisel.

The Complaint alleges that "[o]n or about June 15, 1999, TWP Sports, Inc. (formerly Montgomery Sports, Inc.) merged into Tailwind Sports, LLC.  *Id.* ¶ 7.  From this, Weisel argues that "it is not at all clear what relator's allegations about Montgomery Sports add to any attempt to hold Mr. Weisel liable for purported violations of the FCA by others."  MTD 31 at n.15.  To the extent defendant Weisel is attempting to suggest that defendant Tailwind as successor in interest would bear liability for any acts of Montgomery Sports, Inc., as noted in relator's Response to Order to Show Cause regarding Montgomery Sports, Inc., counsel for Tailwind has specifically declined to acknowledge any such liability.  DE 100.  Moreover, though Montgomery Sports, Inc. may no longer exist, Mr. Weisel does, so he continues to have potential liability under the alter ego theory for the fraudulent conduct of that company before it was merged out of existence.

## VII.   RELATOR'S CLAIMS ARE NOT BARRED BY THE SIX-YEAR STATUTE OF LIMITATIONS IN THE FCA.

### A.   The False Claims Act Statute of Limitations is Tolled by Section 3731(b)(2).

Weisel briefly argues that the False Claims Act case against him should be treated differently for statute of limitations purposes, based on the fact that the United States has not intervened to date in the case against him.  *See* MTD at 33-35.  Weisel argues that a relator in a non-intervened case is limited to the six-year statute of limitations in section 3731(b)(1), because the tolling provision in section 3731(b)(2) only applies to the United States.  *Id.*  Relator contends that the Court should simply follow the language of the False Claims Act and apply the tolling provision in the same manner for both the intervened and declined defendants in this case.

The D.C. Circuit has not yet ruled on these questions, and its district courts are split. Most recently, Judge Lamberth ruled in favor of relator's position in *United States ex rel. Pogue v. Diabetes Treatment Centers*, 474 F. Supp. 2d 75, 81-89 (D.D.C. 2007) and *United States ex rel. Miller v. Bill Harbert Int'l Constr.*, 505 F. Supp. 2d 1, 3 (D.D.C. 2007), holding that section 3731(b)(2) applies to relators and that tolling is determined based on the knowledge of the United States.  Judge Lamberth specifically considered and rejected *El Amin*, 26 F. Supp. 2d at 170-73, in which the court ruled that 3731(b)(2) tolling does not apply to relators, and *United States ex rel. Fisher v. Network Software Assocs., Inc.*, 180 F. Supp. 2d 192, 194 (D.D.C. 2002), which followed *El Amin* without discussion.

In Circuits other than D.C., the Ninth Circuit has ruled that the "clear and unambiguous" language of the statute establishes that section 3731(b)(2)'s tolling provision applies to non-intervened cases.  *See U.S. ex rel. Hyatt v. Northrop*, 91 F.3d 1211, 1214 (9th Cir. 1996); *see also U.S. ex rel. Malloy v. Telephonics Corp.*, 68 F. App'x 270, 273 (3d Cir. 2003) (non-precedential opinion applying section 3731(b)(2) in declined case without discussion).  The Fourth Circuit and a divided panel of the Tenth Circuit, by contrast, have adopted defendants' position that only section 3731(b)(1)'s six-year limitations period applies to relators.  *See U.S. ex rel. Sanders v. N. Am. Bus. Indus., Inc.*, 546 F.3d 288 (4th Cir. 2008); *U.S. ex rel. Sikkenga v. Regence Bluecross*, 472 F.3d 702 (10th Cir. 2006).[28]

---

[28]    Defendant Weisel incorrectly asserts that the Fourth Circuit in *Sanders* "join[ed] the Fifth, Sixth, Tenth, and Eleventh Circuits in adopting [a] majority rule limiting 3731(b)(2) to claims asserted by [the] United States."  Weisel Brief at 34.   In fact, only the Fourth Circuit (in *Sanders*) and the Tenth Circuit (in *Sikkenga*) have taken a position on the issue, and the dissenting judge in *Sikkenga* would have adopted the position advocated by the relator here.  *See* 472 F.3d at 735-36 (Hartz, J., dissenting).

The Fifth Circuit case of *United States ex rel. Erskine v. Baker*, No. 9950034, 2000 WL 554644, at *1 (5th Cir. Apr.13, 2000), is unpublished and thus is not binding precedent even in that Circuit.  5th Cir. R. 47.5.4.

The Sixth Circuit applied section 3731(b)(1) to a relator in *United States ex rel. Bledsoe v.Community Health Systems, Inc.*, 501 F.3d 493, 515, 519-20 (6th Cir. 2007); however, the court found that the six-year statute was equitably tolled such that relator's claims were timely and thus did not reach the issue of whether statutory tolling under section 3731(b)(2) (based on government knowledge) was available to the relator.

At the district court level, *Pogue* and *Miller* in this Circuit, as well as several district courts in other circuits have ruled in favor of relator's position that tolling applies to relator's and is based on the knowledge of the Government, *i.e.*, "the official of the United States charged with responsibility to act in the circumstances," just as in an intervened case.[29]  Judge Lamberth's thoughtful decision in *Pogue* provides a thorough, well-reasoned explanation for why that is the correct result.[30]

> **B.     The FCA Statute of Limitations is Suspended
>          by the Wartime Suspension of Limitations Act ("WSLA").**

The False Claims Act statute of limitations that would otherwise apply in this case has been suspended by the Wartime Suspension of Limitations Act, 18 U.S.C. § 3287 ("WSLA"). The WSLA operates to suspend the running of applicable statute of limitations on claims of fraud against the United States during times of war, plus an additional period of years, after which the statute of limitations begins to run again.

Prior to 2008, the WSLA read as follows:  "When the United States is at war the running of any statute of limitations applicable to any offense . . . involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not, . . . shall be suspended until three years after the termination of hostilities as proclaimed by the President or by a concurrent resolution of Congress."  18 U.S.C. § 3287 (2006).

---

The Eleventh Circuit in *Foster v. Savannah Communication*, 140 Fed.Appx. 905, 907-08 (11th Cir. 2005), likewise applied section 3731(b)(1) to a relator's claims in a non-binding unpublished decision.  *See* 11th Cir. R. 36-2.  However, the case involved a *pro se* relator who "concede[d] that her complaint is untimely in light of the limitation period" and the Court did not address the issue of whether section 3731(b)(2) would apply.  *Id.* at 907.

[29]     *See U.S. ex rel. Ven-a-Care  v. Actavis Mid Atlantic LLC*, 659 F. Supp. 2d 262, 273 (D. Mass. 2009) (Saris, J.); *U.S. ex rel. Repko v. Guthrie Clinic, P.C.*, 557 F. Supp. 2d 522 (M.D. Pa. 2008); *U.S. ex rel. Lewis v. Walker*, No. 3:06-CV-16 (CDL) (M.D. Ga. September 14, 2007); *U.S. ex rel. Salmeron v. Enter. Recovery Sys. Inc.,* 464 F. Supp. 2d 766, 769 (N.D. Ill. 2006); *U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 777 F. Supp. 195, 204-05 (N.D.N.Y. 1991).

[30]     Relator has briefed this issue more extensively in response to CSE's motion to dismiss, where the question was more thoroughly briefed by the defendants, and respectfully incorporates those arguments by reference here.

Congress amended the statute on September 30, 2008 to clarify that suspension occurs "[w]hen the United States is at war or Congress has enacted a specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolution (50 U.S.C. 1544(b))."  18 U.S.C. § 3287 (emphasis added).  The amendment also increased the suspension period from "three years" to "5 years" after the termination of hostilities "as proclaimed by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress." *Id.*

Under either the pre- or post-amendment version of the WSLA, the statute of limitations under the False Claims Act has been tolled since September 18, 2001, the date that Congress passed the Authorization for the Use of Military Force ("AUMF") which was the basis for the use of United States armed forces in Afghanistan.  Pub. L. 107-40, 15 Stat. 224 (2001), as that military action qualifies both as being "at war" under the pre-amendment version of the WSLA and as a specific authorization by Congress under the post-amendment version of the statute.  *See U.S. ex rel. Carter v. Halliburton*, 710 F.3d 171, 179 (4th Cir. 2013) (applying WSLA to civil FCA claims in declined qui tam case).[31]

### C.    Relator has alleged false claims and reverse false claims after June 10, 2004.

Dismissal is also precluded here because plaintiffs have alleged false claims that were paid after June 10, 2004.  Exhibit 1 to relator's Second Amended Complaint lists four payments totaling approximately $68,000 made on August 11, 2004, October 4, 2004 (two payments), and October 20, 2004.  Relator has also alleged reverse false claims violations after June 10, 2004.Relator's discussion of this issue in its opposition to CSE's Motion to Dismiss is incorporated by reference here.

---

[31]    Relator has briefed this issue more thoroughly in the context of his opposition to Armstrong's motion to dismiss the United States' complaint and respectfully incorporates those arguments by reference here.

## VIII.   DOJ'S DECLINATION AND THE ABSENCE OF WEISEL'S NAME FROM USADA'S REASONED  DECISION ARE IRRELEVANT.

Defendant emphasizes that "Mr. Weisel is not mentioned even once in USADA's Reasoned Decision or in the United States' Complaint."  MTD at 36.  He also places weight on the fact that the United States declined to intervene against him.  *Id.* at 2.  From these facts, he argues that the Court should infer relator's complaint is without merit.  MTD at 2.

Contrary to defendant's insinuations, it is well established that the government's decision not to intervene "at this time"[32] is not a basis to infer that the Complaint is without merit.  *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 n.17 (11th Cir. 2006) ("the government's absence from the fray [does not] mean[] that the relator's cause is meritless").  The United States' subsequent decision not to mention Mr. Weisel in its own complaint is thus equally irrelevant.

Finally, the fact that USADA did not reference Mr. Weisel in its Reasoned Decision is no basis to infer he is blameless.  Indeed, to the extent that USADA's views on the responsibility of Mr. Weisel were to be given any weight here, the inference to be drawn would be quite the opposite of that suggested by Mr. Weisel.  *See* Scott Decl.  Ex A at 1-2 (January 14, 2013 Letter from Travis Tygart to Eric Holder, Scott Decl.)("USADA has done everything it can do under the authority of sporting rules to rectify this fraud. . . .  But there were others involved in this massive fraud over whom USADA has no jurisdiction under sporting rules. . . . .  USADA's specific request here is that the Justice Department join in the reported pending civil action to bring to light and impose financial consequences on the non—sports individuals who owned and controlled the U.S. Postal Service team" ).[33]

---

[32]      *See* United States' Intervention Notice, DE 41.

[33]      Relator does not believe that it is necessary for the Court to rely on the views of USADA to deny the motion to dismiss.  In light of defendant Weisel's arguments, however, if the Court were to deem such facts relevant, relator would request permission to amend his Complaint to include reference to Mr. Tygart's letter.  *Shekoyan*, 217 F. Supp. 2d at 73 (citation omitted).

**CONCLUSION AND REQUEST FOR LEAVE TO AMEND**

For all the above reasons, the Court should deny defendants' motion to dismiss. Relator has stated a claim and defendant Weisel and his company Ross Investments have more than sufficient "notice of the charges against them adequate to prepare a defense." In the alternative, if the Court were to grant the motion, relator would request leave to amend. Relator has not yet made any amendments in response to the alleged deficiencies raised by defendants, as the Second Amended Complaint was filed with the Court prior to any motion to dismiss by any defendant. Accordingly, the requested amendment, if necessary, would be relator's first opportunity to address any deficiencies and to incorporate additional information to cure the same. *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (internal quotations omitted) ("[L]eave to amend is almost always allowed to cure deficiencies in pleading fraud.").


Dated:  September 23, 2013

RESPECTFULLY SUBMITTED.


_____/s/_____
Paul D. Scott
pdscott@lopds.com
California State Bar No. 145975
Admitted *Pro Hac Vice*
_____/s/_____
Lani Anne Remick
laremick@lopds.com
California State Bar No. 189889
USDC D.C. Bar No. PA0045
Jon L. Praed
USDC #450764
DC Bar #51665
LAW OFFICES OF PAUL D. SCOTT, P.C.
Pier 9, Suite 100
San Francisco, California 94111
Tel: (415) 981-1212
Fax: (415) 981-1215

Attorneys for Relator Floyd Landis