UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES *ex rel.* LANDIS,<br><br>             Plaintiffs,<br><br>     v.<br><br>TAILWIND SPORTS CORP., TAILWIND SPORTS LLC, LANCE ARMSTRONG, and JOHAN BRUYNEEL,<br><br>             Defendants. | Civil Action No. 10-00976 (RLW)<br><br>**ECF** |

**THE UNITED STATES OF AMERICA'S STATEMENT OF INTEREST
IN RESPONSE TO DEFENDANT WEISEL'S MOTION TO DISMISS FLOYD LANDIS'
COMPLAINT (DOC. 88)**

The United States submits this brief in response to defendant Weisel's argument that claims submitted by Tailwind under the contracts with the Postal Service were not false. *See* Doc. No. 88 ("Wesiel Br.") at *23-27 (pp.13-17). The United States otherwise takes no position on Weisel's motion to dismiss. If the Court finds that the relator's claims were not properly pled, the Government respectfully requests that the Court dismiss the case without prejudice to the United States.

**TAILWIND'S CLAIMS WERE FALSE**

Weisel's motion to dismiss relator's (a)(1) claim pursuant to Rule 9(b) includes the meritless argument that Tailwind's claims to the USPS were not actually "false." Weisel Br. at 13-17. The United States takes no position on whether relator has adequately pled that Tailwind's claims were false. To the extent that Tailwind is arguing that these claims were not

false as a matter of law and the terms of the sponsorship agreements, however, this argument should be rejected.

As set forth in the Government's complaint against the intervened defendants, the two Tailwind contracts provided that "[t]he performance of the obligations of the parties under this Agreement shall at all times and in all events be subject to compliance with all applicable rules of the Union Cycliste Internationale" ("UCI") as well as other governing bodies of sport, including the International Olympic Committee ("IOC"). U.S. Compl. ¶¶16, 20.  The Government's complaint alleges that Lance Armstrong and his teammates did *not* comply with the rules of cycling during the sponsorship agreements, and Armstrong admitted that he used banned substances and techniques during each of his Tour victories. *Id.* at ¶61. Further, among the listed events of default in both Tailwind contracts is the following: "Either party shall make any material misrepresentation or shall materially breach any warranty made herein." *See* Weisel Br., Ex. 4 (2000 sponsorship agreement), ¶8(a)(i). Accordingly, because Tailwind breached a material term of the sponsorship agreements, it was not entitled to be paid for its claims under those agreements, U.S. Compl. at ¶4, and the Government's complaint confirms that the anti-doping provisions of both sponsorship agreements were considered "material" terms by the USPS. *Id*. at ¶¶ 23, 27, 69 and 73.  In short, the United States has explicitly alleged that the anti-doping provisions were core terms of the sponsorship agreements, and therefore defendants' violation of these provisions rendered Tailwind's claims false.

Weisel argues that Tailwind's claims for payment were not false for two reasons:  first, he argues, in effect, that there *were* no anti-doping provisions in the agreements, Weisel Br. at 14;[1] and second, in the alternative, he argues that even if the agreements prohibited doping, the

---

[1] Specifically, Weisel argues that the sponsorship agreements prohibit doping once it is discovered, but do not prohibit the underlying activity so long as it remains secret. *See* Weisel

absence of doping was not a material contract term. *Id.* at 15. As the foregoing description of the contracts makes clear, Weisel is wrong on both scores.

As noted, the sponsorship agreements clearly prohibited doping. Both versions of the sponsorship agreement were explicit that the Team was subject to the rules of cycling, as set forth by the UCI, the IOC, and others. *See* U.S. Compl. at ¶¶16, 21. It is well known – and the Government's complaint properly alleges – that the UCI, the IOC, and others all prohibit precisely the sorts of doping that Armstrong has now admitted his team systematically engaged in to win. *Id.* at ¶17. Further – even if Weisel is right that only *knowledge* of doping is a breach of the contract – the United States has alleged that Bruyneel and other Tailwind employees were aware that the team was doping. *E.g. id.* at ¶36.

Contrary to Weisel's second argument, the contract provisions prohibiting doping were core terms of the sponsorship agreements. The unambiguous contract language requires compliance with the anti-doping provisions, and the Government's complaint explicitly alleged that the anti-doping provisions were material to the sponsorship agreements, that they were considered to be material by the USPS, and that the USPS would not have paid Tailwind's claims had it known that the riders were using banned substances and techniques. *See* U.S. Compl. at ¶¶ 4, 23, and 24.

Weisel's suggestion that the USPS agreed to pay Tailwind's claims notwithstanding evidence of pervasive cheating is contrary to common sense. Like any sponsorship agreement, the whole point of the Tailwind agreements was to generate positive publicity for the sponsor. Thus, like any reasonable sponsor, the USPS expressly made a violation of any provision that would have reflected negatively on the sponsor an event of default. It is hard to imagine

---

Br. at 15 ("Only *knowledge* of [doping] violation on the part of Tailwind would trigger an obligation to take 'immediate action' … Undetected doping by riders … was not itself an event of default.") (emphasis in the original).

anything more material to the benefit the USPS was seeking than the fact that the defendants were engaging in an extensive doping scheme. The positive publicity the USPS was seeking depended crucially on the defendants' promise that the team's accomplishments were legitimate. The benefit of the USPS's bargain, therefore, was directly undermined by the team's use of banned substances and techniques. Quite simply, no sensible sponsor would have sought to associate itself with this fraud.

Weisel also argues that the fact that the sponsorship agreement did not explicitly list doping as an event of default shows that doping was *not* an event of default. Weisel Br. at 15. This argument simply ignores the language of the contracts. Among the listed events of default in both versions of the sponsorship agreement is the following: "Either party shall make any material misrepresentation or shall materially breach any warranty made herein." 2000 sponsorship agreement, ¶8(a)(i). Again, among the warranties contained in both agreements is the central warranty that "the parties under this Agreement shall at all times and in all events be subject to compliance with all applicable rules of [cycling.]" *Id.* at ¶12.

Weisel contends that if the provision requiring compliance with cycling rules truly had been intended to prevent doping, there would have been no need to add doping provisions to the 2000 agreement. *See* Weisel Br. at 16 & n.9 ("if [the rules of cycling] language – which is essentially identical in the two agreements – were in fact intended to cover doping, then there would have been no reason for the parties to address doping explicitly in the 2000 sponsorship agreement."). This argument also lacks merit. First, it is indisputable that the rules of cycling prohibit doping. Accordingly, Weisel's argument requires the Court to ignore the plain meaning of the agreements. Moreover, while the 1995 agreement required compliance with the rules of cycling, it does not explicitly require defendants to patrol the team's compliance with these rules.

The 2000 agreement attempted to fill that gap by inserting additional doping-related events of default. The changes to the 2000 sponsorship agreement were a reasonable response to unproven allegations that Armstrong and his team used prohibited substances and techniques, allegations that Armstrong vehemently denied until recently. The insertion of additional anti-doping provisions into the 2000 agreement confirms, rather than undermines, the conclusion that the sponsorship agreements prohibited doping, and that this prohibition was central to the USPS' bargain with Tailwind.[2]

        Respectfully submitted,

        STUART F. DELERY
        Assistant Attorney General

        RONALD C. MACHEN JR., D.C. Bar # 447889
        United States Attorney

        DANIEL F. VAN HORN, D.C. Bar # 924092
        Assistant United States Attorney


        /s/ Darrell C. Valdez
        DARRELL C. VALDEZ, D.C. Bar # 420232
        MERCEDEH MOMENI
        Assistant United States Attorneys
        Judiciary Center Building
        555 4th St., N.W., Civil Division
        Washington, D.C.  20530
        Tel: (202) 252-2507

---

[2] Although the sponsorship agreements are clear on their face, even if this Court were to find that the contracts were ambiguous with respect to whether the doping prohibitions were material contract terms, this would not warrant dismissal. "The existence of express contractual language specifically linking compliance to eligibility for payment may well constitute dispositive evidence of materiality, but it is not … a necessary condition." *See SAIC*, 626 F.3d at 1269.

/s/ David M. Finkelstein
MICHAEL D. GRANSTON
ROBERT E. CHANDLER
DAVID M. FINKELSTEIN
Attorneys, Department of Justice
Civil Division
Post Office Box 261
Ben Franklin Station
Washington, D.C.  20044
Tel:  (202) 514-4678

DATED: September 23, 2013