UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES *ex rel.* LANDIS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 10- 00976 (RLW) |
| TAILWIND SPORTS CORP., TAILWIND SPORTS LLC, LANCE ARMSTRONG, and JOHAN BRUYNEEL, | ) ) ) ) | ECF |
| Defendants. | ) ) ) ) ) ) | |

**UNITED STATES' OPPOSITION TO DEFENDANT
LANCE ARMSTRONG'S MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION…………………………………………………………...……………1

BACKGROUND……………………………………………………………….…………2

SUMMARY OF THE ARGUMENT……………………………………………..…………5

ARGUMENT………………………………………………………………………………...7

I.    STANDARD OF REVIEW……………………………...…………………………………7

II.    ARMSTRONG'S MOTION TO DISMISS ON STATUTE OF LIMITATIONS
GROUNDS SHOULD BE DENIED………………………………………………..…9

    A. The Face of the Government's Complaint
Establishes That Its Claims Are Timely…..………………………………………9

    B. The USPS's Knowledge of the French Investigation
Does Not Establish That The Government's Claims Are
Conclusively Time-Barred Under the FCA or 28 U.S.C. § 2416(c) ……………10

        1. The USPS's Knowledge of the French Investigation
Did Not Constitute Knowledge of Armstrong's Doping………………...11

        2. Even if the Court Concludes that USPS Should
Have Known About Armstrong's Doping, the Government's
FCA Claims Are Not Barred Because the Complaint Does Not
Demonstrate that the Department of Justice Knew Or Should
Have Known About Armstrong's Doping………………...……………17

III.    THE 2009 AMENDMENT TO THE FALSE CLAIMS ACT APPLIES
TO COUNT II, AND THIS COUNT SURVIVES IN ANY EVENT………………20

    A. The FERA Amendment Applies to the Government's
"False Statements" Claims Against Armstrong………………….……………….……...20

    B. The Government's Complaint States A Claim Under
Either Version of the FCA…………….……………….…………….……………..23

IV.    ARMSTRONG IS LIABLE UNDER THE REVERSE FALSE
CLAIMS PROVISION OF THE FCA…………………….…………..……………….24

    A. Armstrong Made Repeated False Statements Designed to
Conceal His Use of Banned Substances…………….…………….…………..25

    B.   The Reverse False Claim Provision Does Not Require
        Privity Between the Defendant and the Government……………..……………...26

    C.   The Reverse False Claims Provision
        Encompasses Contingent Obligations……………..……………..……………28

CONCLUSION……………..……………..……………..……………..……………..……………30

# TABLE OF AUTHORITIES

**Cases**

*Abou-Hussein v. Mabus*, No. 12-0913 (RBW), 2013 WL 3753553

   (D.D.C. July 17, 2013) ................................................................ 7-8

*\*Allison Engine, Inc. v. United States ex rel. Sanders*, 703 F.3d 930 (6th Cir. 2012) ............. 22-23

*Allison Engine, Inc. v. United States ex rel. Sanders*, 553 U.S. 662 (2008) ..................... 24, 27-28

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................ 7

*Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855 (D.C. Cir. 2001) .................................. 9

*Doe v. Dep't of Justice*, 753 F.2d 1092 (D.C. Cir.1985) ................................................ 9

*Firestone v. Firestone*, 76 F.3d 1205 (D.C. Cir.1996) ............................................. 8, 17

*Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231 (1959) ........................................... 14

*Gomez v. Toledo*, 446 U.S. 635 (1980) ................................................................ 8

*Gonzalez v. Fresnius Med. Care N. Am.*, 689 F.3d 470 (5th Cir. 2012) ................................ 23

*Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318 (11th Cir. 2009) ................................... 23

*Houlihan v. Anderson-Stokes, Inc.*, 434 F. Supp. 1319 (D.D.C. 1977) ............................... 14

*Hoyte v. Am. Nat'l Red Cross*, 439 F. Supp. 2d 38 (D.D.C. 2006) ............................... 27, 30

*Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61 (D.C. Cir. 2008) .................................. 27, 30

*Hudak v. Economic Research Analysts*, 499 F.2d 996 (5th Cir. 1974) ............................. 2, 20

*Jana, Inc. v. United States*, 34 Fed. Cl. 447 (1995) ................................................ 18

*Jones v. Rogers Mem'l Hosp.*, 442 F.2d 773 (D.C. Cir. 1971) ................................... 8, 14

*Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107 (D.D.C. 2012) ............................................. 9

*Koker v. Aurora Loan Servicing, LLC*, 915 F. Supp. 2d 51 (D.D.C. 2013) ................................ 9

*Levin v. United States*, 133 S. Ct. 1224 (2013) ..................................................... 22

*Lindh v. Murphy*, 521 U.S. 320 (1997) ................................................................ 22

*Loving v. United States,* 517 U.S. 748 (1996) ....................................................... 30

*Montclair v. Ramsdell*, 107 U.S. 147 (1883) ......................................................... 21

*\*Richards v. Mileski*, 662 F.2d 65 (D.C. Cir. 1981) ................................... 2, 8, 9, 15, 20

*Riddell v. Riddell Washington Corp.*, 866 F.2d 1480 (D.C. Cir. 1989) ................................ 13

*Smith-Haynie v. District of Columbia*, 155 F.3d 575 (D.C. Cir.1998) ........................................... 8

*TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ........................................................................... 21

\*United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189 (10th Cir. 2006) ................ 27, 29

*United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047

(9th Cir. 2011) ........................................................................................................................... 23

*United States ex rel. Carter v. Halliburton Co.*, 2009 WL 2240331

(E.D. Va. Jul. 23, 2009) ............................................................................................................. 23

*United States ex rel. Condie v. Board of Regents of the University of California*,

1993 WL 740185 (N.D. Cal. 1993) ........................................................................................... 19

*United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94 (2d Cir. 2010) ................... 23

*United States ex rel. Koch v. Koch Indus., Inc.*, 57 F. Supp. 2d 1122

(N.D. Okla. 1999) ...................................................................................................................... 27

*United States ex rel. Kreindler & Kreindler v. United Technologies, Corp.*,

777 F. Supp. 195 (N.D.N.Y. 1991) ........................................................................................... 18

*United States ex rel. Kreindler v. United Technologies Corp.*, 985 F.2d 1148

(2d Cir.1993) .............................................................................................................................. 18

*United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, No. 09-4079,

2010 WL 3025021 (10th Cir. Aug. 4, 2010) ............................................................................. 23

*United States ex rel. Longhi v. Lithium Power Technologies, Inc.*, 575 F.3d 458

(5th Cir. 2009) ............................................................................................................................ 30

*United States ex rel. Loughren v. Unum Group,* No. 09-1606, 2010 WL 2951175

(1st Cir. Jul. 29, 2010) ............................................................................................................... 23

*United States ex rel. Miller v. Bill Harbert International Construction*,

505 F. Supp. 2d 1 (D.D.C. 2007) .............................................................................................. 13

\*United States ex rel. Purcell v. MWI Corp.*, 254 F. Supp. 2d 69 (D.D.C. 2003) ................. 15-17

*United States ex rel. Purcell v. MWI Corp.*, 520 F. Supp. 2d 158 (D.D.C. 2007) ................. 16-17

*United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262 (5th Cir. 2010) .................. 23

*United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818

(7th Cir. 2011) ............................................................................................ 23

*United States v. BNP Paribas SA*, 884 F. Supp. 2d 589 (S.D. Tex. 2012) ................................... 10

*United States v. Carell*, 681 F. Supp. 2d 874 (M.D. Tenn. 2009) ................................ 18

*United States v. Caremark, Inc.*, 634 F.3d 808 (5th Cir. 2011) ................................... 27

*United States v. Gov't Dev. Bank*, 725 F. Supp. 96 (D. P.R. 1989) ............................... 12

*United States v. Incorporated Vill. of Island Park*, 791 F. Supp. 354

(E.D.N.Y. 1992) ............................................................................................ 18

*United States v. Intrados/Int'l Mgmt. Group*, 265 F. Supp. 2d 1 (D.D.C. 2002) .................. 14, 19

*United States v. Macomb Contracting Corp.*, 763 F. Supp. 272 (M.D. Tenn. 1990) ................. 18

*United States v. Merck-Medco Managed Care, L.L.C.*, 336 F. Supp. 2d 430

(E.D. Pa. 2004) ............................................................................................ 27

*United States v. Science Applications Intern. Corp.*, 653 F. Supp. 2d 87

(D.D.C. 2009) ............................................................................................. 23

*\*United States v. Tech Refrigeration*, 143 F. Supp. 2d 1006 (N.D. Ill. 2001) ................... 8, 16, 19

*\*United States v. United Technologies Corp.*, 255 F. Supp. 2d 779

(S.D. Ohio 2003) ........................................................................................... 12

*United States v. Uzzell*, 648 F. Supp. 1362 (D.D.C. 1986) ......................................... 13

*United States v. Wurts*, 303 U.S. 414 (1938) ...................................................... 24

*Walker v. Pharm. Research and Manuf. of America*, 439 F. Supp. 2d 103

(D.D.C. 2006) ............................................................................................. 14

## Statutes

8 C.F.R. Pt. 0, Subpt. Y, App. ...................................................................... 18

28 C.F.R. § 0.45(d) ................................................................................. 17

28 U.S.C. § 2415(a) ................................................................................. 9

28 U.S.C. § 2415(b) ................................................................................. 9

28 U.S.C. § 2416(c) ............................................................................... 5, 9

31 U.S.C. 3729 ..................................................................................... 20

31 U.S.C. § 3729(a)(1)(B) ................................................................. 21, 23

31 U.S.C. § 3729(a)(1)(G) ................................................................. 25, 27

31 U.S.C. § 3729(a)(2)........................................................................23-24

31 U.S.C. § 3729(a)(7)........................................................................ 25, 27

31 U.S.C. § 3729(b)(2) ............................................................................. 22

31 U.S.C. § 3729(b)(3) ...................................................................... 26, 29

31 U.S.C. § 3729(b)(4) ............................................................................. 29

31 U.S.C. § 3730(a) .................................................................................. 17

31 U.S.C. § 3730(e)(4)............................................................................. 21

31 U.S.C. § 3731(b) ................................................................................ 5, 9

31 U.S.C. § 3731(c) ............................................................................... 9-10

## Other Authorities

132 Cong. Rec. S11238-04 ....................................................................... 12

*Federal Practice & Procedure* § 1357 ....................................................... 8

FERA § 4(f)(1)........................................................................................... 20

FERA § 4(f)(2)........................................................................................... 22

Pub. L. No. 111-21, 123 Stat. 1617 ...................................................... 6, 25

S. Rep. No. 111-10 (2009).............................................................. 22, 24, 29

S. Rep. No. 99-345, reprinted in 1986 U.S.C.C.A.N. 5266........................ 27

## **INTRODUCTION**

For over a decade, Lance Armstrong carried out what was arguably the greatest fraud in the history of professional sports.  He claimed seven Tour de France victories, all the while telling the world that he accomplished his feats through hard work and natural training methods. The unfortunate truth, however, is that Armstrong cheated during all seven of these races by secretly using drugs and medical procedures that artificially enhanced his performance and were banned by his sport. As a result, the United States Postal Service (the "USPS") was deceived into paying out $40 million to Armstrong's cycling team – approximately half of which went to Armstrong personally.

The truth of Armstrong's deception remained hidden for years.  In an effort to hold onto his money and apparent Tour victories, Armstrong lied about his use of banned substances repeatedly and emphatically, and threatened or sued anyone who attempted to expose him.  And until recently, his extensive cover-up was successful.  Armstrong duped his friends, sponsors, anti-doping officials, most of the international cycling community, and most of the American public.  Indeed, by Armstrong's own account, even his family thought he was clean.

Now that he is being called to account for the damage he caused, Armstrong contends that his deceit should have been clear to everyone all along.  In particular, he argues that the USPS should have known he was cheating as early as 2000 and, therefore, the Government may no longer seek to recover for the losses it suffered as a result of his lies.  But the Postal Service, like millions of others, cannot be faulted for having been deceived by Armstrong.  As explained

below, "the law of fraud does not … require that an aggrieved party have proceeded from the outset as if he were dealing with thieves."[1]

Armstrong claims that "the government wanted a winner and all the publicity, exposure and acclaim that goes along with being his sponsor."  He further claims that the Government "got exactly what it bargained for."  But the Government did not get a "winner."  On the contrary, it got a fraud, and all of the publicity and exposure that goes along with having sponsored a fraud.  That is decidedly *not* what the Government bargained for.  The United States should have an opportunity to recover damages for the money that it paid in reliance on Armstrong's many lies, and we therefore respectfully request that the Court deny Armstrong's motion to dismiss the Government's complaint.

## BACKGROUND

In its complaint, the United States alleges that from 1996 through 2004, the USPS sponsored a professional cycling team owned by defendant Tailwind Sports Corp. and its predecessors (the "USPS cycling team").  Gov't Compl. at ¶ 2.[2]  Defendant Lance Armstrong was the lead rider for the USPS cycling team from 1999 through 2004.  *Id*. at ¶ 10.

The sponsorship agreements between the USPS and Tailwind gave the USPS certain promotional rights, including the right to prominent placement of the USPS logo on the cycling team's uniform.  *Id*. at ¶ 3.  In exchange for those rights, the USPS paid Tailwind approximately $40 million to sponsor the USPS cycling team from 1998 through 2004.  *Id*. at ¶ 5.  Each of the

---

[1]  *Richards v. Mileski*, 662 F.2d 65, 72 (D.C. Cir. 1981) (*quoting Hudak v. Economic Research Analysts*, 499 F.2d 996, 1002 (5th Cir. 1974)).

[2]  We note that, because the United States has intervened in this action and filed its own complaint in intervention against Armstrong, relator's complaint has been superseded with respect to its claims against Armstrong.   The Government's complaint therefore sets forth the only operable claims against Armstrong.

agreements required the team to follow the rules of cycling's governing bodies, which prohibited the use of certain performance enhancing substances and methods. *Id*. at ¶ 3. Later versions of the agreement also required the team to include in each of its rider agreements a drug and morals provision that permitted the suspension or removal of riders who used banned drugs, and further required the team to take "immediate action" in the event that a rider used such substances or methods in violation of the agreement. *Id*. at ¶¶ 20-21.

Armstrong and other members of the USPS team regularly and systematically violated these requirements of the team's agreement with the USPS by employing banned substances and methods to enhance their performance. *Id*. at ¶ 4. Armstrong and others connected with the team also made false statements that were intended to hide the team's misconduct so that the Postal Service would continue paying Tailwind's invoices. Such statements by Armstrong include the following:

- On or about December 13, 2000, Armstrong said, in a statement on his website, "Here's the bottom line to everyone: I'll start by saying that we are completely innocent[.] We run a very clean and professional team that has been singled out due to our success[.] I can assure everyone we do everything in the highest moral standard." *Id*. at ¶ 63F.

- On or about April 9, 2001, Armstrong stated during a press conference, "I did not use performance-enhancing drugs in winning my two Tours de France and that truth has now been borne out by science[.] Some of you may be disappointed to learn that I am clean but it is the truth and it is what I have been saying since you first accused me in 1999." *Id*. at ¶ 64A.

- On or about July 9, 2001, Armstrong released a statement denying that he had ever taken EPO. Armstrong further stated that he had consulted with Ferrari only regarding "natural methods of improvement[.]" *Id*. at ¶ 64B.

- In a statement he released on January 22, 2005, Armstrong told the media "As I have said before, I do not use and have never used performance-enhancing drugs." *Id*. at ¶ 67A.

- On or about July 14, 2010, Armstrong publicly denied in a statement to the media that he had encouraged his teammates to dope, telling the New York Times Magazine, "As long as I live, I will deny it. … There was absolutely no way I forced people, encouraged people, told people, helped people, facilitated. Absolutely not.  One hundred percent."  *Id*. at ¶ 67C.

- On or about May 19, 2011, Armstrong sent the following message to his followers on Twitter: "20+ year career.  500 drug controls worldwide, in and out of competition.  Never failed a test.  I rest my case."  *Id*. at ¶ 67D.

- On June 13, 2012, Armstrong posted a statement on his website reading, in part, "I have never doped, and, unlike my accusers, I have competed as an endurance athlete for 25 years with no spike in performance, passed more than 500 drug tests and never failed one."  *Id*. at ¶ 67E.

In addition, Armstrong misled the USPS Vice President for Sales by suggesting that the USPS team was "clean."  Gov't Compl. ¶ 63.E.  As a result of these and other statements, the defendants successfully hid their fraud from the public and from the Government for more than a decade.

On June 10, 2010, Armstrong's former teammate, Floyd Landis, filed a *qui tam* action pursuant to the False Claims Act alleging that he, Armstrong, and other members of the USPS cycling team had used banned substances and methods with the encouragement and support of team management.  ECF No. 1.  Following Landis' revelations, Armstrong continued to deny that he used performance enhancing substances and that he facilitated any such drug use by his teammates.  Gov't Compl. at ¶ 67C-E.

Finally, in an interview with Oprah Winfrey televised on January 17 and 18, 2013, Armstrong admitted that he used banned substances and methods, starting in the mid-1990s and continuing until his retirement in 2005.  *Id*. at ¶ 61.  In particular, he admitted having engaged in banned practices during each of the seven Tour de France races in which he competed from 1999 to 2005, including the six in which he raced as a USPS rider.  *Id*.  As a result of his doping conduct, Armstrong's results as a professional cyclist after August 1, 1998 have been

4

disqualified and he is subject to a lifetime ban from competitive sports pursuant to the World Anti-Doping Code.  *Id*. at ¶ 10.  However, none of the money that USPS paid to Tailwind, including the approximately $20 million that Tailwind paid Armstrong, has been returned to the USPS.  On February 22, 2013, the United States elected to intervene in the Landis *qui tam* action against Armstrong and two other defendants.  ECF No. 41.  The Government filed its complaint in intervention on April 22, 2013.  ECF No. 44.

## SUMMARY OF THE ARGUMENT

Armstrong seeks to dismiss the Government's complaint, in whole or in part, on three grounds.  First, he contends that the Government's claims are barred by the applicable statutes of limitations.  Second, he seeks to dismiss the Government's false statements claim on the basis that it relies on the wrong version of the law.  Third, he seeks dismissal of the Government's reverse false claim count, because he was not in privity with the Government and because Tailwind's obligation to repay the Government was not automatic.  None of these arguments has merit.

In order to prevail on his statute of limitations argument, Armstrong must demonstrate that the face of the complaint conclusively establishes that the Government's action is time-barred.  In other words, he must show that the Government has pled itself out of court.  Although nearly all of the Government's claims accrued more than six years ago, the Government's complaint alleges that the official charged with responsibility to act in the circumstances did not know, nor should she have known, the facts material to the Government's claims against Armstrong before June 2010, when Armstrong's doping activities were finally revealed.  Accordingly, its False Claims Act and common law claims are timely.  31 U.S.C. § 3731(b); 28 U.S.C. § 2416(c).

Armstrong contends that the relevant statutes of limitation expired because the Government had constructive knowledge of his cheating in light of an investigation by French authorities related to doping by Armstrong and his team in 2000.  But as explained below, that investigation found no evidence of wrongdoing by Armstrong or any other member of his cycling team, and the mere fact that French authorities were conducting an investigation is not sufficient to bar the Government's claims, particularly in light of the countervailing facts alleged in the Government's complaint.  In any event, Armstrong identifies no facts in the complaint that even arguably demonstrate that the Department of Justice knew or should have known about his doping, as he must in order to prevail on his motion to dismiss the Government's FCA claims.

The Court also should deny Armstrong's motion to dismiss Count II of the Government's complaint, which sets forth a claim for false statement liability under the FCA.  Armstrong contends that the Government should not have pled its false statements claim under the amended version of the False Claims Act, which was expressly made applicable to all "claims under the False Claims Act pending on or after June 7, 2008."  Pub. L. No. 111-21, 123 Stat. 1617. Although Armstrong contends that the word "claims" refers to claims for payment rather than legal claims, both his premise, and the conclusion he draws from it, are flawed.

 A plain reading of the amendment's effective date provision, in particular the fact that it refers to "claims *under the False Claims Act*," rebuts Armstrong's tortured reading of this provision.  Notably, the majority of appellate courts to address the issue have held that "claim" refers to a legal claim under the FCA – and thus applies to any action filed on or after June 7, 2008.

More importantly, the Government has pled its claim properly under *either* version of the FCA.  Accordingly, the question of which version of the statute applies is irrelevant at this stage

of the litigation, and Armstrong's argument does not justify dismissing the Government's false statements claim.

Finally, Armstrong erroneously contends that he is not liable under Count III of the Government's complaint, which asserts that Armstrong violated the FCA's reverse false claims provision for false statements he made to conceal and avoid Tailwind's liability to return the money it received from the Government.  Although Armstrong argues that he was not in privity with the USPS, reverse false claims liability arises whenever a defendant makes a false statement to avoid an obligation to pay the Government, even if the obligation is not his.   And Armstrong cannot evade liability by arguing that Tailwind's obligation to repay the Government was contingent, as Congress never intended the reverse false claims provision to be limited to fixed, non-contingent obligations.  The reverse false claims provision exists because concealing an obligation to pay money to the Government is no less harmful to the treasury than fraudulently causing the Government to pay out money it does not owe.  It is appropriate, therefore, that Armstrong should be liable for having lied to conceal Tailwind's obligation to return the sponsorship dollars the Government paid in the erroneous belief that Armstrong was riding clean.

## **ARGUMENT**

## I.   **STANDARD OF REVIEW**

 "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Abou-Hussein v. Mabus*, No. 12-0913 (RBW), 2013 WL 3753553, *3 (D.D.C. July 17, 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In making this assessment, a plaintiff receives the benefit of all inferences that can be derived from the facts alleged, and the Court

may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint, and matters of which the Court may take judicial notice. *Abou-Hussein*, at *3.  2.  The burden is on the moving party to prove that no legally cognizable claim for relief exists. *Federal Practice & Procedure* § 1357.

The burden on a party moving to dismiss is particularly high when the basis for the motion is the interposition of a statute of limitations defense.  The statute of limitations is an affirmative defense, and a plaintiff need not plead the absence of the defense in its complaint. *United States v. Tech Refrigeration*, 143 F. Supp. 2d 1006, 1007 (N.D. Ill. 2001) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)); *Jones v. Rogers Mem'l Hosp.*, 442 F.2d 773, 775 (D.C. Cir. 1971).  Thus, although a defendant may raise the affirmative defense of statute of limitations via a Rule 12(b)(6) motion, such a motion should be granted only when the facts that give rise to the defense are clear from the face of the complaint. *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir.1998).

Because statute of limitations issues often depend on contested questions of fact, the D.C. Circuit repeatedly has held that courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint. *See Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir.1996) (citing *Richards*, 662 F.2d at 73); *Jones v. Rogers Memorial Hosp.*, 442 F.2d 773, 775 (D.C. Cir. 1971).  As that court has observed, "[t]here is an inherent problem in using a motion to dismiss for purposes of raising a statute of limitations defense. Although it is true that a complaint sometimes discloses such defects on its face, it is more likely that the plaintiff can raise factual setoffs to such an affirmative defense." *Richards*, 662 F.2d at 73.  As a result, the courts should grant motions to dismiss only in those rare cases where "the complaint on its face is conclusively time barred." *Firestone*, 76 F.3d at 1209 (citing *Richards*,

662 F.2d at 73); *see also Doe v. Dep't of Justice*, 753 F.2d 1092, 1115 (D.C. Cir.1985); *Koker v. Aurora Loan Servicing, LLC*, 915 F. Supp. 2d 51, 58 (D.D.C. 2013); *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 113 (D.D.C. 2012).

## II.    ARMSTRONG'S MOTION TO DISMISS ON STATUTE OF LIMITATIONS GROUNDS SHOULD BE DENIED

### A.    The Face of the Government's Complaint Establishes That Its Claims Are Timely

Under the FCA, the Government may file suit either (1) within six years of a violation, or (2) within three years of "the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances," up to within 10 years of the violation. 31 U.S.C. § 3731(b).

The Government's unjust enrichment and common law fraud claims are subject, respectively, to six-year and three-year statutes of limitations. 28 U.S.C. § 2415(a); 28 U.S.C. § 2415(b). However, both of these limitation periods are subject to tolling until the cause of action is known, or should have been known, by the responsible Government official. 28 U.S.C. § 2416(c).

Under the FCA, all of the Government's claims in this case – both the FCA and common law claims – relate back to the filing of Landis's *qui tam* action and thus are deemed to have been filed when Landis filed that action on June 10, 2010. 31 U.S.C. § 3731(c).[3] The

---

[3] In a footnote, Armstrong expresses "serious doubt" as to whether the Government's complaint should relate back to the filing of Landis' original complaint because of unspecified "numerous differences" between the two. Armstrong Br. 5, fn. 3. Expressing doubts is not sufficient to raise this issue, and it is therefore waived. *Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001) ("A litigant does not properly raise an issue by addressing it in a cursory fashion with only bare-bones arguments.") (internal quotation marks omitted). Moreover, there is little question that both the Government and Landis' complaints address the

Government's complaint alleges that the official of the United States charged with responsibility to act in the circumstances learned the facts material to the Government's right of action, at the earliest, upon the filing of Landis's complaint.[4]  Gov't Compl. ¶ 73.  Thus, on the face of the complaint, the Government's claims are timely.

Armstrong notes that, even under the second prong of the FCA's tolling provision, the United States may not bring FCA claims for violations that are more than 10 years old. Armstrong Br. 11-12.  However, Counts I and II of the Government's complaint do not seek a recovery for any claims prior to June 10, 2000, so the ten-year limitation is not implicated. Similarly, Count III, which asserts reverse false claims liability, is predicated on false statements made by Armstrong after June 10, 2000, and thus also is not seeking to recover for any violations that occurred outside the applicable ten-year window.[5]

**B.    The USPS's Knowledge of the French Investigation
Does Not Establish That the Government's Claims Are
Conclusively Time-Barred Under the FCA or 28 U.S.C. § 2416(c)**

Armstrong contends that the face of the complaint shows, as a matter of law, that the Government's allegations are untimely because the Government had actual or constructive

---

same "conduct, transactions, or occurrences," 31 U.S.C. § 3731(c); specifically, that Armstrong and his teammates used banned substances in violation of Tailwind's contracts with the USPS.

[4] A nearly identical allegation recently was held to be sufficient to permit the Government to survive a motion to dismiss in an FCA action.  In *United States v. BNP Paribas SA*, the court stated, "[t]his excerpt from the complaint alleges that as of October 19, 2005, the United States official charged with responsibility to act neither knew nor should have known of the material facts.  Accordingly, the court concludes that the United States' complaint is not subject to dismissal under Rule 12(b)(6) because the complaint's allegations do not affirmatively demonstrate that the plaintiff's claims are barred by the statute of limitations and do raise some basis for tolling."  *United States v. BNP Paribas SA*, 884 F. Supp. 2d 589, 600 (S.D. Tex. 2012).

[5]  A reverse false claim violation is not complete until the acts comprising all the elements of the violation have occurred, and thus it is not sufficient for Armstrong merely to assert that some of the elements, such as the existence of an obligation, may have existed prior to June 10, 2000.

knowledge of his use of banned substances more than 10 years ago.[6]  Armstrong Br. at 7-9.  To

support this argument, he relies on the singular fact that the complaint references a French

investigation into his doping conduct beginning in late 2000.   As discussed below, however, the

sole fact that French authorities were investigating whether Armstrong used banned substances

does not remotely satisfy Armstrong's burden of conclusively demonstrating that the

Government's complaint was untimely – particularly when that investigation found no evidence

of wrongdoing.

### 1.    The USPS' Knowledge of the French Investigation Did Not Constitute Knowledge of Armstrong's Doping

The face of the complaint does not demonstrate that *anyone* within the Government knew

or should have known about Armstrong's doping.  Armstrong's contrary argument relies on a

single fact – the existence of an investigation by French authorities into unspecified allegations

relating to the use of banned substances.[7]  Armstrong Br. at 8.  But the existence of the French

---

[6]  Armstrong also contends that the Government cannot invoke the common law fraudulent concealment doctrine because it failed to plead affirmatively that it exercised due diligence.  The Government is not invoking the common law tolling doctrine of fraudulent concealment, however; rather, the Government is relying on the statutory tolling provisions applicable to its claims, under which the operative question is when the responsible Government official knew or should have known of Armstrong's misconduct.   In any event, as discussed in the text, the complaint makes quite clear that the Government acted reasonably, and with appropriate due diligence, under the circumstances.

[7]  Armstrong also points to a reference to "media inquiries" in the Government's complaint.  As is apparent from the face of the complaint, however, those inquiries related to the French investigation, and thus cannot form a basis for Government knowledge independent of the French investigation.  In any event, the fact that the media may have been directing questions to Armstrong about the French investigation does not suggest in any way that the Government had information beyond the fact that an investigation was occurring.  In addition, Armstrong seems to place some significance on the complaint's use of the term "concerned."  The fact that the USPS was "concerned about [the allegations]" means no more than that they were concerned about the impact that such allegations would have on the value of the sponsorship and that they took the issue of doping seriously.  It does not mean, as Armstrong implies, that they had reason

11

investigation, by itself, is not sufficient to establish that the USPS knew or should have known about Armstrong's doping.

Notably, the investigation closed after 19 months without finding any evidence that the team had used doping products during the 2000 Tour de France.  Investigators tested both blood and urine samples taken from team riders in connection with the race and found no evidence that team members took banned drugs or underwent banned medical procedures.[8]  In fact, Armstrong claimed to have been vindicated by those urine testing results, telling the media in April 2001 "I did not use performance enhancing drugs in winning my two Tours de France and that truth has now been borne out by science." Gov't Compl. ¶ 64.A.

Moreover, the complaint provides no basis to assess the credibility of the allegations giving rise to the investigation.  The credibility of the allegations is, of course, relevant to what the USPS "should have known."  *United States v. United Technologies Corp.*, 255 F. Supp. 2d 779, 785 (S.D. Ohio 2003) (rejecting Government awareness of study as basis for constructive knowledge because study "was later determined to be an insufficient basis for redefining decrements for a multi-year contract."); *United States v. Gov't Dev. Bank*, 725 F. Supp. 96, 102 (D. P.R. 1989) ("The material facts … cannot rest on mere suspicions and allegations").[9]  If the

---

to know that the allegations were true.

[8]  The Court may take judicial notice of the widely-reported conclusions reached by French investigators.  *See*, *e.g.*, Pierre-Antoine Souchard, *French Doping Probe Into Armstrong's Team Closed For Lack Of Evidence*, AP Worldstream, September 2, 2002.

[9]  The relevance of an allegation's credibility is confirmed by the FCA's legislative history, which reads "the committee intends that the False Claims Act tolling provision be liberally construed because the conduct addressed here is so inherently deceptive and carefully concealed. Thus, courts should be leary [sic] of finding that the Government had knowledge of the existence of a possible cause of action based merely upon the discovery of irregularities that fall short of a concrete suspicion that fraud has occurred. Some corroborative information to support that suspicion should be required."  132 Cong. Rec. S11238-04.

investigation was unjustified (or if USPS personnel reasonably believed the investigation to be unjustified), then the fact of the investigation does nothing to establish constructive knowledge on the part of the USPS.

Furthermore, the Government had many reasons *not* to know about Armstrong's doping, some of which are identified in the complaint.  The complaint reflects Armstrong's repeated and vehement public denials, his claim that his innocence had been "borne out by science," his claims to have passed hundreds of drug tests, and his vexatious (and initially successful) use of litigation to silence his critics.  Gov't Compl. ¶¶ 63, 64, 67, and 68.   The complaint also alleges that Armstrong misled the USPS Vice President for Sales by suggesting that the USPS team was "clean."  Gov't Compl. ¶ 63.E.  Moreover, the complaint alleges that these facts reasonably led the USPS, like many others, to believe that Armstrong was not cheating.  Gov't Compl. ¶¶ 70, 73.  Rather than undermine this conclusion, the French investigation's failure to find any evidence of wrongdoing reinforced it.[10]

In light of Armstrong's persistent denials of doping, the fact that he was being investigated by a competent and motivated investigative body, and the fact that he appeared to have passed numerous drug tests, the USPS responded as a reasonable person would.  The USPS

---

[10]  The facts set forth in this paragraph also give rise to a heightened constructive knowledge standard.   That is, where, as here, the defendant concealed the true facts giving rise to the plaintiff's claim, the defendant "must show something closer to actual notice than the merest inquiry notice" in order to demonstrate plaintiff's constructive knowledge.  *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1491 (D.C. Cir. 1989); *see also United States ex rel. Miller v. Bill Harbert International Construction*, 505 F. Supp. 2d 1, 8 (D.D.C. 2007).  Although the Government is not invoking the common law tolling doctrine of fraudulent concealment, the principles applicable to the fraudulent concealment doctrine, such as the heightened knowledge standard describe above, apply to the interpretation of the "should have known" standard under § 3731(b)(2) of the FCA.   *Miller*, 505 F. Supp. 2d 1, at 7, fn.7 (citing *United States v. Intrados/Intl. Mgmt. Group*, 265 F. Supp. 2d 1, 12 (D.D.C. 2002); *see also United States v. Uzzell*, 648 F. Supp. 1362, 1367 (D.D.C. 1986)).

inserted into the 2000 agreement with Tailwind additional provisions relating to the use of banned substances and methods.  Specifically, the USPS changed the contract to make it an event of default if the team failed to take immediate action in response to a violation of a moral or drug clause violation.  Gov't Compl. ¶ 20.  In addition, USPS required each rider to have a morals and drug clause in his contract which allowed Tailwind to suspend or terminate the rider for, among other things, "inappropriate drug conduct prejudicial to the Team, or the Postal Service[.]"  Gov't Compl. ¶ 21.  Also, the USPS sought and received numerous assurances from team management regarding the team's drug use.  Specifically, the USPS Vice President for Sales received private assurances directly from team President Mark Gorski.  Gov't Compl. ¶ 63.D.  Later, after French authorities failed to find any evidence of wrongdoing by Armstrong or the team, the USPS Chief Marketing Officer reasonably relied upon the assurances she received from Tailwind officials over the next three years.  Gov't Compl. ¶ 64.D.  These actions constituted a reasonable response by the USPS to the French  investigation until, in 2010, Landis finally broke the conspiracy of silence and revealed the extent of Armstrong's (and the other team members') use of prohibited substances. [11]

Armstrong relies on *Walker v. Pharm. Research and Manuf. of America*, 439 F. Supp. 2d 103 (D.D.C. 2006), to argue that the mere existence of an investigation conclusively establishes constructive knowledge by the Government.  Armstrong Br. 8 (citing *Walker* for the proposition that "[t]he limitations period begins running when the plaintiff learns that an investigation has

---

[11]  The very fact that the reasonableness of the USPS's conduct is at issue here provides an additional reason why dismissal is not appropriate – such an inquiry is fact-specific, and for that reason the "overwhelming line of authority [] suggests that a plaintiff's diligence cannot be decided [on a motion to dismiss]."  *Intrados*, 265 F. Supp. 2d at 11 (internal quotation omitted) ; s*ee also Richards*, 662 F.2d 65 at 228 n. 13, citing *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 235 (1959); *Jones v. Rogers Mem'l Hosp.*, 442 F.2d 773, 775 (D.C. Cir. 1971); *Houlihan v. Anderson-Stokes, Inc.*, 434 F. Supp. 1319, 1324 (D.D.C. 1977).

been convened to determine whether the conduct at issue occurred.").  *Walker* cannot be read nearly so broadly.

*Walker* involved an internal company audit to determine the employment status of certain contract employees, and the basis for the plaintiff's knowledge was that she personally participated in the audit with full knowledge of its purpose, which included the determination of her employment status.  *Walker*, 439 F. Supp. 2d at 110.  Contrary to Armstrong's suggestion, the court in *Walker* granted summary judgment based on its review of the particular facts related to the plaintiff's knowledge, not based on a broad principle that the statute of limitations starts running whenever a plaintiff learns an investigation has been convened.  *Id.*

Armstrong's attempted read of *Walker* also is contrary to cases such as *Richards*, in which the D.C. Circuit undertook a fact-specific inquiry to determine whether the plaintiff's claims were conclusively time-barred.  *Richards*, 662 F.2d at 71-73 (considering relevant specific circumstances and broader historical context in determining whether plaintiff acted reasonably); *see also Firestone*, 76 F.3d at 1209; *United States ex rel. Purcell v. MWI Corp.*, 254 F. Supp. 2d 69, 78 (D.D.C. 2003) ("*Purcell I*") ("Analyzing when the responsible government official knew or should know facts material to the FCA or equity claims is a complex factual determination[.]" (internal quotation omitted)).  The term "investigation" can involve an endless possibility of factual scenarios, some of which may give rise to a finding of inquiry notice, but many of which will not – such as where the investigation results in no finding of wrongdoing. To ignore the facts involved in any particular case in favor of a rule that presumes constructive knowledge from the mere existence of any type of "investigation" runs counter to the court's approach in *Richards*.

Consistent with this approach, courts have denied motions to dismiss on statute of limitations grounds even where *agencies of the United States* had undertaken earlier investigations.  *Purcell I*, 254 F. Supp. 2d at 73; *Tech Refrigeration*, 143 F. Supp. 2d at 1010.  In *Tech Refrigeration*, the Office of Inspector General (OIG) for Amtrak issued a subpoena to the defendant, and the defendant produced responsive documents in May 1996.  *Tech Refrigeration*, 143 F. Supp. 2d at 1010.  The Government filed its complaint in the case in 2000.  *Id.* at 1008. The defendant filed a motion to dismiss, arguing that the three-year provision began running when the OIG began its investigation, but the court denied the motion, holding that it was without sufficient information to conclude that the action was time-barred.  *Id.* at 1006, 1010-11. In doing so, the court pointed to the existence of many relevant unanswered questions surrounding the investigation, many of which are at issue here:

> We know only that Amtrak's OIG obtained Tech's records on May 1, 1996; we have no idea what those records indicated, what else the OIG did to investigate the matter and what it learned, whether knowledge of the investigation was widely known inside or outside of Amtrak, whether OIG had any communications with Department of Justice personnel, whether it reached any conclusions or issued a report, or indeed any details at all about the investigation. In short, on the current record the Court cannot say that DOJ knew or should have known of the material facts before June 10, 1997.

*Id.* at 1010.  Thus, *Tech Refrigeration* demonstrates that the mere existence of an investigation is not a sufficient basis upon which the court may conclusively determine that the Government should have known about its potential claims.  *See also Purcell I*, 254 F. Supp. 2d at 73 (denying motion to dismiss even though criminal investigation of the defendant CEO had commenced more than three years prior to the filing of the Government's complaint against him).[12]

---

[12]  Armstrong correctly notes that in *United States ex rel. Purcell v. MWI Corp.*, 520 F. Supp. 2d 158 (D.D.C. 2007) ("*Purcell II*"), the court granted summary judgment on statute of limitations

In short, the existence of the French investigation provides no basis to contend that the Government knew or should have known about Armstrong's doping.  Accordingly, the reference to it in the Government's complaint cannot support a conclusion that the Government's claims are "conclusively time barred."  *Firestone*, 76 F.3d at 1209.

> **2.  Even if the Court Concludes that USPS Should Have Known About Armstrong's Doping, The Government's FCA Claims Are Not Barred Because the Complaint Does Not Demonstrate That The Department Of <u>Justice Knew or Should Have Known About Armstrong's Doping</u>**

Armstrong's reliance on the French investigation as the basis for his statute of limitations argument also fails as to the Government's FCA claims because the complaint provides no basis – and Armstrong identifies none – for concluding that the Department of Justice (DOJ) was aware of the investigation.  With regard to the Government's FCA claims, the official charged with responsibility to act in the circumstances is DOJ.  The absence of any allegations in the complaint to establish DOJ's knowledge before the filing of Landis' *qui tam* action is thus fatal to Armstrong's argument that the Government's FCA claims were untimely.

Under the FCA, authority is expressly granted to the Attorney General to investigate and file a civil action alleging a violation of the act.  31 U.S.C. § 3730(a).  The Attorney General, in turn, has delegated such authority to the Assistant Attorney General for the Civil Division, 28 C.F.R. § 0.45(d), and in some cases depending on the amount in controversy, that authority has been further delegated to the Branch Director of the Civil Division's Commercial Litigation

---

grounds.  It did so, however, only after allowing for the development and presentation of a complete factual record. *Id.* at 171-72.  The court denied the defendant's earlier motion to dismiss on statute of limitations grounds, recognizing that "[a]nalyzing when the responsible government official knew or should know facts material to the FCA or equity claims is a complex factual determination. " *Purcell I*, 254 F. Supp. 2d at 78.  The court therefore declined to find that the Government's claims were conclusively time-barred, even though the defendant had been under investigation more than three years prior to the filing of the complaint. *Id.* at 78 (internal quotation omitted).

Branch and to U.S. Attorneys.  28 C.F.R. Pt. 0, Subpt. Y, App.  Accordingly, the "official …

charged with responsibility to act" is unquestionably an official within the Department of Justice.

Applicable case law also confirms that the "responsible official" is an official within

DOJ.  *See, e.g., United States v. Carell*, 681 F. Supp. 2d 874, 881 (M.D. Tenn. 2009) ("[T]he

Court agrees with the Government that the official charged with responsibility to act under the

limitations period established by § 3731(b)(2) is an official within the Justice Department.");

*Jana, Inc. v. United States*, 34 Fed. Cl. 447, 451 n.6 (1995) ("the discovery that triggers 31

U.S.C. § 3731(b)(2) is not knowledge of the fraud by *any* Government official, but knowledge of

the fraud by an official having the authority to initiate litigation under the Act, generally

considered to be an official at the Civil Division of the Department of Justice which has

exclusive litigating authority under the False Claims Act."); *see also Tech Refrigeration*, 143 F.

Supp. 2d at 1009; *United States v. Incorporated Vill. of Island Park*, 791 F. Supp. 354, 363

(E.D.N.Y. 1992); *United States v. Macomb Contracting Corp.*, 763 F. Supp. 272, 274 (M.D.

Tenn. 1990).[13]

Actual knowledge by DOJ is not necessary to begin the running of the statute of

limitations.  *Island Park*, 791 F. Supp. at 363.  Knowledge of Government agencies other than

DOJ may, depending on the facts, establish that DOJ should have known about the existence of

---

[13] *But see United States ex rel. Kreindler & Kreindler v. United Technologies, Corp.*, 777 F. Supp. 195, 204-05 (N.D.N.Y. 1991) (holding that knowledge by senior Army officials could trigger the limitations period).  The *Kreindler* decision is of limited authoritative value for at least two reasons.  First, the relator in that declined *qui tam* action did not raise, and the court did not consider, the interpretation advanced by the United States here.  *Id.*  Rather, the relator argued that the "responsible official" could only be the contracting officer, effectively conceding that the knowledge of agency personnel can trigger the running of the limitations period.  *Id.* Second, in affirming the district court's decision, the Second Circuit stated that the district court should not have reached the limitations issue at all.  *See United States ex rel. Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1155 (2d Cir.1993).

the Government's claims.  *Tech Refrigeration*, 143 F. Supp. 2d at 1009.  Such a finding should

be reserved for unusual situations, however, because the FCA's legislative history suggests that

the "should have known" provision should be applied sparingly, and because defendants are

protected from inordinate delay by the provision barring claims after ten years.  *See Id.* at 1010

(citing *United States ex rel. Condie v. Board of Regents of the University of California*, 1993 WL

740185, *2 (N.D. Cal. 1993) (citation erroneously stated as "1993 WL 740195" in *Tech

Refrigeration*)).

The imputation of an agency's knowledge to DOJ appears to be limited to circumstances

where the agency had *actual* knowledge of the underlying fraud.  Indeed, this is true in each of

the cases cited by Armstrong in support of his argument that the supposed knowledge of USPS

employees should be imputed to DOJ.  *Island Park*, 791 F. Supp. at 363-34 (DOJ charged with

knowledge of facts that were contained in a widely disseminated and detailed inspector general

report and that were known to high-ranking agency officials); *United States v. Intrados/Int'l

Mgmt. Group*, 265 F. Supp. 2d 1, 12 (D.D.C. 2002) (DOJ charged with knowledge of facts

uncovered as part of an audit released by the Defense Contract Audit Agency).  The Government

is not aware of any case under the FCA in which a court has charged DOJ with constructive

knowledge based on another Government agency's constructive knowledge. This stands to

reason, because if an agency's constructive knowledge could be attributed to DOJ, then, as a

practical matter, DOJ would no longer be "the official of the United States charged with

responsibility to act in the circumstances."  31 U.S.C. § 3731(b)(2).

*  *  *

Try as he might, Armstrong cannot identify any basis in the complaint that would allow

the Court to determine conclusively that the relevant Government decision-makers had actual or

19

constructive knowledge that Armstrong was doping.  Rather, the complaint makes clear that the

USPS, other government officials, and the public at large all reasonably concluded, based in part

on Armstrong's words, actions, and lawsuits, that he was not.   Contrary to Armstrong's

suggestion, the Government was not required to undertake an investigation in response to vague

and unsubstantiated allegations, particularly when it had good reason not to believe them.  In

other words, "the law of fraud does not … require that an aggrieved party have proceeded from

the outset as if he were dealing with thieves."  *Richards*, 662 F.2d at 72 (*quoting Hudak*, 499

F.2d at at 1002).  The Court should therefore deny Armstrong's motion to dismiss the

Government's FCA claims as untimely.

## III.   THE 2009 AMENDMENT TO THE FALSE CLAIMS ACT APPLIES TO COUNT II, AND THIS COUNT SURVIVES IN ANY EVENT

Armstrong also seeks dismissal of the Government's claim under the FCA's false

statement provision based on the argument that it cites to the amended version of that provision

rather than the pre-amendment version.   Armstrong Br. at 13-14.  Specifically, he argues that the

pre-2009 version of the False Claims Act applies to the Government's false statements claims,

and that as a result these claims should be dismissed.  Armstrong is wrong on both scores.

### A.   The FERA Amendment Applies To The Government's "False Statements" Claims Against Armstrong

The FCA, as amended in 2009, makes a person liable for "knowingly mak[ing], us[ing],

or caus[ing] to be made or used, a false record or statement material to a false or fraudulent

claim." 31 U.S.C. § 3729(a)(1)(B).  The applicable effective-date provision accompanying this

amendment states that the new provision "shall take effect as if enacted on June 7, 2008, and

apply to all *claims under the False Claims Act* … that are pending on or after that date."  FERA

§ 4(f)(1) (31 U.S.C. 3729 note) (emphasis added).  Because Count II of the Government's

complaint states "claims under the False Claims Act" pending on or after June 7, 2008, new § 3729(a)(1)(B) applies to those claims.

Armstrong contends that the key phrase in the effective date provision – "claims under the False Claims Act" – refers to claims for payment rather than legal claims.  Because the claims for payment at issue in this case are no longer pending, he argues that the old version of the false statement provision applies.  But Armstrong's argument cannot be squared with the plain reading of the phrase "claims under the False Claims Act" for the simple reason that claims for payment are never made *under the FCA*.  Armstrong's proposed interpretation effectively eliminates the words "under the False Claims Act" from the statute and thereby violates the basic tenet that courts must give meaning to all the terms enacted by Congress.  *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (courts must "give effect, if possible, to every clause and word of a statute.") (quoting *Montclair v. Ramsdell*, 107 U.S. 147, 150 (1883)).

Indeed, elsewhere the FCA uses the term "claim" to refer to an action under the FCA. For example, Congress recently amended the FCA's public disclosure bar to provide that a court "shall dismiss . . .  a claim under this section  . . .  if substantially the same allegations or transactions as alleged in the . . . claim were publicly disclosed."  31 U.S.C. § 3730(e)(4). Unquestionably, the relevant phrase "claims under this section," which closely mirrors the phrase "claims under the False Claims Act" in FERA's effective date provision, refers to legal claims asserted under the FCA.  In short, Armstrong's attempt to redefine the phrase "claims under the False Claims Act" cannot be reconciled either with the specific provision in which it appears or the FCA as a whole.

Armstrong argues that because FERA includes a second effective-date provision that makes various other FCA amendments applicable "to *cases* pending on the date of enactment,"

§ 4(f)(2), 123 Stat. 1625 (emphasis added), Congress could not have been referring to *cases* in using the term "claims" in § 4(f)(1).  Armstrong's argument is undermined entirely by the fact that the two retroactive effective date provisions "were drafted by different chambers of Congress at different times."  *Allison Engine*, 703 F.3d 930, 936-37 (6th Cir. 2012).  "[N]egative implications raised by disparate provisions are strongest when the portions of a statute treated different had already been joined together and were being considered simultaneously when the language raising the implication was inserted."  *Lindh v. Murphy*, 521 U.S. 320, 330 (1997).

Armstrong's interpretation also finds no support in the FCA's definition of a "claim."  Although the FCA defines a claim as a request for payment, it expressly states that the definition applies only to the section where it is located – section 3729.  *See* 31 U.S.C. § 3729(b)(2) ("For purposes of this section . . . the term claim means . . . ").  Since FERA's effective-date provision is *not* part of 31 U.S.C. § 3729, it is not subject to the FCA's definition of "claim."  *See Levin v. United States*, 133 S. Ct. 1224, 1231-32 (2013) (Congress's qualification of operative clause "[f]or purposes of this section" limited operation of clause to that section).[14]

Finally, Armstrong is simply incorrect when he asserts that "[t]he majority of courts to have considered the issue have held that 'claims' means … 'claims for payment.'"  Armstrong Br. at 13.  On the contrary, although the Circuits are divided on this issue, the majority of the courts of appeals have rejected Armstrong's proposed construction, including the Sixth Circuit in *Allison Engine*, which contains the most extensive treatment of this issue by any court.  *See*

---

[14]  Armstrong's reliance on FERA's legislative history is equally unavailing.  While Armstrong contends that the Senate Report on the FERA amendments reflects that the term "claim" refers to claims for payment, in fact the Senate Report on FERA also uses the term to refer to "legal claims."  S. Rep. 111-10 (2009 WL 787872, at *438) (stating that the Supreme Court's decision in *Allison Engine* "is contrary to Congress's original intent in passing the law and creates a new element *in a FCA claim* and a new defense for any subcontractor") (emphasis added).

*Allison Engine,* 703 F.3d at 942 (6th Cir.); *see also United States ex rel. Kirk v. Schindler*

*Elevator Corp.*, 601 F.3d 94, 113 (2d Cir. 2010) (holding that "claims" means "civil actions");

*United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 n.2 (7th Cir. 2011)

(same); *but cf. Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318 (11th Cir. 2009) (holding – without

analysis – that "claim" means "claim for payment"); *United States ex rel. Cafasso v. Gen.*

*Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1051 n.1 (9th Cir. 2011) (same).[15]

### B. The Government's Complaint States a Claim Under *Either* Version of the FCA

Even assuming Armstrong's interpretation of FERA's effective date provision were

correct, it does not compel dismissal of Count II of the Government's complaint.  That is because

the government has pled a violation even under the old version of this provision.  Thus, in this

case it is of no practical consequence which version of the statute applies.

The Federal Rules of Civil Procedure require only that a plaintiff provide notice pleading.

Thus a complaint is sufficient so long as it pleads all of the elements giving rise to a legal cause

of action.  The former version of the false statement provision imposed liability on any person

who knowingly used a "false record or statement to get a false or fraudulent claim paid or

---

[15] The Fifth Circuit appears to have taken both positions on this issue.  *Compare United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 n.1 (5th Cir. 2010) *with Gonzalez v. Fresnius Med. Care N. Am.*, 689 F.3d 470, 475 & n.4 (5th Cir. 2012).

District court decisions addressing this statutory issue have also split. Compare *United States ex rel. Carter v. Halliburton Co.*, 2009 WL 2240331, *5 n.3 (E.D. Va. Jul. 23, 2009) (new § 3729(a)(1)(B) applies "[b]ecause this case was pending on June 7, 2008"), with *United States v. Science Applications Intern. Corp.*, 653 F. Supp. 2d 87, 107 (interpreting FERA § 4(f)(1) to call for application of new § 3729(a)(1)(B) only where an FCA defendant's request for payment was pending on June 7, 2008).

Several other courts have acknowledged the statutory interpretation issue but have found no need to resolve it because, on the relevant record, the outcome would be the same regardless of whether former § 3729(a)(2) or new § 3729(a)(1)(B) governed. *See United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, No. 09-4079, 2010 WL 3025021, at *8 n.3 (10th Cir. Aug. 4, 2010); *United States ex rel. Loughren v. Unum Group*, No. 09-1606, 2010 WL 2951175, *14 n.7 (1st Cir. Jul. 29, 2010).  That is equally true in this case, as discussed below.

approved by the Government." 31 U.S.C. § 3729(a) (2). In *Allison Engine, Inc. v. United States ex rel. Sanders*, 553 U.S. 662 (2008), the Supreme Court held that the phrase "to get a false or fraudulent claim paid or approved by the Government" required proof that the defendant had intended the Government itself to pay the claim. 553 U.S. at 668-72.[16]

The Government's complaint clearly alleges that Armstrong acted with the requisite intent. The complaint states that Armstrong knew "all of his sponsorships would be terminated" if his doping were publically known, Gov't Compl. ¶ 66, and that Armstrong's statements to the USPS and to the public denying that he was doping were made "with the intent that the United States and other sponsors would rely on the supposed accuracy of the representation[s]." *Id.* ¶ 65. Indeed, the complaint specifically alleges that when French officials began investigating Armstrong's possible doping, he personally misled a USPS official into thinking that he was clean. *Id.* at ¶63(E). The complaint thus more than adequately alleges conduct giving rise to liability under either version of the FCA's false statement provision, and the Court need not resolve which version of the provision applies in this case.

## IV.   ARMSTRONG IS LIABLE UNDER THE REVERSE FALSE CLAIMS PROVISION OF THE FCA

The USPS paid Tailwind more than $40 million during the time that Armstrong was a member of the USPS cycling team, approximately half of which Tailwind paid to Armstrong personally. As a result of Armstrong's use of banned substances, Tailwind was not entitled to retain the funds it received. *United States v. Wurts*, 303 U.S. 414, 415-16 (1938) (holding Government has "long-established right to sue for money wrongfully or erroneously paid from the public treasury."). Throughout his career, right up until the moment he confessed on national

---

[16] As previously noted, a primary purpose of the 2009 amendments was to overrule the *Allison Engine* decision and to remove any intent requirement from the FCA's false statement provision. *See* S. Rep. No. 10, 111th Cong., 1st Sess. 10 (2009) (Senate Report).

television, Armstrong made false statements about his use of performance enhancing drugs, in part to ensure that Tailwind's obligation to repay the Government would never come to light. The FCA's reverse false claim provision was designed to address just this type of situation – where a person lies to obscure the Government's right to recoup Government funds that were erroneously paid out.

Armstrong contends that he did not violate the FCA's reverse false claim provision because he did not personally sign the contract between Tailwind and the Government and because the Government had discretion over whether or not to seek repayment. Armstrong Br. 14-16.  However, a defendant may be liable for making false statements to avoid the obligation of a third party to pay the Government.  Moreover, as Congress has made clear, the reverse false claim provision is not limited to fixed obligations.  Thus, Armstrong's many false statements about his doping activities over the last decade place him squarely within the prohibitions of the FCA's reverse false claim provision.

### A. Armstrong Made Repeated False Statements Designed to Conceal His Use of Banned Substances

The reverse false claim provision was amended in 2009.  Pub. L. No. 111-21, 123 Stat. 1617.  Prior to 2009, the FCA's reverse false claim provision imposed liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. former § 3729(a)(7) (1986).  In 2009, the provision was expanded to also make liable any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).  Further, Congress added an express definition of obligation as follows:  "the term 'obligation' means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-

grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, *or from the retention of any overpayment*." *Id.* at 3729(b)(3) (emphasis added).  The amended version of the reverse false claim provision continued to impose liability, however, for knowingly making or causing a false statement to conceal an obligation to the United States.  *Id.*

In this case, Armstrong lied throughout his career about his drug use.  As set forth in the Government's complaint (and partially set forth on pages 4-5 above), Armstrong falsely denied his doping conduct on numerous occasions between at least 2000 and 2012 so that he and Tailwind could avoid repaying the Government the millions of dollars in public funds they improperly received.  Indeed, his lies continued until he finally admitted the truth about his doping before a national television audience.  Gov't Comp. ¶ 61.[17]  Each false statement he made renders him liable under the reverse false claim provision.[18]

### B.      The Reverse False Claim Provision Does Not Require Privity Between the Defendant and the Government

Armstrong argues that the Government has failed to plead adequately a reverse false claim because Armstrong himself did not personally sign the contract between Tailwind and the Government.  Armstrong Br. at 14.  However, the reverse false claims provision does not require Armstrong to have been in direct privity with the Government.  Both the current and former versions of the statute state that a person is liable who knowingly makes or causes to be made a

---

[17] In light of this confession on national television, it is perplexing that Armstrong insists on characterizing his lies to his sponsors and to the public as "alleged false statements," *see* Armstrong Br. at 14-15, as if there remained some dispute over whether his denials were in fact true.

[18]  Unlike the changes to section 3729(a)(1)(B), FERA's changes to the reverse false claim provision are not retroactive.  Accordingly, the former version of this provision applies to conduct before the FERA amendment was enacted.  However, as discussed below, the two provisions are similar in all pertinent respects, and thus Armstrong is subject to liability under the applicable reverse false claim provision for both his pre- and post-2009 false statements.

false statement to avoid "an obligation" to pay the Government.  31 U.S.C. former § 3729(a)(7)

(1986); 31 U.S.C. § 3729(a)(1)(G).  The statute imposes liability regardless of whether it is the

defendant or a third party who has an obligation to pay.  *See United States v. Caremark, Inc.*, 634

F.3d 808, 817 (5th Cir. 2011) ("The statute does not require that the statement impair the

*defendant's* obligation; instead, it requires that the statement impair '*an* obligation to pay or

transmit money or property to the Government.'").[19]  Thus, it is enough that Armstrong made

false statements designed to avoid Tailwind's obligation to repay the Government.  Gov't

Compl. ¶ 63.  That Armstrong did not personally sign the contract between Tailwind and the

USPS, or that he did not directly receive money from the USPS, is of no significance.

Armstrong's unduly narrow reading of the reverse false claim provision is also contrary

to Congress' clear purpose in enacting this provision.  Congress intended the reverse false claim

provision to be equal but opposite in scope to the FCA's affirmative false statement provision.

*See Hoyte v. Am. Nat'l Red Cross*, 439 F. Supp. 2d 38, 43 (D.D.C. 2006), *aff'd*, 518 F.3d 61

(D.C. Cir. 2008); *United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1194 (10th Cir.

2006) ("an individual who makes a material misrepresentation to avoid paying money owed to

the Government would be equally liable under the Act as if he had submitted a false claim to

receive money.") (quoting S. Rep. No. 99-345 at 18, reprinted in 1986 U.S.C.C.A.N. 5266,

5283).  Under the latter provision, a defendant may be liable for making a false statement in

order to induce the Government into conferring a benefit on a third party.  *See, e.g., Allison*

---

[19] *See also United States v. Merck-Medco Managed Care, L.L.C.*, 336 F. Supp. 2d 430, 445 (E.D. Pa. 2004) (holding that there is no "direct privity" requirement and that the defendant could not escape liability for having caused another party to avoid making payments to the Government); *United States ex rel. Koch v. Koch Indus., Inc.*, 57 F. Supp. 2d 1122, 1128 (N.D. Okla. 1999) ("[G]iven the history and purpose of the Act, the term 'claim' as used in the FCA also 'includes' indirect reverse false claims.").

*Engine,* 553 U.S. at 671-72 (holding that a subcontractor could be liable under former

§ 3729(a)(2) if the subcontractor submitted a false statement to the prime contractor to enable the

latter to get paid).  That § 3729(a)(7), like § 3729(a)(2), expressly imposes liability for *causing* a

third party to make a false statement underscores Congress' intention to hold defendants

similarly responsible for concealing obligations owed by third parties to the Government.

Finally, there is no logical reason why Congress would have wanted to exclude from

liability those who are not in direct privity with the Government.   As this very case

demonstrates, a party may receive a benefit from the Government's erroneous payment to a third

party, and thus may have a strong incentive to conceal the wrongful payment.   Of the $40

million that Tailwind improperly received from the Government, approximately half was paid to

Armstrong.  Armstrong should not be allowed to escape liability merely because the benefit he

received from lying about his doping activities was funneled through an intermediary rather than

paid to Armstrong directly.  In either situation, the loss to the Government is the same.

### C.      The Reverse False Claim Provision Encompasses Contingent Obligations

Equally without merit is Armstrong's contention that the reverse false claim provision is

inapplicable because the Government had discretion over whether or not to seek repayment.  The

2001 sponsorship agreement provides that the Government "may" terminate the agreement in the

event of default.  Armstrong suggests that this renders Tailwind's repayment obligation

contingent, and his efforts to avoid repayment non-actionable.  Armstrong Br. at 16 ("[T]he

government alleges that the defendants made false statements to avoid a potential, contingent

decision by the government to seek repayment under a breach of contract theory.  That theory

fails to state a claim for relief.").  But the fact that the Government has some discretion whether

to seek repayment of funds does not authorize a defendant to lie about facts bearing on the

Government's consideration whether to exercise that discretion.  Indeed, only if the Government is fully informed of its right to recoup funds can the Government properly decide whether to do so.  By lying to the Government about his (and his team's) compliance with the terms of the Sponsorship Agreement, Armstrong prevented the Government from fully and fairly considering whether to seek repayment.

Congress made clear that such conduct is not exempt from False Claims Act liability when it added a definition of obligation to the FCA in 2009, which expressly provides in relevant part that this term "means an established duty, *whether or not fixed.*"[20]  31 U.S.C. § 3729(b)(4) (emphasis added).   As the legislative history makes clear, the italicized language was added for the very purpose of clarifying that concealment of contingent obligations was not immunized from liability under the FCA:

> [W]hile the new definition of "obligation" expressly includes contingent, non-fixed obligations, the Committee supports the position of the Department of Justice that current section 3729(a)(7) "speaks of an 'obligation,' not a 'fixed obligation.' By including contingent obligations such as, "implied contractual, quasi-contractual, grantor-grantee, licensor-licensee, fee-based, or similar relationship," this new section reflects the Committee's view, held since the passage of the 1986 Amendments, that an "obligation" arises across the spectrum of possibilities from the fixed amount debt obligation where all particulars are defined to the instance where there is a relationship between the Government and a person that "results in a duty to pay the Government money, whether or not the amount owed is yet fixed."

S. Rep. No. 111-10, at 14 (2009).

Moreover, as the foregoing passage makes clear, Congress intended the new definition to clarify rather than change the meaning of an obligation under the FCA.  *Bahrani*, 465 F.3d at 1204 (holding under pre-FERA version of the FCA that "the need for some further governmental

---

[20] The definition of obligation provides in full:  "the term 'obligation' means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3)

action or some further process to liquidate an obligation does not preclude a reverse false claims action." (internal quotation omitted)). "Subsequent legislation clarifying the intent of an earlier statute is entitled to great weight in statutory construction." *Loving v. United States,* 517 U.S. 748, 770 (1996). By specifying that the FCA reaches contingent obligations, the 2009 amendment is persuasive evidence of the meaning of this term prior to the amendment. *Cf. United States ex rel. Longhi v. Lithium Power Technologies, Inc.*, 575 F.3d 458, 470 (5th Cir. 2009) (observing that "Congress enacted § 4 of FERA to clarify the FCA and 'to reflect the original intent of the law'" and therefore the new definition of materiality was relevant to the meaning of this term under the prior version of the statute).[21]

In short, Armstrong's use of false statements to *obtain* Government funds gives rise to liability under one provision of the FCA, and his false statements to aid Tailwind in *retaining* these funds give rise to liability under the separate, reverse false claim provision of the FCA. Armstrong cannot escape liability for his false statements simply because he made them after the USPS had paid Tailwind. Regardless of whether the obligation was "contingent," Tailwind wrongfully received funds that the United States has a right to recover, and Armstrong's concerted efforts to conceal that fact render him separately liable under the FCA.

## CONCLUSION

The Court should deny Armstrong's motion to dismiss the Government's complaint.

---

[21] Although a D.C. District Court described an obligation pre-FERA as "a present, existing debt or liability, owed at the time the alleged false statement is made, and not some future or contingent liability," *Hoyte v. Am. Nat'l Red Cross*, 439 F. Supp. 2d 38, 44 (D.D.C. 2006), *aff'd on other grounds,* 518 F.3d 61, 66 n.6 (D.C. Cir. 2008), in light of Congress' subsequent clarification, this portion of the *Hoyte* case is properly viewed as having been superseded. *Cf. Longhi*, 575 F.3d at 470.

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

RONALD C. MACHEN JR., D.C. Bar # 447889
United States Attorney


DANIEL F. VAN HORN, D.C. Bar # 924092
Assistant United States Attorney


/s/ Darrell C. Valdez
DARRELL C. VALDEZ, D.C. Bar # 420232
MERCEDEH MOMENI
Assistant United States Attorneys
Judiciary Center Building
555 4th St., N.W., Civil Division
Washington, D.C.  20530
Tel: (202) 252-2507


/s/ Robert E. Chandler
MICHAEL D. GRANSTON
ROBERT E. CHANDLER
DAVID M. FINKELSTEIN
Attorneys, Department of Justice
Civil Division
Post Office Box 261
Ben Franklin Station
Washington, D.C.  20044
Tel:  (202) 514-4678


DATED: September 23, 2013