IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* FLOYD LANDIS , | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:10-cv-00976-RLW |
| v. | ) ) | Oral Argument:  November 18, 2013 |
| TAILWIND SPORTS CORPORATION, *et al.,* | ) ) ) | |
| Defendants. | ) ) ) | |

**RELATOR'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS CAPITAL SPORTS & ENTERTAINMENT HOLDINGS, INC.'S, WILLIAM J. STAPLETON'S AND BARTON B. KNAGGS' MOTION TO DISMISS RELATOR'S SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION………………………………………………………………......1

BACKGROUND FACTS………………………………………………..…………2

   Defendants' Concealment of Their Fraudulent Scheme……………………………..2

   The CSE Defendants………………………………………………………………4

ARGUMENT……………………………………………………………7

   I.      PLAINTIFFS' CLAIMS ARE TIMELY…………………………….………..7

      A.     Motions to dismiss based on statute of limitations are strongly disfavored………………………………………………………...7

      B.     Plaintiffs' claims based on FCA violations after June 10, 2000 are timely under the FCA's ten-year statute of limitations (3731(b)(2))……………....8

          1.    The pleadings provide no basis to conclude that the relevant "official of the United States" knew or should have known of the FCA right of action…………………………………………………8

          2.    Defendants assert the wrong notice standard……………………..………9

          3.    The tolling provision applies to relators…………………………………..10

              a.    Judge Lamberth's thoroughly-reasoned decision in *Pogue* holds that tolling applies to relators…………………………………….………10

              b.    The cases defendants rely on fail to consider several key factors in favor of relator's position…………………………………………11

                  i.    Defendants' position leads to inequitable results in partially-intervened cases such as this one……………………………………..12

                  ii.    The specter of relators delaying action due to the potential availability of tolling is illusory…………………………………..13

               c.    Under the clear and unambiguous language of the statute, the FCA tolling provision applies to relators………………………. 14

                  i.    Section 3731(b) applies to "a civil action under section 3730," which includes civil actions brought by a relator………………....15

        ii.      The statute gives relators in declined cases the "right to conduct the action" and contains no words excluding relators from using the tolling provision……..……………….......16

        iii.     Defendants' interpretation creates surplusage…………………..17

    d.      Following the plain language of the statute would not lead to 'absurd' results.………………………………………...18

    e.      Defendants' alternative suggested interpretation is contrary to the plain language of the statute:  relator is not "an official of the United States."…..……………………………………………19

    f.      The legislative history may not be used to contradict the plain meaning of the FCA's tolling provision………………………………21

        i.       Legislative history is irrelevant where a statute is unambiguous.........................................................................................21

        ii.      The legislative history does not support defendants' position…...21

    g.      Policy considerations also weigh in favor of applying section 3731(b)(2) to the United States and relator alike……………………23

  C.      The FCA Statute of Limitations is Suspended by the Wartime Suspension of Limitations Act ("WSLA")……………..........24

  D.      Relators claims for reverse false claims or payments made after June 10, 2004 are timely under the FCA's six-year statute of limitations (3731(b)(1))……………………………………………………………...25

    1.      Relator alleges reverse false claims committed after June 10, 2004……………………………………………………………25

    2.      Plaintiffs allege that false claims were paid after June 10, 2004………..26

II.     FERA APPLIES TO RELATOR'S COUNTS FIVE THROUGH EIGHT….....27

III.    RELATOR HAS STATED A VALID REVERSE FALSE CLAIM BOTH PRE-FERA AND POST-FERA……………………..……………………………30

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Beta Constr.*,
  309 F. Supp. 2d 42 (D.D.C. 2004). ....................................................................... 27

*Allison Engine Co., Inc. v. U.S. ex rel. Sanders*,
  553 U.S. 662 (2008)................................................................................... 28, 29

*Conference of State Bank Supervisors v. Conover*,
  715 F.2d 604 (D.C. Cir. 1983). ............................................................................ 17

*Davis v. Michigan Dep't of Treasury*,
  489 U.S. 803 (1989).......................................................................................... 21

*Firestone v. Firestone*,
  76 F.3d 1205 (D.C. Cir. 1996). ........................................................................ 8, 26

*Glus v. Brooklyn E. Dist. Terminal*,
  359 U.S. 231 (1959)........................................................................................... 7

*Goldring v. District of Columbia*,
  416 F.3d 70 (D.C. Cir. 2005). ............................................................................. 21

*Gonzalez v. Fresenius Med. Care N. Am.*,
  689 F.3d 470 (5th Cir. 2012). ............................................................................. 28

*Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
  545 U.S. 409 (2005).......................................................................................... 15

*Hobson v. Wilson*,
  737 F.2d 1 (D.C. Cir. 1984). ................................................................................. 9

*Hohri v. United States*,
  782 F.2d 227 (D.C. Cir. 1986). ............................................................................ 10

*Hopper v. Solvay Pharms., Inc.*,
  588 F.3d 1318 (11th Cir. 2009). ..................................................................... 28, 29

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987)........................................................................................... 16

*Jones v. Rogers Mem'l Hosp.*,
  442 F.2d at 775. ............................................................................................ 8, 26

*M.K. v. Tenet*, 196
    F. Supp. 2d 8 (D.D.C. 2001)..........................................................................................8

*Macharia v. United States*,
    334 F. 3d 156 (D.C. Cir. 2003) ........................................................................................27

*McCreary v. Offner*,
    172 F.3d 76 (D.C. Cir. 1999)............................................................................................32

*Miller v. Holzmann*,
    563 F. Supp. 2d 54 (D.D.C. 2008)....................................................................................12

*Red Lion Broadcasting Co. v. FCC*,
    395 U.S. 367 (1969)...........................................................................................................32

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979)...........................................................................................................17

*Richards v. Mileski*,
662 F.2d  65 (D.C. Cir. 1981)...............................................................................................7

*Riddell v. Riddell Washington Corp.*,
    866 F.2d 1480 (D.C. Cir. 1989)............................................................................. 7, 9, 10

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997)...........................................................................................................14

*Ry. Labor Execs. v. Nat'l Mediation Bd.*,
    29 F.3d 655 (D.C. Cir. 1994).............................................................................................16

*Sanders v. Allison Engine Co., Inc.*,
    703 F.3d 930 (6th Cir. 2012). ...........................................................................................28

*U.S. ex rel. Atkins v. McInteer*,
    470 F.3d 1350 (11th Cir. 2006). .......................................................................................23

*U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
    637 F.3d 1047 (9th Cir. 2011). .........................................................................................29

*\* U.S. ex rel. Carter v. Halliburton*,
    710 F.3d 171 (4th Cir. 2013) ............................................................................................25

*U.S. ex rel. DeCarlo v. Kiewit/AFC Enters., Inc.*,
    937 F. Supp. 1039 (S.D.N.Y. 1996)..................................................................................23

*U.S. ex rel. El Amin v. George Washington Univ.*,
   26 F. Supp. 2d 162 (D.D.C. 1998). ............................................................ 10, 13, 18

*U.S. ex rel. Fisher v. Network Software Assocs., Inc.*,
   180 F. Supp. 2d 192 (D.D.C. 2002). ................................................................ 10

*U.S. ex rel. Folliard v. Synnex Corp.*,
   798 F. Supp. 2d 66 (D.D.C. 2011). .................................................................. 13

*U.S. ex rel. Head v. Kane Co.*,
   798 F. Supp. 2d 186 (D.D.C. 2011). ................................................................ 28

*U.S. ex rel. Howard v. Lockheed Martin Corp.*,
   499 F. Supp. 2d 972 (D. Ohio 2007) ............................................................... 18

*U.S. ex rel. Hyatt v. Northrop*,
   91 F.3d 1211 (9th Cir. 1996). ............................................................... passim

*U.S. ex rel. Kirk v. Schindler Elevator Corp.*,
   601 F.3d 94 (2d Cir. 2010) ............................................................................. 28

*U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
   777 F. Supp. 195 (N.D.N.Y. 1991). ................................................................ 11

*U.S. ex rel. Lewis v. Walker*,
   No. 3:06-CV-16 (CDL) (M.D. Ga. September 14, 2007) ............................... 11

*U.S. ex rel. Little v. Shell Exploration & Prod. Co.*,
   690 F.3d 282 (5th Cir. 2012 ). ........................................................................ 14

*U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*,
   608 F.3d 871 (D.C. Cir. 2010). ....................................................................... 14

*U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*,
   505 F. Supp. 2d 1 (D.D.C. 2007). ........................................................... passim

*U.S. ex rel. Ortega v. Columbia Healthcare, Inc.*,
   240 F. Supp. 2d (D.D.C. 2003). ..................................................................... 13

* *U.S. ex rel. Pogue v. Diabetes Treatment Ctrs.*,
   474 F. Supp. 2d 75 (D.D.C. 2007). .......................................................... passim

*U.S. ex rel. Repko v. Guthrie Clinic, P.C.*, 557 F. Supp.
   2d 522 (M.D. Pa. 2008). ................................................................................. 11

*U.S. ex rel. Salmeron v. Enter. Recovery Sys. Inc.,*
   464 F. Supp. 2d 766 (N.D. Ill. 2006). ............................................................................. 11, 20

*U.S. ex rel. Sanders v. N. Am. Bus. Indus.,*
   546 F.3d 288 (4th Cir. 2008). ................................................................................ 11, 13, 15, 18

*U.S. ex rel. Sikkenga v. Regence Bluecross,*
   472 F.3d 702 (10th Cir. 2006). ............................................................................. 11, 13, 18, 19

*U.S. ex rel. Steury v. Cardinal Health, Inc.,*
   625 F.3d 262 (5th Cir. 2010). ............................................................................................... 28

*U.S. ex rel. Ven-a-Care of the Florida Keys, Inc. v. Actavis Mid Atlantic LLC,*
   659 F. Supp. 2d 262 (D. Mass. 2009). ........................................................................ 16, 17, 18

*U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.,*
   709 F. Supp. 2d 52 (D.D.C. 2010). ....................................................................................... 28

*U.S. ex rel. Yannacopoulos v. Gen. Dynamics,*
   652 F.3d 818 (7th Cir. 2011). ............................................................................................... 28

*U.S. ex rel.Green v. Serv. Educ. Contract and Training Trust Fund,*
   843 F. Supp. 2d 20 (D.D.C. 2012). ....................................................................................... 13

*United States ex rel. Purcell v. MWI Corp.,*
   520 F. Supp. 2d 158 (D.D.C. 2007). ....................................................................................... 9

*United States v. Caremark, Inc.,*
   634 F.3d 808 (5th Cir. 2011). ............................................................................................... 30

*United States v. Columbia/HCA Healthcare,*
   318 F.3d 214 (D.C. Cir. 2003). ............................................................................................. 13

*United States v. Sci. Applications Int'l Corp.,*
   653 F. Supp. 2d 87 (D.D.C. 2009). .................................................................................. 28, 29

*United States v. Toyobo Co.,*
   811 F. Supp. 2d 37 (D.D.C. 2011). ....................................................................................... 28

*United States v. Uzzell,*
   648 F. Supp. 1362 (D.D.C. 1986). ....................................................................................... 12

*United States v. VanOosterhout,*
   898 F. Supp. 25 (D.D.C. 1995). ........................................................................................... 25

**Statutes**

18 U.S.C. § 3287 ................................................................................................................. 24

31 U.S.C. § 3729(a)(1)(B) ................................................................................ 27, 28, 29
31 U.S.C. § 3729(a)(1)(C) ........................................................................................ 26, 33
31 U.S.C. § 3729(a)(1)(G) ............................................................................ 25, 30, 31, 33
31 U.S.C. § 3729(a)(7) ................................................................................. 25, 30, 31, 32
31 U.S.C. § 3729(b)(3) ......................................................................................................... 30
31 U.S.C. § 3730 ............................................................................................................ 6, 15
31 U.S.C. § 3730(a) ................................................................................................................ 15
31 U.S.C. § 3730(b)(4)(A) ..................................................................................................... 15
31 U.S.C. § 3730(b)(4)(B) ..................................................................................................... 15
31 U.S.C. § 3730(b)(5) .......................................................................................................... 13
31 U.S.C. § 3730(c)(3) .................................................................................................... 12, 16
31 U.S.C. § 3730(e)(4) ........................................................................................................... 13
31 U.S.C. § 3730(h) ................................................................................................................ 15
31 U.S.C. § 3731(b) ...................................................................................................... passim
31 U.S.C. § 3731(b)(1) .................................................................................................. passim
31 U.S.C. § 3731(b)(2) .................................................................................................. passim
31 U.S.C. § 3731(c) .................................................................................................................. 5
50 U.S.C. 1544(b) .................................................................................................................. 24
Pub. L. 107-40, 15 Stat. 224 (2001) .................................................................................... 25
Pub. L. 111-21, 123 Stat. 1617 (2009) ..................................................................... 1, 27, 31

## Other Authorities

*False Claims Act Amendments:  Hearings Before the H. Subcomm. On Admin. Law and Government Relations of the H. Comm. On the Judiciary*, 99th Cong. 118, 159 (1986). ........ 20
H. Rep. No. 660, 99th Cong., 2d Sess., 15 (June 26, 1986). ................................... 21, 22
S. Rep. No. 111-10, 111th Cong., 1st Sess. (2009) ............................................. 28, 32
S. Rep. No. 345, 99th Cong., 2d Sess., at 30 (July 28, 1986), *reprinted in* 1986 U.S.C.C.A.N. 5266 .......................................................................................................... 21, 22, 23

## Rules

Fed. R. Civ. P. 15 ...................................................................................................................... 5
Fed. R. Civ. P. 8(c) ................................................................................................................... 8

## INTRODUCTION

This False Claims Act case involves allegations that the defendants caused false claims for tens of millions of dollars of United States Postal Service sponsorship payments, all the while engaging in a complex and secret scheme to cheat and dope in order to win bicycle races, in clear violation of material contract terms.  When the sponsorship was over, defendants continued to deny and hide their misconduct for many years until relator's actions, including filing this suit, set in motion a chain of events that eventually led to defendant Lance Armstrong finally admitting on national television that he had doped and cheated to win.

Having successfully concealed their fraud for well over a decade, defendants now argue that it is too late to sue them, because the United States should have discovered the fraud earlier.

In fact, the United States neither knew nor should have known of defendants' fraud until they learned of it from relator.  Accordingly, plaintiffs' claims for violations of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA") committed after June 10, 2000 are  timely under the FCA's statutory tolling provision, 31 U.S.C. § 3731(b)(2), which, under the plain language of the statute, applies equally to claims brought by the United States and relators.  In addition, the Wartime Suspension of Limitations Act, 18 U.S.C. § 3287 ("WSLA"), has suspended the FCA's statute of limitations, thus permitting relator to pursue FCA claims on behalf of the United States for the full period of the defendants' admitted fraud back to 1998.

The CSE defendants further argue that Counts V through VIII must be dismissed because the False Claims Act amendments included in the Fraud Enforcement and Recovery Act of 2009, Pub. L. 111-21, 123 Stat. 1617 (2009) ("FERA") do not apply to this case.  The CSE Defendants, however, erroneously rely on the effective date applicable only to amendments to the "false statements" provision as the basis to dismiss all of relator's post-FERA claims.  In any event, under the majority view, even the amendments to the "false statements" count are applicable to this case.

Finally, the CSE Defendants argue that Count IV of relator's complaint must be dismissed because relator has failed to state a valid reverse false claim.  In fact, however, relator has stated a valid claim based on defendants' continued false statements in avoidance of their contractual obligation to return the ill-gotten taxpayer funds.

## BACKGROUND FACTS

In their respective complaints, the United States and relator allege that defendants violated the False Claims Act by submitting, and conspiring to submit, false claims, false statements, and reverse false claims to get and keep sponsorship payments to the United States Postal Service Pro Cycling Team ("USPS Team" or "the Team"), all the while knowing that the Team was secretly taking illegal drugs and doping to win, in violation of contract terms.  *See generally* Relator's Second Amended Complaint, Docket Entry ("DE") 42 ("SAC"); United States' Complaint, DE 44 ("U.S. Compl.").

### <u>Defendants' Concealment of Their Fraudulent Scheme</u>

Defendants' doping conspiracy was clandestine and self-concealing.  Defendants concealed their fraud by secretly doping in various foreign apartments and hotels, SAC ¶¶ 82-86, 88, 92-95, 97-98, 105-06, 108, and even in a bus which "pretended to have engine trouble" on a remote mountain road in Europe, SAC ¶ 109.  Defendants made a "financial agreement" with the head of an international cycling body to avoid discovery, ¶ 87, warned relator not to tell sponsors that the Team was selling donated bikes to support the doping program, ¶¶ 113-17, and told relator to answer any inquiries about whether he had ever used performance enhancing drugs: "Absolutely not." ¶ 120.[1]

Similarly, the United States has alleged, for example, that defendant Armstrong "provided a place where his teammates could receive illicit treatments by team doctors and store

---

[1]     *See also* SAC at ¶¶ 57-58 (when attending "meetings in Washington, D.C." and when "calling by telephone, corresponding by mail, and emailing USPS executives" during the time period relevant to the complaint, defendants "failed to disclose and otherwise knowingly concealed from the USPS the highly material fact that defendants were engaged in a systematic program of doping USPS Team athletes to achieve success in professional cycling."); ¶ 59 ("the defendants . . . misled the USPS at the June 1, 2002 event in Washington, D.C. and elsewhere about the doping of the team and the reasons for its success").

blood that had been extracted for the purpose of blood doping," U.S. Compl. ¶ 35, and that defendant Bruyneel "instruct[ed] riders regarding when and where they should meet doctors for illicit treatments." *Id.* ¶ 36.  The United States has also described the clandestine nature of the doping scheme, U.S. Compl. ¶¶ 35, 36, 44-46, 49-52, 54-56, and how the concealment included getting a "false prescription . . . in order to avoid sanctions for the use of banned substances," *id.* ¶ 42, and "avoid[ing] detection by anti-doping authorities." *Id.* ¶ 61.

In addition to undertaking the doping in secret, defendants concealed their conduct by repeatedly denying it, knowing that the U.S. Postal Service would stop paying them or demand repayment if the doping was discovered.[2]  For example, in response to allegations of doping regarding a French investigation in 2000, defendant Armstrong stated, "We are absolutely innocent.  Our team will stand on its morals and record of being an anti-doping team."  SAC ¶ 123.  Defendants made public and private statements to conceal their fraud both during and after the USPS sponsorship.  *See* SAC ¶¶ 121-30 (quoting and identifying examples of statements made "in order to conceal the defendants' doping from the USPS and to deceive the USPS").  Similarly, the United States lists examples of defendants' denials in the press and to the USPS, *see* U.S. Compl. ¶¶ 62-70, including false denials made prior to, during, and after the sponsorship, continuing until as late as June 2012.  *See* ¶¶ 63.A-63.F, 64.A-64.D, 67.A-67.F.  Defendant Armstrong even falsely denied doping under oath in a deposition, *see* ¶ 68.B, publicly denied doping when relator's allegations were published, SAC ¶ 129, and never admitted his doping publicly until January 2013.  U.S. Compl. ¶ 61.

---

[2]     *See, e.g.,* SAC ¶ 114 (defendants knew they "could not just list doping as a cost item on standard expense reports"); ¶ 130 (defendants falsely denied doping to persuade USPS to: pay defendants, renew the sponsorship contract, and not seek repayment of funds paid); ¶ 207 (defendants conspired to hide doping to obtain and keep payments "despite the fact that it was known such funds were not due and were improperly paid"); ¶ 209 ("defendants knew and/or had reason to know that the USPS Team was engaged in doping and other wrongful conduct in violation of the sponsorship agreements with the USPS and that the funds being paid to Tailwind and CSE should therefore returned to the USPS, but the defendants nonetheless failed to return the funds paid to them by the USPS"); U.S. Compl. at ¶ 4 ("The Defendants also made false statements, both publicly and directly to the USPS, that were intended to hide the team's misconduct so that those invoices would be paid.").

Plaintiffs have also alleged that defendants had contractual duties 1) not to dope or otherwise violate the rules of governing sports bodies, 2) to include moral turpitude and drug clauses in riders' contracts, 3) to take immediate action with regard to morals or drug violations even "without notification by [the U.S. Postal Service]," and 4) not to engage in material misrepresentations.  SAC ¶¶ 36-37; U.S. Compl. ¶¶ 16, 20-21.  Applicable regulations also provide for the suspension or debarment of those doing business with the U.S. Postal Service in the event of, *inter alia*, "willful failure to perform a Postal Service contract in accordance with specifications," "making false statements," or any cause of "serious and compelling nature affecting responsibility as a supplier."  SAC ¶¶ 38-41.  In violation of these duties, defendants remained silent despite knowledge of doping by Armstrong and other USPS Team members, and remaining silent despite knowledge of the false denials being made.

Based on these and other factual allegations, relator has alleged that "during the period relevant to this complaint and through the present, defendants have knowingly concealed and continue to conceal from the USPS the fact that the defendants engaged in a systematic program of doping . . . ."  SAC ¶ 197.[3]  The United States has likewise alleged that defendants' "failure to disclose their doping activity and their repeated denials of such activity" prevented the United States from discovering the facts material to the FCA right of action.  U.S. Compl. ¶ 73.

### The CSE Defendants

Defendant Capital Sports and Entertainment Holdings, Inc. ("CSE") was the agency representing defendant Armstrong, who was the lead rider on the USPS Team.  SAC ¶ 11, 14.  Defendant William J. Stapleton founded CSE, was its President, and personally acted as defendant Armstrong's agent.  *Id.* ¶ 14.  Defendant Barton B. Knaggs also was an owner and officer of CSE.  *Id.* ¶ 15.  (CSE, Stapleton, and Knaggs are collectively referred to herein as the "CSE Defendants").  Starting in at least 2002, CSE started providing management services to

---

[3]     *See also* SAC ¶ 200, ¶ 203 ("the team's management was orchestrating the riders' use of banned substances and methods . . . and they were conspiring with the riders to keep that conduct secret from the Postal Service"); ¶ 107 ("each of the defendants . . . agreed to conceal from the USPS that such doping and other wrongful conduct was occurring and had occurred"); ¶ 210 (defendants "actively concealed and failed to disclose the USPS Team doping program").

Tailwind, the company that operated the Team.  Stapleton and Knaggs later took officer positions with Tailwind.  *Id.* ¶ 236.  CSE ultimately later became a shareholder of Tailwind as well.  *Id.* ¶¶ 11, 14, 15, 236.

The CSE Defendants represented Lance Armstrong for many years and "were aware of and concealed the doping scheme on the USPS Team." *Id.* ¶ 236.  CSE participated in the fraud "with the consent, participation and approval of Stapleton and Knaggs." *Id.*  Relator Landis directly discussed and/or heard others discuss the subject of doping on the USPS Team with each of the defendants Knaggs and Stapleton during the period the U.S. Postal Service was sponsoring the USPS Team.  SAC ¶¶ 90, 113-116.

In its Notice of Intervention, the United States stated that it was not intervening against the CSE Defendants "at this time," but did intervene as to defendant Armstrong, the team manager defendant Johan Bruyneel, and the company that owned the team, Tailwind Sports, LLC and Tailwind Sports Corporation (the "Intervened Defendants").  DE 41.

In their Motion to Dismiss, the CSE Defendants primarily argue that relator's complaint is barred by the statute of limitations.  Relator filed his original complaint on June 10, 2010.  DE 1.  He filed a first amended complaint on December 23, 2010, D.E. 10, and a second amended complaint on February 22, 2013.  DE 42.  The United States filed its complaint on April 23, 2013.  DE 44.  For purposes of the statute of limitations, relator's second amended complaint and the United States' complaint relate back to relator's original complaint.  Fed. R. Civ. P. 15; 31 U.S.C. § 3731(c).  Accordingly, the relevant filing date for purposes of the statute of limitations analysis is June 10, 2010.

Plaintiffs allege that, between 1996 and 2004, defendants submitted and were paid for false claims to the U.S. Postal Service totaling more than $41 million.  SAC ¶¶ 24-35 & Exh. 1; U.S. Compl. ¶¶ 5, 71.  False claims totaling more than $32 million were paid after June 10, 2000, *i.e.,* within ten years prior to the filing of relator's complaint.  *See* SAC ¶ 35 (alleging payment under 1995 Sponsorship Agreement of at least $825,000 on or about August 25, 2000); *id.* ¶ 33 & Exh. 1 (alleging payments under 2000 Sponsorship Agreement totaling at least $31,442,262.57 between January 1, 2001 and October 20, 2004); *see also* U.S. Compl. ¶¶ 25-26,

71.  Plaintiffs' FCA claims to recover these amounts are timely under the FCA's tolling provision.  31 U.S.C. § 3731(b)(2).

False claims totaling approximately $40 million were paid between 1998 and 2004.  SAC ¶¶ 24, 26, 27, 33, 35, Ex. 1; U.S. Compl. ¶¶ 5, 26, 71.  Plaintiffs' FCA claims to recover these amounts are timely because the FCA's statute of limitations was suspended by the WSLA.[4]

Approximately $68,000 of defendants' false claims were paid after June 10, 2004, *i.e.,* within six years prior to the filing of relator's complaint.  SAC ¶ 33 & Exh. 1.   The CSE Defendants contend that only the FCA's six-year statute of limitations, and not its ten-year tolling provision, applies to claims against non-intervened defendants.  Thus, under their view, they would be liable for a maximum of $68,000, while the Intervened Defendants would be liable for up to $32 million—even though all defendants were sued on the same day, in the same complaint, and are alleged to have participated in the same conspiracy.  Under the plain language of the FCA statute of limitations, however, there is no basis for such an inequitable result.

The False Claims Act statute of limitations, 31 U.S.C. § 3731(b), reads as follows:

A civil action under section 3730 may not be brought –

(1) more than 6 years after the date on which the violation of section 3729 is committed, or

(2) more than three years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged

---

[4]      While the WSLA provides a basis for the plaintiffs to assert claims relating to conduct prior to 1998, relator only seeks to assert claims dating back to 1998.  The plaintiffs' complaints include specific allegations of doping by Armstrong in 1998 and later.  *See, e.g.,* U.S. Compl. ¶ 10 (all of Armstrong's competition results after August 1, 1998 disqualified); ¶ 26 ("From 1998 to 2004," USPS paid Tailwind approximately $40 million; Armstrong's salary was $17.9 million (not including bonuses) "from 1998 through 2004"); ¶ 27 ("From at least 1998 through 2004, the USPS cycling team routinely engaged in the use of performance-enhancing drugs . . . ."); ¶ 31 ("Armstrong and his fellow USPS team members engaged in doping on a regular and consistent basis throughout the period from 1998 through 2004"); ¶ 35 ("Throughout his tenure on the team, from 1998 through 2004, Armstrong regularly employed prohibited substances and methods"); ¶ 61 (in Oprah interview, Armstrong admitted using banned substances and methods "starting in the mid-1990s"); *see also* SAC ¶¶ 87, 110-111, 135.

with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,

whichever occurs last.

The limitations provision makes no distinction between intervened vs. non-intervened cases.  *Id.* Therefore, the United States' or a relator's claims based on FCA violations committed within 10 years prior to filing are timely, so long as the suit is brought within three years of when the official of the United States charged with responsibility to act in the circumstances learns of the violations.  *Id.* at § 3731(b)(2).  Alternatively, suit may be brought within six years of when the FCA violation is committed.  *Id.* at § 3731(b)(1).

As explained in detail *infra*, the WSLA has also suspended the FCA statute of limitations and thus relator's claims on behalf of the United States are timely back to 1998.[5]

## ARGUMENT

### I.   PLAINTIFFS' CLAIMS ARE TIMELY.

#### A.   Motions to dismiss based on statute of limitations are strongly disfavored.

Motions to dismiss based on statute of limitations grounds are strongly disfavored, especially where fraudulent concealment is alleged.  "[T]he determination of whether a defendant has committed an act of concealment, where it turns on questions of fact, is a matter for the jury.  Similarly, what a plaintiff knew and when he knew it, in the context of a statute of limitations defense, are questions of fact for the jury."  *Riddell v. Riddell Washington Corp.,* 866 F.2d 1480, 1484 (D.C. Cir. 1989); *see also Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 235, 79 S. Ct. 760, 763, 3 L. Ed.2d 770 (1959) (question of plaintiff's diligence "cannot be decided at this stage of the proceedings," on a motion to dismiss); *Richards v. Mileski*, 662 F.2d 65, 73 n.13 (D.C. Cir. 1981) (noting the "overwhelming line of authority" that statute of limitations issues inappropriate for decision on motion to dismiss).  "[B]ecause statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the

---

[5]       Moreover, as explained *infra*, even under the six-year statute of limitations, defendants have liability for claims after June 10, 2004 and for "reverse false claims."

complaint on its face is conclusively time-barred." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996); *M.K. v. Tenet*, 196 F. Supp. 2d 8, 13-15 (D.D.C. 2001) (dismissal inappropriate if it is "unclear from the face of the complaint" whether claims are timely).

With regard to pleading, "[t]he statute of limitations is an affirmative defense, Fed. R. Civ. P. 8(c), and need not be negatived by the language of the complaint." *Jones v. Rogers Mem'l Hosp.,* 442 F.2d 773, 775 (D.C. Cir. 1971); *see also M.K. v. Tenet*, 196 F. Supp. 2d at 13 ("[T]he statute of limitations is an affirmative defense that does not need to be anticipated and rebutted by the complaint.").  Likewise, a plaintiff has no obligation to plead fraudulent concealment in the complaint.  *Firestone v. Firestone*, 76 F.3d at 1210-11.

## B. Plaintiffs' claims based on FCA violations after June 10, 2000 are timely under the FCA's ten-year statute of limitations (3731(b)(2)).

Plaintiffs' claims for violations committed after June 10, 2000 (*i.e.* with ten years prior to filing) are timely under the FCA's tolling provision, 31 U.S.C. § 3731(b)(2).  Plaintiffs have adequately alleged that suit was brought within three years of when facts material to the FCA cause of action were "known or reasonably should have been known" to the "official of the United States charged with responsibility to act in the circumstances."  *Id.*

### 1. The pleadings provide no basis to conclude that the relevant "official of the United States" knew or should have known of the FCA right of action.

In determining when facts "are known or reasonably should have been known" for purposes of section 3731(b)(2), courts apply a "discovery-due diligence" standard based on principles of equitable tolling.  *See U.S. ex rel. Miller v. Bill Harbert Int'l*, 505 F. Supp. 2d 1, 6-7 (D.D.C. 2007).  The CSE Defendants do not and cannot argue that the United States knew of defendants' secret doping scheme.  Instead, they argue that the United States "should have known" of the fraud due to allegations of doping by French authorities in 2000.

The CSE Defendants state that relator's complaint "does not include any specific information regarding government knowledge of these allegations," but they ask the court to consider allegations in the United States' complaint regarding the Government's knowledge of a

8

French investigation into doping.  CSE MTD at 20.  In support of this argument, they have asked that the Court take judicial notice of the United States' complaint.  Relator has no objection to the Court taking judicial notice of the allegations of the United States' complaint.  Contrary to the CSE Defendants' argument, however, the U.S. Postal Service's mere knowledge of an investigation does not establish that the relevant "official of the United States" "should have known" of the facts material to defendants' FCA violations.  Relator hereby joins and incorporates by reference the United States' arguments on this point in its response to defendant Armstrong's Motion to Dismiss the United States' Complaint.

### 2.    Defendants assert the wrong notice standard.

In arguing that the Government "should have known" of their fraud, defendants cite to cases referencing the "inquiry notice" standard derived from principles of equitable tolling.  CSE MTD at 19-21 (citing *United States ex rel. Purcell v. MWI Corp.*, 520 F. Supp. 2d 158, 170 (D.D.C. 2007)).  As discussed above, defendants are not able to meet that standard, but it is additionally worth noting here that the applicable standard would be more stringent than that cited by defendants.

Both the relator and the United States have alleged facts that show defendants fraudulently concealed their doping scheme.  S*ee supra* Background Facts, Defendants' Concealment of Their Fraudulent Scheme; *see also Hobson v. Wilson*, 737 F.2d 1, 33-36 (D.C. Cir. 1984).  In cases involving fraudulent concealment, it is not sufficient to show a plaintiff was on "inquiry notice" of the need to investigate.  Rather, "defendants must meet a more stringent standard" which is "something closer to actual notice."  *Riddell*, 866 F.2d at 1491; *see also United States ex rel. Miller v. Bill Harbert Int'l*, 505 F. Supp. 2d at 8 (where fraudulent concealment is alleged, "the defendant must prove that the plaintiff had a higher degree of knowledge than inquiry notice of the fraud in order to prevail on a statute of limitations defense").  Notice  "do[es] not mean the kind of notice — based on hints, suspicions, hunches or rumors — that requires a plaintiff to make inquiries in the exercise of due diligence, but not to file suit."  *Hobson v. Wilson*, 737 F.2d at 35.  Even if it is determined that "inquiry notice" has occurred, "a court must still make a situation-specific judgment as to when (or if) subsequent

inquiries might have produced the 'factual basis' of a good faith complaint." *Hohri v. United States*, 782 F.2d 227, 250 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64, 107 S.Ct. 2246 (1987).

Here, the French investigation relied upon by defendants is insufficient to establish notice even in the absence of fraudulent concealment; it fails all the more under the more stringent standards applicable when fraudulent concealment is alleged.  Accordingly, plaintiffs' claims based on FCA violations occurring after June 10, 2000 are timely under 31 U.S.C. § 3731(b)(2).[6]

### 3. The tolling provision applies to relators.

#### a. Judge Lamberth's thoroughly-reasoned decision in *Pogue* holds that tolling applies to relators.

The D.C. Circuit has not yet ruled on the application of the FCA's tolling provision to relators, and its district courts are split.  Most recently, Judge Lamberth ruled in favor of relator's position in *United States ex rel. Pogue v. Diabetes Treatment Centers*, 474 F. Supp. 2d 75, 81-89 (D.D.C. 2007) and *United States ex rel. Miller v. Bill Harbert Int'l Constr.*, 505 F. Supp. 2d at 3, holding that section 3731(b)(2) applies to relators and that tolling is determined based on the knowledge of the United States.  Judge Lamberth specifically considered and rejected *United States ex rel. El Amin v. George Washington University*, 26 F. Supp. 2d 162, 170-73 (D.D.C. 1998) (Flannery, J.), in which the court ruled that 3731(b)(2) tolling does not apply to relators, and *United States ex rel. Fisher v. Network Software Assocs., Inc.*, 180 F. Supp. 2d 192, 194 (D.D.C. 2002) (Friedman, J.), which followed *El Amin* without discussion.

---

[6]     Of additional relevance to the CSE Defendants here, in cases of conspiracy, "where the original conspiracy contemplates concealment, or where the concealment is in furtherance of that conspiracy, affirmative acts of concealment by one or more of the conspirators can be imputed to their co-conspirators for purposes of tolling the statute of limitations." *Riddell*, 866 F.2d at 1493 (citations omitted); *see also* SAC ¶ 207 ("[E]ach of the defendants . . . agreed to conceal from the USPS that such doping and other wrongful conduct was occurring and had occurred, for the purpose of not having to return funds paid by the USPS and for the purpose of not having to return funds paid by the USPS . . . ."); ¶ 236 ("CSE, Staple and Knaggs . . . were aware of and concealed the doping scheme on the USPS Team . . .").

In Circuits other than D.C., the Ninth Circuit has ruled that the "clear and unambiguous" language of the statute establishes that section 3731(b)(2)'s tolling provision applies to non-intervened cases.  *See U.S. ex rel. Hyatt v. Northrop*, 91 F.3d 1211, 1214 (9th Cir. 1996).   The Fourth Circuit and a divided panel of the Tenth Circuit, by contrast, have adopted defendants' position that only section 3731(b)(1)'s six-year limitations period applies to relators.  *See U.S. ex rel. Sanders v. N. Am. Bus. Indus.*, 546 F.3d 288 (4th Cir. 2008); *U.S. ex rel. Sikkenga v. Regence Bluecross*, 472 F.3d 702 (10th Cir. 2006).

As only the Ninth Circuit has ruled that section 3731(b)(2) applies to relators, only that Circuit has considered whether the tolling provision is based on the relator's knowledge or the Government's knowledge.  The Ninth Circuit ruled that tolling is based on the *relator's* knowledge, which is the CSE Defendants' fallback position.  *See Hyatt*, 91 F.3d at 1216-18.  At the district court level, *Pogue* and *Miller* in the D.D.C., as well as several district courts in other circuits have ruled in favor of relator's position that tolling is based on the knowledge of the Government, *i.e.*, "the official of the United States charged with responsibility to act in the circumstances," just as in an intervened case.[7]

> **b.**    **The cases defendants rely on fail to consider several key factors in favor of relator's position.**

Relator explains in detail below why -- based on the statutory language, legislative history, and policy concerns addressed in the various court of appeal and D.D.C. opinions -- the *Pogue* view is the correct view.  By contrast, the cases relied upon by defendants fail to consider several important factors that also weigh strongly in favor of adopting *Pogue*.

---

[7]    *See U.S. ex rel. Ven-a-Care of the Florida Keys, Inc. v. Actavis Mid Atlantic LLC*, 659 F. Supp. 2d 262, 273 (D. Mass. 2009) (Saris, J.); *U.S. ex rel. Repko v. Guthrie Clinic, P.C.*, 557 F. Supp. 2d 522 (M.D. Pa. 2008); *U.S. ex rel. Lewis v. Walker*, No. 3:06-CV-16 (CDL) (M.D. Ga. September 14, 2007); *U.S. ex rel. Salmeron v. Enter. Recovery Sys. Inc.,* 464 F. Supp. 2d 766, 769 (N.D. Ill. 2006); *U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 777 F. Supp. 195, 204-05 (N.D.N.Y. 1991); *but see* CSE MTD at 9-10 (citing district court cases to the contrary).

### i.   Defendants' position leads to inequitable results in partially-intervened cases such as this one.

To date, no Circuit has addressed the application of section 3731(b)(2) in the context of a case such as this one in which the United States has only partially intervened.  Thus, no court of appeal has considered the inequities that could result from having two different statutes of limitations apply to intervened and non-intervened claims in the same case.

As this case illustrates, such concerns are not merely theoretical -- here, applying the FCA statute of limitations differently to the intervened vs. non-intervened claims could result in some co-conspirators being liable for up to $32 million while others involved in the same scheme, who would otherwise have joint and several liability,[8] could conceivably face a maximum liability of $68,000.  Indeed, in a case involving only one defendant in which the United States partially intervenes, defendants' suggested rule could lead to different statutes of limitation being applied in the same False Claims Act case against the *same* defendant.

Not only is this disparity inequitable but, as Judge Lamberth recognized in *Pogue*, it is "antithetical to the purposes of statutes of limitations and repose, which seek in part to afford some measure of predictability and finality to litigation."  474 F. Supp. 2d at 88. For example, the United States has a continuing right to intervene for "good cause" even after initially declining to intervene.  *See* 31 U.S.C. § 3730(c)(3).  Under the rule suggested by defendants, such "good cause" intervention could suddenly expand the six-year statute of limitations by an additional four years at an advanced stage of the case, as the United States would then be entitled to assert the tolling provision.  Again, this was a factor considered by Judge Lamberth in *Pogue*, who recognized that applying the same rule to relators and the United States would lead to a predictable outcome even in those cases in which the United States intervened at a later stage of the litigation.  *See Pogue*, 474 F. Supp. 2d at 88.  Moreover, this is a relevant factor in this case, because the United States has not yet announced any intervention

---

[8]     Where defendants have conspired to violate the Act (or where more than one person has committed a violation of the Act), defendants are jointly and severally liable for damages and penalties.  *Miller v. Holzmann*, 563 F. Supp. 2d 54, 67 (D.D.C. 2008); *United States v. Uzzell*, 648 F. Supp. 1362, 1368 (D.D.C. 1986) (Green, J.).

decision as to defendants Montgomery Sports, Inc. or Ross Investments, Inc. and has stated only

that it was not intervening "at this time" as to the (currently) Non-Intervened Defendants,

including the CSE Defendants.  United States' Notice of Election to Intervene in Part, DE 41.[9]

### ii.   The specter of relators delaying action due to the potential availability of tolling is illusory.

The decisions adopting defendants' view have also relied heavily on the supposition that

a uniform application of section 3731(b)(2)'s tolling provision would encourage relators to "sit

on their claims for up to ten years" and "allow false claims to build up over time . . . thereby

increasing their own potential recovery."  *Sanders*, 546 F.3d at 295.[10]  These decisions, however,

have failed to consider other aspects of the FCA statute which render this concern entirely

illusory.  First and foremost, a relator who chose to delay in such a manner would risk forfeiting

his claims altogether, because the so-called "first-to-file" rule precludes a relator from suing

where the United States or another relator has already filed suit.  31 U.S.C. § 3730(b)(5).  The

plethora of first-to-file rulings barring cases filed too late plainly illustrate the reality and severity

of this concern for potential relators.[11]  Likewise, the "public disclosure" rule can pose an

additional bar if the allegations of fraud are "publicly disclosed" prior to the relator filing suit.

---

[9]   Notably, Judge Lamberth addressed the application of section 3731(b)(2) in a partially-intervened case in the *Miller* case.  Because Judge Lamberth followed his earlier decision in *Pogue*, he applied the statute of limitations equally to two defendants in *Miller*, even though the United States had intervened against one but not the other. 505 F. Supp. 2d at 26-27.

[10]   *See also, e.g., Sikkenga*, 472 F.3d at 725-26 (positing that relators would choose "to delay on bringing an FCA claim, or refrain from informing the government of the fraud, to allow increasing damages to accrue"); *El Amin*, 26 F. Supp. 2d at 173 (applying tolling provision to relators "would allow future *qui tam* relators to allow false claims to build up, to the detriment of the government, and thereby obtain a larger recovery by sitting on their hands until the end of the ten year period").

[11]   *See, e.g., United States v. Columbia/HCA Healthcare,* 318 F.3d 214 (D.C. Cir. 2003) (affirming dismissal under first-to-file bar); *U.S. ex rel. Folliard v. Synnex Corp.,* 798 F. Supp. 2d 66 (D.D.C. 2011) (dismissing relator's complaint as to certain defendants under first-to-file bar)*; U.S. ex rel. Ortega v. Columbia Healthcare, Inc.*, 240 F. Supp. 2d 8, 11 (D.D.C. 2003) (dismissing relator's entire complaint with prejudice under first-to-file rule).

31 U.S.C. § 3730(e)(4).[12]  These very real risks to the viability of relator's case more than outweigh any theoretical possibility that a greater recovery might be achieved through delay.

Conversely, a rule which required relators to file earlier would not necessarily result in an earlier cessation of damages, as courts have posited.  In the first place, the hypothetical concern that a relator would deliberately delay in order to increase damages is simply inapplicable to cases in which the damage has already been completed and is not ongoing.  Moreover, because *qui tam* actions are filed under seal, even if relators theoretically stood to benefit from defendants continuing to commit fraud, that possibility would continue to exist even after their complaints were filed, for defendants are not immediately on notice of suit and, in any event, could very well continue to submit false claims after they did learn of the action.

Thus, in the real world of *qui tam* litigation, it would make no sense whatsoever for a relator with valid claims to sit idly by hoping for additional damages to accrue.  Again, only Judge Lamberth properly considered this issue in the context of the FCA's entire statutory scheme, finding that

> A potential relator has no rights on which to sleep — if he chooses to let claims build up instead of taking early action, he may find that his recovery is reduced by the FCA's original source provision, or foreclosed all together by the fact that the government or a more diligent would-be relator brings suit first. This hypothetical scenario is too implausible to provide a justification for tweaking the straightforward words of a statute.

*Pogue*, 474 F. Supp. 2d at 88.

### c.    Under the clear and unambiguous language of the statute, the FCA tolling provision applies to relators.

The plain language of section 3731(b) clearly provides that both the straight six-year limitations period and the three-year tolling provision apply to the United States and relator alike. "'Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and

---

[12]    *See, e.g., U.S. ex rel. Green v. Serv. Educ. Contract and Training Trust Fund*, 843 F. Supp. 2d 20 (D.D.C. 2012) (dismissing one of relator's two claims under public disclosure bar).

consistent.'"  *U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871, 879 (D.C. Cir. 2010) (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, (1997)); s*ee also U.S. ex rel. Little v. Shell Exploration & Prod. Co.*, 690 F.3d 282, 288 (5th Cir. 2012 ) (declining defendant's invitation to engage in "[f]ine-tuning" the FCA on different issue, when doing so "would be based on little more than [the Court's] perception of reasonable policy limits").

> **i.      Section 3731(b) applies to "a civil action under section 3730," which includes civil actions brought by a relator.**

Section 3731(b) states that it applies to "a civil action under section 3730."  A "civil action under section 3730" includes both an action brought by the Attorney General *and* an action brought by a relator.  *See* 31 U.S.C. § 3730(a) ("the Attorney General may bring a civil action under this section . . ."); 31 U.S.C. § 3730(a) ("A person may bring a civil action for a violation of section 3729 for the person and for the United States Government").  Moreover, with respect to relator-initiated actions, "a civil action under section 3730" specifically includes both those actions in which the Government "proceed[s] with the action," *see* section 3730(b)(4)(A), and those in which the Government "declines to take over the action," *see* section 3730(b)(4)(B).

Thus, by its plain language referencing "a civil action under section 3730," section 3731(b) applies to the United States and relators alike, and to both intervened and non-intervened cases.  *See Pogue*, 474 F. Supp. 2d at 84 ("Subsection (b) of § 3731 states that it applies to "[a] civil action under section 3730," which describes actions that are brought both by the United States and by relators.  Because the major clause of § 3731(b) does not differentiate between these actions, it applies to both."); *see also Hyatt*, 91 F.3d at 1214 ("Section 3731(b) delineates the statute of limitations for 'a civil action under section 3730.'  No distinction is made between actions by the government under § 3730(a) and those by *qui tam* plaintiffs under § 3730(b).").[13]

---

[13]      Searching for a reason to ignore this plain language, the Fourth Circuit in *Sanders* relied on *Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409 (2005), which involved the Act's six-year limitations period in section 3731(b)(1), rather than the tolling provision in section 3731(b)(2) which is at issue here.  *Sanders*, 546 F.3d at 294-95.  The *Graham County* Court held that, despite section 3731's introductory reference to "a civil action under section 3730," section 3731(b)(1)'s six-year limitations period did not apply to a relator's

> **ii.    The statute gives relators in declined cases the "right to conduct the action" and contains no words excluding relators from using the tolling provision.**

In addition to the plain words used in section 3731(b), the words that are *not* there are significant:  the statute contains no words excluding relators from using section 3731(b)(2)'s tolling provision or limiting the section only to the United States.  To the contrary, the FCA broadly provides that, if the government does not intervene, "the person who initiated the action shall have the right to conduct the action."  31 U.S.C. § 3730(c)(3).  Although the statute places certain specific limits on the relator's "right to conduct the action," there is no mention of limiting relator's use of the tolling provision.  *Id.*  "As the relator has the right to conduct the action, the relator has the right to invoke the provisions of the statute, including the tolling provision."  *U.S. ex rel. Ven-a-Care of the Florida Keys, Inc. v. Actavis Mid Atlantic LLC*, 659 F. Supp. 2d 262, 273 (D. Mass. 2009) (Saris, J.).

Had Congress intended for section 3731(b)(2) not to apply to relators, as defendants suggest, it easily could have enacted words to that effect.  *See Ry. Labor Execs. v. Nat'l Mediation Bd.*, 29 F.3d 655, 666 (D.C. Cir. 1994) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432, (1987)) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion'").

As Judge Lamberth pointed out in *Pogue*:

> there are countless ways for Congress to have explicitly excluded relators, any of which would have been clearer and more grammatically appealing.  For instance, if (b)(2) is meant to apply only to the government, it would logically begin with a simple clause such as "in cases where the United States brings the action or elects to intervene," or the even simpler and equally elegant "as to the United States."

---

retaliation claim under section 3730(h).  *Graham County*, 545 U.S. at 415-16. The Supreme Court reasoned that section 3731(b)(1)'s reference to a six-year period running from "the violation of section 3729" was inconsistent with its application to a section 3730(h) retaliation claim, because section 3730(h) claims do not require a section 3729 violation.  *Id.*  As explained *infra*, however, in the present case, there is no such internal inconsistency in section 3731(b)(2) or elsewhere that would suggest it should not apply to suits brought by relators.  Accordingly, *Graham County* is inapposite.

474 F. Supp. 2d at 84-85.  Indeed, this is precisely what Congress did in other parts of the Act:

> Where the drafters of the FCA deemed it necessary, they drew distinctions as to what occurs "[i]f the Government proceeds with the action," "[i]f the Government elects not to proceed with the action," and "[w]hether or not the Government proceeds with the action. . . . The drafters of the FCA knew how to delineate between the rights and responsibilities of the Government and of private parties acting on its behalf [and] they chose not to limit the tolling provision to the Government . . . .

*Actavis Mid Atlantic*, 659 F. Supp. 2d at 273-74.  *See also Hyatt*, 91 F.3d at 1214 ("[T]here is nothing in the entire statute of limitations subsection which differentiates between private and government plaintiffs at all.  If Congress had intended the tolling provisions of § 3731(b)(2) to apply solely to suits brought by the Attorney General, it could have easily expressed its specific intent.").

### iii.    Defendants' interpretation creates surplusage.

Section 3731(b) sets forth the two alternate limitations periods described above for bringing an FCA action then concludes with the stand-alone phrase:  "whichever occurs last."  If only the six-year limitations period (and not the ten-year tolling provision) applied to relators, however, then the section's closing phrase "whichever occurs last" would have no use in cases brought by relators.  Defendants' interpretation of the FCA's tolling provision thus runs contrary to the well-established tenet of statutory construction that statutes should not be construed in a manner which renders some part of the statute extraneous.  *See, e.g., Conference of State Bank Supervisors v. Conover*, 715 F.2d 604, 627 (D.C. Cir. 1983) ("[I]n construing a statute, we `are obliged to give effect, if possible, to every word Congress used.'") (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)); *see also Pogue*, 474 F. Supp. 2d at 85 (noting that if Congress had intended for relators to be excluded from section (b)(2), it would have placed the phrase "whichever occurs last" differently or drafted separate limitations provisions for relators versus the United States).

>        **d.    Following the plain language of the statute would not lead to
>               'absurd' results.**

In contrast to the clear language discussed above, the only textual support defendants cite

for their position is the fact that the tolling language in section 3731(b)(2) refers to the

knowledge of an "official of the United States" and makes no mention of relators.  *See* CSE Brief

at 10 (citing *El Amin*, 26 F. Supp. at 172-73 and *U.S. ex rel. Howard v. Lockheed Martin Corp.,*

499 F. Supp. 2d 972, 981 (D. Ohio 2007)).  But the fact that the tolling provision refers to the

knowledge of an official of the United States does not in any way compel the conclusion that the

provision should not equally apply to declined *qui tam* actions.  "Although the awareness of 'the

official of the United States charged with responsibility to act in the circumstances' determines

the beginning of the tolling period, there is nothing about this trigger which suggests that a

relator cannot invoke the tolling provision."  *Actavis Mid Atlantic*, 659 F. Supp. 2d at 273.

Indeed, even the circuits which have adopted defendants' position acknowledge that the

section could equally be read to mean that the tolling provision applies to suits brought by

relators, with the tolling based on the knowledge of the relevant "official of the United States."

In order to get around this plain language, the courts have simply declared that it would be a

"bizarre scenario," or "run afoul of the absurdity doctrine" to toll the statute in a declined case

based on the knowledge of a "non-party," *i.e.,* the United States.  *Sanders*, 546 F.3d at 293

(declaring it would be a "bizarre scenario" for limitations period in relator's action to "depend[]

on the knowledge of a nonparty"); *Sikkenga*, 472 F.3d at 726 (interpretation would "run afoul of

the absurdity doctrine because "surely Congress could not have intended to base a statute of

limitations on the knowledge of a non-party").

In fact, however, this very case illustrates that applying the statute the same way to the

United States and relators alike is not at all "absurd," but makes eminent sense.  Defendants have

already raised the issue of the United States' knowledge as relevant to the tolling provision.

Whatever finding of fact is ultimately made as to the what the "official of the United States with

responsibility to act" "knew or reasonably should have known" will apply to all of the claims in

this case—intervened and non-intervened alike—which claims were all brought on the same day

and are all based on the exact same conspiracy to submit the same tens of millions of dollars of

false claims under the same contract, and which were all fraudulently concealed by defendants.

*See also Sikkenga*, 472 F.3d at 736 (dissenting opinion) ("[T]he plain meaning of § 3731(b) is

not absurd.  Congress could well have decided that a relator should not be time-barred if the

government is not.").[14]

> e.      **Defendants' alternative suggested interpretation is contrary to the plain language of the statute:  relator is not "an official of the United States."**

Defendants alternatively suggest that, if section 3731(b)(2) applies to relators, then the

start of the three-year period should be measured by the *relator's* knowledge, not the

Government's.  *See* CSE MTD at 17-18.  By its language, the three-year period begins to run

"when facts material to the right of action are known or reasonably should have been known by

the official of the United States charged with responsibility to act in the circumstances . . ." 31

U.S.C. § 3731(b)(2).  Defendant's suggested interpretation thus requires the Court to conclude

that the phrase "the official of the United States charged with responsibility to act" actually

means the "relator," a private person.  Again, this interpretation is contrary to the plain language

of the statute.

"It is true that in other sections the FCA uses 'United States' to refer both to the

government and relators.  But in this instance, § 3731(b)(2) did not use a generic, careless label.

---

[14]     The Tenth Circuit also inaccurately reasoned that "[i]f relators could avail themselves of the tolling provisions of § 3731(b)(2), then we are hard pressed to describe a circumstance where the six year statute of limitations in § 3731(b)(1) would be applicable." *Sikkenga*, 472 F.3d at 726; *see also* CSE MTD at 16 (quoting same).  In fact, the six-year statute would still operate in cases where, for example, the United States knew of the fraud but took no action for three years, and then a relator subsequently filed a *qui tam* suit.  In such a case, the six-year statute would apply whether or not the United States intervened, because the three-year statute would have already expired.  Indeed, this is exactly what occurred in *Miller*.  *See* 505 F. Supp. 2d at 26-27 (finding that section 3731(b)(2)'s three-year period had expired and applying section 3731(b)(1) instead).

Notably, in this same scenario, defendants' alternative interpretation that tolling would be based on relator's knowledge would potentially impermissibly allow a relator to "revive" the tolling provision based on relator's lack of knowledge, even where it had already expired based on the United States' knowledge.

It instead used a very specific phrase that does not occur elsewhere in the Act: 'the official of the United States charged with responsibility to act in the circumstances.'  These precise words must be given their precise meaning."  *Pogue*, 474 F. Supp. 2d at 85; *see also False Claims Act Amendments:  Hearings Before the H. Subcomm. On Admin. Law and Government Relations of the H. Comm. On the Judiciary*, 99th Cong. 118, 159 (1986) (statement of Mr. Richard K. Willard, Assistant Attorney General, Department of Justice) (explaining that proposed language was borrowed from general government statute of limitations, 28 U.S.C. § 2416(c)).

If the Court applies the precise words of the statute, defendant's contention must fail, for the relator does not hold an office of the United States and thus is not an "official of the United States."  Likewise, a relator has no obligation to bring a *qui tam* suit and thus is not "charged with responsibility to act in the circumstances" as section 3731(b)(2) states.  To the contrary,

> before a private relator can bring a *qui tam* action at all, he or she is required to give the true officials of the United States the opportunity to pursue the claim. It is only when those officials decline that opportunity that the private party can go forward with the lawsuit.  That cannot fairly be said to transmute that private party into a governmental "official" in any real world sense of that term.

*United States ex rel. Salmeron v. Enterprise Recovery Systems Inc.,* 464 F. Supp. 2d 766, 769 (N.D. Ill. 2006) (rejecting defendant's request to engage in "judicial legislation" by declaring that tolling would run based on relator's knowledge and comparing the argument to a "conjurer's trick").

The apparent motivation for the Ninth Circuit's strained interpretation that the phrase "the United States official with responsibility to act" actually means the relator was the Court's stated concern about relators sitting on their rights and permitting fraud to continue.  *See Hyatt*, 91 F.3d at 1218 ("Granting *qui tam* relators the power to wait nearly ten years to sue would allow fraud to continue and losses to mount.").  As explained *supra*, however, this concern is directly at odds with the provisions of the FCA which give relators more than sufficient motivation to act promptly.

Moreover, the *Hyatt* court's interpretation that the tolling provision should be based on relator's knowledge in a non-intervened case would lead to absurd results.  For example, in a

situation in which the United States had known about the fraud for three years or more but had failed to act, the relator could still file suit and utilize the tolling provision to reach back ten years, but the United States itself would not be able to do so.  To make matters even more confusing, in such a case the statute would shrink back to six years if the United States intervened, since the U.S. would not be able to rely on the tolling provision.  Simply following the plain language of the statute, *i.e.,* applying the tolling provision equally to the United States and relator based on the United States' knowledge, avoids such absurd results.

**f.     The legislative history may not be used to contradict the plain meaning of the FCA's tolling provision.**

**i.     Legislative history is irrelevant where a statute is unambiguous.**

Defendants also attempt to rely on the FCA's legislative history to support their interpretation of the tolling provision.  *See* CSE Brief at 11-14.  As noted above, the unambiguous language of the statute indicates that section 3731(b)(2) applies to the United States and relators alike, so resort to the legislative history is unnecessary.  *See, e.g., Goldring v. District of Columbia*, 416 F.3d 70, 75 (D.C. Cir. 2005) ("Legislative history is irrelevant to the interpretation of an unambiguous statute.") (quoting *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 808-09 n. 3, 109 S. Ct. 1500, 103 L. Ed.2d 891 (1989)).  In any event, here the legislative history provides no basis to ignore the plain language of the statute.  *See Hyatt*, 91 F.3d at 1215 ("The legislative history [of the tolling provision] is at best ambiguous.").

**ii.    The legislative history does not support defendants' position.**

The tolling provision at issue was added to the FCA as part of the 1986 amendment to the False Claims Act.  Both the House and Senate Reports introduce the amendment broadly as a change in the statute of limitations for "the False Claims Act," without distinguishing between actions brought by the United States versus relators.  *See* H. Rep. No. 660, 99th Cong., 2d Sess., 15 (June 26, 1986) ("House Report") (amendment "expands the statute of limitations *in the False*

21

*Claims Act*"); S. Rep. No. 345, 99th Cong., 2d Sess., at 30 (July 28, 1986), *reprinted in* 1986 U.S.C.C.A.N. 5266 (amendment "would include an explicit tolling provision on the statute of limitations *under the False Claims Act*").  The House Report describes the amendment as providing "a dual statute of limitations" with both a six-year and a ten-year limitations period, again without distinguishing between the United States and relators.  House Report at 32.

In arguing that the amendment was not intended to apply to relators, defendants note that the legislative history "specifically references the government, and not *qui tam* relators, in connection with the tolling provision."  CSE MTD at 11 (citing cases and quoting Senate and House Reports).  But references to "the Government" do not support defendants' position because the legislative history uses the terms "the Government" and "the United States" imprecisely -- several times using these terms when clearly referring to both the United States and the relator.  *Hyatt* 91 F.3d at 1214-15.[15]  These references, therefore, clearly cannot be read as evidence that Congress intended to exclude relators from the tolling provision, in contradiction of the plain language of the statute.

As Judge Lamberth stated in *Pogue*:

> The other cases to consider the issue have asserted that the plain words of § 3731(b) are somehow ambiguous, then turned to legislative history and congressional intent in an effort to give those words different meaning. But the legislative history and congressional intent are perfectly harmonious with the words used by Congress . . . .

474 F. Supp. 2d at 85.

---

[15]    For example, in discussing *scienter* the legislative history refers to the standard "the Government" must meet.  *See, e.g.,* Senate Report at 6-7 ("[T]he civil False Claims Act currently provides that *the Government* need only prove that the defendant knowingly submitted a false claim."); House Report at 21 (amendment's new definition of knowing "enables *the Government* not only to effectively prosecute those persons who have actual knowledge, but also those who play " 'ostrich' ").  The *scienter* standard, however, clearly applies to both cases brought by the United States and those brought by a relator.  Likewise, in discussing the addition of a reverse false claims provision, the House Report states that the amendment "allows *the Government* to prosecute a false claim which has been filed for the purpose of reducing the amount the claimant owes to the Government."  House Report at 20.  Again, despite the use of the term "the Government," the statute clearly also allows relators to prosecute reverse false claims.  *See also id.* at 32 (proposed amendment "further requires *the United States* to prove the essential elements of the cause of action, including damages, by a preponderance of the evidence").

> **g.     Policy considerations also weigh in favor of applying section 3731(b)(2) to the United States and relator alike.**

In addition to the numerous legal arguments for following the plain language of the FCA tolling provision, important policy considerations favor the same result.  First and foremost, the overarching purpose of the False Claims Act is to combat fraud against the federal fisc, and one of the key purposes of the 1986 amendments intended to accomplish that goal was to "encourage more private enforcement suits."  Senate Report at 23-24.  In recognition of Congress' stated purpose to encourage more private enforcement suits, courts have generally avoided unequal treatment of declined *qui tam* cases.  *See, e.g., U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 n.17 (11th Cir. 2006) ("the government's absence from the fray [does not] mean[] that the relator's cause is meritless"); *U.S. ex rel. DeCarlo v. Kiewit/AFC Enters., Inc.*, 937 F. Supp. 1039, 1047 (S.D.N.Y. 1996) ("Non-intervention does not necessarily signal governmental disinterest in an action.").  If the tolling provision were not applied equally to relators and the United States, however, non-intervened claims would be relegated to a second-class status, with the primary result being a reduction in recoveries to the United States in non-intervened cases.

A court-created variance in the FCA's tolling provision for intervened versus declined cases would also constrain the Government's ability to decline meritorious cases, based on resource considerations or otherwise, for declination could mean the loss of potentially valid claims in cases involving fraud dating back more than six years.  In a time of scarce government resources, the position advanced by defendants would thus undermine one of the important benefits of the *qui tam* statute, which permits DOJ trial attorneys to take advantage of relators and their resources to aid in the prosecution of fraud against the United States.

In short, "[e]xcluding relators from § 3731(b)(2)" would do "little to further the FCA's objectives," *Pogue*, 474 F. Supp. 2d at 87, while applying the section to relators would "increase[] the government's ability to punish, deter, and recover upon false claims . . . ."  *Id.* at 87.[16]

---

[16]     "Measuring (b)(2)'s limitations period by the government's knowledge, and never the relator's, makes sense because it means that (1) the government's rights will never be impaired by

For all of the foregoing textual, legislative history, and policy reasons, this Court should follow *Pogue* and should hold that section 3731(b)(2) applies to the United States and relator alike.

**C.    The FCA Statute of Limitations is Suspended
by the Wartime Suspension of Limitations Act ("WSLA")** .

Relator's claims are also timely for the independent reason that the FCA statute of limitations has been suspended by the Wartime Suspension of Limitations Act, 18 U.S.C. § 3287 ("WSLA").  The WSLA operates to suspend the running of applicable statute of limitations on claims of fraud against the United States during times of war, plus an additional period of years, after which the statute of limitations begins to run again.

Prior to 2008, the WSLA read as follows:  "When the United States is at war the running of any statute of limitations applicable to any offense . . . involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not, . . . shall be suspended until three years after the termination of hostilities as proclaimed by the President or by a concurrent resolution of Congress."  18 U.S.C. § 3287 (2006).

Congress amended the statute on September 30, 2008 to clarify that suspension occurs "[w]hen the United States is at war or Congress has enacted a specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolution (50 U.S.C. 1544(b))."  18 U.S.C. § 3287 (emphasis added).  The amendment also increased the suspension period from "three years" to "5 years" after the termination of hostilities "as proclaimed by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress." *Id.*

Under either the pre- or post-amendment version of the WSLA, the statute of limitations under the False Claims Act has been tolled since September 18, 2001, the date that Congress passed the Authorization for the Use of Military Force ("AUMF") which was the basis for the

---

the relator's conduct; and (2) the government will be able to recover upon the maximum amount of claims within the overall ten-year repose period."  *Id.* at 88.

use of United States armed forces in Afghanistan.  Pub. L. 107-40, 15 Stat. 224 (2001).  That

military action qualifies both as being "at war" under the pre-amendment version of the WSLA

and as a specific authorization by Congress under the post-amendment version of the statute.  *See*

*U.S. ex rel. Carter v. Halliburton*, 710 F.3d 171, 179 (4th Cir. 2013) (applying WSLA to civil

FCA claims in declined qui tam case).[17]

> ### D.    Relators claims for reverse false claims or payments made after June 10, 2004 are timely under the FCA's six-year statute of limitations (3731(b)(1)).

Even if the Court were to find that section 3731(b)(1)'s six-year statute of limitations

applies, the SAC cannot be dismissed because relator has alleged FCA violations committed

after June 10, 2004.

> ### 2.    Relator alleges reverse false claims committed after June 10, 2004.

As detailed in section III below, relator alleges that defendants committed so-called

"reverse false claims" violations by making or "caus[ing] to be made" false statements to avoid

the obligation to repay the fraudulently-obtained sponsorship fees.  *See* 31 U.S.C. § 3729(a)(7),

and as amended by FERA, 31 U.S.C. § 3729(a)(1)(G).  Prior to FERA, in the case of a reverse

false claim, "the false statement itself is the 'violation'" and the statute of limitations therefore

runs from the date of the false statement.  *United States v. VanOosterhout*, 898 F. Supp. 25, 29-

30 (D.D.C. 1995), *aff'd,* 96 F.3d 1491 (D.C. Cir. 1996).[18]

Here, plaintiffs have alleged numerous false statements by defendants after June 10, 2004

which were "intended to avoid Tailwind's obligation to repay the United States the amounts it

had received as a result of its submission of false claims."  U.S. Compl. ¶ 74.  *See, e.g.,* U.S.

---

[17]     Relator has briefed this issue more thoroughly in the context of his opposition to Defendant Lance Armstrong's Motion to Dismiss the United States' Complaint and respectfully incorporates those arguments by reference here.

[18]     After FERA, the FCA also provides liability for any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).  No proof of a false record or statement is required.

Compl. ¶ 64.C.  (June 15, 2004 false statement by Armstrong); ¶ 67.A, C, D & E (January 22, 2005, July 14, 2010, May 19, 2011, June 13, 2012 false statements by Armstrong); ¶ 67 B & F (May 21, 2010 and June 15, 2012 false statements by Bruyneel); ¶ 68.B. (false statements under oath by Armstrong); *see also* SAC ¶¶ 121 & 127-130 (alleging false statements by defendant Armstrong on June 15, 2004, August 25, 2005, and May 2010 and alleging that the statements "were knowingly false . . . and were made . . . to have the USPS not seek repayment of funds previously paid under either sponsorship agreement.").[19]

Relator's allegations of reverse false claims violations based on these and other false statements after June 10, 2004 (and related claims for conspiracy to commit reverse false claims under 31 U.S.C. § 3729(a)(1)(C)) should be held timely even under the six-year statute of limitations and not dismissed.

### 2. Plaintiffs allege that false claims were paid after June 10, 2004.

Dismissal is also precluded because plaintiffs have alleged false claims that were paid after June 10, 2004.  Exhibit 1 to relator's Second Amended Complaint lists four payments totaling approximately $68,000 made on August 11, 2004, October 4, 2004 (two payments), and October 20, 2004.

The CSE Defendants acknowledge these four payments but contend that the statute of limitations runs from the (presumably earlier) date of the associated false claims, and that it is relator's obligation to plead the dates of such claims.  CSE MTD at 16-17.  The statute of limitations, however, is an affirmative defense, and plaintiff's complaint is not required to negative a statute of limitations defense.  *Jones v. Rogers Mem'l Hosp.,* 442 F.2d at 775. Dismissal on statute of limitations grounds is inappropriate unless the complaint is "conclusively time-barred" on its face.  *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996).  Thus, in the context of an FCA case, where it is unclear from the face of the complaint whether or not FCA violations occurred within the statute of limitations, dismissal must be denied.  *See Allen v.*

---

[19]     Moreover, both the United States and relator have indicated that the particular false statements listed are only examples.  *See* U.S. Compl. ¶¶ 64, 67, 68 (describing statements "for example"); SAC ¶ 121 ("false statements include, but are not limited to, the following").  Accordingly, discovery may reveal additional false statements after June 10, 2004.

*Beta Constr.*, 309 F. Supp. 2d 42, 48 (D.D.C. 2004) (in absence of allegations as to when last payment was made on each contract, court could not "comfortably conclude that the claims are time-barred" and thus denied defendants' motion to dismiss).[20]

Plaintiffs' claims based on false claims payments made to defendants after June 10, 2004 are thus independently timely under section 3731(b)(1).

## II.   FERA APPLIES TO RELATOR'S COUNTS FIVE THROUGH EIGHT.

The CSE Defendants assert that Counts Five through Eight of relator's complaint, which allege claims under the FCA as amended by FERA, must be dismissed because "the 2009 FERA amendment to the FCA does not apply to Landis' claims." CSE MTD at 23. This argument must fail.

As an initial matter, the CSE Defendants' argument is based solely on language regarding the FERA amendment's applicability to "claims" pending on or after June 7, 2008. CSE MTD at 23-25. This language, however, relates *only* to amended section 31 U.S.C. § 3729(a)(1)(B). *See* Pub. L. 111-21 at § 4(f)(1), 123 Stat. 1617, 1625 ("*[S]ubparagraph (B) of section 3729(a)(1) shall take effect as if enacted on June 7, 2008*, and apply to all claims under the False Claims Act (31 U.S.C. 3729 et seq.) that are pending on or after that date.") (emphasis added). Accordingly, the CSE Defendants' argument is pertinent only to Count Six of the SAC (under section 3729(a)(1)(B) of FERA), and provides no basis to dismiss Counts Five, Seven, or Eight.

Moreover, even as to section 3729(a)(1)(B), the Court should reject the CSE Defendants' argument. The reason FERA included the reference to the June 7, 2008 date as specifically applicable to section 3729(a)(1)(B) is that Congress was trying to correct and nullify the Supreme Court's "erroneous interpretations" of section 3729(a)(2) in *Allison Engine Co., Inc. v.*

---

[20]     In addition, on a motion to dismiss, all reasonable inferences must be drawn in plaintiff's favor. *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012) ("In reviewing a motion to dismiss, we 'treat the complaint's factual allegations as true . . . and must grant [plaintiffs] the benefit of all inferences that can be derived from the facts alleged.'") (citation omitted). Given that relator has alleged payments in mid-August and October, it is reasonably to infer that claims were submitted after June 10. Similarly, although the CSE Defendants muse out loud that the four payments after June 10 "do not appear to relate to the 2000 Sponsorship Agreement," CSE MTD at 17 n.7, there is no basis for such a conclusion on a motion to dismiss.

*U.S. ex rel. Sanders*, 553 U.S. 662, 665 (2008), which was decided on June 9, 2008.  *See* Senate Report 111-10 at 10-12 (2009).  This case was filed after June 7, 2008, and therefore, per FERA's effective date provision, the amended false statements provision section 3729(a)(1)(B) applies to this case.

The CSE Defendants argue to the contrary, claiming that "the majority of courts" to have considered the issue, as well as district courts in this district, have concluded that "claims" as used in the effective date provision means claims for payment, not claims for relief under the False Claims Act.  CSE MTD at 23-24 (citing *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1327 n.3 (11th Cir. 2009); *United States v. Toyobo Co.*, 811 F. Supp. 2d 37, 49 (D.D.C. 2011); *U.S. ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 195 n.10 (D.D.C. 2011); *U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*, 709 F. Supp. 2d 52, 55 (D.D.C. 2010); *United States v. Sci. Applications Int'l Corp.*, 653 F. Supp. 2d 87, 107 (D.D.C. 2009) *vacated in part on other grounds by* 626 F.3d 1257 (D.C. Cir. 2010)).

In fact, although the D.C. Circuit has not passed on the question,[21] the majority of circuits to consider the question have reached the opposite conclusion to that suggested by the CSE Defendants; that is, they have concluded that the phrase "claims under the False Claims Act" refers to cases or claims for relief and not claims for payment.  *See Sanders v. Allison Engine Co., Inc.*, 703 F.3d 930 (6th Cir. 2012); *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 n.2 (7th Cir. 2011); *U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 113 (2d Cir. 2010), *rev'd and remanded on other grounds*, 131 S. Ct. 1885 (2011); *U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 n.1 (5th Cir. 2010).[22]  Thus, under the majority view,

---

[21]     *See U.S. ex rel. Bender v. N. Am. Telecomms., Inc.*, 499 F. App'x 44, 45 (D.C. Cir. 2013) (as it was unnecessary to address the issue, court did "not reach the question"); *SAIC,* 626 F.3d at 1266.

[22]     In *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 475 n. 4 (5th Cir. 2012), decided after *Steury*, the Fifth Circuit noted that the district court applied the pre-amendment version of § 3729(a)(2), but the court did not express any view on the correctness of that ruling. The court upheld the dismissal on the ground that the relators had not established the defendants used a false record, which was required under both the pre- and post-amendment liability standards.  *Id.* at 476.

section 3729(a)(1)(B) applies to relator's "claims" under the FCA in this case, which was filed after June 7, 2008.

Two circuits have ruled as defendants suggest, but both did so without any significant analysis of the issue.  The Eleventh Circuit cited to the district court decision in *SAIC*.  *See Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1327 n.3 (11th Cir. 2009), *cert. denied*, 130 S. Ct. 3465 (2010).  The Ninth Circuit subsequently cited the Eleventh Circuit's decision in *Hopper* without comment.  *U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1051 n. 1 (9th Cir. 2011).

The Eleventh Circuit's *Hopper* decision and the D.D.C. cases cited by defendant have little analysis of their own but rather rely primarily on the analysis in *United States v. Science Applications Int'l Corp.*, 653 F. Supp. 2d 87, 107 (D.D.C. 2009).  In that case, the meaning of the phrase "claims under the False Claims Act" was raised in the context of SAIC's motion for a new trial or judgment as a matter of law following a jury verdict against SAIC.  *Id.* at 107.  The Government contended that section 3729(a)(1)(B) was intended to apply to pending cases under the False Claims Act, but SAIC argued, *inter alia*, that if section 3729(a)(1)(B) did apply to the case, then constitutional concerns required that SAIC be "'entitled to a new trial in which the evidence and instructions would properly reflect the applicable law.'"  *Id.* (quoting SAIC's brief).  The court subsequently ruled against the Government on the application of section 3729(a)(1)(B), thus making it unnecessary to address the constitutional question raised by SAIC, but still upheld the verdict.  On appeal, the Government maintained that section 3729(a)(1)(B) applied to pending "cases" but advised the Court of Appeal that the issue had "no bearing on the outcome of this case," so the Court of Appeal elected not to address the issue.  *SAIC,* 626 F.3d  at 1266.

Given the unique procedural posture of *SAIC,* and the fact that a majority of circuits have now rejected that court's approach, section 3729(a)(1)(B) should be applied in this case.  Among other reasons, relator's interpretation gives effect to Congress' clear purpose to negate the effects of *Allison Engine's* interpretation of the FCA's false statements provision.  Relator also joins in

29

the arguments of the United States on this issue as set forth in its response to defendant

Armstrong's Motion to Dismiss the United States' Complaint.

## III.   RELATOR HAS STATED A VALID REVERSE FALSE CLAIM BOTH PRE-FERA AND POST-FERA.

The CSE Defendants argue that Count Four of relator's complaint fails to state a "reverse

false claim" under section 3729(a)(7) of the Act (prior to amendment by FERA), MTD at 21-23.

Relator, however, has adequately alleged reverse false claims under both section 3729(a)(7), and

under that section as amended by FERA, 31 U.S.C. § 3729(a)(1)(G).  *See* SAC Counts Four and

Eight.

Prior to FERA, section 3729(a)(7) imposed liability on any person who "knowingly

makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or

decrease an obligation to pay or transmit money or property to the Government."  31 U.S.C.

§ 3729(a)(7).  As amended by FERA, the reverse false claims provision also imposes liability on

any person who "knowingly conceals or knowingly and improperly avoids or decreases an

obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).

FERA also added a definition of the term "obligation," defining it to mean "an established duty,

whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-

licensee relationship, from a fee-based or similar relationship, from statute or regulation, *or from

the retention of any overpayment*."  31 U.S.C. § 3729(b)(3) (emphasis added).

The False Claims Act does not require that the false statements have reduced the CSE

Defendants' own obligation to pay.  Even prior to FERA, the Act provided liability for reducing

"an obligation to pay."  31 U.S.C. § 3729(a)(7*).  See also United States v. Caremark, Inc.*, 634

F.3d 808, 817 (5th Cir. 2011) ("The statute does not require that the statement impair the

defendant's obligation; instead, it requires that the statement impair 'an obligation to pay or

transmit money or property to the Government.'").  Likewise, both pre and post FERA the FCA

imposes reverse false claims liability not just on those who actually make false statements to

avoid obligations, but also on those who "cause" such false statements to be made.  31 U.S.C.

§ 3729(a)(7), as amended § 3729(a)(1)(G).  The Second Amended Complaint alleges that the CSE Defendants represented Lance Armstrong for many years and "were aware of and concealed the doping scheme on the USPS Team," and it alleges that CSE participated in the fraud "with the consent participation and approval of Stapleton and Knaggs," that all three defendants acted with the purpose of "not having to return funds paid by the USPS," and that they "knew the funds being paid to Tailwind and CSE should . . . be returned to the USPS" but failed to do so.  SAC ¶¶ 207, 209, 236.  Accordingly, the Second Amended Complaint adequately alleges that the CSE Defendants "caused" reverse false claims, including those based on false statements by defendant Armstrong.

The CSE Defendants contend that relator "alleges no fact or contractual provision establishing" an obligation to return funds to the United States.  MTD at 23.  In fact, plaintiffs have alleged that Tailwind had a contractual obligation to indemnify the U.S. Postal Service in the event of damages arising from material misrepresentations.[23]  Plaintiffs have further alleged that the CSE Defendants "concealed the doping scheme on the USPS Team," SAC ¶ 236, and caused false statements to be made by representatives of Tailwind, which had the effect of avoiding the company's responsibility to indemnify the U.S. Postal Service or repay sponsorship funds which should not have been paid.  *See, e.g.,*  SAC ¶¶ 57-59, 121-130, 207, 236, 276; U.S. Compl. ¶¶ 63, 64, 67, 72.

These include false statements made after May 20, 2009, the effective date of FERA's amendments to the reverse false claims provision.  Pub. L. 111-21 at § 4(f), 123 Stat. 1617, 1625. *See, e.g.,* SAC ¶¶ 121 & 129-30 (alleging false statements by defendant Armstrong including

---

[23]     The Complaint alleges that Tailwind's contracts with the Postal Service contained, *inter alia*, an indemnification clause, pursuant to which Tailwind agreed to "indemnify, defend and hold the Sponsor . . . harmless from and against any and all expenses, damages, claims, suits, losses, action, judgments, liabilities and costs whatsoever (including, without limitation, attorneys' fees) arising out of:  (i) the Company's breach, misrepresentation or nonperformance under this Agreement.  *See* 1995 Sponsorship Agreement, SAC ¶ 37; Sacks Decl. Ex. 2 ¶ 5(referencing indemnification obligation in sponsorship agreement); 2000 Sponsorship Agreement, Sacks Decl. Ex. 4 ¶ 4 (same).  Both agreements also gave the Postal Service the ability to collect its damages from Tailwind in the event of specific forms of default such as misrepresentation or doping violations.  *See id.*

statement in May 2010 and alleging that representations by Armstrong and Tailwind officials "were knowingly false . . . and were made . . . to have the USPS not seek repayment of funds previously paid under either sponsorship agreement."); U.S. Compl. ¶ 67.C, D & E (July 14, 2010, May 19, 2011, June 13, 2012 false statements by Armstrong); ¶ 67 B & F (May 21, 2010 and June 15, 2012 false statements by Bruyneel).[24]

The Senate Judiciary Report on FERA referenced "confusion among the courts" with respect to the term "obligation" and explained that the FCA therefore needed to be "corrected and clarified." *Id*. at 4, 14. "Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380-81 (1969). Accordingly, based on Congress' express clarification of the term "obligation" in the FCA, this Court should interpret the term "obligation" under the pre-FERA False Claims Act to include a duty to pay, the amount of which did not have to be fixed at the time of the relevant false statements. S*ee also McCreary v. Offner*, 172 F.3d 76, 82 (D.C. Cir. 1999) ("Although post-enactment legislative history may or may not be a valid tool for ascertaining congressional intent . . . , our task here is not to divine conclusively the meaning of [the code] section . . . , but rather to determine whether it is reasonably susceptible to more than one meaning. With respect to this question, post-enactment legislative commentary offering a plausible interpretation is certainly relevant, much like plausible interpretations from litigants, other courts, law review articles, or any other source would be") (internal citation omitted).[25]

Even if the Court were to find that plaintiffs' "reverse false claims" counts were not actionable under section 3729(a)(7) (the pre-FERA version of the provision), plaintiffs at a minimum have adequately alleged reverse false claim violations occurring after May 20, 2009, the effective date of FERA, which would be actionable under the provision as amended, 31

---

[24]    Moreover, both the United States and relator have indicated that the particular false statements listed are only examples. *See* U.S. Compl. ¶¶ 64, 67, 68 (describing statements "for example"); SAC ¶ 121 ("false statements include, but are not limited to, the following"). Accordingly, discovery may reveal additional false statements after May 20, 2009.
[25]    Relator also joins in the argument of the United States on this issue, and, for purposes of judicial economy, has not repeated those arguments in full here.

U.S.C. § 3729(a)(1)(G).[26]  Accordingly, the CSE Defendants' motion to dismiss plaintiffs'

reverse false claims cause of action must be denied.


Dated:  September 23, 2013

_____/s/_____
Paul D. Scott
pdscott@lopds.com
California State Bar No. 145975
Admitted *Pro Hac Vice*
_____/s/_____
Lani Anne Remick
laremick@lopds.com
California State Bar No. 189889
U.S.D.C. No. PA0045
Jon L. Praed
U.S.D.C. No. 450764
D.C. Bar No. 51665
LAW OFFICES OF PAUL D. SCOTT, P.C.
Pier 9, Suite 100
San Francisco, California 94111
Tel: (415) 981-1212
Fax: (415) 981-1215

Attorneys for Relator Floyd Landis

---

[26]     Likewise relator has also stated a post-FERA claim for conspiracy to submit reverse false claims based on conduct occurring after May 20, 2009.  31 U.S.C. § 3729(a)(1)(C); SAC, Count Seven.