**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **FLOYD LANDIS,**<br><br>Plaintiffs,<br><br>v.<br><br>**TAILWIND SPORTS CORPORATION,** *et al.*,<br><br>Defendants. | Civil Action No. 10-cv-00976 (RLW) |

## <u>MEMORANDUM OPINION</u>

This is a civil action brought by the United States ("the government") and relator Floyd

Landis under the False Claims Act ("FCA") against Lance Armstrong and several other

defendants to recover damages and penalties because of alleged fraudulent claims and statements

made by the defendants in connection with two sponsorship agreements between the United

States Postal Service ("USPS" or "Postal Service") and the companies that owned and managed

the professional cycling team on which Lance Armstrong was the lead rider.  Both the

government and the relator assert claims against Defendants Lance Armstrong, Johan Bruyneel,

Tailwind Sports Corporation ("TS Corp") and Tailwind Sports, LLC ("TS LLC") (collectively,

the "intervened defendants").  The relator also asserts claims against Defendants Thomas W.

Weisel, Capital Sports and Entertainment Holdings, Inc. ("CSE"), William J. Stapleton, Barton

B. Knaggs, Ross Investments, Inc. ("Ross Investments"), and Montgomery Sports, Inc.

("Montgomery Sports") (collectively, the "non-intervened defendants").

Pending before the Court are motions to dismiss by each defendant.  For the reasons set forth below, the Court grants in part and denies in part the defendants' motions to dismiss.

## I.   BACKGROUND[1]

From 1995 to 2004, the USPS sponsored a professional cycling team owned by Montgomery Sports and its successor, TS LLC.  United States' Compl. ("Gov't Compl.") ¶ 2; Relator's Second Am. Compl. ("Relator SAC") ¶¶ 6, 7, 22–23.[2]  The team was called the USPS cycling team, and Lance Armstrong was the lead rider of the team from 1999 to 2004.  Gov't Compl. ¶¶ 2, 10; Relator SAC ¶¶ 6, 7, 22–23.  Relator Floyd Landis also was a member of this cycling team from 2002 to 2004.  Gov't Compl. ¶ 7; Relator SAC ¶¶ 5, 80.  The cycling team, which was managed by Defendant Johan Bruyneel from approximately 1998 to 2004, Gov't Compl. ¶ 2; Relator SAC ¶ 13, achieved great success.  Most notably, Mr. Armstrong won the Tour de France every year from 1999 to 2004, Relator SAC ¶ 110, and the Tour de France is widely considered professional cycling's most prestigious race.  Pursuant to two agreements—in 1995 and in 2000—the USPS paid Montgomery Sports and its successor companies approximately $42 million for sponsorships.  Gov't Compl. ¶ 26; Relator SAC ¶ 208.  The plaintiffs contend that the defendants breached these agreements and submitted false claims for payment pursuant to these agreements.

---

[1] When ruling on a motion to dismiss, this Court must treat the allegations in the complaint as true. *English v. Dist. of Columbia*, 717 F.3d 968, 971 (D.C. Cir. 2013).

[2] TS LLC has conducted business under the names Disson Furst and Partners, LLC, Disson Furst & Partners, LLC, DFP Cycling, LLC, and Tailwind Cycling, LLC.  Gov't Compl. ¶ 8; Relator SAC ¶ 7.

## A.     The 1995 Sponsorship Agreement[3]

In 1995, the USPS entered into an agreement with Montgomery Sports and, under this agreement, the USPS agreed to pay Montgomery Sports "in exchange for certain promotional rights, including the prominent placement of the USPS logo on the cycling team's uniform and the provision of hospitality services in connection with team events."  Gov't Compl. ¶ 15; Relator SAC ¶¶ 23–24.  This agreement expired on December 31, 1996, but was "subject to automatic renewal on a year-to-year basis unless the Postal Service elected not to renew."  Gov't Compl. ¶ 15; Relator SAC ¶¶ 23–24.  The USPS allowed the agreement to renew each year through 2000.  Gov't Compl. ¶ 15; Relator SAC ¶ 29.  The agreement required the USPS to pay Montgomery Sports "a net sponsorship fee of $1 million in 1996, $1.5 million in 1997, and $2 million in 1998."  Relator SAC ¶ 24.  The parties made additional financial modifications to the agreement in subsequent years, and by the end of the first sponsorship agreement in 2000, the USPS had paid approximately $11 million to Montgomery Sports and its successor companies. Relator SAC ¶ 35.

Under the terms of the 1995 agreement,

> [t]he performance of the obligations of the parties under this Agreement shall at all times and in all events be subject to "compliance with all applicable rules of the *Union Cycliste Internationale* [UCI], the *Federation Internationale du Cyclisme Professional* [FICP]; the United States Professional Cycling Federation, Inc. [USPCF], the International Olympic Committee [IOC], the United States Olympic Committee [USOC], the International Amateur Cycling Federation [IACF], the United States Cycling Federation [USCF] and all other governing organizations."

1995 Agreement ¶ 13.[4]

---

[3] See Attachment A to Defendant Armstrong's Motion to Dismiss the United States' Complaint (Dkt. No. 93-1) for a copy of the 1995 Sponsorship Agreement.

Throughout the duration of both sponsorship agreements, the UCI and IOC prohibited "the use of certain performance enhancing drugs and prohibited other practices known to enhance rider performance."  Gov't Compl. ¶ 17; Relator SAC ¶ 36.

**B.      The 2000 Sponsorship Agreement[5]**

In December 2000, the USPS and TS LLC (then known as DFP Cycling) entered into a four-year sponsorship agreement, which commenced on January 1, 2001 and continued through December 31, 2004, unless terminated earlier by the parties.  Gov't Compl. ¶ 18; Relator SAC ¶ 29.  Prior to entering into the 2000 sponsorship agreement, in November 2000 "various media outlets reported that French authorities had begun an investigation into allegations that Armstrong and the USPS cycling team used banned substances in winning [that year's] Tour de France."  Gov't Compl. ¶ 19.

Despite the defendants' "vehement[ ] deni[al] [of] the allegations," the USPS was "concerned" about the allegations and "consequently inserted into the [2000] sponsorship agreement several additional provisions relating to the use of banned substances and methods."  Gov't Compl. ¶ 19.  Specifically, the following clauses were included in the 2000 agreement as events of default: "The Company fails to take immediate action without notification by the Sponsor in a case of a rider or Team offense related to a morals or drug clause violation"; and/or "[t]here is negative publicity associated with an individual rider or team support personnel, either permanent or temporary, due to misconduct such as, but not limited to, failed drug or medical

---

[4]  When the complaint explicitly references and relies upon a document, that document can be treated as incorporated into the complaint for purposes of a motion to dismiss.  *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).
[5] See Attachment B to Defendant Armstrong's Motion to Dismiss the United States' Complaint (Dkt. No. 93-2) for a copy of the 2000 Sponsorship Agreement.

tests, alleged possession, use or sale of banned substances, or conviction of a crime." 2000

Agreement ¶ 8(a).  The 2000 agreement also included a clause stating:

> The Company represents that each rider on the Team has a morals and drug clause
> that allows the Company to suspend or terminate the rider for cause which shall
> include items such as (1) conviction of a felony; (2) acts that require the Team to
> suspend or terminate a rider under the applicable rules of the [UCI, FICP, USPCF,
> IOC, IACF, and USCF] and all other applicable governing organizations; (3)
> failure to pass drug or medical tests; (4) inappropriate drug conduct prejudicial to
> the Team, or the Postal Service, which is in violation of Team rules or commonly
> accepted standards of morality; and (5) gross neglect of the rider's duty. If any
> rider on the Team is found guilty of such offense, the Company agrees to take
> appropriate action within thirty (30) days.

2000 Agreement ¶ 9(a).  The 2000 sponsorship agreement also retained the requirement from the

1995 agreement that "the team adhere to the rules of the UCI, IOC, and the other bodies that

govern international cycling."  2000 Agreement ¶ 12.

The USPS's payments to TS LLC increased significantly under the 2000 agreement, by

more than $20 million.  The 2000 agreement required the USPS to pay TS LLC approximately

$31 million over its four-year term.  Gov't Compl. ¶ 25; Relator SAC ¶¶ 30, 33.  The USPS

ended its sponsorship of the cycling team by not renewing the 2000 sponsorship agreement

beyond the December 31, 2004 termination date.  Gov't Compl. ¶ 18; Relator SAC ¶¶ 29, 32.

### C.  Performance Enhancing Drugs and Blood Doping

The plaintiffs allege that members of the cycling team, including Defendant Armstrong

and the relator, used performance enhancing drugs and techniques that were banned by the

governing cycling organizations.  These performance enhancing drugs and techniques included

"blood doping," as well as using human growth hormones ("HGH"), anabolic steroids, and

corticosteroids.

Blood doping refers to extracting one's own blood, storing the blood for a certain period of time until the red blood cell count has been restored, and then re-injecting the blood back into the body just before or during competition. Gov't Compl. ¶ 28E; Relator SAC ¶ 61. This artificial means of increasing one's red blood cell count increases the oxygen carrying capacity of an individual's blood and thus enhances his endurance. Gov't Compl. ¶ 28E; Relator SAC ¶ 61. Blood doping may also involve the use of Erythropoietin ("EPO"). Gov't Compl. ¶ 28A; Relator SAC ¶ 61–62. EPO is a hormone that stimulates the production of red blood cells in the human body. Gov't Compl. ¶ 28E; Relator SAC ¶¶ 61–62. Although EPO is a naturally occurring hormone that is produced by the kidneys, it can also be produced in a lab and later ingested. Relator SAC ¶¶ 61–62.

### D. Allegations of the Use of Banned Performance Enhancing Drugs and Blood Doping

The plaintiffs' complaints include numerous allegations of specific instances of doping[6] by Defendant Armstrong and other members of the cycling team. Plaintiffs allege further that Defendant Bruyneel (the team's manager) and the non-intervened defendants either directly facilitated the doping by members of the cycling team, or at the very least knew or should have known of the doping.

#### 1. Allegations Against Intervened Defendants[7]

Plaintiffs allege that Defendant Armstrong doped throughout his tenure on the cycling team, including doping in connection with each Tour de France from 1999 through 2005. Gov't Compl. ¶ 35; Relator SAC ¶¶ 84–112. Specifically, for example, during the 1998 Vuelta a

---

[6] The term "doping" will be used to refer generally to any use of banned substances and techniques to enhance athletic performance.

[7] The intervened defendants are Lance Armstrong, Johan Bruyneel, TS Corp, and TS LLC.

Espana race, Mr. Armstrong injected himself with EPO.  Gov't Compl. ¶ 37.  In May 1999, Mr.

Armstrong gave EPO he had stored in his home to another rider on the team.  Gov't Compl. ¶ 38.

Later, during the 1999 Tour de France, Mr. Armstrong and other riders of the team "arrange[d]

for an associate to follow the team on a motorcycle that contained their supply of EPO," and

from "time to time throughout that year's Tour, the associate would deliver" the EPO to team

personnel who would provide it to Mr. Armstrong and other riders.  Gov't Compl. ¶ 40.

Further, with the assistance and advice of sports doctor Michele Ferrari, members of the team

often used a "mixture that consisted of testosterone dissolved in olive oil"—which some team

members referred to as "the oil"—and Mr. Armstrong provided the oil to another member of the

team in connection with the 1999 Tour de France.  Gov't Compl. ¶ 41.

The following year, several weeks prior to the 2000 Tour de France, Mr. Armstrong and

some other riders on the team traveled to Valencia, Spain to "have blood extracted for the

purpose of having it transfused back into their bodies during the 2000 Tour de France."  Gov't

Compl. ¶ 44.  In 2002, Mr. Landis traveled with Mr. Armstrong to Mr. Armstrong's apartment in

St. Moritz, Switzerland, and upon arriving at his apartment, he gave Mr. Landis a 2.5 ml package

of testosterone patches.  Gov't Compl. ¶ 50; Relator SAC ¶ 84.  About one week later,

Mr. Landis met with Dr. Ferrari at Mr. Armstrong's apartment, at which time Dr. Ferrari

extracted blood from Mr. Landis for later reinjection during that year's Tour de France.  Gov't

Compl. ¶ 51; Relator SAC ¶¶ 85–86, 88.

In or around May 2003, Mr. Landis traveled to Mr. Armstrong's apartment in Gerona,

Spain, where Dr. Ferrari extracted "half a liter of blood and placed it in a refrigerator hidden in

the closet of the master bedroom" that also contained "several other bags of blood."  Relator

SAC ¶ 92.  Shortly thereafter, because Mr. Armstrong was going to leave his apartment for a few

weeks to train, he asked Mr. Landis to stay at the apartment to "check the temperature of the blood each day and make sure there were no problems with the electricity or the refrigerator," which Mr. Landis agreed to do.  Relator SAC ¶ 93.  Later during that year's Tour de France, Mr. Landis received transfusions of previously extracted blood and witnessed other members of the team receiving transfusions.  Relator SAC ¶¶ 96–99.

Prior to the 2004 Tour de France, Mr. Armstrong had his blood extracted by Dr. Dag Van Eslande in a hotel in Kortrijk, Belgium for later reinjection during that year's Tour de France.  Gov't Compl. ¶ 59; Relator SAC ¶ 106.  And on different occasions during the 2004 Tour de France, Mr. Armstrong and Mr. Landis received blood transfusions together.  Gov't Compl. ¶ 60; Relator SAC ¶¶ 108–09.

Plaintiffs also allege that Defendant Bruyneel, the *directeur sportif* (i.e., manager) of the cycling team from approximately 1998 to 2004, was knowledgeable of the team's doping and facilitated the doping.  Gov't Compl. ¶ 36; Relator SAC ¶ 81.  For example, on one occasion in 1999, Mr. Bruyneel provided HGH directly to a rider on the team.  Gov't Compl. ¶ 39.  Also, during the 2000 Tour de France at a hotel near Mont Ventoux, France, Mr. Bruyneel witnessed Mr. Armstrong and other riders having refrigerated blood reinjected into their bodies.  Gov't Compl. ¶ 45.  And it was Mr. Bruyneel that instructed Mr. Landis to travel with Mr. Armstrong to Armstrong's apartment in St. Moritz, Switzerland to obtain the 2.5 ml package of testosterone patches.  Gov't Compl. ¶¶ 49–50; Relator SAC ¶¶ 82–83.  Specifically, Mr. Bruyneel told Mr. Landis that the testosterone patches "should be worn two out of three days after hard training for eight to ten hours at night, which would be relatively free of risk of detection."  Relator SAC ¶ 83.

Later, around May or June of 2003, Mr. Bruyneel instructed Mr. Landis to go to Mr. Armstrong's apartment in Girona, Spain to have a half-liter his blood extracted by Dr. Ferrari. Gov't Compl. ¶ 55. Then, a few months after the 2003 Tour de France, Mr. Bruyneel asked Mr. Landis to ride in the Vuelta a Espana cycle race in September 2003; and, in preparation for the race, he asked Mr. Landis to have his blood drawn so that it could be reinjected during the race. Relator SAC ¶ 100. Mr. Landis agreed to do so. *Id.* And in 2004, team personnel "performed two separate blood extractions and two transfusions on Mr. Landis under the direction of defendant Bruyneel." Relator SAC ¶ 105.

### 2. Allegations Against Non-Intervened Defendants[8]

In addition to the intervened defendants (Lance Armstrong, Johan Bruyneel, TS Corp, and TS LLC), the relator separately raises allegations against Thomas W. Weisel, William J. Stapleton, Barton B. Knaggs, and certain companies that these individuals either owned, managed, or worked for as high-level officers.

During the time period relevant to the relator's complaint, Defendants Stapleton and Knaggs "owned and controlled, directly or indirectly" Capital Sports and Entertainment Holdings, Inc. ("CSE"). Relator SAC ¶ 11. And around May 2004, CSE became a part owner of TS LLC and TS Corp with "approximately a 12 percent stake in the company." *Id.* Relator alleges that around October 2002, he met with Mr. Stapleton at his office near the Four Seasons hotel in Austin, Texas to "discuss a renewal of his contract for the next two years." *Id.* ¶ 90. During this meeting, "Mr. Stapleton specifically referenced the fact that he was aware of the

---

[8] The non-intervened defendants are Thomas W. Weisel, CSE, William J. Stapleton, Barton B. Knaggs, Ross Investments, and Montgomery Sports.

extent to which Mr. Landis had been doping, and commented on the fact that the Team could

help him with further doping to help improve his performance further." *Id.*

With respect to Mr. Knaggs, the relator alleges that around April 2004, after the Paris-

Roubaix race, the relator, Mr. Knaggs, Geert Dueffler[9] (Mr. Bruyneel's assistant), and others had

dinner at a restaurant in France. *Id.* ¶ 113. During dinner, "Mr. Landis expressed concern about

a shortage of equipment that was resulting from team management selling the bikes that were

being provided by sponsors for the riders." *Id.* A "heated" conversation ensued, during which

"Mr. Landis commented to the effect that, while Mr. Armstrong was flying around in his own jet,

the other riders should not be facing problems just obtaining the proper bike." *Id.* Responding to

Mr. Landis' complaint, Mr. Dueffler "explained that the team management needed to sell bikes

to finance the doping program, as they needed cash for the doping program, and the team could

not just list doping as a cost item on standard expense reports." Relator SAC ¶ 114. Relator

alleges that Mr. Knaggs was present during the conversation and "indicated his agreement with

what was being expressed by Mr. [Dueffler]." *Id.* ¶ 115. Further, "to defuse the situation,

Mr. Knaggs thereafter indicated that he would talk to defendant Bill Stapleton about the situation

and try to get a replacement bike for Mr. Landis." *Id.* ¶ 115.

Mr. Weisel, a former cyclist, was a "founder of both [TS LLC and TS Corp,] chairman of

the board, and the largest shareholder," as well as the President of its predecessor, Montgomery

Sports. *Id.* ¶¶ 10, 131–32. Mr. Weisel also owned defendant Ross Investments during the period

relevant to the relator's complaint. *Id.* ¶ 16. Relator alleges that Mr. Weisel was aware of the

doping allegations against Mr. Armstrong, but failed to "take concrete steps to investigate and

---

[9] His last name is spelled both as "Dueffler" and "Duffeleer." *Compare* Relator SAC ¶ 113, *with* Relator SAC ¶¶ 114–15. For consistency, the Court will use the spelling "Dueffler."

prevent any doping by the USPS Team consistent with the team's obligations under its contract with the Postal Service."  *Id.* ¶ 149.

### E.  Denials of the Use of Performance Enhancing Drugs

The plaintiffs' complaints include repeated instances of Mr. Armstrong, Mr. Bruyneel, and other members of the cycling team publicly and privately denying any use or involvement in doping.  Gov't Compl. ¶¶ 62–73; Relator SAC ¶¶ 121–30.  Defendant Armstrong was never caught doping, and he never failed any drug tests.  Gov't Compl. ¶ 67D; Relator SAC ¶ 149.  But in January 2013, during an interview with Oprah Winfrey, Defendant Armstrong admitted that he used banned substances and methods, starting in the mid-1990s up until his retirement in 2005.  Gov't's Compl. ¶ 61; Relator SAC ¶ 225.  In particular, he admitted having engaged in banned practices during each of the seven Tour de France races in which he competed from 1999 to 2005, including the six in which he competed and won as a USPS rider.  Gov't Compl. ¶ 61; Relator SAC ¶ 225.

### F.       FCA and Common Law Claims

On June 10, 2010, the relator filed his initial complaint, alleging violations of the FCA on behalf of himself and the United States Government pursuant to the *qui tam* provisions of the FCA, 31 U.S.C. § 3730(b)(1).  Relator amended his complaint on December 23, 2010, and again on February 22, 2013.  Dkt. Nos. 10, 42.  After completing its preliminary investigation, the government filed its complaint on April 23, 2013, intervening against Defendants Lance Armstrong, Johan Bruyneel, TS Corp and TS LLC.  Dkt. No. 44.

The crux of the relator and government complaints is that the cycling team's doping and use of banned enhanced performance techniques breached the terms of two the sponsorship agreements.  They contend that the defendants defrauded the government by either encouraging,

allowing or participating in the doping, making false statements about the doping, failing to inform the USPS of the doping, and/or continuing to collect payments under the sponsorship agreement even while knowing of the breaches of contract.

The plaintiffs' complaints include four Counts under the FCA: (1) Presentation of False Claims; (2) Presentation of False Records or Statements; (3) Conspiracy to Present False Claims, Records, or Statements; and (4) "Reverse" False Claims.  Gov't Compl. ¶¶ 74–85; Relator SAC ¶¶ 239–277.  The claims asserted by the plaintiffs are brought under the versions of the FCA prior and subsequent to the May 2009 Fraud Enforcement and Recovery Act ("FERA") amendments, Pub. L. No. 111-21, 123 Stat. 1617 (2009).  The government additionally asserts common law fraud claims against each intervened defendant, breach of contract against TS LLC and its predecessors, and an unjust enrichment claim against Defendants Armstrong and Bruyneel.  Gov't Compl. ¶¶ 86–93.

## II.   LEGAL ANALYSIS OF JURISDICTIONAL AND PROCEDURAL ARGUMENTS

All of the defendants raise several jurisdictional and procedural challenges to the plaintiffs' actions.  In addition, Defendants Stapleton, Knaggs, and CSE ask that the court take judicial notice of certain allegations in the government's complaint against TS Corp, TS LLC, Lance Armstrong, and Johan Bruyneel.  Finally, the relator objects to extrinsic evidence found in the Motion to Dismiss and supporting exhibits filed by Defendants Wiesel and Ross Investments.  The Court will separately address each issue.

### A.      Request for Judicial Notice of the Government's Complaint

As part of their motion to dismiss the relator's second amended complaint, Defendants Stapleton, Knaggs, and CSE ask that the court take judicial notice of the government's complaint

against Defendants TS Corp, TS LLC, Lance Armstrong, and Johan Bruyneel.  CSE Request for Judicial Notice in Support of Mot. to Dismiss. Relator's SAC at 1-2 (Dkt. No. 94 at ECF p. 36.)

Under Federal Rule of Evidence 201(b), courts may judicially notice facts that are not subject to reasonable dispute, and under subsection (c)(2), courts "must take judicial notice [of such facts] if a party requests it and the court is supplied with the necessary information."  FED. R. EVID. 201(b), (c)(2).  The government's complaint is part of the public record, and therefore the Court may judicially notice the undisputed factual allegations in the government's complaint. *See Covad Comc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005) (holding that courts may take " 'judicial notice of facts on the public record' ") (citing *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1228 (D.C. Cir. 1993)).  The defendants' request is granted.

### B.      Relator's Objection to Extrinsic Evidence

Relator objects to several statements and supporting exhibits found in a declaration by Robert Sacks that was filed by Defendants Weisel and Ross Investments.   *See* Relator's Objection to Extrinsic Evidence in the Mot. to Dismiss by Thomas Weisel and Ross Investments and in the Decl. of Robert A. Sacks in Supp. Thereof ("Relator's Obj.") at 2–5 (Dkt. No. 107–1). These statements and exhibits primarily concern the relator's doping, Mr. Weisel and his business affairs, and the government's investigation prior to filing its complaint. *See id.*  The relator first challenges this information as extrinsic evidence because it was not referenced in his complaint.  *See id.*  Next, the relator points out that some of these statements come from press releases, though the sources of other statements have not been cited.  The relator argues that the Court is not authorized to take judicial notice of information from sources such as press releases, but in any event he asserts that the defendants have not requested that the Court take judicial

notice.  *See id.*  Accordingly, pursuant to Federal Rule of Civil Procedure ("FRCP") 12(d), the relator asks the Court to exclude this information.  Alternatively, if the Court is inclined to consider this information, the relator argues that the defendants' motion to dismiss should be converted to a motion for summary judgment, and the relator requests an opportunity for discovery pursuant to FRCP 56(d).  *See id.* at 2.

Defendants respond that "[m]uch of the information is readily verifiable," but note that the "information also is far from essential to the motion."  Weisel and Ross Investments' Reply to Realtor's Opp'n ("Weisel Reply") at 5 n.4.  Defendants state that the Court can "exercise its discretion not to consider it, and need not convert the motion to dismiss into a motion for summary judgment."  *Id.* (citing *Feld Entm't Inc.* v. *Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 323 (D.D.C. 2012)).

The challenged information constitutes extrinsic evidence, and the defendants have not requested that the Court take judicial notice of such information. Furthermore, the defendants do not wish for their motions to be converted to motions for summary judgment.  Therefore, the Court will not consider this extrinsic information.

## C.   Relator Standing & Undue Burden

Defendants make two challenges to the relator's participation in this litigation.  First, Defendants argue that the government's intervention has stripped the relator of his Article III standing.  This argument, however, is not consistent with the text of the FCA, which makes clear that relator continues to have standing after the government intervenes.

The FCA states that "[a] person may bring a civil action for a violation of section 3729 for the person and for the United States government."  31 U.S.C. § 3730(b)(1).  Thus, the statute explicitly gives a person—i.e., a relator—a right to proceed as a real party in interest.  Nothing in

the text of section 3730 indicates that a relator no longer has standing following intervention by the Attorney General.  To the contrary, section 3730(c)(1) states: "If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action. Such person *shall have the right to continue as a party to the action* …."  31 U.S.C. 3730(c)(1) (emphasis added).  Indeed, after surveying this statutory landscape, the D.C Circuit stated (albeit in dictum) that "[t]he relator appears to remain a party whether or not the United States intervenes." *United States ex rel. Long v. SCS Business & Technical Institute, Inc.*, 173 F.3d 870, 885 (D.C. Cir. 1999).  Even if all of this were not sufficient, concluding that the relator continues to have standing even after the United States intervenes is consistent with the Supreme Court's observation that "the statute [section 3730(b)] gives the relator *himself* an interest in the lawsuit, and not merely the right to retain a fee out of the recovery."  *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 772 (2000) (emphasis added, other emphasis omitted).  *Accord, Long*, 173 F.3d at 884-85 (noting that the FCA gives the relator a "right" to enforce to statute).  In sum, there is no merit in this contention of the Defendants.[10]

---

[10] In addition, the statute provides that if the government demonstrates that "unrestricted *participation during the course of the litigation by the person initiating the action* would interfere with or unduly delay the Government's prosecution of the case," the court has the discretion to "impose limitations on the person's participation," including limiting the number of witnesses a relator may call, limiting the length of a witnesses' testimony, and so forth.  31 U.S.C. 3730(c)(2)(C)(i)–(iv) (emphasis added).  These provisions make sense only if the government and a relator can simultaneously prosecute an FCA action.  Thus, adopting the defendants' position would be contrary to the fundamental tenet of statutory interpretation that meaning should be given to all provisions in a statute, where possible, and the statute should be read as a whole.  *See, e.g.*, *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000); *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1093 (D.C. Cir. 1996).

Defendants next assert that the relator's "unrestricted participation during the course of the litigation . . . would cause the defendant undue burden or unnecessary expense." Armstrong Mot. to Dismiss Relator SAC at 5 (Dkt. No. 92) (quoting 31 U.S.C. § 3730(c)(2)(D)). Thus, argue Defendants, as provided for in the FCA the Court should "limit the participation by the [relator] in th[is] litigation." *Id.* (citing 31 U.S.C. § 3730(c)(2)(D)).

This argument is unpersuasive. Because the FCA permits the government and a relator to simultaneously prosecute the action, there is no presumption under the statute against allowing both complaints to proceed. Instead, the Court must give meaning to the adjectives "undue" and "unnecessary," as they modify "burden" and "expense." And here, the similarity of the legal theories advanced by the government and the relator—as well as the similarity of the underlying factual allegations—alleviates the potential burden caused by the relator's continued prosecution of this action.[11] Perhaps as the parties delve deeper into discovery or reach trial the defendants may be able to make the required showing under section 3730(c)(2)(D), but at the present stage of this litigation, the defendants cannot show an "undue" burden or an "unnecessary" expense.

### D.   Jurisdiction over the Tailwind Defendants

#### 1.   Dissolution & Timeliness

TS LLC and TS Corp (or "Tailwind defendants") argue that they cannot be sued because they no longer exist. Tailwind Mot. to Dismiss the United States' Compl. and Relator's SAC ("Tailwind Mot. to Dismiss") at 4–9 (Dkt. No. 91).

##### a.   TS LLC

---

[11] As Magistrate Judge Facciola once observed: "I do not see what practical difference dismissing relator's complaint makes. Answering the same allegations in both complaints is hardly burdensome; a legal secretary can do that in a few moments. Insofar as the relator's claims and allegations are identical to the government's, they can be met with the same proof." *Miller v. Holzmann*, No. 95-1231, 2006 WL 3196433, at *2 (D.D.C. Oct. 31, 2006).

With respect to TS LLC, the Tailwind defendants state that it "merged with and into

Tailwind Sports Corporation on July 16, 2002," pursuant to 8 Del. C. § 259(a), and therefore

ceased to exist on that date.  Tailwind Mot. to Dismiss at 5.  The plaintiffs agree that TS LLC

can be dismissed from this matter if the Tailwind defendants concede that TS Corp assumed TS

LLC's liabilities.[12]  The Court finds that the Tailwind defendants have effectively conceded that

TS LLC can be dismissed with prejudice from this action because TS Corp absorbed all of TS

LLC's rights and liabilities.[13]  Consistent with the parties' representations, the Court dismisses

with prejudice all claims against TS LLC.

### b.  TS Corp.

With respect to TS Corp., the Tailwind defendants raise timeliness defenses against the

complaints filed by both the relator and the government.  As to the relator's complaint, the

Tailwind defendants argue that they did not have timely notice of his complaint, as required by

state law.  The Tailwind defendants note that TS Corp. dissolved on December 31, 2007.  *Id.*

Pursuant to Delaware's corporate winding-up statute, they contend that TS Corp. "permanently

ceased to exist for any purpose three years later," on December 31, 2010.  *Id.* at 5 (citing 8 Del.

C. § 278).  The Tailwind defendants recognize that the relator filed his initial complaint on June

---

[12] Gov't Opp. to Tailwind Mot. to Dismiss at 7 ("In light of, and contingent upon, TS Corp.'s concession that it absorbed all rights and liabilities of TS LLC, the United States agrees that TS LLC can be dismissed from this action. TS LLC's conduct remains relevant to this action, however, because that conduct is now imputed to its successor, TS Corp., due to the merger in July 2002."); Relator Opp. to Tailwind Mot. to Dismiss at 4 ("Accordingly, if the Court concludes that Tailwind Sports Corporation is the successor in liability to Tailwind Sports, LLC by reason of the merger, and the United States consents to the dismissal of Tailwind Sports, LLC, relator also consents to the dismissal.").

[13] Tailwind Reply to Motion to United States' and Relator's Opposition ("Tailwind Reply") at 2 (Dkt No. 128) ("Because Tailwind Sports, LLC [TS LLC] ceased to exist upon its merger with Tailwind Sports Corp. and plaintiffs concede that dismissal is appropriate on this basis, the Court should dismiss all claims against Tailwind Sports, LLC [TS LLC] with prejudice.").

10, 2010—before the three-year winding-up period ended on December 31, 2010—but they argue that the relator's lawsuit did not commence until they were served, which occurred, if at all, "approximately three years later." *Id.* at 4. Though acknowledging that "an action is often said to have 'begun' on the date it is filed," the Tailwind defendants claim that Delaware's winding-up statute requires that the "defendant receives relatively prompt notice of the claims, or at least the basic allegations, advanced against it." *Id.* at 7 (citing *Russell v. Olmedo*, 275 A.2d 249, 250 (Del. 1971)). The Tailwind defendants assert that although "Landis may have technically filed his complaint within the windup period . . . he did not notify Tailwind of the action for years; Tailwind did not have any notice whatsoever until long after the corporation was dissolved and wound up." *Id.* at 7.

With respect to the government's complaint, the Tailwind defendants point out that it was filed long after the Landis complaint, and they argue that the government may not claim the date Landis filed his original Complaint as the date on which the government's action was "begun." *Id.* at 8. The Tailwind defendants argue that "§ 278 is not a statute of limitations—it is, rather, a corporate winding up statute—and, consequently, relation-back principles do not apply." *Id.* They add that section 3731(c) of the FCA "permits relation-back *only* '[f]or statute of limitations purposes.' " *Id.* at 8 (emphasis in original) (quoting 31 U.S.C. 3731(c)). "As a result," the Tailwind defendants contend, "even if this court were to find Landis's complaint not barred by section 278, the government could not save its own untimely complaint through the relation-back provision of the False Claims Act, 31 U.S.C. § 3731(c)." *Id.* at 8.

The Court finds these arguments unavailing, because ultimately federal law, not Delaware law, controls when the actions by the relator and government "commenced." And the relevant federal rule does not support the arguments of the Tailwind defendants.

### c.   The Relator's Action Began Upon Filing the Complaint

Whether a corporation can be sued is determined by the law of the state of its incorporation.  *See* FRCP 17(b)(2); *Keeter Trading Co. v. United States*, 79 Fed. Cl. 243, 250 (Fed. Cl. 2007) ("There is no question that in all federal courts, including this one, a corporation's capacity to sue or be sued is to be determined by the law of the state of its incorporation." (citing FRCP 17(b)); CAROL A. JONES, 9 FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 4223, p. 30 (2008) [hereinafter FLETCHER CYCLOPEDIA].  But, as with a natural person as a defendant, questions regarding *how* to initiate a civil action against a corporation,[14] or when a civil action against a corporation begins, are answered by reference to the relevant forum's rules of civil procedure.  "Civil procedure in federal courts is governed by the Federal Rules of Civil Procedure and applicable federal statutes, except where governing federal statutes or the Federal Rules of Civil Procedure otherwise provide for conformity to state practice." FLETCHER CYCLOPEDIA § 4223, p. 31; *see generally* FRCP 1.   In federal court, if a procedural question is answered by a federal rule of civil procedure, then that federal rule of procedure governs "unless it exceeds statutory authorization or Congress's rulemaking power."  *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010).

Rule 3 of the federal rules explicitly answers the question of how and when a lawsuit "begins" in federal court, as it provides that "[a] civil action is commenced by filing a complaint with the court," FRCP 3, and of course, "commence" and "begin" are synonymous.  Webster's Third New International Dictionary, Unabridged, s.v. "begin," (last accessed June 11, 2014, http://unabridged.merriam-webster.com).

---

[14] "The rules governing whether state or federal law is applied in the federal courts [are] the same whether the parties are individuals or corporations," FLETCHER CYCLOPEDIA § 4223, p. 29.

19

Accordingly, Rule 3 of the federal rules governs whether the relator had "begun" his action under Delaware's winding-up statute, 8 Del. C. § 278,[15] unless Rule 3 is not a valid exercise of Congress's rulemaking power.  The defendants have not suggested that Rule 3 exceeds Congress's rulemaking power, and there is no basis for the Court to reach that conclusion. *See* 19 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4509, p. 271 (2d ed.1996) (hereinafter WRIGHT & MILLER) ("In the vast majority of cases, diversity cases included, questions concerning the validity of the Civil Rules safely can be assumed to have been resolved favorably."); *Cf. Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010) ("We have found to be in compliance with § 2072(b) [of the Rules Enabling Act  those] rules prescribing methods for serving process . . . .").  Rule 3 requires only the filing of a complaint to commence a civil action.  The rule does not provide that either notice to the defendant or service of process must be accomplished before a lawsuit can be said to have "begun."

Thus, the Tailwind Defendants' reliance on Rule 3(a) of Delaware Superior Court rules of civil procedure[16] and precedent construing the state rule is unavailing.  *See, e.g.*, *Russell v.*

---

[15] Title 8, Section 278 of the Delaware Code reads, in relevant part: "With respect to any action, suit or proceeding begun by or against the corporation either prior to or within 3 years after the date of its expiration or dissolution, the action shall not abate by reason of the dissolution of the corporation; the corporation shall, solely for the purpose of such action, suit or proceeding, be continued as a body corporate beyond the 3-year period and until any judgments, orders or decrees therein shall be fully executed, without the necessity for any special direction to that effect by the Court of Chancery."  DEL. CODE ANN. tit. 8, § 278 (West 2010).

[16] *Compare* Rule 3(a) of the Delaware Superior Court Rules of Civil Procedure *("[A]n action is commenced by filing* with the Prothonotary *a complaint* or, if required by statute, a petition or statement of claim, all hereafter to be referred to as a 'complaint' *and a praecipe directing the Prothonotary to issue the writ specified therein.*") (*emphasis added*), *with* Rule 3(a)(1) of the Delaware Chancery Court, which is analogous to the federal rule ("An action is commenced by filing with the Register in Chancery a complaint or, if required by statute, a petition or statement of claim all hereafter referred to as 'complaint.' ").

*Olmedo*, 275 A.2d 249, 250 (Del. 1971).  Instead, *International Pulp Equipment Co. v. St. Regis Kraft Co.*, 54 F. Supp. 745 (D. Del. 1944) (*Int'l Pulp Equip. Co. I*) and *International Pulp Equipment Co. v. St. Regis Kraft Co.*, 55 F. Supp. 860 (D. Del. 1944) (*Int'l Pulp Equip. Co. II*) are the cases that are most directly on point.  Both decisions involved a prior version of the Delaware winding-up statute that was similar to the modern version, including having a three-year winding-up period.  *Int'l Pulp Equip. Co. I*, 54 F. Supp. at 747.  The defendant corporation was dissolved on September 30, 1940 and the plaintiff brought suit just short of the three year limitations period on September 23, 1943.  The defendant corporation moved to dismiss the plaintiff's suit, arguing that the plaintiff's attempt to serve it through a resident agent after it filed for dissolution was ineffective.  Thus, the issue was whether "service of process on a resident agent of a dissolved Delaware Corporation" is "invalid for the reason that the resident agent's power to accept such service is terminated by the dissolution."  *Id.* at 746.  The court held that the plaintiff's attempt to serve the defendant was inadequate, but also concluded that the defendant may be served through the Delaware Secretary of State.  *Id.* at 747–49.

Perhaps anticipating that after the plaintiff served the Delaware Secretary of State, the defendants would argue that the plaintiff's suit still could not be maintained because service (and notice) would have occurred well beyond the three-year winding up period, the court preemptively addressed the issue of whether the plaintiff would be permitted to maintain its action after serving the Delaware Secretary of State.  Citing Rule 3 of the federal rules, the court stated that

> [t]he view that the Secretary of State may now be served in the case at bar (even though subsequent to the filing of the complaint more than three years from the date of dissolution have expired) is bottomed on the rule that the *instant action commenced by the filing of the complaint.*

*Id.* at 749 (emphasis added).  *Accord*, *Int'l Pulp Equip. Co. II*, 55 F. Supp. 860–61.

Thus, the relator's action commenced when he filed his complaint on June 10, 2010, six months before the running of the three-year winding-up period.

### d.  The Government Complaint Relates Back to the Relator's Complaint

The issue remains whether the government's complaint was timely filed because it relates back to relator's complaint.  The Tailwind defendants contend that "[a]llowing the government's complaint filed years later to relate back to the relator's complaint would defeat Section 278's fundamental purpose," which is to "provide stockholders repose and certainty with respect to litigation following the defined winding-up period."  Tailwind Reply at 3.  They argue that "[t]his is especially true in the instant case where the government's complaint asserts new common law claims that the relator did not and could not allege."  *Id.*  The Tailwind defendants also assert that the FCA permits relation back only for statute of limitations purposes, and that Delaware's winding-up statute is not a statute of limitations.  The defendants argue further that, in any event, "courts have found relation back principles inapplicable to Section 278 and have been reluctant to find exceptions to the three-year winding-up period."  *Id.* at 4.

This contention of the Tailwind defendants also fails to persuade.  The cases cited concerning the Delaware statute are inapposite, and the relevant federal authority explicitly support relation back.

The operative federal rule provides that "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the law that provides the applicable statute of limitations allows relation back. . . ."  FRCP 15(c)(1)(A).  Thus, the question becomes whether the FCA statute of limitations applicable to the government allows relation back, and it does.

The FCA was amended in May 2009 by the Fraud Enforcement and Recovery Act ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617.  Prior to FERA, the FCA was silent as to whether the government's complaint relates back to the relator's complaint, so courts had to make a judicial determination as to whether the FCA permitted relation back. FERA, however, specifically amended the FCA to provide that the government's complaint can relate back to the relator's complaint:

> If the Government elects to intervene and proceed with an action brought under 3730(b), the Government may file its own complaint or amend the complaint of a person who has brought an action under section 3730(b) to clarify or add detail to the claims in which the Government is intervening and to add any additional claims with respect to which the Government contends it is entitled to relief. *For statute of limitations purposes, any such Government pleading shall relate back to the filing date of the complaint of the person who originally brought the action*, to the extent that the claim of the Government arises out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the prior complaint of that person.

FERA, Pub. L. No. 111-21, § 4(b)(3), 123 Stat. 1617, 1623 (2009) (emphasis added) (codified at 31 U.S.C. § 3731(c)).  Our Court of Appeals has explained that "[u]nder the new [FERA] provision, the Government's complaint can relate back to the original complaint only 'to the extent that the claim of the Government arises out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the prior complaint.'"  *U.S. ex rel. Miller v. Bill Harbert Intern. Const., Inc,.* 608 F.3d 871, 879-880 (D.C. Cir. 2010).  The FERA amendment to section 3731(b) applies to all cases pending at the time of its enactment and to cases filed thereafter, *id.* at 878 (citing Pub. L. No. 111-21, § 4(f)(2)), so it applies to the government's complaint in this case.

Here, there is no question that all of the government's FCA and common law claims are based on the same transactions and occurrences as the relator's complaint—the alleged doping by the cycling team during the period in which the USPS sponsored the team, and the associated false statements, false claims and breaches of contract.  Because the FCA and the relevant federal rules of civil procedure govern and are clearly applicable here, the Court is unpersuaded by the Tailwind defendants' hyper-technical attempts to distinguish the FERA amendments and rely upon the Delaware winding-up statute.

One final note: The government asserts that its complaint has superseded the relator's complaint with respect to its claims against the Tailwind defendants, and therefore, it asserts, the Court may deny Tailwind's motion to dismiss the relator's complaint as moot.  Gov't Opp'n to Tailwind Mot. to Dismiss at 4 n.3.[17]  The government has not cited any legal authority for this assertion nor has it explained why its complaint in intervention renders inoperative only the relator's claims against the Tailwind defendants.  The FCA states that the government has the ability to seek dismissal of a relator's action[18], but the government must file a motion with the court seeking such relief, which has not occurred in this instance.  *See, e.g. Hoyte v. American Nat'l Red Cross*, 518 F.3d 61 (D.C. Cir. 2008).  If the government seeks to dismiss one or more

---

[17] The footnote in the government's brief reads: "We note that, because the United States has intervened in this action and filed its own complaint in intervention against Tailwind, relator's complaint has been superseded with respect to its claims against Tailwind. That is, relator has no operative complaint or claims against Tailwind. Consequently, when Tailwind's motion seeks to dismiss relator's complaint against it, it is seeking the dismissal of a complaint that simply does not exist. For that reason, the Court may hold that relator's complaint has been superseded in all respects as to the intervened defendants in this action and deny Tailwind's motion to dismiss relator's complaint as moot."

[18] "The Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion."  31 U.S.C. § 3730(c)(2)(A).

counts of the relator's complaint, it can file the appropriate motion.  Until then, the relator's

complaint has not been "superseded" by the government's.

### 2.   Service of Process

The Tailwind defendants also challenge service of process as ineffective.  First, in their

view, service of process was ineffective because a "dissolved corporation may not be served

through former agents, officers, or directors of the dissolved corporation."  Tailwind Mot. to

Dismiss at 9.  Moreover, argue the defendants, plaintiffs did not serve the Delaware Secretary of

State and, therefore, service was never effectuated.  *Id.* at 9–10.

The Court concludes that the plaintiffs have properly served the Tailwind defendants.

The government properly served the Delaware Secretary of State.  *See* Dkt. No. 102.  In addition,

both the government and the relator properly served the corporate defendants through individuals

authorized to accept service on behalf of the Tailwind defendants.  *See* Gov't Opp'n to Tailwind

Mot. to Dismiss at 15–18; Relator Opp'n to Tailwind Mot. to Dismiss at 4–8.  As the plaintiffs

correctly observed, Rule 4(h)(1), in conjunction with Rule 4(e)(1), provide for several ways to

serve process on a domestic corporation in the United States: (1) "following state law for serving

a summons in an action brought in courts of general jurisdiction in the state where the district

court is located or where service is made"; (2) "delivering a copy of the summons and of the

complaint to an officer, a managing or general agent, or any other agent authorized" to accept

service of process; and (3) by mailing a copy to an agent that is authorized to accept service of

process.  FRCP 4(h)(1); FRCP 4(e)(1).  These requirements were met here.

### E.      Statute of Limitations

The parties dispute whether, and to what extent, the tolling provision of the FCA Statute

of Limitations ("SOL") at 31 U.S.C. § 3731(b)(2) applies to relators.  The parties also dispute

whether the plaintiffs' FCA claims should be tolled under section 3731(b)(2), to the extent that it

is applicable, and whether the government's common law claims should be tolled under the

tolling provision generally applicable to government actions founded on tort or contracts.  *See* 28

U.S.C. § 2416(c).  Finally, the relator argues that the plaintiffs' claims are tolled by the Wartime

Suspension of Limitations Act, ch. 645, 62 Stat 828 (1948) (codified as amended at 18 U.S.C. §

3287).  The Court addresses separately each SOL and tolling issue.

### 1.   The FCA Tolling Provision Does Not Apply to Relators

The FCA SOL is found at 31 U.S.C. § 3731(b), and its tolling provision is found in

subsection (b)(2). The FCA SOL reads:

> (b) A civil action under section 3730 may not be brought--
>
> > (1) more than 6 years after the date on which the violation of section 3729 is committed, or
> >
> > (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,
>
> whichever occurs last.

31 U.S.C. § 3731(b).

The relator filed his initial complaint on June 10, 2010.  If the Section 3731(b)(2) tolling

provision does not apply to him, then the relator is subject to the six-year SOL in Section

3731(b)(1).  As a result, the relator could not recover against any defendant on allegedly false

claims for payment that were submitted by the defendants to the USPS prior to June 10, 2004.[19]

---

[19] Based on the current record, it appears that of the approximately $31 million paid under the 2000 sponsorship agreement, all except approximately $68,000 would be time-barred if the six-

Conversely, if the Court were to conclude that the tolling provision does apply to relators, then the relator could (assuming he also satisfied the relevant requirements for tolling his claims) recover on allegedly false claims for payment that were submitted by the defendants to the USPS or reverse false claims dating back ten years, to June 10, 2000.[20]

Urging this Court to adopt what appears to be the majority approach among the federal courts of appeal, the defendants argue that section 3731(b)(2) applies only to FCA actions brought by the government. *See, e.g.*, *United States ex rel. Sanders v. N. Am. Bus Indus., Inc.*, 546 F.3d 288, 296 (4th Cir. 2008). Under this approach, the six-year SOL in Section 3731(b)(1) would apply to the relator's claims against all of the defendants. Alternatively, the defendants urge this Court should adopt the Ninth Circuit's approach in *United States ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211, 1218 (9th Cir. 1996), which held not only that section 3731(b)(2) does apply to relators, but also that whether a civil action will be tolled is based on "when facts material to the right of action are known or reasonably should have been known by" the relator— not the government. Under the *Hyatt* approach, the relator (Floyd Landis) would not be able to satisfy the standard for tolling under Section 3731(b)(2) because he had first-hand knowledge of the alleged fraudulent conduct as it allegedly occurred.

---

year SOL was applied to the relator and the government. *See* Relator SAC, Ex. 1; Weisel Mot. to Dismiss at 33.

[20] *See* Gov't Opp'n to Armstrong Mot. to Dismiss at 10 ("Armstrong notes that, even under the second prong of the FCA's tolling provision, the United States may not bring FCA claims for violations that are more than 10 years old. … However, Counts I and II of the Government's complaint do not seek a recovery for any claims prior to June 10, 2000, so the ten-year limitation is not implicated."). It is unclear from the current record the exact amount of payments that would be time-barred if the ten-year SOL was applied to the plaintiffs' claims, but Defendant Armstrong asserts that approximately $9 million in claims would be time-barred. *See* Armstrong Mot. to Dismiss Gov't Compl. at 12.

By contrast, the relator asks this Court to adopt the approach in *United States ex rel. Pogue v. Diabetes Treatment Centers of America*, 474 F. Supp. 2d 75, 85 (D.D.C. 2007), which held that section 3731(b)(2) applies to relators. However, in contrast to *Hyatt*, the court in *Pogue* held that whether a civil action will be tolled is based on "when facts material to the right of action are known or reasonably should have been known by" the relevant government official, rather than when such material facts were known by the relator. *Id.*.

To solve this riddle, the Court must begin with a close examination of the statute's text. *See Murphy Exploration & Prod. Co. v. U.S. Dep't of Interior*, 252 F.3d 473, 480 (D.C. Cir. 2001) (citing *Carter v. United States,* 530 U.S. 255, 271 (2000)). By its express terms, Section 3731(b)(2) is silent as to whether it applies to relators. Some of the courts that have adopted the majority approach concluded that the statutory language is unambiguous and clearly does not apply to relators because it would not make any sense to apply the statute's language to a relator's lawsuit. *See, e.g.*, *Sanders*, 546 F.3d at 294 ("The government's knowledge of 'facts material to the right of action' does not notify the relator of anything, so that knowledge cannot reasonably begin the limitations period for a relator's claims."). This Court agrees, and therefore joins *Sanders* in concluding that the statute's express language demonstrates that Congress did not intend to apply the tolling provisions to relators. Accordingly, the Court declines to follow *Pogue* and *Hyatt*.

The approach by the court in *Pogue*, though thoroughly reasoned, is difficult to square with the Supreme Court's decision in *Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409 (2005). The logic of *Pogue* rests largely upon the premise that the Section 3731(b) reference to "[a] civil action under section 3730" unequivocally encompasses all civil actions allowed under Section 3730, including actions brought by relators

pursuant to Section 3730(c).  But the Supreme Court rejected an analogous premise in *Graham County*.  There, the relator argued that "[a] civil action under section 3730" in Section 3731(b) "unambiguously applies to FCA retaliation actions" because retaliation actions arise under Section 3730(h).  *Graham County*, 545 U.S. at 415.  Rejecting this argument, the Court explained that "the statute is more complex than this argument supposes," and "§ 3731(b), read in its proper context, does not govern § 3730(h) actions for retaliation."  *Id.*  The Court noted, for example, that "[then-section] 3731(c) [21] provides that '[i]n any action brought under section 3730, the United States shall be required to prove all essential elements of the cause of action, including damages, by a preponderance of the evidence.' "  *Id.* at 418.  However, as the Court noted, it would make no sense to construe "any action" to include a retaliation claim brought by an employee against her local county employer; doing so would require the federal government to prove all of the essential elements of the retaliation claim even though it is not even a party to the lawsuit.  *Id*. Accordingly, the Court concluded that then-section 3731(c) makes sense only if " 'any action brought under section 3730' is limited to § 3730(a) actions brought by the United States and § 3730(b) actions in which the United States intervenes as a party, as those are the types of § 3730 actions in which the United States necessarily participates."  *Id.*  The Court explained that this "implicit limitation of the phrase 'action under section 3730' shows that Congress used the term 'action under section 3730' imprecisely in § 3731 and, in particular, that Congress sometimes used the term to refer only to a subset of § 3730 actions."  *Id.*

Applying the reasoning in *Graham County* here, this Court similarly concludes that it is not reasonable to construe Section 3731(b)(2) to mean that the application of tolling to relator's

---

[21] The FERA amendments in 2009 added a new Section 3731(c), so this provision is now Section 3731(d).

lawsuit turns on the knowledge of the responsible United States government official, when the government has in fact declined to prosecute the claims brought by the relator and the government has not intervened or become a party to the relator's lawsuit.  Just as the Supreme Court in *Graham County* sought to devise "a construction [of Section 3731] that avoids . . . counterintuitive results," *id*. at 421, so shall this Court.  It defies logic to hinge the tolling question on when the responsible government official possessed sufficient knowledge to act, when in reality that governmental official has chosen not to act.  The most reasonable and intuitive construction of section 3731(b)(2) is that "[a] civil action under section 3730" does not apply to all actions under section 3730, but only as to those actions in which the United States has "acted," by seeking to participate.  The text's reference to "the official of the United States" indicates that Congress intended Section 3731(b)(2) to apply to lawsuits brought (or intervened in) by the United States.  *See Sanders*, 546 F.3d at 293; *United States ex rel. Sikkenga v. Regence BlueCross BlueShield of Utah*, 472 F.3d 702, 723 (10th Cir. 2006).[22]

In conclusion, the Court holds that the six-year limitations period in section 3731(b)(1) applies to the relator's claims against all of the defendants.  Accordingly, the relator's FCA claims based on alleged fraudulent payments or reverse false claims that occurred prior to June 10, 2004 are dismissed with prejudice.

---

[22] The Court notes a separate problem with *Hyatt*, wherein the court held that Section 3731(b)(2) tolling applied a lawsuit brought by a relator and that the tolling determination was based on the relator's knowledge.  91 F.3d at 1217-18.  Such a construction allows "the official of the United States charged with responsibility to act in the circumstances" to be the relator, even if the relator is not a government official.  If that approach were followed here, then relator Floyd Landis is construed to be "the official of the United States" charged with the responsibility to act pursuant to Section 3731(b)(2), even though he is a private citizen.  This is an even more counterintuitive construction of the statute's text than the construction rejected by the Court in *Graham County*.

### 2. Tolling Under the FCA and the Statute Generally Applicable to Government Actions

The Court next addresses whether the government's FCA and common law claims should be tolled.  As previously discussed, the tolling provision applicable to the government's FCA claims is Section 3731(b)(2), which provides for up to a ten year limitations period.  The government's common law claims of fraud, unjust enrichment, and breach of contract are subject to the SOL generally applicable to government suits for money damages founded on contracts, 28 U.S.C. § 2415(a) (six-year SOL), and torts, 28 U.S.C. § 2415(b) (three-year SOL).  The SOL under Section 2415 are subject to the tolling provisions in 28 U.S.C. § 2416, which allows for tolling in two instances that are relevant here:

> (a) the defendant or the res is outside the United States, its territories and possessions, the District of Columbia, or the Commonwealth of Puerto Rico; … [or]

> (c) facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances[.]

28 U.S.C. §§ 2416(a), (c) (2012).  The tolling provisions in sections 3731(b)(2) and  2416(c) are identical, except that the former refers to "the" official of the United States, while the latter refers to "an" official of the United States.  The use of "an" in section 2416(c) suggests that there could be multiple responsible United States officials with respect to the government's tort and contract claims, but that issue need not be resolved at this juncture.  Rather, the inquiry turns on identifying at least one relevant "official of the United States charged with responsibility to act," and determining when this official knew or reasonably should have known of the "facts material" to the government's right of action.  31 U.S.C. § 3731(b)(2); 28 U.S.C. § 2416(c).

### a) Legal Standard Applicable to SOL Defense at the MTD Stage

"The statute of limitations is an affirmative defense, FRCP 8(c), and need not be negatived by the language of the complaint." *Jones v. Rogers Mem'l Hosp.*, 442 F.2d 773, 775 (D.C. Cir. 1971).  Thus, "[a]s [the D.C. Circuit has] repeatedly held, courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint." *Firestone v. Firestone*, 76 F.3d 1205, 1208–09 (D.C. Cir. 1996) (citing *Richards v. Mileski,* 662 F.2d 65, 73 (D.C. Cir. 1981)).  However, as the Supreme Court has explained, "[i]f the allegations . . . show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim. . . ." *Jones v. Bock,* 549 U.S. 199, 215 (2007).

This is a tricky procedural situation, and the D.C. Circuit has observed that "[t]here is an inherent problem in using a motion to dismiss for purposes of raising a statute of limitations defense.  Although it is true that a complaint sometimes discloses such defects on its face, it is more likely that the plaintiff can raise factual setoffs to such an affirmative defense." *Richards v. Mileski*, 662 F.2d at 73.  Thus, while the *Richards* court "d[id] not hold that the use of a motion to dismiss is always improper to raise a statute of limitations defense," *id.*, it cautioned that the district court should not grant such a motion without giving the plaintiff adequate opportunity to make a record and present any evidence to contradict the defense.  *Id.*  Accordingly, in order to balance these competing considerations, it would appear that a district court can certainly grant a motion to dismiss on statute of limitations grounds, but to do so, the factual allegations in the complaint must clearly demonstrate all elements of the statute of limitations defense *and* that the plaintiff has no viable response to the defense.  *See Nader v. Democratic National Committee*, 567 F.3d 692, 699-702 (D.C. Cir. 2009) (affirming motion to dismiss complaint where

uncontested allegations clearly showed not only when cause of action arose, but also that fraudulent concealment could not apply, citing *Richards*).

### b)  Defendant Bruyneel allegedly outside of the United States

Invoking Section 2416(a), the government argues that its common law fraud and unjust enrichment claims against Defendant Bruyneel were tolled during the periods he was allegedly outside the United States. Gov't Opp'n to Bruyneel Mot. to Dismiss at 2.  The government alleges that "Bruyneel is a resident of the United Kingdom" and was the *directeur sportif* of the cycling team, which "would require his presence in Europe for the substantial majority of each year." *Id*.   The government asserts, therefore, that its "complaint raises factual disputes about Bruyneel's absence from the United States that potentially provide an additional basis to toll the statute of limitations as to the Government's common law claims against him." *Id.* at 3.

Based on this record, the Court concludes that it cannot determine solely from the face of the complaint whether the government's common law claims against Defendant Bruyneel should be tolled under 28 U.S.C. § 2416(a) for the time periods he was allegedly outside the United States.  *See*, *Firestone v. Firestone*, 76 F.3d  at 1208–09.  Further fact development through discovery is required before the Court can make this determination.  Thus, Bruyneel's motion to dismiss the government's complaint on SOL grounds is denied.

### c)  Knowledge of the Investigation by the French Authorities in 2000

Invoking Section 2416(c), the government argues "facts material to the right of action" were not known and reasonably could not have been known by the responsible United States official because the government did not know that members of the cycling team were doping. [23] The defendants disagree, arguing that the government cannot rely on the tolling provision because it had knowledge of the French authorities' investigation in 2000 into allegations that the cycling team was doping.  *See* Armstrong Reply to Gov't Opp'n at 4 (Dkt. No. 124) (citing Gov't Compl. ¶¶ 19, 63).  They also point to the government's statement that back in 2000 it was "concerned" about the doping allegations.  *Id.*

While there does not appear to be any case law from this circuit defining "facts material to the right of action," other courts have interpreted this phrase.  In *Phillips Petroleum Co. v. Lujan*, 4 F.3d 858, 859 (10th Cir. 1993), the issue before the Tenth Circuit was "at what point should the statute of limitations commence to run under section 2416(c) in an action by the government to recover underpaid royalties from an oil and gas lease."  The court stated that a "fact material to the right of action" should be interpreted to "necessarily includ[e] the fact that gave rise to the right of action."  *Id.* at 862 (citing *United States v. Kass*, 740 F.2d 1493, 1498

---

[23]  The relator attempts to invoke the common law doctrine of fraudulent concealment in order to obtain the benefit of tolling.  Relator SAC ¶ 197; Relator Opp'n to CSE Mot. to Dismiss at 2–7 (Dkt. No. 115).  *See generally*, *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO, Dist. Lodge 64 v. NLRB*, 130 F.3d 1083, 1087 (D.C. Cir. 1997).  However, the fraudulent concealment argument is without merit.  With respect to the relator's complaint, his participation in the doping prevents him from asserting the doctrine on his own behalf, as nothing was concealed from him.  With respect to the government's complaint, the government has expressly declined to invoke fraudulent concealment, Gov't Opp'n to Armstrong Mot. to Dismiss at 11 n.6, and the relator has no power to override the government's decision.  *See* 31 U.S.C.A. § 3730(c)(1) ("If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action.").

(11th Cir. 1984)).  Applying this standard, the court stated that "the deficient royalty payment constituted a breach of [the lessee's] contractual duty to the government and it is that fact which gave rise to the government's right of action; therefore, the deficient payment was clearly a material fact."  *Id.*  Therefore, the court held, the SOL should "have been tolled until such time as the government could reasonably have known about [the lessee's] breach."  *Id.*

Similarly, in *Kass*, the Eleventh Circuit construed Section 2416 to mean that "the 6-year statute of limitations began to run, at the very latest, on September 4, 1974, when the Florida Medical Foundation notified Blue Shield of its *finding* that Kass had 'overutilized' Medicare [many years before] in 1970 and 1971." 740 F.2d at 1497 (emphasis added).  The court also suggested that the "facts making up the 'essence' of the cause may have been reasonably knowable by the government before September, 1974," because "[w]hen Blue Shield first referred Kass' claims to the Florida Medical Foundation in February, 1974, it had already noted irregularities in his claims, sought and obtained records from him, and conducted a two-tier internal review of his claims."  *Id.* at 1498 n.5.  Thus, it is not the commencement of an investigation of fraudulent claims, but the investigation's finding of "irregularities" in the claims, that triggers the running of the limitations period.  *Id.*;  *see also United States v. Tech Refrigeration*, 143 F. Supp. 2d 1006, 1010 (N.D. Ill. 2001) (defendants had not shown that government had relevant knowledge, pursuant to Section 2416(c), at the time government first obtained documents pursuant to an investigation, where there was nothing in the record to show what those documents revealed or that the government had reached any conclusions at that time); *United States v. Intrados/International Management Group*, 265 F. Supp. 2d 1, 13-14 (D.D.C. 2002) (court held that SOL was tolled pursuant to Section 2416(c) on payment-by-mistake claim, but only until completion of audit that revealed the improper payment).

Thus, the SOL does not commence upon notice of allegations of impropriety instead, it is when the impropriety *itself* is known or reasonably should have been known by the relevant official that he SOL commences.  Indeed, where an investigation reveals there was *no* impropriety, no "right of action" accrues at all.  In this case, as explained above, the contract required the cycling team to comply with various United States and international cycling regulations, so generally speaking, a breach would not occur unless and until there was a violation of one or more of those regulations.[24]  So it must be a finding of the doping—not an investigation seeking to determine whether doping occurred—that is a "fact material" to the government's FCA and common law claims.  Accordingly, the Court rejects the defendants' argument that knowledge of the investigation by the French authorities was sufficient to run the limitations period because it put the government on notice of its right of action.

### d)  Known or Reasonably Should Have Known

Having established that the riders' doping—and not the investigation or media reports— was a fact material to the government's FCA and common law claims, the remaining issue is when the riders' doping was "known" or "reasonably should have been known" by the responsible government official.

As an initial matter, the defendants argue that because the government did not independently investigate the doping allegations, its claims cannot be tolled.  *See* Armstrong

---

[24] There is one exception, a theory of liability for breach of contract for violating the contractual provision allowing the Postal Service to declare default for "negative publicity associated with an individual rider or team support personnel . . . due to misconduct such as . . . failed drug or medical tests [or] alleged possession, use or sale of banned substances. . . ."  2000 Agreement ¶ 8(a)(v) (Dkt No. 93-2 at 4).  In such a circumstance, if an investigation in and of itself causes negative publicity, the breach occurs at that time, rather than if and when the investigation reveals wrongdoing.  *See* Restatement (Third) Of Agency § 8.10 and comment (2006); 19 Williston on Contracts § 54:45 (4th ed.).

Reply to Gov't Opp'n at 3–4.  Specifically, the defendants contend that "[u]nder the 'discovery-due diligence' standard, 'a plaintiff's failure to exercise due diligence in discovering the material facts underlying the cause of action is fatal to those claims.' "  Armstrong Reply to Gov't Opp'n at 4.

While defendants are correct that due diligence by the government is required, "Congress also intended that the government should not be penalized for excusable ignorance of such claims.  Foremost in the enactment of § 2416(c) was the thought that the government should not be penalized if the *fraud* of an adverse party restricted its ability to discover a valid cause of action until long after its accrual."  *Kass*, 740 F.2d at 1497 (emphasis in original).  Thus, to the extent that the defendants suggest that Section 2416(c) imposes a duty upon the government to investigate independently each and every potential allegation of wrongdoing, the Court disagrees; instead, the question is whether a reasonable governmental official should have conducted further investigation.  *Cf. Gabelli v. S.E.C.*, 133 S. Ct. 1216, 1222 (2013) ("Most of us do not live in a state of constant investigation; absent any reason to think we have been injured, we do not typically spend our days looking for evidence that we were lied to or defrauded.  And the law does not require that we do so.  Instead, courts have developed the discovery rule, providing that the statute of limitations in fraud cases should typically begin to run only when the injury is or reasonably could have been discovered.")

The Court now turns to whether the riders' doping "reasonably should have been known" by the government.  In making this determination, the findings (or lack thereof) of the investigation by the French authorities are significant.  As the above cases demonstrate, an investigative body's uncovering of impropriety is a significant factor in determining if the facts material to the government's right of action reasonably should have been known.  But the

converse also must be true: an investigation that exonerated the defendants—or at the least was inconclusive as to whether there was any impropriety—has bearing on whether the government reasonably should have known of the facts material to its right of action.  And here, it appears— at least on the record currently before the Court—that the investigation *vindicated* Mr. Armstrong and his fellow riders' claims that they were innocent of doping.

Of course, the government's reliance on a "failed" investigation does not preclude a court from concluding that the government still reasonably should have known of the facts material to its right of action.  An investigation may result in findings that, for a variety of reasons, fail to provide a sufficient basis upon which the government may reasonably rely.  But here, the defendants have not presented any reasons why the government should not have deferred to the French authorities in the first instance, or why the findings of the French investigation should have been discredited at the time, and no reason is apparent to the Court from the complaint. Moreover, it was not solely the findings of the French investigation that supported the government's decision to decline further investigation; the members of the cycling team made repeated representations that they were innocent during this same time period.  *See*, *e.g.*, Gov't Compl. ¶ 63E (In November 2000, Armstrong allegedly met with Postal Service officials to discuss the doping allegations, and he denied them and suggested through words and conduct that they were a "clean team").

There could possibly be documents in the government's possession suggesting that it had reason to know the cycling team was doping, despite the findings of the investigation by the French authorities, the drug tests the cycling team repeatedly passed, or any other public information tending to confirm the riders' claims that they never doped.  If so, there may be force to the defendants' argument that the government should have conducted its own

investigation sooner, and that if it had undertaken such an investigation, it would have uncovered

doping.  But the Court cannot make that determination based on the present record and *based*

*solely on the allegations in the complaint*, as required when ruling on a motion to dismiss.  *See*

*Firestone*, 76 F.3d at 1209.   Instead, this issue should be decided after discovery and upon either

briefing on summary judgment, or following an evidentiary hearing, as appropriate.  *See, e.g.*,

*Phillips Petroleum*, 4 F.3d at 863 (instructing the district court on remand to "hold an evidentiary

hearing to determine when the government knew or should have known about the deficient

royalty payment").   Accordingly, the Court denies without prejudice, the defendants' motion to

dismiss the government's action as time-barred.

### 3.   Tolling Under the Wartime Suspension of Limitations Act

Citing the war in Afghanistan, Relator argues on his own behalf, *see* Relator Opp'n to

Weisel Mot. to Dismiss at 41–42, and on behalf of the government,[25] *see* Relator's Mem. in

Opp'n to Def. Armstrong's Mot. to Dismiss the United States Compl. ("Relator Mem. in Opp'n

to Armstrong") at 4–13 (Dkt. No. 109), that the Wartime Suspensions Limitations Act, 18 U.S.C.

§ 3287 ("WSLA"), "has suspended the [FCA's] statute of limitations, thus permitting the

plaintiffs to pursue FCA claims against defendant Armstrong and the other intervened and non-

intervened defendants for the full period of the defendants' admitted fraud back to 1998."

Relator Mem. in Opp'n to Armstrong at 1.

The WSLA reads in relevant part:

When the United States is at war or Congress has enacted a specific authorization
for the use of the Armed Forces, as described in section 5(b) of the War Powers
Resolution (50 U.S.C. 1544(b)), the running of any statute of limitations
applicable to any offense (1) involving fraud or attempted fraud against the

---

[25] Although the government did not make this argument, it has not objected to the relator making
this argument on its behalf.

United States or any agency thereof in any manner … shall be suspended until 5 years after the termination of hostilities as proclaimed by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress. For purposes of applying such definitions in this section, the term "war" includes a specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolution (50 U.S.C. 1544(b)).

Wartime Suspension of Limitations Act, ch. 645, 62 Stat 828 (1948) (codified as amended at 18 U.S.C. § 3287).

However, the WSLA does not appear to apply.  In *Bridges v. United States*, 346 U.S. 209 (1953), the Supreme Court held that the WSLA did not suspend, due to World War II, the SOL for the criminal offense of wilfully and knowingly making a false statement under oath in naturalization proceedings.   In so holding, the Court observed that the "suspension prescribed by the Wartime Suspension of Limitations Act applies to offenses involving the defrauding of the United States or any agency thereof, whether by conspiracy or not, and in any manner, but only where the fraud is of a pecuniary nature or at least of a nature concerning property."  *Id.* at 215. Immediately thereafter, the Court explained *Bridges* as holding that the WLSA applies to offenses "which include fraud as an essential ingredient," meaning that a specific intent to defraud the government is an essential element of the offense or cause of action. *United States v. Grainger*, 346 U.S. 235, 242 (1953)) (citing *Bridges*).[26]

---

[26] In *Bridges*, the Court noted that the legislative history of WSLA indicated a purpose to allow the government additional time to investigate and prosecute "war frauds" and "war contracts," 346 U.S. at 217-19, and some commentators have construed *Bridges* as holding that the WLSA does not apply unless the offense, tort or breach of contract related to war programs.  *See, e.g.*, The Supreme Court, 1952 Term, 67 Harv. L. Rev. 96, 153-54 (1953); Erin M. Brown, Note, The Wartime Suspension of Limitations Act, the Wartime Enforcement of Fraud Act, and the War on Terror, 85 Notre Dame L. Rev. 313, 324-25 (2009); Paul D. Swanson, Note, Limitless Limitations: How War Overwhelms Criminal Statutes of Limitations, 97 Cornell L. Rev. 1557, 1568-69 (2012).  However, the Court in *Grainger*, in holding that WSLA applied to an indictment for violating the criminal False Claims Act, did not state one way or the other whether the offense related specifically to a war program.

Given *Grainger*'s emphasis on offenses that "include fraud as an essential ingredient," the 1986 amendments to the FCA are significant.  These amendments added definitions for the terms "knowing" and "knowingly," providing that "no proof of specific intent to defraud is required."  Pub. L. No. 99-562, § 2(b), 100 Stat. 3153 (1986).  Consistent with these amendments, Rule 9(b)'s pleading requirements, which apply to FCA actions, "specifically allow[] allegations of 'intent, knowledge, and other condition of mind' to be averred *generally*." *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 552 (D.C. Cir. 2002) (emphasis added).  *See also, United States v. TDC Mgmt. Corp.*, 24 F.3d 292, 297 (D.C. Cir. 1994) (FCA does not require proof that "the defendant acted with an intent to deceive," and "[t]he 1986 amendments expressly provided that 'no proof of specific intent to defraud is required' to satisfy the Act's knowledge provisions) (quoting 31 U.S.C. § 3729(b)); *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1274 (D.C. Cir. 2010) (same, citing *TDC Mgmt.*).

Thus, as a result of the 1986 FCA amendments, it is clear in this Circuit that civil FCA actions under the modern version of the statute do not require proof of fraud as an "essential element," which is required by the holdings in *Bridges* and *Grainger* for the WSLA to apply. And the Relator has not contended that proof of specific intent to defraud is required for the FCA claims or any of the other claims at issue.[27]  The Court therefore holds that the WSLA has not

---

[27] The relator's heavy reliance on *United States ex rel. Carter v. Halliburton Co.*, 710 F.3d 171 (4th Cir. 2013), is therefore misplaced, as the "specific intent to defraud" requirement of *Grainger* was not briefed on appeal (none of merits briefs even cited *Grainger*), and was not discussed in the opinion.  Likewise, the Court finds *United States ex rel. McCans v. Armour & Co.*, 146 F.Supp. 546 (D.D.C. 1956), *aff'd per curiam*, 254 F.2d 90 (D.C. Cir. 1958), *cert. denied*, 358 U.S. 834 (1958), to be rather unilluminating.  In that case, the court did not discuss *Grainger* and the specific intent requirement, and its "holding" that the WSLA applied to a civil FCA case was actually dictum, since the court ruled that the complaint was time-barred even if the WSLA applied, and it also held that the complaint should be dismissed because the lawsuit was based on evidence of alleged wrongdoing that was already in the government's possession

tolled the running of the FCA's SOL and that the WSLA does not apply to suspend any SOL in this case.

## III.    LEGAL ANALYSIS OF FCA CLAIMS ON THE MERITS

The analysis thus far has addressed the parties' procedural and jurisdictional arguments. The remaining discussion concerns the defendants' motions to dismiss the plaintiffs' FCA claims on the merits—namely, that the plaintiffs have failed to plead fraud with the particularity required under Rule 9(b) or have failed to state a claim under Rule 12(b)(6).. Before addressing the merits of each FCA claim, however, the Court must determine whether and to what extent the FERA applies to the plaintiffs' FCA claims. After making this determination, the Court will separately address the motions to dismiss each of the plaintiffs' FCA claims for failure to comply with Rule 9(b).

### A. Applicability of the Fraud Enforcement and Recovery Act Amendments of May 2009

The relator has pled four FCA causes of action, but he pled each FCA cause of action both pre- and post-FERA, and therefore asserts eight Counts in his complaint. Specifically, his Counts are presenting false claims (Counts 1 and 5), presenting false records or statements material to a false claim (Counts 2 and 6), conspiracy to commit an FCA violation (Counts 3 and 7), and reverse false claims (Counts 4 and 8). Relator SAC ¶¶ 239–277. Counts 5 through 8 are the relator's post-FERA Counts. The government has also pled the same four FCA causes of action, but it decided to plead only Count 2—presenting false records or statements material to a false claim—both pre- and post-FERA. Gov't Compl. ¶¶ 74–85; Gov't Opp'n to Armstrong Mot. to Dismiss at 20-23. The government's remaining FCA causes of action are pled only pre-

and because the statute prohibited the relator, a former government employee, from bringing the suit. *Id*. at 549-51.

FERA.[28]  The defendants contend that all of the post-FERA causes of action must be dismissed,

because the FERA does not apply to any of the alleged *conduct* or *claims* asserted by plaintiffs

pursuant to the FCA.

Recall that Congress passed FERA on May 20, 2009.  In the law, Congress provided that

"[t]he amendments made by this section shall take effect on the date of enactment of this Act and

*shall apply to conduct on or after the date of enactment. . . .*"  Pub. L. No. 111-21, § 4(f), 123

Stat. 1617, 1625 (2009) (emphasis added).   However, Congress also noted two exceptions, one

of which is relevant to the present argument:

> subparagraph (B) of section 3729(a)(1) of title 31, United States Code, as added
> by subsection (a)(1), *shall take effect as if enacted on June 7, 2008*, *and apply to
> all claims under the False Claims Act* (31 U.S.C. 3729 et seq.) *that are pending
> on or after that date. . . .*

*Id*., § 4(f)(1) (emphasis added).

Thus, this exception, which applies only to post-FERA "false statements" FCA claims

brought under the newly-designated 31 U.S.C. § 3729(a)(1)(B), potentially applies to the

government's Count 2 and relator's Count 6.

The defendants first argue that the relator's post-FERA claims should be dismissed

because he has not pled any actionable conduct occurring on or after May 20, 2009.  Secondly,

defendants argue that the exception should not be construed to permit the post-FERA false

statement FCA claims to apply to conduct that occurred before May 20, 2009.  The Court will

address these arguments in turn.

---

[28] In addition to these four Counts under the FCA, the government asserts common law fraud
against each intervened defendant, breach of contract against TS LLC and its predecessors, and
unjust enrichment against Defendants Armstrong and Bruyneel.  Gov't Compl. ¶¶ 86–93.

### 1.   "Conduct on or After the Date of Enactment"

Defendants argue that since "Relator alleges no *conduct* occurring after the May 2009 enactment of FERA, Relator's post-amendment FCA claims [Counts 5–8]" must be dismissed. Weisel Mot. to Dismiss Relator SAC at 23 (emphasis added).  In response, the relator states that "[a]s plaintiffs' complaints include allegations regarding conduct by defendants after [May 20, 2009], defendants' liability for such conduct will be governed by FERA."  Relator Opp'n to Weisel Mot. to Dismiss at 26.[29]

The relator's response is entirely unacceptable.  The relator cites only one paragraph of his complaint that specifically alleges conduct occurring after May 20, 2009: "[w]hen the relator's allegations regarding Mr. Armstrong were published in May 2010, defendant Armstrong once again publicly denied any involvement in doping."  Relator SAC ¶ 129.  None of the other paragraphs cited by relator as purportedly involving conduct occurring after May 20, 2009 include specific dates.  Instead, those other cited paragraphs have an unspecified temporal scope, using phraseology such as "[d]uring the time period relevant to his complaint" or "[d]uring the time period relevant to his complaint and through the present."  *See, e.g.* ¶¶ 57, 58, 197, 207, and 210.  The Court finds that the single allegation of conduct in paragraph 129 is insufficient to state a claim, and that the remaining allegations are too vaguely pled to demonstrate that sufficient actionable conduct occurred on or after May 20, 2009 to state a claim under any of the relator's FCA theories of liability.  The Court therefore dismisses the relator's Counts 5, 6, 7, and 8, without prejudice, but only to the extent that those claims purport to assert claims based on conduct occurring on or after May 20, 2009.

---

[29] The government never argues that Count 2 of its complaint (or any of the other counts) are intended to apply to conduct occurring on or after May 20, 2009.

### 2. "All Claims under the False Claims Act"

Now, the Court turns to the argument that the post-FERA "false statement" FCA claims of the government and relator cannot be construed to apply to conduct that occurred before May 20, 2009.  As stated above, Congress specified that for FCA actions brought under Section 3729(a)(1)(B) [previously Section 3729(a)(2)], FERA "shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act . . . that are pending on or after that date. . . ."  Pub. L. No. 111-21, § 4(f)(1), 123 Stat. 1617, 1625.

The parties dispute how the phrase "all claims under the False Claims Act" should be interpreted.  The relator and the government argue that "all claims under the False Claims Act" means a civil action or legal claim brought pursuant to Section 3729(a)(1)(B) of the FCA.  *See* Gov't Opp'n to Armstrong Mot. to Dismiss at 21.  Citing the definitions section of the FCA, the defendants argue that "all claims under the False Claims Act" means a "request or demand" for payment under the sponsorship agreement.  Armstrong Reply to Gov't Opp'n at 8. (quoting 31 U.S.C. § 3729(b)(2)(A) ("[T]he term 'claim' means any request or demand, whether under a contract or otherwise, for money or property . . . . ")).

If, as plaintiffs contend, "claim under the False Claims Act" means a civil action or a legal claim pursuant to Section 3729(a)(1)(B), then the FERA amendments apply to the plaintiffs' FCA causes of action, because both of the plaintiffs' civil actions included such "claims" and each of their civil actions were "pending on or after [June 7, 2008]."  Pub. L. No. 111-21, § 4(f)(1), 123 Stat. 1617, 1625.  But if "claim under the False Claims Act" means a request or demand for payment under a contract, then FERA does not apply to the plaintiffs' FCA causes of action, because the latest request or demand for payment under the 2000 Agreement occurred in 2004, when the second sponsorship agreement terminated—which was

well before June 7, 2008.  Courts are split on the meaning of this phrase, and the D.C. Circuit has not decided this issue.

The defendants appear to correctly state that their "request or demand" for payment interpretation has been adopted by every district court judge in this District to have considered the matter thus far.  *See, e.g.*, *United States ex rel. Barko v. Halliburton Co.*, 952 F. Supp. 2d 108, 118 n.94 (D.D.C. 2013) (citing other authorities); *United States v. Toyobo Co.*, 811 F. Supp. 2d 37, 48 n.6 (D.D.C. 2011); *United States v. Sci. Applications Int'l Corp.,* 653 F. Supp. 2d 87, 107 (D.D.C. 2009), *vacated in part and remanded on other grounds,* 626 F.3d 1257 (D.C. Cir. 2010).  And the lone court in this District that had previously ruled the other way later reversed itself.  *See United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 709 F. Supp. 2d 52, 55 (D.D.C. 2010) ("[I]t was error to conclude that FERA's amended provisions applied retroactively to the claims at issue here.").  Additionally, this "request or demand" for payment approach has also been followed by the Eleventh Circuit, *see Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1327 n.3 (11th Cir. 2009), *cert. denied*, 130 S. Ct. 3465 (2010), and the Ninth Circuit, *U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys.*, *Inc.*, 637 F.3d 1047, 1051 n.1 (9th Cir. 2011) (citing *Hopper*).

In contrast, the plaintiffs' view has been followed by a majority – four – of the circuit courts to have addressed the issue thus far.  *See Sanders v. Allison Engine Co., Inc.*, 703 F.3d 930, 938 (6th Cir. 2012); *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 n.2 (7th Cir. 2011); *United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 113 (2d Cir. 2010), *rev'd and remanded on other grounds*, 131 S. Ct. 1885 (2011); *United States ex*

*rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 n.1 (5th Cir. 2010).[30]  The Court finds that the reasoning of the majority of the circuits is more persuasive, and therefore joins the court that have held that "all claims under the [FCA]" means a civil action or legal claim pursuant to Section 3729(a)(1)(B).

The Court agrees with defendants that the analysis should begin with the statutory definition of "claims" under the FCA, as statutory definitions usually control the meaning of words in a statute. *Burgess v. United States*, 553 U.S. 124, 129 (2008) ("Statutory definitions control the meaning of statutory words ... in the usual case.") (ellipses in original) (internal quotation marks omitted).  Nonetheless, even though statutory definitions ordinarily control, this canon does not apply when it creates absurd results. *See C & P Tel. Co. v. Dir., Office of Workers' Comp. Programs, U. S. Dep't of Labor*, 564 F.2d 503, 513 (D.C. Cir. 1977).

The term "claim" is defined under the FCA as "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property ...."  31 U.S.C. § 3729(b)(2)(A).  As the Sixth Circuit observed, inserting this statutory definition into the text of the FERA amendment leads to a "nonsensical result":

> Inserting the definition of "claim" from § 3729 into § 4(f)(1) would result in the following: subparagraph (B) of section 3729(a)(1) of title 31 ... as added by

---

[30] The Court does not read the Fifth Circuit to have contradicted the holding of *Steury* in *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 475 & n.4 (5th Cir. 2012).  In *Gonzalez*, the court noted that the district court had ruled that the FERA's retroactivity provision did not apply because no "claims" were pending on June 7, 2008, and that the district court had applied the pre-FERA version of § 3729(a)(2).  *Id.*  However, a review of the merits briefs in *Gonzalez* reveals that appellant did not challenge this ruling of the district court.  Thus, the issue was not before the circuit court for decision in *Gonzalez*, and the language in the circuit court opinion appears to be only an observation of the lower court's ruling.  Furthermore, *Steury* clearly reached a conclusion that the post-FERA false statements FCA claim brought under Section 3729(a)(1)(B) applied to a complaint pending on June 7, 2008, 625 F.3d at 267 n.1, and the panel in *Gonzalez* would have been bound by that prior panel decision in the same circuit.

> subsection (a)(1), shall take effect as if enacted on June 7, 2008, and apply to all *request[s] or demand[s], whether under contract or otherwise, for money or property* ... under the False Claims Act ... that are pending on or after that date. . . .
>
> \* \* \* \*
>
> This insertion, which juxtaposes the definition normally given to a request to the government for payment with the language "under the False Claims Act," a statutory remedy pursued after an allegedly false claim is made, demonstrates the misfit between the definition and its placement in § 4(f)(1).

*Sanders*, 703 F.3d at 938 n.4 (citations omitted; emphasis in original).  Substituting the statutory definition of 'claim' into the phrase 'claims under the False Claims Act' makes little sense because the definition pertains to a request for payment made by the contractor, not the government, while a "claim under the False Claims Act" pertains to a demand by the government, rather than by the contractor under the FCA.   Indeed, the defendants' briefing recognizes that requests or demands for payment made under the parties' sponsorship agreement, not to the government "under" the FCA: "the government admits that it paid its last claim to Tailwind on June 1, 2004[,]" pursuant to the 2000 sponsorship agreement.  Armstrong Mot. to Dismiss at 14 (citing Gov't Compl. ¶¶ 69–72; Attachment B, Ex. A, § 3).  It is only the ensuing legal action, if any, by the government that is made "under the FCA."   *See Sanders*, 703 F.3d at 938.  The Court therefore finds that the statutory definition is not dispositive in this instance, because utilizing the statutory definition creates an absurd result.

The defendants' other argument—that Congress's use of "cases pending" in § 4(f)(2) of the FERA demonstrates that Congress knew how to refer to "cases" when it wanted to—is also unpersuasive.  First, the original FCA statute uses the words "cases" and "claims" interchangeably to refer to civil causes of action.  *Compare, e.g.*, 31 U.S.C. § 3731(c) (utilizing "claim" to refer to the government's right to bring its own civil action or intervene in a relator's civil action), *and* 31 U.S.C. § 3732(b) (under this provision—entitled "*Claims* under state

law"—district courts have jurisdiction over any action brought under state law for the recovery

of state or local government funds if the "action arises from the same transaction or occurrence"

as an action under § 3730), *with* 31 U.S.C. § 3730(c)(2)(C) (addressing ways in which a court

may limit a relator's participation once the government has intervened  if participation "would

interfere with or unduly delay the Government's prosecution of the *case*") (emphasis added), *and*

31 U.S.C. § 3733(i)(3) ("Whenever any attorney of the Department of Justice has been

designated to appear before any court, grand jury, or Federal agency in any *case* or

proceeding ….") (emphasis added).  Furthermore, Congress loosely used the words "cases" and

"claims" synonymously in legislative reports leading up to enactment of the FERA.  *See*,

*Sanders,* 703 F.3d at 941 (concluding that "in the two contexts where reference is made to a

lawsuit brought pursuant to the FCA, the Senate Report adopts inconsistent terminology and uses

both 'FCA claim' and 'FCA case' ").

     Secondly, the effective date selected by Congress in the § 4(f)(1) FERA amendment

undermines defendants' contention that the use of the term "cases" in § 4(f)(2) only supports

their side of the argument.  The effective date in § 4(f)(1) – June 7, 2008 – is highly significant,

because that date immediately precedes the Supreme Court's June 9, 2008 decision in *Allison*

*Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008), which narrowed the

construction of a false statements FCA cause of action.  It is beyond dispute that with the FERA

amendments, Congress intended to overrule the Supreme Court's narrow interpretation the false

statements FCA theory of liability announced in *Allison Engine*.  "Although the 2009

amendments to the FCA generally apply only to conduct on or after May 20, 2009,

§ 3729(a)(1)(B) [the FCA theory based on false statements] applies retroactively to all claims

pending on or after June 7, 2008 (that is, just before the Supreme Court's decision in [*Allison*

*Engine*].”  *Steury*, 625 F.3d at 267 n.1.  As one commentator has noted, Congress may have used

the term “claim” in § 4(f)(1) given that FERA amended more than one FCA theory of liability,

but Congress only intended retroactive treatment of its new definitions for one cause of action –

those based on the FCA’s false statement theory of liability.  That was the only thing necessary

to overrule *Allison Engine*.  If Congress had used the word “cases” instead, then the amendment

could have been construed to mean that all FCA causes of action included in the “case” would

receive retroactive treatment under FERA.  That would have been a broader and unintended

result:

> The term “claim” has more than one meaning in common discourse.  The term
> “claim,” can refer to a cause of action, as well as a claim for payment.  A claim,
> as in a cause of action, is brought “under the False Claims Act.”  A claim of
> payment is not made or brought “under the False Claims Act.  It is clear that
> Congress sought to overrule the decision in *Allison Engine* and to restore the law
> to what Congress always intended.  When Congress used the word “claims” as
> opposed to “cases,” which was used in the retroactivity section on procedural
> changes [§ (f)(2)], it could have had in mind that False Claims Act complaints
> contain multiple claims, not all of which rest on subsection [3729](a)(1)(B)]
> (a)(1)(B), and that only that type of claim in a case would be affected.  In contrast,
> the procedural provisions [in § 4(f)(2)] apply across the board to an entire case.

Claire M. Sylvia, The False Claims Act: Fraud against the Government § 10:46 (also describing

the approach of the majority of circuits as “both more logical and more consistent with

Congress's goal”).  The Court finds this explanation of the text’s language quite persuasive.

Accordingly, the Court concludes it is not appropriate in this instance to apply

mechanically the statutory definition of “claim” in the FCA to the FERA amendment at § 4(f)(1)

and holds that “claims under the False Claims Act” means a civil action or legal claim under

Section 3729(a)(1)(B), and thus the FERA applies to the government’s Count 2 and the relator’s

Count 6, which are FCA actions based on false records or statements.

### B.      Legal Standard Applicable to FCA Claims — Rule 9(b)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Complaints brought under the FCA must also comply with Rule 9(b). *See United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551-52 (D.C. Cir. 2002) ("Every circuit to consider the issue has held that, because the False Claims Act is self-evidently an anti-fraud statute, complaints brought under it must comply with Rule 9(b)."). Rule 9(b) states that in "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FRCP 9(b). However,

> Rule 9(b) is not to be read in isolation from other procedural canons. As Professor Moore notes, the requirement of particularity does not abrogate Rule 8, and it should be harmonized with the general directives in subdivisions (a) and (e) of Rule 8 that the pleadings should contain a short and plain statement of the claim or defense and that each averment should be simple, concise and direct.

*U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (quoting *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1386 (D.C. Cir. 1981)) (internal quotation marks omitted).

Thus, "[c]ombining Rules 8 and 9(b)," the D.C. Circuit has required "that 'the pleader state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud.' " *Williams*, 389 F.3d at 1256 (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994)). *See also Totten*, 286 F.3d at 552 (explaining that the " 'circumstances' that must be pleaded with specificity are matters such as the 'time, place, and contents of the *false* representations,' such representations

being the *element* of fraud about which the rule is chiefly concerned") (emphasis in original) (quoting WRIGHT & MILLER § 1297).

### 1.   Presenting False Claims (pre-FERA)

Section 3729(a)(1) imposes liability on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A) (2006).  Thus, the elements are "(1) the defendant submitted a claim to the government, (2) the claim was false, and (3) the defendant knew the claim was false." *United States ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 6 (D.D.C. 2003) (citing *United States v. Southland Mgmt. Corp.,* 288 F.3d 665, 674–75 (5th Cir. 2002), *aff'd en banc,* 326 F.3d 669 (5th Cir. 2003)).  The Court will separately address whether the plaintiffs have adequately pled this claim against each of the defendants who raised the Rule 9(b) issue.[31]

### a)   Defendant Weisel

Defendant Weisel argues that the relator's Count 1 fails for three reasons: "Relator does not adequately allege (a) that Mr. Weisel made a claim to the USPS for payment, (b) that any such claim was 'false' or (c) that Mr. Weisel knew that any such claim was false."  Weisel Mot. to Dismiss Relator SAC at 4.

The relator concedes that his complaint "does not allege that Weisel was an employee, the team manager, nor the individual who physically submitted false claims to the U.S. Postal Service."  Relator Opp'n to Weisel Mot. to Dismiss at 5–6.  He contends that it is not necessary for Mr. Weisel to have "personally" submitted a claim, because the statute imposes liability for

---

[31] Defendant Armstrong did not make any Rule 9(b) arguments in opposing the plaintiffs' FCA claims.

those who "cause" false claims to be presented. *Id*. at 5. To support his argument that Mr. Weisel caused the submission of false claims, the relator points to Mr. Weisel's failure—as the founder, president, chairman and largest shareholder of Tailwind— to prevent or at least investigate the allegations of doping. *Id.* at 6. And in "addition to failing to take preventative action," the relator alleges that Mr. Weisel "also took affirmative steps to facilitate the doping scheme and the submission of the false claims by undermining the impartial enforcement of doping rules." *Id.* at 7.

Responding to Defendant Weisel's argument that the claims were not false, the relator states that this argument "boils down to the contention that, even if the [USPS] had understood that virtually the entire USPS Team was engaged in illicit doping, it would not have mattered; the Postal Service still would have been obliged to pay and would have willingly done so." *Id.* at 10. The relator rejects this argument, and further states that the falsity of a claim can be established by "fraudulent inducement" and "false implied certifications." *Id.* at 10–17.

Finally, as to whether Defendant Weisel "knew" the claims were false, the relator contends he has satisfied Rule 9(b)'s requirement that knowledge be pled generally, but that, in any event, he has sufficiently pled that Defendant Weisel had actual knowledge of the defendants' doping. *Id.* at 17.

### i)   Did Mr. Weisel Make a Claim for Payment?

Courts generally require that the defendant affirmatively act in order to impose liability under the FCA, particularly when a plaintiff alleges that the defendant "caused" the submission of false claims. *See Sikkenga*, 472 F.3d 702, 714 (10th Cir. 2006) (requiring "affirmative action on the part of a defendant before imposing liability under the FCA" because "too broad an interpretation of the 'causes to be presented' language in the FCA would impose liability on

parties merely for failing to prevent the fraudulent acts of others") (some internal quotation marks omitted).  Thus, a failure to act, without more, is insufficient to impose FCA liability. *See* JOHN T. BOESE, CIVIL FALSE CLAIMS § 2.01(A), at 15 (4th ed. & 2013-2 Supp.) [hereinafter, CIVIL FALSE CLAIMS] ("Mere inaction does not constitute a violation of the False Claims Act, and the government must argue more than that a defendant was aware of an alleged fraud."). The relator has not alleged with the specificity required under Rule 9(b) that Mr. Weisel "caused" the submission of false claims.  *See United States v. Bornstein*, 423 U.S. 303, 312 (1976) ("The [FCA] does not penalize [a defendant] for what [another defendant] did. It penalizes [a defendant] for what it did.").

### ii)  Were The Claims False?[32]

The relator argues that the claim Defendant Weisel allegedly caused to be submitted was "false" because it was "fraudulently induced" or because there was an "false implied certification." Relator Opp'n to Weisel Mot. to Dismiss at 10–17.  Because the Court concludes the claims were false under the theory of implied certification, it need not address whether the claims were also false under the theory of fraudulent inducement.

Our Court of Appeals has explained that under the theory of implied certification, "a claim for payment is false when it rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term."  *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010) (hereinafter "*SAIC*").  "False certifications can be either express or implied," and courts "infer implied certifications from

---

[32] Having determined that Defendant Weisel did not cause the submission of a false claim, the relator's Count 1 fails, and thus no further analysis of this Count is necessary.  Nonetheless, out of an abundance of caution and to provide guidance to the parties moving forward (as this case has already been pending for four years), the Court will assess the remaining elements and pleading standards related to this Count.

silence where certification was a prerequisite to the government action sought." *Id.* (internal quotation marks omitted).  Further, the plaintiff must show that the defendant "withheld information about its noncompliance with material contractual requirements," and the "existence of express contractual language specifically linking compliance to eligibility for payment may well constitute dispositive evidence of materiality. . . ." *Id.* at 1269.

As explained previously, both the 1995 and 2000 sponsorship agreements required that the cycling team adhere to the rules of the UCI, IOC, and the other governing bodies of international cycling.  *E.g.* 1995 Agreement ¶ 13; 2000 Agreement ¶ 12.  The complaints of the government and the relator both allege that the cycling team engaged in repeated and rampant doping activity that was prohibited by these governing bodies while submitting claims for payment to the Postal Service under those agreements.  This would appear to be sufficient to allege there was a false certification of compliance with a material contract term.  However, the plaintiff must also allege and prove that Weisel withheld information about this noncompliance (doping).  *SAIC*, 626 F.3d at 1269.  Because a person cannot withhold information about something of which he has no knowledge, for the reasons that immediately follow, the pleading of this element also falls short.

### iii) Did Mr. Weisel Know the Claims Were False?

The FCA's scienter requirement should be strictly enforced.  As our Court of Appeals has explained, "strict enforcement of the FCA's scienter requirement will also help to ensure that ordinary breaches of contract are not converted into FCA liability."  *Id.* at 1271.  To allege that Mr. Weisel had knowledge of the falsity, the relator can demonstrate either that Mr. Weisel had actual knowledge or that he deliberately avoided or recklessly disregarded the truth.  *See id.* at 1274–75 ("Although Congress defined 'knowingly' to include some forms of constructive

knowledge, its definition of that term imposes liability for mistakenly false claims only when the defendant deliberately avoided learning the truth or engaged in aggravated gross negligence.").

The relator does not allege that Mr. Weisel had actual knowledge of the riders' doping. Paragraphs 144 through 154 of the relator's complaint fall under the subheading "Weisel's Knowledge," but the relator never alleges in any of these paragraphs that any of the riders told Mr. Weisel about the doping, nor does he allege some other means by which Mr. Weisel would have obtained direct knowledge.  Relator SAC ¶¶ 144–54.

Instead, the relator's allegations mostly emphasize Mr. Weisel's inactions.  For example, the relator states that "Weisel never called for the Team to test the riders for banned substances or otherwise investigate doping by the Team."  Relator Opp'n to Weisel Mot. to Dismiss at 7. But allegations that Mr. Weisel—even as the president, chairman, and largest shareholder of Tailwind—failed to take "preventative action" are insufficient to plead knowledge of the doping activity.

The relator's attempts to identify "affirmative steps" taken by Weisel to "facilitate the doping scheme" also fall short of Rule 9(b)'s specificity requirement.  For example, the relator states that,

> [a]s noted in Weisel's book, "his team" was "largely in charge" of USA Cycling during the period of the U.S. Postal Service contract.  Jim Oschowicz, who worked as a broker at Weisel's investment bank from 2001 to approximately 2011, was the President of the Board of Directors of USA Cycling from 2002 to 2008[, which] had responsibility for the enforcement of anti-doping rules.

*Id*. at 7.  The relator also contends that the USPS was "persuaded by Weisel's company to sponsor" the team, and that Weisel signed the 1995 agreement.  *Id.*  Accepting all of these allegations as true, none identify acts specifically taken by Defendant Weisel that actually

facilitated any of the alleged doping activities, nor do they show that they he knew about the doping.

The relator also relies upon Mr. Weisel's high-ranking position in Tailwind to argue that he was likely aware of the doping.  The problem with the relator's theory is that, if accepted, it threatens to cast too wide of a net around corporate officials for FCA liability.  Given that our Court of Appeals has rejected the theory that the "collective knowledge" of a corporation's officers can support the argument that the corporation knowingly submitted a false claim, *SAIC*, 626 F.3d at 1275, the Court declines to accept the theory that the FCA's scienter requirement can be established solely because an individual had a high-ranking position within the corporation that submitted an allegedly false claim.  Such a theory substitutes the FCA's scienter requirement with "a type of loose constructive knowledge that is inconsistent with the Act's language, structure, and purpose." *Id.* at 1274.  Thus, the relator has failed to plead with particularity that Mr. Weisel knew the claims were false.

Accordingly, the relator has failed to pled facts that would establish each element necessary to establish a prima facie case against Weisel for presenting false claims pre-FERA, and this claim is dismissed without prejudice.

### b)  Tailwind Defendants and Defendant Bruyneel

The Tailwind defendants contend that the

> plaintiffs have failed to adequately allege that Tailwind submitted a false claim to the USPS as defined under the FCA. They fail to adequately allege the falsity of any claims or that the absence of doping was a prerequisite to payment under the 1995 or 2000 Sponsorship Agreements. Additionally, the plaintiffs fail to adequately allege that any claim was made by Tailwind with the requisite scienter.

Tailwind Mot. to Dismiss at 13.  The Tailwind defendants do not develop their argument beyond these few sentences.  Rather, "[t]o the extent applicable, Tailwind joins and incorporates by

reference" the arguments made by Defendants Weisel & Ross Investments in their motion to dismiss the relator's SAC. *Id.* at 13 n.9.

In response, the government asserts, preliminarily, that Tailwinds' "perfunctory and unsupported argument regarding the sufficiency of the Government's pleading should be deemed waived because it gives no indication of *why* the United States' Complaint in Intervention is insufficient." Gov't Opp'n to Tailwind Mot. to Dismiss at 19 (emphasis in original). But in any event, the government argues, its complaint is sufficient. *Id.* at 19–21.

The Court agrees that the Tailwind defendants have waived their Rule 9(b) arguments by not sufficiently developing these arguments. In most instances, joining and incorporating the legal arguments of a co-party is common in complex, multifaceted litigation. The same or similar legal arguments can often be made on behalf of many parties. But the Rule 9(b) analysis is a fact-intensive inquiry as to whether a plaintiff has raised allegations against a particular defendant with the required specificity. As such, it is more difficult for a co-party to join and incorporate the arguments of its co-party. Here, Mr. Weisel's arguments focus on why the relator has not pled fraud with specificity against Mr. Weisel; these arguments do not do much to support the argument that dismissal under Rule 9(b) is proper against the other defendants. At most, Mr. Weisel's arguments may incidentally support the other defendants' Rule 9(b) arguments—but it takes more than incidental support or cursory discussion to sufficiently develop a legal argument. *See Cement Kiln Recycling Coal. v. E.P.A.*, 255 F.3d 855, 869 (D.C. Cir. 2001) ("A litigant does not properly raise an issue by addressing it in a cursory fashion with only bare-bones arguments.") (internal quotation marks omitted). Accordingly, the Court finds that the Tailwind defendants have not sufficiently developed their Rule 9(b) argument with

respect to the pre-FERA presenting false claims cause of action and, consequently, it has been waived.

In moving to dismiss the plaintiffs' complaints, Defendant Bruyneel joined and incorporated Mr. Armstrong's motions to dismiss the plaintiffs' complaints.  Bruyneel Mot. to Dismiss Gov't Compl. at 1; Bruyneel Mot. to Dismiss Relator SAC at 1.  As stated previously, Armstrong did not even raise a Rule 9(b) objection.  Thus, Defendant Bruyneel has also waived this argument.[33]

### 2. Presenting False Records or Statements Material to a False Claim (pre- and post-FERA)

The pre-FERA version of the false records or statements provision imposed liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  31 U.S.C. 3729(a)(2) (2006).  Post-FERA, this provision imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).  This distinction between the two provisions does not affect the Court's analysis of whether relator has pled Counts 2 and 6 with the required specificity.

### a) Defendant Weisel

The relator's Counts 2 and 6 suffer from the same defect as the relator's false claims Counts: the relator has failed to allege that Mr. Weisel "caused" to be made or used a false record or statement material to a false or fraudulent claim.  The Court therefore dismisses these Counts as well, without prejudice.

_____

[33] To the extent any of the other remaining non-intervened defendants have also attempted to raise Rule 9(b) arguments without briefing them, these arguments were also waived.

### b)  Tailwind Defendants and Defendant Bruyneel

For the reasons stated *supra* in Part III.B.1,  the Tailwind Defendants and Defendant Bruyneel have waived any Rule 9(b) argument.

### 3.   Conspiracy to Commit FCA Violation (pre-FERA)

Section 3729(a)(3) imposes liability on any person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid."  31 U.S.C. 3729(a)(3) (2006).  "[T]o prove a False Claims Act conspiracy, a [plaintiff] must show (1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by the Government and (2) at least one act performed in furtherance of that agreement."  *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009) (internal quotation marks omitted).  Furthermore, "it is not enough for a plaintiff to show that the alleged conspirators agreed upon a fraud scheme that had the effect of causing a private entity to make payments using money obtained from the Government.  Instead, it must be shown that the conspirators intended to defraud the Government."  *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008) (internal quotation marks omitted).

### a)  Defendant Weisel

Defendant Weisel argues that Count 3 of the relator's complaint fails for two reasons: "Relator does not adequately allege (a) that Mr. Weisel entered into a conspiracy with anyone, much less (b) with the specific intent to defraud the USPS."  Weisel Mot. to Dismiss Relator SAC at 4.  The relator responds that he has alleged Mr. Weisel conspired with one or more persons to have a fraudulent claim paid by the U.S.; that there were acts by the members of the conspiracy to conceal the doping and submit false claims to the USPS; and the conspirators'

60

continued lies allowed them to keep collecting payments and avoid returning payments.  Relator

Opp'n to Weisel Mot. to Dismiss at 21–22 (citing Relator SAC ¶¶ 53–59, 81–154).

The relator has not adequately pled that Mr. Weisel entered into a conspiracy to defraud

the USPS.  To establish that Mr. Weisel conspired with others, the relator alleges, for example,

that "Weisel, Armstrong, Bruyneel and CSE were all involved in the wrongful conduct by

Tailwind alleged herein, and all four were also shareholders of Tailwind during all or part of the

period covered by the 2000 Sponsorship Agreement . . . .").  Relator Opp'n to Weisel Mot. to

Dismiss at 21 n.16 (citing Relator SAC ¶ 234).  But to satisfy Rule 9(b), the relator must do more

than draw inferences of a conspiracy to defraud the government based on Mr. Weisel being a

shareholder and a corporate official at Tailwind.  *Cf. United States ex rel. Williams v. Martin-*

*Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (requiring the plaintiff to " 'state the

time, place and content of the false misrepresentations, the fact misrepresented and what was

retained or given up as a consequence of the fraud.' " (quoting *Kowal v. MCI Commc'ns Corp.*,

16 F.3d 1271, 1278 (D.C. Cir. 1994)).  The relator has not done so, and therefore the Court

dismisses Count 3, without prejudice.

### b)  Tailwind Defendants and Defendant Bruyneel

For the reasons stated *supra* in Part III.B.1, the Tailwind Defendants and Defendant

Bruyneel have waived their Rule 9(b) argument.

### C.    Reverse False Claims (pre-FERA)

The reverse false claims provision imposes liability on any person who "knowingly

makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or

decrease an obligation to pay or transmit money or property to the Government."  31 U.S.C.

3729(a)(7) (2006).  The parties dispute whether the defendants owed an obligation to pay money to the government within the meaning of this provision.

### 1.  Did Defendants Owe an "Obligation" to the Government

The defendants seek dismissal pursuant to FRCP 12(b)(6) because the "government has not alleged a single contract that requires the defendants to pay the government."  Armstrong Mot. to Dismiss Gov't Compl. at 16.  The defendants also contend that reverse false claims do "not extend to contingent liabilities," and the government "has not pleaded that any defendant owes a non-contingent liability to pay money to the government."  Armstrong Reply to Gov't Opp'n at 11.  Thus, the defendants argue that "[b]ecause any contract liability had not been reduced to an obligation to pay prior to the alleged false statements, the government's section 3729(a)(7) claim fails."  Armstrong Mot. to Dismiss Gov't Compl. at 16.  Other defendants also assert that the reverse false claims Count fails for the additional reason that the defendants never made a false statement or record, even if they had an obligation to pay money to the government. Weisel Mot. to Dismiss at 22–23.

The plaintiffs respond that the reverse false claims provision applies to contingent obligations because, post-FERA, "obligation" is defined as "an established duty, *whether or not fixed*."  Gov't Opp'n to Armstrong Mot. to Dismiss at 29 (emphasis in original) (citing 31 U.S.C. § 3729(b)(4)).  The plaintiffs assert that "Congress intended the new definition to clarify rather than change the meaning of an obligation under the FCA."  *Id.*  Thus, according to plaintiffs, the amended definition of the cause of action informs the interpretation of the pre-FERA provision. Separately, the relator argues that the defendants did have an obligation to pay the government money, because "the Complaint alleges that Tailwind had a contractual obligation to indemnify

the U.S. Postal Service in the event of damages arising from material misrepresentations." Relator Opp'n to Weisel Mot. to Dismiss at 23.

The government's argument essentially is that the defendants had an "obligation" to reimburse the government because they breached the sponsorship agreement, and the defendants made false statements to avoid or prevent the occurrence of any such reimbursement.  *See* Gov't Compl. ¶ 72 ("In making the false statements … the Defendants intended to avoid Tailwind's obligation to repay the United States the amounts it had received as a result of its submission of false claims, and it was reasonably foreseeable that the Defendants' statements would enable Tailwind to avoid its obligation to repay those amounts.").  Thus, the first issue before the Court is whether the alleged breach of the sponsorship agreements due to the riders' doping impose an "obligation" to reimburse the government for money previously awarded under the contract.

The D.C. Circuit has not addressed whether an alleged breach of contract constitutes an "obligation" to pay money to the government under the FCA reverse false claims provision.  See, *Hoyte v. American National Red Cross*, 518 F.3d 61, 69 n.6 (D.C. Cir. 2008).  ("Because Hoyte's allegations identify *no* obligation on ARC's part to tender money or property, we need not decide the extent, if any, to which such an obligation must be fixed to support a reverse false claim action under section 3729(a)(7).")  However, the Sixth Circuit has addressed the meaning of term "obligation" for purposes of the reverse false claims act, and it concluded that this term encompasses a breach of a government contract and the attendant obligation to repay the government.  In *American Textile Manufacturers Institute, Inc. v. The Limited, Inc.*, 190 F.3d 729, 741 (6th Cir. 1999), the court held that " 'obligation' certainly includes those arising from acknowledgements of indebtedness, final judgments, and breaches of government contracts."  *Id.* This Court agrees with the Sixth Circuit's holding, which has also been cited with approval by

the Tenth Circuit.  *See United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1204 (10th

Cir. 2006) (quoting this specific holding from *American Textile*); *see also Hoyte*, 518 F.3d at 73

(Tatel, J., concurring in part and dissenting in part) ("Given that the Red Cross was violating a

contract with the government, Hoyte could reasonably have believed the organization was

violating the FCA, for courts have universally held that 'a contractual obligation falls within the

scope of § 3729(a)(7).' ") (quoting *Bahrani*, 465 F.3d at 1204)); *United States v. Pemco

Aeroplex, Inc.*, 195 F.3d 1234, 1237 (11th Cir. 1999).

Further, the Sixth Circuit's inclusion of both "final judgments" and "breaches of

government contracts" as "obligations" necessarily means that the court was referring to *alleged*

breaches of government contracts, for if the court had intended to refer only to breaches that

have resulted in a court awarding a judgment, it would have been redundant for the court to

separately refer to final judgments in addition to breaches of contracts.  That said, every alleged

breach of contract does not give rise to the type of obligation that would serve as the basis for a

reverse false claims.  Rather, the allegations must be sufficiently weighty to show that the

defendant owes to "the government an obligation sufficiently certain to give rise to an action of

debt at common law."  *Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*, 190 F.3d 729, 736 (6th Cir.

1999).

At common law,[34] a duty to perform under an agreement may be "imposed by a promise

stated in [that] agreement." RESTATEMENT (SECOND) OF CONTRACTS § 235(2) cmt. b. (1981)

_____

[34] The interpretation of both sponsorship agreements is governed by federal law.  *See* 1995
Agreement, Attach. A, ¶ 13, to Armstrong Mot. to Dismiss Gov't Compl. ("1995 Agreement")
("The validity, interpretation and construction of this Agreement, and all other matters related to
this Agreement, shall be interpreted and governed by the federal laws of the United States of
America."); 2000 Agreement, Attach. B, ¶ 12, to Armstrong Mot. to Dismiss Gov't Compl.
("2000 Agreement") (same).

[hereinafter RESTATEMENT].  And "[w]hen performance of a duty under a contract is due any non-performance is a breach."  *Id.* § 235(2); *Franconia Assocs. v. United States*, 536 U.S. 129, 142–43 (2002) ("Failure by the promisor to perform at the time indicated for performance in the contract establishes an immediate breach.") (citing RESTATEMENT § 235(2) (1979)).[35]  While "every breach gives rise to a claim for damages," *id.* § 236 cmt. b, the breach of a core, vital material term that defeats the purpose of the contract constitutes a "total breach," and the injured party can obtain restitution of some or all monies paid to the breaching party as a remedy.  *See generally*, Farnsworth on Contracts § 12.20 (3rd ed. 2004); Corbin on Contracts § 61.2 (Revised ed. 2012); 26 Williston on Contracts § 68:2 (4th ed.).

Turning to the obligations imposed by both the 1995 and 2000 sponsorship agreements, the parties were required to perform those obligations in "compliance with all applicable rules" of various organizations that governed cycling, including the *Union Cycliste Internationale* [UCI] and the International Olympic Committee [IOC].  *See* 1995 Agreement ¶ 13; 2000 Agreement ¶ 12.  Both the UCI and IOC prohibited the use of certain performance enhancing drugs and prohibited other practices known to enhance rider performance.  Gov't Compl. ¶ 17; Relator SAC ¶ 36.  In the 2000 Agreement, the parties added a provision stating:

> Company represents that each rider on the Team has a morals turpitude and drug clause that allows the Company to suspend or terminate the rider for cause which shall include items such as (1) conviction of a felony; (2) acts that require the Team to suspend or terminate the rider under applicable rules of the [various governing cycling organizations]; (3) failure to pass drug or medical tests; (4) inappropriate drug conduct prejudicial to the Team, or the Postal Service, which is in violation of the Team rules or commonly accepted standards of morality; and (5) gross neglect of the rider's duty.

---

[35] The D.C. Circuit has also endorsed provisions of the Restatement of Contracts concerning performance and non-performance.  *See Nashville Lodging Co. v. Resolution Trust Corp.*, 59 F.3d 236 (D.C. Cir. 1995).

If any rider on the Team is found guilty of such offense, the Company agrees to take appropriate action within thirty (30) days.

2000 Agreement ¶ 9(a).

For several reasons, the alleged doping activity would constitute a breach of contract with the Postal Service that would create a potential liability to the government sufficiently certain to constitute an "obligation" under the reverse false claims theory of liability.

First, the parties to the contract unmistakably understood the symbolism embodied by having a bicycle racing team associated with the Postal Service, which was in competition with other courier, mail and delivery services and seeking to enhance its reputation as having "fast" services.  An Addendum to the 1995 Agreement provided that "Montgomery Sports' primary mission is to accomplish the business objectives of the U.S. Postal Service."  1995 Agreement Ex. D (Sponsorship Proposal) (Dkt 93-1 at 23).  Another goal of the sponsorship was "[a]ssociat[ing] the U.S. Postal Service with a sports property that showcases its advances in technology, speed and efficiency of Priority Mail," and "[a]ssociat[ing] with a property that enhances the U.S. Postal Service image in the community and generates goodwill."  *Id.*, Dkt 93-1 at 23-24.  Doping by the cycling team would therefore be a total breach of the contracts, not only because they expressly required compliance with anti-doping rules, but also because rather than being associated with a team that is genuinely fast, the Postal Service's reputation and goodwill are seriously damaged by an association with a team that is faster because it cheats.  Indeed, given the public relations goals of the sponsorship, it is manifest that compliance with anti-doping regulations was an core term of the contracts, because the negative publicity associated with doping defeats the essential purpose of the venture (from the sponsor's perspective).  *See* Restatement (Third) Of Agency § 8.10 and comment (2006) (agent breaches the common law

duty of good conduct when he engages in conduct that is "likely to damage the principal's business reputation," and "[a]n agent who breaches the agent's duty of good conduct is subject to liability . . . for breach of contract to the extent that the breach contravenes an express or implied term of the contract and causes any damages to the principal."); 19 Williston on Contracts § 54:45 (4th ed.) ("An employee may be discharged for violating a covenant against imperiling the morals of the enterprise.").

Secondly, the other core benefit of the bargain for the Postal Service was increased marketing exposure. Thus, another goal of the relationship was to ensure participation of the cycling team in as many promotional events and races as possible in order to "produce significant exposure [for the USPS] in newspapers, radio and television throughout North America, Europe and Asia." 1995 Agreement Exh. D, ¶ C. Competing in races was a central part of the agreement. Indeed, when approximating the expected value to the USPS of advertisements at $12 million, the 1995 Agreement expressly based its valuation on the cycling team competing in various races, and more generally on hours of televised coverage. *Id.* The only way the cycling team could provide the USPS with televised coverage of its iconic logo on the team jerseys—and thereby provide the promotion contemplated under the agreement—was to comply with the governing organizations' rules concerning doping. Doping would lead to suspensions or bans for team members and/or the entire team, and a team that cannot race cannot generate positive publicity for its sponsor.

In sum, the alleged rider doping would have been a total breach of the 1995 agreement, and the same clearly holds true for the 2000 Agreement.[36]  As such, the Postal Service clearly could have sought restitution – repayment of the sponsorship fees – as a remedy.  Consequently, under both agreements the defendants owed "the government an obligation sufficiently certain to give rise to an action of debt at common law."  *Am. Textile Mfrs. Inst., Inc.*, 190 F.3d at 736.

The Court rejects defendants' argument that, even if a breach of contract created an "obligation," it was a contingent obligation because the government had discretion in deciding whether to seek repayment.  *See* Armstrong Mot. to Dismiss Gov't Compl. at 16.  Because contingent obligations cannot give rise to liability for a reverse false claims, the defendants contend, the breach of contract theory is not an "obligation" within the meaning of the reverse false claim statute.  The argument proves too much.  A party to a contract that has allegedly been breached always has "discretion" as to whether to seek remedy for the breach; parties to a contract are not required by law or custom to sue each other for every breach.  Thus, accepting the defendants' argument would mean that a breach of contract could never be an "obligation" until a formal demand was made or a lawsuit was initiated, a result that cannot be squared with the language or the purpose of the statute.  *See, e.g.*, *Bahrani*, 465 F.3d at 1204 ("Some discretion inheres in a wide variety of government decisions. For example, government officials may have discretion as to whether to insist on a party's performance under a contract or whether to file a breach of contract action if a party does not perform. However, a contractual obligation falls within the scope of § 3729(a)(7).")  Accepting the defendants' argument would also have the detrimental and counterproductive effect of allowing those with knowledge of contractual

---

[36] Because the alleged doping alone was clearly sufficient to establish a total breach of contract, the Court need not tarry on the various other theories of breach (particularly of the 2000 Agreement), many of which also appear to be viable.

breaches or other non-compliance to make false statements about those matters, without penalty, unless and until the government files a lawsuit.[37]

Even if the alleged doping created an obligation for breach of contract, the next question is who had the obligation to the government, and does that matter for the reverse false claim purposes?  Defendant Armstrong argues that, even assuming *someone* had an obligation to pay money to the government, *he* does not owe that obligation.  *See* Armstrong Mot. to Dismiss Gov't Compl. at 14–15 ("The government has not—and cannot—plead that Armstrong had an obligation to pay money to the government at the time of the alleged false statements.").  And according to Armstrong, this distinction is critical, because "[t]o recover under section 3729(a), the plaintiff must demonstrate that the defendant owed a specific, legal obligation to pay the government money or property at the time the alleged false record or statement was made."  *Id.* at 15.   Weisel makes a similar argument.  Weisel Mot. To Dismiss Relator Compl. at 22-23.  One can certainly find language that appears to support this contention.  *See, e.g.*, *American Textile Mfrs.*, 190 F.3d at 736 ("[W]e hold that a reverse false claim action cannot proceed without proof that the defendant made a false record or statement *at a time that the defendant owed* to the government an obligation sufficiently certain to give rise to an action of debt at common law.") (emphasis added); S. Rep. No. 345, 99th Cong., 2nd Sess. 18 (1986) ("The

---

[37] The Court pauses briefly to address an argument made only by the relator—that the defendants owed an "obligation" to the government for the additional reason that the parties' agreements contained an indemnification clause, under which TS LLC agreed to indemnify the USPS for, among other things, any damages and expenses arising from TS LLC's breach, misrepresentation or non-performance under the agreement.  Relator Opp'n to Weisel at 23.  This argument has no merit, and it is not surprising that the government decided not to brief it.  As the defendants correctly observe, the indemnification provision requires the Tailwind defendants to compensate the USPS if it becomes liable to a third party, but the relator has not alleged that the USPS has incurred any liability to a third party.  *See* Weisel Reply to Relator Opp'n at 16.

question of whether the False Claims Act covers situations where, by means of false financial statements or accounting reports, a person attempts to defeat or reduce the amount of a claim or potential claim by the United States *against him*, has been the subject of differing judicial interpretations.") (emphasis added); S. Rep. No. 10, 111th Cong., 1st Sess. 13-14 (2009) ("This provision is commonly referred to as creating ''reverse'' false claims liability because it is designed to cover Government money or property that is knowingly *retained by a person even though they have no right to it*.") (emphasis added).

The government responds by stating that "[a]lthough Armstrong argues that he was not in privity with the USPS, reverse false claims liability arises whenever a defendant makes a false statement to avoid an obligation to pay the Government, even if the obligation is not his."  Gov't Opp'n to Armstrong Mot. to Dismiss at 7; *see id.* at 26 ("The statute imposes liability regardless of whether it is the defendant or a third party who has an obligation to pay.").  In support, the government relies on *United States v. Caremark, Inc.*, 634 F.3d 808 (5th Cir. 2011).  There, the court held that the "statute does not require that the statement impair the *defendant's* obligation; instead, it requires that the statement impair '*an* obligation to pay or transmit money or property to the Government.' "  *Id*. at 817 (quoting 31 U.S.C. 3729(a)(7) (2006)) (emphasis in original).

*Caremark* discussed this issue and cited supporting precedent, and unlike the dictum relied upon by Armstrong and the passing observations quoted above, the language in *Caremark* is clearly a holding of a court.  Significantly, Armstrong did not respond in any way to the government's argument or the *Caremark* decision in his reply brief.  See Armstrong's Reply to Gov't Mot. to Dismiss at 11-14.  Armstrong's silence in this regard is deafening.

Nonetheless, as noted above, the Court's analysis of statutory construction must begin with the text of the statute, and the government's position seems more consistent with the text of

the FCA: "The reverse false claims provision imposes liability on any person who 'knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease **_an_** obligation to pay or transmit money or property to the Government.' "  31 U.S.C. 3729(a)(7) (2006) (emphasis added).  Congress's use of the indefinite article certainly supports the interpretation that the scope of the statute is not limited to instances where the person seeks to "conceal, avoid or decrease" his own obligation, as opposed to any obligation.  *See Caremark*, 634 F.3d at 817.  That said, reasonable questions may remain, such as what if any relevance should be placed on the relationship of the putative defendant to the obligation or the obligor, and under what circumstances should the putative defendant bear liability for the entire obligation or just a portion thereof.  However, any such questions are best answered in specific context and after further development of the facts.

In conclusion, with respect to the reverse false statements claim, the Court holds that the plaintiffs have sufficiently pled that the defendants owed an obligation to pay money to the government due to the alleged breach of the sponsorship agreements as a result of the riders' doping.[38]

---

[38] The parties dispute, in footnotes to their briefs, the point at which a reverse false claims violation is complete.  *Compare* Gov't Opp'n to Armstrong Mot. to Dismiss at 10 n.5 ("A reverse false claim violation is not complete until the acts comprising all the elements of the violation have occurred, and thus it is not sufficient for Armstrong merely to assert that some of the elements, such as the existence of an obligation, may have existed prior to June 10, 2000."), *with* Armstrong Reply to Gov't Opp'n at 2 n.1 ("Without citing any authority, the government argues that the limitations period for reverse false claims does not begin to toll when the underlying claim is submitted. That is not the law. The statute of limitations begins running when the defendants 'present[s] an allegedly false claim to the [government].' "  *United States v. Van Oosterhout*, 96 F.3d 1491, 1493–1494 (D.C. Cir. 1996)).  The dueling footnotes are not sufficient briefing to allow the Court to resolve the issue, and its resolution will also likely depend upon the specific circumstances of each "obligation" and false statement or record, so the Court leaves this issue for another day.  To leave no room for doubt, the Court reiterates that it takes no position on whether a reverse false claim allegation, based on an "obligation" to

## 2.   False Records or Statements After Defendants' Obligation Arose

Having determined that the plaintiffs sufficiently pled an obligation, the plaintiffs must also adequately plead that the defendant knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease that obligation to pay money to the government to survive a motion to dismiss.  *See*, 31 U.S.C. 3729(a)(7) (2006).  Weisel and Armstrong are the only defendants whose motions to dismiss addressed this issue with any sufficiency or specificity.

As to Weisel, for reasons as stated above in Part III.B.1., the relator has failed to allege that Mr. Weisel "caused" to be made or used a false record or statement material to a false or fraudulent claim.  Furthermore, there are insufficient allegations that Weisel had knowledge of the doping, and without such knowledge, he could not have had knowledge of any obligation to repay the government or have a purpose to conceal, avoid or decrease any such obligation.  The Court therefore dismisses this reverse false claims count against Weisel, without prejudice.

Armstrong is a different matter.  The government's and relator's complaints are rife with allegations that Armstrong had knowledge of the doping, and that he made false statements to conceal the doping and the attendant obligation which would have resulted if the government had known of the doping.   The Court therefore denies the motion to dismiss the reverse false claims count against Armstrong.

## E.  Piercing The Corporate Veil of Tailwind and Ross Investments

The relator seeks to pierce the Tailwind defendants' corporate veil, and thereby hold Ross Investments and Mr. Weisel personally liable for the alleged violations of the FCA by Tailwind.

---

reimburse the government for payments made by the government prior to June 10, 2000 or June 10, 2004 (as applicable), would be timely.

Relator Opp'n to Weisel Mot. to Dismiss at 37 ("If Tailwind's veil is pierced, then Ross Investments, in addition to Thomas Weisel, will have potential liability, for Ross Investments held the stock of Tailwind.").[39]   The relator also seeks to pierce Ross Investment's corporate veil in an attempt to hold Mr. Weisel personally liable for the alleged violations of the FCA by Ross Investments.  *Id.* ("There are also grounds to pierce the veil of Ross Investments, Inc. to get to defendant Weisel.").  Finally, the relator seeks to pierce Montgomery Sports' corporate veil in an attempt to hold Mr. Weisel personally liable for any FCA violations committed by Montgomery Sports.  *Id.* at 38 ("[T]he piercing allegations regarding Montgomery Sports are also sufficient for purposes of Rule 8.").

### 1.  Legal Standard

In *Labadie Coal Co. v. Black*, 672 F.2d 92, 96 (D.C. Cir. 1982), the D.C. Circuit explained that "[s]everal factors have been identified as helpful in deciding when to pierce the corporate veil …."  *Id.* at 96.  The court stated that

> [i]n evaluating the factors outlined below, it is helpful to group them under a two-prong test: (1) is there such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist?; and (2) if the acts are treated as those of the corporation alone, will an inequitable result follow?

*Id.*  Further, "[r]elevant to the first question is the issue of the degree to which formalities have been followed to maintain a separate corporate identity. The second question looks to the basic issue of fairness under the facts."  *Id.*

---

[39] The relator also argues that "Weisel's knowledge can be imputed to Ross Investments, Inc., which was the entity Weisel used to exercise control over Tailwind and cause it to submit false claims to the U.S. Postal Service."  *Id.*  But as Defendant Weisel correctly observes, the relator's "failure to plead an FCA claim against Mr. Weisel precludes any derivative liability for Ross Investments [for Weisel's actions]."  Weisel Reply to Relator Opp'n at 18.

With respect to the "formalities" prong—i.e., the unity of interest and ownership—the court identified several factors, but stated that "[i]t is clearly not necessary that all of these factors be present in a given case to justify piercing the veil." *Id.* at 97.  The factors were: "(a) The nature of the corporate ownership and control"; (b) "Failure to maintain corporate minutes or adequate corporate records"; (c) "Failure to maintain the corporate formalities for issuance or subscription to stock …."; (d) "Commingling of funds and other assets of the corporation"; (e) "Diversion of the corporation's funds or assets to non-corporate uses such as the personal uses of the corporation's shareholders." *Id.* at 96–99.

Under the "fairness" prong, the court discussed the issue of adequate capitalization.  The court stated that "[w]hether capitalization is adequate is understandably a function of the type of business in which the corporation engages." *Id.* at 99.  The court also explained that the "essence of the fairness test is simply that an individual businessman cannot hide from the normal consequences of carefree entrepreneuring by doing so through a corporate shell." *Id.* at 100.

## 2.  Analysis

### a)  Piercing Tailwind's Corporate Veil to Hold Ross Investments and Weisel Liable

The relator's allegations do not satisfy *Labadie's* two-pronged inquiry. [40]  As to the first prong, regarding "formalities" or "unity of interest," relator contends that he has sufficiently

---

[40] The relator suggests that the standard announced by the D.C. Circuit in *Labadie* is not the prevailing test for piercing a corporation's corporate veil, Relator Opp'n to Weisel Mot. to Dismiss at 32, and that a "totality of facts" standard generally governs whether a plaintiff has satisfied the standard for piercing a corporate veil, as described in cases such as *Founding Church of Scientology of Washington, D.C., Inc. v. Webster*, 802 F.2d 1448, 1452 (D.C. Cir. 1986).  The Court is not convinced.  The standard in *Founding Church of Scientology* does not differ in any material respect from the standard announced in *Labadie*.  Indeed, *Founding Church of Scientology* cites *Labadie* in explaining the standard for piercing the corporate veil. 802 F.2d at 1452.  *See also U.S. Through Small Bus. Admin. v. Pena*, 731 F.2d 8, 13 (D.C. Cir.

alleged Mr. Weisel "dominated and controlled" Tailwind because of the fact that he "created the company, was its largest shareholder, and served as its President and Chairman."  Relator Opp'n to Weisel Mot. to Dismiss at 34.  To show that there was commingling of funds, he alleges that Mr. Weisel used personal funds to pay corporate bills, including paying the bonus portion of Mr. Armstrong's salary in 1998.  *Id.* (citing Relator SAC ¶ 135).  And to establish that there was diversion of corporate funds or assets, the relator asserts that "Tailwind gave Weisel's firm Thomas Weisel Partners, LLP substantially preferential treatment as a sponsor of the USPS Team."  *Id.*  Although Mr. Weisel's use of personal funds tends to show that there may have been some commingling, these allegations do not establish the "significant commingling" required to show that there was such a unity of interest and ownership to pierce the veil.  *See Trustees of Nat. Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 195 (3d Cir. 2003) (affirming the district court's decision to pierce the corporate veil and discussing the district court's finding of "substantial disregard of corporate formalities" and "significant commingling" of assets).  Thus, the first prong is not met.

In any event, even if the relator's allegations regarding commingling were sufficient to satisfy the first prong, the relator has not satisfied the second prong—that it would be unjust if the Court did not pierce Tailwind's corporate veil.  *See*, *Bufco Corp. v. N.L.R.B.*, 147 F.3d 964, 969 (D.C. Cir. 1998); *Labadie*, 672 F.2d at 96.  For example, the relator has not shown that Tailwind was grossly undercapitalized.  To establish that Tailwind was "grossly undercapitalized," the relator alleges that it was "dependent on the U.S. Postal Service payments

---

1984) ("the essential legal test in all jurisdictions [for piercing the corporate veil] is whether it would be equitable to allow the stockholders to invoke the corporate mantle to shield themselves from personal liability."). In sum, applying the standard of *Founding Church of Scientology* yields the same result.

for the vast majority of its revenue, that it lost money each year, and that it had negative equity, while it simultaneously was promising to indemnify the U.S. Postal Service against damages arising from events of default like doping violations."  Relator Opp'n to Weisel Mot. to Dismiss at 34–35.  Just because the company was losing money and relied on one source for the majority of its revenue does not indicate that the company was "grossly" undercapitalized, where there is no specific allegation that the company's assets and revenues were "[grossly] small in relation to the nature of the business of the corporation and the risks attendant to such businesses."  FLETCHER CYCLOPEDIA § 41.33, p.216 (defining inadequate capitalization).  *Compare*, *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 420 (5th Cir. 2006) (finding that the entity "was grossly undercapitalized with the equivalent of $17,000 U.S., a paltry sum to finance oil and gas exploration and production").  *See also*, *Southeast Texas Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 680 (6th Cir. 2006) (applying Delaware and Tennessee law and stating that "[f]ailure of a business venture and resulting loss of capital does not constitute gross under-capitalization as that term is used to pierce the corporate veil") (internal quotation marks omitted).

Accordingly, the relator has not alleged facts sufficient to pierce the corporate veil of Tailwind and hold Ross Investments or Weisel liable.

### b)  Piercing Ross Investments' Corporate Veil to Hold Weisel Liable

The relator's attempt to pierce Ross Investments' corporate veil also comes up short.  He alleges, for example, that "[w]hile not dispositive, the fact that Weisel was the sole shareholder and President of Ross Investments, Inc. is a significant consideration here."  *Id.* at 37.  He also makes the conclusory assertion that "Weisel used the ownership and control he exercised via Ross over Tailwind's shares to cause Tailwind to engage in fraud and less than arms-length

transactions with Weisel's investment banking firm." *Id.* These allegations are not sufficiently substantive, and the Court finds that the relator has not satisfied the high burden required to pierce Ross Investments' corporate veil.

### c) Piercing Montgomery Sports' Corporate Veil to Hold Weisel Liable

The relator's third attempt to pierce a company's corporate veil fares no better. To support his argument that Montgomery Sports' (predecessor to Tailwind) corporate veil should be pierced, he asserts that Mr. Weisel "founded Montgomery Sports as part of Montgomery Securities . . . served as [its] president, and dominated and controlled the company." *Id.* at 38. He also observes that the "company was renamed TWP Sports, Inc., which was presumably an acronym to refer to Weisel himself." *Id.* at 38–39. None of these allegations establish that Mr. Weisel and Montgomery Sports shared such a unity of interest that an inequitable result would follow if Mr. Weisel did not share liability for the acts of Montgomery Sports, nor do the allegations indicate that Montgomery Sports was undercapitalized.

### d) Is the Relator Entitled to Discovery on this Issue?

Relying primarily on *Labadie*, as a fallback argument the relator contends that, at the very least, the Court should grant him discovery on the factors announced in *Labadie*, rather than dismissing these corporate defendants. Relator Opp'n to Weisel Mot. to Dismiss at 35 ("Indeed, the decision in *Labadie* was to reverse a dismissal."). However, the prejudice in *Labadie* was due to the fact that the defendant was dismissed with prejudice after having frustrated the plaintiff's efforts to conduct discovery into its corporate records and affairs to determine whether the corporate veil should be pierced. *Labadie*, 672 F.2d at 93-95. In remanding the decision, the D.C. Circuit instructed that the "plaintiff should be allowed the fullest discovery into [the

77

individual defendant's] private financial records, as well as [the corporation's] corporate records (such as they are), to determine facts bearing on whether [the corporation's] corporate existence should be ignored in this case." *Id.* at 100.  In this case, such discovery can still go forward even if the these defendants are dismissed without prejudice.  *See* FRCP 45.  Depending upon the outcome of such discovery, the relator, of course, remains free to plead these corporate defendants back into this litigation at a later date, *see* FRCP 15(c), but these corporate defendants will not remain parties to this litigation in the meantime.

### D.    Dismissal Without Prejudice and Leave to Amend

The relator has requested that the Court allow him leave to amend his complaint if the Court grants defendants' motion to dismiss. The relator states that he "has not yet made any amendments in response to the alleged deficiencies raised by defendants, as the Second Amended Complaint was filed with the Court prior to any motion to dismiss by any defendant." Relator Opp'n to Weisel Mot. to Dismiss at 44.  The relator notes that any amendment to his complaint would be his "first opportunity to address any deficiencies and to incorporate additional information to cure the same." *Id.*  Defendants Weisel and Ross Investments contend that the relator "now has had three years to investigate the basis of his claims against Mr. Weisel and Ross Investments—claims that are based on nine-year old conduct of which Relator was an integral part—yet he still is unable to state a claim."  Weisel Reply to Relator Opp'n at 24–25. Thus, the defendants argue that "[a]ll of Relator's claims against Mr. Weisel and Ross Investments should be dismissed and Relator's request for leave to amend . . .  should be denied." *Id.* at 25.

"Failure to plead fraud with particularity … does not support a dismissal with prejudice." *Firestone*, 76 F.3d at 1209.  "To the contrary, leave to amend is almost always allowed to cure

deficiencies in pleading fraud." *Id.* (internal citations omitted).  "[D]ismissal *with prejudice*," on the other hand, "is warranted only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 131 (D.C. Cir. 2012) (emphasis in original) (citing *Firestone*, 76 F.3d at 1209).

It is true that the relator was involved in the alleged fraud and has had several years to investigate his claims.  Nonetheless, the Court cannot say that the relator's pleading cannot possibly be cured.  Through discovery or further investigative efforts in this litigation, some of the pleading defects recognized could possibly be cured.  Dismissal is therefore without prejudice, except for the dismissal with prejudice of all claims against TS LLC and the dismissal with prejudice of all of relator's FCA claims arising prior to June 10, 2004.

## IV.    CONCLUSION

For the foregoing reasons, the defendants' motions are **GRANTED IN PART** and **DENIED IN PART**.

Each defendant (or group of defendants) that filed a motion to dismiss shall confer with plaintiffs to settle an order regarding same (said order should explicitly reference the affected docket numbers), and file a proposed order by June 25, 2014.

## Summary of Rulings[*]

## Motions, Requests, Objections

| Motions/Requests/Objections | Ruling |
| --- | --- |
| CSE Request for Judicial Notice (Dkt. No. 94 at ECF p. 36) | Granted |
| Relator's Objection to Extrinsic Evidence (Dkt. No. 107–1) | Granted |
| Bruyneel Mot. to Dismiss Relator SAC (Dkt. No. 84) | Denied |
| Bruyneel Mot. to Dismiss Gov't Compl. (Dkt. No. 85) | Denied |
| Weisel Mot. to Dismiss Relator SAC (Dkt. No. 88) | Granted in Part, Denied in Part |
| TS Corp & TS LLC Mot. to Dismiss Gov't Compl. and Relator SAC (Dkt. No. 91) | Granted as to TS LLC (with prejudice), Denied as to TS Corp |
| Armstrong Mot. to Dismiss Relator SAC (Dkt. No. 92) | Denied |
| Armstrong Mot. to Dismiss Gov't Compl. (Dkt. No. 93) | Denied |
| CSE Mot. to Dismiss Relator SAC (Dkt. No. 94) | Granted in Part, Denied in Part |

## Relator's Counts

| Counts | Ruling |
| --- | --- |
| Count 1: False Claims (pre-FERA) | Dismissed as to Weisel (*see* III.B.1(a)); Not Dismissed as to Tailwind (*see* III.B.1(b)), Bruyneel (*see* III.B.1(c)), and the remaining non-intervened defendants (*see* III.B.1(c), n.33) |
| Count 2: False Statements (pre-FERA) | Dismissed as to Weisel (*see* III.B.1(a)); Not Dismissed as to Tailwind (*see* III.B.1(b)), Bruyneel (*see* III.B.1(c)), and the remaining non-intervened defendants (*see* III.B.1(c), n.33) |
| Count 3: Conspiracy as to False Claims (pre-FERA) | Dismissed as to Weisel (*see* III.B.3(a)); Not Dismissed as to Tailwind (*see* III.B.3(b)), Bruyneel (*see* III.B.3(c)), and the remaining non-intervened defendants (*see* III.B.1(c), n.33) |

---

[*] Dismissals are without prejudice unless specifically noted.

| | |
|---|---|
| Count 4: Reverse False Claims (pre-FERA) | Dismissed as to Weisel (*see* III.B.4(b)(i)); Not Dismissed as to Tailwind (*see* III.B.4(b)(ii), Bruyneel (*see* III.B.4(c)(iii)), and the remaining non-intervened defendants (*see* III.B.1(c), n.33) |
| Count 5: False Claims (post-FERA) | Dismissed as to all defendants (*see* III.A.1; *see also* III.B.1) |
| Count 6: False Statements (post-FERA) | Dismissed as to Weisel (*see* III.B.2(a)); Not Dismissed as to Tailwind (*see* III.B.2(b)), Bruyneel (*see* III.B.2(c)), and the remaining non-intervened defendants (*see* III.B.1(c), n.33) |
| Count 7: Conspiracy as to False Claims (post-FERA) | Dismissed as to all defendants (*see* III.A.1; *see also* III.B.3) |
| Count 8: Reverse False Claims | Dismissed as to all defendants (*see* III.A.1) |

### United States' Counts

| Counts | Ruling |
|---|---|
| Count 1: False Claims (pre-FERA) | Defendants did not seek dismissal |
| Count 2: False Statements (pre- and post-FERA) | post-FERA not dismissed (*see* III.A.2); Pre-FERA was pled and not dismissed (*see* III.A.2) |
| Count 3: Conspiracy as to False Claims (pre-FERA) | Defendants did not seek dismissal |
| Count 4: Reverse False Claims (pre-FERA) | Not dismissed (*see* III.B.4(a)) |
| Count 5: Common Law Fraud | Not Dismissed (*see* II.E.2.) |
| Count 6: Unjust Enrichment against Armstrong and Bruyneel | Not Dismissed (*see* II.E.2.) |
| Count 7: Breach of Contract against Tailwind | Not Dismissed (*see* II.E.2.) |

**SO ORDERED.**

Date: June 19, 2014

_____
ROBERT L. WILKINS
United States Circuit Judge
(Sitting by designation in the United States
District Court for the District of Columbia)