UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES *ex rel.* LANDIS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 10-cv-976 (CRC) |
| | ) | |
| TAILWIND SPORTS CORP., TAILWIND SPORTS LLC, LANCE ARMSTRONG, and JOHAN BRUYNEEL, | ) | **ECF** |
| | ) | REDACTED |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**UNITED STATES' RESPONSE TO
SUPPLEMENTAL BRIEF OF LANCE ARMSTRONG**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 2

BACKGROUND. .............................................................................................................. 2

   The Investigations ...................................................................................................... 2

   The Government's Claim of Privilege Over The Interview Memoranda and Their
   Inadvertent Production ............................................................................................... 3

DISCUSSION .................................................................................................................... 5

   I. THE INADVERTENTLY PRODUCED DOCUMENTS ARE SUBJECT TO
      WORK-PRODUCT PROTECTION ..................................................................... 5

      1. Interviews Conducted by Attorneys in the Civil Division ............................... 7

      2. Interviews Conducted by the Criminal Division ........................................... 10

      3. Armstrong's Has Not Shown "Substantial Need" ......................................... 12

      4. Attorney Notes on the Inadvertently Produced Documents ......................... 14

      5. Armstrong's Waiver Argument Should Be Rejected .................................... 15

   II. ARMSTRONG'S DELIBERATE FAILURE TO FOLLOW THE
       PROCEDURES SET FORTH IN THE AGREED-UPON PROPOSED
       ORDER REGARDING INADVERTENT DISCLOSURE. ................................. 16

   III. GRAND JURY MATERIAL ............................................................................ 18

CONCLUSION ................................................................................................................ 21

# TABLE OF AUTHORITIES

## Cases

*Director, Office of Thrift Supervision v. Vinson & Elkins, LLP*,
  124 F.3d 1304 (D.C. Cir. 1997) ...................................................................................... 8, 14

*FTC v. TRW, Inc.*,
  628 F.2d 207 (D.C. Cir. 1980) ............................................................................................. 7

*Hickman v. Taylor*,
  329 U.S. 495 (1947) ............................................................................................... 2, 5, 6, 8

*In re Grand Jury Subpoena*,
  357 F.3d 900 (9th Cir. 2004) ............................................................................................... 9

*In re Sealed Case*,
  250 F.3d 764 (D.C. Cir. 2001) ........................................................................................... 19

*In re Special September 1978 Grand Jury (II)*,
  640 F.2d 49 (7th Cir.1980) ............................................................................................ 9, 11

*In re. Kellogg Brown & Root, Inc.*,
  14-5055, -- F.3d --, 2014 WL 2895939 (D.C. Cir. June 27, 2014) ................................ 7, 9, 11

*Katz v. AT&T Corp.*,
  191 F.R.D. 433 (E.D. Pa. 2000) ......................................................................................... 16

*Maki v. Unite States*,
  No. 07-0443, 2008 U.S. Dist. LEXIS 31496 (W.D. Va. Apr. 15, 2008) ......................... 11, 12

*Miller v. Holzmann*,
  No. 95-1231, 2007 U.S. Dist. LEXIS 16117 (D.D.C. Mar. 8, 2007) ............................... 11, 12

*SEC v. Dresser Indus., Inc.*,
  628 F.2d 1368 (D.C. Cir. 1980) ......................................................................................... 11

*Tarpeh-Doe v. United States*,
  No 88-0270, 1990 U.S. Dist. LEXIS 15330 (D.DC. Nov. 13, 1990) .................................. 9

*United States v. Adlman*,
  134 F.3d 1194 (2d Cir. 1998) ......................................................................................... 9, 11

*United States v. Davis*,
  131 F.R.D. 391 (S.D.N.Y. 1990) ........................................................................................ 11

*United States v. Davis*,
  636 F.2d 1028 (5th Cir. 1981) ......................................................................................... 9, 11

*United States v. Doe*,
  481 U.S. 101 (1987) ........................................................................................................... 19

*United States v. Dynavac, Inc.*,
  6 F.3d 1407 (9th Cir. 1993) ............................................................................................... 18

*United States v. Interstate Dress Carriers, Inc.*,
  280 F.2d 52 (2d Cir. 1960) ................................................................................................ 18

*United States v. Kordel,*
  397 U.S. 1 (1970) ................................................................................................................. 11
*United States v. Nobles,*
  422 U.S. 225 (1975) ........................................................................................................... 2, 6
*Upjohn Co. v. United States,*
  449 U.S. 383 (1981) ............................................................................................................. 12

**Statutes**

31 U.S.C. § 3730(a) ..................................................................................................................... 3

**Other Authorities**

Advisory Committee Notes Rule 26(b)(3) ....................................................................................... 6

**Rules**

Fed. R. Civ. P. 26(b)(3)(A)(ii) ................................................................................................... 12
Fed. R. Civ. P. 26(b)(3)(C) .......................................................................................................... 8
Fed. R. Crim. P. 6(e) ......................................................................................................... 18, 19
Fed. R. Crim. P. 6(e)(3)(E)(i) ............................................................................................. 19, 20
Fed. R. Crim. P. 6(e)(3)(F) ........................................................................................................ 20
Fed. R. Crim. P. 6(e)(3)(G) ....................................................................................................... 20

**INTRODUCTION**

In his supplemental brief, defendant Lance Armstrong argues that the Government should be compelled to produce 27 interview memoranda prepared by Government investigators under the supervision of Government attorneys.  In doing so, he seeks to invade the zone of privacy around attorney work product and extended notes taken by the agents of attorneys that the Supreme Court recognized in *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947), and *United States v. Nobles,* 422 U.S. 225, 238-39 (1975).  Moreover, Armstrong repeatedly failed to follow the procedures set forth in the parties' agreed-upon Proposed Order Regarding Inadvertent Production, demonstrating a lack of respect for the confidentiality of the Government's protected communications, some of which he now admits are subject to attorney-client privilege.  Armstrong should not be rewarded by being allowed to retain and use the inadvertently produced materials.

**BACKGROUND**

**The Investigations**

Prior to 2010, the United States Attorney's Office for the Central District of California (USAO-CDCA) and the Food and Drug Administration (FDA) Office of Inspector General (FDA-OIG) undertook an investigation into the possible use of illicit performance enhancing drugs (PEDs) by certain professional cycling teams.  Until May 2010, however, neither Lance Armstrong nor the United States Postal Service (USPS) Professional Cycling Team (the USPS team) was a subject of their investigation.  In May 2010, one of Armstrong's teammates, Floyd Landis, alleged publicly that he had personal knowledge of Armstrong's extensive PED use.  He further alleged that other top riders on the USPS team used PEDs, and that team management

assisted them in procuring the drugs and evading detection.  Based in part on these public

revelations, the criminal investigation began to focus on Armstrong and the USPS team.

Approximately one month later, on June 10, 2010, Landis filed his complaint in this

action.  Within days, the Department of Justice's Civil Division and the United States Attorney's

Office for the District of Columbia commenced an investigation of potential claims under the

False Claims Act pursuant to the obligation imposed by 31 U.S.C. § 3730(a).  By early July

2010, civil and criminal investigators had begun coordinating their investigations to the extent

permitted by law.  Attorneys for both investigations exercised oversight and directed the agents

in the conduct of their respective investigations.

### The Government's Claim of Privilege over the Interview Memoranda and Their Inadvertent Production

On January 14, 2014, Armstrong agreed to the terms of a Proposed Order Regarding

Inadvertent Disclosure, which set out a process for the return of inadvertently produced

privileged materials and, if necessary, for the resolution of disputes between the parties over the

privileged status of such materials.  ECF No. 147-1.

In his initial document requests, Armstrong requested the production of "summaries of

investigative interviews relating to this case or the investigation, including but not limited to all

interview transcripts, notes of interviews, summaries of interviews, [and] Federal Bureau of

Investigation FD-302s[.]"  ECF No. 171-2.  On February 10, 2014, the Government objected that

the material sought by this request was subject to both the attorney-client privilege and

protection as attorney work product.  Armstrong was clearly aware of the Government's claim of

privilege over the interview reports, and, on June 4, 2014 moved to compel the production of

such interview reports, which motion was denied without prejudice by Judge Wilkins.  *See* ECF

No. 171 (Armstrong First Motion to Compel); No. 173-1 (Minute Order Denying Armstrong's First Motion to Compel).

On June 7, 2014—approximately three days after Armstrong moved to compel production of "summaries of investigative interviews relating to this case"—the Government inadvertently produced 29 interview memoranda due to an administrative error in the processing of discovery material.  The face of each document indicates that it is an interview memorandum and, indeed, the Federal Bureau of Investigation (FBI) FD-302s are on a form labeled as such. The six memoranda prepared by agents of the USPS are marked on *each page* with the words "RESTRICTED INFORMATION" and a legend that reads:

> This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

The three FBI FD-302s contain a legend reading "[This document] is the property of the FBI and is loaned to your agency.  It and its contents are not to be distributed outside your agency."  All 29 memoranda were grouped together in the United States' production, and are consecutively Bates labeled US00145830 through US00146061.

Armstrong did not notify the Government of the inadvertent production and has refused to identify any steps he took to sequester or limit his use of the documents during the 30 days that elapsed between the inadvertent production and the Government's formal notice to Armstrong regarding the inadvertent production.  *See* Finkelstein Decl., Exs. A-F (Letters between Robert Chandler and Elliot Peters).

The Government discovered the inadvertent production on July 2, 2014.  The next day, Armstrong filed his second motion to compel the production of documents, including interview memoranda prepared by Government agents.  Although Armstrong's motion acknowledged that the Government had asserted privilege with respect to interview memoranda, he nonetheless attached one of the memoranda as an exhibit to his publicly-filed motion.[1]  On July 7, 2014, the Government gave Armstrong formal notice of the inadvertent production in accordance with the Proposed Order Regarding Inadvertent Disclosure agreed-upon by the parties to this matter. Finkelstein Decl., Ex. A.  On July 16, 2014, the Government served Armstrong with a supplemental notice containing legal authority and additional detail about the inadvertently produced documents in support of its privilege claims.  *Id.*, Ex. D.  Though Armstrong sent several communications stating his belief that the inadvertently produced documents were not subject to privilege, none of his communications stated the basis for his challenge to the Government's privilege assertions.  *See id.*, Exs. C, F.

## DISCUSSION

## I.   THE INADVERTENTLY PRODUCED DOCUMENTS ARE SUBJECT TO WORK-PRODUCT PROTECTION

All of the interview reports whose production Armstrong seeks to compel were created by investigators working under the supervision of Government attorneys.  Further, two of the inadvertently produced reports memorialize interviews with current USPS employees, and seven reports contain handwritten notes and highlighting from attorneys in the Department of Justice. Armstrong's motion to compel production of these reports should be denied because these reports are privileged.

---

[1] On July 10, 2014, this Court granted the United States' Motion for Protective Order (ECF No. 193), sealing the exhibit in question at least until the Government's privilege claim could be adjudicated.

The work-product doctrine is intended to preserve a zone of privacy in which a lawyer can prepare for litigation free from unnecessary intrusion by his adversaries. *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947).  In *Hickman*, the Supreme Court held that notes taken by an attorney during interviews with witnesses to the event that eventually gave rise to the lawsuit in the case were not discoverable.  329 U.S. at 510. As the Court explained,

> In performing his various duties ... it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he ... prepare his legal theories and plan his strategy without undue and needless interference.

*Id*. at 510-11; *see also* Rule 26(b)(3) Advisory Committee Notes (stating that the work-product doctrine is intended to ratify the principles that "each side's informal evaluation of its case should be protected, that each side should be encouraged to prepare independently, and that one side should not automatically have the benefit of the detailed preparatory work of the other side.").

Although *Hickman* held only that an *attorney's* interview notes are privileged, in *United States v. Nobles* the Supreme Court extended the work-product privilege to interview notes taken by the *agents* of an attorney.  Specifically *Nobles* held that the work-product doctrine,

> is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial.  *It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.*

422 U.S. 225, 238-39 (1975) (emphasis added).[2]  The D.C. Circuit has also recognized that "communications made by and to non-attorneys serving as agents of attorneys … are routinely protected …."  *In re. Kellogg Brown & Root, Inc. ("KBR")*, 14-5055, -- F.3d --, 2014 WL 2895939, at *3 (D.C. Cir. June 27, 2014) (citing *FTC v. TRW, Inc.*, 628 F.2d 207, 212 (D.C. Cir. 1980)).

In the present case, the interview memoranda whose production Armstrong seeks to compel were all prepared under the supervision of Government attorneys.  Twenty-one (21) of twenty-nine (29) of the inadvertently produced memoranda consist of notes from interviews conducted after the relator filed his *qui tam* complaint, at which time the Government initiated an active civil investigation.  Further, *all* of the witnesses whose interviews are the subject of the inadvertently produced memoranda have been available to Armstrong to be interviewed and are available for Armstrong to depose.  Consequently, as set forth more fully below, even though the memoranda at issue here were written by federal agents, these memos are subject to privilege under *Nobles* and its progeny.

---

[2] As Armstrong observes, *Nobles* also holds that a party can waive work-product privilege by sponsoring testimony concerning the content of otherwise privileged interview reports.  *See* Supplemental Br. at *6, *18 (citing *Nobles*, 422 U.S. at 239).  However, there is absolutely no merit to Armstrong's claim that "[t]he plaintiffs have admitted in their initial disclosures that they intend to call not just the witnesses who gave the interviews, but also Jeff Novitzky, the criminal investigator … who interviewed many of the witnesses …"  *Id.* at *6.  Contrary to Armstrong's claim, the government did *not* list Agent Novitzky—or any other federal agent—in its initial disclosures.  *See* ECF No. 208-17 (Government's Initial Disclosures).

Although the Relator lists Agent Novitzky on his Initial Disclosures, ECF No. 208-18 (Relator's Initial Disclosures) at *24, it goes without saying that the inclusion of Agent Novitzky's name on a twenty-one page list of "individuals [Relator believes to be] likely to have discoverable information …" *id.* at *5, does not obligate the government (or Relator) to call Agent Novitzky as a witness at trial.  Relator's initial disclosures also list Armstrong attorneys John Keker and Elliot Peters as individuals likely to have discoverable information.  *Id.* at *8.  However, the Government does not anticipate calling either of these attorneys as witnesses at trial either.

### 1.    Interviews Conducted by Attorneys in the Civil Division

Six of the inadvertently produced reports memorialize interviews with current and former

USPS employees, including USPS attorneys, who were responsible for the sponsorship of

Armstrong's cycling team.[3]   These reports are not, as Armstrong repeatedly insists,

"substantially verbatim witness statements."  *E.g.* Supplemental Br. at *10; *id.* at *5, *11.  On

the contrary, a "witness statement" within the meaning of the Federal Rules of Civil Procedure

must either be "mechanical[y] recorded" or "signed or otherwise adopted" by the witness.  Fed.

R. Civ. P. 26(b)(3)(C).  The reports at issue here were neither mechanically recorded nor adopted

by the interviewee.  Instead, these reports were based on the preparing agents' notes and

recollections.  The reports rarely attempt to reflect the verbatim statements of witnesses.  More to

the point, the content of the reports reveal the manner in which the Government anticipates using

these witnesses to support its claims and defenses.  *See Director, Office of Thrift Supervision v.*

*Vinson & Elkins, LLP*, 124 F.3d 1304, 1308 (D.C. Cir. 1997) ("At some point … a lawyer's

factual selection reflects his focus; in deciding what to include and what to omit, the lawyer

reveals his view of the case.").  Because Armstrong has access to the witnesses themselves, he

has no need to "borrow" the government's trial preparation materials.  *See Hickman*, 329 U.S. at

---

[3] The six inadvertently produced reports of USPS interviews are:  11/8/10 interview of
Deborah Davis (current USPS attorney), 11/9/10 interview of Gail Sonnenberg (former USPS
Senior Vice President of Sales), 11/9/10 interview of Lydia Zelnick (former USPS Contracting
Officer), 11/10/10 interview of Trent Ensley (current USPS Contracts Manager), 3/10/11
interview of Anita Bizzotto (former USPS Chief Marketing Officer), and 3/1/11 interview of
John Nolan (former Deputy Postmaster General).
      Armstrong now concedes that the memos relating to the Davis and Ensley interviews are
subject to attorney-client privilege.  Suppl. Br. at *12, fn. 6.  However, Armstrong has not
attempted to comply with the provisions of the parties' agreement concerning inadvertently
produced documents even with respect to the Davis and Ensley interview memos.  *See* ECF No.
147-1.  Specifically, Armstrong did not notify the Government of the inadvertent production of
memoranda subject to attorney-client privilege, and has refused to identify any steps he took to
sequester or limit his use of the Davis and Ensley memos.

517 (Jackson, J., concurring) ("Discovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary.").

Armstrong appears to concede that these six memoranda were prepared in anticipation of litigation.[4]  Attorneys from the Civil Division participated in each of the six interviews referenced above.  Indeed, attorneys from the Criminal Division were not present for two of the six interviews, and were present only for a portion of one additional interview, the November 20, 2010 interview of Gail Sonnenberg.  Thus, even if Armstrong were correct that the Government were required to show that  "*the* primary motivating purpose" behind each of the interviews was to prepare for civil litigation, Supplemental Br. at *13 (citing *Tarpeh-Doe v. United States*, No 88-0270, 1990 U.S. Dist. LEXIS 15330, at *7 (D.DC. Nov. 13, 1990) (emphasis added)), it would be able to do so in this case.[5]

_____

[4] Armstrong argues only that "[t]wenty-three of the twenty-nine witness statements were recorded not by attorneys, but by criminal investigators from the FDA and the FBI. The government has not and cannot show that those statements were prepared in anticipation of litigation."  Supplemental Br. at *12.  His argument does not address the six (6) memoranda prepared by agents of the USPS-OIG, which are the same six (6) memos relating to interviews conducted by attorneys from the Civil Division.

[5] The D.C. Circuit has recently clarified that where a communication has multiple purposes, the "primary purpose test" is satisfied so long *one* of the communication's significant purposes justifies the claim of privilege.  *KBR*, -- F.3d --, 2014 WL 2895939, at *5 ("[T]rying to find the one primary purpose for a communication motivated by two sometimes overlapping purposes (one legal and one business, for example) can be an inherently impossible task. It is often not useful or even feasible to try to determine whether the purpose was A or B when the purpose was A and B.").

Although the *KBR* decision discusses the "primary purpose test" in the context of evaluating a claim of attorney-client privilege, the principles underlying the Court's decision— namely the impossibility of identifying a single primary purpose in a communication motivated by multiple, overlapping purposes—are exactly the same in cases like this one, where the government interviews fact-witnesses *both* in connection with a criminal investigation and in anticipation of civil litigation.  Not surprisingly, the consensus view of the Courts of Appeals is that a communication can be subject to work-product privilege when *one* purpose of the communication is to prepare for litigation.  *See United States v. Adlman*, 134 F.3d 1194, 1198 (2d Cir. 1998); *In re Grand Jury Subpoena*, 357 F.3d 900, 909-10 (9th Cir. 2004); *In re Special*

In this case, all of the Government's interviews of USPS personnel responsible for the sponsorship of Armstrong's cycling team were conducted under the supervision of attorneys in the Civil Division after the Relator filed his *qui tam* complaint.  Although attorneys from the Criminal Division participated in certain of these interviews, the dominant purpose of these interviews was to prepare for possible civil litigation against Armstrong.  Further, each of these interviews contains a virtual roadmap to the Government's contemplated direct examination of the USPS personnel responsible for the sponsorship of Armstrong's cycling team.  Therefore, the interview reports are subject to work-product privilege.

### 2.  Interviews Conducted by the Criminal Division

In addition to the six inadvertently produced reports of interviews in which attorneys from the Civil Division directly participated, *supra*, Armstrong seeks to compel the production of fifteen (15) other interview reports that were generated in the course of the government's parallel civil-criminal investigation into his use of PEDs.[6]  The majority of these interviews were of Armstrong's former team members and intimate acquaintances during a time when he still vehemently denied his PED use.  At least one of these interviews contains confidential medical information of an interviewee that is unrelated to doping.

Each of the fifteen (15) interviews conducted under the direct supervision of attorneys in the criminal division after the Relator filed his *qui tam* complaint are subject to work-product

---

*September 1978 Grand Jury (II)*, 640 F.2d 49, 61-62 (7th Cir.1980).  *But cf. United States v. Davis*, 636 F.2d 1028, 1040 (5th Cir. 1981).

[6] In addition to the interview reports generated in the course of the government's parallel civil and criminal investigations, the inadvertently produced documents also include nine (9) interview reports generated by FDA agents before the Relator filed his *qui tam* complaint on June 10, 2010.  Although these interviews were not conducted in anticipation of civil litigation, the majority of these interviews concern the PED use of cycling teams with which Armstrong was never affiliated; these interview reports concern Armstrong only tangentially, if at all.  Thus, Armstrong cannot demonstrate a substantial need for these materials.

privilege because these interviews were conducted *both* as part of the Government's criminal investigation *and also* with a view toward developing the Government's possible civil claims against Armstrong.  It is well-established that the Government may legitimately conduct parallel criminal and civil investigations.  *See United States v. Kordel*, 397 U.S. 1, 10 (1970); *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375 (D.C. Cir. 1980) (en banc).  The Government conducted just such a parallel investigation into Armstrong's PED-use after the Relator filed his *qui tam* complaint on June 10, 2010.  Pursuant to this parallel investigation, it was always the expectation of the attorneys assigned to the civil investigation that they would share information with their criminal counterparts where authorized to do so, and vice versa.  Thus, even where agents assigned to the criminal investigation generated certain interview reports, these reports were shared with attorneys assigned to the civil investigation.

The facts here are distinguishable from the cases on which Armstrong principally relies. *See* Supplemental Br. at *13 (citing *Miller v. Holzmann*, No. 95-1231, 2007 U.S. Dist. LEXIS 16117 (D.D.C. Mar. 8, 2007), and *Maki v. Unite States*, No. 07-0443, 2008 U.S. Dist. LEXIS 31496 (W.D. Va. Apr. 15, 2008)).[7]  In *Miller v. Holzmann*, Magistrate Judge Facciola ordered the Government to produce a criminal investigative file where he found "the defendants have an obvious need for the information," and "the information is otherwise unavailable."  2007 U.S.

---

[7] Although Armstrong correctly notes that "federal district courts … have held that witness statements prepared by the FBI as part of a criminal investigation are not attorney work product," Supplemental Br. at *13, it is worth noting that federal district courts have also come to the opposite conclusion.  For instance, in *United States v. Davis*, 131 F.R.D. 391 (S.D.N.Y. 1990), although the Court ordered the government to produce certain interview reports based on the defendant's showing of "substantial need"—in that case, one of the interviewees had fled from the United States—the Court accepted the underlying assertion of privilege.  *Id.* at 396 ("the Government has not indicated whether the interviews are 'factual work product' or 'opinion work product,' although we are inclined to believe that they are primarily factual.") (internal citations omitted).

Dist. LEXIS 16117, at *8.  Similarly, in *Maki*, Magistrate Judge Urbanski ordered the

Government to produce three reports generated by the Veteran's Administration ("VA") Office

of the Inspector General concerning the death of a psychiatric patient at a VA Medical Center.

Relying on *Miller v. Holzmann*, Magistrate Judge Urbanski found that "the materials at issue …

were created to determine whether to pursue criminal charges … and not in anticipation of this

civil litigation [a Federal Tort Claims Act and *Bivens* action against the VA]."  2008 U.S. Dist.

LEXIS 31496, at *22.  Neither *Miller v. Holzmann* nor *Maki* indicates that the civil action in

question was pending at the time the interview reports were generated.  In this case, by contrast,

one of the Government's purposes at the time the criminal attorneys conducted their post-June

2010 interviews was in part to develop evidence for possible use in a civil case against

Armstrong.  Again, because the Government anticipated using evidence developed during these

interviews in a civil case against Armstrong, the interview reports are subject to work-product

privilege.

### 3.  Armstrong's Has Not Shown "Substantial Need"

Rule 26(b)(3)(A)(ii) of the Federal Rules of Civil Procedure provides that documents

subject to work-product privilege may nevertheless be discoverable if the party seeking

discovery "shows that it has substantial need for the materials to prepare its case and cannot,

without undue hardship, obtain their substantial equivalent by other means."  *See also Upjohn*

*Co. v. United States*, 449 U.S. 383, 401-02 (1981).  In this case, however, Armstrong cannot

establish substantial need for the Government's work-product because each of the witnesses

whose interview report Armstrong seeks is available to Armstrong to interview and/or depose.

Indeed, Armstrong has acknowledged that certain of these witnesses have already been

interviewed by his own attorneys.

In spite of the fact that Armstrong himself has access to all of the witnesses the Government interviewed, Armstrong argues that he has "substantial need" of the Government's work-product for three reasons:  first, the Government's interviews were conducted closer in time to the events at issue in this case; second, the Government has been making use of its interview reports by including facts derived from these reports in its complaint; and third, the interview reports may bear on the credibility of key witnesses.  *See* Supplemental Br. at *17-21. Each of Armstrong's arguments lacks merit.

First, all of the inadvertently produced interview reports were written between July 2009 and November 2011.  By contrast, the events at issue in this case occurred approximately one decade before the Government's interviews were conducted.  It is unlikely that a witness would remember details concerning the details of Armstrong's PED use—or his efforts to conceal his PED use—one decade after the events giving rise to this case only to forget these details a few years after he or she was interviewed by the Government.  At the very least, Armstrong should be required to make some showing that a witnesses' memory has eroded before being permitted access to the Government's work product.  If, during the course of discovery, it becomes apparent that the passage of time has eroded a particular witness's memories, Armstrong can seek the production of that particular witness's interview report.  *Cf.* Supplemental Br. at *21, n.9 (noting that Armstrong may seek to re-raise his motion to compel with respect to specific witnesses after seeking to depose these witnesses).

Next, Armstrong argues that the Government's use of its interview reports "is the best measure of the importance of these documents to Armstrong's defense."  Supplemental Br. at *18.  This argument also is wide of the mark.  If a party could show "substantial need" merely by establishing that its adversary was *using* its work-product to litigate its case, then the exception

13

to the work-product doctrine would swallow the rule.  There is no question that the *facts* that witnesses have communicated to the Government are discoverable, and the Government has properly incorporated the facts that it learned in its investigation into its complaint.  *Not* discoverable are interview reports themselves, which the Government generated in its investigation of its possible civil claims against Armstrong.

Finally, Armstrong argues that the statements contained in the Government's interview reports "bear on critical factual issues, and significantly, the credibility of key witnesses." Supplemental Br. at *19.  This argument fails for the same reason that Armstrong's previous argument fails.  As the D.C. Circuit has held, where interview memoranda "would serve only to reinforce supposed inconsistencies about which [a litigant] already knows," then the party seeking to compel production cannot show either "need" or "hardship."  *See Vinson & Elkins*, 124 F.3d at 1308.  In this case, if Armstrong's theory is that the USPS knew that he was using PEDs, *see* Supplemental Br. at *19, then he can explore this theory when he deposes USPS witnesses.  Armstrong's mere hope that the inadvertently produced interview reports may support his theory that the USPS knew about his doping before the rest of the world is insufficient to justify the invasion of the government's work-product privilege.

### 4.  Attorney Notes on the Inadvertently Produced Documents

Seven of the interview reports whose production Armstrong seeks to compel contain notes and highlighting of Civil Division attorneys.[8]  Armstrong concedes that these attorney notations should be redacted.  *See* Supplemental Br. at *12, n.5.  However, redaction would not be sufficient.  Four of the seven marked interview reports contain highlighting or other marking

---

[8] The seven interview reports containing attorney notes and highlighting are:  7/21/10 interview of Tyler Hamilton; 7/23/10 interview of Betsy Andreu; 8/9/10 interview of Jonathan Vaughters; 8/11/10 interview of George Hincapie; 8/12/10 interview of Dr. Martial Saugy; 8/26/10 interview of Jeffrey Spencer; and 12/6/10 interview of Sheryl Crow.

identifying potential witnesses, or salient facts.  As set forth above, these interview reports

should be found to be privileged.  In the event that this Court finds them not to be privileged,

however, the Court should order Armstrong to return or destroy the copies of those memoranda

in his possession and the Government should be permitted to produce clean copies of the

interview reports.

### 5.  Armstrong's Waiver Argument Should Be Rejected

Armstrong argues that the Government cannot "credibly claim that it has an interest in

the secrecy of these documents" because (1) the Government provided a privilege log listing the

witness's identities and the interview dates, (2) representatives of the United States Anti-Doping

Agency (USADA) attended four of the interviews, and (3) information from some of the

interviews was reported in the media.  Suppl. Br. at *20-21.  Without saying as much, he

intimates that the Government has waived its work product protection through disclosure.

Armstrong offers no support for these novel waiver arguments.

The suggestion that the Government waived work product protection merely because it

listed the interview memoranda on a privilege log obviously should be rejected.  With respect to

USADA's presence at four of the interviews, Armstrong fails to explain why that fact should

destroy the Government's claim of work product protection over memoranda that were prepared

by Government agents subsequent to those interviews.  The Government's assertion of work

product protection is with reference to the memoranda.  Importantly, the memoranda from the

interviews were *not* disclosed to USADA.[9]  As for the supposed "leaks" alleged by Armstrong,

---

[9] Armstrong argues that, in the absence of a formal common interest agreement, the common interest doctrine does not apply to disclosures between the Government and USADA. Suppl. Br. at *20, fn. 8.  Because the Government never disclosed the interview memoranda to USADA, the existence of a common interest between the Government and USADA is beside the point.  In any event, as we explained in our opposition to Armstrong's motion, the common

none of the documents he cites demonstrates that the Government disclosed the interview

memoranda, or their contents.[10]

## II      ARMSTRONG'S DELIBERATE FAILURE TO FOLLOW THE PROCEDURES SET FORTH IN THE AGREED-UPON PROPOSED ORDER REGARDING INADVERTENT DISCLOSURE

At every stage of the dispute over the status of the inadvertently produced documents,

Armstrong has demonstrated a complete lack of regard for the Government's claims of privilege

and the parties' agreement concerning the handling of inadvertently produced documents.  To

begin with, Armstrong knew that the documents were subject to the Government's claim of

privilege long before he received the Government's notice of inadvertent production, but he

failed to comply with his obligation to notify the Government and to return, sequester, or destroy

the documents.  The documents at issue unquestionably were among those as to which the

Government asserted privilege, and Armstrong conceded his knowledge of that fact by arguing

that the Government was "selectively disclosing" privileged documents.  ECF No. 190, at *21.

Moreover, Armstrong now admits that the Davis and Ensley interview memos are subject to

attorney-client privilege.  Suppl. Br. at *12, fn. 6.  All of the information necessary to support

---

interest doctrine applies because any exchange of information between the Government and
USADA was pursuant to their mutual interest in discerning the nature and extent of Armstrong's
and his team's doping activities and in carrying out their respective enforcement authorities.
ECF No. 201, at *35.  Application of the common interest doctrine does not require the existence
of a formal agreement.  *Katz v. AT&T Corp.*, 191 F.R.D. 433, 437 (E.D. Pa. 2000).

[10] Some of the documents cited by Armstrong do not refer to the Government's
interviews at all.  *See* ECF No. 208-1 (Jacob Decl.) Exhs. A, H (relating to Stephanie McIlvain,
who is not a subject of any of the interview memoranda).  As for the others, Armstrong offers no
evidence to suggest that the information came from the Government, rather than the witnesses
themselves or other sources.  In some cases, it is clear from Armstrong's own supposed evidence
that the information did *not* come from the Government.  Exhibit J is an article *written by the
witness*, Mike Anderson.  In Exhibit A, it is clear from the face of the article that the information
came from the witness, Kayle Leogrande.

that conclusion is evident from the first page of those memoranda, which has been in Armstrong's possession since June 7, 2014.

The Proposed Order Regarding Inadvertent Disclosure (the "Proposed Order"), to which Armstrong agreed, requires a "party identifying [a] potentially privileged document [to] promptly notify the party holding the potential claim of privilege." *See* ECF No. 147-1, Proposed Order ¶ 10.  The Proposed Order also requires to Armstrong to abide by Rule 4.4 of the District of Columbia Rules of Professional Conduct, which requires a lawyer who receives an inadvertently produced writing to refrain from examining the writing, notify the sending party, and abide by the instructions of the sending party regarding the return or destruction of the writing.  Armstrong took none of these steps.

In fact, rather than protect the Government's claims of privilege until these claims could be adjudicated, Armstrong has made liberal use of the inadvertently-produced documents and has gone so far as to include one such document in a publicly-available court filing.  Further, contrary to Armstrong's attorneys' insistence that "we made no use of the documents at issue," Finkelstein Decl., Ex. F, Armstrong's continued use of the inadvertently produced material is evident from the references to the content of the memoranda in his supplemental brief.  For example, in attempting to articulate a need for access to the Government's work product, Armstrong identifies what he believes to be contradictions between statements in the memoranda and media accounts.  Suppl. Br. at *19.  Armstrong also identifies particular statements in the Government's interview memos with particular allegations in its complaint.  *Id.*  Armstrong states that he has identified "many contradictions" as a result his careful reading of the Government's work product material.  *Id.*

Even after the Government served notice of the inadvertent production on Armstrong on July 7, 2014, he failed to comply with the Proposed Order. The Proposed Order states that a party receiving notice "must take reasonable steps to retrieve" any copies of the document it disclosed prior to its receipt of the notice. Proposed Order ¶ 4. Not only did Armstrong fail to retrieve the interview memorandum he filed with his motion to compel, he refused to consent to the Government's motion for a protective order seeking removal of its privileged material from the public docket. Armstrong's cavalier attitude concerning the Government's claims of privilege should not be rewarded by being allowed to retain and use the inadvertently produced materials.







## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny Armstrong's motion to compel insofar as he seeks the production of the inadvertently produced interview memoranda.

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

RONALD C. MACHEN JR., D.C. Bar # 447889
United States Attorney

DANIEL F. VAN HORN, D.C. Bar # 924092
Assistant United States Attorney

 /s/ Darrell C. Valdez
DARRELL C. VALDEZ, D.C. Bar # 420232
MERCEDEH MOMENI
Assistant United States Attorneys
Judiciary Center Building
555 4th St., N.W., Civil Division
Washington, D.C.  20530

 /s/ David M. Finkelstein
MICHAEL D. GRANSTON
TRACY L. HILMER
ROBERT E. CHANDLER
DAVID M. FINKELSTEIN
Attorneys, Department of Justice
Civil Division
Post Office Box 261
Ben Franklin Station
Washington, D.C.  20044
Tel:  (202) 514-4678

DATED: August 25, 2014