IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES *ex rel.* FLOYD LANDIS, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 10-cv-00976 (CRC) |
| v. | ) ) | Oral Argument Requested |
| TAILWIND SPORTS CORPORATION, *et al.*, | ) ) ) ) | REDACTED VERSION |
| Defendants. | ) ) | |

**SUPPLEMENTAL BRIEF IN SUPPORT OF UNITED STATES'
CLAIMS OF PRIVILEGE OVER INTERVIEW MEMORANDA**

In accordance with the Court's Order of September 30, 2014, the United States respectfully submits this supplemental brief in support of its privilege assertions over 67 interview memoranda prepared in connection with this matter, the civil investigation that preceded the Government's intervention in this matter, and the related criminal investigation of defendant Lance Armstrong and others.[1]

---

[1] At oral argument on September 15, 2014, counsel for the United States mistakenly informed the Court that there were approximately 55 such memoranda. Counsel neglected to take account of 12 memoranda that had been provided separately by the United States Attorney's Office for the Central District of California, and which the civil attorneys had not reviewed or used. The United States has submitted the memoranda at issue, including these 12 memoranda, for in camera review by the Court. A log identifying these memoranda is attached as Exhibit C hereto. We note that, although the Court's order made reference only to memoranda prepared by criminal investigators, the United States has identified 24 additional memoranda relating to interviews of witnesses in connection with its investigation of its civil claims pursuant to the False Claims Act and has addressed the applicability of the attorney-client privilege and work

1

As explained below, four (4) of the aforementioned memoranda are protected from disclosure by the attorney-client privilege.  In addition, all of the memoranda were prepared by employees of the United States in anticipation of litigation and, thus, are protected from disclosure by Rule 26(b)(3) of the Federal Rules of Civil Procedure.  Moreover, the 31 interview memoranda identified in Exhibits E and F consist of opinion work product, and are not discoverable regardless of whether Armstrong can demonstrate a need for their production.  The remaining memoranda are subject to production only if Armstrong can demonstrate that he has a substantial need for the materials and that he cannot, without undue hardship, obtain their substantial equivalent by other means.  But Armstrong has already interviewed some of the same witnesses, could have interviewed others, and will be able to depose more.  Rather than conduct his own investigation, Armstrong seeks to litigate this case "on wits borrowed from [his] adversary."  *Hickman v. Taylor*, 329 U.S. 495, 515 (Jackson, J., concurring).  His motion to compel production of the Government's work product should be denied.

**I.      The Memoranda Summarizing the Davis, Ensley, Carrier, and Porporino Interviews Are Subject to Attorney-Client Privilege**

The Government interviewed four witnesses who were, at the time of the interview, employees of the United States Postal Service – Deborah Davis, Trent Ensley, Joyce Carrier, and Joseph Porporino.  *See* Exh. D.  Ms. Davis was an attorney in the USPS Law Department at the time of the interview.  A primary purpose of those interviews was for those USPS employees to provide information to the DOJ civil attorneys so that they could provide advice as to whether the Government should assert civil claims against Armstrong and others.  Declaration of Robert E. Chandler ("Chandler Decl."), Exh. A, ¶ 13.  They are therefore subject to the attorney-client

---

product protection to those documents because Armstrong's motion to compel seeks their production.

privilege. Indeed, Armstrong has conceded that the Davis memorandum and one of the Ensley memoranda are subject to attorney-client privilege. ECF No. 208, at *12, n. 6. The remaining Ensley memorandum and the Carrier and Porporino memoranda are indistinguishable from those Armstrong has already acknowledged are privileged.

## II.     All of the Interview Memoranda Are Protected Work Product

Rule 26(b)(3) of the Federal Rules of Civil Procedure protects from discovery documents that are "prepared in anticipation of litigation or for trial by or for [a] party or its representative[.]" In this case, all of the memoranda were prepared in anticipation of litigation, either civil litigation, criminal prosecution, or both. Chandler Decl. ¶ 13; Declaration of Mark Williams ("Williams Decl."), Exh. H, ¶ 4. Moreover, all of the memoranda were prepared by federal agents who were employees of the United States, a party to this action.[2] They are therefore protected work product. *See Two Bank Accounts*, 2007 WL 108392, *2 ("Investigative reports of the FBI and interview notes by its agents are materials prepared in anticipation of litigation and are thus work product.").

As we demonstrate below, at least some of the interview memoranda are "opinion" work product, and are not subject to discovery regardless of Armstrong's showing of need. *See* Exhs.

---

[2] So long as the materials are generated in anticipation of litigation, it is sufficient if the person preparing them is an agent of the party. With the 1970 amendments to the Federal Rules of Civil Procedure, "[t]he technical distinction between materials prepared by an attorney and those obtained by a claim agent or other representative of the party from whom discovery is sought [was] eliminated." *United States v. Chatham City Corp.*, 72 F.R.D. 640, 642 (S.D.Ga. 1976) (holding interview records prepared by FBI agents subject to work product protection). Where the agent is working with the attorney, the work product doctrine unquestionably applies. *United States v. Two Bank Accounts*, 2007 WL 108392, *2 (D.S.D. 2007) ("The work product privilege applies to information compiled not only by an attorney, but also an attorney's consultant or agent, including an FBI agent."). Here, the federal agents who authored the interview memoranda collaborated with attorneys in the United States Attorney's Office for the Central District of California. *See generally,* Williams Decl.

E and F.  The remaining memoranda (set forth in Exhibit G) are at least subject to protection as fact work product and, because Armstrong has failed to demonstrate a substantial need for those materials or an inability to obtain their substantial equivalent, his motion to compel their production should be denied.

      **A.**      **The Memoranda Authored By SA Pugliese Consist of Opinion Work Product**

The civil investigation that preceded the Government's intervention in this case began almost immediately following the filing of Floyd Landis' *qui tam* complaint on June 10, 2010.[3] From its inception, the matter was jointly handled by the Civil Division, Fraud Section, of the Department of Justice (the DOJ Civil Fraud Section), and the United States Attorney's Office for the District of Columbia.  Primary responsibility for the case belonged to Robert Chandler, Trial Attorney in the DOJ Civil Fraud Section, and Assistant United States Attorneys Darrell Valdez and Mercedeh Momeni of the DC USAO.

On or about July 26, 2010, Special Agent Michael Pugliese of the United States Postal Service (USPS) Office of Inspector General (OIG) was assigned to provide investigative support for the civil investigation.  SA Pugliese's assignment was exclusively in connection with the civil matter, and he operated only in that capacity.  SA Pugliese coordinated his activities with the civil attorneys only, and did not take direction from or report to the attorneys responsible for the criminal investigation.  Although he communicated with members of the criminal investigative team from time to time, these communications occurred in his role as the civil investigator, and were undertaken in order to further the civil investigation.  Moreover, SA

---

[3] Declarations in support of the facts in this section and the following section are included as Exhibit A (Declaration of Robert E. Chandler) and Exhibit B (Declaration of Michael J. Pugliese) hereto.

Pugliese did not have access to information in the possession of the criminal investigative team, except to the extent information was shared with the entire civil investigative team.

At all times, the civil attorneys set the direction for the civil investigation. They determined investigative priorities, selected witnesses to be interviewed, selected the topics to be addressed with each witness, selected the documents to be shown to witnesses, led the interviews, and asked the questions. The attorneys drafted all subpoenas, and identified documents to be collected from within the Government. SA Pugliese was, however, a fully-integrated member of the civil investigative team. He routinely participated in team conference calls with the civil attorneys to discuss investigative strategy, and was a participant in countless less-formal strategy discussions with the attorneys in the case. Furthermore, the civil attorneys frequently and freely discussed with SA Pugliese the legal theories underlying the Government's potential claims as a backdrop to these strategy discussions, in preparation for witness interviews, and for other reasons connected to the day-to-day conduct of the investigation.

The first interviews in which the civil investigators participated took place approximately four months after the filing of Landis' complaint, from November 8-10, 2010. By then, the civil team had collected and reviewed key documents, including the sponsorship agreement, the contract file, the file maintained by the contracting officer's technical representative, and interview memoranda shared by the criminal investigators. They also had served three subpoenas by that time. Moreover, as a result of their legal research and many internal discussions, they had begun to develop theories that might support the defendants' liability under the False Claims Act (FCA). Over the course of the investigation, as the civil team obtained more information, the interviews continued to focus further.

In advance of each of the interviews summarized by SA Pugliese, he and the civil attorneys would discuss the purpose and subject matter for the interview. They would collaborate in identifying documents potentially relevant to the attorneys' theories of the case about which the particular witness might be knowledgeable. They would discuss questions to be asked of the witness and, if time permitted, an interview outline drafted by the attorney would be circulated to the team, including SA Pugliese, for comment. Following each interview, the attorneys and SA Pugliese routinely met to discuss the interview. Those discussions included the attorneys' identification of the witness's statements most relevant to their legal theories. Later, SA Pugliese would draft a memorandum that consisted of a paraphrased account of the witness' interview. SA Pugliese would then circulate a draft memorandum to the civil attorneys. In some cases, an attorney would call SA Pugliese to discuss the draft memorandum in order to ensure that the final version reflected all information from the interview that was relevant to the legal theories of the case under consideration.

Where the collection of facts in an interview summary reveals an attorney's thought processes and mental impressions of the case, it is "opinion" work product, and it is "virtually undiscoverable." *United States v. Clemens*, 793 F.Supp.2d 236, 244 (D.D.C. 2011), quoting *Dir. Office of Thrift Supervision*, 124 F.3d 1304, 1307 (D.C. Cir. 1997.). Moreover, if notes or memoranda of attorney interviews contain facts elicited in the course of a "litigation-related investigation," then "the facts elicited necessarily reflect[] the focus chosen by the lawyer." *Clemens*, 793 F.Supp.2d at 252, quoting *In re Sealed Case*, 124 F.3d 230, 236 (D.C. Cir. 1997). Courts in this circuit have found such focus lacking only where (i) the interview was "preliminary" and wide-ranging, *id.*, or (ii) the attorney did not set the direction for the interview. *Clemens*, 793 F.Supp.2d at 255; *In re HealthSouth Corp. Sec. Litig.*, 250 F.R.D. 8, 12

(D.D.C. 2008). Courts have also considered whether the resulting work product amounted to a verbatim recitation of the witness' account, rather than a paraphrasing that might reflect the attorney's thought processes. *Clemens*, 793 F.Supp.2d at 256.

The memoranda prepared by SA Pugliese are the product of "focused" interviews conducted in the course of a "litigation-related" investigation that was well beyond its "preliminary" stage. The first such interview took place in February 2011, more than eight months after Landis filed his *qui tam* action. By that time, the civil investigation was well under way, and the civil attorneys' legal theories were well-developed. In contrast to the interviews in *Clemens*, the witnesses were not only known to the civil attorneys in advance of the interview, the witnesses had been selected for the interviews by the civil attorneys themselves. Moreover, the attorneys had the opportunity to, and did, prepare in advance of the interview and arrived at the interviews with their own questions.

Moreover, the Government attorneys exercised control over the interviews.[4] Only Government personnel were present, and, in almost every case, only members of the civil investigative team were present.[5] The Government attorneys selected the documents to be shown to the witness, they selected the topics, and they led the questioning at each of the interviews. These circumstances stand in sharp contrast to those in *HealthSouth*, where the

---

[4] This appears to have been the determinative factor in *Clemens*. While the court ordered the production of two memoranda in that case, it declined to order the production of a third memorandum pertaining to an interview at which Government agents were not present and which was, presumably, controlled by the attorneys claiming work product protection. *Clemens*, 793 F.Supp.2d at 239.

[5] Amy Fong, a USPS-OIG agent assigned to the criminal matter, was present at four of the interviews (interviews of Bizzotto, Cleffi, Nolan, and Myers). We note that multiple civil attorneys were present for each interview, except three phone interviews conducted by SA Pugliese alone (interviews of Handfelt, Koskie, and Tabler). Prior to those interviews, SA Pugliese discussed the information to be sought during the interview with one of the civil attorneys. Chandler Decl. ¶ 16.

7

attorneys were "merely observers of the interviews" who "did not shape the topics" and "did not frame the questions." *HealthSouth*, 250 F.R.D. at 13. In this case, the substance of the interviews is a direct reflection of the attorneys' thoughts about the case.

Following each of the interviews, SA Pugliese discussed details about the substance of the interviews with the attorneys involved. Those discussions centered on key aspects of the witness' statements that related to the Government attorneys' legal theories of the case. Later, when SA Pugliese paraphrased the witness' statements in his memorandum, his decisions about how those statements should be paraphrased reflected the priorities, legal theories, and investigation strategies he had discussed with the Government attorneys. The statements in the Pugliese memos are therefore inseparable from the thought processes of the attorneys who ran the investigation and with whom SA Pugliese closely collaborated.

The attorneys' thought processes thoroughly permeated the Pugliese memoranda, often in ways not evident from the face of the memoranda themselves. It would therefore be impossible to describe every attorney opinion reflected in those documents, but several examples may be instructive. ████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
██████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████



. This is precisely the type of litigation preparation the Supreme Court sought to protect in *Hickman v. Taylor*, 329 U.S. 495 (1947).

    B.    **The Memoranda of Joint Interviews Authored By SA Fong Consist of Opinion Work Product**

On November 8-10, 2010, and on May 24-25, 2011, the civil investigative team and the criminal investigative team conducted seven joint witness interviews.  Each witness was a current or former employee of the USPS, and each memorandum was prepared by Special Agent Amy Fong of the USPS-OIG.   All of the memoranda contain opinion work product.  Five of the memoranda (pertaining to the Davis, Ensley, Porporino, and Carrier interviews) are subject to the attorney-client privilege, as explained in section I above.  The discussion below relates to the two remaining memoranda, which summarize the interviews of Gail Sonnenberg and Lynda Zelnick that took place on November 9, 2010.  See Exh. F.

The investigative teams conducted the interviews jointly because each had an independent interest in interviewing these particular witnesses.  As a matter of efficiency, the civil and criminal attorneys agreed that only one memorandum, drafted by SA Fong, would be prepared for each interview.  Because the fraud on the USPS was central to the civil investigation, and because SA Fong was not assigned to the criminal matter until the civil investigation was well under way, the civil investigative team had already made substantial

progress in collecting facts specific to the USPS and its sponsorship of the cycling team by the time preparation for the interviews began. Prior to the interviews, the civil investigative team shared its investigative work with the criminal investigators. In addition, the civil attorneys discussed with prosecutors and SA Fong their thinking about the defendants' potential liability under the FCA and the direction of their investigation.

As with the interviews documented by SA Pugliese, the Sonnenberg and Zelnick interviews were focused interviews conducted in the course of a "litigation-related" investigation. During each of the interviews, the civil attorneys asked questions as necessary to develop their legal theories and, in the case of Sonnenberg, the civil attorneys led the questioning for a portion of the interview. SA Fong discussed the substance of each interview with civil attorneys. Her memoranda are paraphrased accounts of the witness interviews, and her selection of facts to be included in each of the memoranda reflects the questions asked by attorneys in each of the interviews, the discussions between the attorneys and agents regarding investigative and litigative strategies and the underlying legal theories. The memoranda were reviewed by SA Pugliese and one of the civil attorneys before they were finalized. Like the Pugliese memoranda, therefore, the facts set forth in the Fong memoranda are inextricably intertwined with the attorneys' opinions and thought processes in this case.

      **C.**    **Armstrong Has Failed to Demonstrate A Substantial Need For the Government's Work Product or That He Has Not Obtained And Cannot Obtain Its Substantial Equivalent By Other Means Without Undue Hardship**

Because the interview memoranda are work product, they are subject to discovery only if Armstrong has a substantial need for them in order to prepare his case and he cannot obtain their substantial equivalent through other means without undue hardship. Armstrong carries the burden with respect to each issue. *Dir., Office of Thrift Supervision v. Vinson & Elkins, LLP*,

124 F.3d 1304, 1307 (D.C.Cir. 1997); *F.T.C. v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 286 F.R.D. 101, 107 (D.D.C. 2012); *McPeek v. Ashcroft*, 202 F.R.D. 332, 339 (D.D.C. 2001). He has failed entirely to make either showing, and the Court should deny his motion to compel.

Significantly, Armstrong has failed to specify the witnesses interviewed by the Government who have information that might be relevant to his defense of this case. The fact that the Government interviewed a witness in connection the related criminal investigation does not, by itself, suggest that the witness is relevant to this civil litigation. In fact, of the 67 memoranda, 39 of them relate to witnesses who do not appear on either Armstrong's or the Government's list of prospective witnesses in their Rule 26 disclosures. Moreover, Armstrong has made no effort to specify the subject matter(s) he believes are important to the preparation of his case and likely to be found among the interview memoranda.[6] Rather than demonstrate a "substantial need" for access to the Government's litigation preparation materials, Armstrong's "claim of necessity for the intrusion into the investigative file appears to be little more than a substantial desire to learn what kind of case the Government has." *Chatham City Corp.*, 72 F.R.D. at 644 (holding FBI interview records subject to work product protection).[7]

---

[6] Neither *Clemens* nor *HealthSouth* permitted the type of wholesale production of work product Armstrong seeks. Rather, they balanced the requesting party's demonstrated need against the respect for the zone of privacy around an attorney's preparation articulated in *Hickman*. In *Clemens*, the court defined the requesting party's need by reference to specific issues. The court declined to turn over the memos in their entirety, recognizing that their contents were largely not relevant to issues at trial. It ordered production of only those portions that directly pertained to defendant and allowed redaction of remainder. In *HealthSouth*, the court limited production to the specific portions of the law firm's notes necessary to address UBS's substantial need to know whether the specific witness at issue had implicated UBS employees. Any production ordered by the Court in this case should be limited to those memoranda as to which Armstrong can demonstrate a substantial need, and the Government should be permitted to redact any portions of such memoranda that do not address that need.

[7] In *Miller v. Holzman*, Magistrate Judge Facciola found that the defendant had demonstrated a substantial need for the release of interview memoranda based largely on the possibility that they

In addition, Armstrong has not explained why the substantial equivalent cannot be obtained by through depositions or other means. Armstrong's claim of the unavailability of alternatives is particularly dubious given that he has been litigating facts related to his doping conduct since at least 2005, approximately five years before the Government began its investigation. Exh. I. Moreover, the Government notified Armstrong about the existence of the *qui tam* action and its subject matter on August 23, 2010, only a little more than two months after the civil investigation began. Exh. L. It is entirely likely, therefore, that Armstrong has interviewed many of the same witnesses already, and in some cases at a time closer to the events in question than the Government.

In fact, Armstrong acknowledges having interviewed Gail Sonnenberg on August 30, 2012.[8] Exh. J. He met with Emma O'Reilly in November 2013 and specifically discussed her allegations about his doping. Exh. K. There is no way for the Court or the Government to know how many other witnesses Armstrong has interviewed because he has not said. Many of the witnesses are not strangers to Armstrong – they are his past and present friends, girlfriends,

---

might contain impeachment material. *Miller v. Holzman*, 2007 U.S. Dist. Lexis 16117 *4 (D.D.C. 2007). In *McPeek v. Ashcroft*, however, he rejected a similar argument, stating that "if the desire to impeach a witness with prior inconsistent statements is a sufficient showing of substantial need, the work product privilege would cease to exist; there is not a lawyer born who would not like to see opposing counsel's files in order to search for inconsistencies in opposing witnesses' potential testimony." *McPeek*, 202 F.R.D. at 339. *See also Bromgard v. Montana*, 2007 WL 2710387 at * 3. The same can be said of the *Miller's* other expressed rationale – the movant's desire to learn of potentially favorable or exculpatory material. It appears *Miller* may have been driven by the particular exigencies of the case. The decision was issued "only a few days" before trial and, thus, the opportunity to depose witnesses likely had passed. *Miller*, 2007 U.S. Dist. Lexis 16117 at *8. This case, in contrast, is still in discovery, and Armstrong will have ample opportunity to depose any of the witnesses who were interviewed by the Government.

[8] Incredibly, Armstrong persists in demanding the Government's memorandum of its interview of Sonnenberg while claiming his own interview memorandum is subject to work product protection. Exh. K.

teammates, and business associates. It is simply not plausible to suggest that Armstrong has a substantial need for access to the Government's work product regarding these witnesses.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court deny Armstrong's motion to compel the production of the Government's work product.

    Respectfully submitted,

    JOYCE R. BRANDA
    Acting Assistant Attorney General

    RONALD C. MACHEN JR., D.C. Bar # 447889
    United States Attorney

    DANIEL F. VAN HORN, D.C. Bar # 924092
    Assistant United States Attorney

/s/ Darrell C. Valdez
Darrell C. Valdez (D.C. Bar No. 420232)
U.S. ATTORNEY'S OFFICE
Judiciary Center Building
555 Fourth Street, NW
Washington, DC 20530
(202) 252-2507
darrell.valdez@usdoj.gov

Michael D. Granston
Tracy L. Hilmer, D.C. Bar # 421219
Robert E. Chandler
David M. Finkelstein
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Fraud Section
601 D Street, NW, Suite 900
Washington, DC 20530
(202) 514-4678 – Telephone
(202) 514-0280 – Facsimile
Robert.chandler@usdoj.gov

Attorneys for the United States of America