UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FLOYD LANDIS, United          :
States of America, ex         :
rel.,                         :
                              :  Docket No.: CA 10-976
         Plaintiff,           :
                              :      Washington, DC
      vs.                     :     2:06 p.m., Friday
                              :     October 24, 2014
TAILWIND SPORTS              :
CORPORATION, et al.,          :
                              :
         Defendants.          :
_____X


REPORTER'S OFFICIAL TRANSCRIPT OF TELEPHONIC DISCOVERY
                   CONFERENCE
      BEFORE THE HONORABLE CHRISTOPHER R. COOPER
            UNITED STATES DISTRICT JUDGE

APPEARANCES:

 For the Relator         PAUL D. SCOTT, ESQ.
 Mr. Landis              LANI ANNE REMICK, ESQ.
 (via telephone):        Law Offices of Paul D. Scott,
                         P.C.
                         The Embarcadero, Pier Nine
                         Suite 100
                         San Francisco, CA 94111
                         (415) 981-1212


 For the Intervenor      DARRELL C. VALDEZ, ESQ.
 Plaintiff United        U.S. Attorney's Office
 States (via             5554th Street, NW
 telephone):             Washington, DC 20530
                         (202)252-2507



Proceedings reported by machine shorthand. Transcript
produced by computer-aided transcription.

_____

**CHANTAL M. GENEUS, RMR, CRR**
Certified Merit Reporter
Certified Realtime Reporter
United States District Court
333 Constitution Avenue, NW
Washington, DC 20001

1                    A P P E A R A N C E S (Continued)

2

3     For the Intervenor        DAVID MICHAEL FINKELSTEIN, ESQ.
      Plaintiff United          ROBERT E. CHANDLER, ESQ.
4     States (via               U.S. Department of Justice
      telephone):               601 D Street, NW
5                               Room 9605
                                Washington, DC 20004
6                                (202) 616-2971

7

      For the Defendant         ELLIOT R. PETERS, ESQ.
8     Lance Armstrong           SHARIF E.A. JACOB, ESQ.
      (via telephone):          Keker & Van Nest, LLP
9                                633 Battery Street
                                San Francisco, CA 94111
10                               (415)676-2273

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S

2              (Whereupon, at 2:06 p.m. the proceedings

3         commenced and the following ensued:)

4              THE DEPUTY CLERK:  Civil Action Number

5    10-976, Floyd Landis versus Tailwind Sports

6    Corporation, et al.

7              Counsel, would you please identify yourself,

8    each, for the record.

9              MR. CHANDLER:  Robert Chandler, David

10   Finkelstein, and Darrell Valdez for the United States.

11             MR. SCOTT:  This is Paul Scott and Lani

12   Remick for Relator Floyd Landis.

13             MR. PETERS:  Elliot Peters on behalf of

14   Lance Armstrong.

15             MR. JACOB:  Accompanied by Sharif Jacob,

16   also on behalf of Lance Armstrong.

17             THE COURT:  Okay.  Good afternoon, everyone.

18   How are we doing?

19             If I could ask each of you guys, since you

20   are on the telephone, to identify yourselves before

21   you speak, that would help the court reporter quite a

22   bit.  Okay?

23             And I will also let you know that we have

24   three GW law students in the audience today who are

25   visiting, so be on your best behavior and set a very
```

1  good example for civility and decorum.  Is that clear?

2  MR. CHANDLER:  That's clear, Your Honor.

3  THE COURT:  Why don't we start with you.

4  Mr. Chandler, would you be handling the

5  presentation for the government, or who?

6  MR. CHANDLER:  I will, Your Honor.  Yes.

7  THE COURT:  Okay.  Why don't we start with

8  the issues that the government raised in its notice, I

9  guess first, with the deposition materials from a

10  prior case.  And that's an arbitration, I take it?

11  MR. CHANDLER:  That is correct, Your Honor.

12  It's actually an ongoing case, is my understanding.

13  But, yes, these are depositions that were taken in

14  June and July of this year.

15  THE COURT:  Okay.  And if I read the papers

16  correctly, we have reached agreement with respect to

17  the transcripts, the video, and the exhibits for

18  Mr. Armstrong's deposition, and the only remaining

19  dispute is the Stapleton deposition; is that correct?

20  MR. CHANDLER:  I think we've reached

21  agreement on that, Your Honor.  I think the remaining

22  issue with the Armstrong deposition is that, even

23  though we reached agreement some time ago we still

24  don't have it.  We had our earliest agreement on that

25  issue back in, I think, July.

1          But the problem is Armstrong's counsel has

2    refused to turn it over until we take steps in

3    connection with our discovery.  So I suppose in that

4    sense, we haven't reached agreement.  If Armstrong's

5    position is that his obligation to turn that over is

6    contingent on our taking other steps, then we would

7    disagree with that.

8          THE COURT:  Okay.  Well, let me hear from

9    you, Mr. Peters.

10          As a preface, let me just say, obviously,

11   this issue sort of permeates a number of the disputes

12   that are on the table today.  And in general, you

13   know, each side's obligations to produce discovery are

14   not contingent on the others.  And if there's an issue

15   with respect to, you know, how promptly or fully one

16   side is producing documents, you know, take that up

17   with the Court, but you can't hold hostage your

18   production if you don't think the other side is moving

19   quickly enough.

20          But I'm not suggesting that that's what's

21   going on here, but that, obviously, is how I feel

22   about it.

23          MR. PETERS:  Understood.

24          I'm sorry, Your Honor.

25          THE COURT:  Go ahead.

1          MR. PETERS:  Understood.  We had meet and

2     conferred on the issues that are before you today on

3     September 10 and September 11.  We reached agreement

4     about -- I thought, about a number of the issues about

5     the government's interrogatory answers on September

6     11th.

7          I kept sending Mr. Chandler e-mails asking

8     when he was gonna comply with his agreements.  He

9     simply didn't answer them and yet asked me when I

10     would produce this transcript.  And I said, why

11     don't -- I'll give it to you as soon as you give

12     your -- as soon as you comply with your obligations.

13          I understand what you just said.  I'm happy

14     to send them the transcript.  I'd be happy to send

15     them the transcript, but I think Your Honor can tell

16     we're frustrated with not only -- I mean, the

17     government makes agreements.  They say they'll do

18     things, and then they don't do it, and then they won't

19     even respond to requests for information about when

20     they'll do it.

21          And so we're frustrated.  And I don't want

22     to -- you know, I get it about our obligations.  We've

23     never denied it.  I'm just at a high level of

24     frustration about getting answers about when they're

25     going to do things that they say they'll do six weeks

1    before.

2           So we'll send them the transcripts, but, you

3    know, to not answer our requests about information and

4    to agree to things and then just blow off doing it is

5    very frustrating for us.

6           THE COURT:  Okay.  The remedy is that you

7    take it up with me if you can't work it out.  It's not

8    to hold back stuff you know you have to produce.

9    Okay?  So you'll send them the Armstrong materials.

10          Now, is there still a dispute about the

11   Stapleton depo?

12          MR. PETERS:  Elliot Peters for

13   Mr. Armstrong.

14          Our view on that was that they should make

15   sure that Stapleton doesn't have any objections to

16   that.  It was taken -- the deposition was taken in a

17   confidential arbitration.  And we don't represent

18   Mr. Stapleton, and he's a party to this case, so they

19   should work that out with him and get the transcript

20   from him and at least see whether he has any

21   objections.

22          THE COURT:  Mr. Chandler --

23          MR. CHANDLER:  Yes, Your Honor.

24          THE COURT:  -- are we just going around in

25   circles here?  Mr. Armstrong doesn't object.  Do we

```
1    know if Mr. Stapleton objects or not?  He's a party to

2    the case.

3             MR. CHANDLER:  No, we don't know whether

4    he's objected.  But certainly, if he has issues as to

5    the confidentiality of information in the transcripts,

6    the protective order provides for that.

7             THE COURT:  Is there any reason to believe

8    that the protective order in this case would not cover

9    the Stapleton transcript?

10            MR. CHANDLER:  I don't know if that question

11   was directed to me, Your Honor.

12            I mean, it may well.  I haven't seen the

13   transcript, so I can't say that with any degree of

14   certainty.  But that wouldn't surprise me if at least

15   portions of it were appropriately deemed confidential

16   under the protective order.

17            THE COURT:  And under the protective order,

18   who gets to -- is there a procedure in the protective

19   order for dealing with a situation like this where

20   potentially confidential material is requested from

21   one party but that material relates to a separate

22   party?

23            MR. SCOTT:  Your Honor, this is Paul Scott

24   for relator.

25            I believe there is a mechanism by which,
```

1    essentially, when you're making discovery from a third

2    party, that there's an opportunity for them to

3    designate.  Here, we have a party, so just letting

4    them know essentially that it's going to be produced

5    and giving them the opportunity to designate it if

6    they wish, I think, would easily fall within the terms

7    of the protective order.

8           MR. CHANDLER:  Your Honor, the government

9    would be willing to take the deposition material

10   subject to the protective order in their entirety and

11   give Mr. Stapleton an opportunity to review them after

12   we've taken them.

13          THE COURT:  I'm sorry.  Say that again,

14   Mr. Chandler.

15          MR. CHANDLER:  In other words, we can take

16   them provisionally under the protective order and then

17   agree to treat the entire thing as subject to the

18   protective order.  And then, if Mr. Stapleton wanted

19   to designate a certain portion of it to be subject to

20   the protective order thereafter, I think the

21   government would be amenable to that.

22          THE COURT:  Here's what I want you to do.  I

23   want you to follow whatever procedures are in the

24   protective order.  I don't remember it, but it sounds

25   as if, Mr. Peters, the procedure would be for you to

1   provide Mr. Stapleton notice that you've gotten a

2   request for it and give him an opportunity to object

3   to its production or to designate sections of it as

4   being confidential.

5            And give him seven days to do that.  And if

6   you don't hear from him otherwise, then produce it in

7   full.  Okay?

8            MR. PETERS:  Okay.

9            THE COURT:  Let's move to the government's

10  request for post-2004 documents.  There's a relevance

11  objection.

12           Mr. Chandler, you want to take that on?

13           MR. CHANDLER:  That's right, Your Honor.

14           Mr. Armstrong has objected to the production

15  of any documents that relate to periods after

16  December 31, 2004, arguing that's when the Postal

17  Service sponsorship ended, so that nothing can be

18  relevant after that.

19           That type of blanket objection just is

20  inappropriate, and for several reasons, which we

21  detailed in our submission with the Court.

22           After -- well, first of all, concealment --

23  Armstrong's concealment of his doping conduct is going

24  to be relevant in this case based on his invocation of

25  a statute of limitations defense.

1              Post-2004 information or documents may also

2    reveal pattern or practice of conduct that relates to

3    prior 2004 periods.  So, for instance, we may find out

4    more about that or we may find out about drugs that

5    Armstrong used or people who helped him use those

6    drugs during the pre-2004 period.

7              Moreover, the government has a Reverse False

8    Claims count in its complaint and -- which survived

9    Armstrong's motion to dismiss.

10             THE COURT:  Let me just stop you there.

11   Your Reverse False Claims Act count is that Armstrong

12   did not return monies that he should have known he was

13   not entitled to post 2004; is that correct?

14             MR. CHANDLER:  That's correct.  Or that

15   Tailwind was obligated to return them.

16             THE COURT:  Tailwind.  Okay.

17             Well, Mr. Peters, you know, I agree that

18   there's no per se relevance objection to any document

19   after 2004, but I would need to see which requests

20   we're actually talking about in order to make a ruling

21   as to, you know, relevance on particular requests.

22             And as far as I see, there weren't any

23   particular requests that you've identified as being

24   irrelevant or objected to as being irrelevant.

25             MR. PETERS:  No, we did, Your Honor.  This

1    is Elliot Peters for Mr. Armstrong.

2           And we mention in our three-page brief a

3    couple of examples of requests which make absolutely

4    no sense for us to respond to after 2004 because they

5    are overbroad, such as any prescriptions that

6    Mr. Armstrong has gotten from a doctor.  And there's

7    other examples of a number of these requests that

8    could not possibly lead to relevant evidence after

9    '04.

10          And there's also an e-mail where I said to

11   Mr. Chandler, we should go through these individually

12   because we're not going to back off of the objection

13   that post-2004 items are irrelevant, but there may be

14   some as to which that objection properly doesn't

15   apply.  But he didn't want to have that conversation,

16   so instead, we're proceeding here.

17          But I do think we've got to do this

18   individually.  Obviously, you know, post 2004 business

19   activities by Mr. Armstrong, communications with the

20   press -- I think there's a number of things as to

21   which post-2004 information is irrelevant, and there

22   are a couple as to which it might be relevant and we

23   should work through those and agree.

24          THE COURT:  Okay.  Mr. Chandler, when can

25   you all schedule a meeting to do that?

1          MR. CHANDLER:  We've already done that, Your

2     Honor.  We've already tried to do that several times,

3     and we've already had a lengthy call with Mr. Peters

4     in which we tried to have particularized discussions

5     about individual document requests and we weren't able

6     to make progress.

7          Mr. Peters', you know, e-mail to me that

8     he's pointed to as his indication that they've tried

9     to take this sort of nuanced approach to this only

10    came on October 15.  Their responses were served on

11    June 30th.  By that point we had been at this two and

12    a half months.

13         So I think it seems late in the game to be

14    having those kinds of discussions.

15         MR. FINKELSTEIN:  This is David Finkelstein.

16         I had one thing, and that is from my notes

17    from our September 10th effort to meet and confer on

18    this post-2004 issue.  According to my notes,

19    Mr. Peters said he would not search for any documents

20    after December 2004; that it's fine with him if we say

21    that we have met and conferred and that we file our

22    motion with the court on the basis of what he said on

23    September 10.

24         THE COURT:  Okay.  Mr. Peters --

25         A SPEAKER:  Can I --

1          THE COURT:  Let me finish.

2          -- to the extent your objection applies to

3   any documents after 2004, it's overruled.

4          If the government would file a motion to

5   compel with respect to specific requests that you have

6   objected to, then I'll accept a motion.  But I can't

7   rule unless the individual requests are before me and

8   the basis for your irrelevance objections.  Okay?

9          MR. CHANDLER:  Thank you, Your Honor.

10          THE COURT:  Now, pre- --

11          MR. PETERS:  Understood.

12          THE COURT:  Pre-2004 ESI.  These are

13   e-mails, I take it?

14          MR. CHANDLER:  I believe e-mails and text

15   messages and possibly also social media

16   communications.

17          But the point is, we don't really know that

18   at this point because Mr. Peters hasn't given us any

19   information about what exactly they've harvested in

20   this context.

21          THE COURT:  Okay.  So this raises the issue

22   as to the overlap between Armstrong's response to the

23   OIG subpoena and his responses to the document

24   production here, or the overlap in the subject matter

25   of those two requests.

1          Anyway, let me hear from you, Mr. Peters.

2          Are those -- you've characterized those two

3    requests as being substantially similar and,

4    therefore, the government should accept your client's

5    response to the OIG subpoena as being sufficient and

6    satisfactory with respect to their production.

7          Is that fair?

8          MR. PETERS:  Not -- I'm sorry, Your Honor.

9          THE COURT:  Go ahead.

10         MR. PETERS:  This is Elliot Peters.

11         And what we've said to the government, and

12   this is why we started getting a court reporter for

13   our meet-and-confer sessions, because we'd sometimes

14   meet and confer and have very different understandings

15   of what was said and very different renditions of what

16   was said.  So it's going to be our practice going

17   forward to transcribe all of our meet-and-confer

18   sessions so there can be no such dispute.

19         But what we said was we have obtained --

20   we've gotten from our client and preserved his text

21   messages and e-mails, as many as we possibly could.

22   And we have them.  But there's a lot of their requests

23   that would be overbroad if we just produced all of our

24   client's texts or e-mails with, say, Bart Knaggs, who

25   is his financial manager.  There's a lot of

1   information between Mr. Armstrong and Mr. Knaggs which

2   aren't properly discoverable in this case.

3          So what we said to the government was we

4   need to work out a protocol that makes sense so that

5   we can then perform searches through this electronic

6   data and produce to you things that are relevant to

7   the case.  And so let's do that.

8          THE COURT:  Yes.

9          MR. PETERS:  And they never responded.  They

10  never pursued, never had any further discussions with

11  us about that.  They just brought that motion.

12         And we have preserved the electronic data so

13  it would be available, but we need to search it.  We

14  are not going to just produce all of these

15  communications, many of which can be private and have

16  nothing to do with the issues in this case.

17         THE COURT:  Okay.

18         MR. PETERS:  So that's what we need to do.

19  That's the next step here that needs to be taken.  But

20  they haven't taken it.  They've just come to court and

21  said that we haven't cooperated with them, and I don't

22  believe that that's a fair characterization of what's

23  happened.

24         THE COURT:  Okay.  Can you all schedule a

25  meeting within the next week to compare search

1  protocols?

2        MR. PETERS:  Yes, we can.  And we'll do it

3  with a court reporter.

4        THE COURT:  Mr. Chandler, is that feasible?

5        MR. CHANDLER:  That would be fine, Your

6  Honor.

7        THE COURT:  Okay.  Why don't you all do

8  that.  Work out the search terms, and if there are

9  competing -- if there are disagreements as to search

10  terms, feel free to submit them.  I mean, I want you

11  to work this stuff out, but if you have to submit

12  something, submit it and the Court will pick the terms

13  that it sees as reasonable.  Okay?

14        I do want to explore, though, this issue of

15  Armstrong's prior production.

16        The government -- you all characterize it as

17  just a litigation file, whereas Armstrong

18  characterizes it as a full-on production of documents

19  in response to the subpoena.  How different is the

20  request -- the government's first request for

21  production from the OIG subpoena?

22        Why don't you start, Mr. Chandler.

23        MR. CHANDLER:  There are a number of ways in

24  which it's a little bit broader.  I'm not sure that we

25  really received everything that would have been

1    responsive to the subpoena the first time around, but

2    we never challenged that because we reached a point in

3    our investigation where that just wasn't necessary.

4         But we've gotten precious little from

5    Armstrong in response to either of them.  I mean, the

6    production sets that we've received appear to be

7    virtually the same, and what they consist of -- I

8    mentioned there is a litigation file.  Mr. Armstrong

9    was engaged in litigation with his personal assistant,

10   a man named Mike Anderson, and we requested that as

11   our Request Number 28.

12        So their response to our -- both our

13   subpoena and our document request provide that

14   litigation file.  And then in addition, the only

15   additional documents that are part of either

16   response -- there are fifty additional documents that

17   total less than 300 pages.  Thirty-eight of them are

18   e-mails.  They are all from a single sender, and there

19   are no outgoing e-mails and no metadata.

20        It just seems implausible that those are the

21   only documents that Mr. Armstrong could possibly have

22   that would be responsive to the government's other

23   thirty-seven requests.

24        THE COURT:  And are the other thirty-seven

25   requests the same as the requests in the OIG subpoena?

1          MR. CHANDLER:  They are not identical, no,
2  Your Honor.
3          THE COURT:  Is there substantial overlap?
4          MR. CHANDLER:  There is some overlap, yes.
5  There is, yes.
6          THE COURT:  And where does his response to
7  the OIG subpoena reside?  Do you already have those
8  documents?
9          MR. CHANDLER:  We do.
10          THE COURT:  And so you just want to make him
11  produce them again?  Is that the point?
12          MR. CHANDLER:  He's already produced them
13  again.  He's already given us the same production in
14  connection with this litigation.
15          THE COURT:  Okay.  But I thought I heard you
16  say that the only production you got was one
17  litigation file in response to one item of your
18  request.
19          MR. CHANDLER:  We got one litigation file,
20  but we got it twice, Your Honor.  Sorry if I was
21  unclear about that.
22          THE COURT:  Okay.  Well, now I'm completely
23  confused.
24          How many requests were in the OIG subpoena?
25          MR. CHANDLER:  If I had to take a guess,

1    Your Honor, it was probably roughly the same number

2    that was in our document requests.  Probably a little

3    fewer, not by many fewer.

4              THE COURT:  Did Armstrong respond to each of

5    those requests?

6              MR. CHANDLER:  He has told us he has

7    responded to each of those requests.

8              THE COURT:  Mr. Peters, has Armstrong

9    responded to each of those requests?

10             MR. PETERS:  Are you asking me?

11             This is Elliot Peters, Your Honor.  Are you

12   asking me that question?

13             THE COURT:  Yes, sir.

14             MR. PETERS:  Yes, we have.  Other than that,

15   we have also e-mails and text messages that we just

16   spoke about.  But we produced documents in addition to

17   that litigation file.  We produced several hundred

18   documents in addition to that litigation file to them,

19   pursuant to the OIG subpoena.  And then when they

20   served this largely identical request for production

21   of documents, they insisted that we produce those

22   documents again, and so we did.

23             And we've continued to meet and confer with

24   them about the additional production relating to the

25   e-mails and the text messages.

1          And I have to say, Your Honor, to the extent

2   that this request for production differs from the OIG

3   subpoena, which we believe we fully complied with, it

4   contains these extremely overbroad requests, like

5   produce all communications between you and any

6   registered lobbyist; produce all communications

7   conveying any threat or other suggestion that you or

8   anyone else might take some action.

9          I mean, these horribly overbroad things

10  which have nothing to do with nothing, and we don't

11  even know what they mean.

12          THE COURT:  Well, that --

13          MR. PETERS:  It's the OIG subpoena all over

14  again.

15          THE COURT:  Well, the overbreadth issue is

16  not before me, so I can't -- I can't assess that.

17          But what I'm trying to figure out is:  Have

18  you represented that the 500 e-mails, that the

19  response to the OIG subpoena is complete?

20          MR. PETERS:  Yes.

21          THE COURT:  So to the extent that the

22  document requests overlap with the requests in the

23  subpoena, I take it your position is you've responded?

24          MR. PETERS:  Correct, Your Honor.

25          THE COURT:  Mr. Chandler, is there any

1   reason -- are you objecting to that?

2              MR. CHANDLER:  Well, first of all, I mean if

3   that's the case, then that's good news, I suppose.

4   But that's not what Mr. Peters' filing said.  It says

5   they produced the lion's share of the documents that

6   are responsive to both the government's document

7   request and its earlier subpoena.

8              THE COURT:  Right.  And I take that to mean

9   there are still some e-mails that they've yet to

10  produce.

11             MR. PETERS:  Correct.

12             That was Elliot Peters saying "correct,"

13  Your Honor.

14             THE COURT:  Mr. Peters, when can you

15  complete the production of those e-mails?

16             MR. PETERS:  We have to meet --

17             THE COURT:  You have to meet on the

18  protocol.  I got it.

19             MR. PETERS:  When we can work out a

20  protocol, we'll search them and make a production.

21             THE COURT:  Good.

22             Mr. Chandler, are we on the same page?

23             MR. FINKELSTEIN:  Your Honor, this is David

24  Finkelstein.

25             I think we are close to on the same page.  I

1    did want to add one thing, again, with reference to

2    our September 10th meet and confer.

3            With all of these items that were also the

4    subject of the OIG subpoena on September 10th,

5    Mr. Peters then said the production was complete

6    subject to his objection that he wasn't gonna produce

7    anything after December 2004.

8            So based on what he said on September 10, I

9    think what he's saying is he still has post-2004

10   documents to produce.

11           THE COURT:  Okay.  We're not going to deal

12   with those -- either you're going to work those out or

13   we are going to deal with those on a

14   request-by-request basis.  Right?

15           MR. FINKELSTEIN:  Right.

16           MR. PETERS:  Right.

17           MR. SCOTT:  Your Honor, this is relator's

18   counsel, Paul Scott.

19           What I thought I would add to that, to the

20   extent that the government's document request in this

21   case and the OIG subpoena don't fully overlap -- in

22   other words, to the extent it requests additional

23   documents beyond the OIG subpoena -- then I suppose

24   they should be allowing for that possibility.  And if

25   the government still wants to pursue anything that

1    goes beyond the OIG subpoena, then the fact that the

2    responses satisfy the OIG subpoena wouldn't

3    necessarily address that issue.

4              THE COURT:  I'm not sure I follow you.

5              MR. SCOTT:  Well, I understand from the

6    government's comments that their document requests do

7    not completely overlap with the OIG subpoena.  It

8    sounded like there may be some differences.

9              THE COURT:  Yes.

10             MR. SCOTT:  The point is if Mr. Armstrong's

11   response to the OIG subpoena is complete, that's fine,

12   that the production of documents which would also be

13   covered by the government's document request in this

14   case would be produced.  But if there are additional

15   requests in the government's --

16             THE COURT:  I follow you.

17             Mr. Peters, that should be clear.  If there

18   are requests that are not included in the OIG

19   subpoena, you still have an obligation to respond to

20   them, right?

21             MR. PETERS:  And we have responded to those.

22   And we've raised overbreadth as a response to a number

23   of them.  And if we can't work those out, I suppose

24   one party would raise that with Your Honor.

25             I think, if you look at those requests, I

1  think you'll understand why we objected.  But I'm not

2  sure that's been teed up at this point.

3          THE COURT:  Okay.

4          MR. PETERS:  Mr. Scott is correct.  There

5  are requests in the request for production that are

6  different than the OIG's requests.

7          MR. CHANDLER:  Your Honor, since Mr. Peters

8  raised the issue of overbreadth with the Court, I'd be

9  willing to take that up as well.  That's very much

10 like the post-2004 issue in that it cuts across every

11 document request.  I think it would be helpful to have

12 guidance from the Court as to how to proceed on that

13 issue as well.

14         THE COURT:  I'm prepared to do that.  I'm

15 not sure how relevant the discussion is going to be

16 outside the context of the particular request.

17         What's the overbreadth objection,

18 Mr. Peters?

19         MR. PETERS:  I think you have to do it in

20 the context of the individual requests.  And I'll read

21 a couple to you, if you want me to, that we contend

22 are overbroad and/or -- or sufficiently vague that we

23 can't understand them.

24         Here's one:  "Produce all communications

25 conveying any threat or other suggestion that you or

1    anyone else might take some action adverse to the

2    interests of the recipient or someone else."

3              Here's another one.  This is 38:  "Produce

4    all communications between you and any registered

5    lobbyists or other person or entity that engages or

6    has engaged in the practice of attempting to influence

7    legislation or other government action."

8              Would that last one include any efforts by

9    Livestrong to get funding for cancer research?  I

10   mean, it's just overbroad.  And I don't really

11   understand what they're looking for.

12             THE COURT:  Mr. Chandler, look, you guys

13   need to work the individual ones out yourselves.  And

14   it sounds like you have in many circumstances.

15             Are there any general principles that I

16   could decide now to help you along in that effort?

17             MR. CHANDLER:  Really, just to have

18   Mr. Armstrong articulate the basis for his objections,

19   which he's not yet done.

20             THE COURT:  Okay.  Well, I think it's

21   premature for me to get into those weeds.

22             Okay.  Let's move to documents from

23   Armstrong's, quote, unquote, "agents."  It seems like

24   the government has narrowed that to include or to

25   define "agents" as those authorized to act on

1    Armstrong's behalf.

2           Is that correct?

3           MR. CHANDLER:  Well, I think as a practical

4    matter, we'd have to include agents, attorneys,

5    managers, employees, and persons acting on his behalf

6    or at his direction.

7           THE COURT:  What are you after?

8           MR. CHANDLER:  What we don't want to do is

9    exclude those documents that were generated by someone

10   other than Mr. Armstrong for Mr. Armstrong's -- acting

11   on his behalf.  So, obviously, if his agent sends out

12   a letter on his behalf, that shouldn't be excluded

13   from their production simply because Mr. Armstrong

14   wasn't the person who actually typed up the letter and

15   sent it out.

16          We just want to be sure that they've not so

17   narrowly construed our references to Mr. Armstrong in

18   a way that only goes to Mr. Armstrong and not the

19   person's that's really acted.

20          THE COURT:  So you mean other than legal

21   agents or his lawyer or his actual agent or his

22   company?  You mean his girlfriend or his friends who

23   he said, you know, Go write a letter for me?

24          Is there any limiting principle?

25          MR. CHANDLER:  Well, it would include, I

1   think, anyone who acted at his direction, even if that

2   person wasn't a legal agent or didn't have an

3   otherwise legally recognizable relationship with him.

4          THE COURT:  How does he have control over

5   documents if it -- if he has no legal authority to

6   request those from the agent you're talking about?

7          MR. CHANDLER:  We're not suggesting, Your

8   Honor, this would expand the scope of his search.  He

9   would just have to produce the documents in his

10  possession, custody, or control.

11         THE COURT:  Actual or constructive?

12         MR. CHANDLER:  Constructive.

13         But the same is true with respect to all of

14  our requests, or at least this doesn't expand any of

15  our requests.

16         THE COURT:  Mr. Peters?

17         MR. PETERS:  Yes, Your Honor.  This is

18  Elliot Peters.

19         What we've done is -- and what we've told

20  the government we've done and what we did in

21  connection with the OIG subpoena is that we searched

22  for and gathered documents from Mr. Armstrong and from

23  his agent.  Because of the nature of his work, he

24  actually has an agent, and that was Bill Stapleton and

25  Capital Sports, which was Bill Stapleton and Bart

1    Knaggs' company.  And so we searched their files

2    because they were his agents.  And we also searched

3    the file of Howry, Breen & Herman, an Austin law firm

4    which represented Mr. Armstrong.  That's how we got

5    and produced the litigation file that Your Honor and

6    Mr. Chandler referred to earlier.

7              And we believe that those are the

8    appropriate places to look because those people did,

9    in fact, act on Mr. Armstrong's behalf, that they were

10   his agents.  And so that's what we have done.  And we

11   think that's adequate.

12             And the other requests of the government we

13   don't understand and they're not concrete and we don't

14   really know what they're looking for.

15             So we believe our search to date has been

16   adequate as I described it to you, and that some of

17   the other definitions that the government has put

18   forward of the word "you" in their request for

19   production are vague and overbroad.

20             Like Mr. Chandler just said, anyone acting

21   on his behalf or anyone he asked to do something.  I

22   mean, I really don't know what they mean by that or

23   what they're looking for.  So I believe that we've

24   complied and we haven't limited our search for just

25   what Mr. Armstrong has.  We've looked in the file of

1    CSE and Mr. Stapleton and Mr. Knaggs for documents as

2    well as in the law firm files.

3            MR. CHANDLER:  Even based on the little that

4    we know, Your Honor, I think that just wouldn't be

5    adequate.

6            For instance, we know Mr. Armstrong's

7    personal assistant was employed through an entity that

8    he owns called Luke David, LLC.  So in the description

9    of where they've searched Mr. Peters just laid out, it

10   doesn't include anything belonging to Luke David, LLC.

11           That's all we want to do.  Because,

12   obviously, if Mr. Armstrong gave his personal

13   assistant an instruction to do something, you know, if

14   his personal assistant wasn't an employee of him

15   directly but was an employee of Luke David, LLC, and

16   if we have excluded the entities that we described in

17   our definition, then you would exclude people like

18   Mr. Anderson, his personal assistant.

19           THE COURT:  Mr. Peters, an indirect employee

20   strikes me as fair game.  Why is it not?

21           MR. PETERS:  Yes, but -- I'm sorry, Your

22   Honor.

23           THE COURT:  Why is it not?

24           MR. PETERS:  This person, Mr. Anderson, who

25   he just mentioned was an assistant a long time ago,

1    with whom he was in litigation, that litigation file

2    that was discussed earlier was in litigation between

3    Mr. Anderson and Mr. Armstrong.  So not only does he

4    not have control over whatever Mr. Anderson may have

5    today, but they were litigation adversaries and we

6    have no ability to get anything from Mr. Anderson

7    today.

8          So we don't have control over those

9    documents.  And if they want things from Mr. Anderson,

10   they should get them from Mr. Anderson.  We are not

11   trying to play any games here.  I mean, that was the

12   first I heard that what they were looking for were

13   documents from Mr. Anderson.  If they would tell us

14   that, we could have a conversation about it.  But we

15   have no ability to get documents from Mr. Anderson.

16         But I agree with Your Honor, if there was an

17   assistant who was working for him, who was employed by

18   an entity, we would have gone and searched that

19   person's documents if we had control over them.

20   That's what we did with CSE.

21         MR. CHANDLER:  To be clear, Your Honor, I'm

22   not suggesting that Mr. Armstrong has to get documents

23   from Mr. Anderson if he doesn't have constructive

24   control over those documents.  But what we're

25   suggesting is that if Mr. Armstrong has a document,

1    let's say, from Mr. Anderson to someone else acting on

2    Mr. Armstrong's behalf, he's obligated to produce

3    that.  And the fact that the document -- when we say

4    "you," if the document wasn't from Mr. Armstrong

5    personally, it doesn't exclude that from the

6    production.

7              MR. PETERS:  We understand that.

8              THE COURT:  I think this is a tempest in a

9    teapot.  We are going to define "agents" as being

10   those who are legally authorized to act directly or

11   indirectly on behalf of Mr. Armstrong, and so that

12   would include employees, right?

13             And the constructive possession issue is

14   another issue.  If he doesn't have constructive

15   possession, and he doesn't have actual possession of

16   documents, then there's no obligation to produce.

17             So that's the way I see that issue.

18             MR. CHANDLER:  Thank you, Your Honor.

19             THE COURT:  Okay.

20             MR. PETERS:  That's fine.

21             THE COURT:  Okay.

22             Let's go to Mr. Armstrong's objections to

23   the government's responses to his interrogatories.

24             As I read this, Mr. Chandler, you say this

25   is premature because you have indicated you're willing

1    to amend certain responses to certain interrogatories;

2    is that right?

3                 MR. CHANDLER:  That's right, Your Honor.

4                 THE COURT:  Okay.  And is that all of the

5    ones that Mr. Armstrong has challenged or just some of

6    them?

7                 MR. CHANDLER:  All but one, I believe.  I

8    think that 1, 3, 4, and 9, the government is -- well,

9    3, 4, and 9 the government is still investigating, but

10   we'll make some revision to our interrogatory

11   responses.

12                1, we already know that we're prepared to

13   amend our response in a way that Mr. Armstrong

14   requested.  In fact, we've already made -- we've

15   already said that in court.

16                THE COURT:  I was gonna say, we handled this

17   at the last hearing, correct?

18                MR. CHANDLER:  Right.  Right.  So we're

19   not -- we're not -- we're going to make that change.

20                THE COURT:  Okay.

21                MR. CHANDLER:  So it looks like the only

22   point of disagreement is with respect to Interrogatory

23   2, which asks for --

24                THE COURT:  Before we get there, when can

25   Mr. Armstrong expect revisions or amendments to those

1    responses?

2              MR. CHANDLER:  I mean, we want to be sure to

3    give Mr. Armstrong something useful.

4              THE COURT:  I agree with that.  I'm not

5    going to press you on a time, but it seems like you

6    all are constantly fighting over pace and

7    responsiveness.

8              MR. CHANDLER:  Right.  So, I mean, you know,

9    the short answer is we could provide something in the

10   short run if there was some exigency, but given more

11   time, we could provide a more complete and probably

12   more useful answer.

13             We could certainly do something a week from

14   today, but it would probably be couched in, you know,

15   cautionary language that Mr. Armstrong might find

16   objectionable, and then we might be right back in the

17   situation in a few weeks.

18             The difficulty here is we're dealing with

19   several other organizations, and this is an evolving

20   issue, right?  We're still in the middle of our

21   document production, and occasionally we come across,

22   you know, the questions in particular with reference

23   to Mr. Armstrong's interrogatories about the loss of

24   documents.

25             So every once in a while questions pop up,

1    we have to track down the answer.  And that has had

2    the effect of pushing back --

3              THE COURT:  Okay.  When were the responses

4    due in the first instance?

5              MR. CHANDLER:  I want to -- I -- I don't

6    recall offhand.  I want to say in early August, maybe.

7              THE COURT:  Okay.  Early August.  We are in

8    mid-October.  Let's say --

9              MR. PETERS:  The interrogatories were dated

10   June 17th.

11             THE COURT:  Okay.  There were two sets.

12   Number 9 came later, right?

13             MR. PETERS:  Later.  Correct.

14             THE COURT:  Okay.  Ten days, Mr. Chandler?

15             MR. CHANDLER:  Okay.  Thank you, Your Honor.

16             THE COURT:  Okay.

17             MR. SCOTT:  Your Honor, this is counsel for

18   relator, Paul Scott.

19             If it's okay, I just want to make a

20   reference back to Mr. Stapleton's deposition.  I had

21   to look through the document requests that we served

22   on counsel for Mr. Stapleton, which included a request

23   for all documents or communications relating to any

24   statements, transcript, declarations, interviews or

25   summaries of interviews of any persons relating to the

```
1    U.S. investigation, the USADA investigation, or this
2    case, relating -- being broadly defined, I'm sure we
3    covered the deposition in the FCA case.
4            And the amended response we have to that
5    request is that they will produce nonprivileged
6    documents that they discover after a diligent search
7    to the extent they exist and have not been produced,
8    and that has not been produced.  So they've already
9    said that they will, you know, agree to the production
10   of that transcript, effectively.
11           THE COURT:  Okay.
12           MR. SCOTT:  So I have an answer to the
13   question which you posed earlier in the call.
14           THE COURT:  Great.  Thank you.
15           MR. SCOTT:  That was Request 76.
16           THE COURT:  Okay.
17           Interrogatory Number 2.  This is the leak
18   issue, I take it.
19           MR. CHANDLER:  That's right, Your Honor.
20           MR. PETERS:  That's correct, Your Honor.
21           MR. CHANDLER:  And the government's position
22   is that the Court has already ruled on this issue.
23   The Court's already decided that documents seeking the
24   same kinds of communications aren't relevant and that
25   Mr. Armstrong is simply wrong when he says that he's
```

1    entitled potentially to dismissal of the action if

2    there was a breach of the seal.

3              So that -- I believe that issue has been

4    decided.

5              THE COURT:  Well, I don't think it's been

6    completely decided.

7              As I recall, my ruling on the production of

8    documents was in part dependent on the government's

9    agreement to produce some documents, right?  It wasn't

10   a -- I don't think it was a blanket ruling that the

11   issue was completely irrelevant.

12             MR. CHANDLER:  I think we may have agreed to

13   produce documents from Postal Service employees -- key

14   Postal Service employees.  And it may have been

15   restricted by time period, but I don't think that's

16   what Mr. Armstrong's interrogatories are asking about.

17   They're asking about the qui tam in particular,

18   whereas we agreed to produce communications

19   particularly between Postal Service employees.

20             THE COURT:  Right.

21             MR. PETERS:  Your Honor, this is Elliot

22   Peters.

23             I think they're missing two important points

24   here.  One is that if -- we believe that if the

25   relator illegally disclosed the existence of the qui

1    tam action to the press, that we could seek to dismiss

2    the relator from the action, and that was not

3    addressed in the Court's order.

4            And it's also -- what we're asking for is

5    fairly simple.  If the government knows who leaked

6    this information which was sealed, they should tell

7    us.  If they don't know, they could simply say, We

8    don't know, or if they know, they should tell us who

9    did it.

10           I don't know why the government would be

11   protecting or shielding information about someone who

12   did something illegal.  If they know that the relator

13   leaked that, they should say so, and then the Court

14   can decide what remedies we have.

15           And I think the same is true if they know

16   that a government employee leaked it, they should say

17   it, and then we can pursue our remedies and the Court

18   will rule on whether we're entitled to any remedy or

19   not.  We obviously can't pursue any remedy without any

20   information.

21           And it's not very burdensome.  We're asking

22   them to tell us if they know.

23           MR. FINKELSTEIN:  Your Honor --

24           MR. PETERS:  And it shouldn't be hard to

25   find out.

1          MR. FINKELSTEIN:  Your Honor, this is David

2     Finkelstein.

3          Very quickly in response to Mr. Peters.  We

4     don't know that either the relator or any government

5     employee leaked the existence of this action to the

6     press, so I can say that right now.

7          As to what further inquiry we need to

8     perform, this Court's order was Document 227, Page 14.

9     This Court said Armstrong moves to compel because he

10    contends he is entitled to dismissal of the action

11    with prejudice, and this Court said Armstrong's motion

12    rests on a faulty premise.  It cites to the

13    legislative history, which says the seal is for the

14    government's benefit.  And the Court says on the

15    following page, Page 15, "The Court will, therefore,

16    deny Armstrong's motion to the extent it seeks

17    disclosure beyond which the government has already

18    agreed."

19          THE COURT:  Okay.

20          MR. PETERS:  Your Honor, this is Elliot

21    Peters.

22          That doesn't address the question of whether

23    we would have remedies against the relator.

24          MR. SCOTT:  Your Honor, if I may, this is

25    Paul Scott for relator.

1          There's additional language in that same

2     order which confirms that -- and this is a quote from

3     the order, "that the rationale behind sealing FCA

4     cases is to allow the United States ample time to

5     investigate the allegations, not to provide protection

6     to defendant."

7          So this isn't supposed to be a tool for

8     attacking the government or the relator.  It's

9     something to protect the government's investigation.

10    The government's already expressed its views, its

11    intervening of the case, so it's kind of a moot issue.

12    To the extent that we spend time chasing it down -- I

13    mean, we're all curious, but it's kind of a -- we've

14    got a lot to do, as you can tell, and spending time on

15    that search is -- doesn't seem to be productive if

16    it's not relevant to any remedy they would have.

17          MR. PETERS:  Well, there are cases -- this

18    is Elliot Peters.

19          There's case law in which there have been

20    remedies against relators who have violated the seal,

21    and we believe that we are entitled to pursue such a

22    remedy.

23          And this isn't just a fishing expedition to

24    see if there was a leak.  I mean, there were articles

25    in *The Wall Street Journal* and *The New York Times*

1   about the filing of this lawsuit when it was under

2   seal.  And we know that *Wall Street Journal* reporters

3   were interviewing Mr. Landis at about that time

4   because they wrote a book about it in which they talk

5   about meeting with Mr. Landis.  So we'd really like to

6   know whether he violated the seal, and we think we can

7   pursue remedies against him.

8        MR. SCOTT:  Your Honor, this is Paul Scott

9   for relator.

10       The thing that makes it difficult is the

11  time that -- the date that's referenced by

12  Mr. Armstrong in his pleadings as to when this

13  disclosure occurred is actually two weeks after the

14  case was -- a copy of the complaint were provided to

15  the defendant.  And so we would then be -- you know,

16  on our part, trying to investigate whether they leaked

17  the case to the press.

18       The reference that he makes to *The Wall

19  Street Journal* talking to Mr. Landis -- sure, they

20  were talking.  They were talking well in advance of

21  any complaint being filed, and that was the thing that

22  blew the whole matter up publicly.  That was well

23  before any complaint, and so referencing those

24  conversations really doesn't prove anything.

25       THE COURT:  Here's how I come out.  The

1   government has to answer that question based on its

2   current knowledge, but I'm not gonna make it conduct a

3   leak investigation.

4               MR. CHANDLER:  Your Honor --

5               THE COURT:  Mr. Peters, you can pursue that

6   question to Mr. Landis in his deposition and

7   interrogatories to him, but this is largely, I think,

8   a side show.  Okay?

9               MR. CHANDLER:  Your Honor, could I just add

10  one thing?  And this is just to be clear, because I

11  don't want the Court to have been misled by anything

12  down the road.

13              To clarify one thing Mr. Scott just said,

14  the existence of the action was disclosed to the

15  defendants pursuant to a partial list, but copies of

16  the complaint were not.

17              THE COURT:  Okay.

18              MR. SCOTT:  Thank you for clarifying that.

19  I apologize.  I was not a party to that information

20  being shared at the time.

21              THE COURT:  Okay.  Anything else?

22              MR. PETERS:  One more item, Your Honor.

23              THE COURT:  Yes.

24              MR. PETERS:  The other item is just we've

25  asked for copies of the relevant document retention

1    policies and the government has said they would give

2    them to us, but then we haven't gotten them.  Can we

3    have that under the same ten-day deadline that I think

4    was agreed on a few minutes ago?

5              THE COURT:  Mr. Chandler, any objection to

6    that?

7              MR. CHANDLER:  I think that would probably

8    be fine, if Your Honor wouldn't mind giving us just a

9    moment to confer.

10             (Pause.)

11             MR. CHANDLER:  Ten days should be possible.

12             THE COURT:  Okay.  Anything else?

13             (No response.)

14             THE COURT:  Well, let's say ten days.  Okay?

15             MR. CHANDLER:  Thank you.

16             MR. SCOTT:  Your Honor, the one thing I

17   would just add is, relative to Mr. Stapleton's

18   deposition, in light of the fact that we have a

19   response to a document request where they are not

20   objecting to the production, it seems to me that

21   there's no need to go ask him that question.  He's

22   answered it.  And Mr. Armstrong should just go ahead

23   and produce the documents to the government.

24             And if the Court and everybody is agreeable

25   that it be taken subject to the protective order, then

1   that would still permit Mr. Stapleton to designate

2   anything that he deems subject to the protective

3   order, you know, within whatever period of time the

4   Court might suggest -- or order, rather.

5           MR. PETERS:  This is Elliott Peters.

6           Mr. Stapleton's counsel isn't on the phone.

7   Mr. Scott read a very, very broad document request.

8   You know, anything related to -- it was a very broad

9   request.  And then he said that Mr. Stapleton had

10  agreed to produce documents pursuant to that request.

11  And then he said, therefore, Mr. Stapleton has agreed

12  to produce this transcript.  And now he's saying,

13  therefore, Mr. Armstrong should produce it.

14          I think that we should stick with what the

15  Court said previously, which is that we should

16  specifically ask Mr. Stapleton's counsel whether he

17  has an objection and proceed that way.

18          I don't -- I just don't think Mr. Scott's

19  characterization that he's agreed -- that

20  Mr. Stapleton has agreed to produce this transcript --

21  I'm not even sure that this deposition, which was

22  taken in 2014, had been taken and transcribed at the

23  time that Mr. Stapleton furnished to Mr. Scott that

24  response to the requests for production.

25          So I don't think the statement that

1   Mr. Stapleton has agreed to it by answering that

2   request for production the way he did is accurate, and

3   I'm not comfortable agreeing to that without

4   Mr. Stapleton's counsel being on the phone.

5         THE COURT:  Okay.  I agree with that,

6   Mr. Peters.  Let's stick with the prior order and

7   let's do it consistent with the protective order.

8   Okay?

9         MR. PETERS:  Okay.

10        MR. CHANDLER:  Just one more thing, Your

11  Honor.  Would it be okay if we had Armstrong subject

12  to the same ten-day production requirement for his

13  deposition materials?

14        MR. PETERS:  That's fine.  We have no

15  objection, Your Honor.

16        Elliot Peters for Mr. Armstrong.

17        MR. SCOTT:  Your Honor, this is counsel for

18  relator with respect to Mr. Stapleton's deposition and

19  the timeline for his -- asserting any objections or

20  not.  I just want to be clear that we have a timeline

21  on that event and when they would be produced

22  otherwise -- it would be produced otherwise.

23        THE COURT:  Did I not state a time?  I think

24  I did.  I don't remember what it is.

25        Seven days?

1          MR. SCOTT:  I guess what I'm concerned about

2     is when do they get produced if there is no objection?

3     Do they then get produced --

4          THE COURT:  If there's no objection after

5     seven days, it shall be produced.

6          MR. SCOTT:  Thank you, Your Honor.

7          THE COURT:  I saw in the file quite a bit of

8     back and forth with my courtroom deputy over the

9     scheduling and the process for this call today.

10          Going forward, the clerk assigned to this

11     matter is named Jordan Goldstein.

12          MR. GROSSMAN:  Grossman.

13          THE COURT:  I'm sorry.  You see where my

14     mind is.

15          Jordan's number is (202) 354-3411.  To the

16     extent we have to do these, call Jordan directly and

17     explain to him the issues that we're going to be

18     discussing, and he will give you a schedule and then

19     work with the courtroom deputy to set everything up.

20     Okay?

21          MR. PETERS:  We will, Your Honor.

22          How do we spell his last name just so we get

23     it correct?

24          THE COURT:  Grossman.  G-R-O-S-S-M-A-N.

25          MR. PETERS:  Thank you.

```
1              THE COURT:  All right.  I think we're done.

2              MR. PETERS:  Thank you for your time, Your

3    Honor.

4              THE COURT:  Sure.

5              MR. CHANDLER:  Thank you, Your Honor.

6              THE COURT:  Have a good weekend.

7              MR. CHANDLER:  You too.

8              MR. PETERS:  Bye.

9              (Whereupon, at 3:00 p.m. the proceedings

10             concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

REPORTER'S CERTIFICATE

1
2
3       I, Chantal M. Geneus, a Registered Merit Reporter
4  and Certified Realtime Reporter of the United States
5  District Court for the District of Columbia, do hereby
6  certify that I stenographically reported the
7  proceedings in the matter of CA 10-976, *Landis versus*
8  *Tailwind, et al.*, on Friday, October 24, 2014, in the
9  United States District Court for the District of
10  Columbia, before the Honorable Christopher R. Cooper,
11  United States District Judge.
12       I further certify that the Page Numbers 1 through
13  47 constitute the official transcript of the
14  proceedings as transcribed by me from my stenographic
15  notes to the within typewritten matter.
16       In witness whereof, I have affixed my signature
17  on November 4, 2014.
18
19
20                      /s/ Chantal M. Geneus
                   Chantal M. Geneus, RMR, CRR
21                    Official Court Reporter
22
23
24
25