```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3     FLOYD LANDIS,              )
                                  )      CA No: 1:10-cv-00976 (CRC)
 4                 Plaintiff,     )
                                  )      Washington, D.C.
 5     vs.                        )      December 11, 2014
                                  )      2:03 p.m.
 6                                )
       TAILWIND SPORTS CORPORATION, )
 7     et al.,                    )
                                  )
 8     _____Defendants.____)

 9

10           TRANSCRIPT OF TELEPHONIC DISCOVERY CONFERENCE
            HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                  UNITED STATES DISTRICT JUDGE

12

13     APPEARANCES:

14

       For the Plaintiff:          PAUL D. SCOTT, ESQ.
15                                  LANI ANNE REMICK, ESQ.
                                    LAW OFFICES OF PAUL D. SCOTT, PC
16                                  The Embarcadero
                                    Pier Nine
17                                  Suite 100
                                    San Francisco, CA 94111
18                                  (415)981-1212
                                    pdscott@lopds.com
19

20     For Intervenor Plaintiff
       United States of America:   DARRELL C. VALDEZ, ESQ.
21                                  U.S. ATTORNEY'S OFFICE
                                    Civil Division
22                                  555 Fourth Street, NW
                                    Washington, DC 20530
23                                  (202)252-2507
                                    darrell.valdez@usdoj.gov
24

25     (APPEARANCES CONTINUED ON NEXT PAGE)
```

```
 1        (APPEARANCES CONTINUED):

 2        For Intervenor Plaintiff
          United States of America:     DAVID MICHAEL FINKELSTEIN, ESQ.
 3                                       U.S. DEPARTMENT OF JUSTICE
                                         Civil Fraud Section
 4                                       601 D Street, NW
                                         Room 9605
 5                                       Washington, DC 20004
                                         (202) 616-2971
 6                                       david.m.finkelstein@usdoj.gov

 7                                       ROBERT E. CHANDLER, ESQ.
                                         U.S. DEPARTMENT OF JUSTICE
 8                                       Civil Division, Fraud Section
                                         601 D Street, NW
 9                                       Suite 900
                                         Washington, DC 20530
10                                       (202) 514-4678
                                         robert.chandler@usdoj.gov
11
          On the line were also Robert McAuliffe and Matthew Golojuch
12
          For the Defendant
13        Lance Armstrong:              SHARIF E. JACOB, ESQ.
                                         R. JAMES SLAUGHTER, ESQ.
14                                       KEKER & VAN NEST, LLP
                                         633 Battery Street
15                                       San Francisco, CA 94111
                                         (415)391-5400
16                                       sjacob@kvn.com
                                         rslaughter@kvn.com
17

18

19

20

21

22
          Court Reporter:               Lisa A. Moreira  RDR, CRR
23                                       Official Court Reporter
                                         U.S. Courthouse, Room 6720
24                                       333 Constitution Avenue, NW
                                         Washington, DC  20001
25                                       202-354-3187
```

```
1                      P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  Good afternoon, Counsel.

3      Judge Cooper is here.

4              THE COURT:  Okay.  Good afternoon, everyone.

5                      (Everyone greets His Honor)

6              THE COURT:  Who do we have?

7              MR. CHANDLER:  For the United States:  Robert

8      Chandler, David Finkelstein, Rob McAuliffe, Matt Golojuch,

9      Darrell Valdez.  I believe that's it.

10             THE COURT:  Okay.

11             MR. JACOB:  And for Lance Armstrong:  Sharif Jacob

12     and my colleague, James Slaughter.

13             MR. SCOTT:  And for the Relator, Floyd Landis:

14     Paul Scott and Lani Remick.

15             THE COURT:  Okay.  So are you folks out in

16     California about to float away out there, or has the storm

17     started?

18             MR. SCOTT:  I lost an umbrella on the way to the

19     office so it's going pretty good.

20             THE COURT:  So we're on the record, and because

21     we're on the phone, if you all could identify yourselves

22     before you begin to speak, the reporter --

23             MR. SCOTT:  That was Paul Scott.

24             THE COURT:  -- the court reporter would appreciate

25     it, and also try not to talk over one another.
```

1          Why don't we start with the Government's request

2     for production, the requests regarding all communications to

3     or from particular individuals.

4          Mr. Jacob, are you prepared to speak to this one?

5          MR. JACOB:  I am, Your Honor.

6          THE COURT:  As I understand it, your objection is

7     an overbreadth objection as opposed to a burdensomeness; is

8     that correct?

9          MR. JACOB:  That's correct, Your Honor.

10          THE COURT:  Okay.

11          MR. JACOB:  Our objection is that these requests

12     seek a number of emails from Lance Armstrong that have

13     nothing to do with this case.  Those emails are private

14     communications, sometimes intimate communications, and are

15     really totally irrelevant.

16          What we've asked the Government to provide us is a

17     list of search terms that will identify relevant documents,

18     but the Government's been unwilling to do that.  Their

19     position is that we should use the email addresses of the

20     custodians themselves as a search term, but, of course, that

21     method of searching doesn't address our overbreadth

22     objection in any way and doesn't narrow the scope of

23     production.

24          THE COURT:  Okay.

25          Mr. Chandler?

1            MR. FINKELSTEIN:  Your Honor, this is David

2      Finkelstein.  I'll be responding.

3            THE COURT:  Okay.

4            MR. FINKELSTEIN:  Your Honor, these requests are

5      for communications with a limited number of people who were

6      at the center of the doping conspiracy.  Mr. Armstrong

7      concedes that some of the responsive emails are relevant to

8      the claims and defenses in this case, and the volume of

9      responsive documents is extremely limited; and so in this

10     case, search terms which are primarily intended to limit

11     volume further would be inappropriate.

12            If I could give an example?

13            THE COURT:  Yes.

14            MR. FINKELSTEIN:  We've requested, in particular,

15     communications to, from, or copying Michele Ferrari, and

16     Mr. Armstrong has identified 124 such communications.  Now,

17     this was Mr. Armstrong's doping doctor.  This was a

18     relationship that Mr. Armstrong denied for years, and so the

19     very existence of these communications showing that there

20     was this relationship is relevant to the Government's claim.

21            THE COURT:  Okay.  Let me cut you off.

22            I completely understand your argument with respect

23     to someone like Dr. Ferrari whose presence on your list is

24     -- who is there only because of the fact that his role was

25     related to the subject matter of the lawsuit.  But there are

1    other folks, as I understand it, whose role is much larger,

2    and it could be expected or it would be anticipated that

3    they would have materials that are completely unrelated to

4    the lawsuit, and that's what I'm more concerned about, that

5    there's no relevance limit with respect to people who may

6    fall in that category.

7            MR. FINKELSTEIN:  Well, in that case, Your Honor,

8    I think that the other individuals can be safely divided

9    into two buckets.

10           THE COURT:  Okay.

11           MR. FINKELSTEIN:  In the first bucket are co-

12   conspirators, either unintervened defendants or people who

13   are known to have helped Mr. Armstrong dope or to conceal

14   it.

15           THE COURT:  Okay.  I'm sorry to cut you off, but

16   these are fellow teammates?

17           MR. FINKELSTEIN:  In some cases fellow teammates,

18   in some cases people who provided essentially, like, alibi

19   information during the periods he was still denying his

20   doping.  And in the cases -- for many of these we're talking

21   about fewer than 100 emails apiece.

22           THE COURT:  Right.

23           MR. FINKELSTEIN:  So where Mr. Armstrong concedes

24   that some of these emails are relevant, rather than blindly

25   using search terms to try to get at the relevant documents

1    he's already identified and concedes exist -- you know, when

2    we're talking about, you know, Mr. Weisel, 89 emails -- the

3    fairest, most cost-effective, efficient process would be to

4    produce the non-privileged ones.

5              THE COURT:  Okay.  Let's talk about Bruyneel,

6    Stapleton and Knaggs where the volume is larger.

7              MR. FINKELSTEIN:  Right.

8              THE COURT:  Why are their roles related solely to

9    the issues in the case?

10             MR. FINKELSTEIN:  Well, to be clear, their roles

11   are not limited solely to the issues in the case, and Your

12   Honor is correct that they account for I think more than 90

13   percent of the volume here.

14             What we proposed in those cases were to do time

15   limits.  We asked for only those emails that were generated

16   on or after -- when was it in 2010, Rob?

17             MR. CHANDLER:  I think June -- or April, sorry.

18             MR. FINKELSTEIN:  Yes, April of 2010, and the

19   reason we asked for that period is that's the period where

20   Mr. Armstrong became aware of the Government's

21   investigation, and so those are the emails we think are most

22   likely to reveal efforts to conceal the doping.

23             MR. JACOB:  Your Honor, this is Sharif Jacob --

24             THE COURT:  Yes.

25             MR. JACOB:  -- on behalf of Lance Armstrong.

1          I can assure you that if we have to produce all

2     emails between William Stapleton and Bart Knaggs, who are

3     Armstrong's business and financial advisors, in addition to

4     some of the other roles that Mr. Stapleton played, there

5     will be very personal, intimate emails that have nothing to

6     do with this case.  The volume of emails that those

7     custodians have is very large, and the overwhelming

8     majority, over, you know, 92 -- over 90 percent in both

9     cases, of them have nothing at all to do with this case.

10    They relate to matters such as Armstrong's children, his

11    family, his personal vacations, and there's -- the

12    Government has no right to those emails under the Federal

13    Rules of Civil Procedure.

14          The Government asked Armstrong to provide a list

15    of search terms for use with its custodians, and of course

16    Armstrong faced the same challenges that the Government

17    faced, which is that you have to spend a little bit of time

18    coming up with terms that will actually produce responsive

19    documents.

20          But we did that.  We supplied search terms to the

21    Government.  We went through a round of negotiations, and we

22    agreed on the set of search terms.  There's nothing

23    burdensome or unusual in modern litigation about using

24    search terms to identify responsive documents.

25          THE COURT:  Here's my concern with the use of

1   search terms alone:  The Government's theory, as I

2   understand it, is that, you know, there was concealment, and

3   concealment is obviously an issue relevant to its case as

4   well as to your defense of knowledge on the part of the

5   Postal Service and others.  And if there are emails

6   reflecting efforts to conceal, then they may not come up as

7   hits to search terms because of things like code words and

8   other subtleties in the email that may not be picked up by

9   code words or search terms.  And so that's my concern with

10  simply a search term approach.

11          I mean, I get your argument about relevance, and

12  the Government isn't entitled to purely personal matters.

13  But on the other hand, there seems to be a need for more of

14  a review of the documents based on relevance than could be

15  accomplished by application of search terms.

16          MR. JACOB:  And, Your Honor, if the Government --

17  so two responses to that.  First of all, we have -- Lance

18  Armstrong has already agreed to produce documents pre-2004

19  and post-2004 that relate to concealment of the use of

20  performance-enhancing substances before 2004; so I

21  understand that the Government's advanced that argument, but

22  that's a set of documents we've agreed to produce.

23          That's not the set of documents the Government has

24  asked for.  The Government has asked for, without

25  limitation, every single communication with these

1    custodians, in some cases bounded by dates or in some cases

2    unbounded by dates.  If the Government wanted to limit its

3    request to topics that are relevant to this action, we're

4    willing to work with them, but we simply cannot agree to

5    produce a set of documents that are on their face

6    overwhelmingly irrelevant and, in some cases, very private.

7              MR. FINKELSTEIN:  Your Honor, it's because of

8    what --

9              THE COURT:  This is Mr. Finkelstein, right?

10             MR. FINKELSTEIN:  Yes, excuse me, Your Honor.

11   This is David Finkelstein.

12             It's because of what Mr. Jacob just said that

13   we're here; that is, Mr. Armstrong has refused to produce

14   these documents without modifiers, and that's why we need to

15   seek the intervention of the Court.  But two things in

16   particular in response to what Mr. Jacob just said.

17             The first is, we're not interested in emails about

18   children and emails about marital relationships, but that's

19   why we have a protective order, and the protective order we

20   negotiated specifically addresses that, you know.  Those

21   emails, if they're just about family, are not going to be

22   introduced into evidence in this case, and they will be

23   handled with the appropriate level of discretion.

24             As to --

25             THE COURT:  But, on the other hand, though, you're

1     not entitled, under the rules, to seek irrelevant materials

2     or materials that are not likely to contain relevant

3     documents simply because there's a protective order in

4     place.

5                MR. FINKELSTEIN:  No, of course not, and our

6     position isn't that we can seek anything.  But what we all,

7     I think, agree on is that we have requested a universe of

8     documents, some of which are relevant; and Mr. Armstrong's

9     arguing because not all of them are, or maybe even most of

10    them are not by his likes, that we don't get any of them

11    unless we can agree on search terms that -- and that's just

12    not appropriate.  And I think we can compare what we're

13    doing with our document request to what he's doing with his.

14               Now, he said he's supplied search terms, and we've

15    agreed to run them, and that's correct.  We're running those

16    search terms against the whole USPS email archive, which is

17    billions of documents.  But in some cases Mr. Armstrong has

18    asked for all communications between defendants in this case

19    and employees of the Postal Service without search term

20    modifiers, and we've agreed to produce those.

21               THE COURT:  Understood.  Understood.

22               Mr. Jacob, are there any names on this list that

23    you can agree to just produce everything, if it's -- you

24    know, because of the low volume of emails, or are you going

25    to fight on all the names?

1          MR. JACOB:  Your Honor, we would be glad -- the

2     Government mentioned the name Michele Ferrari.  We would be

3     glad to produce all of those documents.  The documents that

4     are relevant simply have nothing to do with the use of

5     performance-enhancing substances, but we're glad to produce

6     all of them, 124 of those emails.

7          THE COURT:  Mr. Jacob, are there any other

8     names on this list that fall into the same category as

9     Mr. Ferrari, where the relationship was such that it

10    necessarily would involve the issues in the case?

11         MR. JACOB:  Well, we do not agree that that is the

12    case with Mr. Weisel; that the relationship is such that it

13    necessarily involves the issues in this case.  The vast

14    majority of emails with Mr. Weisel relate to -- the vast

15    majority of nonresponsive emails in Mr. Weisel's case, they

16    relate to the fact that Mr. Weisel sometimes was involved in

17    charitable relationships with Armstrong that simply have

18    nothing to do with this case.  And so while I don't think

19    it implicates privacy necessarily the same way, perhaps

20    Mr. Weisel's privacy to be honest, certainly the majority of

21    those emails are not going to be responsive.

22          There are four emails with Mr. Landis back and

23    forth.  That's a very small number of emails.  Those emails

24    relate to personal and intimate details about Mr. Landis's

25    life, and we do not believe that they're relevant to the

1    case.  But if Mr. Landis's counsel has no objection, we'd be

2    glad to produce all of those documents.

3              THE COURT:  Mr. Scott?

4              (Pause)

5              THE COURT:  Well, while Mr. Scott is thinking,

6    Mr. Finkelstein, let me go back to you.

7              Are there any other people on this list that you

8    think fall into the same category as Mr. Ferrari, namely

9    that the relationship is such that the materials would

10   necessarily implicate matters in the case?

11             MR. FINKELSTEIN:  I don't think I would go so far

12   as to say the relationship would necessarily --

13             THE COURT:  Or are highly likely to?

14             MR. FINKELSTEIN:  In the case of highly likely to,

15   I would include Mr. Weisel.  Here we're talking only about

16   89 emails.  These people were not friends.  They had no

17   other professional relationship apart from the one that led

18   to the sponsorship, and Mr. Armstrong has recently served

19   sworn discovery requests in the other state cases in which

20   he indicates that he believes Mr. Weisel knew about the

21   doping.

22             THE COURT:  Okay.

23             MR. FINKELSTEIN:  And similarly, with the riders,

24   I wouldn't go so far as to say necessarily everything

25   they're going to talk about is going to wind up on the

1    Government's exhibit list in trial, but these were the

2    people that did it right along with him, and in some cases

3    these are the people that helped him to cover it up.

4            THE COURT:  Right.  But you'd think that they'd be

5    talking about riding, right?

6            MR. FINKELSTEIN:  They may be talking about

7    riding, too, in which case, you know, we'd review it, and we

8    don't use it in depositions.

9            MR. JACOB:  Your Honor, this is Sharif Jacob on

10   behalf of Lance Armstrong.

11           I think what we just heard from the Government is

12   that they concede that the majority of documents, or at

13   least a very substantial portion that I've, you know,

14   identified as the majority, are irrelevant, and what they

15   want to do is get access to all of those documents and then

16   review them and decide for themselves what they're going to

17   use in this case, and that's simply not how discovery works.

18           Discovery requires the Government to articulate

19   requests that are for relevant documents.  They're not

20   allowed or permitted, under Rule 26, to seek a giant body of

21   documents, knowing that over 90 percent of them are totally

22   irrelevant, and then find, you know, somewhere in there

23   totally irrelevant documents for use in this case.

24           THE COURT:  Okay.

25           MR. FINKELSTEIN:  Your Honor, can I respond

1    quickly?

2              THE COURT:  Sure.  This is Mr. Finkelstein,

3    correct?

4              MR. FINKELSTEIN:  This is David Finkelstein.

5    Thank you, Your Honor.

6              We obviously have a philosophical disagreement

7    about how discovery works, but this is not a massive

8    quantity of documents.  This is 30,156 total.  And the way

9    discovery works is -- discovery requests can be

10   overinclusive.

11             THE COURT:  So long as they're likely to lead to

12   relevant, admissible evidence.  I understand.

13             MR. FINKELSTEIN:  Exactly.

14             THE COURT:  Okay.

15             Okay.  I will take that under advisement, and

16   we'll get out an order on that issue.

17             Let's move to the post-2004 documents.  Mr. Jacob,

18   do you want to start us off?

19             MR. JACOB:  Yes, Your Honor.  Mr. Jacob, on behalf

20   of Mr. Armstrong.

21             Mr. Armstrong has already agreed to produce

22   documents pre-2004 and post-2004 that relate both to the

23   pre-2004 use of performance-enhancing substances and

24   post-2004 documents that relate to concealment of pre-2004

25   use.

1          THE COURT:  Right.

2          MR. JACOB:  What the Government is exclusively

3   asking for and what this dispute is only about are documents

4   about the use of performance-enhancing substances that may

5   have taken place after Armstrong was no longer a rider for

6   the Postal Service team and after the Government no longer

7   had -- no longer sponsored the Postal Service team.  In

8   other words, when the Government had no financial and no

9   legal interest at all in the use of performance-enhancing

10  substances by cyclists.

11         THE COURT:  Now, respond to their theory of

12  relevance, which is that, as I understand it, there may be

13  discussions of concealment techniques and methods and actual

14  people who helped conceal post -- I mean, excuse me,

15  pre-2005 there may be references and discussions of those

16  topics post-2005.  Why isn't that a valid theory of

17  relevance?

18         MR. JACOB:  We have already agreed to produce

19  post-2005 documents that relate -- I'm sorry, post-2004

20  documents that relate in any way to the concealment of pre-

21  2004 use.  That's not what is in dispute.

22         What is in dispute is the Government's position --

23         THE COURT:  Well, that's not quite their -- that's

24  not quite their theory.  They are saying that there are

25  post-2004 discussions, right, that may not be about pre-2005

1    conduct but that may shed light on how that pre-2005 conduct

2    was undertaken and that therefore they're relevant?

3              Am I putting words in your mouth, Mr. Finkelstein?

4              MR. FINKELSTEIN:  No, that's correct.  I would add

5    something to that, but now might not be the time.

6              MR. JACOB:  And if I can just briefly respond to

7    that?

8              THE COURT:  Okay.

9              MR. JACOB:  These requests, Your Honor, include

10   such things -- the Government's position is that if Lance

11   Armstrong was issued a prescription for testosterone by his

12   doctor yesterday, that they're entitled to a copy of that

13   prescription, and that that prescription is somehow going to

14   reveal something relevant in this case.  And that's wildly

15   overbroad and not tailored to pre-2004 use.

16             If Lance Armstrong used performance-enhancing

17   substances in 2005 and concealed that use in 2005, that, in

18   and of itself, is irrelevant to the Government's case, and

19   getting evidence of that is not going to help them prove any

20   element or rebut any defense.

21             MR. FINKELSTEIN:  Well, that's just incorrect.

22   That's relevant to our A1G claim, the reversal of claims

23   count, and Mr. Armstrong moved to dismiss that, and that

24   motion to dismiss was denied by Judge Wilkins.

25             But the one thing I wanted to add to Your Honor's

1    characterization of the Government's position -- this is

2    David Finkelstein again -- is we shouldn't -- even with

3    respect to the concealment issue, we shouldn't have to take

4    his word for whether doping evidence is germane to

5    concealment.  We may disagree.

6            For instance, one of the practices that

7    Mr. Armstrong allegedly engaged in was microdosing EPO.

8    Now, in our view, that would be concealment because that's

9    use calculated to avoid positive test results.  But if that

10   happened in 2006, are we not entitled to know about it?

11   We've alleged that he's doped, and he's admitted that he's

12   doped, and our position is we're entitled to discover the

13   extent of it.

14           THE COURT:  All right.  How would a prescription

15   issued last month be relevant to his pre-2005 conduct?

16           MR. FINKELSTEIN:  It could be relevant in three

17   ways, Your Honor.

18           First, it could show how he -- assuming he's

19   doping now, it could show how he was doping before.

20           Second, it could show who is helping him to dope,

21   and that could be new information to us.  And we don't

22   pretend we know every single person who has helped him to

23   dope.

24           THE COURT:  Okay.  On that point, let me cut you

25   off.  There's a footnote in your papers regarding a

```
 1   reasonable basis to believe that there are facilitators who

 2   have yet to be identified.  What's the basis for that

 3   belief?

 4              MR. CHANDLER:  I'm sorry, Your Honor, if you could

 5   give us just one moment.

 6              THE COURT:  Sure.

 7              MR. SCOTT:  Your Honor, this is Paul Scott, and

 8   while they're just conferring I wanted to respond to your

 9   question earlier relative to the emails between Mr. Landis

10   and Mr. Armstrong.

11              THE COURT:  Yes.

12              MR. SCOTT:  We're fine with that.  I apologize

13   that I was on mute before, and that's why you didn't hear my

14   response.

15              THE COURT:  Okay.  And I thought you were ignoring

16   me.

17              MR. SCOTT:  Hardly.

18              THE COURT:  So, I'm sorry, Mr. Scott; so no

19   objection to the production of those four emails, right?

20              MR. SCOTT:  Fine.

21              THE COURT:  Okay.

22              MR. FINKELSTEIN:  Your Honor, this is David

23   Finkelstein again.

24              THE COURT:  Yes.

25              MR. FINKELSTEIN:  The answer to the Court's
```

1    question requires describing documents that have been marked

2    as confidential so I don't know where the Court is taking

3    this call or how the Court wants to handle information

4    marked as confidential.

5            THE COURT:  Everybody's subject to the protective

6    order in the room as long as you all don't have a problem

7    with us marking the transcript as sealed.

8            MR. JACOB:  No, and -- this is Sharif Jacob for

9    Armstrong -- we would ask for that if it is documents that

10   Armstrong marked as confidential.

11           THE COURT:  Okay.  Fire away.

12   ████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████

23           THE COURT:  Okay.  So I cut you off.  You were

24   getting to your third basis for relevance of recently issued

25   prescriptions.

1          MR. FINKELSTEIN:  And the third was how he was

2     able to conceal it; and the methods, the pattern, the

3     practice after 2004 may be germane to what he did before

4     2004 with respect to concealment also.

5          THE COURT:  Okay.

6          MR. JACOB:  Your Honor, this is counsel for

7     Mr. Armstrong, Sharif Jacob.

8          THE COURT:  Yes.

9          MR. JACOB:  First of all, I just wanted to make

10    clear for the record that Mr. Armstrong is not using

11    performance-enhancing substances today, and I think, as you

12    can tell from the Government's position, they really are

13    claiming that medical records that Armstrong -- Armstrong's

14    medical records as of today, whether he was prescribed

15    testosterone, whether he was tested for testosterone, are

16    going to tell us something about whether or not Armstrong

17    was using performance-enhancing substances in 2004; and the

18    Government is taking the position apparently that it somehow

19    needs more evidence of the use of performance-enhancing

20    substances, and that's why its' wildly overbroad request is

21    somehow justified.

22         The Government, before this litigation began, took

23    three years of almost unfettered discovery, both through a

24    criminal investigation and a civil investigation.  Not only

25    did they have testimony from dozens of riders in the form of

1    sworn grand jury testimony, affidavits that were taken by

2    USADA, witness statements that are in the Government's

3    possession, they already have and, in fact, have read to

4    this Court Armstrong's discovery responses.  They have his

5    sworn testimony, and they have Armstrong's admissions in his

6    answer about the use of performance-enhancing substances in

7    2004.

8              The Government is issuing overbroad discovery

9    requests to gain evidence of an undisputed legal issue for

10   which they have thousands of pages of documents already

11   demonstrating that use, and that use is admitted.  So why

12   the Government needs more evidence of use that's irrelevant

13   to this case is simply beyond us.

14             THE COURT:  Okay.  I'd like for Mr. Finkelstein to

15   respond to that, but before you do, let me ask you a

16   question, Mr. Jacob:  Has Mr. Armstrong's admissions or do

17   Mr. Armstrong's admissions cover the entirety of the

18   sponsorship agreement periods or not?

19             MR. JACOB:  Yes, Your Honor.

20             THE COURT:  Okay.  Mr. Finkelstein?

21             MR. FINKELSTEIN:  Three responses, Your Honor.

22   First, I was remiss in not adding a fourth to my original

23   list of bases for relevance.  The fourth would be

24   Mr. Armstrong's statute of limitations defense.  He said

25   that at a certain point the Government was aware or should

1    have been aware, and his activities, particularly his

2    concealment, may be germane even if that concealment carried

3    on past the sponsorship period.

4            The second response is, in characterizing this

5    request as overbroad because we already have some evidence,

6    I mean, I think we're just disagreeing about what

7    "overbreadth" means.  This is --

8            THE COURT:  Well, I mean, it's a cumulative

9    argument.  Respond to that.  You know, how much do you need,

10   I guess, is the question?

11           MR. FINKELSTEIN:  Well --

12           THE COURT:  And at some point do the requests

13   become vexatious or harassing if you've gotten everything

14   you need in other forms of discovery?  I take it that's the

15   argument.

16           MR. FINKELSTEIN:  Understood, Your Honor.

17           And I think as to how much we've already gotten,

18   with respect to the records of prescription performance-

19   enhancing drugs and test results relating to performance-

20   enhancing drugs, we don't have anything from Mr. Armstrong

21   or anyone else, and so we don't already have it.

22           THE COURT:  Well, why do you need it if you have

23   his admissions and evidence from multiple other sources?

24           MR. FINKELSTEIN:  We bear the burden on liability,

25   and so our allegation is that he breached the contract.  It

```
 1    was a material term, and he did so knowingly.  We have the
 2    burden of proving the falsity of the claims, and that
 3    includes proving the doping.
 4            Now, he's gone on TV -- and this wasn't sworn --
 5    and he said what he wanted to say, but I think, you know,
 6    you can't, either through Oprah interviews or stipulations,
 7    take out essential issues in the case.
 8            Your Honor, can I add one thing?  This is going to
 9    be Point 3.
10            THE COURT:  Sure.
11            MR. FINKELSTEIN:  If we're getting hung up on how
12    far to the present we go when we ask for prescriptions and
13    test results, we're willing to cut our result off at when
14    Mr. Armstrong stopped riding, which was 2010.
15            THE COURT:  Okay.
16            MR. JACOB:  Your Honor, this is Sharif Jacob on
17    behalf of Mr. Armstrong.
18            The Government, I think, suggested that it doesn't
19    have sworn testimony from Mr. Armstrong, and that's simply
20    not the case.  (Sealed per order of the Court) ████
21    ████████████████████████████████████████████████████
22    ████████████████████████  The Government has Armstrong's sworn
23    deposition testimony.  The Government is going -- the
24    Government has a copy of Mr. Armstrong's answer, which is an
25    operative pleading in this case.  The Government is going to
```

1   have the opportunity to depose Mr. Armstrong.  All of this

2   testimony that it already has and is going to get to take is

3   in the context of Armstrong admitting his pre-2004 use,

4   including at every Tour de France that took place prior to

5   2004.

6          Why the Government would then need evidence of

7   whether or not Armstrong used performance-enhancing

8   substances in 2009 or 2010, years after the sponsorship

9   ended, when Armstrong was no longer riding for the Postal

10  Service team, in light of the fact that it not only has

11  Armstrong's testimony but the testimony of almost every

12  rider on his team has nothing to do with relevance.  It has

13  everything to do with getting -- attempting to seek other --

14  attempting to seek documents that frankly can be used for

15  purposes that aren't related to this litigation and are not

16  proper.

17          THE COURT:  What purposes are you suggesting?

18          MR. JACOB:  We, unfortunately, Your Honor, have

19  had a long history of leaks in the litigation against

20  Armstrong.  During the grand jury proceeding, which are

21  supposed to be secret proceedings --

22          THE COURT:  Okay.  Okay.  I'm aware of your leak

23  argument, and while we decided not to go back, there will

24  certainly be no leaks while this case is pending before this

25  Court; or if they are, they will be dealt with

1   appropriately.  Okay?

2              MR. JACOB:  Thank you, Your Honor.

3              MR. SCOTT:  Your Honor, this is Paul Scott.  May I

4   just add a brief comment?

5              THE COURT:  Yes.

6              MR. SCOTT:  When Mr. Jacob was referring to

7   events in 2009/2010, I think it's worth noting that when

8   Mr. Armstrong was on Oprah he was denying any doping in that

9   period; so to the extent that there's -- you saw a report

10  out there that tells a different story, you know, it

11  obviously goes to his credibility, which is a relevant

12  consideration when he's going to be speaking to other issues

13  in the case.

14             MR. JACOB:  Your Honor, this is Sharif Jacob on

15  behalf of Mr. Armstrong.

16             The Federal Rules of Evidence prohibit attempts to

17  impeach people based on irrelevant or extraneous evidence,

18  and if the Government's position -- you know, Armstrong has

19  admitted his use of performance-enhancing substances.  He's

20  also admitted, in the sworn documents that I previously

21  submitted to the Court, the concealment of that use.  So the

22  Government does not need evidence about 2009 or 2010 to

23  either prove use or concealment or to make the credibility

24  arguments that counsel for Relator has raised.

25             THE COURT:  Okay.  Thank you, Mr. Jacob.  Let's

1    move on.

2          The databases.  Is this an issue simply of timing,

3    or, Mr. Jacob, are there either databases or information

4    contained within databases that you think you're entitled to

5    that the Government has not agreed to provide, putting aside

6    the timing?

7          MR. JACOB:  Yes, Your Honor.  Putting aside the

8    timing, we believe that we're entitled to all of the

9    revenue-tracking databases, and those -- we know of only

10   three of them, and the Government has disclosed it at least

11   has evidence in its possession relating to one of them.

12   They suggested for the first time, to our knowledge, that

13   two of the other databases may have been destroyed.  That

14   was certainly the first time we've learned of it.

15         The Government's prior discovery responses, which

16   asked -- they have not been amended, continue to say that

17   they have no knowledge that these databases were destroyed.

18   But we want all the revenue-tracking databases, and we would

19   like them in a searchable format.

20         We don't agree with the Government's suggestion

21   that it is allowed to do all the searches for us, have its

22   attorneys examine the result, decide whether they believe

23   those results are relevant or useful to Armstrong's case,

24   and then turn them over to us.  And we've cited Rule --

25   Federal Rule of Civil Procedure 34, the advisory committee

1   notes to that rule, and a number of authorities which

2   provide that if the Government's not going to make the

3   entire database available for inspection, which it has

4   declined to do, then it has to make the portion of the

5   database that is relevant available to Armstrong in

6   searchable format; not conduct the searches on its end,

7   decide what's relevant, and then present it in a format that

8   it wishes Armstrong to have.

9          THE COURT:  Okay.  Mr. Finkelstein, let's start --

10   or whoever is going to handle this issue -- let's start off

11   with what databases are actually in existence.  I take it

12   that there's the STARS, the SMARTS, and the Customer First;

13   is that correct?

14          MR. CHANDLER:  That's right.  Well, there's a

15   portion of the SMARTS database that is still in existence as

16   well as the Customer First database.  The Customer First

17   database doesn't have any information from the relevant time

18   period.  So that was the successor database to some of the

19   earlier databases that Mr. Armstrong has referred to, but

20   those data were purged long ago.

21          So really, the only potentially relevant sales

22   information in any database is in the portion of the SMARTS

23   database that we have, which relates to the time period from

24   2000 to 2002.

25          THE COURT:  So what happened to the post-2002

1    records?  Is this Mr. Chandler?

2              MR. CHANDLER:  This is Mr. Chandler.

3              Well, those were rolled into the Customer First

4    database, and then pursuant to the Postal Service's policy

5    of maintaining that data, they would maintain the current

6    fiscal year and the preceding two fiscal years, and at the

7    end of that time, they would eliminate the fiscal year

8    outside of that range.

9              THE COURT:  Okay.  So you've represented that the

10   only relevant sales database records are from 2000 to 2002,

11   and they're contained in the SMARTS system, which is an old

12   database but that you have recovered in part; is that

13   correct?

14             MR. CHANDLER:  That is right, Your Honor.  And it

15   was purely a matter of fortuity.  It just so happened that

16   someone had made a back-up copy of the database in 2002 or

17   2003, and they happen to still have that back-up copy of it.

18             So it wasn't maintained as a matter of, you know,

19   the Postal Service's ordinary practice.  It just so happened

20   that there was a back-up made at that time that still

21   exists.

22             THE COURT:  Okay.  Mr. Jacob, is there any reason

23   for you to question the accuracy of the representation

24   that's just been made?

25             MR. JACOB:  Your Honor, our understanding is that

1    at least the representation may be incomplete, and it raises

2    a question that I would like to have answered.  The last

3    representation the Government made to us is that while it

4    was in possession of back-up tapes, it had not searched them

5    for responsive documents, and so our question would be:

6    Given how crucial this evidence is to the damages case, and

7    given that damages are hotly disputed, do the back-up tapes

8    contain copies of these databases, any of them, for the

9    relevant time period?

10            THE COURT:  Mr. Chandler, can you answer that?

11            MR. CHANDLER:  At the moment, Your Honor, I'm not

12   able to speak authoritatively.  As I recall, I don't think

13   the Postal Service has back-up tapes going back that far.

14            THE COURT:  Okay.

15            MR. CHANDLER:  But I would need to confirm that.

16   I mean, I can certainly check that and let Mr. Armstrong

17   know the result, but it would be my -- as I sit here right

18   now, I can't say authoritatively, but I think that it's

19   unlikely that those do exist.

20            THE COURT:  All right.  Well, why don't you do

21   that.

22            And Mr. Jacob, you can obviously, you know,

23   propound interrogatories or depose the administrator or the

24   custodian of these various databases and, you know,

25   challenge that representation to the extent you can.  And if

1    you do, then we can bring this issue up; but for now, let's

2    proceed under the assumption that we're dealing with three

3    years' worth of data that was harvested from the SMARTS

4    database.  Okay?

5                MR. JACOB:  Thank you, Your Honor.

6                THE COURT:  Now, what format is that in, and how

7    is it being provided to Mr. Armstrong, and when will it be

8    provided?

9                MR. CHANDLER:  It exists in an Oracle database,

10   and as far as the how and when, those are issues that we're

11   sill sorting through, Your Honor.

12               THE COURT:  You've been sorting through these for

13   a while.  We raised this at the last in-person hearing, as I

14   recall.

15               MR. CHANDLER:  That's correct, Your Honor, and

16   since then we've located the database administrator.

17               We initially had given it to someone else within

18   the Postal Service who was unable to provide the help we

19   needed.  We've now found the right person.  That person has

20   been able to get into the database, has been able to review

21   the database, and has actually exported the relevant tables

22   to Excel spreadsheets, which he has sent to us.  So we

23   actually now have what we think are the tables that are most

24   likely to contain the relevant information.  We have those,

25   and we're able to search those.

1            THE COURT:  Now, the raw data that was used to

2    generate those tables, will Mr. Armstrong be able to search

3    and manipulate, in the neutral sense, that data?

4            MR. CHANDLER:  That's not the manner in which we

5    anticipated producing that.  I mean, our intention was to

6    produce just the relevant records.

7            THE COURT:  Okay.  And what are the records?  What

8    is it -- what's in the database?

9            MR. CHANDLER:  Primarily sales information;

10   information reflecting the Postal Service's various clients

11   and information about sales to those clients, leads

12   generated by Postal Service salespeople, people and

13   contacts, that sort of thing.

14           THE COURT:  Okay.  So are you able to search the

15   database?  I mean, if you wanted to query how many leads

16   were generated by a contact or a customer or a marketing

17   campaign, would you be able to do that?

18           MR. CHANDLER:  Yes.  I mean, the way we've got it

19   right now is what the Postal Service has provided to us.

20   What it's done is it's gone through -- there are, I think,

21   162 tables in the database itself.  There are only, I

22   believe, 15 or so that contain searchable text fields for

23   comments of the type that might generate a responsive

24   record, a record that's responsive to Armstrong's request.

25           So we've been provided those 15 or so tables as

1     Excel spreadsheets.  So each of those tables within the

2     database has been exported to an Excel spreadsheet, and

3     we've now got those so that we can run the searches

4     ourselves.

5              We've not yet begun that process, but that's --

6     we've got that in our possession.

7              THE COURT:  Okay.  Mr. Jacob, anything else on

8     this issue?

9              MR. JACOB:  Yes.  I'd just like to add, Your

10    Honor, that we've cited authority specifically for the

11    proposition that the Government doesn't get to choose the

12    format, method, and search terms that are going to be used

13    to identify relevant information; that if it's not going to

14    make the entire database available for inspection, it has to

15    make it available in a method that is searchable so that

16    Armstrong can litigate this action and engage in searches

17    without running his attorney work product through the

18    Government's filter.

19             THE COURT:  Mr. Finkelstein, will it be -- is it

20    searchable at all?  I mean, I just -- I don't understand

21    what the spreadsheets you're running will reflect and why

22    that would be responsive to the request that Mr. Armstrong

23    is making.

24             MR. CHANDLER:  Well, the spreadsheets are

25    searchable.  Pardon me, this is Mr. Chandler.

1          THE COURT:  I'm sorry.

2          MR. CHANDLER:  The spreadsheets themselves are

3     searchable.  So what we're looking at are the tables from

4     the database that might contain relevant information so

5     we're actually able to run the searches ourselves rather

6     than having to build queries in the Oracle database.

7          So, in other words, we can actually find the

8     responsive records among what's in the spreadsheets.

9          THE COURT:  I'm not -- I'm not following you.

10    Give me an example.

11         MR. CHANDLER:  Okay.  So each table set up in the

12    spreadsheet that might contain a comment of the type that

13    Armstrong is looking for has been put in a spreadsheet.

14         THE COURT:  What are the comments?  I mean, what

15    are the comments that he's looking for?

16         MR. CHANDLER:  Anything relating to the

17    sponsorship agreement.

18         THE COURT:  Okay.

19         MR. CHANDLER:  So the document request that

20    Armstrong has cited as calling for the production of records

21    from this database are all ones that essentially ask for

22    anything related to the sponsorship.

23         THE COURT:  Okay.

24         MR. CHANDLER:  So we've used search terms that

25    Armstrong provided in connection with the Postal Service's

1   emails to start to identify records that might relate to the

2   sponsorship.  So the things we're really searching are

3   "sponsorship," "cycling," "Armstrong," "Lance Armstrong," et

4   cetera.  We're able to run each of those in the same way

5   that if you have an Excel spreadsheet, and you want to

6   search that spreadsheet for a particular term on your

7   desktop, we can run the searches the same way on our

8   desktop.

9        THE COURT:  Okay.  So this is not a database

10  necessarily, but it's simply a collection of notations

11  reflecting sales relationships, a sales relationship

12  management database.  Is that really what it is?

13       MR. CHANDLER:  I think that's a fair description

14  of it, Your Honor, although what we have are particular

15  tables from that database that have been exported.

16       THE COURT:  Okay.

17       MR. JACOB:  Your Honor, this is counsel for

18  Mr. Armstrong, Sharif Jacob.  If I may just briefly

19  respond?

20       We did provide search terms to the Government.

21  Those search terms were produced in emails.  Those were not

22  produced in a database.

23       Armstrong has no idea how the database was

24  constructed, how it was put together, or what codes may have

25  been used to identify revenue associated with the

1    sponsorship agreement.  The protocol that the Government has

2    described we certainly never agreed upon, and I think what's

3    crucial to understand is that Federal Rule of Civil

4    Procedure 34 allows Armstrong to access the underlying data.

5    That's what is allowed for under the rules, and we need to

6    be able to access and run our own searches on that

7    underlying data.  In advisory committee notes Rule 34

8    addresses this issue quite explicitly.

9              THE COURT:  Okay.  Counsel, you've made that

10   point.  I understand.

11             MR. JACOB:  Thank you, Your Honor.

12             MR. CHANDLER:  And I'll just note, Your Honor,

13   Mr. Jacob's position is a little surprising given that

14   they've asked us to identify search terms to narrow down the

15   90 emails that Mr. Armstrong received from Thom Weisel, but

16   they're insisting upon getting -- having access to all 3.5

17   million records reflecting the Postal Service and sales

18   information over three years.

19             THE COURT:  Okay.  All right.  I will consult with

20   my counsel, and we will get you an answer on all three of

21   these issues sooner rather than later.  Okay?

22             MR. FINKELSTEIN:  Your Honor?

23             THE COURT:  Yes.

24             MR. FINKELSTEIN:  Could we raise one more thing?

25             THE COURT:  Sure.  Who is this?

1           MR. FINKELSTEIN:  Excuse me, Your Honor, I'm

2     sorry.  This is David Finkelstein.

3           THE COURT:  Okay.

4           MR. FINKELSTEIN:  Our deadline to amend our

5     pleading is fast approaching.  It's currently at January

6     1st.  Any amendment would concern nonintervened defendants,

7     and we had hoped to make such a decision based on our review

8     of emails, which still haven't been produced to us.  So I

9     just wanted to flag for the Court that we're going to have

10    to move to extend that deadline.

11          I'm sure that the defendants will want to be heard

12    on that motion, too.  I just wanted to flag that.

13          THE COURT:  Okay.  When should I anticipate that?

14          MR. FINKELSTEIN:  Well, I'm going to leave town

15    before too long so hopefully next week.

16          THE COURT:  Okay.

17          MR. SLAUGHTER:  Your Honor, James Slaughter on

18    behalf of Lance Armstrong.

19          Obviously, if the Government is talking about

20    adding nonintervening defendants, that doesn't concern

21    Armstrong, but it concerns other counsel who the

22    Government knows is represented, and I'll just note that

23    their raising this issue before you without notifying -- I

24    don't know if they've notified the other counsel or not, but

25    certainly raising it on this call without having the other

1    counsel available to respond doesn't sound exactly correct

2    to me.

3            MR. FINKELSTEIN:  Well, to be clear, Your Honor,

4    we weren't asking the Court to rule; I just didn't want the

5    Court to be surprised either.

6            THE COURT:  Understood.

7            MR. SCOTT:  Your Honor, this is Paul Scott for

8    Relator Landis.  On the topic of not being surprised, I also

9    wanted to let the Court know that following the mediation

10   yesterday, the Relator reached terms with the CSE

11   defendants, which include Stapleton, Knaggs, and CSE, but

12   that's subject to the Government having an opportunity to

13   review and express its views.  So, again, just for the

14   purpose of keeping everybody apprised.

15           THE COURT:  Okay.  Just, you know, in general, I

16   am loathe to jeopardize our discovery -- our overall

17   discovery cut-off, okay?  So to the extent there are

18   amendments or other interim revisions to the scheduling

19   order, I would very much not like them to affect the overall

20   discovery in the case.  Is that fair?

21           MR. SCOTT:  Understood.

22           MR. SLAUGHTER:  Understood, Your Honor.

23           THE COURT:  Okay.  Anything else?

24           MR. JACOB:  Not from Armstrong, Your Honor.

25           THE COURT:  Okay.  Thank you, gentlemen, and Happy

1    Holidays.

2                    (Everybody says "Thank you.")

3                         (Whereupon the hearing was

4                         adjourned at 2:52 p.m.)

5

6                **CERTIFICATE OF OFFICIAL COURT REPORTER**

7

8

9                    I, LISA A. MOREIRA, RDR, CRR, do hereby

10    certify that the above and foregoing constitutes a true and

11    accurate transcript of my stenographic notes and is a full,

12    true and complete transcript of the proceedings to the best

13    of my ability.

14        Dated this 16th day of December, 2014.

15

16                                    /s/Lisa A. Moreira, RDR, CRR
                                      Official Court Reporter
17                                    United States Courthouse
                                      Room 6720
18                                    333 Constitution Avenue, NW
                                      Washington, DC 20001
19

20

21

22

23

24

25