```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3    FLOYD LANDIS,                )
                                   )    CA No: 1:10-cv-00976 (CRC)
 4              Plaintiff,         )
                                   )    Washington, D.C.
 5    vs.                          )    January 21, 2015
                                   )    1:36 p.m.
 6                                 )
      TAILWIND SPORTS CORPORATION, )
 7    et al.,                      )
                                   )
 8              Defendants.        )
      _____)

 9

10          TRANSCRIPT OF TELEPHONIC DISCOVERY CONFERENCE
         HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                 UNITED STATES DISTRICT JUDGE

12    APPEARANCES:

13

14    For the Plaintiff:        PAUL D. SCOTT, ESQ.
                                 LANI ANNE REMICK, ESQ.
                                 LAW OFFICES OF PAUL D. SCOTT, PC
15                               The Embarcadero
                                 Pier Nine
16                               Suite 100
                                 San Francisco, CA 94111
17                               (415)981-1212
                                 pdscott@lopds.com
18

19    For Intervenor Plaintiff
      United States of America:  DARRELL C. VALDEZ, ESQ.
20                               U.S. ATTORNEY'S OFFICE
                                 Civil Division
21                               555 Fourth Street, NW
                                 Washington, DC 20530
22                               (202)252-2507
                                 darrell.valdez@usdoj.gov
23

24    (APPEARANCES CONTINUED ON NEXT PAGE)

25    Proceedings recorded by mechanical stenography; transcript
      produced by computer-aided transcription
```

```
 1      (APPEARANCES CONTINUED):

 2      For Intervenor Plaintiff
        United States of America:   CARL EZEKIEL ROSS, ESQ.
 3                                  U.S. ATTORNEY'S OFFICE
                                    555 Fourth Street, NW
 4                                  Washington, DC 20530
                                    (202) 252-2533
 5                                  carl.ross@usdoj.gov

 6                                  DAVID MICHAEL FINKELSTEIN, ESQ.
                                    U.S. DEPARTMENT OF JUSTICE
 7                                  Civil Fraud Section
                                    601 D Street, NW
 8                                  Room 9605
                                    Washington, DC 20004
 9                                  (202) 616-2971
                                    david.m.finkelstein@usdoj.gov
10
                                    ROBERT E. CHANDLER, ESQ.
11                                  U.S. DEPARTMENT OF JUSTICE
                                    Civil Division, Fraud Section
12                                  601 D Street, NW
                                    Suite 900
13                                  Washington, DC 20530
                                    (202) 514-4678
14                                  robert.chandler@usdoj.gov

15                                  ROBERT JOSEPH MCAULIFFE
                                    U.S. DEPARTMENT OF JUSTICE
16                                  Civil Division
                                    601 D Street, NW
17                                  Suite 9020
                                    Washington, DC 20004
18                                  (202) 514-6832
                                    robert.mcauliffe@usdoj.gov
19
        For the Defendant
20      Lance Armstrong:            SHARIF E. JACOB, ESQ.
                                    ELLIOT PETERS, ESQ.
21                                  R. JAMES SLAUGHTER, ESQ.
                                    KEKER & VAN NEST, LLP
22                                  633 Battery Street
                                    San Francisco, CA 94111
23                                  (415)391-5400
                                    sjacob@kvn.com
24                                  rslaughter@kvn.com

25      (APPEARANCES CONTINUED ON NEXT PAGE)
```

1    For the Defendant
     Capital Sports & Entertainment
2    Holdings, Inc.:                    MARC S. HARRIS, ESQ.
                                        MARGARET E. DAYTON, ESQ.
3                                       SCHEPER KIM & HARRIS LLP
                                        601 West Fifth Street
4                                       12th Floor
                                        Los Angeles, CA 90071-2025
5                                       (213) 613-4655
                                        mharris@scheperkim.com
6                                       pdayton@scheperkim.com

7

8

9

10

11

12

13

14

15

16

17

18

19   Court Reporter:                   Lisa A. Moreira  RDR, CRR
                                        Official Court Reporter
20                                      U.S. Courthouse, Room 6720
                                        333 Constitution Avenue, NW
21                                      Washington, DC  20001
                                        202-354-3187
22

23

24

25

1          P R O C E E D I N G S

2          THE COURTROOM DEPUTY:  Your Honor, this is Civil

3    Action 10-976, *Floyd Landis vs. Tailwind Sports Corporation,*

4    *et al.*

5          Will the parties please identify yourselves for

6    the record.

7          MR. JACOB:  Good afternoon, Your Honor.  This is

8    Sharif Jacob of Keker & Van Nest on behalf of Lance

9    Armstrong, and with me are Elliot Peters and R. James

10   Slaughter.

11         MR. FINKLESTEIN:  Your Honor, good afternoon.

12   This is David Finkelstein for the Government.  With me is

13   the whole team, some of whom you have met, two of whom are

14   new:  Robert Chandler and Darrell Valdez, whom you've met,

15   and the new members of the team are Carl Ross and Robert

16   McAuliffe.

17         MR. SCOTT:  Your Honor, this is Paul Scott for

18   Relator, Floyd Landis.  With us on the call as well is Lani

19   Remick with our firm as well.

20         MR. HARRIS:  Good afternoon, Your Honor.  This is

21   Marc Harris on behalf of the CSE office, and with me is

22   Peggy Dayton of my office.

23         THE COURT:  Okay.  I hope everyone's doing okay.

24   Thanks for calling in.  Let's see, why don't we start with

25   the CSE motion for reconsideration, and then move to the

1    discovery issue.

2         On the former, you know, I'm always happy to hear

3    from you guys, but, you know, frankly I thought that this

4    was a fairly straightforward resolution; so before I hear

5    from you, Mr. Harris, let me just explain what my reasoning

6    was in granting the Government's motion.

7         As I understand it, the request for production of

8    documents by the Government to Armstrong came six months

9    before the January 1 deadline to amend the pleadings, which

10   struck me as being, you know, well enough in advance to

11   expect a production of documents in return.  Now, I

12   understand that there was a legitimate dispute about whether

13   some of the Stapleton and Knaggs emails should have been

14   produced, and the argument was made that there were, you

15   know, personal emails and, you know, other emails unrelated

16   to the case, and I understood that; but as to other emails,

17   those related to the case, including the issue of

18   concealment, as I ruled I thought that the Government was

19   entitled to those, and apparently it still has not received

20   them, according to the Government.

21        Now, I don't know what may be in those emails, but

22   if the Government receives an email it requested six months

23   prior to the deadline that clearly relates to the issues in

24   the case and that arguably establishes a basis for an

25   amendment, I think they should be able to at least consider

1   that email and to come into court and argue that there is a

2   good -- that there's good cause for an amendment.

3        Now, that doesn't mean I'm going to grant it.  You

4   know, believe me, I'm not looking to, you know, expand this

5   case any larger than it needs to be.  That doesn't mean that

6   the defense can't come in at that time and argue lack of

7   good cause or undue prejudice at that stage, but it seems to

8   me the Government ought to be able to at least argue that an

9   amendment is proper.

10       I appreciate why the CSE defendants don't want

11  four more months of uncertainty over whether they'll be

12  joined or not, but it seems to me that on the record the

13  situation was largely created by Mr. Armstrong's failure to

14  produce the documents.  And I'm not ascribing any ill motive

15  to that, but it seems to me that the Government shouldn't be

16  put at a disadvantage of not having received documents that

17  were called for six months prior to the deadline.

18       So that's, in a nutshell, the reasons for the

19  order, and Mr. Harris, you should feel free to tell me why

20  I'm wrong.

21       MR. HARRIS:  Thank you, Your Honor.  Thank you for

22  giving me the opportunity to raise these issues with you

23  today, even after the Court's ruling.

24       As we pointed out in our brief pleading on Friday,

25  the Government didn't raise any of these issues or arguments

1    in its three-page motion, which I sort of attributed --

2    well, putting aside whether it was a proper tactic to sort

3    of lay in the weeds and not disclose the basis for the

4    motion so that we could have addressed it more fully in the

5    opposition, the fact is the moving papers didn't address the

6    diligence issue or the prejudice issue, and for that reason

7    I think the Court should not credit the arguments that are

8    made for the first time in the reply.

9          On the merits of the issue, the -- I'd like to

10   take on both issues, the diligence and the prejudice piece.

11         On the diligence, the Government seems to be

12   arguing, and to some extent the Court has accepted the

13   argument, that more discovery that was -- more discovery may

14   inform its decision as to whether to intervene as to the CSE

15   parties, and it blames Armstrong for that piece of it.  The

16   question, though, isn't whether this missing discovery might

17   change the Government's mind; it's whether the Government

18   has acted diligently in uncovering the evidence.  And while

19   I acknowledge that they filed this discovery request six

20   months ago, that six months was after four years of prior

21   investigation.

22         They issued this discovery well over a year after

23   discovery commenced in this case.  They did precious little

24   to pursue this information that they now claim is critical

25   to making this issue all of the time knowing that this

1     deadline was looming.  In fact, they asked for the January

2     1st deadline after they had Armstrong's responses and

3     objections to this May discovery.

4              So they've known that this deadline was out there.

5     They haven't -- they've done precious little to pursue the

6     information.  There's sort of a lackadaisical meet-and-

7     confer process that's referenced in the reply brief, some

8     emails that were sent in August in exchange of

9     correspondence, but not the sort of effort that should have

10    been required when they knew that they had this deadline

11    four and a half years into the case after a multi-year grand

12    jury investigation, after years of issuing CIDs and taking

13    testimony and subpoenaing documents.

14             If they thought there was some piece missing that

15    they needed to have before January 1st, they should have

16    pressed for it and not waited until December 22nd, for

17    example, to ask the Armstrong counsel if they could

18    prioritize the production of emails regarding Mr. Stapleton.

19    So -- and whether Armstrong has failed to provide documents

20    or that's the reason that the Government has -- is missing a

21    piece should not be held against the CSE parties.

22             So I would respectfully assert, Your Honor, that

23    they have not exercised diligence.  They've had

24    opportunities -- the Relator, for example, who has joined in

25    this motion, incredibly has joined in this motion after

1    settling the case with the CSE defendants six weeks ago,

2    buried us in discovery.

3         We had 281 document requests that were served in

4    January of 2014 that we had -- that we responded to.

5    There's no mention of that in the Government's -- in the

6    plaintiffs' papers, much less any explanation as to why that

7    wasn't sufficient to uncover the facts that they claim they

8    now need to uncover these many years after the investigation

9    started.  The Government neglects the fact that we produced

10   over 6,000 pages of documents in 2011 and 2012 in response

11   to their inquiries.

12        THE COURT:  Let me ask one question.  Did the

13   Relator's request for production to you encompass the

14   request -- the Government's request for production to

15   Armstrong that we're talking about here?  In other words,

16   you know, did it call for the same emails that are at issue?

17        MR. HARRIS:  I have not compared -- I believe so.

18   We had -- like I said, we had 281 document requests from the

19   Relator, and I believe that at least one of them -- or three

20   of them, because there's one to each; there was one to

21   Knaggs, one to Stapleton, and one to CSE -- tracked -- my

22   understanding is it tracked that Request No. 7, which I

23   believe is the email request that's resulted in some

24   litigation and rulings by the Court.

25        We've not been party to that, those discovery

1    squabbles, so I can't say for sure, but yes.  The answer is

2    yes, Your Honor.

3              THE COURT:  Okay.

4              MR. HARRIS:  Now, we did not -- admittedly, we did

5    not have access to many or most of those emails that were

6    called for by the -- by the document request because there

7    was a change in servers many years ago, and those emails

8    were lost.

9              THE COURT:  Okay.  Mr. Finkelstein, do you want to

10   address that?

11             MR. FINKLESTEIN:  Your Honor, this is David

12   Finkelstein.  Rob McAuliffe will address that for the

13   Government.

14             THE COURT:  Okay.

15             MR. McAULIFFE:  And, Your Honor, this is Rob

16   McAuliffe, and before I get into the substance, just to make

17   Your Honor aware, as Mr. Finkelstein mentioned, I am new to

18   the case, and I'm in the process of getting my ECF filing

19   log-in.  I expect that today.  I was hoping to have that

20   already so I could have filed a notice of appearance, but I

21   have not been able to do that yet.

22             THE COURT:  All right.

23             MR. McAULIFFE:  So I'm prepared to address those

24   points unless Your Honor is concerned about the fact that my

25   notice of appearance has not been filed yet.

1          THE COURT:  Well, welcome to the party.  Step

2     right up.

3          MR. McAULIFFE:  All right.  Thank you.

4          Okay.  I'd like to address first Mr. Harris's

5     procedural points about the Government's filings, and I just

6     want to point out that we did, in our original motion, lay

7     out the diligence in outline form in terms of our efforts to

8     get the documents from Mr. Armstrong and how those efforts

9     did not succeed, so we think that that was set forth in the

10    original motion; and we note that -- and diligence is really

11    the primary consideration in this matter, and prejudice is

12    kind of a secondary concern.  So when the CSE defendants

13    raised their concerns in their response, we then felt the

14    need to file a reply to address those points.

15          And on the merits of what Mr. Harris is talking

16    about, we think there absolutely was diligence, and what it

17    really boils down to is discovery did not start in this case

18    until November of 2013, when the parties had their Rule

19    26(f) conference, and that's -- by federal rule discovery

20    doesn't start until that point.  Between November of 2013

21    and May of 2014, the Government and Armstrong were engaged

22    in discussions to try to settle the matter, and during that

23    time there was an agreement to stay discovery.

24          When those discussions reached an impasse in May

25    of 2014, eight days later the Government filed its document

1    request on Mr. Armstrong, and June 30th Armstrong responded

2    with a number of objections and other points in his

3    response.

4         The very next day, which is July 1, 2014, the

5    Government then engaged Mr. Armstrong in meet-and-confer

6    efforts to try to get documents from Mr. Armstrong, and that

7    process went forward through July, August, September, and

8    October of 2014.  We've supplied Your Honor with some emails

9    and other correspondence for that period.  Those efforts did

10   not result in Mr. Armstrong producing information, and, as

11   the Court's aware, the Government had to seek intervention

12   from the Court, which occurred in the fall of 2014 --

13        THE COURT:  Let me interrupt you.  Apart from

14   those emails or including those emails, is there any -- did

15   you all put -- when did you put Armstrong on notice

16   regarding these -- this particular request, the CSE emails?

17   Did it -- did you wait until you raised the issue with the

18   Court?

19        (Pause)

20        MR. FINKELSTEIN:  Your Honor, I'm consulting with

21   Mr. Chandler because he was more involved in this, but we

22   believe through that correspondence we raised concerns about

23   a number of requests, which included communications, and I

24   believe those communications included the communications

25   with CSE and Stapleton.  And that was October 31st of 2014,

1    I believe.  And this is David Finkelstein.

2             MR. CHANDLER:  Yes, I think that's right.  I think

3    those were -- our request -- well, first of all, I mean, our

4    request always included the communications that we're

5    talking about now, and our insistence on Armstrong's

6    production always included communications that we're talking

7    about now.

8             Over time the request narrowed, and I think --

9    and, again, I can't say with absolute certainty -- I believe

10   it was towards the end of October when our request narrowed

11   to the point where we actually identified this set of

12   documents or the communications with those individuals that

13   were the subject of the Court's conference in December of

14   this year.

15            THE COURT:  Okay.  Someone's shuffling papers, and

16   it's causing some feedback on our end.

17            MR. CHANDLER:  We apologize, Your Honor.  I

18   believe it was late October when the request focused to the

19   point where, you know, they reflected what we requested and

20   what was the subject of the Court's December of 2014

21   conference.

22            MR. HARRIS:  Your Honor, this is Marc Harris.  The

23   Court made itself available to taking over this case for

24   expedited resolution of these types of requests or disputes,

25   and the fact that the Government waited until October 31st

1    to raise issues about this discovery that they now claim is

2    so critical where the Court ordered at some point, and I'm

3    not -- I haven't been entirely familiar with the dispute,

4    but I did go back yesterday and read some of the

5    communications and the pleadings.  The Court asked the

6    parties or asked the Government to come up with search terms

7    that would have expedited the review of these emails, and

8    the Government neglected or delayed in doing that.

9         So there were ample opportunities to get this

10   information when the Government had the Court's order, the

11   scheduling order, on its calendar -- the only deadline it

12   was facing -- and it didn't do anything meaningful other

13   than lodging these overbroad discovery requests and now,

14   after the clock's run out, saying, "Well, Armstrong has been

15   slow in responding."

16        And as for this issue of the hiatus between

17   November 2013 and May of 2014, my clients didn't concur in

18   that or didn't tell the Government that they could have six

19   extra months because they unilaterally or bilaterally, I

20   guess, decided they were going to hold off on discovery

21   efforts.

22        THE COURT:  Right.

23        MR. HARRIS:  The Court set a deadline, and they

24   should have had that deadline in mind when they were, for

25   six months, talking about possibly settling the case.

1    THE COURT:  But the discovery we're talking about

2    is discovery from Armstrong; it's not discovery from you.

3    MR. HARRIS:  Correct, but if they -- if they knew

4    that they needed information to meet a Court-ordered

5    deadline, they should have made an agreement with Armstrong,

6    "Hey, look, we're going to put things on hold, but we need

7    information about the CSE defendants or the CSE parties," or

8    truncated that hiatus period.

9    I mean, they had it within their control to seek

10   the discovery that they claim they need, and they can't wait

11   until the eve of that deadline or after that deadline and

12   say, "Well, it's Armstrong's fault because he wasn't prompt

13   enough with the discovery."

14   If I could address the prejudice issue, Your

15   Honor, which I think is again ignored in the moving papers

16   by the Government or by the plaintiff.  I keep forgetting

17   that the Relator is joined in this pleading.

18   The Government says -- sorry, the plaintiffs say

19   nothing in the moving papers, and in the reply they

20   basically include several conclusory statements about there

21   will be no additional expense, and it won't delay any

22   discovery, and it won't have an impact on the scheduling

23   order; and all of those statements are just wrong, Your

24   Honor.

25   They also make the claim that any -- any claims

1    they might assert are likely to arise from the same facts as

2    the Relator's claim.

3                THE COURT:  Well, hold on.  Hold on, Counsel.

4    They're certainly right if the Court doesn't ultimately

5    allow for an amendment, right?

6                MR. HARRIS:  Yes, yes.  If there's --

7                THE COURT:  So the prejudice you're speaking of is

8    the additional four months.  When does that prejudice start?

9    I mean, would an additional month have prejudiced you?

10               MR. HARRIS:  I understand the Court's question.

11   So on the -- on that -- on that piece of it, here's the

12   prejudice for me in the four-month delay.

13               We settled this case six weeks ago, and as the

14   Court knows it's pending for confirmation before the Court.

15   If the Government is now allowed another four months to

16   decide whether to intervene, what's to happen -- what are we

17   to do during that four months?  We can't be forced to

18   litigate the case with a party with whom we've settled and

19   have the Relator and the CSE parties ramp up discovery and

20   continue -- have us continue litigating the case.

21               We've got -- a wave of deposition notices came

22   across my computer last night and this morning.  Are we to

23   defend those depositions, partake in that discovery that's

24   going on in the next four months, or sit on the side waiting

25   for a settlement to be confirmed, meanwhile more discovery

1    and more litigation is taking place?  And if the Government

2    decides after four months to add us, the idea that we could

3    then, from a standing start, take the discovery we need

4    about these new complaints -- this new complaint in three

5    months, when they can't get the discovery they needed after

6    five years, is just -- it's untenable.  And it's a

7    ridiculous assertion by the Government that this will not

8    delay the case, this will not impact discovery, and it won't

9    impact the scheduling order.

10            That's -- and one other piece to the prejudice

11   that the Court may not be -- well, it won't be apparent to

12   the Court.  We settled -- we have ongoing litigation with

13   our insurance carrier in the state of Texas, and as part of

14   our settlement with the Relator, we settled with the

15   carrier.  That settlement is contingent upon Court

16   confirmation of the settlement, and so the litigation in

17   Texas is on hold while we get the settlement confirmed.

18            The Government asked for an extra -- we originally

19   talked about getting the settlement confirmed in early to

20   mid-January.  The Government asked for until the end of

21   January, until January 30th, and we agreed to give them that

22   time to contemplate the settlement, and we've got our case

23   in Texas in abeyance while that -- during that time frame.

24            If we've got four more months to figure out -- to

25   understand whether we're going to be in this case, what are

1    we supposed to do with our litigation in Texas and continue

2    litigating with our insurance carrier?  So the -- even that

3    delay in having us sort of in purgatory while the Government

4    continues to dawdle and contemplate its five-year-old case

5    creates extreme prejudice for the CSE parties, Your Honor.

6              MR. McAULIFFE:  Your Honor, this is Rob McAuliffe

7    to address the points that Mr. Harris made.

8              First, I want to come back to Your Honor's

9    question about when did the Government first raise with

10   Armstrong the failure to produce communications, and we did

11   provide some exhibits to our reply, and in particular

12   Exhibit 9 is a July 1st email.  Your Honor's free to look at

13   it.  It does identify the request that included the

14   correspondence, which was Request No. 7, I believe, and that

15   was included on July 1, 2014.  The day after Mr. Armstrong

16   responded the Government raised that, and it raised it again

17   in the subsequent communications, one being August 5, 2014,

18   which is another email, series of emails, which is

19   Exhibit 10.  So we did raise it right off the bat when we

20   got Armstrong's response.

21             With regard to the prejudice argument, the

22   Government is not dawdling.  The Government is waiting, is

23   what it's doing.  It's waiting for Mr. Armstrong to produce

24   information and materials and documents and emails that he's

25   been ordered to produce, and we will review that when we

```
1    have it.  We don't have it as of today.  So we're not

2    dawdling; we're looking for that.

3              And we understand and recognize, as counsel

4    represented, that there was a January 30th deadline, and the

5    Government will meet that deadline, intends to meet that

6    deadline, and we have not made a decision on that question

7    yet.  And if the result is that the Government agrees to the

8    settlement, this is essentially moot.

9              But if the Government objects, then whether or not

10   there's going to be new evidence that Mr. Armstrong produces

11   that warrants claims against the CSE defendants will have to

12   be determined when those documents are produced, and it will

13   be at that point that the question of prejudice would be

14   something that the CSE parties could be heard on.

15             But at this juncture, it's premature, and there is

16   -- it's speculation as to whether there's any prejudice

17   whatsoever in extending this amendment deadline until May

18   1st.

19             THE COURT:  Okay.  Thanks very much.  This is very

20   helpful.

21             Mr. Harris, I understand your predicament, but I

22   think it is a -- I think Mr. Armstrong has put you into that

23   box.  The Government, I think, has been reasonably diligent

24   in its request for production of the relevant evidence, and

25   the Court will deny the motion for reconsideration to the
```

1    extent that's what it was.  And as I said, that is not meant

2    to prejudge at all any subsequent request for amendment,

3    which we can handle down the road, if we have to.  Okay?

4              So let's move to the discovery dispute regarding

5    the USADA documents.  Mr. Jacob, are you going to handle

6    that?

7              MR. JACOB:  Yes, Your Honor.  This is Sharif Jacob

8    on behalf of Lance Armstrong.

9              Armstrong's request is quite simple.  Armstrong

10   has already filed a motion to compel production of the

11   Government's communications with the United States

12   Anti-Doping Agency.  That motion was filed in July.

13             On September 30th, the Court ruled that the

14   Government must, in fact, produce its communications with

15   USADA unless the Government could assert an independent

16   basis for withholding them.  Almost four months have passed,

17   and the Government hasn't produced a single communication

18   with USADA, not one, nor has the Government identified any

19   objection that would justify continuing to withhold those

20   communications.  So Armstrong is requesting that the Court

21   order the Government to produce all of its communications

22   with USADA within seven days.

23             THE COURT:  Okay.  Mr. McAuliffe?  Mr.

24   Finkelstein?

25             MR. FINKLESTEIN:  Your Honor, this is David

1    Finkelstein.  There's no question Mr. Armstrong is entitled

2    to the nonprivileged USADA communications, and we are

3    working diligently to collect them, and with the goal --

4              THE COURT:  Let me cut you off.  What does that

5    mean?  How many do you have in hand now?  How many documents

6    or how many pages of documents?

7              MR. FINKLESTEIN:  I believe we've collected all of

8    the communications with the civil division, which I believe

9    substantially overlap with communications between USADA and

10   the U.S. Attorney's office for the District of Columbia.

11             THE COURT:  Okay.  And are you asserting any

12   additional privileges besides the common interest privilege,

13   which the Court rejected?

14             MR. FINKLESTEIN:  I think they'll need to be

15   reviewed on a -- I mean, any privileges will be asserted on

16   a document by document basis, but we don't anticipate

17   asserting any blanket privilege that will cover all of them.

18             THE COURT:  Okay.  And how long will it take you

19   to get them what you have in hand right now?

20             MR. FINKLESTEIN:  Your Honor, we said in our

21   papers mid-February, and we think we can roll those out in

22   mid-February.

23             MR. CHANDLER:  And we would anticipate having, you

24   know, documents collected from other offices in that mid-

25   February time frame.

1          THE COURT REPORTER:  Is that Mr. Chandler?

2          THE COURT:  Please identify yourself for the court

3     reporter.

4          MR. CHANDLER:  Pardon me, Your Honor.  This is

5     Robert Chandler.

6          THE COURT:  Okay.  Let's stick with the documents

7     that you have, the civil division documents and the United

8     States Attorney's office documents.

9          What additional review needs to be done?  Do you

10    still need to do a privilege review?

11         MR. CHANDLER:  That's right, Your Honor.

12         THE COURT:  And how long is that going to take?

13         MR. CHANDLER:  I don't anticipate it taking very

14    long.  I think the documents number somewhere on the order

15    of about 200 or so.

16         THE COURT:  Okay.

17         MR. CHANDLER:  So it shouldn't -- it should be a

18    pretty quick review.

19         THE COURT:  Let's get them those within seven

20    days, okay?

21         MR. CHANDLER:  I think we should be in a position

22    to do that.

23         THE COURT:  Okay.  Now, what else is there?

24         MR. FINKLESTEIN:  Well, there's the other

25    agencies.

1          THE COURT:  Precisely.  And what efforts have been

2     undertaken to collect documents from other agencies?

3          MR. FINKLESTEIN:  Well, Counsel and IT offices for

4     each of those other agencies have been contacted, and the

5     collection process has begun, but it's not as simple as

6     pressing a button and having everything ready.  And in

7     particular, I -- you know, I understand Your Honor's concern

8     about getting this moving, but not everything can happen all

9     at once.  We've had to redirect resources away from

10    collecting emails to do this.

11         THE COURT:  I understand that.

12         Now, Mr. Armstrong, would you like them to

13    prioritize the USADA documents that they're collecting from

14    other agencies?  Is that the thrust here?

15         MR. JACOB:  Yes, Your Honor.  Yes.  And there was

16    a representation that was made in the papers that we haven't

17    informed the Government that the USADA documents are a

18    priority, and I'd just like to direct the Court's attention

19    to ECF No. 190-18.  In that letter, which I sent to the

20    Government on June 30, 2014, I explained that Armstrong

21    urgently needs the documents from USADA, and here's why,

22    Your Honor:  We've got a subpoena out to USADA, and USADA

23    has refused to produce its own communications with the

24    Government stating that the Government has objections to

25    production that haven't been ruled upon.  In order to reduce

1    motion practice, you know, before multiple tribunals, USADA

2    has agreed to abide by any orders this Court has issued.

3          So we can't get documents from USADA until the

4    Government produces its communications as the top priority,

5    which is obviously the Department of Justice, and the

6    Government has already -- or the Court has already ruled on

7    that.

8          THE COURT:  Mr. Finkelstein, can you help

9    Mr. Jacob with that predicament?

10          MR. FINKLESTEIN:  Well --

11          THE COURT:  Can you tell USADA to produce the

12    documents and not to wait for -- I mean, obviously if it has

13    other privilege objections besides the common interest

14    privilege, it's entitled to assert them, but otherwise, you

15    know, they shouldn't wait for -- you know, there's nothing

16    else for them to wait for to start producing those

17    documents.

18          MR. FINKLESTEIN:  I can certainly clarify to them

19    and to the Court that they're not acting on our behalf.  I

20    don't want to, however, prejudice any objections they may

21    have.

22          I'm looking at the subpoena to USADA, and it's not

23    the same.  So because it's not a subpoena to us, I haven't

24    looked at it carefully; but I would imagine that they would

25    want the opportunity to be heard, and I don't want to

1    prejudice that.

2            But certainly, Your Honor, we're not telling them

3    not to respond to the subpoena.  This is not at our behest.

4            THE COURT:  Okay.

5            MR. JACOB:  All I know -- this is Sharif Jacob on

6    behalf of Lance Armstrong.  And all I know, Your Honor, is

7    that USADA has told us that the Government is going to

8    assert privilege objections or some sort of objections.  We

9    don't know what those objections are, and we're a little

10   surprised to hear for the first time during this hearing

11   that those objections are privilege objections.  We don't

12   know how the Government could continue to have privilege

13   objections given that the common interest privilege has been

14   overruled.

15           But the objections that USADA is standing on are

16   not its own.  It's standing on the Government's objections.

17   So if the Government is, in fact, representing that it's not

18   asking USADA to withhold documents based on the Government's

19   own objections, we would appreciate the Government telling

20   USADA that so that we can resolve that impasse with USADA

21   over its' subpoena.

22           THE COURT:  When was the return date on the USADA

23   subpoena?

24           MR. SLAUGHTER:  Your Honor, this is James

25   Slaughter on behalf of Armstrong.  I don't have that

1    information at my fingertips, but it was months and months,

2    you know, nine-plus, perhaps a year.  We served that

3    subpoena in 2013 but have been negotiating with USADA and

4    meeting and conferring about it and reached a substantive

5    agreement with them last summer, a portion of which

6    Mr. Jacob just described to you about the agreement not to

7    have to litigate this same issue in multiple tribunals.

8            MR. FINKLESTEIN:  Your Honor, to be clear what our

9    position is -- this is David Finkelstein.  I mean, there

10   will be the transcript, and we're happy to tell USADA what's

11   on the transcript, but to be clear what our position is, we

12   have not claimed privilege with respect to any of the emails

13   that we've collected so far, apart from the common interest

14   privilege that this Court overruled.  We're not going to

15   assert that again.

16           However, we're collecting emails from, among

17   others, the Assistant Attorney General, and we just want an

18   opportunity to review them before we roll them out.  And I

19   understand this Court has said to do so within seven days,

20   and we will.

21           THE COURT:  I mean, obviously you have to review

22   them for privilege or otherwise, but, you know, they've made

23   clear that this is a priority, and so we'll get them the

24   first 200 or so within seven days, and, you know, prioritize

25   the collection from other agencies so that you can produce

1    those in February with your next production.  Okay?

2         MR. VALDEZ:  Your Honor, if I may, this is Darrell

3    Valdez.  I just pulled up -- USADA responded to the subpoena

4    on December 11, 2013 with their objections to the subpoena.

5         THE COURT:  But there's been a stand-still in the

6    meantime.

7         MR. JACOB:  That's correct, Your Honor.  This is

8    Sharif Jacob on behalf of Lance Armstrong.  USADA has

9    produced some documents, and those documents aren't at issue

10   here, but there is a stand-still over USADA's communications

11   with the Government.  USADA won't produce those, and it

12   purports to rely on objections that the Government has not

13   yet disclosed to us.

14        MR. VALDEZ:  I'm sorry, Your Honor, this is

15   Darrell Valdez.  The only reason I brought that up is it

16   kind of undermines the sense of urgency that Mr. Jacobs has

17   been espousing to the Court.  He's waited over a year now.

18   So that was just the only reason why I brought that up.

19        MR. JACOB:  This is Sharif Jacob on behalf of

20   Lance Armstrong.  Just to briefly respond to that, we

21   served these document requests over a year ago.  Lance

22   Armstrong had an extensive meet-and-confer with the

23   Government over these documents.  That meet-and-confer is on

24   the public record, and on May 29th of 2014 I wrote a letter

25   to Mr. Chandler explaining that we were at an impasse over

1    the USADA documents, and we needed them on June 30th of

2    2014.  I sent Mr. Chandler another letter saying that we

3    urgently needed these documents, and, as the Court knows

4    obviously, we moved to compel.  So I think that the record

5    of our diligence is well-established with regard to the

6    USADA documents.

7              THE COURT:  Okay.  So the Government is not

8    objecting to producing the documents.  It wants to review

9    both the documents that it has for substance and privilege,

10   whatever that may be, as well as the documents that it is

11   collecting from other agencies.  It will produce the first

12   tranche within seven days, and I'll direct the Government to

13   prioritize the collection of the USADA documents from other

14   agencies and make every effort to produce them with the

15   February planned production.  Is that clear?

16             MR. CHANDLER:  Your Honor, if I may ask one thing

17   -- this is Robert Chandler -- if Your Honor wouldn't mind

18   making the deadline nine days from now?  Our document

19   production contractor generally requires five days lead time

20   between the time we finalize a set of documents for

21   production and the time it actually turns out in production.

22   So if we were to finalize this coming Monday, that would

23   give us the weekend to look at the documents and resolve any

24   questions we have, and the production would go out on

25   Friday.

1          THE COURT:  That's fine.

2          MR. CHANDLER:  Would that be all right?  All

3     right.  Thank you.

4          THE COURT:  Okay.  Anything else?

5          MR. JACOB:  Nothing from Armstrong, Your Honor.

6          MR. VALDEZ:  This is Darrell Valdez, U.S.

7     Attorney's office.  One more thing, Your Honor.

8          On the December 11th conference that we had there

9     was a request to make some portions of the transcript under

10    seal.  Unfortunately the Court's language in that transcript

11    ended up making the entire transcript under seal, and so we

12    are unable to get a copy of the transcript.  If Your Honor

13    -- I don't know if you want me to file a written motion or

14    if we could just move now to make an oral order partially

15    lifting the seal on that transcript so we can get a copy of

16    it.

17         THE COURT:  Did we designate which portions were

18    to be under seal?

19         MR. VALDEZ:  Well, there was a portion during the

20    conversation when we were to talk about some information

21    about Mr. Armstrong, and we had -- I think the problem was

22    that we all understood it to be that portion to be under

23    seal.  Unfortunately, when the Court gave its order, you

24    stated -- you said -- I'm sorry, I've got it here from the

25    court reporter.  You basically said that if anybody has

1    objections to the transcript being placed under seal, and so

2    the whole transcript -- oh, here it is, I'm sorry.

3    "Everybody's subject to the protective order in the room as

4    long as you all don't have a problem with us marking the

5    transcript as sealed."  So that kind of made the whole

6    transcript sealed.

7            THE COURT:  Okay, I see.  So we'll go back and

8    figure out which pages should remain under seal and unseal

9    the remainder.

10           MR. VALDEZ:  Okay.  Unfortunately, we can't do

11   that because the court reporter won't give us the

12   transcript.

13           THE COURT:  That's fine, okay.

14           MR. VALDEZ:  Thank you, Your Honor.

15           THE COURT:  Okay.  Thank you, all.

16           MR. JACOB:  Thank you, Your Honor.

17       (Whereupon the hearing was concluded at 2:14 p.m.)

18

19

20

21

22

23

24

25

1     <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3          I, LISA A. MOREIRA, RDR, CRR, do hereby certify

4     that the above and foregoing constitutes a true and accurate

5     transcript of my stenographic notes and is a full, true and

6     complete transcript of the proceedings to the best of my

7     ability.

8          Dated this 27th day of January, 2015.

9

10                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
11                              United States Courthouse
                                Room 6720
12                              333 Constitution Avenue, NW
                                Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25