```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
      FLOYD LANDIS,                    )
 3                                     )    CA No: 1:10-cv-00976 (CRC)
                      Plaintiff,       )
 4                                     )    Washington, D.C.
                                       )    February 20, 2015
 5    vs.                              )    2:04 p.m.
                                       )
 6    TAILWIND SPORTS CORPORATION,  )
      et al.,                          )
 7                                     )
      _____Defendants.___)
 8
                 TRANSCRIPT OF TELEPHONIC DISCOVERY CONFERENCE
 9           HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                      UNITED STATES DISTRICT JUDGE
10
      APPEARANCES:
11
      For Intervenor Plaintiff    ROBERT E. CHANDLER, ESQ.
12    United States of America:   U.S. DEPARTMENT OF JUSTICE
                                  Civil Division, Fraud Section
13                                601 D Street, NW
                                  Suite 900
14                                Washington, DC 20530
                                  (202) 514-4678
15                                robert.chandler@usdoj.gov
      (On the line were also Tracy Hilmer, Christopher Belen and
16    Matthew Golojuch)

17    For the Defendant           ELLIOT R. PETERS, ESQ.
      Lance Armstrong:            SHARIF E. JACOB, ESQ.
18                                R. JAMES SLAUGHTER, ESQ.
                                  KEKER & VAN NEST, LLP
19                                633 Battery Street
                                  San Francisco, CA 94111
20                                (415)391-5400
                                  epeters@kvn.com
21
      Court Reporter:            Lisa A. Moreira  RDR, CRR
22                               Official Court Reporter
                                 U.S. Courthouse, Room 6720
23                               333 Constitution Avenue, NW
                                 Washington, DC  20001
24                               202-354-3187

25    Proceedings recorded by mechanical stenography; transcript
      produced by computer-aided transcription
```

```
 1                      P R O C E E D I N G S
 2            THE COURT:  Good afternoon, everyone.
 3            MR. CHANDLER:  Good afternoon, Your Honor.
 4            MR. PETERS:  Good afternoon, Your Honor.
 5            THE COURT:  Who do we have on the line?
 6            MR. CHANDLER:  Your Honor, from the United States,
 7     this is Robert Chandler, and I have with me Tracy Hilmer and
 8     Christopher Belen.
 9            MR. PETERS:  Elliot Peters here for Mr. Armstrong,
10     along with my colleagues Jamie Slaughter and Sharif Jacob.
11            MR. CHANDLER:  Actually, Your Honor, we were just
12     joined by a paralegal from our office, Matt Golojuch.
13            THE COURT:  And it's just the two parties, right?
14            MR. CHANDLER:  That's right, Your Honor.
15            THE COURT:  Okay.  Well, since it's a Friday
16     afternoon, let's try a little different tack today, okay?
17     Instead of you guys describing the dispute, why don't I try
18     to describe it, and then I'll let you tell me why I'm right
19     or wrong.  Okay?
20            With respect to the emails, it seems that the
21     Government identified over nine million response -- a
22     universe of nine million emails in response to the subject
23     matters that Armstrong requested; that after applying the
24     search terms that Armstrong provided, that universe was
25     culled down to a little over a million emails; that based on
```

1    that volume, the Government has made a decision to use some

2    sort of technology-assisted review tool in actually

3    reviewing those emails.

4           Mr. Armstrong is concerned that given that

5    progress and the volume, the discovery deadline may be in

6    jeopardy because there are 23 depositions that need to be

7    taken prior to that and wants, as a priority, emails related

8    to the revenue generated from the sponsorship agreement.

9           And the question is, how to go from there?

10          So Mr. Peters or Mr. Jacob, do you want to respond

11   first?

12          MR. PETERS:  Sure, Your Honor.  This is Elliot

13   Peters.  We never learned that there was the possibility

14   that the Government wanted to pursue a different way of

15   identifying the responsive electronic documents until two

16   days ago, when we read their brief.

17          THE COURT:  Okay.  I understand that.

18          MR. PETERS:  We met and conferred last week, and

19   this process has been ongoing for a very long time, as Your

20   Honor is aware.  So we -- in addition to being frustrated,

21   we are very concerned about our ability to move the case

22   forward, to take the depositions we need to take, to be in a

23   position to file a summary judgment motion, and to comply

24   with the Court's schedule.  And we don't even really

25   understand how the use of technology-assisted research, or

1    TAR, which is a really broad term that can apply to lots of

2    different methods, how that's even going to be utilized

3    here.  And so we want to find a way forward, but we feel

4    like we're at an impasse and aren't even being provided with

5    the information we need to understand what's been done to

6    date.

7          For example, we had a meet-and-confer call last

8    week.  We learned nothing during the meet-and-

9    confer call, and then we read a brief two days ago which

10   says, "Oh, no, we're going to abandon this process we've

11   been working on," and the information that the Court just

12   recited is trotted out in a brief, but it's not shared with

13   us, and we're not able to work together.

14         And so one thing we've thought of -- one of the

15   deposition notices that's out there, Your Honor, is a

16   30(b)(6) to the Postal Service, to the Government, which

17   identifies a group of different topics, several of which

18   relate to document production.  Typically, you know, you get

19   one 30(b)(6) of a party, and you don't split it up, and so

20   you list a variety of different topics.

21         One thing that may be helpful in moving this

22   forward is if the Court would permit us to split that

23   30(b)(6) and take it first on all the issues relating to

24   documents -- their identification, their production, where

25   they're located, what there is, and what's been done -- so

1    we actually understand what's happened to date and what the

2    situation is, because we really don't want to have these

3    discovery disputes.  They're not productive for us.  They're

4    very, very expensive for our client to do this, and we feel

5    like we're getting nowhere, maybe we're even moving

6    backwards, and we really want to be able to figure it out.

7           So potentially one tool that helps us get forward

8    is, you know, in the next two weeks or so let's take the

9    deposition of a USPS person or a U.S. person on Topics 1

10   through 7 from our 30(b)(6) notice, which all relate to

11   documents, because we don't want to make the Government

12   identify and obtain a bunch of irrelevant stuff.  We're

13   looking for the documents we need to litigate this case, but

14   boy, emails from the key people that handled this

15   sponsorship where they discuss the pros and cons of renewing

16   it, where they discuss, you know, what their awareness is of

17   the use of PEDs in cycling, where they talk about the

18   economic benefts of the sponsorship -- and I don't know if

19   there are such emails, but one would suspect that there

20   would be.

21          For us to be at this stage of the litigation and

22   not have any of those documents, which I think Your Honor

23   understands is the kind of evidence that would be

24   particularly compelling and useful for us in questioning

25   these witnesses, we feel -- we just feel very frustrated

1    that here we are, we've noticed the depositions of these

2    witnesses -- and people like Gail Sonnenberg, Anita

3    Bizzotto, Margot Myers, they were the postal people involved

4    in this sponsorship, but we can't move forward because we

5    don't have the documents.

6            And it can't be a surprise to the Government that

7    these would be important documents.  You know, this isn't

8    something that they just figured out last week, that oh, my

9    gosh, Gail Sonnenberg's emails, we're going to need to get

10   those.  They first interviewed Gail Sonnenberg about this

11   case years ago.  I'm surprised they didn't get her emails

12   then.

13           So anyway, that's my response.  I don't know if

14   that's helpful to Your Honor, but we make one suggestion we

15   think is constructive.

16           But this idea of TAR, I don't even really know

17   what they have in mind.  It's kind of meaningless.  It's

18   sprung on us after a long time, and so --

19           THE COURT:  Okay.  Mr. Chandler, do you want to

20   address that?  I mean, I know what TAR is as a general

21   concept.  It seems to me that it might actually increase the

22   speed of the review as opposed to reviewing over a million

23   documents by hand, but address that and tell me how you

24   think this might affect the timing of the production of the

25   emails, which, I agree with Mr. Peters, it's -- you know,

1    obviously emails are an important part of any case.

2            MR. CHANDLER:  Certainly, and the Government's not

3    suggesting, and has never suggested, that we're not prepared

4    to turn over relevant emails.  It's just the question of

5    what's the best way to go about reviewing them before

6    production.

7            And, Your Honor, you're exactly right.  TAR or

8    technology-assisted review really is, you know, the fastest

9    way that we've been able to come up with to accomplish what

10   we need to accomplish to do our production in this case, and

11   that's the reason that we chose to take that approach.  The

12   alternative, which would be, you know, actually setting eyes

13   on, you know, each individual document and perhaps hiring

14   contract attorneys, I mean, that would take us until at

15   least September, if we engage 20 contract attorneys to do

16   that.

17           So this really is, you know, the lowest cost, most

18   efficient, and fastest and most accurate way to go about,

19   you know, getting Armstrong what he needs in order to

20   litigate this case.

21           THE COURT:  And when did you all decide that this

22   is what you needed to do based on the volume?  Why is this

23   coming up now?

24           MR. CHANDLER:  Because we were only able to run

25   the searches recently, and it really wasn't until we had the

1    metrics from the searches that we were able to devise an

2    approach that incorporated TAR.

3            In fact, in our meet-and-confer with Armstrong's

4    counsel before they filed their motion, we let them know

5    that.  I mean, we told them that we were in the process of

6    running metrics, that we expected to have them within a

7    matter of days, but, you know, we could have a detailed

8    discussion about the way forward once we had those metrics.

9    And they filed their motion, you know, notwithstanding the

10   fact that we were, you know, within days of having

11   information that would be useful to the parties in devising

12   a way forward.

13           THE COURT:  Okay.  So you've run their search

14   terms against the 9.3 million.  The result is 1.1 million

15   documents.  How many custodians does that entail?

16           MR. CHANDLER:  97.  And if I can clarify something

17   that Your Honor said earlier?

18           THE COURT:  Okay.

19           MR. CHANDLER:  The nine million is strictly a pull

20   of the 97 custodians.

21           THE COURT:  Okay.

22           MR. CHANDLER:  Armstrong identified 107

23   custodians.  The parties agreed upon a search of 107

24   custodians.  The Postal Service has not been able to locate,

25   you know, anything in their archives for ten of those

1    custodians, but it has found them for 97 of them.

2              THE COURT:  Okay.  So all of the 1.1 contain your

3    -- his search terms, correct?

4              MR. CHANDLER:  That's right.

5              THE COURT:  Okay.  And so what would the TAR then

6    accomplish?  Is it relevance notwithstanding the search

7    term?  Is it privilege?  What's the next level of review?

8              MR. CHANDLER:  It would help us determine the

9    relevance of those documents, and we would apply it to the

10   entire nine million.  So the way we would use the search

11   terms, we would run the search terms against the nine

12   million, start with that 1.1 million, and use that as the

13   basis for our initial review, which would, in effect, train

14   the software to conduct a review for relevance.  But once

15   the software has been effectively encoded in that way, we

16   actually would apply that encoding to the entire universe

17   of, you know, nine-million-plus emails.

18             So in that way, Armstrong actually is going to be

19   getting more than he would be getting if we turned over the

20   responsive documents from the search terms because he's

21   going to get responsive documents that, you know, weren't

22   identified by those search terms as well.

23             THE COURT:  And you have a vendor obviously?

24             MR. CHANDLER:  Pardon, Your Honor?

25             THE COURT:  You have a vendor?

1          MR. CHANDLER:  Yes, we do, Your Honor.

2          THE COURT:  Who is your vendor?

3          MR. CHANDLER:  Le Bot, and they've been engaged on

4     this since October.  We're using a product called

5     Relativity, and they're very familiar with it, quite

6     extensively.

7          THE COURT:  And has Le Bot given you any estimate

8     as to how long this exercise will take?

9          MR. CHANDLER:  Our estimate is that we would go to

10    complete production at the end of April.

11         THE COURT:  So that leaves four months for

12    depositions after that.

13         MR. CHANDLER:  That's right, Your Honor.  And we

14    hear Mr. Armstrong's concerns about timing, and the

15    Government wouldn't oppose a short extension of the

16    discovery deadline, if that's -- you know, if the Court saw

17    fit to do that.

18         THE COURT:  Well, I'd like to avoid that, if

19    possible.

20         MR. PETERS:  Your Honor, Elliot -- I'm sorry.

21         THE COURT:  Go ahead.

22         MR. PETERS:  I was just going to say -- Elliot

23    Peters for Mr. Armstrong -- obviously, even if we get

24    documents at the end of April, that doesn't mean we could

25    really start taking depositions right after that because

1    we'd need to review them and make sense of them and figure

2    out which depositions they pertain to.  So I don't think

3    that depositions then could start until May because we'd

4    need at least 30 days to review those documents and figure

5    out -- until June, I'm sorry.  If we got them the end of

6    April, depositions couldn't start until June because we'd

7    just need some time to make sense of what we received, and

8    we don't know what the volume will be.

9              But I just want to remind --

10             THE COURT:  So you'd have two months for 23 depos.

11             MR. PETERS:  I think it's going to be more than

12   23, Your Honor.  We've noticed 14.  We're going to take an

13   additional ten, and that isn't necessarily the end of it.

14             I mean, I suspect we're going to end up taking 30

15   depositions in the case, and I don't know how many the

16   Government is going to want to take, but, you know, we

17   worked out search terms with the Government last September.

18   This is the first time that we've ever learned that they

19   didn't engage a vendor until October.  And so there's been

20   -- we have spent a lot of time and effort and money on this

21   effort with the search terms, and this is the first time in

22   the last two days we've ever learned that the Government

23   thinks that it's futile to do that.

24             And I don't understand what they have to -- what

25   do they need to review these million documents for?  They

1       said -- I think Mr. Chandler said if they hired 20 contract

2       attorneys, it would take them until September to review all

3       the documents.  What are they reviewing them for?  For

4       privilege?  Is it a privilege review?  What's the review?

5               THE COURT:  Well, I heard relevance and privilege.

6       Just because an email, you know, hits on a particular search

7       term doesn't necessarily mean that it's relevant, right?

8       They're overinclusive.

9               Is that the point, Mr. Chandler?

10              MR. CHANDLER:  That's right, Your Honor.

11              THE COURT:  Okay.  Let's talk a little bit about

12      prioritization.  I mean, clearly the revenue-generating

13      issue is a priority.  Is there a way to stage your review

14      and production so that they get those documents or those

15      custodians first?

16              Mr. Chandler?

17              MR. CHANDLER:  That's something I think we could

18      consider and we could meet and confer with Armstrong about.

19      I think there are some difficulties in trying to undertake

20      that approach, I mean, I think because so much of the TAR

21      review depends on, you know, the statistical significance of

22      the review sets that they're looking at and the review sets

23      that the algorithms are being applied to.  So once you start

24      to pluck out a document with reference to particular people

25      or time frames, then it tends to sort of throw off the

1    physical analysis that underlies, you know, the review.

2             So I guess we have that reservation about it.

3             THE COURT:  Okay.  Well, this sort of takes us to

4    the, you know, emails related to the marketing consultants,

5    or whoever they are.

6             Do we know which custodians -- which employees at

7    USPS managed those relationships?  And wouldn't their emails

8    be a good place to start?  Do you follow me?

9             MR. CHANDLER:  Yes.  I understand, Your Honor.

10            I mean, it's hard to say.  Two of those firms, SEC

11   and Campbell Ewald, had ten-year relationships with the

12   Postal Service, and even if we were to identify, you know,

13   particular people who were principally involved in the

14   relationship, I mean, I think that would involve, you know,

15   a fairly large number of people and, again, over a fairly

16   large period of time.

17            So I don't know that that really, you know, would

18   get us the results that we're looking for.  And, again, by

19   pulling out particular sets with reference to particular

20   people, we start to undermine the effectiveness of TAR.

21            MR. PETERS:  Your Honor, if I may?  This is Elliot

22   Peters for Mr. Armstrong.

23            THE COURT:  Yes.

24            MR. PETERS:  I didn't mean to interrupt Your

25   Honor.

1          THE COURT:  No, go ahead.

2          MR. PETERS:  I was just going to say, on February

3    3rd we sent the Government a list of priority custodians and

4    identified some of the names that I've mentioned this

5    morning or this afternoon -- morning where we are --

6    Ms. Sonnenberg, Ms. Myers, Ms. Bizzotto, Mr. Porporino.

7          THE COURT:  Mr. Peters, could you identify who

8    those people are; what role or what title they have?

9          MR. PETERS:  Sure.  Gail Sonnenberg was a

10   marketing person, a senior marketing person at the Postal

11   Service who kind of led the issue of the renewal of the

12   sponsorship, if you will, which took place at the end of

13   2000.  Anita Bizzotto was also a marketing person at the

14   Postal Service who had responsibility.  Those are the --

15   kind of the two primary people who had responsibility for

16   the sponsorship.

17         Margot Myers, in the earlier days of the

18   sponsorship, was at the Tour de France, out with the team,

19   was in charge of publicity, was involved in the sponsorship

20   when there was a thing called the Festina affair in 1998 --

21   which is at a time when Armstrong was not riding in the

22   Tour; he was still recovering from cancer then -- where it

23   was widely publicized that there were police, arrests of

24   riders, and busts of people for using PEDs, and Margot Myers

25   was there.  There was actually a boycott one day.  The

1    riders refused to ride because of the police action.

2           Joe Porporino, P-o-r-p-o-r-i-n-o, was also on the

3    PR side of the Postal Service involved very much with this

4    sponsorship, and he had responsibility for contracts and

5    payments.

6           And then there's a person named Linda Zelnick,

7    Z-e-l-n-i-c-k.  She actually signed the sponsorship

8    agreement in 2000, so she is an important witness about the

9    terms of the agreement itself.

10          And so those are some of the people that are just

11   obviously key people that -- we gave them a list of ten

12   priority custodians.  I've just mentioned a couple, but it

13   really is possible, I think, to, you know, for example, give

14   us all the emails that you've located that hit the search

15   terms of those people, and we'll look through them and

16   figure out what's useful.  It seems like -- I mean, I don't

17   want to get a ton of irrelevant information, but there's no

18   prejudice to the Government if these search terms have

19   yielded more information than is relevant to the case.

20          And I don't -- that's why I asked the question

21   about the nature of the review.  I don't know whether

22   there's a privilege concern, whether these people

23   communicated about the sponsorship with lawyers internally.

24   I think they probably didn't very much, but I don't know.

25          And I would understand the need to do a privilege

1    review, but to take an extra couple of months to get us the

2    emails from these key custodians because they need to review

3    them or use some other method when there's a certain

4    universe that have hit on the search terms that we agreed on

5    -- they weren't just our search terms.  I mean, we went back

6    and forth with the Government and worked out an agreement on

7    search terms.  Maybe that's a place to start in getting us

8    some of this information.

9         And I still don't really understand what it is

10   that the, you know, TAR really is.  It's a very general

11   concept.  We're familiar with Relativity, with that tool,

12   but I still don't know what the Government has in mind and

13   why at this point, you know -- I don't even understand what

14   it is that they're proposing to do.  I'm not sure they know

15   what they're proposing to do.

16        I'd be curious when it was they concluded that

17   they need to use TAR; and if it was very recently, then I

18   wonder how realistic this end of April date is because, as I

19   understand TAR, you still need to do a bunch of human --

20   human beings still need to eyeball a bunch of these

21   documents because you've kind of got a -- you try to teach

22   the software how to identify relevant documents, and then

23   you run it through a bunch of the documents, and then human

24   beings have to look at it to see if it's working.  And then

25   you may need to modify it and do it again.

 1          It's not just like, you know, magic that the

 2     computer figures out, "Oh, I'll identify the relevant

 3     documents for you."  You really do have to -- have to teach

 4     it.  And if we're going to -- you know, I still don't

 5     understand what it is that they're proposing and how they

 6     could even be confident that this April date isn't as

 7     illusory as a bunch of the other dates that they've given

 8     us.

 9          THE COURT:  Mr. Chandler, do you want to address

10     that, including the idea of bifurcating the 30(b)(6)

11     deposition?

12          MR. CHANDLER:  Thank you, Your Honor.

13          I guess starting with Mr. Peters's points about

14     looking for priority custodians first, I mean, I should note

15     that we asked for months for Armstrong to identify priority

16     issues, priority custodians, priority volumes of documents,

17     and, you know, he didn't do that until I guess late January

18     or early February.  So, you know, at this point we've gotten

19     this body of documents collected, and --

20          THE COURT:  Well, we've been -- I mean, you know,

21     we've had numerous conferences where that's been exactly the

22     topic.  I mean, we prioritized the USADA documents.  We

23     prioritized the interview memos.  We prioritized the STARS

24     database.  Right?  So we've -- that's not exactly fair,

25     right?

1          MR. CHANDLER:  Well, I think, again, we've asked

2    Armstrong, you know, outside the context of this motion to

3    compel to let us know what his priorities are as well, and

4    we never hear about them until the motions are filed.  But I

5    guess the long and short of it is, I mean, this just isn't

6    the most efficient and effective way to go about employing

7    the TAR technology.

8          I guess first of all, every time we select out,

9    you know, particular people or particular issues to try to

10   isolate for priority production, you know, outside of this

11   TAR process, every one of these detours runs the risk of

12   slowing down the overall process, and we realize that we'd

13   be taking, you know, the same people who would be involved

14   in the TAR, you know, review and production process, and

15   we'd be diverting them to addressing these priority people

16   in a way that would slow down the overall process and could,

17   you know, push delay of the entire document production

18   beyond the end of April.

19         To address Mr. Peters's timing concern, you know,

20   we've planned this out very carefully.  We've gone through

21   very carefully and arranged staffing and have talked about,

22   you know, the possibility of how many times we would have to

23   go through and see these sort of teaching reviews.  You

24   know, it's not something we're entering into lightly.  We

25   didn't come up with the date for the completion of the

 1    production lightly either.  We've thought through all these

 2    issues, and we've been working very closely with a lot of

 3    people that are experienced and are familiar with this

 4    software.

 5            THE COURT:  Well, answer this:  Once the TAR

 6    process is completed, to what extent will bodies have to be

 7    devoted to actually review the documents document by

 8    document?

 9            MR. CHANDLER:  Your Honor, if you will give me

10    just one moment, please.

11            THE COURT:  Okay.

12            (Pause)

13            MR. CHANDLER:  Your Honor?

14            THE COURT:  Yes.

15            MR. CHANDLER:  There may be a need to set eyes on

16    some documents for quality control purposes at the end of

17    the process, but we've built the time for that into our

18    schedule.

19            THE COURT:  Okay.

20            MR. CHANDLER:  So we wouldn't anticipate that to

21    slow down the process.

22            There would also be the need to conduct an eyes-on

23    review for privilege.  We would segregate out documents that

24    were hit upon by a privilege search string and actually have

25    people looking at those, and we've made arrangements to have

1    contract attorneys, you know, looking at those.  But, again,

2    we've built time into our process to address that as well.

3           So unless, you know, there is some really unusual

4    number of hits as a result of the privilege string, you

5    know, it shouldn't -- we should be able to hold the

6    schedule.  Although I will say it is a very tight schedule,

7    so if there's any unanticipated variation in the results of

8    the privilege search or anything else, you know, there may

9    be -- it may be necessary to make adjustments.

10          THE COURT:  So it doesn't sound like -- it doesn't

11   sound like you're contemplating a rolling production.  It

12   seems like once the TAR process is finished, there's then a

13   fairly tight window when you have to do the QC and the

14   privilege review; is that right?

15          MR. CHANDLER:  We didn't contemplate a rolling

16   production, but really towards the end of the process,

17   towards the last several weeks in April.  I mean, we will

18   get things out as we can, but, you know, the rolling

19   productions will sort of start and end within a pretty tight

20   time frame as well.

21          THE COURT:  So based on your current projection,

22   the rolling production will start first week of April?

23   Second week of April?

24          MR. CHANDLER:  Just one moment, Your Honor.

25          THE COURT:  Okay.

1          (Pause)

2          MR. CHANDLER:  Your Honor?

3          THE COURT:  Uh-huh.

4          MR. CHANDLER:  Okay.  I think, you know, we would

5    expect to be able to start the rolling production by mid-

6    April.  You know, there's a possibility that it could be

7    sooner, but I couldn't commit to that at this point.

8          THE COURT:  And you could roll it based on

9    priorities identified by Mr. Armstrong?

10         MR. CHANDLER:  It actually -- I mean, the more --

11   well, the recommended way to do it would be to produce based

12   on priorities -- based on the software's review effectively.

13   So whatever the software identifies as the most relevant

14   documents would be the things that would go out the door

15   first.

16         THE COURT:  So not organized by custodian?

17         MR. CHANDLER:  That's right.

18         THE COURT:  Mr. Peters, second week of April

19   starting to get emails?  Does that leave you enough --

20   that's four and a half months for depositions.

21         MR. PETERS:  No, it's really not, Your Honor,

22   because we're not going to have a complete production

23   until --

24         THE COURT:  End of April?

25         MR. PETERS:  -- the end of -- well, maybe you're

1    more confident than we are, but even if you assume that

2    we're going to get all the complete production by the end of

3    April, we need some time to review that before we just start

4    walking in to take depositions.  And so I don't think we

5    could really start taking the depositions until June.  And

6    typically scheduling depositions of a lot of these third

7    parties can become more difficult in the summertime so I

8    just don't see how we could possibly, in June, July, and two

9    weeks of August, comply with that discovery deadline if we

10   don't get the documents until the end of April.

11            Mr. Chandler still didn't respond about the

12   30(b)(6), although Your Honor asked him to, and I just want

13   to say on this -- you know, the Government keeps wanting to

14   say that we failed to prioritize and tell them who the

15   priority custodians were.  Like, you may have just heard

16   the names "Sonnenberg," "Bizzotto," "Myers," "Porporino" and

17   "Zelnick" today, but Mr. Chandler met these people and

18   interviewed them in 2012.  It's no surprise to the

19   Government that these are the people that any lawyer with a

20   brain would want to depose because they're the people that

21   managed the sponsorship, and that's why the Government

22   interviewed them before they intervened in this case, and

23   that's why they knew or should have known before they even

24   intervened that they were going to have to produce these --

25   their emails.

 1          I mean, it is hard for us to understand how

 2     we're having this discussion now about, "Gosh, how do we

 3     go about locating Gail Sonnenberg's relevant emails?" when

 4     Mr. Chandler interviewed her in 2012, and they intervened in

 5     this case in 2013.  I mean, what did they think was going to

 6     happen as we went forward?  So the idea that the problem

 7     we're facing is because we haven't told them who the key

 8     witnesses are is really something that we don't think is

 9     accurate.

10          So, Your Honor, if we're going to go ahead, you

11     know, with -- if they're going to do whatever they do with

12     TAR, we would ask Your Honor set a deadline, and maybe it's

13     one that they'd better be certain that they can live with,

14     but a deadline by which we get this information, readjust

15     the discovery cut-

16     off accordingly so that we're not prejudiced by this because

17     we really do have a lot of depositions to take, and also

18     authorize us to take a 30(b)(6) -- to just split up a

19     30(b)(6).  Let us do it on these document-related topics

20     sooner, and then defer until later on, when we have the

21     documents, the depositions that relate to, you know, the

22     understanding about the sponsorship agreement and the

23     various other topics that we've identified in our 30(b)(6)

24     notice.

25          THE COURT:  Okay.

1          Mr. Chandler, I want you to respond to the

2     30(b)(6) question.

3          But the second question is, do you have at your

4     disposal, you know, sort of a hit list of the number of

5     emails that were responsive that belonged to Ms. Sonnenberg,

6     Ms. Bizzotto and Ms. Myers?  And how far off the critical

7     path would it take you just to give them those emails now

8     for those three custodians?

9          MR. CHANDLER:  Your Honor, I can tell you we are

10    able to come up with a number of hits for those particular

11    custodians.  I know offhand --

12         THE COURT:  But is it a thousand emails, or is it

13    100,000?

14         MR. CHANDLER:  I'll tell you for Gail Sonnenberg,

15    it's zero.  For Margot Myers, I want to say the number is in

16    the low hundreds.  I just -- I don't recall offhand, but

17    it's not much.

18         And it's not surprising because the Postal Service

19    didn't really start archiving its emails until 2007, and

20    Ms. Sonnenberg retired in 2001 so you wouldn't expect to see

21    very much, if anything, in Postal Service archives.

22         THE COURT:  How about Porporino and Zelnick?

23         MR. CHANDLER:  For Porporino, it's a much larger

24    volume.  He didn't leave the Postal Service until I think

25    2011, so that would be a much more involved review.

1          Zelnick left earlier on.  I don't know what the

2     hit number was.  It probably was low because she left

3     earlier on, but I can't say so for sure.

4          But the more important point is, Your Honor, you

5     know, I think this would be a different conversation if

6     Mr. Peters had asked us to pull emails for those four people

7     in September/October, when we started having this

8     conversation.  But they didn't do that.  They asked us to

9     pull emails for 107 people, and so we went about this

10    process in a way that made sense, you know, on the

11    assumption that we were going to be producing emails, you

12    know, from a set of emails for 107 custodians.

13         THE COURT:  I understand that.  I'm not going to

14    get into who shot John and whether you should have

15    anticipated that the people who supervised the sponsorship

16    agreement would be, you know, important witnesses.

17         But where we're at now is that now that you've

18    done 107, the question is how much trouble would it be and

19    how much of a delay would result in the overall production

20    to carve off the four people that Mr. Peters just identified

21    who have a limited number of emails and let them get started

22    on those?

23         MR. CHANDLER:  It's difficult to say, Your Honor.

24    I can say for certain that it would result in some delay.

25    Obviously those documents would still have to be reviewed

1    for privilege and responsiveness so some review would have

2    to be, you know, conducted of those documents.  And, again,

3    I mean, preparing a production for even a small, you know,

4    volume of documents still requires the labor of our IT

5    people to stop working on the TAR process and devote their

6    attention to, you know, getting out 150 documents as opposed

7    to, you know, the much larger set of overall documents.

8            THE COURT:  Well, here's what I'd like for you all

9    to do.  I'd like for you to talk and for you to come up with

10   a realistic-no-BS estimate of how long it would take to

11   process however many emails there are for those four

12   custodians, Sonnenberg, Bizzotto, Myers and Zelnick.

13           And Mr. Peters, based on that estimate, you let

14   them know whether that's worth a candle or not in

15   consideration of how delayed the larger process might be as

16   a result of the production of those four custodians.

17           MR. PETERS:  Your Honor, this is Elliot Peters.

18   There's just something that Mr. Chandler said that I

19   couldn't hear because I coughed just as he said it, and that

20   was that the Postal Service didn't begin to archive

21   electronic documents or emails or something until...  And I

22   didn't hear what year it was.

23           And if I could inquire what it was that you said,

24   Mr. Chandler, just so I understand?

25           And then the follow-up question is going to be,

1    does that mean that there's no electronic information that

2    you have available to you today from before that date?

3              MR. CHANDLER:  The short answers are the Postal

4    Service started its systematic archiving in 2007, but that

5    doesn't guarantee the availability of emails until starting

6    in 2009.  So there's a window there during which that was

7    sort of their first attempt at starting an archive, but it

8    wasn't until 2009 that they came up with the current process

9    which they view to be a guarantee of emails from 2009

10   forward.

11             And to answer your other question, no, that

12   doesn't mean that we don't have ESI for periods prior to

13   2007.

14             MR. PETERS:  I mean, I don't want to -- Your

15   Honor, I don't want to waste your time getting into this,

16   but obviously the period of the sponsorship ended in '04,

17   and so we're particularly -- and it was renewed, and the

18   agreement, which is of particular interest, I think, to

19   everybody, was signed at the end of 2000, in December of

20   2000, and then was operative going forward, and then there

21   was a prior agreement.  But it would be helpful and

22   worthwhile to know how much electronic information there is

23   from the sponsorship period because obviously documents from

24   2009 and 2010 and so on are, I think, going to be much less

25   relevant to the litigation of this case than documents which

1    were exchanged and prepared during the sponsorship period in

2    anticipation of the contract and things like that.

3         So is there -- I mean, is there -- you've got --

4    you told us you had nine million documents, and then you had

5    a million documents that there were hits on.  Are those

6    documents -- do those documents include a lot of documents

7    from the sponsorship period, or are they from some much

8    later period?

9         MR. CHANDLER:  They haven't been reviewed yet.  I

10   mean, at this point we can't say.

11        THE COURT:  Okay.  Guys --

12        MR. CHANDLER:  I think, you know, that's something

13   that we can address in a meet-and-confer.  We can talk a

14   little bit more about, you know, particular information

15   about the volume of documents; and if you ask the questions,

16   we can try to answer them, if it's reasonable.

17        But that's not information I have available right

18   now.

19        THE COURT:  Okay.  So, guys, this all leads me to

20   conclude that this issue is not quite baked yet.

21        Mr. Chandler, I want a response to the 30(b)(6)

22   issue because I think it makes some sense to me.  Would the

23   Government object to holding a fairly early 30(b)(6)

24   deposition on the document production and review issue only?

25        MR. CHANDLER:  Very much so, Your Honor.

1              THE COURT:  Why?

2              MR. CHANDLER:  And the reason is -- well, several

3      reasons; first among them being there's just no basis for it

4      at this point.  I mean, there's no basis to suggest that the

5      Government hasn't been diligent in its document production,

6      or there's been any spoliation or any reason to delve into

7      the Government's preservation or collection processes.  So

8      there's just no reason to do it.

9              And if Armstrong has any questions about our

10     production process -- I mean, first of all, we're going to

11     be producing information about the TAR methodology we used

12     and some of the metrics that result from that, and, you

13     know, I think that it would be useful to have a conversation

14     around those metrics when everybody has more information

15     about what we've actually done rather than sort of guessing

16     at what we're going to do and trying to poke holes in it at

17     this point.

18             And I just don't see how taking a 30(b)(6) on

19     these points now is going to move us forward in any way.  I

20     think really the goal ought to be for us to be able to

21     complete our production as soon as possible, and, again,

22     we'll do it with as much disclosure to Armstrong as we're

23     able.  And if there are issues, you know, we can address

24     them as they arise.

25             MR. PETERS:  Your Honor -- this is Elliot Peters

1    -- I think we'd be entitled to a 30(b)(6) on the

2    preservation of documents, the search for documents, and the

3    production of documents no matter what.  I mean, it's not

4    based upon some allegation of wrongdoing, which we haven't

5    made.  We're just frustrated that nothing's happened.

6        I mean, the exchange that we had a minute ago

7    where I was asking what I think was a reasonable question

8    about what do you have from the time period, and then those

9    related questions like well, what did you archive and when

10   did you archive it and what happened to the emails, I really

11   do think that, given the situation that we're in, it would

12   allow the issue to be more fully baked if we could simply

13   find out from a qualified deponent what the U.S. Postal

14   Service has, where it's archived, when things were deleted,

15   if they were, what there is, because when

16   Mr. Chandler starts talking about, you know, responding to

17   Your Honor's perfectly sensible questions:  How much do you

18   have for Sonnenberg?  How much do you have for Bizzotto?

19   Where were they located?  When did you start archiving? --

20   these are just things that, if we knew, we would understand

21   much more clearly what's going on, and we would know whether

22   or not a diligent search has been made or not.

23        And so I really do think it would advance the ball

24   if we could do that.  I think we have the right to do it

25   anyway.  We've served a 30(b)(6) notice, and the only

```
 1    question, I think, for Your Honor is whether it makes sense

 2    for us to break it out so we do the issues relating to the

 3    document preservation and collection and production first,

 4    and then later on do the issues that relate to more of the

 5    substance of the lawsuit, the interpretation of the

 6    contract, the awareness of doping in the sport, the

 7    advantages, the benefits to the Postal Service from the

 8    sponsorship, topics like that, which is probably a different

 9    custodian anyway.

10          So I would suggest that it does make good sense in

11    getting this thing fully baked for us to be able to develop

12    a factual record about what the documents are and where they

13    are, because right now we don't know that, and quite

14    honestly -- and I don't mean any disrespect by saying this

15    -- I don't think Mr. Chandler knows that.

16          MR. CHANDLER:  Your Honor, if I may?

17          THE COURT:  Quickly.

18          MR. CHANDLER:  Thank you.

19          Yes, I don't think the issue of the 30(b)(6) has

20    been fully baked yet either.  I mean, we only received the

21    notice recently.  It's very broad.  It's got 34 items, and,

22    you know, we're going to have objections to a substantial

23    portion of what Armstrong is asking for in that 30(b)(6),

24    including some of the ones or many or most of the ones

25    related to documents.
```

1          This is the first time Mr. Peters has raised this

2     issue at all.  He's never previously suggested that we

3     accelerate the 30(b)(6) on that issue, which right now is

4     noticed for March 18th, and, you know, so I feel like we're

5     getting a little bit sandbagged on this issue.

6          We've not met and conferred on this issue at all,

7     and if this is something the Court is considering, we'd like

8     an opportunity to brief it and present an argument as to the

9     law on whether or not it's something that Armstrong is

10    entitled to at this stage.

11         THE COURT:  All right.  Why don't you lodge your

12    objections and figure out a way to brief that issue, okay,

13    based on the topics that you've objected to and timing and

14    bifurcation of the 30(b)(6), and we'll just -- we'll decide

15    that on an expedited basis based on a schedule that you guys

16    come up with.  Okay?

17         MR. CHANDLER:  Thank you, Your Honor.

18         THE COURT:  With respect to the production

19    generally, I'd like all of the emails produced by April

20    30th, and, you know, you all need to get together and figure

21    out whether there is a sensible way to prioritize the

22    production in advance of April 30th to get them the emails

23    related to the key custodians.  Okay?

24         And if, you know, Ms. Bizzotto, you know, or

25    Ms. Zelnick, if there are only 100, 200 emails, you know,

1   you should have a good reason why you can't just get those

2   to them now, okay, without considerably delaying that April

3   30th deadline.  And if there's a dispute about it, then

4   that's fine, but, you know, I fail to see how production of

5   a couple of hundred emails will derail the broader process

6   significantly.  Okay?

7           MR. CHANDLER:  May I propose, instead of a hard

8   deadline of April 30th, would the Court consider having the

9   Government file a status report on its document production

10   some time, you know, much earlier, maybe at the beginning of

11   April, so that, you know, we have more information, and we

12   will know better where we are at that point?

13           THE COURT:  No, I'd rather set an April 30th

14   deadline, and if you need to try to extend it, then file

15   something letting me know why you need to extend it.  Okay?

16           MR. CHANDLER:  All right.  Thank you.

17           MR. PETERS:  Your Honor, just one related note.

18   Since -- we were in touch with Sonnenberg, Bizzotto and

19   Myers about scheduling their depositions, and then we --

20   they agreed that we could send them subpoenas, and we did

21   that; and then we heard back from the Government saying, "We

22   now represent them; don't talk to them anymore," and -- with

23   each of them, and "don't talk to them anymore."

24           And then I said, "Well, to the extent that they

25   have documents individually, are you going to produce them?"

1    Because we understand Margot Myers, for example, had said to

2    us, "In my garage in Phoenix, I have file drawers of

3    documents relating to the sponsorship, and you can come and

4    copy them."

5          And then once Mr. Chandler became her lawyer, we

6    were told we couldn't communicate with her anymore, so we

7    didn't, but we would also hope that the production, well in

8    advance of any depositions of these people, includes

9    documents that the individuals have now that they're

10   represented by Mr. Chandler.

11         THE COURT:  Mr. Chandler?

12         MR. CHANDLER:  Your Honor, we are producing those

13   documents.  We're in the process of getting the documents

14   and reviewing them and preparing them for production.

15         THE COURT:  Okay.

16         MR. CHANDLER:  So we will be producing those.  I

17   think there's still some discussion that has to happen

18   between us and Mr. Peters over dates.  There are a few of

19   the deposition dates that are still in flux, and the timing

20   of production hasn't been decided upon, but we're willing to

21   work with counsel on that.

22         MR. PETERS:  We won't be taking the depositions

23   until we get the documents, and we're not going to get the

24   documents until April 30th, so probably all of the depo

25   dates that we've currently noticed are not workable dates.

1      So we're probably going to have to go back to the

2    drawing board on that once we get the production or know

3    more.  We'll have to think about that, but we had originally

4    subpoenaed Margot Myers for next week.

5          THE COURT:  Well, Mr. Peters, that's inconsistent

6    with what I just ruled.  What I said is all the emails by

7    April 30th, and figure out a way to prioritize the

8    custodians you've identified on the phone today.  Okay?

9          MR. PETERS:  Okay.

10          THE COURT:  And I would need a good reason why

11    those emails cannot be produced sooner rather than later.

12    Okay?

13          MR. PETERS:  All right.  We just can't pick dates

14    until we get those, and we don't know when we're going to

15    get them.

16          Your Honor, what do you want to do about the

17    discovery cut-off because it just makes us very nervous?  We

18    don't want it to move, but I think it has to.

19          THE COURT:  I don't want to do anything about it

20    right now.

21          Last topic is the confidentiality designations.

22    Is that now moot now that a number of them have been

23    withdrawn, Mr. Chandler?

24          MR. CHANDLER:  No, I don't believe it is, Your

25    Honor.  There's still a substantial portion of them that

1      haven't been withdrawn.

2              MR. JACOB:  Your Honor, this is Sharif Jacob on

3      behalf of Lance Armstrong.  At the Government's request, we

4      reviewed every single document in our production, and we

5      listed those designations where we didn't feel it wasn't

6      justified.  We think at this point it's not too much to ask

7      the Government to comply with the protective order and

8      actually identify those documents to us that it believes do

9      not justify designations, meet and confer with us, and ask

10     us to list them before raising the issue before the Court.

11             But we've already done, you know, a review of

12     every document and listed every one that we thought was

13     unjustified without the Government's input.

14             MR. CHANDLER:  Your Honor, we've already done

15     that.  We've already given our notice to Mr. Armstrong, and,

16     you know, we did that with reference to the initial 14,000

17     or 15,000 or so documents, so the fact that Mr. Armstrong

18     has withdrawn his confidential designation as to some of

19     them doesn't operate -- it doesn't start everything over as

20     far as our meet-and-confer and our raising objections with

21     respect to the remainder of the documents, and that

22     objection is -- still stands.

23             And Armstrong really engaged in the same practice

24     with reference to those remaining documents as he had with

25     the production initially, which is to just make a blanket

1    assertion of confidentiality of those documents.  And so if

2    we want to use any of those documents in any way, we have no

3    way of knowing what information Armstrong is claiming to be

4    confidential.

5             THE COURT:  So what's the prejudice to the

6    Government now, absent any intent to use a particular

7    document?  I mean, the documents are not public at this

8    point because no one's attempted to file them or use them.

9    I mean, can we avoid having to go through 13,000 documents

10   and figure out whether the designations are proper or not?

11            MR. PETERS:  Your Honor -- this is Elliot Peters

12   -- we'd like to.  We produced them, and then we've revisited

13   this designation, but -- those designations, but it does

14   seem like a fight without a purpose because nobody's using

15   these documents to file anything at this point in time.

16            You could direct us to meet and confer in the

17   event of a filing where anybody wants to use a confidential

18   document so we don't have to waste your time with issues

19   about motions to seal.  But other than that, I'm not really

20   sure what the dispute is about, and we did go back and

21   revisit all of these designations.  We undesignated a bunch

22   of them because the Government asked us to.  I'm not sure

23   what the point was, but we did it because we felt like we

24   needed to comply with the protective order.

25            MR. CHANDLER:  The difficulty is, Your Honor,

1      every time we want to use one of these documents, any of

2      Armstrong's documents really, we have to file it under seal,

3      or we have to try to guess at what Armstrong is claiming to

4      be confidential; and I mean, it's a practical difficulty

5      that we're facing every time we want to use one of the

6      documents from Armstrong's production set.

7              And --

8              THE COURT:  Well, why don't we cross that bridge

9      when we get to it, and if there's something that you need to

10     file or a category of documents, at least, that you think

11     you would need to file that, you know, you're impeded by an

12     unfair confidentiality designation, why don't you raise it

13     then, and we can decide it in the context of a specific

14     document or specific class of documents.

15             MR. CHANDLER:  Well, part of what raised the

16     concerns for us, just with the upcoming depositions, is if

17     we want to use these documents in connection with

18     depositions, we don't want to be limited in the way we're

19     able to use those documents, and we don't want to have to

20     file, you know, prior to the deposition, you know, something

21     allowing us to make use of those documents.  It just -- it

22     creates, you know, all sorts of practical difficulties.

23             MR. PETERS:  Your Honor -- this is Elliot Peters

24     -- a big issue with these confidentiality issues is email

25     addresses because there's a lot of email addresses, and we

1    don't want, you know, Mr. Armstrong's email address and

2    other email addresses of people involved in the case to

3    become public, and that's contemplated by the protective

4    order.

5           I really think this is a tempest in a teapot that

6    we can work out as we go along, maybe in connection with

7    deposition exhibits, by agreeing to redact email addresses

8    from them or something, but I really don't think that this

9    is a dispute at this point that the Court needs to weigh

10   into.

11          THE COURT:  Okay.  Well, I agree with that.

12          So until there's a ripe dispute as to, you know,

13   particular kinds of documents that you all can't reach

14   agreement on, let's defer the confidentiality issue.

15          MR. CHANDLER:  Okay.

16          THE COURT:  Okay?  Anything else?

17          MR. PETERS:  Thank you for your time, Your Honor.

18          THE COURT:  Did we get through -- I know we spent

19   all the time talking about the emails, but -- oh, there's

20   the revenue spreadsheet.

21          MR. PETERS:  As I understood, the Government told

22   us that they were going to produce that, and we did get a

23   production yesterday.  I don't know if that's in there or

24   not.  We haven't had a chance to load it and go through it.

25          MR. CHANDLER:  I will tell you there is a

1  spreadsheet in there.  It was the same one that we sent

2  several weeks ago via email, and it's the only version of

3  the spreadsheet that, you know, we're aware is in the

4  possession of the Government.

5          MR. PETERS:  Because there's interview memoranda

6  that we have which refer to the original of that spreadsheet

7  showing that the Government got over $18 million in direct

8  revenue out of the sponsorship, and obviously that's of

9  particular interest to us.

10          MR. CHANDLER:  I have a dispute that that's what

11  it says, but more importantly I think that memo is from 2003

12  or 2002, so it's not entirely surprising that every version

13  of that spreadsheet is not still in the existence.

14          MR. PETERS:  And that's because you don't have --

15  that's because the Government doesn't have documents from

16  that era?  It's pretty darn important for us to know that.

17          MR. CHANDLER:  That's not what I'm saying.  What

18  I'm saying is it's not surprising that any particular

19  document from 2002 wouldn't still be in existence, and we do

20  have a version of that document that we've given to you.

21          MR. PETERS:  But the version was changed, and a

22  bunch of information was added to it.  We want the original.

23  Do you have the original?

24          MR. CHANDLER:  I understand that.  We've given you

25  what we have.

1          THE COURT:  All right.  Well, there's nothing I

2     can do about that.

3          MR. PETERS:  Not today.

4          THE COURT:  All right, folks.  Have a nice

5     weekend.

6          (Whereupon the hearing was

7          concluded at 3:02 p.m.)

8

9

10     **CERTIFICATE OF OFFICIAL COURT REPORTER**

11

12          I, LISA A. MOREIRA, RDR, CRR, do hereby

13     certify that the above and foregoing constitutes a true and

14     accurate transcript of my stenographic notes and is a full,

15     true and complete transcript of the proceedings to the best

16     of my ability.

17          Dated this 25th day of February, 2015.

18

19                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
20                              United States Courthouse
                                Room 6720
21                              333 Constitution Avenue, NW
                                Washington, DC 20001
22

23

24

25