```
1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2
       FLOYD LANDIS,                  )
3                                     )      CA No: 1:10-cv-00976 (CRC)
                        Plaintiff,    )
4                                     )      Washington, D.C.
                                      )      March 11, 2015
5      vs.                            )      2:04 p.m.
                                      )
6      TAILWIND SPORTS CORPORATION,   )
       et al.,                        )
7                                     )
       _____Defendants._)
8
                 TRANSCRIPT OF TELEPHONIC DISCOVERY CONFERENCE
9            HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                        UNITED STATES DISTRICT JUDGE
10     APPEARANCES:

11     For the Plaintiff:        PAUL D. SCOTT, ESQ.
                                 LANI ANNE REMICK, ESQ.
12                               LAW OFFICES OF PAUL D. SCOTT, PC
                                 The Embarcadero
13                               Pier Nine
                                 Suite 100
14                               San Francisco, CA 94111
                                 (415)981-1212
15
       For Intervenor Plaintiff  ROBERT E. CHANDLER, ESQ.
16     United States of America: DAVID MICHAEL FINKELSTEIN, ESQ.
                                 U.S. DEPARTMENT OF JUSTICE
17                               Civil Division, Fraud Section
                                 601 D Street, NW
18                               Suite 900
                                 Washington, DC 20530
19                               (202) 514-4678

20     (On the line were also Christopher Belen and Amy Likoff)

21                               DARRELL C. VALDEZ, ESQ.
                                 CARL EZEKIAL ROSS, ESQ.
22                               U.S. ATTORNEY'S OFFICE
                                 Civil Division
23                               555 Fourth Street, NW
                                 Washington, DC 20530
24                               (202)252-2507

25     Proceedings recorded by mechanical stenography; transcript
       produced by computer-aided transcription
```

1    A P P E A R A N C E S (CONTINUED):

2    For the Defendant          ELLIOT R. PETERS, ESQ.
     Lance Armstrong:           SHARIF E. JACOB, ESQ.
3                               TIA SHERRINGHAM, ESQ.
                                ELIZABETH McCLOSKEY, ESQ.
4                               KEKER & VAN NEST, LLP
                                633 Battery Street
5                               San Francisco, CA 94111
                                (415)391-5400

6

7

8

9    Court Reporter:            Lisa A. Moreira  RDR, CRR
                                Official Court Reporter
10                              U.S. Courthouse, Room 6718
                                333 Constitution Avenue, NW
11                              Washington, DC  20001
                                202-354-3187

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S
2           THE COURT:  Okay.  Good afternoon, everyone.
3           (Everyone greets the Court)
4           THE COURT:  Who do we have?  Do you want to start
5    with Armstrong?
6           MR. PETERS:  Yes, Your Honor.  Elliot Peters for
7    Mr. Armstrong, and I'm here with my colleagues, Sharif
8    Jacobs, Tia Sherringham, and Elizabeth McCloskey.
9           THE COURT:  Okay.  And the Government?
10          MR. FINKELSTEIN:  Good afternoon, Your Honor.
11   This is David Finkelstein.  With me are my colleagues:
12   Robert Chandler, Christopher Belen and Amy Likoff.
13          MR. VALDEZ:  And, Your Honor, this is Darrell
14   Valdez from the U.S. Attorney's Office, and with me is Carl
15   Ross.
16          MR. SCOTT:  Good morning.  This is Paul Scott for
17   the Relator, and with me is Lani Remick.
18          THE COURT:  Okay.  I've read the papers.  I guess
19   the United States has opposed the notice and has moved for a
20   protective order, so why don't we start with the Government.
21          MR. FINKELSTEIN:  Thank you, Your Honor.  This is
22   David Finkelstein.
23          We think the relief Armstrong seeks, and certainly
24   his request that the relief be ordered while production is
25   ongoing, is inappropriate for at least three reasons that
```

1    don't appear in our papers so hopefully it will not be a

2    regurgitation of what I know the Court is already aware of

3    with respect to our position.  Well, the first one kind of

4    is in our papers, and that is that there's no threshold

5    showing; the burden that the requested relief would impose

6    greatly outweighs the probative value; and third, there's no

7    need to do this now.

8         So I'll get into those as much as the Court would

9    like or it would be helpful, but I think the most important

10   of those points is that in all of the cases that either

11   party cites in their papers there was some sort of threshold

12   showing that there was a problem with document issues, and

13   indeed that's consistent with what this Court has said in

14   the past when it ruled on the Relator's request to get CSE

15   to answer interrogatories.  This Court also required a

16   threshold showing -- a showing of inadequacy, in this

17   Court's words, to justify requiring the interrogatory to be

18   answered, and that's ECF 215.

19        There is no threshold showing in this case, and

20   Mr. Peters has admitted it as recently as 2/20/15 on Page 30

21   of the transcript.  He says he's not making any allegation

22   of wrongdoing in this case, and indeed we all know that the

23   production is premature.  We've dedicated a lot of resources

24   to that production, and it would be grossly inefficient to

25   take those resources away from the production and get those

1   same people involved in preparing a witness, especially when

2   that might not be the end of it, you know?  And then they

3   continue the production, and then are we going to have to do

4   this again?  It just doesn't make sense.

5          THE COURT:  Okay.  But aren't there really two

6   separate thrusts -- and Mr. Peters can speak for himself.

7   But aren't there really two separate thrusts to the request?

8          It seems to me that one, generally speaking,

9   relates to a need to understand because there are so many

10  documents and, you know, certain -- you know, the Government

11  has acknowledged that certain emails no longer exist because

12  of the Postal Service's, you know, email systems and their

13  document retention policies.

14         Isn't one thrust of the request to simply

15  understand what it is they have and what it is they do not

16  have or will not be getting?  And isn't that separate from

17  any suggestion that documents may have been, you know,

18  destroyed or spoiled intentionally?

19         You know, I understand your argument with respect

20  to the need for a threshold showing as to the second purpose

21  for the deposition, but I'm not convinced that there is such

22  a need as to the first.

23         MR. FINKELSTEIN:  Well, as to the first, Your

24  Honor, the cases that the parties have cited don't go to a

25  need generally to understand in document-intensive cases

1      giving rise to a right to a 30(b)(6) deposition on document

2      issues.  I think the standard rule applies, and that rule is

3      26(b)(2)(C)(iii), which is the standard balancing test.  You

4      balance the probative value against the burden.  And the

5      probative value here -- well, first of all, it's premature

6      to assess the probative value because we haven't made our

7      production, but, Your Honor, we're -- our eyes are glazing

8      over looking at Postal Groupon invites.  So I can give you a

9      sneak peek as to what I think the probative value will be,

10     and I think it's extremely minimal.

11             We're going through this exercise, which is an

12     extremely burdensome exercise, to try to prove a negative

13     that no one in the USPS or DOJ knew that Armstrong was

14     doping at the time he was denying it.  We're comfortable,

15     based on what we've seen so far, that the documents will

16     show that, but the probative value of sponsoring testimony

17     about our collection review and production procedures is, at

18     best, minimal.

19             THE COURT:  Okay.

20             MR. FINKELSTEIN:  And the burden would be very

21     high.

22             THE COURT:  Tell me this:  Who would your 30(b)(6)

23     representative be?  Who would testify as to the Postal

24     Service's document retention policies and practices, your

25     collection efforts in this case, et cetera?

1          MR. FINKELSTEIN:  Well, Your Honor, that's part of

2    the problem because they haven't -- they've refused to limit

3    it to Postal --

4          THE COURT:  I understand.  We'll get there.

5          MR. FINKELSTEIN:  And so if it's seven different

6    witnesses, then there may have to be seven different

7    answers.

8          I don't have an answer for Postal right now, but I

9    can tell the Court that attorneys would have to be involved

10   in preparing the witness, and that's another reason that the

11   requested relief is disfavored as to the showing of need in

12   that the information isn't available otherwise, and in this

13   case, we've already answered interrogatories.  We can

14   supplement our answers to interrogatories when the

15   production is complete.  We can do written discovery, or we

16   can do something less formal.  We can just make our

17   contractors available to answer questions.

18         If it's just about getting this information out, a

19   deposition is the most burdensome way of doing it.

20         THE COURT:  Well, tell me this:  Who supervised

21   the document collection process?  Was it a U.S. Postal

22   Service representative, or was it someone from your office

23   or the U.S. Attorney's Office?  I mean, who would have

24   knowledge about not only the Postal Service's production but

25   documents acquired from other agencies?

1          MR. FINKELSTEIN:  Your Honor, the supervisor of

2     this entire process is the lead attorney on this case, and

3     that's Robert Chandler.

4          THE COURT:  Okay.  And roughly speaking, what

5     percentage of the production emanated from the Postal

6     Service as opposed to other places?

7          MR. FINKELSTEIN:  Your Honor, can you bear with us

8     while we try --

9          THE COURT:  Sure.

10          MR. FINKELSTEIN:  -- to get a nonanecdotal answer?

11          THE COURT:  Yes, and just complete ballpark.

12          MR. FINKELSTEIN:  Okay.  We're working on it.  We

13     have the spreadsheet, and we're looking at it.

14          MR. CHANDLER:  Well, and unfortunately -- pardon

15     me, Your Honor.  This is Robert Chandler.  Even looking at

16     the spreadsheet, I don't have a total -- it's really

17     difficult to say with any, you know, degree of accuracy, you

18     know, what percentage of our production consisted of Postal

19     Service documents or has consisted of Postal Service

20     documents so far.

21          THE COURT:  I mean, is it 90 percent, or is it 20

22     percent?

23          MR. CHANDLER:  Well, it would be below 20 percent

24     for sure.

25          THE COURT:  Below 20 percent?

```
1              MR. CHANDLER:  Yes.  And that's in large measure
2    -- a lot of the documents we have produced were documents
3    collected during the course of the investigation, which are
4    documents that Armstrong moved to compel us to produce, and
5    those were a substantial volume.
6              MR. FINKELSTEIN:  Your Honor, this is David
7    Finkelstein.  I would just hasten to add that it's
8    impossible to see how those documents would change after the
9    April 30th production.
10             THE COURT:  Well, that was my question.  The
11   million emails that we talked about the last time, and there
12   may not be a million once they're, you know, put through
13   whatever process you all are putting them through, those --
14   my understanding was that those were all Postal Service
15   emails.  Is that not correct?
16             MR. FINKELSTEIN:  No, that is correct, Your Honor.
17   It won't be a million when we're done though.  I think I can
18   -- it's safe to say at this point.  The problem is we just
19   don't know how many there will be.
20             THE COURT:  Okay.  So that 20 percent estimate
21   does not take into account, you know, what I still assume
22   would be a significant amount of Postal Service emails?
23             MR. FINKELSTEIN:  That's correct, Your Honor.
24             THE COURT:  Okay.  Got it.
25             Okay.  So that's the threshold showing issue, the
```

1    burden issue.  Anything else, Mr. Finkelstein?

2         MR. FINKELSTEIN:  One last thing, and this is our

3    third point, which is that there's no need to do this now.

4    Your Honor, at the conclusion of this call, we're going to

5    be seeking leave to bring a motion for a protective order

6    with respect to the other deposition topics.

7         THE COURT:  Right.

8         MR. FINKELSTEIN:  And I think one thing that the

9    Court could do is just deny without prejudice and take it up

10   in connection with the full briefing.  And we think it may

11   even be useful to have some additional space beyond three

12   pages to deal with some of these issues.

13        THE COURT:  Okay.

14        Now, on the point that a threshold showing of

15   spoliation or some other improper activity is required

16   before allowing inquiry into document production processes,

17   you all cited a couple of cases outside of this District.

18   Anything in D.C.?

19        MR. FINKELSTEIN:  We have not located anything in

20   D.C.

21        THE COURT:  Okay.

22        Mr. Peters?  Mr. Jacob?

23        MR. PETERS:  Your Honor, this is Elliot Peters on

24   behalf of Mr. Armstrong.  We start with Federal Rule of

25   Civil Procedure 26(b)(1), which says that the scope of

1    discovery is as follows:  "the existence, description,

2    nature, custody, condition and location of any documents."

3    And it's common, in our experience, where there's an entity

4    on the other side that has to gather documents, to take a

5    30(b)(6) deposition to make sure that they have collected

6    relevant documents, that relevant documents are available

7    and that they've searched the relevant custodians, and then,

8    to the extent that relevant documents are not available, to

9    find out why not and what's happened, if that's happened.

10           Now, there is a problem here, and I think this

11   conversation today grew out of a conversation that we had a

12   couple of weeks ago where we learned that -- we learned that

13   the Government didn't really begin to search for these

14   materials until 2014.  This sponsorship involves events

15   going back to 1996, and Mr. Finkelstein, I think, misstates

16   the relevance of documents that we're looking for when he

17   says that we're looking for documents about whether they

18   knew that Armstrong was doping.  And I think that they know

19   that's a misstatement.

20           We're interested in documents that address the

21   benefits that the Postal Service received from this

22   sponsorship, the reasons they got into it in the first

23   place, their evaluation of it every year, and when they

24   renewed it.  Because the few documents that we have seen

25   shows that they got a tremendous benefit from this

1    sponsorship, and that, of course, would go to damages.

2          We also would like to see documents that relate to

3    the negotiation of the contract because there is no specific

4    representation -- Mr. Armstrong never saw or signed the

5    contract.  There are no specific representations in the

6    contract about the use of PEDs, so we're interested in

7    whatever they said internally about the contract.

8          There are a lot of topics that we're interested

9    in, but what we've learned and what we've seen so far is

10   that they have produced to us a lot of junk, a lot of stuff

11   which really isn't helpful.  And so the fact that they can't

12   really explain or they've never been willing or able to

13   explain to us or to the Court what system they used and when

14   to try and identify documents that are relevant to this

15   case, that apparently they just started doing it years after

16   intervening and about four and a half years after the case

17   was filed, that gives us cause for very serious concern.

18         And yes, we are concerned that relevant documents

19   are missing, and we don't have any way of knowing whether

20   they were deleted or destroyed after June of 2010, when

21   Mr. Landis filed his action and the Government became aware

22   of it.  We're not in the habit of making accusations about

23   spoliation in the absence of evidence, but boy do we have

24   significant cause for concern.

25         We just got a production of emails relating to

1   Sonnenberg, Bizzotto, Porporino and Myers.  And I think

2   there were a total of about 40 emails, and none of them

3   really had anything to do with the sponsorship except there

4   was one from Porporino which talked about how significant

5   and wonderful an experience it had been for him to be

6   associated with it during his time at the Postal Service.

7   But nothing that would relate to any of the topics that are

8   relevant to us during the years in question.

9        The Government suggests we should do all of this

10  by interrogatory.  We did serve an interrogatory on them.

11  It was Interrogatory No. 9.  And they responded by filling

12  up -- and I won't read you -- I could read it into the

13  record, but I think it's a waste of time.  They filled up

14  pages with nonsense about "we haven't performed an

15  investigation," and "the lawyers handling this case don't

16  have specific knowledge of any particular documents which

17  have been destroyed or are missing," so that they've been

18  unwilling to give us this information.

19       And what we propose, which we believe is squarely

20  permitted by the Federal Rules of Civil Procedure and by all

21  the relevant case law, is a deposition where they designate

22  a witness, and we question that witness about their search

23  for documents, the location of documents, and to the extent

24  there are documents which are missing or one could logically

25  conclude were deleted at some point in time, we'd like to

1    know about that.

2           We're not accusing anybody of anything at this

3    point, but if there were documents that were destroyed after

4    June of 2010, there is a very serious problem.

5           THE COURT:  But --

6           MR. PETERS:  So we want to -- yes, that's part of

7    what we want to look at, but we just want to know what

8    they've done and what there is because thus far there's been

9    much sound and fury signifying nothing.  And we're very

10   mindful of the discovery cut-off in August and the Court's

11   attitude about that, and we're trying very hard to make

12   progress.

13          MR. FINKELSTEIN:  Your Honor, could I respond very

14   briefly?

15          THE COURT:  Let me ask one question first, and

16   I'll let you respond.

17          But knowing what they've done and what you have is

18   different, it seems to me that inquiring of a 30(b)(6)

19   witness about every document that may be missing and what

20   they've done to ensure that the Postal Service has not

21   destroyed any documents and, you know, that whole line of

22   questioning, I mean, that goes back to my first point.

23   Those strike me as being two different things.

24          MR. PETERS:  Your Honor, if I may respond?  This

25   is Elliot Peters again.

1          THE COURT:  Yes.

2          MR. PETERS:  I respectfully disagree with that.

3    If we say, "Did you gather emails from Gail Sonnenberg?"

4    and they say -- or "Did you make any effort to gather emails

5    from Gail Sonnenberg?" and they said, "Yes, we made an

6    effort, but there were no such emails."

7          "What steps did you take?

8          "We looked on the servers, and there was nothing.

9          "Do you have any understanding as to why there was

10   nothing?  Are there any policies of the Postal Service about

11   the deletion of documents after a person leaves or, you

12   know, kind of what happened?"

13          It's not trying to grill somebody in a hostile

14   way, but it's trying to find out if there are significant

15   categories of relevant documents that are missing.

16          "Were they -- when were they deleted?  Was it done

17   in the ordinary course pursuant to some policy, or was it

18   done in some different way?"

19          I think that that's very material because it does

20   seem to me that most -- what I'm divining from the things

21   that the Government lawyers have said on these phone calls

22   is a lot of the truly relevant documents on the topics that

23   I described just a few minutes ago to Your Honor don't exist

24   anymore:  the internal communications about the sponsorship

25   agreement; about why they entered into it; about why it was

1   good for the Postal Service; about what concerns they had,

2   if any, about the use of performance-enhancing drugs

3   throughout this sport.  All of those kinds of things, to the

4   extent that there's no more -- that there's no internal

5   communications from that time period, it would be really

6   helpful to know that, and then when they were destroyed.

7          Because what I think is going to happen is when we

8   depose Sonnenberg, for example, we're going to say:

9          "Did you communicate internally about the

10  sponsorship agreement?

11         "Yes, I did.

12         "How did you do that?"

13         She's probably going to say, "We sent emails to

14  each other."

15         So we're going to be in the situation, I fear,

16  where a lot of the critical evidence is missing, and it's

17  going to be important to know:  Was that done in the

18  ordinary course?  When was it done?  You know, is there

19  something nefarious here, or something for cause for concern

20  or just kind of tough luck that this stuff just kind of

21  happens to not be around anymore, and where does that leave

22  us all?  Because we are very concerned about the absence of

23  evidence on all of the most critical issues in this case in

24  the form of documents.

25         And producing piles of junk doesn't address our

1    concern, and that's what the Government has done.  And

2    they've -- you know, we've -- it's unfortunate, but the

3    simple fact is we don't seem able to have just

4    straightforward lawyer-to-lawyer conversations with each

5    other in this case.  We've learned more from these hearings

6    before Your Honor when they're candid with you; and when we

7    have meet-and-confers and we talk to each other, they're so

8    guarded that they don't tell us anything, and we just argue

9    with each other.

10          And it's really unproductive and frustrating, and

11   I'll accept at least 50 percent of the blame myself.  I'm

12   not trying to point fingers.  I'm just saying that what you

13   would normally hope people would do isn't -- doesn't go on

14   here.  Everything has to be brought to Your Honor.

15          And that interrogatory is an example.  They

16   supplemented it three times, and it's just complete

17   nonsense.  It tells us nothing.

18          MR. FINKELSTEIN:  Your Honor --

19          MR. PETERS:  So I don't believe that you can

20   segregate this kind of "Where are the documents?" from "To

21   the extent the critical documents are missing, why are they

22   missing?"

23          THE COURT:  Okay.

24          MR. PETERS:  "What happened?  Were they deleted?

25   Did you look at the back-up server?  Is there a policy that

1      when a person leaves, you delete their entire Outlook

2      mailbox?  And if so, how do you do that?  And did that

3      happen here with respect to all of these people?"

4                  THE COURT:  Okay.  Before I turn to

5      Mr. Finkelstein, one question, Mr. Peters:

6                  Would you agree that the topics that you have just

7      discussed, the benefits, the supervision of the sponsorship

8      agreement, the negotiation of the contract, and knowledge of

9      Mr. Armstrong's use of performance-enhancing drugs, all of

10     those topics are most likely to reside in documents within

11     the Postal Service as opposed to some place else?

12                 MR. PETERS:  Are you asking me that, Your Honor,

13     or Mr. Finkelstein?

14                 THE COURT:  Yes, you.

15                 And I'll ask you both.

16                 MR. PETERS:  I just don't know.  I just don't

17     know, Your Honor, and the reason I don't know is that the

18     other branches of the Government did an investigation which

19     lasted a number of years.  This Agent Novitzky from the Food

20     and Drug Administration did an investigation.  The Northern

21     District of -- the Central District of California U.S.

22     Attorney's Office did an investigation.  And I don't know

23     whether those investigations turned up additional documents

24     that would be relevant to those issues.

25                 I would think originally the materials relating to

 1     those issues would have been created by people working at

 2     the Postal Service.

 3                 THE COURT:  Okay.

 4                 MR. PETERS:  But if they -- but I don't know

 5     whether they're located in other Government agencies today

 6     because there's been a lot of activity going back to 2010 to

 7     investigate.

 8                 THE COURT:  Okay.

 9                 MR. PETERS:  So I just -- that's one of the things

10     I don't know.

11                 THE COURT:  Well, obviously the burden associated

12     with your request, you know, hinges in significant part on

13     whether a 30(b)(6) witness would have to go out and educate

14     him or herself about the FDA's email retention policies,

15     right?

16                 MR. PETERS:  Yes, but I think --

17                 THE COURT:  And the U.S. Attorney's Office email

18     retention policies.

19                 MR. PETERS:  Yes, except I think that -- I don't

20     -- I think that would be much easier because anything that

21     -- the Postal Service would have documents going back to

22     1996 or maybe even earlier, maybe 1995 when they began to

23     consider the sponsorship.  I don't know.

24                 As I understand it, these Government

25     investigations began in 2010, so anything that the FDA or

```
 1    the U.S. Attorney's Office would have would be much more

 2    recent, and I doubt that there would be anything that would

 3    have been destroyed pursuant to some document retention

 4    policy because they -- you'd think that they would have

 5    known that they had to hold onto it because the criminal

 6    investigation and the qui tam filing by Mr. Landis began at

 7    almost exactly the same time.  I mean, it really was

 8    Landis's information which triggered both, and so I would

 9    think that -- I don't think that there's the same kind of

10    issues about does it still exist with the FDA or the U.S.

11    Attorney's Office.

12            I think those issues are with the Postal Service,

13    and then also with its' Inspector General's office because

14    its' IG did some investigation relating to this sponsorship.

15    And it has a postal inspection service.  I don't know

16    whether they were involved, but, you know, the Post Office

17    has its own internal police force basically capable of

18    conducting investigations and gathering information, and

19    from what little we've seen, it appears that at one point in

20    time they did that.

21            And so we're interested in what, you know -- in

22    what they would have learned about that.

23            THE COURT:  Okay.  Mr. Finkelstein?

24            MR. FINKELSTEIN:  First, to go back to before

25    Mr. Peters answered, Your Honor asked if anybody has any
```

1     D.C. District Court authority, and there is a case we didn't

2     cite in our papers, and that's *True the Vote vs. IRS*, No.

3     13-734, 2014 Westlaw 4347197.  We think that this court --

4     that case is persuasive.  There was also a request for

5     expedited discovery based on the alleged insufficiency of a

6     production.  That request was denied, and we think the

7     reasoning applies here.  So that's just before I start to

8     respond to the things that Mr. Peters said.

9             As to -- a big picture here, Your Honor, is

10    discovery costs in this case are radically asymmetric, and

11    we know that, and we understand that.  They're representing

12    an individual, and we're representing the United States, and

13    they've defined "your" to include the entire United States.

14    And a cynical person might think that some of these requests

15    weren't made in spite of the anticipated expense, but

16    because of that.  And a cynical person might be forgiven

17    that suspicion in view of the shifting justifications I

18    think we've heard for why they need this release and why

19    they need it on an expedited basis.

20            So I've heard at least four different stories.  On

21    2/20 Mr. Peters said he needs this deposition now because

22    he's frustrated nothing happened.  That's in the hearing

23    before this Court on Page 30 of the transcript.

24            2/25, Mr. Jacob says, "The deposition is necessary

25    to make sure the document collection is complete."  That's

1    Page 10 of the transcript which we attached to our

2    opposition.

3              2/27, in his brief, Mr. Armstrong says he's

4    entitled to this because this is relief that's offered in

5    the ordinary course, quote, in most, if not all, complex

6    cases.

7              And now today, a couple of weeks later, Mr. Peters

8    says he's very concerned that there's something nefarious

9    here.

10             Now, these are all different explanations for why

11   they need it.  They're inconsistent explanations for why

12   they need it, and there's -- they rest on a faulty factual

13   predicate.

14             Mr. Peters said we didn't start collecting

15   documents until 2014.  That's simply not the case.  We

16   started collecting documents in 2010.  Those documents

17   included the key documents related to the sponsorship in

18   this case, the contract file itself, documents related to

19   the OIG audit of the contract file; and Mr. Peters has those

20   documents, and frankly he knows it.

21             From what I've heard about the proposed lines of

22   inquiry he wants to get into, it sounds like a lot of

23   fishing.  He just doesn't know how Gail Sonnenberg is going

24   to answer how she emailed, but Gail Sonnenberg retired in

25   2001.

1          At any rate, he can ask her about her email

2     practices, and then if he gets evidence of spoliation, then

3     maybe he can make a threshold showing.  I mean, we don't

4     think he'll be able to, but, you know, that would be a

5     different factual record than the one we have here.

6          THE COURT:  Mr. Finkelstein, let me ask one

7     question.

8          MR. FINKELSTEIN:  Sure.

9          THE COURT:  Were any USPS email servers taken off-

10    line after 2010 such that emails that may have been relevant

11    to the requests are no longer in existence?

12         MR. FINKELSTEIN:  No.

13         THE COURT:  Okay.

14         MR. FINKELSTEIN:  In fact, even before 2010 --

15    there was an archiving system in place as of May 2009 which

16    we're told guarantees the availability of all emails sent

17    and received to USPS addresses after that date.  So the

18    answer to Your Honor's question is no.

19         THE COURT:  Okay.

20         And Mr. Peters, do you have any evidence -- and if

21    so, what is it? -- that emails or other documents were

22    allowed to go away after 2010 when Mr. Landis filed his

23    suit?

24         MR. PETERS:  We have evidence -- we have evidence

25    that emails have gone away.  We don't know how or why or

1    when, but we know that -- we know that there are a lot of

2    critical documents that are missing, and the exchange that

3    you just had with Mr. Finkelstein is a perfect example of

4    our frustration.  You can get information from the

5    Government, but we can't; and the only way we can get

6    information is by asking them questions under oath in a

7    30(b)(6) deposition.

8              We don't have -- that was the first time I got --

9    ever heard a straight answer about emails, and I -- and it

10   was unsworn, and I don't know -- I don't know the extent of

11   it.  I'm not even sure I fully understand the significance

12   of it, but I do know that there's a lot of critical evidence

13   missing.

14             THE COURT:  Well, what's the basis --

15             MR. FINKELSTEIN:  Your Honor, may I respond to

16   that?

17             THE COURT:  What is the basis for that with

18   respect to documents and emails after 2010 when Mr. Landis

19   filed his suit?

20             MR. PETERS:  I don't know when the documents were

21   destroyed or deleted.  I know that there are no

22   communications that have been produced to us that we've ever

23   seen, zero, about -- which talk about internal USPS

24   communications which talk about the reasons for the

25   sponsorship, the benefits of the sponsorship, the contract

1    and the contract provisions relating to the sponsorship.

2              THE COURT:  But those would have been pre-2010

3    documents though, correct?

4              MR. PETERS:  Yes, they would have been.  They

5    absolutely would have been.  They probably would have been

6    pre-2004 documents.

7              THE COURT:  Right.  And from the last hearing, I

8    believe Mr. Finkelstein represented that at some point prior

9    to 2010 there was a changeover of servers or the archiving

10   policies were different, and therefore that would explain,

11   prior to the initiation of any investigation, why those

12   sorts of materials may be missing.

13             MR. PETERS:  Yes, and if there's a simple

14   explanation for it like that, Your Honor, that would take

15   about five minutes in a deposition for a properly prepared

16   30(b)(6) witness to testify to.  We would understand, it

17   would be in the record, and we'd move on to another issue.

18             But all we know at the present time is that we're

19   trying to defend this case where most of what would seem

20   like the logical evidence that you would rely upon to defend

21   the case doesn't exist, and we really don't understand why.

22   And when we asked in an interrogatory why, we got the

23   complete run-around, and they amended it twice.  So there's

24   three different versions of the run-around which doesn't say

25   anything.

1    They've never admitted to us in discovery that a

2    lot of otherwise critical documents have likely been

3    destroyed but for innocent reasons.

4         THE COURT:  Okay.  Mr. Finkelstein?

5         MR. PETERS:  They don't want to make that

6    admission, but that's what Your Honor is suggesting.

7         Look, if it happened prior to the filing of

8    Landis's lawsuit, you know, tough luck.  But the first step

9    in getting there is understanding whether it's likely or a

10   logical inference that what happened is that an awful lot of

11   things were destroyed at some point in time, and then

12   understanding under what circumstances and why, and then

13   how.  What happened?  Could they be located nonetheless?

14        But what we don't even have now is a factual

15   record in discovery about what most likely happened to all

16   these things.  They just don't tell us.

17        THE COURT:  Okay.  Mr. Finkelstein?

18        MR. PETERS:  And I'd like to have a properly

19   prepared 30(b)(6) witness, and I think it's our right under

20   the rules to simply explain that.

21        What happens -- if there are no emails, what

22   happened to the emails of Sonnenberg and Myers and Bizzotto?

23        MR. FINKELSTEIN:  Your Honor --

24        MR. PETERS:  If there's some explanation that

25   relates to a server in 2009, blah, blah, blah, well, let's

1    hear it.

2              THE COURT:  Mr. Finkelstein?

3              MR. FINKELSTEIN:  It's just not true that they

4    can't get information out of us, and that interrogatory

5    response that Mr. Peters is referring to -- I mean, I think

6    we're just going to have to agree to disagree about the

7    contents because we say in that interrogatory response that

8    as of -- I think what we say in that response -- we're going

9    and getting it -- is in February 2009 there was a perfect

10   archive of all emails, but not before then because the

11   archiving system wasn't in place before then.

12             That's what we say in the interrogatory response.

13   If Mr. Peters wants more information about that, written

14   interrogatories are a perfect way to go, or, as I said, we

15   can do it more informally.  I mean, we've offered to make

16   our IT consultants and contractors available to answer

17   questions, but they're spending a lot of time right now

18   trying to comply with the April 30th deadline.

19             We have now 15 attorneys and 38 contractors that

20   are involved in this production effort, and the contractors

21   have spent to date more than 2,200 hours in connection with

22   this effort.  So, you know, we understand the urgency of

23   answering questions, but the best course is to allow us,

24   because we're all concerned about the discovery cut-off, to

25   complete this process and to not redirect resources away

1    from this process.  And we can take calls in the meantime,

2    but then let's figure out the best way of exchanging the

3    information that Mr. Peters wants.

4              THE COURT:  Okay.

5              MR. PETERS:  Your Honor, what I understand

6    Mr. Finkelstein to have said is that in 2009 there was a

7    server which allowed you to archive emails that were created

8    after that date.  That tells us nothing about what happened

9    to emails that were created before that date, which is what

10   we're interested in.

11             MR. FINKELSTEIN:  Your Honor, that's not a

12   technically accurate characterization of what I said.  I can

13   clarify, if you'd like.

14             THE COURT:  Well, I think that what he has said --

15   and correct me if I'm wrong, Mr. Finkelstein -- is emails

16   created prior to that date may not exist because they

17   weren't archived completely, whereas emails after that date

18   should exist because there was a perfect archiving system.

19   Is that fair?

20             MR. FINKELSTEIN:  That's correct, Your Honor.

21             THE COURT:  Okay.

22             Okay.  I've heard enough.  We will get something

23   out within the next day or two on this.

24             MR. FINKELSTEIN:  Your Honor?

25             THE COURT:  Yes.

1            MR. FINKELSTEIN:  We'd like permission to move for

2       a full protective order, and we'd like, you know, the full

3       brief page limit we're allowed.  Can that be included in the

4       order as well?

5            THE COURT:  That's fine.

6            MR. PETERS:  Well, I don't understand what that

7       means.  They want to seek a protective order with respect to

8       the balance of topics in the 30(b)(6) notice?

9            MR. FINKELSTEIN:  That's correct.

10           THE COURT:  That's how I understood it, and you'll

11      have a chance to oppose that.

12           MR. PETERS:  Okay.

13           THE COURT:  Okay.

14           MR. PETERS:  And, Your Honor, can I raise one

15      related issue, which is, as I said, we're mindful of your --

16      of the discovery deadline and the things that we have to do

17      between now and then, and the Government now represents the

18      witnesses Bizzotto, Myers, and Sonnenberg.  We sent them an

19      email asking if they represent Zelnick and whether they'd

20      accept a subpoena for her, but they never responded to that.

21           These people -- Bizzotto's located in D.C.  Myers

22      is in Phoenix.  Sonnenberg is in Florida.  I don't know

23      where Zelnick is, but we think it would make a lot of sense

24      that, when we do take their depositions, the Government

25      would just bring them to Washington, assuming they're

1    willing to do it.  And they -- before they were represented

2    by the Government they told me they'd be willing to do that,

3    each of them, when I was speaking to them.

4           And I think it would make a lot of sense, when we

5    do get around to taking their depositions, to be able to do

6    it all in one chunk of time, you know, over a week or a

7    two-week period all in one place, and I think it would be

8    much more efficient and less expensive for everyone if the

9    Government just brought one witness to D.C. rather than

10   sending three lawyers to Phoenix, and then to Florida, and

11   then to I don't know where else.

12          THE COURT:  You obviously haven't spent the winter

13   here in D.C., Mr. Peters.

14          MR. PETERS:  No, but I'm anticipating, the way

15   we're going with document production, we're going to be

16   doing this during the cherry blossom season, Your Honor.

17          THE COURT:  Mr. Finkelstein, that sounds like --

18          MR. PETERS:  We can come in May.

19          THE COURT:  -- that sounds like a reasonable

20   proposition.  Any chance of doing that?

21          MR. CHANDLER:  That's -- I'm sorry, this is Robert

22   Chandler.  That's certainly a proposition that we're willing

23   to discuss.

24          THE COURT:  Okay.

25          MR. CHANDLER:  Obviously it's something we'd have

1    to discuss with Ms. Sonnenberg and Ms. Myers as well.  We

2    certainly would not commit to bringing them to D.C. or have

3    them travel to D.C. without speaking to them first, but

4    we're willing to talk to Mr. Peters about that.

5              THE COURT:  Why don't we strongly consider doing

6    that, unless the witnesses have some fundamental objection

7    to it.  Okay?

8              MR. PETERS:  And can they tell us if they

9    represent Zelnick so we don't send some process server out

10   to find her and all of that stuff if it's unnecessary?

11             MR. CHANDLER:  At this point we do not represent

12   Ms. Zelnick.

13             MR. PETERS:  Okay.

14             THE COURT:  Okay.  Now, I believe that we ordered

15   the production of documents and emails related to those

16   witnesses.  Do you have those now, Mr. Peters?

17             MR. PETERS:  Well, we received, I think, a total

18   of 40 emails.

19             THE COURT:  Okay.

20             MR. PETERS:  None of which really have anything to

21   do with the sponsorship.  So if that's the production, we've

22   gotten it; but if that's the production, it just kind of

23   heightens our concern that the production isn't really going

24   to help us.  We still haven't received any of the personal

25   documents.

1          I think we mentioned last time that Bizzotto told

2     us she had several file drawers of documents relating to her

3     time at the Postal Service and the cycling team sponsorship

4     in her garage.  She'd invited us to come to Phoenix and look

5     through them, and then I got an email from Mr. Chandler

6     saying that he now represented her, we weren't authorized to

7     speak with her anymore, and we've never received any of

8     Bizzotto's personal documents.

9          THE COURT:  Are those being processed,

10    Mr. Chandler?

11         MR. CHANDLER:  They are, Your Honor.

12         THE COURT:  Okay.

13         MR. CHANDLER:  Yes, they are.

14         THE COURT:  Okay.

15         MR. CHANDLER:  We've now --

16         MR. PETERS:  What does that mean?

17         MR. CHANDLER:  Pardon me.  We've actually had

18    someone travel to Phoenix who looked through the documents,

19    and a lot of them are -- they're very bulky and inconvenient

20    to copy, but we've taken an inventory of the documents, and

21    I think we're going to propose to Mr. Peters shortly that

22    some of the documents be copied and that others not be

23    because they're just simply not relevant.  They're magazine

24    articles or just things that, you know, it just wouldn't be

25    worth the burden for anybody to make copies of.

 1          THE COURT:  Okay.  I will obviously let you all

 2     work that out.  Okay?

 3          MR. CHANDLER:  Thank you.

 4          MR. PETERS:  If those documents are in D.C., if

 5     you brought them all back to D.C., we can just come by and

 6     look at the ones you propose not to produce when we're

 7     there.  I mean, a magazine article could be very relevant if

 8     it were magazine articles about how widespread doping was in

 9     the telethon or the Festina affair in 1998.  That would be

10     very relevant.

11          THE COURT:  All right, guys.  This is an off-line

12     conversation.  Okay?

13          Anything else?

14          MR. PETERS:  Nothing from us, Your Honor.  Thank

15     you.

16          THE COURT:  Okay.  Great.  Have a good afternoon.

17          MR. CHANDLER:  Thank you, Your Honor.

18          MR. PETERS:  Thank you, Your Honor.

19               (Whereupon the hearing was

20                concluded at 2:44 p.m.)

21

22

23

24

25

1            <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3

4            I, LISA A. MOREIRA, RDR, CRR, do hereby certify

5     that the above and foregoing constitutes a true and accurate

6     transcript of my stenographic notes and is a full, true and

7     complete transcript of the proceedings to the best of my

8     ability.

9         Dated this 16th day of March, 2015.

10

11

12                                <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                 Official Court Reporter
13                               United States Courthouse
                                 Room 6720
14                               333 Constitution Avenue, NW
                                 Washington, DC 20001
15

16

17

18

19

20

21

22

23

24

25