## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* FLOYD LANDIS,<br><div align="center">*Plaintiffs*,</div><br>v.<br><br>TAILWIND SPORTS CORPORATION, TAILWIND SPORTS, LLC; MONTGOMERY SPORTS, INC.; CAPITAL SPORTS & ENTERTAINMENT HOLDINGS, INC.; THOMAS W. WEISEL; LANCE ARMSTRONG; JOHAN BRUYNEEL; WILLIAM J. STAPLETON; BARTON B. KNAGGS; ROSS INVESTMENTS, INC., AND DOES 2-50,<br><div align="right">*Defendants*.</div> | Civil No. 1:10-cv-00976-CRC<br><br>***ORAL HEARING REQUESTED*** |

**DEFENDANTS CAPITAL SPORTS & ENTERTAINMENT HOLDINGS, INC., WILLIAM J. STAPLETON, AND BARTON B. KNAGGS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, and based upon the accompanying Memorandum of Points and Authorities, the Statement of Undisputed Material Facts, the Declarations of Laura Hundley Ritts, William J. Stapleton, Barton B. Knaggs, and Margaret E. Dayton, and the exhibits attached thereto, Defendants Capital Sports & Entertainment Holdings, Inc., William J. Stapleton, and Barton B. Knaggs (collectively the "CSE Defendants"), by their undersigned counsel, hereby move this Court, before the Honorable Christopher R. Cooper, United States District Judge, for an Order granting summary judgment in favor of the CSE Defendants on Counts 1, 2, 3, 4, and 6 of Relator's Second Amended Complaint.

///

Dated this 22nd day of April 2015

/s/  Marc S. Harris
Marc S. Harris (*admitted pro hac vice*)
SCHEPER KIM & HARRIS LLP
601 West Fifth Street, 12th Floor
Los Angeles, CA 90071-2025
(213) 613-4655 – Telephone
(213) 613-4546 – Facsimile
mharris@scheperkim.com

Attorneys for Defendants Capital Sports &
Entertainment Holdings, Inc., William J.
Stapleton and Barton B. Knaggs

/s/  John P. Pierce
John P. Pierce (D.C. Bar No. 475101)
THEMIS PLLC
2305 Calvert Street, NW
Washington, DC 20008
(202) 567-2050 – Telephone
(202) 567-2051 – Facsimile
jpierce@themis.us.com

Attorneys for Defendants Capital Sports &
Entertainment Holdings, Inc., William J.
Stapleton and Barton B. Knaggs

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* FLOYD LANDIS,<br><br>                                *Plaintiffs*,<br><br>     v.<br><br>TAILWIND SPORTS CORPORATION, TAILWIND SPORTS, LLC; MONTGOMERY SPORTS, INC.; CAPITAL SPORTS & ENTERTAINMENT HOLDINGS, INC.; THOMAS W. WEISEL; LANCE ARMSTRONG; JOHAN BRUYNEEL; WILLIAM J. STAPLETON; BARTON B. KNAGGS; ROSS INVESTMENTS, INC., AND DOES 2-50,<br><br>                                 *Defendants.* | Civil No. 1:10-cv-00976-CRC |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS**
**CAPITAL SPORTS & ENTERTAINMENT HOLDINGS, INC., WILLIAM J.**
**STAPLETON, AND BARTON B. KNAGGS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION .................................................................................................1

II.     PROCEDURAL BACKGROUND........................................................................3

III.    STATEMENT OF RELEVANT FACTS ..............................................................4

     A.      The CSE Defendants.................................................................................4

     B.      Relevant Provisions of the Sponsorship Agreement.................................4

     C.      USPS Payments to Tailwind.....................................................................5

     D.      The CSE Defendants' Statements Concerning Doping by the Tailwind
          Team ..........................................................................................................6

IV.     LEGAL STANDARD............................................................................................7

V.      ARGUMENT ........................................................................................................8

     A.      Summary Judgment In Favor of the CSE Defendants Is Appropriate On
          Counts 1, 2, 3, and 6 Because the USPS Made No Payments Under the
          Sponsorship Agreement After June 10, 2004 ..........................................8

     B.      Count 4 Must Be Dismissed Because Relator Cannot Establish A "Reverse
          False Claim"..............................................................................................9

          1.      Relator May Not Base His Reverse False Claim on a Potential
                Right of the Government to Recoup Funds Wrongly Paid as a
                Result of Alleged Direct False Claims......................................10

          2.      A Potential Right to Receive Payment In a Suit for Breach of
                Contract Does Not Create An "Obligation" to Pay Money to the
                United States Government .........................................................13

                (a)     The D.C. Circuit has flatly rejected the theory espoused by
                        Relator in this case. ......................................................15

                (b)     The facts in this case are even less compelling than those at
                        issue in *Hoyte*. ............................................................17

                (c)     No case, within or outside the D.C. Circuit, supports the
                        novel theory urged by Relator.......................................18

3. Even if an "Obligation" Exists, the Obligation is Tailwind's and the CSE Defendants Cannot Be Liable for It ................................................20

  (a) *Caremark* is one of a handful of cases that have endorsed an "indirect reverse false claim" theory. ........................................21

4. Relator's Claim Fails Because He Has Not Identified Any Actionable False Statements By Any of the CSE Defendants ..................24

  (a) Relator has not identified a single false statement made by Mr. Knaggs. ...............................................................................24

  (b) Relator has not identified a single, actionable false statement by Mr. Stapleton or CSE that was heard or relied upon by the government ..................................................................25

5. Relator Cannot Establish that CSE, Stapleton, or Knaggs Made Any Statement With the Intention of Avoiding An Obligation to Pay Money to the United States ................................................................25

VI. CONCLUSION ......................................................................................................27

# TABLE OF AUTHORITIES

**Page**

## Federal Cases

*Allison Engine Co. v. United States ex rel. Sanders,*
    553 U.S. 662 (2008)..............................................................................26

*Am. Textile Mfrs. Inst., Inc. v. Limited, Inc.,*
    190 F.3d 729 (6th Cir. 1999) ............................................................ *passim*

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)................................................................................7

*Filebark, II v. United States Dep't of Transp.,*
    555 F.3d 1009 (D.C. Cir. 2009) ...........................................................11

*Greene v. Dalton,*
    164 F.3d 671 (D.C. Cir.1999) ................................................................7

*Hoyte v. Am. Nat'l Red Cross,*
    439 F. Supp. 2d 38 (D.D.C. 2006), ...................................................... *passim*

*Hoyte v. Am. Nat'l Red Cross,*
    518 F.3d 61 (D.C. Cir. 2008) ............................................................... *passim*

*Kennard v. Comstock Res., Inc.,*
    363 F.3d 1039 (10th Cir. 2004) ...........................................................10

*Langevine v. District of Columbia,*
    106 F.3d 1018 (D.C. Cir. 1997) ...........................................................11

*Prawer & Co. v. Verrill & Dana,*
    962 F. Supp. 206 (D. Me. 1997) ...........................................................13

*Scott v. Harris,*
    550 U.S. 372 (2007)................................................................................7

*Si v. Laogai Research Foundation,*
    --- F. Supp. 3d ---, No. 09-cv-2388, 2014 WL 5446487,
    (D.D.C. Oct. 14, 2014)....................................................................12, 26

*Smith v. United States,*
    287 F.2d 299 (5th Cir. 1961) ...........................................................22, 23

*U.S. ex rel. Atkinson v. PA. Shipbuilding Co.,*
    473 F.3d 506 (3d Cir. 2007)...................................................................25

*U.S. ex rel. Atkinson v. Pennsylvania Shipbuilding Co.,*
    CIV. A. 94-7316, 2000 WL 1207162, at * 22 (E.D. Pa. Aug. 24, 2000) .........................25

*United States ex rel. Bahrani v. Conagra,*
    465 F.3d 1189 (10th Cir. 2006)............................................14, 18, 19, 26

*United States ex rel. Barajas v. Northrop Corp.,*
    147 F.3d 905 (9th Cir. 1998) ................................................................12

*United States ex rel. Huangyan Imp. & Exp. Corp. v. Nature's Farm*
    *Prods.,Inc.,*
    370 F.Supp.2d 993 (N.D. Cal. 2005) ....................................................10

*United States ex rel. Hunt v. Merck-Medco Managed Care, LLC,*
    336 F. Supp. 2d 430 (E.D. Pa. 2004) ...............................................22, 23

*United States ex rel. Koch v. Koch Indus., Inc.,*
    57 F. Supp. 2d 1122 (N.D. Okla. 1999) ...................................................22, 23
*United States ex rel. Prawer & Co. v. Verrill & Dana,*
    946 F. Supp. 87 (D. Me. 1996) ...............................................................13
*United States ex rel. Taylor v. Gabelli,*
    345 F. Supp. 2d 313 (S.D.N.Y. 2004)......................................................11
*United States ex. rel. Bahrani v. Conagra, Inc.,*
    624 F.3d 1275 (10th Cir. 2010) ...............................................................29
*United States v. Caremark, Inc.,*
    634 F.3d 808 (5th Cir. 2011) ...................................................21, 22, 23, 26
*United States v. Pemco Aeroplex, Inc.,*
    195 F.3d 1234 (11th Cir. 1999) ...............................................................18, 19
*United States v. Q Int'l Courier, Inc.,*
    131 F.3d 770 (8th Cir. 1997) ...................................................................10, 14
*Wilkins ex rel. U.S. v. State of Ohio,*
    885 F. Supp. 1055 (S.D. Ohio 1995) .......................................................25

### State Cases

*State of California ex rel. Bowen v. Bank of Am. Corp.,*
    126 Cal. App. 4th 225 (2005) ..................................................................14

### Federal Statutes

31 U.S.C. § 3729(a)(7).................................................................................. *passim*

### Federal Rules

Fed. R. Civ. P. 56(a) .................................................................................7

### Miscellaneous

Sen. Rep. No. 99–345, 99th Cong., 2d Sess. 15 *reprinted in* 1986 U.S. Code Cong.
    & Admin. News 5266, 5280, 5283 ..........................................................9

Sen. Rep. No. 345, 99th Cong., 2nd Sess. 18 (1986)..................................21

S. Rep. No. 10, 111th Cong., 1st Sess. 13-14 (2009) ................................21

I.        **INTRODUCTION**

On June 2010, Relator Floyd Landis ("Relator"), a former professional cyclist, filed the

instant False Claims Act ("FCA") case alleging that he and other riders used performance

enhancing drugs ("PEDs") during the time they rode for a cycling team sponsored by the United

States Postal Service ("USPS" or "Postal Service").  In June 2014, the court dismissed virtually

all of Relator's false claim allegations against Capital Sports & Entertainment Holdings, Inc.

("CSE"), William Stapleton, and Barton Knaggs (collectively, the "CSE Defendants") as time-

barred.  The court allowed Relator to pursue his case with respect to four alleged claims

submitted to the Postal Service after June 10, 2004.  The court also left standing Relator's claim

that the CSE Defendants violated the "reverse false claim" provision of the FCA by making

statements to avoid the team owner having to return the sponsorship funds that were obtained by

the alleged false claims.  Relator has been given ample opportunity to come forward with

evidence to support his remaining tenuous claims and has utterly failed to do so.  His complaint

must be dismissed as to the CSE Defendants.

As to the direct FCA counts, Relator's theory is that PED use by members of the cycling

team (including himself) violated the terms of the USPS sponsorship agreement, and that any

claims for payment of sponsorship fees were "false and fraudulent."  The undisputed evidence

proves that no sponsorship fees were paid by the Postal Service within the statute of limitations.

There were four small payments made to the team owner after June 2004, but these were

reimbursements for expenses, not payments under the sponsorship agreement.  Thus, even

accepting Relator's theory – that a breach of the sponsorship agreement renders claims for

payment under that agreement "false and fraudulent" – none of the payments made after June

2004 constitute actionable false claims.

Nor can Relator establish the elements of a reverse false claim.  Sections 3729(a)(1) and (a)(2) of the FCA apply where a defendant makes a false statement to obtain money *from* the government.  The "reverse false claim" provision, subsection (a)(7), applies where a false statement is made for the purpose of avoiding a payment that is owed *to* the government.  To avoid the statute of limitations, Relator attempts to recast his claims under the former provisions as claims under the latter.  He cannot point to a single case that has held that this type of artful pleading is appropriate.

Second, Relator cannot establish an actionable "obligation" that would give rise to a reverse false claim.  The D.C. Circuit has flatly rejected as "frivolous" a virtually identical theory.  No out-of-circuit case holds otherwise.

Third, even if Relator could establish some obligation to repay money to the government, that obligation was not owed by the CSE Defendants.  Ordinarily, a reverse false claim case will lie only against the defendant who owed the obligation to the United States.  A very limited exception for so-called "indirect reverse false claims" has been applied by a handful of courts in other circuits.  However, this limited exception does not apply under the facts of this case.

Fourth, Relator cannot establish that any of the CSE Defendants made any false statement (to the government or anyone else) for the purpose of avoiding (or having another avoid) an obligation to the United States.  Relator can point to no alleged false statement by defendant Knaggs to anyone at any time.  With respect to defendants Stapleton and CSE, Relator merely alleges that, after the USPS sponsorship agreement had ended, they made private statements denying knowledge of doping by Lance Armstrong, and were quoted in the media repeating Mr. Armstrong's denials of doping and pointing out the clean drug testing history of the team's riders.  None of these statements were intended to impact the USPS agreement, which had

2

expired years earlier.  Therefore, the reverse false claim count must be dismissed as to the CSE Defendants.

## II.     **PROCEDURAL BACKGROUND**

Relator Floyd Landis filed his initial complaint in this *qui tam* action under seal on June 10, 2010.  (Statement of Undisputed Material Facts In Support of the CSE Defs.' Mot. for Summ. Judgment ("SOF") ¶ 1).  The United States intervened against certain defendants, but declined to intervene against the CSE Defendants, and the action was unsealed.  (*Id.* ¶ 2).  On July 23, 2013, the CSE Defendants moved to dismiss Relator's Second Amended Complaint. (*Id.* ¶ 3).  On June 19, 2014, the Court granted in part and denied in part the CSE Defendants' motion to dismiss.  The Court held that a six-year statute of limitations applied to Relator's direct, false claims counts (Counts 1, 2, and 3); therefore, Relator could only recover for false claims submitted to the Government on or after June 10, 2004.  (*Id.* ¶ 4).  The Court dismissed Counts 1, 2, and 3 with prejudice as to the CSE Defendants to the extent they were premised on claims submitted before June 10, 2004.  (*Id.* ¶ 5).  Relator's Counts 5, 6, 7, and 8 (the post-FERA counts) were dismissed as to all Defendants.  (*Id.*)[1]

After the Court's ruling on the CSE Defendants' Motion to Dismiss, Relator's case against the CSE Defendants consists of:  (1) alleged direct false claims as to four payments allegedly submitted after June 10, 2004, which total $68,170.45 (Counts 1, 2, 3, and 6); and (2) alleged reverse false claims (Count 4).  The CSE Defendants now move for summary judgment as to all remaining counts because Relator's claims against the CSE Defendants fail as a matter of law:  (1) Relator cannot premise Counts 1, 2, 3, and 6 on payments not made under the

---

[1] The Memorandum Opinion later indicates that Count 6 was not dismissed as to the CSE Defendants.  (Mem. Opinion (Doc. No. 174) at 81).  Because Count 6 is time-barred, as discussed below, the Court may grant summary judgment and need not reconcile the discrepancy.

Sponsorship Agreement; and (2) Relator cannot establish a claim under the reverse false claim statute asserted in Count 4.

### III.   STATEMENT OF RELEVANT FACTS

####   A.   The CSE Defendants

The CSE Defendants acted as the agents and business managers for Mr. Armstrong, another rider on the Tailwind Team.  (SOF ¶ 6).  Mr. Stapleton and CSE acted as Mr. Armstrong's agent beginning in 1995 and approximately 2001, respectively.  (*Id.* ¶¶ 7-8).  Mr. Knaggs acted as Mr. Armstrong's business manager beginning in approximately 2004.  (*Id.* ¶ 9). Mr. Stapleton and Mr. Knaggs are principals of CSE.  (*Id.* ¶ 10).  In 2003, near the end of the term of the USPS sponsorship agreement, CSE was hired by Tailwind Sports Corporation to provide sales and marketing services and to interact with sponsors of the cycling team.  (*Id.* ¶¶ 11, 14).

####   B.   Relevant Provisions of the Sponsorship Agreement

On January 1, 2001, the Postal Service entered into a sponsorship agreement with the predecessor of Tailwind Sports Corporation (collectively with its predecessor entities, "Tailwind") for sponsorship of a professional cycling team (the "Sponsorship Agreement").  (*Id.* ¶ 12).  The Sponsorship Agreement was a continuation of a sponsorship arrangement that began in 1995, and provided for periodic payments to be made to Tailwind by the USPS, in return for the display of USPS logos on the Tailwind team's uniforms and other related promotional opportunities.  (*Id.* ¶ 13).  The Sponsorship Agreement did not include any express certification that the riders on the Tailwind team were not using PEDs.  (*Id.* ¶ 16).  The Sponsorship Agreement stated that the team should comply with all rules of cycling, and required the team to "take immediate action" in the event of a positive drug test or known violation of any rider's

team contract.  (*Id.*)  The Sponsorship Agreement stated that the failure to take such action would

constitute an "Event of Default" under the Sponsorship Agreement, and would provide the Postal

Service with the following remedies:

> Upon the occurrence of an Event of Default, and at time [sic] thereafter so long as
> the same shall be continuing, the nondefaulting party may declare, at its option,
> this Agreement to be in default and; (1) may immediately terminate this
> Agreement without any liability whatsoever:  by providing written notification to
> the defaulting party[;] (2) may seek enforcement by appropriate court action of
> the terms hereof; (3) may exercise any other right or remedy available to it under
> law or in equity; or (4) may seek any permitted combination of such remedies."

(*Id.* ¶ 17).

### C.     USPS Payments to Tailwind

The Postal Service made 39 payments to Tailwind between January 10, 2001 and May

14, 2004.  (*Id.* ¶ 20).  There were no payments under the Sponsorship Agreement after May 14,

2004.  (*Id.* ¶ 21)  The Postal Service made four payments to Tailwind (totaling $68,170.45) after

June 10, 2004.  (*Id.* ¶ 22).  These four payments, paid on August 11, 2004, October 4, 2004, and

October 20, 2004, were for reimbursement for certain Postal Service hospitality-related expenses

that had been advanced by Tailwind.  (*Id.*)  The payment made August 11, 2004 was for

hospitality-related services at the Downers Grove and New York City cycling races and for

media guides previously made and delivered to the Postal Service.  (*Id.* ¶ 23).  One of the

payments made on October 4, 2004 was for a financial contribution the Postal Service made for a

party in Austin, Texas.  (*Id.* ¶ 24).  The second payment made on October 4, 2004 was a deposit

for hospitality-related services in connection with the San Francisco Grand Prix cycling race.

(*Id.* ¶ 25).  The payment made on October 20, 2004 was for hospitality-related services in

connection with the San Francisco Grand Prix cycling race and the balance due on hospitality-

related services for the Downers Grove cycling race.  (*Id.* ¶ 26).

**D.     The CSE Defendants' Statements Concerning Doping by the Tailwind Team**

Although Relator's case is premised on alleged false statements, he fails to attribute any false statements to the CSE Defendants in his Second Amended Complaint ("SAC").  In discovery, Relator has not identified a single statement made by Mr. Knaggs related to PED use or the Tailwind cycling team.  (*Id.* ¶ 28).  With respect to Mr. Stapleton and CSE, Relator has merely alluded to sporadic, generic statements in which Mr. Stapleton or CSE denied knowledge of doping by Lance Armstrong, and referenced certain news articles (several of which do not appear to contain any statements attributed to Mr. Stapleton or CSE), private correspondence, and statements in a confidential arbitration which refer to Mr. Armstrong's denials of doping and the Tailwind team's clean drug testing history.  (*Id.* ¶ 30).

None of the statements referenced by Relator were made for the purpose of avoiding an obligation to the United States.  (*Id.* ¶ 32).  Neither Mr. Stapleton, Mr. Knaggs, nor CSE had any obligation to pay money to the Postal Service (or any other branch of the government) in connection with the Sponsorship Agreement.  (*Id.* ¶ 33).  Nor were Mr. Stapleton or Mr. Knaggs involved in the negotiation, drafting, or execution of the Sponsorship Agreement.  (*Id.* ¶ 34). Nor were Mr. Stapleton or Mr. Knaggs aware at any time of any obligation owed by Tailwind (or any other person or entity) to return money to the Postal Service that was paid under the Sponsorship Agreement.  (*Id.* ¶ 35).  Certainly, once the Sponsorship Agreement had ended in June 2004, neither Mr. Stapleton nor Mr. Knaggs were aware of any basis upon which the Postal Service could recoup or clawback funds that had been paid under the agreement.  (*Id.* ¶ 36).[2]

---

[2] From their perspective, the Sponsorship Agreement was an extraordinary success for the Postal Service.  (*Id.* ¶ 37).  Indeed, Mr. Stapleton and Mr. Knaggs were aware of studies commissioned by the Postal Service that estimated that the economic benefit to the Postal Service far exceeded the amount paid in sponsorship fees.  (*Id.*)  Accordingly, they had no basis

## IV.    <u>LEGAL STANDARD</u>

The Court may grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The standard requires more than the existence of some factual dispute; "the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247-48 (emphasis original).  A dispute is genuine only if a reasonable fact-finder could find for the non-moving party; a fact is only material if it is capable of affecting the outcome of the litigation.  *Id*. at 248.  In assessing a party's motion, the court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion."  *Scott v.* Harris, 550 U.S. 372, 378 (2007) (internal modifications omitted).  A nonmoving party, however, must establish more than "the existence of a scintilla of evidence" in support of its position.  *Anderson*, 477 U.S. at 252.  In addition, he may not rely solely on allegations or conclusory statements.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir.1999).  The nonmoving party must present specific facts that would enable a reasonable jury to find in its favor.  *Id.*  If the evidence presented is "merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50.

---

to conclude that any money was owed to the government in 2005, 2006, or any later date.  (*Id.* ¶ 38).

V.    **ARGUMENT**

    A.    **Summary Judgment In Favor of the CSE Defendants Is Appropriate On Counts 1, 2, 3, and 6 Because the USPS Made No Payments Under the Sponsorship Agreement After June 10, 2004**

As to his false claims counts (Counts 1, 2, 3, and 6), Relator contends that the claims for payment made by Tailwind under the Sponsorship Agreement with the Postal Service were "false or fraudulent" because members of the cycling team (including Relator) used PEDs during the term of the sponsorship. According to Relator, the use of PEDs constituted a breach of the Sponsorship Agreement, and any claims for payment under the Agreement, made with knowledge of this breach, were "false or fraudulent."[3]

Section 3731(b)(1)'s six-year statute of limitations applies to Relator's claims against the CSE Defendants. (SOF ¶ 4). Relator filed his initial complaint on June 10, 2010. (*Id.* ¶ 1). As a result, Relator cannot recover for any false claims submitted for payment on or before June 10, 2004. (*Id.* ¶ 4). The final payment made in connection with the Sponsorship Agreement was made on May 14, 2004. (*Id.* ¶ 21). Accordingly, all payments made in connection with the Sponsorship Agreement occurred before June 10, 2004, and Relator's claims are time-barred.

The Postal Service made four payments (totaling $68,170.45) after June 10, 2004, but these payments do not relate to the Sponsorship Agreement and are not rendered false by the alleged doping. (*Id.* ¶¶ 22-26). The payments were made in August and October 2004, after the Sponsorship Agreement had ended, and were reimbursements for certain hospitality-related expenses that had been advanced by Tailwind on behalf of the Postal Service. (*Id.* ¶ 14, 22-26).

---

[3] The CSE Defendants dispute the legal viability of this theory. No implied or express certification was made to the USPS regarding doping on the Tailwind team, and nothing about the claims for payment under the Sponsorship Agreement were false or fraudulent. However, for purposes of this motion, the CSE Defendants accept Relator's tenuous theory.

The invoices for reimbursement did not certify, explicitly or impliedly, that the Tailwind cycling team was in compliance with the rules of cycling or the terms of the Sponsorship Agreement. (*Id.* ¶ 27).  They were not for sponsorship fees and had nothing to do with the Sponsorship Agreement.  (*Id.*)  Because these payments were not made in connection with the Sponsorship Agreement, even under Relator's theory, Relator cannot show that these claims for payment were false or fraudulent.  Summary judgment in favor of the CSE Defendants is appropriate as to Counts 1, 2, 3, and 6.

**B.      Count 4 Must Be Dismissed Because Relator Cannot Establish A "Reverse False Claim"**

A defendant incurs liability under section 3729(a)(7) if he "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(7). Section 3729(a)(7), the so-called "reverse false claim" provision, was enacted in 1986 to close a perceived loophole in the FCA, and address situations where the defrauding party does not receive money *from* the government, but rather lies to avoid or reduce a payment that he owes *to* the government.  *See* Sen. Rep. No. 99–345, 99th Cong., 2d Sess. 15 *reprinted in* 1986 U.S. Code Cong. & Admin. News 5266, 5280, 5283 (Congress "added a clarification that an individual who makes a material misrepresentation to avoid paying money owed to the Government should be equally liable under the Act as if he had submitted a false claim."); *Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 63 (D.C. Cir. 2008) ("In a reverse false claim action under FCA section 3729(a)(7), the defendant's action does not result in improper payment by the government to the defendant, but instead results in no payment to the government when a payment is obligated.").  Such claims are "reverse" false claims, because the financial obligation

that is the subject of the fraud flows in the opposite of the usual direction. *United States ex rel. Huangyan Imp. & Exp. Corp. v. Nature's Farm Prods., Inc.*, 370 F.Supp.2d 993, 998 (N.D. Cal. 2005). Thus, when money fraudulently flows out from the Government, the direct false claim statutes apply. When money *should* flow into the Government (but does not due to fraud), the *reverse* false claim statute applies.[4]

        1.        Relator May Not Base His Reverse False Claim on a Potential Right of the Government to Recoup Funds Wrongly Paid as a Result of Alleged Direct False Claims

To recover under section 3729(a)(7), a plaintiff must demonstrate that the defendant owed a specific, legal obligation to pay the government money or property at the time the alleged false record or statement was made. *Hoyte v. Am. Nat'l Red Cross*, 439 F. Supp. 2d 38, 43 (D.D.C. 2006), *aff'd*, 518 F.3d 61 (D.C. Cir. 2008); *Am. Textile Mfrs. Inst., Inc. v. Limited, Inc.*, 190 F.3d 729, 734 (6th Cir. 1999) (hereinafter "*ATMI*"); *United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 773 (8th Cir. 1997). In an effort to circumvent the statute of limitations, Relator attempts to convert his direct false claim case into a reverse false claim case by arguing that the potential right to recoup funds wrongly paid out by the government constitutes an "obligation"

---

[4] An example would be a rancher who leases federal land, and must pay a monthly fee based on the number of cattle grazing on the land. If the rancher submits a false report as to the number of cattle on the land in a given month, he has not made a false claim for payment by the government, so he would not be liable for a "direct" false claim. Instead, he has made a false statement and avoided paying money to the government as provided for under the contract, and would be liable under section 3729(a)(7) for a "reverse" false claim. *See Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1048 (10th Cir. 2004) (defendant submitted false reports to federal government to reduce amount of royalties owed under oil and gas leases on Indian land).

under section 3729(a)(7).  However, the filing of a false claim (such as the demand for payment here) cannot create the "obligation" under the reverse false claim statute.[5]

Section 3729(a)(7) was not intended to apply where the contention is that false statements or records were used to induce the government to pay money to the defendant -- that is what the traditional false claims provisions already address.  *See United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 338 (S.D.N.Y. 2004) ("Close examination of these claims leads to the inescapable conclusion that they are redundant – two ways of describing the same transaction. Because [Relator's] allegations state a claim under sections 3729(a)(1) and (2), they cannot also form the basis for a claim under subsection (a)(7)."); *United States ex rel. Prawer & Co. v. Verrill & Dana*, 946 F. Supp. 87, 93 (D. Me. 1996) ("*Prawer I*") (dismissing reverse false claims counts and noting that "[i]f the fraud is proved, the private relators/government certainly have a case for a direct False Claims Act violation by [defendant] and perhaps other tort-based or contractual recovery").

A recent case in this district pointed out the flawed logic of the approach urged by Relator here:

> Under this telling, the concealment (which is alleged in the complaint) prevented the government from uncovering the fraud and requiring repayment of the grant funds that the government had provided.  [citation].  But by this logic, just about any traditional false statement or presentment action would give rise to a reverse false claim action; after all, presumably any false statement actionable under

---

[5] Relator may argue that Judge Wilkins already ruled on this issue in connection with Defendants' motions to dismiss.  However, Judge Wilkins' analysis does not bind the Court, and the Court can and should decide the issue differently for the reasons set forth below.  *See Filebark, II v. United States Dep't of Transp.*, 555 F.3d 1009, 1013 (D.C. Cir. 2009) (denial of a motion to dismiss is an interlocutory order that is "not subject to the law of the case doctrine and may always be reconsidered prior to final judgment") (citation omitted); *Langevine v. District of Columbia*, 106 F.3d 1018, 1023 (D.C. Cir. 1997) (interlocutory orders are subject to modification at any time prior to final judgment "and may be modified to the same extent if the case is reassigned to another judge") (citation omitted).

section 3729(a)(1)(A) or 3729(a)(1)(B) could theoretically trigger an obligation to repay the fraudulently obtained money.

*Si v. Laogai Research Foundation*, --- F. Supp. 3d ---, No. 09-cv-2388, 2014 WL 5446487, at

*16 (D.D.C. Oct. 14, 2014).

Indeed, to allow the approach Relator suggests would turn the reverse false claim

provision on its head, and would allow plaintiffs to (1) circumvent the statute of limitations and

(2) pursue redundant and multiplicative claims based on finite false submissions to the

government.  That is precisely what Relator seeks to do in this case.

Relator concocted the reverse false claim theory in this case in an attempt to avoid the

statute of limitations.  No claims for payment under the Sponsorship Agreement were made

within six years of Relator filing his complaint.  (SOF ¶¶ 1, 20-21).  Under Relator's novel

reverse false claim theory, virtually any claim barred by the FCA statute of limitations could be

resurrected merely by asserting that the defendant was under a continuing obligation to return

fraudulently obtained funds.  Even if a false claim was submitted and paid decades earlier, the

plaintiff could claim that the failure to repay the money to the government (even before it has

been adjudicated that the claims were wrongly paid) constitutes a continuing offense.

Adopting Relator's theory would also allow a plaintiff to multiply causes of action based

on a single false claim for payment.  For example, under the FCA, if a defense contractor fails to

conduct 20 required tests on a part sold to the government, and certifies that all tests have been

performed in connection with its claim for payment, that contractor has submitted a *single* false

claim.  *See United States ex rel. Barajas v. Northrop Corp.*, 147 F.3d 905, 910 (9th Cir. 1998)

("The recovery in a qui tam case is not for each false statement or bad act done to the

government; it is for 'a false or fraudulent claim for payment or approval'").  According to

Relator's theory, if, years later, an employee of that contractor tells a friend or another customer

that his company had a fully compliant testing protocol, the employee has made a reverse false

claim because he is now causing his employer to avoid an obligation to the government -- even if

the contractor never made another claim to the government; neither the contractor nor the

employee had any contact with the government since the single claim for payment; and there had

never been an adjudication of breach of the underlying government contract.  Moreover, every

time the employee mentions his employer's robust testing protocol, he has committed another

FCA violation.  Thus, under Relator's expansive theory, the employee can make an infinite

number of reverse false claims based on the single claim for payment, no matter how remote in

time his statements are from the initial claim.  This theory must be rejected.

> 2. A Potential Right to Receive Payment In a Suit for Breach of Contract Does Not Create An "Obligation" to Pay Money to the United States Government

Relator attempts to recast this "recoupment" theory as a breach of contract claim, arguing

that the same breach of the Sponsorship Agreement that made the claims for payment false -- the

Tailwind team's breach of the anti-doping provisions -- constitutes an "obligation" that gives rise

to the reverse false claim.  However, because the contract does not require payment to the

government, the purported obligation to pay does not arise under the contract, but rather from an

alleged right to recoup previous contractual payments.

In any event, Relator's theory fails because future, contingent obligations to pay the

government under a breach of contract theory do not give rise to reverse false claim liability.  *See*

*Hoyte*, 518 F.3d at 67; *Prawer & Co. v. Verrill & Dana*, 962 F. Supp. 206, 209 (D. Me. 1997)

("*Prawer II*").  An "obligation" does not arise due to a breach of contract when "[t]here is no

allegation that any of the contracts provided for the specific remedy of disgorgement of the

[money paid], or that any judgment was entered to that effect." *State of California ex rel. Bowen v. Bank of Am. Corp.*, 126 Cal. App. 4th 225, 242, 240 n.11 (2005) (examining federal law to construe the reverse false claim provision of the California False Claims Act, which is the same as the reverse false claim provision of the federal FCA). "'[O]bligation' in the False Claims Act refers to something more than potential liability or moral or social duty; a legal obligation seems to be the touchstone." *Prawer I*, 946 F. Supp at 94 (cited with approval by *ATMI*, 190 F.3d at 735 (6th Cir.), . *Q. Intern. Courier, Inc.*, 131 F.3d at, 773 (8th Cir.), and *United States ex rel. Bahrani v. Conagra*, 465 F.3d 1189, 1195 (10th Cir. 2006) ("*Bahrani I*")). As the court explained in *Prawer I*:

> I may negligently cause damage to another in a car accident, but morality aside, I have no tort-based obligation to pay or transmit money to her until she obtains a judgment. I may breach a contract, but absent a specific remedy provided in the contract, I have no obligation to pay or transmit money to the other contracting party until he obtains a judgment. I may even violate the False Claims Act, but until the government or private relators obtain judgment, I have no obligation to pay or transmit money.

946 F. Supp. at 94.

Here, the most Relator can argue is that Tailwind breached the Sponsorship Agreement (prior to 2004), and that this breach gives the government a potential right to payment by Tailwind under some disgorgement or rescission theory. There is no provision in the Sponsorship Agreement that specifies that disgorgement is appropriate in the event of breach,[6] or that otherwise sets forth an obligation of Tailwind to pay the government. (SOF ¶¶ 17-18). Under these circumstances, Relator cannot rely on a breach of contract theory to create the necessary "obligation."

---

[6] Quite the contrary. The Sponsorship Agreement merely states that violation of the provisions relating to doping constitutes an Event of Default, allowing the Postal Service to terminate the contract, seek enforcement, or "exercise any other right or remedy available to it under law or in equity." (SOF ¶¶ 17-18).

(a)      The D.C. Circuit has flatly rejected the theory espoused by Relator in this case.

In *Hoyte v. Am. Nat'l Red Cross*, the D.C. Circuit addressed the exact claim made by Relator in this case, and held that a violation of the terms of an agreement with the government that would trigger the right of the government to seek money from the breaching party does not create an "obligation" sufficient to give rise to a reverse false claim cause of action. 518 F.3d at 66-67, 68. Indeed, the court characterized such a theory as "frivolous." *Id.* at 70.

In *Hoyte*, the plaintiff alleged that the American Red Cross ("ARC") had violated blood handling procedures set forth in a consent decree it had entered into with the government, which allowed the government to assess financial penalties against the ARC for violations. *Id.* at 63.[7] The plaintiff claimed that she was terminated in retaliation for attempting to reveal this breach. The issue before the D.C. Circuit was whether the plaintiff could articulate a reasonable belief that the ARC had committed an FCA violation by concealing its breach of the consent decree. Even under this extremely low standard, the court found that the plaintiff could not state a valid claim.

The court held that the facts alleged by Hoyte could not give rise to a reasonable belief that they constituted a reverse false claim because no obligation to pay money to the government existed: "The Consent Decree imposed no obligation on ARC to tender money or property to the Government but only to follow the prescribed blood handling and reporting requirements." *Id.* at 67. The court went on to point out that "[t]he plain language of [§ 3729(a)(7)] (whether read by a lawyer or layman) requires that there be an obligation to make payment to the Government and

---

[7] The consent decree at issue in *Hoyte* was akin to a contract with the government. *Hoyte*, 518 F.3d at 73 ("[T]he Red Cross violated a consent decree it had entered with the government, and as we have repeatedly held, 'a consent decree . . . is essentially a contract.'") (Tatel, J. concurring in part and dissenting in part).

ARC had no such obligation, 'contractual' or otherwise." *Id.* at 70.  Based on this interpretation

of section 3729(a)(7), the court concluded that the facts being investigated by the plaintiff

"could not have reasonably led to a viable claim under section 3729 of the FCA." *Id.* at 68.  The

court went even further:

> There was not even a 'distinct possibility' that her claim against ARC might become
> viable before or at trial because under any view of the facts as alleged the claim lacked
> one of the legal requirements for a reverse false claim charge: the defendant must have an
> "obligation to pay or transmit money or property to the Government," 31 U.S.C. §
> 3729(a)(7).

*Id.* at 69.  The court concluded its analysis by noting that "a frivolous action is by definition not a

viable one." *Id.* at 70.

The plaintiff and the dissenting judge argued that the plaintiff's belief as to the merits of

her claim was debatable because the reverse false claim related to the *concealment of violations*

*that would trigger an obligation to pay the government if disclosed*:

> The consent decree . . . expressly authorized the government to fine the Red Cross
> if it failed to disclose information like the blood mishandling incident that
> allegedly occurred here.  [citation].  Thus, at the time Hoyte began pressuring her
> superiors to report the mistake, the government already had the authority to fine
> the Red Cross – all it needed was to know of the Red Cross's error, precisely the
> information the Red Cross hid.

*Hoyte*, 518 F.3d at 73 (Tatel, J. dissenting in part).  The *Hoyte* majority flatly rejected this

argument.[8]

The agreement at issue in *Hoyte* imposed obligations on the ARC to act in a certain way,

not an obligation to pay money to the United States.  The court held that, even though the failure

to act in the manner required under the agreement would trigger an immediate right of the

---

[8] It is important to note that even the dissenting judge did not assert that the facts alleged
by the plaintiff would give rise to a violation of the reverse false claims provision.  *Hoyte*, 518
F.3d at 73 ("To be clear, I take no position on whether the Red Cross actually violated section
3729(a)(7); I maintain only that Hoyte could have reasonably believed that the Red Cross
violated the statute by hiding this information.").

government to demand money from the ARC, and even though the concealment of the breach prevented the government from asserting this financial claim, that concealment did not give rise to a reverse false claim.

*Here, Relator makes exactly the same argument that was rejected by the D.C. Circuit.* He claims that the Sponsorship Agreement prohibited doping, and that all the Postal Service needed [to seek money from Tailwind] was to know of this contractual breach.  He contends that the concealment of this breach therefore constitutes a reverse false claim.  Under *Hoyte*, this argument must fail.

> (b)     The facts in this case are even less compelling than those at issue in *Hoyte*.

As noted, the issue in *Hoyte* was whether the plaintiff could demonstrate a reasonable belief that she was investigating a valid claim – she did not have to establish the claim itself. Even under this low standard, the D.C. Circuit rejected the claim as "frivolous."

Moreover, unlike in *Hoyte* where failure to comply with the required blood handling procedures subjected the ARC to an immediate fine, the agreement here did not provide for immediate recovery of funds from Tailwind in the event of doping.  Rather, the Sponsorship Agreement provided that the team's failure to comply with the rules of various cycling organizations would constitute an "event of default" that would entitle (but not require) the Postal Service to terminate the contract.  (SOF ¶ 17).  In fact, during the term of the Sponsorship Agreement, when the Postal Service concluded that the occurrence of negative publicity regarding possible doping on the Tailwind team created an "Event of Default," the Postal Service declined to terminate the contract or seek a refund of all money paid.  (SOF ¶ 19).  Instead, the Postal Service demanded that Tailwind pay $50,000 for public relations services to "remedy the

situation." (*Id.*)  This reaction to an Event of Default related to PED use makes clear that any financial obligation created by an alleged breach of the Sponsorship Agreement was even more contingent than the "obligation" rejected in *Hoyte.*

The uncertainty of any monetary obligation by Tailwind is further compounded by the fact that the Sponsorship Agreement had already been terminated at the time of the alleged false statements, (SOF ¶ 14), raising the question of the Postal Service's rights after an "Event of Default."  To the extent the government contends that it maintained a right to sue for damages, the outcome of such a suit and the determination of the damages (*i.e.*, the "obligation") were very much in doubt at the time of the alleged false statements (and today).  Thus, the breach of contract in this case is even further removed from a fixed monetary obligation than the breach of the pending consent decree in *Hoyte*.

        (c)        No case, within or outside the D.C. Circuit, supports the novel theory urged by Relator.

The D.C. Circuit's holding in *Hoyte* is fatal to Relator's reverse false claim theory.  Nor can Relator point to any out-of-circuit authority that validates his dubious theory.  In denying defendants' motion to dismiss, Judge Wilkins relied on three out-of-circuit cases for the proposition that "a breach of a government contract and the attendant obligation to repay the government" may constitute an "obligation" for purposes of the reverse false claims act.  (Mem. Opinion (Doc. No. 174) at 63-64 (citing *Bahrani I*, 465 F.3d at 1204; *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1237 (11th Cir. 1999); and *ATMI*, 190 F.3d at 741).  None of these cases held that a breach of contract giving rise to a potential claim for repayment constitutes an "obligation" to pay money to the government under section 3729(a)(7).

In *Bahrani I*, the defendant was in the business of exporting animal products.  The relator alleged that when the defendant's employees noticed errors and omissions in export certificates that had been issued by the United States Department of Agriculture ("USDA"), they would alter the original certificates to avoid the fees that the company would have been required to pay for replacement certificates.  465 F.3d at 1194.  The Tenth Circuit held that, under certain circumstances, USDA regulations required exporters to obtain new certificates, and the alleged failure to do so could constitute avoiding an "obligation" under section 3729(a)(7).  *Id.* at 1200.

In *Pemco*, a contract between the government and an aircraft maintenance company required the company to advise the government when it was holding property in excess of the requirements of the contract and to make appropriate arrangements to dispose of it – for example by agreeing to purchase the property or to return it to the government.  195 F.3d at 1235.  The defendant falsely stated the model numbers of the parts (stating they were obsolete parts) to reduce the purchase price.  *Id.* at 1235-36.  The Eleventh Circuit held that "the [defendant] had a contractual obligation to account for the full value of any excess government property." *Id.* at 1237.  Because its statement reduced the amount of money the defendant owed to the government for the parts under the contract, the conduct constituted a reverse false claim.  *Id.* at 1237-38.

The third case relied upon, *ATMI*, is not a contract case at all.  In that case, the court held that the failure to report statutory and regulatory violations which could trigger a fine to be paid to the government did *not* create an action under the reverse false claims provision.  *ATMI*, 190 F.3d at 741.  *ATMI* is not applicable to the present facts, and the holding in the case contradicts Relator's position here.

19

None of these cases held that the novel theory relied upon by Relator (and rejected by the D.C. Circuit) may support a section 3729(a)(7) claim.  Nor is there any other case that so holds.

> 3.      Even if an "Obligation" Exists, the Obligation is Tailwind's and the CSE Defendants Cannot Be Liable for It

Relator's reverse false claim theory fails for the additional reason that, even assuming he could establish that *Tailwind* had some fixed contractual obligation to pay money to the United States, this obligation would not create liability on the part of *the CSE Defendants* for a reverse false claim.  In his Memorandum Opinion, Judge Wilkins recognized that liability may not exist for defendants without a sufficient connection to the obligation.  (Mem. Opinion (Doc. No. 174) at 71 ("reasonable questions may remain, such as what if any relevance should be placed on the relationship of the putative defendant to the obligation or the obligor.")).  As to the CSE Defendants, liability is not appropriate.  The CSE Defendants were not parties to the Sponsorship Agreement, and their conduct is not alleged to have been a breach of the contract.  (SOF ¶ 15).  Thus, even assuming a breach of the Sponsorship Agreement, the CSE Defendants would not have any contractual obligation to repay funds paid to Tailwind by the Postal Service.

Relator and the government have argued that *whenever* a defendant makes a false statement to avoid an obligation to pay the Government, it is actionable under section 3729(a)(7), "even if the obligation is not his."  (Gov't Opp'n to Armstrong Mot. to Dismiss (Doc. No. 114) at 7 & 26).  As acknowledged by Judge Wilkins in his Memorandum Opinion, caselaw and the legislative history of section 3729(a)(7) support the contention that the plaintiff must demonstrate that *the defendant* owed a specific, legal obligation to pay the government money or property at the time the alleged false statement was made.  (Mem. Opinion (Doc. No. 174) at 69-70 (quoting *ATMI*, 190 F.3d at 736 ("[W]e hold that a reverse false claim action cannot proceed

without proof that the defendant made a false record or statement *at a time that the defendant owed* to the government an obligation sufficiently certain to give rise to an action of debt at common law.") (emphasis added by the Court); S. Rep. No. 345, 99th Cong., 2nd Sess. 18 (1986) ("The question of whether the False Claims Act covers situations where, by means of false financial statements or accounting reports, a person attempts to defeat or reduce the amount of a claim or potential claim by the United States *against him*, has been the subject of differing judicial interpretations.") (emphasis added by the Court); and S. Rep. No. 10, 111th Cong., 1st Sess. 13-14 (2009) ("This provision is commonly referred to as creating "reverse" false claims liability because it is designed to cover Government money or property that is knowingly *retained by a person even though they have no right to it*.") (emphasis added by the Court))).

    Relator and the government attempt to counter this authority by relying on the Sixth Circuit's holding in *United States v. Caremark, Inc*., 634 F.3d 808 (5th Cir. 2011), that a defendant may be liable for a reverse false claim even if he is not in privity with the government. (Gov't Opp'n to Armstrong Mot. to Dismiss (Doc. No. 114) at 26-28). *Caremark* does not support the expansive view of section 3729(a)(7) promoted by Relator and the government.

            (a)    *Caremark* is one of a handful of cases that have endorsed an "indirect reverse false claim" theory.

    *Caremark* does <u>not</u> stand for the proposition that any false statement to avoid any obligation to the government is actionable, regardless of who owes that obligation to the government. Rather, *Caremark* and a handful of cases have adopted a limited exception to the ordinary rule that the person making the false statement must himself owe the obligation that he seeks to avoid. This "indirect reverse false claim" theory applies where a person makes a false statement to a third party that causes the third party to impair or avoid its obligation to the

government. *Caremark*, 634 F.3d at 815.  The few courts that have adopted this approach have made clear that the exception requires a "unique relationship" between the third party and the government, such that *deceiving the third party* will necessarily cause that third party to underpay or fail to pay the government money that is owed.

Specifically, in *Caremark*, the defendant was a pharmacy benefits management company that made false statements to avoid making required payments to state Medicaid agencies. *Id.* at 811, 812.  The state agencies were legally required to return federal funds if they recovered from third parties. *Id.* at 817.  Thus, by depriving the state agencies of funds, Caremark was depriving the federal government of funds that would have been paid by the state agencies. *Id.*  The Sixth Circuit found that the defendant's false statements to the state agencies, if proven, caused the agencies to impair their obligations to the federal government. *Id.*

The Sixth Circuit relied on two district court cases that allowed for liability for "indirect reverse false claims" under section 3729(a)(7). *Id.* at 816 (discussing *United States ex rel. Hunt v. Merck-Medco Managed Care, LLC*, 336 F. Supp. 2d 430, 444-45 (E.D. Pa. 2004); and *United States ex rel. Koch v. Koch Indus., Inc.*, 57 F. Supp. 2d 1122, 1124 (N.D. Okla. 1999)).[9]  Neither of these cases supports the expansive reading of *Caremark* urged by Relator here.

In *Hunt*, the defendant also managed prescription drug benefits for health plans, including Blue Cross/Blue Shield ("BC/BS"), which contracted with the federal government to provide health care to federal employees.  336 F. Supp. 2d at 434.  The contract between the defendant and BC/BS explicitly disclosed that the government and its employees were the ultimate beneficiaries of the contract. *Id.* at 444.  The defendant provided numerous false bills to BC/BS.

---

[9] The *Caremark* court also discussed *Smith v. United States*, 287 F.2d 299 (5th Cir. 1961), but properly noted that *Smith* was decided before the passage of section 3729(a)(7), and interpreted a prior version of the FCA.  634 F.2d at 816.

Although the loss to the federal government was unclear, the court found that the government suffers a loss when money appropriated for employee health care is wasted. *Id.* at 443, 445-46. The court also found that any contractual penalties owed by the defendant to BC/BS were required to be turned over to the government. *Id.* at 444. Therefore, monies owed by the defendant to BC/BS were essentially monies owed to the government. *Id.* at 444, 446. Based on this "unique relationship" between the defendant and the government, the court held that the defendant's fraud "had the predictable consequence of depriving the Government of money it was owed," and was therefore "within the ambit of § 3729(a)(7)." *Id.* at 444.

In *Koch*, the defendant submitted false accounting documents to a third party who had mineral leases with the federal government. The court held that the defendant's falsified measurements *caused* the lessee to understate its royalty obligations to the government, which brought the conduct within section 3729(a)(7). 57 F.Supp.2d at 1128-29.[10]

The Sixth Circuit found these cases "instructive because they allow FCA liability for knowingly making a false statement *that will cause a third party to impair its obligation to the federal government.*" 634 F.3d at 817 (emphasis added). The critical factor in each of the cases (and *Caremark*) is that the defendant lied to an entity in privity with the government, which had the "inevitable" consequence of causing the third party to unwittingly fail to pay monies that were owed to the government.

None of these cases supports the application of the "indirect reverse false claim" exception in the present case. Relator's theory is that Tailwind was wrongfully paid under the

---

[10] The third case referenced by the *Caremark* court is similarly unhelpful to Relator. In *Smith*, the defendant made false statements to the Beaumont Housing Authority ("BHA") to avoid financial obligations to the BHA. 287 F.2d at 300. This reduced the rent the government would receive from the BHA. *Id.* The court accepted an indirect reverse false claim theory because the expenses avoided by the defendant were ultimately borne by the United States Treasury. *Id.* at 304.

Sponsorship Agreement, and that Tailwind was aware of Armstrong's doping during the pendency of the Sponsorship Agreement.  (SAC (Doc. No. 42) at ¶¶ 130, 199, 207).  None of the CSE Defendants is alleged to have misled Tailwind, and no false statement alleged by Relator could be said to have *caused* Tailwind to avoid paying any money to the United States.  Nor is there any "unique relationship" between Tailwind and the government, such that the alleged statements would have "inevitably" or "predictably" or "certainly" caused Tailwind not to pay money that was owed.  Thus, Relator cannot rely on an "indirect reverse false claim" theory.

        4.      Relator's Claim Fails Because He Has Not Identified Any Actionable False Statements By Any of the CSE Defendants

Even assuming the reverse false claim statute could apply to these facts and that Relator had established an "obligation" under section 3729(a)(7), Relator must prove that the CSE Defendants knowingly made false statements about doping on the Tailwind team.  Given the six-year statute of limitations, Relator must prove that the CSE Defendants made actionable false statements after June 10, 2004.  He cannot do so.

        (a)      Relator has not identified a single false statement made by Mr. Knaggs.

Relator has not alleged or identified a single statement by Mr. Knaggs related to drug use or the Tailwind cycling team *made at any time to anyone*.  (SOF ¶ 28).  The closest Relator comes on this issue is his claim that "Bill Stapleton, Bart Knaggs, Lance Armstrong and Johan Bruyneel" denied doping at a press conference in August 2007, announcing Tailwind's decision not to continue with a cycling team for the 2008 season.  (*Id.* ¶ 29).  Mr. Knaggs participated in this press conference by cellular telephone and did not make any statements, much less

statements denying doping by the Tailwind team during the term of the Sponsorship Agreement. (*Id.*)  Accordingly, Count Four must be dismissed as to Mr. Knaggs.

> (b)     Relator has not identified a single, actionable false statement by Mr. Stapleton or CSE that was heard or relied upon by the government.

With respect to Stapleton and CSE, Relator has alluded to a handful of sporadic, generic statements made after June 10, 2004, in which Stapleton and CSE denied any knowledge of doping by Armstrong.  (*Id.* ¶ 30).  Even if Relator could prove that these statements were knowingly false, his reverse false claim theory would fail because none of the statements constitute a "claim" under the FCA.

Several courts have held that, in order for the statements to constitute a "claim," the government must at least be made aware of the statement or omission.  *See, e.g.*, *Wilkins ex rel. U.S. v. State of Ohio*, 885 F. Supp. 1055, 1063-65 (S.D. Ohio 1995) ("the government has to be made aware of the false statement, misrepresentation or misleading omission in some fashion, *i.e.*, there has to be a 'claim'"); *U.S. ex rel. Atkinson v. Pennsylvania Shipbuilding Co.*, CIV. A. 94-7316, 2000 WL 1207162, at * 22 (E.D. Pa. Aug. 24, 2000) *aff'd on other grounds sub nom. U.S. ex rel. Atkinson v. PA. Shipbuilding Co.*, 473 F.3d 506 (3d Cir. 2007).  Here, Relator does not allege that CSE or Stapleton made any statement to the United States government after June 10, 2004.  (SOF ¶ 31).  Nor that any representative of the United States government was made aware of any alleged false statement by any of the CSE Defendants.

> 5.     Relator Cannot Establish that CSE, Stapleton, or Knaggs Made Any Statement With the Intention of Avoiding An Obligation to Pay Money to the United States

Assuming Relator could establish a viable "obligation" to pay the United States, and an actionable false statement about doping by the Tailwind cycling team after June 10, 2004, he must also show that the CSE Defendants knowingly made such false statements *for the purpose of* avoiding that obligation. *United States ex. rel. Bahrani v. Conagra, Inc.*, 624 F.3d 1275, 1303 (10th Cir. 2010) ("*Bahrani II*") ("In the case of subsection (a)(7), this means that a plaintiff attempting to prove liability thereunder must establish that the defendant 'made a false record or statement for the purpose of' concealing, avoiding, or decreasing an obligation to pay or transmit money or property to the Government.") (citing *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 671 (2008)); *see also Caremark*, 634 F. 3d at 815 (defendant must make a statement "knowing that its statement would 'conceal, avoid, or decrease' an obligation to the government"); *Si*, --- F. Supp. 3d ---, 2014 WL 5446487, at *14 (the reverse false claim provision "prohibits the making of false claims or statements for the purpose of avoiding an 'obligation' to pay the government").  There is no evidence to support this point.

Neither Mr. Stapleton nor Mr. Knaggs made any statement for the purpose of avoiding an obligation to the United States.  (SOF ¶¶ 32-38).  No evidence disputes this.

As noted above, Relator has not identified any statements by Mr. Knaggs about PED use at any time, including after June 2004.  (*Id.* ¶ 28).  With respect to Mr. Stapleton and CSE, many of the statements relied upon by Relator to support his claim were made in non-public communications and confidential arbitration proceedings.  (*Id.* ¶ 29).  Certainly, these statements were not made for the purpose of avoiding an obligation to pay the United States.  Moreover, there is no evidence that the handful of generic statements by Mr. Stapleton or CSE made years after the Sponsorship Agreement ended were made to avoid any obligation to pay money to the United States.  (*Id.* ¶¶ 14, 32-38).

VI.    <u>**CONCLUSION**</u>

Relator has dragged the CSE Defendants into and through this case without any basis.

His groundless direct false claim case was gutted by the statute of limitations at the pleading

stage.  The limited portions of that claim that survived due to a purported "factual issue," are

now easily disposed of with the introduction of a few simple undisputed facts.  Relator's effort to

circumvent the statute of limitations by recasting his failed direct false claim case as a reverse

false claim case also fails.  For the foregoing reasons, the CSE Defendants respectfully request

the Court grant their motion for summary judgment.


Dated this 22nd day of April 2015                    /s/  Marc S. Harris
                                                     Marc S. Harris (*admitted pro hac vice*)
                                                     SCHEPER KIM & HARRIS LLP
                                                     601 West Fifth Street, 12th Floor
                                                     Los Angeles, CA 90071-2025
                                                     (213) 613-4655 – Telephone
                                                     (213) 613-4546 – Facsimile
                                                     mharris@scheperkim.com

                                                     Attorneys for Defendants Capital Sports &
                                                     Entertainment Holdings, Inc., William J.
                                                     Stapleton and Bart B. Knaggs

                                                     /s/  John P. Pierce
                                                     John P. Pierce (D.C. Bar No. 475101)
                                                     THEMIS PLLC
                                                     2305 Calvert Street, NW
                                                     Washington, DC 20008
                                                     (202) 567-2050 – Telephone
                                                     (202) 567-2051 – Facsimile
                                                     jpierce@themis.us.com

                                                     Attorneys for Defendants Capital Sports &
                                                     Entertainment Holdings, Inc., William J.
                                                     Stapleton and Bart B. Knaggs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *ex rel.* FLOYD
LANDIS,

               *Plaintiffs*,

    v.

TAILWIND SPORTS CORPORATION,
TAILWIND SPORTS, LLC; MONTGOMERY
SPORTS, INC.; CAPITAL SPORTS &
ENTERTAINMENT HOLDINGS, INC.;
THOMAS W. WEISEL; LANCE ARMSTRONG;
JOHAN BRUYNEEL; WILLIAM J.
STAPLETON; BARTON B. KNAGGS; ROSS
INVESTMENTS, INC., AND DOES 2-50,

               *Defendants.*

Civil No. 1:10-cv-00976-CRC

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS
CAPITAL SPORTS & ENTERTAINMENT HOLDINGS, INC., WILLIAM J.
STAPLETON, AND BARTON B. KNAGGS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 7(h)(1), Defendants Capital Sports & Entertainment Holdings, Inc. ("CSE"), William J. Stapleton, and Barton B. Knaggs (collectively, the "CSE Defendants") submit this statement of undisputed material facts in support of their motion for summary judgment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.     Procedural Background

1.     Relator Floyd Landis filed his initial complaint in this *qui tam* action under seal on June 10, 2010.  (Mem. Opinion (Doc. No. 174) at 26).

2.     The United States intervened against certain defendants, but declined to intervene against the CSE Defendants, and the action was unsealed.  (United States' Notice of Election to Intervene in Part (Doc. No. 41) at 1).

3.     On July 23, 2013, the CSE Defendants moved to dismiss Relator's Second Amended Complaint ("SAC").  (CSE Defs.' Mot. to Dismiss Relator's SAC (Doc. No. 94)).

4.     On June 19, 2014, the Court granted in part and denied in part the CSE Defendants' motion to dismiss.  The Court held that a six-year statute of limitations applied to Relator's direct, false claims counts (Counts 1, 2, and 3); therefore, Relator could only recover for false claims submitted to the Government on or after June 10, 2004.  (Mem. Opinion (Doc. No. 174) at 30).

5.     The Court dismissed Counts 1, 2, and 3 with prejudice as to the CSE Defendants to the extent they were premised on claims submitted before June 10, 2004.  (*Id.*)  Relator's

Counts 5, 6, 7, and 8 (the post-FERA counts) were dismissed as to all Defendants.  (*Id.* at 44 ("The Court therefore dismisses the relator's Counts 5, 6, 7, and 8, without prejudice")).[1]

### B.      The CSE Defendants

6.      The CSE Defendants were the agents and business managers for Lance Armstrong, another rider on the Tailwind cycling team.  (Declaration of Barton B. Knaggs in Support of the CSE Defs.' Mot. for Summ. Judgment ("Knaggs Decl.") at ¶ 3; Declaration of William J. Stapleton In Support of the CSE Defs.' Mot. for Summ. Judgment ("Stapleton Decl.") at ¶ 3).

7.      Mr. Stapleton acted as Mr. Armstrong's agent beginning in 1995.  (Stapleton Decl. at ¶ 3).

8.      CSE acted as Mr. Armstrong's agent beginning in approximately 2001.  (Knaggs Decl. at ¶ 3).

9.      Mr. Knaggs acted as Mr. Armstrong's business manager beginning in approximately 2004.  (*Id.*)

10.     Mr. Stapleton and Mr. Knaggs are principals of CSE.  (Stapleton Decl. at ¶ 1; Knaggs Decl. at ¶ 1).

11.     In 2003, CSE was hired by Tailwind Sports Corporation to provide sales and marketing services and to interact with sponsors of the cycling team.  (Declaration of Laura Hundley Ritts In Support of the CSE Defs.' Mot. for Summ. Judgment ("Ritts Decl.") at ¶ 2).

---

[1] The Memorandum Opinion later indicates that Count 6 was not dismissed as to the CSE Defendants.  (Mem. Opinion (Doc. No. 174) at 81).

### C.        Relevant Provisions of the Sponsorship Agreement

12.        On January 1, 2001, the United States Postal Service ("USPS" or "Postal Service") entered into a sponsorship agreement with the predecessor of Tailwind Sports Corporation (collectively with its predecessor entities, "Tailwind") for sponsorship of a professional cycling team (the "Sponsorship Agreement").  (Ritts Decl. at ¶ 3, Ex. A).

13.        The Sponsorship Agreement was a continuation of a sponsorship arrangement that began in 1995, and provided for periodic payments to be made to Tailwind by the USPS, in return for the display of USPS logos on the Tailwind team's uniforms and other related promotional opportunities.  (Ritts Decl. at Ex. A at ¶¶ 2, 9, Ex. A; SAC (Doc. No. 42) at ¶¶ 24, 29).

14.        The Sponsorship Agreement ended on or around June 2004.  (SAC (Doc. No. 42) at ¶ 32).

15.        The CSE Defendants were not parties to the Sponsorship Agreement, and their conduct is not alleged to have been a breach of the contract.  (Ritts Decl. at Ex. A at p. 1 ("This sponsorship agreement is entered into effective 1 January 2001, between DFP Cycling LLC, a Delaware Limited Liability Company (the "Company"), and the United States Postal Service (the Sponsor)."); SAC (Doc. No. 42), *generally*).

16.        The Sponsorship Agreement did not include any express certification that the riders on the Tailwind team were not using performance enhancing drugs ("PEDs").  (Ritts Decl. at Ex. A).  The Sponsorship Agreement stated that the team should comply with all rules of cycling, and required the team to "take immediate action" in the event of a positive drug test or known violation of any rider's team contract.  (*Id.* at ¶ 8(a)(iv), ¶ 12).

17.     The Sponsorship Agreement stated that the failure to take such action would

constitute an "Event of Default" under the Sponsorship Agreement, and would provide the Postal

Service with the following remedies:

> Upon the occurrence of an Event of Default, and at time [sic] thereafter so long as
> the same shall be continuing, the nondefaulting party may declare, at its option,
> this Agreement to be in default and; (1) may immediately terminate this
> Agreement without any liability whatsoever:  by providing written notification to
> the defaulting party[;] (2) may seek enforcement by appropriate court action of
> the terms hereof; (3) may exercise any other right or remedy available to it under
> law or in equity; or (4) may seek any permitted combination of such remedies.

(*Id.* at ¶ 8(c)).

18.     The Sponsorship Agreement states that violation of the provisions relating to

doping constitutes an Event of Default, allowing the Postal Service to terminate the contract,

seek enforcement, or "exercise any other right or remedy available to it under law or in equity."

(*Id.* at ¶ 8(c)).  There is no provision in the Sponsorship Agreement that specifies that

disgorgement is appropriate in the event of breach, or that otherwise sets forth an obligation of

Tailwind to pay the government.  (Ritts Decl. at Ex. A).

### D.     The Postal Service's Reaction to an "Event of Default"

19.     During the term of the Sponsorship Agreement, when the Postal Service

concluded that the occurrence of negative publicity regarding possible doping on the Tailwind

team created an "Event of Default," the Postal Service declined to terminate the contract or seek

a refund of all money paid.  (Declaration of Margaret E. Dayton In Support of the CSE Defs.'

Mot. for Summ. Judgment ("Dayton Decl.") at ¶ 6, Ex. K).  Instead, the Postal Service demanded

that Tailwind pay $50,000 for public relations services to "remedy the situation." (*Id.*)

**E.      USPS Payments to Tailwind**

20.      The Postal Service made 39 payments to Tailwind between January 10, 2001 and

May 14, 2004.  (SAC (Doc. No. 42) at ¶¶ 29, 33-34, Ex. 1).

21.      The final payment made in connection with the Sponsorship Agreement was

made on May 14, 2004.  (Ritts Decl. at ¶¶ 4-5, Exs. B-C; SAC (Doc. No. 42) at Ex. 1).  There

were no payments under the Sponsorship Agreement after May 14, 2004.  (Ritts Decl. at ¶¶ 4-10,

Exs. B-G; SAC (Doc. No. 42) at Ex. 1).

22.      The Postal Service made four payments to Tailwind (totaling $68,170.45) after

June 10, 2004.  These four payments, paid on August 11, 2004, October 4, 2004, and October 20,

2004, were for reimbursement for certain Postal Service hospitality-related expenses that had

been advanced by Tailwind.  (*Id.*)

23.      The payment made August 11, 2004 was for hospitality-related services at the

Downers Grove and New York City cycling races and for media guides previously made and

delivered to the Postal Service.  (Ritts Decl. at ¶ 7, Ex. D; SAC (Doc. No. 42) at Ex. 1).

24.      One of the payments made on October 4, 2004 was for a financial contribution the

Postal Service made for a party in Austin, Texas.  (Ritts Decl. at ¶ 8, Ex. E; SAC (Doc. No. 42)

at Ex. 1).

25.      The second payment made on October 4, 2004 was for a deposit for hospitality-

related services in connection with the San Francisco Grand Prix cycling race.  (Ritts Decl. at ¶

9, Ex. F; SAC (Doc. No. 42) at Ex. 1).

26.      The payment made on October 20, 2004 was for hospitality-related services in

connection with the San Francisco Grand Prix cycling race and the balance due on hospitality-

related services for the Downers Grove cycling race.  (Ritts Decl. at ¶ 10, Ex. G; SAC (Doc. No.

42) at Ex. 1).

27.     The invoices for reimbursement did not certify, explicitly or impliedly, that the

Tailwind cycling team was in compliance with the rules of cycling or the terms of the

Sponsorship Agreement.  (Ritts Decl. at Exs. D-G).  They were not for sponsorship fees and had

nothing to do with the Sponsorship Agreement.  (*Id.* at ¶¶ 6-10, Exs. D-G).

**F.     The CSE Defendants' Statements Concerning Doping by the Tailwind Team**

28.     In discovery, Relator has not identified a single statement made by Mr. Knaggs

related to PED use or the Tailwind cycling team.  (Dayton Decl. at ¶ 4, Ex. H at p. 9-13).

29.     In discovery responses, Relator identified "statements made in a conference call

between reporters and Bill Stapleton, Bart Knaggs, Lance Armstrong and Johan Bruyneel" that

denied doping at a press conference in August 2007, announcing Tailwind's decision not to

continue with a cycling team for the 2008 season.  (*Id.* at ¶5, Ex H at p. 11, Exs. I-J).  Mr.

Knaggs participated in this press conference by cellular telephone and did not make any

statements, much less statements denying doping by the Tailwind team during the term of the

Sponsorship Agreement.  (Knaggs Decl. at ¶ 8; Dayton Decl. at Exs. I-J (not attributing any

statements to Mr. Knaggs)).

30.     In discovery responses, Relator has alluded to sporadic, generic statements in

which Mr. Stapleton or CSE denied knowledge of doping by Mr. Armstrong, and referenced

certain news articles (several of which do not appear to contain any statements attributed to Mr.

Stapleton or CSE), private correspondence, and statements in a confidential arbitration which

refer to Mr. Armstrong's denials of doping and the Tailwind team's clean drug testing history.

(Dayton Decl. at ¶ 4, Ex. H at p. 9-13).

31.     Relator did not identify in discovery any statements made by Mr. Stapleton or CSE to the United States government after June 10, 2004.  (*Id.*)

32.     None of the statements referenced by Relator were made for the purpose of avoiding an obligation to the United States.  (Stapleton Decl. at ¶ 3-7; Knaggs Decl. at ¶ 3-7).

33.     Neither Mr. Stapleton, Mr. Knaggs, nor CSE had any obligation to pay money to the Postal Service (or any other branch of the government) in connection with the Sponsorship Agreement.  (Stapleton Decl. at ¶ 6; Knaggs Decl. at ¶ 6).

34.     Nor were Mr. Stapleton or Mr. Knaggs involved in the negotiation, drafting, or execution of the Sponsorship Agreement.  (Stapleton Decl. at ¶ 3; Knaggs Decl. at ¶ 3).

35.     Nor were Mr. Stapleton or Mr. Knaggs aware at any time of any obligation owed by Tailwind (or any other person or entity) to return money to the Postal Service that was paid under the Sponsorship Agreement.  (Stapleton Decl. at ¶¶ 3-4; Knaggs Decl. at ¶¶ 3-4).

36.     Certainly, once the Sponsorship Agreement had ended in June 2004, neither Mr. Stapleton nor Mr. Knaggs were aware of any basis upon which the Postal Service could recoup or clawback funds that had been paid under the Sponsorship Agreement.  (Stapleton Decl. at ¶ 5; Knaggs Decl. at ¶ 5).

37.     From their perspective, the Sponsorship Agreement was an extraordinary success for the Postal Service.  (Stapleton Decl. at ¶ 7; Knaggs Decl. at ¶ 7).  Indeed, they were aware of studies commissioned by the Postal Service that estimated that the economic benefit to the Postal Service far exceeded the amount paid in sponsorship fees.  (*Id.*)

38.     Accordingly, they had no basis to conclude that money was owed to the government in 2005, 2006 or any later date.  (Stapleton Decl. ¶ 5; Knaggs Decl. ¶ 5).

Dated this 22nd day of April 2015

/s/ Marc S. Harris
Marc S. Harris (admitted pro hac vice)
SCHEPER KIM & HARRIS LLP
601 West Fifth Street, 12th Floor
Los Angeles, CA 90071-2025
(213) 613-4655 – Telephone
(213) 613-4546 – Facsimile
mharris@scheperkim.com

Attorneys for Defendants Capital Sports &
Entertainment Holdings, Inc., William J.
Stapleton and Bart B. Knaggs

/s/ John P. Pierce
John P. Pierce (D.C. Bar No. 475101)
THEMIS PLLC
2305 Calvert Street, NW
Washington, DC 20008
(202) 567-2050 – Telephone
(202) 567-2051 – Facsimile
jpierce@themis.us.com

Attorneys for Defendants Capital Sports &
Entertainment Holdings, Inc., William J.
Stapleton and Bart B. Knaggs