**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES *ex rel.* FLOYD LANDIS, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 10-cv-00976 (CRC) |
| v. | ) ) | |
| TAILWIND SPORTS CORPORATION, *et al.*, | ) ) ) | **ECF** |
| Defendants. | ) ) ) | |
| _____ | ) | |

**UNITED STATES' STATEMENT OF INTEREST IN RESPONSE TO DEFENDANTS
CAPITAL SPORTS & ENTERTAINMENT HOLDINGS, INC., WILLIAM J.
STAPLETON, AND BARTON B. KNAGGS' MOTION FOR SUMMARY
JUDGMENT**

The United States submits this statement of interest[1] in response to defendants Capital

Sports & Entertainment Holdings, Inc., William J. Stapleton, and Barton B. Knaggs' (the

"CSE Defendants'") motion for summary judgment to make the following points:

> (1) the alleged breach of the sponsorship agreements due to riders' doping imposes an obligation to reimburse the government for money paid under the agreements under the reverse false claims provision of the False Claims Act, 31 U.S.C. § 3729(a)(7), *see* Dkt. No. 311 ("CSE Defendants' Br."), at 13-20;

> (2) the CSE Defendants may be liable under the reverse false claims provision even though the obligation "to pay or transmit money or

---

[1]The United States should be allowed to file this statement of interest because (1) even though it has not intervened on Relator's allegations against the CSE Defendants, the United States remains the real party in interest, and the Relator remains a "partial assignee" – not a full assignee – of the United States' FCA claims, *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 773-74 & note 4 (2000);  *Swift v. United States*, 318 F.3d 250, 254 n.* (D.C. Cir. 2003), and (2) issues raised by the CSE Defendants overlap with issues involved in the intervened allegations.

property to the Government" belonged to Tailwind, *see* Dkt. No. 311, at 20-24;

(3) the reverse false claims provision does not require presentment of the false statement to the United States, *see* Dkt. No. 311, at 25;

(4) false statements under the reverse false claims provision are material if they are capable of influencing government decisionmaking, *see* Dkt. No. 311, at 25; and

(5) false statements may be the basis for both direct and reverse false claims violations, *see* Dkt. No. 311, at 10-13.

The United States otherwise takes no position on the CSE Defendants' motion for summary judgment.

## I.     The "Reverse" False Claims Provision

The False Claims Act (FCA) prohibits so-called "reverse" false claims in which a party attempts to conceal an obligation to pay money to the government. The reverse false claims provision was first added by Congress in 1986, and provided that:

> [a]ny person who * * * knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government is liable to the United States.

31 U.S.C. § 3729(a)(7). The Senate Report accompanying the 1986 amendments to the FCA stressed that reverse false claims liability extends to "potential claims" by the government for money owed. *See* S. Rep. No. 99-345, 99th Cong., 2d Sess. 18 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5283.

Congress intended the reverse false claim provision to be equal, but opposite in scope, to the FCA's affirmative false claims and statements provisions. *See Hoyte v. Am. Nat'l Red Cross*, 439 F. Supp. 2d 38, 43 (D.D.C. 2006), *aff'd*, 518 F.3d 61 (D.C. Cir. 2008); *United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1194 (10th Cir. 2006) ("an individual who

makes a material misrepresentation to avoid paying money owed to the Government would be equally liable under the Act as if he had submitted a false claim to receive money.") (quoting S. Rep. No. 99-345 at 18, reprinted in 1986 U.S.C.C.A.N. 5266, 5283).

Before 2009, courts of appeals had adopted different approaches in construing the scope of an actionable "obligation." The Ninth, Tenth, and Eleventh Circuits held that an obligation need not be for a fixed and certain amount to be actionable under the FCA. *See United States v. Bourseau*, 531 F.3d 1159, 1170 (9th Cir. 2008); *United States ex rel. Bahrani* v. *Conagra, Inc.*, 465 F.3d 1189, 1201-02(10th Cir. 2006); *United States* v. *Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1237 (11th Cir. 1999) (en banc). The Sixth and Eighth Circuits more narrowly interpreted the term and held that an obligation must be "sufficiently certain to give rise to an action of debt at common law." *See American Textile Manufacturers Inst.* v. *The Limited, Inc. ("ATMI")*, 190 F.3d 729, 736 (6th Cir. 1999); *United States* v. *Q. International Courier, Inc.*, 131 F.3d 770, 773 (8th Cir. 1997).

In 2009, Congress amended the FCA in part to clarify the "confusion among the courts" with respect to the term "obligation." *See* Fraud Enforcement and Recovery Act of 2009, P.L. 111-21, § 4, 123 Stat. 1625 (2009) ("FERA"); S. Rep. No. 111-10, 111th Cong., 1st Sess. at 14 (2009).[2] The 2009 amendments defined an "obligation" to mean:

> an established duty, whether or not fixed, arising from an express or implied
> contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based

---

[2] FERA revised the reverse false claims provision to provide that "[a]ny person who *** knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government . . . ." 31 U.S.C. § 3729(a)(1)(G) (2009). While FERA's changes to this provision are not retroactive, they are applicable to post-FERA conduct.

or similar relationship, from statute or regulation, or from the retention of any
overpayment;

P.L. 111-21, §4(a)(2), 123 Stat. 1625 (2009), codified at 31 U.S.C. 3729(b)(3).  The Senate

Committee explained that "this new section reflects the Committee's view, held since the

passage of the 1986 Amendments, that an "obligation" arises across the spectrum of

possibilities from the fixed amount debt obligation where all particulars are defined to the

instance where there is a relationship between the Government and a person that "results in a

duty to pay the Government money, whether or not the amount owed is yet fixed."  S. Rep.

No. 111-10, at 14 (2009).

## II.  The Alleged Breach Of The Sponsorship Agreements Due To Riders' Doping Imposes An Obligation To Reimburse The Government For Money Paid Under The Agreements Under 31 U.S.C. § 3729(a)(7)

### A. Judge Wilkins Correctly Decided This Issue

The CSE Defendants erroneously contend that the alleged breach of the sponsorship

agreements does not impose an obligation to repay the government under the reverse false

claims provision.  *See* Dkt. No. 311, at 13-20.  Early in this case, defendant Lance Armstrong

made the same argument, which Judge Wilkins rejected.  *See* Dkt. No. 174 (Memorandum

Opinion), at 62-71.  Judge Wilkins correctly concluded that the alleged breach of the

sponsorship agreements due to riders' doping imposes an "obligation" to repay the

government for money previously paid under the agreements.  *Id.*  Judge Wilkins' conclusion

and reasoning apply equally to the CSE Defendants' contention.  In addition, judges in this

Court are loathe to reconsider rulings of colleagues under the law of the case doctrine.  *See*

*Johnson-Parks v. D.C. Chartered Health Plan*, 2011 WL 3739139, * 1 (D.D.C. Aug 24,

2011) (citing *Fujisawa Pharm. Co., Ltd., v. Kapoor*, 115 F.3d 1332, 1339 (7th Cir. 1997)

("The law of the case requires the second judge in a case in which there has been a

4

reassignment to abide by the rulings of the first judge unless some new development, such as

a new appellate decision, convinces him that his predecessor's ruling was incorrect.")).

 Judge Wilkins held that an alleged breach of contract gives rise to the type of

obligation actionable under the reverse false claims provision where a party owes to the

"'government an obligation sufficiently certain to give rise to an action of debt at common

law.'"[3]   Dkt. No. 174, at 64, citing *ATMI,* 190 F.3d at 736.   He further reasoned that "the

breach of a core, vital material term that defeats the purpose of the contract constitutes a

'total breach,' and the injured party can obtain restitution of some or all of the monies paid to

the breaching party as a remedy."  Dkt. No. 174, at 65 (citations omitted).

 Applying these principles to this case, Judge Wilkins decided that the "alleged rider

doping would have been a total breach" of the sponsorship agreements.  *Id*., at 68.  "As such,

the Postal Service clearly could have sought restitution – repayment of the sponsorship fees –

as a remedy."  *Id*.  Judge Wilkins explained that

> [d]oping by the cycling team would therefore be a total breach of
> the contracts, not only because they expressly required compliance
> with anti-doping rules, but also because rather than being
> associated with a team that is genuinely fast, the Postal Service's
> reputation and goodwill are seriously damaged by an association
> with a team that is faster because it cheats.  Indeed, given the
> public relations goals of the sponsorship, it is manifest that
> compliance with anti-doping regulations was a core term of the
> contracts, because the negative publicity associated with doping

---

[3]Judge Wilkins relied upon the Sixth Circuit's decision in *ATMI*, which more narrowly
interpreted "obligation" than either the Ninth (*Bourseau*), Tenth (*Bahrani*), or Eleventh Circuits
(*Pemco*).  The holdings in *Bourseau*, *Bahrani*, and *Pemco* also support the conclusion that the
alleged breach here imposes an actionable "obligation."
The CSE Defendants also rely upon *ATMI*.  *See* Dkt. No. 311, at 10, 20.  In addition, a second
case upon which the CSE Defendants rely recognized that an obligation was actionable under
California's reverse false claims provision if it was "'sufficiently certain to give rise to an action
of debt at common law.'"  *State of California ex rel. Bowen v. Bank of Am. Corp*., 126 Cal. App.
4th 225, 241 (Cal. Ct. App. 2d Dist. 2005), *see* Dkt. No. 311, at 14.

defeats the essential purpose of the venture (from the sponsor's perspective).

*Id.*, at 66.  Judge Wilkins further determined that the alleged doping defeated the core benefit of the bargain - increased marketing exposure - because doping would lead to suspensions or bans and "a team that cannot race cannot generate positive publicity for its sponsor."  *Id.*, at 67.

In reaching his decision, Judge Wilkins rejected Armstrong's argument, recycled by the CSE Defendants, Dkt. No. 311 at 13, that, at most, the alleged breach of contract created a contingent obligation which cannot give rise to liability for reverse false claims.  Dkt. No. 174, at 68.  As Judge Wilkins reasoned, accepting this argument "would mean that a breach of contract could never be an 'obligation' until a formal demand was made or a lawsuit was initiated, a result that cannot be squared with the language or purpose of the statute."  *Id.*, citing *Bahrani*, 465 F.3d at 1204 ("government officials may have discretion as to whether to insist on a party's performance under a contract or whether to file a breach of contract action if a party does not perform.  However, a contractual obligation falls within the scope of § 3729(a)(7)").  In addition, accepting the defendants' argument "would also have the detrimental and counterproductive effect of allowing those with knowledge of contractual breaches or other non-compliance to make false statements about those matters, without penalty, unless and until the government files a lawsuit."  Dkt. No. 174, at 68-69.

The CSE Defendants contend that an obligation under § 3729(a)(7) does not arise unless the contract provides for the specific remedy of disgorgement.  Dkt. No. 311, at 13-14.  However, neither Judge Wilkins, nor the Sixth Circuit in *ATMI*, nor even the Eighth Circuit which narrowly interpreted § 3729(a)(7) in *Q Int'l Courier, Inc.*, 131 F.3d at 773, so held.  Instead, all three concluded that an obligation sufficiently certain to give rise to an action of

debt at common law suffices.  Dkt. No. at 64; *ATMI*, 190 F.3d at 736; *Q Int'l*, 131 F.3d at 773.[4]  Restitution for a total breach of contract – a debt at common law – does not depend upon a specific contract provision for disgorgement.  In addition, even if a contract provided specifically for disgorgement, a breach of that contract would still be "contingent" because the government may or may not insist on the party's performance or file a breach of contract action.  Consequently, whether the contract provides for the specific remedy of disgorgement has no bearing on the question whether a breach of that contract creates an obligation under § 3729(a)(7).

Contrary to the CSE Defendants' argument regarding *Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61 (D.C. Cir. 2008), *see* Dkt. No. 311, at 15-18, the D.C. Circuit has not rejected the conclusion reached by Judge Wilkins.  First, the D.C. Circuit has not addressed whether an alleged breach of contract constitutes an obligation under § 3729(a)(7).  Dkt. 174 at 63. Second, *Hoyte* did not involve a contractual relationship at all, let alone a total breach of a core contract term.  Instead, Hoyte alleged that the Red Cross took certain actions, and failed to take other actions, in order to avoid the assessment of penalties by the FDA under a Consent Decree.  Even taking those allegations as true, the penalties that may have been assessed under the Consent Decree were akin to a civil or criminal fine, not a debt at common law.  The relationship between the FDA and Red Cross was purely regulatory, unlike the contractual relationship between USPS and the cycling team pursuant to which the team was obligated to repay funds it received if it was in total breach of the contract.  Courts have recognized that penalties, in contrast to other obligations, are not actionable under the reverse

---

[4] *See also United States v. Bourseau*, 531 F.3d 1159, 1169-70 (9th Cir. 2008).

false claims provision.  *See United States ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648,

657 (5th Cir. 2004)

      In addition, the CSE Defendants' reliance on *United States ex rel. Prawer & Co. v.*

*Verrill & Dana*, 946 F.Supp. 87 (D. Me. 1996) ("*Prawer I*"), is misplaced.  Dkt. No. 311, at

14.  That court concluded that there is no obligation to pay or transmit money until the other

party "obtains a judgment."  Dkt. No. 311, at 14, citing *Prawer I*, 946 F.Supp. at 94.

However, that reasoning was contrary to Congress' intent that the reverse false claim

provision apply to potential claims by the government for money owed, and was later

rejected by the Tenth Circuit, *see Bahrani*, 465 F.3d at 1204 ("'the need for some further

government action or some further process to liquidate an obligation does not preclude a

reverse false claims action'"), the Sixth Circuit, *see ATMI*, 190 F.3d at 741 (§ 3729(a)(7)

obligation includes those arising out of "final judgments, and breaches of contract" ), and

Judge Wilkins.  *See* Dkt. No. 174, at 64.  Indeed, that reasoning would preclude a reverse

false claim action even if a contract contained a specific disgorgement provision, because the

government would be required to pursue its breach of contract action to judgment before an

obligation arose.  For all these reasons, this Court should decline to follow the *Prawer I*

decision.

      B.  The Text and History of the FCA Support Judge Wilkins' Decision

      The text and history of the FCA all weigh heavily in favor of Judge Wilkins'

construction, and against the CSE Defendants' constricted interpretation, of "obligation."

First, the plain language of the statute is not limited to those obligations  that are reduced to a

sum certain.  Instead,  § 3729(a)(7) refers  to an "obligation," not a "fixed obligation."  If

Congress had meant to  refer to a duty to a pay a specific and fixed sum of money rather than an

unliquidated sum, it would have said so expressly.  It instead employed far more general language referring only to "an obligation to pay or transmit money or property to the Government."

Second, as noted above the Senate Report accompanying the 1986 amendments to the FCA stressed that reverse false claim liability extends to "potential claims" by the government for money owed – phraseology plainly inconsistent with the notion that the obligation to the government must be for a fixed and known amount, must result from a judgment at the conclusion of a breach of contract action, or must derive from a specific contractual disgorgement provision.  *See* S. Rep. No. 99-345, 99th Cong., 2d Sess. 18 (1986) (emphasis added), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5283.

Third, limiting reverse false claims to actions concealing obligations of a fixed and certain amount would be inconsistent with the broad remedial purposes of the statute.  The FCA is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States* v. *Niefert-White Co.*, 390 U.S. 228, 961 (1968).  Consistent with this broad objective, the manifest purpose of the reverse false claims provision of the FCA is to ensure that persons do not defeat the rights of the United States by concealing an obligation to pay over money to the government.  That the precise amount of money due is unknown at the time a false statement is made does not diminish the injury to the government or the culpability of the defendant.  Indeed, nothing in the statute's text or underlying purposes suggests that liability is confined to concealing obligations of a fixed and certain amount.

Fourth, the 2009 amendments to the FCA confirm that an obligation need not be for a fixed and certain amount to be actionable under the former version of the statute.  Congress added a definition of obligation to the FCA in 2009, which expressly provides in relevant part that this term "means an established duty, *whether or not fixed*." 31 U.S.C. § 3729(b)(3) (2009)

(emphasis added).   As the legislative history makes clear, the italicized language was added for

the very purpose of clarifying that concealment of non-fixed or contingent obligations was not

immunized from liability under the FCA:

> [W]hile the new definition of "obligation" expressly includes contingent, non-fixed
> obligations, the Committee supports the position of the Department of Justice that
> current section 3729(a)(7) "speaks of an 'obligation,' not a 'fixed obligation.' By
> including contingent obligations such as, "implied contractual, quasi-contractual,
> grantor-grantee, licensor-licensee, fee-based, or similar relationship," this new section
> reflects the Committee's view, held since the passage of the 1986 Amendments, that
> an "obligation" arises across the spectrum of possibilities from the fixed amount debt
> obligation where all particulars are defined to the instance where there is a relationship
> between the Government and a person that "results in a duty to pay the Government
> money, whether or not the amount owed is yet fixed."

S. Rep. No. 111-10, at 14 (2009).

Moreover, as the foregoing passage makes clear, Congress intended the new definition

to clarify rather than change the meaning of an obligation under the FCA. "Subsequent

legislation clarifying the intent of an earlier statute is entitled to great weight in statutory

construction." *Loving v. United States,* 517 U.S.748, 770 (1996). By specifying that the FCA

reaches non-fixed or contingent obligations, the 2009 amendment is persuasive evidence of the

meaning of this term prior to the amendment. *Cf. United States ex rel. Longhi v. Lithium Power

Technologies, Inc.*, 575 F.3d 458, 470 (5th Cir. 2009) (observing that "Congress enacted § 4 of

FERA to clarify the FCA and 'to reflect the original intent of the law'" and therefore the new

definition of materiality was relevant to the meaning of this term under the prior version of the

statute).

Finally, the CSE Defendants' position is circular and would preclude the government

from ever being able to pursue a reverse false claims remedy for breach of contract. According

to the CSE Defendants, a defendant can lie about its compliance with a contract, and the

government cannot pursue the defendant under the reverse FCA provision unless and until the

government files a breach of contract claim.  But if the defendant covers up its breach by lying, the government will not learn about the breach and thus will not be in a position to file a breach of contract claim.  In short, the government will be left with neither a reverse FCA claim nor a breach of contract claim against a defendant who willfully covers up its breach of a contract – which cannot possibly be the result that Congress intended.

In sum, the text and history of the former law, as well as subsequent clarifying legislation, all show that an obligation need not be fixed and certain to be actionable under the FCA, and that the alleged breach here imposes an actionable obligation.

### III.     The CSE Defendants May Be Liable Under The Reverse False Claims Provision Even Though The Obligation To Pay The Government Belonged To Tailwind

The CSE Defendants also seek to escape liability because the obligation to repay the government belonged to Tailwind.  *See* Dkt. No. 311, at 20-24.  Armstrong argued this point too, which Judge Wilkins properly rejected.  Dkt. No. 174, at 69-71.  As Judge Wilkins recognized, the reverse false claim provision of the FCA expressly refers to "an obligation," and not only to the defendant's obligation.  *Id*., at 71, citing 31 U.S.C. § 3729(a)(7).  The Fifth Circuit reached the same conclusion in *United States v. Caremark,* 634 F.3d 808, 817 (5th Cir. 2011) ("[t]he statute does not require that the statement impair the *defendant's* obligation; instead, it requires that the statement impair '*an* obligation …'") (emphasis in original).  Consequently, the fact that Tailwind was obligated to repay the government does not exonerate the CSE Defendants from liability under the reverse false claims provision for false statements they made to "conceal, avoid, or decrease" Tailwind's obligation to pay the government.

Furthermore, the CSE Defendants wrongly argue that the "indirect false claims theory" is limited to instances where a defendant makes a false statement to a third party that deceives the

third party into impairing its obligation to pay the government, where the third party *was deceived*. See Dkt. No. 311, at 21-22. Liability attaches under the reverse false claim provision when a defendant "knowingly makes, uses, or *causes to be made* or used, a false record or statement" to impair an obligation to pay the government. 31 U.S.C. § 3729(a)(7) (emphasis added). Whether the third party whose obligation was impaired was duped or participated in the scheme, a defendant causing that third party to make a false statement is still liable.

In the context of *causing* a third party to present a direct false claim under 31 U.S.C. § 3729(a)(1), courts have held that a defendant can be liable even where the third party actually submitted those claims with full knowledge of and participation in the scheme. *See United States ex. rel Sikkenga v. Regence BlueCross BlueShield*, 472 F.3d 702, 715 (10th Cir. 2006) (non-submitter Regence liable even though submitter ARUP knew of scheme); *United States ex rel. Schmidt v. Zimmer*, 386 F.3d 235, 243-44 (3rd Cir. 2004) ("the outcome did not turn on whether the actual presenters were 'duped' or participated in the fraudulent scheme"). To limit reverse false claims to situations only where the third party making the false statement is duped by the defendant, as urged by the CSE Defendants, would run afoul of Congress' intent that the reverse false claims provision mirror in scope the FCA's affirmative false claims and statements provisions. *See Hoyte,* 439 F. Supp. 2d at 43. Consequently, whether the CSE Defendants caused false statements to be made to impair Tailwind's obligations to the government does not turn on whether Tailwind was duped or participated in the scheme.

Likewise, the CSE Defendants may also be liable under § 3729(a)(7) if they caused defendant Lance Armstrong to make false statements to impair Tailwind's obligations to the government.

**IV.     The Reverse False Claims Provision Does Not Require Presentment Of The False Statement To The United States**

CSE contends that to be actionable under the reverse false claims provision, false statements must be made to the government.  *See* Dkt. No. 311, at 25.  However, presentment to the government is not required under  § 3729(a)(7).  *See United States ex rel. Matheny v. Medco Health Solutions,* 671 F.3d 1217, 1224 n. 12 (11th Cir. 2012); *Bourseau*, 531 F.3d at 1169; *Bahrani*, 465 F.3d at 1207.

**V.     False Statements Under The Reverse False Claim Provision Are Material If They Are Capable Of Influencing Government Decisionmaking**

The CSE Defendants further contend that to be actionable under the reverse false claim provision, false statements must be heard or relied upon by the government.  *See* Dkt. No. 311, at 25.  This argument rests on an incorrect premise.  False statements are material if they are *capable* of influencing government decisionmaking, *see Bourseau*, 531 F.3d at 1170-1171; *Bahrani*, 465 F.3d at 1204; *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 445 (6th Cir. 2005) (the inquiry "focuses on the potential effect of the false statement when it is made, not on the actual effect of the false statement when it is discovered"), and materiality does not turn on whether the statements were actually heard or relied upon by the government.  *See e.g., United States ex rel. Omar Badr v. Triple Canopy, Inc.*, 775 F.3d 628, 639 (4th Cir. 2015) (concluding, in a case involving the FCA's direct false record provision, that a "false record may, in the appropriate circumstances, have the potential to influence the Government's payment decision even if the Government ultimately does not review the record").

**VI.      False Statements May Be The Basis For Both Direct And Reverse False Claims Violations**

The CSE Defendants also incorrectly contend that a false statement cannot be the basis for both a direct and a reverse false claim violation, and that Relator's direct and reverse false claim allegations are redundant.  Dkt. No. 311, at 10-13.  On the contrary, a plaintiff in an FCA case "generally may plead theories in the alternative, even if different claims seek relief for the same injury, so long as there is ultimately only one recovery."  *United States ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 505 F. Supp. 2d 20, 24 (D.D.C. 2007) (citations omitted).  For example, in *Bourseau*, the district court concluded that false statements on Medicare cost reports were actionable both as affirmative and reverse false claims.  *United States v. Bourseau*, 2006 WL 3949169, *1 (S.D. Cal. 2006), *aff'd* 531 F.3d 1159 (9th Cir. 2008).   The Ninth Circuit affirmed the reverse false claim judgment, and concluded that it "need not analyze Appellants' liability under the affirmative false claims provisions of the FCA because we hold that the government has established liability under the reverse false claim provision."  531 F. 3d at 1164, n. 1.

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

VINCENT H. COHEN, JR., D.C. Bar # 471489
Acting United States Attorney

DANIEL F. VAN HORN, D.C. Bar # 924092
Assistant United States Attorney

Darrell C. Valdez (D.C. Bar No. 420232)
U.S. ATTORNEY'S OFFICE
Judiciary Center Building
555 Fourth Street, NW
Washington, DC 20530
(202) 252-2507
darrell.valdez@usdoj.gov

/s/ Robert J. McAuliffe
Michael D. Granston
Tracy L. Hilmer
Robert E. Chandler
David M. Finkelstein
Robert J. McAuliffe
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
P.O. Box 261
Ben Franklin Station
Washington, DC 20004
(202) 514-4678 – Telephone
(202) 514-0280 – Facsimile
Robert.chandler@usdoj.gov

Attorneys for the United States of America