IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* FLOYD LANDIS , | ) ) ) ) | **REDACTED** |
| Plaintiffs, | ) ) | No. 1:10-cv-00976-CRC |
| v. | ) ) | **UNDER SEAL** |
| TAILWIND SPORTS CORPORATION, *et al.,* | ) ) ) | **CONTAINS MATERIAL SUBJECT TO SEPTEMBER 15, 2014 PROTECTIVE ORDER (ECF No. 221)** |
| Defendants. | ) ) ) | |

**RELATOR'S OPPOSITION TO DEFENDANTS CAPITAL SPORTS & ENTERTAINMENT HOLDINGS, INC., WILLIAM J. STAPLETON, AND BARTON B. KNAGGS' MOTION FOR SUMMARY JUDGMENT AND, IN THE ALTERNATIVE, MOTION TO ALLOW TIME FOR DISCOVERY UNDER RULE 56(d)**

# Table of Contents

I.     INTRODUCTION ................................................................................. 1

II.     BACKGROUND FACTS:  THE CSE DEFENDANTS' ROLE ......................... 2

    A.    The CSE Defendants were Armstrong's agents. ................................ 2

    B.    Stapleton and Knaggs were owners and principals of CSE. ............. 3

    C.    CSE was the manager of Tailwind and was in charge of the USPS
    sponsorship. ......................................................................................... 3

    D.    The CSE Defendants were also officers of defendant Tailwind and had
    ownership in the company. ................................................................... 5

    E.    The CSE Defendants were aware of doping by Armstrong and the Team and
    also demonstrated reckless disregard for the truth. ................................. 5

III.     PROCEDURAL HISTORY ................................................................... 7

    A.    Relator's complaint ............................................................................ 7

    B.    Motion to Dismiss ............................................................................. 8

        1.    Statute of Limitations ................................................................ 8

        2.    Reverse false claims .................................................................. 9

    C.    Status of discovery ............................................................................ 9

        1.    Relator's Discovery to CSE ...................................................... 10

        2.    Destruction of relevant documents ........................................... 11

IV.     STANDARD OF REVIEW ................................................................... 12

    A.    Summary judgment standard ............................................................. 12

    B.    Standard for granting additional time for discovery under Rule 56(d) ........ 13

V.     ARGUMENT ..................................................................................... 14

    A.    SUMMARY JUDGMENT AS TO RELATOR'S AFFIRMATIVE FALSE
    CLAIMS COUNTS (1, 2, 3 & 6) MUST BE DENIED. ........................................ 14

        1.    CSE admits that four claims were submitted after June 10, 2004 and a
        material issue of fact exists as to whether additional claims were submitted. ... 14

        2.    A material issue of fact exists as to whether the Sponsorship Agreement
        ended in June 2004. ....................................................................... 16

        3.    The claims made after June 10, 2004 related to the Sponsorship
        Agreement. ................................................................................... 17

        4.    At a minimum, a material issue of fact exists as to whether the post-June
        10, 2004 payments were for items covered under the Sponsorship Agreement. 18

    B.    SUMMARY JUDGMENT AS TO RELATOR'S REVERSE FALSE
    CLAIMS COUNT 4 MUST BE DENIED. ......................................................... 22

1. **The Court correctly ruled that a total breach of the Sponsorship Agreement is sufficient to establish an "obligation" under section 3729(a)(7).** 23

    a. **The Court has already rejected defendants' argument that plaintiffs have failed to allege an "obligation."** ........................................................................ 23

    b. **No grounds exist to reconsider Judge Wilkins' rulings.** .......................... 25

    c. **Judge Wilkins' holding is consistent with reverse false claims precedent, including *Hoyte*, which distinguishes between contractual breaches and contingent potential penalties.** ........................................................................ 26

2. **The Court correctly ruled that the "obligation" at issue need not be the CSE Defendants' own obligation.** ........................................................................ 28

3. **The Court should reject CSE's new arguments that relator's reverse false claims count fails to state a claim.** ........................................................................ 30

    a. **The CSE Defendants have waived any further "failure to state a claim" arguments.** ........................................................................ 30

    b. **The Court previously correctly rejected the "inconsistent remedies" argument.** ........................................................................ 31

    c. **Relator's reverse false claim count does not improperly "multiply" his claims.** ........................................................................ 33

4. **A material issue of fact exists as to whether defendant Knaggs "made, used, or caused to be made or used" false statements.** ........................................ 34

5. **Section 3729(a)(7) does not include a "presentment" requirement and a material issue of fact exists as to whether defendants' false statements were material to the concealment of an obligation.** ........................................ 38

6. **A material issue of fact exists as to defendants' knowledge in making false statements.** ........................................................................ 41

VI.   **CONCLUSION** ........................................................................ 44

# TABLE OF AUTHORITIES

## Cases

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................ 13

*Chesbrough v. VPA, P.C.*, 655 F.3d 461 (6th Cir. 2011)................................... 39

*Convertino v. U.S. Department of Justice*, 684 F.3d 93 (2012)........................ 13

*Gleklen v. Democratic Congressional Camp*, 199 F.3d 1365 (D.C. Cir. 2000) .............. 13

*Johnson v. District of Columbia*, Case No. 1:12-cv-00381, 2015 WL 1756083 (CRC) (D.D.C. April, 17, 2015) (Cooper, J.) ................................................ 13

*Singh v. George Washington Univ.*, 383 F.Supp.2d 99 (D. D.C. 2005) .................... 25, 31

*U.S. ex rel. Fry v. Health Alliance of Cincinnati*, No. 1:03-CV-00167, 2009 WL 5033940 (S.D. Ohio Dec. 18, 2008) ................................................ 29

*U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 505 F. Supp. 2d 20 (D.D.C. 2007) .. 31

*U.S. ex rel. Purcell v. MWI Corp.*, 254 F. Supp. 2d 69 (D.D.C. 2003) ....................... 31

*U.S. ex rel. Si v. Laogai Research Foundation*, No. 09-cv-2388, 2014 WL 5446487 (D.D.C. Oct. 14, 2014)................................................ 31

*United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189 (10th Cir. 2006) 26, 27, 39, 40

*United States ex rel. Ervin & Assocs. v. Hamilton Securities, Inc.*, 370 F. Supp.2d 18 (D.D.C. 2005) ................................................ 28

*United States ex rel. Fago v. M & T Mortg.Corp.*, 518 F.Supp.2d 108 (D. D.C. 2007) .. 40

*United States ex rel. Harris v. Bernad*, 275 F. Supp.2d 1 (D.D.C. 2003) ....................... 31

*United States ex rel. Koch v. Koch Industries*, 57 F. Supp.2d 1122 (N.D. Okla. 1999)... 39

*United States ex rel. Matheny v. Medco Health Solutions*, 671 F.3d 1217, n.12 (11th Cir. 2012) ................................................ 39, 40

*United States ex rel. Schwedt v. Planning Research*, 59 F.3d 196 (D.C. Cir. 1995).. 33, 34

*United States ex rel. Shemesh v. CA, Inc.*, Civ. Action No. 09-1600, 2015 WL 1446547 (ESH) (D.D.C. Mar. 31, 2015)................................................ 40

*United States ex rel. Taylor v. Gabelli*, 345 F.Supp.2d 313 (S.D. N.Y. 2004)................ 32

*United States v. Bornstein*, 423 U.S. 303, S.Ct. 523 (1976) ................................... 33

*United States v. Bourseau*, 531 F.3d 1159 (9th Cir. 2008)................................. 29, 40

*United States v. Speqtrum*, 47 F.Supp.3d 81 (D.D.C. 2014) ................................ 34

*United States v. The Intrados/International Management Group*, 265 F. Supp.2d 1 (D.D.C. 2002) ................................................ 32

*Washington Post Company v. Keogh*, 365 F.2d 965 (D.C. Cir. 1966) ...................... 41

*Zeigler v. Potter*, 555 F.Supp.2d 126, 129 (D.D.C. 2008)................................ 25

## Statutes

31 U.S.C. § 3729(a)(1)................................................ 33

31 U.S.C. § 3729(a)(7)................................................ 9, 23, 25, 33

31 U.S.C. § 3730(c)(3)................................................ 8

31 U.S.C. §3729(a)(2)................................................ 33

## Rules

Fed. R. Civ. P. 56(a) ................................................ 12

Fed. R. Civ. P. 56(d) ................................................ 13

## I.     INTRODUCTION

In this False Claims Act case, relator alleges that defendants made false claims and false statements to get and keep tens of millions of dollars paid by the United States Postal Service ("USPS") to sponsor their cycling team, while secretly doping and cheating to win.  In the ensuing investigation, the United States Anti-Doping Agency ("USADA") confirmed that the team had engaged in "the most sophisticated, professionalized and successful doping program that sport has ever seen," and, among other things, stripped defendant Lance Armstrong of the six Tour de France victories he had achieved while riding for the USPS Team.[1]  USADA also lamented, however, that, due to limits on its jurisdiction, it was unable to "impose financial consequences on the non-sports individuals who owned and controlled the U.S. Postal Service team which we now know was involved in a massive economic fraud on the United States Postal Service and other easily identifiable individuals, companies, and the public."[2]

Through their current summary judgment motion, defendants Capital Sports and Entertainment Holdings, Inc. ("CSE"), William Stapleton, and Barton Knaggs (collectively, the "CSE Defendants") seek to escape responsibility for their key roles in this massive fraud on the United States.  Contrary to their arguments, however, there is unequivocal evidence that affirmative false claims to the United States were submitted within the statute of limitations held applicable to relator's claims (*i.e.,* after June 10, 2004).  Moreover, the Court has already rejected defendants' legal arguments that plaintiffs have failed to state a reverse false claims cause of action, and material issues of fact exist as to the CSE Defendants' false statements and their knowledge.  Accordingly,

[1]     *See* Declaration of Paul D. Scott in Support of Relator's Opposition to Defendants Capital Sports and Entertainment Holdings, Inc., William J. Stapleton, and Barton B. Knaggs' Motion for Summary Judgment ("Scott Decl.") at Exh. 17, October 10, 2012 Statement From USADA CEO Travis T. Tygart Regarding The U.S. Postal Service Pro Cycling Team Doping Conspiracy.

[2]     *See* Scott Decl. at Exh. 18, January 14, 2012 letter from USADA CEO Travis Tygart to United States Attorney General Eric Holder.

the Court should deny the CSE Defendants' motion and leave for a jury the question of the appropriate financial consequences for these "non-sports individuals" and the companies they owned.

## II.     BACKGROUND FACTS:  THE CSE DEFENDANTS' ROLE

In their moving papers, the CSE Defendants only partially acknowledge the extent of their involvement in the USPS sponsorship.  In fact, the CSE Defendants were central players whose involvement spanned the entire sponsorship period and involved multiple overlapping roles, including their representation of Lance Armstrong and, for part of the period, as managers, owners, officers and board members of defendant Tailwind Sports Corporation ("Tailwind"), the now-defunct company that owned the cycling team.

This Background Facts section describes the CSE Defendants' extensive role in the USPS sponsorship.  Additional facts specifically relevant to each of the CSE Defendants' arguments for summary judgment are discussed where relevant below.

### A.     The CSE Defendants were Armstrong's agents.

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████ *see also* Declaration of William J. Stapleton In Support of Defendants Capital Sports and Entertainment Holdings, Inc., William J. Stapleton, and Barton B. Knaggs' Motion for Summary Judgment, ECF No. 311-15 ("Stapleton Decl.") at ¶ 3.

████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

███████████████   In 2004, Knaggs also became Armstrong's agent (along with CSE and Bill Stapleton).  Declaration of Barton B. Knaggs In Support of Defendants Capital Sports and Entertainment Holdings, Inc., William J. Stapleton, and Barton B. Knaggs' Motion for Summary Judgment, ECF No. 311-14 ("Knaggs Decl.") at ¶ 3; Stapleton Decl. at ¶ 3.

### B.   Stapleton and Knaggs were owners and principals of CSE.

███████████████████████████████

████████████████████████████████

Stapleton started CSE, and was a principal and owner of the company throughout the period of the USPS sponsorship. *Id.*, Exh. 1, Stapleton SCA I Dep. at 4:12-25; *see also* Stapleton Decl. at ¶ 1.████████████████████

████████████████████████████████

████████████████████████████████

### C.   CSE was the manager of Tailwind and was in charge of the USPS sponsorship.

No later than October 2003, while the USPS Sponsorship was ongoing, CSE took over managing Tailwind.  Stapleton Decl. at ¶ 2; Knaggs Decl. at ¶ 2; Scott Decl., Exh. 27, Sponsorship Agreement.  The CSE Defendants attempt to minimize their role, stating that they only took over management of the Team "near the end of the term of the USPS sponsorship agreement."  CSE Defendants' Motion for Summary Judgment, ECF No. 311 ("CSE MSJ") at 4.  In fact, however, the amounts paid by the USPS increased greatly over the course of the sponsorship, and at least $7.7 million was paid during the time CSE was managing the Team.  Scott Decl., Exh. 11, Accounts Payable Detail (amounts paid by USPS in and after October 2003 total $7,723,108.37); *see also* ECF No. 42, Relator's Second Amended Complaint ("SAC"), at Exh. 1; CSE Defendants' Statement of Undisputed Material Facts, ECF No. 311 ("CSE SUF") at 20-22.  Moreover, as noted in the declaration of CSE's Chief Financial Officer, CSE was the entity that actually submitted claims for payment to the USPS on behalf of Tailwind during this time.

3

Declaration of Laura Hundley Ritts In Support of Defendants Capital Sports and
Entertainment Holdings, Inc., William J. Stapleton, and Barton B. Knaggs' Motion for
Summary Judgment, ECF No. 311-1 ("Ritts Decl.") at ¶ 2.

      The CSE Defendants describe their duties with respect to Tailwind as merely "to
provide sales and marketing services and to interact with sponsors of the cycling team."
CSE MSJ at 4.

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

### D.   The CSE Defendants were also officers of defendant Tailwind and had ownership in the company.

In addition to acting as agents of Armstrong and managing Tailwind's Sponsorship Agreement with the USPS through CSE, Stapleton and Knaggs were also officers of Tailwind itself. ██████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████     ██████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

█████████████

### E.   The CSE Defendants were aware of doping by Armstrong and the Team and also demonstrated reckless disregard for the truth.

The CSE Defendants' moving papers also completely bypass the topic of their knowledge of Armstrong's and the Team's doping. ██████████████████████

█████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████ *id.*, Exh. 7, Hamilton Dep. at 289:11-290:17; 299:24-301:4; 361:1-362:21; ████████████████████████

████████ Relator has also testified that in October 2002 he discussed with Stapleton his own doping as a member of the USPS Team.  Scott Decl., Exh. 9, Landis USADA Decl. at ¶ 23. ████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

████████████████

Relator has also sworn under oath that the Team's doping program was discussed in the presence of Bart Knaggs in or around April 2004, as alleged in the SAC.  Scott Decl., Exh. 9, Landis USADA Decl. at ¶¶ 43-46.  In their Answer, the CSE Defendants admit that a conversation took place, but deny that Mr. Knaggs heard the part of the conversation about doping.  ECF No. 198, CSE Answer at ¶¶ 113-15.████████████

████████████████████████████████████████████████

██████████████████████████████████

In addition to the foregoing evidence of actual knowledge, there is also copious additional evidence available to establish that the CSE Defendants' conduct was at the very minimum knowingly reckless.  █████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████ ████████

██████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████ ██████████████

██████████████████████████

Despite this professed total lack of knowledge and failure to investigate, however, the two men and their company were all involved in extensive, continuing, and

aggressive efforts to deny Armstrong's doping, maintain the *omerta,* and keep the sponsorship dollars flowing.  The CSE Defendants' false statements and other conduct on this front is discussed in detail in section V.B. below regarding relator's False Claims Act cause of action under section 3729(a)(7) (reverse false claims).

## III.    PROCEDURAL HISTORY

### A.    Relator's complaint

On June 10, 2010, relator filed his False Claims Act complaint, alleging that defendants' claims to the United States for payments were false because the USPS Team doped and cheated to win, in violation of the rules of cycling and the 1995 and 2000 Sponsorship Agreements with the USPS.  *See generally*, ECF No. 1, Original Complaint; ECF No. 42, SAC.  Moreover, defendants continued to lie about their conduct for years afterward in order to avoid repaying the ill-gotten sponsorship funds to the USPS, in violation of the Act's "reverse false claims" provision.  *Id.*

As stated in relator's complaint, both the 1995 and the 2000 Sponsorship Contract required the parties to comply with "all applicable rules" of cycling's governing bodies, which included rules prohibiting doping.  Scott Decl., Exh. 27, Sponsorship Agreement ¶ 12; ECF No. 42, SAC at ¶¶ 36-37.  The 2000 Sponsorship Agreement also added the following clause relating to doping:

### 9. Promotional Rights and Activities

\*\*\*
Company represents that each rider on the Team has a morals turpitude and drug clause that allows the Company to suspend or terminate the rider for cause which shall include items such as (1) conviction of a felony; (2) acts that require the Team to suspend or terminate the rider under the applicable rules of the Union Cycliste Internationale, the Federation Internationale du Cyc1isme Professionel; the United States Professional Cycling Federation, Inc.; the International Olympic Committee; the International Amateur Cycling Federation; the United States Cycling Federation and all other applicable governing organizations; (3) failure to pass drug or medical tests; (4) inappropriate drug conduct prejudicial to the Team, or the Postal Service, which is in violation of the Team rules or commonly accepted standards of morality; and (5) gross neglect of the rider's duty.
If any rider on the Team is found guilty of such offense, the Company agrees

to take appropriate action within thirty (30) days.

Scott Decl., Exh. 27, Sponsorship Agreement; ECF 311-2, Ritts Decl., Exh. A.

In February 2013, the United States intervened in relator's *qui tam* action against defendants Armstrong, Tailwind, and Bruyneel.  ECF No. 41, United States' Notice of Election to Intervene in Part.  The United States stated that it was declining to intervene "at this time" as to the CSE Defendants, thus allowing relator to pursue the claims against them.  The United States, however, remains the "real party in interest" as to the claims, 31 U.S.C. § 3730(c)(3), and has recently stated it "still may seek to intervene against the CSE Defendants."  ECF No. 306 at 4.

### B.    Motion to Dismiss

#### 1.    Statute of Limitations

In July 2013, the defendants in this matter, including the CSE Defendants, moved to dismiss the United States and relator's complaints.  Among other things, defendants asserted that plaintiffs' claims were barred by the applicable statute of limitations.  The Court held that the United States' claims were not barred, and that the Act's tolling provision would allow the United States to pursue false claims made within ten years prior to the filing of relator's complaint, *i.e.,* on or after June 10, 2000.  ECF No. 174, Memorandum Opinion on Motions to Dismiss ("Memo Op.")  at 31.  The Court further held, however, that the tolling provision did not apply to claims by a relator, and thus relator's claims against the non-intervened defendants were limited to  claims that arose within the Act's six-year statute of limitations, *i.e.,* on or after June 10, 2004.  *Id.* at 30.

In their current motion, the CSE Defendants seek summary judgment as to the affirmative false claims counts of relator's complaint (Counts 1, 2, 3 and 6), claiming that no claims were submitted under the Sponsorship Agreement after June 10, 2004.  As discussed in detail *infra*, however, the evidence clearly shows that claims were indeed made under the Sponsorship Agreement after that date.

**2.      Reverse false claims**

Defendants' motions to dismiss also challenged the legal basis for relator's and the United States' reverse false claims causes of action.  The Act's reverse false claims provision imposes liability on "any person who knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease ***an obligation*** to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(7) (emphasis added).  Defendants argued that plaintiffs had failed to allege an "obligation." Defendants further argued that if an obligation had been alleged, it was Tailwind's obligation, not theirs, and thus could not form the basis for a reverse false claims action against them.  After a lengthy analysis, the Court rejected both of these arguments. Specifically, the Court held that "the alleged doping activity would constitute a breach of contract with the Postal Service that would create a potential liability to the government sufficiently certain to constitute an 'obligation' under the reverse false claims theory of liability" and further held that "the scope of the statute is not limited to instances where the person seeks to 'conceal, avoid or decrease' his own obligation, as opposed to any obligation."  ECF No. 174, Memo Op. at 66 & 71.

The bulk of CSE's current summary judgment motion consists of asking this Court to reconsider and overrule Judge Wilkins' decisions on these legal issues concerning the United States and relator's reverse false claims counts.  But as discussed in detail *infra*, Judge Wilkins' holdings are correct and fully consonant with applicable precedent, including D.C. Circuit precedent, and there is no basis for the Court to reconsider these issues.

**C.      Status of discovery**

Discovery is ongoing with a current fact discovery cutoff date of August 14, 2015.  ECF No. 228, Scheduling Order.  Document discovery has been the topic of extensive motions practice.  Many of the documents yet to be produced by both the CSE Defendants and defendant Armstrong are potentially relevant to the claims against the CSE Defendants.  Scott Decl. at ¶ 29.

### 1.    Relator's Discovery to CSE

With respect to relator's discovery to the CSE Defendants themselves, relator served document requests on each of the CSE Defendants on January 28, 2014, and served his first set of interrogatories to CSE on July 2, 2014.  Scott Decl. at ¶ 30.  Relator moved to compel regarding certain of these interrogatories and document requests, and the Court issued a Minute Order on September 5, 2014 granting the motion in part and denying it in part.  The CSE Defendants had not yet produced all of the documents at the time the relator and CSE Defendants tentatively settled the matter after a mediation on December 10, 2014.  *Id.*  Following the United States' objection, the Court denied CSE's motion to enforce the settlement by its Order of April 9, 2015, ECF No. 309, and the parties resumed their discovery.  (Relator had continued to pursue other discovery in the interim, however, such as a Hague Convention Letter of Request to the *Union Cycliste Internationale* ("UCI") in Switzerland, which the Court issued on October 23, 2014, *see* ECF No. 240).

One of the items the CSE Defendants owed to relator at the time discovery re-commenced was email communications with certain witnesses.  Scott Decl. at ¶ 31.  CSE had objected to producing all of its communications with the list of witnesses and wished to limit its production to communications held by certain custodians at CSE, but CSE did not provide relator with the list of custodians, with identifying information regarding their duties at CSE, until May 4, 2015, *i.e.,* after filing their motion for summary judgment.  *Id.*  Relator has since requested that the CSE Defendants initially search the emails of 12 individuals out of the more than 80 current and former employees of the company.  *Id.*  The CSE Defendants have advised relator they are conducting that search but have yet to deliver the promised emails.  *Id.*

##### 2.      Destruction of relevant documents

CSE's interrogatory responses indicate that many potentially relevant documents in the CSE Defendants' possession were destroyed in January 2005 shortly after Armstrong and Tailwind [then headed by William Stapleton] entered into arbitration in late 2004 with SCA Promotions, Inc. ("SCA") over SCA's refusal, amidst doping allegations, to pay a bonus to Armstrong for winning the 2004 Tour de France. *See* Scott Decl., Exh. 2, SCA I Hearing, Claimant's Exh. 98, Arbitration Petition.  Specifically, in response to relator's interrogatories, CSE revealed that

> CSE replaced the server for its email in January 2005 ***and did not retain the files from the old server***. CSE does not have emails before January 2005 unless they were printed in hard copy.

Scott Decl., Exh. 10, Defendant CSE's Responses and Objections to Relator's First Set of Interrogatories at 19 (emphasis added).

CSE next replaced its server shortly after Armstrong and other defendants were notified of the existence of this action on August 23, 2010:[3]

> In or around September 2010, CSE switched its server. It was the intent of CSE - using a technology company - to transfer all files from the old server to the new server. For the most part the transfer was successful, and CSE is unaware of any significant loss of data. In a few limited instances, CSE realized that certain documents had not been transferred during the server change.  In response, CSE contacted the hired technology company to search for and recover the files. To CSE's knowledge, the recovery of missing files was successful. Nonetheless, other files could have failed to be transferred over of which CSE was not aware - due to the fact that they were not identified as missing or the technology company was not specifically requested to recover them. It is also possible that files were reported missing to the technology company, but could not be recovered.

*Id.*

Because of the known destruction of many of the CSE Defendants' potentially relevant documents, and possible destruction of others, relator has had to attempt to

---

[3]      *See* ECF Nos. 105-2 to 105-5, August 23, 2010 letters to Thomas Weisel, Mark Gorski, Allen Furst and Tim Herman (counsel for Armstrong) regarding the US investigation and *qui tam* case.  *See also* ECF No. 105-6, November 23, 2010 letter to Marc Harris, counsel for CSE Defendants re: same.

obtain those materials from the entities that likely would have been the other parties to the communications.  Scott Decl. at ¶ 32.  For example, relator is currently engaged in motions practice with defendant Armstrong in an attempt to get copies of certain of his communications with the CSE Defendants.  *Id.*  Relator obtained some documents responsive to his Letter of Request to the UCI in February and late April 2015, but UCI has not yet completed its production.  *Id.*  Defendants Bruyneel and Tailwind did not produce documents in response to relator's document requests.  *Id.* at ¶ 33.  Relator recently subpoenaed Mark Levinstein, another Armstrong attorney who it is believed may have copies of other relevant communications; the current response date for the subpoena is May 29, 2015.  Relator plans to conduct depositions once he has completed his document discovery of defendants.[4]

## IV.   STANDARD OF REVIEW

### A.   Summary judgment standard

Summary judgment is improper unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary

---

[4]      As of this time, none of the defendants' depositions has been taken.  Relator noticed the deposition of defendant Johan Bruyneel for May 22, 2015 but, as he is believed to be living in another country and did not respond, relator took the deposition off calendar for the time being.  Relator has advised the CSE Defendants that he will take depositions of the CSE Defendants and their representatives, including CSE, Stapleton, Knaggs, and Laura Hundley Ritts.  Relator has asked opposing counsel to agree to dates for the depositions for these individuals but has yet to receive any confirmations from them.  Relator also anticipates that he will depose additional persons related to CSE, including, but not limited to, Charlie Jones, Lawrence Temple, Laura Prather, and Mark Levinstein.  Relator has been impeded from noticing further depositions to date, however, as he is waiting for CSE (as well as Armstrong and third parties) to complete their document productions, which relator needs to prepare for the depositions.  Relator anticipates that the United States will take the deposition of defendant Armstrong, and that relator will question Armstrong regarding, *inter alia*, the CSE Defendants.  The United States has also identified a substantial number of other potentially knowledgeable witnesses it intends to depose that will likely have knowledge regarding matters relevant to the claims against the CSE Defendants.  Scott Decl. at ¶¶ 34-38.

judgment bears the burden to demonstrate the "absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

> A fact is "material" if it "might affect the outcome of the suit under the governing
> law." A dispute is "genuine" if "the evidence is such that a reasonable jury could
> return a verdict for the nonmoving party."  The court draws all reasonable
> inferences in favor of the nonmoving party, accepts all competent evidence
> presented by the plaintiff as true, and does not resolve credibility determinations
> or weigh the evidence.

*Johnson v. District of Columbia*, Case No. 1:12-cv-00381, 2015 WL 1756083 (CRC)

(D.D.C. April, 17, 2015) (Cooper, J.) (quoting and citing *Anderson v. Liberty Lobby*, 477

U.S. 242, 248-49 (1986)).  "[A] non-movant is not required to produce evidence in a

form that would be admissible at trial," so long as the evidence is "capable of being

converted into admissible evidence."  *Gleklen v. Democratic Congressional Camp*, 199

F.3d 1365, 1369 (D.C. Cir. 2000).

> **B.      Standard for granting additional time for discovery under Rule 56(d)**

As detailed below, many of the arguments raised by the CSE Defendants in their

motion for summary judgment involve questions of law, including several issues as to

which the Court has already ruled against the CSE Defendants.  To the extent the CSE

Defendants' arguments are dependent on facts, relator believes the evidence currently

before the Court clearly demonstrates that summary judgment must be denied.  However,

if the Court were to determine that the evidence currently available as to any particular

issue was insufficient to raise a genuine issue of material fact, relator requests that the

Court allow additional time to pursue discovery, under Fed. R. Civ. P. 56(d).

Rule 56(b) sets the default deadline for filing a motion for summary judgment at

"30 days after the close of all discovery," but the CSE Defendants brought their motion

nearly four months *before* the August 14, 2015 fact discovery cutoff.  "[S]ummary

judgment is premature unless all parties have 'had a full opportunity to conduct

discovery.'" *Convertino v. U.S. Department of Justice*, 684 F.3d 93, 99 (2012) (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986)).  "A Rule 56(f)[5] motion requesting additional time for discovery should be granted 'almost as a matter of course unless the nonmoving party has not diligently pursued discovery of the evidence.' " *Id.* (quoting *Berkeley v. Home Ins. Co.*, 68 F.3d 1409, 1414 (D.C.Cir.1995)).

As set forth in the Scott Declaration and above in the "Status of Discovery" section, relator has diligently pursued discovery but has not yet completed his discovery relevant to his claims against the CSE Defendants, and significant additional discovery is planned.

## V.   ARGUMENT

### A.   SUMMARY JUDGMENT AS TO RELATOR'S AFFIRMATIVE FALSE CLAIMS COUNTS (1, 2, 3 & 6) MUST BE DENIED.

The CSE Defendants move for summary judgment on relator's Counts 1, 2, 3 and 6 on one ground only:  that the USPS "made no payments under the Sponsorship Agreement" within the statute of limitations applicable to relator -- *i.e.*, after June 10, 2004.  CSE MSJ at 8-9; *see also id.* at n.3 (stating that, for purposes of the motion, the CSE Defendants otherwise accept the "viability" of relator's claims under these Counts).[6] The CSE Defendants' motion as to these Counts must be denied.  The evidence currently available clearly establishes that claims were made under the Sponsorship Agreement on or after June 10, 2004.

### 1.   CSE admits that four claims were submitted after June 10, 2004 and a material issue of fact exists as to whether additional claims were submitted.

The CSE Defendants' own evidence shows that at least four claims for payment were made and paid after June 10, 2004:

---

[5]      Former Rule 56(f) was renumbered to 56(d) in 2010 without making any substantive changes. *See* Fed.R.Civ.P. 56, Comm. Notes on Rules — 2010 Amendments.

[6]      Count 1 is based on false claims and is brought under 31 U.S.C. § 3729(a)(1); Counts 2 and 6 are based on false statements and are brought under 31 U.S.C. § 3729(a)(2) and 31 U.S.C. § 3729(a)(1)(B) (as amended, post-FERA); Count 3 is based on conspiracy and is brought under 31 U.S.C.§ 3729(a)(3).

6/30/2004 Invoice for $28,192.93, paid on 8/11/2004

8/30/2004 Invoice for $10,000.00, paid on 10/4/2004

8/30/2004 Invoice for $14,000.00, paid on 10/4/2004

9/17/2004 Invoice for $15,977.62, paid on 10/20/2004

*See* ECF 311-6 to 8, Ritts Decl. at E-G (invoices); CSE SUF at 20-26 (citing SAC at Exh.

1 (USPS Accounts Payable Detail showing dates and amounts of payments)).  As the

CSE Defendants admit, each of these claims was submitted to the United States by CSE

(acting on behalf of Tailwind) and was paid.  ECF 311, Ritts Decl. at ¶¶ 2, 4.

In addition, documents obtained by relator suggest that additional claims were

submitted after June 10, 2004 and remained pending until 2006 or later.  Specifically, on

or about January 21, 2005, the parties entered into Modification No. 8 to the Sponsorship

Agreement, which provided, in relevant part:  "This modification is issued to extend the

contract end date to May 31, 2005 to allow for payment of final two invoices."  Scott

Decl., Exh. 13.  A January 24, 2005 letter from Alixe Johnson of the USPS to Bill

Stapleton described these claims as follows:

> We are in receipt of our [sic] final invoice in the amount of $150,000 for the 2004
> Team Bonus.  In addition, we have received several invoices for approximately
> $45,000 for attendance at the 2004 Tour de France.  We intend to delay payment
> of these invoices until all of your obligations from our 2004 contract with your
> company, specifically two remaining appearances by Lance Armstrong, have
> been finalized.

Scott Decl., Exh. 15, at USPS 00000318.  Defendant Stapleton wrote back in February

2005, "I look forward to finalizing these appearance dates and receiving your final

payments due to Tailwind."  *Id.* at USPS 00000317.

In addition, Tailwind wrote to the USPS in January 2006, stating that its auditor

Ernst & Young was reviewing its records, and seeking to confirm Tailwind's accounts

receivable.  Scott Decl., Exh. 16, at USPS 00002209.  Tailwind's representative stated

"Our records on December 31, 2005 showed invoice 11/30/04-9 totaling $150,000 as

receivable from you [*i.e.,* the USPS]."  *Id.*  These documents thus suggest that at least

two additional claims for payment were submitted after June 10, 2004 and at least one remained pending as late as 2006.

### 2. A material issue of fact exists as to whether the Sponsorship Agreement ended in June 2004.

The CSE Defendants contend that the claims submitted after June 10, 2004, could not have been made under the Sponsorship Agreement, because that agreement ended in June 2004. *See* CSE SUF 14 ("The Sponsorship Agreement ended on or around June 2004."); CSE MSJ at 8 ("The payments were made in August and October 2004, after the Sponsorship Agreement had ended. . . ."). The CSE Defendants' own evidence, however, belies this contention.

By its terms, the Sponsorship Agreement specifically states that it would remain in effect until December 31, 2004, "unless terminated earlier":

> Term. This Agreement shall be effective for a period (the "Contract Term" or the "Term") commencing on the date hereof and continuing through December 31, 2004 unless terminated earlier as set forth in this Agreement. The Sponsor shall notify the Company no later than July 1, 2004 whether the Sponsorship will continue beyond December 31, 2004. . . .

ECF 311-2, Ritts Decl., Ex. A, 2000 Sponsorship Agreement at 1; Scott Decl., Exh. 27. CSE provides no evidence that the Agreement was "terminated earlier."[7]

Evidence obtained by relator further demonstrates that, at a minimum an issue of material fact exists as to whether the Sponsorship Agreement ended in June 2004:

- On or about June 24, 2004, the parties entered into Modification No. 7 to the Sponsorship Agreement, which provided, in relevant part: "This modification is issued to serve as a notification that the Sponsorship Agreement will not be

---

[7]     In fact, CSE's only citation in support of the contention that the Sponsorship Agreement ended in June 2004 is paragraph 32 of relator's SAC. *See* CSE SUF 14. Paragraph 32 of the SAC states: "On or about June 29, 2004, the USPS ended its sponsorship of the USPS Team by not renewing the 2000 Sponsorship Agreement past December 31, 2004." This statement does not support CSE's contention that the Sponsorship ended in June 2004, but rather is consistent with the above contract term indicating that the USPS was required to notify Tailwind prior to July 1 "whether the Sponsorship will continue beyond December 31, 2004."

extended beyond December 31, 2004.  The existing terms and conditions of the Sponsorship Agreement will remain in effect until Dec 31, 2004."  Scott Decl., Exh. 12, at USPS 00003836.

- On or about July 26, 2005, the parties entered into Modification No. 9 to the Sponsorship Agreement, which provided, in relevant part:  "This modification is issued to extend the contract to December 31, 2006. This extension will allow time for the supplier to fulfill the two remaining appearances by Lance Armstrong at two United States Postal Service events as currently required by the contract. This is a no-cost time extension to the contract."  *Id.,* Exh. 14 at CSE4413.[8]

- On or about March 16, 2009, the parties entered into Modification No. 12 to the Sponsorship Agreement, to close out the contract and to "decommit" funds that had not been spent.  *Id.*, Exh. 13, at USPS 00003815

### 3.    The claims made after June 10, 2004 related to the Sponsorship Agreement.

CSE next contends that "the final payment made in connection with the Sponsorship Agreement was made on May 14, 2004" and that the four payments referenced above paid after June 10, 2004 "do not relate to the Sponsorship Agreement." CSE MSJ at 8.  Once again, though, CSE's contention is directly contradicted by its own evidence.  As an initial matter, like the invoice for the May 14, 2004 payment which CSE concedes was made under the Sponsorship Agreement, the invoices for each of the four post-June 10, 2004 payments are addressed to "United States Postal Service, Attn:  Joe Porporino" and include the heading "United States Postal Service Pro Cycling Team" in the "Description" field.  *See* Ritts Decl., Exh. D-G.  Each of the four post-June 10, 2004 payments is also listed on the USPS "Accounts Payable Detail," along with the May 14, 2004 payment (and numerous other earlier payments).  Scott Decl., Exh. 11; *see also* SAC Ex. 1; CSE SUF 20-22.  Finally, on the Accounts Payable Detail, the "Contract Number" for each of the four post-June 10, 2004 payments, as well as the May 14, 2004 payment, is listed as 10259201F0858.  *Id.*  This is the same number listed at the top of the

---

[8]      Notably, this modification extending the term of the Sponsorship Agreement to December 31, 2006 was produced in discovery by the CSE Defendants and is signed by CSE's CFO Laura Ritts.  Perhaps for this reason, notwithstanding what the CSE Defendants claim in their motion, Ms. Ritts does not state in her Declaration that the Sponsorship Agreement ended as of June 2004.  ECF No. 311-1, Ritts Decl.

Sponsorship Agreement.  ECF 311-1, Ritts Decl., Exh. A.  In sum, the very documents upon which the CSE Defendants rely contradict their own argument.

Separate evidence not provided by the CSE Defendants also demonstrates that the four post-June 10, 2004 payments were made under the Sponsorship Agreement. Specifically, Modification No. 12 to the Sponsorship, which is the contract "closeout" modification mentioned above, indicates that the "Final Contract Amount" for the Sponsorship Agreement was $31,442,262.57.  Scott Decl., Exh. 13, USPS 00003815. Likewise, the Accounts Payable Detail cited by CSE lists the total dollar amount of payments made under Contract Number 10259201F0858 as $31,442,262.57, including the four post-June 10, 2004 payments.  The available evidence thus clearly indicates the four post-June 2004 payments were paid under the Sponsorship Agreement.[9]

> **4.     At a minimum, a material issue of fact exists as to whether the post-June 10, 2004 payments were for items covered under the Sponsorship Agreement.**

It appears that CSE may be attempting to distinguish between certain lump sum payments versus other payments made pursuant to the Sponsorship Agreement which CSE characterizes as "reimbursement for certain Postal Service hospitality-related expenses that had been advanced by Tailwind. "  CSE SUF 22-23 (arguing that the last lump sum payment made on May 14, 2004 *was* made under Sponsorship Agreement, but subsequent "reimbursements" were not).  As the contract documents illustrate, this is a distinction without a difference.  Both types of payments were "payments under the Sponsorship Agreement."  In fact, payments by the USPS for the types of services and items included in the four post-June 10, 2004 invoices -- media guides, hospitality

---

[9]     The matching totals also suggest that the additional claims for $150,000 and $45,000 were not paid, but a false claim need not be paid in order to be actionable under the False Claims Act.  *See, e.g., United States ex rel. Schwedt v. Planning Research*, 59 F.3d 196, 199 (D.C. Cir. 1995) ("[T]he submitter of a 'false claim' or 'statement' is liable for a civil penalty, regardless of whether the submission of the claim actually causes the government any damages;  even if the claim is rejected, its very submission is a basis for liability.").

services at cycling races, and the costs of a victory party for the Team -- were specifically contemplated under the Sponsorship Agreement.

Section 9(b) of the Sponsorship Agreement set forth the "Promotional activities to be performed by the Company during the Term of this Agreement."  *See* ECF No. 311-1, Ritts Decl., Exh. A; *see also* Scott Decl., Exh.27, Sponsorship Agreement, Bates Page Numbers USPS 00000625-634.  Among other things, Tailwind was to "customize a complete VIP hospitality program for selected guests of the Sponsor at the Tour de France " "provide hospitality for Sponsor guests at the annual Champions weekend," "provide hospitality at other events such as the World Cup, other major Tours, and leading domestic races in top markets such as Los Angeles, Philadelphia, Chicago, Houston, Boston, Austin and San Francisco" and "provide media exposure including, but not limited to, television, print, and cross promotions."  *Id.*

While the Sponsorship Agreement contemplated that the "promotional activities" set forth in Section 9(b) were generally to be paid for out of the lump sum payments made to Tailwind by the Postal Service, the agreement also permitted the expenses to be billed separately under certain circumstances, *id.,*[10] and that is simply what happened here.  Moreover, contract modifications further demonstrate that the specific expenses at issue were to be paid for under the Sponsorship Agreement.

On or about March 24, 2003, the parties entered into Modification No. 4, which added $75,000 to the contract amount.  Scott Decl., Exh. 12, at USPS 00003852-3854.  Among other things, Modification No. 4 amended the Sponsorship Agreement to clarify the level of hospitality services which were to be provided and what was included as part of the lump sum payments versus what could be separately billed for.  *Id.*  For example, amended section 9(b) read, in part:

---

[10]        "Company and Sponsor agree to meet within 60 days prior to the start of each calendar year to determine which promotions will be undertaken for the forthcoming year and mutually agree upon the allocation of various responsibilities required to carry out such promotions as well as the parties responsible for any incidental costs associated with such promotions."  *Id.*

> New York City - Company will host a team dinner at the conclusion of the race with all cyclists from the USPS Pro Cycling team in attendance. The Company will allow Sponsor to invite 10 guests to this event. . . .
>
> San Francisco: Company will host a VIP reception for cyclist of the USPS Pro Cycling race team. The expectation level of this event should be on the level of past practice which was hosted in the past by the Postal Service. This event will take place the night before the race. The Sponsor will be allowed to invite 50 guests free of charge to this event.  Sponsor agrees to pay company for any additional guests invited above the 50 count. . . .

Modification No. 4 also amended the "Scope of Work" to read:

> 1. Tailwind will help coordinate VIP hospitality services for eight (8) to 10 racing events that are geared around any of the USPS Pro cycling events for which the Postal Service team competes in.  . .
>
> 2. The cost for these services is a one-time service fee of $5,000.00. The fee covers the period 4/1/03 through 4/1/04.
>
> *Id.*

On or about August 4, 2003, the parties entered into Modification No. 5, which added $100,000 to the Sponsorship Agreement.  *Id.*, Exh. 12, at USPS 00003845.  Modification No. 5 provided in part:

> This modification . . . is issued to:
>
> 1) fund FY04 VIP hospitality services (VIP trailers w/catering) for eight (8) to 10 racing events that are geared around any of the USPS Pro Cycling events for which the Postal Service team competes in. Service fee of $5,000.00 included;
>
> 2) add two additional racings events (Vail, CO and Los Angeles, CA to the above FY04 VIP hospitality services).
>
> Period of Performance; April 2, 2004 through September 15, 2004.
>
> *Id.*

Thus, each of the known post-June 10, 2004 payments was for goods or services that were specifically contemplated to be paid for under the Sponsorship Agreement:

- August 11, 2004 payment

  According to CSE, part of the payment made August 11, 2004 was for "media guides previously made and delivered to the Postal Service."  CSE MSJ at 5.

  Section 9(b) and Exhibit A of the Agreement both state that the USPS is required to pay for all "sales and promotional materials." Ritts Decl., Exh. A; Scott Decl., Exh. 27.

- August 11, October 4, and October 20, 2004 payments

  CSE states that the rest of the August 11, 2004 payment, one of the payments on October 4, 2004, and the payment on October 20, 2004 were for "hospitality-related services" in connection with the Downers Grove, New York City, and San Francisco Grand Prix cycling races.  CSE MSJ at 5.

  Modification No. 4 was issued to fund, *inter alia*, additional hospitality-related services for the New York City and SF Grand Prix events, and Modification Nos. 4 & 5 both included funds for, *inter alia*, "eight (8) to 10 racing events that are geared around any of the USPS Pro Cycling events for which the Postal Service team competes in," such as the Downers Grove event.  Scott Decl., Exh. 12.

- Second October 4, 2000 payment
  CSE describes a second payment made on October 4, 2000 as "a financial contribution the Postal Service made for a party in Austin, Texas."  CSE SUF 24.

  Again, the Agreement encompasses such services, requiring the Company to provide "promotions," "promotional activities" and "media exposure including, but not limited to . . . cross-promotions" such as parties.  Ritts Decl., Exh. A; Scott Decl., Exh. 27.

In addition, the January 2005 letter from the USPS to Bill Stapleton quoted above indicates that Tailwind submitted additional claims after June 2004 for $150,000 for "the 2004 Team Bonus" and approximately $45,000 for "attendance at the 2004 Tour de France."  Scott Decl., Exh. 15.  Section 9(b) of the Sponsorship Agreement specifically required Tailwind to provide "a complete VIP hospitality program for selected guests of the Sponsor at the Tour de France."  ECF 311-1, Ritts Decl., Exh. A; Scott Decl., Exh. 27.  Exhibit A to the Sponsorship Agreement provided that "A bonus pool not to exceed $150,000 in FY04 is in effect for the riders."  *Id.*  Thus, at a minimum, a material issue of fact exists as to whether the four post-June 10, 2004 claims identified in the CSE

Defendants' motion papers, as well as additional claims not mentioned by the CSE

Defendants, were claims for payment submitted under the Sponsorship Agreement.[11]

In sum:  the Modifications clearly establish that the contract was still in effect

long past June 2004 and possibly as late as March 2009; CSE's own evidence shows that

at least four claims were made and paid after June 10, 2004, and additional evidence cited

by relator raises an issue of material fact as to whether additional claims were submitted;

the Sponsorship Agreement clearly contemplated payment for the types of goods and

services described in the four post-June 10, 2004 invoices and in the USPS letter

regarding at least two additional invoices.  Accordingly, relator the evidence currently

before the Court is more than sufficient to require denial of summary judgment as to

Counts 1, 2, 3 and 6.

> **B.     SUMMARY JUDGMENT AS TO RELATOR'S REVERSE FALSE CLAIMS COUNT 4 MUST BE DENIED.**

The CSE Defendants' motion for summary judgment as to relator's reverse false

claims cause of action consists almost entirely of an attempt to rehash arguments on the

law already rejected by the Court in response to defendants' motions to dismiss.  The

CSE Defendants have provided no explanation for why the Court should reconsider these

rulings.  Their latest arguments are similarly wrong as a matter of fact and law.

---

[11]     Although limiting the basis for their motion for summary judgment to their claim that the post-June 10, 2004 payments were not "payments under the Sponsorship Agreement," the CSE Defendants also peripherally suggest that "the invoices for reimbursement did not certify, explicitly or impliedly, that the Tailwind cycling team was in compliance with the rules of cycling" and that the claims for the post-June 10, 2004 payments "are not rendered false by the alleged doping."  CSE MSJ at 8.

The Court has already held that proof "that the cycling team engaged in repeated and rampant doping activity that was prohibited by these governing bodies [mentioned in the Sponsorship Agreement] while submitting claims for payment to the Postal Service under those agreements" would be sufficient to establish that "there was a false certification of compliance with a material contract term."  ECF 174 at 55; *see also id.* at 54 ("[T]he Court concludes the claims were false under the theory of implied certification . . . .").  Moreover, a jury could reasonably conclude that had the doping become known, the USPS would have withheld *any* further payments, whether they were "reimbursements" or not.

    **1.**    **The Court correctly ruled that a total breach of the Sponsorship Agreement is sufficient to establish an "obligation" under section 3729(a)(7).**

The Act's reverse false claims provision imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7).  Here, plaintiffs' theory is that the Team's extensive doping – literally deemed "the most sophisticated, professionalized and successful doping program that sport has ever seen" -- was a total breach of the Sponsorship Agreement giving rise to an obligation to return the ill-gotten funds, and that defendants made false statements in order to "conceal, avoid, or decrease" that obligation.  This theory of liability was explicitly validated by the Court in response to defendants' motion to dismiss.

    **a.**    **The Court has already rejected defendants' argument that plaintiffs have failed to allege an "obligation."**

CSE contends that the breach of the Sponsorship Agreement was not an "obligation" within the meaning of the reverse false claims provision, but the Court has already correctly rejected this contention in its opinion rejecting defendants' motion to dismiss.  Noting that the D.C. Circuit had not yet considered the issue, the Court relied on authority from the Sixth, Tenth, and Eleventh Circuits that "'obligation' certainly includes those arising from acknowledgements of indebtedness, final judgments, and breaches of government contracts."  ECF No. 174, Memo Op. at 63-64 (quoting *American Textile Manufacturers Institute, Inc. v. The Limited, Inc.*, 190 F.3d 729,741 (6th Cir. 1999)); *id.* (citing *United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1204 (l0th Cir. 2006) (quoting this specific holding from *American Textile*); *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1237 (11th Cir. 1999); and *Hoyte v. American National Red Cross*, 518 F.3d 61, 73 (D.C. Cir. 2008) (Tatel, J., concurring in part and dissenting in part)).

Finding that not *every* contractual breach would be sufficient to constitute an "obligation," Judge Wilkins held that "the allegations must be sufficiently weighty to show that the defendant owes to 'the government an obligation sufficiently certain to give rise to an action of debt at common law.'"  Memo Op. at 65 (quoting *Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*, 190 F.3d at 736).  The Court further noted that "the breach of a core, vital material term that defeats the purpose of the contract constitutes a 'total breach,' and the injured party can obtain restitution of some or all monies paid to the breaching party as a remedy."  *Id.* (citing Farnsworth on Contracts § 12.20 (3rd ed. 2004); Corbin on Contracts § 61.2 (Revised ed. 2012); 26 Williston on Contracts § 68:2 (4th ed.)).

Judge Wilkins then reviewed the provisions of the Sponsorship Agreements related to doping and concluded that doping would be a "total breach" of the parties' contract sufficient to give rise to an "obligation" to repay the sponsorship funds. Specifically, the Court held that

- "[T]he alleged doping activity would constitute a breach of contract with the Postal Service that would create a potential liability to the government sufficiently certain to constitute an 'obligation' under the reverse false claims theory of liability."  ECF No. 174, Memo Op. at 66.

- "Doping by the cycling team would therefore be a total breach of the contracts, not only because they expressly required compliance with anti-doping rules, but also because rather than being associated with a team that is genuinely fast, the Postal Service's reputation and goodwill are seriously damaged by an association with a team that is faster because it cheats. Indeed, given the public relations goals of the sponsorship, it is manifest that compliance with anti-doping regulations was an [sic] core term of the contracts, because the negative publicity associated with doping defeats the essential purpose of the venture (from the sponsor's perspective)."  *Id*. at 66.

- The only way the cycling team could provide the USPS with televised coverage of its iconic logo on the team jerseys-and thereby provide the promotion contemplated under the agreement-was to comply with the governing organizations' rules concerning doping. Doping would lead to suspensions or bans for team members and/or the entire team, and a team that cannot race cannot generate positive publicity for its sponsor. *Id.* at 67.

- In sum, the alleged rider doping would have been a total breach of the 1995 agreement, and the same clearly holds true for the 2000 Agreement. As such, the Postal Service clearly could have sought restitution - repayment of the sponsorship fees - as a remedy.  Consequently, under both agreements the defendants owed "the government an obligation sufficiently certain to give rise to an action of debt at common law." *Am. Textile Mfrs. Inst., Inc.,* 190 F.3d at 736. *Id.* at 68.

      **b.**     **No grounds exist to reconsider Judge Wilkins' rulings.**

CSE asks the Court to reconsider Judge Wilkins' above rulings.  CSE MSJ at 11 n.5.  Although CSE correctly notes that the denial of the motion to dismiss is an interlocutory order,  reconsideration of interlocutory orders may only be granted "as justice requires," such as when the court "has patently misunderstood a party, has made a decision outside the adversarial issues presented to the [c]ourt by the parties, has made an error not of reasoning, but of apprehension, or where a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the court." *Singh v. George Washington Univ.,* 383 F.Supp.2d 99, 101 (D. D.C. 2005) (Lamberth, J.) (quoting *Cobell v. Norton,* 224 F.R.D. 266, 272 (D.D.C. 2004)); *see also* FRCP 54(b).  Thus, a motion for reconsideration should be denied unless "the movant demonstrates: (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order.'" *Zeigler v. Potter,* 555 F.Supp.2d 126, 129 (D.D.C. 2008).

Here, CSE has not even attempted to meet this standard.  CSE cites no new evidence, and points to no "intervening change in the law" or any "clear error" in the Court's apprehension of this matter.  To the contrary, CSE's argument is primarily based on arguing for a different interpretation of the cases relied upon by the Court in support of its ruling, especially the D.C. Circuit's decision in *Hoyte*.  But as detailed below, the Court correctly applied *Hoyte* and other applicable law.

       **c.**     **Judge Wilkins' holding is consistent with reverse false claims precedent, including *Hoyte*, which distinguishes between contractual breaches and contingent potential penalties.**

Judge Wilkins' holding is consistent with reverse false claims precedent, including *United States ex rel. Hoyte v. American National Red Cross*, 518 F.3d 61 (D.C. Cir. 2008) ("*Hoyte*"), which distinguishes between existing contractual obligations vs. potential penalties and fines.  In *United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1195-96 (10th Cir. 2006), the Tenth Circuit reviewed the relevant reverse false claims authority up to that point, concluding that the applicable decisions "establish a dichotomy between 'existing debts,' which are covered by the statute, and 'contingent penalties,' which are not."  *Id.* at 1197; *see also id.* at 1204 ("[A] contractual obligation falls within the scope of § 3729(a)(7).") (citing *Pemco Aeroplex*, 195 F.3d at 1237 (concluding that a "specific, ongoing obligation during the life of the contract" was covered by § 3729(a)(7)); *Am. Textile Mfrs.,* 190 F.3d at 741 ("§ 3729(a)'s definition of `obligation' certainly includes those arising from . . . breaches of government contracts")). As Judge Wilkins made clear, the "obligation" at issue here is an "existing debt" arising from a "total breach" of a government contract, it has nothing to do with any fine or penalty.

As the Tenth Circuit explained, one reason fines and penalties are not "obligations" for purposes of reverse false claims is that it was thought such liability would "unduly broaden" the scope of the Act to any person or entity subject to government regulations which might impose penalties or fines, as opposed to limiting it to the much narrower group of persons who are directly receiving payments from or actually have contracts with the Government (as in this case).  *Bahrani*, 465 F.3d at 1196.

Furthermore, an "obligation" to pay a penalty or fine is "contingent" in that it does not even arise in the first instance until a government official exercises authority to levy the penalty or fine.  *Id.* (By way of example, a person who drives over the speed limit does not have an "obligation" to pay a speeding ticket, unless and until a ticket is actually issued).  An "obligation" caused by a breach of contract, by contrast, actually

arises when the breach occurs--even if a government official could subsequently decide to waive or not enforce the existing obligation (which, in any event, did not occur here). *Id.* at 1204 ("The fact that USDA officials may have some subsequent discretion whether to actually charge the authorized fee does not mean that the "obligation" is a contingent one outside the scope of § 3729(a)(7).").

The D.C. Circuit's subsequent decision in *Hoyte* likewise reflects this dichotomy, and is entirely consistent with Judge Wilkins' decision on the motion to dismiss.[12]  The *Hoyte* case involved allegations of avoidance of contingent fines and penalties associated with mishandling of blood by the American Red Cross.  The Court explicitly found that no contractual obligation existed, as follows;

> The Consent Decree imposed no obligation on ARC to tender money or property to the Government but only to follow the prescribed blood handling and reporting requirements.  In this respect, <u>ARC is in the same position as any regulated entity subject to possible sanctions for violating an administrative requirement</u> and we made clear in *Yesudian* that an unassessed potential penalty for regulatory noncompliance does not constitute an obligation that gives rise to a viable FCA claim or, consequently, a related whistleblower claim.

> ***

> The plain language of the statute (whether read by a lawyer or layman) requires that there be an obligation to make payment to the Government and ARC had no such obligation, "contractual" or otherwise.

> 518 F.3d at 67, 70.

Thus, like *Bahrani* and the cases discussed therein*, Hoyte* illustrates the well-established "dichotomy" that potential penalties or fines typically are not sufficient to constitute reverse false claim "obligations," while obligations arising out of a contract

---

[12]     The Court of Appeals was not directly considering whether a reverse false claim cause of action had been stated, as the Court had already affirmed the district court's dismissal of the reverse false claims count based on the United States' "unfettered discretion" to dismiss a relator's FCA claims.  In considering the relator's remaining claim for retaliatory discharge under section 3730(h), the court was addressing the issue of whether the relator could have reasonably believed she was investigating a valid reverse false claim cause of action.  *Hoyte*, 518 F.3d at 67, 70.

with the Government typically are.  Unlike *Hoyte*, this case does not involve potential fines and penalties; it involves an obligation arising out of the "total breach" of a contract with the United States.  Judge Wilkins' ruling that the "total breach" of Tailwind's contract with the government gave rise to an "existing debt" sufficient to constitute an "obligation" is completely in line with applicable precedent, including *Hoyte*.

### 2.  The Court correctly ruled that the "obligation" at issue need not be the CSE Defendants' own obligation.

The CSE Defendants next argue that "even assuming *Tailwind* had some fixed contractual obligation to pay money to the United States, this obligation would not create liability on the part of *the CSE Defendants* for a reverse false claim."  CSE Brief at 20 (emphasis in original).  As an initial matter, the CSE Defendants' argument ignores the fact--nowhere mentioned in their moving papers--that Stapleton and Knaggs were *officers of defendant Tailwind* during the entire post-June 10, 2004 time period currently relevant to relator's complaint.[13]

Moreover, the Court has already ruled against defendants on this issue as well, adopting the holding of *United States v. Caremark, Inc.*, 634 F.3d 808, 817 (5th Cir. 2011) that the "statute does not require that the statement impair the *defendant's* obligation; instead, it requires that the statement impair '*an* obligation to pay or transmit money or property to the Government.'"  *See* ECF No. 174, Memo Op. at 71 (quoting *Caremark*); *see also United States ex rel. Ervin & Assocs. v. Hamilton Securities, Inc.*, 370 F. Supp.2d 18, 47-48 (D.D.C. 2005) (by reporting erroneous "optimization results" that caused HUD to award sale to bidders who were not actually the highest bidders, defendant consulting company avoided the "obligation" of the actual highest bidders to complete sale if the award had correctly been made to them).  As officers of Tailwind, Knaggs and Stapleton were especially well-situated to take actions that would avoid,

---

[13]      As described above, Knaggs and Stapleton were also, through CSE, owners of Tailwind, and Stapleton was on Tailwind's board.

decrease or conceal the company's obligations.  In any event, as discussed above, CSE has provided no basis for the Court to reconsider these previous decisions.

The CSE Defendants' latest argument that relator has failed to establish an "indirect reverse false claim" does not change the result.  Citing several district court cases mentioned in the *Caremark* case, the CSE Defendants assert that relator has failed to establish an "indirect reverse false claim" because relator has not shown that CSE "lied to a defendant in privity with the government," thus "causing the third party to unwittingly fail to pay monies that were owed to the government."  CSE MSJ at 23.  But this contention, beyond just rearguing a decided issue, also mischaracterizes the law.

While an "indirect reverse false claim" involving a false statement made to an innocent party in direct privity with the government may be *one* way to establish reverse false claims liability based on the "obligation" of someone other than the defendant, it is clearly not the *only* way.  For example, in *United States v. Bourseau*, 531 F.3d 1159 (9th Cir. 2008), all of the defendants knew that the defendant hospital's claims for Medicare reimbursement were false.  Although only the defendant hospital directly had an obligation to return the false claimed reimbursement, the court held that a doctor and president of the hospital could also be held liable for making false statements in cost reports to avoid the obligation to return the funds.  Likewise, in *U.S. ex rel. Fry v. Health Alliance of Cincinnati*, No. 1:03-CV-00167, 2009 WL 5033940 (S.D. Ohio Dec. 18, 2008), privity was not required and, like here, none of the defendants was an "unwitting" participant.  Rather, all of the defendants were alleged to have known that their "pay to play" scheme was an illegal kickback arrangement.  Even where defendant Ohio Heart was not the entity that directly submitted claims to the Government, the court held that it could be liable on a reverse false claims theory for "concealing the obligations of another," *i.e.,* the entity that had actually submitted the false claims.

### 3. The Court should reject CSE's new arguments that relator's reverse false claims count fails to state a claim.

In addition to asking this Court to re-visit Judge Wilkins' previous rulings, the CSE Defendants also attempt to raise new arguments as to why relator's reverse false claims count fails to state a claim. Specifically, they contend that relator's reverse false claims count is based on the same conduct as relator's affirmative false claims and false statements counts, was "concocted" by relator "in an attempt to avoid the statute of limitations," and would impermissibly "multiply" relator's causes of action. CSE MSJ at 12. But these arguments have been waived, were already rejected by the Court, and are wrong both factually and legally.

### a. The CSE Defendants have waived any further "failure to state a claim" arguments.

The CSE Defendants already moved to dismiss plaintiffs' reverse false claims counts for failure to state a claim, without raising these new arguments in either their initial motion or their reply. After the court denied the motion to dismiss the reverse false claims, the CSE Defendants even moved for reconsideration (which was denied), but again did not raise the arguments they now seek to raise in their motion for summary judgment. *See* ECF No. 180 (motion for reconsideration); Order of June 26, 2014 (denying motion for reconsideration). Subsequently, relator and the United States moved to strike all of the defendants' "failure to state a claim" affirmative defenses, on the ground that this issue had already been decided. The Court agreed, striking the CSE Defendants' "failure to state a claim" defense and holding that "[w]here . . . a court has previously made a legal determination that a Plaintiff's complaint stated a claim for relief, a subsequent affirmative defense claiming failure to state a claim or to properly plead should be stricken." ECF No. 289, Memorandum Opinion and Order re: Plaintiffs' Motion to Strike, at 3 (quoting *United States ex rel. Spay v. CVS Caremark Corporation*, No. 09-4672, 2013 WL 1755214 (E.D. Pa. Apr. 24, 2013)).

In sum, any further arguments that relator has failed to state a valid reverse false claim cause of action have been waived, and CSE should not be permitted a *third* bite at

the apple on this motion for summary judgment.  *See Singh v. George Washington Univ.,* 383 F.Supp.2d at 101 (citations omitted) ("[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.").

**b.  The Court previously correctly rejected the "inconsistent remedies" argument.**

In any event, the CSE Defendants' argument that relator's reverse false claims count improperly duplicates his other counts and was "concocted" to evade the statute of limitations fails as a matter of law and fact.  The Court previously rejected this same "inconsistent remedies" argument in the context of striking one of defendant Armstrong's affirmative defenses, as follows:

> Armstrong also asserts as an affirmative defense the United States and Relator's failure to choose between inconsistent remedies. Courts in this district have routinely held that the Government may plead alternative theories of liability in FCA cases. *See, e.g., U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 505 F. Supp. 2d 20, 24 (D.D.C. 2007) ("[T]he government in an FCA case generally may plead theories in the alternative, even if different claims seek relief for the same injury, so long as there is ultimately only one recovery."); *U.S. ex rel. Purcell v. MWI Corp.*, 254 F. Supp. 2d 69, 79 (D.D.C. 2003) (inability to recover damages from inconsistent theories does not bar inconsistent claims).  As a result, the Court will grant the motion [to strike] as to this defense.

Opinion on Motion to Strike at 10.[14]

The CSE Defendants rely on a recent unpublished case from this district, *U.S. ex rel. Si v. Laogai Research Foundation*, No. 09-cv-2388, 2014 WL 5446487 at *16 (D.D.C. Oct. 14, 2014), but that case is distinguishable.  In *Si*, the court first held that, like the claims in his original complaint, the affirmative (a)(1) and (a)(2) claims in relator's amended complaint failed to state a claim or comply with Rule 9(b).  Turning to

---

[14]    *See also United States ex rel. Harris v. Bernad*, 275 F. Supp.2d 1, 6 (D.D.C. 2003) ("The defendants also argue that the court should dismiss Count II because one HCFA 1500 claim form cannot constitute a violation of both section 3729(a)(1) and (2). . . .  This argument fails because although a court can only hold a defendant liable under either section 3729(a)(1) or (a)(2), Rule 8(e)(2) permits the government to plead both sections in the alternative.").

relator's reverse false claims allegations, the court held that relator had not pled any obligation, contractual or otherwise, for the defendant to return money to the United States.  Instead, the relator attempted to argue that the "obligation," arose out of the defendants' previous direct false claims themselves (which relator had not sufficiently alleged in any event).  Noting that such a theory would convert every false claims case into a reverse false claims case, the court rejected this theory.  Here, by contrast, as discussed at length in Judge Wilkins' motion to dismiss opinion, the "obligation" underlying plaintiffs' reverse false claims did not arise out of defendants' direct false claims but rather arises from the "total breach" of the Sponsorship Agreement and the resulting repayment obligation.  No such "obligation" was alleged in *Si*.[15]

Likewise, the CSE Defendants' corollary assertion that the "duplicative" 3729(a)(7) claims were "concocted" to evade the statute of limitations, must also fail.  Contrary to the CSE Defendants' claim, the count has been in there since the original complaint was filed in this case.  In all events, there is nothing wrong with a plaintiff pleading causes of action that can be pursued within the applicable statute of limitations. *See, e.g., United States v. The Intrados/International Management Group*, 265 F. Supp.2d 1 (D.D.C. 2002) (false statements claim under 3729(a)(2) could proceed even though underlying false claims count under 3729(a)(1) was barred by the statute of limitations).  Similarly, in this case there is nothing untoward or unusual about relator

---

[15]     Even had *Si* suggested more broadly that inconsistent claims under the various subsections of the False Claims Act must be dismissed prior to trial, such a conclusion would clearly be against the weight of authority in this district and against this Court's previous decision striking Armstrong's "inconsistent remedies" defense.

The decision in *Si* cited *United States ex rel. Taylor v. Gabelli*, 345 F.Supp.2d 313, 338 (S.D. N.Y. 2004), but it did not cite the *Harris*, *Miller* or *Purcell* cases, previously relied on by this Court in this matter.

In *Gabelli*, the court held that plaintiffs were relying on the exact same facts in support of their (a)(1), (a)(2) and (a)(7) claims.  Here, by contrast, although some of the CSE Defendants' false statements, which were made while claims for payment were still pending or prior to closeout of the contract, might be actionable under both (a)(2) and (a)(7), others made after the contract was closed out would only be actionable under (a)(7).  Accordingly, *Gabelli* is also factually distinguishable.

pursuing his timely reverse false claims count even if some of his affirmative false claim counts are time-barred as to some of defendants' claims.

c.      <strong>Relator's reverse false claim count does not improperly "multiply" his claims.</strong>

As their final new argument that relator has failed to state a reverse false claim, the CSE Defendants complain that "[a]dopting Relator's theory would also allow a plaintiff to multiply causes of action based on a single false claim for payment." CSE MSJ at 12. The law is clear however, that this is precisely what the False Claims Act allows: the number of actionable claims against a defendant is based on the defendants' own actions in violation of the Act, and the number of false claims submitted to the Government forms neither a ceiling or floor on the number of acts for which a defendant may be held liable. As the Supreme Court explained in *United States v. Bornstein*, 423 U.S. 303, 96 S.Ct. 523 (1976), "[a] correct application of the statutory language requires, rather, that the focus in each case be upon the specific conduct of the person from whom the Government seeks to collect the statutory forfeitures." 423 U.S. at 313. Thus, for example, because section (a)(1) provides liability both for actually submitting false claims and for "causing" false claims to be submitted, a subcontractor who "committed three separate such causative acts . . . would be liable for three forfeitures, even if [the contractor] had filed only one false claim." 423 U.S. at 312.

In addition, the Act prohibits not just the submission of false claims, as stated in section 31 U.S.C. § 3729(a)(1), but also making or using false statements, or causing such statements to be made or used, as stated in sections 31 U.S.C. §3729(a)(2) and 31 U.S.C. § 3729(a)(7). Thus, consistent with *Bornstein*, the number of actionable false statements under section (a)(2) or (a)(7) may or may not equal the number of false claims actually submitted to the Government. For example, in *United States ex rel. Schwedt v. Planning Research*, 59 F.3d 196 (D.C. Cir. 1995), the D.C. Circuit held that four progress reports submitted by the defendant would be actionable false statements under section (a)(2) even though plaintiff had not adequately pled *any* false claims in violation of

33

section (a)(1).  *Id.* at 199.  Similarly, in the recent case of *United States v. Speqtrum*, 47 F.Supp.3d 81 (JEB) (D.D.C. 2014), a court in this district held that the United States had stated a claim against the defendant home-healthcare agency under (a)(1) based on their false claims submitted to the Government and had also stated a separate claim under (a)(2) based on the multiple false records and statements created in support of each false claim.

Thus, there is no legal barrier to relator pursuing under section (a)(7) (or section (a)(2) or (a)(1)(B)) each of defendants' multiple false statements made, used, or caused to be made or used "to conceal, avoid or decrease" an obligation to the United States.  In accordance with the Supreme Court's instruction in *Bornstein,* that liability should be based on the "specific conduct" of each defendant, and the CSE Defendants' own conduct will set the ceiling on the number of actionable false statements.[16]

### 4.  A material issue of fact exists as to whether defendant Knaggs "made, used, or caused to be made or used" false statements.

Moving on from their purely legal arguments, the CSE Defendants next contend that summary judgment must be granted as to defendant Knaggs because relator "has not identified a single statement made by Mr. Knaggs. . . ."  CSE MSJ at 6; *see also id.* at 24-25.  The False Claims Act, however, imposes liability not just on a person who "makes" a false statement, but rather on any person who "makes, uses, or causes to be made or used" a false statement.  Accordingly, the fact that Mr. Knaggs himself may not have made a false statement, even if true, would not provide a basis to grant summary

---

[16]     While it is true that the CSE Defendants' fraudulent behavior seemingly knew no bounds, even relator has not contended that the CSE Defendants would be liable for an "infinite number" of false statements, as the CSE Defendants fret.  CSE MSJ at 13. Rather, in accordance with the statutory language, defendants' reverse false claims liability will be based on only those statements made, used, or caused to be made or used "to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government," which is an issue of fact for the jury.  The Court need not address the question of whether such claims could be unending in some hypothetical scenario different from this case, because the false statements at issue here were made throughout the time period during which defendants' obligation arising from the total breach could reasonably be deemed to exist.

judgment in his favor.  Relator acknowledges that defendant Stapleton appears to have been the more visible of the two CSE principals, but a material issue of fact exists as to Mr. Knaggs' involvement in the false statements by Armstrong, Stapleton and CSE which have been identified to date.  Moreover, there is evidence of Mr. Knaggs' own misconduct as well.

Defendant Armstrong has already admitted to making numerous false statements denying doping after June 10, 2004.   ECF 44, United States' Complaint at ¶ 67(A)-(F); ECF 298, Armstrong's Answer, at ¶ 67(A)-(F).  Relator's responses to CSE's First Set of Interrogatories list in detail numerous false statements by Stapleton and CSE after June 10, 2004, regarding Armstrong's doping.  *See* ECF 311-10 at 9-13.  Briefly here, just a few examples of those false statements include the following:  In a full page "Dear Colleagues" letter published in a sports journal in October 2004, Stapleton attacked SCA Promotions, Inc. ("SCA") and denied that the doping allegations against Armstrong were true.  Scott Decl., Exh. 1, Stapleton SCA I Dep. at 127:15-130:14, Exh. 10.  In October 2004, when Dr. Michele Ferrari (with whom Armstrong worked) was convicted of sports fraud by an Italian court, CSE released a press release denying Armstrong's participation in doping.  *Id.*, Stapleton SCA I Dep. at 76:1-22, Ex. 5.  In October 2004, in connection with the SCA case,[17] Stapleton solicited false testimony from at least one witness with representations about Armstrong's innocence.  *Id.*, Exh. 2, SCA I Hearing, 1838:1-1840:21, Resp.'s Exh. 35, Email from Bill Stapleton to Stephanie McIlvain dated Oct. 11, 2004.  In the same case, in October 2005, Stapleton testified emphatically and repeatedly under oath that Armstrong was not guilty of doping.  *Id.* at Exh. 1, Stapleton SCA I Dep. at 40:12-20; 66:15-67:13.

---

[17]     This action was brought by Tailwind and Armstrong against SCA Promotions, Inc. for refusing to pay a bonus to Armstrong on the ground that he had doped to win the 2004 Tour de France.  *See* Scott Decl., Exh. 2, SCA I Hearing, Claimant's Exh. 98, Arbitration Petition.  The parties settled the action after Stapleton and Armstrong gave false testimony denying Armstrong's doping.

In addition to the foregoing false statements by Stapleton and CSE, Stapleton was also instrumental in causing false public statements to be made regarding an investigation into doping by defendant Armstrong.  Specifically, Stapleton subverted the 2006 Vrijman Report, which was supposed to reflect an "independent" investigation by Emile Vrijman into an August 23, 2005 article in French publication *L'Equipe* alleging Armstrong's urine samples from the1999 Tour de France had tested positive for EPO.  Scott Decl., Exh. 20, Vrijman report at 9.  *Id.* ███████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████  ████████████████████████████████████

██████████████████████████████████████████

███████████████████  █

─────────────────────

[18] ███████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

When the subject of the investigation came up in Stapleton's testimony at the SCA arbitration in 2005, where others were not privy to the true facts, Stapleton vigorously defended the independence of the investigation.  *Id.* at Exh. 2, SCA I Hearing, Vol. 9 January 16, 2006 at 1804:13-1805:19.  ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████   Not surprisingly, in this context, the Final Arbitration Award in the SCA II matter concluded that "Armstrong and Tailwind [which was headed by Stapleton as CEO during the initial SCA arbitration] "expressed no remorse to the panel for their wrongful conduct and continued to lie to the panel throughout the final hearing even while admitting to prior falsehoods and other wrongful conduct."  *Id.* at Exh. 26, SCA II February 4, 2015 Final Arbitration Award at 17.

---

███████████████████████████████████████████████████████

████████████████████████████████████████████████

"On 5 October 2005, WADA informed UCI that it would be conducting its own investigation. The following day, after Lance Armstrong's agent, Bill Stapleton, assisted UCI in drafting a press release, UCI announced its decision to conduct an independent investigation, and to appoint Emile Vrijman. The press release stated that Emile Vrijman would conduct a comprehensive investigation regarding all issues arising out of the testing conducted by the LNDD."

Scott Decl., Exh. 19, CIRC report at 182.

"UCI, together with the Armstrong team, became directly and heavily involved in the drafting of the Vrijman report, the purpose of which was only partly to expedite the publication of the report. The main goal was to ensure that the report reflected UCI's and Lance Armstrong's personal conclusions. The significant participation of UCI and Armstrong's team was never publicly acknowledged, and was consistently denied by [UCI's President] Hein Verbruggen." *Id.* 186-87.

"On 11 May 2006, . . . Hein Verbruggen terminated Emile Vrijman's contract on behalf of the UCI. Mark Levinstein reiterated that he would work with Emile Vrijman to help him complete the report. Bill Stapleton sought to reassure Hein Verbruggen that the report was good and that: "[T]he document is going after WADA as I know you (and we) want them to do and as they should." … *Id.*

As described in the Background Facts section, relator has presented evidence that Knaggs knew of the Team's doping, or at a minimum acted with reckless disregard as to the existence of doping by Armstrong or other Team members.  Given Knaggs' position as a principal of CSE and an officer of Tailwind and his close relationships with Armstrong and Stapleton, a jury could reasonably infer that Knaggs played a role in the foregoing campaign of deceit.  ███████████████████████

███████████████████████████████████████

███████████████████████

As noted above, relator has not yet completed his document discovery, in part because CSE's emails from the relevant period have been destroyed, and, Knaggs, Stapleton, Bruyneel and Armstrong, among others, have not yet been deposed. Accordingly, if the Court is not satisfied that the evidence already before the Court suffices to raise an issue of material fact as to whether Knaggs made, used or caused to be made or used false statements, relator should at a minimum be permitted additional discovery pursuant to Rule 56(d) in order to discover a) Knaggs' role in the false statements already identified by relator and b) any additional actionable false statements and Knaggs' role in the same.

### 5. Section 3729(a)(7) does not include a "presentment" requirement and a material issue of fact exists as to whether defendants' false statements were material to the concealment of an obligation.

Conceding as they must that relator *has* identified false statements by defendants Stapleton and CSE, the CSE Defendants nonetheless contend that summary judgment

---

[19]    The CSE Defendants refer to an instance where defendant Knaggs attended a press conference after June 2004, where Armstrong repeated his lies about doping.  See ECF 311-11; Knaggs Decl. at ¶ 8.  The CSE Defendants attempt to explain that Knaggs just "listened in by cellular telephone" and "did not make any statements during the press conference."  Knaggs Decl. at ¶ 8.  As noted above, Mr. Knaggs statement that he himself did not make any statements during a single press conference does not preclude a finding that he "caused to be made or used" the false statements in that press conference, not to mention the many other false statements by CSE, Stapleton and Armstrong.

should be granted as to those defendants because their statements were not made directly to the United States and do not constitute a "claim" under the FCA. CSE MSJ at 25. Contrary to the CSE Defendants' contentions, however, it is well-established that "presentment" to the United States is *not* an element of a reverse false claim (or a false statements claim). *See, e.g., Chesbrough v. VPA, P.C.*, 655 F.3d 461, 473 (6th Cir. 2011) ("[T]he Chesbroughs are correct that § 3729(a)(7), known as `the reverse false claims" provision, does not require presentment of a claim to the government . . . .").[20] Accordingly, the fact that Stapleton or CSE did not make statements directly to the United States provides no basis to grant summary judgment in their favor. *See Bahrani*, 465 F.3d at 1206-07 (where defendant argued that summary judgment should be granted on reverse false claims because false import certifications at issue were never presented to the government, motion was denied on the ground that 3729(a)(7) does not require "presentment").

Instead, a reverse false claims plaintiff need only show that the false statement at issue was "material." The CSE Defendants have not asserted, nor could they, that the false statements at issue were not "material."

In the context of affirmative false statements claims under 3729(a)(2), courts in this district have held that "[a] false statement is material if it 'has a natural tendency to influence agency action or is capable of influencing agency action.'" *United States ex rel.*

---

[20]     *See also United States ex rel. Matheny v. Medco Health Solutions*, 671 F.3d 1217, 1224 n.12 (11th Cir. 2012) ("We note that for a reverse false claim action, presentment of a false claim is not at issue and presentment of a false statement is not required by the statute and thus, does not need to be pled."); *Bourseau*, 531 F.3d at 1159 ("Presentment is not an element in a cause of action under § 3729(a)(7), which is the cause of action at issue here. *Cf. Allison Engine Co., Inc. v. U.S. ex rel. Sanders*, _ U.S. _, 128 S.Ct. 2123, 2128-29, 170 L.Ed.2d 1030 (2008) (holding that there is no presentment requirement in § 3729(a)(2), which uses the same "makes, uses, or causes to be made or used" language found in § 3729(a)(7))."); *Bahrani*, 465 F.3d at 1207 ("We agree that § 3729(a)(7) does not require presentment to the United States government."); *United States ex rel. Koch v. Koch Industries*, 57 F. Supp.2d 1122, 1143-44 (N.D. Okla. 1999) ("The bad act under (a)(1) is the presenting of a false claim. The bad act under (a)(7) is the making or using of a false statement or record. There is no "presentment" language in § 3729(a)(7).").

*Fago v. M & T Mortg.Corp.,* 518 F.Supp.2d 108, 118 (D. D.C. 2007); *see also United States ex rel. Shemesh v. CA, Inc.*, Civ. Action No. 09-1600, 2015 WL 1446547 (ESH) (D.D.C. Mar. 31, 2015).  This same standard applies to reverse false claims.  *See, e.g., Matheny*, 671 F.3d at 1228-29 (holding, in context of reverse false claims case, that in order to be "material" a misrepresentation "must have the ability to affect the government's decisionmaking"); *Bourseau,* 531 F.3d at 1171 (in reverse false claims case, cost reports were "material" because they "had the potential effect, or natural tendency, to decrease the amount CPMS owed Medicare in overpayments, *despite the fact that cost reports were never audited*") (emphasis added); *Bahrani,* 465 F.3d at 1204 ("[I]n determining whether a false statement is material under § 3729(a)(7), the inquiry "focuses on the potential effect of the false statement when it is made, not on the actual effect of the false statement when it is discovered.") (citing *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 445 (6th Cir. 2005)).  Thus, materiality does not require that the United States actually learn of the false statements, but only that plaintiff show that if the United States had learned the truth, it might have demanded repayment of the sponsorship funds.

Here, relator has identified numerous false statements by Stapleton and CSE made in the press and made to suppress the truth about doping from coming out in the press.  The Court has already ruled, in the context of discussing relator's "implied certification" theory, that "repeated and rampant doping activity" would be material to the United States' decision to pay.  ECF No. 174, Memo Op. at 55.  The evidence also shows that the United States was aware of press reports and had taken actions with respect to the Sponsorship Agreement based on press reports in the past.  For example, after allegations of possible doping surfaced in 1999, the United States added additional provisions to the 2000 Sponsorship Agreement to address doping.  ECF No. 44, US Complaint at ¶¶ 19-21.  The CSE Defendants cite another incident in which they contend USPS charged back $50,000 to Tailwind under the Sponsorship Agreement due to mere "negative publicity," *i.e.,* when it was not even known that Armstrong had been doping.  Accordingly, a jury

could reasonably infer that, had the CSE Defendants' told the truth about the Team's doping instead of making false statements in their press releases, or had the truth otherwise come out through, for example, the SCA litigation or the Vrijman report, that such knowledge would have affected the USPS' decision-making as to whether to seek repayment of the sponsorship funds.

### 6.    A material issue of fact exists as to defendants' knowledge in making false statements.

Finally, the CSE Defendants contend that they are entitled to summary judgment as to their subjective intent.  Noting that the reverse false claims provision requires that a false statement be made "to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government," the CSE Defendants argue that they could not have had an intention to avoid the contractual obligation to repay the USPS, because they had no idea that there was any such obligation.  CSE MSJ at 25-26.  But "summary judgment is not usually appropriate when the issue raised concerns a subjective state of mind." *Washington Post Company v. Keogh*, 365 F.2d 965 (D.C. Cir. 1966).[21]  In any event, other facts in the record, including their own previous sworn testimony, contradict the CSE Defendants' current self-serving affidavits and raise an issue of material fact as to their knowledge.



As of the Effective Date of

---

[21]    Where issues of knowledge, and other "fact-intensive" issues are concerned, the standard for granting additional discovery is particularly generous, with courts not even necessarily requiring a Rule 56(d) affidavit (although relator has submitted one here). *See, e.g., Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) ("[W]hen fact-intensive issues, such as intent, are involved, courts have not always insisted on a Rule 56(f) affidavit if the nonmoving party has adequately informed the district court that the motion is pre-mature and that more discovery is necessary.") (citing, *inter alia, First Chicago Int'l v. United Exchange Co.,* 836 F.2d 1375, 1380-81 (D.C. Cir. 1988)).

October 1, 2003, the USPS was the Team's title sponsor and its biggest sponsor, and the "contractual agreement" in place with the USPS was the Sponsorship Agreement. Another of CSE's duties under the Service Agreement was "complying in all material respects with all the regulations of all applicable cycling governing bodies, including the UCI."

The Sponsorship Agreement further required Tailwind to ensure that the Team's riders complied with all of the applicable rules of cycling, including those prohibiting doping.  It also provided that, upon the occurrence of an "Event of Default," such as doping,

> the nondefaulting party may declare, at its option, this Agreement to be in default and; (1) may immediately terminate this Agreement without any liability whatsoever: by providing written notification to the defaulting party[;] (2) may seek enforcement by appropriate court action of the terms hereof; (3) *may exercise any other right or remedy available to it under law or in equity;* or (4) may seek any permitted combination of such remedies.

Scott Decl., Exh. 27, Sponsorship Agreement (8)(c) (emphasis added); Ritts Decl., Exh. A.  As the Court has already ruled, doping was a "total breach" of the contract that would entitle the USPS to repayment of the sponsorship fees.

Despite these facts, both Stapleton and Knaggs state in their respective declarations that "Once the Sponsorship Agreement ended in June 2004, I was not aware of any basis upon which the Postal Service could recoup or clawback funds that had been paid under the Sponsorship Agreement.  Being unaware of any such requirement to refund the money paid, I never made any statement for the purpose of avoiding any repayment obligation to the Postal Service or any other branch of the United States government."  Stapleton Decl. at ¶ 5; Knaggs Decl. at ¶ 5.  As an initial matter, as discussed in detail in Section IV.A. above, the Sponsorship Agreement did not in fact "end in June 2004," but rather continued in effect until at least December 31, 2006 and was not closed out until March 2009.  Accordingly, the very premise of Stapleton and Knaggs' statements denying knowledge is incorrect.  Moreover, as detailed above, relator's evidence indicates that additional direct claims for payment remained pending

after June 2004 and until at least January 2006.  To the extent claims for payment were still pending and/or the contract was not yet closed, the CSE Defendants' false statements would be actionable as direct false statements under 3729(a)(1)(B), which does not require an intent to "avoid, decrease or conceal an obligation," but only that the false statements be "material to a false statement or claim."  Accordingly, even if taken at face value, the defendants' declarations provide no basis for summary judgment.

Both defendants also state:  "I did not believe that the Sponsorship Agreement allowed the Postal Service to recover sponsorship fees paid under the Sponsorship Agreement in the event that a member of the Tailwind cycling team was found to have used performance enhancing drugs."  Stapleton Decl. at ¶ 3; Knaggs Decl. at ¶ 3.  Plaintiffs' allegations, however, involve much more than "a member" of the team being "found to have used performance enhancing drugs."  Rather, the team was engaged in "the most sophisticated doping scheme in the history of sport," including the participation of team management, and its lead rider Lance Armstrong has now admitted that he doped throughout the course of the sponsorship, including during his six Tour de France "victories."

Indeed, defendants' self-serving claims regarding intent are completely implausible.  Stapleton is trained as a lawyer and was the sports agent for Lance Armstrong -- one of the most famous athletes in the world.  Knaggs worked for CSE in the sports management field for numerous years and was also Armstrong's agent.  The USPS also was not just any ordinary sponsor; it is a United States government entity.  Based on these facts alone, a jury could easily infer that Stapleton and Knaggs were well aware that if the USPS had learned that Tailwind was engaged in "the most sophisticated doping scheme in the history of sport," it would likely, at a minimum, have demanded its money back.  Indeed, even their own client testified that he understood that if it were to come out that he was doping that his sponsorships "would all go away."  Scott Decl., Exh. 6, Armstrong SCA I Dep. at 117:19-118:17.



As noted above, the USPS' "rights under the contract" included not just terminating the contract but also the exercise of "any other right or remedy available to it under law or equity," which would include, as the Court had already determined, the right to seek repayment in the event of a "total breach" of the contract.  As Knaggs' testimony about conversations between himself and Stapleton implicates the knowledge of each of them, relator has raised a material issue of fact regarding knowledge precluding summary judgment as to either Knaggs or Stapleton.

**VI.    CONCLUSION**

For all of the foregoing reasons, the motion for summary judgment should be denied.  While relator strongly believes the motion can be denied on its merits based on the current record, in the event the Court believes there is additional evidence needed on a particular issue of fact, relator respectfully requests, in the alternative, that he be granted additional time for discovery pursuant to Rule 56(d).

/

/

/

/

/

Dated:  May 26, 2015                         Respectfully submitted,

                                             _____/s/_____
                                             Paul D. Scott
                                             pdscott@lopds.com
                                             California State Bar No. 145975
                                             Admitted *Pro Hac Vice*

                                             _____/s/_____
                                             Lani Anne Remick
                                             laremick@lopds.com
                                             California State Bar No. 189889
                                             U.S.D.C. No. PA0045
                                             Jon L. Praed
                                             U.S.D.C. No. 450764
                                             D.C. Bar No. 51665
                                             LAW OFFICES OF PAUL D. SCOTT, P.C.
                                             Pier 9, Suite 100
                                             San Francisco, California 94111
                                             Tel: (415) 981-1212
                                             Fax: (415) 981-1215

                                             Attorneys for Relator Floyd Landis