```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - -
FLOYD LANDIS,
                              CA No: 1:10-cv-00976 (CRC)
            Plaintiff,
                              Washington, D.C.
                              Thursday, June 18, 2015
vs.                           4:05 p.m.

TAILWIND SPORTS CORPORATION,
et al.,

            Defendants.
- - - - - - - - - - - - - - - - -
_____

              TRANSCRIPT OF TELEPHONIC CONFERENCE
      HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                 UNITED STATES DISTRICT JUDGE
_____
```

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | **PAUL D. SCOTT, ESQ.** |
| | **LANI ANNE REMICK, ESQ.** |
| | LAW OFFICES OF PAUL D. SCOTT, PC |
| | The Embarcadero |
| | Pier Nine, Suite 100 |
| | San Francisco, CA 94111 |
| | (415)981-1212 |
| | |
| For Intervenor Plaintiff | **DARRELL C. VALDEZ, ESQ.** |
| United States of America: | U.S. ATTORNEY'S OFFICE |
| | Civil Division |
| | 555 Fourth Street, NW |
| | Washington, DC 20530 |
| | (202)252-2507 |
| | darrell.valdez@usdoj.gov |
| | |
| | **ROBERT E. CHANDLER, ESQ.** |
| | **DAVID MICHAEL FINKELSTEIN, ESQ.** |
| | **TRACY HILMER, ESQ.** |
| | U.S. DEPARTMENT OF JUSTICE |
| | Civil Division, Fraud Section |
| | 601 D Street, NW |
| | Suite 900 |
| | Washington, DC 20530 |
| | (202) 514-4678 |

(CONTINUED ON NEXT PAGE)

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

1     APPEARANCES (CONTINUED):

2     For the Defendant           **ELLIOT R. PETERS, ESQ.**
      Lance Armstrong:            **SHARIF E. JACOB, ESQ.**
3                                 **ELIZABETH McCLOSKEY, ESQ.**
                                  KEKER & VAN NEST, LLP
4                                 633 Battery Street
                                  San Francisco, CA 94111
5                                 (415)391-5400
                                  epeters@kvn.com
6

7     For the Capital Sports &    **MARGARET E. DAYTON, ESQ.**
      Entertainment Holdings:     SCHEPER KIM & HARRIS LLP
8                                 601 West Fifth Street
                                  Los Angeles, CA 90071-2025
9                                 (213)613-4655
                                  pdayton@scheperkim.com
10

11

12

13

14    Court Reporter:            Lisa A. Moreira  RDR, CRR
                                 Official Court Reporter
15                               U.S. Courthouse, Room 6718
                                 333 Constitution Avenue, NW
16                               Washington, DC  20001
                                 202-354-3187

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S

 2            THE COURT:  Okay.  Everyone, thanks for calling

 3    in.  You've probably already done this, but why don't we go

 4    around real quickly just so I know who all is on.

 5            MR. CHANDLER:  For the United States, Your Honor,

 6    it's Robert Chandler, Tracy Hilmer, David Finkelstein, and

 7    Darrell Valdez.

 8            MR. SCOTT:  For relator, it's Paul Scott and Lani

 9    Remick, Your Honor.

10            THE COURT:  Okay.

11            MR. PETERS:  Good afternoon, Your Honor.  For

12    Mr. Armstrong:  Elliot Peters, Sharif Jacob, and Elizabeth

13    McCloskey.

14            MS. DAYTON:  Good afternoon, Your Honor.  For CSE,

15    William Stapleton and Bart Knaggs:  Margaret Dayton.

16            THE COURT:  Okay.  We have quite a bit to cover.

17    I've read all of the submissions and have a pretty good

18    sense of the issues and how I'm coming out.  Instead of sort

19    of hearing chapter and verse on every disputed issue, I

20    thought I would just go down the motions, give a few

21    thoughts as to my reactions, and have you react to that or

22    answer specific questions that I have.

23            Why don't we start with the Hansen subpoena.  I'm

24    inclined to grant the motion to quash with regard to the car

25    accident.  It seems to me to be extrinsic to Armstrong's
```

1     character for truthfulness, largely duplicative of the

2     public record, and, you know, without prejudging the issue

3     entirely, it's also got some 403 problems.  I'm inclined to

4     deny the motion with respect to information about

5     concealment and knowledge of others.

6               This is obviously a recurring theme in the case.

7     It seems like this touches on virtually every dispute, but

8     concealment is relevant to Armstrong's statute of

9     limitations defense, and Ms. Hansen would seem to be in a

10    position to have relevant information about it.

11              I share the concerns of Mr. Armstrong and the

12    sensitivities regarding their relationship, but absent a

13    privilege, it seems to me that inquiry into after-the-fact

14    concealment, even though she was not on the scene during the

15    period of the sponsorship agreement, would appear to be

16    relevant.  And Mr. Peters, I'll obviously give you an

17    opportunity to convince me otherwise.

18              As for the questions regarding international

19    travel.  A question for the government:  Do you all have his

20    passport?

21              MR. FINKELSTEIN:  Your Honor, this is David

22    Finkelstein.  The answer is yes, we do, but we're having a

23    hard time putting it together and matching up exits with re-

24    entries.

25              THE COURT:  Okay.

 1              MR. FINKELSTEIN:  Excuse me, Your Honor, and the

 2    passport only goes from 2002 forward.

 3              THE COURT:  Well, she wouldn't have any

 4    information pre-2002, would she?

 5              MR. FINKELSTEIN:  She may.

 6              THE COURT:  Okay.

 7              MR. PETERS:  She didn't meet him -- this is Elliot

 8    Peters.  She didn't meet him until 2008.

 9              THE COURT:  Okay.

10              On the Tyler Hamilton incident, which I think is

11    the last topic referenced by the government, it strikes me

12    as being duplicative of other witness testimony, but I'll

13    let the government address that as well.

14              So why don't we start with you, Mr. Peters or

15    Mr. Jacob, whichever.

16              MR. PETERS:  Your Honor, it's Elliot Peters, and

17    thank you for considering the matter in advance and giving

18    us your tentative ruling.  That's very helpful.

19              If the only issue that she's going to be deposed

20    about is whether she overheard some conversation with

21    someone else, I think that the deposition is a complete

22    waste of time because there's going to be no evidence that

23    she can give about that.

24              THE COURT:  Well, I think -- I would imagine the

25    government will want to ask her about her conversations with

1    Mr. Armstrong concerning after-the-fact concealment.

2            MR. PETERS:  But to what end, Your Honor?

3    Mr. Armstrong -- and I guess my suggestion is maybe what we

4    should do is depose Mr. Armstrong, and we have a date for

5    that now, and -- because he's going to admit that he used

6    PEDs.  He's admitted that in his answer.  He's going to

7    admit that he publicly denied it for a long time, really

8    until he went on Oprah Winfrey in the really beginning of

9    2013.  So I just -- I'm not sure what the dispute is.

10           And while it's easy to say that they want to

11   attack Mr. Armstrong's credibility, Mr. Armstrong's

12   testimony in this case is, "Yes, I used PEDs.  I did

13   transfusions.  I used EPO like just about every other

14   cyclist did.  And I lied about it; I denied it; I didn't

15   admit it throughout my cycling career, including during the

16   period of time when I rode for the Postal Service."  And so

17   all of these attacks on his credibility we just view as kind

18   of character assassination and not developing probative

19   evidence.

20           And his conversations with Ms. Hansen, which

21   are -- yes, they're not married, but she's the mother of his

22   children.  She's the domestic partner.  What he may have

23   said to her in '08 or '09 is really probative of nothing

24   when he's going to admit that during that same time period,

25   if asked by the press, for example, during his come-back in

1    2009 and 2010, yes, he denied that he used PEDs.  He did

2    that.

3          And so I just don't understand what a conversation

4    with Ms. Hansen adds to the evidentiary record other than

5    that they get to drag Lance's domestic partner and the

6    mother of his two small children into a deposition for a

7    day.

8          THE COURT:  Well, I guess your point -- and I

9    don't want to speak for the government, but what I take

10   it they will say is that he has taken the position that no

11   one -- that people at the Postal Service knew about his

12   doping, right?  And --

13         MR. PETERS:  Well, we're -- I'm sorry.

14         THE COURT:  And if, hypothetically, he had a

15   conversation with Ms. Hansen in which he said, "Yes, I never

16   told the Postal Service about it, and I went to great

17   lengths to conceal it from them," why aren't they entitled

18   to ask her a deposition question about that?

19         MR. FINKELSTEIN:  And, Your Honor, can I add one

20   thing to that?

21         THE COURT:  Please say your name before you speak

22   so the court reporter can get it down.

23         MR. FINKELSTEIN:  This is David Finkelstein.  So

24   the one thing I would add is that Mr. Peters didn't say

25   anything about co-conspirators.  We've now deposed a few

1     witnesses, and a few people have told us that they had --

2     they, including Mr. Armstrong's ex-wife, Kristin Armstrong,

3     had conversations with Bill Stapleton, and that Bill

4     Stapleton knew that Mr. Armstrong was doping.

5          If Ms. Hansen had personal knowledge of Bill

6     Stapleton's knowledge, that's extremely relevant from our

7     perspective.

8          THE COURT:  Okay.  Mr. Peters, address those two

9     points.  And after you do, I would like Mr. Finkelstein to

10    ask you why you did not or why the government did not

11    include Ms. Hansen on your list -- on your witness list or

12    Rule 26 list before the car accident occurred.

13         Go ahead, Mr. Peters.

14         MR. PETERS:  So the government's argument -- I

15    mean, I guess the second one is that Ms. Hansen is going to

16    have information about what Mr. Armstrong -- about what

17    Mr. Stapleton knew is just pure speculation.  It's a

18    complete fishing expedition, and there is -- and it's going

19    to come up completely empty.

20         She has no knowledge of what Mr. Armstrong said to

21    Mr. Stapleton, and what's really critical is that what

22    matters is that -- the most critical thing is the knowledge

23    of the Postal Service during the period of time of the

24    sponsorship, when she didn't even know Mr. Armstrong, and

25    she certainly has no information about what Mr. Stapleton

1    and Mr. Armstrong discussed during a period of time four

2    years before she met him.

3            And what we're trying to prove about the Postal

4    Service is that they knew and that they should have known

5    during the period of the sponsorship.  What they knew or

6    didn't know after the sponsorship was over is -- really

7    isn't the focus of our statute of limitations defense.  The

8    focus is on what they knew really in 2000 when they renewed

9    the sponsorship agreement, and that's eight years before

10   Ms. Hansen knew Mr. Armstrong.

11           THE COURT:  So her testimony would be relevant

12   only to the extent that they had a conversation about what

13   took place four years prior?

14           MR. PETERS:  It would only be -- I think it would

15   only be relevant if they had a conversation about that, and

16   I'm quite confident that they didn't.

17           THE COURT:  Right.  It might be a short deposition

18   then.

19           MR. SCOTT:  Your Honor, this is Paul Scott.  If I

20   could add one point?

21           THE COURT:  Sure.

22           MR. SCOTT:  In Mr. Stapleton's deposition in the

23   FCA matter, he's maintained that he had no awareness of

24   Mr. Armstrong's doping up until 2012, and so conversations

25   in 2008 and 2009, apart from being relevant to past events

1    when Postal was still operating, those would obviously be

2    irrelevant.  But also knowing that Mr. Stapleton was aware

3    of what was going on yet again in 2008 and 2009, when

4    Mr. Armstrong is claiming he wasn't doping, you know, those

5    would also be relevant to both whether Mr. Armstrong was

6    doping in that year and also to whether Mr. Stapleton's

7    telling the truth in his deposition when he says he didn't

8    learn until 2012.

9              THE COURT:  Okay.

10             MR. PETERS:  But, Your Honor -- this is Elliot

11   Peters again -- the idea -- now we've pivoted.  Anna Hansen

12   is going to give testimony not that's relevant to Lance

13   Armstrong.  She's going to give testimony that's somehow

14   relevant to Bill Stapleton?

15             Her connection to Bill Stapleton is just that her

16   significant other worked with Stapleton as his manager.  She

17   didn't have a personal relationship with Bill Stapleton.

18   She didn't live with him.  You could pick almost any random

19   person who had some association with Lance Armstrong and

20   say, "Oh, we're going to question them about what Bill

21   Stapleton knew."

22             There isn't even the hint of a good faith basis to

23   suspect that Anna Hansen has any knowledge about Bill

24   Stapleton's knowledge.  She has a personal relationship with

25   Lance Armstrong.  They live together, and they raise

1    children together.  And she met him after this whole period

2    in which he raced for U.S. Postal Service and used PEDs was

3    over.

4            So the idea that now she's a witness who's got

5    some knowledge about Bill Stapleton's knowledge is really

6    very, very attenuated and highly speculative.  And that the

7    first two witnesses the government wants to depose in this

8    case are his ex-wife, Kristin Armstrong, who they did

9    depose, and his effective wife but who he's not married to,

10   Anna Hansen, to me is highly suspicious.

11         MR. FINKELSTEIN:  Well, Your Honor -- this is

12   David Finkelstein -- that's just not correct, that these are

13   the first two witnesses, but they are the early witnesses so

14   I understand what Mr. Peters is getting at.

15           I think what I would say very briefly in response,

16   before I answer Your Honor's question, is that first we have

17   a conspiracy claim against Mr. Armstrong, and part of that

18   is he conspired with, among others, Bill Stapleton.  Second,

19   the relator has a claim against Mr. Stapleton which survived

20   a motion to dismiss in which we can intervene with good

21   cause; a decision that we continue to consider.  And I don't

22   think it's completely speculative that Anna Hansen would

23   know what Stapleton knew because Kristin Armstrong knew what

24   Stapleton knew, and she just testified that Stapleton knew.

25           So Stapleton was close to the family.  They had

1    contacts with Stapleton, and you could understand why we

2    wouldn't want to just take Mr. Peters's word for it.

3              But in answer to Your Honor's question about why

4    Ms. Hansen wasn't included on the initial list is this was

5    simply an omission on our part.  It was -- we didn't

6    consider and reject the decision to put her on the list.  We

7    just didn't consider it.

8              MR. PETERS:  I mean, Your Honor -- this is Elliot

9    Peters -- if you look at the length of that list, that

10   doesn't make a lot of sense.

11             And Kristin Armstrong didn't say that -- she

12   doesn't have any facts that -- she didn't testify to any

13   facts which would furnish the basis that Mr. Stapleton knew.

14   That was her belief.

15             In fact, I understand her testimony was that

16   she's not -- that she, Kristin Armstrong, who was married to

17   Lance while he rode for the Postal Service team, that she

18   wasn't aware of any conversation or any communication

19   involving Mr. Stapleton that she could testify to.  It was

20   just her belief that he must have known.

21             THE COURT:  Okay.

22             MR. FINKELSTEIN:  Your Honor, this is David

23   Finkelstein.  That's simply not correct.  We have a rough

24   version of the transcript.  I'd be happy to submit it to

25   Your Honor if he thinks it would help.

```
1              What she testified about -- and I was there;
2     Mr. Peters wasn't -- was that she has a general recollection
3     of conversations that she herself had with Bill Stapleton in
4     which he indicated he was aware of Lance's doping.
5              THE COURT:  Okay.  Okay.  I've heard enough on
6     that one.  We will consider what you all have added, and
7     I'll get out an omnibus order that deals with all of this
8     stuff in pretty due course.
9              Let's move to the London documents.  I got the
10    index.  I appreciate that.  And I guess my question to the
11    government is why is not this index sufficient to allow you
12    to identify categories of documents that you might be
13    interested in as opposed to the whole set in London?
14             MR. VALDEZ:  Your Honor, if you look at the index
15    it's actually very -- I'm sorry, this is Darrell Valdez.  If
16    you look at the index, it's actually very, very -- it
17    doesn't give us specifics as to what is within those.  It
18    gives us general ideas.  It gives us witness's names and
19    matters like that, but it doesn't give us anything in
20    particular.
21             There's also other files within those other --
22    entries within that index that is completely -- in all
23    honesty, you can't tell anything from all of those entries.
24             But more importantly, Your Honor, I think the fact
25    is is that -- I mean, first of all, we were never made aware
```

1  of this index until counsel filed their response to our

2  summary.  They never pointed it out to us, even though we

3  were emailing back and forth during the whole time that they

4  produced the index to us, and it was hidden within their

5  multiple thousand pages of production, and they never

6  pointed it out to us that it was there.

7       The agreement between the parties is very clear,

8  Your Honor, as well as the instructions within the document

9  itself, which matches what the parties agreed to, that they

10 would produce the documents electronically.

11      THE COURT:  I agree with Mr. Armstrong, that that

12 applies if the documents are going to be produced.  If there

13 is a reason to justify inspection rather than introduction,

14 that agreement obviously would not apply.

15      It's similar to the government's agreement to

16 allow Mr. Armstrong to inspect the documents in Las Vegas.

17 There was something about those documents that did not make

18 them amenable to production.

19      MR. VALDEZ:  Right, Your Honor.  They weren't

20 coming from the United States.  They came from a person who

21 was no longer employed by the United States; and, therefore,

22 we had no control over that person, and they were not a part

23 of the party of the United States.

24      THE COURT:  Well, these documents are coming from

25 a third party as well, right?

 1              MR. VALDEZ:  No, Your Honor.  These are coming

 2      from Mr. Armstrong's legal representative with whom he can

 3      easily ask for and which, under the rules, he has control

 4      of.

 5              MR. JACOB:  Your Honor, this is Sharif Jacob on

 6      behalf of Mr. Armstrong, and I'd just like to respond to a

 7      couple of points of the government's.

 8              THE COURT:  Before you respond, tell me why this

 9      stuff is not privileged or work product in the hands of

10      Mr. Armstrong's lawyer.

11              MR. VALDEZ:  Well, Your Honor, first of all, we

12      can't tell whether they are or not, and I think with --

13      especially since the fact that -- I think what you need to

14      do is you need to look at this request, Your Honor, not from

15      the lens that Mr. Armstrong presented it to Your Honor.  He

16      did not ask -- the only request that is out there is not

17      just for the witness statements.  It is for anything that is

18      related to the litigation, and it would include a number of

19      lists as well as privileged documents, but they have not

20      asserted privilege to any of these documents as of yet.

21              THE COURT:  Well, my question really was to

22      Mr. Jacob.

23              MR. VALDEZ:  Okay.

24              THE COURT:  Is there a privilege to be asserted

25      over these documents in the first instance?  And why hasn't

1    it been?

2              MR. JACOB:  Absolutely, Your Honor, and I just

3    want to give you a little bit of background to help explain

4    why we're at this point.

5              Lance Armstrong received the government's document

6    request asking for the Schillings file.  He contacted

7    Mr. Armstrong's lead attorney, who prepared a careful review

8    of the file that was available to him and produced

9    nonprivileged material.  The government has those.  Those

10   documents have been produced.

11             He learned at a later date that Schillings, the

12   law firm -- Armstrong's lead attorney at Schillings had then

13   left -- apparently had an archive that contained all of the

14   files.

15             Honestly, we believe these files are completely

16   peripheral to this litigation.  These are the litigation

17   files from a defamation action in London.  We don't believe

18   it has anything to do with this case.  However, we agreed to

19   make them available for inspection despite the fact that a

20   number of these may, in fact, be attorney-client privilege

21   or attorney work product --

22             THE COURT:  Okay.  Mr. Jacobs, hold on one second.

23   So was the privilege review conducted from this universe of

24   documents?

25             MR. JACOB:  No, Your Honor.  My understanding is

1      that Mr. Benaim, Armstrong's lead attorney in Schillings,

2      had a separate file that he took with him when he left

3      Schillings.  So he had some subset of this archive.  He

4      didn't have the whole archive when he left the Schilling --

5                THE COURT:  So no one has reviewed these documents

6      for privilege?

7                MR. JACOB:  That's right, Your Honor.

8                THE COURT:  Okay.

9                MR. JACOB:  And we made them available subject to

10     the government's agreement that making them available would

11     not waive privilege --

12               THE COURT:  I see.

13               MR. JACOB:  -- and would not waive attorney work

14     product.  If they happened to choose some document that is,

15     in fact, privileged, we would claw it back pursuant to our

16     stipulated clawback order.

17               MR. CHANDLER:  Your Honor, if I may?  This is

18     Robert Chandler.  There is one fact that I think would be

19     helpful to the Court.  We requested these documents in May

20     of 2014, and apparently whatever secondary search there was

21     to these documents didn't occur until after December 23,

22     2014, when the government served the document requests that

23     are referred to in Mr. Armstrong's brief.

24               Mr. Armstrong says that prior to that time they

25     approached Mr. Benaim, and Mr. Benaim had produced documents

1   from the litigation file.  That production amounted to 547

2   pages, and we're now talking about 30 boxes of documents or

3   something close to 90,000 pages.  So I think it's pretty

4   clear that, you know, when Armstrong initially produced

5   those documents, that 547 pages did not comprise the

6   entirety of the *Times of London* litigation file, which is

7   what we had requested in May of 2014.

8          MR. VALDEZ:  If I may also -- this is Darrell

9   Valdez.  Mr. Benaim, when they contacted him, was not even

10  with Schillings so even in response to our first request

11  there was no specific request by Mr. Armstrong to

12  Schillings, who is the law firm that had the case.  Instead,

13  they went to the attorney who is no longer with Schillings

14  for his files, which, of course, is where we -- most of the

15  documents would not be, and so -- and of course they didn't

16  think about going to Schillings until well over a year after

17  we had made our request.

18          MR. JACOB:  Your Honor, this is Mr. Jacob on

19  behalf of Lance Armstrong.  Lance Armstrong has cooperated

20  extensively to make this very voluminous and almost

21  certainly totally irrelevant file available to the

22  government.  We have -- the government has had access to

23  this file for over three months.  If the government actually

24  thinks that this file is going to prove anything in this

25  litigation, they could have flown out and reviewed it or

1    have any of the attorneys who are already stationed in

2    London go in and inspect it.

3            The simple fact, and really all that this motion

4    is about, is that the government doesn't think it's worth

5    $30,000 to look at these files.  The government already has

6    a collection that was carefully culled out for attorney work

7    product by the counsel itself.  If the government believes

8    these files are useful to it, it can go and inspect them

9    subject to an agreement that making them available won't

10   waive attorney-client privilege and won't waive attorney

11   work product.

12           Armstrong satisfied his discovery duties three

13   months ago.

14           THE COURT:  All right.  Mr. Valdez or

15   Mr. Chandler, address the relevance.

16           MR. CHANDLER:  I'd be happy to, Your Honor.

17   This is Robert Chandler.  I just looked at this index that

18   Mr. Armstrong has finally provided.  There are entry lines

19   here.  There are individual files relevant to key witnesses

20   in the case.

21           There's a file on Michele Ferrari, who was the

22   doctor that Mr. Armstrong used essentially with doping.

23   There's a file on Jonathan Vaughters, whose deposition

24   Mr. Armstrong subpoenaed at one point.  There's a file on

25   Prentice Steffen, who is in the same circumstance where

1    Mr. Armstrong subpoenaed him for depositions and then

2    withdrew the depositions.  There's a file on Frankie Andreu,

3    whose deposition he actually took.  So he's obviously got

4    documents that are relevant to witnesses who are being

5    deposed in this case that we were not given an opportunity

6    to see.

7         So looking at the index that we have, it's pretty

8    clear that there are some -- there are documents in their

9    possession that are very relevant to the case, and

10   unfortunately the index doesn't give us enough indication

11   about the other files to know one way or the other whether

12   or not -- the degree of their relevancy.

13        You know, for Mr. Jacobs to suggest that we've

14   been sitting on this for a period of months is just not

15   accurate.  This index was produced to us on May 8th, after

16   we had been asking for an index for a period of months, and

17   it was done -- the index itself appeared as the final three

18   documents in a production that was over 3,000 pages.  No one

19   alerted us to the fact that they had slipped this index in

20   their production, and, in fact, there was further

21   communication after May 8th where we were specifically

22   asking for an index, and they still didn't tell us that they

23   had given an index.  This wasn't in our document database

24   until May 20th, after we had filed the present motion.

25        But sitting where we are now, looking at this

1      index, we certainly can identify documents that are very

2      relevant to the case, very relevant to the concealment

3      issue, relevant to the witnesses who are in the process of

4      being questioned about issues in this case, and, like I

5      said, with respect to documents, we just don't have enough

6      to know.

7              THE COURT:  Okay.  To the extent that you believe

8      the estimate provided by the government's -- excuse me,

9      by Mr. Armstrong's selected vendor is too high, I assume,

10     Mr. Jacob, that you would allow the government to identify

11     an expert or vendor over there to go take a look at the

12     documents and provide an alternative quote?

13             MR. JACOBS:  Your Honor, we have already done

14     that.  We provided and arranged for a vendor as a courtesy

15     to the government, and we've already made it clear in emails

16     to the government that if they prefer to use their own

17     vendor, they're free to do so.

18             MR. VALDEZ:  If I may, just real quick, this is

19     not a situation where we can just send somebody who is

20     already over there to take a look at the documents.  I mean,

21     as you know, this case is very -- I'm sorry, this is Darrell

22     Valdez.  This case is very involved.  It's going to require

23     somebody with some intimate knowledge into the case to

24     actually travel out there.

25             Now, in addition, 18,000 pounds, Your Honor, is

1    equivalent of approximately $30,000.  That is a lot of

2    money.  I don't even think some of the -- any of the vendors

3    around here would charge that much.  So yes, we would like

4    to be able to have a say in here, but we asked them about

5    it.

6              If you look at the correspondence, Your Honor, we

7    agreed that they would be subject to the clawback.  We

8    agreed we wanted to take a look at these documents.  We

9    agreed to all of this.  All we wanted was the index so that

10   we could determine, one, if we could narrow the search down,

11   or two, maybe we could even figure out what boxes we want

12   copied and just have them copied and sent here without

13   having to go.  And he never gave that to us.  He never told

14   us he had it.  Instead, he played games with us.  He played

15   Hide the Ball on us.

16             So, Your Honor, the fault doesn't lie with the

17   government as to why we're arguing to you today.  It's with

18   Mr. Armstrong and why he didn't tell us a long time ago what

19   was in these files and why he never responded.

20             THE COURT:  All right.  Look, I'm not -- it's not

21   productive at this point to assign blame one way or the

22   other.  We are where we are.  We have an index, and it seems

23   to me that, you know, the government ought to look at the

24   index and see if they can narrow or at least prioritize what

25   it wants.  If you believe that the vendor quote is too high,

1    arrange to have an alternative vendor look at the documents

2    and give you a quote for scanning and, you know, producing

3    them, or go over and take a look yourself.

4            MR. PETERS:  And, Your Honor -- this is Elliot

5    Peters -- that's exactly what we did.  It wasn't Las Vegas,

6    but it was Phoenix.

7            THE COURT:  Phoenix, I'm sorry.

8            MR. PETERS:  And those documents were produced to

9    us, and I reviewed them in the U.S. Attorney's Office.  So

10   whatever government lawyer 15 minutes ago said, "Oh, we

11   didn't have control over those documents," they were

12   produced to me in the U.S. Attorney's Office with an

13   employee of the government sitting there watching me while I

14   spent the morning reviewing them.  So they were very much in

15   the custody of the government.

16           THE COURT:  Okay.  Mr. Scott, you've been on the

17   sidelines so why don't we skip to your motion to compel

18   against Mr. Armstrong.  There are two requests, Request 90

19   and Request 77; is that right?

20           MR. SCOTT:  Yes.  That's correct, Your Honor.

21           THE COURT:  Okay.  Let's start with Request 90.

22   And as I understand it, these are requests for

23   communications, mostly emails, with 22 witnesses that were

24   not included on the list that the government requested

25   communications between; is that right?

1          MR. SCOTT:  Yes.  That's right, Your Honor.

2          THE COURT:  Okay.  And Mr. Jacob, I read the chart

3     that you all prepared, and as I understand it, you've

4     reviewed emails from the 22 custodians, and for ten of them

5     there are zero documents that are responsive to Landis's

6     document requests; is that right?

7          MS. McCLOSKEY:  Yes.  This is Elizabeth McCloskey

8     on behalf of Armstrong; and yes, that is correct.

9          THE COURT:  Got it.

10          MR. SCOTT:  Your Honor, may I chime in on that

11     relevance question?

12          THE COURT REPORTER:  Who is this?

13          MR. SCOTT:  Because it appears from just reading

14     the paper --

15          THE COURT:  This is Mr. Scott, correct?

16          MR. SCOTT:  I'm sorry.

17          THE COURT:  Go ahead.

18          MR. SCOTT:  I was just going to say that the

19     relevance determination is not clear to us.  We had

20     basically asked that they produce the documents, you know,

21     the correspondence with the persons in Request No. 90 on

22     topics that you had included in your December 11, 2014,

23     order.

24          THE COURT:  Yes.

25          MR. SCOTT:  But in reading the declaration, it

1    wasn't clear to me that that was -- they were limiting it or

2    that they were including within the ambit of what they were

3    defining as relevant the topics at the core that's set forth

4    in this December 11th order, and, you know, they appear to

5    be looking at whether or not the emails would be responsive

6    to any of Landis's other requests instead of whether they

7    were responsive to the topics that you had called out in

8    your December 11th order with respect to the other witnesses

9    that Armstrong was producing information of.  So that was

10   problematic for us.

11          THE COURT:  Okay.  And that was the point that I

12   was getting to.  What is the sort of categories -- how do

13   the categories that you all screened for relate to the

14   topical categories that were contained in the Court's prior

15   order regarding the government's emails?

16          MS. McCLOSKEY:  There is essentially no

17   difference.  We designated communications as relevant if

18   they were responsive to any of Mr. Landis's over 80 requests

19   that he served thus far in this action; so there's

20   essentially -- I mean, he's asked about a whole host of

21   issues so we think there's no difference between the Court's

22   previous ruling and what we've designated as relevant.

23          THE COURT:  Well, your objection is one of burden,

24   if I understand it, and as I look at those email counts,

25   they don't appear to be that substantial except for one

1      witness, who I want to ask you about.

2            MS. McCLOSKEY:  Yes.  I assume you want to ask us

3      about Mrs. Ritts -- Mrs. Hundley.

4            THE COURT:  Hundley.  Hundley, yes.  She was the

5      only custodian for whom there were significant numbers of

6      documents.

7            MS. McCLOSKEY:  That's right, and Mrs. Hundley is

8      an employee of CSE, and she has been Mr. Armstrong --

9      involved in the management of Mr. Armstrong's business

10     affairs for a very long period of time so many of those

11     documents -- we've already produced a lot of them, and the

12     rest of them are not going to be responsive to any of

13     Mr. Landis's requests.

14           MR. SCOTT:  Your Honor, this is Paul Scott.  If I

15     may?

16           THE COURT:  Yes.

17           MR. SCOTT:  I mean, to the extent that, you know,

18     we now have concrete evidence that Mr. Stapleton was

19     knowledgeable about doping by Mr. Armstrong, then also

20     communications with basically, you know, one of his key

21     people at CSE would be of relevance to us based upon the

22     dates on this topic that would inform the knowledge of CSE

23     on the same subject, on the topic of doping and the

24     awareness by the company in addition to Stapleton's

25     knowledge.

1          MS. McCLOSKEY:  And just to respond to that.

2     We've already produced her communications that have to do

3     with doping or any of those related issues.

4          MR. SCOTT:  And I guess in my mind, Your Honor,

5     it's not clear to me how there's some additional burden in

6     screening these emails for the same, you know, kinds of

7     information that they've already screened Armstrong's

8     communications with other witnesses.  As you know, there

9     aren't that many documents or emails that we're talking

10    about here; so to the extent that there is information in

11    there that is responsive to whatever search that they were

12    using for the other witnesses that they agreed on with the

13    government, then, you know, just apply the same criteria

14    here.

15         THE COURT:  Mr. Scott, there was a lot of back-

16    and-forth in the papers about your involvement in the

17    agreement on the custodian names that Armstrong reached with

18    the government.  Why didn't we deal with this issue when we

19    were dealing with the government's request?

20         MR. SCOTT:  Relator provided a document request to

21    Mr. Armstrong, and the government did so, I guess, in a

22    similar time frame.  So there were discussions between the

23    relator -- excuse me, Mr. Armstrong and the government

24    regarding the witnesses that were essential to why the

25    government was seeking information from Armstrong on with

1      respect to particular topics, and we were not asked to

2      participate in those conversations.

3              Basically there was no --

4              THE COURT:  But you knew they were going on,

5      though, right?

6              MR. SCOTT:  No, I did not.  I did not know that.

7      I did not know that they were agreeing on a list of people,

8      Your Honor.  I had no awareness of that.

9              Later on, when I told them about it -- and I had

10     to ask them in the meet-and-confer correspondence very

11     recently about, you know, "Who is this list of people that

12     you're talking about?"  They had to provide it to me.  I

13     just was unaware of it.

14             And in any event, I mean, the fact that the

15     government, perhaps, didn't think of all the different

16     people that it perhaps would benefit from getting

17     information on, you know, shouldn't take away from their

18     ability to, you know, make a second request.  And it could

19     very well -- and I'll let the government speak for itself --

20     have assumed that we were collecting some of that

21     information through our requests.

22             So there was no conspiracy to sort of delay or

23     create some, you know, burden after the fact.  This was

24     just -- we had made our request.  There was a delay, you

25     know, in the meet-and-confer process between the parties and

1    our mutual written discovery.  But the government has made

2    very clear that they believe that the communication that

3    we're talking about here, now that the issue is front and

4    center, that they believe these communications would indeed

5    be responsive and relevant.

6         MS. McCLOSKEY:  The government and Mr. Armstrong

7    negotiated a list of key custodians.  There were several

8    meet-and-confer conversations.  There was a motion to

9    compel.  At any point Mr. Scott could have participated

10   in those discussions, and if Mr. Scott is now saying that

11   the government has identified more people that they would

12   like to see communications with, then they're just reneging

13   on the previous agreement that the government made with

14   Mr. Armstrong.

15        MR. SCOTT:  It wasn't an agreement.  It was like a

16   culling of a limited list.  I didn't mean that the people

17   that we would ask for emails on wouldn't also be potentially

18   relevant.

19        MR. CHANDLER:  This is Robert Chandler for the

20   government.  It's my best recollection that we never had an

21   agreement with Armstrong to limit requests to certain

22   people.  We ultimately decided not to move to compel

23   production with respect to communications about certain

24   people, between Armstrong and people that were on the list

25   on our RFP, but that certainly was no -- you know, that was

1    no concession from us.  Communications between Armstrong and

2    those people were irrelevant, or they weren't properly the

3    subject of discovery.

4            MR. JACOB:  Your Honor, this is Sharif Jacob on

5    behalf of Mr. Armstrong.  I just want to make sure that the

6    record is totally clear on this point.  I engaged in a

7    series of very lengthy meet-and-confers with Mr. Chandler by

8    email and on the telephone during which we agreed to a

9    limited number of custodians.  That agreement is

10   memorialized in an email.  I believe it's an exhibit to the

11   prior motion to compel relating to this issue, but if it's

12   not, I can gladly submit it to the Court if the Court

13   believes that would be helpful in deciding this dispute.

14           THE COURT:  I have enough -- I have what I need.

15           Let's move to Request 77.  These are agreements

16   between Mr. Armstrong and CSE.  I guess let's start with why

17   are they relevant?

18           MR. SCOTT:  Your Honor, basically we're -- we've

19   got two defendants, two defendants who we are alleging are

20   co-conspirators, Armstrong and CSE and Stapleton, as well as

21   the entity, as well as the individuals who ran that company.

22   To the extent that there are financial relationships, you

23   know, that sort of information is obviously going to be

24   relevant to bias.

25           As it stands now, Armstrong has been trying

1    to protect Mr. Stapleton by claiming that he didn't tell

2    Mr. Stapleton about his doping.  We don't believe that's

3    true, and we have other information indicating that, you

4    know, Mr. Stapleton did, in fact, know about this doping.

5    And there could be reasons for why Mr. Stapleton -- or

6    Mr. Armstrong wanted to protect Mr. Stapleton, and those

7    would come from the financial relationship between them.

8            The last time around we referenced a million

9    dollar loan that Mr. Peters said, you know, he was not aware

10   of, and we provided documentation -- excuse me, we provided

11   an excerpt from Mr. Stapleton's deposition on that point for

12   the Court.  Mr. Armstrong's counsel has filed under seal, I

13   understand, a copy of whatever that loan agreement is.

14           THE COURT:  Yes.

15           MR. SCOTT:  Certainly, in response to the Court's

16   request in our last call on this topic, we attempted to

17   narrow and be as specific as we could with respect to the

18   categories of documents that would go to this point, and

19   those categories are set forth on I think it's Page 4 of

20   our -- Page 3 of our brief, and basically they include

21   Armstrong's financial stake in CSE.

22           Certainly, to the extent that the co-defendant in

23   the case, the co-conspirator, you know, and Armstrong is

24   interested in seeing that they don't have liability, his

25   financial stake in that entity would be relevant.  It

1    also would be relevant to the possibility of piercing, if

2    Mr. Armstrong is a shareholder in that company.  So his

3    financial stake in that company is relevant.

4         We also asked for agreements reflecting loans, and

5    we had specifically mentioned the million dollar loan, but

6    certainly any other material loan of that nature would be

7    relevant to possible bias by Mr. Stapleton on behalf of

8    Mr. Armstrong, or vice versa.

9         And then the final category we listed was

10   agreements reflecting other arrangements for payment, and

11   this point being simply, whether you call it a loan or a

12   payment or some other financial connection that is, you

13   know, liable to create bias, we'd want to know about it.

14        THE COURT:  Okay.  I've reviewed what

15   Mr. Armstrong has submitted in camera and will not order

16   those materials produced.  But the other category that

17   Mr. Scott has just described would appear to be relevant to

18   the point of bias.

19        Mr. Peters, do you want to respond to that?

20        MR. PETERS:  Ms. McCloskey is going to respond,

21   Your Honor.

22        MS. McCLOSKEY:  I've told Landis, as I set forth

23   in our opposition, we already produced documents sufficient

24   to show Armstrong's ownership interest in CSE; so we believe

25   that that request is moot.

```
1                THE COURT:  Okay.

2                MS. McCLOSKEY:  As for his other requests about

3     any payments by Armstrong to CSE, we simply are aware of no

4     payments or loans, however you want to categorize it,

5     relevant to this action.

6                THE COURT:  Okay.

7                MS. McCLOSKEY:  There just are no payments.

8                THE COURT:  So this may be moot then, but we'll

9     include it in the order.

10               Do you want to move to Mr. Armstrong's motion to

11    compel as to the relator?

12               MR. PETERS:  Yes, Your Honor.  Do you want us to

13    dive in, or do you want us to --

14               THE COURT:  Let's see here.  My initial impression

15    is most, if not all of this, seems to be fair game to show

16    Mr. Landis's bias, particularly if I accept the government's

17    position that his attorneys should not be put up as 30(b)(6)

18    witnesses to testify about similar inducements, benefits, et

19    cetera, given to Mr. Landis.

20               MR. PETERS:  Your Honor, this is Elliot Peters.

21    We tried to be very clear that we're not seeking any

22    privileged information, but we believe that there are a lot

23    of documents that Mr. Landis has and, frankly, that the

24    government has and Mr. Landis's attorneys have which are not

25    privileged but which would shed light on the deferred
```

1    prosecution arrangement and the underlying prosecution of

2    Landis in the related USADA case against Landis.

3         Mr. Landis obviously is the relator.  He plays an

4    important role in this case.  He's got to establish a number

5    of things to be the relator, and he also testifies about

6    some contested facts.  So his credibility and his bias are

7    at issue, and his own wrongdoing and the deal that he made

8    with the government relating to prosecution of him for mail

9    fraud or for defrauding people in a way that was closely

10   related to his own lies about his cycling career are fair

11   game.

12        Obviously Mr. Landis seems to think that that

13   kind of thing is fair game when it comes to not just

14   Mr. Armstrong, but his ex-wife and his girlfriend, and

15   we just want nonprivileged documents so we can question

16   Mr. Landis about that at his deposition.

17             THE COURT:  All right.  Mr. Scott?

18             MR. SCOTT:  Well, Your Honor, to the point that

19   you made --

20             THE COURT:  Yes.

21             MR. SCOTT:  -- I appreciate the rationale

22   behind that, that to the extent that there's a question

23   about Mr. Landis being offered some inducements by either

24   USADA or the government to provide information, then yes, I

25   understand that, and that would be relevant.  But these

1   requests go much farther than that.  They asked for

2   basically any and all information about past events that go

3   back to, you know, 2006 essentially, when Mr. Landis tested

4   positive for testosterone.

5           So those kinds of requests, which basically

6   include all the arbitration material related to

7   Mr. Landis's proceedings around his positive test and all of

8   the material around that, that has no relevance whatsoever

9   to this case.  And we've cited authority for the Court about

10  how, you know, proof of past, you know, misconduct like that

11  isn't even going to be admissible.

12          To the extent that we're -- they want to have a

13  detailed description of all the lies that he told and, you

14  know, have it written on paper and signed by him, they have

15  it.  We've given the deferred prosecution agreement.

16          What they're interested in is, "Hey, have you been

17  offered anything to come forward to the government that

18  would, you know, bias your testimony or somehow influence

19  what you've been saying?"  I understand that.  So if that's

20  what the focus is, you know, any kind of deal struck with

21  the government or USADA, then yes, you know, I appreciate

22  that point, and we'd be happy to provide it.

23          But it's when you go into all of the materials

24  that are relating to two entirely separate cases, one of

25  which went through various levels of appeal and so forth as

```
 1   well, I mean, it's just an enormous burden, and we're not

 2   set up like, you know, Keker & Van Nest in terms of the

 3   resources to be going through all that stuff to try to find

 4   it all and do privilege reviews and all the rest of it.

 5   It's totally irrelevant.

 6           If what they're after is evidence of inducement,

 7   then I get it, and we're more than happy to provide it.

 8           THE COURT:  How was the prior criminal case

 9   resolved?

10           MR. SCOTT:  By way of a deferred prosecution.

11           THE COURT:  So the DPA is with respect to that.

12   Have you all filed the DPA?  Do I have it?

13           MR. SCOTT:  Yes.  It should be an exhibit.  We

14   referenced it in our papers, Your Honor.

15           THE COURT:  Okay.

16           MR. SCOTT:  And it's detailed in terms of

17   describing exactly what he did.

18           THE COURT:  So your position is that any

19   inducement or benefit that the government provided in the

20   prior criminal case is reflected in the DPA, and

21   therefore --

22           MR. SCOTT:  No.

23           THE COURT:  Go ahead.

24           MR. SCOTT:  What I'm saying is that DPA describes

25   the course of his conduct in excruciating detail, but if
```

1    they want -- if they're asking us now, "Give us any evidence

2    or anything you have on inducement, the inducement that

3    Mr. Landis was offered or any agreements he struck in order

4    to come forward to the government or to do a deal with

5    USADA," if there's any agreements like that, we'd be happy

6    to provide them.

7           The reality is he basically came forward on his

8    own, and if they want us to sort of like prove it by, you

9    know, responding to a request that shows that he didn't

10   strike any deals, then we're happy to do that.

11          THE COURT:  Okay.  Who wants to take this one on?

12          MR. PETERS:  Elliot Peters for Mr. Armstrong, Your

13   Honor.

14          THE COURT:  Okay.

15          MR. PETERS:  To the extent Mr. Landis is talking

16   about burden by making a reference to going back to 2006,

17   he's the relator.  He brought this case.  And we've been

18   producing documents going back to 1996 and 1997 and 1998.

19   And so the burden to ask Mr. Landis to produce documents

20   that are most likely in the files of his lawyers at Wilson

21   Sonsini -- and I know who the lawyer is.  I think it's

22   likely they're all sitting in one place and could be

23   produced based on a fairly quick privilege review.

24          And we don't want anything that's privileged, but

25   we do want to know the underlying facts so we can make sense

1    of the deferred prosecution agreement because Mr. Landis got

2    substantial benefits from the government.

3              And then the second point is that Mr. Landis's

4    lawyer just said that there's -- tried to act as if there

5    were two separate cases, and I just want to be clear about

6    that.

7              Here's what happened to Mr. Landis.  He was caught

8    for using testosterone, and he was, in essence, prosecuted

9    by USADA and suspended.  And in that USADA case, he put up a

10   defense, and he went out there, and he raised a lot of money

11   from people by lying to them about what he had really done.

12   And then the criminal investigation against him focused on

13   his conduct in that case.

14             So the two are inextricably intertwined because

15   the prosecution of Mr. Landis was based on his

16   misrepresentations to various people about what, in fact, he

17   had done in order to get them to give him money, which he

18   then paid lawyers to defend himself.

19             So the USADA case and his conduct of the defense

20   of it is the crime.  It's not a separate case.  And in order

21   to evaluate this deferred prosecution agreement, which we've

22   seen and which we have no doubt was the result of extensive

23   negotiation between Mr. Landis's lawyers and the government,

24   we want to see evidence relating to the underlying facts and

25   the communications so we can understand and demonstrate what

1    Mr. Landis really got in exchange -- at a time when he was

2    also working with the government on this case.  And we want

3    the facts which will allow us to question Mr. Landis about

4    that and ultimately to demonstrate that at trial, and I

5    think it's just completely in the center of the road about

6    what we're entitled to do in terms of his bias, the bias and

7    credibility of Mr. Landis.

8            And boy have they been demanding that we produce

9    the exact same kind of stuff in every conceivable way.  We

10   just had a discussion about production of thousands of

11   documents from Armstrong's lawyers in London about some case

12   which isn't even related, and this case is about Landis's

13   own doping and benefits the government gave him while he's

14   the relator.  It is so much closer.  It is directly relevant

15   to what we're going to litigate before Your Honor.

16           THE COURT:  Okay.

17           MR. SCOTT:  Your Honor, if I can just --

18           THE COURT:  Real quick.

19           MR. SCOTT:  -- reply briefly?  I mean, just all

20   of the material that he is referring to as being sought

21   from Mr. Armstrong pertains to the period of time when

22   Mr. Armstrong was doping and evidence about doping and what

23   was going on in the U.S. Postal Service team.  He's asking

24   about stuff that happened after Mr. Landis was away from the

25   team and is completely irrelevant to this case, as is

1    evidenced by the fact that all of the affirmative defenses

2    that they had in pari delicto, unclean hands and so forth,

3    are gone from the case.

4         All that they're trying to do is basically develop

5    information to show that Mr. Landis was lying, and they have

6    that in spades in this DPA, in the deferred prosecution

7    agreement.

8         If they're looking for evidence of inducement, as

9    Your Honor started out with, we get it, and we'll provide

10   it; but it shouldn't be a basis for a fishing expedition

11   into all the details in two cases which are summarized

12   beautifully in a document the Court can see for itself as an

13   exhibit in the record.

14        THE COURT:  Okay.  We'll take a look at the DPA

15   and noodle this and get back to you on it.

16        Okay.  Let's move to the protective order.  I

17   would prefer not to go through each topic.  I've obviously

18   read it and the materials.  Let me give you a couple of

19   general thoughts at the outset.

20        Given the broad scope of the topics and the fact

21   that many of them will be covered, I assume, by fact witness

22   depositions, it strikes me as sort of an efficient way to

23   proceed as the government has suggested, which is leaving

24   the 30(b)(6)s until the end and enabling them to prepare

25   using the transcripts from the depositions of fact witnesses

1    who precede them.

2         The second point:  There are a number of disputes

3    regarding topics related to, you know, all statements or all

4    communications or identifications of all employees, et

5    cetera.  Those strike me as being overbroad and that the

6    government seems to have suggested that to the extent those

7    topics are limited, that there may not be a real dispute,

8    and so I tend to agree with that.

9         And third, as I think I've referred to before,

10   while there's no rule prohibiting attorneys from testifying

11   as 30(b)(6) witnesses, I am hesitant here to require the

12   government attorneys to be deposed, particularly about areas

13   involving the government's presuit investigation and

14   litigation strategy and work product, et cetera.

15        So with those general thoughts, what top -- A,

16   reactions to that; B, what are the most pertinent and

17   important topics that there are in dispute here?

18        MR. JACOB:  Your Honor, this is Sharif Jacob on

19   behalf of Mr. Armstrong, and since we're seeking his

20   testimony, perhaps we're in the best position to answer the

21   last question.  And I'll also respond to the three concerns

22   that you raised.

23        THE COURT:  Okay.

24        MR. JACOB:  This deposition is crucially important

25   to Mr. Armstrong, and it is an imprint from the numerous

1    depositions from former U.S. Postal Service employees that

2    he's noted and is taking.  A 30(b)(6) deposition, by its own

3    terms, requires the government to investigate these topics

4    and set forth a government position.  The government is then

5    bound to that testimony.

6            THE COURT:  I understand the role of a 30(b)(6),

7    Mr. Jacob.

8            MR. JACOB:  Okay.  So then I think the first --

9    the first concern that the Court raised was about taking the

10   30(b)(6) deposition after the U.S. Postal Service employees

11   have testified --

12           THE COURT:  Yes.

13           MR. JACOB:  -- so that the government may use

14   their testimony to prepare.  The first response to that is

15   that the government can designate any of those employees as

16   a 30(b)(6) witness, if it wants to.  It has the ability to

17   do that, but has chosen not to.

18           I think perhaps secondly, and most importantly,

19   the government position that Armstrong has to wait until

20   after those employees have testified in order to take his

21   30(b)(6) deposition is impossible.  It is practically

22   impossible.

23           Two of the witnesses that the government

24   claims that Armstrong has to wait for are Ms. Myers and

25   Ms. Bizzotto.  The parties have agreed that those witnesses

1    are going to testify on the 12th -- August 12th and August

2    13th; in other words, during the last week when fact

3    discovery is available.

4         If Armstrong is not permitted to take a 30(b)(6)

5    deposition until he's scheduled and taken the depositions of

6    all the Postal Service employees, he will be entirely

7    precluded from taking a 30(b)(6).

8         THE COURT:  Why is that?  I don't understand that.

9         MR. JACOB:  Because the fact discovery cutoff is

10   set for the 15th, and so they've literally -- the government

11   has literally given Armstrong no time to take a 30(b)(6)

12   deposition after the last Postal Service employees are

13   scheduled to testify.

14        MR. FINKELSTEIN:  Your Honor, this is David

15   Finkelstein.  May I respond?

16        THE COURT:  Sure.

17        MR. FINKELSTEIN:  August 12th and August 13th were

18   Mr. Armstrong's proposed dates, but having said that, you

19   know, we would stipulate to a small extension to the end of

20   August to accomplish the 30(b)(6).

21        We're not trying to trick him out of a 30(b)(6)

22   deposition, but we completely agree with you, Your Honor,

23   that the most useful materials would be the deposition

24   transcripts which are being produced and some of which won't

25   be produced.  And, again, August 12th and August 13th were

1   Mr. Armstrong's proposed dates.

2            THE COURT:  While I have you, Mr. Finkelstein, how

3   many 30(b)(6)s do you anticipate designating?

4            MR. FINKELSTEIN:  Your Honor, we anticipate having

5   to designate fewer witnesses for the substantive topics than

6   for the production topics because of the technical

7   complexity of the latter.  However, it depends on Your

8   Honor's order because, while we think one witness could

9   address many of these, if there's too much to cram into one

10  meal for one witness, we may have to break it into two or

11  even three.

12            THE COURT:  Okay.  But there was a suggestion in

13  the papers that there could be as many as eight; but that's

14  not for the substantive topics, I take it.

15            MR. FINKELSTEIN:  Your Honor, did we suggest that

16  there would be as many as eight?

17            THE COURT:  I'm not sure, to be honest with you.

18            MR. FINKELSTEIN:  I certainly didn't mean to

19  suggest that there would be as many as eight.  I think that

20  would have been a misstatement on our part.

21            MR. PETERS:  Your Honor, this is Elliot Peters.

22  What we're concerned about is these former Postal Service

23  employees who -- all of whom are represented by the

24  government, will be prepared by the government, the

25  government has access to, who presumably the government

1    spoke to before filing their complaint and before preparing

2    interrogatory answers; and, therefore, they've already

3    spoken to them.

4          When we depose them, we're going to get a lot of

5    "I don't recalls" and "I don't knows."  And there's a bunch

6    of different people because different people had different

7    jobs, different people operated within the sponsorship

8    during a different time frame.

9          We believe the government should prepare someone

10   or a couple of people to testify about the facts that are

11   relevant to this dispute and that they base this complaint

12   about, and that we shouldn't be put in a position where we

13   have to go through deposing all these individuals and then

14   they come up with a 30(b)(6) witness who they prepare

15   basically to just parrot the information that we've already

16   gotten.

17         THE COURT:  Well, they can't do that.  I mean,

18   that's the whole point of a 30(b)(6), is that -- is to, you

19   know, avoid the prejudice from fact witnesses not being

20   prepared and being able to say "I don't know."  If they say

21   "I don't know," then obviously the government is not going

22   to be able to use those transcripts to effectively prepare a

23   witness.

24         But if they don't say "I don't know" and testify

25   substantively, it seems to me the government ought to be

1    able to rely on those transcripts to prepare their 30(b)(6).

2          MR. PETERS:  Except, Your Honor, that they've

3    already had access to all of these witnesses for months, if

4    not years, and, I'm certain, talked to them and I think had

5    a duty to talk to them in preparing their complaint and

6    their discovery responses in this case.  And so we would

7    like to utilize the procedural tool of the 30(b)(6) to

8    efficiently sit down and understand the position that the

9    government's going to be bound by, and then question the

10   fact witnesses who will have information to give that may or

11   may not be consistent with what the government says is their

12   position about the facts.

13         We're concerned about the government basically

14   being able to conform its 30(b)(6) witnesses to depositions

15   where we may question witnesses in ways that the government

16   hasn't.  We think -- they're the plaintiff.  We think they

17   should go on record under 30(b)(6) and make the statements

18   about what occurred and what their contentions are in this

19   case and not be able to kind of cobble it together after

20   we've already gone ahead and questioned a bunch of

21   percipient witnesses, all of whom they represent.

22         THE COURT:  Now, I didn't see an objection to the

23   government's proposal in the papers, and I certainly didn't

24   see any cases discussing the appropriate timing of 30(b)(6)

25   depositions relative to percipient witnesses.  Was that an

1    oversight, or did I miss it, or is there authority out there

2    on this question?

3            MR. JACOB:  Your Honor, there absolutely is

4    authority for the proposition that Armstrong gets to control

5    the timing of depositions, and it's actually just the

6    Federal Rules itself.  Armstrong -- Federal Rule of Civil

7    Procedure 26(d)(2) says that discovery proceeds in the order

8    in which it occurs.  There's no set order.  One set of

9    discovery doesn't have to proceed after another set of

10   discovery.

11           Federal Rules of Civil Procedure 30 says that

12   Armstrong gets to choose the notice dates of his

13   depositions.  Armstrong is the one who chooses on what date

14   he's going to take depositions of witnesses subject to

15   witness convenience, which is not an issue.

16           But I do want to return to this initial issue of

17   scheduling, Your Honor.  The government has ten Postal

18   Service custodians whose depositions are now scheduled to

19   take place between August 8th and almost the very last day

20   of discovery.  Armstrong is not --

21           MR. PETERS:  July 8th.

22           MR. JACOB:  I'm sorry, July 8th; you know, the

23   beginning of next month and the end of discovery.  In other

24   words, if the government's motion is granted as to timing,

25   there is going to be a complete moratorium on any 30(b)(6)

1    deposition from today until the end of discovery.  There

2    will be no period in time when discovery is open when

3    Armstrong is permitted to take these depositions.

4           THE COURT:  That's not the case for the document

5    depositions.

6           MR. FINKELSTEIN:  Your Honor, this is David

7    Finkelstein.  That's correct, and those depositions have

8    already been scheduled.

9           But just to respond real quickly.  Mr. Jacob's

10   argument regarding the authority concerning timing we're

11   hearing for the first time right here so it's kind of

12   unfair, but I guess I would just say there's no question

13   that this Court has broad discretion to issue appropriate

14   orders regarding discovery, including the sequence of

15   discovery, and many of the answers that Mr. Armstrong seeks

16   from the government will be answers that we will be learning

17   at the same time that he is learning in his depositions, and

18   we should be permitted to educate our witness based on those

19   depositions.

20          THE COURT:  Okay.

21          MR. PETERS:  But if I may, Your Honor -- this is

22   Elliot Peters -- how can that be true?  They represent all

23   of these witnesses.  They had a Rule 11 obligation when

24   preparing their complaint.  They've verified discovery

25   answers.  They're not learning this information for the

1    first time.  They started learning it in 2010 when they

2    performed an investigation relating to Mr. Landis's

3    complaint.  They've been doing this for five years.  They're

4    not hearing it for the first time.

5              We will be, but we're entitled to get -- we're

6    entitled to get their binding testimony under Rule 30(b)(6),

7    and that's really what we want.

8              For this to be a moving target where the first

9    time we ever can really pin down the government on the facts

10   that we're going to -- they're going to be bound by in terms

11   of summary judgment and trial is after the discovery cutoff,

12   that doesn't seem satisfactory to us.

13             THE COURT:  Okay.

14             MR. SCOTT:  Your Honor, this is Paul Scott for

15   relator.

16             THE COURT:  Yes.

17             MR. SCOTT:  I just wanted to point out that

18   Mr. Peters himself said that Mr. Armstrong's counsel could

19   very well ask questions that the government didn't ask, and

20   then so that would, indeed, be new information for the

21   government; and if they didn't have an opportunity to know

22   that information in advance to educate its 30(b)(6)

23   witnesses, that would seem unfair.

24             MR. PETERS:  Well, it certainly would have the

25   opportunity.  If they didn't ask the question, that isn't

1    our fault.

2              THE COURT:  Okay.  I've heard enough.

3              I have a question for you all on Topics 10 and 11.

4    The government maintains it's already responded -- 10 is

5    names of employees familiar with the sponsorship agreements.

6    11 is the identity of all claims and payments.  The

7    government says it's responded to those topics by a document

8    production, and I guess my question is, how has the

9    government provided those responses?  Do you all already

10   have lists of employees, any identities of claims and

11   payments; or was it just a document dump?

12             MR. SCOTT:  Document dump.

13             THE COURT:  Has Armstrong lodged interrogatories

14   for those materials?

15             MR. JACOB:  No, Your Honor, and here's the reason

16   we haven't lodged interrogatories, and in particular, this

17   goes to Topic No. 11.  The government has alleged and has

18   the burden to prove that Armstrong presented or caused to be

19   presented false claims to the United States government.

20   Those false claims -- the government is alleging that those

21   are invoices.  We believe and have strong reason to believe

22   Armstrong had nothing to do with those invoices, and the

23   government's document production is not going to

24   definitively answer that question.

25             What we need to understand about Topic 11 is what

1    were the invoices?  Who issued them?  Who were they issued

2    to?  Did those people interact with Mr. Armstrong?  Did

3    Mr. Armstrong make payments for a totally different entity?

4    Tailwind.  We strongly doubt it.

5              And so Topic No. 11 is not just a topic about a

6    list of people.  It's about who issued the invoices, who

7    received responses to the invoices, and in particular, I

8    think the concern that we have is we need to be able to

9    ask questions about whether those people interacted with

10   Mr. Armstrong.

11             I'll also just note that we cited --

12             THE COURT:  Is there a fact witness who ought to

13   be able to provide that information?

14             MR. JACOB:  We don't know who that person is.

15             THE COURT:  Okay.  But you've not noticed a

16   deposition of an accounts receivables person or someone who

17   had responsibility for accounting with respect to the

18   sponsorship agreement or anyone of that nature?

19             MR. PETERS:  Your Honor -- this is Elliot

20   Peters -- we took the deposition of one person named

21   Zelnick.  She said she didn't know very much, but she did

22   approve some of the early invoices.  And then there's other

23   people who approved later invoices.

24             But it's not clear who really did the approving.

25   Zelnick said she signed certain things, but one of the

1    things we're concerned about is later learning that, yes,

2    somebody else was a decision-maker.

3          We really need the government to be bound by this.

4    Otherwise, we're really on a wild goose chase subpoenaing

5    people and taking their deposition.  Is this the person?  Do

6    you know?  Did you think about this, and what was on your

7    mind when you approved this payment?  It could be something

8    like six or seven different people, and we're not even sure

9    we know all of who they are.

10         THE COURT:  But isn't that the proper topic for an

11   interrogatory?  "Please identify every person who was

12   involved in payments under the agreement."  And then you

13   take that list and decide whether to depose them or not.

14         MR. FINKELSTEIN:  Your Honor -- this is David

15   Finkelstein -- could I add one more thing to that?

16         THE COURT:  Sure.

17         MR. FINKELSTEIN:  What I would add is -- and it

18   would turn out the answer to that would be people they

19   have -- whose deposition notices have already issued.  The

20   invoices were submitted to Joe Porporino and Bob McKenna,

21   who were the contracting officer's technical

22   representatives, or COTRs, C-O-T-R, and Mr. Armstrong has

23   noticed both of their depositions.

24         Linda Zelnick was the contracting officer, and as

25   contracting officer, she was also involved in the approval

1    process up the chain, and, as Mr. Peters indicated, her

2    deposition was taken as well.

3              MR. JACOB:  Unfortunately, Your Honor, though, the

4    government has not agreed to be bound by the testimony of

5    those witnesses, and yes, while it's possible, after much

6    consternation and back-and-forth, to get a partial list of

7    names subject to objections from the government through an

8    interrogatory, you can't, during that deposition, ask the

9    witness in response to Topic No. 10, for example:  What was

10   your involvement in the negotiation of the sponsorship

11   agreement?  How many drafts did you send back and forth?

12   Did you consider this provision?  Was this provision a

13   subject of dispute between the parties?

14             For Topic No. 11, you can't ask the individual:

15   What was the extent of the involvement in sending and paying

16   for the claim?  Was it a totally perfunctory activity?

17   Would you have any reason to believe that Mr. Armstrong was

18   involved in that activity?

19             Yes, we can get a -- you know, a completely

20   sterilized list of names from the government, but we

21   can't ask the crucial questions that actually matter to

22   Mr. Armstrong's defenses.

23             I did also want to raise a Topic No. 13 because I

24   believe it was suggested --

25             MR. FINKELSTEIN:  Well, before we go on to Topic

1    No. 13, Your Honor, can I respond to that?

2              MR. PETERS:  Please don't interrupt.  Please don't

3    interrupt.

4              THE COURT:  Guys.  Let's -- Mr. Finkelstein, go

5    ahead.

6              MR. FINKELSTEIN:  Of course Mr. Armstrong can

7    ask the people to whom invoices were submitted, including

8    Mr. Porporino and Mr. McKenna, what was involved in the

9    process, and I imagine he will and also anybody else who was

10   involved in the approval of the invoices up the chain.

11             The invoices have been introduced.  I mean, it was

12   a document dump only to the extent that there were a lot of

13   document requests, but he has the invoices, and he also has

14   the payment records, which gives most of the factual

15   information.  And what's not on the paper itself will be in

16   the knowledge of the witnesses whose depositions he noticed.

17             THE COURT:  Okay.

18             MR. PETERS:  So they want us to go on a wild goose

19   chase rather than simply producing a witness who will bind

20   them.

21             Obviously Mr. Finkelstein knows a lot more about

22   this than we do because he just told you things that we

23   didn't know, and what we want is for them to prepare a

24   witness who will bind them rather than make us go on this

25   kind of hunt for who's the right witness and will we ask him

 1    the right question and will he be able to say "I don't know"

 2    and then we won't get the information.

 3         Why can't they produce someone who can explain

 4    this process?  Tell us who was involved, what they've relied

 5    on, what the role of any alleged false statement was in the

 6    approval of any invoice, and then be bound by it.  That's

 7    the core of this case.  And we're identifying different

 8    people who we think may have information, and we're going to

 9    question them, and the government is happy if they never

10    have to give us information which will actually bind them

11    about that.  I just don't think it's fair.

12         THE COURT:  Well, I think -- frankly, I think

13    we're talking about two different things.  One is

14    designating a 30(b)(6) to give the identities of people who

15    could more appropriately be ferreted out by an

16    interrogatory.  That's one issue.

17         And the second issue is the point that you've just

18    made, Mr. Peters, which is whether the fact witnesses can

19    actually bind the Postal Service to whatever testimony those

20    witnesses would have given in a fact deposition.

21         MR. PETERS:  I mean, one thing they could do is

22    just say, "We'll be bound by the testimony of these people."

23         MR. FINKELSTEIN:  Your Honor, Topic 12, I think,

24    gets to the latter point, which I think is the materiality

25    of Mr. Armstrong's false statements, and so he will have the

1    opportunity to get the government to produce a witness who

2    will bind the government with respect to the effect of those

3    false statements on the USPS.  And I guess our only point

4    will be the prior one, which is this process will be most

5    efficient if we could educate that witness based on the

6    testimony of the individual former USPS employee.

7              THE COURT:  Okay.  Mr. Jacob, you wanted to skip

8    to 13?

9              MR. JACOB:  I did just want to raise 13 because I

10   don't know if the Court alluded to it or not in its initial

11   comments, but the Court did, I think, raise an initial

12   concern about topics that ask for all statements, and Topic

13   13 does ask for all statements.  And I want to explain why

14   we don't agree to the government's narrowing of this topic

15   or really to the government's proposed narrowing of other

16   topics, but I'll start with that Topic 13 is a prime

17   example.

18             The government is advancing an affirmative theory

19   in this case that statements were made by Armstrong and

20   others to induce the Postal Service to enter into the 2000

21   sponsorship agreement.

22             THE COURT:  And they've referenced particular

23   statements in the complaint.

24             MR. JACOB:  Well, they don't.  I mean, they

25   vaguely refer to some statements that we don't understand.

1    But the government -- I think what the government is trying

2    to do is limit the depositions to Paragraph 63E of its

3    complaint, but here's the problem with that approach.  If

4    there were a number of conversations that persuaded the

5    government to enter into the 2000 sponsorship agreement, and

6    none of them had anything to do with representations by

7    Mr. Armstrong, that's probative about what actually caused

8    the government to enter into it.

9         If there are 13 conversations, none of which had

10   anything to do with Mr. Armstrong, that occurred before the

11   board of governors and remained in official presentations to

12   the board of governors, but one of them is an offhand remark

13   that's not actually clearly identified, the contract between

14   those two is something that Armstrong is going to want to

15   present at trial, and so that's why Armstrong needs all

16   statements that actually did cause these sponsorship

17   agreements to be renewed.  We have no way of finding out

18   what those statements are without taking 30(b)(6) testimony.

19        And so what the government has done in response to

20   Topic 13 and their response to a number of other topics upon

21   which it's capitulated in its reply is to suggest that

22   Armstrong has the duty before taking this deposition to

23   identify particular statements or particular documents about

24   which he's going to ask questions.  There is no such duty in

25   the Federal Rules of Civil Procedure or in any of the case

1   law that's been cited about 30(b)(6) depositions.

2        The closest the government comes to that is the

3   provision in Federal Rules of Civil Procedure 30(b)(6) which

4   talks about reasonable particularity, and then they cite a

5   couple of cases for the proposition that the topic has to be

6   specific and that you can't ask about contention.  But when

7   you actually go and look at those cases, those cases quashed

8   subjects such as the following:  All statements and

9   contentions in support of all of your claims and defenses in

10  this case.  Those are the types of topics that are being

11  quashed.  Topics relating to interpretation of contracts,

12  provisions in contracts.  There's no authority that's been

13  provided by anybody that quashes topics such as that; topics

14  that relate specifically to individual allegations in the

15  government's complaint.

16       I mean, how else is Armstrong supposed to learn

17  about those allegations other than through the civil

18  discovery process?  It really is an end-around around

19  discovery to say, "You have to tell us what you're going to

20  ask about before we even know what the information is.  You

21  have to tell us what you're going to ask about before we

22  even have discovery on it."

23       MR. FINKELSTEIN:  Your Honor, this is David

24  Finkelstein.

25       THE COURT:  Go ahead.

1          MR. FINKELSTEIN:  That's what Rule 30(b)(6) says.

2     It says they have to tell us with reasonable particularity

3     what they want us to educate our witness about.

4          And it's not true that we just relied on 30(b)(6).

5     We cited two cases on Pages 14 and 15 of opening brief, ECF

6     313-1, and there are others that say that requesting all

7     statements or all communications of a particular sort just

8     has no outer limit and is, therefore, improper.

9          THE COURT:  Okay.  Let's move to 15, 17, 20, and

10    23, and perhaps 34 as well, all of which relate to damages

11    in the case.  I guess my question is, in the complaint the

12    government's theory is that its damages are all of the

13    sponsorship payments that were made over the years, which

14    total $40 million, as I understand it.

15          Is that your position, Mr. Finkelstein and

16    Mr. Chandler?  Is that your position now at trial, or do you

17    plan to have an expert say that there were no positive

18    benefits from the agreement that should be offset against

19    the $40 million?

20          MR. FINKELSTEIN:  Well, I hope you won't hold me

21    to --

22          THE COURT:  I will not.  I'm trying to understand.

23          MR. FINKELSTEIN:  We do plan to have an expert

24    witness to talk about the net effect of the negative

25    information on the alleged benefits before that negative

 1    information was revealed.

 2              THE COURT:  Okay.  And I take it -- this whole

 3    issue came up with respect to the Postal Service's revenue-

 4    tracking databases that we went back and forth on a few

 5    months back, correct?

 6              MR. JACOB:  It is, in part, Your Honor.  One of

 7    the --

 8              THE COURT:  Okay.  And I take it that there are

 9    additional studies and revenue-tracking surveys, et cetera,

10    and evaluations that will go to what the positive benefits

11    of the agreements were at the time.

12              MR. JACOB:  Yes.  That's correct, Your Honor.

13    There really are three main areas that Armstrong has been

14    pursuing from the beginning of this case as soon as he

15    obtained some discovery from the government.  One is the

16    value of positive advertising that's been quantified and

17    measured by the government, and it's hundreds of millions of

18    dollars.  That's one set of documents, reports,

19    communications, public representations, statements to the

20    board.  There are a large set of documents that relate to

21    that topic.

22              The second area that Armstrong has been pursuing

23    is the one Your Honor just alluded to, and that is evidence

24    of direct revenue; hard cash in the door that the government

25    made by effectively hobnobbing and making connections at

1     Postal Service cycling events.

2          And then the third avenue that Armstrong is

3     seeking discovery on is merchandising.  The government sold

4     merchandise at these various events and made at least

5     hundreds of thousands of dollars a year, according to the

6     documents that have already been produced by the government.

7          The government, in its reply, attempts to limit

8     Armstrong's deposition to three reports, when there are

9     others; one Postal Service presentation to the board of

10    governors, when there are dozens and dozens of meeting

11    minutes; and no questions at all about the merchandising

12    that the government made.  And that really is just an

13    attempt to avoid difficult questions on the merits of this

14    case when the government knows what the issues are and has

15    produced those documents to us.

16         We didn't learn about that from some independent

17    source.  We learned about these facts from the government's

18    own document production.

19         MR. FINKELSTEIN:  Your Honor, this is David

20    Finkelstein.  But we need to learn from Mr. Armstrong what

21    he wants us to educate our witness on, and the reason we

22    talked about three reports is those are the three reports he

23    told us about.

24         And this was -- you know, we met and conferred

25    with them and said, "What are you really interested in?"  He

1    said what he just said now, which is, "You know what a

2    report means; you know what we're interested in."

3              And we said, "No, we really don't."

4              And then in his opposition briefing he named those

5    reports, and we said, "Fine.  We'll educate a witness on

6    those reports."

7              MR. JACOB:  There's no requirement in the Federal

8    Rules of Civil Procedure or in any case cited by the

9    government that we send the government our deposition

10   exhibits prior to the deposition.  Despite that, despite

11   that, we've been utterly forthcoming about what we intend

12   this deposition to cover.

13             But to somehow impose a new rule that nobody

14   follows in this case -- I'm not aware of any witness who's

15   received deposition exhibits before the deposition -- that

16   somehow or another Armstrong has to identify them and

17   actually -- for the government and is only permitted to ask

18   questions about them, that's not how 30(b)(6) works.

19             30(b)(6) requires us to identify topics, not to

20   set forth a list of documents that the government can answer

21   questions about and then -- for example, one question the

22   government doesn't want to answer is, "Can we ask if the

23   Postal Service benefited from the, you know, hundreds of

24   millions of dollars in financial value that it obtained

25   from the positive publicity of being associated with

1    Mr. Armstrong?"

2         The government said, "You can ask questions about

3    the documents, but if you use the word 'benefit,' we're not

4    going to answer a question about that."  That sort of

5    deposition -- that's an RFA.  That's not even a deposition.

6    There is no case law in support of the arbitrary limitations

7    that the government has put on Armstrong's topics, and

8    Armstrong believes that its topics are reasonably

9    particular, as that term is used in Federal Rule of Civil

10   Procedure 30(b)(6).

11        MR. SCOTT:  Your Honor, this is Paul Scott.  May I

12   just chime in with one comment on this issue?

13        THE COURT:  Sure.

14        MR. SCOTT:  And that is that the entire discussion

15   is predicated on this notion of value during a period when

16   the government was plainly -- you know, was being deceived,

17   and all I mean to, you know, sort of put my foot in the door

18   on is, you know, the legal standard, the decision that the

19   Court makes on how value -- you know, any kind of benefit to

20   the government should properly be measured.  That's going to

21   be an important decision, you know.

22        If you look at value in terms of the value to the

23   government, if the true facts were known at the time that

24   claim for payment was made, it's a different matter than if

25   you look retrospectively to when the government was being

1      lied to and evaluate any value to the government in that

2      context.

3              So I just mean to highlight that point because it

4      becomes an issue for determining damages down the line.

5              THE COURT:  Okay.

6              MR. SCOTT:  I don't mean to argue it, but just put

7      it out there for later --

8              THE COURT:  No.  That is helpful.

9              MR. FINKELSTEIN:  Your Honor, this is David

10     Finkelstein.  I think what Mr. Scott just said will be a

11     matter for later proceedings, but for right now the question

12     of benefits is Topic 15, and I thought we had made progress

13     on Topic 15, and I guess that was naive.

14             I mean, in Topic 15 all we want to know is what

15     exactly do you want our witness to talk about?  And they

16     gave us something in the opposition brief, and we said we'll

17     educate our witness about those things that they

18     specifically mention in Topic 15, and if there's more, they

19     should tell us.

20             THE COURT:  Well, I mean, and that's what -- you

21     know, what I'm struggling with is just that balance, to be

22     honest.  I mean, obviously if there are studies or

23     evaluations and analysis concerning the, you know, benefits

24     of either of these three categories that Mr. Jacobs

25     mentioned, those are fair game.  But are there a discrete

1     number that can be identified easily by the Postal Service,

2     or, you know, would it take two years to go out and

3     interview 100 people to determine and to prepare a witness

4     as to, you know, what potential benefits there were?  I

5     mean, that's the balance I'm trying to strike here.

6          MR. FINKELSTEIN:  Your Honor, Dave Finkelstein

7     again.  I think, without some help, I don't know that I

8     can -- we can identify very easily a discrete number, but

9     where they have told us -- and I'm not suggesting they need

10    to give us their depo exhibits in advance.  Again, you know,

11    it requires identification of topics.

12         But where they have identified topics with

13    reasonable particularity, we have agreed to produce

14    witnesses.

15         MR. PETERS:  Your Honor, this is Elliot Peters.  I

16    was just going to say that we have told them about, and they

17    know about, the documents that we're aware of that reflect

18    their internal analysis and the analysis of outside

19    consultants that they hire.  One of those people was deposed

20    yesterday.

21         So the government certainly knows what we know,

22    but our question is, is there additional information that

23    the government has that we don't know about?  Yes.  There

24    is, I don't know, a dozen or so documents that we've

25    received and that the government is well aware of that are

1    going to be the focus of this topic at a deposition, but --

2    and that -- and I think those documents pretty well identify

3    the parameters, you know, actual revenue of merchandise

4    sales and then advertising value, what they call

5    impressives, and sort of the PR benefit to the brand of

6    having Lance Armstrong on the cover of *Sports Illustrated*.

7         And so we know that there are some documents, but

8    they can't confine their preparation to what we already

9    know.  They're supposed to prepare a witness about what the

10   Postal Service knows.

11        Now, maybe it's nothing more than what we already

12   know.  I hope that there's more information, but they know

13   what we're talking about.

14        And I thought it was helpful just to hear

15   Mr. Finkelstein, as I understood him a couple of minutes

16   ago, say that their theory of damages isn't the $40 million

17   set forth in the complaint.  It appears to be some other

18   number based on a net analysis, and I guess -- and maybe

19   that's the subject of -- ultimately of expert testimony and

20   also of Topic 34, which is going to be the underlying facts

21   that relate to it.

22        But this is really going to be a very central part

23   of this case because there's a lot of evidence of tremendous

24   benefits to the government, and if you net it out and it's

25   zero, the net harm is zero, then we're all spending a lot of

1    time and money and energy over something which may not be

2    worth very much.

3              MR. JACOB:  Your Honor, this is Mr. Jacob.  I'll

4    just add, on Topic No. 34, we are expressly not seeking

5    expert discovery via Topic 34.  We understand the reports

6    aren't due.  We're not asking the government to furnish the

7    expert and have the expert give us their early opinion.

8              We're asking for the Postal Service's position.

9    And the government has said in its reply that the U.S.

10   Postal Service did not track the negative publicity in the

11   ordinary course of business.  The very first time that we

12   learned that fact wasn't in its reply.  Just establishing

13   that fact alone in binding 30(b)(6) testimony is going to be

14   crucial to Armstrong's case.

15             If the U.S. Postal Service doesn't care to

16   expend any resources to determine whether or not it's been

17   harmed by Mr. Armstrong or, more likely, really doesn't

18   believe that it's been harmed in any way by media articles

19   about Mr. Armstrong presenting the contrast between the

20   Postal Service's regular business -- you know, the position

21   it takes in the regular course of business versus its expert

22   is going to be a crucial fact that Armstrong wants to

23   present to the jury, and we intend to get that testimony

24   through Topic No. 34.

25             MR. FINKELSTEIN:  Your Honor, this is David

1   Finkelstein.  I mean, we're just making jury arguments now,

2   but I guess we weren't done with Topic 15, or we weren't

3   done responding to Topic 15.  Can we go back to that before

4   we move on to Topic 34?

5          THE COURT:  Sure.  This is all benefits?

6          MR. FINKELSTEIN:  Yes, all benefits.  I guess

7   three points in response.

8          First, Mr. Peters appears to do what Your Honor

9   agreed not to do, which is to hold me to any sort of

10  concession about what the government's theory of damages is

11  going to be at trial.  So let me say again, we are not

12  retreating from any serious damages about which we have

13  relied previously.

14         Second, part of the problem is we just disagree

15  about what's a benefit.  I mean, some of these studies

16  measure the ad equivalency value of media impressions in

17  which riders were captured wearing jerseys with USPS logos

18  on them, and Mr. Armstrong thinks that that's a benefit, and

19  he wants us to talk about those studies, and so fine.  Tell

20  us what you mean by "benefit," and we'll produce a witness.

21         But what Mr. Peters said, and this is the third

22  point, is, "We want to know any additional information that

23  you have that we don't already know about," and that just

24  doesn't give us a topic to prepare a witness on with

25  sufficient particularity.

1          THE COURT:  Right.  But if there are studies in

2     one of those three categories that they don't know about

3     that you do, that's fair game.  Do you agree?

4          MR. FINKELSTEIN:  If there are -- I'm unaware of

5     any studies that they don't know about, but if they said --

6     and this would be a new topic.  I'm thinking out loud.

7     Topic 15, studies apart from these but of a similar nature.

8     Yes, yes, that would be fair game.  That would be reasonably

9     particular.

10          But that wasn't our topic.

11          MR. PETERS:  This is Elliot Peters again.  How

12     about internal discussions by the board of governors or by

13     the people that handle this sponsorship where they discuss

14     these outside studies and use -- and adopt them effectively

15     and use them as the basis for decisions that they make about

16     continuing on with the sponsorship or how much they're

17     willing to pay for the sponsorship, or ultimately deciding

18     to end the sponsorship.

19          I mean, of course one of the things we want to do

20     is have the government's use of these -- the government's

21     adoption of these studies bind the government, and we want

22     them to testify about their use of these studies because

23     they paid for these consultants to perform these studies

24     which they each -- in the early years.  Each year -- they

25     decided year by year to renew the contract, and then they

1    renewed it again in 2000, and they had various ways of

2    opting out of it; and so they obviously made a decision

3    based upon economics to continue to renew and participate in

4    this sponsorship.  So, you know, just limiting it to what

5    the studies say isn't what we want.

6              But I think it is very clear to the government

7    what we're talking about.  We're talking -- when we talk

8    about benefits, we're talking about financial economic

9    benefits in the nature of the categories Mr. Jacob listed.

10             THE COURT:  Okay.

11             MR. FINKELSTEIN:  Your Honor, David Finkelstein,

12   just really quickly.  If you read Topic 15, you'll see how

13   far afield from Topic 15 we are right now, and with respect

14   to all communications to the USPS board of governors, that

15   has the same problem as all statements on which the USPS

16   relied.  I mean, all statements, all communications, there's

17   no outer limit.

18             THE COURT:  Okay.  Any other topics that merit

19   discussion in the late hour of the day?

20             MR. FINKELSTEIN:  Your Honor, may I respond

21   briefly to Topic 34 because I was --

22             THE COURT REPORTER:  Is this Mr. Jacob?  Who is

23   speaking?

24             THE COURT:  Mr. Finkelstein, correct?

25             MR. FINKELSTEIN:  Yes, this is David Finkelstein.

1    Excuse me.

2           As to Topic 34, we've said in our brief that the

3    USPS didn't track negative media in the ordinary course of

4    business.  Mr. Armstrong knows because we told him that the

5    government's lawyers responsible for litigating this case

6    have tracked negative media, and so if all he wants is

7    negative media that's made and kept by the USPS in the

8    ordinary course of business, then the answer's going to be

9    very quick.  And since Mr. Armstrong said he doesn't want

10   premature expert discovery, presumably he'll be satisfied

11   with that answer.

12           THE COURT:  Okay.

13           MR. FINKELSTEIN:  I guess my concern is Topic 34

14   is broad enough on its face.  I mean, if Mr. Armstrong is

15   willing to concede that he's going to limit himself to made

16   and kept by the USPS in the ordinary course of business

17   right here, I guess that would be satisfactory.

18           MR. JACOB:  I mean, the whole purpose of a

19   30(b)(6) deposition is to bind the government.  I've made it

20   perfectly clear that we're not seeking expert discovery, but

21   if the government does give a number of admissions that the

22   Postal Service doesn't see any harm to it as a result of

23   negative publicity about Mr. Armstrong, you can be certain

24   that Mr. Armstrong is going to seek to confront the

25   government's expert with that and to present that testimony

1    at trial and to show the contradiction between information

2    that was developed solely for the purposes of litigation and

3    information that was developed in the ordinary course of

4    business.

5              MR. FINKELSTEIN:  Your Honor, this is David

6    Finkelstein again.  We're certainly not saying that there

7    was no harm.  What we're saying is that the evidence of the

8    harm that we've developed was developed in preparation for

9    litigation.

10              I think this topic seeks information regarding our

11    contention.  It seeks information which we developed in

12    preparation for expert discovery.  Mr. Jacob says he doesn't

13    want premature expert discovery, and indeed this issue was

14    already before the Court on Mr. Armstrong's motion to

15    compel, and this Court ruled on -- the order is dated

16    September 30, 2014.  It's at the very end of the order.

17              MR. JACOB:  Your Honor, Armstrong has no objection

18    to an order that cuts out expert discovery.

19              THE COURT:  Okay.

20              MR. JACOB:  I just want to make it perfectly

21    clear.  We're not seeking expert discovery on Topic 34.

22              THE COURT:  Okay.  Last chance.  Anything else?

23              MR. FINKELSTEIN:  Your Honor, time limits is

24    something that we raised, and we think it makes sense here

25    because this is a 34-topic depo notice, and even if you take

1    out the stuff that we still disagree about, there's many,

2    many things on which we don't disagree.  We have agreed to

3    produce the witness, and we would just like to draw an outer

4    limit to the total overall burden that this will impose on

5    government attorneys and the witness designees.

6              THE COURT:  And Mr. Peters, you're going to tell

7    me to stick to the rule, correct?

8              MR. JACOB:  That's correct, Your Honor.  And

9    here's the reason why the rules make sense in application

10   here.  We have no idea how many witnesses the government is

11   going to put up.  The government said maybe three.  Maybe

12   three on all of the topics, or on just the topics on which

13   it's offered?  When are those witnesses going to be put up?

14   How many topics are those witnesses going to testify about?

15             Until we have that information, we can't even have

16   a sensible meet-and-confer about it, honestly.  This is, I

17   think, why the government first proposed 11 hours without

18   seeking to meet and confer with Armstrong, then withdrew

19   that, then proposed 21 hours for the first time in a reply.

20   Again, that was the very first time that Armstrong had ever

21   heard that proposal.

22             MR. PETERS:  Your Honor, this is Elliot Peters.

23   We've taken -- I think there's been nine depositions we've

24   taken in the case.  None of them has gone over seven hours.

25   We're not going to sit there and question someone for more

1    time than we need to get what's done done.  I mean, I think

2    we have enough problems and disagreements without creating

3    abstract ones.

4         I really -- I think that once we know how many

5    deponents there's going to be, let us meet and confer.  I

6    think it will be worked out to everybody's satisfaction.

7         MR. FINKELSTEIN:  Well, Your Honor -- this is

8    David Finkelstein -- I'm not so optimistic.

9         Mr. Peters took a full seven hours, or nearly

10   seven hours, like six hours and 40 minutes, with the

11   government designee who was educated regarding -- one of

12   four designees who was going to respond to the document

13   issues, and he spent a substantial part of that time outside

14   of the document issues.  If that happens with every witness

15   we put forward, that they think that they have the full

16   seven hours, then -- you know, Mr. Armstrong says in his

17   papers he's worried about having 33 minutes per witness.  I

18   suppose we're worried about this taking 33 days.

19        THE COURT:  Well, look, we will cross this bridge

20   when we get to it after our order and your decision as to

21   how many witnesses you need to cover the topics that still

22   remain.

23        MR. SCOTT:  Your Honor, this is Paul Scott.  May I

24   just add one clerical matter?

25        THE COURT:  Go ahead.

1            MR. SCOTT:  As you know, we have a motion to

2     compel a production of documents by Williams & Connolly, and

3     we have two responses that have been filed.  Although we

4     were initially contemplating one response, and it suggested

5     a four-page reply, since we have two responses, I would just

6     ask permission to file an eight-page reply.

7            THE COURT:  That's fine.

8            MR. SCOTT:  Thank you, Your Honor.

9            THE COURT:  Okay.  Anything else?

10           MR. CHANDLER:  Not from the government, Your

11     Honor.

12           MR. PETERS:  Thank you, Your Honor.  Thank you for

13     your patience and your time.  We appreciate it.

14           MS. McCLOSKEY:  Thank you, Your Honor.

15           THE COURT:  Okay.  We'll be in touch.

16                   (Whereupon the hearing was

17                    concluded at 5:44 p.m.)

18

19

20

21

22

23

24

25

1    **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3              I, LISA A. MOREIRA, RDR, CRR, do hereby

4    certify that the above and foregoing constitutes a true and

5    accurate transcript of my stenographic notes and is a full,

6    true and complete transcript of the proceedings to the best

7    of my ability.

8         Dated this 23rd day of July, 2015.

9

10                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
11                              United States Courthouse
                                Room 6718
12                              333 Constitution Avenue, NW
                                Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25