IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


FLOYD LANDIS,                          )
                                       )
          Plaintiff,                   )     CA No. 10-976
                                       )
                                       )     Washington, D.C.
          vs.                          )     September 5, 2014
                                       )     2:00 p.m.
TAILWIND SPORTS                        )
CORPORATION, ET AL.,                   )
                                       )
          Defendants.                  )
_____)


          TRANSCRIPT OF TELEPHONIC DISCOVERY CONFERENCE
           BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                 UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:              Paul D. Scott
                                Lani A. Remick
                                (Appearing telephonically)
                                LAW OFFICES
                                OF PAUL D. SCOTT, P.C.
                                The Embarcadero
                                Pier Nine
                                Suite 100
                                San Francisco, CA 94111
                                (415)981-1212
                                pdscott@lopds.com
                                laremick@lopds.com



For the Defendants:             Darrell C. Valdez
                                (Appearing telephonically)
                                U.S. ATTORNEY'S OFFICE
                                Civil Division
                                555 Fourth Street, NW
                                Washington, D.C. 20530
                                (202)252-2507
                                darrell.valdez@usdoj.gov

APPEARANCES CONTINUED:

For the Defendants:                Robert E. Chandler
                                   (Appearing telephonically)
                                   UNITED STATES
                                   DEPARTMENT OF JUSTICE
                                   Civil Division, Fraud Section
                                   601 D Street, NW
                                   Suite 900
                                   Washington, D.C. 20530
                                   (202)514-4678
                                   robert.chandler@usdoj.gov

                                   David Michael Finkelstein
                                   (Appearing telephonically)
                                   U.S. DEPARTMENT OF JUSTICE
                                   Civil Fraud Section
                                   601 D Street, NW
                                   Room 9605
                                   Washington, D.C. 20004
                                   (202)616-2971
                                   david.m.finkelstein@usdoj.gov

                                   Mercedeh Momeni
                                   (Appearing telephonically)
                                   U.S. ATTORNEY'S OFFICE
                                   Civil Division
                                   Room E4822
                                   555 Fourth Street, NW
                                   Washington, D.C. 20530
                                   (202)307-0821
                                   mercedeh.momeni@usdoj.gov

                                   Margaret E. Dayton
                                   Marc Harris
                                   (Appearing telephonically)
                                   SCHEPER KIM & HARRIS LLP
                                   601 West Fifth Street,
                                   12th Floor
                                   Los Angeles, CA 90071-2025
                                   (213)613-4655
                                   pdayton@scheperkim.com

APPEARANCES CONTINUED:

Court Reporter:                William P. Zaremba, RMR, CRR
                               U.S. Courthouse
                               333 Constitution Avenue, NW
                               Room 6511
                               Washington, D.C. 20001
                               (202)354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

```
 1                  P R O C E E D I N G S
 2           DEPUTY CLERK:  This is civil Case, 10-976,
 3    Floyd Landis versus Tailwind Sports Corporation, et al.
 4           Counsel, will you please identify yourselves for
 5    the record.
 6           MR. VALDEZ:  Good afternoon, Your Honor.  This is
 7    Darrell Valdez, United States Attorney's Office.
 8           MR. CHANDLER:  And also from the government,
 9    Robert Chandler, David Finkelstein and Mercedeh Momeni.
10           MR. SCOTT:  Your Honor, this is Paul Scott for
11    relator, Floyd Landis.
12           MS. DAYTON:  Your Honor, Margaret Dayton and Marc
13    Harris for CSE, Stapleton and Knaggs.
14           THE COURT:  Okay.  Good afternoon, everyone, or
15    good morning in California, I guess.
16           No one for Mr. Armstrong or the other defendants
17    on the line?  Do we have everyone?
18           MR. SCOTT:  I think I just heard another beep,
19    Your Honor.  This is Paul Scott.
20           MS. REMICK:  Hi.  I'm Lani Remick, also for
21    relator, on the line.
22           THE COURT:  Okay.
23           MR. SCOTT:  Your Honor, just in -- Paul Scott --
24    just in looking at the correspondence from the Court, the
25    call-in information was -- I'm looking at the e-mail
```

1   circulated to the government and to Mr. Harris, and then

2   also to us.  I don't know if this was circulated to

3   Defendant Armstrong.

4           So that -- I understood from speaking to the

5   deputy that these are the parties that you wanted on the

6   line.  If you would like to have Defendant Armstrong in the

7   conversation as well, we can easily contact them, if you

8   like.

9           THE COURT:  I don't think that'll be necessary,

10  unless there's some objection by you guys to proceeding.

11  It's -- they're not parties to this motion.  And the notice

12  was published on ECF, so they were certainly in a position

13  to join if they saw fit.  Is that okay with everyone?

14          MR. SCOTT:  No objection from relator.

15          MR. CHANDLER:  None from the government,

16  Your Honor.

17          MR. VALDEZ:  None from the U.S. Attorney's Office.

18          MS. DAYTON:  No from Margaret Dayton.

19          THE COURT:  I guess one question at the outset --

20  and I've read your summary and I appreciate you're getting

21  it in and keeping to the page limit.  Are the -- is the

22  government and the relator coordinating their discovery

23  requests?  This request, obviously, comes only from the

24  relator.  You know, are these issues going to be duplicated

25  by, you know, requests filed by the government?

1          MR. CHANDLER:  Well, as far as requests filed by

2   the government, at this point, it's probably too early to

3   say.  We're still in our meet-and-confer process with

4   Armstrong.

5          And I suppose there are some similarities between

6   our requests and the relator's.  I think there are probably

7   more similarities in the issues that exist in our responses

8   to Armstrong's requests and interrogatories.

9          THE COURT:  Okay.

10          MR. SCOTT:  Your Honor, this is Paul Scott.

11   Just in terms of, like, the discovery that's been directed

12   at CSE, this is the -- the government has not directed in

13   this litigation document requests or interrogatories to CSE,

14   to my knowledge.

15          There were some -- there was some -- there were

16   documents collected from them in the course of the

17   government's investigation.  As far as I'm aware, there's no

18   duplicative discovery aimed at CSE right now from the

19   government.

20          THE COURT:  Okay.  So discovery, written

21   discovery, well, all discovery, I guess, is proceeding along

22   two separate tracks, or the government simply has -- there's

23   been no discovery ordered entered as to the government;

24   is that right?

25          MR. CHANDLER:  That's right, Your Honor.

1    The government hasn't served any discovery on CSE.

2              THE COURT:  Okay.

3              MR. SCOTT:  And in terms of -- Your Honor, this is

4    Paul Scott.

5              In terms of the progress of discovery, the parties

6    have engaged in some written discovery, as you obviously

7    know from the motions that have been filed.

8              But, yeah, short of an order being put in place

9    defining exactly how discovery is going to look in terms of

10   the limits and so forth on interrogatories and that sort of

11   thing.

12             THE COURT:  Okay.  So you all did not deal with

13   Judge Wilkins on any sort of consolidated discovery

14   proposal; is that fair?

15             MR. CHANDLER:  That's correct, Your Honor.

16             THE COURT:  Okay.  And he was content to allow

17   sort of the two tracks to proceed?

18             MR. SCOTT:  This is Paul Scott.

19             The order -- you know, the submissions that the

20   parties made, the joint submissions in that connection,

21   describe some of their agreements or disagreements relative

22   to how discovery should be contoured to address the fact

23   that we had, you know, the situation that we do.

24             THE COURT:  Okay.

25             MR. SCOTT:  So although it hadn't been ruled on,

1   I think that's one of the issues that we'll be addressing on

2   the 15th.

3            THE COURT:  Okay.  And there's a statement

4   concerning the revised scheduling order, and that's all in

5   there, correct?

6            MR. SCOTT:  I believe so.

7            I mean, I'll let the other parties speak for

8   themselves, but I think that we --

9            THE COURT:  Okay.

10           MR. SCOTT:  -- have all been trying to wrestle

11  with the fact that we have this arrangement, where it's a

12  partially intervened and partially not intervened case.

13           THE COURT:  Okay.

14           MR. CHANDLER:  And the remaining issues on that

15  score will be reflected in the notice that we filed with the

16  Court on Monday.

17           THE COURT:  I'm sorry.  One more time?

18           MR. CHANDLER:  The remaining issues with respect

19  to discovery issues that were flagged in the Rule 26(f)

20  report will be reflected in the notice that we're going to

21  file with the Court on Monday.  The Court had asked that we

22  file a notice --

23           THE COURT:  Yes.

24           MR. CHANDLER:  -- of pending issues.  So those

25  issues will be reflected in that report.

1          THE COURT:  Okay.  And so we can discuss all of

2   that on the 15th.  And this is just an intervening issue

3   that has come up before then?

4          MR. CHANDLER:  That's correct.

5          THE COURT:  Okay.  Got it.

6          So I've read your summary.  Why don't we start

7   with the first interrogatory, interrogatory No. 1.

8          MR. SCOTT:  Your Honor, this is relator counsel,

9   Paul Scott.

10          THE COURT:  Yep.

11          MR. SCOTT:  So, basically, the -- you've seen the

12   back and forth in the papers about this interrogatory.

13   Basically, another way we could have asked this question

14   was, who knew about the doping prior to it becoming public

15   in 2010.  But we didn't want the defendants to exclude

16   people who, you know, they might reasonably believe were

17   knowledgeable but they didn't know for certain were

18   knowledgeable.

19          So we've phrased it at as we did to ask them to

20   identify persons who they knew or believed had knowledge at

21   any point back between '95 and 2010 about the doping by

22   Armstrong or any other rider on the team.

23          They've indicated that -- you know, that they

24   think that this is asking them to be speculative, and that

25   it's asking for information that these -- we're asking for

1    information that might be coming from the public record.

2          The second part of this interrogatory makes clear

3    that we're also asking for the basis for their knowledge.

4    And there can be more than one basis for knowledge.  So,

5    though some people might believe now that the members of the

6    team all knew about the doping based on what they were

7    reading about in the press, we understand that there's going

8    to be that level of knowledge.

9          But obviously, as well, they could have been

10   having communications with people between '95 and 2010 about

11   the doping by the team, including communications with people

12   who are on the list attached to the interrogatories that we

13   were asking them about.

14         Indeed, even after 2010 -- after it became public

15   in 2010, someone could call them up and say, gee whiz, I,

16   you know, I hope I don't get caught, I was involved in the

17   doping at the time, and, you know, let's keep it secret;

18   or there could have been other communications, private

19   communications, that would also obviously inform them, let

20   them know that these individuals were knowledgeable at the

21   time between '95 and 2010.

22         Mr. Stapleton was Mr. Armstrong's agent throughout

23   the period.  It's undisputed that everyone on the team knew

24   about it.  Mr. Armstrong has already said that members of

25   management, certain members of management were either --

1    they either believed or knew they were aware of it.  And yet

2    Mr. Stapleton, who was his agent all along and his

3    confidant, is saying that he didn't know.  So we would like

4    to know exactly what the level of knowledge is among these

5    folks.  And that's the direction we're headed with that.

6            If they want to exclude information, you know,

7    coming from press coverage, they can simply exclude from

8    their response any individuals who they know or believe were

9    knowledgeable at the time, solely based on press coverage.

10   They can exclude, you know, that kind of information.

11           But we're interested in, you know, the information

12   that isn't based on press coverage but is based on their

13   being insiders and very much involved with Mr. Armstrong and

14   the team throughout this period.

15           THE COURT:  And, Ms. Dayton, do you want to

16   respond to that?

17           MS. DAYTON:  Yes.  I think there's a lot to unpack

18   there.

19           But I think the first point is this idea that,

20   you know, who they believe but don't know, might have known,

21   back then.  It's just -- it's really speculative.  I don't

22   see how it's relevant.

23           That kind of tailors into the idea that, I don't

24   see how their current knowledge has anything to do with the

25   allegations in this case.  The current knowledge is, you

1   know, seriously impacted by the press reports.

2           We're talking about time periods that begin nearly

3   20 years ago.  It's just -- it's a very difficult question

4   to answer.  It basically asks, knowing what you know now,

5   what do you think a litany of people may have known back

6   then, 20 years ago?

7           And, you know, if the Court needs briefing on

8   this, I think we could try to articulate, but the question

9   is just not answerable; there's just too much to unpack

10  there.

11          MR. SCOTT:  Your Honor, this is Paul Scott.

12          THE COURT:  Yeah.

13          MR. SCOTT:  Do you care to hear anything further?

14          THE COURT:  I mean, respond to the relevance

15  argument as to later obtained knowledge.  I mean, obviously,

16  everyone now would say, sure, I have some level of belief

17  because of press coverage but, you know, how is that

18  relevant to the claims in the case?

19          MR. SCOTT:  Understood.

20          And the only knowledge we can ask them about is

21  their current state of knowledge.  We would like to know

22  what they know now about what people knew back then.

23          And we plainly are not interested in what they

24  have learned from press coverage or what other people, you

25  know, may have learned from press coverage.  That's why that

1    second part of that interrogatory is there that asks them

2    for the basis of their knowledge.  And I'm happy to say

3    today and agree today that we can exclude, as I said, any

4    knowledge that's based solely on press coverage.

5          But to the extent that they had other sources of

6    knowledge; in other words, as I mentioned, communications

7    with people about what was happening at the time -- I mean,

8    these people were intimately involved with the team and with

9    Mr. Armstrong at the time.  They would have had the

10   opportunity to have numerous conversations with many people

11   about what they know or didn't know about doping during that

12   period.  And they would have also had the opportunity, even

13   after this became public in 2010, to have further

14   conversations about people who had been very concerned about

15   what was happening.  And though they may not have shared

16   those comments or that knowledge in the press, they could

17   have communicated with these defendants.

18         So that's the information we're after.  And its

19   relevance is, if these people knew about the doping at the

20   time, it's -- that could be very relevant to the continued

21   progress of the case --

22         THE COURT:  Okay.  I've heard enough.

23         MR. SCOTT:  -- he was unaware that they had

24   communications with Mr. Weisel and he was knowledgeable

25   about these events, that would be relevant.

1          You know, whether other folks were knowledgeable

2    within CSE, that would be relevant to CSE's liability.  And

3    it also might lead us to information about the knowledge,

4    indeed, of Stapleton and Knaggs, who are professing not to

5    have known.  So, you know, who knew what back then is highly

6    relevant.

7          THE COURT:  Okay.  I'm going to cut you off.

8    I've heard enough.

9          We're going to allow this interrogatory.

10   We're going to base it on personal knowledge or belief based

11   on communications with the people on your list, okay?

12         And we'll enter an amended order that better

13   articulates these rulings, but I think we can move on that

14   one.

15         Let's go to interrogatory No. 9.  You want the

16   search terms and the steps that have been taken to respond

17   to the request for production; is that right?

18         MR. VALDEZ:  That's correct, Your Honor.

19         THE COURT:  Okay.  Any reason to doubt the

20   adequacy of CSE's search thus far?

21         MR. SCOTT:  Your Honor, we haven't -- I mean, been

22   given anything to be able to evaluate the search.

23         We -- what they have described in their response

24   is that they looked at hard-copy policy determined were

25   likely to contain requested documents, and that they

1   searched the e-mail files of custodians they determined were

2   likely to have the requested documents.  There is no

3   identification of who those custodians were or what search

4   terms were used.  So we just have no ability to evaluate how

5   effective those searches would be.

6         And they've mentioned to us that the person who

7   conducted the search was a lady who was pregnant at the time

8   and now has a newly born child.

9         There were references to 200 boxes of documents.

10  We don't know how many computers or custodians were looked

11  at, but that's who, as we understand it, has been the person

12  in charge of searching through those various sources of

13  data.  So we just are at a loss without more information.

14        And the authority that we've cited for the Court

15  is -- seems to say pretty clearly that that kind of

16  information is the sort of information you need in order to

17  have transparency in discovery.  And so that's all we're

18  looking for is transparency.  And that's the direction of

19  this interrogatory.

20        And also, this authority, which I think is

21  independent of an interrogatory, it's just what's normally

22  required in -- of the parties in document production with

23  respect to ESI, particularly.

24        THE COURT:  Ms. Dayton.

25        MS. DAYTON:  You know, I think, first, CSE has

1   already produced, with its initial disclosures, voluminous

2   production of documents to Mr. Scott.  So I don't think that

3   there's a -- I do think he has a basis to believe that the

4   search effort has been appropriate.

5           I don't think it's necessary at this time for us

6   to quibble over the search terms used for adequate searches.

7   And, you know, it's just -- this process has been

8   burdensome, the meet-and-confer process has been burdensome,

9   and this just seems to be another layer of burden being

10  unnecessarily imposed.

11          THE COURT:  Well, okay.  I'm not sure how

12  burdensome it is for you to give him search terms; but,

13  nonetheless, I don't think that, Mr. Scott, you're entitled

14  to them necessarily under the rules at this stage.

15          I'm going to sustain the objection to this

16  particular interrogatory for the time being.  If there's

17  something that you can show me which demonstrates that the

18  response is inadequate some way, we can revisit that.

19          You know, the counsel for CSE is under an

20  obligation under Rule 26(g) to certify the completeness of

21  the response.  And unless there's something to suggest that

22  that certification may be lacking, we're not going to --

23  I'm not going to order that at this time, okay?

24          MR. SCOTT:  Understood.

25          THE COURT:  Let's go to the document requests, 69

1    and 70.

2              MR. SCOTT:  Your Honor.

3              THE COURT:  First of all, let me start on these.

4    These strike me as being sort of the document request

5    equivalents of contention interrogatories, in a sense.

6              I guess let me start with Ms. Dayton.  Do you have

7    authority that would be a basis for denying these sorts of

8    questions as a general matter, or these sorts of requests as

9    a general matter?

10             MS. DAYTON:  Not on that particular point,

11   Your Honor.

12             I think our bigger issue with the request is that

13   it's just -- obviously, we believe that the documents

14   responsive to these requests are included in our production.

15   These just seem to be overbroad catchalls.  And we don't

16   want to be caught in a position where it's being, you know,

17   represented that we didn't produce something just based on

18   the brass of this request.  If something in the complaint

19   says that an event happened on Tuesday and it turns out we

20   have a receipt that shows that it happened on Thursday and

21   we didn't produce that, that's just not an issue we're

22   looking to get into.  It's not that we're trying to withhold

23   documents or hide our cards here.

24             THE COURT:  Right.  Well, that's more of a

25   burdensomeness argument.  And I appreciate that.

```
1              But, you know, as a general matter, if the request
2    were to say, you know, produce all documents that support,
3    you know, your affirmative defense No. 7, I mean, I think
4    that's a fair question.  But it strikes me as being
5    something different to ask for all documents that contradict
6    our allegations in the complaint.
7              And the question I have is whether -- I mean,
8    I know we haven't briefed this, but, you know, whether
9    there's any authority on one side or the other to suggest
10   that that sort of request is proper or improper in general.
11             MR. SCOTT:  Your Honor, this is Paul Scott.
12             THE COURT:  Yes.
13             MR. SCOTT:  I might be able to save some time on
14   this.
15             In talking with the government about this request
16   late in the day yesterday, we basically arrived at the
17   conclusion that we could probably just pass on request
18   No. 69 --
19             THE COURT:  Okay.
20             MR. SCOTT:  -- which has that "contradict"
21   language in it.
22             THE COURT:  Yeah.  That one, you weren't going to
23   get by me, I don't think, so that's probably a good
24   decision.
25             MR. SCOTT:  But --
```

1           THE COURT:  I mean, it strikes me that that's

2    asking them to do your work, you know?

3           MR. SCOTT:  I understand.

4           And -- but with respect to request No. 70, I think

5    that marries up with Rule 26(a)(1)(A)(ii), which talks about

6    providing, you know, a copy of documents that they may use

7    to support claims or defenses.  Obviously, they can describe

8    them by categories as well.

9           But that concept of them being required to

10   produce, whether it's the intent to rely on, I think, is

11   consistent with the request here.

12          THE COURT:  Right.  But claims and defenses is

13   different from denials in an answer.

14          And I guess the question I have is, are there any

15   cases that deal with contention interrogatories, you know,

16   or contention requests for productions in the context of

17   denials.

18          I mean, I see your point that it's an analogue,

19   but, you know, denials are driven by the breadth of your

20   complaint.  And the whole case, really, you know, their

21   whole case is a denial of your complaint, whereas claims or

22   defenses are things that you, you know, a party, puts forth,

23   and it's fair to ask for the supporting documentation,

24   whereas, you know, the denial strikes me as being a little

25   different.

1          MR. SCOTT:  Your Honor, perhaps what we could do

2  is just, you know, table this issue.  We can look at it and

3  see if we can find some authority to that point.  And if we

4  do, we'll share it with counsel for the CSE defendants, and,

5  perhaps, we'll just move forward from there, if we can

6  convince them.  And if not, I guess we can give you another

7  call on that.

8          THE COURT:  Okay.  Why don't we do that.

9          And I'll tell you what.  If you can't resolve it

10  yourself, why don't you agree to an abbreviated and

11  relatively short, in terms of pages, briefing schedule, and

12  we can take that up on the 15th, okay?

13          MR. SCOTT:  Okay.

14          MS. DAYTON:  Absolutely, Your Honor.

15          THE COURT:  Okay.  78 and 80.

16          Mr. Scott, what is it you want here?  I don't have

17  enough background to really assess what the focus of these

18  two requests are.

19          MR. SCOTT:  Mr. Stapleton used to practice law

20  before he started CSE, and counsel for Mr. Stapleton can

21  correct me if I get any of this wrong in their view.  But

22  when CSE wasn't a law firm, it was functioning, essentially,

23  as an agent for Mr. Armstrong, amongst other things.

24          THE COURT:  Okay.  Let me interrupt you.  CSE was

25  a law firm?  Was organized as a law firm?

1          MR. SCOTT:  Was not.

2          THE COURT:  Was not.  Okay.  It's a business that

3     provides agency services; is that correct?

4          MR. SCOTT:  Amongst other things, they had some

5     other sides to the business, but that was certainly a

6     significant portion of what they did, representing

7     Mr. Armstrong.

8          THE COURT:  And Mr. Stapleton is the principal of

9     that business?

10          MR. SCOTT:  Yes.

11          THE COURT:  Okay.

12          MR. SCOTT:  There were some other -- Knaggs is

13     also a part-owner of the company as well.

14          But so for -- you know, so he used to practice

15     law, then he started CSE, and it's been essentially an

16     agency.

17          And then in addition, for a substantial period of

18     the time relevant to this case, Mr. Stapleton wasn't even

19     authorized to practice law, because he was inactive, as far

20     as we know from, the Texas State Bar.  Between about 2003

21     and 2010, he was claiming a nonpracticing exemption, and he

22     was, you know, ineligible to practice, because he was

23     inactive from at least 2005 to 2010.  That's what --

24     approximately the time frame we understand.

25          THE COURT:  Excuse me.  Was he barred anyplace

1  else besides Texas?

2          MR. SCOTT:  He was only licensed there, as far as

3  I know.

4          MR. HARRIS:  Your Honor, this is Marc Harris.

5  I can answer the Court's question.  He was not barred

6  anywhere but Texas.

7          THE COURT:  Okay.

8          MR. SCOTT:  So -- but, nonetheless, Mr. Armstrong

9  has a certain privilege over his communications with

10 Mr. Stapleton or with some of our discovery requests to him

11 that are going to relate to Mr. Stapleton.

12         In some of my dialogue on this with Mr. Harris,

13 the question was raised, well, why don't you wait and see if

14 Mr. Armstrong even asserts a privilege.  But as far as we

15 can tell, privilege is being asserted, and so we, therefore,

16 you know, need to know about, well, you know, was there, in

17 fact, an attorney-client relationship would seem not to be

18 possible with that period of time of an activity by

19 Mr. Stapleton.

20         But we also need to get at Mr. Armstrong's

21 understanding of those events.  And so that's where,

22 you know, the communications that we're talking about become

23 pertinent to Mr. Armstrong's knowledge, as well as just how

24 the parties understood their relationship to be.  And what

25 they propose to provide us with are very narrow categories

1    of information that eliminate some of the types of documents

2    that would help us to understand what knowledge Stapleton --

3    well, primarily Mr. Armstrong had, relative to what sort of

4    relationship he had with Mr. Stapleton.

5                THE COURT:  Okay.

6                MR. SCOTT:  For example, documents that describe

7    Mr. Stapleton as, you know, Armstrong's agent or his

8    business partner, or, you know, anything other than as his

9    lawyer kind of correspondence is going to be relevant to

10   Mr. Armstrong's understanding of what services he's getting

11   from Mr. Stapleton.

12               Similarly, documents that just generally refer to

13   Mr. Stapleton no longer being in the practice of law or not

14   authorized to practice law or along that line do not

15   necessarily refer to the Texas Bar but would be relevant to,

16   again, what the nature of the relationship was and

17   Mr. Armstrong's understanding of that relationship.

18               THE COURT:  Okay.

19               MR. VALDEZ:  So these are carefully tailored

20   categories that they put forth there.

21               We had a half dozen different document requests

22   along this line, but these two specifically are the only

23   ones that we're pressing on.

24               And I think if you just read the requests, they're

25   pretty reasonable as they're written.  And we don't think

1    that they should be able to just tell us specifically the

2    categories of documents that they want to give us that fall

3    within those requests, because we think the requests

4    themselves are reasonable at the outset.

5              THE COURT:  Okay.  So when you say you want

6    documents that, quote/unquote, describe the nature of the

7    services, you would include those within that category, any

8    document that refers to Mr. Stapleton as, you know, an agent

9    or a lawyer or a business manager or whatnot?

10             MR. SCOTT:  Yes, Your Honor.

11             THE COURT:  Or are you just seeking documents that

12   discuss what types of services Stapleton is providing?

13             Because, frankly, I don't think what name is

14   assigned to him in a particular e-mail or letter really goes

15   to what services he's providing or what Mr. Armstrong's

16   understanding of his role may have been.

17             MR. SCOTT:  I agree with that, Your Honor.

18             And I'm simply trying to give examples of --

19             THE COURT:  Understood.

20             MR. SCOTT:  -- the kind of thing that we'd be

21   looking for.

22             But, yes, certainly to the extent that they

23   describe -- Mr. Stapleton says, okay, we're going to meet

24   with Coca-Cola, and I'm going to talk to them about whatever

25   kind of responsibilities an agent has in getting a deal done

1  for a client, you know, or they talk about a business deal

2  that they're doing together, because, at times, I believe

3  they were part owners of some of the same entities, then

4  that's the kind of thing that we'd be interested in.

5          THE COURT:  Well, those would be documents that

6  might reflect the nature of the services, but they don't, in

7  and of itself, describe the natures of the services.

8  That's what I'm getting hung up on here.

9          MR. SCOTT:  I understand --

10          THE COURT:  Because any case of correspondence --

11          MR. SCOTT:  -- could be made, Your Honor.

12          If it goes beyond describing what the service is,

13  then, you know, we wouldn't be entitled to deal with this

14  request.  But if there's a description of what he's going to

15  do or the type of service he's providing, you know, that's

16  what we'd be after.

17          THE COURT:  Okay.  Mr. Harris or Ms. Dayton,

18  I guess the threshold question is, are you asserting a

19  privilege with respect to communications between Armstrong

20  and Stapleton?

21          MR. HARRIS:  Well, Your Honor, we -- let me --

22  I'll give a very short background on this and why we've

23  taken the position that we have.

24          Mr. Stapleton acknowledges that at a substantial

25  period of time here, he was not an active member of any Bar,

1  a Texas Bar or any other Bar.  And so we don't know -- we

2  weren't sure that anyone was going to claim, that Armstrong

3  or anyone, was going to claim that Mr. Stapleton was

4  providing attorney-client services or the communications

5  were privileged during that time frame.

6         We've been told that Mr. Armstrong is making those

7  claims with respect -- or may make those claims with respect

8  to certain communications.

9         And I believe that that claim may be based on a

10  subjective belief by Mr. Armstrong that he knew that

11  Mr. Stapleton was a lawyer, did not know that he was

12  inactive, and believed, at certain times -- and I don't know

13  what the context of these privilege assertions are -- but

14  that at certain times, Mr. Stapleton was his lawyer and was

15  acting as his lawyer.

16        And so I suggested to Mr. Scott that we should see

17  when -- what communications is being claimed with respect

18  to.  And if there are documents or other evidence that would

19  go to whether, in that context, Mr. Stapleton was or was not

20  acting as his attorney, perhaps we could help him find that.

21        But the alternative that he's proposed here in

22  these document requests really is -- is extraordinarily

23  overbroad and becomes quite burdensome.

24        For example, to talk about to have us identify

25  anything that evidences the lack of an attorney-client

1  relationship, or documents that describe the nature of the

2  services that CSE provided, that arguably would call for

3  every document that reflects what CSE was doing at any time

4  for Lance Armstrong over the course of the decades-long

5  relationship.  I may be exaggerating the time of the

6  relationship, but it certainly was 10, 15 years, and to --

7  or to have us scrutinize correspondence to determine whether

8  we believe that evidence is the lack of an attorney-client

9  relationship, seemed, again, difficult, if not impossible,

10  for us to perform that task.

11          So we propose that we would provide -- if you want

12  the nature of the services, we could provide the contract

13  and engagement letters that we're aware of or that we have.

14  We would give documentation showing when Mr. Stapleton was

15  active and when he was inactive; and any communications

16  where they're talking about whether he was acting or not

17  acting as -- Mr. Stapleton was acting or not acting as

18  Mr. Armstrong's attorney.

19          And then if there's some point in this litigation

20  where Mr. Armstrong claims that a particular transaction --

21  I thought Mr. Stapleton was asking as my attorney, perhaps

22  there's more focused inquiry that we could make that

23  responds directly to that allegation or claim.

24          I hope that's helpful to the Court.  But that's my

25  understanding of the context of this, and where this might

1    be heading in terms of an assertion of privilege.

2             THE COURT:  When will you be in a position to

3    know, if we're not already, if Mr. Armstrong's lawyers are

4    asserting attorney-client privilege as to communications

5    with Stapleton?

6             MR. SCOTT:  Your Honor, this is Paul --

7    Your Honor, this is Paul Scott.

8             We already have responses to document requests,

9    where, in fact, they basically just asserted the privilege

10   in response to our request.

11            You know, for example, when we asked them for, you

12   know, documents evidencing the lack of an attorney-client

13   relationship between them, they assert the attorney-client

14   privilege.  When we ask about documents relating to

15   William Stapleton's authorization or lack of authorization

16   to practice law, they assert the privilege.  When we asked

17   about his knowledge, Armstrong's knowledge, documents

18   relating to his knowledge, Stapleton was inactive or

19   unauthorized to practice law, again, the privilege is

20   asserted.  On and on, we have quite a number of requests

21   like that.

22            MR. HARRIS:  Well --

23            MR. SCOTT:  So these are generally being asserted.

24            And the problem with kind of trying to pigeonhole

25   their response on this is, there can be a continuum of

1    information -- or of documents that demonstrate what the

2    state of knowledge is that would help establish the state of

3    knowledge of Mr. Armstrong.

4              And if we're looking at, you know, just on or

5    about the date of some correspondence that he doesn't want

6    to produce, that's not going to give us the full picture.

7              THE COURT:  Okay.

8              MR. HARRIS:  Your Honor, if I can just address the

9    statements that Mr. Scott just made about our assertions of

10   the privilege.  He didn't -- I don't think that was directly

11   responsive to the Court's question.

12             Those privilege assertions, which were in our

13   general objections or in the specific objections with

14   respect to these document requests, are not asserting --

15   we are not asserting in those responses an attorney-client

16   privilege on behalf of Mr. Armstrong with Mr. Stapleton as

17   the lawyer for Mr. Armstrong, in which I think --

18             MR. SCOTT:  May I clarify, Your Honor?  This is

19   Paul Scott.

20             I was referring just now to Armstrong's responses

21   to the latest document requests.

22             THE COURT:  Right.  So --

23             MR. HARRIS:  Oh, okay.  Well, then, I'm sorry.

24   I thought you were talking about our -- you said "they," and

25   I thought you meant the CSE defendants.

```
 1            THE COURT:  So CSE is not asserting a privilege on

 2   Mr. Armstrong's behalf.  I mean, it's not his privilege to

 3   assert, right?

 4            MR. HARRIS:  I understood that was the Court's

 5   question.  Let me respond to that.

 6            THE COURT:  I'm wondering whether Mr. Armstrong

 7   has asserted the privilege.  If he has, then it seems to me

 8   fair for Mr. Scott to be able to challenge that assertion

 9   through documents that may show that Armstrong understood

10   him not to be acting as a lawyer.

11            So the predicate question is whether Mr. Armstrong

12   is asserting his attorney-client privilege as to

13   conversations with Stapleton.

14            MR. SCOTT:  And, Your Honor, the answer to that is

15   very firmly yes.  It's asserted over and over and over again

16   in Armstrong's responses to our document requests.

17            THE COURT:  Okay.  Mr. Harris, do you disagree

18   with that?

19            MR. HARRIS:  Well, I don't -- I accept the

20   representation that he may be -- that Mr. -- and I've been

21   told that Mr. Armstrong has asserted privilege with respect

22   to certain communications with Mr. Stapleton.  So yes.

23            THE COURT:  Okay.

24            MR. HARRIS:  And that's in another litigation,

25   and, perhaps, in this litigation as well.
```

1          THE COURT:  Okay.

2          MR. HARRIS:  So I do accept that.

3          And we've tried to address Mr. Scott's desire to

4   get that from our document.

5          THE COURT:  Got it.

6          MR. CHANDLER:  What we proposed, rather than

7   requiring us to go through every document we have to

8   determine whether evidence is the lack of an attorney-client

9   relationship or describe the nature of services that are

10  being provided.

11         THE COURT:  Okay.

12         MR. CHANDLER:  On that issue.

13         THE COURT:  So the next question is, if

14  Mr. Armstrong did have a subjective belief that

15  Mr. Stapleton was a lawyer and was acting as a lawyer even

16  if he was not licensed, is that a basis for the assertion of

17  the privilege?

18         And I guess, Mr. Scott, that's a question for you.

19  I mean, can you -- do you need these documents in order to

20  overcome that assertion of the privilege?

21         MR. HARRIS:  The state of -- as I understand it --

22  well, you know, part of that, I guess, depends on you,

23  because I'm not sure that there's circuit court authority on

24  this.

25         THE COURT:  Uh-huh.

1          MR. HARRIS:  And I think that this issue has been

2    looked at differently in different district courts.

3          THE COURT:  Okay.

4          MR. HARRIS:  And, unfortunately, I'm sorry

5    I don't have that authority immediately in front of me.

6          But I know that certainly in some cases, the state

7    of the -- of knowledge of the individual who's claiming the

8    privilege, even when the lawyer was not authorized to

9    practice law, you know, becomes a relevant factor.

10          You know, the credibility of that belief,

11    obviously, I think, is another consideration, and that's the

12    kind of thing we want to get to.

13          To the extent that you have years of

14    representation as an agent and Stapleton is no longer at a

15    law firm and he's at his own agency and they have a general

16    counsel working for CSE, you know, who's holding a different

17    position for Mr. Stapleton; and yet Mr. Stapleton is

18    still -- or, rather, Mr. Armstrong still claims that there's

19    a privilege at some point in the line about a piece of

20    correspondence he's concerned about, you know, that's where

21    we'd want to get into the knowledge through the period of

22    time that these folks were working together.

23          THE COURT:  Okay.  Well, here's --

24          I got it.

25          Here's what we're going to do on that one.

1    I think the request for documents showing a, quote/unquote,

2    lack of an attorney-client relationship is too broad and

3    vague, and it requires the defendants to make sort of legal

4    conclusions.

5         What I'd like to do is adopt the CSE's proposal

6    with the following changes.  Let's say -- and, again, we'll

7    put this in an order:  All contracts, engagement letters

8    between the parties or other documents that reflect -- not

9    reflect, but that describe the nature of the services that

10   CSE provided, okay?

11        So we don't want every document between them, but

12   we want documents -- any document that lists or otherwise

13   describes or enumerates what CSE was being hired to do.

14        Okay.  All documents reflecting Stapleton's status

15   with the Texas Bar, I think that's fair.

16        And all communications between Stapleton and

17   Armstrong discussing or relating to whether Stapleton was or

18   was not acting as Armstrong's lawyer.

19        MR. SCOTT:  Your Honor, this is Paul Scott.

20        May I just ask with respect to No. 3 that those

21   communications not be limited to communications between

22   Stapleton and Armstrong?

23        THE COURT:  Well, Armstrong has to be a party to

24   them, if you're looking to assess his subjective belief as

25   to whether Stapleton was a lawyer.

1            How about all communications received by

2     Armstrong, or to which Armstrong was a party?

3            MR. SCOTT:  That's fine, Your Honor.  Thank you.

4            THE COURT:  Okay.

5            No. 88.  These are employee lists, right?

6            MR. SCOTT:  That's correct, Your Honor.

7            So, again, the purpose of this request is really

8     just to learn the identities of possible witnesses who can

9     speak to the knowledge of CSE, Stapleton and Knaggs,

10    you know, about their knowledge relative to what was

11    happening in the relevant period.

12            So the response that we've been given has two

13    issues from our perspective.  One is, the language says

14    that -- I mean, it says that they'll give us the officers

15    and directors and full-time employees of CSE sports group.

16    Well, the sports group is not a legal entity.  CSE is the

17    legal entity.  It had within it, as I understand it --

18    you know, a part of the business was related to sports, and

19    part of it was related to music.  So we would need the

20    officers and directors of CSE, not just officers and

21    directors of the sports group, because the officers and

22    directors would be, obviously, directors of the company and

23    not of a group or division within the company.

24            The second concern relates to only giving us the

25    full-time employees of the sports group.  The company had,

1    as I said, different facets to its business, and employees

2    could presumably work on both the sports-group side and

3    music-group side and be employed full time by the company.

4    So if they're full-time employees of CSE, that is a more

5    reasonable category than just full-time employees of the

6    sports group, because, as I said, they could have divided

7    responsibilities.

8           And then finally with respect to part-time

9    employees, we had considerable back and forth with that,

10   because they were arguing, I thought reasonably, that, look,

11   there's this big music side to the business, and they would

12   oftentimes have temporary labor helping with the concert or

13   an event or something like that, and, you know, calling,

14   asking them to find all those names isn't reasonable, and we

15   agreed.

16          But what we suggested as an alternative was if you

17   have a part-time employee who's around for a year or more

18   and they're working on the sports-group side of the

19   business, perhaps they're only there 20, 30 hours a week.

20   But they're really not that different in kind from the

21   full-time employees, and they may well be in a position to

22   be knowledgable.

23          At the end of the day, we're really just talking

24   about payroll records, so that shouldn't be that significant

25   a burden to just generate the records or pull the records

1    that have the names of these individuals in them, as well

2    as, you know, the identifying information we've asked for.

3              THE COURT:  Okay.

4              Now, I take it you got an initial disclosure with

5    all witnesses who are likely to have discoverable evidence;

6    is that correct?

7              MR. SCOTT:  Well, full disclosure, yes,

8    Your Honor, although those disclosures tend to be a listing

9    of the folks that people are inclined to use, and they're

10   not looking for every witness who we might be able to, you

11   know, find has helpful information regarding their

12   knowledge.

13             THE COURT:  Okay.  Mr. Harris or Ms. Dayton.

14             MR. HARRIS:  I'm happy to respond.

15             THE COURT:  Sure.

16             MS. DAYTON:  On the first point Mr. Scott raised

17   regarding the officers and directors of CSE versus the

18   officers and directors of CSE's sports group, I apologize

19   for the ambiguity space was truncated.

20             We've already discussed with Mr. Scott, there are

21   no officers and directors of CSE sports group.  So the

22   officers and directors would be of CSE, as he has requested.

23   So that's a non-issue.

24             THE COURT:  Okay.  Well, what is the relationship

25   between CSE proper and the sports group?

 1          MS. DAYTON:  So it's not -- the sports group isn't

 2   a distinct entity.  The business has just two very different

 3   sides.  There's a music side to the business that promotes

 4   music festivals, and then there's the agency side of the

 5   business, which is involved in sports representation.

 6          THE COURT:  And give me a sense of how large each

 7   side is in terms of employees, both full and part time.

 8          MS. DAYTON:  So right now, Your Honor, the company

 9   is incredibly slow.  It's three employees, and not even

10   employees.  It's the two principals and one employee who's

11   on maternity leave.

12          THE COURT:  Okay.

13          MS. DAYTON:  The company is varied in size.

14   At its peak was probably quite large.  Marc might know --

15          MR. HARRIS:  Your Honor, in terms of full-time

16   employees -- I actually am not prepared -- I'm not able to

17   answer the Court's question.

18          I do know that in terms of temporary employees,

19   the music side would have -- could have hundreds of

20   employees working on these music festivals, where if you

21   didn't see that same sort of transient, as much transient

22   activity on the sports-agency side -- but I don't know the

23   answer today, Your Honor, of, at any given time period, what

24   the employee count was.

25          THE COURT:  All right.

```
1              MR. HARRIS:  But if you're talking -- if I had to
2   guess, I would say maximum of a dozen on the sports side but
3   hundreds on the music side.
4              THE COURT:  Okay.
5              MR. SCOTT:  Your Honor, this is Paul Scott.
6              THE COURT:  Yep.
7              MR. SCOTT:  I think that's helpful information.
8   We haven't heard that number before.
9              But if the maximum number is dozens on the sports
10  side and we're just talking about full-time employees and
11  part-time employees over a year on the sports side, it would
12  seem to be a pretty discrete number of people to give us a
13  record of.
14             THE COURT:  But I guess their point is that, and
15  I don't want to put words in your mouth, but if there's not
16  a, you know, tight or sort of legal division -- I assume
17  they're all paid by the same entity.  You never know if,
18  you know, there's certain part-time employees who did
19  90 percent of their work for the sports group but who did
20  10 percent of their work -- I mean, 90 percent of their work
21  for the music group but 10 for the sports group, how are you
22  going to catch all those people?
23             I mean, is that the argument, Ms. Dayton?
24             MS. DAYTON:  You know, Your Honor, we can delve
25  into it further with our clients.
```

1              The payroll records are difficult.  They're not

2    all in one place, is what we've been told.  And this

3    information is just very practically difficult to gather,

4    which is why, given Mr. Scott's interests in, you know,

5    these people's knowledge of Mr. Stapleton and Mr. Knaggs'

6    knowledge, we felt like limiting the universe to full-time

7    employees was appropriate, given the difficulty in gathering

8    the information.

9              I can get more information on the specifics of

10   that difficulty if the Court would find that helpful.

11             THE COURT:  Yeah.  Why don't you go back and see

12   what you can do, you know.  If there's some way of

13   determining if there are employees who spent, you know, a

14   substantial -- and you can define that amongst yourselves --

15   amount of time working at the sports group, even if they're,

16   quote/unquote, part time based on payroll records or

17   attendance records or other HR records, it seems to me that

18   that's the best way to skin this cat.

19             MR. SCOTT:  Your Honor, would, say, a one-year

20   period, maybe in at least halftime, be a possible reference

21   point so we could have some guidance on that?

22             THE COURT:  Well, I'll let you figure that out,

23   but that strikes me as reasonable.

24             MR. SCOTT:  Okay.

25             THE COURT:  Okay.  Let's move to 89:

1    Board minutes.  So the company has no formal board minute

2    meetings?

3              MR. SCOTT:  At the end of the day, Your Honor, in

4    our request initial request, we sought board minutes, and we

5    were told that they would give us the board minutes that

6    touched on the matter of doping or other allegations in this

7    case.  And then we received interrogatory responses,

8    indicating that they weren't having formal board meetings as

9    a company.

10             And in the submission to the Court now, that

11   interrogatory response is referenced, and the indication is,

12   I take it that they don't have board minutes, from what

13   they're saying now.

14             But to the extent that there are informal board

15   minutes or notes, you know, of meetings that, theoretically,

16   were board meetings, we'd like to know about them, not only

17   because they would potentially contain relevant knowledge

18   with respect to the allegations in the case, but also

19   because we have a piercing allegation, and, the, you know,

20   whether they were following corporate formalities is

21   obviously relevant as well.

22             THE COURT:  Okay.  So would not the request for

23   notes and other types of documents be subsumed within other

24   requests that you've made or no?

25             MR. SCOTT:  I mean -- well, I mean, we're

```
 1   specifically asking for board minutes, and their response

 2   is, we don't have formal board minutes.

 3          So the -- what we're saying is formal or informal

 4   minutes from any board meetings, produce them, so we can

 5   know whether these events even occurred, whether there were

 6   even any board meetings.  Or if there's documentation about

 7   some or not, then we'll just know.

 8          And if there are no formal or informal board

 9   minutes, that's the end of it, we're done pressing on the

10   subject.

11          THE COURT:  Okay.

12          MR. SCOTT:  We just said formal --

13          THE COURT:  Mr. Dayton, if the requests were

14   reformulated to say notes or other documents reflecting

15   board conversations -- you know, proceedings at board

16   meetings, I think units may be hanging us up because that's

17   sort of a formal corporate term.  If the requests were

18   reformulated along those lines, would it be objectionable

19   still?

20          MS. DAYTON:  It's not objectionable in the sense,

21   we're not trying to withhold the documents.

22          It's practically a bit challenging, because the

23   members of the board frequently met to discuss the business

24   just because they were also the principals who conducted the

25   day-to-day business of the entity.
```

1          So when I say there aren't formal board minutes or

2   formal board meetings, it's because the discussions between

3   the members of the board happened on the -- off the cuff in

4   real-time when matters that would be pertinent to the board

5   came up.

6          So it's just because of this situation, it's just

7   really, you know, difficult to figure out what to classify

8   as a board meeting and what to classify as notes from the

9   meeting.

10         MR. SCOTT:  Your Honor, this is Paul Scott.

11         And I guess that kind of gets to the crux of it,

12  because if they're going to maintain that, you know, later

13  in the case that on X date they, in fact, when they sat down

14  for coffee, that that was actually a board meeting, well,

15  we'd like to have whatever notes or documentation that would

16  constitute the minutes of that board meeting produced so we

17  can know where they're headed with that argument.

18         If they're saying --

19         THE COURT:  Well, what she's saying is that there

20  are no minutes, right?  I mean, I'm not sure there's such a

21  thing as informal minutes.  Either they're minutes or

22  they're not.

23         The question is whether there's a secretary there

24  or whether individual board members took notes.  That's a

25  different question, it seems to me.

```
 1              MR. SCOTT:  Uh-huh.
 2              THE COURT:  I mean, if you want to ask for,
 3    you know, notes of board meetings, I think that's fair, but
 4    they've said that there are no minutes.
 5              MR. SCOTT:  Okay.
 6              THE COURT:  So why don't we reformulate that, and
 7    then, you know, you just have to -- you go ask the people
 8    who were at the meeting whether they took notes or not.
 9    I don't think that's so burdensome.
10              MR. SCOTT:  Understood.  That's fine with us,
11    Your Honor.
12              MS. DAYTON:  Your Honor, the only thing I would
13    raise is the practical difficulty I was just discussing
14    about what to consider a board meeting.
15              You know, Bill Stapleton and Bart Knaggs are the
16    board for the majority of this time, and they're working and
17    running this business together, so they're talking all the
18    time.  Clearly not at the time those two individuals are
19    talking is a board meeting, and it's hard to figure out
20    where to draw that line.
21              THE COURT:  I see.
22              MS. DAYTON:  If we assert that something was a
23    board meeting later, we're happy to produce any notes anyone
24    would have, if there are any, if that helps Mr. Scott's
25    concerns.
```

1      MR. SCOTT:  Your Honor, we're asking the question

2  now.  So, you know, we want to know now, because it's

3  relevant to our piercing allegations particularly.

4  If they're saying they had, you know, any events -- they can

5  ask their clients, did you have any board meetings?  If so,

6  when?  Do you have any notes from those meetings?  It's that

7  simple.

8      MR. HARRIS:  Your Honor, it would be helpful for

9  us -- and I don't -- oh, you do have this information, you

10  have this document, I believe.  You have our interrogatory

11  response in which we said that for some time, Mr. Stapleton

12  was the sole director of the CSE related entity.  And

13  between 2000 and 2007, the directors of the entity

14  frequently met to discuss the business of the entity.  There

15  are no formal minutes of these meetings and their precise

16  dates are unknown.

17      So we've answered an interrogatory already as to

18  whether there were, quote, board meetings, and that's sort

19  of the best answer that we can give.

20      THE COURT:  And that's not satisfactory,

21  Mr. Scott?  They're saying that there were no formal board

22  meetings.  I mean, that gets you to your piercing

23  allegation, right?

24      MR. SCOTT:  I apologize, Your Honor.  I have to

25  pull that -- could you, Mr. Harris, could you tell us the

1    specific interrogatory reference you're referring to?

2            MR. HARRIS:  It's the very last, interrogatory

3    No. 11.  It's the last page of the interrogatory responses

4    for the document that was, I think, attached to --

5            MS. DAYTON:  It's 252.  I think it's Exhibit B,

6    docket number --

7            MR. SCOTT:  It doesn't say that they didn't have

8    any board meetings.  It says there are no formal meetings

9    minutes of these meetings.  It says, you know, Stapleton was

10   the sole director.

11           If they're going to stipulate and agree now that

12   there were no board meetings, then, yes, you're right,

13   Your Honor, we would be fine with that.  But that's -- this

14   interrogatory response doesn't say that.  It just says that

15   Stapleton was the sole director, and the directors between

16   2000 and 2007 frequently met to discuss the business and the

17   entities.  They don't characterize what those meetings were,

18   and they said there were no formal minutes of these meetings

19   and their date are unknown.

20           I mean, it sounds like there were no formal board

21   meetings plainly, but they haven't said that.  And we don't

22   want to have them arguing it later, and, you know, producing

23   documents that are, you know, a record of some board

24   meeting, you know, six months from now when we've asked for

25   it earlier on.

1          THE COURT:  Mr. Harris, would you be willing to

2    amend your interrogatory response No. 11 to make more clear

3    that there were no board meetings?

4          MR. HARRIS:  Well, we could try to do that.

5          You'll note at that same page, we say that that

6    term is undefined.  So it's -- the challenges as we set

7    forth in the interrogatory response, that the board members

8    did meet to discuss the business of the entity.

9          THE COURT:  Yep.

10          MR. HARRIS:  I don't know how else to say it.

11          MR. SCOTT:  Well -- Your Honor, this is

12    Paul Scott.

13          I think the reality is, all corporations have that

14    same dynamic at a greater or lesser scale.  And that's why,

15    you know -- that's why they're called corporate formalities,

16    because you call a meeting as a board meeting because it's

17    necessary pursuant to the rules that go into operating a

18    corporation.

19          So it either complies with the rules or it doesn't

20    in terms of requirements of how you call a board meeting and

21    who's there and the rest of it.

22          THE COURT:  Have you elsewhere in the request

23    asked for notes of meetings of business meetings or

24    management committee meetings regarding the relevant topics?

25          MR. SCOTT:  I don't believe we do.

1          THE COURT:  So you have those?

2          MR. VALDEZ:  Yes.

3          THE COURT:  And you were told that there were no

4   formal minutes in response to your request for board

5   minutes.  And you've been told that there were meetings to

6   discuss the business but that there were no formal meetings

7   of these minutes.  So I'm not sure how much else we need or

8   they can give you, hmm?

9          MR. SCOTT:  It's the use of the term -- because my

10  concern, Your Honor, is simply they introduced the word

11  "formal" in there.  And the argument I will expect to hear

12  later is, well, they weren't formal minutes, but we have

13  notes and it was a board meeting because they discussed, you

14  know, X, Y and Z business at that meeting.

15          So if they're going to call it a board meeting,

16  what you're supposed to produce at a board meeting are

17  minutes.  If they didn't produce those and if they want to

18  say they're notes instead of minutes, then that's the kind

19  of thing, I think, would fall within the request.  The idea

20  just being to learn about whatever board meetings they may

21  claim later, if they do.

22          THE COURT:  Well, you can raise that sort of level

23  of, you know, subtlety in depositions and whatnot.

24          I think there's not much else we can do on these

25  document requests.  Either -- you know, they said there were

1  no informal minutes and they've given you the notes, and you

2  can -- or they can argue that the notes represent --

3          MR. SCOTT:  Your Honor, I may have misspoke

4  before.  They have not given us notes of meetings, that I'm

5  aware of.

6          THE COURT:  But you've asked for notes?

7          MR. SCOTT:  No, Your Honor, I don't believe that

8  we specifically asked for that.

9          I mean, there's 90 requests, I'd have to go

10 through them.  But I don't believe that we're asking for all

11 of their notes of business meetings.  We specifically

12 limited it to board minutes to be -- to avoid a burdensome

13 request.

14         But if it were to be in this context of your

15 order, you know, that the board minutes were interpreted to

16 mean, including notes of meetings of the board, then that

17 would be fine with us.

18         THE COURT:  I mean, I think board minutes are,

19 you know, that, as you say, it's a legal term, and there are

20 different interpretations as to what constitutes minutes or

21 not.  If they didn't produce something in response to your

22 request for minutes and then later argue that these are, in

23 fact, duly corporate and official minutes, then they're

24 going to have a problem with that.

25         MR. HARRIS:  We agree with that, Your Honor.

1            THE COURT:  Now, there may be notes of the meeting

2    where they talked about stuff that you might talk about in a

3    board meeting, but that doesn't make it a formal meeting for

4    purposes of corporate formalities.

5            MR. SCOTT:  Yes.

6            And I guess, Your Honor, to the interrogatory that

7    Mr. Harris referred to, it says, list all board meetings.

8    And so they talked about frequently meeting between 2000 and

9    2007, but -- to discuss the business.  They don't give us

10   any listing of what are board meetings.  They just say, we

11   met a lot.  And then they say there are no informal minutes.

12           So perhaps the issue, then, is their response to

13   interrogatory 11, where they either had board meetings or

14   they didn't.  Telling us that they met a bunch of times in

15   seven years is not answering whether or not they had any

16   board meetings.

17           THE COURT:  All right.  I'm going to take that one

18   under advisement, and we'll put it in the order, okay?

19           MR. SCOTT:  Thank you, Your Honor.

20           THE COURT:  Last one.  Folks were writing books,

21   hmm?

22           MR. SCOTT:  So on this one, Your Honor, I had some

23   back and forth, a variety of exchanges trying to narrow this

24   down, and, really, the -- I just have to pull the request up

25   here.

1          The kind of thing we're after is, we're not

2     looking for published books, we're not looking for their

3     copies of books.

4          But the request that you have in our document

5     requests was subsequently narrowed in our correspondence

6     with the CSE defendants to be basically what you have in the

7     submission before you, where we were asking for documents or

8     communications relating to cycling or doping, where the

9     author, or the subject of the book, was one of the

10    defendants in whole or part.  We don't want published books.

11         The kind of thing that would be relevant here, as

12    an example, I'm not sure how many --

13         THE COURT:  Okay.  Which of the defendants have

14    written books?

15         MR. VALDEZ:  Well, if it's about them.  It doesn't

16    have to be written by them.

17         So, for example, David Walsh wrote a book about

18    Armstrong doping in 2005; or, you know, some allegations as

19    to that.  You know, Tyler Hamilton has written a book.

20    Other people have written books relating to these events

21    back then.

22         To the extent that the defendant, the CSE

23    defendants, are corresponding or have any kind of

24    communications relating to those books that make allegations

25    of doping or concern the defendants in this case, then

1   that's going to be relevant.

2          If they're saying, we have to, you know, make sure

3   we get Walsh and trying to prevent him from publishing his

4   book, because there was an effort made to prevent him from

5   publishing his book, you know, that kind of correspondence

6   is going to be of interest to us, because it shows an effort

7   to avoid folks learning about their doping.  And there are a

8   number of these books.

9          The government actually made a suggestion to me

10  that I thought made some sense as a possible solution to

11  this, which would be to, perhaps, just list the books that

12  we're talking about.  So if there's communications or any

13  documents basically relating to these list of books that

14  concern doping or the members of the U.S. Postal Service

15  team, then that kind of correspondence is what we're after.

16          THE COURT:  Okay.

17          MS. DAYTON:  Your Honor, if I could respond?

18          THE COURT:  Sure.

19          MS. DAYTON:  So this request has been a moving

20  target.  This new iteration is the latest of several.

21          You know, there were many, many document requests.

22  And there's already a request for all documents relating to

23  doping, discussing doping, communications about doping.  All

24  of that stuff has already been requested.  To layer on the

25  confusion about who is and isn't an author or a subject at

1    one point or later represented that books authored by

2    writers of the team who rode for Tailwind were to be

3    considered defendants based on their relationship with

4    tailwind, even though they're third parties to this dispute.

5    It's really just been a confusion with respect to this

6    request.

7                So, I mean, I think that if the issue of people

8    talking about doping, he has -- they're going to get

9    anything that exists, if anything exists, on that already

10   based on the other 289 requests or whatever the number is.

11               THE COURT:  Okay.

12               MR. SCOTT:  Your Honor, speaking to that last

13   point.

14               To the extent that, as I gave as an example,

15   there's a -- there's a documented history of the efforts

16   that Armstrong made to, you know, prevent Walsh's book from

17   being published, as an example.  And there's --

18               THE COURT:  And would that -- to go directly to

19   her point, would that be subsumed within other requests?

20               MR. VALDEZ:  I don't think it's necessarily so if

21   there's no reference to doping.

22               But simply a, you know, we need to make sure Walsh

23   doesn't, you know, talk or anything about other people.

24   If there's just a reference to trying to, you know, stop

25   them or -- there's not a reference to the word "doping" in

1   there, you know, we --

2             MS. DAYTON:  Your Honor --

3             MR. SCOTT:  -- want to prefer that stuff gets

4   picked up.

5             And if they have already picked it up in

6   connection with, you know, their search for another request,

7   that's fine, but it doesn't mean that this isn't a

8   legitimate request.

9             THE COURT:  Ms. Dayton, what if the e-mail says,

10  you know, we have to get to Walsh's publisher?  Period.

11  There's no reference to doping.

12            MS. DAYTON:  If Mr. Scott gives us a list of books

13  and their author, I think we can probably run those search

14  terms as long as it's reasonable.  It's not every book about

15  bicycle racing that exists.

16            THE COURT:  Okay.  But that sounds like a

17  reasonable proposal to me.

18            So why don't we rephrase the request to refer to

19  specific books or authors that you're interested in and go

20  from there?

21            MR. SCOTT:  Thank you, Your Honor.

22            THE COURT:  Okay?

23            Anything else?

24            MR. HARRIS:  No.  Thank you for your time,

25  Your Honor.

1              THE COURT:  Sure.  We'll get out an order.

2          And I think that most of these were things that

3   were legitimately broad, a couple of them were not.  I would

4   just counsel you all in the future to try to work as much

5   things out as you can, okay?

6              MR. HARRIS:  Thank you, Your Honor.

7              THE COURT:  Okay.  Thanks, guys.  Have a good

8   weekend.

9          (Proceedings concluded at 3:09 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: July 24, 2015_____    /S/__William P. Zaremba_____

                               William P. Zaremba, RMR, CRR