1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2

       - - - - - - - - - - - - - - - - -
3      FLOYD LANDIS,
                               CA No: 1:10-cv-00976 (CRC)
4                 Plaintiff,
                               Washington, D.C.
5                              Friday, May 8, 2015
       vs.                     12:34 p.m.
6

       TAILWIND SPORTS CORPORATION,
7      et al.,

8                 Defendants.
       - - - - - - - - - - - - - - - - -
9      _____

10              TRANSCRIPT OF TELEPHONIC CONFERENCE
          HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                  UNITED STATES DISTRICT JUDGE
       _____
12

13     APPEARANCES:

14     For the Plaintiff:        **PAUL D. SCOTT, ESQ.**
                                 **LANI ANNE REMICK, ESQ.**
15                               LAW OFFICES OF PAUL D. SCOTT, PC
                                 The Embarcadero
16                               Pier Nine, Suite 100
                                 San Francisco, CA 94111
17                               (415)981-1212
                                 pdscott@lopds.com
18

19     For Intervenor Plaintiff  **ROBERT E. CHANDLER, ESQ.**
       United States of America: U.S. DEPARTMENT OF JUSTICE
20                               Civil Division, Fraud Section
                                 601 D Street, NW
21                               Suite 900
                                 Washington, DC 20530
22                               (202) 514-4678
                                 robert.chandler@usdoj.gov
23

       (Continued on Next Page)
24

       Proceedings recorded by mechanical stenography; transcript
25     produced by computer-aided transcription

```
 1      APPEARANCES (CONTINUED):

 2      For the Defendant          ELLIOT R. PETERS, ESQ.
        Lance Armstrong:           SHARIF E. JACOB, ESQ.
 3                                 ELIZABETH McCLOSKEY, ESQ.
                                   KEKER & VAN NEST, LLP
 4                                 633 Battery Street
                                   San Francisco, CA 94111
 5                                 (415)391-5400
                                   epeters@kvn.com
 6

 7

 8      Court Reporter:           Lisa A. Moreira  RDR, CRR
                                  Official Court Reporter
 9                                U.S. Courthouse, Room 6718
                                  333 Constitution Avenue, NW
10                                Washington, DC  20001
                                  202-354-3187
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2              THE COURT:  Good afternoon, everyone; or good
3     morning in California.  Who do we have?
4              MS. McCLOSKEY:  We have Elliot Peters, Sharif
5     Jacob, and Elizabeth McCloskey on behalf of Defendant
6     Armstrong.
7              THE COURT:  Okay.  How are you all?
8              MS. McCLOSKEY:  Fine, thank you.
9              THE COURT:  Good.
10             MR. CHANDLER:  Robert Chandler for the United
11    States.
12             THE COURT:  Okay.
13             MR. SCOTT:  And Paul Scott and Lani Remick for
14    relator, Paul Landis.
15             THE COURT:  This should be quick, you all.  I
16    understand that there are some motions to compel that you
17    want to file; is that correct?
18             MS. McCLOSKEY:  Yes, that's correct.
19             MR. SCOTT:  That's right, Your Honor.
20             THE COURT:  Can you give me a preview of what the
21    disputes are?
22             MS. McCLOSKEY:  Yes.  This is Liz McCloskey for
23    Defendant Armstrong.  The category of documents on which we
24    will move all relate to relator, Floyd Landis, who is a
25    defendant in a federal criminal investigation relating to
```

1    fraud that was resolved during the pendency of this qui tam

2    action.  Landis admitted defrauding donors by lying about

3    his own doping during his cycling career, and during that

4    investigation Landis cooperated with the government,

5    including by wearing a wire to collect government evidence.

6         THE COURT:  I'm sorry.  Slow down just a little

7    bit, Ms. McCloskey.  Thanks.

8         MS. McCLOSKEY:  That investigation was resolved by

9    the a deferred prosecution agreement between Landis and the

10   government.

11        THE COURT:  Okay.

12        MS. McCLOSKEY:  We want to know the details of

13   that agreement and the communications relating to it.  We

14   would like information relating to the victims, the amount

15   of the fraud and, in particular, the extent of his

16   cooperation with the government.

17        THE COURT:  Okay.  Mr. Chandler, are there

18   privilege objections, or what's the basis for not

19   providing --

20        MR. SCOTT:  Your Honor, if I could --

21        MR. CHANDLER:  These are relator's objections.

22   These objections are related to relator.

23        THE COURT:  Okay.

24        MR. SCOTT:  Your Honor, we're more than happy to

25   provide them with the deferred prosecution agreement which

1     spells all of that, or whatever is relevant, out in

2     excruciating detail.  It describes the misrepresentations

3     that were made by my client and, you know, exactly how the

4     scheme worked, the amount of money that was going to be

5     returned to donors.  It's all spelled out there.  Our

6     concern is just that the Court has already ruled that

7     there's no in pari delicto defense here, or they've

8     withdrawn their unclean hands and in pari dilecto defenses,

9     and this just isn't relevant.  We could wind up going down

10    an entirely separate road with this.

11          We don't have to produce everything relating to

12    that matter.  It's already on public record spelled out in

13    detail and admitted to by our client.  All they have to do

14    is read the deferred prosecution agreement.

15          We're also happy to give them anything else that

16    was filed in that case, but going beyond that is just a

17    waste of time.  If they're trying to prove that he lied,

18    it's admitted.

19          MS. McCLOSKEY:  Your Honor, we're not looking for

20    just the agreement.  We feel that we should look at the

21    communications, the evidence.  All this information goes to

22    Landis's credibility and also his bias in this case.

23          THE COURT:  Okay.  Mr. Scott, what's the volume

24    of -- I mean, if you set aside the DPA, what's the volume of

25    materials we're looking at?  I mean, is there a burden -- is

```
1     there a burdensomeness objection as well or just --

2               MR. SCOTT:  Yes.  Absolutely, Your Honor.  It will

3     be a massive project to try and gather all of the

4     information relating to this -- you know, Floyd's Fairness

5     Fund that was developed and the misrepresentations that were

6     made in the book and all of the things that went into the

7     criminal prosecution that related -- resulted in the

8     deferred prosecution agreement.  And all of this is just

9     spelled out entirely in the documents so why would we be

10    going and collecting a bunch of documents that lead to a

11    conclusion that's already been admitted?  This is just a

12    huge waste of time, and we're obviously, you know, meanwhile

13    dealing with the motion for summary judgment and all sorts

14    of other discovery.

15              It's just going to be a lot of work for nothing,

16    in my view, Your Honor.

17              THE COURT:  Okay.  I take it you all have met and

18    conferred as much as you can about this?

19              MS. McCLOSKEY:  We have.

20              MR. SCOTT:  Yes, Your Honor.

21              THE COURT:  Okay.  Well, we'll accept a motion.  I

22    understand that you've agreed to a schedule.

23              MS. McCLOSKEY:  We have, yes.  We've agreed.

24              MR. SCOTT:  Yes, we have, Your Honor.

25              THE COURT:  Okay.  We will accept a motion
```

1    according to that agreed-upon schedule and make a decision.

2          Are there -- is that the only dispute, or are

3    there others, I take it?

4          MR. SCOTT:  Your Honor, the relator also has

5    additional issues that relator would like to pursue.  There

6    is a request for communications that we have made of

7    Defendant Armstrong.  There are a list of individuals that

8    we provided to Defendant Armstrong in our request, and they

9    have been taking the position that they don't have to

10   provide us those communications because of some agreement

11   they struck with the government regarding a separate request

12   by the government where the government gave them a different

13   list of individuals for whom they want the communications.

14         We've conferred with the government.  The

15   government does not believe that any agreement it made with

16   respect to its request should govern our request, and indeed

17   I can let Mr. Chandler speak to this himself, but it's my

18   understanding that they believe we're entitled to this

19   information that we're requesting.  The names on that list

20   include doctors that were involved with doping and other,

21   you know, people who are key individuals involved with the

22   fraud so Mr. Armstrong's communications with them would

23   obviously be relevant.

24         THE COURT:  How many people are we talking about?

25         MR. SCOTT:  I think the list is about -- I would

1    say if you just strike off the names that overlapped with

2    the government's list, it's in the neighborhood of about 25

3    names or so, perhaps less.  But we also, Your Honor,

4    made clear in our meet-and-confer correspondence with

5    Mr. Armstrong that we are happy to have a limitation put on

6    that request that the Court did in its December 11th order

7    where it limited the types of communications that they would

8    be required to produce to things like professional cycling,

9    doping, and so forth.  The Court came up with a subject list

10   essentially in its December 11th order, and we've agreed to

11   narrow the request so that they only need to produce

12   communications on those subjects with these key witnesses.

13          THE COURT:  Ms. McCloskey or Mr. Peters, these are

14   separate parties.  They're entitled to lodge independent

15   requests.  Is there anything else objectionable about the

16   request?

17          MS. McCLOSKEY:  Your Honor, we went through the

18   process of selecting a lengthy list of custodians with the

19   government, and Mr. Landis was aware of that and certainly

20   could have participated in that process, and he now insists

21   on having an additional 25 names.  And these are names that

22   the government has never been interested in, and we just

23   don't think that they should be allowed to tag team up like

24   that and, you know, get one set of documents and then

25   another one additionally later.

1          MR. SCOTT:  Your Honor, if I can respond to that?

2          THE COURT:  Yes.

3          MR. SCOTT:  This is Paul Scott for relator.  Our

4    document request has been outstanding for I think close to a

5    year.  They've had these names all along.  When they met and

6    conferred with the government, we weren't invited to

7    participate and develop a list.  We didn't even know that

8    they had come up with a list until very recently when they

9    told us, and we didn't know the names on that list until

10   they informed us in a meet-and-confer letter in recent

11   weeks.

12          So to say that we somehow had some responsibility

13   to meet and confer on that when we had no idea that they

14   were having that discussion or limiting the -- you know,

15   agree with some limitation on the government's list, it's

16   just -- that is not reasonable.

17          THE COURT:  Okay.  Well, why don't you all -- I

18   don't want to get too far into the weeds today -- brief that

19   issue at the same time on the same schedule so we'll have

20   two motions and two oppositions on the same schedule, and

21   set forth the facts and circumstances regarding when the

22   requests were made, et cetera --

23          MR. SCOTT:  Okay.

24          THE COURT:  -- and we'll deal with both of those

25   issues.  Okay?

1          MR. SCOTT:  Your Honor, if I may, relator had one

2     other set of items.

3          THE COURT:  Okay.

4          MR. SCOTT:  If I could describe them?

5          THE COURT:  Of course.

6          MR. SCOTT:  Request 77 and also 79 through 83

7     basically ask for documents relating to the contractual

8     relationships between Armstrong and CSE and including

9     Stapleton, and the idea there is obviously if there are

10    financial transactions between the two of them, it can be

11    relevant to bias and also to, you know, what the motivations

12    were for some decisions that were made at various times.

13          And in addition, there's a privilege question.

14    We've been sending a number of requests for documents

15    relating to communications between Armstrong and Stapleton.

16    Armstrong has said that those -- that it will not be

17    withholding documents on the basis of privilege.

18          Stapleton was licensed as an attorney briefly and

19    then not active for much of the time that he was working

20    with Armstrong, and so Armstrong has said they're not going

21    to withhold documents on the basis of privilege with respect

22    to those communications, but they have not said that the

23    same is true with respect to oral communications between

24    Armstrong and Stapleton; and, you know, whether or not

25    Armstrong might have had some reasonable belief that

1   Stapleton was his attorney, you know, could be something

2   that they argue.

3          We want to make sure, if they're going to argue

4   that, that we have the documents that would inform him one

5   way or the other as to what that relationship was so, with

6   respect to some of those documents, we're interested in them

7   because of the potential relevance to any privilege claim

8   they may try and assert; and then, secondly, we're

9   interested in them for the, you know, considerations I

10  mentioned relative to financial influence and bias and so

11  forth.

12          THE COURT:  I may be misrecalling this, but didn't

13  we deal with that issue previously, and weren't there some

14  agreements that set forth the nature of the relationship

15  that came up earlier in the case?

16          MR. SCOTT:  I believe that's right, Your Honor.  I

17  think we discussed that with a motion to compel with CSE,

18  and I think what they were doing was piping it down the road

19  at that point.

20          THE COURT:  Okay.

21          MR. SCOTT:  Certainly it wasn't in our call with

22  the Court.  They were at some juncture saying we need to see

23  if Mr. Armstrong is going to assert this privilege before we

24  need to get into this document.  And he has indeed said he's

25  not withholding documents on the basis of privilege, but

1     after repeated questioning, they have not said that he will

2     not assert the privilege with respect to oral

3     communications.

4            If they concede that, then we don't need to get

5     into some of these documents, but we would still be

6     interested in the financial relationships that would be

7     reflected in some of the contracts between them.

8            THE COURT:  Okay.  Ms. McCloskey or Mr. Peters,

9     why would the existence of the privilege change depending on

10    whether the communications were in writing or oral?

11           MR. PETERS:  It wouldn't.  Your Honor, this is

12    Elliot Peters.  I'm not -- I really don't understand what

13    Mr. Scott is driving at here.  We have told them that we are

14    not asserting the attorney-client privilege as a basis for

15    withholding documents as between Stapleton and Armstrong,

16    and we're not asserting the privilege.  Period.  That would

17    apply -- our nonassertion of the privilege would, of course,

18    apply to oral communications as well as writings.  It hasn't

19    come up because we're talking about a request for production

20    of documents, and we responded to them and said we'll

21    produce the documents.

22           When it comes time to ask Mr. Armstrong or

23    Mr. Stapleton a question, we're not going to assert a

24    privilege that we said we're not going to assert.  I think

25    that's clear.  And if it isn't clear, I hope I just made it

1    clear.

2              MR. SCOTT:  Indeed that does make it clear, Your

3    Honor.  And I appreciate that, Mr. Peters.

4              So really, then, we're down to simply one request,

5    No. 77, which asks for contracts between them.  Not all the

6    different documents that might, you know, inform us as to

7    the nature of the relationship --

8              THE COURT:  Okay.

9              MR. SCOTT:  -- but simply contracts because we

10   are interested -- for example, as we understand it,

11   Mr. Stapleton was loaned a million dollars by Mr. Armstrong

12   and Mr. Armstrong's other attorney, Mr. Herman, in and

13   around the time of Mr. Landis's disclosure of what was going

14   on at the Postal Service team in 2010.  There are other

15   financial, you know, connections between them in terms --

16   including Armstrong owning part of CSE, and these are things

17   that we need to understand to understand what the financial

18   interests are that Armstrong has and Stapleton and, you

19   know, whatever bias that might result from that as well as,

20   you know, responsibility for piercing CSE's interests, as an

21   additional point.

22             THE COURT:  Mr. Peters, that sounds like a bias

23   argument to me, huh?

24             MR. PETERS:  We've produced the agency agreement

25   between Stapleton and -- between CSE, Stapleton's company,

1    and Armstrong.  That's what's relevant.  Their other

2    business or financial dealings, to just go on a fishing

3    expedition into that, I don't see what relevance it has in

4    any way that relates to the U.S. Postal Service and

5    allegations of doping in a contract between 1997 and 2004.

6    What ongoing business dealings they had, if they invested in

7    some project together, I mean, it just has no relevance to

8    this case.

9        THE COURT:  Well, if Mr. Armstrong gave them a

10   million dollar loan and he's a witness in the case, why

11   wouldn't that be relevant to his credibility and his

12   potential bias?

13       MR. PETERS:  He's a party in the case,

14   Mr. Stapleton is, and I don't know -- I'm not saying -- I've

15   never heard this, about a million dollar loan, before so I

16   don't know where Mr. Scott got that.  I've never -- I've

17   truly never heard it before.

18       I'm not saying it's not true.  I just have never

19   heard such a thing before, and so I can't really respond

20   whether it exists or not.  But I just think that the

21   financial dealings between Stapleton and Armstrong, they --

22   Mr. Stapleton was Mr. Armstrong's agent, and they did

23   business -- they were involved in business deals long after

24   this contract ended, and if we're going to dig up every one

25   of those on the rubric that there's some bias that Stapleton

1    was Armstrong's agent and they went in and invested in some

2    piece of real estate together or that he did that, that all

3    becomes open to discovery.  I really think we're going off

4    in a direction that's not reasonably calculated to lead to

5    anything admissible.

6              THE COURT:  Okay.

7              MR. PETERS:  And I think this is really just a

8    fishing expedition into all of the -- whatever financial

9    arrangements Mr. Armstrong was involved in.  Mr. Stapleton

10   was his manager.

11             THE COURT:  Okay.

12             MR. PETERS:  And so now we're just going to kind

13   of open up all of Armstrong's economic activities in any way

14   that includes Stapleton to discovery in this case on the

15   idea of bias?

16             THE COURT:  Okay.

17             MR. PETERS:  I think they're very, very

18   attenuated.  The suggestion that if there was some loan

19   because Stapleton was going to be a potential witness, that

20   really makes no sense either.

21             I mean, Armstrong has gone on television and

22   admitted his use of performance-enhancing substances.  The

23   idea that there's probative evidence to be had about him

24   covering it up when it's now admitted -- you know, Mr. Scott

25   was arguing five minutes ago about all of Mr. Landis's

1     criminal activity is admitted therefore we shouldn't be

2     allowed discovery about it, but now -- and what we want to

3     do is just find out about his criminal activity.

4            But with respect to Armstrong, we've given them

5     every bit of information we could that relates to cycling,

6     to the use of PEDs, to prior statements by Armstrong, but

7     now it's every economic dealing he had with his long-time

8     agent and business manager, Mr. Stapleton.

9            THE COURT:  Okay.

10           MR. PETERS:  I just don't see how that's anywhere

11    near the playing field of relevance in this case.

12           THE COURT:  Okay.  Let's brief that issue as well.

13           And, Mr. Scott, if you can be as specific as

14    possible in terms of the types of financial relationships

15    you think exist that would, you know, be relevant or lead to

16    relevant evidence, please explain that in your motion.

17    Okay?

18           MR. SCOTT:  Understood.

19           THE COURT:  Okay.

20           MR. PETERS:  Your Honor, one more thing, if I may?

21    I'm sorry, I didn't mean to interrupt you.

22           THE COURT:  Sure.

23           MR. PETERS:  There is pending before Your Honor a

24    motion to quash a subpoena, deposition subpoena, served on

25    Anna Hansen.

```
1              THE COURT:  Yes.
2              MR. PETERS:  And we're going to file something I
3     think momentarily.  We're waiting for the government to say
4     whether they object to us filing a short reply --
5              THE COURT:  Okay.
6              MR. PETERS:  -- and then we're planning to file a
7     short reply this afternoon, or if Your Honor gives us leave
8     to do that, we'll file it promptly.
9              THE COURT:  I'm happy to accept that.  We have a
10    call scheduled to discuss that issue; is that correct?  No,
11    we do not.
12             MR. PETERS:  We do not have a call scheduled on
13    that issue, Your Honor.
14             THE COURT:  All right.  Well, let us get all the
15    briefing, and then if we need a call, we will let you know.
16             MR. PETERS:  Good.  Thank you, Your Honor.
17             THE COURT:  Okay.  When is the deposition noticed?
18             MR. PETERS:  May 18th.  Is that right, Rob?
19             MR. CHANDLER:  That sounds right, yes.  I don't
20    have my calendar in front of me.  I think that's right.
21             THE COURT:  That's in Texas?
22             MR. PETERS:  We'd probably do it in San Francisco
23    because although Anna Hansen lives in Austin, Texas, it's
24    much less expensive for her to get on a plane than for
25    lawyers to go down there; so we think we would ask her to
```

1    come out here and do it in San Francisco.

2              MR. SCOTT:  No objection from the relator.

3              MR. PETERS:  But we still don't think it should

4    happen for reasons that we have briefed a little bit and are

5    going to respond to further today.

6              THE COURT:  Understood.  Okay.

7              MR. PETERS:  Thank you, Your Honor.

8              THE COURT:  That was all on my agenda today.

9    Thank you, guys.  Have a good weekend.

10                   (Whereupon the hearing was

11                   concluded at 12:53 p.m.)

12

13         **CERTIFICATE OF OFFICIAL COURT REPORTER**

14

15              I, LISA A. MOREIRA, RDR, CRR, do hereby

16    certify that the above and foregoing constitutes a true and

17    accurate transcript of my stenographic notes and is a full,

18    true and complete transcript of the proceedings to the best

19    of my ability.

20       Dated this 11th day of August, 2015.

21

22                        /s/Lisa A. Moreira, RDR, CRR
                          Official Court Reporter
23                        United States Courthouse
                          Room 6718
24                        333 Constitution Avenue, NW
                          Washington, DC 20001
25