<pre>
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2      - - - - - - - - - - - - - - - - -
        FLOYD LANDIS,
 3                                   CA No: 1:10-cv-00976 (CRC)
                     Plaintiff,
 4                                   Washington, D.C.
                                     Wednesday, August 12, 2015
 5      vs.                          12:34 p.m.

 6      TAILWIND SPORTS CORPORATION,
        et al.,
 7
                     Defendants.
 8      - - - - - - - - - - - - - - - - -

 9      _____

10           TRANSCRIPT OF TELEPHONIC DISCOVERY CONFERENCE
            HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                    UNITED STATES DISTRICT JUDGE
        _____
        APPEARANCES:
12      For the Plaintiff:          PAUL D. SCOTT, ESQ.
                                    JON LINDEN PRAED, ESQ.
13                                  LANI ANNE REMICK, ESQ.
                                    LAW OFFICES OF PAUL D. SCOTT, PC
14                                  The Embarcadero
                                    Pier Nine, Suite 100
15                                  San Francisco, CA 94111
                                    (415)981-1212
16
        For Intervenor Plaintiff    ROBERT E. CHANDLER, ESQ.
17      United States of America:   DAVID MICHAEL FINKELSTEIN, ESQ.
                                    U.S. DEPARTMENT OF JUSTICE
18                                  Civil Division, Fraud Section
                                    601 D Street, NW
19                                  Suite 900
                                    Washington, DC 20530
20                                  (202) 514-4678

21      For the Capital Sports &    MARC S. HARRIS, ESQ.
        Entertainment Holdings:     SCHEPER KIM & HARRIS LLP
22                                  601 West Fifth Street
                                    Los Angeles, CA 90071-2025
23                                  (213)613-4655

24      (CONTINUED ON NEXT PAGE)

25      Proceedings recorded by mechanical stenography; transcript
        produced by computer-aided transcription
</pre>

1    APPEARANCES (CONTINUED):

2    For the Defendant          **ELLIOT R. PETERS, ESQ.**
     Lance Armstrong:           **R. JAMES SLAUGHTER, ESQ.**
3                               **ELIZABETH McCLOSKEY, ESQ.**
                                KEKER & VAN NEST, LLP
4                               633 Battery Street
                                San Francisco, CA 94111
5                               (415)391-5400

6

7

8

9    Court Reporter:            Lisa A. Moreira  RDR, CRR
                                Official Court Reporter
10                              U.S. Courthouse, Room 6718
                                333 Constitution Avenue, NW
11                              Washington, DC  20001
                                202-354-3187
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2            THE COURT:  Okay.  Good afternoon, everyone.
 3            MR. PETERS:  Good afternoon, Your Honor.
 4            THE COURT:  I assume everyone's on so I'm not
 5      going to make you all enter your appearances again.  You all
 6      have been busy.
 7            MR. PETERS:  Yes, we have.  Fair enough.
 8            THE COURT:  Good.  Why don't we start with the
 9      marital privilege issue.
10            Mr. Scott, are you on?  Mr. Scott?
11            MR. SCOTT:  I'm here.
12            THE COURT:  Do you want to address the marital
13      privilege issue briefly?
14            MR. SCOTT:  Well, Your Honor, we have briefed the
15      issue fairly thoroughly.
16            THE COURT:  Okay.
17            MR. SCOTT:  So we're comfortable with the
18      arguments we have on the papers.
19            THE COURT:  Okay.
20            MR. SCOTT:  If Mr. Harris has particular
21      arguments, we'd be happy to take them up, or if there's an
22      issue that troubles you particularly.
23            THE COURT:  No.  I guess the only question that I
24      had was there seemed to be a lack of any case law for the
25      proposition that, you know, a recap of communications that
```

1    may have taken place within the marriage would serve to

2    disrupt the privilege or take away the privilege.  Am I

3    correct about that?

4          MR. SCOTT:  I understand that, Your Honor.  We

5    were noting that same consideration, but, I mean, just the

6    reality is that there is no protection whatsoever for

7    communications between two unmarried persons, you know, that

8    aren't covered by an attorney-client privilege or some other

9    privilege.  So that communication is, you know,

10   presumptively a nonprotected communication, and it was drawn

11   on by Mr. Stapleton in the first instance, you know, in an

12   effort to, you know, get a heads up, I suppose, on what was

13   going to go on before the grand jury.

14          But I think even, you know, beyond that is the

15   fact that these communications were repeated again and again

16   and again and again.  I mean, apart from just in the

17   restaurant between the two of them, it was repeated in the

18   deposition.  It was repeated later in the proceeding itself.

19   Excerpts of these conversations and Ms. Prather's testimony

20   were agreed upon by counsel who was still representing

21   Mr. Stapleton at the time although he was contesting

22   jurisdiction by the arbitration panel and the Court at the

23   time.

24          But, I mean, these events have been replayed over

25   and over again apart from just occurring at that restaurant;

1   so I think it's not only an unprotected communication once

2   he draws it out, it has been repeatedly retold.

3          Again, it was produced in discovery at the request

4   of the government.  The transcript was produced in

5   discovery, and Mr. Stapleton's represented in this

6   litigation he's been aware of the fact that that discovery

7   was out there.  We've, not surprisingly, gotten the

8   transcript, and so there has been no attempt to object as

9   we've gone along.

10          And that's, I think, just at this point, you

11   know -- really the horse is out of the barn, very far out of

12   the barn.  And obviously the information is critical as it

13   goes to -- directly to Mr. Stapleton's knowledge of the

14   fraud.

15          THE COURT:  Mr. Harris?

16          MR. HARRIS:  Yes, Your Honor.  This is Marc

17   Harris.

18          First, I want to -- well, let me address the

19   substance of it.  Well, let me first address the procedural

20   issues.

21          Mr. Scott filed, without permission, a

22   supplemental brief on this, which is -- I don't know if the

23   Court's considered that.  We ask the Court not to and to

24   give us a chance to respond, if the Court was going to.

25          The Court's been very accommodating with respect

1    to the parties' desires to bring matters to the Court's

2    attention in an informal way, but I think relator's counsel

3    has taken advantage of the Court's accommodating nature both

4    with respect to bringing up issues whenever they occur to

5    him without a proper meet-and-confer and then flouting the

6    Court's rules with respect to the limits on briefing and the

7    timing.  So that's troubling.

8              But on the substance of it, Mr. Scott -- when he

9    says this has come up over and over again, I don't know what

10   exactly he's talking about.  There was a conversation that

11   Ms. Prather claims she had with Mr. Stapleton before her

12   grand jury appearance.  When she was asked in the grand jury

13   about that, whether she had any conversations with him, she

14   said no.  When asked if he said anything to her to influence

15   her testimony, she said no.  This is under oath in front of

16   the grand jury.

17             Then, years later, when she decides it's in her

18   interest, she says at a deposition in this FCA case -- she

19   recaps some old conversations, and then Mr. Scott's view is

20   that saying that in a deposition and then having it come out

21   again or snippets of it referenced in the arbitration is the

22   retelling of the story again and again.

23             Ms. Prather told this story once.  She didn't say

24   it in the grand jury under oath, but she said it one time in

25   the deposition.  So that's it.  It's not the story that's

1    been told and retold and retold.

2                THE COURT:  And Mr. Stapleton --

3                MR. HARRIS:  With respect to -- sorry.

4                THE COURT:  And Mr. Stapleton was not a party to

5    that arbitration; is that correct?

6                MR. HARRIS:  That's correct.

7                THE COURT:  And he was not --

8                MR. HARRIS:  Now, the lawyer -- Mr. Scott has made

9    the point that the lawyer who was representing Mr. Armstrong

10   at that arbitration had previously represented Mr. Stapleton

11   or Tailwind in the arbitration, and that's true, and that

12   lawyer said at the arbitration, "This is privileged.  I

13   don't know -- I'm not representing Mr. Stapleton here, but

14   this seems like a marital privilege communication."

15               And then the testimony continued, and he cross-

16   examined the witness about the testimony on behalf of

17   Tailwind or Mr. Armstrong, not on behalf of Mr. Stapleton.

18               MR. SCOTT:  Your Honor, this is Mr. Scott.

19               MR. HARRIS:  Go ahead.

20               MR. SCOTT:  Your Honor, the point that I'm making

21   with respect to the repetition of this discussion is that

22   they had the conversation the one time that they're

23   specifically referencing there, but it was repeated; that

24   conversation was repeated not just in the deposition, but

25   also in the arbitration where -- and you asked the question,

1    you know, "Was Mr. Stapleton a party?"  He was a party in

2    the -- this is what the reply goes into because they made

3    some inaccurate characterizations of what Mr. Stapleton's

4    role was in these proceedings, and that's what we helped

5    clarify in the reply, which I would actually ask the Court

6    to read.

7              We asked for permission to file that reply, as

8    many other parties have in this case, because we wanted to

9    make sure that the Court had the true facts on this, and if

10   Mr. Harris would like to respond to that reply, we're happy

11   to have him do so.

12             But in any event, the fact is that Mr. Stapleton

13   was named as a defendant in the state court proceeding, and

14   then that proceeding was kicked over to arbitration, and he

15   was disputing the Court's jurisdiction over him, but it was

16   only until later, when the arbitration panel concluded that

17   it did not, in fact, have jurisdiction over him, that, you

18   know, he was in the clear, at least in that proceeding.  But

19   meanwhile --

20             THE COURT:  But if he -- let me interrupt you.  If

21   he doesn't have -- if his counsel is not in the deposition

22   and cannot direct --

23             MR. SCOTT:  Your Honor, his counsel in the state

24   court proceeding was in that deposition.  His counsel

25   continued to represent him in the state court proceeding

1    until after the arbitration was concluded.

2            And, again, the reply addresses this, but his

3    counsel filed a notice of hearing, you know, months after

4    Ms. Prather's deposition, and he filed that notice of

5    hearing in the state court action specifically representing

6    Mr. Stapleton, saying he was representing Mr. Stapleton.

7            So he continued to represent him throughout this

8    entire period.  He was there.  And I don't know what

9    strategic, you know, ideas he had in mind while he was

10   sitting there, but the fact is he was represented at that

11   deposition, and he had every right to be there because he

12   was also the corporate representative of Tailwind, which

13   was, you know, indisputably a party also in that proceeding.

14   So he had every right to be in that deposition and have

15   counsel there.  In fact, he did have counsel there.

16           And then, as I say, after that proceeding

17   occurred, that deposition was replayed during the

18   arbitration and without any kind of dispute.  I mean, they

19   agreed to having this same testimony played before third

20   parties.  So, you know, apart from the fact that we don't

21   think that it's privileged to begin with, if there was any

22   argument, it was waived.

23           And then that transcript was produced to the

24   government, again with Mr. Stapleton's knowledge and his

25   counsel's knowledge that it was going to happen.  No

1    objection.

2           So, I mean, you've got to zealously protect a

3    privilege if one exists at all, and that hasn't happened

4    here.

5           THE COURT:  I'll take a look at the reply.

6           Mr. Harris, if I need a response to it, I'll give

7    you an opportunity to file one.  Okay?

8           MR. HARRIS:  Thank you, Your Honor.  And I had not

9    finished my comments.  Mr. Scott seemed like he wanted to

10    make a brief comment so I acceded to him.  I didn't expect

11    him to go on like he did.

12           THE COURT:  All right.

13           MR. HARRIS:  So I would like to address another

14    point that he made in his earlier comment and the Court's

15    question, which is whether a recap of prior communications

16    outside the marriage should be privileged.

17           Well, first, we dispute that there even was this

18    conversation outside the marriage because she said in her

19    grand jury testimony two weeks after the supposed

20    conversation took place that there was no such conversation.

21    But if Ms. Prather had gone to a friend or someone else and

22    disclosed confidential marital communications, that would

23    not be privileged.  I mean, that would not waive the

24    privilege.  She can't recap -- the fact that she recapped a

25    marital communication to a third party would not abrogate

1    the privilege.

2          So the fact that she was recapping, if, in fact,

3    she did, to a person who was within that privilege at the

4    time the communication was made shouldn't abrogate the

5    privilege, and that's, at most, what they're claiming

6    happened here.  That she sort of -- it's somewhat

7    incredible, but she claimed that she went back in this

8    conversation and recounted all the conversations that they

9    had over the course of their marriage on this topic.

10          And like I said, if she had done that to a third

11    party, it wouldn't waive the privilege, and so it can't

12    waive the privilege by telling it to Mr. Stapleton.

13          MR. SCOTT:  Your Honor, there's obviously a

14    difference in time between recapping or telling someone

15    outside the marriage about marital communication without the

16    consent of the party, you know, the other -- the spouse.  In

17    this case, the spouse was the one who elicited and basically

18    said, okay, let's talk about this subject outside the

19    marriage, and so those communications -- that communication

20    was had with the consent of Mr. Stapleton outside the

21    marital privilege.

22          THE COURT:  And that was the basis of the question

23    that I began with.  Is there any authority for that

24    proposition?

25          MR. SCOTT:  I think, Your Honor, there was some

1   back-and-forth regarding the attorney-client privilege

2   concept that Mr. Harris put in his brief, and we addressed

3   that again in the reply.

4           THE COURT:  Okay.

5           MR. SCOTT:  I think we've sort of muddled through

6   the concept underlying that very issue.

7           THE COURT:  Okay.

8           MR. SCOTT:  So I think it might be helpful there.

9           I did -- the only other thing I'd like to address

10  is these allegations that get repeated about Ms. Prather

11  sort of being the scorned woman who is making these things

12  up.  You know, if you read the transcript, you get a sense

13  of the character of the woman that we're talking about, and

14  I don't take those kind of suggestions that she is just

15  making things up under oath -- she's an attorney practicing

16  law in Texas, and I don't see it as highly likely that a

17  person in her position is just going to make up out of whole

18  cloth these allegations of Mr. Stapleton.

19          THE COURT:  When are these depositions scheduled?

20          MR. SCOTT:  That's for the 14th of -- yes, 14th of

21  September tentatively, but we were, of course, going to wait

22  until we found out what the Court's view on the appropriate

23  close of deposition discovery would be.

24          THE COURT:  Okay.

25          MR. HARRIS:  Your Honor, that deposition was set

1    for July 28th on a schedule that was circulated amongst

2    counsel for weeks.  I flew to Austin for that deposition,

3    prepared to cross-examine Ms. Prather on the inconsistencies

4    in her testimony and her testimony in the grand jury, and

5    the night after I arrived in Austin, the night before the

6    deposition, it was cancelled.

7              And now relator's asking that it take place after

8    the discovery cutoff, which we vehemently object to, and I'm

9    sure we're going to discuss later in this call the idea that

10   discovery keeps getting fluffed off past the Court-ordered

11   discovery cutoff, and so we're going to object to that, and

12   we'll have that discussion as the call proceeds, I'm sure.

13             THE COURT:  Okay.

14             MR. SCOTT:  Your Honor, just on that point, there

15   was correspondence from Ms. Prather's counsel early on

16   saying, "We can't make that date," and it was sent to

17   Mr. Harris as well as myself, and so everybody understood,

18   as far as I knew, that that deposition wasn't going to go

19   because he had said -- her counsel had said, "We can't make

20   that date."  And so while we were trying to sort ought a new

21   date and while we were addressing the privilege issue, in

22   fact, when we discussed the privilege -- the notion of

23   briefing the privilege issue with the Court, I explained at

24   the time, with Mr. Harris on the line, that the purpose was

25   to have this issue decided so we didn't have to take the

1    deposition twice.

2         And of course the issue hasn't been decided, and

3    we've been trying to, you know, find a date for her that's

4    convenient, also keeping in mind that we need to hear from

5    the Court before we sit her down so we don't waste her time

6    and bring her back two times.

7         THE COURT:  Understood.  Let's move to the Indiana

8    University subpoena issue.  This is obviously yet another in

9    a series of disputes related to Mr. Armstrong's statute of

10   limitations defense and the relevance of purported

11   concealment evidence in connection with that defense.

12        So Mr. Peters, do you want to start us off

13   briefly?

14        MR. PETERS:  Sure.  Your Honor, this is Elliot

15   Peters.  We don't understand how events taking place in 1996

16   relating to Mr. Armstrong's cancer surgery could be relevant

17   to anything in this case.  He --

18        THE COURT:  Well, as I said, the argument is it's

19   related to your statute of limitations defense.  Why isn't

20   evidence that he may have concealed or the lengths to which

21   he concealed his use of performance-enhancing drugs at that

22   time, even if he has subsequently admitted to it, relevant

23   to your argument that the Postal Service should have known

24   that he was doping?

25        MR. PETERS:  That would potentially be true if

1    that took place at some period of time in which his denials

2    would toll the statute of limitations.

3              THE COURT:  Okay.

4              MR. PETERS:  But in 1996, he hasn't even begun

5    riding for the Postal Service team then, and so whatever he

6    did -- the statute of limitations hadn't begun to run in

7    1996.  He hadn't even begun to ride for the team yet, and so

8    how some events which took place eight years before the

9    sponsorship of the team ended and there would be any

10   question about the statute of limitations, how that's

11   relevant to the statute of limitations, we really -- we

12   really don't understand that.

13             THE COURT:  Okay.  Remind me when the sponsorship

14   began?

15             MR. PETERS:  Mr. Armstrong joined the Postal

16   Service team in 1997.  He was not on the U.S. Postal Service

17   team in '96, and he joined the team at the end of '97.

18             He did not ride in the Tour de France for the

19   Postal Service team in 1998.  The first time he rode in the

20   Tour de France for the Postal Service team and won it was in

21   1999.

22             So what happened in 1996 is just before any of the

23   events in question, and what happened in 1996 and this whole

24   hospital room incident, which was kind of part of the soap

25   opera for a long time but is now, we would submit,

1    irrelevant just based on the remoteness of the time, it

2    really doesn't have anything to do with the statute of

3    limitations defense or -- the other issue --

4              THE COURT:  Okay.  When was the doctor's affidavit

5    that he -- nothing in his blood indicated doping?

6              MR. PETERS:  I don't know the date of that, Your

7    Honor.  I'm here in the room with Mr. Chandler, and he may

8    know the answer to that.

9              MR. CHANDLER:  Your Honor, this is Robert Chandler

10   for the United States.  The date of the affidavit is

11   December 8, 2005.  It was released through the Associated

12   Press in 2006.

13             THE COURT:  Okay.

14             MR. PETERS:  Your Honor, the other thing I was

15   going to say is that I think it's less -- I mean, we think

16   it's less relating to any statute of limitations defense and

17   more relating to this reverse False Claims Act theory.

18             I mean, a lot of the breadth of the discovery in

19   the case is because of that allegation whereby kind of

20   failure to admit doping through the -- basically through

21   2010 is viewed as a violation of the False Claims Act by the

22   government and by the relator, and I know that Mr. Harris

23   has a motion for summary judgment pending on that issue, and

24   I submit that that would really -- it would streamline -- it

25   would potentially streamline this case a lot to have that

1    resolved at some point because the way the government and

2    the relator look at the False Claims Act and the reverse

3    False Claims Act is basically any statement that took place

4    or any failure to admit it or any denial taking place is a

5    violation of the False Claims Act, and that's a dispute the

6    parties have.  And I really think it would narrow the case

7    and help resolve some of these issues if and when we could

8    get that issue resolved by the Court.

9              MR. CHANDLER:  Your Honor, this is Robert

10   Chandler.  If I could respond, please?

11             THE COURT:  Sure.

12             MR. CHANDLER:  I mean, the last issue that

13   Mr. Peters raised about the reverse False Claims Act is not

14   something that is at issue right now.  It's not something

15   that needs to be decided in order to decide the present

16   motion.

17             The basis on which we're seeking this discovery is

18   that it relates to Mr. Armstrong's concealment, and as the

19   Court, I think rightly, pointed out, the act of concealment

20   occurred at a much later time than the 1996 time frame that

21   Mr. Peters has identified.

22             The book that first made the allegations public

23   about the hospital room incident was published sometime in

24   early 2004.  The litigation that gave rise to Dr. Nichols's

25   subpoena took place in 2005, and the relevant depositions

1   were in October of 2005 with Dr. Nichols's subpoena

2   following in December of 2005, and then the allegations --

3   or pardon me, the subpoena -- the affidavit was made public

4   in 2006.

5           So all of these acts on Armstrong's part to

6   suppress the testimony of the two witnesses to the hospital

7   room incident, the release of Dr. Nichols's subpoena, all

8   those things were occurring during times when it was --

9   Mr. Armstrong's concealment was very relevant to the

10  potential litigation.

11          MR. PETERS:  Those weren't actions undertaken by

12  Mr. Armstrong.  The book wasn't published by Mr. Armstrong.

13  The affidavit that's being referred to wasn't an affidavit

14  of Mr. Armstrong.  So I don't understand -- I mean, what

15  they want to do is get his private medical records from

16  cancer surgery in 1996.  That's what the subpoena's about.

17          The rest of the facts that Mr. Chandler referred

18  to are already available.  The so-called efforts to suppress

19  the people testifying about the hospital room incident,

20  that's all -- that's the Andreu and -- Frankie Andreu and

21  has long been out there.  What we're talking about is

22  medical records relating to a surgical procedure in 1996.

23          THE COURT:  Right.  But Mr. Peters, it seems to me

24  that the new piece of information, regardless of the -- you

25  know, of the Andreus, is this notion that his doctor may

1    have filed an affidavit in litigation in 2005 or 2006 that

2    he knew to be untruthful based upon his familiarity with the

3    treatment and the records, and that they are entitled to

4    test the veracity of that and to test whether the affidavit

5    was motivated by a donation or putting the guy on the board

6    of the foundation, et cetera.

7         I mean, why -- address that.  Why isn't that

8    relevant to his efforts to conceal?

9         MR. PETERS:  It's extremely far afield.  It

10   involves, I guess, an allegation that some other doctor --

11   that some doctor would have concealed something.  I think

12   we're going to discover that -- if we get there, you'll

13   discover that there's not a shred of evidence to support

14   that.

15        But how does that relate to Mr. Armstrong's

16   statute of limitations defense?  The idea that -- I mean,

17   it's going to be -- it would, at the very best, be cobbled

18   together with pieces of speculation.  There was a donation,

19   and that motivated the doctor to submit some false

20   declaration in connection with all of this.  I mean, I don't

21   think that there's any corroboration of any of that.  And

22   how -- the link to Mr. Armstrong would be somehow he

23   procured it?  It's all just complete speculation.

24        And --

25        THE COURT:  Mr. Chandler, isn't that what you're

1    getting at, if I read your papers correctly?

2          MR. CHANDLER:  That's exactly it, Your Honor.

3    Precisely.

4          And to the extent that Mr. Peters, you know,

5    referenced, you know, these are Mr. Armstrong's private

6    medical records, you know, I would note, first of all,

7    there's extensive -- throughout Dr. Nichols's declaration he

8    makes reference to the medical records a number of times.

9    His representations about Mr. Armstrong not having used PEDs

10   at that time is based on, you know, his assertion that there

11   is no reference in the medical record to the use of PEDs so,

12   you know, that's something that Mr. Armstrong put into --

13   opened the door to in connection with this litigation, and

14   then further opened the door by releasing the affidavit to

15   the Associated Press.

16         I would note, too, that, you know, there's no

17   reason that these medical records couldn't be designated

18   confidential under the protective order.  The government has

19   gone about making this request in the narrowest way

20   possible.  We've only requested records that either contain

21   references to performance-enhancing drugs, performance-

22   enhancing drug use prior to October 1996, and one specific

23   set of notes for one specific date that Dr. Nichols, in his

24   affidavit, identified as particularly relevant to the

25   records.

1          MR. PETERS:  So they're interested in statements

2     in the medical records of drug use several years before he

3     ever rode for the U.S. Postal Service team, and that's

4     supposed to be evidence relating to his concealment of some

5     fraud on the Postal Service with whom he had no arrangement

6     of any sort at the time these statements were allegedly

7     made.

8          MR. SCOTT:  Your Honor, this is Paul Scott.  May I

9     just add one comment here?

10          THE COURT:  Sure.  Sure, go ahead.

11          MR. SCOTT:  Well, in addition to the arguments

12     made by the government that though Mr. Armstrong, of course,

13     has admitted to using PEDs, Mr. Stapleton has continued to

14     deny that he was aware of that fact, and he was very much

15     involved in this hospital room incident and has denied that

16     he heard anything about PEDs being used or Mr. Armstrong's

17     admission to PED use at the hospital.

18          So to the extent that the records bear that out,

19     that, in fact, that admission was made, then that will

20     be of relevance to the arguments we have relative to

21     Mr. Stapleton's knowledge.

22          THE COURT:  Okay.  All right.  I've heard enough

23     on that, and we will get something out on that issue as

24     well.

25          Why don't we move to the scheduling -- unless

1    there's -- are there any other more substantive issues

2    besides the scheduling issues?

3              MR. FINKELSTEIN:  Your Honor, this is David

4    Finkelstein.  In addition to the scheduling, there's the

5    government's motion to reopen Mr. Armstrong's deposition.

6              THE COURT:  Okay.  Why don't we address that.  To

7    be honest with you, I have not read Mr. Armstrong's reply

8    that I think just came in last night or this morning, but --

9              MR. PETERS:  It was our opposition, Your Honor.

10             THE COURT:  Your opposition, yes.

11             MR. PETERS:  We'd rather take that up after the

12   Court's obviously had an opportunity to read our papers so

13   maybe we should --

14             THE COURT:  Well, why don't we do that.  I'm

15   going to be basically unavailable for ten days so if you

16   want to -- if you want to argue it, let's argue it now.

17   Otherwise, I'll decide it just based on the papers.

18             MR. FINKELSTEIN:  Your Honor, I'm happy to put it

19   to the Court under submission.  Our preference would be,

20   however, to take it up now and to not wait to argue it

21   again.

22             Just very briefly, this Court has seen our papers,

23   and I think the deposition should be reopened for three

24   reasons, one of which is not contained in the papers and

25   it's based on late-breaking information.

1           The new information is, as recently as I think

2     Monday, I think Monday, Mr. Armstrong produced 5,000 pages

3     of additional documents which we're loading into the

4     database.  We're still getting the Schillings litigation

5     file.  We need an opportunity to ask about those.

6           But in addition to that, you know, quite simply,

7     Mr. Armstrong has said more in public that's relevant to

8     this case in the ten years leading up to this case than

9     we've had an opportunity to ask him about in Denver that one

10    day, and he has interesting explanations for all those

11    things, and we're entitled to discover them.

12          MR. PETERS:  And, Your Honor, our response is that

13    what they're entitled to is seven hours of deposition.  They

14    asked -- there's something like 385 pages of transcript.

15    They asked every question that was relevant.

16          And keep in mind that Mr. Armstrong, he never had

17    any agreement with the Postal Service so he's not -- he's

18    not questioned about the Postal Service sponsorship

19    agreements.  He doesn't have information relating to the

20    Postal Service's damages claims, which is the subject of a

21    lot of discovery in this case.

22          All there is really to question Mr. Armstrong

23    about is his use of PEDs and his denials of using PEDs.  He

24    testified at great length and very forthrightly about those

25    topics.  He has been questioned about those topics two other

1    times under oath in the recent past, at an FCA deposition

2    and at the FCA proceeding.  The government has all of that,

3    those transcripts.  He was questioned about it for many

4    hours by Oprah.  They have videotapes and transcripts of the

5    Oprah interviews.

6          And so what they really want to do is just try and

7    spend another eight hours beating up Lance Armstrong, and

8    they -- Mr. Chandler asked him questions like, "Newspaper

9    articles refer to you as Disgraced Lance Armstrong.  Do you

10   consider yourself a disgrace?  Do you feel disgraced?  Are

11   you a liar?  Do you consider yourself to be a liar?"  I

12   mean, just this nasty, mean-spirited kind of in your face,

13   and they want eight more hours of it.

14         Mr. Armstrong was completely truthful and

15   cooperative.  We've submitted to you the entire transcript.

16   The idea that we obstructed it or interfered with it is

17   completely false.  It will be belied by the transcript.

18   Lance answered every question that he was asked.

19         And this idea that the relator, Mr. Scott, oh, he

20   needs time to ask questions, they're working hand in glove

21   together, the relator and the government.  They were in the

22   room together strategizing during breaks in the deposition.

23   Mr. Chandler asked a lot of questions that were clearly

24   Mr. Scott's questions about Stapleton and Knaggs and CSE.

25   "Do you vacation together with Mr. Stapleton?"  "Are you

1   friends with Mr. Knaggs?"  "Do you consider him a good

2   friend?"  And all of this stuff which obviously came from

3   Mr. Scott, and they made a decision about how to divide up

4   the time.  Let's let the government ask the questions --

5   we'll let Mr. Chandler ask the questions, and then we'll go

6   back to the Court and try and ask for more time.

7          There's a presumption under the rule of seven

8   hours.  This has been raised by the government before and by

9   the relator.  It was denied by the Court on the morning of

10  the deposition.  There's no reason to do anything new.

11         The documents that we recently produced were these

12  Williams & Connolly documents that Your Honor issued an

13  order about, and we complied with that order, and when they

14  went ahead with his deposition, they knew that those

15  documents hadn't yet been produced because they hadn't been

16  ordered to be produced.  They chose to go ahead with the

17  deposition.  They didn't say, "Oh, let's reschedule the

18  deposition until we get all the documents," as we have done

19  and been forced to do in connection with Mr. Landis, and

20  what they want to do is just have the opportunity to

21  question Mr. Armstrong for a day and then kind of reload and

22  come back and have at him for another day.

23         It's not what the rules contemplate.  It's not

24  necessary in this case.  It's not fair.  And particularly

25  given where we are with discovery, where the government and

1    the relator have come in and noticed nine depositions like

2    ten days ago all set for August 14th, the day of the

3    discovery close, for them to come in and say yes, and now

4    we'd also like another day with Mr. Armstrong after we're

5    basically trying to force the Court to move the discovery

6    cutoff back, we just don't think it's fair.

7          We produced Mr. Armstrong on the date agreed.  He

8    answered every question.

9          THE COURT:  Okay.

10         MR. PETERS:  He's no different than any other

11   witness in this case, none of whom have been deposed for

12   more than a day, and they have -- they've got all the

13   answers they need.  They've asked all the questions they

14   need, and to just turn him into this punching bag for

15   another day isn't necessary or appropriate.

16         MR. FINKELSTEIN:  Your Honor, this is David

17   Finkelstein, and that was quite a speech.  I'll try to

18   respond briefly and succinctly.

19         As to the coordination with Mr. Scott, what

20   Mr. Peters said is pure speculation, and it turns out to be

21   factually false.  We did not run our outline by him.  He did

22   not have input into our outline, and Mr. Scott was -- I'm

23   sorry, Mr. Peters wasn't in the room with us when they were

24   there.  Mostly what we were doing was eating sandwiches; so

25   that's a red herring.

1          I don't see how Mr. Peters can be so confident

2     that we've asked all the questions we need to ask.  First of

3     all, he hasn't seen the outline, but he knows we haven't

4     asked about all the statements to Oprah because we didn't

5     get through them all.  He knows we didn't have an

6     opportunity to know about the Bob Ley interview and the

7     other interviews.  Those are all prior statements.  Mr.

8     Armstrong has explanations, and we're entitled not to be

9     surprised by them.

10          So seven hours is the presumption.  It can be

11    extended for good cause, and this is a classic case where

12    there is good cause.  Courts routinely grant this relief

13    where we have more questions that we needed to ask than we

14    had time to ask them within seven hours.

15          MR. SCOTT:  Your Honor, this is Paul Scott.

16          MR. PETERS:  How is it probative?

17          THE COURT:  All right.  One at a time.

18          MR. PETERS:  How is it probative for the

19    government?

20          Mr. Finkelstein says we haven't asked him about

21    all of his prior statements.  We didn't ask him about all of

22    his statements to Oprah.  How is that relevant to anything

23    or probative of anything?  They want to go through every

24    prior statement that he made, most of which are admissions

25    that, in fact, he did use PEDs, which is the only issue

1    really which his testimony is relevant for in this case, and

2    they want to go over every single prior statement he made.

3              There's nothing in the Federal Rules of Civil

4    Procedure that says, oh, yeah, if you want to keep asking a

5    person about prior statements that they've already made

6    which aren't even in controversy, then you get to go past

7    the seven-hour limit.

8              I mean, the existence of all these prior

9    statements actually cuts in the other direction because

10   they're not trying to get information from Mr. Armstrong.

11   They have all the information.  They just kind of want to

12   keep beating him up with this.

13             MR. FINKELSTEIN:  Your Honor, David Finkelstein.

14   The existence of the prior statements is not in controversy.

15   The explanation for the meaning of those prior statements

16   very much is, and if he's going to withdraw or attempt to

17   withdraw from these prior statements on the stand at trial,

18   this is what discovery is for, so we're not surprised at

19   trial.

20             MR. SCOTT:  Your Honor, this is Paul Scott.  May I

21   chime in here as well?

22             THE COURT:  I'd like for you to chime in, but only

23   with respect to -- answer this question:  Why didn't you

24   have an opportunity to ask questions at the deposition?

25             MR. SCOTT:  I was reading Mr. Armstrong's response

1    with a half smile, I suppose.  He said relator has no one

2    but himself to blame for his failure to seek deposition time

3    from the government.  Well, the reality is I did seek it

4    repeatedly, and the reality is the government couldn't or

5    was unable to spare the time to let me ask questions.  So I

6    did everything I could, including, you know, noticing the

7    deposition as well.

8            You know, and Mr. Armstrong talks about us

9    carrying -- the government carrying our water.  That's not

10   the case.  I mean, certainly a couple of questions touched

11   on questions of interest to us, but if they were carrying

12   our water, they were using a teaspoon, and we needed a

13   bucket.

14           There's a number of topics there.  If you look

15   through the response that Armstrong filed, they suggest that

16   all of the topics that we said we -- you know, as examples

17   of topics that we still need to cover, you know, we're --

18   they suggested that they were covered in the deposition, and

19   that's just totally incorrect.

20           With respect to videos, for example, you know,

21   there's plenty of statements by Mr. Armstrong on tape where

22   he's denying that he was doping.  You know, and the

23   government made an effort to authenticate one of those

24   movies, and they declined.  They wouldn't stipulate to that.

25   So we're obviously interested in that because that material

1    shows the concealing that was going on and the

2    persuasiveness of Mr. Armstrong and the force of his

3    personality in convincing people that this wasn't going on,

4    and that, of course, goes to whether or not the Postal

5    Service should have been expected to know what was going on.

6              So we're interested in authenticating those

7    kinds of statements on video, and with the citations that

8    Mr. Armstrong gives in his response, you know, they

9    basically -- they don't hold up when you look at them

10   because, you know, he says he didn't even see a couple of

11   movies.  He hasn't watched them so we couldn't use that to

12   authenticate the videos.  We would need to, you know, do

13   something more deliberate and go through them.

14             THE COURT:  Okay.

15             MR. SCOTT:  He also says that, you know, the

16   communications with the relator and the relator's

17   allegations against Mr. Armstrong were covered in the

18   deposition.  If you look at the cites in the transcript,

19   though, there are only two references to Mr. Landis in the

20   transcript.  There's an email reference by Armstrong,

21   actually, to Floyd making allegations about USADA, not about

22   him, but about USADA; and there's another exchange where

23   Mr. Armstrong acknowledges that Mr. Landis was the real

24   tipping point when he came forward to confess to his

25   involvement and telling folks about what had been going on

1   with the Postal Service team.  But that's not an allegation

2   that involved Mr. Armstrong, nor is it a communication with

3   Mr. Armstrong, and, of course, there are a plethora of

4   those, many of which are referenced in the complaint.

5          And there are plenty of denials in the complaint

6   as well, which, you know, we would like to explore that

7   involve Mr. Landis.  The entire relationship between them,

8   the factual disputes relative to, you know, their different

9   versions of events, all of that is fodder that we would, of

10  course, be interested in exploring, and we've had zero

11  opportunity to do it.

12         Another topic is the CSE defendant.  Yes, there

13  were questions.  There were some limited questions about the

14  knowledge of Stapleton and Knaggs, but there were a few sets

15  of questions that were repeated with respect to the two of

16  them, but there was nothing about the financial relationship

17  between them and nothing about the very specific instances

18  that we would like to explore that would tell us about

19  whether or not, you know, Stapleton might have known instead

20  of just sort of general questions about that topic.

21         I mean, the government was hampered by this time

22  limit and trying to get everything that it could get done in

23  the seven hours, and it obviously didn't get done everything

24  that it was trying to accomplish.

25         Another topic, for example, is McIlvain.  We had a

1    whole motion before the Court by Mr. Armstrong relative to

2    whether or not he could be asked about the duration of his

3    relationship with Ms. McIlvain because that would be

4    relevant to the case.  The Court decided we could pursue

5    that line of inquiry.  That conversation hasn't happened

6    yet, and of course we're interested in that because it goes

7    to, you know, whether or not she might have been motivated

8    to lie relative to what went on in the hospital room, as one

9    example.

10             There are other instances.  They say that we

11   talked about LIVESTRONG.  The details of that weren't gone

12   into in any detail.  Demand Media, that's the company that

13   paid for Mr. Armstrong to be a spokesperson at the same time

14   that it was getting the rights to use the LIVESTRONG name

15   and obviously would have given Mr. Armstrong the financial

16   interest in being able to -- in keeping his doping quiet.

17   That's another example of concealing that is illustrative of

18   why, perhaps, the Postal Service didn't know what was going

19   on.

20             So there's just a ton of stuff that we need to

21   talk about that we haven't had any chance whatsoever to do,

22   and so we feel very strongly -- when we ask for four hours,

23   I mean, we could go on for a couple of days, and we're

24   trying to tighten this up as much as we conceivably can, but

25   we need to have an opportunity, Your Honor, in fairness, I

1     think.

2          MR. PETERS:  Your Honor, if I could --

3          THE COURT:  I'm going to cut you off, Mr. Peters.

4     I don't want to spend too much time on this.  I will review

5     the opposition and look at the transcript, and we'll issue

6     an order on this.

7          Let's move to the scheduling issues.  I'm prepared

8     to authorize the extension of the cutoff to September 15th

9     to take additional depositions.  Now, there was an issue

10    regarding a notice cutoff date; is that correct?

11         MR. PETERS:  Well, I think what we would like, at

12    least, is that there be some kind of cutoff, and I think we

13    suggested -- I can't remember what we suggested in our

14    pleading, whether it was the date of the Court's request for

15    a notice or whether it was August 1st, but we should

16    definitely see the end of new depo notices by a date to be

17    designated by the Court.

18         THE COURT:  Okay.  That's fine, but it will -- you

19    know, when was the last notice issued?  Anyone know that?

20         MR. PETERS:  Yes.  August 3rd was the last.  There

21    was a series of deposition notices that were dated August

22    3rd.

23         THE COURT:  Okay.

24         MR. PETERS:  Those are the last ones, and I think

25    the Court's -- there's something like 11 depositions noticed

1    after the Court requested the status report.

2            THE COURT:  Yes, that was not -- I mean, the

3    purpose of -- the reason we issued that was just to get a

4    sense of how many depos were left to be taken so that we

5    could assess whether an extension was necessary or not.  It

6    was not meant to suggest that no notices could go out after

7    that date.

8            Assuming that there was no notice cutoff in the

9    scheduling order, there was no -- was there a deadline for

10   noticing of depositions in the scheduling order?

11           MR. CHANDLER:  I don't think there is, Your Honor.

12           MR. SCOTT:  I don't believe so.  I mean, we had a

13   discovery cutoff of the 14th, and it's my understanding --

14   this is Paul Scott.  It's my understanding that the notices

15   that went out were noticed to fall within the Court's August

16   14th discovery cutoff.

17           THE COURT:  Okay.  So we will extend deposition

18   discovery to September 15th to include any depositions that

19   were noticed by August the 3rd.  Okay?

20           MR. PETERS:  Okay.

21           MR. CHANDLER:  Your Honor, I think that leaves the

22   question -- this is Robert Chandler.  I think that leaves

23   the question of expert discovery as well.  Will there be a

24   commensurate change in the deadline for expert discovery?

25           THE COURT:  That makes sense to me.  Mr. Peters,

1   you all objected?

2        MR. PETERS:  We'd rather -- we really want to get

3   this case -- I mean, I know that we're the defendants, and

4   it's uncharacteristic, but we'd really like to put an end --

5   we don't have infinite resources.  We're not the government.

6   We'd like to keep the expert date where it is.

7        THE COURT:  Well, the date that expert reports are

8   due shouldn't affect the expenditure of resources on those

9   reports, unless I'm missing something.  I mean, if your

10  concern is just -- if your concern is just the money, then

11  I'm not sure I appreciate that.

12       MR. PETERS:  No, I think if we're going to move

13  the discovery cutoff to the 15th, and we're going to have

14  something like, you know, 15 more depositions in the next 30

15  days, which is what it looks like, it probably does make

16  sense to move the discovery cutoff to October -- the expert

17  disclosure date.  It's not the date of the reports.  I think

18  the disclosure date is the 15th.

19       THE COURT:  I see.

20       MR. PETERS:  Is that when the reports are due?

21  Yes.  So I guess it's fine to move that 30 days from our

22  perspective because we're going to be so busy taking

23  depositions for the next 30 days.

24       THE COURT:  Exactly.  So why don't you all get

25  together and submit an amended proposed scheduling order

1    that pushes back the expert disclosure dates and any other

2    dates that are necessary given that we're extending

3    deposition discovery by 30 days.  Okay?

4           MR. PETERS:  Your Honor, can you direct us to meet

5    and confer and try and come up with a schedule?  We were

6    doing that well for a while, but then recently there's just

7    been a lot of kind of freelancing when people send out

8    deposition notices.  It works a lot better if we all get on

9    the phone and try to coordinate so we can do this in a way

10   that's geographically sensible and try and get it all done

11   in time.

12          THE COURT:  That makes perfect sense to me so I

13   will direct you to do that.

14          MR. PETERS:  Your Honor, there's one more issue,

15   which is that we were supposed to take Mr. Landis's

16   deposition two days ago, but, notwithstanding multiple court

17   orders that he produce documents, he still hasn't completed

18   his production of documents so we were forced to take his

19   deposition off calendar.  And, I mean, I don't want to

20   come back and say, "Oh, please set another deadline for

21   Mr. Landis to produce documents because he doesn't comply

22   with them," but we're frustrated that we can't take Mr.

23   Landis's deposition because he won't produce the documents

24   and complete his production of documents.

25          So I raise that as an issue of concern and ask for

1    the Court's assistance in putting us in a position where we

2    can take his deposition.

3            THE COURT:  Are these the 100 boxes of Gibson Dunn

4    documents?

5            MR. SCOTT:  I mean, we produced the documents in

6    our possession.  William -- excuse me, Wilson Sonsini has

7    produced the records that Mr. Armstrong is after and that

8    they have in their possession.  The problem is these

9    documents -- you know, we're wrapped with 100 boxes of

10   unfiltered documents that Gibson Dunn has.

11           Keep in mind that we're talking about a request

12   that they made for information about proceedings against

13   Mr. Landis which have nothing to do with this case.  It's

14   really -- you know, I think they've acknowledged -- well,

15   the Court's order basically said it might be relevant to

16   credibility and/or bias.  It has nothing to do with the

17   substantive issues in the case, and they have the deferred

18   prosecution agreement that lays out in detail how he made

19   misrepresentations with respect to the proceedings against

20   him, and we've given them the transcripts from that case

21   should they want to cross-examine Mr. Landis about the

22   misrepresentations that he may have made in the course of

23   those proceedings to, again, you know, go to his

24   credibility.

25           And the problem is that we have 100 boxes of

1    documents that are unfiltered.  It's insane to go through

2    this stuff that is substantively irrelevant to this case.

3            What we suggested was, as a potential solution, to

4    give them the trial exhibits, because obviously the

5    evidentiary matters are going to be in there, and I don't

6    know what they're going to do with it, but if they want to

7    cross-examine him or have more evidence to do what they can

8    to affect his credibility, they'll have all the trial

9    exhibits as well.

10           But to have us go through 100 boxes of documents

11   searching for, you know, privileged materials and/or, you

12   know, things that are responsive or not to the Court's, you

13   know, order that's relative to the proceedings against him,

14   it is very, very clearly, in my mind, Your Honor, you know,

15   far more burdensome than it's likely to produce anything.

16           THE COURT:  Okay.

17           MR. SCOTT:  It's certainly not relevant to the

18   substantive issues in the case, and it would only be perhaps

19   pertinent to credibility, and they already have a mountain

20   of evidence on that topic.  So our hope was that the Court

21   would agree that, listen, with the transcripts and the trial

22   exhibits from that case, from the stuff that we've given

23   them already from, you know, Mr. Landis's own records, from

24   the -- including some of the pleadings and so forth in the

25   case, they've got enough.

1          I mean, they can beat him over the head senseless

2     with what they have from the USADA proceedings back in 2006.

3     They don't need any more.

4          THE COURT:  Okay.  Mr. Peters, I'm obviously not

5     going to make them produce 100 boxes of documents for many

6     of the same reasons that I didn't require you guys to

7     produce all the documents that were sitting over in London.

8          Now, his suggestion makes some sense to me, but,

9     you know, you tell me.  Why isn't that acceptable, the trial

10    exhibits?

11         MR. PETERS:  I think the relevance of this

12    information has already been litigated and established in

13    this Court's orders.

14         THE COURT:  But now there's a burdensome argument,

15    which is different, okay.

16         MR. PETERS:  Except -- but, A, Gibson Dunn -- he

17    says they're not in his possession.  They are in his

18    possession.  Gibson Dunn are his lawyers, and they have an

19    ethical duty to give him the file, and this is the file.

20         It's perfectly fine with us if Gibson Dunn wants

21    to make those documents available.  Exactly the same deal

22    that we made with Schillings --

23         THE COURT:  Mr. Scott, is there an index?

24         MR. SCOTT:  What I was getting from them -- and I

25    want to be careful, obviously, because I don't know if

1    there's a clear index of what was there.  I was told you

2    can't, you know, be certain that, you know, any one of those

3    boxes doesn't have privileged materials mixed in with it.

4    You know, it would require us going through the boxes.  It's

5    just, you know --

6          MR. PETERS:  Here's what we did with Schillings,

7    and we'll do it with Gibson, too.

8          THE COURT:  All right.  Production subject to

9    clawback, right?

10          MR. SCOTT:  The documents aren't relevant --

11          MR. PETERS:  Yes, Gibson Dunn --

12          THE COURT:  One at a time, guys.

13          MR. PETERS:  I was just going to say, Your

14    Honor -- this is Elliot Peters -- Gibson Dunn puts the 100

15    boxes in a conference room, and we go and review them, and

16    we mark the documents that we want; and then if any of those

17    documents are privileged, then they can claw them back, or

18    they don't get produced to us.

19          We don't want 100 boxes of materials, but there is

20    going to be plenty of relevant useful material in there.

21    Those are the files relating to this USADA litigation in

22    which Mr. Landis kind of perpetrated his own fraud.

23          And it's also the mirror image.  Mr. Scott's

24    complaining here about the burden.  He subpoenaed Williams &

25    Connolly, and we actually have gone through their documents

1    and done a privilege review, and the documents that Mr.

2    Finkelstein was just referring to that we produced this week

3    are the Williams & Connolly documents that are the subject

4    of our going through this burdensome procedure that Mr.

5    Scott required by serving the subpoena and that he's now

6    complaining about having to do himself.  It's the same

7    thing.

8         We'll make it easier for him.  We'll review the

9    hundred boxes ourselves and tab documents, and then, if

10    there's a privilege issue, they can claw it back, and then

11    they're not harmed.  But these are materials that I think

12    are indisputably relevant, and I think we can deal with the

13    burdensome issue in the way that I described.

14         And Mr. Scott, you know, he's made us do the exact

15    same thing with Williams & Connolly, and the government made

16    us do it with Schillings.  I think it's fair.

17         MR. SCOTT:  Your Honor, there's obviously an

18    enormous difference between the Schillings case and what was

19    requested from Williams & Connolly and what they're trying

20    to get, and that is the Schillings case and the materials

21    that we were seeking from Williams & Connolly are materials

22    that relate to the concealing of the fraud and the entire,

23    you know, effort that was made -- that is the subject of our

24    case.

25         The information that they're asking about might as

1    well be a divorce proceeding because it basically -- the

2    fact that's relevant is that he lied in that proceeding so

3    it's only about credibility.

4          The Court has already ordered that.  The Court

5    hasn't held that those issues in the USADA proceeding

6    involving Mr. Landis are relevant to the substantive issues

7    in this case.  It's only relevant to the fact that he may

8    have lied, and, you know, we're not even contesting he did.

9    He signed the deferred prosecution agreement saying yes, I

10   lied, and, you know, he's paying a big price for it.

11         So it's completely different to say we need to go

12   dig through or, you know, give them an open look at, you

13   know, potentially privileged materials and say it's the same

14   thing.  It is not the same thing at all.

15         THE COURT:  Okay.

16         MR. PETERS:  Well, you can either go through the

17   materials and remove the privileged materials yourself, or

18   let us mark them and then claw them back if you want to, but

19   having ruled that this area of inquiry is, in fact, relevant

20   to this case, we're entitled to gather documentary evidence

21   relating to those issues, and that's what the Gibson Dunn

22   files contain.

23         MR. SCOTT:  The Court makes the fair point that

24   now we're talking about burden, and is it -- how worth it is

25   it to go through these documents when the sole thing you're

1    trying to do is show that Mr. Landis lied, and the reality

2    is you can do that with the transcripts, you can do that

3    with the deferred prosecution agreement, and if you can

4    think of some way to do it with the trial exhibits, more

5    power to you.  But you just don't need, and we don't need,

6    to spend the time and the energy dealing with 100 boxes of

7    documents.

8            The reality is still, even with the Court's

9    continued discovery depositions cutoff, we're going to have

10   a ton of depositions to deal with, to prepare for.  We're

11   not Keker & Van Nest.  Going through and dealing with 100

12   boxes of documents without having a chance to filter them,

13   to see what's there, to, you know, see if it's privileged,

14   it's irresponsible.  We can't do that.

15           And so, Your Honor, I would just ask, there has

16   to be some amount of reason to the materials that they get

17   or that they need to prove that Mr. Armstrong -- that

18   Mr. Landis lied in those proceedings, and it's not even a

19   disputed fact.

20           THE COURT:  Okay.  All right.  I've got enough.

21           Is there anything else?  There was the de bene

22   esse depositions.  We're not going to presumptively bar

23   those.  If someone wants to make an application to take one

24   and state the reasons, we'll consider it on a case-by-case

25   basis.

```
 1                And there's an issue with letters rogatory.  Is

 2       that still outstanding that I need to decide?  Is that

 3       correct?

 4                MR. SCOTT:  Yes, Your Honor.  There's a motion

 5       before the Court for a letter of request to take the

 6       deposition of Mr. Bruyneel.

 7                THE COURT:  Okay.

 8                MR. SCOTT:  And to the extent that that vehicle is

 9       a necessary vehicle to getting testimony for trial, we

10       looked at that as another thing that we'd like to have open,

11       both the government and the relator, for the discovery

12       beyond just the typical civil discovery.

13                THE COURT:  Okay.  We will grant the letters

14       rogatory request.  We'll get that out.

15                MR. SCOTT:  Thank you.

16                THE COURT:  Okay.  I think that's all on my list.

17                MR. SCOTT:  Your Honor, only one thing, and I

18       apologize for not having this at my fingertips, but the

19       Court specified an August 3rd deposition notice cutoff, and

20       I just -- I don't have it in front of me here, but it seems

21       to me that perhaps the safer thing to do is to say August

22       4th, because that's within ten days of the 14th, and I think

23       that's what we were shooting for.  And I don't know if

24       anybody sent any notices out on August 4th, but I think

25       really there haven't been any notices since that time frame,
```

1    so if someone sent a notice out one day or the other on

2    August 3rd or August 4th, I don't think the Court's

3    intending to cut those off.

4         THE COURT:  We'll make it August 4th.

5         MR. SCOTT:  Okay.

6         THE COURT:  Okay.

7         Okay.  Well --

8         MR. CHANDLER:  Your Honor, this is Robert Chandler

9    for the United States.  One other small matter.  We had

10   noted in our filing relative to scheduling that there was a

11   final round of written discovery served on July 15th, and it

12   appears that Mr. Armstrong is preparing to argue that the

13   government is untimely for not having made hand delivery,

14   notwithstanding the fact that it was served by email, on

15   July 15th, the same day as Mr. Armstrong's.

16        The entire issue can be obviated if the Court were

17   to grant a three-day extension of time, which really would

18   just be one business day, to August 17th.  So with the

19   Court's permission, we'd like to build that into the

20   schedule that we submit to the Court.

21        MR. PETERS:  Your Honor, there was -- the deadline

22   for serving written discovery has now long passed, and the

23   fact is, under the rules, the government failed to comply

24   with it; so what Mr. Chandler is casually asking the Court

25   to do is to basically grant them relief from failing to

```
1    comply with a deadline which has now long passed.  And if

2    they want to seek relief somehow, I think they should do it

3    by noticed motion because the written discovery that they

4    served, it wasn't served in a timely fashion under the

5    rules.  It just wasn't.

6              THE COURT:  Did they send it to you --

7              MR. PETERS:  We did, but the government didn't,

8    and I don't think that they should get relief from that.

9              THE COURT:  Did you receive notice through email,

10   Mr. Peters?

11             MR. PETERS:  We got an email.  I'm not exactly

12   sure when we got it.  I think it was, you know, very late at

13   night.

14             THE COURT:  All right.

15             MR. PETERS:  We got an email, and then the -- but

16   that didn't effect service on us.  They didn't do so during

17   business hours, and we weren't served properly.

18             THE COURT:  And what was the subject of the

19   request for production?

20             MR. PETERS:  It was a whole -- it was in a whole

21   lot of written -- a whole lot of written discovery.

22             MR. SLAUGHTER:  Your Honor, this is James

23   Slaughter.  I don't have it in front of me, but it wasn't an

24   isolated one or two requests here or there, but tens, if not

25   hundreds, of logs and RFAs and RFPs.
```

```
1              MR. PETERS:  I think it was a huge number of

2         requests for admissions that were served at that time.

3              MR. SCOTT:  Your Honor, that's incorrect.

4              MR. CHANDLER:  Your Honor, that's not correct.

5         The government didn't serve those RFAs.  Those were

6         relator's.

7              MR. SCOTT:  And those were served separate.

8              MR. CHANDLER:  I want to say something on the

9         order of five interrogatories and document requests that

10        paralleled those interrogatories.

11             MR. SCOTT:  Keeping in mind that Armstrong has

12        served --

13             MR. CHANDLER:  We have served maybe four sets of

14        RFPs compared to Armstrong's ten.

15             MR. PETERS:  But they didn't serve them timely,

16        which is the rule.

17             THE COURT:  Mr. Peters, file a motion to quash.

18        I'll take a look at it, and we'll do it by motion.  Okay?

19             MR. SCOTT:  Your Honor, one last thing.  I

20        apologize to raise yet another issue, but there is also

21        a motion pending for the relator to have more time with

22        Mr. Stapleton, and so I'm not sure if the Court's had an

23        opportunity to read those papers, but if the Court wanted to

24        hear on that -- hear us on that issue?

25             THE COURT:  That's not necessary.  I'll include
```

1        that in our order.

2                 MR. HARRIS:  Your Honor, may I have two minutes of

3        the Court's time on this issue because there was extensive

4        discussion by Mr. Armstrong's -- on the issue relating to

5        Mr. Armstrong's deposition, and I don't want to get -- I

6        know the Court will review the papers carefully, but I

7        don't want to get swept into those arguments, although I

8        thought they were very compelling, because I think there

9        are at least two facts that are critical with respect to

10       Mr. Stapleton that I just want to make sure I highlight for

11       the Court.

12                 THE COURT:  Okay.

13                 MR. HARRIS:  First, the only party that noticed

14       the deposition of Mr. Stapleton was the relator, and the

15       relator is now complaining that he -- that relator's counsel

16       only got three hours of that deposition because the

17       government took the other four hours.  That was Mr. Scott's

18       decision, to save four hours of his time for the government

19       and allow them to use his deposition time in a case where

20       the government is not a party.  They're not a party as to

21       Mr. Stapleton, and he gave up that time and now he wants it

22       back.

23                 The other thing I'd point out is, contrary to the

24       robust discussion we had about Mr. Armstrong's deposition

25       and whether there were topics that were raised or could have

1    been raised or had been raised, with respect to Mr. Scott's

2    request vis-a-vis Mr. Stapleton, there's nothing in the

3    papers about the topics that they didn't ask or couldn't

4    have asked.  So there's been no showing that they've -- that

5    because of this, the time limit, they were precluded from

6    going to any particular topic or describing what topic they

7    might go into in their follow-up deposition.

8            At most, they're talking about documents that

9    they've received since the deposition or that they hope to

10   receive in the future that they want to question him about,

11   and if they -- if that was the concern, they should have

12   carved out a couple of hours, saved it for after they got

13   the documents, or continued the deposition, which is what

14   they did with Mr. Knaggs.

15           So on that I submit, Your Honor.

16           THE COURT:  Okay.  Thank you very much.

17           MR. SCOTT:  Your Honor, may I just respond very

18   briefly to that?

19           THE COURT:  Sure.

20           MR. SCOTT:  Okay.  First of all, the Court had

21   ordered that they produce the documents that we were

22   requesting before Mr. Stapleton's deposition, and the way

23   that was complied with was by delivering us documents near

24   5:00 the evening before the deposition when I was already in

25   Austin, Texas, preparing, of course, for Mr. Stapleton's

1    deposition and without any time whatsoever to review these

2    4,000 something documents.  So we have had no opportunity to

3    use those documents in deposition at all.

4         The second thing is, you know, Mr. Harris talks

5    about, you know, the fact that the government didn't notice

6    the deposition.  I think it's pretty clear that the notice

7    issue isn't what drives this.  The Court's ruling previously

8    with Mr. Armstrong when we had both noticed the deposition

9    was focused on the time and whether the additional time was

10   necessary, and in this case, you know, we're obviously

11   trying to be cooperative with the government, and when the

12   government's asking to take some time to examine

13   Mr. Stapleton, we're not going to say no to the government.

14   But we're still trying to pursue the nonintervened part of

15   this case, and having three hours to do that with the

16   principal defendant in the case with, you know, 20 years of

17   conduct and hundreds of thousands of documents to deal with

18   is impossible.

19        I mean, we've certainly had, you know, additional

20   Redwelds full of documents that we would have liked to

21   question him on.  He was very deliberate in his review of

22   each document.  They were very conscious of the clock in

23   trying to get that deposition done, and the result was we

24   were not able to question him regarding, you know, highly

25   critical documents.

1          There's a metaphor that they provide at the end of

2    their briefing about, you know, going on a shopping spree,

3    and it's not clear to me, you know, whether, you know,

4    they're talking about the store's hours of operation or the

5    inventory or the, you know, amount of money.  I don't get

6    the metaphor, but it doesn't matter.  The fact is we need

7    more time.

8          The rules provide for it saying it must be

9    provided, if it's necessary, to fairly examine a witness,

10   and this is, you know, a poster child of a case where we

11   just need more time to talk to Mr. Stapleton about a number

12   of different events that we just couldn't get to in the time

13   that we had.

14         THE COURT:  Okay.  Okay.  Well, good luck.  I will

15   look out for the schedule, and we'll get something out

16   shortly on all of these issues.  Okay?

17         MR. SCOTT:  Thank you, Your Honor.

18         MR. PETERS:  Thanks, Your Honor.

19         THE COURT:  Okay.  Take care.

20              (Whereupon the hearing was

21               concluded at 1:37 p.m.)

22

23

24

25

1        **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3             I, LISA A. MOREIRA, RDR, CRR, do hereby

4    certify that the above and foregoing constitutes a true and

5    accurate transcript of my stenographic notes and is a full,

6    true and complete transcript of the proceedings to the best

7    of my ability.

8      Dated this 19th day of August, 2015.

9

10                    /s/Lisa A. Moreira, RDR, CRR

                           Official Court Reporter

11                   United States Courthouse

                           Room 6718

12                   333 Constitution Avenue, NW

                           Washington, DC 20001

13

14

15

16

17

18

19

20

21

22

23

24

25