1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2      - - - - - - - - - - - - - - - - -

       FLOYD LANDIS,
3                                       CA No: 1:10-cv-00976 (CRC)
                    Plaintiff,
4                                       Washington, D.C.
                                        Tuesday, September 8, 2015
5      vs.                              4:04 p.m.

6      TAILWIND SPORTS CORPORATION,
       et al.,
7
                    Defendants.
8      - - - - - - - - - - - - - - - - -

9      _____

10                 TRANSCRIPT OF TELEPHONIC CONFERENCE
           HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                   UNITED STATES DISTRICT JUDGE
       _____

12     APPEARANCES:

13     For the Plaintiff:        **PAUL D. SCOTT, ESQ.**
                                 **LANI ANNE REMICK, ESQ.**
14                               LAW OFFICES OF PAUL D. SCOTT, PC
                                 The Embarcadero
15                               Pier Nine, Suite 100
                                 San Francisco, CA 94111
16                               (415)981-1212

17     For Intervenor Plaintiff  **DARRELL C. VALDEZ, ESQ.**
       United States of America: U.S. ATTORNEY'S OFFICE
18                               Civil Division
                                 555 Fourth Street, NW
19                               Washington, DC 20530
                                 (202)252-2507
20
                                 **ROBERT E. CHANDLER, ESQ.**
21                               **GREGORY A. MASON, ESQ.**
                                 U.S. DEPARTMENT OF JUSTICE
22                               Civil Division, Fraud Section
                                 601 D Street, NW, Suite 900
23                               Washington, DC 20530
                                 (202) 514-4678
24     (CONTINUED ON NEXT PAGE)

25     Proceedings recorded by mechanical stenography; transcript
       produced by computer-aided transcription

```
1    APPEARANCES (CONTINUED):

2    For the Defendant          R. JAMES SLAUGHTER, ESQ.
     Lance Armstrong:           KEKER & VAN NEST, LLP
3                               633 Battery Street
                                San Francisco, CA 94111
4                               (415)391-5400

5

6

7

8

9    Court Reporter:            Lisa A. Moreira  RDR, CRR
                                Official Court Reporter
10                              U.S. Courthouse, Room 6718
                                333 Constitution Avenue, NW
11                              Washington, DC  20001
                                202-354-3187
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                            P R O C E E D I N G S

2              THE COURT:  All right.  Good afternoon, everyone.

3              IN UNISON:  Good afternoon.

4              THE COURT:  Thanks for calling in.  This will

5    hopefully be very brief.  I've taken a look at the materials

6    submitted on the latest discovery dispute and just had a

7    couple of questions.

8              The government, in its sur-reply with respect to

9    Request No. 74 and Interrogatory 20, makes the point that

10   Armstrong is not entitled to the information sought at least

11   with respect to the companies not specifically identified

12   because it was not a part of the interrogatory.  I wanted to

13   give counsel for Mr. Armstrong an opportunity to respond to

14   that point.

15             I've looked at the request and the interrogatory,

16   and they seem to request information for 81 separate

17   companies, and I guess the question I had is whether there's

18   any basis in the evidence for believing that representatives

19   from those 81 companies attended the Tour at the Postal

20   Service's request.

21             So whoever is on for Mr. Armstrong, if you could

22   speak to that.

23             MR. SLAUGHTER:  Yes, Your Honor; this is James

24   Slaughter on behalf of Lance Armstrong.  Thank you, Your

25   Honor.
```

1          During the meet-and-confer we narrowed our list,

2     and the answer is, with respect to those 81, I can tell you

3     how we got that 81 and why we originally included that large

4     number.  The Postal Service each year, during the

5     sponsorship, would consider a wide variety of its customers

6     and potential customers as invitees to the Tour de France,

7     and each one of those 81 entities in Interrogatory 20 was

8     amongst those that the Postal Service considered inviting to

9     the Tour de France.  The reason -- and that's why we

10    included them in the original interrogatory.

11         In meet-and-confer, the government objected to it

12    as being too broad, and as a way to narrow it, we identified

13    with specificity those entities that we could confirm

14    actually attended the Tour de France as an invitee of the

15    Postal Service as a way to build business and gain new

16    business, and so we identified those.

17         But the Postal Service alone is the entity that

18    can tell us which entities, in fact, in addition to the ones

19    that we identified, attended the Tour at their invitation,

20    and that's why we wanted to make the point in our motion and

21    I think our -- make it a point in our motion that we want

22    these that we've identified.  And we realize that all 81 of

23    those entities in Interrogatory 20 may not, and likely did

24    not, attend the Tour, but some others did, and we think that

25    the Postal Service ought to provide us the same information

1     they're providing from those that did attend the Tour, you

2     know, as they provided -- as they've already agreed to

3     provide with the ones we've identified.

4          THE COURT:   Okay.   So the question then becomes

5     whether you have asked for that information in the form of a

6     discovery request apart from just raising it in your motion

7     to compel.

8          MR. SLAUGHTER:   At a minimum, we've requested it

9     of those 81.   So if any of those 81, other than the ones

10    that we -- from the subset, they ought to produce; but, Your

11    Honor, it's a little bit more of a cat-and-mouse game

12    because we've been struggling for years now to get the

13    Postal Service to identify all the revenue attributable to

14    the sponsorship, and we've asked that in many different

15    ways.   In Interrogatory 20, we've tried to be as specific as

16    possible to avoid the objection that "you're too vague," and

17    so, okay, we'll be very specific; and in response to "you're

18    so specific," we get "it's too much, and we don't know which

19    of these entities attended."

20          So at a minimum, if any of the other 81 -- any of

21    those 81 entities not specifically identified from the

22    subset in our motion, if any of those attended the Tour de

23    France at the invitation of the Postal Service, we should

24    definitely get the revenue information from those.

25          THE COURT:   But you did not pose an interrogatory

1    along the lines of, "Please identify each company who

2    supplied a representative to attend the Tour de France at

3    the Postal Service's invitation," or something like that.

4    Is that right?

5              MR. SLAUGHTER:  We did not.  We did not submit an

6    interrogatory along those lines, Your Honor, no.

7              THE COURT:  Okay.  Whoever is on for the

8    government, respond to their argument that:  We've requested

9    the 81.  We're willing to limit it to those who actually

10   attended, but you have the information, not us.

11             MR. MASON:  Yes, Your Honor.  This is Greg Mason

12   on behalf of the United States, and the response to that is

13   twofold.

14             First, as Your Honor has pointed out, Armstrong

15   has never requested a list of all entities that attended the

16   Tour de France.  The information --

17             THE COURT:  But they have requested -- they have

18   given you a list of folks who were invited, correct?

19             MR. MASON:  They have given us a list of 81

20   entities that they would like revenue information for, but

21   Armstrong admittedly doesn't have a basis to believe that

22   all 81 of those entities actually attended the Tour.  In

23   fact, after having looked at all of the documents, Armstrong

24   was able to provide a basis for nine of those 81 entities

25   having attended the Tour de France, and the government had

1     thereby agreed to provide revenue data for those entities.

2          For other entities for which neither Armstrong nor

3     the government has any indication that they've attended the

4     Tour de France, to ask the government to now, at this late

5     hour, investigate whether each of the other 72 entities on

6     Armstrong's list attended the Tour de France is essentially

7     allowing Armstrong to impose another interrogatory after the

8     discovery cutoff and to impose a burden on the government

9     that's equally -- that's data that's equally available to

10    Armstrong.

11         Armstrong can look through all of the documents,

12    as it has, to determine whether any of those entities

13    attended the Tour de France.  Apparently there was

14    information in the documents produced to indicate that nine

15    such entities did attend, and since Armstrong has no basis

16    as to the other 72 entities, there's really no reason to

17    force the government to conduct a second investigation into

18    that.

19              THE COURT:  Mr. Slaughter, did you ask --

20              MR. SLAUGHTER:  Your Honor, this is --

21              THE COURT:  I'm sorry, let me finish.  Did you ask

22    any of the folks at the Postal Service who oversaw the

23    sponsorship whether any of those folks from the 81 attended?

24              MR. SLAUGHTER:  Your Honor, I didn't -- if you're

25    asking if those questions were asked during the depositions,

1    I didn't take the depositions of those individuals.

2    Mr. Peters did, and he's not -- and he's on a plane right

3    now, and so he's unavailable.

4            But Mr. Mason's suggestion that the information is

5    equally available to Armstrong as it is to the government is

6    just not true.  He's right; we've done our best.  We've gone

7    through the documents.  But we can't -- but the idea that

8    the Postal Service doesn't know which of the entities it

9    invited to the Tour de France that actually attended is a

10   little bit hard to believe, and we're saying, "Hey, listen,

11   here's 81."  Okay.  We didn't ask the interrogatory that

12   says identify, you know, every entity that came, but we know

13   at least some, and the reason we know some was because it

14   was sort of a hodgepodge, a reference here, a reference

15   there.

16           But the Postal Service certainly has its own

17   records that would indicate who went and who didn't, and if

18   any of those that went are among those 81, we think that

19   we're entitled to get the information about the revenues

20   that were generated as a result.

21           THE COURT:  And, again, the 81 are companies that

22   you have reason to believe were invited but may or may not

23   have attended.

24           MR. SLAUGHTER:  Your Honor, so -- the Postal

25   Service, each year, as far as we can tell, put out the word

1     to its -- across the country to various Postal Service

2     offices across the country saying, "Hey, listen, the Tour de

3     France is coming up.  If there's any sales opportunities or

4     customers that you think would make good candidates to

5     attend the tour, please let us know who they are."

6          And these 81 include those companies, or at least

7     some of them because we don't know if we have a complete

8     list or not, but those that we could identify of being

9     considered to be invited.  We don't know if each one was

10    invited or not because it wasn't -- the documents were not

11    provided to us in such a way that we could tell.  But those

12    were the entities that we could identify as being at least

13    considered to be invited to the tour, and some of the -- and

14    we know that each year the Postal Service did, in fact, take

15    a group of sales opportunities because they trumpeted it

16    left, right, and center as a great opportunity and as

17    leading to new business and new revenue for the Postal

18    Service.

19          MR. CHANDLER:  Your Honor, if I -- this is Robert

20    Chandler for the United States.

21          THE COURT:  Okay.

22          MR. CHANDLER:  Just by way of background, my

23    understanding is that there was a nomination process

24    within the Postal Service to determine who the attendees of

25    the Tour de France would be each year, and that not each

1    nominee -- not every nominee actually received an

2    invitation; and so I think -- I mean, my best guess is that

3    the information that Mr. Slaughter is working from, you

4    know, would identify nominees but not necessarily invitees,

5    and certainly not necessarily attendees.

6          I can also add -- I think it may be helpful to the

7    Court -- I attended the majority of the depositions of the

8    Postal Service witnesses, and to the best of my

9    recollection, I don't recall any witness having been asked

10   about these other 81 companies.  And I know that, you know,

11   this is certainly -- well, in the discovery request

12   themselves really it's the first time we have seen that list

13   of entities as a complete list, and, you know, to my

14   recollection, that list wasn't put in front of any of the

15   witnesses or they weren't asked about any companies that

16   appear on that list.

17         THE COURT:  Well, Mr. Chandler, if attendants were

18   determined by a nomination process, I would think that

19   records regarding who was nominated, who was invited, and

20   who actually attended would be fairly readily available.

21   Why wouldn't that be the case?

22         MR. CHANDLER:  Well, if they are, then Armstrong

23   has them as well.  You know, then they've been produced.

24         I know -- you know, I only have a vague

25   recollection of having seen the nomination documents.  This

1    is the first time actually today that we've heard the

2    explanation that this list was compiled based on the

3    nomination documents, and so we've not made any effort to

4    see -- you know, to sort of track that back to see if there

5    was, you know, a way to, you know, bring that forward.

6              But, again, whatever documents there are would be

7    equally available to Armstrong at this point.

8              THE COURT:  Okay.  Let's move to No. 73, the trail

9    sort of ran dry towards the end of the briefing.  Is

10   Armstrong satisfied that the government's supplemental

11   response provides all the requested information regarding

12   merchandising sales?

13             MR. SLAUGHTER:  Well, Your Honor -- this is

14   Mr. Slaughter again -- the government's response is that

15   they've searched for and produced all the documents; and if

16   that's what they're now telling us, that's what they're

17   telling us.

18             I would say, just for the record, that the

19   interrogatory that they've identified for you and for us as

20   reflecting that information is inconsistent with other

21   documents that indicated that they were receiving at least

22   a half a million dollars a year in merchandise revenue, and

23   so it -- and the testimony was that the person who was

24   managing that merchandise effort created spreadsheets that

25   indicated the revenue associated with the spreadsheets.  The

1    government's now told you and told us that they've searched

2    for and haven't been able to find those spreadsheets; so

3    we'll -- you know, I guess there's nothing further for us to

4    do other than --

5              THE COURT:  Hold on.  Hold on.

6              MR. SLAUGHTER:  -- to note that the information

7    they've provided for us is not consistent with what he

8    testified and with what the other documents, including

9    Exhibit P to Ms. McCloskey's declaration, show.

10             THE COURT:  Okay.  Well, that sounds like a fight

11   for another day.

12             Speaking of which, any other anticipated disputes

13   out there, just for my scheduling purposes?  And how are we

14   doing with wrapping up depositions and whatnot?

15             MR. SLAUGHTER:  Your Honor, this is James

16   Slaughter again.  We expected that you might ask that

17   question, and Mr. Chandler and I spoke this morning, and

18   we've also been working hard, all parties, at scheduling the

19   remaining depositions.  We are going to be submitting to

20   you, later today or first thing tomorrow, an amended

21   scheduling order that calls for the fact discovery to close

22   on September 30th.  We're scheduling all the depositions we

23   can to occur before then.

24             There are two exceptions to that, which is there

25   are two third-party depositions, Nike and Giro, that are

1      going to be the subject of motion practice.  We asked both

2      Nike and Giro to consent to have those motions heard before

3      Your Honor, but they declined and exercised their right to

4      have it heard out of the court that the subpoena was issued

5      from.

6                  THE COURT:  Uh-huh.

7                  MR. SLAUGHTER:  So those motions are going to be

8      heard.  The Nike one is going to be heard on September 29th

9      in Portland; and the Giro motion is being filed later today

10     or first thing in the morning, and we're going to ask for an

11     expedited briefing schedule on that motion.

12                 THE COURT:  Okay.

13                 MR. SLAUGHTER:  And so we -- the parties have

14     agreed that those two entities' depositions can be taken

15     beyond September 30th, but all of the other depositions that

16     were -- that we've been discussing, the parties are

17     cooperatively setting.

18                 THE COURT:  And will the delay in the taking of

19     those two depositions affect the expert report disclosure

20     dates?

21                 MR. SLAUGHTER:  Yes, Your Honor, and so that was

22     the next thing I was going to -- I was going to identify for

23     you.  The original scheduling order had the experts being

24     identified actually at September 15th.  We knew that that

25     was going to get pushed back a month.

1          In light of Nike and Giro, which the parties both

2     agree could be relevant -- we don't know until we hear what

3     they say, but could be relevant to expert reports, the

4     parties are going to suggest to Your Honor that the parties

5     exchange expert reports on November 13th, that rebuttal

6     reports be exchanged on December 18th, and that expert

7     discovery close on February 5th, with a post-discovery

8     conference before Your Honor a week or two after that at the

9     Court's availability.

10          THE COURT:  And how much of a delay is that from

11     the current schedule?

12          MR. SLAUGHTER:  Boy, I don't -- it's hard to say,

13     Your Honor, because, remember, the current schedule was

14     essentially vacated when we extended the fact discovery

15     before, and we had indicated --

16          THE COURT:  Right.

17          MR. SLAUGHTER:  -- I think generally extending it

18     by about a month, and I think this is extending it by

19     approximately -- a little bit less than another month.

20          And Mr. Chandler can correct me if I'm wrong, but

21     I think that's -- and we tried to shorten it up on the back

22     end as well and not -- so it might not be a full month, but

23     that's my best estimate.

24          Mr. Chandler, is that --

25          MR. CHANDLER:  I actually think it may even be

1    less than that.  As I recall, the original date set for the

2    conference with the Court was January 11th, and I think that

3    contemplated almost -- you know, nearly 30 days between the

4    end of expert discovery and the conference simply because it

5    would have overlapped with the holidays.

6          THE COURT:  Got it.

7          MR. CHANDLER:  And given that, you know, we're

8    not -- that the conference wouldn't have to be delayed as a

9    result of the holidays if everything is pushed back to the

10   end of January or early February, I think, you know, we can

11   kind of compress that time down.  And assuming that the

12   conference occurs, you know, within a week or two after the

13   end of expert discovery, sometime in about mid-February,

14   you're really only talking about a delay of, you know, 30

15   days or maybe a little bit more.

16         THE COURT:  Okay.  Well, I'll take a look at

17   whatever you all submit.

18         Are the Nike and Giro subpoenas in the same court,

19   or -- are they both in Washington, or are they in two

20   different districts?

21         MR. SLAUGHTER:  They're in two different -- this

22   is James Slaughter, Your Honor.  They're in two different

23   districts.  One is in the District of Portland, and one --

24   District of Oregon, excuse me, and the other is in the

25   Northern District of California.

1          THE COURT:  That's right.  Nike's in Oregon, not

2     Washington.  I should know that.

3          Okay.  We'll get something out on the discovery

4     dispute.  Is there anything else?

5          MR. SCOTT:  Your Honor, this is Paul Scott for

6     Relator.

7          THE COURT:  Mr. Scott.

8          MR. SCOTT:  Just with respect to the same kind of

9     issue, LIVESTRONG, we are having some discussions with them

10    to address their concerns relative to the protective order;

11    so there may be some activity around that, but I just don't

12    know what the result will be as we're still in discussions

13    with them.  But that just remains out there to, again, kind

14    of satisfy their concerns.

15         THE COURT:  Okay.  Speaking of the protective

16    order, there's an outstanding motion to seal Mr. Armstrong's

17    entire deposition transcript, which was attached to the

18    papers concerning whether his deposition would be reopened

19    or not.

20         Mr. Slaughter, I don't know if you're prepared to

21    address this issue, but what authority is there for me to

22    seal the entire transcript?

23         And what's the government's position on that as

24    well?

25         MR. SLAUGHTER:  Your Honor, this is James

1    Slaughter.  I am not, unfortunately, prepared to address

2    that issue.  If you'd like us to submit something, we can,

3    but I wasn't involved with either the deposition or with the

4    preparation of that motion; so I apologize, Your Honor, but

5    I'm not prepared to address it on this call.

6             THE COURT:  All right.  Mr. Chandler, does the

7    government take a position as to whether the entire

8    transcript can properly be sealed?

9             MR. CHANDLER:  Your Honor, I anticipate that we

10   would oppose the motion, but I'm not prepared to take that

11   up at this point either.

12            THE COURT:  Okay.  Well, I will leave that motion

13   out there.  I've got to tell you, though, I don't know if

14   there's any authority for me to do that, and I would be, off

15   the cuff, uncomfortable doing it.

16            Did you all, at the deposition or thereafter,

17   designate particular parts that would be subject to the

18   protective order, or no?

19            MR. SLAUGHTER:  Again, Your Honor, this is

20   Mr. Slaughter.  It was Mr. Peters and Mr. Jacob who

21   attended -- defended that deposition on behalf of

22   Mr. Armstrong; so I don't know specifically what was

23   designated or not, but I can certainly follow up promptly.

24            THE COURT:  Okay.  Why don't you do that.  I won't

25   rule until I hear from you, but if you all could do that

1   fairly soon, and confer with one another and submit

2   something relatively short, then we'll go from there.  Okay?

3          MR. SLAUGHTER:  We will do that, Your Honor.  This

4   is Mr. Slaughter.

5          MR. SCOTT:  Your Honor, this is Paul Scott for

6   Relator.  Again, just to touch on a couple of other matters.

7          THE COURT:  Okay.

8          MR. SCOTT:  One is just with respect to the

9   scheduling order.  We've already had some conversation

10  previously about de bene esse depositions and those

11  depositions being taken under the Hague.  The scheduling

12  order we're going to be submitting isn't contemplating

13  dealing with those, and so those remain, you know, items

14  that we'll, you know, potentially be pursuing.  And so the

15  cutoff that is set forth in that order isn't meant to

16  address those types of depositions, and I think that's --

17  you know, it's not stated explicitly, but I just wanted to,

18  again, put that out there while we're on as a group.

19          And then the second --

20          THE COURT:  Well, correct me if I'm wrong, but de

21  bene esse depositions typically can be taken any time before

22  trial for good cause, right?

23          MR. SCOTT:  Right.  Exactly.  I mean by -- right.

24  That's correct.  So I was just trying to, you know, be clear

25  so we're all on the same page on that point.

1          THE COURT:  Okay.

2          MR. SCOTT:  And then the second thing was just

3    with respect to a fairly mundane point with regard to the

4    production of documents by Williams & Connolly.  Early on,

5    in their response to us, we asked that they prioritize the

6    production of documents that involved correspondence with

7    certain third parties so we could avoid privilege issues,

8    and they agreed to do that and do the discrete prioritized

9    production along that line.  But then, when it was produced

10   to us, it was blended in with a separate production, and the

11   Bates page numbers that Williams & Connolly introduced were

12   removed.  So we asked that we get that as a discrete

13   production but have been told Armstrong's folks aren't

14   prepared to do that.

15          And I realize this is not -- it's a new issue for

16   Jamie, but you asked if there were any other discovery

17   conflicts out there, and I just thought some basic guidance

18   on this might save us from having to go through a whole

19   meet-and-confer -- well, we've already met and conferred on

20   it, but any further briefing on this.  It just seems like a

21   fairly obvious thing; that if Williams & Connolly has

22   produced it separately, that we should be able to get that

23   as a separate production and with the Bates numbers that

24   Williams & Connolly put on it.  So that's --

25          THE COURT:  I'm not sure how much guidance I can

1     give except to say that discovery is not an exercise in

2     hiding the ball, and folks should be forthcoming and, you

3     know, live up to their professional obligations to fulfill

4     the production of a full discovery.  That's about all I can

5     say.

6              MR. SCOTT:  Okay.

7              THE COURT:  Okay.

8              MR. SCOTT:  Thank you for that.

9              THE COURT:  Okay.  If there's nothing else, you

10    all have a good afternoon.

11             MR. SLAUGHTER:  Thank you, Your Honor.

12             MR. CHANDLER:  Thank you, Your Honor.

13                  (Whereupon the hearing was

14                   concluded at 4:28 p.m.)

15            **CERTIFICATE OF OFFICIAL COURT REPORTER**

16       I, LISA A. MOREIRA, RDR, CRR, do hereby certify that the

17    above and foregoing constitutes a true and accurate

18    transcript of my stenographic notes and is a full, true and

19    complete transcript of the proceedings to the best of my

20    ability.

21       Dated this 17th day of September, 2015.

22

23                            /s/Lisa A. Moreira, RDR, CRR
                              Official Court Reporter
24                            United States Courthouse
                              Room 6718
25                            333 Constitution Avenue, NW
                              Washington, DC 20001