IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -

FLOYD LANDIS,

                       CA No. 1:10-cv-00976 (CRC)

        Plaintiff,

                       Washington, D.C.
      vs.                 Tuesday, September 22, 2015
                       12:41 p.m.

TAILWIND SPORTS CORPORATION,
et al.,

        Defendants.
- - - - - - - - - - - - - - -

---

TRANSCRIPT OF TELEPHONIC DISCOVERY CONFERENCE
BEFORE THE HONORABLE CHRISTOPHER R. COOPER
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

For the Plaintiff:        PAUL D. SCOTT, ESQ.
                       Law Offices of Paul D. Scott, P.C.
                       The Embarcadero
                       Pier Nine, Suite 100
                       San Francisco, CA 94111

For Intervenor Plaintiff   ROBERT JOSEPH McAULIFFE, ESQ.
United States of America:  U.S. Department of Justice
                       Civil Division
                       601 D Street, NW, Suite 9020
                       Washington, DC 20004

For Capital Sports &        MARC S. HARRIS, ESQ.
Entertainment Holdings:    Scheper, Kim & Harris
                       601 West Fifth Street
                       Los Angeles, CA 90071

      (CONTINUED NEXT PAGE)

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

**APPEARANCES (CONTINUED):**

| | |
|---|---|
| **For the Defendant** | **ELLIOT R. PETERS, ESQ.** |
| **Lance Armstrong:** | **ELIZABETH K. McCLOSKEY, ESQ.** |
| | **Keker & Van Nest, LLP** |
| | **633 Battery Street** |
| | **San Francisco, CA 94111** |
| | |
| **Court Reporter:** | **JEFF M. HOOK, CSR, RPR** |
| | **Official Court Reporter** |
| | **U.S. Courthouse, Room 4700-C** |
| | **333 Constitution Avenue, NW** |
| | **Washington, DC  20001** |

1                        **P R O C E E D I N G S**

2              THE COURT:  Good afternoon, everyone.  Who do we

3    have on?

4              MR. SCOTT:  This is Paul Scott for Relator Floyd

5    Landis.

6              MR. PETERS:  Elliot Peters and Lizzie McCloskey for

7    Lance Armstrong.

8              MR. HARRIS:  Your Honor, you also have Marc Harris

9    on behalf of the CSE defendants.

10             MR. McAULIFFE:  And Rob McAuliffe for the United

11   States.

12             THE COURT:  I'm in the middle of a trial and just

13   got off the bench, and I've taken a quick look at the

14   submissions from last night.  Why don't we start with the

15   requests for admission issue.

16             I guess, Mr. Scott, the first question I have is why

17   is it necessary to get admissions at this level of granularity

18   given the legal issues involved in the case?

19             MR. SCOTT:  Thanks, your Honor.  The reason is part

20   of the -- there are a number of reasons.  Part of the argument

21   that we've been hearing and that is sort of espoused through

22   the testimony or other comments being made by the defense is

23   that the degree of usage was -- it's being minimized.  I mean,

24   there are admissions being made, but they're carefully sort of

25   vague admissions at various points.  And knowing the degree of

1    usage is going to be an important factor, you know, and the

2    extent of usage is relevant to that sort of minimization

3    strategy.

4           I mean, we get comments from Mr. Armstrong like it

5    was taking Skittles just sort of trying to make it like no big

6    deal and/or suggesting that he used less than others, those

7    kinds of comments.  To the extent that we're getting those

8    kinds of arguments, obviously we're interested in narrowing

9    down specifically when he used and what he used these PEDs

10   for.  And it also frankly is relevant just in terms of the

11   actual violation itself.  I mean, once we have use of PEDs in

12   a particular race, well, that's a specific violation in and of

13   itself that is later falsely represented when he's making --

14   telling the story about not having used PEDs at all.  So

15   individual events are themselves violations that could be

16   factors later on for false statement discussion.  So those are

17   the kinds of reasons that we get into the level of

18   particularity that we do.

19          And in terms of the number of RFAs, these really

20   aren't that burdensome to answer.  He either remembers or he

21   doesn't.  The rules are very clear, we've laid out the law on

22   this.  There's no prohibition on having, you know, this number

23   of RFAs.  There's numerous cases we've cited for you where

24   hundreds of RFAs have been answered.  And in this case, it's

25   justified just by the facts of this case because we have to

1    cover a broad period.  There are a number of races that

2    occurred in that period.  It's not our doing that he was

3    doping throughout this extensive period, so that's why the

4    RFAs reflect -- include that number.

5         THE COURT:  Mr. Scott, let me cut you off.  I read

6    the deposition transcript from the first go around, and did he

7    not admit to using a whole host of substances in each year of

8    the sponsorship agreement, and why isn't that admission

9    sufficient to cover what you're asking for here?  Why does he

10   need to say it for each particular race and each particular

11   substance in the form that you've asked him?

12        MR. SCOTT:  Well, I mean, as I said, it's in part to

13   respond to this minimization argument that they make.  And

14   also frankly just in terms of the materiality, the

15   significance and materiality issues.  Doing it once in some

16   very limited fashion is qualitatively -- you know, it's still

17   a violation.  But in terms of the materiality question, if

18   it's more extensive and he's using multiple drugs, that's

19   going to be relevant to the materiality issue as well.

20        And also, your Honor, just there are some questions

21   in there for example about whether he knew it was a violation

22   and whether it was against the rules.  Those sort of questions

23   are also blended in there as well.  He did indeed answer with

24   respect to some specific races, but part of the problem is we

25   have this constraint on the amount of time that we're able to

1    ask questions.  And so though the Government may have wanted

2    to go into more detail in the deposition of Mr. Armstrong, it

3    couldn't because we're constrained by time when we take the

4    deposition.

5          And part of the reason that at least I wanted to

6    have this issue heard ahead of Mr. Armstrong's deposition was

7    to have a sense of whether or not we could be expecting

8    answers on the other races and some of these other questions

9    that are in the RFAs that the Government just didn't have time

10   to ask in the deposition.

11         THE COURT:  Okay.  Mr. Peters, start with whether

12   Mr. Scott has accurately characterized your defenses.  In

13   other words, will it be your defense or a defense that

14   Mr. Armstrong did not breach the sponsorship agreements

15   because his use of PEDs was minimal or that because of the

16   extent of the use it was not material to the Postal Service?

17         MR. PETERS:  We're not making other either of those

18   arguments, your Honor.  The premise -- Mr. Armstrong wasn't a

19   party to the sponsorship agreements and so he couldn't have

20   and didn't breach them.  I mean, we have defenses relating to

21   his involvement in making any claims because he wasn't a party

22   to the agreements.  But in terms of his PED --

23         THE COURT:  Wait, wait, wait.  Didn't he certify

24   that he was not doping and isn't that part of the agreement?

25         MR. PETERS:  No, he never certified that to anyone.

1      He denied it publicly, but he never certified -- he never

2      certified anything.  He wasn't -- he didn't sign the agreement

3      with the Postal Service, he wasn't a party to it.  He never

4      saw it in fact.  He didn't know the terms of it.  He had an

5      agreement to ride for Tailwind, and Tailwind -- it had

6      different names at different times.

7              THE COURT:  Right.

8              MR. PETERS:  But Tailwind had an agreement to be

9      sponsored by the Postal Service, and Armstrong wasn't a party

10     to that agreement.  It's their theory -- I mean, it's really

11     kind of an implied certification theory under the False Claims

12     Act.  But I think the thrust of your Honor's question -- which

13     I agree with 100 percent, is we're not minimizing

14     Mr. Armstrong's use.  He's admitted it.  He's testified about

15     the different substances he used.  He's testified that he used

16     them in every year of the sponsorship agreement.  He's

17     testified in some detail about how that happened.

18              But the level of granularity called for by these 435

19     RFAs -- I guess 410 that we haven't answered is unnecessary

20     and it's burdensome and harassing to go substance by

21     substance, race by race when the important fact which is that,

22     yes, he did use PEDs as did a lot of other if not all other

23     racers during this time period.  But he did, and he's

24     testified about what they are, blood transfusions, EPO,

25     testosterone, cortisone.

1    He was asked -- you're absolutely right, your Honor,

2    he was asked by Mr. Chandler those questions in detail in his

3    deposition, and he answered every single one of them.  So

4    we think --

5    THE COURT:  Mr. Peters, is there some number between

6    430 or whatever it is and 25 that would be a reasonable number

7    that you guys can agree on?  And Mr. Scott, you can ask them

8    in some sort of compound way, and if you get answers that you

9    think are, you know, not direct then go from there.  I mean,

10   isn't there a way -- another way to skin this cat?

11   MR. PETERS:  Your Honor, I -- you go ahead, Paul.

12   MR. SCOTT:  You can go ahead.

13   MR. PETERS:  I was just going to say no.  I don't

14   think that any of these really are reasonably calculated to

15   lead to the discovery of admissible evidence beyond what

16   Mr. Armstrong has testified to.  Mr. Scott and the Government,

17   your Honor's given them five more hours.  They can ask

18   Mr. Armstrong questions that appear relevant in that

19   deposition.  They're going to have had 12 hours with him.  And

20   to answer any of these is just unnecessary.  Did you use

21   cortisone in the 2002 Tour of Georgia; did you use EPO in that

22   race.

23   And typically, you know, they were on a program.

24   Like they would use EPO, but they might not use it during the

25   race, they would use it in training.  And then they had ways

1    of not using it during the race because there were more doping

2    controls then.  This is just a level of detail that is

3    unnecessary in this case particularly given the candid

4    admissions Mr. Armstrong has made about the issues that are

5    relevant.

6              So I would say no, making us answer 100 of these is

7    less burdensome and harassing than 400, but still burdensome

8    and harassing to no valid end.

9              MR. SCOTT:  Your Honor, this is Paul Scott, if I

10   may?

11             THE COURT:  Yes.

12             MR. SCOTT:  I hear the direction that you're going,

13   your Honor, and I think maybe one alternative -- I think

14   there's 40 something races -- and I have to do the actual

15   calculation, but I think that these questions pertain to I

16   think 40 something races that occurred during the period that

17   we're asking about.  And perhaps one way of trying to narrow

18   this to address the concerns that Mr. Peters has articulated

19   would be to have the more compound questions that you have

20   suggested where it would be did you use any PEDs at all during

21   this race.  You know, that certainly narrows it quite

22   significantly.

23             And if we had our other questions also included

24   about whether you knew that was a violation of the rules and

25   whether that was in violation and you knew it was in violation

1    of the rules, that's not certainly the detail that we want.

2    And we're looking for it to be narrower than that, but

3    I'm hearing what you're saying.

4              THE COURT:  But that still doesn't respond to the

5    concern of Mr. Peters that it was a program and they used

6    throughout the year and it's -- you know, looking back, how's

7    he going to say whether he used within a certain race or not

8    with respect to a certain substance.

9              MR. SCOTT:  Your Honor, the way that the questions

10   were framed was to anticipate that issue by taking into

11   consideration whether PEDs were used in training as well.  So

12   in other words -- not training but in preparation for a race.

13   So in other words, if they're used in preparation for or

14   during the race is fine.  I mean, when you take EPO for

15   example, it stays in your blood for I think 120 days.  So if

16   you take it two weeks out -- you know, it has benefits for

17   that period of time.  So if you take it two weeks out, even

18   though you're not taking it during the race it's obviously

19   relevant.  And testosterone similarly is going to have that

20   official effect, it goes far beyond just when you are using it

21   that day.  So we deal with that problem by just saying in

22   preparation for or during.

23             THE COURT:  Did you all --

24             MR. PETERS:  Your Honor, that level of detail just

25   isn't necessary.  In the deposition of Mr. Armstrong they can

1    say, "In 2003, did you use EPO?"

2            "Yes."

3            "Did you use it -- how frequently did you use it?

4    Did you use testosterone?  Did you use cortisone?  Did you use

5    it to improve your performance?"  He focused really on the

6    Tour de France.  But you could accomplish this in a deposition

7    in about a minute or two, and he's got a couple of hours.

8            MR. SCOTT:  Your Honor, this is precisely the

9    problem.  You know, we have two hours which obviously this is

10   for the Relator.  And incidentally, I think the Government is

11   supporting us on this issue from my discussions with the

12   Government -- and Mr. McAuliffe can chime in if he chooses I

13   suppose.  But we have an extremely limited period of time.

14   We're obviously asking for considerably more outside of the

15   minimal as I could in the request for time that we made.

16           Now, the Relator's going to have two hours total

17   deposition time with this witness.  So by going through this

18   kind of bingo card kind of itemization -- which is an easy

19   thing for Mr. Armstrong to answer but is time consuming, is

20   obviously an inefficient way for us to use time in his

21   deposition.

22           THE COURT:  Okay.  When is the deposition scheduled?

23           MR. SCOTT:  Thursday.

24           MR. PETERS:  In two days, your Honor.

25           MR. SCOTT:  Day after tomorrow.

1        THE COURT:  Okay.  I'm going to look at the actual

2    requests, and I'll get something out as soon as I can.  Let's

3    move to the Williams & Connolly documents.

4        MR. SCOTT:  Your Honor, would you like me --

5        THE COURT:  I'm sorry, Mr. Scott, you're sort of

6    breaking up.  I think you may be on a cellphone.

7        MR. SCOTT:  Sorry, I'll take that off, I apologize.

8    So basically just a brief background.  We knew that early on

9    when we were trying to get documents from Williams & Connolly

10   in an expedited way, we had a discussion with them about a

11   prioritized search that would basically --

12       THE COURT:  Yeah, I read that.  I guess my question

13   is --

14       MR. SCOTT:  Okay.

15       THE COURT:  -- what's the basis for your suggestion

16   that these 10 pages fall within your request and were in fact

17   shared with third parties?

18       MR. SCOTT:  Well, because of the nature of the

19   prioritized search was only give us e-mails to third parties.

20   And we gave them a list of things like UCI or Vrijman or

21   others who basically had no relationship theoretically at

22   least with Armstrong, you know, regulating entities and so

23   forth, Dick Pound, that kind of thing.

24       THE COURT:  Right.

25       MR. SCOTT:  And asked them to produce those e-mails

1    so we could be safe in knowing that we didn't have to deal

2    with attorney-client privilege issues and we would get those

3    documents more quickly.  Well, they then gave us those

4    documents blended in with a second production that Williams &

5    Connolly made so we couldn't identify whether or not we had

6    received them all.  That's when we argued over it for a while,

7    and finally we got the Bates numbers that Williams & Connolly

8    had assigned to that prayer type production, and we were able

9    to determine that in fact 10 documents had been withheld.

10            I've been promised multiple times a privilege log of

11    those 10 documents, I still haven't received that.  But the

12    reason we are concerned that those documents have been shared

13    with third parties and are therefore discoverable is that by

14    the nature of our search, it necessarily required them only to

15    give us documents that should be non-privileged because they

16    were shared with third parties.  And even if the document

17    itself is some e-mail between Lance and some other -- you

18    know, an attorney, to the extent that that document was then

19    shared with the UCI, obviously it's no longer a privileged

20    document.  So that's why we believe we're -- you know, we need

21    to see what those documents are and confirm that in fact they

22    weren't shared.

23            THE COURT:  Mr. Peters, if you know, are the 10

24    documents actual e-mails or are they documents that may be

25    attached to e-mails or maintained otherwise?

1        MR. PETERS:  I do know, your Honor.  I do know, your

2   Honor.  There's 10 pages.  There's two documents.  One is

3   completely irrelevant.  It's an e-mail between Mark Levinstein

4   of Williams & Connolly and some person about how much that

5   person would get paid for performing work on the Williams &

6   Connolly website.  It has absolutely nothing to do with this

7   litigation.  That's one of the documents Mr. Scott has made

8   this motion over.  And he did get a privilege log last night

9   by the way.

10        The other one is an e-mail between Mark Levinstein

11   and Bill Stapleton acting as Armstrong's manager, and various

12   attachments to that e-mail.  So there's really two documents.

13   One is privileged and the other has absolutely nothing to do

14   with this litigation.  That's the 10 pages that we're here

15   talking about.

16        MR. SCOTT:  If I may, your Honor, just to respond.

17   I haven't seen that privilege log.  And if I missed it, I

18   apologize.  But the Keker firm was saying yesterday they had

19   e-mailed it, so perhaps that's an explanation.  I'll have to

20   check my own e-mail.

21        THE COURT:  Let's talk about the two documents.

22        MR. SCOTT:  Yes, okay.  So with respect to the

23   document between Levinstein and Stapleton, by the nature of

24   the way that search was conducted it was supposed to be only

25   searching for documents that had metadata indicating that

1    these documents went to third parties.  So it's possible

2    there's an e-mail between Levinstein and Stapleton that was

3    forwarded onto third parties, because certainly we know that

4    there was multiple correspondence between Levinstein,

5    Stapleton and Verbruggen at the UCI and others at the UCI.

6              So even though that might appear to be privileged

7    under the agency argument that Mr. Armstrong has been making,

8    to the extent it was in the family of an e-mail that was going

9    to UCI, then that would take it out of that protection and

10   that's why we're interested.

11             THE COURT:  Mr. Peters, is it in that family of

12   documents?

13             MR. PETERS:  No.  I'm looking at it, it's an e-mail

14   from Levinstein to Stapleton dated September 7th, 2006.  And

15   it has certain attachments to it.  And it's between Levinstein

16   and Stapleton, and Stapleton is acting on behalf of Armstrong.

17   And it relates to certain communications -- it relates to

18   certain attachments that involve communications with UCI which

19   are sent by Levinstein to Stapleton.

20             THE COURT:  Okay.  Mr. Peters, can you submit both

21   of the documents to chambers by e-mail and I'll take I look at

22   them in-camera and make a ruling, okay?

23             MR. PETERS:  Sure, yes.

24             MR. SCOTT:  Your Honor, if I may just add one thing?

25             THE COURT:  Yes.

1          MR. SCOTT:  The concern I have is that a document

2    like that can be either BCC'd or it can be also forwarded with

3    another e-mail.  So in order to determine whether or not in

4    fact the metadata -- that this document isn't within the

5    family of something that was sent to UCI or some other party,

6    then it's something that needs to get looked at on Concordance

7    or whatever system they're using to make that confirmation.

8    So I'd ask if they could --

9          MR. PETERS:  You know --

10          THE COURT:  Mr. Scott, I'm not going to look behind

11    the representation of counsel.  I mean, if they put it on a

12    privilege log and that's the basis for it -- I'll look at it

13    in-camera, but I'm not going to examine metadata to look

14    behind counsel's representation on this, okay?

15          MR. SCOTT:  Understood.

16          THE COURT:  There's some remaining documents to be

17    produced, is that correct?

18          MR. PETERS:  Well, the other issue -- some Williams

19    & Connolly documents, your Honor, is that what you're asking

20    about?

21          THE COURT:  Yes.

22          MR. PETERS:  Yeah, there's some more Williams &

23    Connolly documents that we just got last week that we're

24    processing and we're going to produce early next week we

25    think.

1          THE COURT:  Does that suit your purposes, Mr. Scott,

2    or no?

3          MR. SCOTT:  Well, we're trying to get the documents

4    in advance of Mr. Armstrong's deposition which is what we've

5    been pushing for.  But I think we got another production last

6    night, so I'm not sure if that's going to contain the

7    information already or not.  I guess we'll find out when we

8    see the information that gets produced at the later date

9    Mr. Peters is suggesting.

10          THE COURT:  Okay.  Let's go to the Floyd Fairness

11   Fund.

12          MR. PETERS:  Your Honor, this is Elliot Peters.  Our

13   problem with that is that Mr. Scott or Wilson Sonsini just

14   redacted information out of documents they produced not

15   because they claim it was privileged, but because they claim

16   it's confidential or they just didn't want us to see it or

17   something.  But we've tried to get them to produce this

18   information in an unredacted form.  We have a protective order

19   in the case.  If it's confidential, then it can be so

20   designated like a lot of things in this case.

21          THE COURT:  What's the relevance of the donor names?

22   Why do you need them?

23          MR. PETERS:  These are people that Mr. Landis lied

24   to and defrauded, and I'd like when I depose him to find out

25   the nature of his misrepresentations to these people and ask

1    him.  But it's hard for me to ask him about specific

2    misrepresentations to people unless I know who those people

3    were.  He traveled around --

4                 THE COURT:  What do the records reflect apart from

5    the donor's name?  Does it reflect the date of the donation,

6    the amount of the donation, et cetera?  Is all you're lacking

7    is the identity of the donor?

8                 MR. PETERS:  The entire page is redacted except one

9    column which says the amount of donation.  But all the other

10   information on the page -- which is I assume some kind of

11   schedule, everything's been redacted.  I assume names, dates,

12   association.  I don't know.  It's a page with everything

13   redacted except one column on the far right which contains

14   amount of donation.  And so I have no information about who

15   these people were that Mr. Landis defrauded, and I'd like to

16   be able to ask him about them.

17                 And if there's a concern about confidentiality, we

18   designate it confidential and people obey those kinds of

19   things.  And we can mark the deposition transcript

20   confidential.  But I should be entitled to ask Mr. Landis --

21   whose credibility is going to be at issue in this case --

22   about specific misrepresentations he made to people in order

23   to induce them to part with their money.

24                 THE COURT:  Right, and the question is do you really

25   need their names in order to do that.  Mr. Scott --

1          MR. PETERS:  I don't know any other way to ask

2     them -- him specifically about any particular

3     misrepresentation without knowing the name of the person who

4     it's attached to.

5          THE COURT:  Mr. Scott?

6          MR. SCOTT:  Your Honor, if I may, it's sort of --

7     it's kind of sounding like the granularity argument that

8     Mr. Peters was making a moment ago.  I mean, he has already a

9     deferred prosecution agreement which is in writing and is a

10    very explicit admission to misrepresentations by Mr. Landis

11    over a series of time to these donors to get some money.  It

12    couldn't be clearer than that.  I mean, he's obviously also

13    admitted that he was lying about whether or not he was doping.

14    The fact that he knowingly lied couldn't be clearer.

15         So the fact -- asking him exactly how he phrased it

16    is obviously a great deal of granularity into -- you know,

17    that sort of leaves aside the major point that he was in fact

18    lying.  So I don't think it's necessary information, and it's

19    not proportional to the needs of the case under Rule 26.

20         And there is a very real concern about

21    confidentiality here.  The U.S. Attorney's Office and the

22    Court in the Southern District of California have been

23    treating this information as confidential.

24         THE COURT:  Why is that relevant to what we do here

25    though?

1      MR. SCOTT:  Well, because I think to the extent that

2   third parties' financial privacy interests are at issue, they

3   may well want to weigh in on a topic like that and/or the

4   Court in the Southern District of California.  Even Exhibit C

5   I think attached to the submission by the Defendants is an

6   example of that where one of the donors is saying that they

7   don't want this to become a public matter or they want it to

8   just be over with.  They're obviously expressing concern about

9   confidentiality.  And I'll bet you they would prefer that

10   Mr. Armstrong and/or other Defendants in this case not know

11   their identity.

12      So if we give this information over to

13   Mr. Armstrong, these people will not have been consulted and

14   will not have been consulted when basically when the Court and

15   the U.S. Attorney's Office in the Southern District of

16   California were respecting their confidentiality.  We would

17   put that against what is obviously an overkill type desire for

18   talking about who these particular individuals are.  I don't

19   think it justifies the information they're seeking.  They're

20   not going to be able to put on extrinsic evidence as to what

21   someone was told.  They can't put these people up as

22   witnesses.  And it's already been -- it's very clear, it's

23   been admitted.

24      MR. PETERS:  Your Honor, Mr. Scott doesn't represent

25   the United States, Mr. McAuliffe does.  He's on this phone.

1    They haven't joined in Mr. Scott's position, they haven't

2    filed anything in support of his position.  And in fact, when

3    we asked them about producing these documents, Rob Chandler

4    said, "I think we have produced them to you and we didn't

5    redact them."  But then it turned out that they hadn't

6    produced them to us because they thought Mr. Scott was going

7    to, and we didn't want to make them do it twice.  And he said

8    to me, "Yeah, we don't see any reason to redact that out."

9           So I think Mr. Scott is making some argument on

10    behalf of the Government that they're not making.

11           MR. SCOTT:  Well, I didn't make an argument on

12    behalf of the Government.  And what Mr. Peters just said as to

13    the Government's position is inaccurate.  Mr. Chandler --

14    because I have spoken to him on this, has never said, you

15    know, we think this information should be produced.  I mean,

16    this is something that the U.S. Attorney's Office in the

17    Southern District has been dealing with as well as the Court

18    there which entered an order incorporating by reference the

19    terms of the DPA which was calling for this information to be

20    treated as confidential.

21           MR. PETERS:  It wasn't calling for this information

22    to be treated as confidential, it just didn't mention the

23    names of the people in the Deferred Prosecution Agreement

24    because it didn't need to.  But, you know, recently the

25    Government just kind of let Mr. Landis off the hook on this DP

1       agreement, and I don't think he's paid back much money at all.

2               And I'd like to know if he did who he repaid it to

3       or who got repaid, because I think most of these victims

4       haven't been repaid.  But the Government has dismissed the

5       criminal case against Mr. Landis anyway which also goes to his

6       bias in connection with his current relationship with the

7       Government.  To redact these --

8               THE COURT:  Hold on guys.  Is the Government

9       prepared to take a position here on this issue?

10              MR. McAULIFFE:  Your Honor, this is Rob McAuliffe.

11      I can't make representation about what Rob Chandler had said,

12      I wasn't on those calls.  But it's my understanding that there

13      was a court order that indicated what the Government had to

14      produce, and I believe it had to do with communications

15      between Landis and others.  And I believe that we've produced

16      those documents.

17              THE COURT:  Not redacted?

18              MR. McAULIFFE:  I don't know that we produced the

19      documents that are being talked about on this call with the

20      donor list.  I think we've produced the documents that we were

21      required to produce.  I'm not aware that that included a list

22      of donors.

23              THE COURT:  Well, whether it included a list of

24      donors, does it include correspondence between Mr. Landis and

25      donors?  I mean, are the names already out there is what I'm

1   saying regardless of what form the production was made?

2           MR. McAULIFFE:  I can't make a representation one

3   way or the other, I just don't know.

4           MR. SCOTT:  Your Honor, this is Paul Scott --

5           MR. PETERS:  We don't have that information, your

6   Honor.

7           MR. SCOTT:  No, that information is not public.

8   Mr. Peters said a moment ago that the Deferred Prosecution

9   Agreement does not treat this information as confidential, and

10  that's just not correct.  If you look at section seven of that

11  agreement, it specifically says, "A confidential list of

12  donors will be provided to the Clerk of the Court."  So it was

13  very clear that this information was to be treated as

14  confidential.

15          THE COURT:  Mr. Scott, I'm not suggesting that the

16  names are public.  My question was whether the names are

17  included in the Government's production with respect to these

18  same areas, the DPA, subject to the protective order in this

19  case which of course would not make them public.

20          MR. SCOTT:  Oh, I understand.  I'm not aware of that

21  having happened myself.

22          THE COURT:  Okay.

23          MR. PETERS:  Your Honor, I'm not either -- this is

24  Elliot Peters.  And if we had them, we wouldn't have filed

25  this motion.

1      THE COURT:  Okay, I've heard enough.  We'll get

2  something out to you hopefully today.

3      MR. SCOTT:  Your Honor, there's just only one other

4  item in there which they were asking for my client's tax

5  return information from 2012 which, you know, like these names

6  is completely irrelevant to the issues in the case and not

7  something that they need for purposes of queuing up any lies

8  by my client with respect to the donors.  They already have

9  that in the DPA anyhow.

10     THE COURT:  I didn't see that.  Mr. Peters, why do

11  you need his tax returns?

12     MR. PETERS:  Because how much income -- what they

13  did is they produced to us Mr. Landis' tax returns but they've

14  just redacted out all the information.  How much income he was

15  making per his tax returns in 2012 is relevant to his

16  repayment obligations under the Deferred Prosecution Agreement

17  from which he's been basically relieved by the United States

18  as of a joint filing they made within the last month or two.

19  And so but we have no idea --

20     MR. SCOTT:  Your Honor --

21     MR. PETERS:  The reason we're interested in that

22  information is because his income is relevant to his ability

23  to repay victims under the Deferred Prosecution Agreement, and

24  we'd like to know what it was.

25     MR. SCOTT:  Your Honor?

1          THE COURT:  Mr. Scott.

2          MR. SCOTT:  Mr. Landis has not been relieved of

3   anything.  He still owes the money.  What happened is with the

4   Deferred Prosecution Agreement, if you don't get in trouble

5   for three years they dismiss the case.  That's all that's

6   happened.  They didn't let him off the hook.  They followed

7   the terms of the deal which was stay out of trouble and, you

8   know, we dismiss the case.  But his financial obligation

9   remains.

10          The fact that he's been able to repay whatever

11   amount based on his income since the date that Deferred

12   Prosecution Agreement was entered into has only to do with

13   whatever income he might happened to have made in that period.

14   It has nothing to do with any kind of a deal as Mr. Peters is

15   suggesting.  There is no deal, he owes the money.  He's paid

16   back some of it based on the income that he's had, and he's

17   going to owe the rest.  It's that simple.

18          MR. PETERS:  That's just not right.  A Deferred

19   Prosecution Agreement with a condition of repayment to victims

20   usually means that in order to get the case against you

21   dismissed, you have to comply with your obligation to repay

22   victims.  But what we believe happened here is that Mr. Landis

23   didn't repay anybody, and we don't know how much income he had

24   during that period.  Yet the case was dismissed against him

25   nonetheless.

1          Mr. Scott says oh, he still has an obligation to

2    repay.  That may be true, but he no longer has the hammer of a

3    criminal case hanging over his head which is the basis of a

4    Deferred Prosecution Agreement.

5          MR. SCOTT:  Your Honor, if you'd like a further

6    one-page explanation of this to confirm what the Relator is

7    saying, we'd be more than happy to provide it.  The DPA itself

8    should lay this out.

9          THE COURT:  That would be helpful to me.  Why don't

10   we do a one-page or a two-page max submission on this issue

11   alone, okay.  And can you attach another copy of the DPA?

12         MR. SCOTT:  Sure.  And so the only issue is whether

13   or not --

14         THE COURT:  The tax return.

15         MR. SCOTT:  -- he has a continuing obligation to pay

16   back this money, that's the issue, right?

17         MR. PETERS:  I don't know what the issue -- I'm not

18   sure what the issue is.  I mean, the issue as I understand it

19   is that -- is whether it was proper for you to redact the tax

20   returns that you produced to us so that basically we got a

21   piece of paper with no information on it.

22         MR. SCOTT:  Your Honor, that's what I'm concerned

23   about.  I don't want to re-brief the entire argument.  What

24   I'm understanding you want clarity on is whether this DPA

25   requires him -- if he had a continuing obligation for him to

1  pay or whether because it's been dismissed he no longer has an

2  obligation to pay.  That's what I understood you were saying.

3  THE COURT:  Well, that was the relevance argument

4  that Mr. Peters just made if I understand it correctly.

5  MR. PETERS:  No, he may still have some kind of

6  obligation to pay, but he doesn't have the threat of a

7  criminal prosecution hanging over his head in connection with

8  that anymore.  That's the basis of a Deferred Prosecution

9  Agreement.  And I think Mr. Scott would have to admit that

10  once the criminal case against him was dismissed, he may still

11  have some obligation to pay but he's not going to get

12  prosecuted and sent to jail if he doesn't do it.

13  THE COURT:  But why do you need his tax returns to

14  establish that fact?

15  MR. PETERS:  Well, because his ability to pay would

16  be the basis for relieving him of the threat of criminal

17  prosecution if he doesn't pay.  And we have no information

18  about what his ability to pay was because they redacted the

19  information out of his tax returns.  We don't know how much

20  income he made.  That's what's relevant about that

21  information.

22  MR. SCOTT:  Your Honor --

23  THE COURT:  But if he's not relieved of the ability

24  to pay regardless of whether there's a pending criminal case

25  or not, what does it matter if he made $20,000 or whether he

1    made $2,000,000?  I must be -- I'm just thick today I guess.

2              MR. PETERS:  If he made a lot of money and didn't

3    repay it, then why should he have been cut loose from the

4    obligations of the Deferred Prosecution Agreement.  If he had

5    no income and he couldn't repay people, then I guess it's more

6    understandable that the Government would say okay, you tried

7    your best, you had no income and you paid a thousand dollars

8    so that's okay.  But if he made $2,000,000 and he didn't repay

9    these people, that would make this Deferred Prosecution

10   Agreement look kind of like a sham to me.

11             THE COURT:  But what I understand Mr. Scott to say

12   is that he's not being relieved -- the DPA does not relieve

13   him of the obligation to repay the donors.  Is that correct or

14   is that not correct?  So he's not getting out from under

15   anything based on what Mr. Scott has told me.

16             MR. PETERS:  Yeah, he's getting out of the criminal

17   case.  He's getting out of the fact that he had admitted

18   criminal liability and there was criminal information out

19   there that was dismissed.  What he got out from under was the

20   fact that if he didn't comply with these terms and conditions

21   he would be prosecuted.  And he didn't comply with the terms

22   and conditions, and he wasn't prosecuted.

23             MR. SCOTT:  Your Honor, I think that basically what

24   Mr. Peters doesn't like is the terms of the Deferred

25   Prosecution Agreement.  Because all that's happened is this

1    dismissal has proceeded as required by the Deferred

2    Prosecution Agreement.  And frankly just as I listen to the

3    argument, I don't know that there's really anything to submit

4    to you.

5            You can look at the Deferred Prosecution Agreement,

6    it's docket number 225, I think item Exhibit 15 to that

7    submission.  It tells you what the terms are.  We're not

8    disputing that the charges were dismissed against him.  We can

9    perhaps send a copy to the Clerk, just e-mail a copy of the

10   dismissal to the Clerk so that the Court has that.  There's no

11   debate about the fact that the charges were dismissed and that

12   this -- I mean, and the agreement speaks for itself as to

13   whether that was appropriate and whether the -- you know, if

14   there's a continuing obligation to pay.

15           MR. PETERS:  No, what I don't like --

16           MR. SCOTT:  And the Defendants have -- just let me

17   finish, please.  The Defendants already have record of -- in

18   the materials that we gave them, records of the fact that

19   payments were being made by Mr. Landis under that Deferred

20   Prosecution Agreement to the extent that he had the ability to

21   do so.  So that information is there.  Going into his tax

22   returns to examine whether he made five dollars more or less,

23   you know, that's --

24           THE COURT:  But is he still fulfilling his

25   obligations to repay?

1          MR. SCOTT:  Right, exactly.

2          THE COURT:  Is he I'm asking?  Has he met the

3     schedule?

4          MR. SCOTT:  Yes, he has been.  He's been paying --

5     he's followed the line and letter of this agreement to the

6     extent he's had the ability to pay.  You know, he hasn't

7     exactly been in the greatest economic shape, but he's done

8     what he has been charged to do and more.

9          THE COURT:  Well, isn't that precisely why they want

10    the tax returns?  I mean, I need to look at this, but if he

11    has a schedule of payments to make and he hasn't met that

12    schedule based on financial hardship, why wouldn't it be

13    relevant to show that he actually does have the money to pay

14    based on his income?

15         MR. PETERS:  Precisely.

16         MR. SCOTT:  Because we're talking about whether or

17    not there was some sort of a deal done with the Government.

18    That's their argument is that there's been some sort of a side

19    deal or some sort of arrangement, and that's not necessary

20    from the tax returns.  You can just see what was represented

21    in the correspondence between the Relator and the Government,

22    you don't need his tax returns for that.

23         THE COURT:  Okay, I see the issue now.  No need to

24    submit anything, I'll look at the DPA and we'll get something

25    out to you all.

1          MR. PETERS:  And your Honor, just one thing -- this

2    is Elliot Peters.  From the documents I've seen, Mr. Landis

3    has in the three years of this DPA made one $10,000 payment

4    and that was it.

5          THE COURT:  Okay.

6          MR. SCOTT:  That's not accurate, he's made more than

7    that.  You haven't looked at it carefully enough.

8          THE COURT:  Okay, folks.  Have a good day.

9       (Proceedings adjourned at 1:20 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2

3            I, Jeff M. Hook, CSR, RPR, certify that the

4    foregoing is a correct transcript from the record of

5    proceedings in the above-entitled matter.

6

7

8

9    Date: September 30, 2015      _____

10                                 Jeff M. Hook, CSR, RPR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25