**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|   |   |
|---|---|
| **UNITED STATES <u>ex rel.</u> LANDIS**, | |
| Plaintiffs, | |
| v. | Case No. 1:10-cv-00976 (CRC) |
| **TAILWIND SPORTS CORP., <u>et al.</u>**, | |
| Defendants. | |

<u>**MEMORANDUM OPINION**</u>

Former professional cyclist Floyd Landis filed this False Claims Act ("FCA") *qui tam* action against Lance Armstrong—his former teammate on the U.S. Postal Service ("USPS") cycling team—and a host of associated defendants. Landis ("Relator") alleged that the defendants had wrongly obtained and retained money under a Sponsorship Agreement with USPS by concealing the team's use of performance-enhancing drugs. The Government intervened against Armstrong but has thus far declined to do so against his longstanding business representatives William Stapleton and Barton Knaggs, and their company, Capital Sports & Entertainment Holdings, Inc. (collectively, "CSE Defendants").

While the case was still in the early stages of discovery, the CSE Defendants moved for summary judgment on the five counts that remain against them. Four of these counts relate to "direct" false claims, while the other alleges a series of "reverse" false claims. Direct false claims cause the United States to remit money directly to claimants, whereas reverse false claims facilitate the improper withholding of money or property to which the United States is legally entitled. Compare 31 U.S.C. § 3729(1)–(2) (2006), with id. § 3729(a)(7) (2006). Direct and reverse false claims are mirror images of one another—both result in a loss to the Government. See <u>United States ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Grp., Inc.</u>, 370 F. Supp. 2d 18, 37 (D.D.C.

2005) (noting that Congress intended § 3729(a)(7) "to treat 'an individual who makes a material misrepresentation to avoid paying money owed to the Government . . . as if he submitted a false claim to receive money'" (quoting <u>United States ex rel. Wilkins v. N. Am. Constr. Corp.</u>, 173 F. Supp. 2d 601, 630 (S.D. Tex. 2001)).  Armstrong has joined those parts of the CSE Defendants' motion pertaining to reverse-false-claim liability.  The Court held a hearing on the motion for summary judgment on December 7, 2015.

Because a genuine issue of material fact exists as to whether any false claims for payment under the Sponsorship Agreement were submitted within the FCA's six-year limitations period, the Court will deny the CSE Defendants' motion as to Relator's Counts 1, 2, 3, and 6 (direct false claims).  But the Court will grant the CSE Defendants' motion with respect to Count 4 (reverse false claims), because the Sponsorship Agreement created no legal obligation to repay USPS any sponsorship fees obtained as a result of materially false statements.  Accordingly, the Court will enter summary judgment in favor of both the CSE Defendants and Armstrong on Count 4 of Relator's Second Amended Complaint.

## I.    Background

### A.    The Sponsorship Agreement, Tailwind, and the CSE Defendants

In 1995 and again in 2000, USPS agreed to sponsor the professional cycling team prominently linked with Lance Armstrong.[1]  The 2000 Sponsorship Agreement ("Sponsorship Agreement") was a contract between USPS and DFP Cycling, LLC, a predecessor of Tailwind Sports Corporation ("Tailwind"), which managed the USPS team.  Under the Agreement and subsequent modifications, USPS was obligated to pay Tailwind sponsorship fees in exchange for

_____

[1]  As explained below, the point at which the Sponsorship Agreement lapsed is a matter of dispute among the parties.

various "Promotional Rights and Activities," including media exposure, the display of USPS's logo on the team's uniforms, and hospitality at major cycling events.  Decl. of Laura Hundley Ritts Supp. Defs.' Mot. Summ. J. ("MSJ") ("Ritts Decl."), Ex. A ("Sponsorship Agreement") 4–6.  The Sponsorship Agreement specified the amount and frequency of lump-sum payments from USPS to Tailwind over a four-year period, but it also contemplated various other "incidental costs" to be allocated between the parties, depending on which promotions were undertaken.  Id. at 7, 9.

In the contract, Tailwind's predecessor represented to USPS that "each rider on the Team has a moral[] turpitude and drug clause that allows the Company to suspend or terminate the rider" for reasons such as failure to abide by the rules of international cycling organizations, "failure to pass drug or medical tests," or "inappropriate drug conduct prejudicial to the Team, or the Postal Service, which is in violation of the Team rules or commonly accepted standards of morality."  Id. at 5.  The "Company agree[d] to take appropriate action within thirty (30) days" in the event of such behavior.  Id.  The Sponsorship Agreement itself did not obligate Tailwind to return any funds received during periods of noncompliance, but it did authorize USPS to "immediately terminate" the contract, and recognized its right to "exercise any . . . right or remedy available to it under law or in equity," upon the occurrence of a specified Event of Default.  Id. at 4.  Two such events were Tailwind's "fail[ure] to take immediate action . . . in a case of a rider or Team offense related to a morals or drug clause violation," and "negative publicity associated with an individual rider or team support personnel, . . . due to misconduct such as but not limited to, failed drug or medical tests, alleged possession, use or sale of banned substances, or a conviction of a crime."  Id.



[2] CSE was responsible for submitting Tailwind's invoices for sponsorship fees to USPS during the time period relevant to the present motion.  Ritts Decl. ¶ 2.

Stapleton and CSE began acting as Armstrong's business agents in 1995 and 2001, respectively.  Decl. of William Stapleton Supp. Defs.' MSJ ("Stapleton Decl.") ¶ 3; Decl. of Barton B. Knaggs Supp. Defs.' MSJ ("Knaggs Decl.") ¶ 3.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Knaggs began acting as Armstrong's business manager in 2004. Knaggs Decl. ¶ 3.  Stapleton and Knaggs were both principals of CSE throughout the sponsorship period, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Stapleton Decl. ¶ 1; Knaggs Decl. ¶ 3; ▮▮▮▮▮▮▮▮▮

B.   <u>Prior Proceedings in This Case</u>

Relator filed this *qui tam* action in June 2010 against Lance Armstrong and several other individuals and entities associated with the USPS professional cycling team.  Relator's Second Amended Complaint included four counts (5 through 8) based on the FCA as amended by the Fraud Enforcement and Recovery Act ("FERA") of 2009, Pub. L. No. 111-21, 123 Stat. 1617 (2009), and four counts (1 through 4) based on the pre-2009 version of the FCA.  Relator's pre-FERA counts

---

[2]  The Court has redacted certain information from the publicly filed version of this opinion based on exhibits that Relator has filed under seal.  The Court will order Relator to show cause within seven days why these redactions should not be removed.

alleged that all defendants knowingly submitted, or caused to be submitted, false or fraudulent claims for payment under the Sponsorship Agreement, in violation of 31 U.S.C. § 3729(a)(1) (Count 1); knowingly made or used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States, in violation of § 3729(a)(2) (Count 2); conspired to defraud the United States by getting false or fraudulent claims allowed or paid, in violation of 31 U.S.C. § 3729(a)(3) (Count 3); and avoided the obligation to return funds paid by the United States by concealing and failing to disclose the USPS team's doping, in violation of § 3729(a)(7) (Count 4).  Am. Compl. ¶¶ 239–58.  In February 2013, the Government intervened against Armstrong and certain other defendants but declined to intervene against the CSE Defendants.[3]

In June 2014, the Court granted in part and denied in part several defendants' motions to dismiss Relator's Second Amended Complaint in an opinion issued by Judge Wilkins, who previously presided over the case.  Mem. Op. June 19, 2014, ECF No. 174.  The Court initially held that 31 U.S.C. § 3731(b)(1)'s six-year statute-of-limitations period applied to all of Relator's claims.  Id. at 30.  The Court then dismissed Counts 5, 7, and 8 as to all defendants (including the CSE Defendants and Armstrong), id. at 44, 81, and held that Relator could recover under Counts 1, 2, 3, and 6 only for "direct" false claims submitted after June 10, 2004 (within the six-year limitations period), id. at 30.[4]  The Court further denied the CSE Defendants' motion to dismiss as to Count 4, brought under the pre-FERA reverse-false-claim provision.  That provision imposed

---

[3]  Relator and the CSE Defendants reached a proposed settlement in December 2014, but the United States withheld its consent, which the FCA requires for settlements between relators and non-intervened defendants.  Mem. Op. Apr. 9, 2015, ECF No. 309.

[4]  Count 6, brought under the FCA as amended by FERA, alleged that all defendants "knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims."  Am. Compl. ¶ 266.

liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7). The Court identified three key questions with respect to Count 4: First, can the alleged breach of a government contract—here, the Sponsorship Agreement—ever impose an "obligation" on the breaching party to reimburse the Government for money previously awarded under the contract? Second, would the alleged doping on the part of the USPS riders have generated an indebtedness sufficiently certain to constitute such an "obligation"? And third, can a person or entity that does not itself owe the obligation be liable for a reverse false claim?

The Court first held that the statutory term "obligation" "encompasses a breach of a government contract and the attendant obligation to repay the government." Mem. Op. June 19, 2014, at 63. The Court determined that the D.C. Circuit had not addressed the issue, and went on to agree with the Sixth Circuit's conclusion that "'obligation' certainly includes those arising from acknowledgments of indebtedness, final judgments, and breaches of government contracts." Id. (quoting Am. Textile Mfrs. Inst. v. The Limited, Inc., 190 F.3d 729, 741 (6th Cir. 1999)). The Court further observed that the Sixth Circuit must have been referring to *alleged* breaches of government contracts, because if it had intended to limit its statement only to adjudicated breaches resulting in monetary judgments, it would have been redundant to mention both final judgments and breaches of contracts. Id. at 64.

But not every alleged breach of contract with the Government gives rise to a reverse-false-claim "obligation," the Court reasoned. Instead, "the allegations must be sufficiently weighty to show that the defendant owes to 'the government an obligation sufficiently certain to give rise to an action of debt at common law.'" Id. (quoting Am. Textile, 190 F.3d at 736). The Court found that such an obligation is triggered by a "total breach"—"the breach of a core, vital material term that

6

defeats the purpose of the contract." Id. at 65.  When a contract is breached in this way, "the injured party can obtain restitution of some or all monies paid to the breaching party as a remedy." Id.  (citing Farnsworth on Contracts § 12.20 (3d ed. 2004); Corbin on Contracts § 61.2 (revised ed. 2012); 26 Williston on Contracts § 68:2 (4th ed.)).  By this reasoning, the indebtedness created by a "total" breach exists entirely apart from a later decision to seek restitution through the coercive machinery of the judicial process.  The breaching party is legally obligated to return payments made under the contract until the applicable statute of limitations has expired, whether or not the Government ever brings suit.

Second, the Court held that the doping activity alleged in this case "would constitute a breach of contract with the Postal Service that would create a potential liability . . . sufficiently certain to constitute an 'obligation'" under the FCA.  Id. at 66.  Both the 1995 and 2000 Sponsorship Agreements, after all, mandated compliance with the governing rules of various cycling organizations, which expressly prohibited certain performance-enhancing substances and practices.  Id. at 65.  In the 2000 Agreement, Tailwind's predecessor even "represent[ed] that each rider on the Team has a moral[] turpitude and drug clause" allowing it to suspend or terminate a rider for (among other things) "inappropriate drug conduct prejudicial to the Team, or the Postal Service, which is in violation of Team rules or commonly accepted standards of morality."  Id.

The Court gave additional reasons why doping by USPS riders would "be a total breach of the contracts."  Id. at 66.  "[T]he Postal Service's reputation and goodwill," it concluded, would be "seriously damaged by an association with a team that is faster because it cheats."  Id.  The anti-doping regulations incorporated by reference were therefore a "core term of the contracts, because the negative publicity associated with doping defeats the essential purpose of the venture (from the sponsor's perspective)."  Id.  USPS had also sought to maximize its marketing exposure through the cycling team's participation in as many races and promotional events as possible.  But because "a

team that cannot race cannot generate positive publicity for its sponsor," rider doping—culminating in failed blood tests, suspensions, and bans—would have destroyed "a core benefit of the bargain for the Postal Service." Id. at 67. For all these reasons, the alleged doping "would have been a total breach" of the Sponsorship Agreement, enabling the Government to seek "restitution—repayment of the sponsorship fees—as a remedy." Id. at 68. Such conduct therefore generated an "obligation sufficiently certain to give rise to an action of debt at common law." Id. (quoting Am. Textile, 190 F.3d at 736).

In relation to these first two issues, the Court rejected the CSE Defendants' argument that any breach of the Sponsorship Agreement was merely a *contingent* obligation (one incapable of creating reverse-false-claim liability) because it depended on the Government exercising its discretion to seek damages or repayment in restitution for breach of the Sponsorship Agreement. The Defendants' argument—that a final judgment or an acknowledgment of indebtedness was necessary to ripen Tailwind's alleged breach into an "obligation"—"prove[d] too much," because otherwise a breach of contract could never create an "obligation" in the absence of a demand or a lawsuit. Id. In the Court's view, this result could "[]not be squared with the language or the purpose of the statute." Id. It would also have the pernicious effect of "allowing those with knowledge of contractual breaches or other non-compliance to make false statements about those matters, without penalty, unless and until the government files a lawsuit." Id. at 68–69.

Lastly, the Court rejected Defendant Armstrong's argument that Tailwind alone could be liable for reverse false claims given that no other defendant had contracted with the United States. As the Court noted, some authorities seem to suggest that only a defendant who personally owed an obligation to the Government can be subject to reverse-false-claim liability. See id. at 69–70. The Court nonetheless focused on the FCA's text, which speaks of "decreas[ing] *an* obligation to pay or transmit money or property to the Government" rather than a defendant's "own obligation." Id. at

8

71 (quoting 31 U.S.C. § 3729(a)(7)) (emphasis in original); see id. (emphasizing "Congress's use of the indefinite article").  The Court cited a Fifth Circuit decision for this proposition.  See United States v. Caremark, Inc., 634 F.3d 808, 817 (5th Cir. 2011) ("The statute does not require that the statement impair the *defendant's* obligation; instead, it requires that the statement impair '*an* obligation . . . .'").[5]

C.     The Present Motion for Summary Judgment

The CSE Defendants move for summary judgment on Relator's remaining claims: Counts 1, 2, 3, 4, and 6.  They contend that the direct-false-claim counts (Counts 1, 2, 3, and 6) are time-barred under 31 U.S.C. § 3731(b)(1)'s six-year statute of limitations.  Mem. Supp. Defs.' MSJ ("Mem. Supp. MSJ") 8.  Relator filed his original complaint on June 10, 2010.  Although the parties agree that Tailwind made four claims for payment to USPS after June 10, 2004, the CSE Defendants maintain that the resulting payments were reimbursements for "hospitality-related expenses" that "had nothing to do with the Sponsorship Agreement," which they say ended before the four claims for payment were made.  Id. at 8–9.  Relator counters that, at the very least, a genuine issue exists as to whether the Sponsorship Agreement contemplated these claims and whether the Agreement was still in effect when they were submitted.  Relator's Opp'n Defs.' MSJ ("Relator's Opp'n") 16, 18.

The CSE Defendants, joined by Armstrong, also urge the Court to grant summary judgment as to Count 4, which is grounded in a reverse-false-claim theory.  They contend—contrary to the

---

[5]  The Court also acknowledged that "reasonable questions may remain, such as what if any relevance should be placed on the relationship of the putative defendant to the obligation of the obligor, and under what circumstances should the putative defendant bear liability for the entire obligation or just a portion thereof."  Mem. Op. June 19, 2014, at 71.  But it believed that "any such questions are best answered in specific context and after further development of the facts."  Id.

Court's June 2014 Memorandum Opinion—that the mere breach of a government contract that enables the United States to sue for repayment cannot create an "obligation" within the meaning of § 3729(a)(7), Mem. Supp. MSJ 15, and that even if such an obligation existed, it belonged only to Tailwind, as the party to the Sponsorship Agreement, id. at 20. The CSE Defendants further contend that Relator has not identified a single actionable false statement by Stapleton, Knaggs, or CSE, and that any statement made by the CSE Defendants was not made with the intent of avoiding an obligation to repay the United States. Id. at 24–26.

## II.     Standard of Review

A party is entitled to summary judgment if the pleadings and other materials in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, [or] interrogatory answers," show that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law." Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). An issue is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on a particular claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The ultimate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251–52.

When reviewing a motion for summary judgment, courts "view the evidence in the light most favorable to the nonmoving party and draw all inferences in its favor." Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 850 (D.C. Cir. 2006). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions" and thus

inappropriate for "a judge at summary judgment." Barnett v. PA Consulting Grp., Inc., 715 F.3d

354, 358 (D.C. Cir. 2013) (quoting Pardo–Kronemann v. Donovan, 601 F.3d 599, 604 (D.C. Cir.

2010)).  A party seeking to defeat summary judgment cannot rest merely on its pleadings; it must

support its opposition with depositions, affidavits, declarations, or other evidence setting forth

specific facts that reveal a genuine issue for trial.  Fed. R. Civ. P. 56(c).

### III.    Analysis

#### A.    Counts 1, 2, 3, and 6: Direct False Claims

The parties agree that Tailwind submitted four claims for payment to USPS within the

FCA's applicable six-year limitations period.[6]  Relator also does not dispute the CSE Defendants'

contention that these four claims—one made on June 30, 2004, two on August 30, 2004, and one on

September 17, 2004—were largely for "reimbursement of certain Postal Service hospitality-related

expenses that had been advanced by Tailwind."  Mem. Supp. MSJ 5.  The parties disagree,

however, as to whether these four claims were false or fraudulent so as to be actionable under the

FCA.  See, e.g., 31 U.S.C. § 3729(1) (2006) (imposing liability on any person who "knowingly

presents, or causes to be presented, to an officer or employee of the United States Government or a

member of the Armed Forces of the United States a false or fraudulent claim for payment or

approval").

The Court notes at the outset that the CSE Defendants' precise argument on this point has

been somewhat of a moving target.  In their motion for summary judgment, they explicitly

"accept[ed]" for present purposes that Tailwind's "claims for payment under the Sponsorship

Agreement were false or fraudulent."  Mem. Supp. MSJ 8 n.3.  But they contended that the four

---

[6]  As discussed below, Relator argues that a genuine issue exists as to whether two additional claims
were submitted after June 10, 2004.

hospitality payments noted above "were not made in connection with the Sponsorship Agreement" and "had nothing to do with the Sponsorship Agreement." Id. at 9. The CSE Defendants seem to have walked back each point. They now concede that the Sponsorship Agreement at least "covered the idea of a reimbursement payment." Dec. 7, 2015 Hr'g Tr., ECF No. 463, at 22. But they maintain that "the claims for reimbursement of expenses fronted by Tailwind were neither false nor fraudulent." Reply Supp. MSJ 24–25. This is so, they contend, because the four reimbursement payments—even if explicitly contemplated by the Sponsorship Agreement—"were not sponsorship fees." Hr'g Tr. 22. In advancing this argument, the CSE Defendants appear to be drawing a distinction between the quarterly lump-sum payments spelled out in the Agreement, see Sponsorship Agreement 9, and other types of payments that the Agreement obligated USPS to make.

The Court fails to see the relevance of this distinction to false-claim liability. The Court's previous Memorandum Opinion held that claims for payment submitted to USPS could qualify as "false under the theory of implied certification." Mem. Op. June 19, 2014, at 54 (citing United States v. Science Applications Int'l Corp., 626 F.3d 1257, 1266 (D.C. Cir. 2010) ("SAIC")). The Court will not revisit this determination because the CSE Defendants have offered no persuasive reason to believe that if USPS had known that Tailwind breached the Agreement's anti-doping provisions, it would have been willing to make some payments specifically contemplated by the instrument, but not others.[7] With that distinction aside, resolution of the CSE Defendants' motion

---

[7] In holding that the USPS team's alleged drug use alone did not obligate Tailwind to return any sponsorship payments, see Part III.B.2 infra, the Court does not question Judge Wilkins's holding that the doping alleged by Relator would have constituted a "total" breach of the Sponsorship Agreement enabling the United States to sue in restitution. So the Sponsorship Agreement's anti-doping provisions were certainly a "material contractual requirement[]" under SAIC's test for implied certification. SAIC, 626 F.3d at 1269.

turns on whether a reasonable jury could conclude that the four claims for reimbursement payments were made under the Sponsorship Agreement.  As explained below, the Court finds that, at the very least, a genuine dispute exists as to that question.  A reasonable jury could also conclude, based on the available evidence, that Tailwind submitted two additional actionable claims to USPS after September 2004.  The Court will therefore deny the CSE Defendants' motion as to Counts 1, 2, 3, and 6.

> 1. <u>Whether the Four Acknowledged Claims for Reimbursement Payments Were Made Under the Sponsorship Agreement</u>

The CSE Defendants contend that Tailwind's claims for the four hospitality reimbursement payments were not made under the Sponsorship Agreement because (1) they were made after the Sponsorship Agreement had ended, and (2) they "had nothing to do with" the core subject matter of the Agreement.  Mem. Supp. MSJ 9.  The Court considers each argument below.

> a. <u>When Did the Sponsorship Agreement End?</u>

The CSE Defendants contend that the four post–June 2004 claims were made "after the Sponsorship Agreement had ended," <u>id.</u> at 8, which in their view happened "on or around June 2004," Defs.' MSJ Statement of Undisputed Material Facts ("SOF") ¶ 14; <u>see also</u> Hr'g Tr. 17 (claiming that "late 2003" fell within the "last six months or so of the agreement").  These statements are conclusory, and the CSE Defendants have made no effort to support them with facts outside the pleadings.  Nor have they acknowledged ample contrary documentary evidence.

To begin, the 2000 Sponsorship Agreement provided that its terms would "be effective . . . through December 31, 2004 unless terminated earlier as set forth in this Agreement."  Sponsorship Agreement 1.  The "end date c[ould] be extended upon mutual agreement," <u>id.</u>, and the Agreement could also be terminated upon a specified Event of Default or if Tailwind or its riders were found guilty of a felony, <u>id.</u> at 4.  The CSE Defendants do not argue that either party terminated the

contract.  On the contrary, it appears that USPS and Tailwind extended the duration of the Sponsorship Agreement beyond 2004 through a series of written modifications.  And most of the modifications that did not extend the Agreement's effective period plainly recognized that it was scheduled to end after the four post–June 2004 claims were made.

For example, Modification No. 4 (issued in March 2003) identified "the end of the contract" as falling on "12/31/04."  Scott Decl., Ex. 12, at 2.  Modification No. 5 (issued on June 24, 2004) tells a similar story.  That document was meant to "serve as a notification that the Sponsorship Agreement will not be extended beyond December 31, 2004," but it clarified that "[t]he existing terms and conditions of the Sponsorship Agreement will remain in effect until Dec. 31, 2004."  Id. at 7.  Modification No. 8 (issued in January 2005) "extend[ed] the contract end date to May 31, 2005," and Modification No. 9 (issued in March 2005) "extend[ed] the contract to December 31, 2006."  Id. Ex. 13, at 2–3.  Modifications No. 10 and 11 (both issued in May 2006) similarly specified that the "Period of Performance" would end on "12/31/2006."  Id. at 5, 7.  Lastly, Modification No. 12 (issued on March 16, 2009) indicated that "all services have been received and payments have been made . . . . [T]he contractor releases the USPS from any future claims arising under the contract and the contract is complete."  Id. at 8.  A letter sent from USPS to Tailwind on that date likewise declared that "performance under referenced contract is completed.  Consequently, this contract will be closed in its entirety pending any outstanding issues."  Id. at 10.  Each of these modifications referenced the same Contract Number (102592-01-F-0858, or 10259201F0858) that appears in USPS's Accounts Payable Detail in conjunction with large lump-sum payments that were concededly made under the Sponsorship Agreement.  See Scott Decl., Ex. 11, at 2–3.

Based on these records, whose authenticity the CSE Defendants do not question, the Court concludes that Relator has raised a genuine issue as to whether the Sponsorship Agreement

remained in effect at the time that Tailwind made four claims for payment to USPS in June, August, and September 2004.

> ### b. Were the Four Claims for Payment Contemplated by the Sponsorship Agreement?

Even if these four claims for payment somehow predated the Sponsorship Agreement's termination, they cannot have been "false or fraudulent" (and thus actionable under the FCA) unless the Agreement contemplated them. The CSE Defendants contend that the June, August, and September 2004 claims "d[id] not relate to the Sponsorship Agreement" but were instead principally "reimbursements for certain hospitality-related expenses that had been advanced by Tailwind on behalf of the Postal Service." Mem. Supp. MSJ 8; see also id. at 9 ("They were not for sponsorship fees and had nothing to do with the Sponsorship Agreement."). The CSE Defendants cannot ward off FCA liability through the force of assertion. Given that they have not even attempted to demonstrate why the kinds of promotional and hospitality-related expenses covered under the Sponsorship Agreement would not encompass the four acknowledged timely claims, there is at least a genuine issue as to whether these claims were contemplated by the Agreement. And as the Court has already concluded, there is no meaningful distinction between contractual lump-sum payments and all other payments made under the Sponsorship Agreement.

Tailwind's invoices described the four claims as follows:

(1) *June 30, 2004 Claim for Payment* ($28,192.83): "Downers Grove Hospitality & USPS Team Media Guides," "NYC VIP Hospitality," and "Reimbursement owed to Tailwind." Ritts Decl., Ex. D, at 2.

(2) *First August 30, 2004 Claim for Payment* ($10,000): "Sponsorship of Lance Armstrong- Victory #6 Celebration." Id. Ex. E, at 2. (The CSE Defendants characterize this payment as a "financial contribution the Postal Service made for a party in Austin, Texas." Defs.' MSJ SOF ¶ 24.)

(3) *Second August 30, 2004 Claim for Payment* ($14,000): "San Francisco Grand Prix – Hospitality Deposit." Ritts Decl., Ex. F, at 2.

(4)  *September 17, 2004 Claim for Payment* ($15,977.62):  "Balance of money due from SF VIP tent" and "Balance of money due from Downers Grove Event."  <u>Id.</u> Ex. G, at 2.

The "Description" field for each of these invoices indicated that the expenses pertained to the "United States Postal Service Pro Cycling Team."  Each invoice was also addressed to "United States Postal Service, Attn: Joe Porporino."  Porporino was USPS's sponsorship director during this time.  Ritts Decl. ¶ 6.  USPS's "Accounts Payable Detail" worksheet also strongly suggests that these four claims were submitted pursuant to the Sponsorship Agreement.  That document itemizes forty payments made from January 10, 2001, until October 20, 2004.  <u>See</u> Scott Decl., Ex. 11, at 2–3.  Only sixteen of these were quarterly lump-sum payments whose amount had been predetermined when the contract was signed.  <u>See</u> Sponsorship Agreement 9.  Yet according to USPS's records, all forty payments related to the same Contract Number: 10259201F0858.  Scott Decl., Ex. 11, at 2–3.  And finally, Modification No. 12—the 2009 document that seemingly closed out the Sponsorship Agreement—reflected that a cumulative total of "$31,442,262.57 ha[d] been paid under the said contract to Tailwind Sports Corporation."  Scott Decl., Ex. 13, at 9.  This figure corresponds precisely with the overall amount that USPS's Accounts Payable Detail records USPS as having paid to Tailwind from 2001 to 2004.  <u>Id.</u> Ex. 11, at 2–3.  These copious clues are more than enough to allow a reasonable jury to infer that the June, August, and September 2004 claims for payment were contemplated by the Sponsorship Agreement.

The text of the Agreement itself further supports this allowable inference.  The late-2004 payments collectively covered reimbursements for hospitality expenses advanced for the Downers Grove, New York City, and San Francisco cycling races.  Section 9(a) of the Sponsorship Agreement provided that Tailwind would annually "maximize [USPS's] exposure" at the "Downer's Grove event and Company sponsored San Francisco race event,"

16

among others, through such methods as "on-site hospitality."  Sponsorship Agreement 5.

Under § 9(b), Tailwind was to "provide hospitality at . . . leading domestic races in top

markets such as Los Angeles, Philadelphia, Chicago, Houston, Boston, Austin and San

Francisco."  Id. at 6.  These provisions belie the CSE Defendants' suggested dichotomy

between hospitality-related reimbursements and payments made under the Sponsorship

Agreement.

The parties' modifications to the Sponsorship Agreement also tend to show that the

contract between Tailwind and USPS envisaged the very hospitality expenses referenced in

the final four invoices.  Modification No. 4 (issued in March 2003), which added $75,000 to

the contract amount, amended § 9(b) to require Tailwind to "provide hospitality at . . . leading

domestic races such as Philadelphia, New York, and San Francisco."  Scott Decl., Ex. 12, at 3.

This modification detailed what type of hospitality Tailwind would provide for each race—a

VIP reception and team dinner for San Francisco, and a team dinner for New York—and the

number of guests USPS could invite to each.  See id. at 3–4.  Even if the Downers Grove

event had not been mentioned by name in the original Agreement, it could well have fallen

under another of the modification's insertions:  "Tailwind will help coordinate VIP hospitality

services for eight (8) to 10 racing events that are geared around any of the USPS Pro Cycling

Events . . . the Postal Service team competes in."  Id. at 4.[8]  The precise hospitality services to

be provided would not necessarily appear in later contract modifications.  Instead,

"[a]dvance[] notification will be provided to Tailwind for these additional events."  Id.

---

[8]  In a similar vein, Modification Five (issued in August 2003) added $100,000 to the Sponsorship
Agreement to "fund FY04 VIP hospitality services (VIP trailers w/catering) for eight (8) to 10
racing events that are geared around any of the USPS Pro-Cycling events . . . the Postal Service
team competes in."  Id. at 5.

Relator has also raised a genuine issue as to whether Tailwind's claims for

reimbursement for USPS team media guides and the Austin, Texas victory celebration were

contemplated by the Sponsorship Agreement.  Section 9(b) of the Agreement provided that

Tailwind would "provide media exposure in, but not limited to, television, print, and cross

promotions."  Sponsorship Agreement 6.  Media guides, it would seem, qualify as one type of

print promotion. The parties also agreed that USPS would generally be responsible for the

"cost to produce Sponsor['s] sales and promotional materials."  Id. at 6–7; see also id. at 9

("Sponsor shall pay for all sales and promotional materials which may be distributed by its

representatives or at its request at events.").  So it makes sense that Tailwind would have

requested reimbursement for promotional expenses it had advanced.  And although victory

celebrations were not explicitly mentioned in the Agreement or associated modifications, a

reasonable jury could conclude that such an event—which may also have been intended to

enhance USPS's goodwill, reputation, and marketing exposure—was a type of "promotional

activit[y]" or "media exposure" covered under the Agreement.  Id. at 6.  After all, each of

these invoices was submitted to USPS's sponsorship director, was described (by Tailwind) as

pertaining to the "United States Postal Service Pro Cycling Team," and bore the same contract

number as the quarterly lump-sum payments in USPS's Accounts Payable Detail.

## 2. Did Tailwind Submit Any Other Non-Time-Barred Claims?

Lastly, Relator presents evidence that Tailwind submitted two additional claims for payment

under the Sponsorship Agreement after September 2004.  He does not contend that USPS actually

paid these amounts—only that the act of submitting these non-time-barred claims violated the

FCA's direct-false-claim provision, as well.  The Court has already found that a reasonable jury

could conclude that the Sponsorship Agreement was still in effect after the September 17, 2004

claim for payment.  For the reasons explained below, it also concludes that Relator has raised a genuine issue as to whether additional Sponsorship-related claims were submitted after that date.

Modification No. 8 extended the Agreement's end date to May 31, 2005 "to allow for payment of final two invoices."  Scott Decl., Ex. 13, at 2.  A January 24, 2005 letter from a USPS sales manager to Defendant Stapleton sheds light on what these invoices entailed.  The letter opened by mentioning "some pending issues around the 2004 contract" between CSE and USPS. Id. Ex. 15, at 3.  According to this letter, USPS had received an "invoice in the amount of $150,000 for the 2004 Team Bonus" and "invoices for approximately $45,000 for attendance at the 2004 Tour de France."  Id.  USPS "intend[ed] to delay payment of these invoices" until Tailwind had satisfied all of its contractual obligations.  Id.  Stapleton closed his February 21, 2005 reply letter by saying that "I look forward to . . . receiving your final payments due to Tailwind."  Id. at 2. Moreover, Tailwind's Accounting Manager wrote to USPS's sponsorship director on January 6, 2006 to request "direct confirmation of amounts owed to us as of December 31, 2005"— information sought by Tailwind's auditors.  Id. Ex. 16, at 2.  Tailwind's representative claimed that "[o]ur records on December 31, 2005 showed invoice 11/30/04-9 totaling $150,000 as receivable from you."  Id.  Records from both contracting parties thus strongly support Relator's theory that Tailwind submitted additional claims to USPS after September 17, 2004.

A reasonable jury could also conclude that both claims were contemplated by the Sponsorship Agreement.  Section 9(b) of that Agreement required Tailwind to "customize a complete VIP hospitality program for selected guests of the Sponsor at the Tour de France." Sponsorship Agreement 6.  Modification No. 4 clarified that Tailwind would advance the necessary expenses for hospitality at the Tour and "bill back those charges to the United States Postal Service."  Scott Decl., Ex. 12, at 3.  And Exhibit A to the Sponsorship Agreement provided that "[a] bonus pool not to exceed $150,000 in FY04 is in effect for the riders.  The supplier may invoice for

bonuses after they are earned per the rider's [*sic*] contracts." Sponsorship Agreement 9. The Court therefore finds that Relator has—at a minimum—raised a genuine issue as to whether Tailwind submitted two claims for payment after September 2004, and whether these claims would have arisen under the Sponsorship Agreement.

In sum, a reasonable jury could conclude that one or more non-time-barred direct false claims were submitted to USPS under the Sponsorship Agreement. The Court will accordingly deny the CSE Defendants' motion for summary judgment as to Counts 1, 2, 3, and 6.

>	B.	Count 4: Reverse False Claims

The CSE Defendants next contend that Relator cannot establish a reverse false claim under 31 U.S.C. § 3729(a)(7). They (and Armstrong) argue—just as in their previous motions to dismiss—that a breach of a contract that recognizes the Government's right to sue for repayment, but does not itself require the transmission of money or property to the Government, cannot generate a statutory "obligation." The Court rejected this theory in its Memorandum Opinion of June 19, 2014; on this point, the CSE Defendants' motion for summary judgment is effectively a motion for reconsideration of the Court's prior legal ruling. Upon considerable further review, the Court is persuaded that Tailwind's alleged breach of the Sponsorship Agreement did not create a statutory "obligation." It will therefore grant the CSE Defendants' motion for summary judgment as to Relator's Count 4, a reverse-false-claim count brought under § 3729(a)(7).

>	1.	Law-of-the-Case Principles

The parties spar over what degree of deference (if any) the Court should accord to Judge Wilkins's prior Memorandum Opinion. Under the so-called "law of the case" doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Arizona v. California, 460 U.S. 605, 618 (1983). The CSE Defendants rightly note that the doctrine, as such, does not apply to interlocutory orders such as the

denial of a motion to dismiss.  Langevine v. District of Columbia, 106 F.3d 1018, 1023 (D.C. Cir.

1997).  Under Rule 54(b), then, the Court's earlier decision "may be revised at any time before the

entry of a [final] judgment."  Fed. R. Civ. P. 54(b).  Technically speaking, the Court is "free to

reconsider" its analysis on the reverse-false-claim issue in all respects.  Filebark v. Dep't of Transp.,

555 F.3d 1009, 1013 (D.C. Cir. 2009); see also Langevine, 106 F.3d at 215 (explaining that

interlocutory orders "may always be reconsidered prior to final judgment . . . even when a case is

reassigned to a new judge"); Wultz v. Islamic Republic of Iran, 762 F. Supp. 2d 18, 23 (D.D.C.

2011) ("[A] court has wide discretion in deciding a motion for reconsideration and can revise its

earlier decision if such relief is necessary under the circumstances." (alteration in original) (quoting

United States v. Second Chance Body Armor, Inc., 709 F. Supp. 2d 52, 55 (D.D.C. 2010))).

But "this is not to say that district courts should take lightly reconsideration of the orders of

their colleagues."  Moore v. Hartman, 332 F. Supp. 2d 252, 256 (D.D.C. 2004).  Although Rule

54(b) does not specify the standard of review applicable to motions for reconsideration of

interlocutory orders, they should be reconsidered only "as justice requires."  United States v.

Slough, 61 F. Supp. 3d 103, 107 (D.D.C. 2014) (quoting United States v. Coughlin, 821 F. Supp. 2d

8, 18 (D.D.C. 2011)).  That phrase is a doctrinal term of art—in deciding whether "justice requires"

reversal of its prior interlocutory order, a court may consider whether it

> [1] patently misunderstood a party, [2] has made a decision outside the adversarial
> issues presented to the Court by the parties, [3] has made an error not of reasoning
> but of apprehension, or [4] whe[ther] a controlling or significant change in the law
> or facts [has occurred] since the submission of the issue to the Court.

Singh v. George Washington Univ., 383 F. Supp. 2d 99, 101 (D.D.C. 2005).  Under a slightly

different formulation, a court should "grant a motion for reconsideration of an interlocutory order

only when the movant demonstrates: (1) an intervening change in the law; (2) the discovery of new

evidence not previously available; or (3) a clear error in the first order."  BEG Investments, LLC v.

Alberti, 85 F. Supp. 3d 54, 58 (D.D.C. 2015) (quoting Stewart v. Panetta, 826 F. Supp. 2d 176, 177

(D.D.C. 2011)).  So although the law-of-the-case doctrine does not formally apply here, district

courts "should nevertheless be guided by the general principles underlying the doctrine" when

deciding motions for reconsideration of interlocutory orders.  Sloan v. Urban Title Servs., Inc., 770

F. Supp. 2d 216, 224 (D.D.C. 2011).

The CSE Defendants argue that "justice requires" reconsideration of the Court's previous

reverse-false-claim holdings.  They contend both that the Court misread a key D.C. Circuit

precedent that forecloses Relator's theory of obligation, and that it misinterpreted a line of cases

from other jurisdictions that it invoked to support its holding.  After considerable review, the Court

agrees:  Tailwind owed no legal obligation to the United States at the time that any defendants

allegedly made (or caused to be made) false statements to avoid repaying money received under the

Sponsorship Agreement.  Relator may not proceed on this theory of reverse-false-claim liability.[9]

## 2.  Was the United States Owed an "Obligation"?

### a.  Case Law from Other Jurisdictions

The Court's previous opinion cited American Textile, a Sixth Circuit decision, for the

proposition that a breach of a contract with the Government can create an "obligation" within the

meaning of § 3729(a)(7)'s reverse-false-claim provision.  Mem. Op. June 19, 2014, at 63.  Yet in its

first and fullest statement of its holding, American Textile envisioned a very different type of

breach than the one alleged here.  The court explained that § 3729(a)(7) prohibits "making a false

statement to [impair] . . . a *contractual duty to pay* or transmit money or property to the

---

[9]  It is therefore unnecessary to address the CSE Defendants' alternative arguments that only
Tailwind—as party to the Sponsorship Agreement—could be liable for reverse false claims; that
Relator has not identified any false statement that Stapleton, Knaggs, or CSE made, used, or caused
to be made or used; and that any such act was not undertaken with the intent to impair Tailwind's
obligation to the United States.

government." 190 F.3d at 736 (emphasis added).  Here, the Sponsorship Agreement itself did not obligate Tailwind to reimburse the Government upon an Event of Default; rather, it acknowledged USPS's preexisting entitlement to "exercise any other right or remedy available to it under law or in equity."  Sponsorship Agreement 4.  One such means of redress would have been a suit for damages under a breach-of-contract theory.  The Court even assumes for present purposes that the USPS team's alleged doping would have been a total breach of the Sponsorship Agreement, enabling the United States to sue in restitution for the return of all sponsorship payments.  But both of these options would have required the Government to exercise its discretion to sue for repayment.  As the vast majority of courts to have considered the issue have held, "[c]ontingent obligations—those that will arise only after the exercise of discretion by government actors—are not contemplated by the statute."  Id. at 738.

American Textile adopted the reasoning of Q International Courier, Inc. v. United States Postal Service, 131 F.3d 770 (8th Cir. 1997), a seminal decision on the scope of reverse-false-claim liability.  Q International held that "[t]he obligation cannot be merely a potential liability."  Id. at 773.  Instead, "a defendant must have had a present duty to pay money or property that was created by a statute, regulation, contract, judgment, or acknowledgment of indebtedness."  Id.  The court described *these* types of arrangements as "obligation[s] in the nature of those that gave rise to actions of debt at common law."  Id.  Q International spearheaded what became the customary method of analysis in reverse-false-claim decisions: asking what the relevant legal instrument actually obligates a party to do.  Does a contract or generally applicable regulation require an entity to transmit money or property to United States, or just to avoid certain actions?  If monetary liability can arise only after the Government chooses to levy a fine, bring an enforcement action, or sue for repayment, any legal indebtedness is contingent on events that, by definition, did not precede the making or actuation of false statements.  But the United States must have been "owed a

specific, legal obligation *at the time* that" a defendant's allegedly unlawful actions occurred.  Id. (emphasis added).  Under this framework, the mere breach of a contract—even a "total" breach—can never create an "obligation."  Either the contract itself obligates a party to pay or repay the Government, or liability arises only "after the exercise of government discretion" to sue for restitution or damages (and after a court enters a favorable judgment).  Am. Textile, 190 F.3d at 741.

A district court decision cited by Q International drew an apt analogy to tort law to sharpen this fundamental distinction between preexisting and contingent obligations.  "I may negligently cause damage to another in a car accident, but morality aside, I have no tort-based obligation to pay or transmit money to her until she obtains a judgment."  United States ex rel. S. Prawer & Co. v. Verrill & Dana, 946 F. Supp. 87, 94 (D. Me. 1996).  Similarly, "I may breach a contract, but absent a specific remedy provided in the contract, I have no obligation to pay or transmit money to the other contracting party until he obtains a judgment."  Id.  Any other understanding would condition liability on "moral or social duty" rather than "legal obligation."  Id.  In other words, "[e]ven if the government's sanctions for noncompliance could include the ability to sue for reimbursement of previously funded moneys, that potential does not arise to an 'obligation to pay' that would support a reverse False Claims Act claim."  United States ex rel. Graves v. ITT Educ. Servs., 284 F. Supp. 2d 487, 508–09 (S.D. Tex. 2003), aff'd, 111 Fed. App'x 296 (5th Cir. 2004).  Relator thus misses the mark in arguing that an obligation "arises when the breach occurs—even if a government official could subsequently decide to waive or not enforce the existing obligation."  Relator's Opp'n 27.

A considerable body of case law confirms that the Government's ability to pursue reimbursement for overpayments or fraudulently induced payments does not constitute an "obligation."  See Chesbrough v. VPA, P.C., 655 F.3d 461, 473 (6th Cir. 2011) (merely alleging

that the defendant was obligated to reimburse the Government for fraudulent Medicare and

Medicaid payments, without citing a remedial provision to that effect, did not state a claim under

§ 3729(a)(7)); United States ex rel. Mason v. State Farm Mut. Auto. Ins. Co., 398 Fed. App'x 233,

235 (9th Cir. 2010) (a defendant "had no obligation to reimburse Medicare" for allegedly fraudulent

payments, but would "become[] liable to Medicare only when . . . liability is established by

judgment, concession, or other means"); United States ex rel. Quinn v. Omnicare, Inc., 382 F.3d

432, 434 (3d Cir. 2004) (no "obligation" existed because of a "lack of legal authority[] requiring

Medicaid-provider pharmacies to credit Medicaid when a medication is returned for resale");

United States ex rel. Branch Consultants, LLC v. Allstate Ins. Co., 668 F. Supp. 2d 780, 811–12

(E.D. La. 2009) (no "obligation to reimburse the Government" existed without an "agreed or

expected payment" from a defendant to the Government); United States v. Aggarwal, No. 6:03-cv-

117-Orl-31-KRS, 2005 WL 6011259, at *7 (M.D. Fla. Feb. 10, 2005) (the retention of inflated

Medicare payments did not create a "specific legal obligation," as would a "judgment, fine, levy or

contractual obligation"); United States ex rel. Gay v. Lincoln Technical Inst., No. Civ.A.

301CV505K, 2003 WL 22474586, at *5 (N.D. Tex. Sept. 3, 2003), aff'd, 111 Fed. App'x 286 (5th

Cir. 2004) (allegations of a false certification of compliance, and the retention of resulting

payments, failed to establish "a duty or obligation to pay money to the Government"); United States

ex rel. Reagan v. East Tex. Med. Ctr. Reg'l Healthcare Sys., 274 F. Supp. 2d 824, 854–55 (S.D.

Tex. 2003), aff'd, 384 F.3d 168 (5th Cir. 2004) (the retention of "excessive" Medicare payments

created, at most, a "contingent" obligation); United States ex rel. Lamers v. City of Green Bay, 998

F. Supp. 971, 997 (E.D. Wis. 1998), aff'd, 168 F.3d 1013 (7th Cir. 1999) (no "obligation" existed at

a time when the defendant "ma[d]e false representations to protect itself from the possibility that the

[Government], once conscious of the truth, would demand reimbursement of grant monies"); State

ex rel. Bowen v. Bank of America Corp., 126 Cal. App. 4th 225, 242 (2005) (no "obligation"

existed under a state law identical to § 3729(a)(7) because "[t]here [was] no allegation that any of the contracts provided for the specific remedy of disgorgement of the reconveyance fees, or that any judgment was entered to that effect").

The Sponsorship Agreement fits comfortably within this line of cases. As the CSE Defendants rightly note, Tailwind's "purported obligation to pay does not arise under the contract, but rather from an alleged right to recoup previous contractual payments." Mem. Supp. MSJ 13. Other than its prior Memorandum Opinion, the Court has found no decision holding that the breach of a contract with the United States, enabling the Government to sue for reimbursement, qualifies as an "obligation" under § 3729(a)(7). An equally extensive body of case law has affirmed the existence of an "obligation" when a contract, statute, or regulation explicitly contemplated the payment or transmission of money or property to the United States.[10] But it is also black-letter law that one does not incur reverse-false-claim liability by violating, and affirmatively concealing one's violation of, a statute, regulation, or contract that merely authorizes the Government to levy certain fines and penalties. Section 3729(a)(7) simply does not encompass "contingent obligations that arise only because the government has prohibited an act" whose commission *may* generate a

---

[10] See United States ex rel. Matheny v. Medco Health Solutions, 671 F.3d 1217, 1223 (11th Cir. 2012); United States v. Borseau, 531 F.3d 1159, 1170 (9th Cir. 2008); United States v. Pemco Aeroplex, 195 F.3d 1234, 1237 (11th Cir. 1999); United States ex rel. Wuestenhoefer v. Jefferson, No. 4:10–CV–00012–DMB–DAS, 2015 WL 226026, at *24 (N.D. Miss. Jan. 16, 2015); United States ex rel. Holbrook v. Brink's Co., No. 2:13–CV–873, 2015 WL 196424, at *21 (S.D. Ohio Jan. 15, 2015); United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp., No. 04–cv–01224–REB–CBS, 2009 WL 3161828, at *6 (D. Colo. Sept. 30, 2009); United States ex rel. Hunt v. Merck-Medco Managed Care, LLC, 336 F. Supp. 2d 430, 445 (E.D. Pa. 2004); United States v. Raymond & Whitcomb Co., 53 F. Supp. 2d 436, 445–46 (S.D.N.Y. 1999); see also United States ex rel. Coppock v. Northrup Grumman Corp., No. Civ.A. 3:98-CV-2143, 2003 WL 21730668, at *14 (N.D. Tex. July 22, 2003) ("A reverse [false] claim might be available if there were set damages that a contract or statute dictated must be paid . . . . Such established penalties would be obligations comparable to debts at common law.").

relationship of indebtedness if the United States chooses to create one.  Am. Textile, 190 F.3d at

741.[11]  And as one court has observed, "[a] decision . . . that [s]tipulated [p]enalties are

'appropriate' is identical to the decision by any contracting party to sue for a breach."  Ruscher v.

Omnicare Inc., No. 4:08–CV–3396, 2014 WL 4388726, at *5 (S.D. Tex. Sept. 5, 2014).

　　　The Court was previously troubled by the prospect that "a breach of contract could never be

an 'obligation' until a formal demand was made or a lawsuit initiated," which it thought "cannot be

squared with the language or the purpose of the statute."  Mem. Op. June 19, 2014, at 68.  This

misgiving highlights the basic oversight of the Court's earlier decision: its failure to distinguish

between legal instruments that actually create an obligation and those that condition indebtedness

on the exercise of governmental discretion.  No formal demand or lawsuit (or even breach) need

occur for the former type of contract to obligate a party to pay the United States.  The Court also

worried that the defendants' argument would be "detrimental" and "counterproductive" by

"allowing those with knowledge of contractual breaches or other non-compliance to make false

statements about those matters, without penalty, unless and until the government files a lawsuit."

Id. at 69; see also Govt.'s Statement of Interest Opp'n Defs.' MSJ, ECF No. 334, at 11 ("[I]f the

defendant covers up its breach by lying, the government will not learn about the breach and thus

will not be in a position to file a breach of contract claim.").  But most regulated parties may do

precisely this without exposing themselves to reverse-false-claim liability.  However "disturbing" it

might be, Quinn, 382 F.3d at 434, "[t]he mere contingent potential that such fines or penalties might

---

[11]  For holdings to this effect, see United States ex rel. Marcy v. Rowan Cos., 520 F.3d 384, 391–92
(5th Cir. 2008); United States ex rel. Bain v. Ga. Gulf Corp., 386 F.3d 648, 658 (5th Cir. 2004);
Am. Textile, 190 F.3d at 738; Q Int'l Courier, Inc., 131 F.3d at 773–74; United States ex rel.
Booker v. Pfizer, Inc., 9 F. Supp. 3d 34, 49–50 (D. Mass. 2014); United States ex rel. Huangyan
Import & Export Co. v. Nature's Farm Prods., Inc., 370 F. Supp. 2d 993, 1000 (N.D. Cal. 2005);
Coppock, 2003 WL 21730668, at *14; Graves, 284 F. Supp. 2d at 508.

be . . . sought and imposed does not constitute 'an obligation,'" <u>Bain</u>, 386 F.3d at 658.  The same principle holds in the contractual setting.

b.      D.C. Circuit Precedent

The D.C. Circuit's decision in <u>Hoyte v. American National Red Cross</u>, 518 F.3d 61 (D.C. Cir. 2008), hews to the above principles and forecloses Relator's theory of "obligation."  <u>Hoyte</u> involved a consent decree ("the Consent Decree") entered into between the Food and Drug Administration ("FDA") and the Red Cross.  The Consent Decree, though taking the form of a contract,[12] functioned as a targeted regulation:  It obligated the Red Cross to adopt certain blood-handling practices and report any lapses to the FDA.  <u>Id.</u> at 63.  Rather than specify that each violation would trigger a certain amount of monetary liability, the Consent Decree merely authorized the FDA to assess penalties for each violation.  <u>Id.</u>; <u>see also</u> <u>Hoyte v. Am. Nat'l Red Cross</u>, 439 F. Supp. 2d 38, 44 (D.D.C. 2006), <u>aff'd</u>, 518 F.3d 61 (D.C. Cir. 2008) (observing that "none of the sanctions . . . are automatically imposed on the defendant for its alleged violations," for "[t]he decision whether to impose sanctions rests exclusively with the FDA"); <u>id.</u> (noting that the FDA "*may* seek these particular penalties . . . or may refrain from doing so").

The D.C. Circuit held that an investigation undertaken by a Red Cross employee-whistleblower could not have reasonably led to a viable reverse-false-claim action, because no "obligation" existed at the time of the alleged blood mishandling.  <u>Id.</u> at 66.  This was because the Consent Decree obligated the Red Cross only "to follow the prescribed blood handling and reporting requirements"; it "imposed no obligation on [the Red Cross] to tender money or property to the Government."  <u>Id.</u> at 67.  The Red Cross was indeed "subject to possible sanctions for

---

[12]  Courts interpret consent decrees "according to general principles of contract law," for a "consent decree is 'essentially a contract.'"  <u>United States v. Volvo Powertrain Corp.</u>, 758 F.3d 330, 339 (D.C. Cir. 2014) (quoting <u>Segar v. Mukasey</u>, 508 F.3d 16, 21 (D.C. Cir. 2007)).

violating an administrative requirement," but the court concluded that such an "unassessed potential penalty" is not the same as a present indebtedness.  Id.

Hoyte is not perfectly analogous to this case, because the United States did not tender the Red Cross any payments for which it might have sought reimbursement.  Still, its reasoning dictates the result here.  The lesson of Hoyte is that, in the absence of acknowledged liability, whether an "obligation" exists depends entirely on what the relevant legal instrument—be it a contract, regulation, statute, or judicial order—requires a party to do.  Reverse-false-claim liability was absent in that case because "[t]he Consent Decree imposed no obligation on [the Red Cross] to tender money or property to the Government but only to follow the prescribed blood handling and reporting requirements."  Id.  So too, here, the Sponsorship Agreement imposed no obligation on Tailwind to tender money or property to the Government in the event of a breach, but instead to ensure the team's compliance with anti-doping provisions stated expressly or incorporated by reference.  If it so chose, the Government could "exercise any other right or remedy available to it under law or in equity," Sponsorship Agreement 4, just as the FDA could sanction the Red Cross for its backsliding.  But neither contractual remedy obligated the breaching party to pay in the absence of some separate discretionary act.  The Court also notes that any contract-based recovery in this case would have been *more* contingent than the theory of obligation rejected in Hoyte.  The Consent Decree authorized the FDA to assess financial penalties unilaterally, whereas USPS would have had to vindicate its remedial claims through potentially lengthy and costly court proceedings.

The Court has found three decisions holding that an "obligation" can exist even if some discretionary governmental act is needed to perfect it.  See United States ex rel. Bahrani v. Conagra, Inc., 465 F.3d 1189, 1204 (10th Cir. 2006) ("The fact that USDA officials may have some subsequent discretion whether to actually charge the authorized fee does not mean that the 'obligation' is a contingent one outside the scope of § 3729(a)(7)."); United States ex rel. Boise v.

Cephalon, Inc., CV No. 08–287, 2015 WL 4461793, at *1, 6 (E.D. Pa. July 21, 2015) (relying on the Court's June 19, 2014 Memorandum Opinion in holding that the violation of a corporate integrity agreement created an "obligation," even though the agreement specified that "failure to comply . . . *may lead to* the imposition of" fines) (emphasis added); Ruscher, 2014 WL 4388726, at *5 ("[T]he fact that some discretion is involved in th[e] decision [to assess penalties] does not preclude False Claims Act liability."). These decisions are flatly inconsistent with the D.C. Circuit's reasoning in Hoyte, and with dozens of decisions affirming the well-established distinction between present and contingent obligations.

In the D.C. Circuit, absent an acknowledgment of indebtedness, reverse-false-claim liability is unavailable under § 3729(a)(7) unless the relevant legal instrument imposes a self-executing obligation to tender money or property to the United States. That essential condition was not met here. Because the Court's prior opinion misarticulated the basis for identifying a statutory "obligation" under § 3729(a)(7), the Court will grant summary judgment in favor of both the CSE Defendants and Armstrong on Count 4 of Relator's Second Amended Complaint.[13]

## IV.     Conclusion

For the foregoing reasons, the Court will grant in part and deny in part the CSE Defendants' Motion for Summary Judgment. A separate Order accompanies this Memorandum Opinion.

---

[13]  In his motion for joinder in the CSE Defendants' motion for summary judgment, Armstrong contended that the arguments contained in the CSE Defendants' motion "require entry of partial summary judgment in Armstrong's favor on Count 4 of the Government's Complaint in Intervention (ECF No. 44)." Mot. Joinder, ECF No. 450. Count 4 of the Government's Complaint is styled as one brought under § 3729(a)(7); the Court has already determined that it was "pled only pre-FERA." Mem. Op. June 19, 2014, at 42–43. It therefore appears that the interpretation of § 3729(a)(7) that the Court adopts today would logically dictate the entry of summary judgment in favor of Armstrong on Count 4 of the Government's Complaint. But because no party has formally moved for summary judgment on Count 4, the Court will order the Government to show cause why that relief should not be granted.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:   January 12, 2016