# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES, *ex rel.*, | ) |
| FLOYD LANDIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 1:10-cv-00976 (CRC) |
| v. | ) |
| | ) |
| TAILWIND SPORTS CORPORATION, | ) |
| *et al.*, | ) |
| | ) |
| Defendants. | ) |

**REBUTTAL REPORT**

**JOEL STECKEL**

**February 22, 2016**

# Table of Contents

I.      INTRODUCTION ........................................................................................................ 4

    A.   ASSIGNMENT ............................................................................................................. 4
    B.   QUALIFICATIONS ....................................................................................................... 4
    C.   COMPENSATION ......................................................................................................... 5
    D.   EVIDENCE CONSIDERED ............................................................................................. 5
    E.   SUMMARY OF CONCLUSIONS ..................................................................................... 6

II.     BACKGROUND ........................................................................................................ 8

    A.   USPS ........................................................................................................................ 8
    B.   THE SPONSORSHIP ..................................................................................................... 9
    C.   LANCE ARMSTRONG ................................................................................................ 10
    D.   CURRENT ACTION .................................................................................................... 11

III.     SUMMARY OF DR. JOACHIMSTHALER'S EXPERT REPORT ............................. 12

    A.   DR. JOACHIMSTHALER'S ANALYSIS OF THE BENEFITS OF THE SPONSORSHIP TO USPS ........... 14
    B.   DR. JOACHIMSTHALER'S ANALYSIS OF THE EFFECTS OF THE TRANSGRESSION TO USPS ........ 17
       *Key Factor 1: Brand Relationship* ........................................................................ 19
       *Key Factor 2: Brand Building* .............................................................................. 20
       *Key Factor 3: Brand Congruence* ........................................................................ 21
       *Key Factor 4: Information Integration* ................................................................. 23
       *Key Factor 5: Circles of Competence* ................................................................... 25
       *Key Factor 6: Personal Responsibility* ................................................................. 27
    C.   SUMMARY ............................................................................................................... 31

IV.     DR. JOACHIMSTHALER'S ANALYSIS OF THE BENEFIT THE USPS BRAND RECEIVED FROM USPS' SPONSORSHIP OF LANCE ARMSTRONG AND HIS CYCLING TEAM IS FLAWED AND CANNOT SUPPORT HIS CONCLUSION ......................................................... 32

    A.   ARTIFICIAL ATTRIBUTES ......................................................................................... 33
    B.   OTHER FACTORS ...................................................................................................... 37

V.     DR. JOACHIMSTHALER'S ANALYSIS OF LANCE ARMSTRONG'S TRANSGRESSION IS FLAWED AND CANNOT SUPPORT HIS CONCLUSION THAT THE TRANSGRESSION DID NOT HARM THE USPS BRAND. ................................................................................................. 40

    A.   FLAWS IN DEVELOPMENT OF CONCEPTUAL ARCHITECTURE ..................................... 40
       *Dr. Joachimsthaler's Transgression Theory is Not a Theory* ............................... 40
       *Dr. Joachimsthaler's Transgression Theory Propositions Are Baseless* .............. 42
       *Dr. Joachimsthaler's Experimental Manipulation was Inappropriately Weak* ...... 45
    B.   FLAWS IN THE SURVEY ............................................................................................ 46
       *Dr. Joachimsthaler's Samples Excluded Mailing/Shipping Professionals* ........... 48
       *Key Factor 1 (Brand Relationship) - Dr. Joachimsthaler Underestimates Awareness of the USPS Sponsorship* ......................................................................................................... 49
       *Key Factor 2 (Brand Building) – Sponsorship of a Salient Brand is not Necessarily a Salience-Focused Sponsorship* ......................................................................................................... 51
       *Key Factor 3 (Brand Congruence) - The Data Show Neither Brand Congruence nor Different Brand Archetype* ................................................................................................................ 54
       *Key Factor 4 (Information Integration) – The Test-Control 'Experiment' is Fatally Flawed* ........... 58
       *Key Factor 5 (Circles of Competence) – Dr. Joachimsthaler's Analysis is Not on Point with Respect to his Transgression Theory* ...................................................................................... 63
       *Key Factor 6 (Personal Responsibility) – Allocation of Blame Does Not Equate to Opinion Change* .. 65
    C.   ADDITIONAL SHORTCOMINGS ................................................................................. 66
    D.   APPLYING DR. JOACHIMSTHALER'S LOGIC TO THE BAV DATA ACTUALLY DEMONSTRATES HARM TO THE USPS

Post-Transgression ................................................................................................................... 67

**VI.     CONCLUSION** ................................................................................................................ **69**

**APPENDIX A – RESUME OF DR. JOEL STECKEL** ........................................................ **72**

**APPENDIX B – DR. STECKEL'S TESTIMONY IN THE LAST FOUR YEARS** ............... **86**

**APPENDIX C – MATERIALS CONSIDERED** ................................................................. **88**

**APPENDIX D – VERBATIM RESPONSES INCLUDED IN UNAIDED AWARENESS CALCULATION** ....... **92**

# I. INTRODUCTION

## A. Assignment

1.      I have been retained by the Department of Justice, counsel for the United States of America in the lawsuit *United States of America, ex rel. Floyd Landis* (plaintiffs) *v. Tailwind Sports Corp., et. al.* (defendants) (United States District Court, District of Columbia, Civil Action 10CV976 (CRC) to comment on Dr. Erich Joachimsthaler's expert report in that matter.  I was asked to focus in particular on his analysis of the impact of the professional cycling team sponsorship on the USPS brand.  I was asked to review the report's use of secondary data, consumer survey data, and its presentation of marketing theories. I was further asked whether Dr. Joachimsthaler's conclusions were valid in light of the evidence he presented.  It is my understanding that Dr. Jonathan Walker has been retained to review Dr. Joachimsthaler's conclusions regarding the financial impact of the sponsorship.

## B. Qualifications

2.      I am a Professor of Marketing and the Vice Dean for Doctoral Education at the Leonard N. Stern School of Business, New York University, where I have taught since January 1989. I was the Chairperson of the Marketing Department for six years, from July 1998 to June 2004, and the faculty director of the Stern School Doctoral Program for five years, from May 2007 to July 2012.  I have also held either permanent or visiting faculty appointments at the Graduate School of Business, Columbia University; the Anderson Graduate School of Management, U.C.L.A.; the School of Management, Yale University; and the Wharton School, University of Pennsylvania.  I received my B.A. from Columbia University in 1977, and my M.B.A., M.A., and Ph.D. degrees from the Wharton School, University of Pennsylvania in 1979, 1980, and 1982, respectively.

3.      I was the Founding President of the INFORMS (Institute for Operations Research and Management Science) Society for Marketing Science, the foremost professional group for the development and application of management science theory and tools in marketing. In addition, I am a member of the American Marketing Association, the American Statistical Association, the American Psychological Association, the Association for Consumer Research, the American Association for Public Opinion Research, the International Trademark Association, and the Society for Consumer Psychology.

4.      My fields of specialization within marketing include marketing research methodology (including surveys and experiments), marketing and branding strategies, electronic commerce, and managerial decision making.  I am an author of three books and over 40 peer-reviewed articles. In the course of my scholarly research, teaching, and consulting work, I have studied issues of marketing research and branding, and their roles in consumer choice and marketing strategy.  My professional qualifications are described further in my *curriculum vitae*, which is attached as [Appendix A]. I have served as an expert witness on marketing research, marketing strategy, branding, and issues related to consumer decision making in a variety of litigation matters.  In the past four years, I have testified as an expert witness in the matters listed in [Appendix B].

**C.  <u>Compensation</u>**

5.      I am compensated for my time in this matter at my government discounted rate of $900 per hour. My compensation is contingent on neither my findings nor testimony rendered nor the outcome of this litigation.

**D.  <u>Evidence Considered</u>**

6.      In undertaking my analysis, I have considered the sources listed in [Appendix C]. Analytical staff members, working under my direction and supervision, performed some of

5

the analyses that support the opinions expressed in this report.

**E. Summary of Conclusions**

7.    My work in this matter has led me to the following conclusions:

    a.  Dr. Joachimsthaler's analysis of the benefit the USPS brand received from USPS' sponsorship of Lance Armstrong and his cycling team is flawed and cannot support his conclusions.

        i.  His analyses of the BrandAsset Valuator (BAV) data are subjective and flawed. He uses BAV's data in an idiosyncratic way that lacks empirical foundation. Reconstructing his analysis in a more straightforward manner results in very different conclusions.

        ii.  Even granting Dr. Joachimsthaler's arbitrary analysis of the BAV data, his conclusions require the implausible assumption that all changes to the USPS brand over the six-year period were attributable to the USPS sponsorship of Mr. Armstrong and his cycling team. He neglects to consider factors other than the cycling sponsorship that could have impacted (and surely did impact) the USPS brand during the period of the sponsorship.

    b.  Dr. Joachimsthaler's analysis of Lance Armstrong's "transgression" is flawed and cannot support his conclusion that the transgression did not harm the USPS brand.

        i.  Dr. Joachimsthaler's "transgression theory," which he attempts to use as a conceptual architecture of his work, is unscientific.

            1.  To attempt to support transgression theory, he cites to literature that is either not on topic, contains material that runs counter to his propositions, or is completely irrelevant.

            2.  Dr. Joachimsthaler also ignores an established body of literature that focuses on the power of negative information. In particular, it is well known that a "negativity bias" results in negative information, generally, having a larger and longer-lasting impact than positive information.

        ii.  In an attempt to 'test' his transgression theory/conceptual architecture, Dr. Joachimsthaler conducted a web-based opinion survey consisting of two largely similar surveys that ask questions about the connection between Armstrong and the USPS brand. The survey and Dr. Joachimsthaler's interpretation of its results suffer from many flaws of construction and interpretation. Among them:

            1.  The survey sample deliberately excluded the most important targets of the sponsorship: mailing and shipping professionals. Consequently, Dr. Joachimsthaler's study can provide no insight into the perceptions held by the people targeted by the USPS sponsorship.

6

2.  Dr. Joachimsthaler's analysis of both aided and unaided awareness of the USPS sponsorship is flawed and the conclusions he draws from the analyses are incorrect. Dr. Joachimsthaler concluded that the 24% percent of survey respondents were able to link the USPS to Mr. Armstrong. That awareness level is not low, as Dr. Joachimsthaler contends, but at least as strong as contemporary sponsorships by Subway and Under Armour of Olympic swimmer Michael Phelps.

3.  Dr. Joachimsthaler's data do not support his application of his supposed "transgression theory" to Lance Armstrong and USPS; in many cases they actually refute it.

4.  Additionally, the test-control manipulation used was entirely ineffective.  The overwhelming majority of Dr. Joachimsthaler's survey respondents knew about Mr. Armstrong's doping prior to taking the survey. Between 88% and 90% percent knew that Mr. Armstrong had been stripped of his Tour de France titles because of his usage of performance enhancing drugs. As such, there was no difference in knowledge between the test and control groups.

5.  Furthermore, Dr. Joachimsthaler's experimental manipulation was too weak. Dr. Joachimsthaler minimizes the nature of Mr. Armstrong's transgression on consumer perception by confining it to the use of performance enhancing drugs.  In fact, in the public's eyes, Armstrong's transgressions went well beyond the mere isolated use of performance enhancing drugs.

iii.  Dr. Joachimsthaler also quotes selected snippets of depositions in an attempt to support his conclusion that the USPS was not harmed. His opinions regarding the significance of the deposition testimony in this case are subjective and without expert basis.  Further, a more expansive review of deposition testimony and exhibits would refute this conclusion.

c.  Overall, I find Dr. Joachimsthaler's report to be without scientific support and academic foundation. His self-serving theoretical constructs are arbitrary and his own data do not support them. His treatment of data is flawed and his conclusions cannot be relied upon in the matter at hand.

8.  The remainder of this report presents the analyses that have led to these conclusions. The analysis is based on the evidence that has been made available to date.  I reserve the right to supplement or amend these conclusions should further information become available.

7

## II. <u>BACKGROUND</u>

### A. <u>USPS</u>

9.      The USPS is the "self-supporting independent establishment" of the government with a monopoly on the delivery of letters in the United States.[1] As defined by the "Postal Reorganization Act of 1970," the "basic function" of the USPS is *"to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people."*[2] Operating with a universal service obligation [USO], the USPS is obligated to provide postal service to the entire population of the United States.[3] To fund the USO, the USPS has been granted a monopoly on the delivery of letters and is the only company permitted to deliver to US mailboxes.[4]

10.     In 2015, the USPS delivered over 155 billion pieces of mail,[5] down from its peak of 213 billion in 2006.[6] A decline in profits accompanied the decline in mail volume. The USPS reported revenues of $69 billion but a loss of $5 billion in 2015, and has operated at a loss since 2007.[7] The USPS operates approximately 35,000 retail offices and 211,000 vehicles, and delivers to over 244,000 delivery routes.[8] In 2015, a report commissioned by

---

[1]   "Report on Universal Postal Service and The Postal Monopoly," USPS, October 2008, p. 5, https://about.usps.com/universal-postal-service/usps-uso-report.pdf, accessed February 5, 2016.

[2]   "Title 39—Postal Service," Public Law 91-375, August 12, 1970, http://www.21cpw.com/wp-content/uploads/2015/05/Postal-Reorganization-Act-1970.pdf, retrieved February 5, 2016.

[3]   "Report on Universal Postal Service and The Postal Monopoly," USPS, October 2008, p. 2, https://about.usps.com/universal-postal-service/usps-uso-report.pdf, accessed February 5, 2016.

[4]   "Report on Universal Postal Service and The Postal Monopoly," USPS, October 2008, p. 2, https://about.usps.com/universal-postal-service/usps-uso-report.pdf, accessed February 5, 2016.

[5]   "Postal Facts 2015," USPS, https://about.usps.com/who-we-are/postal-facts/postalfacts2015.pdf, accessed February 6, 2015, p. 5.

[6]   "Annual Report 2006," USPS, http://www.prc.gov/docs/56/56080/anrpt2006_final.pdf, accessed February 12, 2016, p. 3.

[7]   "Financial History Summary," USPS, https://about.usps.com/publications/annual-report-comprehensive-statement-2011/html/ar2011_financial_1.htm, accessed February 6, 2016.

[8]   "Postal Facts 2015," USPS, https://about.usps.com/who-we-are/postal-facts/postalfacts2015.pdf, accessed February 6, 2015. p. 5.

the USPS valued its brand at $3.6 billion.[9]

**B. <u>The Sponsorship</u>**

11.     The USPS sponsored the U.S. Postal Service Pro Cycling Team from 1996-2004. Over the course of the sponsorship, there were two sponsorship agreements. The original sponsorship agreement was made between the USPS and Montgomery Sports and was signed in 1995. This contract was renewed each year by the USPS until 2000. In 2000, a new agreement was signed by the USPS and DFP Cycling LLC that commenced in 2001 and continued until 2004. In total the USPS paid approximately $42 million to sponsor the cycling team. The sponsorship ended after the USPS chose not to renew the 2004 sponsorship.[10]

12.     The team was invited to its first Tour de France in 1997 and appeared in the event in each subsequent year. The Tour de France is a well-known annual multi-stage bike race that takes place each July and is held primarily in France. During the Tour and other events, members of the Team wore USPS-branded jerseys, shorts, helmets and headwear, rain gear, gloves, warm-ups, and leisure wear. In addition, the USPS logo was seen on team vehicles, in media guides, press releases, etc.[11]

---

[9]   "The Value of the U.S. Postal Service Brand," Office of Inspector General USPS, January 28, 2015, p. 1.
[10]  Deposition of Anita Bizzotto, former Executive Vice President and Chief Marketing Officer, August 13, 2015, Vol. 1, 125:19-21, 133:1-6.
[11]  "Sponsorship Proposal United States Postal Service Cycling Team," Ex. 46, US00601217.

**Figure 1: Members of the USPS cycling team wearing USPS-branded jerseys**



### C. Lance Armstrong

13.     The best known and most important member of that team was Lance Armstrong,

who joined the team for the 1998 season. Before the Union Cycliste Internationale (UCI)

stripped him of his titles, Mr. Armstrong won the Tour a record six of his seven consecutive

times while racing for on the USPS team. During the sponsorship, Mr. Armstrong also won

a bronze medal at the 2000 Olympic Games.

14.     From time to time throughout the duration of the sponsorship, Mr. Armstrong faced

public allegations of doping. Mr. Armstrong consistently (and forcefully) denied the

allegations to the public and to the USPS.[12] Managers and representatives of the team also

---

[12]   For examples of Mr. Armstrong's denials, see Second Amended Complaint, pp. 32-34. See also,
Deposition of William Henderson, former Postmaster General, September 22, 2015, Vol. 1, 67:25, 68:1-
25, 70:21-25, 71:1.

told the USPS that the allegations against Mr. Armstrong were false.[13]

**D.  Current Action**

15.     Whistleblower relator Floyd Landis was a teammate of Mr. Armstrong on the team

from 2002-2004. A Tour de France winner in 2005, Mr. Landis was found guilty of doping

in 2007 and had his title stripped. In 2010, Mr. Landis disclosed details of a sophisticated

doping program[14] operating during his time on the team to governing bodies of cycling, to

the government, and to various members of the media. The same year, Mr. Landis filed a

whistleblower lawsuit under the False Claims Act, alleging that Mr. Armstrong and

members of the USPS cycling team had defrauded the government.

16.     After a lengthy investigation, the United States Anti-Doping Agency [USADA]

released its Reasoned Decision in 2012. The report concluded that, "The achievements of

the USPS/Discovery Channel Pro Cycling Team, including those of Lance Armstrong as its

leader, were accomplished through a massive team doping scheme, more extensive than

any previously revealed in professional sports history."[15] In addition, it noted the following:

> The evidence is overwhelming that Lance Armstrong did not just use performance
> enhancing drugs, he supplied them to his teammates…It was not enough that his
> teammates give maximum effort on the bike, he also required that they adhere to the
> doping program outlined for them or be replaced. He was not just a part of the doping
> culture on his team, he enforced and re-enforced it.[16]

17.     USADA suggested Mr. Armstrong be stripped of his titles and be given a lifetime

ban from competition. Both of these sanctions were accepted by the UCI, the governing

---

[13]   See, for instance, Deposition of Gail Sonnenberg, former Senior Vice President of Sales, July 13, 2015,
Vol. 1, 94:18-25-95:1-3, and 288-291.

[14]   See Second Amended Complaint pp. 24-32 for the incidences of doping related by Mr. Landis.

[15]   Reasoned Decision of the United States Anti-Doping Agency On Disqualification and Ineligibility,"
USADA, October 10, 2012, http://d3epuodzu3wuis.cloudfront.net/ReasonedDecision.pdf retrieved
February 3, 2016, p. 5.

[16]   Reasoned Decision of the United States Anti-Doping Agency On Disqualification and Ineligibility,"
USADA, October 10, 2012, http://d3epuodzu3wuis.cloudfront.net/ReasonedDecision.pdf retrieved
February 3, 2016, pp. 6-7.

body of international cycling.

18.     After the release of the Reasoned Decision, Mr. Armstrong confessed to doping in a

televised interview with Oprah Winfrey in 2013. During the interview Mr. Armstrong

admitted to doping during all of his Tour wins.

19.     Following Mr. Armstrong's admission, the Department of Justice decided to

intervene in the False Claims case. In a statement, the Postal Service General Counsel and

Executive Vice President Mary Anne Gibbons explained:

> The defendants agreed to play by the rules and not use performance enhancing drugs.
> We now know that the defendants failed to live up to their agreement, and instead
> knowingly engaged in a pattern of activity that violated the rules of professional
> cycling and, therefore, violated the terms of their contracts with the Postal Service.
> For that reason, the Postal Service fully agrees with the decision by the Department
> of Justice to seek appropriate damages under the False Claims Act.[17]

20.     By joining the lawsuit, the USPS seeks to recover the sponsorship money it asserts

was "illegitimately procured" by Mr. Armstrong and other members of the team.[18]

## III.  SUMMARY OF DR. JOACHIMSTHALER'S EXPERT REPORT

21.     Dr. Joachimsthaler has submitted an expert report in this matter.  As I indicated

above, I have been asked to comment on that report.  I found it difficult to follow.  It is

verbose, makes excessive use of unnecessary (and frequently undefined) jargon and name

dropping, and invokes references that are peripheral at best and only serve to distract from

the main argument.  These flaws in construction render the report incomprehensible at

points.  The lack of clarity is a major reason why I reserve the right to supplement or amend

---

[17]  "United States Joins Lawsuit Alleging Lance Armstrong and Others Caused the Submission of False
Claims to the U.S. Postal Service," Department of Justice, February 22, 2013,
http://www.justice.gov/opa/pr/united-states-joins-lawsuit-alleging-lance-armstrong-and-others-caused-
submission-false, accessed February 6, 2016.
[18]  "United States Joins Lawsuit Alleging Lance Armstrong and Others Caused the Submission of False
Claims to the U.S. Postal Service," Department of Justice, February 22, 2013,
http://www.justice.gov/opa/pr/united-states-joins-lawsuit-alleging-lance-armstrong-and-others-caused-
submission-false, accessed February 6, 2016.

my opinions at a later point in time. I expect that Dr. Joachimsthaler's logic and analysis

will be further described as the discovery process proceeds.

22.     Dr. Joachimsthaler was asked by attorneys for Lance Armstrong to provide opinions

on the following issues:[19]

    a.  The role of brands and sponsorship in business and in sports

    b.  The Lance Armstrong and the USPS brands: what they are, what they stand for, their historical and cultural legacy, and their strength and value

    c.  The impact that the USPS sponsorship of the USPS Team and its association with Lance Armstrong had on the USPS brand

    d.  The likelihood that the USPS brand was impacted by Mr. Armstrong's admission in 2013 of doping during the USPS sponsorship period

    e.  The likelihood of future injury to the USPS brand from the past association with Lance Armstrong and the USPS Team

23.     With respect to his assignment, Dr. Joachimsthaler offers the following

conclusions:[20]

    a.  Brands are important in the postage and parcel delivery industry, and the USPS needed to improve its brand perceptions prior to the sponsorship of the USPS Team.

    b.  A sponsorship, when properly managed, is a powerful brand building tool, in particular to build salience and performance associations.

    c.  Sponsorships are influenced by more than just the sponsor and the sponsored, meaning that a transgression by one party does not necessarily have a direct or indirect impact on other parties.

    d.  The sponsorship of the USPS team and the association with Lance Armstrong was a successful brand building program for the USPS, both in building salience and performance attributes.

    e.  The USPS enjoyed substantial tangible benefits as a result of the sponsorship that well-exceed the costs of the sponsorship.

---

[19]  Expert Report of Erich Joachimsthaler, November 19, 2015, ("Joachimsthaler Report"), p. 9.
[20]  Joachimsthaler Report, p. 11.

   f. There was no negative impact on the USPS brand as a result of the revelation that Lance Armstrong used performance-enhancing substances while riding for the USPS Team.

24. My comments focus primarily on issues c through e and conclusions d through f above.  To the extent that I need to draw from analyses related to the remaining issues and conclusions, I will do so.  However, my focus is on the topics stated.  Furthermore, it seems to me that Dr. Joachimsthaler's conclusions d and e are so closely related that I will summarize and comment on them together.

### A.  Dr. Joachimsthaler's Analysis of the Benefits of the Sponsorship to USPS

25. Dr. Joachimsthaler bases his analysis on five qualities with which he claims the USPS sought to associate its brand:[21] (1) Tradition, (2) Trust, (3) Scope (viz. relevance of products and services to customer needs), (4) Reliability, and (5) Affordability.

26. He then defines the above-mentioned qualities in terms of sets of BrandAsset Valuator ("BAV") attributes, and uses BAV data to assess how these attribute sets changed over time. The BrandAsset Valuator was originally developed by Young and Rubicam and is now marketed by a spinoff, BAV Consulting.[22]  The BAV is the world's largest database on how consumers see brands.[23]  It purports to provide insight on how brands grow, get into trouble, and can recover.  BAV collects consumer perceptions of approximately 43,000 brands along 72 dimensions.[24] It reports the percentile for each of its 72 measured brand dimensions for each of the brands compared to the entire database.  For example, a single USPS brand characteristic might score a 90, meaning survey respondents rated that

---

[21] Joachimsthaler Report, pp. 35-6.
[22] "How We Think About Brands," Young & Rubicam Group, http://www.yr.com/BAV, accessed February 16, 2016.
[23] "BAV Insights," BAV Consulting, http://bavconsulting.com/insights/, accessed February 22, 2016.
[24] "BAV Consulting," BAV Consulting, http://bavconsulting.com/, accessed February 22, 2016.

characteristic higher for the USPS than for 90 percent of the other brands in the database.

27.    As a result of extensive statistical analyses of the underlying data, BAV has found it effective to aggregate these 72 dimensions into four fundamental measures underlying the brand asset.  These measures, referred to as "pillars," are:

     i    Energized Differentiation (A brand's unique meaning with motion and direction);
    ii    Relevance (How appropriate the brand is for you);
   iii    Esteem (How you regard the brand); and
   iv    Knowledge (An intimate understanding of the brand).[25]

These "pillars" represent empirically grounded combinations of the 72 dimensions and are the basis of most generally accepted uses of the BAV data. These four pillars and the subset of the 72 brand dimensions that contribute to each of them are shown in Figure 2 below:

**Figure 2: BAV's work is based on the "Pillars of the Brand Asset"[26]**

| BAV Pillar | Underlying Perceptual Metrics | Survey Scale | BAV Data | Meaning and Role of the Pillar |
|---|---|---|---|---|
| Differentiation | Unique | Yes/No | % Responding "yes" | Perceived distinctiveness of the brand. Defines the brand and reflects its ability to stand out from competition. Is the "engine of the brand train;… if the engine stops, so will the train." |
| | Distinctive | Yes/No | % Responding "yes" | |
| Relevance | Relevant to me | 1-7 Scale | Average | Personal relevance and appropriateness and perceived importance of the brand. Drives market penetration and is a source of the brand's staying power. |
| Esteem | Personal regard | 1-7 Scale | Average | Level of regard consumers hold for the brand and valence of consumer attitude. Reflects how well the brand fulfills its promises. |
| | Leader | Yes/No | % Responding "yes" | |
| | High quality | Yes/No | % Responding "yes" | |
| | Reliable | Yes/No | % Responding "yes" | |
| Knowledge | Familiarity with the brand | 1-7 Scale | Average | Awareness and understanding of the brand identity. Captures consumer intimacy with the brand. Results from brand-related (marketing) communications and personal experiences with the brand. |

28.    Instead of focusing on the BAV pillars, Dr. Joachimsthaler's analysis begins by "mapping" 17 of the 72 BAV measured dimensions onto the five attributes discussed above. With no formal empirical or theoretical basis beyond simply his judgment, Dr.

---

[25]    "Industry Leading Brand Insights," BAV Consulting, http://bavconsulting.com/insights/reports/, accessed February 18, 2016.

[26]    Adapted from Mizik, Natalie & Robert Jacobson, "The Financial Value Impact of Perceptual Brand Attributes," *Journal of Marketing Research*, 45, 2008, p. 16.

Joachimsthaler assigns two or more BAV dimensions that, in his opinion, comprise the essence of the attribute.[27]   His mapping is summarized in Figure 3 below:

**Figure 3: Dr. Joachimsthaler's brand attributes are based on 17 of 72 BAV dimensions**

| Dr. Joachimsthaler's Brand Attributes | Included BAV Dimensions |
|---|---|
| Tradition | Knowledge, Original, Traditional |
| Trust | Trustworthy, Authentic, Distinctive, Leader, Prestigious |
| Scope | Up-To-Date, Relevant, Helpful |
| Reliability | High Quality, High Performance, Reliable, Cares For Customers |
| Affordability | Good Value, Worth More |

29.     Then he calculates an average percentile for each of the five derived attribute measures and notes how it changes over the time of the sponsorship. Following this step, the report goes on to compare the USPS performance on those attributes to the performance of what Dr. Joachimsthaler describes as competitors, UPS and FedEx, over the time period of the sponsorship.

30.     Generally speaking, Dr. Joachimsthaler concludes that the USPS brand grew stronger relative to its competitors during the sponsorship period and that this phenomenon was evidence of the benefits the USPS received from its sponsorship of Mr. Armstrong.[28]

31.     Dr. Joachimsthaler assumes, as far as can be determined from the report, that the improvement in BAV scores is solely due to the sponsorship of the team.[29]   In other words, he does not explore what other advertising the USPS was doing, what was happening to service levels, media coverage or any other factors that might have impacted public perception of the USPS brand over that time period.

---

[27]   Joachimsthaler Report, pp. 44-47.
[28]   Joachimsthaler Report, p. 53.
[29]   Joachimsthaler Report, pp. 44-47.

32.     Overall, I find many flaws with this approach to assessing the value of the USPS sponsorship. I describe these flaws below.

### B.  Dr. Joachimsthaler's Analysis of the Effects of the Transgression to USPS

33.     Next, Dr. Joachimsthaler turns his attention to assessing whether the Armstrong doping scandal had any negative effect on the USPS.  Dr. Joachimsthaler purports to rely in part on academic literature to reach his conclusion that Mr. Armstrong's doping and the extensive worldwide publicity that followed, both for Mr. Armstrong and for USPS, had no effect on USPS.[30]  The articles that he cites do not support his conclusions.

34.     More specifically, Dr. Joachimsthaler  claims to base his analysis on something he calls "transgression theory."[31]  Dr. Joachimsthaler says that "[p]airing the theory of transgressions in general and the reality of the transgression at hand, it is my expectation that there will be no damage to the USPS brand as a result of Lance Armstrong's transgression."[32] However, Dr. Joachimsthaler admits that there is very little peer reviewed literature on this topic, and he specifically cites only one article.[33]

35.     The single article that Dr. Joachimsthaler cites, by Till and Shimp (1998),[34] is not an empirical analysis demonstrating that transgressions by endorsers have benign effects on sponsors. To the contrary, the article reports the results of experiments tending to prove the opposite and the authors caution that the impact on sponsors in the real world could be even worse than their experimental results.

---

[30]   Joachimsthaler Report, pp. 10, 54, 59, and 74.
[31]   Joachimsthaler Report, p. 53.
[32]   Joachimsthaler Report, pp. 58-59.
[33]   Dr. Joachimsthaler writes, "Of this literature, there is a much smaller subset discussing sponsorship transgressions—that is, where the transgression is committed not by the brand, but by an individual or team that is sponsored by or endorses the brand in question.[220]" Footnote 220 refers to the single article by Till and Shimp discussed below. Joachimsthaler Report, p. 54.
[34]   Till, Brian & Terence A. Shimp, "Endorsers in Advertising: The Case of Negative Celebrity Information," *Journal of Advertising*, 27, 1998, pp. 67-82.

36.     Till and Shimp report the results of experiments from which they concluded that their results supported the hypothesis that "negative information about the celebrity lowers evaluations of the advertised brand."[35]  Till and Shimp summarize the practitioner view of how the market reacts to endorser transgressions in the real world as follows: "Marketing practitioners apparently operate under the assumption that negative celebrity news holds strong potential for sullying their brands' reputations, as celebrity endorsers are commonly discharged when negative information about them surfaces (Miciak and Shanklin 1994)."[36]

37.     In summary, transgression theory – as Dr. Joachimsthaler conceives it – is not a generally accepted in the academy.  Indeed, despite promising to do so, Dr. Joachimsthaler neither clearly defines nor provides references to transgression theory in the academic literature.

38.     Nevertheless, to the best of my ability to decipher his report, the theoretical architecture behind his arguments resides in the enumeration of "six key factors that influenced the nature and value of the relationship between the USPS and Lance Armstrong…"  These factors are:[37]

> i   The brand relationship;
> ii  Brand building;
> iii Brand congruence;
> iv  Information integration;
> v   Circles of competence; and
> vi  Personal responsibility.

39.     After providing a conceptual discussion about how each of these factors impact the effect of transgressions in general, Dr. Joachimsthaler applies the principles he asserts to

---

[35]  Till, Brian & Terence A. Shimp, "Endorsers in Advertising: The Case of Negative Celebrity Information," *Journal of Advertising*, 27, 1998, p. 72.

[36]  Till, Brian & Terence A. Shimp, "Endorsers in Advertising: The Case of Negative Celebrity Information," *Journal of Advertising*, 27, 1998, p. 81.

[37]  Joachimsthaler Report, pp. 60-73.

the instant matter.  He then purports to test these six factors in a research study or survey conducted by Chadwick Martin Bailey ("CMB").

40.    I next summarize Dr. Joachimsthaler's analysis of these factors. Later in the report, I will provide my complete assessment of his analyses, but I include here as part of the discussion of these factors some criticisms related to the applicability of the theoretical principles and academic literature on which Dr. Joachimsthaler relies. I conclude that none of Dr. Joachimsthaler's propositions with respect to the six factors has a theoretical or empirical basis, at least not one presented in his report.

Key Factor 1: Brand Relationship

41.    Dr. Joachimsthaler distinguishes endorsements as being either one-way or two-way. He describes a one-way endorsement (and presumably a one-way sponsorship) as one where one party endorses (sponsors) another with the endorsed (sponsored) party offering nothing in return apart from, for example, a logo on his jersey.[38]  In contrast, in a two-way relationship, one party sponsors another in exchange for endorsement of the sponsors' brand, products, or services.  Dr. Joachimsthaler offers Nike and Michael Jordan as an example of a two-way relationship.[39]  He argues that USPS' sponsorship of the USPS Team, of which Lance Armstrong is a member, was more of a one-way relationship.[40]

42.    Dr. Joachimsthaler claims that the more "two-way" the relationship between sponsor and athlete, the greater the impact on brand attributes when there are transgressions by the brand representative. Conversely, he claims that a one-way sponsorship insulates the brand from such transgressions.[41] As I describe in more detail below, his explanation is

---

[38]  Joachimsthaler Report, p. 60.
[39]  Joachimsthaler Report, p. 60.
[40]  Joachimsthaler Report, p. 60.
[41]  Joachimsthaler Report, pp. 60-61.

incomprehensible. As such, I see no justification for this conclusion.

43.      Indeed, the only justification Dr. Joachimsthaler cites in support of his conclusion

that one-way relationships insulate the sponsor in his own survey, which shows that Lance

Armstrong and the USPS' relationship was recognized by "just" 24% (aided) and less than

10% (unaided) of the survey participants.[42]  It is not clear how this relates to the one- or

two-way nature of the relationship between Lance Armstrong and USPS.  Nevertheless,

pairing these results with his assertion that the relationship between them was one-way

leads him to a conclusion that the brand was not harmed from the standpoint of the brand

relationship factor.

Key Factor 2: Brand Building

44.      Next, Dr. Joachimsthaler focuses on what he calls "brand building." He states that

most of the USPS objectives were "salience-focused."  What he means by this is that the

USPS' primary objective was to create brand awareness at the point of purchase.[43]

45.      Dr. Joachimsthaler asserts without apparent justification that salience-focused

sponsorships can insulate the sponsor brand from damage.[44] He supports this assertion by

citing to page 80 of Keller's *Strategic Brand Management*.[45]  However, page 80 of Keller

does not address insulating a brand from external harm.  It merely describes brand salience.

As such, this assertion stands without justification.

46.      Dr. Joachimsthaler cites survey evidence that USPS is a salient brand.  In particular,

"49% think about USPS frequently,"[46] and that "USPS is considered by 88% of customers

---

[42]   Joachimsthaler Report, p. 78
[43]   Joachimsthaler Report, p. 62-3.
[44]   Joachimsthaler Report, p. 63.
[45]   Keller, Kevin L., *Strategic Brand Management: Building, Measuring, and Managing Brand Equity*, New
        Jersey: Pearson, 4th Ed., 2013.
[46]   Joachimsthaler Report, p. 79.

at the point of purchase."[47]  He also recites as evidence of no harm a conclusion from his study that "there is no significant difference in the USPS' consideration levels between consumers who are aware of the USPS/Lance Armstrong relationship and those who are not…"[48]

47.       I note that the first two sets of data at least do not provide a direct test of how the salience-focus of a sponsorship impacts the effect of the transgression.  Instead, Dr. Joachimsthaler essentially assumes the existence of a causal relationship (if a sponsorship is "salience-focused" then it insulates the brand), demonstrates that the antecedent in the posited relationship exists (the USPS is salient, or well known), then asserts that the consequence must also exist (it must be insulated).  The problem with this analysis is that Dr. Joachimsthaler offers no evidence to support the existence of the causal relationship in the first place.

48.       Finally, Dr. Joachimsthaler argues that Lance Armstrong's transgression did not impact perceptions of USPS' brand attributes based on certain sets of BAV scores, which did not decline after the scandal was made public.[49]

Key Factor 3: Brand Congruence

49.       Dr. Joachimsthaler next analyzes "brand congruence," which he defines as the closeness of fit between the sponsored figure and the sponsor.[50] The report claims that for the sponsorship to be effective there needs to be congruence between the sponsor and the athlete or representative.[51]

50.       Dr. Joachimsthaler's discussion of "brand congruence" rests on a dimension of

---

[47]   Joachimsthaler Report, p. 79.
[48]   Joachimsthaler Report, p. 79.
[49]   Joachimsthaler Report, p. 80.
[50]   Joachimsthaler Report, p. 64.
[51]   Joachimsthaler Report, p. 26.

brands or personalities called 'archetypes.'[52]  He claims that brands "with a high level of congruence (are) typically the result of brands with shared archetypes."[53] Dr. Joachimsthaler argues that brands that do not share 'archetypes' are insulated from harm.[54]

51.    He points to page 223 of the book he co-authored with David Aaker, *Brand Leadership*, to support this proposition.[55]  However, that page discusses objectives for sponsorship and says nothing about archetypes or insulation from transgressions. As such, this proposition remains unjustified.

52.    Dr. Joachimsthaler contends that his survey shows that Lance Armstrong shared a few key characteristics with the USPS.  However, and in apparent contradiction to his brand archetype analysis, Dr. Joachimsthaler argues that Mr. Armstrong also offered characteristics that USPS wished to integrate into the USPS "brand personality."[56] The report boldly states that "the brand congruence of Lance Armstrong and the USPS cannot be denied."[57]

53.    Notwithstanding his own assessment of the "undeniable" brand congruence between Armstrong and the USPS, Dr. Joachimsthaler argues that there is not a match between their "archetypes."[58]  He claims the results show that "Lance Armstrong is perceived predominantly as a "destroyer," defined as "able to change, adapt, and progress gracefully; but sometimes rationalize rule-breaking." By contrast, he claims that the USPS had no strong connection to any single brand archetype."[59] Dr. Joachimsthaler uses the fact that

---

[52]   Joachimsthaler Report, p. 64
[53]   Joachimsthaler Report, p. 64
[54]   Joachimsthaler Report, p. 67.
[55]   Aaker, David A. & Erich Joachimsthaler, *Brand Leadership*, New York: The Free Press, 2000.
[56]   Joachimsthaler Report, pp. 42 and 82-83.
[57]   Joachimsthaler Report, p. 83.
[58]   He incorporated the Pearson-Marr Archetype Indicator (PMAI), which he claims is the primary model for archetype testing into his survey.
[59]   Joachimsthaler Report, p. 83.

Lance Armstrong and the USPS did not match archetypes to argue that the USPS brand was insulated from the effects of the scandal.[60]

54.     This analysis is puzzling. Dr. Joachimsthaler appears to suggest that as long as the basis for that fit is not brand archetype, the sponsoring party will be insulated from harm from transgressions committed by the sponsored party.  However, he offers no concrete reason why 'archetype' plays this special role.  He seems to be arguing the USPS was able to have its cake and eat it too because there was congruence enough to make the sponsorship worthwhile but not so much as to have exposed the USPS brand to harm. I will expand my analysis of this point later in this report.

Key Factor 4: Information Integration.

55.     Dr. Joachimsthaler's analysis next turns to "information integration," which he describes as the way in which consumers integrate information about brands. He argues that transgressions on the "periphery" of a brand have lesser impacts, as consumers do not integrate the new information into the core of their memory network.[61]

56.     Dr. Joachimsthaler attempts to justify this principle by pointing to three references; page 44 of his book, pages 43 and 49 of Keller's book, and Darwar and Lei (2008). However, none of these sources relate either to the principles for which the report relies. Page 44 of his own book presents his Brand Identity Planning Model.  Page 43 of Keller's book simply presents the associative network memory model; page 49 describes what constitutes brand image. Neither page discusses anything related to what does and does not become part of the consumers' core memory network.

57.     Finally, Darwar and Lei (2008) is off point.  This paper discusses brand crises; that

---

[60]   Joachimsthaler Report, p. 67.
[61]   Joachimsthaler Report, p. 68.

is, situations where the brand fails to live up to an explicit or implied promise (e.g., when Proctor and Gamble's Wash & Go shampoo caused hair loss in Denmark, it failed to live up to the core brand association 'hair protection;' when Snow brand beef in Japan mislabeled its beef as being of Japanese origin when it was in fact imported from Australia, damaged a core association of 'authenticity'). The Darwar and Lei paper focuses on *the brand* committing a transgression. It has nothing to say about endorser or sponsored party transgressions.

58.   Furthermore, even if the paper was on point, Darwar and Lei's conclusions about brand transgressions do not support Dr. Joachimsthaler's conclusions. The authors find that the more familiar the brand and the less serious the allegation, the less harm caused by the crisis.[62] However, Dawar and Lei's findings do not imply that it is harmless to a sponsor for its endorser to be engulfed in scandal so long as the brand is familiar and the scandal is unrelated to a key brand proposition. They imply only that the sponsor could be worse off if it were otherwise poorly known and the scandal related more directly to its key attribute. As with the other theoretical principles Dr. Joachimsthaler invokes in this section of the report, this one stands without justification.

59.   Dr. Joachimsthaler claims that his survey data demonstrate that there is no difference between consumers who are aware of Mr. Armstrong's transgression as well as his relationship to the USPS – and the control group's opinion of the USPS brand.[63] In addition, the mean response for feelings towards USPS was not significantly different between test and control groups.[64]

---

[62]   Dawar, Niraj & Jing Lei, "Brand crises: The roles of brand familiarity and crisis relevance in determining the impact on brand evaluations," *Journal of Business Research,* 62, 2009, pp. 514-5.
[63]   Joachimsthaler Report, p. 84.
[64]   Joachimsthaler Report, p. 84.

60.     This appears to be a disconnect in the Joachimsthaler report.  The empirical evidence he offers on the information integration factor, which is the *only* empirical evidence he offers that seems directly related to the relationship between the transgression and the brand, is unrelated to the principles he describes in his conceptual discussion of that same factor, for the reasons I describe later.

Key Factor 5: Circles of Competence

61.     Dr. Joachimsthaler claims that if consumers use a brand for a particular product or service and a transgression does not impact that product or service, consumers may simply disregard that information as irrelevant.[65] As such, the transgression would not have a negative impact on the brand.

62.     Dr. Joachimsthaler contends that because Lance Armstrong's transgression is irrelevant to the USPS' ability to deliver the mail and due to the passage of time, the crisis relevance of Lance Armstrong's admission of the transgression would be expected to be minimal.[66]

63.     Dr. Joachimsthaler cites two articles, Bhattacharjee et al (2013) and Carrilat et al (2013) as his justification for the underlying principle.  However, neither article is on point. The article by Professor Bhattacharjee et al. is not about sponsorships or brands, it is about "moral decoupling," the phenomenon in which "consumers selectively dissociate judgments of morality from judgments of performance," with respect to public figures.[67] The article provides no direct insight into the impact of Armstrong's transgressions on the USPS brand.

---

[65]   Joachimsthaler Report, p. 71.
[66]   Joachimsthaler Report, p. 71.
[67]   Bhattacharjee, Amit, et al., "Tip of the Hat, Wag of the Finger: How Moral Decoupling Enables Consumers to Admire and Admonish," *Journal of Consumer Research*, 39, 2013 p. 1168.

64.     Moreover, recent research conducted by Lee and Kwak (2015) suggests consumers do not engage in "moral decoupling" when a transgression is performance-related, as is the case with Mr. Armstrong and his use of performance enhancing drugs.[68] Lee and Kwak also found that transgressions that are performance-related have the most damaging effect on the athlete and the brand.[69] They note:

> [A]ssociated brands should be careful when consumers find it difficult to separate the judgments of the wrongdoer's performance from immorality. This is when the endorsed brands can actually be damaged from the endorser's unethical transgression.[70]

65.     Dr. Joachimsthaler's use of the article by Carrilat *et al* is equally inappropriate.  One of the conclusions of the paper is that "When there is strong evidence that the endorser is guilty of wrongdoing, it is in the best interest of the endorser—and the brand—to acknowledge the allegations."[71]  Thus, to the extent that the article has any applicability to USPS' sponsorship of Armstrong, it runs counter to Dr. Joachimsthaler's point.  Mr. Armstrong's repeated and forceful denials of doping despite strong evidence to the contrary would have had "detrimental effects" for the USPS.[72]

66.     As with the other key principles that Dr. Joachimsthaler derives, this one is not well supported by the evidence or literature. I will describe these flaws below.

---

[68]  Lee, John S., & Dae H. Kwak, "Consumers' Responses to Public Figures' Transgression: Moral Reasoning Strategies and Implications for Endorsed Brands," *Journal of Business Ethics*, 2015, DOI: 10.1007/s10551-015-2544-1, p. 6.

[69]  Lee, John S., & Dae H. Kwak, "Consumers' Responses to Public Figures' Transgression: Moral Reasoning Strategies and Implications for Endorsed Brands," *Journal of Business Ethics*, 2015, DOI: 10.1007/s10551-015-2544-1, p. 8.

[70]  Lee, John S., & Dae H. Kwak, "Consumers' Responses to Public Figures' Transgression: Moral Reasoning Strategies and Implications for Endorsed Brands," *Journal of Business Ethics*, 2015, DOI: 10.1007/s10551-015-2544-1, p. 10.

[71]  Carrilat, Francois, et al., "For Better, for Worse? What to do when celebrity endorsements go bad," *Journal of Advertising Research*, 53, 2013, p. 27.

[72]  Carrilat, Francois, et al., "For Better, for Worse? What to do when celebrity endorsements go bad," *Journal of Advertising Research*, 53, 2013, p. 27.

Key Factor 6: Personal Responsibility

67.     Finally, Dr. Joachimsthaler claims that the USPS brand was insulated from harm because "attribution theory" predicts that consumers will attribute the responsibility of doping to Lance Armstrong, rather than to USPS. If this is the case, it is likely that consumers will divorce Lance's actions from the USPS, as they do not see the USPS as an "at fault" party.[73]

68.     Dr. Joachimsthaler justifies this idea by pointing to two references, Zhou and Witla (2013) and Wilson et al (2008).[74]  However, these references do not support his arguments. The first article Dr. Joachimsthaler's cites regarding consumers' allocation of responsibility for Armstrong's transgressions is Lianxi Zhou's and Paul Whitla's "How negative celebrity publicity influences consumer attitudes: The mediating role of moral reputation."[75] However, the article has nothing do with apportionment of blame between sponsor and endorser or measuring the degree to which the endorser is considered at fault. Instead, it concerns differential effects of transgressions on endorsers' and sponsors' respective reputations depending on the moral nature of the endorsers' misconduct and the degree to which the consequences of the misconduct are private (e.g., marital infidelity) versus public (e.g., effectively encouraging drug use among the young).[76]

69.     Not only is the article unrelated to Dr. Joachimsthaler's proposition that USPS would be insulated from harm because it was not to blame for Mr. Armstrong's drug use, but the article implies more generally that USPS would be harmed by Mr. Armstrong's

---

[73]   Joachimsthaler Report, p. 72.
[74]   Joachimsthaler Report, pp. 72-3.
[75]   Zhou, Lianxi & Paul Whitla, "How negative celebrity publicity influences consumer attitudes: The mediating role of moral reputation," *Journal of Business Research,* 66, 2013, pp. 1013-1020.
[76]   Zhou, Lianxi and Paul Whitla, "How negative celebrity publicity influences consumer attitudes: The mediating role of moral reputation," *Journal of Business Research,* 66, 2013, p. 1013.

misconduct. The authors opine that endorser misconduct hurts sponsors' brand value, especially when the endorser is responsible for the wrongdoing:

- "[S]tudies have shown that negative information tends to be more detrimental when the celebrity is judged to be responsible for his/her own wrongdoing."[77]

- "Research in cognitive psychology suggests that moral judgement is a matter of emotion (Greene & Haidt, 2006) and negative emotions associated with a tarnished spokesperson could become especially problematic because they can be transferred to endorsed brands."[78]

- "[W]e believe that individual perceptions of immorality downgrade the attractiveness or credibility of the celebrity, which leads to poorer attitudes toward the person as well as his/her endorsed brands."[79]

- "The extent to which the moral reputation of the celebrity is hit by negative publicity has an impact on attitudes toward the celebrity and the products they endorse."[80]

70.     In other words, and directly counter to Dr. Joachimsthaler's assertion, the Zhou and Witla paper shows that a celebrity's moral reputation directly impacts a consumer's attitude to the sponsoring brand.  This is in line with Heider's balance theory, which is reflected in the statements: 'The friend of my friend is my friend' and 'the friend of my enemy is my enemy.'

71.     Balance theory holds that pressures to resolve inconsistencies lead to attitude change through an associative process.[81]  In particular, the theory proposes a triad as the unit of analysis:  the perceiver (P), another person (O), and an attitude object (X), all linked

---

[77]   Zhou, Lianxi and Paul Whitla, "How negative celebrity publicity influences consumer attitudes: The mediating role of moral reputation," *Journal of Business Research,* 66, 2013, p. 1014.

[78]   Zhou, Lianxi and Paul Whitla, "How negative celebrity publicity influences consumer attitudes: The mediating role of moral reputation," *Journal of Business Research,* 66, 2013, p. 1015.

[79]   Zhou, Lianxi and Paul Whitla, "How negative celebrity publicity influences consumer attitudes: The mediating role of moral reputation," *Journal of Business Research,* 66, 2013, p. 1015.

[80]   Zhou, Lianxi and Paul Whitla, "How negative celebrity publicity influences consumer attitudes: The mediating role of moral reputation," *Journal of Business Research,* 66, 2013, p. 1018.

[81]   Heider, Fritz, *The Psychology of Interpersonal Relations*, Wiley, 1958, pp. 174-217.

by positive or negative relationships.  If the relationship between (O) and (X) is positive, as is the relationship between (P) and (O), pressures mount to make the relationship between (P) and (X) consistent with the other two.  In particular, if a celebrity (O) likes a brand (X), and a consumer (P) likes the celebrity (O), pressures emerge for the consumer (P) to also like the brand (X) to ensure consistency.  Figure 4 illustrates the application of Heider's balance theory to the present situation where  (P) is the consumer, (O) is Lance Armstrong and (X) is the USPS brand.

**Figure 4:  Heider's Balance Theory Applied to the USPS' Sponsorship of Lance Armstrong**



In other words, a product endorsed by someone I like (dislike) becomes something I like (dislike).

29

72.     The second article Dr. Joachimsthaler's cites about consumers' allocation of responsibility for Armstrong's transgressions is "Player transgressions and the management of the sport sponsor relationship," by Wilson, *et al.*[82] This article is also unrelated to Dr. Joachimsthaler's premise. It has nothing to do with whether a sponsor is "at fault" for its endorser's misconduct or whether sponsors who are not "at fault" are insulated from harm when endorsers transgress. To the contrary, the article concerns the implications of player misconduct on their teams' relationships with team sponsors.[83] The article does not address the potential impact on sponsors' brand value from endorsers' misconduct, and takes this risk as a given. The article does not measure consumer responses to endorser misconduct, either in the laboratory or in real life. The article is not even focused on the effects of transgressions on consumers or consumer behavior. To the contrary, the article reports the results of interviews with eight senior executives at Australian sports teams.[84] It concerns how teams can manage their relationships with sponsors in light of player misconduct.[85] The article does not even mention the word "attribution" until its penultimate paragraph in which the authors say: "In addition, future studies should consider how key stakeholders attribute blame (Gardial, Flint & Woodruff, 1996)."[86]

73.     In Dr. Joachimsthaler's study, 79% of blame was placed solely on Lance

---

[82]  Wilson, Bradley, et al., "Player transgressions and the management of the sport sponsor relationship," *Public Relations Review*, 34, 2008, pp. 99-107.

[83]  Wilson, Bradley, et al., "Player transgressions and the management of the sport sponsor relationship," *Public Relations Review*, 34, 2008, pp. 99.

[84]  Wilson, Bradley, et al., "Player transgressions and the management of the sport sponsor relationship," *Public Relations Review*, 34, 2008, pp. 101.

[85]  Wilson, Bradley, et al., "Player transgressions and the management of the sport sponsor relationship," *Public Relations Review*, 34, 2008, pp. 105.

[86]  Wilson, Bradley, et al., "Player transgressions and the management of the sport sponsor relationship," Public Relations Review, 34, 2008, p. 105. In addition, the paper cautions against accepting its findings as it is an 'exploratory' study (p. 105).  Finally, and perhaps most revealing, is that I was unable to find blame apportionment in its conceptual model.  The paper does distinguish between on and off field transgressions, but emphasizes that players need to be held accountable in either case (pp. 101-104),

Armstrong, with just a few percentage points of blame pointed at the USPS.[87]  Dr.

Joachimsthaler suggests that these data show that the USPS brand was insulated from Mr.

Armstrong's transgressions. My review of this contention is covered later in this report.

### C.  Summary

74.     Dr. Joachimsthaler's analysis of the effect of Mr. Armstrong's transgression is

complex and difficult to understand.  It rests on the analysis of six factors.  The guiding

principle of each factor can be written in the form of a logical "if – then" statement:

    i    If the relationship between the sponsor and the sponsored party is one-way, then the sponsor will be insulated from harm in the event of a transgression performed by the sponsored party;

    ii    If a sponsorship is salience-focused, then the sponsor will be insulated from harm in the event of a transgression performed by the sponsored party;

    iii    If the sponsor and the sponsored party have different brand archetypes, then the sponsor will be insulated from harm in the event of a transgression performed by the sponsored party, even if there is strong brand congruence apart from archetype;

    iv    If a transgression is on the periphery of a brand, which it usually is, then the sponsor's brand will be insulated from harm in the event of a transgression performed by the sponsored party;

    v    If a transgression is unrelated to a brand's product or service, then the sponsor's brand will be insulated from harm in the event of a transgression performed by the sponsored party; and

    vi    If consumers attribute a transgression to the sponsored party and not to the sponsor, then the sponsor's brand will be insulated from harm in the event of a transgression performed by the sponsored party.

None of these propositions is presented with sufficient empirical or theoretical justification.

75.     That said, Dr. Joachimsthaler "tests" these six propositions (i.e., his key factors)

mostly with the aid of a survey.  For the most part (propositions ii, iii, v, and vi), he uses his

---

[87]   Joachimsthaler Report, p. 87.

survey to investigate the antecedent of the proposition at hand.  He then invokes the logical

consequence as a conclusion.  In each case, he appears to (erroneously) argue that because

the antecedent obtains, the consequent must obtain as well. For proposition i, he simply

observes that the relationship is one-way.  For proposition iv, he offers empirical evidence

not related to the proposition at all.

## IV.  DR. JOACHIMSTHALER'S ANALYSIS OF THE BENEFIT THE USPS BRAND RECEIVED FROM USPS' SPONSORSHIP OF LANCE ARMSTRONG AND HIS CYCLING TEAM IS FLAWED AND CANNOT SUPPORT HIS CONCLUSION

76.     Dr. Joachimsthaler relies extensively on BrandAsset Valuator (BAV) data in his

attempt to measure the benefit the USPS received from its sponsorship of Mr. Armstrong.

Dr. Joachimsthaler's analysis focuses on a comparison between the USPS brand and brands

he defines as competitive, namely, the UPS and FedEx brands. He organizes his argument

by focusing on what he calls five attributes of the USPS brand: tradition, trust, scope,

reliability, and affordability.[88] Generally speaking, Dr. Joachimsthaler concludes that the

USPS brand grew stronger relative to its competitors during the sponsorship period and that

this phenomenon was evidence of the benefits the USPS received from its sponsorship of

Mr. Armstrong.[89]

77.     His analysis is flawed in at least two significant respects.  First, by cherry picking

from the 72 BAV dimensions he has, as I like to say "tortured the data until they

confessed."  In other words, he has either found or stumbled on a way to present results that

appear to support his point but are easily contradicted by simply looking at the results in

another way.  Second, Dr. Joachimsthaler's work implicitly assumes that USPS'

sponsorship of Lance Armstrong and his cycling team was the only factor that impacted the

---

[88]   Joachimsthaler Report, p. 42.
[89]   Joachimsthaler Report, p. 53.

USPS brand during the period of the sponsorship.

78.      Furthermore, I note that Dr. Joachimsthaler refers to 72 BAV brand attributes but has only provided data on 51 of them.[90]  Therefore, I am unable to review fully his analysis of these data.

###   A.  Artificial attributes

79.       Dr. Joachimsthaler justifies his use of the BAV data by citing BAV's long track record and the fact that its data has been relied upon and field tested extensively by both researchers and practitioners.[91] However, he uses BAV's data in an idiosyncratic way that is contrary to industry practice and lacks empirical foundation. Consequently, Dr. Joachimsthaler's analysis and conclusions are based on a methodology that was neither empirically tested nor for which there is a theoretical basis other than own his subjective opinion.

80.      Instead of using the empirically validated Four Pillars (described in paragraph above), which are routinely used by BAV and others to assess the strength of a brand,[92] Dr. Joachimsthaler constructed five of his own attributes to measure the changes in the strength of the USPS brand during the sponsorship period.[93] Without any empirical validation beyond the fact that "he says so," Dr. Joachimsthaler claims that his constructed attributes measure the strength of the USPS brand.

81.      To construct his own attribute measures, Dr. Joachimsthaler selectively picks out 17 of the 72 BAV brand dimensions. He provides no justification for his selections, other than his own opinion, and provides no statistical measures or other evidence to support his

---

[90]   Joachimsthaler Report, p. 43 and JOACHIMSTHALER00000251.
[91]   Joachimsthaler Report, p. 43.
[92]   See for example Mizic, Natalie, and Robert Jacobson, "The Financial Value Impact of Perceptual Brand Attributes," *Robert Journal of Marketing Research,* 45, 2008, pp. 15-32.
[93]   Joachimsthaler Report, pp. 43-47.

choices. Figure 5 below shows which dimensions make up each of Dr. Joachimsthaler's five brand attributes.

**Figure 5: Dr. Joachimsthaler's brand attributes are based on 17 of 72 BAV dimensions**

| Dr. Joachimsthaler's Brand Attributes | Included BAV Dimensions |
|---|---|
| Tradition | Knowledge, Original, Traditional |
| Trust | Trustworthy, Authentic, Distinctive, Leader, Prestigious |
| Scope | Up-To-Date, Relevant, Helpful |
| Reliability | High Quality, High Performance, Reliable, Cares For Customers |
| Affordability | Good Value, Worth More |

82.     While some of the choices Dr. Joachimsthaler makes about which dimensions to include in a particular attribute are obvious and sensible on their face ("trust" includes "trustworthy"), others are neither obvious nor sensible and are made without justification (for example, Dr. Joachimsthaler's constructed "trust" attribute also includes "distinctive" and "prestigious").

83.     Furthermore, to construct each of these untested, and essentially "made up" attributes, Dr. Joachimsthaler weights each dimension equally, again without justification.[94] The implication of this equal weighting is illustrated by looking at the trust, tradition, and reliability pillars.

84.     Dr. Joachimsthaler's analysis of "trust" is illustrative.  In his analysis, BAV dimensions, "distinctive" and "prestigious" each contribute as much to the measure of trust as the BAV dimension "trustworthy." No complex analysis should be required to conclude that "trustworthy" is the most important dimension in measuring the "trust" attribute.

---

[94]   There are well established statistical methods that are designed to create a smaller set of attributes (in this case 5) out of a larger set of variables (in this case 72). For example, Dr. Joachimsthaler could have performed a factor analysis on the BAV data. However, Dr. Joachimsthaler did not make use of any of these methods.

85.     Reconstructing the "trust" attribute to include only the "trustworthy" BAV

dimension leads to the conclusion that the USPS brand remained virtually unchanged

throughout the sponsorship period, as shown in Figure 6 below. By contrast, Dr.

Joachimsthaler's artificial "trust" attribute increased 9% over the same period. By removing

Dr. Joachimsthaler's subjective dimensions (Authentic, Distinctive, Leader, Prestigious)

from the category, it becomes clear that the USPS sponsorship of Mr. Armstrong did not

materially affect consumer trust in the USPS brand. This statement even grants Dr.

Joachimsthaler's assumption that changes in the USPS brand over the sponsorship time

period were due only to the sponsorship and not a number of other factors.

**Figure 6: Dr. Joachimsthaler's self-defined "trust" attribute gives the false impression that trust in the USPS brand improved during the sponsorship period**



86.     The same exercise can be performed on Dr. Joachimsthaler's "tradition" attribute,

with similar results. As shown in Figure 7 below, removing the "original" and "knowledge"

dimensions from the "tradition" attribute makes it clear that the USPS brand's "tradition"

attribute did not materially change during the sponsorship period. Again, this runs directly

counter to the 6% improvement in Dr. Joachimsthaler's self-defined "tradition" attribute.

**Figure 7: Dr. Joachimsthaler's self-defined "tradition" attribute gives the false impression that the USPS brand's tradition attribute improved during the sponsorship period**



87.     Finally, removing all dimensions except for "reliable" from the "reliability"

attribute again produces materially different results from Dr. Joachimsthaler's subjectively-

defined "reliability" attribute. As shown in Figure 8 below, the USPS brand's perceived

reliability did not improve during the sponsorship period as measured by the reliable

dimension. Once again, removing potentially superfluous dimensions from Dr.

Joachimsthaler's self-defined "reliability" attribute results in the elimination of any

improvement.



**Figure 8: Dr. Joachimsthaler's self-defined "reliability" attribute gives the false impression that the USPS brand's perceived reliability improved during the sponsorship period**



88.   In conclusion, contrary to Dr. Joachimsthaler's claims, using more straightforward definitions leads to the conclusion that the BAV data show the USPS brand showed little to no improvement in the three attributes most likely to have been affected by Mr. Armstrong (trust, tradition and reliability as opposed to scope and affordability) during the sponsorship period. It was only by including marginally related brand dimensions in his calculus that Dr. Joachimsthaler was able to give the impression that the USPS brand improved during the period in which it sponsored Mr. Armstrong.

### B.   Other Factors

89.   Even if one were to grant that the USPS brand showed improvement during the sponsorship period, Dr. Joachimsthaler's conclusions require the assumption of the highly unlikely premise that all changes to the USPS brand stature over the six-year period were solely attributable to the USPS sponsorship of Mr. Armstrong. In making this assumption,

Dr. Joachimsthaler fails to account for a variety of external factors that could have affected the USPS brand stature. For example, the USPS has more than 31,000 retail locations, more than 200,000 vehicles, and processed more than 150 billion pieces of mail in 2015.[95] Given this infrastructure and business process, the average American has, at the very least, hundreds of interactions with the USPS every year. Improvements in anything from pricing, to service quality, to reliability, or to product offering could all serve to increase the USPS brand stature. Dr. Joachimsthaler's analysis makes no attempt to account for any of these potential factors as possible drivers of impressions of the USPS brand.

90.    Even if one were to ignore these interactions and only consider USPS promotional activities, the sponsorship of Mr. Armstrong was dwarfed by the USPS' other promotional efforts. From 1998 to 2004 the USPS spent a total of $1.2 billion on advertising.  Its sponsorship spend, in contrast, constituted only between 1% and 8% of its annual advertising budget.[96]

91.    Further, the graphs of BAV data that Dr. Joachimsthaler presents in Exhibit C to his report show that the USPS', FedEx's, and UPS' rankings rise and fall together in the dimensions constructed by Dr. Joachimsthaler. This suggests that something was going on that impacted all the firms at the same time and second, that the changes in the USPS' scores on Dr. Joachimsthaler's attributes were not attributable to its sponsorship of Mr.

---

[95]   "About – Size and Scope," USPS, https://about.usps.com/who-we-are/postal-facts/size-scope.htm, accessed January 24, 2016.

[96]   Advertising figures for 1999, 2000, 2001, and 2004 are taken from "Notes to the Financial Statements," *USPS 2001 Annual Report*, http://about.usps.com/who-we-are/financials/annual-reports/fy2001/financial/note2.htm, accessed February 18, 2016; and "Notes to the Financial Statements," *USPS 2006 Annual Report*, http://about.usps.com/who-we-are/financials/annual-reports/fy2006/fstatements_007.htm, accessed February 18, 2016. Advertising budget for 1998 is sourced from "USPS Cuts Ad Budget," Chief Marketer, August 20, 1999, http://www.chiefmarketer.com/usps-cuts-ad-budget/, accessed February 8, 2016. Advertising budget for 2002 and 2003 is sourced from Irwin, Tanya, "The Quick and the Cheap: New Positioning for USPS," AdWeek, February 17, 2003, http://www.adweek.com/news/advertising/quick-and-cheap-new-positioning-usps-61893, accessed February 8, 2016.

Armstrong or to anything else that affected consumers' perceptions of the USPS brand independently of those of FedEx or UPS.

92.    Statistical analysis bears out the visual impression of synchronized movement apparent in the graphs in Joachimsthaler's Report Exhibit C. As the table below shows, the USPS' score on each of Dr. Joachimsthaler's five attributes was highly correlated with the scores of its major competitors (FedEx and UPS), and nine of these ten correlations were statistically significant at the 95% confidence level.

**Figure 9:  Correlation between USPS' scores on Dr. Joachimsthaler's brand attributes and those of its major competitors, 1997 - 2014[97]**

|  | Competitor | |
|---|---|---|
| **Attribute** | **FedEx** | **UPS** |
| Tradition | 0.84* | 0.88* |
| Trust | 0.62* | 0.74* |
| Scope | 0.36 | 0.43* |
| Reliability | 0.75* | 0.88* |
| Affordability | 0.85* | 0.87* |

93.    Given that the sponsorship did not cover the entire data period and that neither FedEx nor UPS were ever Armstrong sponsors, this pattern indicates that something other than the Armstrong sponsorship must be affecting consumer rankings.   This analysis strongly supports my conclusion that even if Dr. Joachimsthaler had identified a statistically significant improvement in the USPS' BAV rank in some dimension during the term of the sponsorship, he still could not reliably attribute the improvement to the sponsorship because clearly there are other factors that affected consumer perceptions of

---

[97] *Correlation is statistically significant at 95% confidence level.

the USPS brand, along with those if its competitors' brands during this period.

## V.  DR. JOACHIMSTHALER'S ANALYSIS OF LANCE ARMSTRONG'S TRANSGRESSION IS FLAWED AND CANNOT SUPPORT HIS CONCLUSION THAT THE TRANSGRESSION DID NOT HARM THE USPS BRAND.

94.     Dr. Joachimsthaler's investigation consists of two parts: (1) the conceptual development of a theoretical architecture for investigating the effects of the transgression; and (2) an empirical analysis, based largely on survey data he collected, to support the application of that architecture to the case of Lance Armstrong and the USPS brand.

95.     Each part of the investigation suffers from fatal flaws.  As set forth above, the development of the conceptual architecture is unscientific and illogical.  In addition, the construction and implementation of the survey violates several principles of survey practice.  As such, Dr. Joachimsthaler's conclusion that Lance Armstrong's transgressions did not harm the USPS cannot be relied upon.

### A.  Flaws in Development of Conceptual Architecture

Dr. Joachimsthaler's Transgression Theory is Not a Theory

96.     The six factor model and the associated six "if-then" statements derived from it form the core of Dr. Joachimsthaler's transgression theory and his conceptual development. Any analysis of the 'transgression theory' embodied therein must begin with those six factors listed above.  A reader of Dr. Joachimsthaler's report is left with several questions. Where do these factors come from?  Are they the product of a logical process or merely the result of Dr. Joachimsthaler's off-hand thinking?  Why these six and not others?  How do they relate to each other?  Are other factors missing?  Without compelling answers to these questions, Dr. Joachimsthaler's transgression theory is nothing more than a cherry-picked list of items without any collective scientific foundation that he appears to have created just for the purposes of this report.  It is certainly not a theory.

97.    The major textbooks on social research posit similar definitions of what a theory is.

Hoyle, Harris and Judd's *Research Methods in Social Relations* (7th ed.) defines a theory

"as a set of interrelated hypotheses that is used to explain a phenomenon and make

predictions about associations among constructs relevant to the phenomenon."[98]  Kerlinger

and Lee's *Foundations of Behavioral Research* (4th ed.) says "A theory is a set of

interrelated constructs (concepts), definitions, and propositions that present a systematic

view of phenomena by specifying relations among variables, with the purpose of explaining

and predicting the phenomena."[99]

98.    Given these definitions, the six factor model and the six "if-then" statements do not

comprise a theory.  Dr. Joachimsthaler illustrates no interrelationships among the variables

in the usual sense.  The hypotheses are not interrelated; each is stated and examined in

isolation.  The constructs (concepts) were not systematically chosen.  Instead, the six

statements are ad-hoc propositions that are neither theoretically nor empirically justified

and apparently selected simply for the purposes of making an argument in this case.

Calling Dr. Joachimsthaler's conceptual architecture a theory glorifies it as something it

absolutely is not.

99.    Harris, Hoyle, and Judd's book lists eleven criteria of a productive theory.  A

productive theory

   1)    Is falsifiable;
   2)    States hypotheses as specifically as possible;
   3)    Is as parsimonious as possible;
   4)    Addresses an important social phenomenon;
   5)    Is internally consistent; that is, the hypotheses do not contradict one another;
   6)    Is coherent and comprehensible;

---

[98]  Hoyle, Rick H., Monica J. Harris, and Charles M. Judd, *Research Methods in Social Relations*, 7th ed., Ft. Worth, TX: Wadsworth, 2002.
[99]  Kerlinger, Fred N., *Foundations of Behavioral Research*, 4th ed., Ft. Worth TX: Harcourt College Publishers, 2000.

7)      Specifies its relevant constructs and how they are measured;

8)      Agrees with what is already known about the topic;

9)      Explains data better than existing theories on the same topic;

10)      Agrees with existing theories about related topics; and

11)      Generates new insights about the topic.[100]

100.    Dr. Joachimsthaler's "Transgression Theory" does not satisfy several (perhaps most) of these characteristics.  The problems in construction and presentation prevent it from satisfying the second, sixth, and seventh. Since the six factors are chosen on the spot without empirical basis, the "theory" cannot satisfy the ninth.  Most importantly though, Dr. Joachimsthaler's "theory" does not satisfy the fifth criterion as I shall illustrate below in my discussion of brand congruence.

Dr. Joachimsthaler's Transgression Theory Propositions Are Baseless

101.    In the section of this report where I summarize Dr. Joachimsthaler's arguments, I have already demonstrated that none of his propositions with respect to the six factors have a theoretical or empirical basis, at least not one presented in the Joachimsthaler report. Absent such a basis, the only justification available is 'because he says so.'

102.    Indeed, in each case, Dr. Joachimsthaler's antecedent could easily lead to the conclusion opposite to the one he draws. For example,

     a.   In a one-way sponsorship relationship, the sponsor is perceived to be the decision maker because the sponsored party does not offer the sponsor anything. As such, the sponsor's judgment is called into question when the sponsored party commits a transgression;

     b.   Because salience-focused sponsorships focus on building overall awareness, they do not focus on specific brand characteristics.  The only psychological target then is overall affect.  Salience-focused sponsorships then leave the sponsored party open to harm from transgressions because negative affect towards the sponsored party would be transferred to the sponsor as in balance theory;

---

[100] Hoyle, Rick H., Monica J. Harris, and Charles M. Judd, Research Methods in Social Relations, 7th ed., Ft. Worth, TX: Wadsworth, 2002.

    c.   Similarly, differences in brand archetypes deprive the consumer of specific bases upon which to evaluate the relationship between brands.  As such, they have no choice but to focus on overall affect as the basis of their perceived relationship.  This leaves them open to harm from sponsored transgressors; the friend of my enemy is my enemy;

    d.   If a transgression is on the periphery of a brand, the consumer has no motivation to deeply process brand information.  Instead, they form judgments based purely on overall affect.  Again, this leaves them open to harm from sponsored transgressors;

    e.   Similarly, if a transgression is unrelated to a brand's product or service, then any relationship perceived between the sponsored party and the brand must be based on overall affect.  Once more, this leaves the brand open to harm from sponsored transgressors; and

    f.   Even if consumers attribute a transgression to a sponsored party and not the sponsor, overall affect transfers and leaves the sponsor brand open to harm from sponsored transgressors.

103.    I do not expect either the court or Dr. Joachimsthaler to accept my versions any more than I am willing to accept his.  However, I am compelled to point out that the last five of the propositions outlined above are based on the transfer of affect and the principle that the friend of my enemy is my enemy as in Heider's balance theory.  They also conform to the Zhou and Witla (2013) results used by Dr. Joachimsthaler and cited above.  If someone I like (dislike) represents the brand, then I will also like (dislike) the brand.  My propositions have as much foundation in the literature as Joachimsthaler's, perhaps more.

104.    Dr. Joachimsthaler derives his transgression theory and conceptual architecture from various sources in the literature.  However, as I have argued above, those sources either are not quite on topic (i.e., they are about when brands misbehave, not sponsored or endorsed parties), cut both ways (i.e., present arguments that run counter to the principles Dr. Joachimsthaler presents as well as ones that support them), or are virtually irrelevant.

105.    Interestingly, though, Dr. Joachimsthaler ignores a very established stream of

literature that focuses on the persuasive value of negative information. One of the well-studied phenomena that Dr. Joachimsthaler ignores is the fact that there exists a negativity bias such that negative information has a larger and longer-lasting impact than positive information.[101] In fact, according to one method of estimating the differential impact (the "Merriam formula"), one piece of negative information can have four times the weight of positive information.[102]

106.    Other studies have demonstrated that negative information draws more attention than positive information.[103] Negative information is also recalled more easily and more accurately than positive information.[104] The negativity bias is also evident in other areas, including emotions, relationships, learning, etc.[105]

107.    In sum, a number of studies have demonstrated the strong impact of negative information in a variety of settings. Certainly, any building of a conceptual architecture of transgression theory must account for this literature. Dr. Joachimsthaler's does not.

108.    In sum, Dr. Joachimsthaler's propositions are not straightforward and uncontroversial.  Without a complete and coherent theoretical or empirical basis, Dr.

---

[101] See, for instance, Anderson, Norman H., "Averaging versus adding as a stimulus-combination rule in impression formation," *Journal of Personality and Social Psychology*, 2, 1965, pp. 1-9; Hamilton, D. L., & L. J. Huffman, "'Generality of impression formation processes for evaluative and nonevaluative judgments," *Journal of Personality and Social Psychology*, 20, 1971, pp. 200-207; Hodges B. H., "Effect of valence on relative weighting in impression formation," *Journal of Personality and Social Psychology*, 30, 1974, pp. 378-381; and Wyer, R. S., and R. L. Hinkle, "Informational factors underlying inferences about hypothetical persons," *Journal of Personality and Social Psychology*, 34, 1971, pp. 481-495.

[102] Kroloff, G., "Media: At home and abroad," *Public Relations Journal*, October 1988, pp. 8-10.

[103] Fiske, S. T., "Attention and weight in person perception: The impact of negative and extreme behavior," *Journal of Experimental Research in Personality*, 22, 1980, pp. 889-906; and Pratto, F., and O. P John, "Automatic vigilance: The attention-grabbing power of negative social information," *Journal of Personality and Social Psychology*, 61, 1991, 380-391

[104] Carlston, Donal E., "The recall and use of traits and events in social inference processes," *Journal of Experimental Social Psychology*, 16, 1980, pp. 303-328. Robinson-Riegler, G. L., and W.M. Winton, "The role of conscious recollection in recognition of affective material: Evidence for positive-negative asymmetry," *Journal of General Psychology*, 123, 1996, pp. 93-104.

[105] For a review of the literature on the negativity bias, see, Vohs, Kathleen, "Bad is Stronger Than Good," *Review of General Psychology*, 5, 2001, 323-370.

Joachimsthaler's propositions are little more than mere musings.

Dr. Joachimsthaler's Experimental Manipulation was Inappropriately Weak

109.   Experimental manipulation is the act of manipulating an independent variable (in this case, awareness of Mr. Armstrong's transgression) to determine the effect it has on one or more dependent variables (in this case, whether or not the USPS was harmed as a result of Mr. Armstrong's transgression).

110.   Dr. Joachimsthaler's analysis assumes Mr. Armstrong's use of performance enhancing drugs, and perhaps lying about it, as the full extent of his transgression in this case[106] when, in fact, his transgressions were far greater.

111.   For the record, Mr. Armstrong himself disagrees with Dr. Joachimsthaler. According to Mr. Armstrong, an additional major component of the transgression was mistreating people.[107] Mr. Armstrong admits that his transgression consisted of more than merely doping:

> But all those people that made that first mistake, which now nobody cares about, none of them treated people like shit.  None of them attached another human being. None of them sued another human being.  And I did all those things.  So my words to an 18-year-old me would be, you know, *Understand that you may face some decisions in this sport, but, man, don't ever isolate, attack, ostracize, incite another human being.*  Because the doping isn't – we're not talking about this because I doped.  We're talking about this because of the way I treated other people.  And that's my mistake, and I own that…. But these are people who – and again, it goes back to the most important word in all of this is 'betrayal.'  So the people who have a tremendous sense of betrayal, that's the walk I walk the rest of my life.[108]

112.   In other words, Mr. Armstrong's transgression involved even more than cheating to win a bike race and lying about it.  Looking at the transgression in this broader sense casts a

---

[106] Joachimsthaler report, pp. 56-59.

[107] McMahon, Daniel, "Lance Armstrong Says His Critical Mistake in Life was Bigger than Doping—Is He Still Making It?" *Business Insider,* Dec. 9, 2015, http://www.businessinsider.com/lance-armstrong-biggest-mistakes-2015-12, accessed February 5, 2016.

[108] McMahon, Daniel, "Lance Armstrong Says His Critical Mistake in Life was Bigger than Doping—Is He Still Making It?" *Business Insider,* Dec. 9, 2015, http://www.businessinsider.com/lance-armstrong-biggest-mistakes-2015-12, accessed February 5, 2016.

very different light on some aspects of Dr. Joachimsthaler's work.  The transgression can no longer be viewed as on the periphery or unrelated to any service in which human interaction is important. In spite of this, Dr. Joachimsthaler's experiment did not attempt to measure his subjects' response to information that rendered his transgression so outrageous in many people's view (including Mr. Armstrong himself).

113.    As I will discuss in more detail below, Dr. Joachimsthaler's failure to describe fully Mr. Armstrong's transgression meant his study's experimental manipulation was too weak to be effective.

### B.  Flaws in the Survey

114.     In an attempt to 'test' his six factor transgression theory/conceptual architecture, Dr. Joachimsthaler conducted a web-based study consisting of two largely similar surveys, both of which claim to probe the connection between Armstrong and the USPS brand. One, the "athlete" survey, focused on questions about Armstrong and other high-profile athletes (Michael Phelps and Alex Rodriguez); the other, the "brand" survey, focused on questions about the USPS and other brands (e.g. Nike, Speedo, FedEx, Trek, etc.). The athlete version of the survey sampled 1,008 respondents; the brand version sampled 1,006, for a total of 2,014 respondents across both surveys.

115.    The survey interviews had three components:[109]

    a.  Open-ended questions to reveal unaided awareness of the former sponsor relationship the USPS had with Lance Armstrong and his team;

    b.  Closed-ended rating scales to determine brand impression, salience, and relevance of the people or brands investigated; and

    c.  Closed-ended multiple choice questions to determine aided awareness of the former sponsor relationship, brand archetypes, and the existence and

---

[109] Joachimsthaler report, p. 75.

strength of various pre-specified possible associations for Mr. Armstrong, the USPS, and other brands and athletes.

The specific questions a respondent was presented with differed according to which survey (athlete or brand), he or she participated in.

116.   Embedded in each of the two surveys was a test-control "experiment."  Respondents in the control group were presented with a brief description outlining how athletes are often sponsored by brands.  It included the following examples: Lance Armstrong by the USPS, Alex Rodriguez by Topps, and Michael Phelps by Subway.  Respondents in the test group were exposed to an expanded version that included the transgressions committed by each of the three athletes: Lance Armstrong's doping, Alex Rodriguez's use of performance enhancing drugs, and Michael Phelps' use of marijuana. Closed-end multiple-choice questions (positive, neutral, negative) were used in an attempt to assess the impact of the additional information.

117.   Finally, for the test groups only, respondents were asked to perform a constant-sum allocation task to apportion blame for the transgressions described.

118.   The survey and Dr. Joachimsthaler's interpretation of its results suffer from many flaws of construction and interpretation.  I shall enumerate several of these in the following sections.  These include improper sampling strategy, ambiguous survey questions, and errors in interpretation.

119.   Additionally, I note that Dr. Joachimsthaler does not report any pretest of his survey. Given that, I assume none was done.  Pretests are an important tool used in research studies to ensure the questions posed are clear and unambiguous. In fact, the academic literature states "[p]retesting a survey questionnaire is always recommended – no text in

survey methods would speak against such hallowed scientific advice,"[110] and "[i]t is an article of faith among survey researchers that pretesting should be an integral part of questionnaire development."[111] In *Asking Questions*, a well-known guide to questionnaire design, Bradburn et al. (2004) elaborate that a pretest helps researchers determine if the survey is collecting the data they need and identify any problems with the questions. Specifically, the authors state:

> Even after years of experience, no expert can write a perfect questionnaire. Among the three authors, we have more than one hundred years of experience in questionnaire construction, and we have never written a perfect questionnaire on the first or second draft, nor do we know any professional social scientists who claim they can write questionnaires that need no revision. We do, however, know many beginners who have spent all their limited resources sending out a first draft of a questionnaire, only to dishearteningly discover that some key questions were misunderstood and not answered in a useable way … If you do not have the resources to pilot-test your questionnaire, don't do the study …. a pretest will help you determine if the questionnaire is gathering the data you need and whether it is convenient and clear for respondents to fill out. Additionally, a pretest will often suggest problems you were unaware of, and it can help you avoid costly mistakes[112]

Indeed, the verbatim survey responses illustrate that many respondents felt that the survey did not allow them to properly express their true opinion about the matters at issue. Because he apparently did not conduct a pretest, Dr. Joachimsthaler was not able to correct the flaws in his survey questionnaire.

Dr. Joachimsthaler's Samples Excluded Mailing/Shipping Professionals

120.    Dr. Joachimsthaler's report states that one of the goals of the USPS sponsorship of Mr. Armstrong was generating new business-to-business revenues, not increased consumer

---

[110] Converse, Jean M., et al., *Survey Questions: Handcrafting the Standardized Questionnaire*, Beverley Hills: Sage Publications, 1986, p. 51.

[111] Schaeffer, Nora C., et al., "The Science of Asking Questions," *Annual Review in Sociology,* 29, 2003, p. 81.

[112] Bradburn, Norman, et al., *Asking Questions: The Definitive Guide to Questionnaire Design – For Market Research, Political Polls, and Social and Health Questionnaires*, San Francisco: Jossey-Bass Publishers, 2004, p. 317.

sales.[113] Specifically, Dr. Joachimsthaler states, with regard to the sponsorship goals, the following: "notable by its absence here is generating revenue through sales to general consumers – the hoped for revenue gains were focused on sales to businesses."[114]

121.    However, despite this stated target, Dr. Joachimsthaler chose to exclude all marketing and shipping/mailing professionals from his study, the very people who are involved with the services the USPS was trying to market. Consequently, Dr. Joachimsthaler's study can provide no insight into the perceptions held by the people targeted by the USPS sponsorship.

122.    I structure the next several paragraphs according to how Dr. Joachimsthaler uses the results of his surveys to support his transgression theory/conceptual architecture.

Key Factor 1 (Brand Relationship) - Dr. Joachimsthaler Underestimates Awareness of the USPS Sponsorship

123.    Dr. Joachimsthaler cites awareness data as part of his discussion of the first of his six factors, brand relationship.  However, it is not clear how it supports his assertion that a one-way relationship insulates the sponsor.  His point seems to be that low awareness of the Armstrong-USPS relationship protects the USPS from harm, a point which is independent from his transgression theory.  Nevertheless, he includes it in this section.  Dr. Joachimsthaler discusses both aided and unaided awareness but his analyses of both are flawed.

124.    To determine aided awareness of the sponsorship, Dr. Joachimsthaler asked respondents to indicate which brand or brands sponsored Mr. Armstrong. However, the USPS sponsored the US Tour de France team, of which Mr. Armstrong was a member. They did not sponsor Mr. Armstrong himself.  Despite this mistaken assertion in the

---

[113]  Joachimsthaler Report, pp. 40-41.
[114]  Joachimsthaler Report, pp. 40-41.

question, 24% percent of survey respondents were still able to link the USPS to Mr.

Armstrong,[115,116]

125.    In presenting the data for aided awareness, Dr. Joachimsthaler compares respondent

awareness of the more current Speedo-Phelps sponsorship relationship (33% in athlete

version and 39% in brand version) in an apparent attempt to minimize the awareness of the

12 year old USPS-Armstrong relationship which "...was *just* 24% in both versions of the

survey" (emphasis added).[117]

126.    Despite Dr. Joachimsthaler's characterization of 24% as low, results from his owns

survey suggest that 24% aided awareness is not low. For example, only 22% to 27% of

respondents identified Subway as a Michael Phelps sponsor even though that sponsorship

was ongoing as of the time of the survey.[118] Additionally, only 4% to 6% identified Under

Armour as a Michael Phelps sponsor although that sponsorship was ongoing too.[119]

127.    To determine unaided awareness of the USPS sponsorship of Mr. Armstrong, Dr.

Joachimsthaler asked respondents to list all of the brands they knew had sponsored Mr.

Armstrong (athlete survey) or all of the celebrities/athletes that the USPS had sponsored

(brand survey).[120] He then proceeded to calculate the percentage of respondents who listed

the USPS or Mr. Armstrong, respectively. These percentages represented the study's

---

[115] Joachimsthaler report, p. 146.

[116] Dr. Joachimsthaler also asked respondents whether or not they were aware of the USPS sponsorship of Mr. Armstrong's Tour de France cycling team prior to beginning the survey. 39% of Dr. Joachimsthaler's 1,006 Brand Survey respondents and 40% of his 1,008 Athlete Survey respondents reported being aware of this relationship, a significantly higher percentage than matched the USPS to Mr. Armstrong personally. However, for the purposes of this report I will focus on the aided awareness of the (non-existent) USPS sponsorship of Mr. Armstrong personally, as this is the figure Dr. Joachimsthaler based his analysis on. Joachimsthaler Report, pp. 154 and 183.

[117] Joachimsthaler report, p. 78.

[118] Joachimsthaler report, p. 146.

[119] Joachimsthaler report, pp. 146 and 164

[120] This question suffers from the same deficiency as the aided awareness question in that it once again asks respondents to name sponsors of Mr. Armstrong personally, not the U.S. Tour de France team Mr. Armstrong was a member of.

"unaided awareness" of the USPS sponsorship of Mr. Armstrong.

128.     A review of the verbatim responses to these questions demonstrates that Dr. Joachimsthaler ignored a number of responses that I believe many people would have counted as responses indicating awareness.

129.     To determine perhaps a more accurate level of awareness of the sponsorship, I recalculated Dr. Joachimsthaler's figures.[121] Across the two surveys, I have determined that the USPS sponsorships of Mr. Armstrong had approximately 11% unaided awareness, compared to the 8% that Dr. Joachimsthaler reported.[122]

130.     Dr. Joachimsthaler's report states that consumers "recalled many sponsor/celebrity partnerships ahead of Lance Armstrong and the USPS:"[123] Nike/Tiger Woods (10%), Speedo/Michael Phelps (8%), Topps/Alex Rodriguez (13%), and Subway/Michael Phelps (15%). However, using even Dr. Joachimsthaler's original tabulation resulting in a calculated value of 8%, it is clear that the USPS/Armstrong relationship is as well-known as many of the other sponsorships tested in the study, despite the fact that the others are more current.  Thus, his own experiment shows awareness of the USPS sponsorship remains high more than ten years after the sponsorship ended.

Key Factor 2 (Brand Building) – Sponsorship of a Salient Brand is not Necessarily a Salience-Focused Sponsorship

131.     The principle underlying the brand building factor of Dr. Joachimsthaler's transgression theory is that salience-focused sponsorships insulate the sponsor.[124]  He uses as support the statistics that (a) 49% of respondents think about the USPS frequently versus

---

[121] For a complete list of all responses included in my awareness calculation, please see Appendix [D].
[122] Joachimsthaler Report, p. 78.
[123] Joachimsthaler Report, p. 78.
[124] If Dr. Joachimsthaler is correct that a salience-focused sponsorship insulates the sponsor from negative associations, it would seem to follow that that the sponsor would not realize the full benefit of positive associations. Dr. Joachimsthaler never considers this implication.

26% and 22% for UPS and FedEx; and (b) 88% of respondents consider the USPS at the point of purchase, compared with 63% for UPS and 44% for FedEx.  He claims that these data are evidence of the salience focus of the sponsorship.  He is mistaken.

132.     What these data are evidence of, if anything, is the salience of the brand, not of the sponsorship.  As such, these data do not support the principle underlying the second key factor, brand building.

133.     In fact, salient brands do not require salience building.  They are already salient.  Accordingly, if Dr. Joachimsthaler were correct that the sponsorship was salience-focused, it seems to follow that the USPS would not have greatly benefitted from the sponsorship.  The USPS is an extremely well-known and visible brand; every person in the United States who mails a letter has to deal with the USPS.

134.     With respect to the Brand Resonance Pyramid referenced by Dr. Joachimsthaler,[125] sponsorships of salient brands need to be focused on higher levels in the pyramid.  Indeed, Dr. Joachimsthaler himself assumes that the USPS was intent on building the brand associations tradition, trust, scope, reliability, and affordability.  These are much more in line with the higher elements in the pyramid (performance, imagery, judgments, feelings, and resonance) than is merely broad-based awareness that is salience.  Indeed, logic points to the conclusion that if the sponsorship had any focus with respect to the Brand Resonance Pyramid, it was certainly not salience.

135.     Moreover, despite Dr. Joachimsthaler's claim that the sponsorship was salience-focused, the objectives of the sponsorship were much broader. A presentation to the Board of Governor's from June 6, 2000 identifies four broad objectives of the sponsorship:

---

[125] Joachimsthaler Report, p. 62.

generating revenues, building the brand, gaining positive PR value, and leveraging retail sales.[126] Generating revenues and leveraging retail sales are not salience-focused objectives. Gaining positive PR certainly can increase salience; however, the 2000 presentation lists employee pride and customer affiliation as benefits of the PR, neither of which is salience-focused.[127] In fact, in deposition testimony William Henderson, former Postmaster General, noted that the primary benefit of the sponsorship was building employee morale.[128] Finally, the USPS identifies many brand-building objectives throughout the lifetime of the sponsorship, some of which are listed below:

- "Enhance the USPS image nationally and locally among mailers and employees"[129]

- "Cross-promotion of U.S. Postal Service name and image in advertising of team sponsors"[130]

- "Associate U.S. Postal Service name and logo with a world-class American sports team"[131]

- "Utilize world-class sports property to highlight U.S. Postal Service emphasis on speed and efficiency"[132]

- "Build upon the positive image achieved by the team"[133]

136.    None of these brand-building objectives is salience-focused. Dr. Joachimsthaler's analysis fails to consider these broader objectives and benefits.

137.    Finally, Dr. Joachimsthaler asserts that his data show no statistically significant

---

[126] "United States Postal Service Pro Cycling Team – Board of Governors' Meeting," June 6, 2000, Myers Ex. 376, MYERS00000291.
[127] "United States Postal Service Pro Cycling Team – Board of Governors' Meeting," June 6, 2000, Myers Ex. 376, MYERS00000298.
[128] Deposition of William Henderson, former Postmaster General, September 22, 2015, Vol. 1, 39:9-18.
[129] "United States Postal Service Pro Cycling Team Business Plan 1998 Season," Myers Ex. 366, US00164542.
[130] "1999 Team Sponsorship Outline," Sonnenberg Ex. 229, US00000425.
[131] "1999 Team Sponsorship Outline," Sonnenberg Ex. 229, US00000425.
[132] "1999 Team Sponsorship Outline," Sonnenberg Ex. 229, US00000425.
[133] "1999 Team Sponsorship Outline," Sonnenberg Ex. 229, US00000425.

difference between how often consumers aware of Mr. Armstrong's use of performance enhancing drugs think about the USPS and how often those who are unaware think about the USPS.  He also presents a similar analysis with respect to no statistically significant difference between how often consumers who are aware of the sponsorship consider using the USPS and how often those who are unaware consider using the USPS.  He claims that these data suggest that consumers are not turned off by their knowledge of either the sponsorship or the use of performance enhancing drugs.[134]  Again, he is mistaken.

138.    The data were collected in 2015. The scandal broke in 2010 when Mr. Landis publically accused Mr. Armstrong of doping. Public knowledge of the scandal became entrenched in January 2013 when the interview with Oprah Winfrey aired. It is entirely possible, if not likely, that the thoughts and consideration of the USPS for the people who were aware were actually higher when the scandal broke.  Indeed, people who were more active thinkers and considerers of the USPS would have been more sensitive to the scandal. As such, the scandal could well have caused the thoughts and consideration of these people to decrease by the time the survey was conducted.  These data demonstrate nothing about whether or not consumers were or were not turned off by the scandal.

Key Factor 3 (Brand Congruence) - The Data Show Neither Brand Congruence nor Different Brand Archetype

139.    As set forth above, there is no evidence that brand archetype incongruence insulates a sponsor from a celebrity transgression.  Moreover, the data do not show the strong congruence or fit Dr. Joachimsthaler asserts and the 'principle' requires.  Any evidence it provides that the archetypes differ is weak at best.

140.    In his study, Dr. Joachimsthaler attempts to measure the attributes that consumers

---

[134] Joachimsthaler Report, p. 79-80.

54

associate with Mr. Armstrong and the USPS brand. Survey respondents selected from a list of attributes and what he calls "archetypes" for Lance Armstrong and for the USPS brand. Dr. Joachimsthaler then draws a number of conclusions based on his interpretation of the results.

141.    First, Dr. Joachimsthaler claims that "the brand congruence of Lance Armstrong and the USPS cannot be denied."[135] He makes this claim on the basis that Mr. Armstrong "shared a few key characteristics with the USPS" and that he "offered characteristics the USPS wished to integrate into the USPS brand personality."[136] Specifically, he states that "Lance Armstrong's top three attributes were all traits the USPS wished to gain."[137]

142.    There are a number of flaws in this assessment. First, as figure 10 shows, while it is true that Mr. Armstrong and the USPS share two attributes among their respective top ten, Mr. Armstrong's attribute associations are substantially weaker than those of the USPS brand. Mr. Armstrong's strongest attribute, "performs at a high level," (chosen by 16% of respondents) would only rank sixth for the USPS, while Mr. Armstrong's second strongest attribute, "fast," (chosen by 12%) would not even be among the top ten USPS brand attributes. In other words, Mr. Armstrong's mostly highly rated characteristics were mentioned by very few survey respondents. They were his "highest" scores, but they were very low indeed.

---

[135] Joachimsthaler Report, p. 83.
[136] Joachimsthaler Report, p. 82.
[137] Joachimsthaler Report, p. 83.

**Figure 10: Mr. Armstrong "top ten" attributes were not highly rated, compared to the USPS top ten[138]**

| | USPS | Lance Armstrong |
|---|---|---|
| 25% | Traditional | |
| 20% | Reliable<br>Helpful | |
| 19% | Credible | |
| 17% | Trustworthy | |
| 16% | Committed<br>Knowledgeable<br>Relevant | Performs at a high level |
| 15% | I respect this brand<br>Cares about its customers | |
| 12% | | Fast |
| 11% | | Focussed on excellence |
| 9% | | Committed |
| 8% | | Knowledgeable<br>Advocates for important issues<br>Philanthropic |
| 7% | | Distinctive |
| 6% | | Is a leader<br>Original |

143.    Therefore, on an absolute basis, there was little overlap between Mr. Armstrong and the USPS brand, especially when one considers that these attributes were mentioned by very few respondents.

144.    Dr. Joachimsthaler's survey also indicates that Mr. Armstrong's reputation is particularly poor even in comparison to other athletes who were involved in scandals. Among the respondents who reported being familiar with him, Mr. Armstrong was rated unfavorably by 53% of Brand Survey respondents as opposed to only 33% rating Alex Rodriguez unfavorably and only 17% rating Michael Phelps unfavorably.[139] Not only did a higher percentage of the people who were familiar with Mr. Armstrong rate him

---

[138] Joachimsthaler Report, p. 116.
[139] Joachimsthaler Report, p. 147.

unfavorably, but more people were familiar with him even though his career ended roughly ten years ago while Mr. Rodriguez's and Mr. Phelps' careers are ongoing.[140]

145.     In a number of cases, respondents noted that the survey forced them to make choices that were not reflective of their true opinions

146.     Confusing questions aside, even Dr. Joachimsthaler's report is inconsistent on the issue of similarity or congruence. In the section on Brand Competence, Dr. Joachimsthaler's analysis of brand attributes leads him to conclude that "there is relatively little overlap in brand strengths"[141] between the USPS and Mr. Armstrong and that "Lance Armstrong and the USPS do not share competencies,"[142] an odd statement to make in the same report in which he claims that "the brand congruence of Lance Armstrong and the USPS cannot be denied."[143]

147.     With respect to brand archetypes, Dr. Joachimsthaler's study assumes that both Mr. Armstrong's and the USPS' brand archetypes are one of the 12 pre-specified PMAI[144] categories.  The data cast doubt on this presumption for both. First, Lance Armstrong was classified as a "destroyer" on the PMAI scale by 34% of respondents.  While this was three times higher than any other PMAI category, it was chosen by considerably less than half the respondents, a fact that suggests there is no dominant PMAI category that clearly defines Lance Armstrong.  Second, the study revealed that "USPS had no connection to any single brand archetype, with contrasting results between the brand and athlete versions, and little consensus within each version." To the extent that the USPS has an identifiable brand

---

[140] Fifty-nine percent of Athlete Survey respondents were very familiar with Mr. Armstrong and only 6% were unfamiliar. The corresponding figures for Mr. Phelps were 56% very familiar and 9% unfamiliar. For Mr. Rodriguez, the figures were 43% very familiar and 28% unfamiliar.
[141] Joachimsthaler Report, p. 85.
[142] Joachimsthaler Report, p. 86.
[143] Joachimsthaler Report, p. 83.
[144] The Pearson-Marr Archetype Indicator (PMAI), which he claims is the primary model for archetypes.

archetype, it is not captured by the PMAI categories.

148.    Furthermore, the archetype measures were taken two years after the transgression came to light.  It is likely that the archetypes, Lance Armstrong's in particular, shifted.  The relevant archetypes for the comparison would have been those measured immediately before the transgression became public.  Mr. Armstrong's archetype in 2015 is not relevant for assessing whether or not the USPS and Lance Armstrong shared the same archetype during the period of the sponsorship.

Key Factor 4 (Information Integration) – The Test-Control 'Experiment' is Fatally Flawed

149.    In an attempt to determine whether or not knowledge of Mr. Armstrong's transgression impacted consumer opinion of the USPS, Dr. Joachimsthaler split respondents into test and control groups. The control group was shown a statement outlining the relationship between Mr. Armstrong and the USPS, absent any mention of Mr. Armstrong's transgression. The test group was shown the same statement, but with the addition of a sanitized description of Mr. Armstrong's transgression.[145] Both groups were then asked whether they felt more positive, neutral, or negative towards the USPS and Mr. Armstrong. The results are shown in Figure 11 below.

---

[145] Both the test and control groups were shown the following statement:

Many brands have sponsored teams and athlets to enable them to perform in their sports. For example, at different times in the past, Topps has sponsored the baseball player Alex Rodriguez, the U.S. Postal Service has sponsored the cyclist Lance Armstrong, and Subway has sponsored the swimmer Michael Phelps. These sponsorships sometimes extend beyond the athletes themselves and can include coaches, fans, and other companies. (JOACHIMSTHALER00000269-270 and JOACHIMSTHALER00000294)

Only the test group was shown this additional statement:

Occasionally, athletes currently or formerly sponsored by brands become involved in issues. For example, Alex Rodriguez and Lance Armstrong both admitted to using banned performance-enhancing drugs during their careers, and Michael Phelps admitted to smoking marijuana and driving under the influence of alcohol (twice). (JOACHIMSTHALER00000269-270 and JOACHIMSTHALER00000294)

**Figure 11: Respondents' change in perception of the USPS brand**

|  | Test | Control |
|---|---|---|
| **More positive** | 21% | 26% |
| **Neutral** | 68% | 61% |
| **More negative** | 11% | 13% |

150.    Dr. Joachimsthaler notes, "there is no significant difference between the test group –

that is, the consumers who are aware of the transgression as well as the relationship – and

the control group's opinion of the brand."[146] He concludes that "consumers are not

integrating Armstrong's transgression into their perceptions of the USPS."[147]

151.    The data underlying this conclusion is unreliable for several reasons.  First, more

than 20% of test group respondents stated that their impression of the USPS actually

*improved* after reading a statement linking Mr. Armstrong's transgression to the brand. This

is roughly twice the number of respondents that stated they held a more negative

impression. In fact, this comparison also holds for the Michael Phelps/Subway

transgression combination.[148] These data defy logic and common sense and illustrate the

'experiment's' overall lack of reliability.

152.    Flaws that cause this lack of reliability are easy to find.  First, Dr. Joachimsthaler

provided the test group with an incomplete description of Mr. Armstrong's transgression.

Specifically, Dr. Joachimsthaler informed respondents that Mr. Armstrong "admitted to

using banned performance-enhancing drugs."[149] As discussed above, in my opinion, Dr.

Joachimsthaler's characterization of Mr. Armstrong's transgression as simply the usage of

---

[146]  Joachimsthaler Report, p. 84.
[147]  Joachimsthaler Report, p. 85.
[148]  22% of control group respondents stated that their impression of the Subway brand improved after being exposed to Mr. Phelps' transgression vs. 11% who held a more negative impression.
[149]  JOACHIMSTHALER00000270

performance enhancing drugs minimizes the offense. Without exposing respondents to a complete account of Mr. Armstrong's offenses,[150] it is impossible to determine how the transgression could have affected their perception of the USPS.

153.    Further, the experimental prompt appears to invite respondents to focus on the fact that Armstrong *admitted* (however belatedly) to using drugs, rather than the fact that he used drugs.  Respondents with a negative impression of Armstrong's doping may nevertheless have a positive impression of the fact of his confession and putative repentance.  Indeed, the fact that members of the test group were twice as likely to report that their attitude toward the USPS had *improved* as a result of being presented with Dr. Joachimsthaler's experimental prompt is evidence that the information was ambiguous at best.

154.    Second, the 'experiment' lacks internal validity.  In layperson's parlance, that means the experiment does not test what it is supposed to test.  An appropriate study should test how a difference in *knowledge* of Mr. Armstrong's transgressions would affect respondents' perceptions of the USPS brand.  Dr. Joachimsthaler cannot replicate that by simply manipulating a description of the transgression in a written passage.  What he tests is the irrelevant proposition as to how a difference in *what was read* would affect respondents' perceptions of the USPS brand.

155.    Differences in what was read bear no relationship to differences in knowledge. According to Larry Gerbrandt's Expert Report, approximately 10 million people watched

---

[150] From my reading of the case documents the long list of offenses includes frequent and persistent doping throughout the seven years he rode for the USPS team, accepting cycling's highest accolades over that period based on the false pretense that he was clean, lying about doping, pressuring others to dope or lie about it, intimidating those who accused him of cheating, etc.

Lance Armstrong's confession to Oprah Winfrey.[151] Across a variety of forms of media, coverage of Mr. Armstrong's doping produced nearly 1.5 billion impressions. I also understand that the 1.5 billion number does not even include the extensive internet media coverage of Mr. Armstrong.[152] The story was on the front page of almost every newspaper in the world.  It would be hard to find people who did not have knowledge of Lance Armstrong's transgressions.  At least 90% of respondents in Dr. Joachimsthaler's brand survey and 88% in his athlete survey responded they were aware of Mr. Armstrong's use of performance enhancing drugs.[153]  Everybody knew.

156.    That Dr. Joachimsthaler did not find differences in perceptions of the USPS between the test and control conditions is not surprising.  Actually, it was entirely predictable.  If there is no difference in knowledge between the two conditions, there is no way their perceptions could differ as a result of that knowledge, regardless of what they read.  Indeed, an experienced experimentalist should recognize that this experimental manipulation tells us nothing.

157.    Finally, the question Dr. Joachimsthaler used to measure perception is a bad question.  It is ambiguous and unnecessarily complicates the cognitive processes a respondent would have to undertake in order to respond appropriately. The question is "Keeping in mind the description you just read, does it make you feel more positive, neutral, or negative toward the U.S. Postal Service?"  One might expect possible responses: 'more positive than before I read about the transgression,' 'more negative than before I read

---

[151] Expert Report of Larry Gerbrandt, November 23, 2015, pp. 31-32.
[152] Expert Report of Larry Gerbrandt, November 23, 2015, pp. 49.
[153] Joachimsthaler Report, pp. 154 and 183.  I use the phrase 'at least' because Dr. Joachimsthaler's data relates to how many people knew that Lance Armstrong was stripped of his Tour de France titles because of performance enhancing drugs.  The number of people who knew of the performance enhancing drugs has to be greater than that by definition.

about the transgression,' or 'about the same as before I read about the transgression.' Instead the possible answers are 'Very Positive,' 'Positive,' 'Neutral,' 'Negative,' and 'Very Negative.'

158.    The question's ambiguity lies in the inconsistency between the question and the response alternatives.  The question asks about a change in perception of Mr. Armstrong after reading the description of the transgression (or, really, one part of his transgression) but the answers are "static state" responses. In other words, a respondent might feel very negative about Mr. Armstrong after reading about the transgression but that person might have felt very negative about Mr. Armstrong in the first place.  A respondent is left to guess on the spot whether he or she should respond to a change or with the current state of feeling. In our example, the respondent would answer 'very negative' even though nothing had changed even though he or she would have answered 'no change' had that option been available. The ambiguity in Dr. Joachimsthaler's survey questions and responses renders the results of the survey unreliable.

159.    In addition, Dr. Joachimsthaler's survey question requires respondents to recall past behavior. Specifically, the question asks respondents to remember how they felt before reading the passage. As such, Dr. Joachimsthaler is asking respondents to search their "autobiographical memory."[154] Shaeffer, et al (2003) describe how autobiographical recall can generally lead to inaccurate answers to survey questions:

> Most cognitive psychologists believe that memories and autobiographical reports of events are as much constructed as retrieved….Respondents who believe they have changed (or stayed the same) may be guided by that belief when recalling the past. Efforts to remember may also focus on salient prototypes or exemplars…[155]

---

[154] Conway, Martin A., *Autobiographical Memory: An Introduction*, Buckingham: Open University Press, 1990.

[155] Schaeffer, Nora C., et al., "The Science of Asking Questions," *Annual Review in Sociology,* 29, 2003, p. 65-88 at p. 67-68 (references omitted).

160.     There is substantial academic literature on possible biases from autobiographical recall and the implications of these biases on survey construction.[156] Dr. Joachimsthaler's survey is subject to these autobiographical recall issues.

161.     Experienced experimentalists would have approached the situation in a different way, one that eliminates the possibility of autobiographical memory issues.  If the question is not about change, the impact of an experimental stimulus (ideally one that reflects actual incremental knowledge) can be inferred from the differences in response between test and control groups.  The effect would be calculated by simply subtracting the mean response of a 'how do you currently feel' question addressed to the control group from the same question addressed to the test group.  In this standard approach, there is no need to incorporate a change component to the question.

Key Factor 5 (Circles of Competence) – Dr. Joachimsthaler's Analysis is Not on Point with Respect to his Transgression Theory

162.     Dr. Joachimsthaler's transgression theory/conceptual architecture posits that if the sponsor and sponsored parties do not share competencies and the transgression is unrelated to delivery of the sponsor's products and services, the sponsor would be protected from transgressions committed by the sponsored party.

163.     Dr. Joachimsthaler created a list of 28 brand attributes based on some documents he cites, his BAV analyses, and some of his own impressions. He asked respondents to select those attributes that were in alignment with each brand (brand survey) and/or athlete (athlete survey).  He then evaluated each brand or athlete's overlap in competences by

---

[156] Clark, Leslie F., et al., "Biasing Effects of Retrospective Reports on Current Self-Assessments," in *Autobiographical Memory and the Validity of Retrospective Reports*, N. Schwarz and S. Seymour (Eds), New York: Springer-Verlag, 1994, p.291. See also Schwarz, Norbert, et al., *Autobiographical Memory and the Validity of Retrospective Reports*, New York: Springer-Verlag, 1994.

seeing how closely the top 10 and bottom 5 attributes aligned for the USPS and Lance
Armstrong.  As set forth above, Dr. Joachimsthaler's analysis of brand congruence is
flawed.

164.    There are several additional problems with Dr. Joachimsthaler's conclusion that
brand archetype mismatch protected the USPS from being harmed by its association with
Armstrong:

   a.  The inventory summarized in Figure 10 at paragraph 142 above depends on
       the selection of the original set of 28 attributes.  That set has not been
       validated.

   b.   As outlined above, Dr. Joachimsthaler's survey took place two years after
       Lance Armstrong's confession.  As such, there is no telling what the overlap
       would have been prior to the Oprah Winfrey interview.

   c.  Any overlap or lack of overlap of brand strengths at the time of Dr.
       Joachimsthaler's survey has little to do with whether the transgression has
       anything to do with USPS' products and services.

165.    With respect to the last point in the previous paragraph, consider the fact that one of
the brand associations USPS was striving to build was "trust."[157]  Dr. Joachimsthaler's
inventory of 'brand strengths' had Lance Armstrong rated very low on trust.  Only four
percent of respondents rated him as trustworthy.[158]  Similarly, only 3% of survey
respondents rated Mr. Armstrong as credible.[159] To the extent that these low ratings are
attributable to the transgressions in this case,[160] the transgressions relate directly to
attributes that the USPS hoped to positively influence consumer perception.  If anything,
Dr. Joachimsthaler's data do not support his application of transgression theory to Lance

---

[157] "Five Year Strategic Plan FY 2001-2005," USPS, p. 5, https://about.usps.com/strategic-
      planning/fiveyear.pdf, accessed February 8, 2016; Joachimsthaler report, p. 35.
[158] Joachimsthaler Report, p. 155.
[159] Joachimsthaler Report, p. 116.
[160] I note that Mr. Armstrong's scores on all attributes were low, including a score of ten percent on 'fast.'  I
      believe that this is because the attributes were generally positive and few respondents had a positive view
      of the cyclist.

Armstrong and USPS; they refute it.

Key Factor 6 (Personal Responsibility) – Allocation of Blame Does Not Equate to Opinion Change

166.    To determine where consumers place the blame for Mr. Armstrong's transgression, Dr. Joachimsthaler asked respondents to allocate 100 points among a series of parties based on whom they felt was responsible for Mr. Armstrong's transgression. Respondents were told to "use any number from 0 to 100, where 0 means this entity is not at fault whatsoever and 100 means it is the only entity at fault."[161] Dr. Joachimsthaler provided the following options for respondents:

- U.S. Postal Service
- Nike
- Discovery Channel
- Trek
- Lance Armstrong
- Cycling Team Coaches
- Fans
- Cycling Culture
- Other [please specify].

167.    Dr. Joachimsthaler concludes that "the results were unequivocal: 79% of the blame was placed solely on Lance Armstrong's shoulders … the USPS received just 2.5%."[162] He also states that "other sponsors received a similar amount of blame to the USPS."[163] While, unlike for the first five factors, these data are probably reliable indicators of the fact that most of the blame would be placed on Lance Armstrong, they also show that a small percentage of the public actually blames the USPS for Armstrong's conduct.  Further, there remain a number of flaws in Dr. Joachimsthaler's conclusion, mostly traceable to the lack of basis for this component of the conceptual architecture.

---

[161] JOACHIMSTHALER00000272
[162] Joachimsthaler Report, p. 87.
[163] Joachimsthaler Report, p. 87.

168.    Contrary to Dr. Joachimsthaler's proposition, where blame is placed may or may not translate into harm to the brand.  An analysis of the verbatim responses shows that the USPS brand in the minds of respondents who did not necessarily blame the USPS for Armstrong's transgression.

169.    Indeed, I doubt that consumers blamed Buick for Tiger Woods' marital infidelity.  I similarly doubt that consumers blamed Pepsi for Mike Tyson's rape allegation or Coke for Bill Cosby's.  Yet, as a direct and immediate consequence of these transgressions, these sponsors severed their ties to these celebrities because of the concern about damage to their brands.

170.    A final point is that respondents did not find the USPS as blameless for the transgression as Dr. Joachimsthaler suggests.  Indeed, the USPS brand received between 60% and 100% more blame than did the next closest organizational sponsor (Nike in the brand survey; Discovery Channel in the athlete survey).[164]

## C.  Additional shortcomings

171.    Dr. Joachimsthaler relies on a limited excerpt EBS's 30(b)(6) witnesses' deposition transcript to conclude that EBS[165] was not harmed by Mr. Armstrong's transgressions.[166] Presumably, Dr. Joachimsthaler means to imply that the USPS was not harmed either. The EBS excerpt does not support Dr. Joachimsthaler's conclusions that EBS was unharmed or that the USPS was unharmed. In the quoted passage, the witness merely states that he is unable to point to evidence establishing harm and that EBS chose not to sue Mr.

---

[164] Both surveys included four former sponsors of Armstrong: the USPS, Nike, Discovery Channel, and Trek.
[165] Easton-Bell Sports [EBS] (currently known as BRG Sports), is a sports equipment and clothing company that sells under various brands, including Giro. Giro is a bicycle helmet manufacturer that had sponsored Mr. Armstrong from 1996 to 2012.
[166] Joachimsthaler Report, p. 50.

Armstrong.[167] The witness did not say that EBS was actually unharmed or even that he believed that EBS was unharmed.   To the contrary, EBS is on record saying the opposite. EBS wrote Mr. Armstrong's attorney and stated, "EBS feels strongly that it has suffered financial harm as a result of the monies expended both in endorsement payments and marketing efforts promoting Armstrong products. Further, EBS believes it should recover, at least, a significant portion of the endorsement expenditures paid to Armstrong in compensation for its damages."[168]

172.    Other sponsors whose testimony Dr. Joachimsthaler chose not to cite also expressed belief that they had been harmed by Mr. Armstrong's doping and alleged fraud. Trek's 30(b)(6) witness testified that Trek's reputation was harmed as a result of the USADA report chronicling Mr. Armstrong's transgressions.[169]

### D.   Applying Dr. Joachimsthaler's Logic to the BAV Data Actually Demonstrates Harm to the USPS Post-Transgression

173.    Dr. Joachimsthaler appears to imply that the change in BAV rankings following the Reasoned Decision and the televised confession somehow illustrate the absence of impact on the USPS.[170]  This inference is not sound. To demonstrate the absence of impact, Dr. Joachimsthaler would need to have some objective basis to limit his analysis to the specific BAV dimensions he measures. He has none.  He would also need to control for the effect of other factors affecting consumer perception. He has not done that.

174.    A review of the BAV data show the USPS declined in Dr. Joachimsthaler's

---

[167] Deposition of Greg Shapleigh (Undesignated), General Manager at Giro Sport Design, October 28, 2015, Vol. 1A, pp. 126:19-127:7 and 128:14-23.

[168] Letter from Nelson Mullins to Bill Stapleton, November 6, 2012, Shapleigh exhibit 693, GIRO_Subpoena_006434.

[169] Deposition of Robert Burns, Vice President and General Counsel at Trek Bicycle Corporation, September 9, 2015, Vol. 1, 90:1-4.

[170] Joachimsthaler report, pp. 80-82.

"reliability" attribute in both absolute percentile ranking and in comparison to FedEx and UPS in the year following the Reasoned Decision.[171] Figure 12 below shows the percentile rankings of USPS, FedEx and UPS in terms of reliability from 2011 to 2014.

**Figure 12: The USPS ranking in the "reliability" attribute declined following the release of the Reasoned Decision in 2012 by USADA**



175.    Dr. Joachimsthaler focuses on improvements in other dimensions, but he has no reason to believe that revelation of Mr. Armstrong's transgressions caused these improvements, so they are not offsets to the reduction in the reliability ranking.

176.    Another flaw in Dr. Joachimsthaler's methodology is that he looks to annual changes in BAV rankings in certain BAV categories without consideration of the myriad reasons unrelated to this litigation that those rankings change and without consideration that the harm may manifest itself in some other BAV category or in some dimension that BAV does not capture. If the methodology were valid, it would suggest harm to the USPS rather than lack of harm because the USPS' reliability rating declined in the year following the

---

[171] Joachimsthaler Report, Exhibit C.

Reasoned Decision.

177.     Further, several attributes actually declined during the sponsorship.  For example, the attribute "Innovative" declined by over 14 percentile points. The attribute "Distinctive" declined by nearly three percentile points.  And "Dynamic" declined by four percentiles. Dr. Joachimsthaler did not address these declining attributes, nor several others that also declined, in his analysis.[172]

178.     The absurd nature of Dr. Joachimsthaler's causal attribution of the positive changes in brand attributes during the period of the sponsorship to the sponsorship itself is made clear by considering the opposite; namely, the inappropriateness of attributing the USPS' decline in the attribute "Innovative" to the sponsorship of Lance Armstrong.  Causal attribution given correlational data in either direction is the same egregious error.

179.     The upshot of these observations though are that if Dr. Joachimsthaler believes that his BAV analyses (discussed earlier in the report) demonstrate that the sponsorship helped the USPS brand, then he absolutely as a matter of logic and consistency, must believe that these analyses similarly demonstrate that the transgression harmed the USPS brand.  In other words, he 'cannot have his cake and eat it too.'

## VI.  CONCLUSION

180.     Dr. Joachimsthaler's opinions that the USPS suffered no harm as a result of Mr. Armstrong's transgressions are baseless. They purportedly flow from Dr. Joachimsthaler's review of the discovery record, marketing literature, his web survey and his analysis of BrandAsset Valuator or "BAV" data.  In reality, Dr. Joachimsthaler refers only to vague snippets from a deposition when a more expansive review of deposition testimony and

---

[172] JOACHIMSTHALER00000251

69

exhibits would refute his opinion. The marketing literature that Dr. Joachimsthaler cites does not support the opinions he draws. Dr. Joachimsthaler's analysis of BAV data and his survey results do not disprove impact either. To the contrary, the overwhelming majority of Dr. Joachimsthaler's survey respondents knew about Mr. Armstrong's doping prior to taking Dr. Joachimsthaler's survey. Between 88% and 90% percent knew that Mr. Armstrong had been stripped of his Tour de France titles because of his usage of performance enhancing drugs.

181.    Many or most respondents viewed Mr. Armstrong unfavorably and virtually none of them found him to be credible or trustworthy. A very large percentage of respondents continued to associate Mr. Armstrong with the USPS as late as August 2015 when Dr. Joachimsthaler had a marketing research firm administer his survey. In fact, about as many people were able to identify that the USPS sponsored Mr. Armstrong's team over ten years in the past as were aware of the relationship between Michael Phelps and one of his current sponsors, Subway.  Additionally, nearly 40% of respondents stated, at the end of the survey, that they were aware of the USPS sponsorship (even though not all of them had answered it that way in the previous question).  Therefore, the actual knowledge of the respondents of the sponsorship, ten years after it ended, was certainly more than 24%.

182.    These facts, that survey respondents remain aware of Mr. Armstrong's doping, hold him in low regard and continue to associate Mr. Armstrong with USPS suggest harm to USPS rather than lack thereof.

183.    Overall, I find Dr. Joachimsthaler's report to be unpersuasive, lacking in scientific support and without academic foundation. His self-serving theoretical constructs are arbitrary and even his own data do not support them. His treatment of data is flawed and his conclusions cannot be relied upon in the matter at hand.

184.    My analysis may change before trial if additional information from any of the parties-in-suit or their experts becomes available.  I, therefore, reserve the right to supplement my report accordingly.


February 22, 2016

Joel Steckel

## APPENDIX A – RESUME OF DR. JOEL STECKEL

### JOEL HOWARD STECKEL

New York University
812 Tisch Hall
New York, NY  10012-1126
Tel: (212) 998-0521
Email: JSTECKEL@STERN.NYU.EDU

### EDUCATION

UNIVERSITY OF PENNSYLVANIA, THE WHARTON SCHOOL

Doctor of Philosophy Degree (Marketing/Statistics) awarded, May 1982.
Dissertation Title:  "A Game Theoretic and Experimental Approach to the Group Choice
Phenomenon in Organizational Buying Behavior;" Professor Yoram Wind, advisor.

Master of Arts Degree (Statistics) awarded May 1980.

Master of Business Administration Degree (Management Science) awarded with
Distinction, May 1979.

Elected to Beta Gamma Sigma, May 1979.

COLUMBIA UNIVERSITY

Bachelor of Arts (Mathematics) awarded Summa Cum Laude, May 1977.

Elected to Phi Beta Kappa, May 1977.

### ACADEMIC POSITIONS

Vice Dean for Doctoral Education, Stern School of Business, New York University, August
2012-Present.

Director PhD Programs, Stern School of Business, New York University, May 2007-July
2012.

Marketing Department Chairperson, Stern School of Business, New York University,  July
1998-June 2004.

Professor and Associate Professor, Stern School of Business, New York University,
January 1989 - present.  Taught courses in Business Strategy, Marketing Management,
Marketing Research, Corporate Reputation and Branding, Models of Pricing and

Promotion, Field Studies in the New Economy, Marketing Engineering, and Analytic Marketing for Management Consulting.  Also taught Doctoral Seminars in Mathematical Models in Marketing and Research Methods.

Visiting Professor, Wharton School, University of Pennsylvania, January 1995 - December 1995.  Taught Core Marketing course.

Visiting Professor, Escola de Pós-Graduação em Ciências Económicas e Empresariais, Universidade Católica Portuguesa, May - June 1992, May - June 1993.  Taught Industrial Marketing and Marketing Strategy.

Associate Professor and Assistant Professor, Graduate School of Business, Columbia University, July 1981 - December 1988.  Taught MBA-level courses in Industrial Marketing, Marketing Planning, and Marketing Research.  Taught three Ph.D.-level Marketing Seminars and Applied Multivariate Statistics.

Visiting Associate Professor, School of Organization and Management, Yale University, September - December 1988.  Taught graduate course in Marketing Strategy.

Visiting Assistant and Associate Professor, Graduate School of Management, University of California at Los Angeles, July 1984 - June 1985, January - March 1987.  Taught Advanced Marketing Management, Marketing Research, and Strategic Marketing Planning.

Assistant Instructor, Department of Statistics, University of Pennsylvania, July 1979 - June 1980.  Assisted in undergraduate and MBA-level courses in Statistics.  Taught undergraduate course in Calculus.

Teaching Assistant, Department of Mathematics, Columbia University, September 1976 - May 1977.  Assisted in courses in Number Theory and Differential Equations.


## PROFESSIONAL INTERESTS

Marketing Strategy and Marketing Research.  In particular, marketing research methodology, marketing and branding strategies, electronic commerce, approaches for one-to-one marketing, and managerial decision making.


## PUBLICATIONS

### Books

Marketing Research (with D. Lehmann and S. Gupta), Boston: Addison-Wesley Longman, 1998.

Analysis for Strategic Marketing (with V. Rao), Boston: Addison-Wesley Longman, 1998.

The New Science of Marketing: State of the Art Tools for Anticipating and Tracking the Market Forces that will Shape Your Company's Future (with V. Rao), Chicago: Irwin

Professional Publishers, 1995.

## Journal Articles

"Behavioral Reasons for New Product Failure: Does Overconfidence Induce Over-forecasts?" (with D. Markovitch, A/ Michaut-Denizeau, D. Philip, and W. M. Tracy), Journal of Product Innovation Management  Vol. 32, No. 5, September 2015.

"Modeling Credit Card Share of Wallet: Solving the Incomplete Information Problem," (with Y. Chen), Journal of Marketing Research, Vol. 49, No. 5, October 2012.

"The Role of Consumer Surveys in Trademark Infringement: Evidence From the Federal Courts," (with R. Bird), University of Pennsylvania Journal of Business Law, Vol. 14, Issue 4, Summer 2012, 1013-1054.

"Do Initial Stock Price Reactions Provide a Good Measurement Stick for Marketing Strategies? The Case of Major New Product Introductions in the US" (with D. Markovich), European Journal of Marketing, Vol. 46, Iss. 3, 2012, 406-421.

"When Do Purchase Intentions Predict Sales?" (with V. Morwitz and A. Gupta), International Journal of Forecasting, Vol. 23, November 2007, 347-64.

"Dilution through the Looking Glass: A Marketing View of the Trademark Dilution Revision Act of 2005," (with R. Klein and S. Schussheim), The Trademark Reporter, Vol. 96, No. 3, May-June 2006.

"Choice in Interactive Environments," (with R. Winer, R.Bucklin, B. Dellaert, X. Drèze, G. Häubl, S. Jap. J.D.C. Little, T. Meyvis, A. Montgomery, and A. Rangaswamy), Marketing Letters, Vol. 16, No.3/4, 2005.

"Using Capital Markets as Market Intelligence: Evidence from the Pharmaceutical Industry," (with D. Markovich and B. Yeung), Management Science, October 2005.

"Marketing Science – Growth and Evolution," (with J. Hauser, G. Allenby, F.H. Murphy, J.S. Raju, and R. Staelin), Marketing Science, Vol. 24, No. 1, Winter 2005.

"Supply Chain Decision Making: Will Shorter Cycle Times and Shared Point of Sale Information Necessarily Help?," (with S. Gupta and A. Banerji), Management Science, Vol. 50, No. 4, April 2004.

"Choice and the Internet: From Clickstream to Research Stream," (with R. Bucklin, J. Lattin, A. Ansari, S. Gupta, D. Bell, E. Coupey, J.D.C. Little, C. Mela, and A. Montgomery), Marketing Letters, Vol. 13, No. 3, Summer 2002.

"A Multiple Ideal Point Model: Capturing Multiple Preference Effects from within an Ideal Point Framework," (with J. Lee and K. Sudhir), Journal of Marketing Research, Vol. 39, No. 1, February 2002.

"2001: A Marketing Odyssey," (with E. Brody), Vol. 20, No. 4, Marketing Science, Fall 2001.

74

"Consumer Strategies for Purchasing Assortments within a Single Product Class," (with Jack K.H. Lee), Journal of Retailing, Vol. 75, No. 3, Fall 1999.

"The Max-Min-Min Principle of Product Differentiation," (with A. Ansari and N. Economides), Journal of Regional Science, May 1998.

"Dynamic Influences on Individual Choice Behavior," (with R. Meyer, T. Erdem, F. Feinberg, I. Gilboa, W. Hutchinson, A. Krishna, S. Lippman, C. Mela, A. Pazgal, and D. Prelic), Marketing Letters, Vol. 8, No. 3, July 1997.

"Addendum to 'Cross Validating Regression Models in Marketing Research'," (with W. Vanhonacker), Marketing Science, Vol. 15, No. 1, 1996.

"Selecting, Evaluating, and Updating Prospects in Direct Mail Marketing," (with V. Rao), Journal of Direct Marketing, Vol. 9, No. 2, Spring 1995.

"A Cross-Cultural Analysis of Price Responses to Environmental Changes," (with V. Rao), Marketing Letters, Vol. 6, No. 1, January 1995.

"Cross Validating Regression Models in Marketing Research," (with W. Vanhonacker), Marketing Science, Vol. 12, No. 4, Fall 1993.

"Preference Aggregation and Repeat Buying in Households," (with S. Gupta), Marketing Letters, Vol. 4, No. 4, October 1993.

"Roles in the NBA:  There's Still Always Room for a Big Man, But His Role Has Changed" (with A. Ghosh), Interfaces, Vol. 23, No. 4, July-August 1993.

"Introduction to `Contributions of Panel and Point of Sale Data to Retailing Theory and Practice'," Journal of Retailing, Vol. 68, No.3, Fall 1992.

"Explanations for Successful and Unsuccessful Marketing Decisions: The Decision Maker's Perspective" (with M.T. Curren and V.S. Folkes), Journal of Marketing, Vol. 56, No. 2, April 1992.

"Locally Rational Decision Making:  The Distracting Effect of Information on Managerial Performance" (with R. Glazer and R. Winer), Management Science, Vol. 38, No. 2, February 1992.

"Prospects and Problems in Modelling Group Decisions"  (with K.P. Corfman, D.J. Curry, S. Gupta, and J. Shanteau), Marketing Letters, Vol. 2, No. 3, July 1991.

"A Stochastic Multidimensional Scaling Methodology for the Empirical Determination of Convex Indifference Curves in Consumer Preference/Choice Analysis" (with W.S. DeSarbo and K. Jedidi), Psychometrika, Vol. 56, No. 2, June 1991.

"A Polarization Model for Describing Group Preferences" (with V. Rao),  Journal of Consumer Research, Vol. 18, No. 1, June 1991.

" On the Creation of Acceptable Conjoint Analysis Experimental Designs," (with W.S. DeSarbo and V. Mahajan), Decision Sciences, Vol. 22, No. 2, Spring 1991.

"Longitudinal Patterns of Group Decisions:  An Exploratory Analysis" (with K.P. Corfman and D.R. Lehmann), Multivariate Behavioral Research, Vol. 25, No. 3, July 1990.

"Investing in the Stock Market: Statistical Pooling of Individual Preference Judgments," (with N. Capon), Annals of Operations Research, Vol. 23, 1990.

"Judgmental Forecasts of Key Marketing Variables: Rational vs. Adaptive Expectations" (with R. Glazer and R. Winer), International Journal of Forecasting, Vol. 6, No. 3, July 1990.

"Committee Decision Making in Organizations: An Experimental Test of the Core," Decision Sciences, Vol. 21, No. 1, Winter 1990.

"Towards a New Way to Measure Power:  Applying Conjoint Analysis to Group Purchase Decisions" (with J. O'Shaughnessy), Marketing Letters, Vol. 1, No. 1, December 1989.

"The Formation and Use of Key Marketing Variable Expectations and their Impact on Firm Performance:  Some Experimental Evidence" (with R. Glazer and R. Winer), Marketing Science, Vol. 8, No. 1, Winter 1989.

"A Heterogeneous Conditional Logit Model of Choice" (with W. Vanhonacker), Journal of Business and Economic Statistics, Vol. 6, No. 3, July 1988.

"Estimating Probabilistic Choice Models from Sparse Data: A Method and an Application to Groups" (with D.R. Lehmann and K. Corfman), Psychological Bulletin, Vol. 95, No. 1, January 1988.

"A Friction Model for Describing and Forecasting Price Changes" (with W.S. DeSarbo, V.R. Rao, Y.J. Wind and R. Colombo), Marketing Science, Vol. 6, No. 4, Fall 1987.

"Group Process and Decision Performance in a Simulated Marketing Environment" (with R. Glazer and R. Winer), Journal of Business Research, Vol. 15, No. 6, December 1987.

"Effective Advertising in Industrial Supplier Directories" (with D.R. Lehmann), Industrial Marketing Management, Vol. 15, No. 2, April 1985.


**Book Chapters**

"Dynamic Decision Making in Marketing Channels", with S. Gupta, and A. Banerji), in Experimental Business Research, A. Rapoport and R. Zwick (eds.), Boston, MA: Kluwer Academic Publishers, 2002.


**Refereed Proceedings**

"PIONEER:  Decision Support for Industrial Product Planning" in Efficiency and Effectiveness in Marketing, Proceedings of the American Marketing Association Educator's Conference, Vol. 54, 1988, G.L. Frazier and C.A. Ingene, eds., Chicago.

"Mathematical Approaches to the Study of Power: A Critical Review" in Advances in Consumer Research, Vol. XII, 1985, E. Hirschman and M. Holbrook, eds., Provo, UT.

"On Obtaining Measures from Ranks" in An Assessment of Marketing Thought and Practice, Proceedings of the American Marketing Association Educator's Conference, Vol. 48, B.J. Walker, ed., 1982, Chicago.

**Other**

"Forecasting Online Shopping," Stern Business, Fall/Winter 2000, pp. 22-27.

"Method to Their Madness," The Industry Standard, August 7, 2000.

Book review of The Application of Regression Analysis by D.R. Wittink, Journal of Marketing Research, Vol. 26, No. 4, November 1989.

Co-author (with many others) of The Statistics Problem Solver, Research and Education Association, New York, 1978.

## CONFERENCE PRESENTATIONS

"Measuring Trademark Dilution", Conference on Empirical Analysis of Intellectual Property, NYU Law School, October 2014.

"Using Surveys in Intellectual Property Cases:; What's the Damage," AIPLA Spring Meeting,  May 2013, Seattle WA.

"Trademark Dilution: An Elusive Concept in the Law,"  Conference on Brands and Branding in Law, Accounting, and Marketing Kanan Flagler School, University of North Caroline, April 2012

"The Role of Consumer Surveys in Trademark Infringement Cases: Evidence from the Federal Courts," (with R. Bird), AMA Summer Educator's Conference, August 2010, Boston.

"Global Market Share Dynamics: Winners and Losers in a Tumultuous World," (with P. Golder and S. Chang),  INFORMS Marketing Science Conference, June 2010, Cologne, Germany.

"Use and Abuse of Consumer Perception Research in Antitrust and Advertising Cases," ABA Antitrust Section Spring Meeting, March 2009, Washington, DC.

"New Product Development: The Stock Market as Crystal Ball," (with D. Markovich), INFORMS Marketing Science Conference, Atlanta, GA., June 2005.

"Modeling Credit Card Usage Behavior: Where is my VISA and Should I Use It?," (with Y. Chen), INFORMS Marketing Science Conference, College Park, Md., June 2003.

"Using Capital Markets as Market Intelligence: Evidence from the Pharmaceutical Industry," (with D. Markovich and B. Yeung), INFORMS Marketing Science Conference, College Park, Md., June 2003.

"Using Capital Markets as Market Intelligence: Evidence from the Pharmaceutical Industry," (with D. Markovich and B. Yeung), Share Price Accuracy and Transition Economies Conference, U. of Mich. Law School, Ann Arbor, Mi., May 2003.

"Modeling Internet Site Visit Behavior," (with E. Bradlow and O. Sak), Joint Statistical Meetings, Indianapolis, August 2000.

"Consumer Strategies for Purchasing Assortments within a Single Product Class," (with Jack K.H. Lee), INFORMS Fall Conference, Philadelphia, November 1999.

"When Do Purchase Intentions Predict Sales?" (with V. Morwitz and A. Gupta), AMA Advanced Research Techniques Forum, Santa Fe, NM, June 1999.

"Modeling New Product Preannouncements as a Signaling Game," (with H. Jung), University of Mainz Conference on Competition in Marketing, Germany, June 1999.

"A Multiple Idea Point Model: Capturing Multiple Preference Effects from within an Ideal Point Framework," (with J. Lee), Joint Statistical Meetings, Dallas, TX, Aug. 1998.

"Modeling New Product Preannouncements as a Signaling Game," (with H. Jung), INFORMS Marketing Science Conference, Fontainbleau, France, July 1998.

"Dynamic Decision-Making in Marketing Channels: Traditional Systems, Quick Response, and POS Information," (with S. Gupta and A. Banerji), NYU Conference on Managerial Cognition, May 1998.

"When Do Purchase Intentions Predict Sales?" (with V. Morwitz and A. Gupta), INFORMS International Meetings, Barcelona, July 1997.

"Mental Models in Competitive Decision Making: A Blessing and A Curse," Conference on Competitive Decision Making, Charleston, SC, June 1997.

"When Do Purchase Intentions Predict Sales?" (with V. Morwitz and A. Gupta), INFORMS Marketing Science Conference, Berkeley, March 1997.

"Model Adequacy versus Model Comparison: Is the 'Best' Model Any 'Good'?, " (with A. Ansari and P. Manchanda), INFORMS Marketing Science Conference, Berkeley, March 1997.

"Dynamic Decision-Making in Marketing Channels: Traditional Systems, Quick Response, and POS Information," (with S. Gupta and A. Banerji), First Conference in Retailing and Service Sciences, Banff, 1994.

"Dynamic Decision-Making in Marketing Channels: Traditional Systems, Quick Response, and POS Information," (with S. Gupta and A. Banerji), Behavioral Decision Research in Management Conference, Boston, 1994.

"Modeling Consideration Set Formation:  The Role of Uncertainty," (with B. Buchanan and S. Sen), TIMS Marketing Science Conference, Tuscon, 1994.

"A Cross-Cultural Analysis of Price Conjectures to Environmental Changes," (with V. Rao), TIMS Marketing Science Conference, St. Louis, 1993.

"Decision-Making in a Dynamic Distribution Channel Environment," (with S. Gupta and A. Banerji), TIMS Marketing Science Conference, St. Louis, 1993.

"Cross Validating Regression Models in Marketing Research," (with W. Vanhonacker), TIMS Marketing Science Conference, London, 1992.

"The Influence of Stock Price on Marketing Strategy," (with D. Gautschi and D. Sabavala), TIMS Marketing Science Conference, Wilmington, DE, 1991.

"A Polarization Model for Describing Group Preferences" (with V. Rao), ORSA/TIMS National Fall Meetings, Philadelphia, 1990.

"A Polarization Model for Describing Group Preference," (with V. Rao), Behavioral Decision Research in Management Conference, Philadelphia, 1990.

"Conflict Resolution and Repeat Buying" (with S. Gupta), TIMS Marketing Science Conference, Champaign, Ill., 1990.

"Variety Seeking at the Group Level" (with S. Gupta), Association for Consumer Research Fall Meetings, New Orleans, 1989.

"On Using Attraction Models to Allocate Resources in a Competitive Environment," TIMS Marketing Science Conference, Durham, NC, 1989.

"Multidimensional Scaling with Convex Preferences" (with W.S. DeSarbo), ORSA/TIMS National Fall Meetings, St. Louis, 1987.

"A Social Comparison Model for Describing Group Preference Evaluations" (with V. Rao), TIMS Marketing Science Conference, Jouy-en-Josas, France, 1987.

"The Day the Earth Stood Still," Association for Consumer Research Fall Meetings, Toronto, 1986.

"A Friction Model For Describing and Forecasting Price Movements" (with W. DeSarbo, V. Rao, Y. Wind, and R. Colombo), ORSA/TIMS National Fall Meetings, Miami Beach, 1986.

"An Eigenvalue Method for Measuring Consumer Preferences" (with E. Greenleaf and R. Stinerock), TIMS Marketing Science Conference, Dallas, 1986.

"Creating Conjoint Analysis Experimental Designs without Infeasible Stimuli" (with W. DeSarbo and V. Mahajan), TIMS Marketing Science Conference, Dallas, 1986.

"The Mediating Role of Information in Marketing Managers' Decisions" (with R. Glazer and R. Winer), TIMS Marketing Science Conference, Dallas, 1986.

"Incorporating Interdependencies of Utility Functions into Models of Bargaining" (with S. Gupta), ORSA/TIMS National Fall Meetings, Atlanta, 1985.

"The Formation of Key Marketing Variable Expectations" (with R. Glazer and R. Winer), ORSA/TIMS National Fall Meetings, Atlanta, 1985.

"Does the Nash Equilibrium Really Describe Competitive Behavior?: The Case of Cigarette Advertising," TIMS Marketing Science Conference, Nashville, 1985.

"A Heterogeneous Conditional Logit Model of Choice" (with W. Vanhonacker), ORSA/TIMS National Fall Meetings, Dallas, 1984.

"Using a 'Robust' Response Function to Allocate Resources in a Competitive Environment," TIMS Marketing Science Conference, Chicago, 1984.

"Longitudinal Models of Group Choice Behavior," (with D. Lehmann and K. Corfman), ORSA/TIMS National Fall Meetings, Orlando, 1983.

"Considerations of Optimal Design of New Task Industrial Products," ORSA/TIMS National Fall Meetings, San Diego, 1982.

"Game Theoretic Choice Models in Organizational Buying Behavior," TIMS Special Interest Conference in Marketing Measurement and Analysis, Philadelphia, 1982.

## OTHER RESEARCH IN PROGRESS

Marketing Research in the Courtroom vs. the Boardroom: What are the Differences and Do They Matter? (with R. Bird)

The Impact of Trademark Litigation Outcomes on Brand Equity and Marketing Decision Making (with R. Bird)

Loss Aversion – Are Professional Tennis Players too Careful with the Second Serve? (with L. Nelson and S. Yang)

Modeling the Tradeoffs between Marketing Research and Flexible Manufacturing.

Modeling the Strategic Use of List Rentals (with D. Schmittlein)

## INVITED SEMINARS

| | |
|---|---|
| Columbia University | Spring 1991, Summer 1994 |
| Cornell University | Fall 1983, Spring 1989 |
| Georgetown University | Fall 2006 |
| Pennsylvania State University | Fall 1996, Fall 2006 |

| | |
|---|---|
| Rutgers University | Spring 1994 |
| Temple University | Fall 1995 |
| University of California, Berkeley | Spring 1990 |
| University of California, Los Angeles | Spring 1985, Spring 1996 |
| University of California, San Diego | Fall 2003 |
| University of Florida | Spring 1992 |
| University of Mainz, Germany | Summer 1998 |
| University of Michigan | Spring 1993 |
| University of Pennsylvania | Spring 1992, Spring 1995, Spring 1998 |
| University of Southern California | Spring 1987 |
| Washington University, St. Louis | Spring 2003 |

## EDITORIAL SERVICE

### Editorships

Co-Editor, *Marketing Letters,* July 2010 - Present

Guest editor, special section of Marketing Science on the history of marketing science theory and practice, 2001.

Consulting editor in marketing, Addison-Wesley Longman Academic Publishers, Boston, MA, 1993-1999.

Guest editor, special issue of Journal of Retailing on the use of panel and point of sale data, 1992.

### Other

Member of Editorial Boards, Marketing Science,  Review of Marketing Science, Journal of Retailing.

Have served as ad-hoc referee for Journal of Marketing, Journal of Marketing Research, Management Science, Journal of Consumer Research, Journal of Retailing and Consumer Services, Manufacturing and Service Operations Management, Decision Sciences, Journal of Business and Economic Statistics, Journal of Econometrics, Strategic Information Systems, Corporate Reputation Review, and Journal of Business Research.

## SERVICE

### Dissertation Committees Chaired

Joseph Pancras (co-chair)          (Marketing - New York University)

81

Sergio Meza (co-chair)          (Marketing – New York University)
Dmitri Markovich                (Marketing – New York University)
Heonsoo Jung                    (Marketing - New York University)
Jack Lee                        (Marketing - New York University)
Asim Ansari (co-chair)          (Marketing - New York University)
Shahana Sen (co-chair)          (Marketing - New York University)

**Dissertation Committees Served on**

Tingting Fan (Marketing – New York University)
Kei-Wei Huang (Information Systems – New York University)
Sherrif Nassir (Marketing – New York University)
Jane Gu (Marketing – New York University)
Orkun Sak (Marketing – University of Pennsylvania)
Atanu Sinha (Marketing - New York University)
Louis Choi (Marketing - Columbia University)
Sunder Narayanan (Marketing - Columbia University)
Carol Rhodes (Ed. Psych. - Columbia University)
Rita Wheat (Marketing - Columbia University)
Robert Stinerock (Marketing - Columbia University)
Bruce Buchanan (Business Economics - Columbia University)
Chen Young Chang (Marketing - University of Pennsylvania)

**Other Discipline Related Service**

Chairperson, Marketing Committee, INFORMS, January 2006 – June 2010.

Past President, INFORMS Society on Marketing Science, January 2004 – December 2005.

Founding President, INFORMS Society on Marketing Science, January 2003 – December 2003.

President, INFORMS College on Marketing, January 2002 – December 2002.

President Elect, INFORMS College on Marketing, January 2000- December 2001.

Secretary-Treasurer, INFORMS College on Marketing, January 1998-December 1999.

Association of Consumer Research, Annual Program Committee, 1999.

Co-Organizer of 1996 Conference on Consumer Choice and Decision Making, Arden House, Harriman, New York, June 1996.

Organized Marketing Sessions at Fall 1989 TIMS/ORSA Joint National Meetings, New York, October 1989.

**Other University Related Service**

Member, Research Resources Committee, Stern School of Business, September 2009 – Present.

Chair, Statistical and Quantiative Reasoning Task Force, Stern School of Business, September 2005 – August 2007.

Member, Specialization Committee, Stern School of Business, September 2004 - Present.

Member, PhD Oversight Committee, Stern School of Business, January 2006 – May 2007.

Member, Executive Committee, Digital Economy Initiative, Stern School of Business, January 2000 – August 2002.

Member, Board of Directors, Center for Information Intensive Organizations, Stern School of Business, September 1998 – December 1999.

Member of MBA Committee, Stern School of Business, New York University, 1989-December 1998.  Committee was responsible for supervising redesign of MBA programs in 1991 and 1995, Chairman September 1997-August 1998.

Member of Stern MBA Curriculum Review Committee, September 1997-December 1998.  Committee redesigned MBA Core.

Member of Stern School Committee on Improving Consulting Activities, July 1998-December, 1998.

Member of Building Committee, Stern School of Business, New York University, 1990-1992.

Member of Research Committee, Stern School of Business, New York University, 1990-1.

Elected member of Columbia University Senate.  Served on Budget Review and Alumni Relations Committees, 1986-1988.


**AWARDS**

Awarded the J. Parker Bursk Memorial Prize as the outstanding student participating in the Department of Statistics, University of Pennsylvania, 1979.

Dissertation was awarded Honorable Mention in the 1982 American Marketing Association Dissertation Competition.

Dissertation was named Winner of the 1983 Academy of Marketing Science Dissertation Competition.

Invited speaker at the J. Parker Bursk Memorial Prize Luncheon, Department of Statistics, University of Pennsylvania, 1992.

Invited speaker at American Marketing Association Doctoral Consortium, University of

Southern California, 1999.

Cited for outstanding editorial support, Fordham University Pricing Center, Sept. 2002.

Named one of the inaugural winners of the Best Reviewer Award for the *Journal of Retailing,* 2003.

Work recognized by West publishing as one of the outstanding 2012 law review articles on Intellectual Property.

Work regonized with the Highly Commended Paper Award at the Literati Network Awards for Excellence 2013.


## SELECTED CONSULTING AND OTHER PROFESSIONAL ACTIVITIES

AOL MovieFone, Inc., New York, NY.  Performed general consulting on analyzing caller data for telephone movie information service; Consulted as expert in conjunction with damage assessment in legal procedings.

Citicorp, New York, NY. Built choice model for bank services.   Gave lectures on Marketing Strategy to CitiCards executives.

Directions for Decisions, Inc., New York, NY and Jersey City, NJ. Consulted on segmentation study of sports apparel market, designed and implemented "Construction Test", a concept design decision tool.  Performed general consulting on marketing research practice on an ongoing basis.

eComplaints.com, New York, NY.  Member board of advisors.

Federal Trade Commission, Washington, D.C.  Served as consultant on branding strategies in antitrust investigation.

J.C. Penney Co., New York, NY.  Performed sales-advertising response analysis.  Work was done on request for Management Decision Systems, Inc., Weston, MA.

The Open Center, New York, NY.  Consulted on marketing strategy and direct marketing practices.

Pfizer Pharmaceuticals, New York, NY.  Conducted seminar on conjoint analysis.

Union Carbide Corporation, Danbury CT, Built econometric model to forecast prices .

Various Expert Witness Engagements in Intellectual Property Cases.   Clients include AOL Moviefone, AT&T, Avon, Brother International, Dyson, Epson, Hershey's, BM, JP Morgan Chase, Gerber Products, Johnson & Johnson, K-Swiss, Mead Johnson, Microsoft, Monster Cable, McDonald's, Playtex, PNC Financial, Proctor & Gamble, Roche, Seagate, Sergio Garcia, Sharp, TiVo, Under Armour, Wal-Mart, Warnaco, and various plaintiffs in consumer class actions.

**<u>MEMBERSHIPS</u>**

American Marketing Association

American Statistical Association

Association for Consumer Research

The Institute for Operations Research and Management Science (INFORMS)

International Trademark Association

Society for Consumer Psychology

American Association for Public Opinion Research

## APPENDIX B – DR. STECKEL'S TESTIMONY IN THE LAST FOUR YEARS

## Depositions

Munchkin, Inc. v. Playtex Products, LLC. 2011 WL 2174383 (United States District Court, Central District of California).

Hewlett-Packard Company v. Oracle Corporation, Case  No.: 1-11-CV-203163 (Superior Court of the State of California, Santa Clara County).

Tria Beauty, Inc. v. Radiancy, Inc., Case No.:  CV-10-5030 RS (NJV) (United States District Court, Northern District of California – San Francisco Division).

TiVo Inc. v. Verizon Communications, Inc., Civil Action No. 2:09-cv-257-JRG (United States District Court, Eastern District of Texas – Marshall Division).

Visteon Technologies, LLC. v. Garmin International, Inc., Civil Action No. 2:10-cv-10578-PDB-MAR (United States District Court, Eastern District of Michigan – Southern Division).

Margaret Korrow, on behalf of herself and others similarly situated, v. Aaron' Inc., also known as Aaron's Sales & Lease Ownership, Inc. and formerly known as Aaron Rents and John Does 1-25, Civil Action No. 10-cv-06317 (JAP) (LHG) (United States District Court, District of New Jersey).

Etkin & Company, Inc. v. SBD LLC, Dr. Arthur Agatston, SBD Trademark Limited Partnership, and SBD Holdings Group Corp., Civil Action No.: 1:11-cv-21321-Lenard/O'Sullivan, United States District Court (Southern District of Florida).

Under Armour, Inc. v. Body Armor Nutrition LLC, Civil Action No. 1:12-cv-01283-JKB, United States District Court (District of Maryland – Baltimore Division).

United States of America et. al. v. American Express Co., et. al., Case No. 10-CV-04496 (NGG) (RER), United States District Court (Eastern District of New York).

People of the State of California vs. Overstock.com, Inc., Case No. RG10-546833. Superior Court of California, (County of Alameda).

Denimafia, Inc. v. New Balance Athletic Shoe, Inc., Foot Locker, Inc., The Sports Authority, Inc., and Famous Horse, Inc., d/b/a V.I.M., Civil Action No. 12-cv-04112 (AJP), United States District Court (Southern District of New York).

Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc., Case No. CV 13-02747 DMG (ARGx),
United States District Court (Central District of California, Western Division).

QS Wholesale, Inc. and Quiksilver, Inc.v. Rox Volleyball, Inc. and 1st Place Team Sales, Inc., Case No. SACV 13-00512 AG (JPRx), United States District Court (Central District

of California, Southern Division).

Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics GmbH, Civil Action No.: 14-CV-585 (AJN), United States District Court (Southern District of New York).

Twentieth Century Fox, et al. v. Empire Distribution, Inc. Case No: 2:15-cv-02158-PA-FFM (United States District Court for the Central District of California).

## Trial

The Hershey Company and Hershey Chocolate & Confectionery Corporation v. Promotion in Motion, Inc., No. 07-CV-1601 (SDW) (MCA), United States District Court (District of New Jersey).

Sergio Garcia v. Commissioner of Internal Revenue, Docket No. 13649-10 (United States Tax Court, Miami Florida).

Munchkin, Inc. v. Playtex Products, LLC. 2011 WL 2174383 (United States District Court, Central District of California).

In Re Tobacco Cases II, JCCP No. 4042, Case No. 711400 (Superior Court of the State of California for the County of San Diego).

People of the State of California vs. Overstock.com, Inc., Case No. RG10-546833. Superior Court of California, (County of Alameda).

Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics GmbH, Civil Action No.: 14-CV-585 (AJN), United States District Court (Southern District of New York).

## APPENDIX C – MATERIALS CONSIDERED

**Documents Produced in Litigation**
- Second Amended Complaint.
- Expert Report of Erich Joachimsthaler, November 19, 2015.
- Expert Report of Larry Gerbrandt, November 23, 2016.
- Deposition of Anita Bizzotto, former Executive Vice President and Chief Marketing Officer, August 13, 2015, Vol. 1.
- Deposition of Gail Sonnenberg, former Senior Vice President of Sales, July 13, 2015, Vol. 1.
- Deposition of Greg Shapleigh (Undesignated), General Manager at Giro Sport Design, October 28, 2015, Vol. 1A
- Deposition of Robert Burns, Vice President and General Counsel at Trek Bicycle Corporation, September 9, 2015, Vol. 1.
- Deposition of William Henderson, former Postmaster General, September 22, 2015, Vol. 1.
- Letter from Nelson Mullins to Bill Stapleton, November 6, 2012, Shapleigh exhibit 693, GIRO_Subpoena_006432-006434.
- "1999 Team Sponsorship Outline," Sonnenberg Ex. 229, US00000416.
- "Sponsorship Proposal United States Postal Service Cycling Team," Ex. 46, US00601207.
- "United States Postal Service Pro Cycling Team – Board of Governors' Meeting," June 6, 2000, Myers Ex. 376, MYERS00000289.
- "United States Postal Service Pro Cycling Team Business Plan 1998 Season," Myers Ex. 366, US00164540.

**Documents Produced by Dr. Joachimsthaler**
- "LARM Litigation Consulting Questionnaire (Athlete Version) FINAL," Chadwick Martin Baily, August, 7, 2015, JOACHIMSTHALER00000252.
- "LARM Litigation Consulting Questionnaire (Brand Version) FINAL," Chadwick Martin Baily, August, 7, 2015, JOACHIMSTHALER00000277.
- "04 Vivaldi LA Brand - Client VE," JOACHIMSTHALER00000425.
- "04 Vivaldi LA Athlete – Client," JOACHIMSTHALER00000424.
- JOACHIMSTHALER00000251
- Wilson, Bradley, et al., "Player transgressions and the management of the sport sponsor relationship," Public Relations Review, 34, 2008, pp. 99-107, JOACHIMSTHALER00000242.
- Till, Brian & Terrance A. Shimp, "Endorsers in Advertising: The Case of Negative Celebrity Information," Journal of Advertising, 27, 1998, pp. 67-82, JOACHIMSTHALER00000216.

**Academic Articles**
- Anderson, Norman H., "Averaging versus adding as a stimulus-combination rule in impression formation," *Journal of Personality and Social Psychology*, 2, 1965, pp.394-400.

- Bhattacharjee, Amit, et al., "Tip of the Hat, Wag of the Finger: How Moral Decoupling Enables Consumers to Admire and Admonish," Journal of Consumer Research, 39, 2013, pp. 1167-1184.
- Carlston, Donal E., "The recall and use of traits and events in social inference processes," Journal of Experimental Social Psychology, 16, 1980, 303-328.
- Carrilat, Francois, et al., "For Better, for Worse? What to do when celebrity endorsements go bad," Journal of Advertising Research, 53, 2013, pp. 15-30.
- Clark, Leslie F., et al., "Biasing Effects of Retrospective Reports on Current Self-Assessments," in *Autobiographical Memory and the Validity of Retrospective Reports*, N. Schwarz and S. Seymour (Eds), New York: Springer-Verlag, 1994, p.291.
- Dawar, Niraj & Jing Lei, "Brand crises: The roles of brand familiarity and crisis relevance in determining the impact on brand evaluations," Journal of Business Research, 62, 2009, pp. 509-516.
- Fiske, Susan T., "Attention and weight in person perception: The impact of negative and extreme behavior," Journal of Experimental Research in Personality, 22, 1980, pp. 889-906.
- Hamilton, David L., & Leroy J. Huffman, "Generality of Impression-Formation Process for Evaluative and Nonevaluative Judgements," Journal of Personality and Social Psychology, 20, 1971, pp. 200-207.
- Heinen, James R.K., "A primer on psychological theory," The Journal of Psychology, 119, 1985, pp. 413-421.
- Hodges, Bert H., "Effect of valence on relative weighting in impression formation," Journal of Personality and Social Psychology, 30, 1974, pp. 378-381.
- Kroloff, George, "Media: At home and abroad," Public Relations Journal, 1988, pp. 8-10.
- Lee, John S., & Dae H. Kwak, "Consumers' Responses to Public Figures' Transgression: Moral Reasoning Strategies and Implications for Endorsed Brands," *Journal of Business Ethics*, DOI: 10.1007/s10551-015-2544-1.
- Mizic, Natalie, and Robert Jacobson, "The Financial Value Impact of Perceptual Brand Attributes," Journal of Marketing Research, 45, 2008, pp. 15-32.
- Pratto, Felicia, and Oliver P John, "Automatic vigilance: The attention-grabbing power of negative social information," Journal of Personality and Social Psychology, 61, 1991, 380-391
- Robinson-Riegler, Gregory L., and Ward M. Winton, "The role of conscious recollection in recognition of affective material: Evidence for positive-negative asymmetry," *Journal of General Psychology*, 123, 1996, pp. 93-104.
- Schaeffer, Nora C., et al., "The Science of Asking Questions," Annual Review in Sociology, 29, 2003, pp. 65-88.
- Vohs, Kathleen, "Bad is Stronger Than Good," Review of General Psychology, 5, 2001, pp. 323-370.
- Wyer, Robert. S., and Ronald L. Hinkle, "Informational factors underlying inferences about hypothetical persons," Journal of Personality and Social Psychology, 34, 1971, pp. 481-495.
- Zhou, Lianxi & Paul Whitla, "How negative celebrity publicity influences consumer attitudes: The mediating role of moral reputation," Journal of Business Research,

89

66, 2013, pp. 1013-1020.

**Books**
- Aaker, David A. & Erich Joachimsthaler, *Brand Leadership*, New York: The Free Press, 2000.
- Bradburn, Norman, et al., *Asking Questions: The Definitive Guide to Questionnaire Design – For Market Research, Political Polls, and Social and Health Questionnaires*, San Francisco: Jossey-Bass Publishers, 2004, p. 317.
- Converse, Jean M., et al., *Survey Questions: Handcrafting the Standardized Questionnaire*, Beverley Hills: Sage Publications, 1986.
- Conway, Martin A., *Autobiographical Memory: An Introduction*, Buckingham: Open University Press, 1990.
- Heider, Fritz, *The Psychology of Interpersonal Relations*, Wiley, 1958, pp. 174-217.
- Hoyle, Rick H., Monica J. Harris, and Charles M. Judd, *Research Methods in Social Relations, 7th ed.*, Ft. Worth, TX: Wadsworth, 2002.
- Keller, Kevin L., *Strategic Brand Management: Building, Measuring, and Managing Brand Equity*, New Jersey: Pearson, 4th Ed., 2013.
- Kerlinger, Fred N., *Foundations of Behavioral Research, 4th ed.,* Ft. Worth TX: Harcourt College Publishers, 2000.
- Schwarz, Norbert, et al., *Autobiographical Memory and the Validity of Retrospective Reports*, New York: Springer-Verlag, 1994.

**News Articles**
- Irwin, Tanya, "The Quick and the Cheap: New Positioning for USPS," Adweek, February 17, 2003, http://www.adweek.com/news/advertising/quick-and-cheap-new-positioning-usps-61893, accessed February 12, 2016.
- McMahon, Daniel, "Lance Armstrong Says His Critical Mistake in Life was Bigger than Doping—Is He Still Making It?" Business Insider, Dec. 9, 2015, http://www.businessinsider.com/lance-armstrong-biggest-mistakes-2015-12, accessed February 5, 2016.
- "United States Joins Lawsuit Alleging Lance Armstrong and Others Caused the Submission of False Claims to the U.S. Postal Service," Department of Justice, February 22, 2013, http://www.justice.gov/opa/pr/united-states-joins-lawsuit-alleging-lance-armstrong-and-others-caused-submission-false, accessed February 6, 2016.
- "USPS Cuts Ad Budget," Chief Marketer, August 20, 1999, http://www.chiefmarketer.com/usps-cuts-ad-budget, accessed February 12, 2016.

**Business Documents**
- "About – Size and Scope," USPS, https://about.usps.com/who-we-are/postal-facts/size-scope.htm, accessed January 24, 2016.
- "Annual Report 2001," USPS, http://about.usps.com/who-we-are/financials/annualreports/fy2001/contents.htm, accessed February 12, 2016.
- "Annual Report 2006," USPS, http://www.prc.gov/docs/56/56080/anrpt2006_final.pdf, accessed February 12, 2016.

- "Financial History Summary," USPS, https://about.usps.com/publications/annual-report-comprehensive-statement-2011/html/ar2011_financial_1.htm, accessed February 6, 2016.
- "Five Year Strategic Plan – 2001-2005," USPS, https://about.usps.com/strategic-planning/fiveyear.pdf, accessed February 12, 2016.
- "Notes to the Financial Statements," USPS 2001 Annual Report, http://about.usps.com/who-we-are/financials/annual-reports/fy2001/financial/note2.htm, accessed February 18, 2016.
- "Notes to the Financial Statements," USPS 2006 Annual Report, http://about.usps.com/who-we-are/financials/annual-reports/fy2006/fstatements_007.htm, accessed February 18, 2016.
- "Postal Facts 2015," USPS, https://about.usps.com/who-we-are/postal-facts/postalfacts2015.pdf, accessed February 6, 2015.
- "Reasoned Decision of the United States Anti-Doping Agency On Disqualification and Ineligibility," USADA, October 10, 2012, http://d3epuodzu3wuis.cloudfront.net/ReasonedDecision.pdf retrieved February 3, 2016.
- "Report on Universal Postal Service and The Postal Monopoly," USPS, October 2008, https://about.usps.com/universal-postal-service/usps-uso-report.pdf, accessed February 6, 2016.
- "The Value of the U.S. Postal Service Brand," Office of Inspector General USPS, January 28, 2015, https://www.uspsoig.gov/sites/default/files/document-library-files/2015/rarc-wp-15-005_0.pdf, accessed February 12, 2016.
- "Title 39—Postal Service," Public Law 91-375, August 12, 1970, http://www.21cpw.com/wp-content/uploads/2015/05/Postal-Reorganization-Act-1970.pdf, accessed February 5, 2016.

**Websites**
- "How We Think About Brands," Young & Rubicam Group, http://www.yr.com/BAV, accessed February 16, 2016.
- "BAV Consulting," BAV Consulting, http://bavconsulting.com/, accessed February 22, 2016.
- "BAV Insights," BAV Consulting, http://bavconsulting.com/insights/, accessed February 22, 2016
- "Industry Leading Brand Insights," BAV Consulting, http://bavconsulting.com/insights/reports/, accessed February 18, 2016.

## APPENDIX D – VERBATIM RESPONSES INCLUDED IN UNAIDED AWARENESS CALCULATION

| Athlete Survey | | Brand Survey | |
|---|---|---|---|
| **Respondent_ID** | **Verbatim Response** | **Respondent_ID** | **Verbatim Response** |
| 3R9Y43A1Q2 | U.S. Post office<br>Nike | WOUCTQD198 | Lance Armstrong |
| 534Z4ETB9Z | United Sates Postal Service | EEDI23KG4H | lance armstrong |
| FJ9YU3IX5P | usps | RQ8OYZB5OO | Lance Armstrong |
| NVQU80ZJ5B | Nike,Live Strong, USPS | VSD7NBIR7A | Lance Armstrong |
| TQCL3HH910 | usps | YKJZGPACOB | US bicycling team |
| G6AY826YHQ | usps | VDA0C6KD2P | Lance Armstrong |
| 10U7V9UYKO | US Postal Service | DSGB08788Z | Cycling team in Tour de France |
| 10W6VTTLDD | United States postal service | J8GTQHIE0W | Lance Armstrong |
| IYVZQ3I4CB | US postal service | WVX27QBBIT | Tour de France racers |
| 118G1EA6FU | usps | 11DX6NR7BK | lance armstrong |
| WBS1F0CNRN | Usps | GPBT5S3WY7 | LAnce Armstrong |
| Z28M3GX3B4 | He ripped off the public and the U.S. Postal Service. I never want to see him again and resent that you didn't give unfavorable traits to match him with on the past screens. | 2C7VU23AIC | Lance Armstrong |
| 11CTTL3QYN | U.S. Post Officee | 11QSMXHPOE | Armstrong |
| 12WQROZ2BK | US Post office | 1M00E6JZ3N | armstrong |
| CYFPOP996W | us postal service | UPJR8RZSAF | Lance Armstrong |
| PELCNR6X4U | US Postal Service | 9LXP0DUNGJ | cycling |
| 13JWE1XDBH | Usps | UJA8U0XKGJ | a cycling team |
| 4BWQL989LU | usps | 12I1N5Q8LW | Can't think of his name but the disgraced Tour de France rider |
| F0CQGP4XEN | USPS | N755ORU91Q | lance armstrong |
| 145D7WZEO2 | us post office | 3O21BV9B3W | Lan ce Armstrong |
| IZZRCBWHZ5 | Postal Service | 134H8SJ5TN | Lance Armstrong |
| TM8NDABFDM | U S Postal | 3R51L1CNKV | Lance |
| 16J2NW1UT6 | USPS | 66FROO9U69 | Lance Armstrong |
| 16O5WEYP2D | US post office | 1024LXQ301 | Armstrong hahaha |
| 1740PW95M8 | U.S. Postal Service | F1I7205PGH | Cyclists |
| 178RQ1ELIW | Usps | IH3ZVI1JH5 | Lance Armstrong |
| 17KNRMVDZ1 | Livestrong, USPS, Nike | V3GDSFFKVA | Bike team |
| 17SDDC1R87 | USPS | 2NJI9T248Y | Lance Armstrong |

| | | | |
|---|---|---|---|
| 17ZYHCH4EN | Nike<br>Postal Service | W1I2FDU8KA | Tour de France Bicycle Team |
| 18G3AEAOEU | Coca Cola, Subaru, Trek, Oakley, US Postal Service | WASAALQ7J5 | Lance Armstrong |
| 18GC5O023Y | post office | 111FPIDF02 | Lance Armstrong |
| 18JISOEOC5 | U.S. Postal Service | 11ECWSK6U0 | Lance Armstrong |
| 6UB7IW9BLN | USPS<br>Nike | 11NK4EWV7F | Lance Armstrong |
| JI1C6ZJ7Q4 | USPS<br>Nike | 11PAPC4B5I | Lance Armstrong |
| JFRDPDWB3V | Nike, US Postal Service, Michelob | IG6PHPG3TA | Lance Armstrong |
| VOG9CSZJDG | us mail | 129ETBXK56 | Lance armstrong |
| ZM4WF8O7U7 | UsPs | WXQE6LI0P1 | L. Armstrong |
| 19NUT79W7G | United States Postal Service | 12IV6N3HK9 | lance armstrong |
| 19OZE9ZJLJ | USPS | 12TT2P5I7U | Lance Armstrong |
| 19RJ89647B | US Post Office | R5JBZ85A6R | armstrong |
| 1B41YAAM9F | USPS | 12XYV5DX8A | lance armstrong |
| 9LGBO4SPFC | Post office | FEP0GJTB1I | U. S Cyclists such as Lance Armstrong |
| 1BBDOBXW7H | usps | V2GVOZ27C9 | US Cycling team |
| 1CJI47VYMA | USPS | 138YGBCCCQ | Armstrong |
| 1CLWFHMS4F | USPS | 13EALB7NDP | Armstrong |
| ILDJIB93JH | U S Postal service   Live Strong | 13G66KG158 | l\ance armstrong |
| 1CPU97Q9O9 | US Postal Service | AWZT6ZNBFC | lance Armstrong |
| 1CWW5084YH | nike, postal service, live strong | 13LCQ9IIR1 | lance armstrong |
| 1DRWC8X9PV | US postal service | 1JPOZECBTW | lance armstrong |
| 1EMI00NAC6 | usps | Z8CUGEGX7B | Lance Armstrong |
| 1FLI2J0DMP | Us postal service, Nike, Wheaties | 14MGM4QTNY | lance armstrong |
| 1GTY3GOXKW | U.S. Post Office | 14TAWVNOAB | Lance Armstrong |
| 1GW5KWNT0J | USPS | 93EZZA54RN | Lance Armstrong |
| 1HCBXUGIUU | Nike LiveStrong US Postal Service | 8DI2I8DPED | Lance Armstrong |
| 1IA1LMT1UA | USPS | 16GIYBO1YN | Lance Armstrong |
| 1JEUY5XM1W | USPS | WHNI9Q5I35 | lance armstrong |
| 1JHI7J4VNY | united States Postal Service | 16Q4W4FNWU | Lance Armstrong |
| 1JVBRKK8FK | USPS | 16V0UQGVW1 | tour de france |
| 1K0C72OYRI | US Postal Service | ZQTKQBUFGB | Tour De France Team |

| | | | | |
|---|---|---|---|---|
| 1K0SF3B83H | Garmin, usps | | 175TG6U4I4 | Lance Armstrong |
| 1K13HPAKII | USPS | | KLVXA1WTRD | Lance Armstrong,  US Biking Team |
| 1K23JP0CKF | USPS | | PH2M72BY6N | Tour de France bike team (Lance Armstrong) |
| 1KK65QQYEO | Usps | | 7WMV5PJIB6 | Bike racer |
| 1L9YXYF4JW | Nike Postal Service | | O9J1AA5GQ8 | Lance Armstrong |
| 1LPL2I1M8M | USPS | | 17LC03VVOP | US cycling team |
| 1LQIF0N74X | USPS | | FQEVA7Z929 | Lance Armstrong |
| 1O6JHARQ7D | USPS | | 17XFB47L2G | Lance Armstrong |
| 1OBHX9V8QX | USPS | | 17Y89CEHZS | lance armstrong |
| 1P0ORD4H5X | Nike, trek, us postal service, Michelob, | | XHB9CR7P00 | Armstrong |
| 1Q4KVSKQ4Y | USPS | | P8AIFSIF5J | Lance Armstrong |
| 1QDA0XOWZY | USPS | | MRXN42SZH7 | Lance armstrong |
| 1QKQX63PJ3 | US Postal Service | | 18BS4XII13 | lance armstrong |
| EGXTQVQJCY | US postal service | | YUVFQ06BW7 | Lance Armstrong |
| MYSE67JZ8T | U. S. Postal Service | | 191Y5OTMBZ | Lance Armstrong |
| 79ZU89WH9M | US Postal Service | | 194T2UMULF | Cyclists |
| KV42H65CUQ | Post Office | | 19B2G4MRVP | Lance Armstrong |
| 1R7J76HAF8 | USPS | | 2XXAB6DGJM | lance |
| 1R5A5634TW | U.S. Postal service | | XAJ9D3SIQU | Lance Armstrong |
| MEQ3POMS03 | US Postal Service, Nike | | ER5EH54CFE | Lance Armstrong |
| G9XYISA9P6 | Visa, post office | | JJ9ABW98YU | Lance Armstrong |
| JJ3OD8MKIM | US Postal | | DAT89S0XHE | U.S. Postal cycling team from way back :) |
| 1RTSMFSA7K | usps | | 6F8I7L0IMC | Lance Armstrong |
| 1RWWZ8WODX | USPS, | | 8J9WI9LJTO | Lance armstrong |
| 1RZ7CB3Z1D | t-mobile us post office | | W1GFVP3X92 | Armstrong the druggie liar |
| 1SC6DZ921F | USPS | | L8Q7CX1EPG | Lance Armstrong |
| KQMWCGHB3D | USPS | | ICDAEQ5BHA | Tour de France |
| 1UMNJ7XN48 | US Post Office | | 5TUZ9WHHSG | Lance Armstrong |
| 1UVFX9I0Z3 | US Postal system | | 24NPK4BVSF | Lance Armstrong |
| 1V31B8PB7L | Nike, US Postal Service | | MTTRZ6IL1Q | Lance Armstrong |
| 1VY85YUJQV | USPS | | T8BGG3IR85 | US Bike Team |
| 1W0M9DM339 | US Post Office | | N74Z58GPY7 | Lance Armstrong |
| 1WLQSP9K0Y | USPS | | RRBWI3T0GH | lance armstrong |
| 1WVXT84X23 | US Post Office | | P6UPZAXLBH | lance armstrong |
| 1X6T2N0QH2 | US Post Office | | OWUU9YK7NI | Lance Armstrong |
| 1XNWV1M6M9 | Nike, US Post Office | | RDHLOA1DCB | Lance Armstrong |
| 1XWCA5IYF4 | USPS | | 3MEOQ7G90G | Bicycle racing Tour De |

| | | | |
|---|---|---|---|
| | | | France |
| 1Y2XZGU9F3 | USPS, Trex | M17NXY6RNV | lance  armstrong |
| J21FKR351N | post office | U6EPW61YP4 | Lance Armstrong |
| 1YJB7U451G | Nike, post office | PZ9VIABW3T | Lance Armstrong |
| 1YCST173C6 | Nike, USPS | VNAX0LHENX | US Cycling Team |
| 1YKRMC2G4E | US Postal Service | 1A3U9IZUJ6 | Tour de France cyclist |
| 1YQE14ZDY0 | wheaties, usps | O7HYR55LYA | Lance armstrong |
| C9GZA3ARCV | US Post | 1AF6MRNVNH | Armstrong |
| 1YSQ282U28 | usps | 1AQ1QHKHRK | Lance Armstrong |
| YJ77Q8C7JH | US Postal Service | EHBOJVYU7M | Lance Armstrong |
| 1ZU8AWD2QT | U.S. Mail, Nike | 5EWK7WPPKO | Lance Armstrong |
| 1ZUXJDDKGH | Usps | D76LBERKAU | Lance Armstrong |
| 1ZYPRJEBBP | Usps | 1BFCAZ9KN7 | lance armstrong |
| Z4M7HUZVH7 | usps | 1BRXPEEPJN | US Cycling team |
| 21E2G1BRA0 | usps | 1BR05X67MW | Cycling team |
| 2274A7P8FK | U.S. Post office | 4MZKDVJA40 | Lance Armstrong |
| 227TJQ9O6J | Watch Maker Post Office | 1CNXJTGZ8G | Lance Armstrong |
| 22H26NG9BB | USPS | 85DX5HGRPU | Lance Armstong |
| 22WKYVC1M2 | USPS | | |
| 236G9BHSMC | USPS, Discover | | |
| 8X6TIHJXVK | US Post Office | | |
| OUVJNQ6V8E | USPS | | |
| 257BIZ8RWY | us postal | | |
| 25DEDKCU1X | USPS Bikes | | |
| 26J9V18MOD | Post office | | |
| 26WAG53Y73 | post office | | |
| LXWIQV7IAV | Radio shack, usps | | |
| RJ98CNM19Y | post office | | |
| 28PW4ZX2E4 | Post office | | |
| 26CVYL1Z1A | us postal service | | |
| 29ISGZ4S6V | Postal service | | |
| 29XUC60988 | USPS | | |