# Exhibit C

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES, *ex rel.*, <br> FLOYD LANDIS, <br><br> Plaintiff, <br><br> v. <br><br> TAILWIND SPORTS CORPORATION, <br> *et al.*, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) No. 1:10-cv-00976 (CRC) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

# EXPERT REPORT OF BRIAN TILL

My Name is Brian David Till. I am Dean of the College of Business and Administration and Professor of Marketing at Marquette University. I have a B.S. in Advertising and MBA from the University of Texas at Austin and a Ph.D. in Business with a major in marketing and a minor in psychology from the University of South Carolina. Prior to my university career, I worked in brand management at Purina. I have taught in the areas of marketing and advertising full-time for approximately twenty years. My research has been primarily in the areas of associative learning, brand equity, and celebrity endorsers. I have published in journals such as *Journal of Advertising, Journal of Marketing Research, Journal of the Academy of Marketing Science, Journal of Consumer Marketing, Psychology & Marketing*, and *Journal of Product & Brand Management*. I also consult in the area of marketing strategy and advertising. Past clients include Monsanto, Energizer, Charter Communication, AT&T, Medicine Shoppe International, and Growmark.

I have been retained on several occasions to give expert testimony in connection with my areas of academic expertise. Attached to this report is my curriculum vita, where I describe my background in more detail. Within the past 4 years I served as an expert witness in Playtex Products, LLC and Eveready Battery Company v. Munchkin, Inc. (U.S. Patent and Trade Office).

I am being compensated for my work in this case at my standard hourly rate of $300 per hour. My compensation for my work in this case does not depend in any way on the outcome of the case.

I have reviewed a variety of materials in the United States ex rel. Landis v. Tailwind Sports, Lance Armstrong & Johan Bruyneel case including the complaint, the Order denying the defendants' motion to dismiss, USADA decision, sponsorship agreements, Q Scores, and relevant academic literature. Below is a complete statement of the materials on which I have relied in forming my opinions. While I may receive more information that will be relevant to my opinions, based on my training, knowledge, education, experience, and research-to-date in this case, I make the following observations and express the following opinions.

**SUMMARY OF CONCLUSIONS**

1. The USPS Sponsorship of Lance Armstrong's cycling team created an associative link between the USPS and Armstrong. There is evidence that consumers associated Armstrong with the USPS even after the Sponsorship ended.
2. A 1998 study I co-authored shows that negative information about celebrity athletes (in the study, a bicycle racer) affects consumer perception of the brands the celebrity endorses.
3. Due to the associative link between the USPS and Armstrong, it is highly likely that information about Armstrong's use of performance-enhancing substances and techniques negatively affected consumer perception of the USPS.

1

4. It is highly likely that Armstrong's tarnished image reflected negatively on the USPS and deprived the USPS of the positive associative benefits expected through their Sponsorship.

**DISCUSSION**

1. The USPS sponsored a professional cycling team from 1996-2004, with Lance Armstrong as the lead rider during the sponsorship years 1998-2004. Research on sponsorships indicates that they can be effective brand building tools even for non-profits and reinforce specific brand associations (Becker-Olsen and Hill 2006), increase consumer preference (Dean 2004), increase sales, particularly when the athlete has a strong reputation (Elberse and Verleun 2012).

The associative links built between an endorser and a brand extend over time and are resistant to extinction (Till, Stanley and Priluck 2008).
The 2000 renewal of USPS sponsorship of Lance Armstrong's cycling team reflected USPS' commitment to the importance of that sponsorship in its brand building activities. The importance of repetition in building a strong connection between an endorser and a brand is key principle of associative learning and an important factor in using an endorser effectively (Till 1998). And the length of the sponsorship relationship between Lance Armstrong's cycling team and the USPS is a significant contributing factor to the development of a strong associative link between the two.

The theoretical mechanism underlying sponsorship and endorsement effects is associative learning, a process through which associative links are built (and strengthened) between the sponsoring brand (USPS) and the sponsored property (Lance Armstrong and the USPS bicycle team).

At a fundamental level, associative learning is a process by which connections (associative links) are formed in memory. There are several basic principles underlying this process (overviewed as applied to celebrity endorsers in Till 1998). A brief overview of these principles includes:

-repetition (including media impressions linking sponsored property and sponsoring brand) builds and strengthens these links
-links are formed more easily when there are fewer competing stimuli for the building of the association (overshadowing and blocking)
-links are formed more easily when there is some congruence between the association objects (fit/similarity)
-links are formed more easily between two association objects when those association objects have fewer pre-existing links with other association objects

Repeated association via a variety of sponsorship and communication activities builds a link between the brand and the sponsored entity (Till and Shimp 1998, Till 1998, Zdravkovic and Till 2012). And it is through this link that meanings, both positive and

2

negative, transfer from the sponsored property to the sponsoring brand (McCracken 1989, Till 1998).

In this case, the USPS management of its sponsorship aligned itself well with principles associated with the development of a strong link between USPS and the Lance Armstrong riding team. The sponsorship extended over multiple years (1996-2004). The USPS logo was prominently displayed on the team uniform and vehicle and the USPS engaged in various activities (identified in above paragraph) to activate the sponsorship and build a strong link between Lance Armstrong and the USPS. Additionally, this was the primary sponsorship activity for the USPS and the primary (main) sponsorship for Lance Armstrong's team. The combination of repetition, prominence of visibility of the sponsorship, and no similar USPS sponsorships all are consistent with theoretical mechanisms (repetition, overshadowing/blocking) that increase the likelihood of a strong associative link between USPS and Lance Armstrong.

Further, associative links are built through repetition. The reports on the media coverage of the Sponsorship authored by IEG, FCB, and CE provide substantiation that consumer exposure to the sponsoring relationship was widespread and relatively intense.

An IPSOS December 2012 study provides additional evidence for the effectiveness of creating an association between USPS and Lance Armstrong's cycling team. In 2012, 8 years after the discontinuation of the sponsorship, awareness of sponsorship was 12.3%, with individuals reporting shipping responsibilities in workplace more likely to be aware of the sponsorship.

2. When there is a strong associative link between a brand and an endorser, negative information about the endorser is likely to have a negative effect on the endorsed brand. The Till and Shimp (1998) paper demonstrated empirically that negative information about an athlete endorser can negatively affect attitude toward the endorsed brand. The causal explanation behind this effect is that it is across the associative link between the brand and the endorser that negative feelings toward the endorser transfer to the brand. This is simply the inverse of the value of using a celebrity endorser in which positive feelings toward a well-liked celebrity can transfer to the brand(s) they endorse. However there is always some risk of negative celebrity publicity affecting endorsed brands.

These effects are consistent with research showing that negative information about celebrity impacts attitude toward brand (Amos, Holmes and Strutton 2008, Bailey 2007, Till and Shimp 1998, White, Goddard and Wilbur) 2009), purchase intent (Bailey 2007, Money, Shimp and Sakano 2006), and firm value as reflected by stock price, particularly with greater media attention and more prominent celebrities (Bartz, Molchanov and Stork 2013) and when the celebrity is considered responsible for the negative event (Louie, Kulik and Jacobson 2001),

Such negative celebrity effects also hold true for athletes (as athletes are one type of celebrity). In the Till and Shimp (1998) study, the researchers conducted several experiments to understand whether or not (and under what conditions) negative

3

information about an athlete (in their study, a bicycle racer) might affect attitude toward the endorsed brand (in their study, a bicycle). The experiments examined several variables including the type of negative information, the size of the association sets for the brand and the athlete, and the strength of the associative link between the brand and the athlete. The findings consistently demonstrated that negative information about an athlete affects the endorsed brand. And that this effect is particularly pronounced when the association sets for the brand and athlete are small and the associative link between the brand and athlete is strong. These negative associations more easily transfer from endorser to brand than positive associations (Campbell and Warren 2012).

Recently several NFL players have been struck by off-field problems, most notably (now ex-) Baltimore Raven Ray Rice was dropped by all his sponsors as a result of the allegation of striking his then fiancé (Adweek 9/9/14). Nike suspended their endorsement relationship with Adrian Peterson, and Castrol oil dropped their endorsement relationship with him, as a result of child abuse allegations against him (CNNMoney 9/16/14). These actions are a direct consequence of the sensitivity that brand managers have with respect to the associations their brand has.

3. As the public face of the USPS cycling team, Lance Armstrong's admitted PED use, accompanied by substantial news coverage, resulted in a lowering (tarnishing) of Lance Armstrong's image.

Armstrong admitted use of ban substances in a televised interview with Oprah Winfrey on January 17 and 18, 2013. Media coverage of Armstrong's PED use was wide-ranging—television, internet, social media and high profile print publications. Such extensive coverage did impact the public's perception of Armstrong. Armstrong's resultant tarnished image led to a series of sponsor defections including Nike, Anheuser-Busch and Trek (USA Today 10/18/12).

Q Scores are, very generally, indicators of the familiarity and appeal of celebrities. In this case, Q Score data show high familiarity with Lance Armstrong with above 50% starting in September 2001 and continuing in the upper 70%/lower 80% starting September 2005. With respect to his Positive Q Score, a notable drop-off occurs between September 2005 (30) and March 2013 (4). Similarly a large up-tick in Armstrong's Negative Q Score occurs with the March 2013 survey (69). Both the decrease in Armstrong's Positive Q Scores and the Increase in his Negative Q Scores are consistent with the timing of the negative publicity concerning his use of performance-enhancing substances and techniques.

IPSOS is a company that studies audiences and their perceptions of various media, and that measures public opinion trends. A 2012 December IPSOS Study indicated that those who believed Armstrong to be guilty of PED use rated him lower on a variety of personal characteristics (e.g. "ethical," "fair," "honest" etc.) than those who believed him innocent. The Study showed that those who believed Armstrong to be guilty of PED use rated USPS lower on a variety of brand attributes (e.g. "dependable," "ethical," "high quality" etc.) than those who believed him innocent. Generally, those who believed

4

Armstrong to be guilty of PED use were more likely to be negatively impacted (future purchase intent) than those believing he is innocent. The Study also showed that respondents with shipping authority were more likely to have decisions negatively impacted (future purchase intent) by the PED allegations than those without shipping responsibilities. In short, the Study indicated a relationship between how people felt about Lance Armstrong and how they felt about UPS.

4. The tarnished image as a result of Lance Armstrong's PED use likely reflected negatively on the USPS and deprived the USPS of the positive associative benefits expected through their sponsorship of Lance Armstrong's racing team.

From my review of available information, this negative information regarding Lance Armstrong is highly likely to have negatively affected perceptions of the USPS as there has been a strong associative link between Lance Armstrong and the USPS, across which negative affect transfers (Till and Shimp 1998).

*B. D. Till*

Brian D. Till

11/23/2015

Materials Reviewed

1. United States' Complaint
2. Order Denying Defendants' Motions to Dismiss
3. USADA Reasoned Decision Lance Armstrong
4. 1995 Sponsorship Agreement US Postal Service Cycling Team
5. 2001 Sponsorship Agreement US Postal Service Cycling Team
6. IPSOS Sponsorship Evaluation 2012
7. Biannual Lance Armstrong Q Scores March 2000-March 2013
8. FCB 2001 Sponsorship Evaluation
9. FCB 2002 Sponsorship Evaluation
10. CE 2003 Tour de France Media Coverage Evaluation
11. CE 2004 Tour de France Media Coverage Evaluation
12. IEG 2002 Valuation Statement
13. IEG 2004 Valuation Statement

References

Amos, Clinton, Gary Holmes and David Strutton (2008), "Exploring the Relationship between Celebrity Endorser Effects and Advertising Effectiveness," *International Journal of Advertising*, 27 (2), 209-234.

Bailey, Ainsworth Anthony (2013), "Public Information and Consumer Skepticism Effects on Celebrity Endorsements: Studies Among Young Consumers," *Journal of Marketing Communications*, June, 85-107.

Bartz, Sherry, Alexander Molchanov and Philip A. Stork (2013), "When a Celebrity is Disgraced: A Twenty-five-year Event Study," *Marketing Letters*, 2, 131-141.

Becker-Olsen, Karen L. and Ronald Paul Hill (2006), "The Impact of Sponsor Fit on Brand Equity," *Journal of Service Research*, August, 73-83.

Campbell, Margaret C. and Caleb Warren (2012), "A Risk of Meaning Transfer: Are Negative Associations More Likely to Transfer than Positive Associations?," *Social Influence*, 10, 1-21.

Castillo, Michelle (2014), "Ray Rice's Last Sponsor, Nike Has Dropped Him No brand is standing by disgraced NFL player," *Adweek*, September 9, 2014.

Dean, Dwane Hal (2004, "Evaluating Potential Brand Associations through Conjoint Analysis and Market Simulation," *The Journal of Product and Brand Management*, 13(7), 506-513.

Elberse, Anita and Jerden Verleun (2012), "The Economic Value of Celebrity Endorsements," *Journal of Advertising Research*, June, 149-165.

6

Louie, Theresa A., Robert L. Kulik and Robert Jacobson (2001), "When Bad Things Happen to Endorsers of Good Products," *Marketing Letters*, 12 (1), 13-23.

McCracken, Grant (1989), "Who is the Celebrity Endorser? Cutural Foundations of the Endorsement Process," *Journal of Consumer Research*, 16 (3), 310-321.

Money, Bruce R, Terrence A. Shimp and Tomoaki Sakano (2006), "Celebrity Endorsements in Japan and the United States: Is Negative Information all that Harmful?," *Journal of Advertising Research*, March, 113-123.

Schrotenboer, Brent (2012), "Paying the price: Doping case costs Lance Armstrong," *USA Today*, October 18, 2012.

Till, Brian D. (1998), "Using Celebrity Endorsers Effectively: Lessons from Associative Learning," *Journal of Product & Brand Management*, Vol. 7 (5), 400-407.

Till, Brian D., Randi Priluck, and Sarah M. Stanley (2008), "Classical Conditioning and Celebrity Endorsers: An Examination of Belongingness and Resistance to Extinction," *Psychology & Marketing*, Vol. 25 (2), 183-201.

Till, Brian D. and Terrence A. Shimp (1998), "Endorsers in Advertising: The Case of Negative Celebrity Information," *Journal of Advertising*, 27(1), 67-82.

Wallace, Gregory and Chris Isidore (2014), "Adrian Peterson sponsors Nike, Castrol back away from NFL star," *CNNMoney*, September 16, 2014.

White, Darin W., Lucretia Goddard and Nick Wilbur (2009), "The Effects of Negative Information Transference in the Celebrity Endorsement Relationship," *International Journal of Retail & Distribution Management*, 37 (4), 322-335.

Zdravkovic, Srdan and Brian D. Till (2012), "Enhancing Brand Image via Sponsorship: Strength of Association Effects," *International Journal of Advertising*, Vol 31 (1), 113-132.