**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* FLOYD LANDIS, <br><br> Plaintiffs, <br><br> v. <br><br> TAILWIND SPORTS CORP., *et al.*, <br><br> Defendants. | Civil Action No. 1:10-cv-00976-CRC <br><br> **ECF** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
LANCE ARMSTRONG'S MOTION FOR SUMMARY JUDGMENT OR,
IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL BACKGROUND.................................................................................2

    A.    Professional Bicycle Racing .........................................................................2

    B.    Use of Performance Enhancing Substances in Professional Cycling .....................4

    C.    Lance Armstrong ...........................................................................................6

    D.    USPS Sponsorship of the Cycling Team ......................................................8

        1.    1995 Sponsorship Agreement ...............................................................8

        2.    USPS Employees Responsible for the Sponsorship .................................10

        3.    USPS Decision to Enter into 2000 Sponsorship Agreement .....................12

        4.    USPS Consideration of PED Use before Executing the 2000 Sponsorship Agreement .......................................................................13

        5.    2000 Sponsorship Agreement ..............................................................15

        6.    USPS Knowledge of PED Use by Cyclists Post-2000 Agreement............17

        7.    Sponsorship Benefits Enjoyed by the USPS............................................17

            a.    Quantified Benefits .......................................................................18

                (i)    New Revenues ................................................................18

                (ii)    Media Exposure ..............................................................20

                (iii)    Merchandising................................................................22

                (iv)    Total Quantifiable Benefits Based on USPS Statements................................................................23

            b.    Other Benefits ...............................................................................24

                 (i)    Employee Morale..............................................................24

         8.    Expiration of the 2000 Sponsorship Agreement......................................24

    E.    Filing of the Qui Tam Action.......................................................................25

i

III.   LEGAL STANDARD...............................................................................................................26

IV.   SUMMARY OF ARGUMENT ...............................................................................................27

V.   ARGUMENT...........................................................................................................................28

    A.   Plaintiffs Cannot Prove that the USPS Suffered Any Actual Damages ................28

        1.   Legal framework for FCA damages .........................................................28

        2.   Quantified benefits received by the USPS as a result of the
            sponsorship vastly outweigh any alleged actual damages ........................32

    B.   Plaintiffs Cannot Prove the Existence of a False Claim .......................................35

        1.   Plaintiffs Cannot Prove Fraudulent Inducement......................................35

            a.   Legal Framework for Fraudulent Inducement under FCA ............35

            b.   Armstrong made no statement to the USPS that
                fraudulently induced it to enter into the 2000 Sponsorship
                Agreement.....................................................................................38

            c.   Armstrong's alleged statement on a website did not
                fraudulently induce the USPS to enter into the 2000
                Sponsorship Agreement .................................................................39

        2.   Plaintiffs Cannot Prove Implied Certification .........................................41

    C.   The Government Cannot Prove Common Law Fraud...........................................44

    D.   The Government Cannot Prove Unjust Enrichment .............................................46

        1.   Legal Framework.....................................................................................46

        2.   Armstrong's retention of his earned salary is not unjust. .........................47

        3.   Restitution is not available when the plaintiff cannot disgorge the
            benefits it received. .................................................................................50

VI.   CONCLUSION.......................................................................................................................52

1054256

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*A Love of Food I, LLC v. Maoz Vegetarian USA, Inc.*
  70 F. Supp. 3d 376, 415 (D.D.C. 2014) ................................................................................43

*Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*
  525 F.3d 8 (D.C. Cir. 2008) ................................................................................................45

*Anderson v. Liberty Lobby, Inc.*
  477 U.S. 242 (1986) ............................................................................................................26

*Canopy Corp. v. Symantec Corp.*
  395 F. Supp. 2d 1103 (D. Utah 2005) ................................................................................47

*Celotex Corp. v. Catrett*
  477 U.S. 317 (1986) ............................................................................................................26

*Chen v. Bell-Smith*
  768 F. Supp. 2d 121 (D.D.C. 2011) ....................................................................................46

*Fink v. Nat'l Sav. & Trust Co.*
  772 F.2d 951 (D.C. Cir. 1985) ............................................................................................36

*Greene v. Dalton*
  164 F.3d 671 (D.C. Cir. 1999) ............................................................................................26

*In re APA Assessment Fee Litig.*
  766 F.3d 39 (D.C. Cir. 2014) ..............................................................................................50

*Landmark Land Co. v. FDIC*
  256 F.3d 1365 (Fed. Cir. 2001) ....................................................................................28, 49

*Laningham v. U.S. Navy*
  259 U.S. App. D.C. 115 (D.C. Cir. 1987) ...........................................................................26

*Pencheng Si v. Laogai Research Found.*
  71 F. Supp. 3d 73, 92-93 (D.D.C. 2014) .............................................................................39

*Rapaport v. U.S. Dep't of Treasury*
  59 F.3d 212 (D.C.Cir.1995) ................................................................................................47

*Raynor v. Richardson-Merrell, Inc.*
  643 F. Supp. 238 (D.D.C. 1986) .........................................................................................44

iii

*Redmond v. Birkel*
933 F. Supp. 1 (D.D.C. 1996)........................................................................................44

*Richardson v. U.S. News & World Report, Inc.*
639 F. Supp. 595 (D.D.C. 1986)................................................................................28, 44

*Samuels v. Wilder*
871 F.2d 1346 (7th Cir. 1989) ......................................................................................37

*Shenandoah Associates Ltd. P'ship v. Tirana*
182 F. Supp. 2d 14 (D.D.C. 2001)..................................................................................48

*Sununu v. Philippine Airlines, Inc.*
638 F. Supp. 2d 35 (D.D.C. 2009)..............................................................................28, 46

*U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*
543 F.3d 1211 (10th Cir. 2008) ....................................................................................41

*U.S. ex. rel. Williams v. Martin-Baker Aircraft Co.*
389 F.3d 1251 (D.C. Cir. 2004).....................................................................................36

*United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*
393 F.3d 1321 (D.C. Cir. 2005)......................................................................................28

*United States ex rel. Debra Hockett v. Columbia/HCA Healthcare Corp.*
498 F. Supp. 2d 25 (D.D.C. 2007)..................................................................................35

*United States ex rel. Fago v. M&T Mortg. Corp.*
518 F. Supp. 2d 108 (D.D.C. 2007)................................................................................34

*United States ex rel. Folliard v. CDW Tech. Servs., Inc.*
722 F. Supp. 2d 20 (D.D.C. 2010)..................................................................................34

*United States ex rel. Fox RX, Inc. v. Omnicare, Inc.*
No. 1:11cv0962, 2012 WL 8020674 (N.D. Ga. Aug. 29, 2012) ............................................35

*United States ex rel. Graves v. ITT Educ. Servs., Inc.*
284 F. Supp. 2d 487 (S.D. Tex. 2003)..............................................................................35

*United States ex rel. Head v. Kane Co.*
798 F. Supp. 2d 186 (D.D.C. 2011)............................................................................36, 40

*United States ex rel. Hopper v. Anton*
91 F.3d 1261 (9th Cir. 1996) ........................................................................................41

*United States ex rel. Landis v. Tailwind Sports Corp.*
308 F.R.D. 1 (D.D.C. 2015)..........................................................................................28

iv

*United States ex rel. McLain v. Fluor Enters., Inc.*
   No. 06-11229, 2015 WL 5321692 (E.D. La. Sept. 11, 2015)...................................................31

*United States ex rel. Schwedt v. Planning Research Corp.*
   59 F.3d 196 (D.C. Cir. 1995)....................................................................................................28

*United States ex rel. Siewick v. Jamieson Science & Eng'g, Inc.*
   214 F.3d 1372 (D.C. Cir. 2000)...............................................................................................41

*United States ex rel. Thomas v. Siemens AG*
   991 F. Supp. 2d 540 (E.D. Pa. 2014).......................................................................27, 35, 37, 39

*United States ex rel. Totten v. Bombardier Corp.*
   286 F.3d 542 (D.C. Cir. 2002).................................................................................................36

*United States ex rel. Tran v. Comp. Scis. Corp.*
   53 F. Supp. 3d 104, 131 (D.D.C. 2014)...................................................................................40

*United States v. Honeywell Int'l Inc.*
   798 F. Supp. 2d 12 (D.D.C. 2011)...........................................................................................46

*United States v. Kimble Foods, Inc.*
   440 U.S. 715 (1979).................................................................................................................46

*United States v. Science Applications International Corp*.,
   626 F.3d 1257 (D.C. Cir. 2010)........................................................................................ *passim*

*United States v. Speqtrum, Inc.*
   47 F. Supp. 3d 81, 92 (D.D.C. 2014).......................................................................................41

*Universal Health Servs., Inc. v. United States ex rel. Escobar*
   No. 15-7, 2015 WL 4078340 ......................................................................................41, 42, 43

*Vanacore v. Kennedy*
   86 F. Supp. 2d 42 (D. Conn. 1998)..........................................................................................47

   **State Cases**

*News World Commc'ns, Inc. v. Thompsen*
   878 A.2d 1218 (D.C. 2005) ....................................................................................................46

*Parliment v. Yukon Flats Sch. Dist.*
   760 P.2d 513 (Alaska 1988) ....................................................................................................47

*Pendleton v. Sard*
   297 A.2d 889 (Me. 1972)..........................................................................................................47

1054256

*Soules v. Ramstack*
    95 P.3d 933 (Alaska 2004) ..............................................................................................47

*Virginia Acad. of Clinical Psychologists v. Group Hospitalization & Med. Servs., Inc.*
    878 A.2d 1226 (D.C. 2005) ...........................................................................................27

#### Federal Statutes

1 U.S.C. § 3729(a)(1) ................................................................................................28, 34, 35

31 U.S.C. § 3729(a) .............................................................................................................28

31 U.S.C. § 3729(a)(1)(B) ...................................................................................................35

42 U.S.C. § 2210(a) .............................................................................................................30

#### Federal Rules

Fed. R. Civ. P. 9(b) .......................................................................................................36, 37

Fed. R. Civ. P. 56 ..................................................................................................................1

Fed. R. Civ. P. 56(a) ...........................................................................................................26

Fed. R. Civ. P. 56(c) ...........................................................................................................26

Fed. R. Civ. P. 56(e) ...........................................................................................................26

#### Treatises

66 Am. Jur. 2d Restitution and Implied Contracts § 12 (2001) .........................................47

Restatement (First) of Restitution § 65, illus. 1 (1937) .....................................................50

Restatement (Second) of Contracts § 384, cmt. a ..............................................................49

#### Other Authorities

1 DOBBS, § 4.8 at 675 ..........................................................................................................50

2 DOBBS, § 9.3(3) at 587 ......................................................................................................49

2 DOBBS, § 9.3(3) at 584-85 .................................................................................................49

Defendant Lance Armstrong files this Memorandum of Points and Authorities in Support of his Motion for Summary Judgment, or in the alternative, Partial Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Armstrong seeks summary judgment on the issue of actual damages, on the non-existence of a false claim, and on the common law fraud and unjust enrichment claims, as set forth in Counts 1-3, 5-6 of the United States' Complaint.[1] Armstrong also seeks summary judgment of the issue of actual damages and on the non-existence of a false claim, as set forth in Counts 1-3, 6 of the Relator's Second Amended Complaint.[2]

## I.    INTRODUCTION

Relator Floyd Landis' case against Defendant Lance Armstrong, as amplified and refined by the United States government's complaint in intervention, is long on speculation and hyperbole—but short on evidence and viable legal theories.  The United States Postal Service ("USPS") entered into two sponsorship agreements with an entity that owned a cycling team. Armstrong was never a party to those agreements; he did not read or sign them.  He never submitted a claim for payment under either sponsorship agreement.  In fact, he was not even a member of the cycling team when the USPS decided to sponsor the team.  Although it turns out that Armstrong and other riders on the team used performance enhancing substances and publicly denied doing so, the USPS enjoyed substantial benefits from the sponsorship and never took steps directly to address or prevent the use of performance enhancing substances by team

---

[1] Armstrong moves on all remaining counts of the government's complaint.  ECF No. 44 ("Compl.").  The Court granted summary judgment on Count 4 of the government's complaint, ECF No. 495, and Count 7 is alleged only against Tailwind.

[2] Armstrong moves on all remaining counts of the relator's second amended complaint.  ECF No. 42 ("SAC").  This Court previously dismissed Counts 5, 7 and 8 of the relator's second amended complaint, and held that relator could only recover under Counts 1, 2, 3 and 6 for "direct" false claims submitted after June 10, 2004.  ECF No. 174 at 30, 44, 80-81.  The Court subsequently granted summary judgment on Count 4.  ECF No. 495.

1

riders.  Its assertion of claims for damages against Armstrong alone among the team riders, a decade after the end of the sponsorship, is hypocritical and meritless.

The undisputed facts now establish that the Plaintiffs have insufficient evidence of having actually been damaged under the False Claims Act.  Moreover, Plaintiffs cannot prove the submission of a false claim.  Their claim of fraud in the inducement (which they were required to plead with specificity) fails in light of the actual evidence.  Their "implied certification" theory fails as a matter of law.  Further, because the USPS never relied on any statement by Armstrong in approving claims for payment, the government's common law fraud claim is without merit.  Finally, the government's allegation of "unjust enrichment" similarly fails because there is no such cause of action which pertains to the activities alleged.

In the cold light of morning, the USPS sponsored a cycling team, received far more benefits from that sponsorship than anyone could have anticipated, and therefore have no actual damages and no viable claims against Armstrong.  For these reasons, as more fully discussed below, the Court should grant Armstrong's motion for summary judgment.

## II.    FACTUAL BACKGROUND[3]

### A.    Professional Bicycle Racing

By many accounts, professional cycling is the hardest sport in the world, one characterized by constant suffering and physical exertion.  Declaration of Elizabeth K. McCloskey, Ex. 1 at 70:12-71:18; Ex. 2 at 33:22-34:3, 34:13-35:5; Ex. 3 at 49:10-17, 54:2-8.  During races, riders are involved in life-threatening crashes.  Ex. 2 at 35:6-7; Ex. 3 at 54:9-19;

---

[3] All evidence cited is submitted as exhibits to the Declaration of Elizabeth K. McCloskey.  Some of the facts mentioned in the background section are presented solely to provide background and context for the Court.  Undisputed facts material to the issues presented in this Motion are set forth in Armstrong's Separate Statement of Undisputed Facts, and cited to in this brief as "SUF."

1054256

Ex. 1 at 76:4-10.  They break bones—hips, elbows, collar bones, and fingers.  Ex. 1 at 72:3-15; Ex. 3 at 54:9-16.  When one rider falls, dozens more can follow.  Ex. 1 at 72:21-25; Ex. 2 at 34:1-3, 34:21-35:5.

Professional bicycle racing is centered in Europe.  Ex. 2 at 77:6-11.  The most important races take place in Europe, and the majority of professional riders are European.  Ex. 1 at 66:3-18; 67:6-8; Ex. 2 at 30:25-31:9, 77:13-16.  Each year, there are three grand tours, or multi-day races:  the Tour de France ("Tour"), the Tour of Italy ("Giro"), and the Tour of Spain ("Vuelta").  Ex. 1 at 68:14-21.  The Tour de France is the world's most famous, most prestigious, and most grueling race.  Ex. 1 at 44:11-12; Ex. 2 at 32:21-33:3; Ex. 3 at 19:1-4.  Teams participate in the Tour by invitation only.  Ex. 1 at 44:18-25; Ex. 2 at 63:20-64:4; Ex. 3 at 26:4-24.  The race takes place over three weeks in July and covers approximately 2,500 miles.  Ex. 1 at 69:14-70:7; Ex. 2 at 33:9-21; Ex. 3 at 19:5-7.  During the Tour, riders spend four to seven hours a day on their bicycles.  Ex. 1 at 70:8-11; Ex. 2 at 33:18-21.

The management of a professional cycling team is costly.  Sponsor companies financially support teams.  Ex. 1 at 30:18-21; Ex. 2 at 27:6-17, 29:22-30:9; Ex. 3 at 21:5-15.  Successful teams tend to have large, corporate sponsors.  Ex. 1 at 41:15-24.  Sponsors pay for the expenses involved with running a cycling team.  Ex. 1 at 33:22-34:13, 36:13-16.  Teams are named after their title sponsor, whose logo is displayed prominently on their cyclists' jerseys.  Ex. 1 at 29:18-23; Ex. 2 at 23:6-15, 26:21-27:5, 53:10-15; Ex. 3 at 21:20-22:2; Ex. 4 at 115:24-116:5.  Riders serve as "traveling billboards" for their sponsors.  Ex. 1 at 31:23-32:9.

In exchange for their sponsorship dollars, sponsors demand that their teams generate revenue and exposure.  Ex. 2 at 52:14-53:20; Ex. 3 at 21:16-19.  Because successful teams generate more exposure, sponsors want their teams to win.  Ex. 1 at 32:14-33:7, 45:1-9, 47:4-

3

1054256

48:10; Ex. 2 at 60:16-61:21, 65:24-66:11, 67:14-19; Ex. 3 at 22:3-19, 22:22-23:1.  Many sponsors track the value generated by their sponsorships.  Ex. 1 at 36:17-37:11; Ex. 2 at 57:16-19; Ex. 3 at 25:3-9.  If they determine that a sponsorship is not generating sufficient value, sponsors are known to back out of or refuse to renew sponsorship agreements.  Ex. 1 at 37:22-38:12, 43:1-7; Ex. 3 at 25:10-19.

**B.      Use of Performance Enhancing Substances in Professional Cycling**

The use of performance enhancing substances ("PEDs") has long been a part of professional cycling.  Ex. 3 at 40:3-7.  Cyclists have used PEDs to compete in the Tour de France since the race's inception.  Riders have taken advantage of a variety of performance enhancing substances, including testosterone, cortisone, amphetamines, and even alcohol and cocaine.  Before the 1984 Olympic Games, the U.S. Olympic road racing team openly transfused blood (a method used by cyclists to improve endurance).  Ex. 1 at 200:14-17; Ex. 3 at 41:23-42:4.  In the early 1990s, the introduction of erythropoietin ("EPO") as a performance enhancing substance dramatically changed bicycle racing.  Ex. 1 at 113:23-114:2, 117:11-15, 117:25-118:2; Ex. 2 at 79:23-81:2, 82:3-83:6, 119:13-21.  The average speed of the Tour increased from 37.5 kilometers per hour between 1980 to 1990, to 41.6 kilometers per hour between 1995 and 2005.  Ex. 1 at 112:19-113:3.

The history of professional cycling is plagued by doping scandals.  The 1998 Tour de France, for example, was notable for a massive scandal known as the "Festina Affair."  Ex. 1 at 53:12-18; Ex. 3 at 29:24-30:2; Ex. 5 at 174:14-175:1; Ex. 46.  The scandal received immense and widespread press attention.  Ex. 1 at 53:19-25, 395:21-396:8; Ex. 2 at 138:7-18, 141:6-12; Ex. 3 at 35:25-36:12; Ex. 5 at 174:14-175:1.  Willy Voet, Belgian soigneur of the Festina[4] professional

---

[4] Festina is a watch manufacturer, headquartered in Barcelona, Spain.

4

cycling team, was stopped en route to the 1998 Tour by customs officers at the border of Belgium and France. At that time, the Festina team was one of the top professional cycling teams in France. Ex. 3 at 30:3-9. In the trunk of Voet's Festina-branded car, officers uncovered anabolic steroids, EPO, growth hormones, and amphetamines. Ex. 1 at 54:4-17; Ex. 2 at 135:11-24; Ex. 3 at 30:3-9. Tour officials expelled the Festina team from the race. Ex. 1 at 54:18-23; Ex. 3 at 33:24-34:1; Ex. 4 at 55:6-19. The police raided team hotel rooms and arrested riders. Ex. 1 at 54:24-55: 11; Ex. 2 at 137:23-138:6, 138:19-139:3; Ex. 3 at 30:10-14; Ex. 5 at 176:15-18. The raids provoked a protest. In the middle of the Tour, cyclists refused to race; they sat down on the course before eventually walking their bikes across the finish line. Ex. 1 at 55:19-56:10; Ex. 2 at 139:18-140:15; Ex. 3 at 33:16-23; 34:11-18. With at least one USPS employee looking on, a couple of hundred feet away, USPS riders participated in the protest. Ex. 6 at 72:16-73:25; Ex. 3 at 34:4-9.

By some accounts, over 90 percent of riders were using PEDs during the 1998 Tour. Ex. 3 at 35:8-15. As one USPS employee later described it, PED-use was "endemic" to the peloton in 1998. Ex. 7 at 46:16-47:4.

Former USPS team riders testified in this action about the widespread use of PEDs by professional cyclists, including during the years 1998 through 2004. Ex. 2 at 218:18-22; Ex. 4 at 302:18-23. USPS riders George Hincapie and Tyler Hamilton conceded that, beginning in 1997, they, along with other USPS riders, had used PEDs, supplied by USPS team doctors. Ex. 1 at 64:14-65:6, 98:25-99:5, 143:19-144:20, 150:2-5, 150:12-151:2; Ex. 3 at 92:19-93:7; Ex. 2 at 221:16-222:8. The riders explained that USPS team doctors supplied these substances and encouraged the riders to use them. Ex. 1 at 64:13-23; Ex. 2 at 97:8-14, 221:16-222:8; Ex. 3 at 31:15-24. Hamilton testified that he considered it part of his job as a rider for the USPS cycling

5

1054256

team to take the drugs that were administered to him by team doctors. Ex. 1 at 99:6-13. Hincapie and former USPS rider Francisco Andreu admitted that, once EPO had infiltrated the peloton, they could not compete without also using the drug. Ex. 2 at 85:13-25, 184:2-8; 276:21-277:4; Ex. 3 at 44:5-22 60:24-62:2, 16:6-15.

Riders deposed in this action admitted that, although they had used PEDs, they—along with many other top cyclists—had lied about their use. Ex. 2 at 171:6-172:11, 263:19-23; Ex. 3 at: 141:14-24; Ex. 5 at 212:6-213:20, 215:3-18; Ex. 4 at 199:19-20. Riders who admitted to using PEDs risked their cycling careers. Ex. 4 at 210:13-23, 212:1-25; Ex. 5 at 215:20-24; 217:1-6. The Tour de France winners in 1996, 1997, and 1998, the years immediately preceding Lance Armstrong's winning streak, all later confessed to their own PED use. Ex. 1 at 157:2-158:19; Ex. 2 at 120:16-24.

C.    **Lance Armstrong**

Lance Armstrong was raised in Plano, Texas by a single mother. He became a professional triathlete at the age of 15, and was the national sprint-course triathlon champion in 1998 and 1990. In 1992, Armstrong began his career as a professional cyclist with the Motorola cycling team. He began racing in Europe, and won the one-day World Championship in 1993, and in 1995 won the Clásica de San Sebastián and a stage of the Tour de France. In 1996, as one of the world's top young cyclists, Armstrong became ill and was forced to drop out of the Tour. He was diagnosed with testicular cancer, which had metastasized into his brain. Ex. 1 at 126:7-11; Ex. 2 at 174:23-175:3. After treatment, including both surgery and chemotherapy, Armstrong began to recover, and wanted to return to cycling.

In late 1997, Armstrong signed an agreement with Montgomery Sports to ride for its cycling team. Ex. 20. He did not compete in the 1998 Tour de France, the year of the Festina

6

1054256

Affair.  Ex. 8 at 55:2-7; Ex. 1 at 160:14-161:5; Ex. 3 at 109:18-110:5.  In 1999, Armstrong rode in the Tour for the USPS team and won the race, making him the second American ever to win the Tour de France.  Armstrong's win, along with his comeback from cancer, attracted significant media attention.  Ex. 9 at 480:2-15.  Like other riders in contention for the overall tour victory in the 1999 Tour, Armstrong used PEDs, including EPO, corticoids, and testosterone, to prepare for the race.  Ex. 8 at 80:19-20, 82:12-83:10, 84:5-8, 87:1-3.

Armstrong won the Tour de France again in 2000, although due to concerns that a test for EPO was about to be introduced, Armstrong did not use EPO.  Ex. 8 at 87:5-15.  Instead, USPS riders Armstrong, Tyler Hamilton and Kevin Livingston each infused their own blood during the race.  Ex. 1 at 196:8-198:4; Ex 10 at 168:8-13.  During the 2000 Tour race, reporters followed a garbage disposal unit, allegedly originating from the USPS team hotel.  Ex. 1 at 342:16-343:1; Ex. 11  at 61:23-62:2.  The French media then reported that the garbage contained the performance enhancing substance Actovegin.  Ex. 1 at 342:16-343:1.  In November 2000, the French police announced a legal investigation of the USPS team.  Ex. 3 at 37:13-21; Ex. 1 at 396:9-17.

Armstrong's winning streak continued, and he won the Tour every year between 2001 and 2005.  He trained extremely hard and rode with tremendous skill, grit, and courage.  Ex. 1 at 85:17-21, 257:4-11; Ex. 2 at 169:5-15; Ex. 3 at 110:10-20; Ex. 4 at 301:14-15, 302:24-303:3.  He avoided dangerous crashes and defeated international rivals, including Jan Ullrich, Marco Pantani, Ivan Basso, and Alex Zulle, all of whom have now confessed to having taken PEDs throughout this period.  Ex. 5 at 205:14-206:7.  Like each of those riders, Armstrong consistently denied using PEDs.  Ex. 5 at 212:6-213:20, 215:3-18.

7

1054256

### D.       USPS Sponsorship of the Cycling Team

#### 1.       1995 Sponsorship Agreement

On October 1, 1995, the USPS entered into a sponsorship agreement ("1995 Sponsorship Agreement") with Montgomery Sports to sponsor a professional bicycle racing team.  Statement of Undisputed Material Facts In Support of Armstrong's Mot. for Summ. Judgment ("SUF")[5] ¶ 3.  Armstrong was not a party to the sponsorship agreement, **SUF 21**, nor a member of the cycling team at that time.  **SUF 22**.  The agreement provided, *inter alia*, that the USPS would pay a sponsorship fee each year to serve as the title sponsor of the team.  Ex. 21 (Ex. B).  The Sponsorship Agreement provided that the USPS would pay Montgomery Sports fees totaling $1,000,000 in 1996, $1,500,000 in 1997, $2,000,000 in 1998, and $2,500,000 in 1999.  Ex. 21 (Ex. B); Ex. 23.  Co-sponsors, including Trek, Visa, and Nike also signed on.  Ex. 24 at MYERS00000272-73.  The USPS sponsorship payments, and those of the other sponsors, would fund the expenses of the team.  Ex. 25 at US00003347-48.  In exchange, the riders on the team would wear the USPS eagle insignia on their team jerseys, shorts, cycling caps, gloves, team leisure wear, and helmets; the team would be known as the "U.S. Postal Service Cycling Team"; and the riders would make a designated number of promotional appearances on behalf of the USPS.  Ex. 21 ¶ 7 and Ex. A.  The agreement was for a one-year period, but could be renewed annually at the option of the USPS.  Ex. 21 ¶ 4; Ex. 23; Ex. 12 at 175:4-10.   In each year between 1996 and 1999, the USPS determined that the sponsorship was economically beneficial to the USPS, and renewed it.  Exs. 23, 26-27, and 28 at US00000621-2; Ex. 14 at 51:18-53:3, 142:14-21; Ex. 12 at 170:14-25; Ex. 9 at 329:12-330:9.

---

[5] Certain facts set forth in Section II (Factual Background) are undisputed facts, material to Armstrong's motion for summary judgment.  Those facts are supported in Armstrong's Statement of Undisputed Material Facts, submitted in connection with this motion, and are denoted as such within Armstrong's Memorandum of Points and Authorities.

1054256

The goals of the sponsorship for the USPS were set forth in contemporaneous documents, and confirmed by deposition testimony of USPS employees as having been:  to generate new revenue for the USPS; to build the USPS brand; to gain positive public relations value; to leverage retail sales at cycling events, on the USPS website, and through retailers; and to improve employee morale.  Exs. 24, 28-29; Ex. 12 at 171:3-13, 175:23-176:1, 212:2-213:24, 216:7-16, 218:24-219:11, 260:19-261:21, 262:4-23, 263:15-264:16, 264:25-265:3; Ex. 14 at 60:4-63:18, 179:2-186:11; Ex. 13 at 91:24-92:21, 125:17-127:12; Ex. 15 at 59:20-63:1; Ex. 16 at 83:24-85:1; Exs. 26, 30-31.

The sponsorship agreement contained a paragraph, Section 13, which provided that the parties' (USPS and Montgomery Sports) performance of their obligations under the agreement was subject to compliance with the applicable rules of organizations governing the sport of cycling, including the *Union Cycliste Internationale*, the *Federation Internationale du Cyclisme Professionel;* and the United States Professional Cycling Federation.  **SUF 24**.  USPS employees with responsibility for the sponsorship, including Gail Sonnenberg, Lynda Zelnick and Joseph Porporino testified that they never read those rules.[6]  **SUF 26-28**.

Over the years, the entity owning the team changed names, from Montgomery Sports, to Disson Furst Partners ("DFP"), to Tailwind Sports ("Tailwind").  **SUF 2, 7, 20**.  But insofar as is relevant for purposes of this motion, the structure of the business relationship remained the same.[7]  The USPS entered into an agreement with the entity owning the team.  **SUF 6, 18**.  That entity submitted claims for payment of the agreed-upon sponsorship fees to the USPS, and the

---

[6] In fact, certain USPS employees with responsibility for the contract confirmed that they had never reviewed, and were not familiar with the terms of the Sponsorship Agreements.  Ex. 12 at 166:3-19, 168:9-20, 169:6-9; Ex. 9 at 325:6-17; Ex. 14 at 49:12-21, 108:22-109:19; Ex. 17 at 66:11-22, 239:15-19; Ex. 6 at 84:5-21.

[7] Accordingly, throughout this motion, Armstrong will refer generally to the entity that owned the cycling team as "Tailwind."

1054256

USPS paid the sponsorship fees to the entity.  **SUF 32-33**.  The evidence confirms that nothing in the Sponsorship Agreements or any of the claims submitted for payment conditioned payment on a promise or certification that the riders were not using PEDs, or made any such representation a condition of payment under the Agreements.  **SUF 34**.

Armstrong was not a party to either of the Sponsorship Agreements between the USPS and the entity owning the team.  **SUF 21**.  The USPS never entered into an agreement with Armstrong, or any of the team's riders.  Ex. 12 at 168:23-169:5, 322:21-323:6, 324:7-18, 325:2-5; Ex. 1 at 89:15-19; Ex. 2 at 127:23-128:1; Ex. 3 at 95:3-5; Ex. 4 at 110:17-22; Exs. 32-33 and 77.  The USPS never paid Armstrong.  **SUF 23**.  Indeed, Armstrong and other riders deposed in this action never saw the USPS Sponsorship Agreements.[8]  Ex. 1 at 89:20-23; Ex. 2 at 128:2-9; Ex. 3 at 95:6-17; Ex. 4 at 112:5-10; Ex. 10 at 227:7-12.

### 2.    USPS Employees Responsible for the Sponsorship

Certain USPS employees were responsible for management of the cycling team sponsorship, including the decision to enter into and renew the Sponsorship Agreements.  Those individuals became involved with, and knowledgeable about, the sponsorship and the sport of cycling.  They got to know the team's riders, visiting with them on team buses and hotels.  Ex. 14 at 300:18-23; Ex. 1 at 53:4-11; Ex. 15 at 33:7-17.  They attended team events, including races, training camps, and social occasions.  Ex. 17 (Bizzotto Tr.) at 18:15-20:8, 21:3-5, 198:6-11; Ex. 1 at 91:24-93:1; Ex. 3 at 28:4-12, 29:5-20, 39:21-23, 129:8-15; Ex. 4 at 109:10-110:8; Ex. 34; Ex. 15 at 93:3-94:8.  On the USPS's dime, they flew to France to watch the Tour de France.  Exs. 35-36 and 78; Ex. 11 at 49:9-50:14; Ex. 17 at 18:15-20:8, 21:6-12, 56:3-58:20, 189:4-15, 211:18-22; Ex. 6 at 53:10-17; Ex. 16 at 100:25-101:4; Ex. 14 at 96:1-6.  At the Tour,

10

they attended, with their team's riders, celebratory dinners and parties.  Ex. 17 at 20:12-25, 210:23-211:22, 215:5-17; Ex. 78 at US00242527; Ex. 37.

**William Henderson** served as the Postmaster General between 1998 and 2001.  **SUF 37.** As Postmaster General, Henderson was responsible for the day-to-day and strategic operations of the USPS. *Id.*.

**Gail Sonnenberg**, as USPS Senior Vice President of Sales, had primary responsibility for the cycling team sponsorship between 1998 and 2001, and was tasked with using the sponsorship to generate revenue for the USPS.  **SUF 38**.  In 2000, Sonnenberg and Henderson decided to renew the sponsorship.  **SUF 10.**

In 2001, USPS Chief Marketing Officer **Anita Bizzotto** took over management of the cycling team sponsorship.  **SUF 39**.

Between 1998 and 2002, **Lynda Zelnick** was the contracting officer for the sponsorship agreement, and executed the 2000 Agreement on behalf of the USPS.  **SUF 40-41.**  Beginning in 1996, **Robert McKenna** was the contracting officer's representative for the cycling team sponsorship; he reviewed and approved invoices submitted pursuant to the sponsorship agreements.  **SUF 42**.  In 2002, **Joseph Porporino** replaced McKenna as the contracting officer's representative, and took over McKenna's duties in reviewing and approving invoices. **SUF 43.**

**Alexandra Johnson**, between 2001 and 2004, was responsible for activation of the USPS cycling team sponsorship.  **SUF 44**.

USPS employees also managed public relations relating to its sponsorship of the cycling team.  **Margot Myers** served as the USPS spokesperson for the sponsorship until 2000, when **Joyce Carrier** took over.  **SUF 45-46**.

11

### 3.     USPS Decision to Enter into 2000 Sponsorship Agreement

In 2000, after Armstrong had won his second Tour, Henderson and Sonnenberg, among others at the USPS, decided that they wanted to renew the sponsorship of the cycling team, locking up for the USPS the benefits of sponsoring the team.  **SUF 10**.  Because each of Armstrong's Tour wins had made the sponsorship increasingly valuable to the USPS, it wanted to ensure that Armstrong would continue to ride for its team.  Ex. 12 at 181:2-15, 191:1-9; Ex. 16 at 111:4-12; Ex. 14 at 165:12-24.

Sonnenberg and Henderson consulted the USPS Board of Governors regarding the decision to renew the sponsorship.  Ex. 29; Ex. 12 at 192:21-194:19.  At the Board's request, Sonnenberg prepared a business case for continuing the sponsorship, which she presented at a June 6, 2000 USPS Board of Governors meeting. **SUF 71**.  Sonnenberg informed the Board that the USPS Sales department had assumed responsibility for attracting revenue attributable to the cycling team sponsorship.  **SUF 72**.  She reported that the USPS had earned $3.2 million in revenue in 1998 as a result of its sponsorship of the cycling team; $10.2 million in revenue in 1999; and $2.7 million to date in 2000.  **SUF 73**.  Sonnenberg reported that she expected her sales team to close an additional $8.2 million in sales that year and to kick-off a major partnership with Visa.  **SUF 73-74.**  Sonnenberg informed the Board that, through the sponsorship, the USPS had received "tremendous" public relations value; built relationships with key customers; identified potential customers to target; increased sales at trade show events; and improved USPS employee morale.  Ex. 9 at 355:8-356:17, 375:3-376:16, 385:1-16,  391:5-19, 428:8-17, 470:1-10; Ex. 14 at 60:18-63:12, 176:20-179:13, 183:17-184:13, 185:8-24, Ex 24.

12

During this action, Sonnenberg testified at deposition that she believed that the information contained in the business case and the June 2000 Board presentation was truthful and accurate. **SUF 76**.

On August 31, 2000, Henderson informed the Board of Governors that he intended to proceed with the four-year contract for the cycling team. **SUF 12**. By November 29, 2000, the USPS reported that it had "completed the negotiations for the renewal of the cycling sponsorship for a firm four-year commitment." **SUF 13**. The Agreement was signed on December 26, 2000. Ex. 22.

### 4.    USPS Consideration of PED Use before Executing the 2000 Sponsorship Agreement

During the cycling team sponsorship, USPS employees with responsibility for the sponsorship were aware of allegations that professional cyclists, including cyclists on the USPS team, were using PEDs. Exs. 45-46; Ex. 12 at 100:6-12; Ex. 12 at 44:10-22, 50:10-22, 50:25-51:7; Ex. 14 at 96:16-22, 98:5-23, 99:5-100:2, 101:13-19, 233:1-11; Ex. 17 at 148:5-17, 151:7-9; Ex. 16 at 67:8-18. Henderson and Sonnenberg testified that they knew about the allegations concerning PED use, both by riders on the USPS team and in professional cycling. Ex. 14 at 96:16-22, 98:5-23, 99:5-100:2, 101:13-19, 233:1-11; Ex. 16 at 67:8-18. Myers knew that doping in cycling "went back to . . . the beginning of the Tour when the guys stopped in the bar and had a few drinks before they went on and finished a stage." Ex. 6 at 58:8-21. Carrier monitored media coverage of "allegations of doping [by] our cycling team." Ex. 11 at 111:1-19. In 1998, Sonnenberg, Myers, and McKenna learned about the Festina Affair. Ex. 14 at 96:16-22; Ex. 6 at 62:2-64:5; Ex. 7 at 46:7-48:21. During the cyclists' Festina Affair protest, Myers was in the USPS team car, a couple hundred yards from the start line. Ex. 6 at 72:16-73:25. McKenna

13

knew, by the end of the 1998 Tour, that doping in professional cycling was "endemic." Ex. 7 at 46:7-47:4.

The evidence confirms that, although USPS employees knew that doping in cycling was prevalent, it was focused on the impact of negative publicity relating to PED use by the team's riders. In the fall of 2000, the USPS followed the press reports of the French investigation into the use of PEDs by its team. Ex. 47. After the USPS had completed negotiations for the 2000 Sponsorship Agreement, Sonnenberg traveled to Austin, Texas to meet with Armstrong. **SUF 47.** On November 30, 2000, Sonnenberg and Armstrong met for approximately one hour over breakfast at the Four Seasons hotel. **SUF 48**. Sonnenberg encouraged Armstrong to refer all press calls to the team's general manager Mark Gorski. **SUF 50**. She urged Armstrong to "stop talking to the press" in response to allegations about PED use. **SUF 51.** Sonnenberg testified that she believed that if Armstrong stopped talking to the press, the story about his PED use would die down. Ex. 14 at 235:25-237:9. During breakfast, Sonnenberg also discussed a public relations strategy, in which reputable cycling teams would commit to a zero tolerance policy regarding PEDs. **SUF 52.** Sonnenberg testified that she—and not Armstrong—talked about this strategy. **SUF 53.** Sonnenberg never inquired whether Armstrong had ever used PEDs, nor did she instruct Armstrong not to do so. **SUF 54**.

During the period of the sponsorship, the USPS had at its disposal two in-house law-enforcement agencies staffed by trained federal law enforcement agents capable of performing an investigation: the USPS Office of Inspector General and the US Postal Inspection Service. Yet the USPS never requested—before, during, or after the eight-year sponsorship—that either the Office of Inspector General or the US Postal Inspection Service make any effort to ascertain from riders on the USPS team whether they were using or had used PEDs. **SUF 56-58.** USPS

14

employees spent time with and got to know the USPS riders.  Ex. 1 at 91:24-93:5; Ex. 2 at 12:11-20.  Yet the USPS never requested certifications of non-PED use.  **SUF 34, 55-67**.  USPS employees with responsibility for the sponsorship never interviewed or questioned riders, team doctors, or masseurs about PEDs.  **SUF 55-67**.  Instead, any concern the USPS had about PEDs was reflected in revisions made to the 2000 Sponsorship Agreement.  Ex. 14 at 74:10-75:2, 243:22-244:18, 246:7-15; Ex. 13 at 177:18-181:2, 192:22-193:25.

### 5.       2000 Sponsorship Agreement

The 2000 Sponsorship Agreement was based on its predecessor, but with some changes.  Ex. 22; Ex. 13 at 112:11-23, 191:21-24.  The agreement was for a period of four years.  **SUF 16**.  The contracting parties were the USPS and DFP.  **SUF 17-18**.  Armstrong was neither a party nor a signatory.  **SUF 17, 21**.  The agreement called for the USPS to pay sponsorship fees of $6,138,000 in 2001; $7,610,000 in 2002; $8,235,000 in 2003; and $8,660,000 in 2004.  Ex. 22 at US00167839.  The services to be provided in exchange remained in significant part the same: riders would wear the USPS eagle insignia, ride in races, and make promotional appearances on behalf of the USPS.  **SUF 19**.  The language about compliance with the rules of cycling (moved to Paragraph 12) remained unchanged.  **SUF 25**.

The 2000 Agreement added language requiring DFP to represent that each rider on the team had a "morals [sic] turpitude and drug clause" in their agreement with DFP that allowed it "to suspend or terminate the rider for cause which shall include items such as . . . (3) failure to pass drug or medical tests; (4) inappropriate drug conduct prejudicial to the Team, or the Postal Service, which is in violation of the Team rules or commonly accepted standards of morality."  **SUF 29.**

15

1054256

USPS concerns about negative publicity concerning PEDs were addressed in language added to Paragraph 8.  Ex. 22 at US00167833-34; Ex. 14 at 244:6-18; 246:7-15; Ex. 12 at 158:22-24.  Paragraph 8 enumerated various "events of default," one of which occurs if "[t]here is negative publicity associated with an individual rider or team support personnel . . . due to misconduct such as but not limited to, failed drug or medical tests, alleged possession, use or sale of banned substances, or conviction of a crime."  **SUF 30**.  Another event of default occurs if Tailwind "fails to take immediate action without notification by the Sponsor in a case of a rider or Team offense related to a moral or drug clause violation."  *Id*.

Under the agreement, if the USPS believed that either event had occurred, it had two options.  *First*, it could decide whether the "event" was sufficient to rise to the level of an event of default.  **SUF 31**.  *Second*, the USPS then could decide whether it wanted to terminate the sponsorship agreement.  *Id*.

Like the 1995 Agreement, nothing in the 2000 Agreement or any of the claims submitted for payment ever conditioned payment on a promise or certification that the riders were not using PEDs, or made any such promise a condition of the agreement.  Ex. 22; Ex. 15 at 229:5-230:11.  Nothing in the agreement provided, or suggested, that previously made sponsorship payments would be returned in the event a default was declared due to negative publicity about the use of banned substances.  Ex. 12 at 157:7-11.  Nothing suggested that the USPS would be damaged by such an event of default.  Ex. 12 at 157:7-11.  The only remedy provided was the *option* to terminate the agreement going forward in the event of negative publicity due to a doping violation.  **SUF 31**.

16

### 6.    USPS Knowledge of PED Use by Cyclists Post-2000 Agreement

In February 2001, the USPS notified DFP of its concern that paragraphs 8 and 9 of the 2000 Sponsorship Agreement had been implicated by the negative publicity generated by allegations of PED use by members of the cycling team. Ex. 48; Ex. 14 at 231:19-232:6. The USPS did not terminate the Agreement. Instead, it hired public relations firm Manning Salvage and Lee ("MSL") to "correct[] the unfortunate publicity," and informed DFP that it would deduct MSL's cost ($50,000) from its sponsorship fee. Ex. 48; Ex. 13 at 211:25-212:20. The USPS asked MSL to draft a chronology of drug testing procedures, including a background on the use of EPO. Ex. 9 at 554:8-555:10; Exs. 49-50. MSL also created a contingency plan, directing USPS employees on how to respond to the possible outcomes of the French investigation into PED use by the USPS team. Ex. 9 at 550:17-551:21; Ex. 50; Ex. 11 at 70:7-14, 70:21-71:9. If a USPS rider tested positive for EPO, the contingency plan directed the USPS to hold a press event and point out that urine EPO test are unreliable, and that the USPS team, including Armstrong, had passed the more accurate blood test for EPO during previous races. Ex. 50 at US00008873. If the test results proved inconclusive, MSL directed the USPS to emphasize that inconclusive tests "simply confirm that [the] USPS team is drug free." *Id.*

### 7.    Sponsorship Benefits Enjoyed by the USPS

The USPS consistently reported to the public that its cycling team sponsorship was:

- "[O]ne of the most effective public relations ventures the Postal Service—and for that matter, any other organization—has ever undertaken." [Ex. 79][9]

- The "deal of the century," [Ex. 16 at 112:6-10; Ex. 12 at 192:10-20]

- A "brilliant marketing deal," [Ex. 16 at 37:23-38:12]

---

[9] *See also* Ex. 51; Ex. 14 at 268:3-20; Ex. 12 at 472:5-24.

17

1054256

- A "real bargain," [Ex. 52]; and

- An "awfully lucky venture," [Ex. 53].

It repeatedly represented that the benefits of the sponsorship more than outweighed its costs.

**SUF 68** (including Ex. 82[10] ("[B]ottom line, USPS got more than it paid for and is not a victim

of fraud."); Ex. 80 ("2001 – Domestic media evaluation of Tour de France* by Foote, Cone, and

Belding (FCB) Sports Marketing - $18,539,777, represents 3 times more value than what the

global sponsorship cost in 2001."), Ex. 54 ("I can assure you that the value of the brand

advertising we receive from the USPS Pro-Cycling Team more than offsets the cost of the

sponsorship."); Ex. 55 ("We have quantified our business-to-business sales increase due to

cycling team activities and they more than cover the cost of our sponsorship."); Ex. 52 ("The

sponsorship has provided a substantial return-on-investment and has been a real bargain."); Ex.

81 ("While postal officials decline to say how much they pay, spokesman Joyce Carrier said the

free advertising they received 'is way more than we ever spent' to sponsor it. 'Anyone who was

looking at it on a return from investment, and everybody does . . . they think it's pretty darn

good."); Ex. 56 ("Postal officials won't discuss specific financial information but say the

sponsorship dollars reach much further than the cost.");).

### a.    Quantified Benefits

### (i)    New Revenues

The undisputed facts confirm that the USPS successfully used its sponsorship of the

cycling team to generate new revenues.  The USPS "quantified its business-to-business sales

---

[10] Pursuant to Paragraph 1(f) of the Protective Order, ECF No. 221, Armstrong has redacted personally identifiable information from certain documents.  To avoid burdening the Court with a motion to seal immaterial information, Armstrong has not filed unredacted versions of these documents.  Should the Court wish Armstrong to file unredacted versions under seal, Armstrong would be glad to do so.

increase due to cycling team activities and [determined that the new revenue it generated] more than covered the cost of the sponsorship." **SUF 70**.

The USPS implemented the following process for generating revenues, as described in a presentation to the USPS Board of Governors: (1) identify potential customers among co-sponsors; (2) identify decision makers in other industries who have interest in the team; (3) use cycling race venues to build relationships with customers; and (4) use team owners' contacts to achieve sales opportunities. Exs. 24-25, 57; Ex. 9 at 355:8-356:17. The USPS tracked its revenues associated with the cycling sponsorship. Ex. 7 at 227:15-25; Ex. 16 at 43:3-25; Ex. 14 at 48:1-24. Robert McKenna testified that he prepared reports regarding sales figures for Sonnenberg and Bizzotto. Ex. 7 at 72:25-73:15, 74:17-23, 86:16-87:4. To prepare those reports, McKenna consulted with USPS sales managers. Ex. 7 at 77:16-79:6. The sales managers identified increases in sales resulting from the cycling team sponsorship, which McKenna then included in his reports. Ex. 7 at 79:7-14, 80:3-14. Based on these reports, McKenna confirmed that sales associated with the sponsorship increased each year. Ex. 7 at 82:15-83:3.

In November 2000, a USPS "business case" for the sponsorship quantified the new business revenue generated to date as a result of the sponsorship. **SUF 78-79**. It reported, along with numerous other documents, that the USPS had generated **$3.3 million in 1998; $10.2 million in 1999; and $4.8 million in 2000, with an additional $7.9 million pending**. **SUF 79**. The business case also reported that the USPS had generated 282 leads "at targeted trade shows through leveraging the pro cycling sponsorship." The USPS determined that those leads had the potential to generate $114 million in new revenue. Ex. 29 at US00167803. Finally, the business case targeted a revenue goal of $10-$20 million per year for the duration of the cycling team sponsorship (2001-04). Ex. 29 at US00167802. The USPS reported these revenue results to the

19

Postmaster General, relied upon them in presentations to the Board of Governors, and in statements to the public.  **SUF 77-79, 81-82**.

In addition to the sales efforts to businesses, the USPS ran a "major retail promotion" with Visa in 2000 to promote customer use of credit cards to purchase USPS products.  **SUF 83.** The Visa promotion used the cycling team and the Tour de France as its theme.  **SUF 84**.  The USPS quantified the results of this promotion as being an additional **$39.8 million of revenue**. **SUF 85**.

### (ii)   Media Exposure

The USPS also received "tremendous public relations value" as a result of Armstrong's six consecutive Tour de France wins while he was riding for the USPS cycling team.  **SUF 75, 86-87**.  It determined that "the value of the brand advertising [it] receive[d] from the USPS Pro-Cycling Team more than offset[] the cost of the sponsorship." **SUF 102**.

The undisputed evidence confirms that each of Armstrong's six Tour wins made the sponsorship increasingly valuable to the USPS.  **SUF 160-62**.  The USPS attributed part of that value to Armstrong's story as a cancer survivor and "true American hero."  Ex. 14 at 58:7-60:10, 85:19-86:15, 195:1-9.  Armstrong's picture graced the cover of national and international news publications, including Sports Illustrated.  **SUF 164**.  In pictures of Armstrong, he wore his USPS-branded jersey.  **SUF 165**.  After Armstrong's 2000 Tour win, Henderson told Sonnenberg that the sponsorship had become so valuable on its own that Sonnenberg did not need to worry about using the sponsorship to develop new business.  Ex. 14 at 194:14-196:17.

During the sponsorship, the USPS quantified the value it received from media coverage of the cycling team.  Prior to Armstrong's first win in the Tour de France in 1999, USPS estimated the value of media coverage as **$601,500 and $1,059,000** for 1996 and 1997

20

respectively.  **SUF 88-90**.  In 1998, the USPS communicated these figures to the Chairman of the Board of Governors.  **SUF 88**.

In each year from 2001 to 2004, the USPS commissioned outside experts to quantify the value of the media exposure for USPS generated by the sponsorship of the cycling team.  **SUF 92-99**.  The large advertising agencies retained to do this work were Campbell-Ewald ("CE") and FCB Sports Marketing ("FCB").  The methodologies employed by both agencies were similar and based on an industry-used formula.  Ex. 19 (Mieth Tr.) at 44:22-46:1; Ex. 76 (Talbert Tr.) 87:8-88:21.  The agencies reviewed print, TV and Internet exposure for the USPS.  Exs. 62-64, 83.  They determined the value of the exposure by applying a discount factor to the equivalent cost of purchasing the exposure directly.  Exs. 62-64, 83.

According to FCB's and CE's studies, and to the USPS statements about them, the USPS received the following dollar values as a result of the sponsorship between 2001 and 2004:

| Year | Agency | Value of Domestic Media Exposure | Evidentiary Support | Estimated Value of Global Exposure[11] |
|------|--------|----------------------------------|---------------------|-----------------------------------------|
| 2001 | FCB | $18,539,777 | **SUF 93** | "[A] conservative $35-40MM." |
| 2002 | FCB | $19,296,788 | **SUF 95** | "[A] conservative $38-42MM." |
| July/August 2003 | CE | $31.2 million | **SUF 97** | |
| July/August 2004 | CE | $34.6 million | **SUF 99** | |

---

[11] International exposure was a desired goal of the sponsorship and the USPS reported that it received international revenue as a result of the sponsorship.  Ex. 12 at 218:24-219:11; Ex. 14 at 110:5-111:7; Ex. 18 at 206:24-207:15; Exs. 21 and 28.

1054256

The USPS relied on FCB's and CE's media evaluations, adopted them, and trumpeted their conclusions internally and to the public via press statements and press releases. **SUF 100-01** (including Ex. 58 ("[A] recent survey of media coverage during the FY 2001 Pro-Cycling season . . . by the advertising firm Foote Cone & Belding (FCB) estimates that $18.451 million worth of brand advertising was obtained. This estimate was based on an industry-used formula to determine the media brand value from exposure of the USPS logo/brand."); Ex. 52 ("According to [FCB] study -- $19 million in free advertising."); Ex. 79 ("Sponsoring the USPS Pro Cycling team generated millions of dollars in free advertising for the Postal Service. In 2003, ad agency Campbell-Ewald estimated the Postal Service garnered the equivalent of $31 million in free advertising space in the U.S. alone—a first-class deal by any measure."); Ex. 81 ("Last year, Armstrong and his team generated $19.3 million in free advertising space for the post office in the United States alone, and worldwide exposure of nearly $42 million . . . ."); Ex. 69 ("Last year, Armstrong and crew generated some $19 million in free advertising in American for U.S. Postal, according to ad agency Foote, Cone & Belding –despite the fact that the team races almost exclusively abroad")).

### (iii)    Merchandising

The USPS also sold merchandise relating to the cycling team at U.S. races, the Mall of the Americas, and on the USPS website. **SUF 103**. Each year, from 2001 through 2004, sales of merchandise relating to the cycling team increased. Ex. 15 at 151:1-152:8; Ex. 9 at 486:5-19. The USPS tracked sales revenue that resulted from merchandise sales relating to the cycling team. **SUF 104**. The USPS reported that it had earned at least **$500,000** in 2003 through retail sales of USPS cycling merchandise. **SUF 105**.

22

1054256

**(iv)    Total Quantifiable Benefits Based on USPS Statements**

As set forth above, the undisputed evidence demonstrates that, according to the USPS's own contemporaneous documents and public statements, between 1998 and 2004, the USPS enjoyed at least $163.7 million in quantified benefits as a result of its sponsorship of the cycling team[12]:

| Year Generated | Quantified Benefit | Evidentiary Support | Amount Generated by the USPS as a result of the Sponsorship |
|---|---|---|---|
| **1996** | Earned Media | **SUF 89** | $601,500 |
| **1997** | Earned Media | **SUF 90** | $1 million |
| **1998** | New Revenue | **SUF 79** | $3.3 million |
| **1999** | New Revenue | **SUF 79** | $10.2 million |
| **2000** | New Revenue | **SUF 79** | $4.8 million |
| **2000** | Visa Promotion | **SUF 85** | $39.8 million |
| **2001** | Earned Media | **SUF 93** | $18.5 million |
| **2002** | Earned Media | **SUF 95** | $19.3 million |
| **2003** | Earned Media | **SUF 97** | $31.2 million |
| **2003** | Merchandising | **SUF 105** | $500,000 |
| **2004** | Earned Media | **SUF 99** | $34.6 million |
| **Total** | | | **$163.8 million** |

---

[12] This total does not include:  (1) $7.9 million in new revenue identified as "pending" in November 2000; (2) $35-40 million estimated value of global exposure in 2001; (3) $38-42 million estimated value of global exposure in 2002; (4) estimated revenue potential of $114 million from 282 leads generated at targeted trade shows (Ex. 29 and 65); (5) USPS's revenue goal of $10-$20 million in each year between 2001 and 2004 (Ex. 29); (6) merchandise sales in any year before or after 2003 (Ex. 65).

1054256

### b.     Other Benefits

### (i)     Employee Morale

Some of the benefits the USPS obtained as a result of the sponsorship were not quantified.  For example, improving employee morale was a goal of the USPS sponsorship of the cycling team.  Ex. 28 at US00000624.  Contemporaneous documents confirm that sponsorship met that goal:  the USPS cycling sponsorship had a "tremendous impact on employee pride."  Ex. 24.  The sponsorship "motivate[d] employees by linking the Bike Team to commitment, teamwork and excellence" and "completely changed the meaning of 'going postal.'"  Exs. 52 and 90.  Sonnenberg reported to the USPS Board of Governors that the "combination of forces— positive publicity and employees with a sense of pride—help[ed] employees and customers to feel good about the Postal Service as an organization."  Ex. 24.  During this case, Postmaster General Henderson confirmed that the sponsorship improved USPS employee morale.  Ex. 16 at 46:13-19.

### 8.     Expiration of the 2000 Sponsorship Agreement

The USPS sponsorship expired on December 31, 2004, and the USPS chose not to renew.  Ex. 12 at 62:3-6; Ex. 17 at 71:22-72:6.  It cited concerns that Armstrong might not continue riding much longer.  Ex. 12 at 62:3-9, 62:25-63:18; Ex. 17 at 71:22-72:25, 130:10-22; Ex. 18 at 194:10-195:8; Ex. 91 at CE-000442.

In 2005, Tailwind entered into a contract with The Discovery Channel to be the lead sponsor of the cycling team.  Armstrong rode for that team in 2005 and won the Tour de France.  He then announced his retirement from professional road racing.

24

1054256

### E.      Filing of the Qui Tam Action

Floyd Landis rode in the Tour for the USPS team in 2004.  SAC ¶ 118.  In 2005, Landis

left the USPS team to join the Phonak cycling team—allegedly in part because he wanted access

to more PEDs than were available to him on the USPS team.  Ex. 4 at 303:9-11; Ex. 3 at 103:3-

16.  Indeed, Landis testified that, in 2005, he used any PEDs he could get his hands on.  Ex. 4 at

305:8-23.  In 2006, Landis appeared to have won the Tour de France.  SAC ¶ 119.  However, he

tested positive for testosterone after Stage 17, and was stripped of his title.  SAC ¶ 119; Ex. 4 at

129:3-8; Ex. 3 at 103:24-104:4; Ex. 5 at 178:14-179:25, 219:24-220:7.  In spite of this positive

test, Landis denied having used PEDs.  Ex. 4 at 129:20-25, 199:16-200:25, 205:2-206:9; Ex. 5 at

217:9-218:1, 219:24-220:7.  He formed the Floyd Fairness Fund to raise money for his defense

based on (false) claims of innocence.  Ex. 4 at 213:19-214:3, 214:20-215:6, 216:19-218:1,

263:23-264:6.  Landis used the fruits of that fraudulent fundraising vehicle to hire the law firm

Gibson Dunn to litigate his doping case against the United States Anti-Doping Agency.  Ex. 4 at

129:17-19, 216:19-218, 218:14-219:2; Ex. 3 at 104:20-105:6; Ex. 5 at 220:8-22.  Landis lost that

case.  Ex. 5 at 223:14-21, 237:14-238:14.

Landis was eventually charged criminally with defrauding donors to the Floyd Fairness

Fund.  Ex. 4 at 266:19-267:17.  He entered into a deferred prosecution agreement with the

government, and the case against him was dismissed.  Ex. 4 at 268:16-269:23, 272:4-276:15,

298:20-23.  He served a two-year suspension from cycling.  When Landis's suspension ended

and he could not resurrect his professional cycling career, he went public with his allegations

about widespread doping in professional cycling, including by members of the USPS cycling

team.  SAC ¶¶ 211-15.

1054256

Hoping to profit personally from these public revelations, Landis filed in June 2010 the instant lawsuit under the False Claims Act.  ECF No. 1; Ex. 4 at 142:14-143:4.  The government investigated for over thirty months before intervening in February 2013.  ECF No. 41.  Throughout the period in which the government investigated this case, it was focused on Armstrong.  Ex. 1 at 287:13-16.  The parties have engaged in active discovery, which is now closed.  The record is ripe for summary judgment.

## III.    LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The standard requires more than the existence of some factual dispute; "the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis original).  A dispute is genuine only if a reasonable fact-finder could find for the non-moving party; a fact is material only if it is capable of affecting the outcome of the litigation.  *Id.* at 248.

The moving party must first meet its burden of production by showing the absence of a genuine issue of fact.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the motion for summary judgment is properly supported, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Laningham v. U.S. Navy*, 259 U.S. App. D.C. 115, 120 (D.C. Cir. 1987).  The nonmoving party cannot satisfy this burden by resting on mere allegations or conclusory statements.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  It must present specific facts that would enable a reasonable jury to find in its favor.  *Id.*  If the evidence presented is "merely colorable,

26

or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## IV.    SUMMARY OF ARGUMENT

Armstrong is entitled to summary judgment on the following four grounds:

*First,* the undisputed evidence makes clear that the USPS will be unable to satisfy its burden of proving that it suffered any damages as a result of its sponsorship of the cycling team. The U.S. Court of Appeals for the District of Columbia has made clear that False Claims Act damages must be based "on the amount the government actually paid minus the value of the goods or services the government received or used." *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1278-79 (D.C. Cir. 2010) (internal citations omitted). The government cannot show any evidence of damage to the USPS exceeding the benefits it received.

*Second,* because the plaintiffs cannot prove the existence of a false claim under the fraudulent inducement or implied certifications theories of liability, Counts One, Two, and Three of the government's complaint, and Counts One, Two, Three, and Six of the relator's second amended complaint must fail.

The record is devoid of evidence showing that Armstrong fraudulently induced the USPS to enter into the 2000 Sponsorship Agreement. To prove fraud in the inducement, the government must show "not only that the omitted information was material but also that the government was induced by, or relied on, the fraudulent statement or omission when it awarded the contract." *United States ex rel. Thomas v. Siemens AG*, 991 F. Supp. 2d 540, 569 (E.D. Pa. 2014). Here, there is no evidence of either factor:  **(a)** Armstrong did not make any false statement to the USPS; and **(b)** the USPS did not rely on any statement alleged to have been made by Armstrong when deciding to award the 2000 Sponsorship Agreement.

27

Further, the evidence is insufficient to support liability under either the express or implied certification theories of FCA liability. *See United States v. Sci. Applications*, 626 F.3d at 1266, 1269. The claims submitted for payment do not contain any promise, certification, or representation that the riders were not using performance enhancing substances.

*Third*, the undisputed evidence confirms that the USPS took no action in reliance on any false representation by Armstrong—a required element of its common law fraud claim. *Virginia Acad. of Clinical Psychologists v. Group Hospitalization & Med. Servs., Inc.*, 878 A.2d 1226, 1233 (D.C. 2005). Because the government has failed to show, by clear and convincing evidence, that the USPS relied upon a false representation by Armstrong, he is entitled to summary judgment on the government's common law fraud cause of action. *See Richardson v. U.S. News & World Report, Inc.*, 639 F. Supp. 595, 607 (D.D.C. 1986).

*Fourth*, the government cannot establish the elements of unjust enrichment. There is nothing unjust about Armstrong retaining the salary he earned under his contract with Tailwind, and both Tailwind and the USPS benefited from Armstrong's labors. *See Sununu v. Philippine Airlines, Inc.*, 638 F. Supp. 2d 35, 40 (D.D.C. 2009). Further, restitution, the only remedy for unjust enrichment, is not available without restoration by the plaintiff. *See Landmark Land Co. v. FDIC*, 256 F.3d 1365, 1373 (Fed. Cir. 2001). Restoration is impossible in this case.

## V.    ARGUMENT

### A.    Plaintiffs Cannot Prove that the USPS Suffered Any Actual Damages

#### 1.    Legal framework for FCA damages

The False Claims Act ("FCA") "imposes two types of liability." *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005). *First*, a defendant who submits a false claim is liable for civil penalties of between $5,500 and $11,000

28

1054256

for each false claim.  *Id.*; 1 U.S.C. § 3729(a)(1).  **Second**, where (and only where) the plaintiff proves actual damages, the defendant is also liable for "3 times the amount of damages which the Government sustains because of the act of [the defendant]."  31 U.S.C. § 3729(a).  Accordingly, here, to recover its alleged actual damages of $**40,344,696**, the government must prove that Mr. Armstrong's acts in fact caused $**40,344,696** in damages to the USPS.  *See United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 200 (D.C. Cir. 1995); *see also United States v. Sci. Applications*, 626 F.3d at 1278-79; *United States ex rel. Landis v. Tailwind Sports Corp.*, 308 F.R.D. 1, *6 (D.D.C. 2015) ("[A] showing of damage is necessary to obtain treble damages, which are based on the amount of damages which the Government sustains because of the act of [the defendant]." (internal quotations and citations omitted)).

Calculation of the government's FCA damages must account for the value of the benefits actually received.  "Where a [defendant's] fraud consists of knowingly submitting nonconforming goods with ascertainable market value, the Supreme Court has instructed that '[t]he Government's actual damages are equal to the difference between the market value of the [product] it received and retained and the market value that the [product] would have had if [it] had been of the specified quality.'"  *United States v. Sci. Applications*, 626 F.3d at 1278-79 (quoting *U.S. v. Bornstein*, 423 U.S. 303, 317 n.13 (1976)).  "But if the value that conforming goods or services would have had is impossible to determine, then the fact-finder bases damages on the amount the government actually paid minus the value of the goods or services the government received or used."  *Id.* at 1279 (internal citations omitted).

In this case, the government and the relator want to side-step this benefit-of-the-bargain analysis.  They argue that they are entitled to recover damages for all claims paid, ignoring the actual value of the goods received by the USPS as a result of the cycling team sponsorship.  In

29

*United States v. Science Applications International Corp.* (hereinafter "*SAIC*"), the U.S. Court of Appeals for the District of Columbia flatly rejected such an attempt.  626 F.3d 1257 (D.C. Cir. 2010).

*SAIC* is a tainted-services case.  In 1992, the Nuclear Regulatory Commission ("NRC") awarded SAIC a contract to provide technical assistance and analysis to support NRC's rulemaking regarding the reuse and recycling of radioactive materials.  *Id.* at 1261.  SAIC performed significant work under the contract.  *Id.*  SAIC's contributions proved valuable enough that in 1999, SAIC and the NRC entered into a substantially similar, follow-up contract.  *Id.* at 1262.

The statutes governing the NRC require it to enter into contracts with businesses that are "able to render impartial, technically sound, or objective assistance or advice in light of other activities or relationships with other persons."  42 U.S.C. § 2210(a).  Therefore, the NRC's contracts contain provisions requiring contractors to disclose their relationships with other entities that are subject to regulation by the NRC.  *Id.*  Unbeknownst to the government, SAIC was involved in multiple business relationships with for-profit entities that were engaged in the very activities that would be subject to the regulatory policies that SAIC was assisting NRC in developing.  SAIC thus was on the one hand assisting the government regulator in crafting appropriate controls, and was on the other hand working with for-profit clients who had a pecuniary interest in the activities that would be subject to NRC's rules.

Despite the contractual requirement, SAIC never disclosed these conflicts to the government.  As a result, the NRC terminated its contract with SAIC.  *Id.* at 1263.  The United States then filed suit, alleging that SAIC had submitted false statements certifying compliance

30

1054256

with the contracts' conflict-of-interest provisions, and that SAIC's claims for payment were false in light of the company's non-compliance. *Id.*

The United States argued that SAIC was liable for the full amount of its contracts, regardless of whether the NRC received anything of value from SAIC, because the SAIC's undisclosed conflicts irreparably tainted its work and NRC would never have awarded SAIC the contracts had it known of the conflicts. *Id*. at 1278. The district court accepted the government's damages theory and instructed the jury to ignore the value of SAIC's work, stating: "Your calculation of damages should not attempt to account for the value of services, if any, that SAIC conferred upon the Nuclear Regulatory Commission." *Id*. The jury found in favor of the government on the FCA claim, and awarded the government three times the entire amount paid to SAIC under the contracts.

The D.C. Circuit reversed with respect to damages, expressly rejecting the government's damages theory. The court held that the value of the goods or services the government received or used must be included in the damage calculation, and the district court's failure to instruct the jury to do so was in error. *Id*. at 1278-80; *see also United States ex rel. McLain v. Fluor Enters., Inc.,* No. 06-11229, 2015 WL 5321692, *10 (E.D. La. Sept. 11, 2015) ("Under the FCA, the government's damages are calculated by the difference between the amounts the government paid and the value of goods or services the government received."). In a tainted-services case, where the services have no ascertainable market price, "the fact-finder bases damages on the amount the government actually paid minus the value of the . . . services the government received or used." *SAIC,* 626 F.3d at 1279. Thus, in this case, the fact-finder must take into account the value the government received from the sponsorship.

31

### 2.     Quantified benefits received by the USPS as a result of the sponsorship vastly outweigh any alleged actual damages

The USPS has already conceded the very issue that *SAIC* held is dispositive on the issue of damages.  The value of the benefits the USPS actually received under the 1995 and 2000 Sponsorship Agreements vastly exceeded the costs; thus, the USPS can have no actual damages.  This is not a case in which a defendant is moving for summary judgment on the basis of an expert's after-the-fact calculation of an alleged benefit to a plaintiff.  Instead, Armstrong's motion is based entirely on the USPS's ***own contemporaneous and admissible documents, testimony, and admissions***.  The USPS—by its own admission—received millions more, in both revenue and exposure, than it paid for the cycling team sponsorship.  The USPS claims to have paid, between 1998 and 2004, approximately **$40,344,696** to sponsor the USPS cycling team.  **SUF 36**.  Based on the USPS's own contemporaneous documents, it quantified the benefits it received as a result of the sponsorship as at least **$163.8 million**.  Those benefits consist primarily of new revenue and earned media value—two primary goals of the USPS in entering into the sponsorship.

First, the undisputed evidence confirms that the USPS successfully used the sponsorship to generate new revenue.  The USPS prepared reports regarding the new revenues it received as a result of the cycling sponsorship.  It reported the results to the Postmaster General, presented them to the Board of Governors, and relied upon them in statements to the public.  **SUF 73, 77-79, 81-82.**  In June 2000, Sonnenberg reported to the Board of Governors:  "In 1998, we generated $3.2 million in new sales; in 1999, new revenue grew to over $10.2 million.  To date, in the [sic] 2000, the sponsorship has added a new $2.7 million and there's about $8.2 million left to be closed this year."  **SUF 73**.  In July 2000, she reported to the public:  "In 1999, relationships with sponsors brought the postal office $10 million . . . more than offsetting the

32

cost of being the team's title sponsor." **SUF 77**.  Again in this case, Sonnenberg confirmed that she believed, to the best of her knowledge, that the information presented to the Board of Governors was accurate.  **SUF 76**.

Second, the undisputed evidence confirms that the sponsorship helped the USPS to build its brand and to gain positive public relations value—far and above what the USPS could have hoped for when awarding the sponsorship.  **SUF 75, 86-87**.  The USPS reported that "the value of the brand advertising [it] receive[d] from the USPS Pro-Cycling Team more than offset[] the cost of the sponsorship."  **SUF 102**.  The USPS estimated the value of media coverage it received as a result of the sponsorship as $601,500 in 1996 and $1,059,000 in 1997.  **SUF 89-90**.  The value of the media generated by the sponsorship was so important to the USPS that it commissioned (and paid), in each year between 2001 and 2004, two well-established advertising agencies to conduct studies, based on an "industry-used formula," to calculate the value.  **SUF 92, 94, 96, 98**.  As set forth in detail above, the agencies concluded that the value of the domestic exposure the USPS received in 2001 was $18.5 million; in 2002 was $19.3 million; in 2003 was $31.2 million; and in 2004 was $34.5 million—altogether more than double what the USPS paid for the sponsorship.  **SUF 93, 95, 97, 99.**  The USPS adopted these earned media values—USPS employees with responsibility for the sponsorship reported them up the chain of command, and trumpeted them to the public.  **SUF 100-01**.

The facts and law are clear.  The USPS's own statements ***directly*** address the *SAIC* standard.  Time after time, the USPS confirmed that the benefits it received as a result of the sponsorship outweighed the cost.  **SUF 68** (including Ex. 82 ("[B]ottom line, USPS got more than it paid for and is not a victim of fraud."); Ex. 80 ("2001 – Domestic media evaluation of Tour de France* by Foote, Cone, and Belding (FCB) Sports Marketing - $18,539,777, represents

33

1054256

3 times more value than what the global sponsorship cost in 2001."), Ex. 54 ("I can assure you that the value of the brand advertising we receive from the USPS Pro-Cycling Team more than offsets the cost of the sponsorship."); Ex. 55 ("We have quantified our business-to-business sales increase due to cycling team activities and they more than cover the cost of our sponsorship."); Ex. 52 ("The sponsorship has provided a substantial return-on-investment and has been a real bargain."); Ex. 81 ("While postal officials decline to say how much they pay, spokesman Joyce Carrier said the free advertising they received 'is way more than we ever spent' to sponsor it. 'Anyone who was looking at it on a return from investment, and everybody does . . . they think it's pretty darn good."); Ex. 56 ("Postal officials won't discuss specific financial information but say the sponsorship dollars reach much further than the cost.")).  The D.C. Circuit has made clear that the government can only recover the full value of the payments it made where it "***proves that it received no value from the product delivered***."  *SAIC*, 626 F.3d at 1279 (emphasis added).  Because the government cannot satisfy this burden, it is not entitled to recover in damages any of the payments it made under the Sponsorship Agreements.  *Id.*

Accordingly, even if the Court finds that the claims Tailwind submitted to the USPS were false, and that Armstrong is somehow liable for those claims, the government can only recover statutory penalties.  Exs. 70 and 71, Ex. 12 at 57:25-59:9, 59:20-60:3, 62:3-67-17.  With statutory penalties of between $5,500 and $11,000 a claim, the maximum the USPS can recover from Armstrong under the FCA is the number of claims multiplied by $11,000.  Summary judgment should be granted on the issue of actual damages.  *See United States ex rel. Fago v. M&T Mortg. Corp.*, 518 F. Supp. 2d 108, 122 (D.D.C. 2007) (granting motion for summary judgment on the issue of actual damages, but allowing plaintiff to seek statutory civil penalties under the False Claims Act).

34

1054256

**B.** **Plaintiffs Cannot Prove the Existence of a False Claim**

For the government to prevail on Counts One, Two, and Three of its complaint, and for the relator to prevail on Counts One, Two, Three, and Six of its second amended complaint, plaintiffs must prove the existence of a false claim. A false claim is a foundational requirement of liability under 31 U.S.C. §§ 3729(a)(1) (presentation of false claims), (a)(1)(B)(2009) (making or using false record or statement), and (a)(3)(conspiracy). *See* 31 U.S.C. § 3729(a)(1); *SAIC*, 626 F.3d at 1271 ("FCA section 3729(a)(1) imposes liability only when a person 'knowingly presents, or causes to be presented . . . a false or fraudulent claim.'"); *United States ex rel. Folliard v. CDW Tech. Servs., Inc.*, 722 F. Supp. 2d 20, 35  (D.D.C. 2010) ("[T]he statutory text [of 31 U.S.C. § 3729(a)(1)(B)] plainly prohibits the use of a false statement material to a false or fraudulent claim, . . . which presupposes the existence of a claim."); *United States ex rel. Fox RX, Inc. v. Omnicare, Inc.*, No. 1:11cv0962, 2012 WL 8020674  *9-10 (N.D. Ga. Aug. 29, 2012) ("To state a claim under either [subsections (a)(1)(A) and (a)(1)(B) of 31 U.S.C. § 3729], a relator must allege a false claim. Under subsection (a)(1)(B), a relator is required also to allege a false record or statement." (internal quotations omitted)). Unable to show the existence of an actual false claim, the government relies on two legal fictions to establish falsity:  fraudulent inducement and implied certification. As set forth below, the undisputed evidence is insufficient to support either theory of liability.

**1.** **Plaintiffs Cannot Prove Fraudulent Inducement**

**a.** **Legal Framework for Fraudulent Inducement under FCA**

Fraudulent inducement is a "'rare' basis for liability under the False Claims Act." *United States ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487, 503 (S.D. Tex. 2003) (quoting *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996)). To prevail

35

1054256

on a fraudulent inducement theory, the government must show **(1)** **"**that the false statements

upon which [it] relied, assuming [it] establishes that it did", **(2)** **"**caused [the government] to

award the contract at the rate that it did." *United States ex rel. Thomas v. Siemens AG*, 991 F.

Supp. 2d 540, 569 (E.D. Pa. 2014) [hereinafter *Thomas*] (citing *United States ex rel. Marcus v.*

*Hess*, 317 U.S. 537, 543-44 (1943)). "[T]he essential element of inducement or reliance is one

of causation." *Thomas*, 991 F. Supp. 2d at 569. The government "must prove not only that the

omitted information was material but also that the government was induced by, or relied on, the

fraudulent statement or omission when it awarded the contract." *Id.*; *see also United States ex*

*rel. Debra Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 69 n.33 (D.D.C.

2007) (the plaintiff must show that "had the government known about the fraud in the

inducement, it never would have entered the contract, and no payments would have been

made."); *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 197 n.14 (D.D.C. 2011)

(the plaintiff must show that the "defendant initially obtained its government contracts through

false statements or fraudulent conduct." (internal quotation marks omitted)).

Further, a False Claims Act plaintiff[13] must comply with Federal Rule of Civil Procedure

9(b). *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551-52 (D.C. Cir. 2002)

(hereinafter "*Totten*"). Accordingly, a plaintiff must allege with particularity the circumstances

underlying a fraudulent inducement claim. *U.S. ex. rel. Williams v. Martin-Baker Aircraft Co.*,

389 F.3d 1251, 1256 (D.C. Cir. 2004) (hereinafter "*Williams*"). The circumstances that must be

pleaded with specificity "are matters such as the 'time, place, and ***contents*** of the false

---

[13] Relator contends that Armstrong fraudulently induced the USPS to enter into the 2000
Sponsorship Agreement, *see* SAC ¶¶ 121-30, 198, but fails to allege that Armstrong made any
specific statement to the USPS on which the USPS relied in awarding the agreement. For the
reasons set forth below, the relator cannot rely on Armstrong's public statements regarding his
use of performance enhancing substances. *See* Section V(B)(1)(c).

36

representations.'"  *Totten*, 286 F.3d at 552 (quoting 5 Charles Alan Wright & Arthur R. Miller, Fed. Prac. and Proc. § 1297 (2d ed. 1990)) (emphasis added); *see also Williams*, 389 F.3d at 1256 ("Combining Rules 8 and 9(b), [the D.C. Circuit] has required that the pleader state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud."). A defendant is entitled to rely on these specific allegations in responding to an FCA claim.  *Williams*, 389 F.3d at 1256, 1259; *see also Fink v. Nat'l Sav. & Trust Co.*, 772 F.2d 951, 963 (D.C. Cir. 1985) ("[O]f course Rule 9(b) is not intended for plaintiffs' benefit at all, but rather to give defendants fair notice of the plaintiffs' claims and grounds therefor[], so that they can frame their answers and defenses." (internal citations and quotation omitted)).

The government's complaint, upon which Armstrong has relied upon to litigate this action and file this motion, rests its fraudulent inducement claim on two specific statements by Armstrong upon which the USPS supposedly relied in deciding to award the 2000 Agreement.[14] *First*, the government alleged that, on or about November 30, 2000, Armstrong "misled the USPS Vice President for Sales [Gail Sonnenberg] by suggesting, through his words and his conduct, that the USPS team was among the clean teams that might lead by example." Compl. ¶ 63(E). *Second*, the government claimed that the USPS relied on a December 13, 2000 statement by Armstrong on his public website in which he denied the team's use of performance enhancing substances. *Id.* ¶ 63(F). The government's fraudulent inducement claim is limited to these allegations.  *See Samuels v. Wilder*, 871 F.2d 1346, 1350 (7th Cir. 1989) (affirming district

---

[14] Both the government and the relator allege that Armstrong made false statements both after the execution and termination of the 2000 Agreement. Compl. ¶¶ 64, 67; SAC ¶¶ 127-29. There can be no dispute that the USPS did not enter into the 2000 Agreement in reliance on any statement made after the execution of the 2000 Agreement. *Thomas*, 991 F. Supp. 2d at 569-570.

37

court's refusal to allow plaintiffs to bypass Rule 9(b) by adding additional claims for fraud at summary judgment).

Yet, as set forth below, the undisputed evidence confirms that neither of these statements (nor any other by Armstrong) induced the USPS to enter into the 2000 Agreement.

> **b.        Armstrong made no statement to the USPS that fraudulently induced it to enter into the 2000 Sponsorship Agreement**

The United States alleged that statements Armstrong made to Sonnenberg in a November 30, 2000 meeting fraudulently induced the USPS to enter into the 2000 Sponsorship Agreement. Compl. ¶ 63(E). Specifically, the government alleged that Armstrong met with Sonnenberg in Austin, Texas on November 30, 2000:

> [T]o discuss Armstrong's response to media inquiries regarding the doping allegations. During their conversation, they also discussed ways to clean up cycling. In response to the suggestion by USPS Vice President for Sales [Gail Sonnenberg] that teams sponsored by large, reputable institutions such as the USPS might lead the way in such an effort by serving as examples of success achieved without doping, and by exerting pressure on other teams to be more open, Armstrong misled [Sonnenberg] by suggesting, through his words and his conduct, that the USPS team was among the clean teams that might lead by example.

Compl. ¶ 63(E).

The undisputed evidence shows that United States' complaint does not comport with the record evidence of the content of Sonnenberg's conversation with Armstrong. During her testimony in this case, Sonnenberg confirmed that the primary purpose of her meeting with Armstrong was to convince him to stop responding to press inquiries. **SUF 114-16**. At their meeting, Sonnenberg told Armstrong that "this story [about the French investigation of Armstrong] only has legs because [he] continue[s] to respond to it. And any reporter can get [Armstrong] to call back. And if you could just not do that, and let Mark handle the press and refer the press calls to Mark, I think maybe this story would not continue to grow and continue."

38

1054256

**SUF 115.**. Sonnenberg also suggested to Armstrong that "reputable" cycling teams make a "joint proclamation or commitment to zero tolerance, publicly." **SUF 117**. Yet Sonnenberg conceded that she was the one who talked about this idea, and Armstrong "didn't jump on it like it was a super great idea, and he didn't tell me that it was a horrible idea." **SUF 117-18.**

Sonnenberg never once asked Armstrong whether he had ever used a PED. **SUF 119**. Further, the government cannot prove that Armstrong denied his PED use to Sonnenberg. More importantly, there is no evidence showing that Sonnenberg, or anyone at the USPS, relied on—or even considered—any statement made by Armstrong to Sonnenberg in deciding to award the 2000 Sponsorship Agreement. Months before Sonnenberg met with Armstrong, Henderson had informed the Board of Governors that he intended to proceed with a four-year contract for the cycling team. **SUF 121**. By at late as November 29, 2000, the USPS had "**completed** the negotiations for the renewal of the cycling sponsorship for a firm four year commitment." **SUF 122**; *see also* Ex. 43.[15] Accordingly, the Plaintiffs have failed to show that any false statement or omission by Armstrong caused the USPS to enter into the 2000 Agreement. *See Thomas*, 991 F. Supp. 2d at 570-71.

> ### c. Armstrong's alleged statement on a website did not fraudulently induce the USPS to enter into the 2000 Sponsorship Agreement

The government alleged that a December 13, 2000 statement on Armstrong's public website fraudulently induced the USPS to enter into the 2000 Sponsorship Agreement. *See* Compl. ¶ 63(F) ("On or about December 13, 2000, Armstrong said, in a statement on his website, 'Here's the bottom line to everyone: I'll start by saying that we are completely

---

[15] Additionally, there is no evidence showing that Sonnenberg was involved in the negotiations or drafting of the 2000 Sponsorship Agreement. Instead, Vice President of Procurement Keith Strange was responsible for overseeing the negotiation and creation of the 2000 Agreement. **SUF 11**.

innocent[.] We run a very clean and professional team that has been singled out due to our success[.]  I can assure everyone we do everything in the highest moral standard.'").  The undisputed evidence demonstrates that the USPS could not have relied upon Armstrong's public website statement in deciding to renew the sponsorship agreement:  the statement was made *after* the USPS had both made its decision to renew and completed negotiations of the 2000 Agreement.  **SUF 121-22**.

Moreover, a public statement, not directed to the government in any way, cannot as a matter of law form the basis of a fraudulent inducement claim.  *See Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 92-93 (D.D.C. 2014).  There is no evidence that any member of the USPS with responsibility for renewing the sponsorship agreement ever read, saw, or relied upon Armstrong's December 13, 2000 website statement.  Likewise, there is no evidence suggesting that Armstrong made any effort to confirm that the USPS saw the statement on his website, or that Armstrong even saw, wrote, or published the statement himself.  *See United States ex rel. Tran v. Comp. Scis. Corp.,* 53 F. Supp. 3d 104, 131 (D.D.C. 2014).

Both the law of this District and common sense preclude the government from contending that it was induced to enter into a contract by a public statement there was no evidence it relied upon, and indeed which was issued after it made its decision to renew.  *See United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 197 n.14 (D.D.C. 2011) (holding that the plaintiff must show, *inter alia*, that the "defendant initially obtained its government contracts through false statements or fraudulent conduct." (internal quotations and citation omitted)).  Armstrong is therefore entitled to summary judgment on the plaintiffs' fraudulent inducement theory of liability.

40

1054256

## 2.     Plaintiffs Cannot Prove Implied Certification

Plaintiffs also resort to a second legal fiction to establish falsity:  the theory of implied certification.  Under the implied certification theory of liability, as is alleged in this case, a claim for payment is false when it rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term.  *SAIC*, 626 F.3d at 1266.  False certifications can be either express or implied.  *Id.*  Here, plaintiffs have not even alleged a theory of express false certification because they cannot.  The claims submitted for payment do not contain any promise, certification, or representation that the riders were not using performance enhancing substances.  **SUF 126**.

In the absence of any express certification suggesting that the USPS claims were approved and paid in reliance on a representation that the team was not using performance enhancing substances, the plaintiffs' FCA case rests on the "implied certification theory." Under the implied certification theory, courts have created a legal fiction that a claim is "impliedly false" when the defendant's compliance with an applicable federal statute, federal regulation, or contractual provision is at issue, regardless of the fact that the claim itself makes no such representation.  *SAIC*, 626 F.3d at 1266, 1269; *U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1218 (10th Cir. 2008).  To establish the existence of a false claim on the basis of implied certification, the plaintiff must show that the contractor requested payment, yet withheld information about its noncompliance with material contractual or regulatory requirements.  *See United States v. Speqtrum, Inc.*, 47 F. Supp. 3d 81, 92 (D.D.C. 2014); *United States ex rel. Siewick v. Jamieson Science & Eng'g, Inc.*, 214 F.3d 1372, 1376 (D.C. Cir. 2000) ("[A] false certification of compliance with a statute or regulation cannot serve as the basis for a *qui tam* action under the FCA unless payment is conditioned on that

41

certification."); *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996) ("Violations of laws, rules, or regulations alone do not create a cause of action under the FCA. It is the false *certification* of compliance which creates liability when certification is a prerequisite to obtaining a government benefit.").

On December 4, 2015, the U.S. Supreme Court granted *certiorari* in a case squarely challenging the validity of the implied certification theory—*Universal Health Servs., Inc. v. United States ex rel. Escobar*, No. 15-7, 2015 WL 4078340.  The U.S. Supreme Court granted *certiorari* on the following two questions:  **(1)** "Whether the 'implied certification' theory of legal falsity under the FCA—applied by the First Circuit below but recently rejected by the Seventh Circuit—is viable."  **(2)** "If the 'implied certification' theory is viable, whether a government contractor's reimbursement claim can be legally 'false' under that theory if the provider failed to comply with a statute, regulation, or contractual provision that does not state that it is a condition of payment, as held by the First, Fourth, and D.C. Circuits; or whether liability for a legally 'false' reimbursement claim requires that the statute, regulation, or contractual provision *expressly* state that it is a condition of payment, as held by the Second and Sixth Circuits."  *Universal Health Servs., Inc.*, No. 15-7, 2015 WL 4035937, *1 (June 30, 2015).  If the Supreme Court rules that the implied certification theory is invalid as a matter of law, plaintiffs may not advance it to establish the element of falsity required by all of their FCA claims.

But even if the Court rules in favor of Universal Health on the second question only— finding that liability for a legally false claim requires that the statute, regulation, or contractual provision ***expressly*** state that it is a condition of payment—Armstrong will still be entitled to summary judgment on the implied certification theory.  The Sponsorship Agreements do not

42

1054256

make a certification that the riders are not using PEDs as a prerequisite to payment.  As set forth above, there is no express provision in the contracts to that effect.  Instead, as the government's 30(b)(6) witness testified, the remedy for any violation of the provisions relating to performance enhancing substances was to allow the USPS to decide to declare an event of default.  **SUF 133-34**.  In other words, the USPS's *only* remedy for a violation of any provision of the Sponsorship Agreement relating to the use of performance enhancing substances was to terminate the agreement.  *Id.*  No evidence in this case suggests that the USPS could have asked for, or received, any money back, had it learned that the team's riders were using PEDs.[16]

The 2000 Sponsorship Agreement itself makes abundantly clear that the USPS knew how to insert a requirement for payment for an issue that it determined was of sufficient importance. Exhibit A to the 2000 Sponsorship Agreement provides that, "[i]f Lance Armstrong or Roberto Heras do not complete their four year contracts, then 60% of their respective recovered salaries shall be credited to Sponsor for the applicable terms." Ex. 22 at US00167839; Ex. 44 at US00163872.  Thus, there is no question that, had the USPS wanted Tailwind to certify that no rider was using PEDs as a condition of payment, it would have requested such a provision.  It chose not to.

Accordingly, because the undisputed evidence confirms that there has been no false claim under either the fraudulent inducement or implied certification theories of liability, Armstrong is entitled to summary judgment on Counts One, Two, and Three of the government's complaint, and on Counts One, Two, Three, and Six of the relator's second amended complaint.

---

[16] Indeed, this Court has previously noted that the cycling team's alleged doping would not have obligated Tailwind to reimburse the government; instead, the government would have had to "exercise its discretion to sue for repayment."  ECF No. 490 at 23.

43

1054256

**C.**     The Government Cannot Prove Common Law Fraud

The elements of common law fraud are:  "(1) a false representation regarding a material fact; (2) known to be false when made or made with reckless indifference to the truth; (3) for the purpose of deceiving or defrauding the person claiming injury; (4) that action was taken in reliance upon the misrepresentation, and the person had a right to rely upon it; and (5) that actual damage was suffered resulting from the misrepresentation."  *A Love of Food I, LLC v. Maoz Vegetarian USA, Inc.*, 70 F. Supp. 3d 376, 415 (D.D.C. 2014) (citation omitted).  A "fraud plaintiff must prove each of these factors by clear and convincing evidence and lack of proof as to *one* or more of the elements causes a fraud claim to fail."  *Redmond v. Birkel*, 933 F. Supp. 1, 3 (D.D.C. 1996) (citations omitted) (emphasis added).  "In the face of such a heightened evidentiary standard, the nonmoving party must, as the bearer of that burden of proof, demonstrate the existence of facts such as would enable a rational jury to conclude that that party had met its burden at trial."  *Richardson*, 639 F. Supp. at 607; *see also Raynor v. Richardson-Merrell, Inc.*, 643 F. Supp. 238, 243 (D.D.C. 1986).

For the same reason that the government's fraudulent inducement theory of liability fails, so too does its common law fraud claim.  The government alleges, generally, that Armstrong defrauded the USPS.  Compl. ¶¶ 86-88.  Yet it cannot prove, by clear and convincing evidence, that the USPS took *any action* in reliance upon a false representation by Armstrong.  Indeed, the undisputed evidence confirms that the USPS did not rely on any representation by Armstrong in deciding to enter into the 1995 or 2000 Sponsorship Agreements.  *See* above at Part V(B)(1).  Moreover, the government cannot prove that the USPS provided any payment to Tailwind under the Sponsorship Agreements in reliance on any representation by Armstrong.  Robert McKenna, the contracting officer's representative for the cycling team sponsorship between 1996 and 2002,

44

did not consult with Armstrong when approving invoices submitted pursuant to the Agreements.

**SUF 138**.  Joseph Porporino, the contracting officer's representative for the sponsorship between

2002 and 2004, confirmed that he never had any communication with Armstrong about either the

Sponsorship Agreement or any of the invoices submitted pursuant to the Agreement.  **SUF 139**.

Finally, Lynda Zelnick, the sponsorship's contracting officer of record between 1998 and 2002,

never had any communication with Armstrong.  **SUF 140**.

Further, in light of the abundance of evidence concerning the USPS's knowledge of PED

use in cycling, it is evident that the USPS took no action in reliance on Armstong's general

statements to the public regarding his use of performance enhancing substances.  It is undisputed

that during the cycling team sponsorship, USPS employees with responsibility for the

sponsorship, including Sonnenberg, Bizzotto, and Henderson, were aware of allegations that

professional cyclists, including cyclists on the USPS team, were using PEDs.  **SUF 141**.

Yet the USPS took no action in reliance on any statement by Armstrong, or its knowledge

of PED use in cycling.  It took no action to insert a provision into the 2000 Agreement that

would allow it to recoup previously made sponsorship payments in the event a default was

declared due to negative publicity about the use of banned substances.  Ex. 22; Ex. 12 at 157:7-

11.  The USPS employees with responsibility for the sponsorship took no action to request

express certifications of non-PED use.  **SUF 126, 142-54**.  They took no action to interview or

question riders, team doctors, or masseurs. [17]  **SUF 142-54**.  Finally, they took no action to

---

[17] As evidence of Armstrong's direct denial of doping to the USPS, the government relies on the fuzzy details of a November 2000 meeting between Sonnenberg and Armstrong.  Yet there is no question that during their conversation, Sonnenberg carefully avoided asking any direct questions of Armstrong regarding his own, or other riders', use of performance enhancing substances.  Sonnenberg's actions made clear the priorities of the USPS:  she wanted Armstrong to "stop talking to the press" so that the allegations of PED use would die down.  Ex. 14 at 238:23-25.

1054256

request that the USPS Officer of Inspector General or the USPS Postal Inspection Service take efforts to ascertain whether riders on the team were using or had used PEDs.  **SUF 143-45.**

Accordingly, because there is zero evidence showing that the USPS took ***any action*** in reliance on a false representation by Armstrong, Armstrong is entitled to summary judgment on the government's common law fraud claim.  *See Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 22-23 (D.C. Cir. 2008).

### D.    The Government Cannot Prove Unjust Enrichment

#### 1.    Legal Framework

In the D.C. Circuit,[18] a plaintiff claiming unjust enrichment must establish: "(1) the plaintiff conferred a benefit upon the defendant; (2) the defendant accepted and retained the benefit; and (3) it would be unjust for the defendant not to pay the plaintiff the value of the benefit."  *Sununu*, 638 F. Supp. 2d at 40 (quoting *Rapaport v. U.S. Dep't of Treasury,* 59 F.3d 212, 217 (D.C.Cir.1995)).  If, and only if, the plaintiff proves those elements, "the recipient of the benefit has a duty to make restitution to the other person if the circumstances of his receipt or retention are such that, as between the two persons, it is unjust for the recipient to retain it." *Chen v. Bell-Smith*, 768 F. Supp. 2d 121, 151 (D.D.C. 2011) (internal quotations and citation omitted); *see also News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1225 (D.C. 2005) ("In any unjust enrichment case, the plaintiff must, of course, prove that the defendant's enrichment is ***unjust***." (emphasis in original)).

---

[18] The government's unjust enrichment claim is governed by federal common law, *see United States v. Kimble Foods, Inc.*, 440 U.S. 715, 726 (1979), but the applicable federal law derives its substance from the common law of unjust enrichment in the District of Columbia, *see id.* at 728-29.  The standard for unjust enrichment in the D.C. Circuit, thus, mirrors that in the District of Columbia.  *See, e.g.*, *United States v. Honeywell Int'l Inc.*, 798 F. Supp. 2d 12, 25-26 (D.D.C. 2011) (citing D.C. law for standard of unjust enrichment in FCA case).

46

1054256

The government contends, generally, that Armstrong was "unjustly enriched at the expense of the United States." Compl. ¶¶ 89-90; *see also id.* ¶ 5. Yet, for two reasons, the government's argument fails. ***First***, the undisputed evidence shows that there is nothing unjust about Armstrong retaining the salary he earned under his contract with Tailwind.[19] His contract required him to train and ride for the Tailwind team. He did so. Both Tailwind and the USPS benefited from Armstrong's labors. ***Second***, restitution—the appropriate remedy for unjust enrichment—is not available without restoration by the plaintiff. Restoration is impossible in this case because the USPS cannot disgorge the benefits it received.

### 2.    Armstrong's retention of his earned salary is not unjust.

Unjust enrichment is not a residual remedy the government can rely on whenever it feels buyer's remorse but has suffered no damages. Rather, it is a remedy predicated on the concept of a "quasi-contract," where restitution is necessary to prevent a party from "getting something for nothing." 66 Am. Jur. 2d Restitution and Implied Contracts § 12 (2001). "[T]he fundamental characteristic of unjust enrichment is 'that the defendant has been unjustly enriched by receiving something . . . that properly belongs to the plaintiff.'" *Rapaport* 59 F.3d at 217 (quoting 1 DOBBS, LAW OF REMEDIES § 4.1(2)). "[T]here can be no valid claim of unjust enrichment where a party has given fair consideration or value for the benefits obtained." *Canopy Corp. v. Symantec Corp.*, 395 F. Supp. 2d 1103, 1112-14 (D. Utah 2005) (citation omitted).[20] The

---

[19] As set forth above, the entity owning the team changed names, from Montgomery Sports, to DFP, to Tailwind. For the purposes of Section V(D), Armstrong will refer to the entity that owned the team as Tailwind.

[20] Courts around the country have reached this same conclusion. *See Soules v. Ramstack*, 95 P.3d 933, 940 (Alaska 2004) ("[T]here can be no valid claim of unjust enrichment where a party has given fair consideration or value for the benefits obtained."); *Parliament v. Yukon Flats Sch. Dist.,* 760 P.2d 513, 518 (Alaska 1988) ("[W]here a defendant has given fair consideration or value to a third party in exchange for the benefits conferred by the plaintiff, there is no windfall and no recovery will lie."(citation omitted)); *Am. Towers Owners Ass 'n v. CCI Mechanical, Inc.,* 930 P.2d 1182, 1193 (Utah 1996) ("[D]efendants' retention of the benefits under their

47

government cannot show that the salary Armstrong received from Tailwind *belongs to the government*, or anyone else.

The undisputed evidence confirms that Armstrong gave fair consideration or value for the benefits he obtained from Tailwind. The 2000 Sponsorship Agreement provides that—in exchange for payment—riders would wear the USPS eagle insignia, ride in races, and make promotional appearances on behalf of the USPS. **SUF 159**. Because Armstrong never entered into a contract with the USPS, he never owed any obligations directly to the USPS, nor did the USPS ever pay Armstrong's salary. **SUF 156, 158**. Pursuant to his rider agreement, Armstrong was entitled to payment of his salary by Tailwind if he (a) competed in competitive cycling, (b) allowed certain sponsors, including USPS, to use his likeness, and (c) made appearances for team sponsors. Ex. 33 at US00031749-52. The uncontradicted evidence confirms that Armstrong substantially performed these duties. Armstrong competed in numerous cycling events. He rode in, and won, seven consecutive Tours de France, including six while the USPS was sponsoring the team. **SUF 160**. Armstrong also made appearances on behalf of team sponsors, including the USPS, and allowed the USPS to use his likeness.[21] **SUF 163-65.** In exchange for these efforts, Tailwind paid Armstrong the agreed upon compensation. Because any benefit Armstrong received was in exchange for services *actually rendered* to Tailwind

---

construction contracts was not unjust. Defendants all provided services and materials in exchange for their contract price. That value was accepted as sufficient and appropriate."); *Pendleton v. Sard,* 297 A.2d 889, 893-94 (Me. 1972) (same); *Vanacore v. Kennedy,* 86 F. Supp. 2d 42, 52 (D. Conn. 1998) (same).

[21] Armstrong's 2003 rider agreement required him to comply with the rules governing competitive cycling, including rules governing the use of PEDs. Ex. 273 at 27. But the contract only entitled Tailwind to suspend Armstrong *with compensation*, or to terminate the agreement, and even then only if Armstrong "unreasonably refuse[d] to take any [drug] test or . . . fails any such test." *Id.* at 29. There is no evidence that Armstrong refused or failed any drug test during the period of the contract, and even if he had, Tailwind never sought to terminate the agreement or suspend Armstrong.

48

1054256

pursuant to his rider contract, his receipt and retention of that benefit cannot be "unjustified." *Shenandoah Associates Ltd. P'ship v. Tirana*, 182 F. Supp. 2d 14, 25 (D.D.C. 2001) ("[T]he facts do not demonstrate that the defendant was unjustly enriched simply by receiving payment . . . for services rendered under an existing agreement.").

Unjust enrichment arises in the context of FCA claims because, in many cases, the government has paid an invoice for goods or services which were never provided. But that is not the case here. The undisputed evidence shows that the government received services and intangible benefits from Armstrong's efforts.[22] There is no question that Armstrong compensated the government for the benefit he received from Tailwind. In fact, the undisputed evidence shows that Armstrong's victories at the Tour de France increased the value of the cycling team sponsorship. **SUF 161-62**. After Armstrong's 2000 Tour win, Henderson told Sonnenberg that the sponsorship had become so valuable on its own that Sonnenberg did not need to continue tracking the revenues obtained as a result of the sponsorship. Ex. 14 at 194:14-196:17. Armstrong permitted the USPS to use his likeness and image, he made appearances on behalf of USPS, he rode and competed with the USPS logo emblazoned across his chest, he proudly displayed the USPS logo when he was pictured on the cover of *Sports Illustrated*. **SUF 160, 163-65**. Armstrong did all of these things, to the benefit of the USPS, and the USPS accordingly paid Tailwind. Because Armstrong was compensated for service he did provide, and the government received consideration for the payments it made to Tailwind, the government has no claim for unjust enrichment.

---

[22] Any claim that what the government received was less than what it bargained for is a claim for breach of contract (against Tailwind) or an FCA action. It does not make out a claim for unjust enrichment against an employee of the company that contracted with the government.

### 3. Restitution is not available when the plaintiff cannot disgorge the benefits it received.

To recover in restitution, a plaintiff is required to restore what he received in the transaction. *See Landmark Land Co. v. FDIC*, 256 F.3d 1365, 1373 (Fed. Cir. 2001); *see also* 2 DOBBS, § 9.3(3) at 584-85; Restatement (Second) of Contracts § 384, cmt. a ("A party who seeks restitution of a benefit that he has conferred on the other party is expected to return what he has received from the other party."). When the benefit the plaintiff received is in the form of services or intangibles, as here, the plaintiff must return the value of those services and intangibles. *See* 2 DOBBS, § 9.3(3) at 587.

The undisputed evidence demonstrates that the value of the benefit that Armstrong and the cycling team conferred on the USPS is, according to the USPS's own contemporaneous documents and public statements, at least $163.7 million. **SUF 166-75.** Accordingly, to recover Armstrong's earned salary, the government too must return the value of the services Armstrong provided to the USPS. If it does not return this value, restitution is not an available remedy. *See In re APA Assessment Fee Litig.*, 766 F.3d 39, 56 (D.C. Cir. 2014) (denying rescission and restitution when it was impossible to "restore the status quo ante"). This is the case even if the transaction was induced by fraud or misrepresentation. *See id.* ("This rule applies even when the party against whom rescission is sought has committed fraud.") (quoting *Dean v. Garland*, 779 A.2d 911, 915 (D.C. 2001)); Restatement (First) of Restitution § 65, illus. 1 (1937).

Because the government cannot restore to Armstrong the services which he has rendered, it cannot seek an unjust enrichment remedy. If Armstrong is forced to return his salary, then USPS will itself have been enriched—through Armstrong's performance under the applicable contracts—without the government having paid for that enrichment. The government is **not**

50

**entitled to "get back what [it] gave and keep what [it] got, too."**  1 DOBBS, § 4.8 at 675.

Unjust enrichment and restitution, then, are simply unavailable to the government.

/ /

/ /

/ /

51

1054256

## VI.    CONCLUSION

For the reasons set forth above, the Court should grant Armstrong's motion for summary judgment.

Respectfully submitted,

KEKER & VAN NEST LLP

Dated:  April 27, 2016

By:    */s/ Elliot R. Peters*

JOHN KEKER (*pro hac vice*)
ELLIOT R. PETERS (*pro hac vice*)
R. JAMES SLAUGHTER (*pro hac vice*)
SHARIF E. JACOB (*pro hac vice*)
ELIZABETH K. MCCLOSKEY (*pro hac vice*)
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:   415 397 7188

ROBERT D. LUSKIN (D.C. Bar # 293621)
PAUL HASTINGS LLP
875 15TH St., NW
Washington, DC  20037
Telephone: (202) 551-1966
Facsimile: (202) 551-0466

Attorneys for Defendant
LANCE ARMSTRONG

52

1054256