UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES *ex rel.* LANDIS, | ) ) | |
| Plaintiffs, | ) ) ) | No. 10-cv-00976 (CRC) |
| v. | ) ) | |
| TAILWIND SPORTS CORPORATION, *et al.*, | ) ) ) | ECF |
| Defendants. | ) ) ) ) ) ) ) ) | |

**UNITED STATES' RESPONSE TO DEFENDANT
LANCE ARMSTRONG'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 2

   I.   THE SPONSORSHIP ........................................................................................ 2

       A.   The Sponsorship Agreements .................................................................. 2
       B.   Sponsorship Purposes ............................................................................. 4
       C.   Anti-Doping Provisions .......................................................................... 5

   II.   LANCE ARMSTRONG AND THE USPS TEAM ........................................... 7

       A.   Armstrong's Rider Agreements ............................................................... 8
       B.   Armstrong's Control over the USPS Team ............................................. 9
       C.   Armstrong Knew that he was not Permitted to Use Prohibited Substances (e.g. EPO) or Techniques (e.g. blood transfusions) ............................................................ 11

   III.   ARMSTRONG'S USE AND ENCOURAGEMENT OF DOPING .............................. 12
   IV.   ARMSTRONG'S FALSE STATEMENTS ....................................................... 15

SUMMARY OF THE ARGUMENT ............................................................................ 19

ARGUMENT ............................................................................................................... 21

   I.   ARMSTRONG'S FCA LIABILITY ................................................................. 21

       A.   Armstrong Is Liable for Making and Causing False Statements Material to Tailwind's Claims for Payment ...................................................................................... 21
       B.   Armstrong Is Liable Under the "Implied Certification" Theory of Liability ............. 29

   III.   THE GOVERNMENT'S FCA DAMAGES ....................................................... 32

       A.   The FCA Damages Standard .................................................................. 32
       B.   The Government Did Not Receive the Benefit of its Bargain .................... 34
       C.   Armstrong Erroneously Relies on the "Consequential Benefits" of the Sponsorship to Contest Damages .............................................................................................. 37
       D.   Armstrong Ignores the Consequential Harms Suffered by the USPS ......... 44

   III.   THE GOVERNMENT'S COMMON LAW CLAIMS ........................................ 46

       A.   Armstrong was Unjustly Enriched ........................................................ 46
       B.   Armstrong May be Found Liable for Common Law Fraud .................... 53

   V.   CONCLUSION ................................................................................................ 54

**TABLE OF AUTHORITIES**

**Cases**

*Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662 (2008) .................................................. 28

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 25

*Blythe Holdings, Inc. v. DeAngelis.*, 750 F.3d 653 (7th Cir. 2015) ............................................ 52

*Catrett v. Johns-Manville Sales Corp.*, 826 F.2d 33 (D.C. Cir. 1987) ........................................ 30

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................................. 25

*Cook County Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119 (2003) ................................................. 41

*Dawson v. Contractors Transport Corp.*, 467 F.2d 727 (D.C. Cir. 1972) ................................... 51

*DiCarlo v. St. Mary Hosp.*, 530 F.3d 255 (3rd Cir. 2008) ........................................................... 52

*Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993 (9th Cir. 2010) ..................................................... 31

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002) ....................................... 53

*Guyana Telephone & Telegraph Co. v. Melbourne Int'l Comms.*, 329 F.3d 1241 (11th Cir. 2003)
.................................................................................................................................................... 52

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999) ........................... 27

*In re APA Assessment Fee Litig.*, 766 F.3d 39 (D.C. Cir. 2014) ................................ 51, 53, 54, 55

*In re Burlington Coat Factory Securities Litig.*, 114 F.3d 1410 (3d Cir. 1997) .......................... 31

*In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30 (D.D.C. 2003) ................. 50

*Landmark Land Co. v. FDIC*, 256 F.3d 1365 (Fed. Cir. 2001) .................................................... 54

*Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1 (2d Cir. 1989) ................ 52

*Media Gen., Inc. v. Tomlin*, 532 F.3d 854 (D.C. Cir. 2008) .................................................. 30, 56

*Morse Diesel Int'l, Inc. v. United States*, 79 Fed. Cl. 116 (Fed. Cl. 2007) ................................. 35

*New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065 (2d Cir.1988) ........................................... 35

*Pan American Life Ins. Co. v. Macinnis*, No 99-2491, 1999 WL 1220763 (E.D. La. Dec. 17,
1999) .......................................................................................................................................... 53

*Pence v. United States*, 316 U.S. 332 (1942) ............................................................................... 55

*Pilgrim v. Trustees of Tufts College*, 118 F.3d 864 (1st Cir. 1997) ............................................ 45

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436 (7th Cir.
2011) .......................................................................................................................................... 31

*Rapaport v. U.S. Dep't of Treasury, Office of Thrift Supervision*, 59 F.3d 212 (D.C. Cir. 1995) 49

*Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133 (2000) ......................................................... 25

*Samaritan Inns v. District of Columbia*, 114 F.3d 1227 (D.C. Cir. 1997) .................................. 35

*Samuels v. Wilder*, 871 F.2d 1346 (7th Cir. 1989) ................................................................ 31, 32

*Schering Corp. v Pfizer Inc.*, 189 F.3d 218 (2d Cir. 1999) ......................................................... 46

*See Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133 (2000) .................................................... 5

*St. Luke's Hospital v. Sebelius*, 611 F.3d 900 (D.C. Cir. 2010) .................................................. 35

*Story Parchment Co. v. Paterson Parchment Paper Co. et al.*, 282 U.S. 555 (1931) ................. 35

*Sundstrand Corp. v. Standard Kollsman Industries, Inc.*, 488 F.2d 807 (7th Cir. 1973) ............ 30

*Sununu v Philippine Airlines, Inc.*, 638 F. Supp. 2d 35 (D.D.C. 2009) ....................................... 51

*U.S. ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321 (D.C. Cir. 2005) ........ 27

*U.S. ex rel. Feldman v. van Gorp*, 697 F.3d 78 (2d Cir. 2012) ................................................... 27

*U.S. ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416 (9th Cir. 1991) .............. 27

*U.S. ex rel. Hovkett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25 (D.D.C. 2007).... 30

*U.S. ex rel. Longhi v. Lithium Power Technologies, Inc.,* 575 F.3d 458 (5th Cir. 2009) ............ 27

*U.S. ex rel. Marcus v. Hess*, 317 U.S. 537 (1943) ....................................................................... 27

*U.S. ex rel. Roby v. Boeing Co.*, 302 F.3d 637 (6th Cir. 2002)...................................................... 36

*U.S. ex rel. Wall v. Circle C Const., LLC*, 813 F.3d 616 (2016) .................................................. 40

*U.S. ex rel. Westrick v. Second Chance Body Armor Inc.*, 128 F. Supp. 3d 1 (D.D.C. 2015)27, 28, 50

*U.S. v. Toyobo Co., Ltd.*, 811 F. Supp. 2d 37 (D.D.C. 2011) ................................................. 26, 55

*United States ex rel. Compton v. Midwest Specialties, Inc., et al.*, 142 F.3d 296 (6th Cir. 1998)35, 36

*United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394 (4th Cir. 2012)  51

*United States ex rel. Modern Electric, Inc. v. Ideal Electronic Security Co.*, 81 F.3d 240 (D.C. Cir. 1996) ............................................................................................................................... 49

*United States ex rel. Purcell v. MWI Corp.*, 520 F. Supp. 2d 158, 180 (D.D.C. 2007)............... 51

*United States ex rel. Roberts v. Aging Care Home Health, Inc.*, 474 F. Supp. 2d 810 (W.D. La. 2007) ............................................................................................................................................. 54

*United States ex rel. Zissler v. Regents of U. of Minn.*, No. 95-CV-168, 1998 WL 2026226 (D. Minn. June 1, 1998) ................................................................................................................... 54

*United States v. Bornstein*, 423 U.S. 303 (1976)....................................................... 24, 35, 42

*United States v. Cartwright*, 411 U.S. 546 (1973)....................................................................... 36

*United States v. Honeywell Int'l Inc.*, 798 F. Supp. 2d 12 (D.D.C. 2011).................................... 50

*United States v. Khan*, No. 03-CV-74300, 2009 WL 2461031 (E.D. Mich. Aug. 5 2009) .......... 54

*United States v. Killough, et al.*, 848 F.2d 1523 (11th Cir. 1988) ............................................... 35

*United States v. Nazon*, No. 93 C 5456, 1993 WL 410150 (N.D. Ill. Oct. 14, 1993)................... 54

*United States v. Rogan*, 459 F. Supp. 2d 692 (N.D. Ill. 2006) ...................................................... 54

*United States v. Sci. Applications Int'l Corp.* ("*SAIC*"), 626 F.3d 1257 (D.C. Cir. 2010).... passim

*United States v. Speqtrum, Inc.*, 47 F. Supp. 3d 81 (D.D.C. 2014) .............................................. 29

*United States v. United Technologies Corp.*, No 3:99-cv-093, 2016 WL 3141569 (S.D. Oh. June 3, 2016) ....................................................................................................................................... 53

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 579 U.S. (2016)  23, 33, 34

*Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264 (10th Cir. 1998)............................... 45

## Statutes

31 U.SC. § 3729................................................................................................................... passim

Fed. R. Civ. P. 26 ............................................................................................................... 31, 46

Fed. R. Civ. P. 56 ......................................................................................................... 25, 30, 31

Fed. R. Evid. 702 ....................................................................................................................... 46

Fed. R. Evid. 801-807 ............................................................................................................... 45

Rule 9(b) ................................................................................................................................... 31

## Other Authorities

Restatement (Second) of Contracts § 384(a) ............................................................................. 54

Restatement (Third) of Restitution and Unjust Enrichment § 13(a) (2011) ..................... 50, 52, 53

S. Rep. No. 615, 96th Cong., 2d Sess. ...................................................................................... 35

## Regulations

USPS Employee and Labor Relations Manual (ELM) 16, Code of Ethical Conduct, § 661.3, Standards of Conduct (August 2000, effective through February 2001) ................................. 39

USPS Purchasing Manual, Chapter 3, Sources, § 3.7.1.e Causes for Debarment ........................ 39

**<u>INTRODUCTION</u>**

The United States Postal Service paid more than $40 million to sponsor Lance

Armstrong's cycling team, and approximately half of this money was used to pay Armstrong's

salary.  When it sponsored Armstrong's team, the USPS hoped that the public would associate

the USPS brand with the heroic qualities Armstrong conjured in the public's mind at the time.  In

order to protect its brand, the USPS bargained for specific contractual provisions that prohibited

Armstrong and his teammates from using banned performance enhancing drugs and practices.

Armstrong and his business partners repeatedly assured the USPS and the public that he was

honoring this agreement, and that his apparent successes as a cyclist were purely the product of

hard work and natural ability.

Throughout his tenure as leader of the USPS team, Armstrong unlawfully boosted his

performance using testosterone, cortisone, erythropoietin, human growth hormone,

dexamethasone, synacthen, corticosteroids, calf's blood extract, illicit blood transfusions, and

more.  Armstrong also abused his position and power to coerce his teammates to risk their own

health and careers by cheating in order to enhance Armstrong's legacy, status, and fortune.  In

short, the USPS paid more than $40 million to associate its brand with Lance Armstrong:

American hero; instead, it unwittingly tied its brand to Lance Armstrong: doper, dealer, and liar.

The latter, naturally, held no value to the USPS.

Armstrong argues, however, that he was worth *even more* to the USPS as a drug-fueled

cheat.  Even though the annual sponsorship fee Armstrong and his business partners negotiated

was less than $9 million per year from 2000 to 2004, Armstrong now claims the value of the

sponsorship to the USPS was $37 million per year – i.e., more than four times what the USPS

paid when it (and the public) believed that Armstrong was the model of hard work and

determination he pretended to be.  Armstrong's claims about the value of the benefits resulting

from the sponsorship rest on a patchwork of unreliable data and half-truths, untethered to any

economic or legal principle.  Armstrong's inflated account of sponsorship benefits are merely a

distraction designed to avoid an obvious truth: no sponsor who knew the truth about *how*

Armstrong achieved his apparent Tour de France victories would have paid any amount of

money to sponsor him or his team.

In the final analysis, Armstrong induced the USPS to pay him and his associates more

than $40 million by lying about his and the team's doping, and the USPS is now publicly and

indelibly linked to one of the biggest sports scandals in history.  This clearly was not what the

USPS bargained or paid for.

## **BACKGROUND**

Following is a summary of the relevant record facts, both disputed and undisputed, set

forth in the light most favorable to the United States as the non-moving party.  *See Reeves v.*

*Sanderson Plumbing, Inc*., 530 U.S. 133, 150 (2000).[1]

## I.  THE SPONSORSHIP

### A.    The Sponsorship Agreements

In 1995, the USPS entered an agreement with Montgomery Sports LLC (along with its

successors, "Tailwind") to sponsor a professional cycling team.[2]  Pursuant to the 1995

---

[1] The United States Statement of Facts ("USSOF") responding to Armstrong's Statement of
Undisputed Material Facts is filed contemporaneously herewith.  The United States reserves the
right to dispute at trial the background and contextual facts that were not included in
Armstrong's statement of facts.  *See* Armstrong Br. at 2, n.3.
[2] The initial sponsorship agreement signed in 1995 was between the USPS and the owner of the
team, Montgomery Sports, LLC.  During the course of the sponsorship, the identity and/or form
of the team's ownership changed several times: Montgomery Sports, LLC was succeeded by
DFP Cycling LLC in 1999, which changed its name to Tailwind Cycling LLC in 2001, which
merged with and into Tailwind Cycling Corp in 2004.  Tailwind Cycling Corp. dissolved on

sponsorship agreement (the "1995 Agreement"), the USPS agreed to pay Tailwind a sponsorship fee in exchange for certain promotional rights.  The rights the USPS obtained pursuant to the 1995 Agreement included the prominent placement of the USPS logo on the cycling team's uniform, and the provision of hospitality services in connection with team events.  The team was to be named the "U.S. Postal Service Professional Cycling Team."  The 1995 Agreement was subject to automatic renewal on a year-to-year basis, and the Postal Service continued the sponsorship each year through 2000.

On December 26, 2000, the Postal Service and Tailwind entered a four-year agreement for the USPS to sponsor the team for the 2001 through 2004 cycling seasons (the "2000 Agreement").  The 2000 Agreement called for the Postal Service to pay Tailwind $31,593,000 over its four-year term.

The amount of the sponsorship fee paid by the USPS each year between 1998 and 2004 is set forth below:

- 1998 – $2,000,000;
- 1999 – $2,500,000;
- 2000 – $3,300,000;
- 2001 – $6,138,000;
- 2002 – $7,610,000;
- 2003 – $8,235,000;
- 2004 – $8,660,000.

**USSOF 9-15.**  In all, the USPS paid Tailwind (and its predecessor entities) $40 million from 1998 through 2004.  The USPS did not renew the agreement when it expired on December 31, 2004.

---

December 31, 2007.  For ease of reference and clarity, the government will refer to the entity that owned the team and was the USPS's counterparty to the sponsorship agreement during the time period at issue here as "Tailwind," unless the distinction between entities is relevant.

**B.**     **Sponsorship Purposes**

From the USPS's perspective, the sponsorship had two purposes, which shifted in importance throughout the term of the sponsorship.  Prior to 2000, the USPS's principal use of the sponsorship was as a business-to-business marketing tool.  The USPS would entertain current or potential clients at cycling events in the same way many companies entertain clients at sporting events:  USPS executives and sales staff would use these events as opportunities to build relationships with clients, and also to network with other attendees at the cycling events. **USSOF 19-20**.

The USPS expended significant effort laying the groundwork for a sale before the customer attended the cycling event.  Customers invited by USPS were businesses with whom the USPS already had a pre-existing relationship and to whom the USPS already had directed some sales effort.  **USSOF 21**.  In many cases, USPS sales staff met with the customer and performed on-site reviews of shipping practices in order to recommend ways that the USPS might be able to reduce the customer's shipping costs.  **USSOF 22.**

A second purpose of the sponsorship was to garner favorable media exposure for the USPS.  In particular, the USPS hoped that the public would associate the USPS with the attributes that it believed the cycling team represented, and that the public's affinity and respect for the USPS would grow as a result.  Qualities that the USPS attributed at the time to Armstrong—and that it hoped the public would associate with the USPS—included "technology," "speed," "efficiency," "innovation," "perseverance, ""courage," "teamwork," "commitment," and "excellence."  **USSOF 236.**  Initially, the USPS's public relations goals were a secondary purpose of the sponsorship.  However, as the team began to accumulate apparent Tour de France victories, the USPS's public relations aspirations took on a more central role.  By

4

2000, the desire for positive exposure had eclipsed business-to-business sales as the principal purpose of the sponsorship.

Over time, the amount of the USPS's monetary investment in the team grew significantly.  As demonstrated above, the sponsorship fee paid by the USPS climbed steeply over the course of the sponsorship.  Notably, the USPS also devoted significantly greater personnel resources to handling the sponsorship starting in 2001 in order to maximize the USPS's exposure.

### C.      Anti-Doping Provisions

The USPS believed that the purposes of the sponsorship would be completely undermined if the team were using banned performance-enhancing drugs (PEDs) or blood doping techniques.  It viewed doping to be morally repugnant and in direct opposition to the favorable qualities with which it sought to associate the USPS brand.  At all times throughout the sponsorship, the USPS employees responsible for the sponsorship believed that team riders were not doping.  If any of them had known that Armstrong or other team members were doping, they would not have entered into the sponsorship agreement, or they would have terminated the sponsorship and all payments immediately.  **USSOF 29-32.**

Several protections against the team's doping were incorporated into each of the sponsorship agreements.  The 1995 Agreement required that:

> The performance of the obligations of the parties under this Agreement shall at all times and in all events be subject to compliance with all applicable rules of the *Union Cycliste Internationale*, the *Federation Internationale du Cyclisme Professionel*; the United States Professional Cycling Federation, Inc., the International Olympic Committee, the United States Olympic Committee, the International Amateur Cycling Federation, the United States Cycling Federation and all other governing organizations.

**USSOF 33.**

At the time the 1995 Agreement was executed, and at all times relevant to the United

States' claims, the rules applicable to the Union Cycliste Internationale (UCI) and International

Olympic Committee (IOC) forbade the use of PEDs, including erythropoietin, human growth

hormone, corticosteroids, testosterone, and blood transfusions.  **USSOF 34.**  The agreement

further made it an event of default if "Either party shall make a material misrepresentation or

shall materially breach any warranty made herein[.]"  **USSOF 35.**

During the time that the USPS and DFP Cycling were negotiating an extension of the

sponsorship agreement, French authorities began an investigation into whether members of the

USPS team had used banned substances.  Although Armstrong vehemently denied the

allegations and the French investigation later concluded without a finding of wrongdoing, the

Postal Service sought to ensure that its brand was not tarnished by association with a doping

team by inserting several additional provisions relating to PEDs into its sponsorship agreement

extension.  Specifically, the following provisions were added to the 2000 Agreement's events of

default:

> (iv)     The Company fails to take immediate action without
> notification by the Sponsor in a case of a rider or Team offense related to a
> morals or drug clause violation.

> (v)     There is negative publicity associated with an individual
> rider or team support personnel, either permanent or temporary, due to
> misconduct such as, but not limited to, failed drug or medical tests, alleged
> possession, use or sale of banned substances, or conviction of a crime.

**USSOF 42.**  In addition, the 2000 Agreement included the following paragraphs:

> The Company represents that each rider on the Team has a morals and
> drug clause that allows the Company to suspend or terminate the rider for
> cause which shall include items such as (1) conviction of a felony; (2) acts
> that require the Team to suspend or terminate a rider under the applicable

rules of the Union Cycliste Internationale; the Federation Internationale du Cyclisme Professionel; the United States Professional Cycling Federation, Inc.; the International Olympic Committee; the International Amateur Cycling Federation; the United States Cycling Federation and all other applicable governing organizations; (3) failure to pass drug or medical tests; (4) inappropriate drug conduct prejudicial to the Team, or the Postal Service, which is in violation of Team rules or commonly accepted standards of morality; and (5) gross neglect of the rider's duty.

If any rider on the Team is found guilty of such offense, the Company agrees to take appropriate action within thirty (30) days.

**USSOF 43.**

These provisions were added to the 2000 Agreement to reinforce the doping prohibitions in the 1995 Agreement, and to ensure that USPS could terminate the sponsorship if any doping offense occurred.  Each of the provisions of the agreement described above—including the provision requiring the team's adherence to the rules of cycling's governing bodies, the events of default, and the representation about the morals and drug clause in each rider's contract—were regarded by the USPS as material terms of the 1995 and the 2000 Agreements.  **USSOF 45.**  If Tailwind violated any of those provisions, the USPS could elect to terminate the agreement immediately and to "exercise any other right or remedy available to it under law or in equity."  **USSOF 46.**

Postal Service employees responsible for the sponsorship understood both the 1995 and the 2000 Agreements to prohibit doping.  **USSOF 47.**  Tailwind executives also acknowledged that the anti-doping requirements of the 2000 Agreement were extremely broad.  **USSOF 49.**

## II.    LANCE ARMSTRONG AND THE USPS TEAM

After Lance Armstrong recovered from cancer, USPS cycling team management approached the USPS to ask whether it would be willing to increase its payments under the sponsorship in order to sign Armstrong as a rider.  **USSOF 50.**  The USPS agreed, and added

funding specifically for that purpose.  Armstrong joined the team in 1998, and was the team's

lead rider from 1999 through 2004.  **USSOF 51.**

A.     **Armstrong's Rider Agreements**

Armstrong signed his first Professional Rider Agreement with Montgomery Sports on or

about December 15, 1997.  At all relevant times, Armstrong's rider agreement required him "to

abide by the rules and regulations of the Union Cyclists International ("UCI"), the Federation

Internationale du Cyclisme Professionel ("FICP"), the United States Professional Cycling

Federation, Inc. ("USPRO") and any other governing bodies."  **USSOF 54**; *cf.* ECF 514-1

(Armstrong Br.), at *55, fn.21.  Armstrong's rider agreement also prohibited him from making

"public statements which are intentionally inaccurate . . . ."  **USSOF 55.**  In addition, the rider

agreement prohibited Armstrong from using any "performance enhancing substance while

training, traveling, or performing for the Team."  **USSOF 56.**  Armstrong concedes that, at all

times he rode for the USPS team, he knew that he had to comply with the anti-doping rules of the

UCI, the IOC and the other governing bodies of professional cycling or risk termination of his

contract and the USPS sponsorship of the team.  **USSOF 59.**

Armstrong was by far the highest paid rider on the team.  His combined salary and Tour

de France bonus from Tailwind (which does not include bonuses for other races or Armstrong's

personal paid endorsements) for each of the following years was:

- 1999 – $1,595,000
- 2000 – $2,590,000
- 2001 – $4,000,000
- 2002 – $5,000,000
- 2003 – $7,000,000
- 2004 – $14,500,000

**USSOF 60-65.**  Armstrong's letter agreement with Tailwind dated July 31, 1998 guaranteed that

"Armstrong shall be the highest paid rider on the team in terms of overall compensation,

bonuses, and benefits." **USSOF 66.** Indeed, in one year three of Armstrong's teammates were paid $40,000 each. **USSOF 68.** Tailwind never turned a profit. **USSOF 239.**

On October 10, 2000, after Armstrong appeared to have won his second Tour de France, he entered a new letter agreement with Tailwind that included a substantial increase in Armstrong's salary and bonus structure. **USSOF 69.** At the time, the USPS was in the midst of negotiations with Tailwind over the USPS's agreement to sponsor the team for the 2001 through 2004 seasons. Even though at that time Armstrong was under contract to Tailwind for another year, he agreed to extend his commitment to the team through 2004 so that Tailwind could obtain a four year agreement with the USPS under more favorable terms, including a higher sponsorship fee. **USSOF 240-41**. The letter agreement between Armstrong and Tailwind gave Armstrong "the unilateral right to terminate [the agreement]" if the USPS did not extend the sponsorship before November 15, 2000. **USSOF 71.** Armstrong also agreed to permit the USPS to use his name, likeness, and image—a right that was extended to just one other sponsor—and he agreed to make six personal appearances for the USPS each year. **USSOF 72.**[3]

## B. Armstrong's Control over the USPS Team

Armstrong was the team's unquestioned leader. As one teammate put it, "Lance called the shots on the team ... and what Lance said went." **USSOF 75.** Another teammate explained that Armstrong wielded an "iron fist," and that he and Bruyneel ran the team as "a dictatorship." **USSOF 76.**

Armstrong's power extended beyond the USPS team to the broader professional cycling community. Among members of the peloton, he was referred to as a "patrón" (Spanish for

---

[3] Parallel provisions – giving the USPS the right to use Armstrong's name, likeness, and image, and requiring Armstrong to make personal appearances for the USPS – appear in the agreement between the USPS and Tailwind.

"boss"), meaning that he was "someone you didn't mess with in the peloton." **USSOF 78.**
Armstrong's teammates worried that, if they did not comply with Armstrong's wishes, he might
wield his power to harm their cycling careers. **USSOF 79.**

Members of the team, commonly referred as "domestiques" (French for "servants"),
were expected to work to ensure that Armstrong, their lead rider, was victorious at the Tour de
France. **USSOF 80.** Propelling Armstrong to win the Tour de France each year was the team's
singular focus. **USSOF 81.** Rider George Hincapie explained "[W]e were there to help Lance
win. So if we were there for our own sort of success, that – that wasn't going to be accepted . . .
Johan [Bruyneel] and Lance [told] other members of the team that we were not there for personal
ambition, so if we had designs on individual glory, we'd better pack our bags." **USSOF 82-83.**
This type of focused devotion to the success of a single rider in a single event each year is not
something USPS riders had experienced on other teams. **USSOF 84.**

Armstrong's October 10, 2000 letter agreement, which remained in effect throughout
his time on the USPS team, gave him the right to "have extensive input into rider and staff
composition." **USSOF 85.** In reality, Armstrong had the last word when it came to hiring and
firing riders and staff. Armstrong explained that he and Bruyneel carefully identified, recruited
and signed "[the kind of people Armstrong wanted to work with.]" **USSOF 86.** The team
invariably followed Armstrong's recommendations concerning team composition. **USSOF 87.**

Armstrong also exerted direct influence over the team's hiring of his nominal
supervisors, including Johan Bruyneel. After Armstrong joined the team in 1998, he concluded
that the team's director, Johnny Weltz was "disorganized," and Armstrong expressed his
dissatisfaction with Weltz to Tailwind's president, Mark Gorski, and its Chairman, Thom
Weisel. **USSOF 88-89.** Weltz was replaced after Armstrong's first season with the team.

10

**USSOF 90.**  Armstrong personally reached out to Bruyneel and invited him to become the team's new director.  **USSOF 91.**

Armstrong's control over team matters extended well beyond personnel decisions.  In particular, Armstrong decided the races in which the team would compete and the team riders who would compete in each race.  **USSOF 92.**

Armstrong and his agents formally assumed control over Tailwind in 2003.  Bill Stapleton and Bart Knaggs—both longtime agents of Armstrong—gained operational control of Tailwind pursuant to a service agreement effective October 1, 2003.  **USSOF 94.**  Stapleton was named CEO of Tailwind, and Knaggs was named its president.  Armstrong and Stapleton were also members of the Tailwind board of directors.  **USSOF 96.**  By 2004, Lance Armstrong had acquired 28.68% of Tailwind's common stock.  **USSOF 97.**

> **C.**     **Armstrong Knew that he was not Permitted to Use Prohibited Substances (e.g. EPO) or Techniques (e.g. blood transfusions)**

Armstrong knew and understood that sponsors, including the USPS, did not want to be associated with a team that used PEDs, **USSOF 99**, and that he was required to follow the rules of cycling.  **USSOF 100.**  Armstrong further understood that the USPS expected team riders to exhibit good character, which included, at a minimum, not doping, lying, and attacking innocent third parties for making truthful statements.  **USSOF 101.**

Writing about the 2000 French investigation in one of his books, Armstrong stated:

> Meanwhile, the investigation threatened to seriously mess with my reputation.  Bill Stapleton was finding it difficult to conduct business. Coca-Cola was running scared of me, and so were other sponsors.  Bill finally said to them, "Look, he doesn't take drugs, okay?  I will stake my entire career on it."  We wrote in anti-drug out-clauses in our contracts:  if I tested positive, I'd give the money back.  Bill had also begun trying to negotiate a new four-year deal with the U.S. Postal Service, the contract that was my chief income.  But now Postal was wary of re-signing the

entire team, and even briefly considered not renewing its team
sponsorship.  All because of a French fishing expedition.

**USSOF 102.**  In sworn testimony, Armstrong admitted he was aware that if he had "any

connection to doping," all of his sponsorship contracts would be terminated.  **USSOF 103.**

## III.   ARMSTRONG'S USE AND ENCOURAGEMENT OF DOPING

Armstrong appeared to win the Tour de France each year from 1999 through 2004, but as

the world later learned, Armstrong's apparent success as a cyclist was the product of his use of

banned PEDs and blood doping techniques.  Indeed, Armstrong now acknowledges he "would

not have been very successful" if he had not engaged in the use of banned substances and

practices. **USSOF 104.**

Armstrong began using banned substances in 1993, when he used a corticoid called

Synachten to boost his cycling performance.  **USSOF 106.**  In 1995, Armstrong began working

with Michele Ferrari, an Italian doctor who employed advanced and innovative doping methods.

**USSOF 107-08.**  That same year, Armstrong began using erythropoietin ("EPO,") which is a

hormone that increases the production of oxygen-carrying red blood cells in the body, thereby

enhancing an athlete's ability to compete in endurance sports.  Armstrong knew that the use of

EPO by cyclists was prohibited by the IOC and UCI from 1998 to 2004.  **USSOF 109.**

Armstrong used EPO, corticoids, and anabolic steroids throughout his first apparent Tour

de France win in 1999.  **USSOF 113-14.**  Armstrong knew that each of these substances was

prohibited by the rules of the IOC and UCI from 1998 to 2004.  **USSOF 115.**  After cycling

regulatory agencies developed a test for EPO in 2000, Armstrong continued using EPO in

connection with his preparation for the Tour de France.  **USSOF 116.**  During the race itself,

however, Armstrong substituted "blood doping" techniques for EPO.  **USSOF 117.**[4]  Armstrong

switched from EPO to blood doping in 2000 on the urging of Ferrari, and this enabled him to

avoid detection during the investigation by French authorities that followed Armstrong's

apparent win in the 2000 Tour de France.  **USSOF 118.**

Armstrong engaged in blood doping from 2000 through 2005.  **USSOF 119.**  During this

period, Armstrong knew perfectly well that blood doping was prohibited by the IOC and UCI.

**USSOF 120.**

Armstrong also used his control over the team to pressure other riders to use PEDs, and

he facilitated his teammates' use of PEDs.  Under Armstrong and Bruyneel's leadership, the use

of banned substances and practices was part of the team's strategy to propel Armstrong to the top

of the Tour de France podium.  **USSOF 121.**  Several other USPS team riders have admitted to

using PEDs during the time that Armstrong was lead rider for the USPS team.  **USSOF 122.**

Many of these riders have testified that Armstrong pressured them to use (or otherwise

encouraged) banned substances and techniques.

Armstrong encouraged other USPS team riders to use PEDs.  **USSOF 123.**  Armstrong

also supplied drugs to other riders.  **USSOF 124.**  Armstrong made it clear to his teammates that

he expected that their physical preparation include the use PEDs.  **USSOF 125.**  Armstrong

monitored his teammates' use of banned substances and, on at least one occasion, threatened to

remove a rider who did not use PEDs.  **USSOF 126, 130.**

Armstrong also pressured his teammates to consult with Dr. Ferrari.  Armstrong

personally introduced several of his teammates to Ferrari.  When teammate Frankie Andreu did

---

[4] "Blood doping" refers to the practice of extracting one's own blood for later re-infusion
immediately before or during competition.  Like EPO, it has the effect of increasing the red
blood cell and hemoglobin concentrations, which enhances the oxygen carrying capacity of an
athlete's blood.

not hire Ferrari, Armstrong pressured him to do so.  **USSOF 129.**  In order to make blood doping

techniques available to additional team members, Armstrong facilitated Ferrari's attendance at a

2001 team training camp in Austin, Texas.  **USSOF 128, 133.**  During this training camp, Ferrari

advised USPS team riders to switch from EPO to blood transfusions, which have a similar effect

on performance but which cannot be detected.  **USSOF 131.**  Armstrong told rider Christian

Vandevelde that if Vandevelde wanted to remain on the USPS team he "would have to use what

Dr. Ferrari had been telling [Vandevelde] to use and would have to follow Dr. Ferrari's program

to the letter."  **USSOF 130.**

Armstrong's doping operation was sophisticated, and it drew upon his considerable

personal resources, the team's resources, and a network of enablers.  As Armstrong put it, the

doping program was "professional" and "smart." **USSOF 134.**  After Armstrong complained in

1998 that the team's doctor Pedro Celaya was too conservative, Celaya was replaced by Dr. Luis

del Moral, whose approach to doping was much more organized and aggressive.  **USSOF 135-

36.**  Del Moral developed a detailed doping plan for each rider.  **USSOF 137.**  Dr. Ferrari also

helped refine the USPS team's doping plans during the off-season.  **USSOF 139.**

Armstrong used the team medical staff to procure PEDs, and he used team staff to

transport and conceal them.  **USSOF 140-41.**  Armstrong also enlisted his wife to dispense illicit

doping products to his teammates.  **USSOF 142.**

Armstrong also used his considerable wealth to obtain further unlawful advantage over

his competitors.  For instance, during the 1999 Tour de France, Armstrong paid his gardener to

follow the USPS team around on a motorcycle carrying EPO.  **USSOF 143-47.**  In this way,

Armstrong was able to ensure that his team had a constant supply of EPO without having to bear

the risk of transporting the EPO personally. Additionally, on at least one occasion, Armstrong

chartered a private jet to transport himself and his principal domestiques to Spain where they had their blood withdrawn for later reinfusion under the supervision of team doctors. **USSOF 148-49**

As a result of the doping conduct described above, the United States Anti-Doping Agency (USADA) banned Armstrong from cycling for life in 2012, and vacated all of his racing results from 1998 forward, including the seven Tour de France titles awarded to Armstrong between 1999 and 2005. **USSOF 152.**

In January 2013, Armstrong publicly admitted, for the first time, to the use of multiple illicit PEDs and/or banned practices in connection with each Tour de France from 1999 to 2005.

## IV.    ARMSTRONG'S FALSE STATEMENTS

Throughout the term of the USPS's sponsorship of the team, Armstrong and other Tailwind employees made numerous false statements denying that Armstrong and other riders had engaged in any prohibited practices. Some of these denials were made directly to USPS employees. On other occasions, Armstrong and Tailwind representatives made false statements by way of press releases and other public statements. These public statements were designed, in part, to assure the team's sponsors, including the USPS, that the team was not involved in the use of banned substances or practices. Armstrong was aware that sponsors would not tolerate his doping, and he made his denials knowing that sponsors would read them and rely upon them. **USSOF 103, 153, 209-10.**

In 1999, the year after the Festina scandal, Armstrong sought to reassure the public and sponsors that cycling was a clean sport. He told reporters at the time, "It's been a long year for cycling … and as far as I'm concerned, it's history. Perhaps there was a problem, but problems

exist in every facet of life:  sport, cycling, politics. … You come to training camps to assume we are all doped.  That's bullshit.  We're not."  **USSOF 154.**

On or about July 19, 1999, Armstrong told reporters, "I can emphatically say I am not on drugs … I thought a rider with my history and my health situation wouldn't be such a surprise." **USSOF 155.**  Indeed, Armstrong frequently cited his history with cancer in order to convince people he could not possibly be doping.  **USSOF 156.**  Postal Service employees responsible for the sponsorship heard Armstrong make such statements on numerous occasions and relied upon those statements in continuing to sponsor the team.  **USSOF 160, 170.**

In November and December 2000, Armstrong denied his doping—and caused others to deny his doping— following the reports that French authorities had begun a preliminary investigation into allegations that the USPS cycling team used PEDs during the 2000 Tour de France.  Armstrong made these statements with the full knowledge that the USPS and Tailwind were negotiating an extension to the sponsorship agreement.  **USSOF 157.**

After learning of the French Investigation in 2000, Armstrong "immediately issued an angry denial through our . . . spokesperson, Dan Osipow.  Our team had 'zero tolerance' for any form of doping, we said.  It sounded like the usual clichéd statement, but we meant it.  We were absolutely innocent."  **USSOF 158.**  Dan Osipow told reporters in November 2000 "We categorically deny any involvement with banned substances," and that the team had a zero-tolerance policy when it can to PED use.  **USSOF 159.**  Armstrong would later testify that the French investigation was "great for us" because it proved that USPS team samples "were clean." **USSOF 242.**

Armstrong also employed a team of handlers to make public false statements on his behalf about his PED use.  Many such statements were made on or about the time the USPS was

deciding whether to renew its sponsorship.  In addition to the statements from Osipow, Tailwind President Mark Gorski issued a press release stating that there had been "no improprieties," that the team had followed all UCI rules, and that the team had a "zero-tolerance policy" when it came to the use of PEDs.  **USSOF 161.**  Osipow and Gorksi also repeated Armstrong's denial, including the reference to the team's supposed zero-tolerance policy, directly to USPS employees involved with the sponsorship.  **USSOF 162.**

On or about November 30, 2000, Armstrong met with USPS Senior Vice President Gail Sonnenberg in Austin, Texas, to discuss Armstrong's response to media inquiries regarding the doping allegations.  During their conversation, they also discussed ways to clean up cycling.  Armstrong misled Sonnenberg by suggesting, through his words and his conduct, that the USPS team was one of the clean teams, and that the team could lead an effort to clean up cycling by serving as an example and applying pressure to other teams to be more open. **USSOF 163-66.**

At about the same time, Postmaster General William Henderson contacted Armstrong to discuss Armstrong's responses to media inquiries about the French investigation.  **USSOF 167.** [WH6x-71].  During Postmaster General Henderson's conversation with Armstrong, Armstrong angrily denied the allegations and expressed to Henderson his belief that they were motivated by anti-American animus.  **USSOF 168.**  On or about December 13, 2000, Armstrong said in a statement on his website, "Here's the bottom line to everyone:  I'll start by saying that we are completely innocent[.]  We run a very clean and professional team that has been singled out due to our success[.]  I can assure everyone we do everything in the highest moral standard." **USSOF 169.**

USPS employees relied upon Armstrong's and team's doping denials in agreeing to enter into the 2000 Sponsorship Agreement.  **USSOF 170.**

Armstrong denied his doping on many other occasions, both before and after the execution of the 2000 Agreement.  Like other sponsors, USPS employees heard Armstrong state on numerous occasions that he had never failed a drug test, and believed that Armstrong had passed every drug test he had taken, and relied upon that belief in concluding that he had not been doping.  **USSOF 176.**  In fact, Armstrong had produced several test results that indicated he had used PEDs.  **USSOF 173.**  Moreover, Armstrong had learned from Ferrari how to continue doping without producing a positive test result, so Armstrong knew that he could pass drug tests even though he was doping.  **USSOF 174.**

Armstrong was unique among his competitors because he repeatedly initiated litigation against those who suggested he had doped.  For example, in 2004, Armstrong sued the Sunday Times of London for libel, claiming that the newspaper had printed false reports of his doping.  By Armstrong's own account, the purpose of this lawsuit was to discredit Sunday Times journalist David Walsh, who was among the first to publically expose Armstrong's PED use.  **USSOF 243.**  That same year, Armstrong also sued Emma O'Reilly, a soigneur (masseuse) for the USPS team, after she alleged that he had used PEDs.  Armstrong admits that he attempted to vilify and discredit O'Reilly, even though her statements about his PED use were true.  **USSOF 245.**

Also in 2004, Armstrong sued SCA Promotions, Inc. ("SCA") over a dispute that involved allegations of Armstrong's doping.  SCA had agreed that, if Armstrong won the Tour de France in 2004, it would pay Tailwind $5 million, which was half of the $10 million bonus Tailwind would owe Armstrong for the victory.  When Armstrong was declared the winner of that year's Tour, SCA refused to pay Tailwind, arguing that it was not liable for Armstrong's bonus because Armstrong had cheated to win the Tour.  Armstrong pursued SCA in a contested

arbitration and, in support of his suit, falsely testified under oath that he had not doped in 2004 or prior years.

Armstrong and his teammates kept their doping hidden from sponsors because they knew that their careers would suffer if sponsors learned of their doping.  **USSOF 179.**  In particular, team riders took steps to keep their doping hidden from the USPS because they knew that the USPS expected them to follow cycling's rules.  **USSOF 180.**  Furthermore, they understood that if the USPS found out about their doping, it would have terminated its sponsorship of the team. **USSOF 181.**  No rider or any other person affiliated with Tailwind ever informed the USPS that the team was doping.  **USSOF 182.**

## SUMMARY OF THE ARGUMENT

In addition to Lance Armstrong's doping—which he now acknowledges—Armstrong cheated, lied, and intimidated others for almost two decades before the truth about his fraud was revealed and he was stripped of all of his Tour de France victories.  The evidence of Armstrong's misconduct is overwhelming and undisputed.   There is also ample evidence that the USPS reasonably relied on Armstrong's intentionally false statements in deciding to renew the sponsorship in 2000– a $31 million deal from which Armstrong profited far more than any of his teammates or anyone else affiliated with Tailwind.

Armstrong was aware the USPS would not sponsor him or the team if it knew about his doping.  But he raises a series of factually and legally incorrect arguments as to why the Court should absolve him of financial responsibility for his wrongdoing.

First, Armstrong is not entitled to summary judgment as to liability under the FCA. Armstrong's motion does not address the government's claim that he made explicit false statements material to the USPS's sponsorship payments.  See ECF 44, ¶¶ 77-79.  For this reason

alone, summary judgment should be denied.  Armstrong may also be held liable under the FCA

for fraudulently inducing the USPS to enter the 2000 Agreement.  And in view of the Supreme

Court's decision in Universal Health Servs., Inc. v. U.S. ex rel. Escobar, 136 S. Ct. 1989, 579

U.S. ___ (2016), Armstrong's challenge to the government's implied certification theory of

liability is similarly without merit.

Second, Armstrong is not entitled to summary judgment as to FCA damages.  The

government's damages in an FCA case are "'the difference between the market value of the

[product] [the government] received and retained and the market value that the [product] would

have had if [it] had been of the specified quality.'"  *United States v. Sci. Applications Int'l Corp.*

("*SAIC*"), 626 F.3d 1257, 1278-79 (D.C. Cir. 2010) (citing *United States v. Bornstein*, 423 U.S.

303, 316, n. 13 (1976)).  Thus, the government's damages in this case are equal to the difference

between the market value of the sponsorship of a "clean" USPS cycling team (*i.e.*, what the

government was promised) and the market value of the sponsorship of a "doping" team (*i.e.*,

what the government actually received).  Here, the actual market value of the sponsorship rights

the USPS received was zero, as the evidence will show – and a reasonable factfinder can

therefore conclude that the government suffered damages up to everything it paid for those

sponsorship rights.

Armstrong attempts to rely on documents that he claims show "new revenue" and

"earned media" resulting from the sponsorship.   Even if these alleged consequential benefits on

which Armstrong attempts to rely were relevant (which they are not), Armstrong dramatically

overstates the extent of the consequential benefits he attributes to the sponsorship.  Further,

Armstrong fails to account for the substantial consequential harms to the USPS due to the

negative media exposure the USPS suffered (and continues to suffer) following the revelation of Armstrong's doping, cheating and lying.

Finally, Armstrong cannot escape liability under the government's common law claims, which furnish an independent basis for liability and an alternative measure of recovery.

## ARGUMENT

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party must first meet its burden of production by showing the absence of a genuine issue of fact.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In evaluating whether a genuine issue of material fact exists, the evidence must be examined in the light most favorable to the non-moving party.  *Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133, 150 (2000).  Armstrong's motion does not meet these standards and, accordingly, should be denied.

## I.     ARMSTRONG'S FCA LIABILITY

### A.     Armstrong Is Liable for Making and Causing Express False Statements Material to Tailwind's Claims for Payment in Violation of Section 3729(a)(1)(B).

Armstrong's repeated lies to the USPS and to the public both before and during the 2000 Sponsorship Agreement render him liable under Section 3729(a)(1)(B) for making and causing express false statements that resulted in the improper payment of federal funds.  Not only did these express false statements fraudulently induce the USPS to enter into the agreement, but they also deceived the USPS into continuing with the agreement and paying the claims submitted by

21

Tailwind under the agreement.  As a result, Armstrong is liable for causing false claims both under a fraudulent inducement as well as a false express certification theory of liability, in violation of Section 3729(a)(1)(B).

    **1.**  **Armstrong Does Not Challenge The Government's Express False Certification Theory of Liability.**

   Although Armstrong's motion for summary judgment challenges the government's "fraud in the inducement" theory of liability predicated on the express false statements he made and caused prior to the execution of the 2000 Sponsorship Agreement, he ignores his separate liability for the express false statements he made and caused during the sponsorship agreement which render him liable under an express false certification theory of liability. [5]   However, liability for making a false statement may attach *either* "because of the fraud surrounding the efforts to obtain the contract or benefit status, or the payments thereunder."  *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir.1999).  Although the latter theory of liability is commonly called "false express certification" liability, as the courts have pointed out, it is somewhat of a misnomer, since liability may exist so long as the defendant uses any false statement to get a claim for payment approved, and no actual certification is required.  *U.S. ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1172 (9th Cir. 2006) ("That the theory of liability is commonly called 'false certification' is no indication that 'certification' is being used with technical precision, or as a term of art; the theory could just as easily be called the 'false statement of compliance with a government regulation that is a precursor to government funding' theory, but that is not as succinct. Furthermore, because the word "certification" does not appear in 31 U.S.C. § 3729(a)(1) or (a)(2) . . . [s]o long as the statement in question is knowingly false

---

[5] Armstrong's motion also does not address the government's conspiracy count, U.S. Compl. ¶¶ 80-82.

when made, it matters not whether it is a certification, assertion, statement, or secret handshake; False Claims liability can attach.").

The undisputed evidence shows not only that the USPS would have refused to enter into the 2000 Agreement if it had known that the doping denials were false, but also that it would have sought to cancel the contract if it had learned about Armstrong's doping at any point after the contract was extended and before it paid Tailwind's claims under the contract. **USSOF 30, 32, 181, 89, 206-07.** For that reason alone, Armstrong's motion for summary judgment as to liability should be denied.

### 2.      Armstrong Fraudulently Induced the USPS to Enter the 2000 Agreement

Armstrong's challenges to the government's "fraud in the inducement" theory of liability – predicated on the false statements that Armstrong made prior to the 2000 sponsorship agreement and which induced the government to enter into that agreement – provide yet another basis for holding Armstrong liable. **A**mple record evidence demonstrates that (1) prior to the execution of the 2000 Agreement, Armstrong made, and caused others to make, numerous false statements that he and the other members of the Cycling Team were not doping, (2) these statements fraudulently induced the USPS to enter the 2000 Agreement because the USPS officials with responsibility for the sponsorship relied on Armstrong and his team's false assurances, and the USPS would not have entered the 2000 Agreement if it had known of their falsity. Armstrong's claim that he is entitled to summary judgment on the government's fraudulent inducement count is thus without merit.

### a.      Legal Framework For Fraudulent Inducement

Liability for fraudulent inducement attaches when the Government "was induced by, or relied on, [a] fraudulent statement or omission when it awarded [a] contract." *U.S. ex rel.*

*Westrick v. Second Chance Body Armor Inc.*, 128 F. Supp. 3d 1, 18 (D.D.C. 2015).   "If the government made payment based on a false statement, then that is enough for liability in an FCA case, regardless of whether that false statement comes at the beginning of a contractual relationship or later." *U.S. ex rel. Feldman v. van Gorp*, 697 F.3d 78, 91 (2d Cir. 2012).

When a contract is procured through fraud, every claim for payment submitted to the government under that contract is a false claim for payment that is actionable under the FCA. *See U.S. ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.,* 393 F.3d 1321, 1326 (D.C. Cir. 2005) ("even in the absence of evidence that the claims were fraudulent in themselves," claims that were submitted under a contract procured by fraud can be actionable); *see also U.S. ex rel. Longhi v. Lithium Power Technologies, Inc.,* 575 F.3d 458, at *19 (5th Cir. 2009); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 787-88 (4th Cir. 1999); *U.S. ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1420-21 (9th Cir. 1991).   This rule applies irrespective of whether the person who fraudulently induced the contract had direct contractual relations with the Government.   *See Second Chance Body Armor*, 128 F. Supp. 3d at 19 (quoting *U.S. ex rel. Marcus v. Hess*, 317 U.S. at 537, 544-45 (1943)).

### b.      Armstrong Made and Caused False Statements

Prior to the 2000 Agreement, Armstrong and other Tailwind employees made numerous and repeated false statements denying the use of prohibited PEDs.  Specifically, team managers Mark Gorski and Dan Ossipow repeatedly (and falsely) assured numerous USPS employees that the team was clean and had "zero tolerance" for doping.  **USSOF 158, 217.**  Armstrong himself had direct conversations with the USPS Postmaster General and Senior Vice President for Sales in which he misled them into believing that he was clean and that rumors to the contrary were false.  **USSOF 163-66.**  Armstrong also made other false statements through press releases and

24

other public statements.  *E.g.* **USSOF 169.**   Typical of such statements, Armstrong told reporters

in 1999, "I can emphatically say I am not on drugs … I thought a rider with my history and my

health situation wouldn't be such a surprise [sic]." **USSOF 155.**

Armstrong's false statement's were designed, in part, to assure the team's sponsors,

including the USPS, that the team was clean.  Armstrong was aware that sponsors would not

tolerate doping, and he made his public denials knowing that sponsors, including the USPS,

would read them and rely upon them.  **USSOF 103, 153, 209-10.**

Armstrong erroneously contends that there is a categorical rule against public statements

forming the basis of a fraudulent inducement claim.  Armstrong's Br., at 40.  There is no such

rule; any false statement that induces the government to enter into a contract is actionable.  *See*

*Second Chance Body Armor*, 128 F. Supp. 3d at 21.  In *Second Chance Body Armor*, this Court

specifically rejected the argument Armstrong is making here.  *Id.*  In that case, the defendant

argued that it could not be liable for fraudulent inducement because it never made any false

statements *directly* to the government.  *Id.*  The Court held: "If Toyobo provided invalid

assurances to the market and put manipulated data into the marketplace, that could allow the

government to demonstrate that it was fraudulently induced to reimburse for vests that agencies

selected in reliance on Toyobo's assertions." *Id.*  This is consistent with the general rule that the

FCA's false record provision does not require "presentment" to the Government.  *See Allison*

*Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 671 (2008) ("What [the Act] demands is not

proof that the defendant caused a false record or statement to be presented or submitted to the

Government but that the defendant made a false record or statement for the purpose of getting a

false or fraudulent claim paid or approved by the Government."); *United States v. Speqtrum,*

*Inc.*, 47 F. Supp. 3d 81, 95 (D.D.C. 2014) ("These false records may be actionable even if they were never actually presented to the Government along with Speqtrum's request for payment.").

Armstrong's repeated and numerous public false denials are actionable because the Government relied on them in entering the 2000 Agreement. Indeed, Armstrong acknowledged he expected that sponsors to read his public doping denials and to rely on them. **USSOF 103, 153, 209-10.** Gorski testified that sponsors were entitled to rely on such statements. **USSOF 237.**

Armstrong's motion also states, without support, that he can be held liable only for his own statements and not for the false statements of others. Armstrong Br. at 37. However, the FCA is not so limited. *See* 31 U.S.C. 3729(a)(2) (2000); 31 U.S.C. § 3729(a)(1)(B) (2009) (establishing liability for *causing* false statements to be made). The record evidence here shows that Armstrong caused others to make false statements denying his and the team's doping shortly before the 2000 Agreement was executed. **USSOF 159, 161-62, 217.**

### c. USPS Officials Relied Upon Armstrong's False Statements

The record shows that USPS officials relied on the false doping denials they received directly from Armstrong and team management **USSOF 170.** USPS employees responsible for the sponsorship also heard or read Armstrong's false or misleading public statements and relied on them in concluding that Armstrong and the team were not doping and in agreeing to enter into the 2000 Agreement. **USSOF 176.** These facts are more than sufficient to defeat Armstrong's Motion because, as Armstrong acknowledges, the government need only show that "had the government known about the fraud in the inducement, it never would have entered the contract, and no payments would have been made." Armstrong's Br., at 36 (quoting *U.S. ex rel. Hovkett v.*

*Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 69 n.3 (D.D.C. 2007).  The record

evidence clearly meets this threshold.

Armstrong contends that USPS employees "were aware *of allegations* that professional

cyclists, including cyclists on the USPS team, were using PEDs."  *See* Armstrong Br. at 45

(emphasis added).  This is a red herring – USPS's knowledge of doping *allegations* is irrelevant,

because USPS credited Armstrong's and Tailwind's many representations that those allegations

were false.  **USSOF 170.**  At a minimum, because USPS's reliance on Armstrong's false denials

is a disputed fact, summary judgment should be denied.  *See Media Gen., Inc. v. Tomlin*, 532

F.3d 854, 859 (D.C. Cir. 2008) (reversing summary judgment on common law fraud claim

because the plaintiff's "actual state of mind is a question for the jury," and "a reasonable jury

could find [defendant] made misleading omissions and misrepresentations upon which [plaintiff]

reasonably relied.").

> **d.    The Government's May Support its Claim with Statements in Addition to those Specifically Quoted in the Complaint**

Armstrong erroneously contends that the United States' fraudulent inducement claim is

limited to the false statements provided as examples in the Complaint.  Armstrong's Br., at 37-

38.  This argument misstates the law.

Where additional facts support the fraud claim that has been pled, they may, of course, be

considered at summary judgment.  *See, e.g.*, *Catrett v. Johns-Manville Sales Corp.*, 826 F.2d 33,

38 (D.C. Cir. 1987) ("In passing on a summary judgment motion, a court may consider materials

specified in Federal Rule of Civil Procedure 56(c) as well as 'any material that would be

admissible or usable at trial.'") (citations and emphasis omitted); *Sundstrand Corp. v. Standard

Kollsman Industries, Inc.*, 488 F.2d 807, 811-12 (7th Cir. 1973) (in securities fraud case,

permitting proof of fraud at trial beyond specific statements in complaint).  Indeed, the whole

point of discovery is to permit the parties to obtain additional evidence relevant to their claims

and defenses.  *See* Fed. R. Civ. P. 26(b)(1).  It is this factual record that the parties then present

to the Court on summary judgment.  *See* Rule 56(c)(1); LCvR 7(h)(1).

It is nonsensical to claim that a plaintiff's evidence for summary judgment or trial is

limited to the factual material pled in the complaint to satisfy Rule 9(b).  The purpose of Rule

9(b) is not to limit the scope of evidence that may be considered on summary judgment or

admitted at trial, but rather to ensure that a defendant has been afforded adequate notice of the

nature of the false claims with which the defendant is charged.  *See, e.g., In re Burlington Coat*

*Factory Securities Litig*., 114 F.3d 1410, 1418 (3d Cir. 1997); *Pirelli Armstrong Tire Corp.*

*Retiree Med. Benefits Trust v. Walgreen Co*., 631 F.3d 436, 441 (7th Cir. 2011).  Further, it is

well settled that the requirement that a complaint give fair notice may be satisfied when a

complaint provides "representative examples" of an alleged fraud.  *See, e.g., Ebeid ex rel. U.S. v.*

*Lungwitz*, 616 F.3d 993, 998-99 (9th Cir. 2010)  ("In our view, use of representative examples is

simply one means of meeting the pleading obligation.").  A comprehensive list is not required at

the pleading stage.

In support of his erroneous argument that the Government's proof at trial should be

limited to the representative examples identified in its Complaint, Armstrong cites a single case,

which actually does not support his proposition.  *See* Armstrong's Br., at 37-38 (citing *Samuels*

*v. Wilder*, 871 F.2d 1346 (7th Cir. 1989)).  In *Samuels*, the court prevented the plaintiffs from

adding facts at summary judgment because they supported "completely new claims for fraud."

871 F.2d at 1349-50 ("These additional facts . . . have little to do with the 'cherry-picking'

complaint at issue.  Instead, plaintiffs attempted to greatly expand the apparently baseless

'cherry-picking' claim by alleging *completely new claims* for fraud.") (emphasis added); *see also id.* at 1351 (noting again that the additional facts at issue "presented a new case of fraud.").

Here, however, the Government is not presenting any new claims for relief, but merely relying on additional facts—including facts obtained through the extensive discovery that has taken place in this case—in support of its existing claims. Indeed, the Complaint makes clear that the doping denials included in that pleading are simply representative examples of false statements that were intended to cause the USPS to enter into the 2000 Agreement. ECF No. 44, at ¶¶ 62-63. Further, the Complaint clearly placed Armstrong on notice that the United States' fraudulent inducement claim encompassed "press releases and other public statements that were designed, in part, to assure the team's sponsors, including the USPS, that the team was not involved in the use of banned substances or practices," *id.* ¶ 62, as well as other "false statements [defendants made] directly to USPS employees" that denied the team's doping. *Id.* Nothing in *Samuels* or any other case precludes the Government's reliance on additional factual support for its fraudulent inducement claim. *Compare Samuels*, 871 F.2d at 1349-50. To hold otherwise would render the civil discovery process entirely pointless.

### B. Armstrong Is Liable Under the "Implied Certification" Theory of Liability in Violation of Section 3729(a)(1)(A)

In addition to his liability under Section 3729(a)(1)(B), Armstrong is also liable under Section 3729(a)(1)(A) under the implied certification theory of liability. Under this theory, a claim for payment may be false when the contractor conceals or otherwise fails to acknowledge its non-compliance with a material statute, regulation, or contractual term. *See SAIC*, 636 F.3d at 1257. This Court has already decided that Armstrong's conduct falls squarely within *SAIC's* articulation of the implied certification theory, ECF No. 174, at *54 (citing *SAIC*, 626 F.3d at 1266), and Armstrong does not argue that summary judgment on implied certification is

inappropriate under *SAIC*.  Rather, Armstrong's motion rests entirely upon a hoped for change in the law, arguing that summary judgment should be granted if the Supreme Court rejected the implied certification theory of liability outright, or strictly limited its application to cases where a defendant has violated an express condition of payment.  *See* Armstrong Br. at 42.

On June 16, 2016, the Supreme Court unanimously rejected both of the scenarios posited by Armstrong.  *See Escobar*, 136 S. Ct. 1989.  Specifically, the Court held both that "the implied false certification theory can be a basis for liability," *id.* at 1995, and that "[d]efendants can be liable for violating requirements even if they were not expressly designated as conditions of payment."  *Id.* at 1996.[6]

The claims in this case are analogous to those in *Escobar*.  In *Escobar*, the defendant submitted claims for payment using payment codes that corresponded to specific healthcare services; the Medicaid regulations promulgated requirements for those services; and the defendant's employees made false representations that they satisfied the applicable regulations. 136 S. Ct. at 2000-01.  Similarly, the claims in this case identify the sponsorship agreements, and these agreements explicitly prohibit doping, including by incorporation of the rules of cycling. Moreover, unlike the defendant in *Escobar*, Armstrong made statements prior to and contemporaneous with the claims to the USPS that were not just half-truths, but were outright lies about his doping activities – and thus the basis for finding that the claims here were deceptive is even stronger than in *Escobar*.

---

[6] Because the Supreme Court held that a defendant may be liable for violating requirements that are not expressly designated as "conditions of payment," Armstrong's argument that "the USPS's *only* remedy for a violation of any provision of the Sponsorship Agreement relating to the use of performance enhancing substances was to terminate the agreement," Armstrong Br. at 43, remains meritless.

Further, although *Escobar* affirmed the implied certification theory in situations where the defendant provides some description of the goods or services that render the claim misleading, the Court explicitly did not decide "whether *all* claims for payment implicitly represent that the billing party is legally entitled to payment."  136 S. Ct. at 2000 (emphasis added).  Thus, *SAIC's* prior endorsement of implied certification liability whenever a claim for payment is submitted while the defendant has failed to comply with a material contract term remains good law.  In its order denying defendants' motion to dismiss, this Court stated that the facts the government alleged—and which Armstrong has conceded—sufficed to establish that Armstrong's cycling team's claims "were false under the theory of implied certification" under *SAIC*.  ECF No. 174, at *54 (citing 626 F.3d at 1266).  And this Court has acknowledged that the anti-doping provisions were critically material terms of the Sponsorship Agreement.[7]  *Id.* at 66; *see also* ECF 474, at 12, n. 7.  Thus, contrary to Armstrong's hope, *Escobar* provides no basis to reconsider this Court's determination that the government has asserted viable claims under the implied certification theory.

---

[7] Armstrong has not sought summary judgment on the issue of the "materiality" of his fraudulent conduct, and with good reason.  "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. s. 3729(b)(4).  As the Supreme Court recently explained, the government's decision to identify a contract provision as a condition of payment is evidence of materiality.  *Escobar*, 136 S. Ct. at 2003.  Here, the sponsorship agreement required that team riders comply with the rules of international cycling, and made failure to enforce the team's supposed "zero tolerance" policy regarding doping an "event of default."  **USSOF 33-35, 43-44**.  Further, the USPS managers responsible for overseeing the sponsorship gave uncontradicted testimony that they would have sought to terminate the sponsorship immediately if they had known that Armstrong or other team members were doping.  **USSOF 32**.  Thus, Armstrong's fraud was clearly material to the USPS's payment of his team's claims.  *See Escobar*, 136 S. Ct. at 2002 ("materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.") (internal marks omitted).

III.    **THE GOVERNMENT'S FCA DAMAGES**

Armstrong's doping undermined what this Court has called "the essential purpose" of the USPS sponsorship of Armstrong's cycling team.  ECF 174, at 66.  As a result, the services that Armstrong and his team provided to the USPS were worth far less than those that were promised under the contract, and were likely worthless.

A.    **The FCA Damages Standard**

Under the FCA, the United States is entitled to recover three times the amount of damages which it sustains because of the acts of a person who caused false claims to be submitted.  31 U.S.C. § 3729(a)(1) (2000).  Congress intended courts to fashion damages measures, "guided only by the principles that the United States' damages should be liberally measured to effectuate the remedial purposes of the Act, and that the United States should be afforded a full and complete recovery of all its damages."  S. Rep. No. 615, 96th Cong., 2d Sess. at 4; *see also United States ex rel. Compton v. Midwest Specialties, Inc., et al.*, 142 F.3d 296, 304 (6th Cir. 1998); *United States v. Killough, et al.*, 848 F.2d 1523, 1532 (11th Cir. 1988); *Morse Diesel Int'l, Inc. v. United States*, 79 Fed. Cl. 116, 124 (Fed. Cl. 2007).  To the extent that Armstrong's fraud on the government caused uncertainty regarding the measurement of those damages, the case law is clear that Armstrong—not the government—bears the risk of that uncertainty when damages are assessed.  *See Story Parchment Co. v. Paterson Parchment Paper Co. et al.*, 282 U.S. 555, 565 (1931) ("whatever ... uncertainty there may be in [a] mode of estimating damages, it is an uncertainty caused by the defendant's own wrong act; and justice and sound public policy alike require that he should bear the risk of the uncertainty thus produced"); *Samaritan Inns v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997); *see also New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1077 (2d Cir.1988) (plaintiff's burden

of proving what would have been paid absent collusion is lightened where "there is a dearth of

market information unaffected by the collusive action of the defendants").

      In *SAIC*, the D.C. Circuit held that "[i]n a case where the defendant agreed to provide

goods or services to the government, the proper measure of damages is the difference between

**the value of the goods or services actually provided** by the contractor and **the value the goods**

**or services would have had to the government had they been delivered as promised**."  626

F.3d at 1278 (emphasis added).  Where ascertainable, the value of the services promised and

delivered must be based on their market value.  *Id*. at 1278-79 (citing *United States v. Bornstein*,

423 U.S. 303, 316, n. 13 (1976)).  Fair market value is the "price that the asset would bring by

bona fide bargaining between well-informed buyers and sellers at the date of acquisition."  *St.*

*Luke's Hospital v. Sebelius*, 611 F.3d 900, 905 (D.C. Cir. 2010);  *see also United States v.*

*Cartwright*, 411 U.S. 546, 551 (1973) ("the price at which the property would change hands

between a willing buyer and a willing seller . . . both having reasonable knowledge of the

relevant facts").

      The government's damages in this case, therefore, are equal to the difference between the

value of the services as promised (*i.e.*, the market value of the sponsorship of a team that

complied with material contractual requirements, including the anti-doping rules of international

cycling) and the value of the services actually delivered (i.e., the market value of the sponsorship

of a doping team).  As explained below, the actual participants in the market for Armstrong's

services (including not only the USPS but other sponsors) have confirmed that if Armstrong had

not fraudulently denied them reasonable knowledge of the relevant facts, then they would not

have paid *anything* to associate themselves with Armstrong.  *See U.S. ex rel. Roby v. Boeing Co.*,

302 F.3d 637 646-649 (6th Cir. 2002) (finding that even though helicopter was used by the Army

before the truth was known of its flight-critical defect, the helicopter had no value); *Midwest Specialties, Inc.*, 142 F.3d at 304-05 (finding that even though brake shoes were used by the Army before the truth was known about defendant's failure to test them, the brake shoes had no value).   Expert testimony further confirms that the market value of the sponsorship that the USPS actually received had little if any value.

### B.        The Government Did Not Receive the Benefit of its Bargain

#### 1.        The Market Value of the Promised Sponsorship

The parties agree that the USPS was promised that Armstrong's team would identify itself as the "U.S. Postal Service Cycling Team," that team riders would wear clothes bearing the USPS insignia, and that riders would make certain promotional appearances on behalf of the USPS.   *See* Def. Mot. at 8.   Crucially, the team also promised to follow the rules of international cycling prohibiting doping, and gave the USPS the right to terminate the sponsorship if the team failed to enforce these rules, or if there were negative publicity following a team member's violation of these rules.

The best evidence of the market value of the rights the USPS negotiated for under the sponsorship is what the USPS actually paid for them.   Armstrong does not dispute this.   Here, the USPS paid approximately $32 million between 2001 and 2004 (approximately $8 million/year). That these payments accurately reflected the market value of the promised services is corroborated by the fact that the first year following the USPS sponsorship, Discovery Channel paid only slightly more to sponsor Armstrong's team ($10 million).[8]

---

[8] If the market value of the services promised is impossible to determine, then the factfinder bases damages on the amount the government actually paid, and the result here is the same. *SAIC*, 626 F.3d at 1279.

### 2.    Market Value of the Sponsorship the USPS Actually Received

As this Court has observed,

> Doping by the cycling team would . . . be a total breach of the contracts,
> not only because they expressly required compliance with anti-
> doping rules, but also because rather than being associated with a team that is
> genuinely fast, the Postal Service's reputation and goodwill are seriously
> damaged by an association with a team that is faster because it cheats.
> Indeed, given the public relations goals of the sponsorship, it is manifest
> that compliance with anti-doping regulations was a[] core term of the
> contracts, because the negative publicity associated with doping defeats
> the essential purpose of the venture (from the sponsor's perspective)."

ECF 174 at 66.[9]

The record in this case confirms that Armstrong's flagrant and repeated breach of his

team's obligation to abide by the rules of international cycling rendered the actual value of the

sponsorship worthless.  First, the actual participants in the market for Armstrong's services have

confirmed that had they known of Armstrong's doping—*i.e.*, had Armstrong not fraudulently

denied them reasonable knowledge of this essential fact—they would not have paid *anything* to

associate themselves with him.  Trek testified that it "relied on [Armstrong's] public

representations that he was not doping," and "would not have entered into an endorsement

agreement with someone who we knew was violating the rules."  **USSOF 188.**  The same is true

for sponsors Discovery Channel and Giro.  **USSOF 216, 219.**  The USPS witnesses also testified

in no uncertain terms that "if we knew then what we know now, we would never have sponsored

him."  **USSOF 189.**

The fact that the actual value of Armstrong's sponsorship services was zero is borne out

by the market participants' actions, as well as their words.  After the USADA Reasoned Decision

---

[9] *See also*, ECF No. 474, at 12 n. 7 ("the Court does not question Judge Wilkins's holding that
the doping alleged by Relator would have constituted a 'total' breach of the Sponsorship
Agreement . . . .").

was published, *all* of Armstrong's then-current sponsors terminated their sponsorships.  One

company explained that it was ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████",[10]  **USSOF 185.**  Not a single new company has endorsed

or otherwise sponsored Armstrong since then.  **USSOF 186.**  In fact, the year after the Reasoned

Decision's release, contributions to Armstrong's foundation, Livestrong, fell by 50 percent.

**USSOF 187.**

    All of the expert testimony in this case further confirms the worthlessness of Armstrong's

sponsorship services.  Larry Gerbrandt has more than 30 years of experience as a media and

entertainment analysis.  He has explained that sponsors would not willingly pay *anything* for the

mixture of positive and negative impressions resulting from the media coverage of Armstrong.

**USSOF 190.**  Economist Dr. Jonathan Walker analyzed the results of the impact of celebrity

scandals on endorsing entities between 1986 and 2011.  He too has estimated that the value of

the sponsorship was zero on a fully-informed basis.  **USSOF 191.**  *Even Armstrong's own*

*proffered experts do not dispute these conclusions.*  Instead, the individuals whom Armstrong

retained to opine on the supposed "benefits" of the USPS sponsorship admit that the alleged

benefits they purport to identify in their reports do not reflect the market value of Armstrong's

services, and they offer no opinion as to the actual fair market value of those services.  **USSOF**

**192.**  Armstrong's "branding" expert has also admitted that the so-called "earned media" reports

---

[10] The government has redacted the text and provisionally filed the document supporting USSOF 185 under seal because Armstrong designated that document confidential pursuant to the Court's protective order.  The document is not subject to protection, however, and the government respectfully requests that the court unseal the document and place the un-redacted version of the government's brief on the public record.

on which he opines—which are discussed further below—do not calculate or otherwise reflect the fair market value of the sponsorship.  *Id.*

The record demonstrates that the sponsorship of a doping team had no more value to USPS than to any commercial sponsor.  Perhaps even more so than a commercial sponsor, the USPS, as a federal government agency, especially sought to avoid any association with illegal drugs and drug trafficking.  The USPS has significant public policy concerns that are not necessarily implicated when a commercial entity contracts for the same services.  Unlike an ordinary commercial entity, the USPS must also consider critical factors such as the integrity of its programs, the United States' public policy interest in deterring drug abuse, and our nation's strategic interest in having its anti-drug abuse and anti-drug trafficking values properly represented internationally.  *See* USPS Employee and Labor Relations Manual (ELM) 16, Code of Ethical Conduct, § 661.3, Standards of Conduct (August 2000, effective through February 2001) (Regulations applicable to the USPS's entry into the sponsorship transaction mandate that the USPS avoid actions that would compromise the integrity of the United States); USPS Purchasing Manual, Chapter 3, Sources, § 3.7.1.e Causes for Debarment (describing "[v]iolation of a contract clause concerning the maintenance of a drug-free workplace" as a violation "so serious as to justify debarment action."); *see also U.S. ex rel. Wall v. Circle C Const., LLC*, 813 F.3d 616, 618 (2016) ("*Circle C*") (an "unalterable moral taint [may render] goods worthless to the government").

### C.     Armstrong Erroneously Relies on the "Consequential Benefits" of the Sponsorship to Contest Damages

Although the record clearly demonstrates that Armstrong's use and encouragement of doping destroyed the market value of the USPS sponsorship, Armstrong nevertheless argues that the USPS suffered no damages because it received certain consequential benefits from that

sponsorship during the period that everyone was duped into believing he was riding clean. However, these consequential benefits do not entitle Armstrong to any credit as a legal matter, and as a factual matter these claimed benefits are both overstated, and swamped by the negative consequential harms that occurred (and continue to occur) following the disclosure of his cheating.

### 1.    Armstrong's Interpretation of *SAIC* is Legally Incorrect

Armstrong's argument that he is entitled to a credit for certain consequential benefits that he claims resulted from the tainted sponsorship is built upon a misstatement of the applicable legal standard.  Armstrong's brief initially quotes the standard for calculating damages set forth in *SAIC*:  "the fact-finder bases damages on the amount the government actually paid minus **the value of the goods or services** the government received or used."  *See* Armstrong Br. at 29 (emphasis added).  Later, however, Armstrong reformulates this test in a way that alters its meaning, stating that "the fact-finder must take into account **the value the government received** from the sponsorship."  *Id.* at 31 (emphasis added).  In other words, Armstrong suggests that the fact-finder must consider the but-for consequences of the sponsorship, rather than the market value of the sponsorship.

Armstrong's misapplication of *SAIC* seeks to divert the focus of the damages inquiry from the market value of the non-conforming services (which the record here demonstrates is zero) to the consequential effects that he alleges the USPS was able to receive through the sponsorship, such as alleged sales revenues and media exposure.  However, just as the government is not entitled to seek a recovery for consequential damages, *see Cook County Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 131 (2003), a defendant is not entitled to seek a credit for

consequential benefits as part of the fair market value computation of the government's damages.[11]

Armstrong's re-formulation of *SAIC* is unambiguously incorrect.  Again, *SAIC* was explicit that "[i]n a case where the defendant agreed to provide goods or services to the government, the proper measure of damages is the difference between *the value of the goods or services actually provided by the contractor* and *the value the goods or services would have had to the government had they been delivered as promised.*"  *SAIC*, 626 F.3d at 1278 (emphasis added); *id*. at 1279 (government must show that "the *performance* the government received was worth less than what it believed it had purchased") (emphasis added).  Indeed, the *SAIC* test itself derives from the Supreme Court's instruction in *Bornstein* that "[t]he Government's actual damages are equal to the difference between the market value of the [product] it received and the market value that the [product] would have had if [it] had been of the specified quality."  *SAIC,* 626 F.3d at 1279 (quoting *Bornstein*, 423 U.S. at 316 n.13).

## 2.    Armstrong's Claimed Consequential Benefits are Inflated and Unreliable

Even if Armstrong were permitted to rely on consequential benefits as a defense to damages, his analysis of these alleged benefits is flawed and unreliable.  Armstrong proclaims that the value of the sponsorship's benefits was "at least" $163.8 million, and potentially as much as $387 million.  Def. Br. at 23.[12]  At best, these estimates rest on disputed facts.

---

[11] Although *Chandler* anticipates that in certain circumstances, the FCA's trebling provision may account for the government's consequential damages among other costs (such as the government's investigative expenses, lost interest and the relator's share) that are not included in the single damages figure,  538 U.S. at 130-131, as set forth below, the government's consequential damages in this case are well in excess of even three times what the USPS paid to Armstrong's team.

### a.      The Sales Figures on which Armstrong Relies are Inflated

Armstrong claims that the USPS received $18.1 million in new revenue "as a result of the

sponsorship."  Def. Br. at 23.  First, this claim is factually unsupported.  There is no record

evidence of a direct causal relationship between the sponsorship and any sale.  At most, the

figures cited by Armstrong were intended to reflect a rough estimate of sales that had a very

loose connection to the sponsorship.  **USSOF 222.**  And even on that basis, the USPS employees

with responsibility for the sponsorship testified that these sales estimates were "highly

exaggerated," and that they "could never find substantiation for the sales that were listed" in the

documents on which Armstrong relies.  **USSOF 221.**    Further, a 2003 audit by the USPS Office

of Inspector General did not find any support for the figures Armstrong cites.  **USSOF 223.**

Indeed, Armstrong's *own* designated expert has cast doubt on the validity of Armstrong's

attempt to link event marketing opportunities to actual sales.  **USSOF 224**.

Armstrong also fails to take account of the many factors other than the sponsorship that

contributed to USPS sales, and the cost of providing the goods and services the USPS sold.

Notably, Armstrong ignores the Postal Service's expenses incurred in connection with the

sponsorship.  USPS employed a vast sales force, which was involved in all of the marketing

efforts resulting in the sales for which Armstrong claims credit.  USPS sales representatives also

performed in-depth customer audits/analyses in order to demonstrate potential cost savings to the

customer.  **USSOF 225.**  The sales figures on which Armstrong seeks to rely do not take account

of the cost of providing the goods and services sold.   To read Armstrong's brief, one would

think that the sponsorship was a money tree that required only a good whack with a stick to rain

money into the Postal Service's coffers.  It was not.

Even if Armstrong could causally attribute specific sales to the sponsorship *and* account for the cost of USPS sales and marketing efforts, he *still* would not be entitled to claim credit for USPS sales.  The sponsorship was a tool the USPS used to market its products and services.  In particular, the USPS used its hospitality space at race venues to entertain certain existing business customers in an effort to expand its existing customer relationships.  In other words, the USPS used the sponsorship in the same way that corporations commonly use stadium sky boxes at sporting events.  In arguing that new revenues represent "the value" of the sponsorship, Armstrong attempts to conflate the value of the marketing opportunity (*e.g.*, the cost of the skybox) with the value of all sales to customers who attend sports marketing events.[13]

### b.      The "Earned Media" Figures on which Armstrong Relies are Inflated

Citing measured media reports prepared by advertising firms Foot Cone & Belding ("FCB") (2001 and 2002) and Campbell Ewald (2003 and 2004), Armstrong urges that the USPS's damages should be offset by $103.6 million due to alleged "earned media" resulting from the sponsorship.  This argument is also baseless.

First, the authors of both the FCB and the Campbell Ewald reports acknowledged that their "earned media" estimates were not intended to measure the market value of the sponsorship.  As FCB's witness explained, although FCB concluded that the value of so-called "earned media" in 2001 was $18.5 million, "at that time no one is going to pay $18 million for a cycling sponsorship[,] even if it was Lance Armstrong."  **USSOF 197.**[14]  Similarly, Campbell

---

[13] Indeed, according to FCB studies on which Armstrong attempts to rely, the actual services provided under the contract (*i.e.*, the hospitality services the USPS used to entertain prospective clients) were valued at just $52,125 per year.  **USSOF 247.**  Armstrong offers no economic justification for valuing these promotional activities, which cost just $52,125 to supply in any given year, at over $18 million.

[14] The USPS employees also were aware that the "earned media" studies were not intended as estimates of the market value of the sponsorship.  **USSOF 248.**

Ewald's witness testified that it did not, as part of its 2003 or 2004 reports, endeavor to determine the value of the sponsorship or the market price for the media exposure the USPS received.  **USSOF 198.**

Second, expert testimony in this case will establish that advertising equivalency valuations inevitably greatly exceed observable sponsorship market values.  **USSOF 201.** Indeed, Armstrong's proffered experts confirmed that advertising equivalency does not reflect sponsorship market value.  *See* **USSOF 192** (the deposition testimony of Armstrong's proffered experts, Dr. Erich Joachimsthaler and Mr. Douglass Kidder).

Finally, the reports also suffer from deficiencies in their respective methodologies that cause them to overestimate the value received by the USPS.  **USSOF 226.**  Most notably, the reports were based on flawed and non-industry standard methods for determining the value of sponsorship impressions.  Further, some of the reports estimated the amount of domestic media coverage of the sponsorship based on nothing more than unsupported guesses, while other reports extrapolated based on flawed samples.[15]

### c.     The "Earned Media" Reports on which Armstrong Relies are Inadmissible Hearsay

The out-of-court third-party statements of FCB and Campbell Ewald, offered by Armstrong to show the supposed value of the media exposure the USPS received, are plainly hearsay.  Fed. R. Evid. 801-807. The reports may not, therefore, be considered on summary judgment.  *Gleklen v. Democratic Congressional Campaign Committee, Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) ("Verdicts cannot rest on inadmissible evidence.  Gleklen's evidence … is sheer hearsay[.]  It therefore counts for nothing.").

---

[15] For the reasons stated in the government's response to Armstrong's Statement of Undisputed Facts, Armstrong's claim that $39.8 million in USPS revenue was attributable to the sponsorship is speculative at best.  *See* **US Resp. 84-85**.

In arguing that USPS employees "trumpeted" the conclusions in the reports, Pl. Br. at 22, Armstrong appears to be laying the groundwork to argue that the reports were adopted by USPS employees.  A statement is not an adoptive admission, however, unless it "is one the party manifested that it adopted or believed to be true[.]" Fed. R. Evid. 801(d)(2)(B); *see also Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1268 (10th Cir. 1998) (party has manifested belief in truth of a document when "the surrounding circumstances tie the possessor and the document together in some meaningful way. . . a document is sufficiently 'tied' to the possessor 'to the extent the adoptive party accepted and acted upon the evidence.'") (citing *Pilgrim v. Trustees of Tufts College*, 118 F.3d 864, 870 (1st Cir. 1997)).

In reality, the USPS employees to whom the FCB and Campbell Ewald reports were directed believed that the reports' conclusions were not meaningful, and they did not rely on them.   Against that backdrop, it is not surprising that none of the statements presented by Armstrong manifests the USPS's adoption of any of the FCB or Campbell Ewald reports.

Armstrong has not cited any documents related to the report prepared by Campbell Ewald in 2004.  He cites only two documents related to the Campbell Ewald report for 2003 and the FCB report for 2002.  *See* Armstrong SOF 100-02.  Neither document is a letter, email, or other type of communication, and neither document expresses on its face the adoption of, or reliance upon, the Campbell Ewald report or the FCB report.  Critically, Armstrong offers no supporting testimony for the exhibits on which he relies, so it is impossible to know who prepared the documents, whether they are in draft or final form, or whether they actually were used for any purpose.  Standing alone, these exhibits provide no basis to conclude that anyone at USPS actually vouched for the trustworthiness of the statements in either the Campbell Ewald report or the FCB report.

With regard to the 2001 FCB report, Armstrong cites an email in which Ms. Johnson passed along a preliminary conclusion of the FCB report before the report had been completed. Given the timing, Ms. Johnson's email could not have been intended to adopt the final FCB report. Moreover, Ms. Johnson was operating purely as a conduit for the information in the email. **USSOF 229.** A statement that "merely repeats hearsay and thus fails to concede its underlying trustworthiness" is not admissible as an adoptive admission. *Schering Corp. v Pfizer Inc.*, 189 F.3d 218, 239 (2d Cir. 1999).[16]

### D.   Armstrong Ignores the Consequential Harms Suffered by the USPS

As explained above, Armstrong's analysis of the consequential benefits earned during the sponsorship is legally irrelevant and factually flawed. However, if evidence of consequential benefits during the sponsorship is deemed relevant, then the extensive consequential harms that undisputedly occurred after Armstrong's doping was proven, particularly in the form of negative media exposure, must also be considered.

There is no question that there was substantial negative media in this case following the disclosure of Armstrong's misconduct. The media studies on which Armstrong relies do not take into account the fact of Armstrong's doping or any of the negative media coverage of his doping scandal. For instance, Brian Mieth, the author of the FCB report, testified that FCB did not know at the time it prepared its reports that Armstrong was doping, and the fact of Armstrong's doping is not in any way reflected in the report. Moreover, Mr. Mieth testified that knowledge of Armstrong's doping would have had a negative impact on FCB's valuation of the sponsorship.

---

[16] Armstrong also seeks to do an end run around the expert designation and evidence rules by presenting the Campbell Ewald and FCB reports as expert analysis based on a supposed "industry-used formula." Armstrong Br. at 21. However, Armstrong has not designated Campbell Ewald, FCB, or their spokesmen as experts, nor has he provided any evidentiary basis for the allegedly expert analysis contained within the reports. Consequently, neither report should be treated as expert opinion. *See* Fed. R. Civ. P. 26(a)(2)(A); Fed. R. Evid. 702.

As Mr. Mieth explained: "[Y]ou're trying to build a case for his brand attributes and borrowing that imagery and attributes to strengthen your brand.  And if somebody is doping, it's doing just the other.  It's devaluing it and being destructive.  So that would negatively impact the value that you're getting from it."  **USSOF 232-34.**

Further, the record shows that the intensity and scope of the negative media exceeds any purported consequential benefits that accrued while the truth was hidden.  Media expert Larry Gerbrandt has identified *1.5 billion* "traditional media" impressions that negatively associated Armstrong with the USPS since 2010. The bulk of these negative impressions were national broadcast television segments that covered Armstrong's doping scandal and portrayed him wearing clothing bearing the USPS insignia.  Gerbrandt also identified an *additional 154 billion negative internet impressions*, consisting primarily of online news coverage of Armstrong's doping scandal. **USSOF 230-31.**

The harm from the USPS's continuing association with Armstrong will continue into the foreseeable future because Armstrong—who is regularly depicted wearing a USPS jersey—is now widely considered a poster child for lying and cheating.  In just three years since Armstrong "confessed," the story of his fraud has been the subject of at least three books and three full-length feature films, as well as countless television, internet, and print media reports.  It is, and will be, virtually impossible to tell that story without observing that, at the time he perpetrated this fraud, Armstrong was a rider for the "U.S. Postal Service Professional Cycling Team."  And many of these accounts show images of Armstrong in his racing jersey, with the USPS logo prominently displayed, as a narrator or witness recounts the sordid details of Armstrong's pilfering of cycling's greatest honor.  It is precisely this sort of negative media that the USPS sought to avoid by explicitly requiring compliance with the rules prohibiting doping.

A reasonable fact-finder could thus plausibly find that the USPS has suffered negative consequences that exceed and erase *all* of the purported public relations benefits that Armstrong claims the USPS obtained from the sponsorship while Armstrong's doping was concealed.  But a factfinder is entitled to find that the government suffered damages so long as the factfinder concludes that the government suffered *any* amount of negative media exposure as a result of Armstrong's actions.  By entering into the sponsorship, the USPS was entitled to whatever amount of media exposure it ultimately was able to receive.  Although the USPS could not have predicted the specific amount of exposure that would result, the USPS quite clearly and reasonably expected no negative media exposure attributable to Armstrong's use of prohibited substances and methods.  To the extent, therefore, that the USPS lost *any* part of the positive exposure it explicitly bargained for as a result of such misconduct, it lost some of what it bargained for and thereby suffered some quantum of damages.  And because it is irrefutable that the USPS has in fact suffered substantial consequential harms from Armstrong's violation of the sponsorship agreement, it follows that Armstrong's argument that he is entitled to summary judgment on damages must be denied.

## III.    THE GOVERNMENT'S COMMON LAW CLAIMS

Armstrong's demand for summary judgment on the government's common law theories also is without merit, and should be denied.

### A.    Armstrong was Unjustly Enriched

The undisputed evidence shows that the USPS would not have sponsored Armstrong's team if it knew about Armstrong's doping.  Armstrong's fraud caused the USPS to pay his cycling team tens of millions of dollars, a significant portion of which was used to pay

Armstrong's own salary.  It would be unjust to allow Armstrong to retain the portion of his

salary that was paid by the USPS.

"Recovery on an unjust enrichment theory requires a showing that a person retains a

benefit . . . which in justice and equity belongs to another."  *United States ex rel. Modern*

*Electric, Inc. v. Ideal Electronic Security Co*., 81 F.3d 240, 247 (D.C. Cir. 1996).  "The elements

of a cause of action based upon unjust enrichment are that:  (1) the plaintiff conferred a benefit

upon the defendant; (2) the defendant accepted and retained the benefit; and (3) it would be

unjust for the defendant not to pay the plaintiff the value of the benefit."  *Rapaport v. U.S. Dep't*

*of Treasury, Office of Thrift Supervision*, 59 F.3d 212, 217 (D.C. Cir. 1995).[17]

As set forth above, the USPS paid Armstrong's cycling team – a team of which he was a

part owner – more than $40 million.  Armstrong's cycling team in turn paid him $22.3 million,

and approximately 60% of these payments ($13.4 million) was derived from the USPS's

sponsorship fee payments.  **USSOF 208.**  Thus, there is no dispute that Armstrong was enriched

by the USPS's payments to Armstrong's cycling team.[18]

It would be unjust to allow Armstrong to keep the portion of his salary that was paid by

the USPS.  Armstrong was fully aware that all his sponsorships would "go away" if the sponsors

---

[17] The *Rapaport* case applied the Florida state law test for unjust enrichment, which the Court noted was a "typical" formulation.  59 F.3d at 217.  Other cases in this Circuit have applied slightly different versions of the test for unjust enrichment.  *See, e.g., United States v. Honeywell Int'l Inc.*, 798 F. Supp. 2d 12, 25 (D.D.C. 2011).

[18] It is well-established that the law of unjust enrichment applies to benefits that are transmitted from a plaintiff to a defendant through third-parties, *see, e.g., Honeywell*, 798 F. Supp. 2d at 25; *United States ex rel. Westrick v. Second Chance Body Armor, Inc*., 685 F. Supp. 2d 129, 142 (D.D.C. 2010); *In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 51 (D.D.C. 2003), and Armstrong does not contend otherwise.

learned about his doping.  **USSOF 209.**[19]  By his own account, Armstrong sought to reassure his sponsors by agreeing to "antidrug clauses" that required him to give back any sponsorship fee payments if he was proven to have doped.  **USSOF 210.**  The undisputed evidence also shows that the USPS employees with responsibility for the sponsorship believed Armstrong's doping denials, and would have immediately sought to terminate the sponsorship if they had known the truth about his use of PEDs and blood doping techniques.  **USSOF 31.**  "Fraud is one of the principal grounds for restitution and one of the principal sources of unjust enrichment." Restatement (Third) of Restitution and Unjust Enrichment § 13(a) (2011).  Armstrong's fraud during the sponsorship period fits what the D.C. Circuit has described as a "standard pattern of unjust enrichment recovery," because the government seeks to recover payments that were caused by Armstrong's deception.  *In re APA Assessment Fee Litig.*, 766 F.3d 39, 46-47 (D.C. Cir. 2014).[20]

     Armstrong's discussion of the government's unjust enrichment claim rests on two arguments.  As a factual matter, Armstrong argues that his retention of USPS money is not unjust

---

[19] The undisputed evidence shows that Armstrong's prediction was correct, and that all of his sponsors severed their relationship with him after USADA published its Reasoned Decision. **USSOF 186.**

[20] Partial summary judgment on the government's unjust enrichment claim would also be inappropriate under the Seventh Amendment.  Payments pursuant to false claims are unjust as a matter of law.  *See Sununu v Philippine Airlines, Inc.*, 638 F. Supp. 2d 35, 40 (D.D.C. 2009); *United States ex rel. Purcell v. MWI Corp.*, 520 F. Supp. 2d 158, 180 (D.D.C. 2007).  Because – as set forth above – there are triable issues of fact based on the government's FCA claims, summary judgment on the government's unjust enrichment claims would violate the Seventh Amendment.  "When equitable claims rest on facts necessary to [the] determination of legal claims, the legal claims involved in the action must be determined prior to any final court determination of the equitable claims."  *United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 404 (4th Cir. 2012) (internal quotation marks omitted); *see also Dawson v. Contractors Transport Corp.*, 467 F.2d 727, 733 (D.C. Cir. 1972).  Because the jury's resolution of the disputed factual issues underlying the government's FCA claims against Armstrong would also implicate the government's unjust enrichment claim, summary judgment on the unjust enrichment claim would be improper at this stage.

because he "gave fair consideration or value for the benefits he obtained."  Armstrong Br. at 48.

Armstrong also argues that the government's unjust enrichment fails as a matter of law

"[b]ecause the government cannot restore to Armstrong the services which he has rendered."  *Id.*

at 50.  Both of these arguments are without merit.

### 1.      Armstrong's Retention of USPS Money was Unjust

Armstrong demonstrably did *not* give "fair consideration" in exchange for the USPS

sponsorship fee payments.  Armstrong did not satisfy his obligations under the sponsorship

agreements.  Each of the sponsorship agreements included anti-doping provisions requiring

Armstrong's team to follow the rules of cycling, *e.g.* **USSOF 210**, and Armstrong himself

acknowledges this.  *See* Armstrong Br. at 48, n.21.  Thus, Armstrong's observation that he

competed, won Tours de France (of which victories he was subsequently stripped), and made

appearances on behalf of the USPS, Armstrong Br. at 48, is irrelevant.  Again, "[a] transfer

induced by fraud will usually be a source of unjust enrichment to the transferee."  Restatement

(Third) of Restitution § 13(a).  Here, Armstrong's conduct "defeat[ed] the essential purpose of

the [USPS's] venture."  ECF 174 (Order Denying Motion to Dismiss), at 66.  This renders his

retention of USPS payments unjust.

In a footnote, Armstrong suggests that his doping was immaterial because his rider

agreement called for him to be suspended with pay if he failed a drug test.  Armstrong Br. at 48,

n.21.  This argument ignores the terms of the Sponsorship Agreements, which allowed the USPS

to terminate the contract if he failed to follow the rules of cycling.  Order Denying Motion to

Dismiss, at 66.  Thus, there is no basis for Armstrong's suggestion that the USPS would have

been required to continue to pay his salary if it had learned that he was cheating.

### 2.      The USPS is not required to "Return Armstrong's Services"

Unjust enrichment is measured by the defendant's gain rather than the plaintiff's loss.

*See, e.g.*, *Blythe Holdings, Inc. v. DeAngelis.*, 750 F.3d 653, 658 (7th Cir. 2015); *DiCarlo v. St.*

*Mary Hosp.*, 530 F.3d 255, 268 (3rd Cir. 2008); *Guyana Telephone & Telegraph Co. v.*

*Melbourne Int'l Comms.*, 329 F.3d 1241, 1249 (11th Cir. 2003); *Manhattan Industries, Inc. v.*

*Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 6 (2d Cir. 1989).   Accordingly, the government's unjust

enrichment claim—unlike its FCA claims—does not require proof that the USPS suffered a loss

as a result of Armstrong's fraud.   Moreover, the government's right to seek complete

disgorgement of Armstrong's illicit gains is not limited by the alleged value of his tainted

services.   As one Court has recently explained, where the remedy the plaintiff seeks is

disgorgement based on unjust enrichment, "[m]arket value does not act as a limitation on

damages because the focus in disgorgement is on the amount wrongfully obtained."   *United*

*States v. United Technologies Corp.*, No 3:99-cv-093, 2016 WL 3141569, at *7 (S.D. Oh. June 3,

2016); *see also* Restatement (Third) of Restitution § 1(a) ("the consecrated formula '[unjustly

enriched] at the expense of another' can also mean 'in violation of the other's legally protected

rights,' without the need to show that the claimant has suffered a loss."); *id.* at § 13(h) ("When a

fraudulent transaction has been profitable to the defendant, restitution allows the claimant to

obtain disgorgement of the defendant's consequential gains—and thereby to recover more than

the claimant's loss.").

Armstrong's argument that unjust enrichment requires the USPS to "restore to Armstrong

the services which he has rendered," Armstrong Br. at 50, is incorrect for two reasons.   First, as

set forth above, Armstrong's services had no market value because they were tainted by his

fraud.   Second, even if Armstrong could show that his services had some positive value, however

50

diminished, his argument that the USPS must "restore" this value to him confuses contractual rescission with equitable restitution.[21]   Although restitution and rescission are "often related, [the two terms] are not interchangeable.  An action for rescission seeks to undo a contract or agreement, typically for fraud or mistake.  An action for restitution seeks the return of funds." *Pan American Life Ins. Co. v. Macinnis*, No 99-2491, 1999 WL 1220763, at *1 (E.D. La. Dec. 17, 1999); *see also In re APA Assessment Fee Litig.*, 766 F.3d 39, 46-47, 56 (D.C. Cir. 2014) (noting that unjust enrichment is an equitable claim that seeks the recovery of payments resulting from fraud, whereas rescission is a contractual remedy that requires the plaintiff to restore the other party to that party's position at the time the contract was made).[22]

In evaluating claims for unjust enrichment, courts have routinely refused to credit defendants for the alleged value of the services they provide to the government when those services are tainted by fraud.  *See, e.g.*, *United States ex rel. Roberts v. Aging Care Home Health, Inc.*, 474 F. Supp. 2d 810, 818-19 (W.D. La. 2007); *United States v. Khan*, No. 03-CV-74300, 2009 WL 2461031, at *5 n.4 (E.D. Mich. Aug. 5 2009); *United States v. Rogan*, 459 F. Supp. 2d 692, 728 (N.D. Ill. 2006); *United States ex rel. Zissler v. Regents of U. of Minn.*, No. 95-CV-168, 1998 WL 2026226, at *1, 3 (D. Minn. June 1, 1998); *United States v. Nazon*, No. 93 C 5456, 1993 WL 410150, at *3 (N.D. Ill. Oct. 14, 1993).

---

[21] The term "restitution" can be a source of confusion because it can be used to refer to different legal theories.  *See Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 212 (2002) ("restitution is a legal remedy when ordered in a case at law and an equitable remedy ordered in an equity case, and whether it is legal or equitable depends on the basis for the plaintiff's claim and the nature of the underlying remedies sought.") (internal marks omitted).

[22] Armstrong's reliance on *Landmark Land Co. v. FDIC*, 256 F.3d 1365 (Fed. Cir. 2001), is misplaced.  *Landmark* was an appeal of a judgment for breach of contract in the Court of Federal Claims.  *Id.* at 1369.  Accordingly, the Court of Appeals' discussion applied *contract* law, a fact about which the Court was explicit.  *Id.* at 1373 (discussing and applying Restatement (Second) of Contracts § 384(a)).

The outcome in the *APA Assessment Fee* case demonstrates that Armstrong's characterization of the law of unjust enrichment is incorrect.  In the *APA Assessment Fee* case, the D.C. Circuit observed, "the parties cannot be returned to the pre-contractual status quo."  766 F.3d at 56.  As a result, the Court affirmed the District Court's denial of the plaintiffs' request for leave to amend their complaint to add a claim for rescission.  However, notwithstanding the Court's observation that the parties could *not* be returned to their pre-contractual positions, the D.C. Circuit reversed the dismissal of the plaintiffs' unjust enrichment claim.  *Id.* at 56-57.  The implication of this decision is clear:  even where the parties cannot be restored to the "pre-contractual status quo," a plaintiff can still prevail on a claim for unjust enrichment.

Armstrong's request for summary judgment on account of the "benefits" he alleges the USPS received also incorporates a number of misleading characterizations of the factual record.  First, as explained above, Armstrong's statement that "the value of the benefit [he] . . . conferred on the USPS is . . . at least $163.7 million," Armstrong Br. at 23, is disputed at best.  Second, even if Armstrong's characterization of the disputed factual record were credited, Armstrong's *own* experts have acknowledged that the figures on which Armstrong attempts to rely do not measure the actual value of Armstrong's sponsorship services.  **USSOF 192.**  Third, Armstrong ignores the significant (and ongoing) negative media that associated the USPS with Armstrong after his fraud was exposed.  **USSOF 230-31.**  Armstrong also ignores the harm to the USPS by being associated with a team that was inferior to the team it was expressly promised.

In short, the facts in this case exhibit a "standard pattern of unjust enrichment recovery."  *APA Assessment Fee*, 766 at 46-47.  Armstrong's motion, therefore, should be denied.

### B.        Armstrong May be Found Liable for Common Law Fraud

Under the federal common law, the elements of fraud are: (1) a false representation, (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) with action taken in reliance upon the representation.  *See Pence v. United States*, 316 U.S. 332, 337 (1942); *Toyobo*, 811 F. Supp. 2d at 52 (D.D.C. 2011).

Armstrong's principal argument in connection with the government's common law fraud claim is that the USPS did not rely on false representations that Armstrong made or caused to be made.  As set forth more fully above, the USPS's reliance on Armstrong's false denials of doping is supported by abundant record evidence that USPS employees would not have agreed to enter into the 2000 Agreement if they had known that Armstrong was doping, and would have stopped paying Tailwind if they had learned that Armstrong was doping.   **USSOF 32**.

Armstrong also contends that USPS employees "were aware of allegations that professional cyclists, including cyclists on the USPS team, were using PEDs."  Armstrong Br. at 45.  Again, this is a red herring – USPS's knowledge of doping *allegations* is irrelevant, because, as set forth above, USPS credited Armstrong's and Tailwind's many representations that those very same allegations were false.  Because, at a minimum, USPS's reliance on Armstrong's false denials is a disputed fact, summary judgment should be denied.  *See Media Gen., Inc. v. Tomlin*, 532 F.3d 854, 859 (D.C. Cir. 2008) (reversing summary judgment on common law fraud claim because the plaintiff's "actual state of mind is a question for the jury," and "a reasonable jury could find [defendant] made misleading omissions and misrepresentations upon which [plaintiff] reasonably relied.").

V.    **CONCLUSION**

For all the foregoing reasons, Armstrong's motion for summary judgment should be

denied in its entirety, and this Court should set a date for trial.


Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

CHANNING D. PHILLIPS, D.C. Bar # 415793
United States Attorney

DANIEL F. VAN HORN, D.C. Bar # 924092
Assistant United States Attorney

/s/ Darrell C. Valdez
Darrell C. Valdez (D.C. Bar No. 420232)
U.S. ATTORNEY'S OFFICE
Judiciary Center Building
555 Fourth Street, NW
Washington, DC 20530
(202) 252-2507
darrell.valdez@usdoj.gov

/s/ Robert E. Chandler
Michael D. Granston
Tracy L. Hilmer
Robert E. Chandler
David M. Finkelstein
Robert J. McAuliffe
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
P.O. Box 261
Ben Franklin Station
Washington, DC 20004
(202) 514-4678 – Telephone
(202) 514-0280 – Facsimile
Robert.chandler@usdoj.gov

Attorneys for the United States of America