**United States ex rel. Landis v. Tailwind Sports**
**United States' Statement of Facts**

| No. | Statement of Fact | Citation |
|---|---|---|
| 1 | In 1995, the USPS entered an agreement with Montgomery Sports LLC to sponsor a professional cycling team (the "1995 Agreement"). | Def. Ex. 21 at US00601194, US00601199 |
| 2 | Pursuant to the sponsorship agreement, the USPS agreed to pay Tailwind a sponsorship fee in exchange for certain promotional rights. | Def. Ex. 21 at US00601194, US00601201 |
| 3 | Among these promotional rights were the prominent placement of the USPS logo on the cycling team's uniform and the provision of hospitality services in connection with team events. | Def. Ex. 21 at US00601199-200 |
| 4 | The team was to be named the "U.S. Postal Service Professional Cycling Team." | Def. Ex. 21 at US00601199 |
| 5 | The initial agreement expired on December 31, 1996, but was subject to automatic renewal on a year-to-year basis unless the Postal Service elected not to renew. | Def. Ex. 21 at US00601194-95 |
| 6 | The Postal Service continued the sponsorship each year through 2000. | Def. SUF; Def. Ex. 21 at US00601252 |
| 7 | On December 26, 2000, the Postal Service and DFP Cycling (collectively referred to with Tailwind and Montgomery Sports as Tailwind) entered a four-year agreement for the USPS to sponsor the team for the 2001 through 2004 cycling seasons (the "2000 Agreement"). | Def. Ex. 22 at US00167832, US00167834, US00167838 |
| 8 | The 2000 Agreement called for the Postal Service to pay Tailwind $31,593,000 over its four-year term. | Def. Ex. 22 at US00167832, US00167839 |
| 9 | The sponsorship fee paid by the USPS to Tailwind in 1998 was $2,000,000. | Def. Ex. 21 at US00601201; US Mot. Sum. J., Findley Decl. at ¶ 13, 14 |
| 10 | The sponsorship fee paid by the USPS to Tailwind in 1999 was $2,500,000. | Def. Ex. 21 at US00601252; US Mot. Sum. J., Findley Decl. at ¶ 13, 14 |
| 11 | The sponsorship fee paid by the USPS to Tailwind in 2000 was $3,300,000. | Def. Ex. 21 at US00601246; US Mot. Sum. J., Findley Decl. at ¶ 13, 14 |
| 12 | The sponsorship fee paid by the USPS to Tailwind in 2001 was $6,138,000. | Def. Ex. 22 at US00167839; US Mot. Sum. J., Findley Decl. at ¶ 15 |
| 13 | The sponsorship fee paid by the USPS to Tailwind in 2002 was $7,610,000. | Def. Ex. 22 at US00167839; US Mot. Sum. J., Findley Decl. at ¶ 15 |
| 14 | The sponsorship fee paid by the USPS to Tailwind in 2003 was $8,235,000. | Def. Ex. 22 at US00167839; US Mot. Sum. J., Findley Decl. at ¶ 15 |
| 15 | The sponsorship fee paid by the USPS to Tailwind in 2004 was $8,660,000. | Def. Ex. 22 at US00167839; US Mot. Sum. J., Findley Decl. at ¶ 15 |
| 16 | In all, the USPS paid Tailwind and its predecessors $40,000,000 million from 1998 through 2004. | Def. Ex. 22 at US00167839; US Mot. Sum. J., Findley Decl. at ¶ 13, 14 |
| 17 | From the USPS's perspective, the sponsorship had two main purposes. | US Ex. 32 at ¶ 3, 7 |
| 18 | Prior to 2000, the USPS's principal use of the sponsorship was as a business-to-business sales tool. | US Ex. 32 at ¶ 3 |

| | | |
|---|---|---|
| 19 | The USPS would entertain current or potential clients at cycling events in the same way many U.S. companies entertain clients at sporting events. | US Ex. 32 at ¶ 3 |
| 20 | USPS executives and sales staff would use these events as opportunities to build relationships with potential clients, and also to network with other attendees at the cycling events. | US Ex. 32 at ¶ 3 |
| 21 | Customers invited by USPS often were companies or individuals with whom the USPS already had a pre-existing relationship and to whom the USPS already had directed some sales effort. | US Ex. 32 at ¶ 4; US Ex. 3 at 65:9-13 |
| 22 | In some cases the USPS sales staff had met with the customer prior to inviting them to the cycling event and performed an on-site review of that customer's shipping practices in order to recommend ways that the USPS might be able to reduce the customer's shipping costs.  Site visits like these typically included a sales manager and 3-4 other USPS employees, and often would be followed by a written report or proposal.  Postal Service operations personnel would review these proposals for feasibility and pricing.  The proposal would be presented to the customer, sometimes in an in-person presentation.  The USPS often had expended significant effort laying the groundwork for a sale before a customer attended the cycling event. | US Ex. 32 at ¶ 4 |
| 23 | The cycling team sponsorship was a helpful tool in marketing USPS products and services, but to the extent that it contributed to sales, it was only one of many factors that contributed to the USPS concluding any sale.  USPS employed a vast sales force, which was involved in all of the marketing efforts resulting in all sales that might have been associated with the sponsorship.  USPS sales representatives also performed in-depth customer audits/analyses in order to demonstrate potential cost savings to the customer.  After any sale was concluded, the USPS incurred certain costs to provide the good or service. | US Ex. 32 at ¶ 5 |
| 24 | Although the USPS Sales group made some attempt to track sales related to the cycling sponsorship, the USPS lacked the ability to track such figures accurately.  Any representations we made at the time about new revenue associated with the sponsorship were only very rough estimates and were understood as such by others within the USPS to whom they were made.  These representations were intended to reflect only that the sponsorship was in some way associated with a  sale, meaning that the sponsorship had been used to market USPS products and services to the customer.  These representations were not meant to suggest that any sale had been solely the result of the sponsorship, and no one within the USPS understood them as such. | US Ex. 32 at ¶ 7; US Ex. 1 at 120:13-122:4, 179:25-181:6; US Ex. 4 at 151:2-25, 229:8-231:10 |

| | | |
|---|---|---|
| 25 | Although the USPS Sales group made some attempt to track sales related to the cycling sponsorship, the USPS lacked the ability to track such figures accurately. Any representations made at the time about new revenue associated with the sponsorship were only very rough estimates, and they were understood as such by others within the USPS to whom they were made. Moreover, these representations were intended to reflect only that the sponsorship was in some way associated with a given sale, meaning that the sponsorship had been used to market USPS products and services to the customer. These representations were not meant to suggest that any sale had been solely the result of the sponsorship and, to my knowledge and belief, no one within the USPS understood them as such. | US Ex. 32 at ¶ 6 |
| 26 | A second purpose of the sponsorship was to garner favorable exposure for the USPS. | US Ex. 32 at ¶ 7 |
| 27 | The USPS hoped that the public would associate the USPS with the attributes that it believed the cycling team represented – commitment, teamwork, and excellence – and that the public's affinity and respect for the USPS would grow as a result. | US Ex. 32 at ¶ 7 |
| 28 | The sponsorship fee continued to climb steeply until it reached $8.7 million in 2004. | Def. Ex. 22 at US00167839 |
| 29 | The USPS believed that the purposes of the sponsorship would have been defeated if the team were using banned performance enhancing substances or practices, i.e., "doping." | US Ex. 32 at ¶ 8 |
| 30 | The USPS viewed doping to be morally repugnant and in direct opposition to the favorable qualities with which they sought to associate the USPS brand. | US Ex. 32 at ¶ 8 |
| 31 | At all times throughout the sponsorship, the USPS believed that team riders were not doping. | US Ex. 32 at ¶ 15, 17; US Ex. 7 at 193:13-17 |
| 32 | If any USPS employees responsible for the sponsorship had known that Armstrong or other team members were doping, they would not have entered into the sponsorship agreement, or they would have terminated the sponsorship and all payments immediately. | US Ex. 32 at ¶ 16, 18; US Ex. 7 at 193:13-17; US Ex. 4 at 226:11-17; US Ex. 1 at 296:1-15 |
| 33 | The 1995 Agreement required that:<br><br>The performance of the obligations of the parties under this Agreement shall at all times and in all events be subject to compliance with all applicable rules of the Union Cycliste Internationale, the Federation Internationale du Cyclisme Professionel; the United States Professional Cycling Federation, Inc., the International Olympic Committee, the United States Olympic Committee, the International Amateur Cycling Federation, the United States Cycling Federation and all other governing organizations. | Def. Ex. 21 at ¶ 13 (US00601197) |

| | | |
|---|---|---|
| 34 | At all times relevant to the United States' claims, the rules applicable to the Union Cycliste Internationale (UCI) and International Olympic Committee (IOC) forbade the use of certain performance enhancing drugs, including EPO, corticosteroids, testosterone, and certain practices known to enhance rider performance, including blood transfusions. | US Ex. 35 at ¶ 8, 9 |
| 35 | The 1995 Agreement made it an event of default if "Either party shall make any material misrepresentation or shall materially breach any warranty made herein[.]" | Def. Ex 21. at ¶9(a)(i) (US00601196) |
| 36 | Postal Service employees responsible for the sponsorship understood the agreement and the rules applicable to professional cycling to prohibit doping. | US Ex. 32 at ¶ 8; US Ex. 1 at 78:13-24 |
| 37 | The contracting officer's technical representative, Robert McKenna, reviewed the rules of cycling to confirm they prohibited doping. | US Ex. 5 at 55:7-56:9 |
| 38 | In October 2000, French authorities began an investigation into whether members of the USPS team had used banned substances during the 2000 Tour de France. | US Ex. 46 at US00160783 |
| 39 | The French investigation arose during the time that the USPS and DFP Cycling were negotiating the extension of the 2000 Agreement. | Def. Ex. 22; Def. Ex. 42; Def. Ex. 43; Def. Ex. 47 |
| 40 | Armstrong, Bruyneel, Gorski, and Tailwind's operations director each made statements to the news media denying allegations that Armstrong used PEDs during the 2000 Tour de France, which were the subject of an investigation by French authorities beginning in October 2000. | US Compl. at ¶ 63A-C, F; Armstrong's Answer to US Compl. at ¶ 63A-C, F |
| 41 | The French investigation later concluded without a finding of wrongdoing. | US Ex. 68 at 219-220 |
| 42 | Specifically, the following provisions were added to the 2000 Agreement's events of default:<br><br>(iv)  The Company fails to take immediate action without notification by the Sponsor in a case of a rider or Team offense related to a morals or drug clause violation.<br><br>(v) There is negative publicity associated with an individual rider or team support personnel, either permanent or temporary, due to misconduct such as, but not limited to, failed drug or medical tests, alleged possession, use or sale of banned substances, or conviction of a crime. | Def. Ex. 22 at ¶ 8 (a) (US00167833-34) |

| | | |
|---|---|---|
| 43 | In addition, the 2000 Agreement included the following paragraphs:<br><br>The Company represents that each rider on the Team has a morals and drug clause that allows the Company to suspend or terminate the rider for cause which shall include items such as (1) conviction of a felony; (2) acts that require the Team to suspend or terminate a rider under the applicable rules of the Union Cycliste Internationale; the Federation Internationale du Cyclisme Professionel; the United States Professional Cycling Federation, Inc.; the International Olympic Committee; the International Amateur Cycling Federation; the United States Cycling Federation and all other applicable governing organizations; (3) failure to pass drug or medical tests; (4) inappropriate drug conduct prejudicial to the Team, or the Postal Service, which is in violation of Team rules or commonly accepted standards of morality; and (5) gross neglect of the rider's duty.<br><br>If any rider on the Team is found guilty of such offense, the Company agrees to take appropriate action within thirty (30) days. | Def. Ex. 22 at US00167835 |
| 44 | The provisions described in USSOF 42 and 43 were added to the 2000 agreement to reinforce the sponsorship agreement's doping prohibition and to ensure that USPS could terminate the sponsorship if any doping offense occurred. | US Ex. 32 at ¶ 8 |
| 45 | Each of the provisions of the agreement described in USSOF 33, 42, and 43 – including the provision requiring the team's adherence to the rules of cycling's governing bodies, the events of default, and the representation about the morals and drug clause in each rider's contract – were regarded by the USPS as material terms of the 1995 Agreement and the 2000 Agreement. | US Ex. 32 at ¶ 8 |
| 46 | If Tailwind violated any of those provisions, the agreement permitted USPS to terminate the agreement immediately and to "exercise any other right or remedy available to it under law or in equity." | Def. Ex. 22 at ¶ 8(c) (US00167834) |
| 47 | Postal Service employees responsible for the sponsorship understood both the 1995 and the 2000 Agreements to prohibit doping. | US Ex. 32 at ¶ 8; US Ex. 1 at 78:13-24 |
| 48 | The contracting officer's representative, Robert McKenna, reviewed the UCI rules in order to understand the team's obligations under the contract. | US Ex. 5 at 55:7-10, 55:19-21 |
| 49 | Tailwind CEO Allen Furst understood that the anti-doping provisions to the 2000 Agreement were extremely broad. | US Ex. 42 |
| 50 | Team officials approached the USPS to ask whether it would be willing to increase its payments under the sponsorship in order to sign Armstrong as a rider. | US Ex. 5 at 103:19-104:7 |
| 51 | The USPS agreed, and added funding specifically for that purpose. | US Ex. 5 at 106:14-18; Def. Ex. 21 at US00601252 |

| | | |
|---|---|---|
| 52 | Armstrong was the team's lead rider from 1999 through 2004. | US Ex. 39 at ¶ 123; US Ex. 16 at 189:6-190:9; US Ex. 17 at 434:24-435:9 |
| 53 | Armstrong signed his first Professional Rider Agreement with Montgomery Sports on or about December 15, 1997. | US Ex. 57 |
| 54 | In addition to defining Armstrong's salary and the nature of Armstrong's services as a professional cyclist, the agreement contained a provision captioned "Conduct of Rider," which read in part: "Rider agrees to abide by the rules and regulations of the Union Cyclists International ("UCI"), the Federation Internationale du Cyclisme Professionel ("FICP"), the United States Professional Cycling Federation, Inc. ("USPRO") and any other governing bodies." | US Ex. 57 at US00031409-11 |
| 55 | The rider conduct provision of Armstrong's rider agreement stated that "Rider agrees to make no public statements which are intentionally inaccurate and/or damaging to the reputation of the Company … or the Company's sponsors[,] and this sentence shall survive any termination of this Agreement." | US Ex. 57] at US00031411 |
| 56 | A separate provision of Armstrong's rider agreement, which contained the heading "Rider's Condition and Drug or Medical Tests," stated "Rider understands it is imperative he or she refrain from the use of drugs, intoxicants, alcohol, narcotics or any other controlled substance or performance enhancing substance while training, traveling, or performing for the Team.  Rider represents to the Company that he is not currently using drugs, intoxicants, alcohol, narcotics, or any other controlled substance or performance enhancing substance." | US Ex. 57 at US00031412 |
| 57 | Similar language from this provision and the "Conduct of Rider" provision appears in Professional Rider Agreements executed by or for Armstrong on or about December 7, 2001 and March 27, 2003. | US Ex. 58 at US00031787, US00031789; US Ex. 47 at US00031773-74 |
| 58 | The "Conduct of Rider" provision in the 2003 agreement adds that Armstrong was "expected to … conduct himself on the road according to the highest standards of honesty and sportsmanship." | US Ex. 47 at US00031773 |
| 59 | Armstrong concedes that, at all times he rode for the USPS team, he knew that he had to comply with the anti-doping rules of the UCI, the IOC and the other governing bodies of professional cycling or risk termination of his contract and the USPS sponsorship of the team. | US Ex. 18 at 117:5-118:22; US Ex. 16 at 254:18-256:6 |
| 60 | Armstrong's combined salary and Tour de France bonus from Tailwind (which does not include bonuses for other races or Armstrong's personal paid endorsements) for 1999 was $1,125,000. | US Ex. 48 at US00030203-04; US Ex. 16 at 125:2-126:17 |
| 61 | Armstrong's combined salary and Tour de France bonus from Tailwind (which does not include bonuses for other races or Armstrong's personal paid endorsements) for 2000 was $2,550,000. | US Ex. 48 at US00030203-04; US Ex. 16 at 125:2-126:17 |

| | | |
|---|---|---|
| 62 | Armstrong's combined salary and Tour de France bonus from Tailwind (which does not include bonuses for other races or Armstrong's personal paid endorsements) for 2001 was $4,000,000. | US Ex. 47 at US00031749-50; US Ex. 16 at 125:2-126:17 |
| 63 | Armstrong's combined salary and Tour de France bonus from Tailwind (which does not include bonuses for other races or Armstrong's personal paid endorsements) for 2002 was $5,000,000. | US Ex. 47 at US00031749-50, US00031755; US Ex. 16 at 125:2-126:17 |
| 64 | Armstrong's combined salary and Tour de France bonus from Tailwind (which does not include bonuses for other races or Armstrong's personal paid endorsements) for 2003 was $7,000,000. | US Ex. 47 at US00031749-50, US00031755; US Ex. 16 at 125:2-126:17 |
| 65 | Armstrong's combined salary and Tour de France bonus from Tailwind (which does not include bonuses for other races or Armstrong's personal paid endorsements) for 2004 was $14,500,000. | US Ex. 47 at US00031749-50, US00031755; US Ex. 16 at 125:2-126:17 |
| 66 | Armstrong's letter agreement with Tailwind dated July 31, 1998 provided that from that point until the end of 2000 "Armstrong shall be the highest paid rider on the team in terms of overall compensation, bonuses, and benefits." | US Ex. 48 at US00030203 |
| 67 | Armstrong's October 10, 2000 letter agreement also gave him the right to have "extensive input into team and staff composition." | US Ex. 47 at US00031752 |
| 68 | In 2001, Jamie Burrow's salary was $30,000, David Zabriskie's salary was $37,000, and Robbie Ventura's salary was $32,000. | US Ex. 61 |
| 69 | On October 10, 2000, Armstrong entered a new letter agreement with Tailwind that included a substantial increase in Armstrong's salary and bonus structure. | US Ex. 47 at US00031749-53 |
| 70 | As of October 10, 2000, the USPS was in the midst of negotiations with Tailwind over the USPS's agreement to sponsor the team for the 2001 through 2004 seasons. | Def. Ex. 22; Def. Ex. 42; Def. Ex. 43 |
| 71 | The letter agreement stated "This Letter Agreement will become fully binding upon the execution of the new sponsorship agreement between DF&P and the United States Postal Service.  Should the agreement not be executed prior to November 15, 2000, Armstrong will have the unilateral right to terminate this Letter Agreement." | US Ex. 47] at US00031749 |
| 72 | Armstrong agreed to permit the USPS to use his name, likeness, and image – a right that was extended to just one other unnamed sponsor. | US Ex. 47 at US00031751 |
| 73 | Armstrong agreed to make six personal appearances for the USPS each year. | US Ex. 47 at US00031751 |
| 74 | Like the USPS sponsorship agreement, Armstrong's agreement covered the 2001 through 2004 seasons. | US Ex. 47 at US00031749 |
| 75 | As one teammate put it, "Lance called the shots on the team … and what Lance said went." | US Ex. 39 at ¶ 123; *see also* US Ex. 13 at 290:13-291:6 |
| 76 | Another teammate explained that Armstrong wielded an "iron fist," and that he and Bruyneel ran the team as "a dictatorship." | US Ex. 14 at 199:5-14, 202:4-12 |

| | | |
|---|---|---|
| 77 | Armstrong's considerable power extended beyond the team to the broader cycling community. | US Ex. 13 at 330:14-22 |
| 78 | Among members of the peloton, he was referred to as a "patrón" (Spanish for "boss"), meaning that he was "someone you didn't mess with in the peloton." | US Ex. 14 at 262:15-20, 263:6-263:20 |
| 79 | Some of Armstrong's teammates worried that, if they did not comply with Armstrong's wishes, he might wield his power to harm their cycling careers. | US Ex. 13 at 329:23-330:6, 330:23-331.1; US Ex. 39 at ¶ 121 |
| 80 | Members of the team, commonly referred as "domestiques" (French for "servants"), were expected to work to ensure that Armstrong, their lead rider, was victorious at the team's most important races, including the Tour de France. | US Ex. 14 at 175:5-177:7, 202:21-203:24 |
| 81 | Propelling Armstrong to win the Tour de France each year was the team's singular focus. | US Ex. 14 at 203:14-24; US Ex. 13 at 296:12-20 |
| 82 | George Hincapie testified "[W]e were there to help Lance win. So if we were there for our own sort of success, that -- that wasn't going to be accepted." | US Ex. 14 203:10-13 |
| 83 | In his book, "The Loyal Lieutenant," George Hincapie stated, "Johan and Lance [told] other members of the team that we were not there for personal ambition, so if we had designs on individual glory, we'd better pack our bags." George Hincapie confirmed in his deposition that that statement reflected his understanding in 1999. | US Ex. 71 at 75; US Ex. 14 at 205:3-6 |
| 84 | This type of focused devotion to the success of a single rider in a single event each year is not something Hincapie had experienced on other teams. | US Ex. 14 208:10-13 |
| 85 | Armstrong's October 10, 2000 letter agreement, which remained in effect throughout his time on the USPS team, gave him the right to "have extensive input into rider and staff composition." | US Ex. 47 at US00031749, US00031752 |
| 86 | Armstrong explained that he and Bruyneel carefully identified, recruited and signed "the kind of people [Armstrong] wanted to work with." | US Ex. 54; US Ex. 17 at 552:11-553:2 |
| 87 | The team always followed Armstrong's recommendations regarding team composition. | US Ex. 16 at 192:17-22 |
| 88 | After Armstrong joined the team in 1998, he quickly reached the conclusion that the team's director, Johnny Weltz was "completely disorganized." | US Ex. 16 at 436:24-439:12 |
| 89 | Armstrong expressed his view of Weltz to Tailwind's president, Mark Gorski, and the Chairman of the company's board, Thom Weisel. | US Ex. 17 at 437:23-438:8 |
| 90 | Weltz was replaced after Armstrong's first season with the team. | US Ex. 17 at 436:24-439:12 |
| 91 | Armstrong personally reached out Johan Bruyneel and invited him to become the team's new director. | US Ex. 17 at 439:8-12 |
| 92 | Armstrong, along with Bruyneel, decided the races in which the team would compete and the team riders who would compete in each race. | US Ex. 13 at 294:23-295:2, 295:22-296:2 |
| 93 | Armstrong viewed all riders to be either friends or enemies, without any middle ground. | US Ex. 39 at ¶ 136 |


| | | |
|---|---|---|
| 94 | Bill Stapleton, who had been Armstrong's agent and business manager since 1995, and Bart Knaggs, who was Armstrong's longtime agent gained operational control of Tailwind pursuant to a service agreement effective October 1, 2003 between Tailwind and Stapleton's and Knaggs' company, Capital Sports and Entertainment ("CSE"). | US Ex. 20 at 70:9-71:1, 83:1-8; US Ex. 22 at 24:3-21; US Ex. 45 |
| 95 | Stapleton was later named CEO of Tailwind, and Knaggs was named its president. | US Ex. 59 |
| 96 | Armstrong and Stapleton were also members of the Tailwind board of directors. | US Ex. 59 |
| 97 | By 2004 Lance Armstrong had acquired 471,814 shares of Tailwind common stock, which represented 28.68% of Tailwind's issued and outstanding common stock. | US Ex. 18 at 7:16-8:1; US Ex. 60 |
| 99 | Riders on the team knew and understood that sponsors, including the USPS, did not want to be associated with a team that used performance enhancing drugs. | US Ex. 13 at 297:18-298:1, 298:6-16; US Ex. 14 at 130:12-20, 131:5-10, 170:13-18, 171:15-20 |
| 100 | Riders believed they owed a duty to sponsors not to violate the rules of cycling. | US Ex. 14 at 124:12-16 |
| 101 | They further understood that the USPS expected team riders to exhibit good character on and off their bikes, which included, at the very least, not using performance enhancing drugs. | US Ex. 13 at 299:10-20, 322:12-16 |
| 102 | Lance Armstrong understood this as well.  Writing about the 2000 French investigation in one of his books, Armstrong stated:<br><br>Meanwhile, the investigation threatened to seriously mess with my reputation. Bill Stapleton was finding it difficult to conduct business. Coca-Cola was running scared of me, and so were other sponsors. Bill finally said to them, "Look, he doesn't take drugs, okay? I will stake my entire career on it."  We wrote in anti-drug out-clauses in our contracts: if I tested positive, I'd give the money back.  Bill had also begun trying to negotiate a new four-year deal with the U.S. Postal Service, the contract that was my chief income.  But now Postal was wary of re-signing the entire team, and even briefly considered not renewing its team sponsorship.  All because of a French fishing expedition. | US Ex. 68 at 83-84 |
| 103 | Armstrong was aware that if he had "any connection to doping," all of his sponsorship contracts would be terminated. | US Ex. 18 at 117:5-118:22, 122:17-23 |
| 104 | Armstrong acknowledged, he "would not have been very successful" between 1999 and 2004 if he had not engaged in the use of banned substances and practices. | US Ex. 16 at 175:24-176:13 |
| 105 | From at least 1998 through 2004, Armstrong knew that doping was prohibited by the rules of cycling. | US Compl. at ¶ 30; Armstrong's Amended Answer to US Compl. at ¶ 30 |
| 106 | Armstrong began using banned substances as early as 1993, when he used a corticoid called Synachten to boost his cycling performance. | US Ex. 16 at 132:11-13, 132:23-133:11 |
| 108 | Ferrari employed advanced doping methods. | US Ex. 72 at 139; US Ex. 39 at ¶ 71, 72 |

| | | |
|---|---|---|
| 109 | In 1995, Armstrong began using erythropoietin, or "EPO." | US Ex. 16 at 133:20-23 |
| 110 | Armstrong was aware that the use of EPO by cyclists was prohibited by the IOC and UCI from 1998 to 2004. | US Ex. 16 at 254:18-256:6 |
| 111 | Armstrong began taking human growth hormone in 1996. | US Ex. 17 at 515:24-516:10 |
| 112 | Armstrong's use of human growth hormone was based on Ferrari's recommendation. | US Ex. 17 at 515:24-516:10 |
| 113 | Armstrong used EPO throughout his first apparent Tour de France win in 1999. | US Ex. 16 80:10-20 |
| 114 | Armstrong also used corticoids, anabolic steroids, and testosterone in connection with his first apparent tour win. | US Ex. 16 at 82:10-83:10 |
| 115 | Armstrong knew corticoids, anabolic steroids, and testosterone were prohibited by the rules of the IOC and UCI from 1998 to 2004. | US Ex. 16 at 254:18-256:6 |
| 116 | Upon the development of a test for EPO in 2000, Armstrong limited his use of EPO to the period during which he was training for the 2000 Tour de France. | US Ex. 16 at 78:1-79:3, 87:5-11 |
| 117 | Armstrong did not use EPO in connection with the 2000 Tour de France, but instead began "blood doping." | US Ex. 16 at 78:1-79:3, 87:5-11 |
| 118 | Armstrong's switch from EPO to blood doping enabled him to avoid detection during the investigation by French authorities that followed Armstrong's apparent win in the 2000 Tour de France. | US Ex. 17 at 486:13-487:23 |
| 119 | Armstrong engaged in blood doping each year from 2000 through 2005. | US Ex. 16 at 87:12-15; US Ex. 17 at 471:12-13, 607:13-15; US Ex. 14 at |
| 120 | Armstrong knew blood doping by cyclists was prohibited by the IOC and UCI throughout that time period. | US Ex. 16 at 255:11-17 |
| 121 | Under Armstrong and Bruyneel's leadership, the use of banned substances and practices was an acknowledged part of the team's strategy to propel Armstrong to the top of the Tour de France podium. | US Ex. 14 at 199:9-203:24; *see also* US Ex. 41 at ¶ 36 |
| 122 | Multiple other USPS team riders have admitted to using PEDs. | US Ex. 39; US Ex. 40; US Ex. 37; US Ex. 41; US Ex. 14 at 60:24-62:2; US Ex. 13 at 98:21-99:2, 309:7-310:8 |
| 123 | Armstrong encouraged other USPS team riders to use PEDs. | US Ex. 13 at 352:8-10 |
| 124 | In some cases, Armstrong supplied the drugs they used. | US Ex. 13 at 343:16-344:21 |
| 125 | Armstrong made it clear to his teammates that he expected them to be physically prepared to win the Tour de France, including through the use of PEDs. | US Ex. 13 at 336:18-339:8; US Ex. 39 at ¶ 113-22 |
| 126 | Armstrong monitored his teammates' use of banned substances and, on at least one occasion, threatened to remove a rider from the team if he did not use PEDs to prepare for races. | US Ex. 40 at ¶ 39; US Ex. 39 at ¶ 115-122 |
| 127 | Armstrong or Bruyneel introduced numerous USPS team riders to Ferrari. | US Ex. 17 at 458:17-460:5 |

| | | |
|---|---|---|
| 128 | Armstrong also facilitated Ferrari's attendance at a 2001 team training camp in Austin, Texas. | US Ex. 17 at 486:25-487:14 |
| 129 | When teammate Frankie Andreu did not engage Ferrari, Armstrong pressured him to do so. | US Ex. 37 at ¶53; US Ex. 17 at 442:15-445:8 |
| 130 | Armstrong told rider Christian Vandevelde that if he wanted to remain on the USPS team he "would have to use what Dr. Ferrari had been telling [Vandevelde] to use and would have to follow Dr. Ferrari's program to the letter." | US Ex. 39 at ¶ 120 |
| 131 | In 2000, after a test to detect EPO had been developed, Ferrari advised switching to blood transfusions, which had a similar effect but could not be detected. | US Ex. 17 at 471:10-18, 486:13-487:23 |
| 132 | The entire USPS team made the switch from EPO to transfusions in 2000. | US Ex. 17 at 484:9-487:23 |
| 133 | Ferrari later briefed the entire team on the details of the blood doping operation at a training camp held in Austin, Texas, in late 2000 or early 2001. | US Ex. 38 at ¶ 61-63; US Ex. 39 at ¶ 71-80 |
| 134 | As Armstrong put it, the doping program was "professional" and "smart." | US Ex. 16 at 136:5-11 |
| 135 | Armstrong complained in 1998 that the team's doctor, Pedro Celaya, was too conservative. | US Ex 40 at ¶ 42 |
| 136 | Celaya was replaced by Dr. Luis del Moral. | US Ex. 40 at ¶ 49 |
| 137 | Dr. Luis del Moral's approach to doping was much more organized and aggressive. | US Ex. 40 at ¶ 42, 52 |
| 138 | Del Moral developed a detailed doping plan for each rider. | US Ex. 40 at ¶ 52 |
| 139 | Ferrari also advised Armstrong and other team riders on how and when to take doping products and techniques. | US Ex 16 at 59:10-15, 64:7-18, 78:1-79:3; US Ex. 72 at 139 |
| 140 | Armstrong used USPS team medical staff to procure PEDs. | US Ex. 16 at 53:6-20, 55:8-22, 58:13-59:5 |
| 141 | In 1998 and 1999, Armstrong used team soigneurs and mechanics to transport and conceal them. | US Ex. 16 138:16-139:23, 392:7-393:14 |
| 142 | On at least one occasion, Armstrong enlisted his wife to dispense illicit doping products to his teammates. | US Ex. 40 at ¶ 48; US Ex. 39 at ¶ 39 |
| 143 | Armstrong engaged his personal gardener to follow the team on a motorcycle during the 1999 Tour de France and to deliver EPO to himself and teammates Tyler Hamilton and Kevin Livingston upon Armstrong's request. | US Ex. 16 308:21-311.1; US Ex. 13 at 309:7-310.8 |
| 144 | Armstrong and the others referred to their drug-delivering gardener as "Motoman." | US Ex. 16 at 308:21-309.16; US Ex. 13 at 309:7-12, 310:9-12 |
| 145 | Whenever Armstrong wanted to arrange for a delivery of EPO during the race, he would contact Motoman using an untraceable cell phone in order to avoid detection by the police. | US Ex. 13 at 311:17-312:6, 312:11-313:2, 313:10-24 |
| 146 | Motoman would deliver EPO to a team staff member, who delivered it to a team doctor, who supplied Armstrong or his teammates. | US Ex. 13 at 309:8-10, 309:13-310:8 |
| 147 | Armstrong paid Motoman and, after Armstrong's apparent victory in the 1999 Tour de France, he encouraged Hamilton and Livingston to purchase a Rolex watch for Motoman as a demonstration of their gratitude for his illicit drug deliveries. | US Ex. 13 at 314:10-23; US Ex. 72 at 97-98 |

| | | |
|---|---|---|
| 148 | In 2000, Armstrong personally chartered a jet to fly himself, Hamilton, and Livingston to Spain to have their blood withdrawn for later reinfusion during that year's Tour de France. | US Ex. 16 at 311:2-312:2 |
| 149 | Others affiliated with the team -- including Bruyneel and Ferrari -- provided the careful storage Armstrong's blood needed in the weeks following its extraction, and transported the blood from Spain to France so that Armstrong could reinfuse it in connection with the race. | US Ex. 16 at 386:16-25, 387:21-25; US Ex. 17 at 490:7-14 |
| 150 | Armstrong's doping operation – which included the use of in-race drug couriers, chartering private jets to undertake blood extraction, and cross-border transportation of extracted blood – gave Armstrong a distinct advantage over his competitors. | US Ex. 13 at 309:7-314:23, 322:18-324:23, 327:1-328:24; US Ex. 39 at ¶ 85 |
| 151 | Armstrong paid Ferrari approximately $2 million. | US Ex. 17 at 461:17-20 |
| 152 | As a result of the doping conduct described above, the United States Anti-Doping Agency (USADA) banned Armstrong from cycling for life in 2012, and vacated all of his racing results from August 1, 1998 forward, including the seven Tour de France titles awarded to Armstrong between 1999 and 2005. | US Ex 35 at ¶¶ 11-12 |
| 153 | Armstrong was aware that sponsors would not tolerate his doping, and he made his denials knowing that sponsors would read them and rely upon them. | US Ex. 18 at 117:5-118:22, 120:22-121:7, 122:17-23; US Ex. 68 at 83-84; US Ex. 16 at 278:21-279:3 |
| 154 | Armstrong told reporters at the time (in 1999), "It's been a long year for cycling … and as far as I'm concerned, it's history. Perhaps there was a problem, but problems exist in every facet of life: sport, cycling, politics. … You come to training camps to assume we are all doped. That's bullshit. We're not." | US Ex. 70 at 126-127 |
| 155 | On or about July 19, 1999, Armstrong told reporters, "I can emphatically say I am not on drugs … I thought a rider with my history and my health situation wouldn't be such a surprise." | US Ex. 69 at 246 |
| 156 | Armstrong frequently cited his history with cancer in order to convince people he could not possibly be doping. | US Ex. 69 at 200-01; US Ex. 68 at 120; US Ex. 67 at 01:12:36:07 on transcript |
| 157 | Armstrong made these statements with the full knowledge that the USPS and Tailwind were negotiating an extension to the sponsorship agreement. | US Ex. 18 at 120:22-121:7; US Ex. 16 at 278:21-279:3; US Ex. 68 at 83-84 |
| 158 | In his book Every Second Counts, Armstrong wrote that after learning of the French Investigation in 2000, "I immediately issued an angry denial through our Postal Service spokesperson, Dan Osipow. Our team had 'zero tolerance' for any form of doping, we said. It sounded like the usual clichéd statement, but we meant it. We were absolutely innocent." | US Ex. 68 at 72-73 |

| | | |
|---|---|---|
| 159 | Dan Osipow told reporters in November 2000 "[w]e categorically deny any involvement with banned substances," and that the team had a zero-tolerance policy when it can to PED use. | US Ex. 74 |
| 160 | Postal Service employees responsible for the sponsorship heard Armstrong state that he would not use performance enhancing drugs given his history with cancer. | US Ex. 6 at 242:21-243:7; US Ex. 32 at ¶ 9 |
| 161 | On or about November 7, 2000, Tailwind President Mark Gorski issued a press release stating that there had been "no improprieties," that the team had followed all UCI rules, and that the team had a "zero-tolerance policy" when it came to the use of PEDs. | US Ex. 46 at US00160782 |
| 162 | Osipow and Gorksi repeated Armstrong's denial, including the reference to the team's supposed zero-tolerance policy, directly to USPS employees involved with the sponsorship. | US Ex. 6 at 80:4-19, 107:2-11, 238:16-239:13; US Ex. 1 287:7-290:4, 290:13-18; US Ex. 7 187:7-189:4 |
| 163 | On or about November 30, 2000, Armstrong met with Sonnenberg in Austin, Texas. | US Ex. 32 at ¶ 12 |
| 164 | At their meeting in Austin, Armstrong and Sonnenberg discussed Armstrong's response to media inquiries regarding the doping allegations. | US Ex. 32 at ¶ 12 |
| 165 | During their conversation, they also discussed ways to clean up cycling. | US Ex. 32 at ¶ 12 |
| 166 | Armstrong misled Sonnenberg by suggesting, through his words and his conduct, that the USPS team was among the clean teams that might lead by example and could apply pressure to other teams to be more open. | US Ex. 32 at ¶ 12 |
| 167 | At about the same time, Postmaster General William Henderson contacted Armstrong to discuss Armstrong's responses to media inquiries about the French investigation. | US Ex. 10 at 67:25-71:6 |
| 168 | During the phone call, Armstrong angrily denied the allegations and expressed to Henderson his belief that they were motivated by anti-American animus. | US Ex. 10 at 67:25-71:6 |
| 169 | On or about December 13, 2000, Armstrong said in a statement on his website, "Here's the bottom line to everyone: I'll start by saying that we are completely innocent[.] We run a very clean and professional team that has been singled out due to our success[.] I can assure everyone we do everything in the highest moral standard." | US Compl. at ¶ 63F; Armstrong Answer to US Compl. at ¶ 63F |
| 170 | USPS employees relied upon Armstrong's and team's doping denials in agreeing to enter into the 2000 Sponsorship Agreement. | US Ex. 32 at ¶ 15; US Ex. 10 at 229:16-231:19 |
| 171 | Armstrong repeatedly made public statements claiming that he had never failed a drug test. | US Ex. 68 at 120; US Ex. 67 at 01:35:49:18 |
| 172 | As Armstrong later acknowledged, these statements were misleading. | US Ex. 16 at 268:6-15 |
| 173 | Armstrong had produced several test results that indicated he had used performance enhancing drugs. | US Ex. 75; US Ex. 78 |
| 174 | Armstrong had learned from Ferrari how to continue doping without producing a positive test result. | US Ex. 17 at 481:6-23, 484:9-485:5 |

| | | |
|---|---|---|
| 175 | Armstrong knew that his having passed drug tests did not prove that he was not doping, as he suggested. | US Ex. 16 at 268:6-15 |
| 176 | Like other sponsors of Armstrong, Postal Service employees heard Armstrong state on numerous occasions that he had never failed a drug test. | US Ex. 3 at 271:23-273:8; US Ex. 25 at 67:4-68:9; US Ex. 26 at 64:8-18. |
| 177 | Postal Service employees (and other sponsors) believed that Armstrong had passed every drug test he had taken. | US Ex. 3 at 271:23-273:8; US Ex. 25 at 67:4-68:9; US Ex. 26 at 64:8-18. |
| 178 | Postal Service employees (and other sponsors) relied upon their belief that Armstrong had passed all doping controls in concluding that he had not been doping. | US Ex. 3 at 271:23-273:8; US Ex. 25 at 67:4-68:9; US Ex. 26 at 64:8-18. |
| 179 | Riders knew that their careers would suffer if sponsors learned of their doping. | US Ex. 13 at 321:16-322:8 |
| 180 | Riders took steps to keep their doping hidden from the USPS because they knew that USPS expected them to follow cycling's rules. | US Ex. 13 at 319:15-20, 322:12-16 |
| 181 | Riders understood that if the USPS found out about their doping, it would have terminated its sponsorship of the team. | US Ex. 14 at 129:16-131:10; US Ex. 13 at 321:16-322:8. |
| 182 | No rider or any other person affiliated with Tailwind ever informed the USPS that the team was doping. | US Ex 32 at ¶ 14; US Ex. 13 at 303:17-304:1, 318:16-319:20, 343:12-15; US Ex. 14 at 133:3-10 |
| 184 | In 1995 Armstrong started using doping products and techniques that he now characterizes as "high octane" because they increased his red blood cell concentration | US Ex. 16 at 133:17-23 |
| 185 | One former sponsor explained, the company [redacted] | US Ex. 55 |
| 186 | No new companies have hired Armstrong as an endorser or otherwise sponsored him since then. | US Ex. 16 at 293:11-299:22; US Ex. 17 at 567:1-20 |
| 187 | Between 2011, which was the year before the USADA Reasoned Decision to 2013, the year after the Reasoned Decision was released, Livestrong Foundation contributions dropped from $15.9 million to $7.9 million. | US Ex. 62 at 4; US Ex. 63 at 4. |
| 188 | Trek testified that it "relied on [Armstrong's] public representations that he was not doping," and "would not have entered into an endorsement agreement with someone who we knew was violating the rules." | US Ex. 26 at 32:8-19, 62:14-21 |
| 189 | Alixe Johnson testified that "if we knew then what we know now, we would never have sponsored him." Gail Sonnenberg and Joyce Carrier also testified that the USPS would not have sponsored the team if they had known Armstrong was doping. | US Ex. 4 at 226:11-17; US Ex. 7 at 193:13-17; US Ex. 1 at 297:16-300:2 |
| 190 | Larry Gerbrandt has opined that "viewed as a whole across the time period from 1998 to 2014, [the] mixture of positive and negative impressions [resulting from the media coverage of Armstrong] would have no market value." | US Ex. 33 at ¶ 8 |

| | | |
|---|---|---|
| 191 | Economist Dr. Jonathan Walker has concluded that disclosure to sponsors of historical PED use and planned future PED use would necessarily have driven the sponsorship value down. Dr. Walker estimates that the market value of the sponsorship on a fully disclosed basis is zero. | US Ex. 34 at ¶ 5 |
| 192 | Douglas Kidder and Dr. Erich Joacimsthaler testified that the reports by FCB and Campbell Ewald do not reflect the market value of Armstrong's services on behalf of the USPS cycling team. Neither Kidder nor Joachimsthaler has expressed any opinion about the fair market value value of those services. | US Ex. 29 at 223:21-224:2; US Ex. 30 at 179:12-16 |
| 193 | The sponsorship fee paid by Discovery Channel in 2005 was $10 million. | US Ex. 36 at ¶ 4 |
| 194 | USPS employed a vast sales force, which was involved in all of the marketing efforts resulting in all sales that might have been associated with the sponsorship. | US Ex. 32 at ¶ 5 |
| 195 | USPS sales representatives also performed in-depth customer audits/analyses in order to demonstrate potential cost savings to the customer. | US Ex. 32 at ¶ 4, 5 |
| 196 | Armstrong's "new revenue" figures cannot represent the benefit to the USPS, if any, because those figures do not take account of the cost of providing the goods and services sold. | US Ex. 1 at 193:13-194:7; US Ex. 10 at 142:3-148.1 |
| 197 | As FCB's witness explained, although FCB concluded that the value of so-called "earned media" in 2001 was $18.5 million, "at that time no one is going to pay $18 million for a cycling sponsorship[,] even if it was Lance Armstrong." | US Ex. 28 at 114:4-6 |
| 198 | Campbell Ewald's witness testified that it did not endeavor to determine the value of the sponsorship or the market price for the media exposure the USPS received. | US Ex. 27 at 121:9-122:7 |
| 199 | When asked whether earned media reflected the sponsorship's fair market value, one of Armstrong's proffered experts stated "I -- they're -- they're two unrelated -- not unrelated, but they're two different concepts, and I don't understand why you would tie them together. So I think the answer is no." | US Ex. 29 at 223:22-224:2 |
| 200 | Erich Joachimsthaler, Armstrong's proffered "branding expert," conceded that fair market value is "entirely different" from advertising equivalency. | US Ex. 30 at 179:12-16 |
| 201 | Advertising equivalency valuations always greatly exceed observable sponsorship market values. | US Ex. 34 at ¶ 6 |
| 202 | The studies performed by FCB and Campbell Ewald do not take into account the fact that Armstrong was doping. | Def. Ex. 63; Def. Ex. 64 |
| 203 | The studies performed by FCB and Campbell Ewald do not take into account the negative media coverage of his doping scandal after he was stripped of his titles and forced to confess. | Def. Ex. 63; Def. Ex. 64 |
| 204 | USPS officials did read Armstrong's denials and the denials of other Tailwind employees. | US Ex. 6 at 242:21-243:7; US Ex. 32 at ¶ 9-11 |

| | | |
|---|---|---|
| 205 | USPS employees responsible for the sponsorship heard or read Armstrong's false or misleading statements and relied on them in concluding that Armstrong and the team were not doping and in agreeing to enter into the 2000 Agreement. | US Ex. 32 at ¶ 15; US Ex. 10 at 229:16-231:19; US Ex. 46 |
| 206 | The undisputed evidence shows that the USPS would not have agreed to enter into the 2000 Agreement if it knew that the doping denials were false. | US Ex. 32 at ¶ 15; US Ex. 10 at 229:16-231:19 |
| 207 | USPS employees would not have agreed to enter into the 2000 Agreement if they had known that Armstrong was doping, and would have stopped paying Tailwind if they had learned that Armstrong was doping. | US Ex. 32 at ¶ 15-18; US Ex. 10 at 229:16-231:19; US Ex. 5 at 231:24-233:1 |
| 208 | Armstrong's cycling team in turn paid him $22.3 million, and approximately 60% of these payments ($13.4 million) was derived from the USPS's sponsorship fee payments. | Def. Ex. 22 at US00167839; US Ex. 24 at 17:24-18:18; US Ex. 73 at US00600723; US Ex. 16 at 125:2-127:5 |
| 209 | Armstrong was fully aware that all his sponsorships would "go away" if the sponsors learned about his doping. | US Ex. 18 at 117:5-118:22, 122:17-23 |
| 210 | Armstrong was aware that the USPS sponsorship agreements included anti-doping provisions requiring Armstrong's team to follow the rules of cycling. | US Ex. 18 at 117:5-118:22; US Ex. 76 at 1710:15-25 |
| 211 | In June 2004, Discovery Channel entered into an endorsement contract with Tailwind and Armstrong pursuant to which Discovery Channel was a Team Sponsor through 2004 and the Title Sponsor from 2005 through 2007. | US Ex. 36 at ¶ 4 |
| 212 | Before and during its sponsorship, Discovery Channel had no knowledge that Armstrong and other team riders were using prohibited PEDs. | US Ex. 36 at ¶ 7, 9 |
| 213 | Discovery Channel would not have entered into its endorsement contract with the team "if it had known that Armstrong and other Team riders had used prohibited PEDs." | US Ex. 36 at ¶ 8 |
| 214 | Giro sponsored Armstrong in 1996, on the recommendation of Greg Shapleigh, Giro's then- Director of Marking. | US Ex. 25 at 29:12-40:15, 49:13-50:17 |
| 215 | Shapleigh, who eventually became Giro's Senior Vice President of Marketing, was responsible for Giro's sponsorship of Armstrong. | US Ex. 25 at 29:12-40:15 |
| 216 | Mr. Shapleigh testified that he did not know that Armstrong was doping, but that if he had known, he would never have recommended that Giro sponsor Armstrong. | US Ex. 25 at 53:17-54:10 |
| 217 | Team managers Mark Gorski and Dan Ossipow repeatedly (and falsely) assured numerous USPS employees that the team was clean and had "zero tolerance" for doping. | US Ex. 6 at 80:4-19, 107:2-11, 238:16-239:13; US Ex. 1 at 287:7-290:4, 290:13-18; US Ex. 7 at 187:7-189:4; US Ex. 32 at ¶ 13 |
| 218 | Armstrong had conversations with the USPS Postmaster General and Senior Vice President for Sales in which he misled them into believing that he was clean and that rumors to the contrary were false. | US Ex. 10 at 67:25-71:6; US Ex. 32 at ¶ 12 |

| | | |
|---|---|---|
| 219 | Discovery Channel and Giro relied on Armstrong's doping denials, and would not have entered into sponsorship agreements with Armstrong if they had known he was doping. | US Ex. 36 at ¶ 7, 8; US Ex. 25 at 53:17-54:10 |
| 220 | Armstrong's "branding" expert has also admitted that the so-called "earned media" reports on which he opines—which are discussed further below—do not calculate or otherwise reflect the fair market value of the sponsorship. | US Ex. 30 at 201:2-202:15 |
| 221 | The USPS employees with responsibility for the sponsorship testified that these sales estimates were "highly exaggerated," and that they "could never find substantiation for the sales that were listed" in the documents on which Armstrong relies. | US Ex. 4 at 74:12-75.4 |
| 222 | At most, they were intended to reflect a rough estimate of sales that had a very loose connection to the sponsorship. | US Ex. 32 at ¶ 6 |
| 223 | A 2003 audit by the USPS Office of Inspector General was unable to validate more than 96% of the new revenue amount Armstrong cites. | US Ex. 56; US Ex. 77 |
| 224 | Armstrong's own designated expert has cast doubt on the validity of Armstrong's attempt to link event marketing opportunities to actual sales. ("It is very difficult to do an empirical research study, an academic study that relates sponsorship to actual sales. That's difficult to do."). | US Ex. 31 at 434:7-435:7 |
| 225 | USPS sales representatives also performed in-depth customer audits/analyses in order to demonstrate potential cost savings to the customer. | US Ex. 32 at ¶ 4 |
| 226 | The reports also "suffer[] from deficiencies in their respective methodologies that cause them to overestimate the value received by the USPS." | US Ex. 33 at ¶ 6 |
| 227 | Most notably, the reports were based on flawed and non-industry standard methods for determining the value of sponsorship impressions. | US Ex. 33 at ¶ 6 |
| 228 | Further, some of the reports simply made up the amount of domestic media coverage of the sponsorship, while other reports extrapolated based on flawed samples. | US Ex. 33 at ¶ 6 |
| 229 | Moreover, Ms. Johnson was operating purely as a conduit for the information in the email. | US Ex. 4 at 113:19-20 |
| 230 | Media expert Larry Gerbrandt has identified 1.5 billion "traditional media" impressions that negatively associated Armstrong with the USPS since 2010. | US Ex. 33 at ¶ 4 |
| 231 | Gerbrandt also identified an additional 154 billion negative internet impressions, consisting primarily of online news coverage of Armstrong's doping scandal. | US Ex. 33 at ¶ 4 |
| 232 | Brian Mieth, the author of the FCB report, testified that FCB did not know at the time it prepared its reports that Armstrong was doping, and the fact of Armstrong's doping is not in any way reflected in the report. | US Ex. 28 at 24:13-25, 66:14-17, 240:1-6 |

| | | |
|---|---|---|
| 233 | Mr. Mieth testified that knowledge of Armstrong's doping would have had a negative impact on FCB's valuation of the sponsorship. | US Ex. 28 at 240:16-241:4 |
| 234 | As Mr. Mieth explained: "[Y]ou're trying to build a case for his brand attributes and borrowing that imagery and attributes to strengthen your brand.  And if somebody is doping, it's doing just the other.  It's devaluing it and being destructive.  So that would negatively impact the value that you're getting from it." | US Ex. 28 at 241:5-13 |
| 235 | By his own account, Armstrong sought to reassure his sponsors by agreeing to "antidrug clauses" that required him to give back any sponsorship fee payments if he was proven to have doped. | US Ex. 68 at 131 |
| 236 | Qualities that the USPS attributed to Armstrong at the time—and that it hoped the public would associate with the USPS—included "technology," "speed," "efficiency," "innovation," "perseverance,""courage," "teamwork," "commitment," and "excellence." | US Ex. 49; US Ex. 44; US Ex. 50; US Ex. 51; US Ex. 52 |
| 237 | Tailwind President Mark Gorski acknowledged in his 2005 deposition in the SCA arbitration that sponsors are entitled to rely on the public statements the team made denying doping by team members. | US Ex. 23 at 111.22-112:17 |
| 238 | Tailwind would not have been able to pay Lance Armstrong's salary if USPS did not sponsor the team. | US Ex. 24 at 17:24-18:18 |
| 239 | Tailwind never turned a profit.  In fact, it lost money every year. | US Ex. 24 at 18:21-19:18 |
| 240 | Even though in 2000 Armstrong was still under contract to Tailwind for another year, Armstrong agreed to extend his commitment through 2004 so that Tailwind could obtain a four year agreement with the USPS under more favorable terms. | US Ex. 23 at 35:7-37:2 |
| 241 | By using Armstrong's contract extension as a bargaining chip, Tailwind was able to obtain a higher sponsorship fee from the USPS. | US Ex. 23 at 35:7-37:2 |
| 242 | Armstrong testified that the French investigation was "great" for his team because it proved that they were clean. | US Ex. 18 at 89:3-12 |
| 243 | The purpose of Armstrong's 2004 lawsuit against the Sunday Times was to discredit David Walsh. | US Ex. 16 at 335:15-336:3 |
| 245 | Armstrong attempted to vilify and discredit former team masseuse Emma O'Reilly after she cooperated with David Walsh's reporting regarding Armstrong's PED use. | US Ex. 16 at 328:12-20 |
| 247 | In each of the FCB reports for 2001 and 2002, FCB valued hospitality services under the contract at $52,125 for the year. | Def. Ex. 63; Def. Ex. 64 |
| 248 | The USPS employees also were aware that the "earned media" studies were not intended as estimates of the market value of the sponsorship. | US Ex. 4 at 124:8-125:6 |
| 249 | Armstrong publicly admitted for the first time that he used performance enhancing drugs in a televised interview on January 17 and 18, 2013. | US Compl. at ¶ 61; Armstrong's Answer to US Compl. at ¶ 61 |