**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES, *ex rel.*, FLOYD LANDIS, Plaintiff, | ) | No. 1:10-cv-00976 (CRC) |
| v. | ) | **ECF** |
| TAILWIND SPORTS CORPORATION, *et al.*, Defendants. | ) | |

**DECLARATION OF GAIL SONNENBERG**

I, Gail Sonnenberg, hereby declare that:

1. I have personal knowledge of the facts set forth herein, to which I could competently testify under oath if called as a witness.

2. I was employed by the United States Postal Service (USPS) from 1973 to 2001. In 1998, I became Senior Vice President for Sales. Between 1998 and 2001, my duties in that position included oversight of the USPS sponsorship of the professional cycling team owned by Tailwind Sports LLC and its predecessor, for which Lance Armstrong was the lead rider. In consultation with my superiors at USPS, I made the decision to enter the sponsorship agreement between the USPS and DFP Cycling LLC signed on December 26, 2000 (the 2000 Agreement). Although I was ultimately responsible for the sponsorship, management of the sponsorship was only a small part of my responsibilities at the time and was not typically part of my day-to-day activities.

3. Prior to 2000, the USPS's principal use of the sponsorship was as a business-to-business sales tool. In particular, the USPS would entertain current or potential clients at cycling events in the same way many U.S. companies entertain clients at sporting events. USPS executives and

sales staff would use these events as opportunities to build relationships with potential clients, and also to network with other attendees at the cycling events.

4. Customers invited by USPS often were companies or individuals with whom the USPS already had a pre-existing relationship and to whom the USPS already had directed some sales effort. For example, in some cases the USPS sales staff had met with the customer and performed an on-site review of that customer's shipping practices in order to recommend ways that the USPS might be able to reduce the customer's shipping costs. Site visits like these typically included a sales manager and 3-4 other USPS employees, and often would be followed by a written report or proposal. Postal Service operations personnel would review these proposals for feasibility and pricing. The proposal would be presented to the customer, sometimes in an in-person presentation. The USPS often had expended significant effort laying the groundwork for a sale before a customer attended the cycling event.

5. The cycling team sponsorship was a helpful tool in marketing USPS products and services, but to the extent that it contributed to sales, it was only one of many factors that contributed to the USPS concluding any sale. USPS employed a vast sales force, which was involved in all of the marketing efforts resulting in all sales that might have been associated with the sponsorship. USPS sales representatives also performed in-depth customer audits/analyses in order to demonstrate potential cost savings to the customer. Additionally, the USPS incurred certain costs to provide any good or service.

6. Although the USPS Sales group made some attempt to track sales related to the cycling sponsorship, the USPS lacked the ability to track such figures accurately at least up until the time of my retirement from the USPS in 2001. Any representations we made at the time about new revenue associated with the sponsorship during or before 2001 were only very rough estimates

and, to my knowledge and belief, they were understood as such by others within the USPS to whom they were made. Moreover, these representations were intended to reflect only that the sponsorship was in some way associated with a given sale, meaning that the sponsorship had been used to market USPS products and services to the customer. These representations were not meant to suggest that any sale had been solely the result of the sponsorship and, to my knowledge and belief, no one within the USPS understood them as such.

7. A second purpose of the sponsorship was to garner favorable exposure for the USPS. In doing so, we hoped that the public would associate the USPS with the attributes that it believed the cycling team represented – commitment, teamwork and excellence – and that the public's affinity and respect for the USPS would grow as a result. By 2000, the desire for positive exposure had eclipsed business-to-business sales as the principal purpose of the sponsorship.

8. My view throughout the term of the sponsorship, including at the time I approved the 2000 Agreement, was that doping by the cycling team would have defeated the purposes of the sponsorship and eliminated the benefits of the sponsorship. In fact, I believed that a doping scandal involving the team would have been harmful to the USPS. I also viewed doping by the team as immoral and in direct opposition to the favorable qualities with which we sought to associate the USPS brand. I and others at USPS did not want to associate the USPS with a team that engaged in doping. As an agency of the United States, we also had to take into account the integrity of the USPS's programs, policy considerations, and consistency between the sponsorship and broader government objectives, such as deterring the use of illicit drugs. For these reasons, we wanted to reinforce the sponsorship agreement's doping prohibition and to ensure that USPS could terminate the sponsorship if any doping offense occurred, so we included provisions in the 2000 Agreement that prohibited the team from doping, including

paragraphs 8(a)(iv), 8(a)(v), and 12. We further required each rider to have a morals and turpitude provision in his agreement with DFP Cycling that satisfied certain conditions. Each of these terms was a material term of the contract.

9. Throughout the course of my time managing the sponsorship for the USPS, I heard Armstrong make numerous public statements denying that he had ever engaged in doping. In particular, I was aware of his frequently-repeated statements to the effect that, after his experience with cancer, he would not be so reckless with his health as to take any sort of performance enhancing drug. I also was aware of his claim to be the most tested athlete in the world, and that he had never failed a doping control test. I was aware that Armstrong made such statements before November 30, 2000, and I was aware of numerous similar statements he made after that date.

10. I read Armstrong's book, It's Not About the Bike, within 1-2 months after its initial publication on May 22, 2000. Among the statements that I read in the book are the following:

a. Writing about a press conference in which Armstrong addressed the reports that he produced a positive test result during the 1999 Tour de France: "'I can emphatically say I am not on drugs,' I said. 'I thought a rider with my history and my health situation wouldn't be such a surprise. I'm not a new rider. I know there's been looking, and prying, and digging, but you're not going to find anything. There's nothing to find... and once everyone has done their due diligence and realizes they need to be professional and can't print a lot of crap, they'll realize they're dealing with a clean guy.'" It's Not About the Bike at 246.

b. "Doping is an unfortunate fact of life in cycling, or any other endurance sport for that matter. Inevitably, some teams and riders feel it's like nuclear weapons-- that they have to do it to stay competitive within the peloton. I never felt that way, and certainly after chemo the idea of putting anything foreign in my body was especially repulsive. Overall, I had extremely mixed feelings about the 1998 Tour: I sympathized with the riders caught in the firestorm, some of whom I knew well, but I also felt the Tour would be a more fair event from then on." It's Not About the Bike at 200-01.

c. Writing about the reports that he produced a positive test result during the 1999 Tour de France: "I had absolutely nothing to hide, and the drug tests proved it. It

was no coincidence that every time Tour officials chose a rider from our team for random drug testing, I was their man. Drug testing was the most demeaning aspect of the Tour: right after I finished a stage I was whisked to an open tent, where I sat in a chair while a doctor wrapped a piece of rubber tubing around my arm, jabbed me with a needle, and drew blood. As I lay there, a battery of photographers flashed their cameras at me. We called the doctors Vampires. 'Here come the Vampires,' we'd say. But the drug tests became my best friend, because they proved I was clean. I had been tested and checked, and retested." It's Not About the Bike at 242.

d. Writing about the reports that he produced a positive test result during the 1999 Tour de France: "Not long after I crossed the finish line, a French TV journalist confronted me: there were reports that I had tested positive for a banned substance. The report was wrong, of course. I returned to the team hotel, and pushed through a throng of clamoring media, and called another press conference. All I could do was assert my innocence each time there was a new wave of speculation in the papers-- and there was one every three of four days. Le Monde had published a story stating that a drug test had turned up minute traces of corticosteroid in my urine. I was using a cortisone cream to treat a case of saddle sores-- and I had cleared the cream with the Tour authorities before the race ever started. Immediately, Tour authorities issued a statement affirming my innocence. 'Le Monde was looking for a drug story, and they got one on skin cream,' I said. I was hurt and demoralized by the constant barrage from the press. I put forth such an effort, and had paid such a high price to ride again, and now that effort was being devalued. I tried to deal with the reporters honestly and straightforwardly, but it didn't seem to do any good." It's Not About the Bike at 247.

11. In early November 2000, I became aware that French authorities were investigating Armstrong and the USPS team to determine whether they had doped during the 2000 Tour de France. During the next 3-4 weeks, I read and heard numerous public statements by Armstrong denying that he or the team had doped during the 2000 Tour de France. I also inquired of Tailwind executives Mark Gorski and Dan Osipow, each of whom assured me that the team was not doping, that the investigation was purely the product of anti-American animosity on the part of the French, and that the team strictly adhered to its "zero tolerance policy." Furthermore, I read public denials by team officials, including the statements contained in the press report attached as Exhibit A hereto.

12. On or about November 30, 2000, I met with Armstrong in Austin, Texas, to discuss Armstrong's response to media inquiries regarding the doping allegations. We also discussed ways to clean up cycling. During our conversation, Armstrong misled me by suggesting, through his words and his conduct, that the USPS team was one of the clean teams, and that the team could lead an effort to clean up cycling by serving as an example and applying pressure to other teams to be more open.

13. Throughout the course of my time managing the sponsorship for the USPS, I received numerous assurances from Mark Gorski and Dan Osipow that the team was not involved in any sort of prohibited practice. On a number of occasions, I stated clearly to each of them that the USPS would not tolerate doping and that it would terminate the sponsorship if any of the allegations regarding Armstrong were true.

14. Neither Armstrong, nor anyone else from Tailwind, informed me at any time during the sponsorship that Armstrong and his teammates were doping, and to my knowledge and belief, no one from Tailwind informed any other USPS employee of that fact.

15. At no time prior to my approval of the 2000 Agreement did I know that Lance Armstrong or any other member of the USPS cycling team was engaged in doping. In fact, at the time I approved the agreement, I believed that Armstrong was not doping, and that the team was not doping. In forming that belief, I relied in part on the statements by Armstrong described in paragraphs 9-12, and the statements of Tailwind officials described in paragraphs 11 and 13. Furthermore, because I believed the doping denials contained in those statements, I informed the Deputy Postmaster General that the allegations under investigation by French authorities in 2000 were untrue, and I prepared talking points for Postmaster General William Henderson to use while briefing the USPS Board of Governors about the 2000 Agreement on December 4, 2000,

stating that "there is absolutely no truth to any sort of impropriety" in connection with allegations of the team's use of performance enhancing drugs.

16. I would not have approved the 2000 Agreement if I had known that Lance Armstrong was doping or if I had known that other members of the cycling team were doping.

17. During the period between my approval of the 2000 Agreement and my retirement from the USPS, I did not know that Lance Armstrong or any other member of the USPS cycling team was engaged in doping. In fact, I believed that Armstrong was not doping, and that the team was not doping. In forming that belief, I relied in part on the statements by Armstrong described in paragraphs 9-12, and the statements of Tailwind officials described in paragraphs 11 and 13.

18. Had I known during the pendency of the sponsorship that Lance Armstrong was doping or that other members of the USPS cycling team were doping, I would have taken steps immediately to terminate the 2000 Agreement and to stop paying the team.

I declare under penalty of perjury that the foregoing is true and correct.

/s/ Gail Sonnenberg
GAIL SONNENBERG

DATED: July 11, 2016