**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. FLOYD LANDIS,<br><br>Plaintiffs,<br><br>v.<br><br>TAILWIND SPORTS CORPORATION, TAILWIND SPORTS, LLC; MONTGOMERY SPORTS, INC.; CAPITAL SPORTS & ENTERTAINMENT HOLDINGS, INC.; THOMAS W. WEISEL; LANCE ARMSTRONG; JOHAN BRUYNEEL; WILLIAM J. STAPLETON; BARTON B. KNAGGS; ROSS INVESTMENTS, INC., and DOES 2-50,<br><br>Defendants. | Civil No. 1:10-cv-00976-CRC<br><br>**REDACTED** |

**DEFENDANTS CAPITAL SPORTS & ENTERTAINMENT HOLDINGS, INC., WILLIAM J. STAPLETON, AND BARTON B. KNAGGS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

**I. INTRODUCTION** .......... 1

**II. ARGUMENT** .......... 2

A. Relator Dodges the Critical Damages Issue Raised by the CSE Motion. .......... 2

B. Relator Ignores the Key Shortcoming of his Fraudulent Inducement Theory .......... 6

C. Relator's Implied Certification Claim Fails Under the Standard Set Forth By the Supreme Court in *Universal Health*. .......... 10

**III. CONCLUSION** .......... 11

# TABLE OF AUTHORITIES

**Page**

Cases

*Si v. Laogai Research Found.*,
71 F. Supp. 3d 73 (D.D.C. 2014) .......... 7, 8

*United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*,
393 F.3d 1321 (D.C. Cir. 2005) .......... 7

*United States ex rel. Head v. Kane Co.*,
798 F. Supp. 2d 186 (D.D.C. 2011) .......... 7

*United States ex rel. Marcus v. Hess*,
317 U.S. 537 (1943) .......... 8, 9

*United States ex rel. Schwedt v. Planning Research Corp.*,
59 F.3d 196 (D.C. Cir. 1995) .......... 6

*United States ex rel. Thomas v. Siemens AG*,
991 F.Supp.2d 540 (E.D. Pa. 2014) .......... 8, 9

*United States ex rel. Westrick v. Second Chance Body Armor, Inc.*,
128 F.Supp.3d 1 (D.D.C. 2015) .......... 7

*United States v. Science Applications Int'l Corp.*,
626 F.3d 1257 (D.C. Cir. 2010) .......... 1, 3, 4, 5

*United States v. TDC Management Corporation, Inc.*,
288 F.3d 421 (D.C. Cir. 2002) .......... 4, 5, 6

*Universal Health Services v. United States ex rel. Escobar*,
136 S.Ct. 1989 (2016) .......... 2, 10

## I. INTRODUCTION

The pending Motion for Summary Judgment filed by the CSE Defendants (the "CSE Motion") is quite simple. The CSE Defendants joined in two of the arguments raised in Lance Armstrong's motion for summary judgment: (1) that the government cannot establish that it suffered any damages as a result of the alleged false claims submitted by Tailwind under the Sponsorship Agreements; and (2) that the government (and Relator) cannot prove a false claim through the fraudulent inducement theory of liability. With respect to each of these arguments, the CSE Defendants offered a one-paragraph explanation as to why the Armstrong arguments have particular force when applied to the specific claims remaining against the CSE Defendants. In response to these concise and focused arguments, Relator dumped a 47-page barrage of irrelevant and inaccurate allegations on the Court. Remarkably, nowhere in the 47 pages does Relator address the two basic points raised in the CSE Motion.

On the damages issue, the CSE Motion established that each of the claims remaining in the case with respect to the CSE Defendants relates to reimbursement or payment for hospitality or entertainment expenses, and neither the government nor Relator can establish that any of the Tailwind invoices for these goods and services were inflated, inappropriate or described goods or services that were not delivered exactly as promised. In his lengthy response, Relator fails to confront the fundamental premise of the CSE Motion – that the USPS received exactly the hospitality goods and services that it was promised and paid for. Relator implicitly concedes that the food, beverages and tents provided by Tailwind were exactly as promised, and he cites the controlling case in this circuit (*United States v. Science Applications Int'l Corp.*, 626 F.3d 1257 (D.C. Cir. 2010) ("*SAIC*")), which makes clear that under such circumstances the government fails to meet its damages burden. Nevertheless, Relator espouses a damages theory that was flatly rejected in *SAIC*, and persists in his claim that the government received no benefit from these goods and services because it would not have requested such services if it had known of Tailwind's breach of the Sponsorship Agreement.

On the fraudulent inducement theory, the CSE Motion pointed out that there is no

evidence that any of the CSE Defendants ever made any statements to USPS representatives to induce the USPS to enter into the Sponsorship Agreement. Again, Relator fails to confront the critical shortcomings of his theory. He spends pages attempting to introduce two heretofore undisclosed public statements by Mr. Stapleton and arguing tenuous theories of vicarious liability. However, he completely ignores the fact that none of the CSE Defendants ever spoke with any representative of the USPS prior to the execution of the Sponsorship Agreements and the complete lack of evidence of reliance by the USPS on any public statements by the CSE Defendants. Without such proof, Relator's fraudulent inducement theory must also be rejected.

Relator also misconstrues the holding of the recent Supreme Court case of *Universal Health Services v. United States ex rel. Escobar*, 136 S.Ct. 1989 (2016) ("*Universal Health*"), which makes clear that Relator's "implied certification" theory also fails with respect to the four invoices involving the CSE Defendants. Unlike the claims at issue in *Universal Health*, the subject invoices here made no false or misleading assertions or "half-truths" about the goods and services provided. Accordingly, Relator cannot rely on an implied certification theory.

## II. ARGUMENT

### A. <u>Relator Dodges the Critical Damages Issue Raised by the CSE Motion</u>.

Relator acknowledges two important points in his opposition brief: (1) Relator's damage claim against the CSE Defendants is limited to four claims for payment submitted and paid after June 10, 2004, totaling $68,000; and (2) there is no evidence that Tailwind failed to provide, or charged too much for, the hospitality goods and services referenced in the subject invoices. However, he ignores the legal implication of these undisputed facts: The government fails to meet its burden of proving damages where the goods and services provided are exactly what were promised and paid for.

The entirety of Relator's response on this issue is contained in two paragraphs, buried on pages 35-36 of his opposition brief. In the first of these paragraphs, Relator attempts to sidestep the issue by arguing that the Court may not evaluate the purported damages related to the four claims submitted by the CSE Defendants because it has "already rejected" any contention that these claims are to be treated differently from the lump-sum sponsorship fees paid under the

Sponsorship Agreements. (Relator's brief, at 35).[1] However, the Court's ruling in connection with a prior motion that the hospitality reimbursements were made "under the Sponsorship Agreements" does not constitute a finding that all claims under the Sponsorship Agreement are to be treated in the same way with respect to damages.

In order to prove damages in this case, the government and Relator must establish that the amount the government paid in connection with the allegedly false invoices exceeds the value of the goods and services provided. *SAIC*, 626 F.3d at 1279. This necessarily involves an evaluation of the particular goods and services provided in connection with each claim for payment, and how those goods and services compare to what was promised and paid for. The goods and services related to the four invoices at issue with respect to the CSE Defendants differ markedly from the goods and services covered by the lump-sum contract payments under the Sponsorship Agreements. Thus, the four claims at issue with respect to the CSE Defendants must be evaluated independently.

Relator devotes fully one paragraph to the merits of the CSE Defendants' damages argument. (Relator's brief, at 35-36). After effectively conceding that the hospitality services provided by Tailwind were as promised and at the agreed upon price, Relator argues that the damages suffered by the government are equal to the full amount paid on the invoices because the USPS would not have participated in the sponsorship events or enjoyed the food and beverages provided had the USPS known that the cycling team was "doping and cheating." (*Id.*, at 35). According to Relator, because the USPS would not have participated in the events had it known certain facts, "the value of the services provided is zero." (*Id.*, at 23, 35-36). This argument completely ignores the authority and controlling legal standard quoted elsewhere in Relator's brief.

Relator acknowledges that *SAIC* is the leading case in this circuit regarding the manner in which False Claims Act damages are to be calculated. (Relator's brief, at 34). In *SAIC*, the court

---

[1] Relator attempts this same tactic elsewhere in his brief, falsely claiming that this Court "already effectively determined" that the Postal Service received no value from the sponsorship of the cycling team. (Relator's brief, at 25).

held that the government does not meet its burden of proving damages by establishing that it would not have entered into the contract at issue or would have withheld payment had it known of certain facts. *Id.* at 1279. In that case, government witnesses testified that had they been aware of SAIC's breaches of contract, they would not have awarded the subject contracts to SAIC, and would not have made payments under those contracts. *Id.* at 1271. The district court instructed the jury that the proper measure of damages was "what the [government] paid to SAIC over and above what the [government] would have paid had it known of SAIC's organizational conflicts of interest." *Id.* at 1278. The D.C. Circuit rejected the district court's damages instruction, which equated the government's payments with its damages. The court made clear that the burden of proof with respect to damages rests squarely on the government (or the relator) and that "[t]o establish damages, the government must show not only that the defendant's false claims caused the government to make payments that it would have otherwise withheld, but also that the performance the government received was worth less than what it believed it had purchased." *Id.* at 1279. The court refused to adopt the presumption that services tainted by a knowing and material breach of contract were "worthless." *Id.* at 1280.

Yet that is precisely the position that Relator urges on this Court. Relator asks the Court to absolve the government of its obligation to prove damages by pointing to an alleged material breach of the Sponsorship Agreement. Relator claims that the Postal Service would not have attended the events or consumed the food and beverages that it paid for had it known of the cycling team's breach of the contract. SAIC makes clear that such an allegation is legally insufficient. Even if the USPS could prove in this case that it would not have attended the subject events, or it would have terminated the contract, or it would have withheld payment under the Sponsorship Agreement, or its executives would have spit out the food they consumed at the events, that would not satisfy Relator's burden of proving damages in this case.

Elsewhere in his brief, Relator relies upon *United States v. TDC Management Corporation, Inc.*, 288 F.3d 421 (D.C. Cir. 2002), for the proposition that the government may recover the full amount paid under a contract where it would not have paid anything had it known of information that was withheld by the defendant. (Relator's brief, at 24-25). In *TDC*,

the defendant was hired to act as an "impartial ombudsman" to assist in locating investors that might support minority businesses in obtaining government contracts. The defendant failed to attract any investors to assist the minority businesses, and also fraudulently concealed that it sought to obtain a financial interest in the projects it was supposed to be promoting. *Id.* at 424, 426-27. Thus, not only were there no tangible benefits from TDC's efforts, but the court found that the defendant had so deviated from the terms of the agreement by secretly seeking a financial stake in the projects that it ceased to play the role of impartial ombudsman for which it was being paid. *Id.* at 428. Thus, there was absolutely no value to the government.

In *SAIC*, the court distinguished *TDC*, and other cases where the government payment is intended to further a program to benefit third parties, from cases where the government itself is the beneficiary of the goods or services at issue. 626 F.3d at 1279 ("In some cases, such as where the defendant fraudulently sought payments for participating in programs designed to benefit third-parties rather than the government itself, the government can easily establish that it received nothing of value from the defendant and that all payments made are therefore recoverable as damages.") (citing *TDC*, 288 F.3d at 428, and similar cases). Here, as in *SAIC*, the government was the direct beneficiary of the goods and services provided under the applicable contracts, and neither the government nor the Relator have made any effort to prove that the goods and services provided at the hospitality events were worthless. Therefore, the reasoning and holding of *TDC* does not apply.

The only one of the four invoices for which Relator offers any substantive response is the August 30, 2004 invoice, related to the USPS contribution to a celebration following the 2004 Tour de France (the "August 30 invoice"). In his brief and his Statement of Genuine Issues and Additional Material Facts ("Relator's fact statement"), Relator asserts that the August 30 invoice was not for hospitality services under the Sponsorship Agreement, but rather a voluntary contribution towards a victory party. (Relator's brief, at 2, n. 1; Relator's fact statement, at 5 (Response to CSE SUF ¶ 2)). However, the distinguishing characteristic relied upon by Relator only further undermines his claim with respect to this payment.

As noted in Relator's fact statement, CSE asked USPS representatives to consider

making a voluntary contribution to an impromptu party that was to be thrown in Austin following the 2004 Tour de France. USPS chose to contribute $10,000 to the party. (Relator's fact statement, at 5-6 (Response to CSE SUF ¶ 2)). This $10,000 payment by USPS was not called for by the Sponsorship Agreement (or any other contract), and according to Relator, "the United States did not receive any goods or services in exchange for the $10,000 [it] paid." (*Id.*, at 5 (Response to CSE SUF ¶ 2)). Indeed, Relator admits "the payment was merely a 'contribution' to the promotional event and not a reimbursement for any good or services provided to the USPS." (*Id.*) No goods or services were provided, because none were promised. Thus, the government has suffered no damages.[2]

Neither the government nor Relator has made any effort to establish that the goods and services provided by Tailwind in connection with the four invoices at issues were deficient or worth less than what the Postal Service believed it had received at these hospitality events. Accordingly, the government cannot meet its burden of proving damages.

**B. Relator Ignores the Key Shortcoming of his Fraudulent Inducement Theory**

None of the four invoices submitted by Tailwind after June 2004 contained any false or fraudulent information. Thus, to establish that the claims are "false" under the FCA, Relator alleges that the defendants fraudulently induced the USPS to enter into the Sponsorship Agreement, and that these original misrepresentations "tainted every subsequent claim made in relation to the contract." (Relator's brief, at 39 (quoting *United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995)).[3]

In order to rely on a fraudulent inducement theory, Relator must prove three elements:

---

[2] Indeed, not only can Relator not establish damages with respect to this payment, but the circumstances of this voluntary contribution undermine any claim of FCA *liability* based on the payment. As discussed further below, if the payment was not required under the Sponsorship Agreement, then the invoice seeking fulfillment of the pledged contribution carried with it no implied certification regarding the terms of the Sponsorship Agreement (or any other contract). Accordingly, the implied certification theory fails as to this invoice.

[3] It is worth noting that *Schwedt* does not stand for this proposition. The contention quoted by Relator was obliquely raised by the plaintiff in his complaint, but dropped during the appeal. Thus, the *Schwedt* court declined to address it. 59 F.3d at 199.

First, Relator must prove that the CSE Defendants made or caused to be made false or fraudulent statements prior to the execution of the 2000 Sponsorship Agreement. *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 196 (D.D.C. 2011). Second, the statements must have been directed to the USPS. *Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 92-93 (D.D.C. 2014). Third, Relator must prove that the USPS was induced by these statements to enter into the Sponsorship Agreement. *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 128 F.Supp.3d 1, 18 (D.D.C. 2015).

The CSE Motion points out three critical facts that dispose of this theory: (1) the CSE Defendants were not involved in the negotiation, drafting or execution of the Sponsorship Agreements; (2) the CSE Defendants never directed any statements towards the USPS prior to 2004; and (3) Relator can point to no statements by any of the CSE Defendants that induced the USPS to enter into the Sponsorship Agreements. Relator does not, and cannot, dispute any of these points. Instead, he struggles mightily to justify his late disclosure of two public statements by Mr. Stapleton that predate the execution of the 2000 Sponsorship Agreement, and argues various theories of vicarious liability to account for his utter failure of proof.

First, Relator asserts that it is "simply irrelevant" that the CSE Defendants were not involved in the negotiation, drafting or execution of the contract, relying on authority purporting to establish that a defendant need not be a party to a contract to be liable under the FCA. (Relator's brief, at 38). However, the issue here is not whether a non-party to a contract can be an FCA defendant, but whether a person who has no interaction with the contracting party can fraudulently induce that party to enter into a contract. In *Head*, the court noted that a fraudulent inducement theory "require[s] the making of initial false representations to the Government." 798 F.Supp.2d at 196. "An initial false representation occurs when a party makes promises at the time of contracting that it intends to break." *Id.* (citing *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1329 (D.C. Cir. 2005)). Obviously, if the CSE Defendants had no interactions with the USPS, they could not have made promises to the USPS that they intended to break.

Next, Relator asserts that neither the CSE Defendants nor anyone else need make any

statements to the government to be liable for fraudulent inducement. (Relator's brief, at 39-40). According to Relator, the CSE Defendants can be liable under this theory because they "fraudulently perpetuated the understanding that the [Tailwind cycling] team was not doping." (Relator's brief, at 40). There is no legal basis for this attenuated theory of liability. *See Si*, 71 F.Supp.3d at 92-93 (dismissing claims based on false statements in "publications, brochures, and other media" because they "bear no relationship to a false statement made *to the government* in connection with a requested claim *for payment*") (emphasis in original).

Most importantly, Relator virtually ignores the critical element of reliance. He includes one sentence in his 47-page brief on the issue: "USPS personnel relied on denials in the press in ultimately deciding to go forward with the Sponsorship Agreement." (Relator's brief, at 42). For support, he relies on an inadmissible declaration filed by the government, purporting to establish the element of reliance with respect to alleged statements by Armstrong, and a handful of excerpts from the depositions of former USPS employees generically referring to press reports. (Relator's fact statement, at 18, 23-24 (Relator's supplemental material fact ¶¶ 20, 42-43)). Putting aside the fact that the proffered declaration directly contradicts prior sworn testimony by the declarant and is, therefore, inadmissible, Relator's "evidence" utterly fails to establish any reliance by the USPS *on any statement made by any of the CSE Defendants*. None of the cited testimony claims that the USPS employees were aware of any statement by any CSE Defendant prior to the execution of the 2000 Sponsorship Agreement, much less that they relied on any such statement in entering into the agreement. (CSE Reply ISO Undisputed Facts at Reply ISO SUF ¶ 3).

In *United States ex rel. Thomas v. Siemens AG*, 991 F.Supp.2d 540 (E.D. Pa. 2014), the court traced the history of the "fraud in the inducement" theory of FCA liability, and discussed at length the reliance element of a fraudulent inducement claim. Relying on the Supreme Court decision in *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543-44 (1943), the court noted:

> To prevail under his fraudulent inducement theory, Thomas must prove not only that the omitted information was material but also that the government was *induced* by, or relied on, the fraudulent statement or omission when it awarded the contract.

(emphasis in original) (internal citations omitted). The *Thomas* court stressed repeatedly that, "to establish FCA liability for fraudulent inducement, the false statement must have 'caused' or 'induced' the government to enter into a contract, such that but for the misrepresentation, the government would not have awarded the contract and would not have paid the claim." *Id.* at 570; *see also id.* at 570-71 ("for a claim based on the fraudulent inducement of a contract, a plaintiff is also required to show that the government relied on, or was induced by, a material false statement in deciding to award a contract"), *id.* at 571 ("before Thomas can claim that any purchase made pursuant to the contracts at issue constituted a false claim, he must first show that fraudulent statements made by SMS induced the government to enter into a contract that it would not have entered into but for the misrepresentations"), *id.* ("the FCA requires the plaintiff in a fraudulent inducement case to establish that the *decision to award a contract* was *actually*, not just potentially, based on a false statement") (emphasis in original), *id.* ("in a fraudulent inducement case, a defendant who attempts to induce a contract award by making a materially false statement will *not* be held liable for making a false claim *unless* the government relied on and was induced by the false statement to award the contract") (emphasis in original), and *id.* ("Even if the false statement is material, there is no violation unless the government relied on it.").

Here, Relator cannot show that any alleged false statements by the CSE Defendants (including the recently "discovered" press accounts in December 2000) were relied upon by the USPS or *caused* the USPS to enter into the 2000 Sponsorship Agreement. Accordingly, Relator's fraudulent inducement claim fails as to the CSE Defendants.[4]

---

[4] Relator also spends a substantial portion of his brief seeking to promote his "veil-piercing" theories. [redacted]

**C. Relator's Implied Certification Claim Fails Under the Standard Set Forth By the Supreme Court in *Universal Health*.**

The last refuge for Relator's claims against the CSE Defendants is that the four 2004 invoices are "false" because they impliedly certified that the Tailwind cycling team was in compliance with the anti-doping provisions of the 2000 Sponsorship Agreement. Since the filing of the CSE Motion, the Supreme Court has addressed the viability of the "implied certification" theory in *Universal Health*. The Court held that the implied certification theory can be a basis for liability where the claim for payment "makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." 136 S.Ct. at 2001.

The essence of the holding in *Universal Health* is "if the defendant does speak, he must disclose enough to prevent his words from being misleading." *Id.* at 2000, n.3. The Court held that because the defendant submitted claims using Medicare payment codes detailing certain services and included provider ID numbers suggesting the people performing the treatment were properly credentialed to have those provider numbers, "these representations were clearly misleading in context." *Id.* at 2000.

Relator can point to no comparable representation or omission in the four claims at issue with respect to the CSE Defendants. Nothing in the subject invoice was false or even partly false -- Tailwind sought reimbursement and/or payment for approved hospitality expenses that were provided as promised. Nor did Tailwind impliedly certify anything about the cycling team's compliance with the rules of cycling or any other statutory or regulatory provisions. In short there was nothing about the "context" of the invoices that rendered them "misleading."

Relator will argue that, with respect to the August 30 invoice, it was misleading for Tailwind to refer to the proposed party as a "victory" celebration because that term suggests that Armstrong "rode clean." The fact is, however, that Armstrong did win the 2004 Tour de France, and the party was intended to celebrate that victory. Moreover, as noted above, Relator's implied certification theory fails with respect to this claim because Tailwind made no

certification, express or implied, about compliance with the Sponsorship Agreement in connection with this payment. The government's and Relator's theory in this case is that each invoice for payment under the Sponsorship Agreement impliedly certified that the cycling team was in compliance with certain anti-doping provisions in the Sponsorship Agreement. According to Relator, no goods or services were promised or provided by Tailwind with respect to the August 30 invoice. Rather, the USPS agreed to make a voluntary contribution to defray the expenses of the Austin party in response to an email solicitation by CSE. (Relator's fact statement, at 5-6 (Response to CSE SUF ¶ 2)). This voluntary contribution was neither required nor suggested by the Sponsorship Agreement, and Tailwind did not certify compliance with any contractual terms. Accordingly, under *Universal Health*, the implied certification theory fails as to this invoice also.

## III. CONCLUSION

For the foregoing reasons and the reasons set forth in Armstrong's Memorandum and Reply, the CSE Defendants respectfully request the Court grant summary judgment in their favor on Counts 1, 2, 3, and 6 of Relator's SAC or, in the alternative, hold that only statutory damages are available to Relator if he prevails against the CSE Defendants on those counts.

Respectfully submitted,

Dated August 29, 2016

/S/ Marc S. Harris
Marc S. Harris (Admitted *Pro Hac Vice*)
Margaret E. Dayton (Admitted *Pro Hac Vice*)
SCHEPER KIM & HARRIS LLP
601 West Fifth Street, 12th Floor
Los Angeles, CA 90071-2025
(213) 613-4655 – Telephone
(213) 613-4656 – Facsimile
mharris@scheperkim.com

John P. Pierce (D.C. Bar No. 475101)
THEMIS PLLC
2305 Calvert Street, NW
Washington, DC 20008
(202) 567-2050 – Telephone
(202) 567-2051 – Facsimile
jpierce@themis.us.com

Attorneys for Defendants Capital Sports & Entertainment Holdings, Inc., William J. Stapleton and Barton B. Knaggs