# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* FLOYD LANDIS, | |
| Plaintiffs, | Civil Action No. 1:10-cv-00976-CRC |
| v. | **ECF** |
| TAILWIND SPORTS CORP., *et al.*, | |
| Defendants. | |

## LANCE ARMSTRONG'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

1101061

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................1

II.   ARGUMENT ..............................................................................................................3

      A.    The Government Cannot Prove that the USPS Suffered Any Actual
            Damages...........................................................................................................3

            1.    The FCB and CE earned media valuation reports are admissible ..............4

                  a.    The reports are adoptive admissions................................................4

                  b.    The reports are business records. .....................................................6

            2.    The Court should strike Gail Sonnenberg's post-deposition
                  declaration because it contradicts her deposition testimony.......................7

            3.    The conclusory declarations of Jonathan Walker and Larry
                  Gerbrandt are inadmissible under Federal Rule of Evidence 702 ..............9

                  a.    Walker's opinions are inadmissible because they have no
                        basis, are irrelevant, and because he is not qualified to
                        render them ....................................................................................10

                  b.    Gerbrandt's opinion is inadmissible because it has no basis,
                        he is not qualified to render it, and because it is irrelevant...........11

            4.    Under *SAIC*, the Government cannot disregard the benefits the
                  USPS enjoyed as a result of the sponsorship .............................................12

      B.    The Government Cannot Prove the Existence of a False Claim............................15

            1.    Express False Certification ......................................................................15

            2.    Implied Certification................................................................................16

            3.    Fraudulent Inducement ............................................................................18

                  a.    The government has failed to prove that the USPS relied on
                        a false statement by Armstrong to Sonnenberg or
                        Henderson .....................................................................................19

                  b.    The government has failed to prove that the USPS relied on
                        public statements by Armstrong or statements by others .............20

                  c.    The government's fraudulent inducement claim should be
                        limited to the allegedly fraudulent statements identified in

its complaint................................................................................21

C.     The Government Cannot Prove Unjust Enrichment ..............................................22

III.    CONCLUSION.....................................................................................................25

1101061

TABLE OF AUTHORITIES

**Federal Cases**

*Cannon v. Wells Fargo Bank, N.A.*
   952 F. Supp. 2d 1 (D.D.C. 2013) ..........................................................................23

*Catrett v. Johns-Manville Sales Cor*p.
   826 F.2d 33 (D.C. Cir. 1987) ................................................................................22

*Chesapeake Climate Action Network v. Export-Import Bank of the United States*
   78 F. Supp. 3d 208, 219 (D.D.C. 2015) ..................................................................9

*Dominguez v. UAL Corp.*
   No. 07-0418 (RJL) 2010 U.S. Dist. LEXIS 144189 (D.D.C. Sept. 28, 2010) ..........................25

*EEOC v. Waffle House, Inc.*
   534 U.S. 279 (2002) ..............................................................................................24

*Galvin v. Eli Lilly & Co.*
   488 F.3d 1026 (D.C. Cir. 2007) ..............................................................................8

*Glass v. Lahood*
   786 F. Supp. 2d 189 (D.D.C. 2011) ........................................................................8

*Halcomb v. Wash. Metro. Area Transit Auth.*
   526 F. Supp. 2d 24 (D.D.C. 2007) ........................................................................11

*Kalekiristos v. CTS Hotel Mgmt. Cor*p.
   958 F. Supp. 641 (D.D.C. 1997) ..............................................................................9

*Kaplan v. Rose*
   49 F. 3d 1363 (9th Cir. 1994) ................................................................................21

*Kumho Tire Co. v. Carmichael*
   526 U.S. 137 (1999) ..............................................................................................10

*Mack v. United States*
   814 F.2d 120 (2d Cir. 1987) ....................................................................................9

*Perma Research and Dev. Co. v. Singer C*o.
   410 F.2d 572 (2d Cir. 1969) ....................................................................................9

*\*Pyramid Sec. Ltd. v. IB Resolution, Inc*.
   924 F.2d 1114 (D.C. Cir. 1991) ....................................................................2, 8, 19

*Rainey v. American Forest & Paper Ass'n*
   26 F. Supp. 2d 82 (D.D.C. 1998) ..............................................................................9

iii

*Rapaport v. Dep't of Treasury*
   59 F.3d 212 (D.C. Cir 1995)..................................................................23

*Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*
   742 F.2d 786 (3d Cir. 1984) ................................................................21

*Shenandoah Assocs. L.P. v. Tirana*
   182 F. Supp. 2d 14 (D.D.C. 2001).........................................................25

*Travelers Cas. & Sur. Co. v. Dormitory Auth. State of NY*
   735 F. Supp. 2d 42 (S.D.N.Y. 2010) .....................................................24

*\*Universal Health Servs. v. U.S. ex rel. Escobar*
   136 S. Ct. 1989 (2016)........................................................16, 17, 18

*\*U.S. ex rel. Thomas v. Siemens AG*
   991 F. Supp. 2d 540 (E.D. Pa. 2015) ................................................19, 20

*U.S. ex rel. Westrick v. Second Chance Body Armor*
   128 F. Supp. 3d 1, 18-19 (D.D.C. 2015)........................16, 19, 21, 24

*U.S. ex rel. Williams v. Martin-Baker Aircraft Co.Ltd.*
   389 F.3d 1251 (D.C. Cir. 2004).............................................................21

*U.S. ex rel. Bender v. N. Am. Telecomms., Inc.*
   686 F. Supp. 2d 46 (D.D.C. 2010) .........................................................15

*U.S. ex rel. Davis v. District of Columbia*
   793 F.3d 120 (D.C.Cir. 2015)................................................................15

*U.S. ex rel. Debra Hockett v. Columbia/HCA Healthcare Corp.*
   498 F. Supp. 2d 25 (D.D.C. 2007).........................................................15

*U.S. ex rel. Harris v. Bernad*
   275 F. Supp. 2d 1 (D.D.C. 2003)...........................................................15

*U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*
   352 F.3d 908 (4th Cir. 2003) ................................................................21

*U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*
   525 F.3d 370 (4th Cir. 2008) ................................................................22

*U.S. v. Beckham*
   968 F.2d 47 (D.D.C. 1992) ...............................................................4, 6

*U.S. v. Fahnbulleh*
   752 F.3d 470 (D.C. Cir. 2014)............................................................6, 7

iv

*U.S. v. McGill*
  815 F.3d 846 (D.C. Cir. 2016) ............................................................................10

*U.S. Philip Morris USA, Inc.*
  566 F.3d 1095 (D.C. Cir. 2009) ..........................................................................18

*\*U.S. v. Science Applications Int'l*
  626 F.3d 1257 (D.C. Cir. 2010) .................................................................. *passim*

*Wright-Simmons v. City of Okla. City*
  155 F.3d 1264 (10th Cir. 1998) .............................................................................4

**Federal Statutes**

31 U.S.C. § 3729(a)(1) ..........................................................................................15

**Federal Rules**

Fed. R. Evid. 702 .............................................................................2, 9, 10, 11, 12

Fed. R. Evid. 801(d)(2)(B) .............................................................................2, 4, 5

Fed. R. Evid. 803(6) ............................................................................................2, 6

Federal Rule of Civil Procedure 9(b) ....................................................................21

Federal Rule of Civil Procedure 30(b)(6) ...............................................................9

v

## I.    INTRODUCTION

The USPS pro cycling sponsorship was a remarkable success.  During the term of the sponsorship, the team won six consecutive Tours de France, generating tens of millions of dollars in new sales and more than a hundred million dollars in public relations value for the USPS.  The undisputed evidence, developed over years of intensive discovery, establishes that the government's damages claims cannot survive.[1]  Further, Armstrong cannot be held liable under either the express or implied certification theory of False Claims Act liability because the undisputed evidence confirms that none of the invoices submitted to the USPS by Tailwind include either a specific representation or a "misleading half-truth."  And he did not induce, fraudulently or otherwise, the USPS to renew the sponsorship agreement.

The government's opposition fails to squarely face either the facts or the law.  With respect to the facts, it disputes the admissibility of evidence of benefits, introduces new declarations that contradict the testimony of its witnesses, and submits bare-bones, inadmissible declarations of its experts—all in an effort to create the appearance of a dispute of fact.  Each of the government's efforts presents a legal issue which the Court can resolve on this motion.  And when each of those legal questions is resolved, Armstrong is entitled to summary judgment.

For instance, rather than address the power and probity of the USPS-commissioned media valuation reports which eviscerate its damages claim, the government argues that the Foote, Cone & Belding and Campbell-Ewald reports are inadmissible.  Yet these reports, which the USPS commissioned and paid for year after year, and then trumpeted to the press, the public, and internal USPS constituencies, are admissible both as adoptive admissions and records of

---

[1] Armstrong moves for summary judgment on all remaining claims of the United States' Complaint and the relator's Second Amended Complaint.  *See* Mot. at 1.  Because the relator's opposition brief incorporates by reference the government's arguments and then focuses on the CSE defendants, Armstrong herein generally refers to the government.  However, Armstrong's arguments apply equally to the relator's remaining claims.

1

regularly conducted activity.  Fed. R. Evid. 801(d)(2)(B), 803(6).  These reports alone prove that the government has insufficient evidence of damages under the False Claims Act.

In addition, former USPS Vice President of Sales Gail Sonnenberg, the USPS executive responsible for managing the sponsorship, testified at deposition that the USPS received millions in new revenue because of the sponsorship.  Rather than accept this testimony, as the law requires it to do, the government submits a declaration from Sonnenberg that contradicts the admissions given in her deposition.  But "[c]ourts have long held that a party may not create a material issue of fact by simply contradicting [her] prior sworn testimony."  *Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1123 (D.C. Cir. 1991) (internal quotations omitted).  A declaration which contradicts previous testimony should be stricken.

The government also tries to create factual questions by submitting conclusory and unsupported expert declarations.  The bare-bones opinions are inadmissible because they are not properly rooted in identifiable facts, principles, and methods. Fed. R. Evid. 702.  Moreover, even if accepted, these expert declarations raise no fact issues that preclude summary judgment.

With respect to the law, the government argues that the court should ignore the evidence of the economic benefits from the sponsorship and instead allow it to argue that if it had known that riders on the cycling team were using performance enhancing substances, it would never have entered into the sponsorship, and therefore every penny it spent, without offset, constitutes its actual damages.  This is precisely the argument the D.C. Circuit rejected in *United States v. Science Applications Int'l*, where the Court held that "the fact-finder bases damages on the amount the government actually paid minus the value of the goods or services the government received or used."  626 F.3d 1257, 1279 (D.C. Cir. 2010) (hereinafter *SAIC*).

Accordingly, as more fully discussed in Armstrong moving papers and below, the Court should grant Armstrong's motion for summary judgment.

2

## II.    ARGUMENT[2]

### A.    The Government Cannot Prove that the USPS Suffered Any Actual Damages

Armstrong's opening papers established that the benefits the USPS enjoyed as a result of the sponsorship vastly exceeded its costs.  *See* Mot. at 17-24.  The undisputed facts establish that the USPS successfully used the sponsorship to generate new revenues.  RSUF 70.  Indeed, in November 2000, a USPS "business case" for the sponsorship reported that the USPS had generated $3.3 million in 1998; $10.2 million in 1999; and $4.8 million in 2000, with an additional $7.9 million pending. RSUF 79.  The USPS also received "tremendous public relations value" as a result of Armstrong's Tour de France wins while he was racing for the USPS cycling team. RSUF 75, 86-87.  It determined that "the value of the brand advertising [it] receive[d] from the USPS Pro-Cycling Team more than offset[] the cost of the sponsorship." RSUF 102.  Indeed, the evidence confirms that, according to the USPS's contemporaneous documents and public statements, between 1998 and 2004, the USPS enjoyed at least $163.7 million in quantified benefits as a result of the cycling team sponsorship.  Accordingly, because the undisputed evidence shows that "the value of the goods or services the government received or used" is greater than "the amount the government actually paid," *SAIC*, 626 F.3d at 1278-29, the government is not entitled to recover in damages any of the payments it made under the Sponsorship Agreements.

The government attempts to side-step the extensive evidentiary record concerning the benefits the USPS received as a result of the sponsorship by arguing that (1) the Foote, Cone

---

[2] Undisputed facts material to the issues presented in this Reply are set forth in Armstrong's concurrently-filed Reply Statement of Undisputed Facts, and cited to in this brief as "RSUF." All exhibits cited herein, and numbered between 1 and 92, were previously submitted with the Declaration of Elizabeth K. McCloskey in support of Armstrong's Motion for Summary Judgment.  ECF No. 514-3.  All exhibits cited herein, and numbered between 92 and 99, are submitted with the concurrently-filed Declaration of R. James Slaughter. With this reply brief, Armstrong also submits a Response to the United States' Statement of Facts (ECF No. 531-3) and a Response the Relator's Statement of Genuine Issues (ECF No. 532-1).  Facts set forth in the government's Statement of Facts are cited to herein as "USSOF."

Belding ("FCB") and Campbell-Ewald ("CE") earned media valuations are inadmissible hearsay; (2) in spite of the evidence, and in direct contradiction to its own witnesses' testimony, the government did not earn new revenue as a result of the sponsorship; (3) conclusory expert declarations raise a triable issue of fact on damages; and (4) regardless of the actual benefits, the government should be permitted to argue that it never would have entered into the sponsorship in the first place.  Each of these arguments should be rejected by the Court as a matter of law.

### 1.       The FCB and CE earned media valuation reports are admissible

Each year from 2001 to 2004, the USPS commissioned advertising agencies CE and FCB to quantify the value of the media exposure the USPS earned from the sponsorship. RSUF 92-99. The agencies reviewed print, TV and Internet exposure. Exs. 62-64, 83.  In accordance with best practices, they determined the value of the exposure by applying a discount factor to the equivalent cost of purchasing the exposure directly.  *Id.*  Those reports established that the USPS received at least $165 million in domestic and international media exposure as a result of the cycling team sponsorship between 2001 and 2004.  *Id.*  The reports are admissible both as adoptive admissions and as business records.  And when admitted, the reports alone eviscerate the government's damages claim.

### a.       The reports are adoptive admissions

A statement "offered against an opposing party," which "manifested that it adopted or believed to be true," is an adoptive admission exempt from the general rule against hearsay.  Fed. R. Evid. 801(d)(2)(B).  The exemption applies where the opposing party "understood and unambiguously assented to" a third-party statement, which "may be established through conduct as well as through words."  *United States v. Beckham*, 968 F.2d 47, 52 (D.D.C. 1992).  Where the underlying hearsay is a document, courts ask "whether the surrounding circumstances tie the possessor and the document together in some meaningful way."  *Wright-Simmons v. City of Okla. City*, 155 F.3d 1264, 1268 (10th Cir. 1998).  "A document is sufficiently tied to the possessor to the extent the adoptive party accepted and acted upon the evidence."  *Id.*

4

The USPS manifested that it believed the CE and FCB reports to be true. *See* Fed. R. Evid. 801(d)(2)(B).  The government's 30(b)(6) witness testified that the FCB and CE reports were repeatedly commissioned, paid for, and then given to the USPS Public Affairs and Communication Group so that they could be used to respond to the public when it questioned the USPS about its investment in the sponsorship.  Ex. 9 at 523:17-524:3.  The USPS relied on the information in these reports when speaking to the public.  RSUF 101.

For instance, after a customer contacted the USPS in 2002 regarding the sponsorship, a USPS executive responded, "I can assure you that the value of the brand advertising we receive from the USPS Pro-Cycling Team more than offsets the cost of the sponsorship." Ex. 54 at US00001260-62.  The USPS also relied on the evaluations when communicating with the press. USPS talking points for a March 2003 press teleconference describe "[t]he incredible free publicity generated" as a result of its sponsorship, citing FCB's finding that the Postal Service earned "$19 million in free advertising." Ex. 89 at USPS_TAR00239649; *see also id.* at USPS_TAR00239650, Ex. 52.  Another set of talking points cites the 2003 CE report, noting that "ad agency Campbell-Ewald estimated the Postal Service garnered the equivalent of $31 million in free advertising space in the U.S. alone – a first-class deal by any measure."  Ex. 79 at USPS_TAR00237703; *see also* Ex. 68 (requesting approval to respond to inquiries about the sponsorship with FCB's calculation "that $18.451 million worth of brand advertising was obtained" in 2001 as a result of the sponsorship).

The USPS also manifested its belief in the reports in internal communications.  RSUF 100.  It commissioned the reports both to communicate publicly and "to get an outside opinion of worth [of the sponsorship]," and then "report that up to [USPS] management as a marker."  Ex. 18 at 50:7-12.  In March 2002, for example, a USPS executive sent an email summarizing the conclusions from FCB's 2001 evaluation "for ultimate use by the Postmaster General . . . ."  Ex. 18 at 111:4-113:4.  The USPS relied on the valuations to conclude that the sponsorship was a

5

"first-class deal," Ex. 79 at USPS_TAR00237703, and that it was generating "incredible free publicity."  Ex. 89 at USPS_TAR00239649.

Whether dealing with the press, public, or its own management and staff, the USPS "unambiguously assented" to the evaluations' conclusions.  *Beckham*, 968 F.2d at 52.  Therefore, the evaluations are adoptive admissions, exempt from the rule against hearsay.

### b.   The reports are business records.

FCB and CE's media evaluations are also admissible as business records.  A record must be admitted as a business record over a hearsay objection if:

> [1] the record was made at or near the time by—or from information transmitted by—someone with knowledge;
> [2] the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
> [3] making the record was a regular practice of that activity;
> [4] all these conditions are shown by the testimony of the custodian or another qualified witness . . . ; and
> [5] the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6); *accord United States v. Fahnbulleh*, 752 F.3d 470, 478 (D.C. Cir. 2014).

The first element of the business records exception is satisfied where the records "were prepared by . . . employees as part of their job responsibility throughout the course of the" events set forth in the record.  *Fahnbulleh*, 752 F.3d at 479.  Here, employees of FCB and CE employees prepared the media evaluations each year after the Tour de France concluded.  *See* Ex. 92 at 16:9-17:6, 23:13-24:3, 66:14-17; Ex. 78; Ex. 86; Ex. 93 at 92:14-93:23, 96:10-98:1; Ex. 57; Ex. 59.

The second and third elements are satisfied by testimony that the forms were made and maintained in the ordinary course of business.  *Fahnbulleh*, 752 F.3d at 478.  Here, not only were the reports prepared and maintained in the ordinary course of business, they were made using a methodology routinely used by FCB and CE, and indeed standard in the industry.  *See* Ex. 92 at 43:22-45:20, 71:17-72:12; Ex. 93 at 87:8-88:21, 32:5-19, 57:6-12, 27:7-21.

The fourth element is satisfied by the testimony of an employee "familiar with the forms and circumstances of their creation," including a supervisor who did not prepare the forms himself. *See Fahnbulleh*, 752 F.3d at 479.  Here, Brian Mieth, who prepared the FCB reports, and Robert Talbert, who supervised the employees who created the CE reports, authenticated them at their depositions. *See* Ex. 92 at 24:8-25, 65:12-67:21, Ex. 93 at 23:14-20, 27:7-21, 54:12-55:14, 56:17-57:5, 23:3-13, 92:14-93:23.

"Finally, there [is] no evidence that the documents . . . were not reliable reports of the data that" they contain.  *Fahnbulleh*, 752 F.3d at 479.  Although the government has presented declarations from experts who quibble with FCB's and CE's industry-standard methodologies, those reports are inadmissible for the reasons described below and, regardless, no party has suggested that the evaluations do not accurately report the analysis of FCB and CE.  Therefore, the reports are admissible as business records.

## 2.     The Court should strike Gail Sonnenberg's post-deposition declaration because it contradicts her deposition testimony

Sonnenberg was the USPS executive responsible for managing the sponsorship and, with Postmaster General Henderson, for renewing the sponsorship in 2000.  She testified in detail regarding the new revenue the USPS generated as a result of its cycling team sponsorship.  She explained that the USPS decided to renew the sponsorship in 2000 because it believed it would generate new revenue as a result of the cycling team sponsorship.  Ex. 94 at 49:5-53:8.  On June 6, 2000, while the USPS was preparing to make this decision, Sonnenberg made a presentation to the USPS Board of Governors, which identified revenue generation as a benefit of the sponsorship.  *Id.* at 49:5-53:8.  Indeed, Sonnenberg explained to the Board of Governors that, "[a]s the title sponsor [of the cycling team] . . . [w]e are generating revenue by making sales to companies and individuals affiliated with cycling." Ex. 25 at 9:3-4.  "In 1998, we generated $3.2 million in new sales; in 1999, new revenue grew to over $10 million.  To date, in the 2000, the sponsorship had added a new $2.7 million and there's about $8.2 million left to be closed this year.  We expect that the exposure of the team at the Tour de France and at the Olympic Games

7

are going to provide additional opportunities for revenue this year." *Id.*at 11:4-11.  At her deposition, Sonnenberg testified unequivocally that all information she presented to the USPS Board of Governors—including these revenues figures—was truthful and accurate.  Ex. 94 at 174:8-180:1, 190:15-191:24; *see also id.* at 36:12-38:6.

Sonnenberg also testified that the USPS had obtained new business from at least Montgomery Securities, Bell, Shimano, Pearl Izumi, Trek, and Nashbar as a result of the sponsorship.  *Id.* at 126:1-29:3.  She testified that she believed that sales attributable to the sponsorship increased during each year of its existence.  *Id.* at 190:15-191:4; *see also id.* at 142:14-143:22.  The USPS tracked these sales.  For example, Sonnenberg testified that she could determine whether new business resulted from a specific customer meeting.  *Id.* at 118:2-17.

Now, the government submits a post-deposition declaration from Sonnenberg that attempts to disclaim her sworn testimony that the USPS generated new revenue as a result of the cycling team sponsorship.  For example, the declaration claims that, to the extent the sponsorship contributed to sales, "it was only one of many factors that contributed to the USPS concluding any sale," and the USPS lacked the ability to track those sales.  Chandler Decl., Ex. 32 ¶¶ 5, 6.  Any representations she and other USPS representatives "made at the time about new revenue associated with the sponsorship . . . were only very rough estimates and, to my knowledge and belief, they were understood as such by others within the USPS to whom they were made.  Moreover, these representations . . . were not meant to suggest that any sale had been solely the result of the sponsorship and, to my knowledge and belief, no one within the USPS understood them as such."  *Id.* at ¶ 6.  These assertions flatly contradict Sonnenberg's sworn testimony.

A party may not create a triable issue of fact by contradicting its prior sworn testimony. *See, e.g., Pyramid Sec. Ltd*, 924 F.2d at 1123; *accord Glass v. Lahood*, 786 F. Supp. 2d 189, 216 (D.D.C. 2011); *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting [her] own prior testimony, this would greatly diminish the utility of

8

summary judgment as a procedure for screening out sham issues of fact." *Perma Research and Dev. Co. v. Singer C*o., 410 F.2d 572, 578 (2d Cir. 1969). Accordingly, "a party's affidavit which contradicts [her] own prior deposition testimony should be disregarded on a motion for summary judgment." *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987); *see also Kalekiristos v. CTS Hotel Mgmt. Cor*p., 958 F. Supp. 641, 669 (D.D.C. 1997).

In light of the significant contradictions between Sonnenberg's sworn testimony and her late-filed declaration, the court should disregard and strike the Sonnenberg declaration.[3]

### 3.    The conclusory declarations of Jonathan Walker and Larry Gerbrandt are inadmissible under Federal Rule of Evidence 702

The government submitted declarations signed by its experts Jonathan Walker and Larry Gerbrandt in an effort to create a fact issue with respect to damages. These declarations attempt to cram complex expert opinions into less than three pages each. Yet, in doing so, they fail to disclose the facts or methodologies, if any, upon which their opinions are based.

An expert declaration is inadmissible where it fails to set forth the facts, principles, and methodology upon which its conclusions are based. *Chesapeake Climate Action Network v. Export-Import Bank of the United States*, 78 F. Supp. 3d 208, 219 (D.D.C. 2015). "The proponent of the expert testimony bears the burden to establish the admissibility of the testimony

---

[3] The government also repeatedly contradicts the binding deposition testimony of its 30(b)(6) witness, Brett Elliott, a deposition the Court permitted the government to postpone until the end of discovery in acknowledgement of the fact that the answers given would bind the government. Courts routinely strike later-proffered evidence that contradicts a 30(b)(6) witness's testimony. *See Rainey v. American Forest & Paper Ass'n*, 26 F. Supp. 2d 82, 95 (D.D.C. 1998) (Rule 30(b)(6) "aims to prevent a corporate [party] from thwarting inquiries during discovery, then staging an ambush during a later phase of the case."). Armstrong identifies in his reply separate statement forty-two times the government disputes or attempts to re-characterize Elliott's testimony. To give just one example, the government disputes that "[t]he Tour de France victories increased the amount of exposure that the USPS was getting in the media." Dkt. No. 531-2 ¶ 162. Yet Elliott testified unequivocally: "Q. [W]inning the Tour de France increased the amount of exposure that the Postal Service was getting in the media, correct? A. Yes." Ex. 12 at 296:21-24. The Court should disregard the government's improper attempts to contradict the sworn and binding testimony of its Rule 30(b)(6) witness.

and the qualifications of the expert." *United States v. McGill*, 815 F.3d 846, 903 (D.C. Cir. 2016).

> **a.    Walker's opinions are inadmissible because they have no basis, are irrelevant, and because he is not qualified to render them**

Walker's declaration is inadmissible under Rule 702 because it fails to disclose the facts, if any, upon which it is based, the methodologies used, and how those methodologies were applied to form Walker's opinions. Walker's declaration contains only a series of unsupported and conclusory opinions. He does not disclose any facts upon which he relied in forming his "best estimate" that "market value of the sponsorship on a fully disclosed basis is zero." Chandler Decl. Ex. 34 ¶ 5. He does not reconcile his opinion with the documentary evidence to the contrary—including USPS's own valuations and third-party valuations. Nor does Walker explain his methodology, making it impossible for the Court to determine whether it is reliable, or whether it was reliably applied.[4] "[N]othing . . . requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999).

Walker's opinions suffer from two additional defects that render them inadmissible. First, they are irrelevant, legal conclusions. Walker's opinion that the USPS cannot be damaged by "valuations that do not correspond to market values" directly contradicts the governing law. The District of Columbia Circuit has held that where "the value that conforming goods or services would have had is impossible to determine, then the fact-finder bases damages on the amount the government actually paid minus the value of the goods or services the government received or used." *SAIC*, 626 F.3d at 1279. Instead of applying the standard for damages that

---

[4] Walker states that his opinions are "[b]ased on his background and experience and analysis detailed in my expert report," which the government has not introduced into the record. Had it done so, the government would have exposed that Walker's analysis is based on mistaken facts, speculation, and a failure to reliably apply the principles he claims to espouse.

governs this action, Walker ignores it without disclosing any sound basis or any alternative method of valuation.[5]

Second, Walker is not "qualified as an expert by knowledge, skill, experience, training, or education" to testify about media valuations. Fed. R. Evid. 702. "[I]t is a mistake for a trial judge to declare anyone to be generically an expert." *Berry*, 25 F.3d at 1352. "The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Id.* at 1351. Walker is unqualified to address questions about the conclusions and methodology used in media valuations. He has never been employed by an advertising, sports marketing, or sponsorship evaluation firm. Ex. 95 at 72:14-24. He has no degree in and has never published any papers about advertising or marketing. *Id.* 70:2-12. Nor has he ever designed, performed, or been retained to perform a media coverage evaluation study. *Id.* 70:13-21. Walker's lack of relevant qualifications provides an independent basis to exclude his opinions regarding the media valuations. Because Walker's affidavit does not satisfy any of the requirements of Rule 702, the opinions contained therein are inadmissible.

### b.   Gerbrandt's opinion is inadmissible because it has no basis, he is not qualified to render it, and because it is irrelevant.

Gerbrandt's declaration is inadmissible under Rule 702, as it fails to set forth the facts and principles upon which it is based. With effectively no explanation, Gerbrandt opines that "no sponsor would pay anything for a media package that includes both the positive impression estimates in the FCB and CE reports from 2001-04, and the negative impressions that [he] counted" Chandler Decl., Ex. 33 ¶ 5. Yet Gerbrandt discloses no methodology whatsoever underlying his opinion.

---

[5] *See Halcomb v. Wash. Metro. Area Transit Auth.*, 526 F. Supp. 2d 24, 27 (D.D.C. 2007) ("Expert testimony consisting of legal conclusions is impermissible because such testimony merely states what result should be reached, thereby improperly influencing the decisions of the trier of fact and impinging upon the responsibilities of the court.").

The only basis Gerbrandt provides for his opinion is his "background and experience." *Id.* ¶ 5. Yet, at deposition, Gerbrandt conceded that he has no background in valuation methods. Ex. 96 at 45:2-46:3. He has never valued a sports team sponsorship, never assessed benefits derived by a sports team sponsorship, and never valued the effects of negative publicity on the value of a sports team sponsorship. *Id.* at 52:20-54:21, 60:25-61:4, 63:16-20, 80:20-23, 82:6-12. Gerbrandt has no experience analyzing damages under the FCA. *Id.* at 61:6-8. Instead, Gerbrandt is a professional expert in television and other programming. *Id. at* 11:2-12, 122:7-17.

Gerbrandt's conclusion is also, on its face, unreliable and irrelevant. Gerbrandt contends that the negative impressions he *counted* outweigh the positive *dollar* estimates set forth in the FCB and CE reports. But that is comparing apples and oranges. FCB and CE, using industry-standard methodologies, valued the earned media enjoyed by the USPS, estimating a dollar value of the benefits earned by the USPS. That dollar value well exceeded the cost of the sponsorship. Gerbrandt does not estimate a dollar value of the alleged harm. Nor, given his lack of experience, could he. Given the *SAIC* standard, that is the only relevant question, and Gerbrandt does not even purport to address it. Because Gerbrandt's declaration does not satisfy any of the requirements of Rule 702, the opinions contained therein are inadmissible.

> **4.     Under *SAIC*, the Government cannot disregard the benefits the USPS enjoyed as a result of the sponsorship**

Instead of confronting the evidence of the massive benefits that the USPS enjoyed as a result of the sponsorship, the government suggests that the Court (and the trier of fact) ignore those benefits, and take the government at its word that the sponsorship was worthless. Yet this is the same ploy the D.C. Circuit rejected in *SAIC. See* 626 F.3d at 1280.

In *SAIC*, the government argued that a contractor who performed its end of the contract was nevertheless liable under the FCA because it violated a contractual provision requiring disclosure of conflicts of interest. *Id.* at 1262. The government advanced the same theory of damages it advances here: if it had "known about [the contractor's] organizational conflicts, it would have made no payments whatsoever for the consulting advice and technical assistance it

12

received." *Id.* at 1265. The district court adopted the government's theory, and instructed the jury that its "calculations of damages should be limited to determining what the [government] paid to [the contractor] over and above what the [government] would have paid had it known of [the contractor's] organizational conflicts of interest." *Id.* at 1278.

The Court of Appeals held that the instruction was erroneous as a matter of law. *Id.* "[The] automatic equation of the government's payments with its damages is mistaken." *Id.* Instead, "the district court should instruct the jury to calculate the government's damages by determining the amount of money the government paid due to [the contractor's] false claims over and above what the services the company actually delivered were worth to the government." *Id.* at 1279. Where "the value that conforming goods or services would have had is impossible to determine, then the fact-finder bases damages on the amount the government actually paid minus the value of the goods or services the government received or used." *Id.*

Here, the government invites this Court to make the same error the District Court made in *SAIC*. As the Relator admitted: "[T]here is no way to know with certainty what the precise market value of the sponsorship would have been had the team complied with the rules." Relator's Opp. 22. Therefore, the trier of fact must account for "the value of the goods or services the government received."

Even if the government were correct that the damages should be the difference between the value the cycling team provided, and the value the of a team in which none of the riders were using banned substances, the government has failed to provide any evidence of the value of a PED-free team. Instead, the government merely cites statements by USPS employees and third-parties speculating that the USPS would not have paid for the sponsorship had they known. On precisely the same evidence, the District of Columbia Circuit held that it was impossible to determine the value of conforming services. *See SAIC,* 626 F.3d at 1279-80.[6]

---

[6] The only other evidence the government cites is the unsupported opinion of Walker, who concludes that the market value of the sponsorship is zero. But, as set forth above, Walker's declaration is inadmissible.

13

Because the government merely assumes that the value of the services the USPS received were "likely worthless," it does not attempt to prove its damages under the *SAIC* standard. Instead, it raises immaterial issues.  First, the government argues that Armstrong seeks credit for "consequential benefits."  That phrase does not appear in any of the cases the government cites, and the government never explains what it means by the term.  To the extent the government suggests that the earned media and increased sales are somehow impermissible "consequential benefits," it is wrong.  The earned media and new revenue the government received were core benefits that the government negotiated for and hoped to receive.  RSUF 4.  The Sponsorship Agreements define the USPS's promotional rights as "increase[d] revenue and sales of the U.S. Postal service products," "increase[d] public awareness of the quality of the U.S. Postal Service products and services," and "media & on-site impressions."  Ex. 21 at Ex. A §§ 1-2, Ex. D; *see also* Ex. 22 § 9.  The USPS and USPS-commissioned sponsorship evaluations directly value the bargained-for public awareness and media impressions. RSUF 89-99.  And in her presentation to the Board, Sonnenberg identified (and quantified) the increased revenue as a result of the cycling sponsorship as an objective of the sponsorship.  RSUF 73.

The government also seeks to introduce evidence of "consequential harms . . . in the form of negative media exposure." Opp. at 44.  This theory is triply deficient.  First, the government admits that it "is not entitled to seek a recovery for consequential damages."  *Id*. at 38.  Second, it is irrelevant because under *SAIC* the government may only assert as damages amounts it "***actually paid.***" *See* 626 F.3d at 1279 (emphasis added).  The government has not and cannot show it "actually paid" any sums as a result of mentions of the USPS in articles about Armstrong's admission.  Third, neither of the government's experts attempted to quantify the value of the so-called negative media impressions the USPS received.  Ex. 95 at 131:10-23; Ex. 96 at 93:9-12.  The government has not put any amounts beyond the sponsorship fees on a ledger to measure against the new cash revenue and earned media actually received by the USPS.

14

Because the undisputed evidence shows that the value of the services the government received is greater than the amount the government paid, the government is not entitled to recover in damages any of the payments it made under the Sponsorship Agreements.

### B.       The Government Cannot Prove the Existence of a False Claim

To hold Armstrong liable under any of the remaining FCA claims pled against him, the government must prove the existence of a false claim. *See* 31 U.S.C. § 3729(a)(1); *U.S. ex rel. Davis v. District of Columbia,* 793 F.3d 120, 124 (D.C.Cir. 2015); *U.S. ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 5-6 (D.D.C. 2003).  Indeed, the "sine qua non" of the FCA is a false claim. *See U.S. ex rel. Bender v. N. Am. Telecomms., Inc*., 686 F. Supp. 2d 46, 52 (D.D.C. 2010).  The FCA provides numerous ways to prove a false claim.  A claim can be false where a claimant falsely certifies—either expressly or impliedly—compliance with a condition (express or implied certification).  A claim can also be false even if it is literally true, but the claimant previously made misrepresentations in order to induce the government to enter into the contract (fraudulent inducement).  The government has failed to prove a false claim under any of these theories.

### 1.       Express False Certification

The government asserts that Armstrong has not challenged its express false certification theory of liability.  That is because the government never previously asserted liability under the express certification theory.[7]  *See* Mot. at 35; *see also generally* Compl.  Even if it had, the government has failed to prove express false certification.  Express false certification occurs when a claim "falsely certifies compliance with a particular statute, regulation or contractual terms, where compliance is a prerequisite to payment." *U.S. ex rel. Debra Hockett v. Columbia/HCA Healthcare Corp*., 498 F. Supp. 2d 25, 64 (D.D.C. 2007).  Neither the government's complaint, nor its opposition, identifies evidence showing that Armstrong, or any other individual or entity, submitted a claim to the USPS which expressly and falsely certified

---

[7] The government also mistakenly asserts that Armstrong does not challenge its conspiracy charge, Count Three.  Armstrong's motion, at page 35, directly addresses Count Three.

compliance with any term.  Indeed, the undisputed evidence shows that the invoices Tailwind submitted for payment pursuant to the Sponsorship Agreements do not certify compliance with anything, including the use or nonuse of performance enhancing substances.  RSUF 34. Accordingly, the government cannot prevail on an express false certification theory.[8]

### 2.     Implied Certification

The government relies on the implied certification theory of liability to prove the existence of a false claim.[9]  This effort fails in light of the Supreme Court's recent decision in *Universal Health Servs. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989 (2016) (hereinafter *Universal Health*).  The invoices that Tailwind submitted to the USPS do not contain any representation about the services provided, nor does their failure to disclose noncompliance make any representation they include misleading.

The Supreme Court held in *Universal Health* that, to find a defendant liable under the implied certification theory of FCA liability, the government must prove:  ***First***, that the allegedly false claim includes "specific representations about the goods or services provided," and ***second***, that the "defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths."  *Id.* at 2001.

In *Universal Health*, a Medicaid patient undergoing treatment at a facility owned and operated by a subsidiary of Universal Health Services, died of a seizure.  The patient's parents filed a *qui tam* action after discovering that the individuals treating her, who had purported to be mental health professionals, were not properly licensed.  They contended that Universal Health's

---

[8] The government also argues that Armstrong made "express false statements" that render him liable under the express certification theory.  Opp. at 22-23.  Armstrong addresses the significance of the alleged false statements in Part II(B)(3), *infra*.

[9] The government incorrectly asserts that this Court "has already decided that Armstrong's conduct falls squarely within *SAIC*'s articulation of the implied certification theory," citing the Court's June 19, 2014 Order.  Opp. at 29 (citing ECF No. 174, at *54).  The cited portion of that Order relates to Defendant Thomas W. Weisel's conduct, not Armstrong's.

Medicaid invoices contained false claims, because they "made *representations about the specific services provided by specific types of professionals*, but [] failed to disclose serious violations of regulations pertaining to staff qualifications and licensing requirements for these services." *Id.* at 1998 (emphasis added).  The district court dismissed plaintiffs' complaint on the ground that it failed to state any implied falsity because it relied on noncompliance with regulations that were conditions of *participation* in the state Medicaid program, rather than conditions of *payment*. The First Circuit reversed, concluding that conditions of payment need not be expressly designated to give rise to FCA liability. 780 F.3d 504, 514 n.14 (2015).

The Supreme Court vacated the First Circuit's decision and remanded.  It clarified that implied certification can only provide a basis for liability where a claim makes a specific representation about the goods or services provided, but knowingly fails to disclose noncompliance with a statutory, regulatory, or contractual requirement, and the omission renders those representations misleading.[10] *Universal Health*, 136 S. Ct at 1989-93.  In *Universal Health*, the defendant had done "more than merely demand payment"—it had submitted claims for payment using payment codes that corresponded to specific counseling services, thereby representing that it had provided specific kinds of treatment—which it had not actually provided. *Id.* at 2000 ("When, as here, a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided.").  Such misrepresentations fell "squarely within the rule that half-truths—

---

[10] The Supreme Court noted that it "need not resolve whether all claims for payment implicitly represent that the billing party is legally entitled to payment." *Universal Health*, 136 S. Ct. at 2000.  Yet, because the Court held that implied certification can only provide a basis for liability where the defendant makes a specific representation about the goods or services provided, and that representation can be characterized as a "misleading half-truth[]," a violation of a material statutory, regulatory, or contractual requirement is not sufficient for implied certification liability.  Indeed, to read *Universal Health* as not requiring a plaintiff to satisfy those conditions would render the decision meaningless.

representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations." *Id*. at 1999-2000.

Here, unlike in *Universal Health*, the invoices submitted by Tailwind to the USPS make no representations that relate to the use of performance enhancing substances.[11]  Nor do they contain "misleading half-truths" that can be characterized as relating to performance enhancing substances.  The invoices set forth the amount to be paid, and the location where payment should be remitted. They make no claims that are "literally false," "partially true," or "intentionally misleading." *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1128 (D.C. Cir. 2009).  To the extent they contain any detail at all, other than as set forth above, that detail does not relate to prohibited substances.[12]

Because the undisputed evidence confirms that none of the invoices submitted to the USPS include either a specific representation or a "misleading half-truth," Armstrong cannot be held liable under the implied certification theory of FCA liability.

### 3.    Fraudulent Inducement

Finally, the government attempts to prove the existence of a false claim through the fraudulent inducement theory of liability.  Yet again, the government has not presented admissible evidence that the USPS was induced by, or relied on, any statement made by Armstrong (or anyone else) when it awarded the 2000 Sponsorship Agreement.[13]

---

[11] The government's argument that Armstrong's statements "prior to and contemporaneous with the claims to the USPS" qualify as half-truths sufficient for implied certification liability ignores the legal standard.  Opp. at 30.  The appropriate question is what representations were made in the claims for payment. *See Universal Health*, 136 S. Ct. at 1995 ("[L]iability [under the implied certification theory] can attach when the defendant *submits a claim for payment that makes specific representations* . . . ." (emphasis added)).

[12] *See, e.g.,* Ex 97 ("United States Postal Service Pro Cycle Team, Outstanding balance of 2003 Tour de France Hospitality Program."); Ex 98 ("United States Postal Service Pro Cycling Team, Sponsorship Agreement 2004.").

[13] For the same reason that the government's fraudulent inducement theory of liability fails, so too does its common law fraud claim.  The government must prove that it relied upon the false representation. *See, e.g.,* Opp. at 53.  Here, the government has failed to produce evidence showing that it took any action in reliance on a false representation by Armstrong.

To prove fraudulent inducement, the government "must prove not only that the omitted information was material but also that the government was *induced by*, or *relied on*, the fraudulent statement or omission when it awarded the contract." *U.S. ex rel. Thomas v. Siemens AG*, 991 F. Supp. 2d 540, 569 (E.D. Pa. 2015) (hereinafter *Thomas*). "[T]he essential element of inducement or reliance is one of causation." *Id.*; *see also U.S. ex rel. Westrick v. Second Chance Body Armor*, 128 F. Supp. 3d 1, 18-19 (D.D.C. 2015) (hereinafter *Westrick*).

Here, the government rests its fraudulent inducement argument on evidence of Armstrong's statements denying his PED-use.  It is not enough that Armstrong falsely denied using PEDs.  To prove a false claim under fraudulent inducement liability, the government must prove *causation*—that it relied on the false statements when it awarded the contract or paid claims pursuant to it.  *See Thomas*, 991 F. Supp. 2d at 569.  The government has failed to provide any evidence of causation.

### a.   The government has failed to prove that the USPS relied on a false statement by Armstrong to Sonnenberg or Henderson

The government identifies just two conversations between Armstrong and USPS representatives to support its fraudulent inducement theory.  First, it relies on portions of the Sonnenberg declaration which contradict her earlier deposition testimony relating to a November 2000 meeting between Sonnenberg and Armstrong.  Yet, at her deposition, Sonnenberg testified in detail about this meeting, and never once claimed to have relied on any false statement by Armstrong in deciding to enter into the 2000 Sponsorship Agreement. RSUF 52, 53; Mot. at 38-39.  A party may not create an issue of fact by contracting prior sworn testimony.  *Pyramid Securities Ltd.,* 924 F.2d at 1123.  Accordingly, Sonnenberg's declaration is insufficient.

Second, the government cites the deposition testimony of former Postmaster General William Henderson.  In the portion of Henderson's testimony upon which the government relies, Henderson states generally that, had he known Armstrong was doping, he would not have approved the extension of the Sponsorship Agreement in 2000. Chandler Decl., Ex. 10 at 229:16-230:12.  But Henderson never testified that he relied on or was induced by *any* statement by

Armstrong in deciding to award the Agreement.  The government must prove that the USPS was *induced by*, or *relied on*, the fraudulent statement when it awarded the contract. *Thomas*, 991 F. Supp. 2d at 569.  The government has failed to make that showing.

> **b.**     **The government has failed to prove that the USPS relied on public statements by Armstrong or statements by others**

The government also lists various public statements Armstrong made in which he denied PED-use and statements by others regarding a clean team.  Critically, however, the government fails to provide any evidence that the USPS *relied* on any of these public statements or statements by others.  To the extent the government's brief claims reliance, its argument either lack citation to any factual support[14] or the cited evidence does not support the government's claim.[15]  For instance, the government claims that "USPS officials relied on the false doping denials they received directly from Armstrong and team management." Opp. at 26 (citing USSOF 170).  The evidence cited in USSOF 170 is Sonnenberg's declaration contradicting her deposition and deposition testimony by Henderson.  But Henderson never testified that he relied on any false doping denial by Armstrong in awarding the 2000 Agreement.

The government's argument that Armstrong should be liable for causing others to make false statements fails for two independent reasons.  First, the government again fails to provide evidence showing that the USPS relied any statements by others in awarding the contract or paying its claims.  But second, the government claims that Armstrong can be liable if he caused others to make false statements, but does not provide evidence showing that Armstrong caused

---

[14] *See, e.g.,* Opp. at 25 ("Armstrong's false statement's [sic] were designed, in part, to assure the team's sponsors, including the USPS that the team was clean."); *id.* at 26 ("Armstrong's repeated and numerous public false denials are actionable because the Government relied on them in entering the 2000 Agreement.").

[15] *See* Opp. at 26 ("USPS responsible for the sponsorship also heard or read Armstrong's false or misleading public statements *and relied on them* . . . . USSOF 176." (emphasis added)); *but see* USSOF 176 ("Like other sponsors of Armstrong, Postal Service employees heard Armstrong state on numerous occasions that he had never failed a drug test.").

20

others to make false statements.  *See* Opp. at 26 (citing USSOF 159, 161-62, 217, each refers to evidence of others' statements, but not evidence that Armstrong caused those statements).[16]

> **c.**    **The government's fraudulent inducement claim should be limited to the allegedly fraudulent statements identified in its complaint**

The government's complaint rests its fraudulent inducement claim on two statements by Armstrong upon which the USPS allegedly relied in deciding to enter into the 2000 Agreement. Compl. ¶¶ 63(E), (F).  Now, the government argues that it should be permitted to support its fraudulent inducement claim with brand new allegations of false statements.   The government cannot disregard the requirement that it timely provide Armstrong with "sufficient information to formulate a defense." *See Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3d Cir. 1984).  These new allegations should be disregarded.

Federal Rule of Civil Procedure 9(b) has a clear purpose: it puts the defendant on notice of all the claims asserted against him, and allows him to build an adequate defense.  A defendant must be able to rely on these claims. *U.S. ex rel. Williams v. Martin-Baker Aircraft Co.Ltd.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004); *see also U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 921 (4th Cir. 2003) ("[Rule 9(b)] ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of" and "eliminate[s] fraud actions in which all the facts are learned after discovery"); *Kaplan v. Rose,* 49 F. 3d 1363, 1370 (9th Cir. 1994) (declining to consider, on summary judgment,

---

[16] Under *Pencheng Si v. Laogai Research Found.*, false statements by the defendant made in "publications, brochures, and other media" could not provide a basis for liability under the fraudulent inducement theory unless they were made "in connection with a requested claim ***for payment***." 71 F. Supp. 3d 73, 92-93 (D.D.C. 2014) (emphasis added).  The government cites no admissible evidence showing that Armstrong made false statements "in connection with a requested claim for payment."  The government's reliance on *Westrick*, 128 F. Supp. 3d at 20-21, in response, is mistaken.  In *Westrick*, the Court held that the government might be able to prove fraudulent inducement on the basis of manipulated data if the government had relied on that data. Here, however, the government has failed to prove that the USPS relied on any public statement by Armstrong.

allegedly false and misleading statements that were not before the Court in any pleading at the time motions for summary judgment were filed).

The government does not claim that its complaint or discovery put Armstrong on notice of the new allegations it now hopes to assert against him.[17]  Instead, it cites case law which it claims should justify its belated attempt to supplement original, insufficient allegations.  But the government's cases are not on point.  One case has nothing to do with fraud, *Catrett v. Johns-Manville Sales Cor*p., 826 F.2d 33, 38 (D.C. Cir. 1987), and the other is readily distinguishable.  In *Sundstrand Corp. v. Standard Kollsman Industries, Inc*., plaintiff had put defendant on notice of additional allegations of fraudulent conduct through discovery, and thus the Court found, in that circumstance, that the defendant had sufficient notice.  488 F. 2d 807, 811-12 (7th Cir. 1973).  This is not a case where the government, at the time it filed its complaint, was not aware of and thus could not identify, the specific fraudulent conduct upon which the USPS had relied.

Accordingly, Armstrong respectfully requests that the Court grant partial summary judgment for Armstrong on plaintiffs' fraudulent inducement claim.

### C.    The Government Cannot Prove Unjust Enrichment

The government has failed to carry its burden to present admissible evidence that Armstrong was unjustly enriched by the USPS's payments to Tailwind.[18]  There is nothing

---

[17] The government's Opposition and its supporting papers make allegations against Armstrong never before revealed.  For example, Sonnenberg's declaration claims—for the first time—that she relied on statements included in Armstrong's book in deciding to enter into the 2000 Agreement.  Chandler Decl., Ex. 32.  Armstrong would be unquestionably prejudiced if the government were allowed to supplement its allegations at this late stage.  Had the government properly put Armstrong on notice of this allegation, Armstrong would have questioned Sonnenberg about it at her deposition.  Further, any opportunity to question Sonnenberg about this allegation would have proven it insufficient to sustain FCA liability. It appears that by the time Sonnenberg allegedly read Armstrong's book, she had already made a presentation to the Board of Governors in support of the 2000 Agreement.  *See, e.g., United States ex rel. Wilson v. Kellogg Brown & Root, Inc*., 525 F.3d 370, 379 (4th Cir. 2008) (form that the defendant signed could not have influenced the government to award the contract because it was signed after the government had decided to award the contract).

[18] The government contends that partial summary judgment on its unjust enrichment claim is inappropriate under the Seventh Amendment because "[p]ayments pursuant to false claims are unjust as a matter of law."  Opp. at 48 n.20.  Because the government has failed to prove any

unjust about Armstrong retaining the salary he earned under his contract with Tailwind, and which paid to him by Tailwind (not the USPS).

"A party asserting a claim for unjust enrichment must show that: '(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust.'" *Cannon v. Wells Fargo Bank, N.A.*, 952 F. Supp. 2d 1, 9 (D.D.C. 2013) (quoting *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005)).  "[T]he fundamental characteristic of unjust enrichment is that the defendant has been unjustly enriched by receiving something that ***properly belongs to the plaintiff,*** thereby forcing restoration to the plaintiff."  *Rapaport v. Dep't of Treasury*, 59 F.3d 212, 217 (D.C. Cir 1995) (emphasis added) (internal quotations omitted).

For three independent reasons, the government's unjust enrichment claim fails.

***First***, the government has failed to show that Armstrong's retention of his salary is unjust.  The government insists, repeatedly but without support, that "[i]t would be unjust to allow Armstrong to keep the portion of his salary that was paid by the USPS." Opp. at 47; *see also id.* at 49.  The only case cited by the government, *In re APA Assessment Fee Litig.*, is inapplicable.[19]  766 F. 3d 39, 46-47, 56 (D.C. Cir. 2014) (hereinafter *APA*).  There, the American Psychological Association had represented to its members that a special assessment fee was a requirement for membership when in fact it was not. *Id*. at 44.   A class of APA members sued the APA and based its unjust enrichment claim "on a theory of mistaken payment of money not due." *Id*. at 44, 47 (internal citations omitted).  The plaintiffs contended that because their membership was not conditioned on paying the special assessment fee, they had provided money to the APA but received nothing in return. *Id*. at 44, 47.

---

false claims, summary judgment on the unjust enrichment claim does not implicate the Seventh Amendment.

[19] The government asserts that the facts of *In re APA* exhibit a "standard pattern" of unjust enrichment.   But the Court in *APA* used that phrase to describe "mistaken payment of money not due." *Id*. at 46.  Here, there were no "mistaken payments" on the part of the USPS.

Here, though, it is undisputed that the USPS received services for the money it paid Tailwind under the Sponsorship Agreements.  Had the USPS not paid Tailwind, it would not have received the benefits of sponsoring the cycling team.  In *APA*, had the plaintiffs not paid the fee, they still would have received the benefits of membership in the APA—this is what the D.C. Circuit called a "standard pattern of unjust enrichment recovery."  Opp. at 48 (quoting *APA,* 766 F.3d at 46-47).  The government's reliance on *APA* is misplaced.

*Second*, the government's contention that its unjust enrichment claim has merit because "Armstrong did not satisfy his obligation under the sponsorship agreements" is wrong.[20]  It is undisputed that Armstrong was not a party to, and therefore had no obligations under, either the 1996 or the 2000 Sponsorship Agreements.  *See EEOC v. Waffle House, Inc*., 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty.").  "[P]rivity or its equivalent remains the predicate for imposing liability for nonperformance of contractual obligations." *Travelers Cas. & Sur. Co. v. Dormitory Auth. State of NY*, 735 F. Supp. 2d 42, 80 (S.D.N.Y. 2010) (internal quotations and citations omitted).

The government misleadingly asserts that Armstrong has conceded that he was bound by the Sponsorship Agreements.  Opp. at 49.  This is factually and legally inaccurate.  Because the undisputed evidence confirms that Armstrong was never a party to the Sponsorship Agreements, *see* RSUF 6, 18, he cannot legally be bound by their terms.  *See EEOC*, 534 U.S. at 294.  To the extent the government hopes to allege a breach of the Sponsorship Agreements, it must bring that claim against Tailwind, not Armstrong.[21]

---

[20] The government claims that Armstrong acknowledges that "[e]ach of the sponsorship agreements included anti-doping provisions requiring Armstrong's team to follow the rules of cycling."  Opp. at 49.  The government is mistaken.  Armstrong's brief states that his 2003 rider agreement, to which Armstrong was a party, required him to comply with the rules governing competitive cycling.  Mot. at 48 n.21.  Armstrong makes no concession regarding any agreement to which he had no obligation.

[21] The government's contention that Armstrong is beholden to the terms of the Sponsorship Agreements provides yet another basis upon which its unjust enrichment claim must fail.  *See APA*, 766 F.3d at 46 ("Unjust enrichment will not lie when the parties have a contract governing an aspect of [their] relation, because a court will not displace the terms of that contract and

**Third**, the government has failed to show that Armstrong's salary "properly belongs" to the USPS. *See Shenandoah Assocs. L.P. v. Tirana*, 182 F. Supp. 2d 14, 24 (D.D.C. 2001) ("The only way for [a plaintiff] to succeed on a claim of unjust enrichment is to prove that the money paid to the defendant actually belonged to the plaintiff[].").  The government has presented no evidence showing that it possesses a property right in the salary Armstrong received from Tailwind.  A plaintiff has a property right in a defendant's funds when, for example, the defendant has received the money as a result of overpayment or mistake.  Here, however, Armstrong was entitled to payment of his salary **by Tailwind**, if he (a) competed in competitive cycling, (b) allowed certain sponsors, including USPS, to use his likeness, and (c) made appearances for team sponsors.  Ex. 33 at US00031749-52.  Armstrong has presented admissible, undisputed evidence showing that he performed these duties, and the government has failed to raise any disputed fact. *See* RSUF 159-160, 164.  Accordingly, Armstrong requests that the Court grant summary judgment on the government's unjust enrichment claim.

### III.   CONCLUSION

For the reasons set forth above, Armstrong respectfully requests that the Court grant his motion for summary judgment.

Respectfully submitted,

KEKER & VAN NEST LLP

Dated:   August 29, 2016

By:   *s/ Elliot R. Peters*
_____

---

impose some other duties not chosen by the parties." (internal quotations and citations omitted)); *accord Dominguez v. UAL Corp.,* No. 07-0418 (RJL) 2010 U.S. Dist. LEXIS 144189, *23 (D.D.C. Sept. 28, 2010).

1101061

JOHN W. KEKER (*pro hac vice*)
ELLIOT R. PETERS (*pro hac vice*)
R. JAMES SLAUGHTER (*pro hac vice*)
SHARIF E. JACOB (*pro hac vice*)
ELIZABETH K. MCCLOSKEY  (*pro hac vice*)
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:   415 397 7188

ROBERT D. LUSKIN (D.C. Bar # 293621)
PAUL HASTINGS LLP
875 15TH St., NW
Washington, DC  20037
Telephone: (202) 551-1966
Facsimile: (202) 551-0466

Attorneys for Defendant
LANCE ARMSTRONG