# EXHIBIT 96

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,

ex rel., FLOYD LANDIS,


           Plaintiffs,


 vs.                       Case No.  1:10-CV-00976 (CRC)


TAILWIND SPORTS CORP., et al.,


           Defendants.

-------------------------------/


---oOo---

VIDEOTAPED DEPOSITION OF LARRY GERBRANDT

Thursday, March 31, 2016

San Francisco, California

---oOo---


Reported by:

LORRIE L. MARCHANT, RMR, CCRR, CLR, CRR

California CSR No. 10523

**Page 2**

APPEARANCES

Appearing as counsel on behalf of the Plaintiff USA:
ROBERT CHANDLER, Esquire
DAVID M. FINKELSTEIN, Esquire
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FRAUD SECTION
601 D Street, N.W., Room 9605
Washington, D.C. 20579-0001
Phone: (202) 514-6832
Fax: (202) 616-3085
e-mail: Robert.chandler@usdoj.gov
          david.m.finkelstein@usdoj.gov

Appearing as counsel on behalf of the Defendant, Lance Armstrong:

ELLIOT R. PETERS, Esquire
ELIZABETH McCLOSKEY, ESQ., Esquire
KEKER & VAN NEST, LLP
633 Battery Street
San Francisco, CA 94111
Phone: (415) 391-5400
e-mail: Epeters@kvn.com
          Emccloskey@kvn.com

Appearing as counsel on behalf of relator, Floyd Landis:

PAUL D. SCOTT, Esquire
LAW OFFICES OF PAUL D. SCOTT, P.C.
Pier Nine, Suite 100
The Embarcadero
San Francisco, CA 94111
Phone: (415) 981-1212
e-mail: Pdscott@lopds.com

Also present:

Keith Stephens, Videographer

---oOo---

**Page 4**

PREVIOUSLY MARKED EXHIBITS

| NO. | PAGE |
|-----|------|
| 57 | 188 |
| 59 | 154 |
| 78 | 179 |
| 86 | 179 |
| 256 | 210 |
| 258 | 212 |
| 261 | 214 |

---oOo---

**Page 3**

INDEX

INDEX OF EXAMINATION

| EXAMINATION BY | PAGE |
|----------------|------|
| BY MR. PETERS | 7 |

---oOo---

INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-------------|------|
| Exhibit 755 | Expert Report of Larry Gerbrandt | 6 |
| Exhibit 756 | Expert Rebuttal Report of Larry Gerbrandt | 6 |
| Exhibit 757 | Cision data, pages 3671, 3672, 3681, 3682 | 225 |
| Exhibit 758 | Cision data, pages 3087 - 3114) | 230 |
| Exhibit 759 | Cision data, pages 205 - 208 | 232 |
| Exhibit 760 | Cision data, pages 5709 - 5710 | 235 |
| Exhibit 761 | ABC News article entitled "Justices Hear Love Triangle Meets States' Rights Case" | 237 |
| Exhibit 762 | GBX data spreadsheet entitled "US00658780.xlsx" | 248 |

---oOo---

**Page 5**

BE IT REMEMBERED that on Thursday, March 31, 2016, commencing at the hour of 9:08 a.m., thereof, at the offices of Keker & Van Nest, LLP, 633 Battery Street, San Francisco, before me, LORRIE L. MARCHANT, CSR, RMR, CRR, CLR, CCRR, a Certified Shorthand Reporter for the State of California, personally appeared

LARRY GERBRANDT,

called as a witness by the Defendant, Lance Armstrong, herein, who, being by me first duly sworn/affirmed, was thereupon examined and testified as hereinafter set forth.

---oOo---

2 (Pages 2 to 5)

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

case."

Q.  Have you frequently testified about the value of TV programming?

MR. FINKELSTEIN: Objection. Vague.

THE WITNESS: I think that would be an accurate most frequently, yes. Probably.

BY MR. PETERS:

Q.  And have most of those cases been in Southern California?

A.  Not necessarily. A lot of my testimony about television has been actually in New York or D.C.

Q.  Has most of it been in the L.A. area?

A.  When I've testified in California, most of the cases have been in Southern California.

Q.  And -- and most of your testimony has been in cases about TV programming; correct?

A.  Just so I make sure I'm answering the right question, when you say "most of the cases," in which I have testified.

Q.  Right.

(Mr. Scott enters room.)

THE WITNESS: I'm not sure I would necessarily agree with that. Not just television.

///

BY MR. PETERS:

Q.  So you would not agree with the statement that most of the cases in which you've testified have been about television programming?

A.  Not -- like I said, not just television.

Q.  Some other type of programming?

A.  Yes.

Q.  Movies?

A.  Sure.

Q.  Okay.

A.  A lot of them involve libraries, which contain both -- contain multiple kinds of content.

Q.  When you say "a lot of them involve libraries," what do you mean?

A.  I'll give you an example. I was Disney's expert in the Katzenberg v. Disney case. That involved all of the intellectual property produced by the Disney Entertainment Division over a ten-year time span, and it was movies, TV series, plays, merchandising, licensing of characters.

So those are -- and that's -- that's actually fairly common. I've also frequently testified about the economics of the television business, which may involve multiple types of programming.

Q.  Fair enough. You are an expert for the government in this case?

A.  I am.

Q.  When were you first contacted by the government about this case?

A.  I actually wasn't contacted by the government.

Q.  When were you first contacted about this case?

A.  I was contacted in early -- early 2005.

Q.  Who contacted you in early 2005 about this case?

MR. SCOTT: Objection. Was that 2005?

THE WITNESS: 2015.

BY MR. PETERS:

Q.  So you were contacted originally not in 2005, as you testified, but 2015?

A.  I misspoke.

Q.  No problem.

Who contacted you in early 2015?

A.  Rubin -- someone from Rubin/Anders.

Q.  Is Rubin/Anders a person or a company?

A.  Well, it may be a person, but -- there may be a person in the name, but it's a company.

Q.  And who contacted you from Rubin/Anders?

A.  I actually don't recall.

Q.  What did that person -- what is Rubin/Anders?

A.  As I understand it, they're a litigation support and consulting firm.

Q.  Have you interacted with Rubin/Anders prior to that contact in early 2015?

A.  I had.

Q.  In what capacity?

A.  We had discussed another case.

Q.  So is Rubin/Anders a firm that -- that locates and recommends experts to people in litigation?

A.  I believe it is a firm that is retained to do that, yes.

Q.  Okay. What did the person from Rubin/Anders, whose name you don't recall, say to you?

A.  That they had a case that I might be interested in and might be qualified for.

Q.  What happened next with Rubin/Anders?

A.  I believe -- first of all, I did a conflict check, and then I believe I requested if there was anything that they could send me about the case.

Q.  What was the response?

A. Correct.

Q. One class?

A. Yes.

Q. Have you taken any other classes at UCLA Extension since then?

A. I have not.

Q. It also says on your résumé, "Done course work in statistics through statistics.com."

What coursework did you do through statistics.com?

A. I completed a couple of introductory statistics. They were six-week programs that were done online.

Q. So there's something called statistics.com that's an online program?

A. Correct.

Q. And did they offer a course of study?

A. They offer a large number of online courses, yes.

Q. And -- but is there a course of study that you enroll in?

A. You enroll in specific classes.

Q. And did you enroll in specific classes or in a course of study there?

A. I enrolled in two of the -- I'm not sure

what you mean by "course of study." That's --

Q. What did you enroll in?

A. I enrolled in, as I recall, two of their courses.

Q. What were the courses?

A. I think I just answered that. They were -- they were introductory courses into statistics.

Q. Each of them were introductory courses in statistics?

A. Well, they were -- yes, they were -- one was a little more advanced than the other, but it was -- it was really introductory statistics.

Q. Did you take them at the same time, these two courses, or one after the other?

A. One after the other, as I recall. They both were out of the same textbook, so -- but covering different portions of the textbook.

Q. Did you complete the two courses?

A. I did.

Q. Do you get grades in the courses?

A. Not that I recall.

Q. And the total was six weeks?

A. My recollection is they were six weeks. They may have been eight weeks, but it was something on that order.

Q. The two courses took six or eight weeks?

A. Each.

Q. So -- and did you do them -- and I think you told us you did them one after the other?

A. As I recall.

Q. When did you do this?

A. I -- I believe it was 2007.

Q. So you took two courses through statistics.com online?

A. Correct.

Q. That means you just took them on your computer, sitting wherever you were by yourself?

A. Yes.

Q. And you completed both courses?

A. Yes. It may have been 2008. And over --

Q. And you completed both courses?

A. As I recall.

Q. And by completing, was there an exam at the end given?

A. There may have been. I don't recall specifics at this point.

Q. Other than what you've now told us about statistics.com and the UCLA extension class in the winter of 2008, after graduating from Loretto Heights College, have you had any other schooling?

A. No. I think that's it.

Q. Are you a certified public accountant?

A. I am not.

Q. Do you have an MBA?

A. I do not.

Q. Do you have any type of economics degree?

A. I do not.

Q. Do you have a degree in statistics?

A. I do not.

Q. Do you have a graduate degree in business administration?

A. I do not.

Q. Do you have any credentials in forensic accounting?

A. I do not.

Q. Do you have any license or credentials in valuation?

A. I do not.

Q. Do you have a degree in marketing?

A. No.

Q. Have you ever received a graduate degree of any sort?

A. No.

Q. Do you have any type of certification in valuation or valuation methods?

THORSNES LITIGATION SERVICES, LLC   |   877.771.3312   |   www.thorsnes.com

MR. FINKELSTEIN: Objection. Vague.

THE WITNESS: I do not have a certification.

BY MR. PETERS:

Q.   Have you ever been enrolled in a graduate program that was leading to a graduate degree?

A.   No.

Q.   Do you have any formal training of any -- of any sort of relevance to the opinions expressed in your reports in this case?

MR. FINKELSTEIN: Objection. Vague.

THE WITNESS: Yes.

BY MR. PETERS:

Q.   What -- what training is that?

A.   I was trained as a media analyst and -- and an appraiser by Paul Kagan.

Q.   Was -- did they have a formal training program?

MR. FINKELSTEIN: Objection. Vague.

THE WITNESS: He did.  At times he did hold formal classes, yes, for analysts.

BY MR. PETERS:

Q.   This is on-the-job training you got with Paul Kagan?

A.   Yes.

Page 46

Q.   Other than that, have you had any training of relevance to the opinions expressed in your report?

A.   I have attended dozens, if not hundreds, of seminars related to media and entertainment, trends, technology, finance.  There are literally hundreds.

Q.   Okay.  Trying to be as specific as possible, tell us what in your educational background or training qualifies you, in your view, to render the opinions contained in your reports.

A.   Well, first of all, I actually published -- I actually created many of the databases that are still in use today related to television economics, and literally the individual numbers that -- the measurement of media that are relied upon to this day in the industry, as well as you will find it extensive references to the data I created and supervised in -- at the FCC, the Department of Commerce and dozens, if not hundreds, of Wall Street reports and books that have been published.  So I actually literally tracked and created the metrics for portions of the television industry.

Q.   What else?  Anything else?  And the question is, trying to be as specific as possible, tell us what in your educational background or

Page 47

training qualifies you, in your view, to render the opinions contained in your reports.  And you've told us about these databases that you've created.

My question is what else?

A.   I was responsible for -- ultimately I ran -- I was chief operating officer of the company supervising a team of analysts that was -- that was sort of the -- at the endpoint of my career at Kagan -- starting out, I started working on several newsletters, tracking cable TV advertising, electronic publishing, a sector of the industry called SMATV.

Ultimately -- these were sometimes biweekly, sometimes monthly newsletters.  Ultimately I was responsible for writing for about 20 of them over the years, and then literally dozens of reports, deep-dive reports, on various industry sectors.  I've listed many of those in my CV here.

Q.   Anything else?

A.   Running a division of Nielsen and sitting on their research council was highly instructive.

Q.   Anything else?

A.   Yeah, having -- over the course of my expert witness work, I get to see a very large amount of contracts, source materials, databases,

Page 48

many of them highly proprietary, on the detail, the -- in general, the economics, the finances, of broadcast TV, the television industry, the programming industry, the production industry, the exhibition industry, the music industry, at a very granular level.

So -- I mean, it's -- more recently, a lot of it has been on the online industry as a result of my work with -- for the -- involving the performing rights organizations.  So all of that is part of my collective knowledge or how I've gone about gaining an -- a deep understanding of how these businesses work.

Q.   Anything else?

A.   Yes.  I've done dozens of appraisals of media and entertainment companies, again, in which I've had access to very granular company numbers.  So I've actually seen how it works.

I also sit on the board of a cable network now and get to actually see and involved in how the sausage gets made.

Q.   "The sausage" being cable television programming and the cable television business?

A.   Well, television programming, yes.

Q.   And is it a fair statement that that's

Page 49

13 (Pages 46 to 49)

Larry Gerbrandt                                                                        March 31, 2016

really your sweet spot, is television programming?

MR. SCOTT: Objection. Vague.

THE WITNESS: No, not at all. I've been a senior executive at one of the -- at the time the largest magazine publisher in the world. So I've had -- I have been a part-owner of an industry trade magazine, so I started my career in the print -- in the publishing business. Kagan itself was one of the largest publishers of newsletters at one time.

BY MR. PETERS:

Q. Are you familiar --

MR. FINKELSTEIN: Hang on. Let him finish.

THE WITNESS: I've done a lot of work in the music industry. I've also done a lot of work in the movie business in terms of various kinds of assignments. So my specialty has been content. Understanding the economics and the trends of content creation and dissemination.

BY MR. PETERS:

Q. By "content" you mean media content?

A. Correct.

Q. Movies, TV programming, magazines?

A. Newspapers, radio.

Q. Got it.

A. Streaming media. Everything is moving

Page 50

digitally, so I've --

Q. Media content is your thing?

A. Broadly. Again, it's creation. It's dissemination. It's monetization and distribution.

Q. Are you familiar with the phrase "earned media reports"?

A. No.

Q. Okay. You reviewed the -- some certain reports performed for the Postal Service back in the early part of the -- this century by Foote, Cone & Belding and Campbell Ewald.

Do you recall that?

A. I do.

Q. Let's just come up with a mutually agreeable name for what kind of reports those are.

Can we call them earned media studies or reports, or do you want to call them something else? I just want to have a name that we agree on.

A. Well, they actually had specific titles. I mean, I really don't care what you call them. Each of them was labeled something different. They were -- I think in one case some of them were an evaluation. Others were labeled, I think, valuation. But I have no problem with whatever you want to call them.

Page 51

Q. Okay. What if we call them "earned media reports" just so we can have a -- so we know what we're talking about.

A. Collectively, the four reports that were done by CE -- Campbell Ewald and FCB.

Q. And you the read the deposition of Brian Meith?

A. I did.

Q. And he referred to a methodology created by a company called IEG.

Do you recall that?

A. Yes.

Q. And you also reviewed a valuation statement prepared by IEG for the Postal Service?

A. I did.

Q. Prior to your work on this case, were you familiar with the IEG methodology that Mr. Meith refers to?

A. Not specifically.

Q. Prior to your work on this case, did you have experience valuing any sponsorship of sports teams?

A. Yes.

Q. What sports teams did you -- what sponsorship of sports teams did you have experience

Page 52

valuing?

A. Well, when I was at Kagan, we did extensive work for Major League Baseball in regards to the possible launch of a cable network. And as I recall, there was a sponsorship component to that.

Q. Did you value a sponsorship in connection with that work?

A. Not separately.

Q. Did that work include valuing some sponsorship of Major League Baseball or of a team?

A. As I recall, it involved taking into account sponsorship revenue that would have been part of the network.

Q. So you didn't -- in connection with that assignment, you didn't have to value in any way a sponsorship of a baseball team or of Major League Baseball?

A. Well, again, the network would have been owned by Major League Baseball and the owners, so it would have been their network. And ultimately part of that assignment was to value that bundle of assets or at least project what that bundle of assets could be worth.

Q. You were valuing a bundle of assets which included revenue streams from sponsors; right?

Page 53

14 (Pages 50 to 53)

A.  Correct.

Q.  But you weren't looking at it from the standpoint of the sponsors and trying to value how much those sponsorship opportunities were worth?

A.  That's correct.

MR. FINKELSTEIN:  Objection.  Vague.

BY MR. PETERS:

Q.  And you weren't -- and you weren't looking at it from the standpoint of the sponsors to try and figure out what return on investment, if any, they got from sponsoring a Major League Baseball team; correct?

A.  The -- we were working in it from the team perspective.

Q.  From the baseball -- the Major League Baseball side of it?

A.  Correct.

Q.  Okay.  Other than that, did you have any experience, prior to this case, valuing the sponsorship of any sports teams?

A.  Not that I recall.

Q.  Prior to this case, did you have any experience valuing the sponsorship of sports event?

A.  Yes.

Q.  What sports events have you valued the

sponsorship of?

A.  I did -- I did some preliminary work for someone who was trying to bring a rugby league to the U.S.

Q.  What was the sponsorship that you were valuing in connection with that?

A.  Well, there was a sponsorship component to that, as I recall.

Q.  Were you valuing that sponsorship in connection with that work?

A.  It was part of the valuation assignment, yes.

Q.  What were you -- you were valuing a sponsorship by whom?

A.  No.  It was -- again, it was the sponsorship of a -- you asked me if there were any instances where I did sports sponsorship work, and that particular consulting assignment was one of the components.  It had a sponsorship component to it.

Q.  But the question was do you have any experience valuing the sponsorship of a sports event prior to this case?

A.  Those were to be sporting events.

Q.  And you valued a sponsorship -- okay.  So who was the sponsor that you valued the

sponsorship for?

A.  As I said, there was a sponsorship component to these -- to the rugby league events.

Q.  Who were the sponsors?

A.  The league had not started.  So they hadn't identified sponsors, just other than there would be.

Q.  Well, how could you value a sponsorship without knowing who the sponsors were going to be?

A.  You can create economic models that involve projections of sponsorships.

MR. FINKELSTEIN:  So we've been going for an hour and 15, so after you're done with this line of questions, let's break.

BY MR. PETERS:

Q.  Did you do that?

A.  My recollection is that that assignment included projecting sponsorship revenue streams.

Q.  So you estimated how much sponsorship money the rugby league could attract?

A.  Correct.

Q.  But you didn't try to value how much any sponsor would get out of the rugby sponsorship?

A.  Well, we didn't do it from the sponsor perspective.  It was always from the league's perspective.

Q.  Got it.  Prior to this case, do you have any experience valuing the sponsorship of a sporting venue, like a stadium or ...

A.  I did work on the naming rights of an IMAX theater, but not of a sporting venue.

MR. PETERS:  Okay.  Let's go off the record.

THE VIDEOGRAPHER:  This marks the end of Disk 1 in the deposition of Larry Gerbrandt.  We are off the record at 10:16.

(Recess taken, from 10:16 to 10:28.)

THE VIDEOGRAPHER:  This marks the beginning of Disk 2 to the deposition of Larry Gerbrandt, and we are going back on the record at 10:28.

BY MR. PETERS:

Q.  Mr. Gerbrandt, have you ever had any of your opinions excluded by order of a Court?

A.  As I recall -- I'm aware of at least one instance in which a portion of an opinion was excluded.

Q.  What case was that?

A.  I believe that was the Medical Illustrators case.

Q.  Where was that case pending?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Larry Gerbrandt                                                    March 31, 2016

A.  I don't recall where it was pending specifically.  It was -- I believe it was a Southern California case.

Q.  What portion of your opinion was excluded?

A.  I've actually never seen the -- seen the exclusion or -- what I've been told was that it was -- that the Court found that -- that the testimony related to the value of Medical Illustrations overseas was included -- excluded.

Q.  When was that?

A.  Let me see if I can -- I believe that was in 2005.

Q.  Any other instance in which an opinion or a portion of an opinion was excluded by a Court?

A.  Not that I am aware.

Q.  Were you hired as an expert in a case called Theodore Pearlman v. Cablevision Systems?

A.  That's a class action lawsuit, yes.

Q.  So the answer is you were hired as an expert in that case?

A.  Yes.  And it took me a second to -- I think I only once heard it referred to like that, but, yes.

Q.  Okay.  That's a case pending in the United States District Court for the Eastern District of

Page 58

New York?

A.  Yes.

Q.  Before Judge Seybert, S-E-Y-B-E-R-T?

A.  I believe that's correct.

Q.  Was your opinion excluded, in whole or in part, in that case?

A.  What I was told was that the judge ruled that the opinion -- and I'm lacking the proper legal terminology, but what the lawyer told me was that -- she said the judge determined that the areas on which I was opining were matters of law, and that she would make those decisions.  So my testimony was no longer needed.

Q.  Did you understand that the judge excluded your opinions in that case?

A.  I believe that's correct.

Q.  So that would be -- the Pearlman versus Cablevision Systems case would be another case where your opinion was excluded?

A.  Yes.  It's not how -- the term -- the lawyer didn't use the term "excluded."  I was just told that she'd ruled that she was not going to -- they were not going to use my report or my testimony.

Q.  Okay.  I'm going the read you a sentence

Page 59

from the Court's opinion in that case, dated December 28th, 2015.

"Accordingly, the branch of Cablevision's motion seeking to exclude Gerbrandt's expert opinion is granted based on the Court's finding that the Gerbrandt report asserts legal conclusions."

Does that refresh your recollection that the Court excluded your expert opinion?

A.  I think it reflects what I told you earlier.

Q.  That was in 2015, that was just four months ago?

A.  Correct.

Q.  Any others besides Medical Illustrators and the Pearlman class action where your opinion was excluded?

A.  I don't recall any others.

Q.  Do you have any experience assessing the benefits derived by a sponsor from a sponsorship of a sports team?

MR. FINKELSTEIN:  Objection.  Vague.

THE WITNESS:  Can I have the question back again, please?

BY MR. PETERS:

Q.  Do you have any experience assessing the

Page 60

benefits derived by a sponsor from a sponsorship of a sports team?

MR. FINKELSTEIN:  Same objection.

THE WITNESS:  No.

BY MR. PETERS:

Q.  Do you have any experience -- experience analyzing damages under the False Claims Act?

A.  No.

MR. SCOTT:  Calls for a legal conclusion.

BY MR. PETERS:

Q.  Have you ever taught a course at a university?

A.  Yes.

Q.  Where?

A.  UCLA.

Q.  What course did you teach?

A.  I was hired to teach a course in the structure of the U.S. media business and the underlying economics for a -- for Chinese media executives.

Q.  Did you teach that course?

A.  I did.

Q.  When?

A.  Best recollection is that it was in -- that was in -- I want to say 2010.

Page 61

16 (Pages 58 to 61)

Q. And this was for Chinese media executives?
A. Yes.
Q. So they were -- they were not full-time UCLA students?
A. They were not.
Q. And was this offered through the UCLA Extension?
A. No. I was hired directly by UCLA.
Q. How long was the course?
A. Several weeks.
Q. How many weeks?
A. I taught on different days over -- I think it was a period of about two, three weeks.
Q. How many days a week?
A. It was several mornings, as I recall.
Q. Several mornings a week for two to three weeks?
A. No. Several mornings over two or three weeks.
Q. How many mornings?
A. I don't recall.
Q. So the course consisted of several mornings?
A. No. The course consisted of several weeks. I taught portions of it. I wasn't the only

Page 62

instructor.
Q. Were you paid by UCLA for that?
A. I was.
Q. Any other courses that you've ever taught?
A. I've been a guest --
Q. I meant at a university.
A. Yes. I've been a guest speaker at formal courses at both UCLA and USC.
Q. I was asking you actually about courses where you were the teacher.
A. I was the guest.
Q. You were a guest -- you were invited by the teacher to be a guest?
A. Correct. And to actually lecture to the -- to the students.
Q. Okay. Do you have any experience valuing the effects of negative publicity on the value of the sponsorship of a sports team?
MR. FINKELSTEIN: Objection. Vague.
THE WITNESS: No.
BY MR. PETERS:
Q. Are you familiar with the name Floyd Landis?
A. Yes.
Q. Have you ever read any studies on the

Page 63

impact of publicity concerning Floyd Landis on the sponsor of his cycling team?
MR. FINKELSTEIN: Objection. Vague.
THE WITNESS: Are we talking about the Tailwind team or the postal team, or are we talking about a different team?
BY MR. PETERS:
Q. A different team. The team that he was -- do you know the name of the team that Floyd Landis was riding for when he was busted for doping?
A. I believe I've read that somewhere. I just don't recall what it is.
Q. Okay. Have you ever read any studies of the impact of publicity concerning Floyd Landis on the sponsor of his cycling team at the time he was busted for doping, which was not the U.S. Postal Service cycling team?
A. I have not.
Q. Does -- do you know whether or not the team that Floyd Landis was riding for when he was busted for doping was called Phonak, P-H-O-N-A-K?
A. Thank you. That does ring a bell.
Q. But you're not familiar with anything that's been written about the effect of his doping on the value of Phonak?

Page 64

A. I don't recall seeing an analysis like that.
Q. In the connection of your work in this case, have you spoken to any present or former employees of the United States Postal Service?
A. I have not.
Q. In the course of doing your work in this case, have you spoken to any other testifying experts retained by the government in this case?
A. I have not.
Q. Does this case involve -- as you understand it, involve a sponsorship?
MR. FINKELSTEIN: Objection. Vague.
THE WITNESS: It does -- it relates -- it certainly relates to the USPS sponsorship of what's known as the postal -- the USPS or the postal team. The postal racing team, I believe is what it was called.
BY MR. PETERS:
Q. And it's known as the USPS cycling team because the USPS was a sponsor of it; right?
A. Was the lead sponsor, yes.
Q. What is a sponsorship?
MR. FINKELSTEIN: Objection. Vague.
THE WITNESS: Are we talking just

Page 65

17 (Pages 62 to 65)

were done, that were performed in those reports, yes.

BY MR. PETERS:

Q. When did you start working for Kagan?

A. 1984.

Q. So that's 32 years ago?

A. Correct.

Q. You keep saying 40 years of experience. Is it -- is it 40 or some smaller number?

A. It's actually -- since my first job in the media industry started in 1973, it's more than 40 years.

Q. That was when you worked for Christ for the Nations?

A. Correct.

Q. So when you worked for the Christ for the Nations, you were performing valuations of advertising and sponsorships?

MR. FINKELSTEIN: Objection. Mischaracterizes the witness's testimony.

THE WITNESS: I said that that was my first media job.

BY MR. PETERS:

Q. Do you consider the IEG materials generally accepted methods for valuing a sponsorship?

Page 78

MR. FINKELSTEIN: Object to the form.

MR. SCOTT: Calls for speculation.

THE WITNESS: Can I have that question one more time?

BY MR. PETERS:

Q. Sure. And I'd just reread it because I have in front of me, and I don't want to make the court reporter do it. It's the same thing.

Do you consider the IEG materials generally accepted methods for valuing a sponsorship.

MR. FINKELSTEIN: Same objection.

THE WITNESS: I haven't surveyed the industry -- the industry's acceptance. I do know that both FCB and Campbell Ewald referred to IEG as the industry standard.

BY MR. PETERS:

Q. Do you have any reason to disagree with that characterization of IEG as the industry standard?

MR. FINKELSTEIN: Object to the form.

THE WITNESS: I don't have a reason to disagree, at least within their -- within a part of the sponsorship world that -- in which they are -- in which they work. They are probably the largest evaluator of sponsorship packages.

Page 79

BY MR. PETERS:

Q. IEG is?

A. IEG is.

Q. And when you use the term "industry standard," is the industry you're referring to the advertising industry?

A. No. I'm referring to the sponsorship industry, probably with an emphasis in sports. But they've branched out over the years.

Q. Have you reviewed an IEG valuation statement relating to the United States Postal Service Pro Cycling Team in connection with your work in this case?

A. I did.

Q. You don't have any opinions about it in your report; is that correct?

A. That is correct.

Q. But you did review it; correct?

A. I did.

Q. Have you ever in your career been asked to determine whether negative publicity regarding an individual on a sponsored team harmed the sponsor?

A. No.

Q. Are you familiar with any academic literature regarding whether negative publicity

Page 80

about an individual on a sponsored team harms the sponsor?

A. I hate to ask you to do this, but would you mind reading that back. I want to make sure I got it.

Q. Are you familiar with any academic literature regarding whether negative publicity about an individual on a sponsored team harmed the sponsor?

A. I did read -- I think it's called Fortunato report or study that, actually, I believe Dr. Joachimsthaler considered.

Q. Is that cited in -- in either of your reports, the appendix to either of your reports?

A. It is.

Q. Which report? Is that in the rebuttal?

A. Yes.

Q. Okay. Besides -- let's have a look at your rebuttal report, page 30. Just point it out to me where that is referenced.

A. It is the last bullet point under documents produced in litigation.

Q. John Fortunato, "Sponsorship Implications of the Lance Armstrong v. USPS Lawsuit."

Is that what you're referring to?

Page 81

21 (Pages 78 to 81)

Larry Gerbrandt                                                                March 31, 2016

A. I am.

Q. Okay. Any other academic literature regarding negative publicity about an individual on a sponsored team harmed a sponsor?

A. Not that I recall.

Q. Are you familiar with any generally accepted methods for making the determination of whether negative publicity about an individual on a sponsored team harmed the sponsor?

MR. FINKELSTEIN: Object to the form.

THE WITNESS: I'm not familiar with any specific studies, no.

BY MR. PETERS:

Q. Or any generally accepted methods for making that determination?

MR. FINKELSTEIN: Same objection.

THE WITNESS: I'm not familiar.

BY MR. PETERS:

Q. Do you recall in what year the USPS sponsorship of the cycling team ended?

A. I believe it ended in 2004. There may have been some carryover into 2005, but I don't recall specific termination dates.

Q. Did you perform any research into whether, by 2012, the public still associated Lance Armstrong

Page 82

with the USPS?

MR. FINKELSTEIN: Object to the form.

THE WITNESS: Did I do a separate study of that? Did I just -- did I do a survey of that? No.

BY MR. PETERS:

Q. Did you perform any research into that question?

MR. FINKELSTEIN: Same objection.

THE WITNESS: I -- on a casual or observational basis, yes.

BY MR. PETERS:

Q. Well, I'm asking about research.

A. Well, as part of my research, I did come across instances where individuals negatively associated Lance Armstrong with the USPS specifically.

Q. Okay. What do you mean by -- give us an example of a negative association of the -- Lance Armstrong with the USPS that you ran across.

A. Well, there was one rather cynical tweet that was in response to Lance Armstrong's tweet that he had returned his Olympic medal to Switzerland, or wherever it was -- wherever the IIOC is based. And one of the tweets was a rather snarky comment, Via the U.S. Postal Service. So I remember that

Page 83

specifically and even cited it in my report.

There were other negative comments about the U.S. Postal Service in -- when I was looking at various YouTube -- YouTube videos, and they allow people to comment. And as I scanned through, there were -- you know, in multiple occasions there were people who made negative comments about the U.S. Postal Service.

Q. Did you -- did you assume in connection with your work that there was a -- say, in 2012, that there was still a connection in the mind of the public between Lance Armstrong and the Postal Service?

A. There was a very visual connection between -- it was continuously reinforced in the tens, hundreds and thousands and millions of times.

Q. My question is whether that's an assumption you made or a conclusion you drew.

MR. SCOTT: Objection to the form of the question.

THE WITNESS: If you read a story, there were hundreds, if not thousands, of stories where viewers -- either readers saw the connection in print or saw the video and stills on TV connecting Armstrong with the Postal Service and in a negative

Page 84

context in 2012.

BY MR. PETERS:

Q. Are you familiar with any academic research regarding how long after the end of a sponsorship the public continues to associate a sponsor with a person associated with a sponsored team?

MR. SCOTT: Objection. Incomplete hypothetical. Vague.

THE WITNESS: I am not familiar with academic studies.

BY MR. PETERS:

Q. Are you familiar with any generally accepted method for determining how long that association lasts?

MR. SCOTT: Same objections.

THE WITNESS: I'm familiar with survey and research techniques that -- of how you go about asking people their opinions.

BY MR. PETERS:

Q. Okay. Any other -- and you didn't do anything like that; right?

A. Not for this case, no.

Q. And you're not relying on any survey in connection with this case; correct?

MR. SCOTT: Objection as to form.

Page 85

22 (Pages 82 to 85)

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

the value of the exposure of the fact that they had designed that nursery?

A. That's correct. Or in this case their claim -- they had a specific claim of how much they thought they had lost in terms of exposure as a result of what they claimed to be a breach. And I researched what the value of the exposure actually was.

Q. And did you rely on a survey in that case?

MR. FINKELSTEIN: Objection. Form.

BY MR. PETERS:

Q. It just says, "Consult & Custom Survey" in the document. That's why I'm asking.

A. Yeah, there was a survey that was done of design firms, to find out what kind of media they normally promoted and used to promote themselves, and, more important, what was considered the standard market area of a design firm.

BY MR. PETERS:

Q. What -- what's your assignment in this case?

A. I've been asked to analyze the media coverage --

Q. You're just going to read paragraph 6 of your report?

MR. FINKELSTEIN: Let the witness answer the question.

MR. PETERS: Well, I don't want him to just read. If the answer is No. 6 of your report, then that's fine.

THE WITNESS: Yeah, that's the most accurate.

BY MR. PETERS:

Q. That's the assignment?

A. That's the assignment.

Q. Who gave you the assignment?

A. That was the assignment from -- that I received in connection with communication with counsel.

Q. Okay. And it's set forth in paragraph 6 of Exhibit 755?

A. Correct. But -- and, of course, there was a rebuttal that also had specific opinions attached to it.

Q. Fair enough. Fair enough.

And it says here -- I guess the second sentence says, "In particular, I've been asked to calculate the number of impressions that were created linking Mr. Armstrong to the USPS and the doping activity."

Did I read that properly?

A. Yes, you did.

Q. So, for example, impressions about Mr. Armstrong and doping but without any direct link to the USPS would be outside of your assignment; is that right?

MR. SCOTT: Objection. Vague.

THE WITNESS: It was outside of the assignment, but it actually wound up at times being part of the work.

BY MR. PETERS:

Q. Because in gathering up media impressions about Lance Armstrong, you might have to sort through ones that were about Lance Armstrong but didn't mention or show a visual of the logo of the Postal Service?

MR. SCOTT: Objection. Mischaracterizes --

BY MR. PETERS:

Q. Is that what you mean?

MR. SCOTT: Mischaracterizes testimony. And compound.

THE WITNESS: That would be one example.

BY MR. PETERS:

Q. The last sentence of your assignment says, "In addition, I have been asked to offer an analysis

of the market value of these negative impressions as well as an opinion about the various valuation studies that were produced by third parties in the 2001 to 2004 time frame."

Where in your report is the analysis of the market value of these negative impressions?

A. I would say that is encapsulated in paragraph 8 on page 6 of 755.

Q. So does your report contain a valuation, meaning a dollar amount or dollar range, of the so-called negative impressions?

A. It does not.

Q. And the only analysis of the market value of the negative impressions is in paragraph 8?

A. It contains my conclusion that there would be -- that no one would pay for this.

Q. Okay. But -- and I'll ask you about that in a minute, but I'm just trying to make sure that -- that the only place in this report that I'm going to find your analysis of the market value of these negative impressions is in paragraph 8?

MR. SCOTT: Objection. Mischaracterizes the witness's testimony.

THE WITNESS: The entire report analyzes the negative impressions. That's just the

Larry Gerbrandt                                                March 31, 2016

THE VIDEOGRAPHER: This marks the beginning of Disk No. 3 in the deposition of Larry Gerbrandt, and we are going back on the record at 1:03.

BY MR. PETERS:

Q. Good afternoon, Mr. Gerbrandt.

A. Good afternoon.

Q. What percentage of your income over the last five years has been derived from expert work?

A. Probably the majority.

Q. Can you be a little more specific?

A. Not without going back and taking a look at -- at my income statements.

Q. How about in 2015? What percentage of your income came from expert work?

A. Probably the majority. I mean, I do have -- I do have a gallery that -- that generates income as well.

Q. And you're a -- you're a photographer?

A. Well, that -- well, I'm a gallery owner.

Q. Okay.

A. And I also happen to be a fine art photographer.

Q. Okay. So the other sources of -- your other sources of income would involve the gallery?

A. Correct.

Page 122

Q. And photography?

A. Correct.

Q. Okay. Any other sources of income besides those and your work as an expert?

A. Yes. I do appraisals.

Q. Appraisals of what?

A. Media and entertainment properties, assets.

Q. Okay.

A. Outside of litigation.

Q. Okay. But for the last five years, the majority of your income has been from -- you think the majority of your income has been from litigation work?

A. Correct.

Q. And what's second, the appraisals or the arts related?

A. The rest of it -- the mix really varies year to year.

Q. Let's go back to your report.

A. Okay.

Q. You have a figure on page 8, Figure 1, Lance Armstrong wearing the USPS cycling jersey. Where did you get that from?

A. Probably a Google search.

Q. Does this image represent harm to the USPS

Page 123

or a benefit to the USPS?

MR. FINKELSTEIN: Objection. Vague.

MR. SCOTT: Objection. Vague. Incomplete hypothetical.

THE WITNESS: Well, the first question is in what context? If it was used to illustrate a negative story, it's kind of hard to see whether it could be a benefit.

BY MR. PETERS:

Q. So -- so the answer, then, is it depends on the context of the story that it's a part of?

A. Correct.

Q. Okay.

A. That is one factor.

Q. Okay. What are the others?

A. How it's used. It's really contextual.

Q. Okay. So if this photo appeared in a 2000 story about the U.S. Postal Service cycling team winning the Tour de France, would that create harm or benefit to the USPS?

MR. FINKELSTEIN: Objection. Vague. Incomplete hypothetical.

THE WITNESS: I'm troubled by the binary nature of -- of the choices. I -- I really think a better -- I really can't answer that that way.

Page 124

BY MR. PETERS:

Q. Okay. What -- what choice -- what's a better way to think about it?

MR. SCOTT: Objection. Vague.

THE WITNESS: Well, I'd prefer to use the terms that I use, which is "positive" and "negative."

BY MR. PETERS:

Q. Okay. Same hypothetical, assuming that this is in a 2000 story about the USPS cycling team winning the Tour de France, is that positive for the Postal Service?

MR. SCOTT: Incomplete hypothetical.

MR. FINKELSTEIN: Objection. Vague.

THE WITNESS: If it was in a -- if the story was positive about it, then it wasn't negative.

BY MR. PETERS:

Q. And if the story was positive, would that be a benefit for the Postal Service, the use of this photo?

MR. FINKELSTEIN: Same objection. Incomplete hypothetical.

THE WITNESS: I haven't analyzed or come to -- I haven't analyzed what a benefit would be. I

Page 125

32 (Pages 122 to 125)