## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES, *ex rel.*, | ) | |
| FLOYD LANDIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:10-cv-00976 (CRC) |
| v. | ) | |
| | ) | **ECF** |
| TAILWIND SPORTS CORPORATION, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## SUR-REPLY OF THE UNITED STATES

In his reply, Lance Armstrong raises several new arguments and cites several portions of the record for the first time.  The United States respectfully submits this sur-reply to address those new arguments and Armstrong's supplement to the summary judgment record.

## I.      The FCB and Campbell Ewald Reports are Inadmissible Hearsay

### A.      The FCB and Campbell Ewald Reports are not admissible as adoptive admissions

Armstrong does not dispute that the FCB and Campbell Ewald reports are hearsay, but he contends that they are nonetheless admissible because the USPS adopted those reports.  This contention, however, is not supported by the evidence he cites.  As Armstrong correctly notes, a statement is adopted only if "understood and unambiguously assented to[.]" Def. Reply (ECF No. 539), at 4, quoting *United States v. Beckham*, 968 F.2d 47, 52 (D.D.C. 1992).  None of the documents cited by Armstrong, however, manifests the USPS's unambiguous assent to the contents of the FCB and Campbell Ewald reports.  For example, Armstrong cites the testimony of the government's Rule 30(b)(6) witness, who testified that "one of the reasons for commissioning the study" was to be able to respond to inquiries about the utility and efficacy of

the sponsorship.  The reasons for commissioning the reports obviously do not in any way manifest assent to the contents of the resulting reports, however.  Armstrong's contention thus rests on his claim that the reports were "given to the USPS Public Affairs and Communication Group[,]" a claim which is not supported by the cited testimony.  Indeed, immediately after the passage cited by Armstrong, the government's witness twice stated "I'm not sure that the reports were actually provided to Public Affairs and Communications."  US Ex. 79 at 523:17-524:20.

The testimony of Alixe Johnson, which Armstrong also cites, states only that the purpose of the reports was to obtain an outside opinion of the sponsorship; it does not suggest that the reports actually fulfilled their intended purpose.  In fact, Johnson went on to explain, "I was always fairly skeptical of the marketing evaluations because even though they laid out factors, I never quite believed that they were grounded in reality."  US Ex. 80 at 50:17-21.  Two other exhibits cited by Armstrong actually provide additional evidence of Johnson's skepticism about the reports, not her unambiguous assent to their contents.  See Def. Ex. 54 (letter in response to citizen inquiry that does not cite the reports or state the amount of their conclusions); Def. Ex. 68 (email asking whether the conclusion in the 2001 may be relied upon).

The three remaining documents identified by Armstrong are sets of "talking points" that refer to the FCB reports and the 2003 Campbell Ewald report.[1]  Armstrong cites no evidence, however, to suggest that any of the talking points actually were used by the USPS.  Two of the documents (Def. Ex. 52 and Def. Ex. 79) are stand-alone documents that do not indicate in any way they were ever transmitted.  The only document that, on its face, reflects communication between two persons is an email between low-level USPS employees.  (Def. Ex. 89).  However,

---

[1] Armstrong does not cite any document that refers to the 2004 Campbell Ewald report and, thus, it cannot be admitted as an adoptive admission.  In fact, none of the statements he cites were made after the report's completion in September 2004.

this preliminary, internal exchange is not sufficient to establish the USPS's adoption of the reports it cites.  In order to give rise to an adoptive admission, a party's use of a document must be significant.  *White Industries, Inc. v. Cessna Aircraft Co.*, 611 F.Supp. 1049 (W.D.Mo.1985) ("On balance, it seems appropriate to suggest that before this sort of internalized 'use' of information from another can be qualified as an adoptive admission, it must be shown that the party acted (or failed to act) in some *significant, identifiable way, in direct reliance upon the specific information in question*, so as to demonstrate clearly the party's belief in and intentional adoption of that information.") (italics in original).  The talking points documents do not, by themselves, reflect any "significant, identifiable" use of either the Campbell Ewald or FCB reports.[2]

**B.      The FCB and Campbell Ewald Reports are not subject to the business records exception**

The information contained in the FCB and Campbell Ewald reports is not subject to the business record exception, for several reasons.  First, the vast majority of data in those reports was supplied by firms other than FCB and Campbell Ewald, and Armstrong has failed to articulate a basis for the admissibility of that data.  Brian Mieth, the corporate designee who testified about the FCB reports, testified that FCB obtained data used in its reports from the following firms: Luce, Metro Media, Dow Jones Interactive, Spot Quotations and Data (SQAD), Nielsen, as well as several broadcast networks.  US Ex. 81 at 54:6-19; 63:25-65:2; 132:21-133:8; 134:14-135:7; 188:2-19; 285:13-19.  Similarly, Campbell Ewald's 30(b)(6) designee, Thomas

---

[2] Even if the Court concludes that the talking points documents are adoptive admissions, they cannot reasonably be understood as an adoption of each of the FCB and Campbell Ewald reports in their entirety.  Those reports express opinions relating to matters well beyond the scope of the statements identified by Armstrong, including the value of international exposure.  Moreover, none of the statements identified by Armstrong relates to the 2004 report by Campbell Ewald.

Talbert, testified that Campbell Ewald used Luce, Metro Media, SQAD, and Nielsen to obtain data used in the Campbell Ewald reports.  Where information contained in a proffered business record is supplied by someone outside the firm preparing the record, it is inadmissible unless the statement of the "outsider" satisfies another hearsay exception.  *United States v. Baker*, 693 F.2d 183, 188 (D.C. Cir. 1982).  Armstrong, however, has not even attempted to lay a foundation for the admissibility of the outsider-supplied data under the business records exception or any other exception.

Armstrong also has failed to demonstrate that the various reports were made at or near the time of events they document by, or from information transmitted by, someone with knowledge.  FRE 803(6).  With respect to the Campbell Ewald reports, the testimony Armstrong cites establishes only that the company's Rule 30(b)(6) designee, Thomas Talbert, was personally "aware" that Campbell Ewald was preparing a report for the USPS in 2003 (Def. Ex. 93 at 92:14-93:23) and that the employees who worked on the report were Kevin Pietsch, Helen Boutorwick, and Lindsay Fritzer (*Id*. at 96:10-98:1).  Narrowing the identity of the report's authors to three individuals is not sufficient to demonstrate that the report was prepared by "someone with knowledge." *Boca Investerings Parntership v. United States*, 128 F.Supp.2d 16, 19-20 (D.D.C. 2000).  Moreover, Armstrong has not identified any evidence to suggest that the data in the report were transmitted to its author, whoever that might be, by someone with knowledge.  Indeed, Talbert, who was not personally involved in preparation of the reports, was unable to identify the source or selection criteria for key data used in the reports, could not explain the evaluation criteria applied by Campbell Ewald, and did not know the objective of the report as defined by the USPS.  US Ex. 82 at 89:9-12; 98:1-25; 99:22-100:13; 135:15-137:9;

142:13-145:6; 146:14-22; 190:10-16; 198:18-21; 199:17-201:21; 218:2-6; 219:13-22; 222:9-21; 226:14-227:8.

The testimony Armstrong cites with reference to the FCB reports is similarly unavailing. It establishes only that Mieth authored the 2001 and 2002 reports and "oversaw" the work that went into them in his role as Managing Director in charge of FCB's New York office.  Again, Armstrong cites no evidence to suggest that the data in the reports were transmitted to Mieth by someone with knowledge.  And like Talbert, Mieth was unable to explain how data critical to the report had been ascertained or transmitted.  US Ex. 81 at 134:14-135:7; 177:24-178:7; 185:10-15; 236:16-25; 283:17-284:11; 286:24-287:1.  "When the proponent of a document cannot point with any degree of certainty to the individual or individuals who generated it or from whom they received the most important information the document contains, there is no reliable basis on which to admit the document and accept it for its truth." *Boca Investerings*, 128 F.Supp.2d at 20.

Also, in the case of the 2001 report, it is clear that the data in the report were not transmitted "at or near the time" of the events documented.  In the subsequent year's report, FCB explained, "Last year, we began the evaluation long after the completion of the race, which forced us to make certain assumptions."  Def. Ex. 64 at US00164766.  The report acknowledged that, as a result of those assumptions, "our figure [from 2001] was inflated." *Id*.

Armstrong also has failed to demonstrate that it is the "regular practice" of either FCB or Campbell Ewald to produce reports employing the same methodologies they used in preparing their reports for the USPS.  Armstrong must show that creation of the record is "typical of entries made systematically or as a matter of routine to record events or occurrences, to reflect transactions with others, or to provide internal controls." *Sabre Int'l Sec. v. Torres Advanced Enter. Sols.*, LLC, 72 F. Supp. 3d 131, 142 (D.D.C. 2014) (internal quotations omitted), quoting

*Palmer v. Hoffman*, 318 U.S. 109, 113 (1943).  As the testimony of Mieth and Talbert amply demonstrates, however, the preparation of the reports in this case was subjective and *ad hoc*, not "typical" or "routine."[3]

The exclusive basis for Armstrong's contention that preparation of the reports was routine is that they allegedly were prepared "using a methodology [that is] standard in the industry."  Def. Reply at 6.  Even if this were true, it does not follow that the reports represent the type of "routine reflections of the day to day operations of a business" that give rise to the "probability of trustworthiness" underlying the business records exception.  *Palmer*, 318 U.S. at 113–14.  Moreover, Armstrong cannot rely on the opinion testimony of Mieth or Talbert to establish the existence of an industry standard or the reports' adherence to such a standard, as Armstrong has not designated either of them as an expert in this case.  FRE 701, 702.

In any event, the assertion that FCB and Campbell Ewald followed an industry standard practice in preparing their reports is disproved by the reports themselves.  First, it is impossible that FCB and Campbell Ewald both followed the "industry standard," as the methodologies in their reports are drastically different from one another.[4]  *Compare* Def. Ex. 63 (FCB 2001 Report) and Def. Ex. 64 (FCB 2002 Report) *with* Def. Ex. 83 (CE 2003 Report) and US Ex. 83 (CE 2004 Report).  Indeed, FCB's report in each of 2001 and 2002 states that no industry standard for sponsorship valuation exists.  Def. Ex. 63 (2001 FCB Report) at US00164741 ("The

---

[3] *See, e.g.,* US Ex. 82 at 114:21-116:4; 135:15-136:23; 140:8-12; 145:3-6; 146:14-22; 148:13-24; 152:2-143:9; 155:14-156:18; 167:3-13; 172:6-174:22; 190:10-16; 198:18-21; 206:4-21; 207:3-20; 222:9-21.  US Ex. 81 at 96:24-97:12; 129:6-14; 130:11-131:20; 139:19-140:13; 142:2-146:2; 164:1-165:12; 169:4-25; 171:15-172:8; 184:2-4; 186:8-21; 189:15-190:20; 196:5-16; 205:25-207:7; 211:6-14; 219:21-220:10; 224:2-15.

[4] As just one example, FCB used un-factored "Page Rate Equivalents" to value print media, Def. Ex. 64 at US00002071-72, while Campbell Ewald valued print media by applying a "soft sell factor" to its estimate of the cost per "mention."  Def. Ex. 83 at US00002114-15.

fundamental question that needs to be asked is 'how does this compare with other title sponsorships and are we getting a Return On Investment?' The answer is simple, *there are no standards* and the value lies with the individual corporation and their objectives for the sponsorship.") (emphasis added); Def. Ex. 64 (FCB 2002 Report) at US00164766 (same).  The *ad hoc* nature of each firm's approach further demonstrates that neither FCB nor Campbell Ewald applied an "industry standard" methodology.[5] *See* fn. 3 above.

## II.    The Court should not exclude Sonnenberg's declaration under the "sham affidavit rule"

Armstrong argues that the Court should strike the declaration of Gail Sonnenberg under the "sham affidavit rule," which provides that a party cannot create an issue of fact and avoid summary judgment by offering an affidavit contradicting the party's prior deposition testimony. The sham affidavit rule is not applicable to Sonnenberg's declaration, however, because it does not contradict her prior testimony.[6]

A witness may use a declaration to explain his or her prior deposition testimony.  *See, e.g., Shephard v. Slater Steel*, 168 F.3d 998, 1007 (7th Cir. 1999).  In order for the sham affidavit rule to apply, "the [declaration] must clearly contradict prior sworn testimony." *Ng v. Lahood,*

---

[5] Although this sur-reply does not address FRE 803(6)(E) (record of regularly conducted activity admissible unless there is an indicia of a lack of trustworthiness) the United States reserves its right to argue the untrustworthiness of the FCB and Campbell Ewald reports at a later stage of this litigation, including in a motion in limine to exclude the reports from evidence at trial.

[6] The sham affidavit rule is not applicable here for an additional reason – Sonnenberg is not a party to this case.  Typically, the sham affidavit rule applies only to parties, though some appellate courts have extended the doctrine to non-parties.  *Pyramid Sec. Ltd. v. IB Resolution, Inc.,* 924 F.2d 1114, 1123 (D.C.Cir.1991); *Gonzalez v. City of McFarland*, No. 1:13-CV-00086-JLT, 2014 WL 3940295, at *9 (E.D. Cal. Aug. 12, 2014).  The D.C. Circuit has not decided the issue.  *Richardson v. Petasis*, 160 F. Supp. 3d 88, 105 n. 17 (D.D.C. 2015) (describing the issue as an "open question"), citing *Solomon v. Vilsack*, 628 F.3d 555, 566 (D.C.Cir.2010) (assuming without deciding that the rule applies to non-parties); *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030–31 (D.C. Cir. 2007) (refraining from deciding whether the sham affidavit rule should apply to a non-party witness).

952 F. Supp. 2d 85, 93 (D.D.C. 2013), quoting *St. Paul Mercury Ins. Co. v. Capitol Sprinkler Inspection, Inc.*, 573 F.Supp.2d 152, 160–161 (D.D.C.2008).  *See also Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007) ("If the supplemental affidavit does not contradict but instead clarifies the prior sworn statement, then it is usually considered admissible").  "[T]he non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition[.]" *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998–99 (9th Cir. 2009) (citation omitted).

Although Armstrong asks the Court to strike Sonnenberg's declaration in its entirety, he identifies only two statements that he believes contradict her prior testimony.  First, Armstrong points to Sonnenberg's statement that the sponsorship was "only one of many factors" contributing to USPS sales associated with the sponsorship and that statements about sales related to the sponsorship were not meant to imply that the sponsorship was the sole cause of any sale.  Armstrong alleges that the statement contradicts several portions of Sonnenberg's testimony about sales associated with the sponsorship.  In each case, however, Sonnenberg's testimony suggests no more than the existence of some connection between the sponsorship and particular sales. Sonnenberg's declaration acknowledges this, US Ex. 32 at ¶ 5 (stating that the sponsorship was a "helpful [marketing] tool" and that it contributed to USPS sales to some extent) and, consistent with that statement, adds that many other factors contributed to those sales, too.  Sonnenberg did not maintain in her deposition that the sponsorship was the exclusive, but-for cause of any sale, or that the USPS sales force and prior marketing efforts did not

contribute to those sales in any way.[7]  Thus, the statement in Sonnenberg's declaration that other

factors played a role in those sales does not contradict her deposition testimony.

Second, Armstrong takes issue with the portion of Sonnenberg's declaration in which she

explains that the sales figures associated with the sponsorship were estimates.  As evidence of a

supposed contradiction, Armstrong claims that Sonnenberg "unequivocally" testified that the

figures were "truthful and accurate."  Not so.  Sonnenberg explained during her deposition that

the USPS lacked the reporting systems necessary to be able to identify "new" revenue with

confidence, or to be able to associate any new revenue with a particular event or cause.  US Ex.

84 at 121:2-122:4.  Thus, when Armstrong's counsel asked Sonnenberg whether the figures were

"truthful and accurate *to the best of your ability*[,]" she answered "That's correct[,]" in light of

her earlier testimony that the USPS lacked the ability to produce such figures reliably.  *Id.* at

179:21-24 (emphasis added).   Just moments later, when Armstrong's counsel asked whether a

related set of figures she cited was "truthful and accurate," Sonnenberg responded "[a]s best we

could calculate the numbers" and explained, again, that "[t]here [was] no information system

within the Postal Service" that could link sales with the cycling sponsorship.  *Id.* at 180:22-

182:12; 192:1-5.  Sonnenberg noted that this was one among many "deficienc[ies]" in the

---

[7] Armstrong's attempt to stretch Sonnenberg's testimony to this effect is not supported by the record and, even if it were, the testimony would not be inconsistent with Sonnenberg's declaration.  Although Armstrong claims "Sonnenberg also testified that the USPS had *obtained new business* from at least Montgomery Securities, Bell, Shimano, Pearl Izumi, Trek, and Nashbar as a result of the sponsorship[,]" Reply at 8 (emphasis added), Sonnenberg actually testified to the more limited proposition that the USPS was able to market to those companies as a result of the sponsorship.  US Ex. 84 at 128:24-129:3 (the USPS "got entrees" to those companies).  Even as mischaracterized, however, the testimony is consistent with the possibility that other factors contributed to those sales, as well. Moreover, Armstrong conflates "sales" with "revenue" throughout his reply.  To the extent Armstrong's argument rests on his assertion that Sonnenberg testified the USPS received *revenues* from sales associated with the sponsorship, he clearly is mistaken.  Sonnenberg testified that she did not know whether USPS realized any revenue from those sales.  *Id.* at 213:7-214:19.

information system from which the figures had been derived.  Sonnenberg's declaration is

entirely consistent with this testimony.

III.     **The declarations of Jonathan Walker and Larry Gerbrandt are admissible, and these declarations highlight the parties' dispute as to the market value of Armstrong's sponsorship services.**

A central issue in this case is the extent to which the USPS was damaged by

Armstrong's fraudulent conduct when he was the lead rider on the USPS Team.  Under the

settled law of this Circuit, in order to calculate the USPS's damages, the jury must determine the

difference in the market value of the services for which the USPS bargained and the market

value of the services it actually received (i.e., the price a buyer would have paid to sponsor

Armstrong's team if it knew about Armstrong's historical PED use and his intended future use).

*United States v. Sci. Applications Int'l Corp.* ("*SAIC*"), 626 F.3d 1257, 1278-79 (D.C. Cir. 2010).

The opinions of both Jonathan Walker and Larry Gerbrandt are indisputably relevant to

this issue.  Both Dr. Walker and Mr. Gerbrandt testified that the FCB and Campbell Ewald

reports did not reflect the market value of the sponsorship, and that the best estimate of the actual

market value of Armstrong's sponsorship services is zero.  *Compare* US Ex. 34 (Walker Decl.)

at ¶ 6 (earned media evaluations "always grossly exceed[]  the true market value of media

exposure," and that the methods on which these reports rely are "subjective, unscientific and ad

hoc . . .") *and id.* at ¶ 5 ("disclosure to sponsors of historical PED use and planned future PED

use would necessarily have driven the sponsorship value down . . . [and that the] best estimate of

the market value of the sponsorship on a fully disclosed basis is zero." *with*  US Ex. 33

(Gerbrandt Decl.), at ¶¶ 2,6 (FCB and Campbell Ewald reports "suffered from deficiencies in

their respective methodologies that cause them to overestimate the value received by the USPS,"

*and id.* at ¶ 5 ("no sponsor would pay anything for a media package that includes both the

positive impression estimates in the FCB and CE reports from 2001-04, and the negative

impressions that I counted.").

Armstrong argues in his reply brief that this Court should refuse to consider these expert

opinions because the declarations summarizing these opinions "fail to disclose the facts or

methodologies, if any, upon which their opinions are based." Armstrong Br. at 9.  This argument

rests on a mischaracterization both of the law and the facts.  First, the D.C. Circuit has followed

the Ninth Circuit in holding that Rule 56 does not require an expert affidavit to describe the

reasoning process underlying the expert's opinion.  See *Ambrosini v. Labarraque*, 966 F.2d

1464, 1470-71 (D.C. Cir. 1992) (an expert conclusion offered in a short affidavit and purportedly

based on "the available scientific and epidemiological data" and "a review of relevant medical

records" of the plaintiff was sufficient to withstand summary judgment); *see also First United*

*Fin. Corp. v. U.S. Fid. & Guar. Co.*, 96 F.3d 135, 140 (5th Cir. 1996) (discussing circuit split

regarding whether Rule 56 requires experts to explain the reasoning process underlying their

opinions); *but cf. Mendes-Silva v. United States*, 980 F.2d 1482, 1488 (D.C. Cir. 1993) (noting

that "only preliminary discovery had been conducted in Ambrosini when the district court

granted summary judgment.").

Second, as a factual matter, Armstrong's claim that the government's expert declarations

do not disclose the facts on which the opinions are based is incorrect.  On the contrary,

Gerbrandt states that his expert opinion is based on the fact that were approximately 155 billion

negative media impressions linking Armstrong's doping scandal to the USPS.  US Ex. 33

(Gerbrandt Decl.) at ¶ 4.  Similarly, Dr. Walker is clearly qualified to testify based on his

training and experience about the market value of a sponsorship and the economic significance

of the earned media valuations on which Armstrong attempts to rely.  US Ex. 34 (Walker Decl.)

at ¶¶ 3, 6.  Even without more, Dr. Walker's opinion that these reports grossly overstate the market value of the Sponsorship creates an issue of fact concerning the reliability of the earned media studies on which Armstrong's theory of damages depends.  Dr. Walker's declaration also states that his opinion that the "the market value of the sponsorship on a fully disclosed basis is zero," is based on his training and experience as an economist, his review of relevant economics literature, and  on the discovery record in this case, *id.* at ¶ 3, which demonstrates that each of Armstrong's remaining sponsors terminated their relationship with him after his PED use was conclusively proven.

Armstrong's challenge to the government's experts' qualifications to render these opinions is even less plausible.  *Daubert* challenges are disfavored at the summary judgment stage.  "When a court denies the right to have a jury decide a disputed issue, especially one of a scientific nature, its reasons for doing so must be strong."  *Ambrosini*, 966 F.2d at 1469; *Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997) ("courts will be hard-pressed in all but the most clear-cut cases to gauge the reliability of expert proof on a truncated record. Because the summary judgment process does not conform well to the discipline that *Daubert* imposes, the *Daubert* regime should be employed only with great care and circumspection at the summary judgment stage.")  In the present case, Dr. Walker is a sports economist with a doctorate in economics from the Massachusetts Institute of Technology.  US Ex. 34 (Walker Decl.) at ¶1.  Larry Gerbrandt is a veteran media analyst with over 30 years of experience in media analysis. US Ex. 33 (Gerbrandt Decl.) at ¶¶ 1-2.  Both experts' opinions are squarely within their area of expertise:  the fair market value of the USPS sponsorship (Dr. Walker) and the nature and significance of the media coverage that associated the USPS brand with Armstrong's doping scandal (Larry Gerbrandt).

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

CHANNING D. PHILLIPS, D.C. Bar # 415793
United States Attorney

DANIEL F. VAN HORN, D.C. Bar # 924092
Assistant United States Attorney

Darrell C. Valdez (D.C. Bar No. 420232)
Carl E. Ross
U.S. ATTORNEY'S OFFICE
Judiciary Center Building
555 Fourth Street, NW
Washington, DC 20530
(202) 252-2507
darrell.valdez@usdoj.gov

/s/ Robert E. Chandler
Michael D. Granston
Tracy L. Hilmer
Robert E. Chandler
David M. Finkelstein
Robert J. McAuliffe
Gregory A. Mason
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
P.O. Box 261
Ben Franklin Station
Washington, DC 20004
(202) 514-4678 – Telephone
Robert.Chandler@usdoj.gov

Attorneys for the United States of America