**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES ex rel. LANDIS**,<br><br>Plaintiffs,<br><br>v.<br><br>**TAILWIND SPORTS CORP., et al.**,<br><br>Defendants. | Case No. 1:10-cv-00976 (CRC) |

**MEMORANDUM OPINION**

In 1995, the United States Postal Service ("USPS" or "Postal Service") sponsored a professional cycling team that would soon recruit Lance Armstrong to be its lead rider. Five years later, after Armstrong had battled back from cancer to win two consecutive Tour de France titles, the Postal Service renewed the sponsorship for an additional four years on the condition that Armstrong remain on the team. Armstrong proceeded to win the Tour de France five more times, making him one of the world's most recognized and celebrated athletes. From 2000 to 2004, USPS paid the team's owner just over $32 million, the lion's share of which went to Armstrong as the team's star rider. In exchange, the Postal Service sought to associate itself with the positive attributes that Armstrong presented to the public: perseverance, speed, and reliability. It hoped that this association would boost sales and enhance the reputation of its brand relative to its competitors in the express delivery market. Armstrong appeared to hold up his end of the bargain, and the Postal Service readily touted the benefits it received from the sponsorship.

But appearances proved to be deceiving. What few knew at the time was that Armstrong and his teammates had used performance enhancing drugs ("PEDs") throughout the course of the sponsorship. Their conduct was contrary to the team owner's contractual assurance to USPS that the team would abide by the rules of professional cycling and compete drug-free. It also conflicted

with Armstrong's repeated denials of doping, both publicly and, allegedly, to Postal Service officials.  After investigations by the United States Anti-Doping Agency and federal law enforcement confirmed the team's widespread PED use, Armstrong was banned from competitive cycling for life and stripped of his seven Tour de France titles.  Only then did he come clean to the public, in a 2013 interview with Oprah Winfrey.  Four months later, the federal government intervened in this False Claims Act ("FCA") lawsuit, which had been filed under seal in 2010 by Armstrong's former teammate, and fellow PED-user, Floyd Landis.  The FCA permits private citizens, known as "relators," to bring so-called *qui tam* actions against anyone who has submitted false or fraudulent claims for payment to the United States government.

The government's suit alleges that Armstrong; the team's owner, Tailwind Sports Corporation ("Tailwind"); and the team's sporting director, Johan Bruyneel, violated the FCA by issuing payment invoices to the Postal Service under the sponsorship agreements (or causing them to be issued) while actively concealing the team's violations of the agreements' anti-doping provisions.  It also alleges common-law fraud and unjust enrichment.  Landis' suit also alleges violations of the FCA, but includes Armstrong's agents at the sports management firm Capital Sports & Entertainment ("CSE") as additional defendants.  The government seeks nearly $100 million in actual damages, calculated at three times the total amount of USPS's sponsorship payments.  If successful, Landis, as the *qui tam* relator, would be entitled by statute to receive up to twenty-five percent of any monetary recovery.

With discovery in the case complete, both sides have moved for summary judgment.  The government's motion is aimed narrowly.  It seeks to establish as a matter of law the precise number (41) and the total amount ($32,267,279) of the payment invoices that Tailwind submitted to USPS during the period of the sponsorship that is at issue in this case.  Because the record is uncontested as to those figures, the Court will grant the government's motion.

Armstrong, joined by the CSE Defendants, takes a broader approach, moving for summary judgment as to liability on all pending claims.  Finding that the government has raised genuine issues of fact regarding the applicability of two recognized theories of FCA liability, as well as its common-law claims, the Court will largely deny the motion as to liability.

Armstrong also asks the Court to find, as a matter of law, that the government has suffered no actual damages, entitling him to summary judgment on that issue.  The government's actual damages are zero, in his view, because the present record conclusively demonstrates that the benefits USPS reaped from the sponsorship exceeded its $32 million price tag.  This issue presents a closer question.  The Court generally adopts Armstrong's proposed "benefit-of-the-bargain" approach to calculating damages in FCA cases, like this one, where the market value of goods or services supplied under a government contract are difficult to determine.  It also agrees that the record evidence—including internal Postal Service correspondence and contemporaneous third-party valuation studies—supports a finding that USPS received substantial benefits as a direct result of the sponsorship.  Ultimately, however, the Court concludes that the monetary amount of the benefits USPS received is not sufficiently quantifiable to keep any reasonable juror from finding that the agency suffered a net loss on the sponsorship, especially if one considers the adverse effect on the Postal Service's revenues and brand value that may have resulted from the negative publicity surrounding the subsequent investigations of Armstrong's doping and his widely publicized confession.  Determination of damages must therefore be left to a jury.  Accordingly, the Court declines to grant Armstrong summary judgment on damages and will set the case for trial.

I.      **Background**

A.      Sponsorship Agreements

In 1995, the Postal Service entered into an agreement with Montgomery Sports, Inc., later renamed Tailwind, to sponsor a professional cycling team.[1]  Armstrong's Mem. Supp. Mot. Summ. J. ("Armstrong's MSJ"), Ex. 21 ("1995 Sponsorship Agreement").[2]  Under that agreement, USPS made quarterly sponsorship payments in exchange for various "Promotional Rights and Activities," including media exposure, the right to prominently display USPS's eagle insignia on team uniforms, and hospitality at major cycling events.  Id. at US00601199.  Although the agreement expired after a year, it was automatically renewed on a year-to-year basis until 2000.  Id. at US00601194.  USPS's motivations for sponsoring a cycling team evolved over the course of its relationship with Armstrong and the team.  Originally, it intended to use the sponsorship to generate corporate sales by inviting potential clients to cycling events.  But by 2000, USPS placed more emphasis on the favorable media attention it garnered through coverage of the team's racing success and Armstrong's compelling personal story.  Gov't's Opp'n Armstrong's MSJ ("Gov't's Opp'n"), Ex. 32 ("Sonnenberg Decl.") at ¶¶ 3, 7.

Heralding Armstrong's Tour de France victories in 1998 and 1999, USPS modified the sponsorship agreement in 2000 to extend for a full four years.  See Armstrong's MSJ, Ex. 22 ("2000 Sponsorship Agreement").  Under the sponsorship terms, Tailwind remained responsible for managing the cycling team and submitting payment invoices to USPS.  Both sponsorship agreements specified the amount and frequency of lump-sum payments from USPS to Tailwind,

---

[1]  The Court will refer to "Tailwind" to include its corporate predecessors Montgomery Sports, Inc. and DFP Cycling LLC.

[2]  The Court will adopt the exhibit numbers as designated by the parties in their briefing, irrespective of how they are docketed electronically.

and provided for various other "incidental costs" to be allocated between the parties, depending on the promotions undertaken.  See 1995 Sponsorship Agreement; 2000 Sponsorship Agreement. Across the entire period of sponsorship, the Postal Service paid Tailwind over $42 million.  See Gov't's Mem. Supp. Mot. Partial Summ. J. ("Gov't's MPSJ") Statement of Material Facts ¶¶ 3, 5 (citing Landis's Second Am. Compl. ("SAC") ¶¶ 24–33, Gov't's Compl. ¶ 25, and Armstrong's Am. Answer SAC ¶¶ 24–33).[3]

The 1995 agreement required that the parties "in all events be subject to compliance with all applicable rules of the Union Cycliste Internationale, the Federation Internationale du Cyclisme Professionel, . . . the United States Cycling Federation and all other governing organizations."  1995 Sponsorship Agreement at US000601197.  Those rules strictly prohibited the use of PEDs.  Gov't's Opp'n, Ex. 35 ("Bock Decl.") at ¶¶ 8–9.  After the French police investigated the Postal Service team on accusations of doping in 2000, USPS insisted on including specific provisions in the 2000 agreement concerning the use of banned substances by team members.  See Sonnenberg Decl. ¶ 8; Armstrong's MSJ, Ex. 47; 2000 Sponsorship Agreement.  The new agreement, for example, required Tailwind to "represent[] that each rider on the Team has a morals turpitude and drug clause that allows [Tailwind] to suspend or terminate the rider" for reasons such as "failure to pass drug or medical tests," or "inappropriate drug conduct prejudicial to the Team, or the Postal Service[,]" and "to take appropriate action within thirty (30) days" of discovering such behavior.  2000 Sponsorship Agreement at US00167835.  While the agreement did not obligate Tailwind to return any funds received during periods of noncompliance, it did authorize USPS to terminate the contract and

---

[3] While the total cost of the Postal Service sponsorship from 1995 to 2004 was over $42 million, the government's claims are based on the invoices submitted within FCA's statute of limitations.  This includes all invoices submitted under the 2000 Sponsorship Agreement and the final invoice submitted on July 25, 2000 under the 1995 Sponsorship Agreement.  These invoices total $32,267,279.85.  See infra Section III.A.

exercise any "right or remedy available to it under law or in equity" if an "Event of Default" occurred. Id. at US00167833–34. "Events of Default" included Tailwind's "fail[ure] to take immediate action . . . in a case of a rider or Team offense related to a morals or drug clause violation," and "negative publicity associated with an individual rider or team support personnel . . . due to misconduct such as but not limited to, failed drug or medical tests, alleged possession, use or sale of banned substances, or a conviction of a crime." Id. When the agreement expired on December 31, 2004, USPS opted not to renew it.

Barton Knaggs and William Stapleton acted as Armstrong's business manager and agent throughout his cycling career. Knaggs began working with Armstrong in 1993 and introduced him to Stapleton in 1994. Gov't's Opp'n, Ex. 20 ("Stapleton Dep.") at 70:19–23. Stapleton went on to be Armstrong's agent from 1995 to 2013. Id. Stapleton created Capital Sports Ventures in 1998 and renamed it CSE in 2001. Gov't's Opp'n, Ex. 22 ("Knaggs Dep.") at 24:3–21. From 2001 onwards, CSE maintained a contract with Armstrong with Stapleton serving as his agent. CSE's Mem. Supp. Mot. Summ. J. (ECF No. 311), Ex. I ("Knaggs Decl.") at ¶ 3. Around 2001, Knaggs joined Stapleton at CSE, and, in 2004, began acting as Armstrong's business manager. Id. Stapleton and Knaggs were both principals of CSE, and as of 2002 they collectively owned a controlling interest in the company. Id. During the early 2000's, Armstrong was CSE's primary client.

In October 2003, Tailwind (the team's owner) and CSE entered into a service contract in which CSE agreed to manage Tailwind's business affairs. Gov't's Opp'n, Ex. 45. Under the contract, Stapleton and Knaggs were to perform "general management" services for Tailwind on CSE's behalf. Id. For instance, CSE assumed "responsib[ility] for the Team's sponsors, including . . . servicing the sponsors, subject to contractual agreements in place." Id. at 5663. CSE also agreed to provide "all sales and marketing services related to Tailwind and the Team," such as

"hospitality for sponsors"; "media and public relations services"; "all accounting services required by Tailwind," including preparation of "books of accounts and records"; "legal services"; and assistance in "complying in all material respects with all the regulations of all applicable cycling governing bodies." Id. CSE was responsible for submitting Tailwind's invoices for sponsorship fees to USPS from 2003 to 2004. CSE's Mem. Supp. Mot. Summ. J., ECF No. 311, Ex. A ¶ 2.

          B.    <u>Armstrong's History with Tailwind, USPS, and Professional Cycling</u>

Armstrong rode for Tailwind and the USPS cycling team from 1998 until 2004. In his first Professional Rider Agreement with Tailwind, he agreed to abide by the rules and regulations of professional cycling's governing bodies. Gov't's Opp'n, Ex 57. The rider agreement also forbade Armstrong from issuing intentionally false public statements and from using any PEDs while he rode for the team. Id. at US00031411–12. Throughout USPS's sponsorship, Armstrong was the highest-paid rider on the team, with a salary over double that of the next highest-paid rider. See Gov't's Opp'n, Ex. 48 ("Armstrong shall be the highest paid rider on the team in terms of overall compensation, bonuses, and benefits."); Ex. 61 (listing rider salaries). While Armstrong's agreement with Tailwind was independent of the USPS sponsorship agreements, the two were often linked. For example, in 2000, Armstrong extended his commitment to the team for another three years so that Tailwind could successfully negotiate a four-year sponsorship agreement with USPS under more favorable terms. See Gov't's Opp'n, Ex. 23 at 35:15–24, 36:13–37:2. Additionally, USPS had the right to use Armstrong's name, likeness, and image in their promotions—a right extended to only one other of the team's sponsors. Gov't's Opp'n, Ex. 47 at US00031751.

Throughout the course of the Postal Service's sponsorship, Armstrong and Tailwind repeatedly denied all allegations of doping. In response to the French police's investigation in 2000, for example, the cycling team's spokesperson "categorically den[ied] any involvement with banned substances" and dismissed "[a]nything [said] in the media [as] pure speculation." Gov't's

Opp'n, Ex. 74 at 1.  And in a 2003 autobiography, Armstrong proclaimed the team "absolutely

innocent."  Gov't's Opp'n, Ex. 68 ("Every Second Counts") at 73.  Rumors of doping persisted

nonetheless, and Armstrong continued to deny accusations of PED use after the USPS sponsorship

ended in 2004.  In 2010, the U.S. Department of Justice initiated a criminal grand jury investigation

of Armstrong.  About the same time, the United States Anti-Doping Agency ("USADA")

commenced its own investigation, partly on the basis of information provided by Armstrong's

former teammate, Floyd Landis, who had himself received a two-year ban from cycling following a

positive drug test during the 2006 Tour de France.  USADA concluded its inquiry in 2012 by

formally charging Armstrong with use and trafficking of PEDs and ultimately found that he had

doped throughout the majority of his professional career.  Bock Decl. at ¶ 5, 8.  Based on its

findings, USADA permanently banned Armstrong from professional cycling and the Union

Cycliste Internationale ("UCI"), which governs international cycling competitions, stripped him of

his seven Tour de France titles.  Id. at ¶ 16.  Shortly thereafter, in 2013, Armstrong acknowledged

in a televised interview that he had used PEDs throughout his career, including his time on the

Postal Service team.  Gov't's Compl. ¶ 61.

       C.      Procedural History

       While supplying information against Armstrong to investigators, Landis simultaneously

filed this *qui tam* action on June 10, 2010.  The suit raises various claims under the FCA against

Armstrong, the CSE Defendants, Tailwind, the cycling team's sporting director Johan Bruyneel,

and Tailwind's founder Thomas Weisel.  After declining to charge Armstrong criminally, the

government intervened in Landis's suit against Armstrong, Tailwind, and Bruyneel, and reserved

the right to intervene against the CSE Defendants at a later time.  The Court has since dismissed

Landis's claims against Weisel, and the Clerk has entered a default against Tailwind and Bruyneel,

who have been largely absent from the current litigation.  In addition, the Court held that the FCA's

six-year statute-of-limitations period, see 31 U.S.C. § 3731(b)(1) (2012), applied to all of Landis's

claims, and thus, Landis could only recover for "direct" false claims submitted after June 10, 2004.

Mem. Op. June 19, 2014, ECF No. 174.  Accordingly, Landis's FCA claims against the CSE

Defendants are limited to four payment invoices, totaling $68,000, submitted by Tailwind in June,

August, and September of 2004.  Id.  All of these invoices are requests for reimbursements for

hospitality-related expenses, specifically food and beverage expenditures, tent rentals, and the costs

associated with a victory celebration following Armstrong's 2004 Tour de France win.  Id.  In

earlier rulings, the Court also awarded summary judgment in favor of all defendants on the claim

that Armstrong and CSE were responsible for so-called "reverse" false claim violations.[4]

The remaining active defendants, then, are Armstrong, against whom the government has

intervened, and the CSE Defendants, against whom it has not.  Multiple FCA claims remain against

both defendants, and the government has also charged Armstrong with common-law fraud and

unjust enrichment.  With discovery having concluded, the parties now move for summary

judgment.  As noted above, the government has moved for partial summary judgment on two

discrete issues related to the potential damages award, and Armstrong has moved for summary

judgment on all of the remaining claims against him.  Along with joining Armstrong's motion, the

CSE Defendants also seek summary judgment on the specific claims against them.  The Court heard

oral argument on the pending motions on November 2, 2016.

## II.     Standard of Review

A party is entitled to summary judgment if the pleadings and other materials in the record,

"including depositions, documents, electronically stored information, affidavits or declarations,

---

[4] A "reverse" false claim imposes liability on a defendant that "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7).

stipulations . . . , admissions, [or] interrogatory answers," show that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law." Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). An issue is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on a particular claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The ultimate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251–52.

When reviewing a motion for summary judgment, courts "view the evidence in the light most favorable to the nonmoving party and draw all inferences in its favor." Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 850 (D.C. Cir. 2006). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions" and thus inappropriate for "a judge at summary judgment." Barnett v. PA Consulting Grp., Inc., 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting Pardo–Kronemann v. Donovan, 601 F.3d 599, 604 (D.C. Cir. 2010)). A party seeking to defeat summary judgment cannot simply rest on its pleadings, but rather must support its opposition with depositions, affidavits, declarations, or other evidence setting forth specific facts that reveal a genuine issue warranting a trial. Fed. R. Civ. P. 56(c).

III.   **Analysis**

A.   Government's Motion for Summary Judgment

The government has moved for summary judgment against Armstrong on two narrow issues relating to its FCA claims: (1) the presentment of claims by Tailwind to the United States and (2) the amount paid by the United States on those claims. The first issue is a necessary predicate for

the government's remaining FCA claims, while the second is relevant to its damages claim.  Neither

issue, however, prevents Armstrong from contesting his liability or the proper amount of damages

at trial.

"A party may move for summary judgment, identifying each claim or defense—*or the part*

*of each claim or defense*—on which summary judgment is sought."  Fed. R. Civ. P. 56(a) (emphasis

added).  When Rule 56(a) was amended in 2010, the accompanying commentary indicated that the

quoted sentence was intended to clarify that summary judgment is proper for even a portion of a

claim.  See Fed. R. Civ. P. 56(a) advisory committee's note to 2010 amendment.  Regardless of

whether a party seeks summary judgment on part of a claim or the entire claim, the same standard

applies:  The movant must establish through its pleadings that no genuine issue exists as to a

material fact.  See Celotex Corp., 477 U.S. at 324.

Applying that standard, the existence of a "claim" is clearly essential to—and thus *part of*—

the FCA violations alleged in the government's complaint.  Gov't MPSJ 6–7.  The FCA defines a

claim as "any request or demand, whether under a contract or otherwise, for money or property, that

. . . is presented to an officer, employee, or agent of the United States."  § 3729(b)(2).  Here,

Tailwind submitted requests for money to the Postal Service, in the form of invoices, under the

sponsorship agreements.  Invoices requesting payment for goods or services are certainly "claims"

under the FCA.  See United States v. Bornstein, 423 U.S. 303, 312 (1976).  The government puts

forth evidence to establish that Tailwind submitted forty invoices to USPS, totaling $31,442,279.85,

under the 2000 Sponsorship Agreement.  Gov't MPSJ, Ex. 5 (Invoices Under 2000 Agreement).

It also offers proof that, on July 25, 2000, Tailwind submitted another invoice for $825,000 under

the 1995 Sponsorship Agreement.  Gov't MPSJ, Ex. 2 ("Pugliese Decl."), Ex. 8.  In sum, the

government has shown that USPS paid $32,267,279.85 on 41 invoices, or "claims."  See Gov't

MPSJ, Ex. 4 ("Findley Decl.") at ¶¶ 18, 21.

Armstrong does not dispute these figures, but instead argues that the Court may not decide facts at summary judgment and, alternatively, that the government's evidence would be inadmissible at trial and thus cannot support summary judgment on this issue.[5]  The Court rejects both arguments.

First, summary judgment can be entered on narrow, factual issues.  The cases Armstrong relies upon to contend otherwise either pre-date the 2010 amendment to Rule 56—which clarifies that summary judgment is permissible on portions of a claim—or involve disputed facts that prevented summary judgment in the first place.[6]  By contrast, courts in this district have entered summary judgment on discrete factual issues when warranted by the record.  See, e.g., Branch Banking & Trust Co. v. Rappaport, 982 F. Supp. 2d 66, 69 (D.D.C. 2013) (entering summary judgment on the principal amount of money owed on a loan).  Armstrong's objections are thus unfounded and the Court has the authority to enter summary judgment on the existence and value of claims submitted to USPS if no material factual disputes are apparent from the record.

 Again without disputing the underlying facts, Armstrong also urges the Court to strike three government declarations establishing the existence of the claims, on the ground that they were belatedly disclosed under Federal Rule of Civil Procedure 26(a)(1).[7]  The declarations at issue are

---

[5] Armstrong further argues that the government has not offered any proof that Armstrong himself *caused* the submission of these invoices.  This issue is beyond the scope of the government's motion, however, and therefore not included in their request for summary judgment.  See Gov't's Reply 5.

[6] See LaPrade v. Abramson, 2006 WL 3469532 (D.D.C. Nov. 29, 2006) (pre-2010 amendment); SEC v. Thrasher, 152 F. Supp. 2d 291 (S.D.N.Y 2001) (same); Capitol Records v. Progress Record Distrib., Inc., 106 F.R.D. 25 (N. D. Ill. 1985) (same); see also Fin. Res. Network, Inc. v. Brown & Brown, Inc., 930 F. Supp. 2d 287, 319 (D. Mass. 2013) ("All of the proposed facts plaintiffs seek to establish are genuinely disputed.").

[7] While the Court will address Armstrong's objections to the late disclosures of these witnesses, it questions why striking their declarations would create a genuine issue of material fact,

from Michael Kiely, a USPS attorney involved in the government's investigation of this case; Jose Posada, an employee in USPS's accounts payable department; and Michael Pugliese, a special agent in USPS's Office of Inspector General.  Gov't's MPSJ, Exs. 2–3, 6.  Each of these witnesses was a longstanding USPS employee and thus known to the government at the time it intervened in the suit.  The government's failure to disclose the witnesses in a timely manner was prejudicial, according to Armstrong, because it prevented him from deposing them on the content of their declarations.  Armstrong's Opp'n Gov't's MPSJ ("Armstrong's Opp'n") 9–10.

Rule 26(e) provides that a party "who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response . . . in a timely manner."  Fed. R. Civ. P. 26(e).  In conjunction with this requirement, Rule 37(c)(1) provides that a party who fails to provide the identity of witnesses as required shall be precluded from calling those witnesses at trial unless the failure was "substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  "Under Rule 37, the district court has broad discretion to impose sanctions for discovery violations."  Bonds v. District of Columbia, 93 F.3d 801, 807 (D.C. Cir. 1996); see also Shatsky v. Syrian Arab Republic, 312 F.R.D. 219, 223 (D.D.C. 2015).

Before it considers such sanctions, however, the Court must first find that the government violated its supplemental disclosure obligations under Rule 26(e).  A party need supplement its initial disclosure only "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1)(A); see also Elion v. Jackson, 544 F. Supp. 2d 1, 10 n.9 (D.D.C. 2008) (finding witness's testimony

---

as the government has offered additional evidence establishing the existence and value of these invoices.  See, e.g., Findley Decl. at ¶¶ 15, 18.

admissible because the witness's name had been provided in response to an interrogatory, putting the opposing party "on notice that [she] had discoverable information"). While the government does not explain why it failed to include these witnesses in its initial Rule 26 disclosure, it has satisfied the Court that they were "made known to [the defendants] through the discovery process." Fed. R. Civ. P. 26(e)(1)(A). Armstrong was therefore "on notice" that each of these witnesses could have potentially relevant and discoverable information. For instance, the government designated Special Agent Pugliese as a Rule 30(b)(6) witness on the topic of USPS's efforts to collect documents related to the submission of claims alleged in the Complaint, and Armstrong deposed him on May 19, 2015. Gov't's Reply 6. Furthermore, Pugliese testified that Mr. Kiely had also been involved in the process of assembling relevant documents from USPS—the topic of Kiely's current declaration. Likewise, when Armstrong deposed another USPS Rule 30(b)(6) designee, Brett Elliott, she testified that she spoke with Mr. Posada to prepare herself for the deposition. Id. Posada's declaration details USPS's accounts payable system. The cases cited by Armstrong, by contrast, involve situations where one party had never heard of the new witnesses until receiving their declarations during summary judgment proceedings. See, e.g., U.S. ex rel. Purcell v. MWI Corp., 824 F. Supp. 2d 12, 19 (D.D.C. 2011), rev'd on other grounds, 807 F.3d 281 (D.C. Cir. 2015) (striking declarations from two witnesses not disclosed to the government during discovery); Thomas v. Paulson, 507 F. Supp. 2d 59, 80 (D.D.C. 2007) (refusing to consider an affidavit because the witness was not mentioned at all in plaintiff's deposition, answers to interrogatories, or Rule 26(a)(1) disclosures).

Because the Court rejects Armstrong's admissibility and procedural concerns, and the relevant facts are undisputed, the Court will grant the government's motion for partial summary judgment on Tailwind's submission of 41 claims in the amount of $32,267,279.85.

## B.    Armstrong and the CSE Defendants' Motions for Summary Judgment

Moving to the defendants' motions, Armstrong seeks summary judgment on all of the FCA

and common-law claims against him.  The CSE Defendants join him in contesting the pending FCA

claims.  They argue that the government cannot prove (1) a viable theory of liability to establish the

falsity of Tailwind's invoices or (2) that USPS suffered actual damages.  Before reaching these

arguments, however, the Court must first resolve a threshold evidentiary dispute over a declaration

that the government has offered in opposition to the defendants' motions.

### 1.   Admissibility of the Sonnenberg Declaration

The contested declaration is from USPS's former Senior Vice President Gail Sonnenberg,

who was responsible for overseeing the cycling sponsorship.  It is dated July 11, 2016, which is

after discovery had concluded in this case.  See Sonnenberg Decl.  Armstrong and the CSE

Defendants urge the Court to strike Ms. Sonnenberg's declaration as unacceptable summary

judgment evidence under the "sham affidavit" rule, which prohibits a party from "creat[ing] a

material issue of fact simply by contradicting its prior sworn testimony."  Pyramid Sec. Ltd. v. IB

Resolution, Inc., 924 F.2d 1114, 1123 (D.C. Cir. 1991).  Under the rule, a party offering a new

affidavit with material revisions of prior testimony must justify the reasons for those revisions or

they will be excluded for the purposes of summary judgment.  Id.  However, if the supplemental

affidavit "does not contradict but instead clarifies the prior sworn statement, then it is usually

considered admissible." Galvin v. Eli Lilly & Co., 488 F.3d 1026, 1030 (D.C. Cir. 2007) (internal

citation omitted); see also Hinch v. Lucy Webb Hayes Nat. Training Sch. for Deaconesses &

Missionaries Conducting Sibley Mem'l Hosp., 814 A.2d 926, 930 (D.C. 2003) ("[F]or the doctrine

to apply, the affidavit must clearly contradict prior sworn testimony, rather than clarify confusing or

ambiguous testimony, and the contradiction must lack credible explanation, such as new

evidence.").

Armstrong contends that Sonnenberg's declaration contradicts her prior sworn testimony in two respects.  First, Sonnenberg states in the declaration that the cycling sponsorship was "only one of many factors" contributing to Postal Service sales, and that USPS lacked a reliable method for tracking new sales generated from the sponsorship, thus making the sales figures she presented to the USPS Board "only very rough estimates."  Sonnenberg Decl. at ¶¶ 5–6.  Armstrong argues that these statements are at odds with Sonnenberg's earlier deposition testimony concerning the positive effects of the sponsorship.  Armstrong's Reply 6–7.  Second, Sonnenberg asserts in the declaration that she read and relied on statements Armstrong made in his 2000 book, It's Not About the Bike, in recommending that USPS enter the 2000 Sponsorship Agreement.  Sonnenberg Decl. at ¶ 10, 15.  Armstrong casts this assertion as a new allegation that he was unable to explore at her deposition.  See Armstrong's Reply 22 n.17.

Having compared Sonnenberg's declaration to her earlier deposition testimony, the Court finds her latest attestations to be more in the nature of clarifications or additions to her prior testimony than contradictions that would implicate the "sham affidavit" rule.  With respect to the effects of the sponsorship on USPS sales, Sonnenberg testified in her deposition that it helped USPS acquire new clients and new sales, but she never stated that the sponsorship alone generated all new revenue.  Gov't's Opp'n, Ex. 1 ("Sonnenberg Dep.") at 48:13–24.  Nor did she identify the precise amount of revenue that the sponsorship generated.  In fact, she testified that "at that time, the Postal Service had not very good reporting systems to understand cause and effect for revenue."  Id. at 121:2–122:4.  She further explained that it was hard to differentiate "new" revenue associated with the sponsorship from general increases in revenue brought about by other factors, like promotions and increased sales activity.  Id. at 122:22–123:4 ("But there was no way to know for a fact that [a customer] didn't decide to increase their advertising mail or put coupons in the mail at the same time, which would not have related to what the [sponsorship] sales calls were about.").

16

Nor was she ever asked what other efforts USPS undertook to increase its revenue and sales, which presumably included marketing activities apart from sponsoring a single cycling team. Accordingly, Sonnenberg's more recent statements that the sponsorship was "one of many factors" and that the internal sales figures were "rough estimates" are generally in line with her prior testimony.

As for Sonnenberg's purported reliance on statements in Armstrong's book, while she might not have discussed the book in her deposition, Armstrong fails to point to a question or line of inquiry that would have elicited this information from her.  Armstrong was on notice that as the person responsible for managing the sponsorship and recommending the 2000 agreement, USPS would rely on Ms. Sonnenberg to establish its detrimental reliance on his repeated doping denials. Armstrong therefore had the opportunity at her deposition to ask her to identify any and all statements that shaped her belief in Armstrong's clean record, including any statements made in his book, which was published just six months before the 2000 Sponsorship Agreement was signed. By failing to do so, Armstrong cannot now complain that he was blindsided by this revelation. Finding that none of the statements highlighted by Armstrong in Ms. Sonnenberg's declaration contradict her prior testimony, the Court will therefore deny his request to strike it.

2.  FCA Liability

Moving to the merits of the defendants' motions for summary judgment on FCA liability, the government alleges violations of three separate FCA provisions:  presenting a false claim, 31 U.S.C. § 3729(a)(1)(A); making or using a false record or statement, id. § 3729(a)(1)(B); and conspiring to commit a violation of the FCA, id. § 3729 (a)(1)(C).  A necessary predicate for each

violation is the existence of a "false" claim.[8]  The government contends that the defendants made

false claims (or caused them to be made) under three recognized theories of FCA liability:  (1) fraud

in the inducement; (2) express false certification; and (3) implied false certification.  Defendants

challenge the government's pursuit of each theory.  As explained below, the Court finds that the

government has offered sufficient evidence to create a genuine issue of material fact with respect to

its fraudulent-inducement and implied-certification theories, but not its express-certification theory.

The Court will therefore grant defendants' summary judgment motions only on the latter issue.

a.  *Fraudulent Inducement*

A defendant can violate the FCA under a fraud-in-the-inducement theory of liability by

submitting claims to the government "under a contract which was procured by fraud, even in the

absence of evidence that the claims were fraudulent in themselves."  United States *ex. rel*. Bettis v.

Odebrecht Contractors of Cal., Inc., 393 F.3d 1321, 1326 (D.C. Cir. 2005) (internal citation

omitted); see also United States *ex rel*. Westrick v. Second Chance Body Armor Inc., 128 F. Supp.

3d 1, 18 (D.D.C. 2015).  Fraud encompasses affirmative false statements as well as fraudulent

conduct.  See, e.g., U.S. *ex rel*. Head v. Kane Co., 798 F. Supp. 2d 186, 197 (D.D.C. 2011).

Furthermore, fraud-in-the-inducement liability is not restricted to the party who submitted the claim

to the government, but can extend to anyone who knowingly engaged in a fraudulent scheme that

induced the government to enter into the contract.  See U.S. *ex rel*. Marcus v. Hess, 317 U.S. 537,

544–45 (1943) ("[FCA provisions] considered together, indicate a purpose to reach any person who

knowingly assisted in causing the government to pay claims which were grounded in fraud, without

---

[8] A claim can be either factually or legally false.  A factually false claim, as opposed to a legally false one, would include an invoice for non-existent or incorrectly described services. United States v. Toyobo Co., 811 F. Supp. 2d 37, 45 (D.D.C. 2011).  Because Tailwind provided the requested services and properly described them in its invoices, the government is left to pursue theories of legal falsity.

regard to whether that person had direct contractual relations with the government.”); see also United States ex rel. Keaveney v. SRA Int’l, Inc., 2016 WL 6988787, at *3 (D.D.C. Nov. 29, 2016); Second Chance Body Armor, 128 F. Supp. 3d at 19.  For this theory to succeed here, the government must prove that Armstrong made a material misrepresentation or omission, which USPS then relied on when entering into the 2000 Sponsorship Agreement.

    At this stage, the government and Landis have raised genuine issues as to whether the 2000 Sponsorship Agreement was procured by fraud on the part of each of the remaining defendants. The government points specifically to Armstrong’s conversation with Ms. Sonnenberg on November 30, 2000; public statements by Armstrong denying his PED use; and a conversation between Armstrong and then-Postmaster General Henderson that took place before the 2000 Sponsorship Agreement was formally executed.  In each of these statements or conversations, Armstrong purportedly led the listener (or listeners) to believe that doping allegations against him were false.  Postmaster General Henderson testified in his deposition that “Lance railed . . . about the French and their bullshit charges, and [felt] that they were just out [to get him] because . . . an American was winning the tour – their Tour de France.”  Gov’t Opp’n, Ex. 10 (“Henderson Dep.”) at 70:21–71:1.  Sonnenberg recalled Armstrong repeatedly saying that “after his experience with cancer, he would not be so reckless with his health as to take any sort of performance enhancing drug.”  Sonnenberg Decl. at ¶ 9.  Sonnenberg further indicated that “Armstrong misled [her] by suggesting, through his words and his conduct, that the USPS team was one of the clean teams” in a conversation held shortly before USPS renewed the sponsorship in 2000.  Id. at ¶ 12. Landis has likewise raised genuine issues of material fact regarding the CSE Defendants’ knowledge of Armstrong’s doping and their role in perpetuating his denials and cover-up.  See, e.g., Landis’s Statement of Facts, ECF No. 457, ¶¶ 21–23 (citing deposition testimony from a variety of sources).

Armstrong and CSE also fail to establish as a matter of law that USPS did not rely on their statements and conduct when entering into the 2000 Sponsorship Agreement.  Multiple USPS executives have indicated that if they had known about the team's extensive doping, they would not have recommended continuing or renewing the sponsorship.  See, e.g., Henderson Dep. at 229:16–230:25.  And several go further in stating that they relied on Armstrong's denials—and ones made on his behalf—when evaluating the sponsorship.  See, e.g., id. at 231:2–19; Gov't's Opp'n, Ex. 6 ("Myers Dep.") at 238:12–240:14.  For her part, Sonnenberg swears that "[a]t no time prior to [her] approval of the 2000 Agreement did [she] know that Lance Armstrong . . . was engaged in doping. In forming that belief, [she] relied in part on the statements by Armstrong . . . [and] believ[ing] the doping denials contained in those statements, [she] informed the Deputy Postmaster General that the allegations under investigation by French authorities in 2000 were untrue[.]"  Sonnenberg Decl. at ¶ 15.

Armstrong's primary rejoinder is that the government cannot prove reliance because he made many of his purportedly fraudulent statements, including those to Ms. Sonnenberg on November 30, 2000 and the public statement on his website on December 13, 2000, *after* USPS negotiated the 2000 Agreement, and thus USPS could not have relied on them when entering into it. Armstrong's MSJ 39–40.  Citing internal USPS documents and deposition testimony, Armstrong zeroes in on November 29, 2000 as the date by which USPS had completed negotiations for the four-year agreement.  Id.; see also Armstrong's MSJ, Exs. 9, 14, 29, 42.  But even if Armstrong is correct that USPS formed an intention to sponsor the cycling team prior to November 29, 2000, the contract itself was not formally executed by the parties until December 26, 2000.  See 2000 Sponsorship Agreement.  Accordingly, while Armstrong's proposed timeline may well go to assessing the weight of the government's reliance evidence, it does not incontrovertibly prove that USPS disregarded his statements when it formally bound itself to the contract.  Because a

reasonable juror could conclude that USPS might have declined to sign the 2000 Sponsorship

Agreement had Armstrong not made the statements he did, the Court will deny summary judgment

on the issue of fraudulent inducement.[9]

<strong>b.  <em>Express Certification</em></strong>

"[A] claim is legally false if it contains an express false certification—that is, 'a claim that

falsely certifies compliance with a particular statute, regulation or contractual terms, where

compliance is a prerequisite for payment.'"  United States v. Toyobo Co., 811 F. Supp. 2d 37, 45

(D.D.C. 2011) (quoting United States *ex rel*. Hockett v. Columbia/HCA Healthcare Corp., 498 F.

Supp. 2d 25, 64 (D.D.C. 2007)).  Importantly, a claim must *contain* an express false certification for

liability to be imposed.  See United States v. Sci. Applications Int'l Corp., 555 F. Supp. 2d 40, 49–

50 (D.D.C. 2008) (noting that neither party contended that invoices submitted by the contractor

contained express false certifications).  The government baldly states that any "express false

statements [Armstrong] made and caused during the sponsorship agreement . . . render him liable

under an express false certification theory of liability."  Gov't Opp'n 22.  Yet a review of the

invoices submitted by Tailwind to USPS—which are the only "claims" the government has

---

[9]  Armstrong also objects to specific pieces of the government's fraudulent-inducement evidence by arguing (1) that Federal Rule of Civil Procedure 9(b) prohibits the government from offering "brand new allegations of false statements" that were not previously disclosed in the complaint, and (2) that public statements cannot form the basis of a FCA claim.  Neither argument is persuasive.  First, Rule 9(b) weeds out vague claims of fraud and prevents parties from greatly expanding theories of liability from what was alleged in the initial complaint.  It was not intended, however, to preclude parties from offering new and specific evidence relevant to their initial claims, as the government has done here.  Cf. Samuels v. Wilder, 871 F.2d 1346, 1349–50 (7th Cir. 1989) (excluding facts because they had little to with the plaintiff's initial claim).  Second, public statements can form the basis of an FCA claim as long as "the defendant made [them] for the purpose of getting 'a false or fraudulent claim paid or approved by the Government.'"  Allison Engine Co. v. United States *ex rel*. Sanders, 553 U.S. 662, 671 (2008) (quoting 31 U.S.C. § 3729(a)(2)); see also United States v. Speqtrum, Inc., 47 F. Supp. 3d 81, 95 (D.D.C. 2014).  While there were likely many reasons that Armstrong denied doping, the government is entitled to have a jury consider whether one of them was to preserve the team's sponsorship payments.

identified—reveals no express certifications of compliance with the terms of the sponsorship

agreement.  Accordingly, Armstrong and CSE are entitled to summary judgment on this issue.

c.  <em>Implied Certification</em>

Under an implied-certification theory of FCA liability, a defendant need not expressly

certify its compliance with a specific contractual obligation.  Rather, as a unanimous Supreme

Court recently confirmed, "liability can attach when the defendant submits a claim for payment that

makes specific representations about the goods or services provided, but knowingly fails to disclose

the defendant's noncompliance with a [material] statutory, regulatory, or contractual requirement."

Universal Health Servs., Inc. v. United States, <em>ex rel.</em> Julio Escobar and Carmen Correa, 136 S. Ct.

1989, 1995 (2016) ("Universal Health").  The government contends that Tailwind's submission of

payment invoices, coupled with the active concealment of Armstrong's PED use, constituted an

implied false certification that Armstrong was in compliance with the anti-doping provisions of the

sponsorship agreements.

In Universal Health, a mental health counseling center submitted reimbursement claims to

the Medicaid program containing billing codes indicating that its staff members were licensed to

provide certain types of counseling services, when in fact they had fraudulently obtained their

licenses.  Id. at 1997–98, 2000.  The Supreme Court upheld the application of the implied-

certification theory to those facts on the grounds that the use of the billing codes misrepresented

that the center was in compliance with key Medicaid licensing requirements.  Id. at 2001.  The

Court limited its holding, however, to cases where two conditions are met:  "first, the claim does

not merely request payment, but also makes specific representations about the goods or services

provided; and second, the defendant's failure to disclose noncompliance with material statutory,

regulatory, or contractual requirements makes those representations misleading half-truths."  Id.

The Court expressly declined to "resolve whether *all* claims for payment implicitly represent that the billing party is legally entitled to payment." Id. at 2000 (emphasis added).

Armstrong argues that Universal Health does not control here because Tailwind's invoices made no specific representations about the services provided and, therefore, fail to satisfy either of the two conditions for liability identified by the Supreme Court.  True enough.  Unfortunately for Armstrong, however, the D.C. Circuit has spoken on the question the Supreme Court declined to resolve.  In United States v. Sci. Applications Int'l Corp., 626 F.3d 1257 (D.C. Cir. 2010) ("SAIC"), the Circuit held that to qualify as an implied false certification, a claim for payment need not include "express contractual language specifically linking compliance to eligibility for payment."  Id. at 1269.  Rather, all the government must show is "that the contractor withheld information about its noncompliance with material contractual requirements."  Id.  Like Tailwind's invoices here, the payment invoices in SAIC merely requested payment; they did not represent anything about the nature of the services rendered.  Given the Supreme Court's silence, the standard announced in SAIC remains good law in this circuit and the Court is bound to apply it.  See United States v. Dynamic Visions, Inc., 2016 WL 6208349, at *9 (D.D.C. Oct. 24, 2016) (holding that a plaintiff must show that the defendant "withheld information in a misleading way regarding its noncompliance" and that the noncompliance was material to the government's decision to pay).

Because the government has offered evidence that Armstrong withheld information about the team's doping and use of PEDs and that the anti-doping provisions of the sponsorship agreements were material to USPS's decision to continue the sponsorship and make payments under the agreements, the Court must deny Armstrong's motion for summary judgment on this issue.

3.  Actual Damages

The Court now moves to damages.  The FCA imposes two types of damages:  first, civil

penalties ranging between $5,500 and $10,000 for each false claim submitted to the government,

and, on top of that, actual damages calculated at three times the amount of any monetary loss the

government suffered because of the false claims.  31 U.S.C. § 3729(a); see also Universal Health,

136 S. Ct. at 1996.[10]  If the government seeks treble damages, as it does here, it bears the burden of

proving its damages.  See SAIC, 626 F.3d at 1278–79.  Arguing that the government cannot prove it

sustained any losses, Armstrong requests summary judgment only on the issue of actual damages,

not civil penalties.

As noted previously, the government paid Tailwind approximately $32.3 million from July

2000 to the end of 2004.  See Findley Decl.  Armstrong received the largest portion of these

payments, roughly $13.4 million, from Tailwind as the team's star rider.  See Gov't's Opp'n, Exs.

47–48, 61.  Armstrong nonetheless contends that the government's actual damages are zero—and

that he is therefore entitled to summary judgment on that issue—because the benefits USPS reaped

from the agreements demonstrably outweighed its sponsorship costs.  Unsurprisingly, the

government and Landis see things differently.  They assert that the government's actual damages

are three times the entire $32.3 million in sponsorship payments because the cycling sponsorship

would have been worthless to USPS had it learned of Armstrong's PED use.  Gov't's Opp'n 33–37.

Both sides miss the mark.  Damages in FCA cases are generally measured based on the

"benefit of the bargain" received by both parties.  Under this approach, "the [g]overnment's actual

damages are equal to the difference between the market value of the [products] it received and

---

[10] Taking inflation into account, FCA civil penalties currently range from $5,500 to $11,000.
28 CFR § 85.3(a)(9) (2015).

retained and the market value that the [products] would have had if they had been the specified quality." Bornstein, 423 U.S. at 324 n.13 (internal citations omitted).  Applying this benefit-of-the-bargain rule is often straightforward.  In a typical case involving a government supply contract, for example, the difference in market value between a conforming good and a non-conforming good can be easily calculated.  See, e.g., id. at 314 (computing the precise cost to replace a falsely branded tube in a radio kit supplied to the government).  Calculating the benefit of the bargain becomes more difficult in cases where the market value of the product or service involved is not readily ascertainable.  This is particularly true with contracts for personal or professional services like those provided by the cycling team here.

The D.C. Circuit considered just such a contract in SAIC.  The Nuclear Regulatory Commission ("NRC") hired SAIC, an engineering and technology firm, to provide technical assistance and expertise to support an NRC rulemaking regarding the regulation of radioactive material waste.  SAIC, 626 F.3d at 1261.  The contract included conflict-of-interest provisions, which required SAIC to certify that it would refrain from business relationships with organizations regulated by the NRC, thus preserving the impartiality of its advice.  Id. at 1262.  After the existence of several such undisclosed relationships came to light, the government sued claiming that SAIC had violated the FCA by continuing to submit invoices even after the conflicting relationships arose.  Id. at 1263.  The government sought damages in the full amount of its payments under the contracts, trebled.  Previewing its argument here, the government claimed it had received no value from the contract because "had the NRC known about SAIC's organizational conflicts, it would have made no payments whatsoever for the consulting advice and technical assistance it received." Id. at 1265.  The district court accepted the government's proposed damages measure and instructed the jury to limit its assessment of damages to "what the [NRC] paid to [SAIC] over and above what the NRC would have paid had it known of SAIC's organizational conflicts of interests."  Id. at

1278.  The court emphasized that "[the jury's] calculation of damages should not attempt to account for the value of services, if any, that SAIC conferred upon the [NRC]."  Id.  The jury found SAIC liable and awarded the government the full amount of payments it made under the contract, which the court then trebled.  Id. at 1277.

The D.C. Circuit overturned the verdict on appeal.  The Circuit held that the trial court erred in instructing the jury to disregard any value the government may have received from SAIC's services, notwithstanding the company's conflicting interests:  "This automatic equation of the government's payments with its damages is mistaken."  Id. at 1278.  The Court explained that "[i]n calculating FCA damages, the fact-finder seeks to set an award that puts the government in the same position as it would have been if the defendant's claims had not been false."  Id. (internal citation omitted).  Where "the value that conforming goods or services would have had is impossible to determine, then the fact-finder bases damages on the amount the government actually paid minus the value of the goods or services the government received or used."  Id. at 1279 (internal citation omitted).  After determining that SAIC's services "had no ascertainable market price," the Court directed the district court to instruct the jury "to calculate the government's damages by determining the amount of money the government paid due to SAIC's false claims over and above what the services the company actually delivered were worth to the government."  Id.

The framework for assessing damages established by the D.C. Circuit in SAIC applies equally here.  The market value of the cycling team's "PED-tainted" promotional services is just as "impossible to determine"—perhaps even more so—as the "conflict-tainted" consulting services and technical advice provided by SAIC.  As a result, assuming the government proves that it would have withheld payment under the agreement had it discovered the team's doping, the proper calculation of the government's actual damages (if any) is the difference between "the amount the government paid" under the sponsorship agreements (i.e., $32.3 million) minus what the

defendants' services "were worth to the government" as measured by "the value of the . . . services the government received or used."  Id.

Pointing to a declaration provided by one of its economic experts, the government argues that Tailwind's services were "worth" zero because neither USPS nor any other company would have paid a dime to sponsor a team using PEDs.  See Gov't's Opp'n, Ex. 34 ("Walker Decl.") at ¶ 5.[11]  The government focuses here on comparative fair market value as the proper measure of damages:  "the difference between the market value of the sponsorship of a 'clean' USPS cycling team (*i.e.*, what the government was promised) and the market value of the sponsorship of a 'doping' team (*i.e.*, what the government actually received)."  Gov't's Opp'n 20.  This approach comports with false claims involving "nonconforming goods with ascertainable market value[.]" SAIC, 626 F.3d at 1278 (citing Bronstein, 423 U.S. at 316 n.13).  But it overlooks the real-world complexities presented by cases where market values are difficult to assess and the government receives some contemporaneous, tangible benefit from a contract even though it later discovers information that would have caused it to reject the agreement in the first place.  In such situations, SAIC requires that the fact-finder be free to consider what, if any, monetary value "the government received or used" from the delivered services based "on the particular circumstances of the case." Id.

---

[11] Armstrong argues that the Walker declaration, as well as a separate declaration from another expert on the negative publicity resulting from the revelations of Armstrong's PED use, should be excluded on relevance grounds and because they fail "to disclose the facts or methodologies, if any, upon which their opinions are based."  Armstrong's Reply 9.  As discussed below, however, see infra pp. 32–33, both declarations have some bearing on the calculation of benefits USPS obtained from the cycling sponsorship, and thus are relevant to the award of actual damages.  Furthermore, the D.C. Circuit has ruled that "an expert's affidavit, no matter what the basis, cannot be excluded solely because it fails to disclose the facts or data underlying the opinion."  Ambrosini v. Labarraque, 966 F.2d 1464, 1469 (D.C. Cir. 1992).  The Court at this stage declines to address the alleged methodological deficiencies in the experts' analysis.

In SAIC, for instance, the government was not entitled to the full amount of its contractual payments, as a matter of law at least, because there was evidence suggesting that it had relied on SAIC's technical advice even after learning about the conflicts of interest. Id. at 1279. That the government would not have entered into the contract had it been aware of the potential conflicts was immaterial to damages. Accord United States ex rel. Wall v. Circle C Constr. LLC, 813 F.3d 616, 618 (6th Cir. 2016) ("In determining actual damages, . . . the relevant question is not whether in some hypothetical scenario the government would have withheld payment, but rather, more prosaically, whether the government in fact got less value than it bargained for.") The same reasoning holds true here: Armstrong has produced evidence showing that, notwithstanding the team's undisclosed PED use, USPS benefited from the promotional services it received during the course of the sponsorship. The government may attempt to prove that the positive benefits of the sponsorship were reduced—or even eliminated altogether—by the negative publicity that accompanied the subsequent investigation and disclosure of Armstrong's doping. See SAIC, 626 F.3d at 1297 ("[T]he government will sometimes be able to recover the full value of payments made to the defendant, but only where the government proves that it received no value from the product delivered."). But it is not entitled to the return of all of its money, tripled no less, simply because it never would have sponsored a "doping" team.

The Court recognizes that calculating the government's damages in this case is fraught with considerations of fairness and culpability. As both the government and Landis point out, giving Armstrong "credit" for the benefits he delivered while using PEDs could be viewed as an unjust reward for having successfully concealed his doping for so long. It could also, in theory at least, encourage other government contractors to behave similarly. But by the same token, disregarding any benefits USPS received from the sponsorship could bestow the government with an undeserved windfall. The same could be said of Landis, whose role in this entire affair some would view as

less than pure.  In the end, the Court will avoid the types of moral and policy judgments that both sides invite, and instead apply the law as it interprets the D.C. Circuit to have instructed.[12]

How, then, does the SAIC damages framework apply to Armstrong's request for summary judgment?  Armstrong argues that he is entitled to judgment as a matter of law on the question of actual damages because the record conclusively establishes that the value of the promotional services that Tailwind provided to USPS far exceeded the $32.3 million USPS paid the team during the relevant period of sponsorship.  Armstrong identifies two types of monetary benefits that USPS derived from the sponsorship.

The first is increased revenue from new sales generated by the sponsorship.  Citing sales figures from a presentation that USPS Vice President Gail Sonnenberg made to the Postal Service's Board of Governors in 2000, Armstrong contends that the sponsorship generated approximately $24.4 million in new revenue from 1998 to 2000 alone.  Armstrong's MSJ, Ex. 24.  But the government has raised genuine disputes over both the relevance and reliability of these figures.  For starters, it correctly points out that the cited figures reflect *gross* revenue and do not account for the *costs* associated with the sales (apart from the sponsorship payments).  The comparable measure of benefits received by the Postal Service would be *net income* from the sales in question, not gross revenue.  The government has documented some of the associated sales cost.  Sonnenberg Decl. at ¶ 4 (noting, for example, that a sales team would often perform an on-site analysis prior to recommending USPS's services to new or existing customers, a cost not captured in gross revenue figures).  Notwithstanding her more definitive pronouncements to the Board, Sonnenberg also

---

[12] This is not to say that products or services supplied to the government can never be so tainted by fraud or illegal conduct as to render them worthless as a matter of law.  See United States *ex rel.* Wall v. Circle C Const., LLC, 813 F.3d 616, 618 (6th Cir. 2016) (offering potential hypotheticals).  In the Court's view, however, this is not that case.

clarifies in her recent declaration that the cycling team was "only one of many factors that contributed to the USPS concluding any sale." Id. at ¶¶ 5–6. And finally, the government cites a 2003 USPS Inspector General audit which found that only $698,000 of the $18 million in revenue that USPS itself attributed to the sponsorship from 2000 to 2004 could be verified. Gov't Opp'n, Ex. 56 at US00163739. The Inspector General's findings thus support USPS's claims that it lacked the ability to isolate sales generated solely by the sponsorship. Sonnenberg Decl. at ¶¶ 5–6. All of this evidence, if credited by the jury, could substantially reduce the actual value of new sales that USPS estimated it received due to the sponsorship.

The second category of benefits that Armstrong attributes to the cycling sponsorship is the positive exposure that USPS received from the media's coverage of the team. During the course of the sponsorship, the Postal Service commissioned reports from two sports marketing firms estimating the dollar value of this "earned media" exposure. In essence, the firms attempted to monetize the press coverage that Armstrong and the USPS team received by first identifying all positive "impressions" of the team, in both media and print. They then discounted each piece of coverage relative to what it would have cost the Postal Service to place a paid advertisement or commercial with that same media outlet. For example, one report indicates that CBS devoted roughly 27 minutes of coverage to the USPS team during its three-hour broadcast of the 2001 Tour de France. Armstrong's MSJ, Ex. 63 at US00164735. The report valued this coverage at $436,085 by calculating the price of purchasing 27 minutes of paid advertising on CBS (at $30,000 per 30-second spot) and reducing it by 75% to reflect the fact that general broadcast coverage is less effective at influencing consumers than targeted commercials. Id. at US00164746. It also attempted to value the "intangible assets" that USPS derived from sponsoring Armstrong, including such enigmatic brand-loyalty attributes as "prestige of property," "lack of sponsor clutter," and "ability to activate." Id. at US00164741. According to these marketing reports, the total value of

the earned media derived from the sponsorship was approximately $103.5 million from 2001 to 2004. Armstrong's MSJ Statement of Material Facts ¶¶ 93–99 (compiling the results of the 2001, 2002, 2003, and 2004 earned media valuations).

Armstrong offers further evidence demonstrating that Postal Service officials touted these earned-media valuations, both internally and to the public, to justify the costs of the sponsorship. See Armstrong's MSJ, Ex. 52 (talking points for a USPS press conference indicating that "[w]e have garnered incredible advertising value" and estimating the ad value of the sponsorship at over $18.4 million in 2001 and $19 million in 2002 based on a consultant's estimates); Ex. 58 (internal email stating "a recent survey of media coverage . . . estimates that $18.451 million worth of brand advertising was obtained"); Ex. 79 (USPS publicly-posted FAQs stating that "[s]ponsoring the USPS Pro Cycling team generated millions of dollars in free advertising for the Postal Service . . . a first-class deal by any measure."); Ex. 81 (internal email forwarding a news article quoting a USPS spokesperson's belief that "the free advertising they received 'is way more than we ever spent' to sponsor it"). Even after USADA formally charged Armstrong with using and trafficking PEDs, Ms. Sonnenberg maintained her positive assessment of the net value of the sponsorship. She summed up her opinion in an email to former Postmaster General Henderson in August 2012:

> I agree that the sponsorship was hugely successful for USPS; that real $ sales value was established; that media/pr $ value was proven; that the link to the cycling team across the country helped improve the stodgy image of USPS; and that it was a source of pride for USPS. We also agree that we would have taken swift action if we had ever known of a positive test (in fact at least one rider was kicked off due to test) or systemic doping. But bottom line: USPS got more than it paid for and is not a victim of fraud.

Armstrong's MSJ, Ex. 82. In Armstrong's view, the earned-media valuations and USPS's repeated embrace of them as a reflection of the sponsorship's success erase any doubt that the benefits of the sponsorship greatly outweighed the costs under SAIC's benefit-of-the-bargain framework.

Armstrong indeed makes a persuasive case that USPS received substantial value from the positive media coverage of the team, which, after all, was one of the Postal Service's central objectives in entering into (and renewing) the sponsorship.  See Armstrong's MSJ, Ex. 16 at 133:7–134:19, 160:18–161:1; see also Gov't's Opp'n, Ex. 51 ("Sponsorship Objectives[:] Generating Revenue [,] Building the Brand [,] Gaining Positive PR Value").[13]  But as with the new sales revenues, the government has raised colorable factual questions as to what this benefit ultimately amounted to.  The valuation reports themselves acknowledge that earned-media figures are simply estimates and that industry-wide standards and methodologies might not exist for each type of assessment.  See, e.g., Armstrong's MSJ, Ex. 63 at US00164734 (2001 valuation report stating that "[d]eriving a monetary value for some of these assets was not an easy task.").  The government also offers evidence that the $103.5 million earned-media valuation may be inflated.  Indeed, one of the primary authors of the 2002 valuation report confessed as much in his deposition, noting that "at that time no one [was] going to pay [that amount] for a cycling sponsorship even if it was Lance Armstrong."  Gov't's Opp'n, Ex. 28 at 114:4–6.  And some of the supposed benefits detailed in the reports—particularly "intangible assets" associated with brand loyalty and the like—are inherently subjective.

As noted above, moreover, the earned-media valuations do not account for the subsequent *negative* media coverage surrounding Armstrong's suspected doping and his resulting lifetime ban from cycling competitions in 2012.  Bock Decl. at ¶ 6.  The government does not attempt to quantify how much the Postal Service's revenues or brand value may have suffered due to the negative publicity, a task no doubt made difficult by the delay in public awareness of Armstrong's

_____

[13] Given that public relations exposure was a primary objective of the sponsorship, the Court rejects the government's argument that earned media is a "consequential benefit" that must be excluded from the damages calculation.  Gov't's Opp'n 37–39.

doping caused by his concealment.  The government's lack of a precise figure, Armstrong argues, should preclude it from making this argument to a jury.  The government does, however, offer an expert declaration indicating that there were some 1.5 billion negative media impressions "connecting Mr. Armstrong's doping scandal to the USPS" between 2010 and 2014.  Gov't's Opp'n, Ex. 33 ("Gerbrandt Decl.") at ¶¶ 3–4.[14]  And another government expert attests that the market value of the sponsorship would have been zero had sponsors known at the time that Armstrong was using PEDs.  Walker Decl. at ¶ 5.  Although this evidence does not specify the amount of damage USPS suffered as a result of the cheating scandal, it has at least some bearing on how the brand-strengthening associations of a "clean" team may have been offset in the public mind by revelations of a "dirty" one.

The D.C. Circuit in SAIC "recognize[d] the difficulty the jury will face in calculating the value of services tainted by potential conflict[s of interest.]"  626 F.3d at 1280.  Yet that recognition did not prevent the court from entrusting the jury with precisely that task in the apparent absence of expert valuations or similarly quantitative evidence.  The government here will be likewise entitled to present admissible evidence regarding the negative publicity the Postal Service received following the disclosure of Armstrong's PED use, just as Armstrong will be permitted to present admissible evidence of the sponsorship's positive benefits.  Should the government prove liability, it will then be up to the jury to weigh the evidence on both sides of the scale and decide whether the government can prove it sustained actual damages and, if so, the corresponding amount.  The Court will, therefore, deny Armstrong's motion for summary judgment on the issue of actual damages.

---

[14] A negative media impression includes any instances of media coverage of Armstrong's doping scandal that implicated USPS visually or verbally.  See Gerbrandt Decl. at ¶ 3.

The Court reaches the same conclusion with respect to Landis's remaining claims against the CSE Defendants.  The amount, if any, of the government's actual damages on the four claims that fall within the statute of limitations applicable to the CSE Defendants are likewise for the jury to decide.  While CSE argues that the June, August, and September 2004 invoices are "particularly flawed" because they were requests for reimbursements for hospitality-related expenses that were indisputably provided, they share a common attribute with invoices for quarterly sponsorship payments:  All of these requested payments, no matter what they were specifically earmarked for, were contemplated by the sponsorship agreement and intended for the same purpose—to increase sales and garner positive media exposure.  See Mem. Op. Jan. 12, 2016, ECF No. 474, at 15 ("[As] the Court has already concluded, there is no meaningful distinction between contractual lump-sum payments and all other payments made under the [2000] Sponsorship Agreement"); see generally id. at 15–18.  The question is whether the promotional benefits derived from the four payments outweighed the costs.  Because the record does not provide a definitive answer to that question, summary judgment is inappropriate.

### 4.  Fraud

Count V of the government's complaint generally alleges that the defendants engaged in common-law fraud by entering into and profiting from the sponsorship agreements while concealing the team's PED use.  See Gov't's Compl. Count V.  Fraud requires "(1) a false representation regarding a material fact; (2) known to be false when made or made with reckless indifference to the truth; (3) for the purpose of deceiving or defrauding the person claiming injury; (4) that action was taken in reliance upon the misrepresentation, and the person had a right to rely upon it; and (5) that actual damage was suffered resulting from the misrepresentation."  A Love of Food I, LLC v. Maoz Vegetarian USA, Inc., 70 F. Supp. 3d 376, 415 (D.D.C. 2014) (citing Blake Constr. Co. v. C.J. Coakley Co., 431 A.2d 569, 577 (D.C. 1981)).  "A fraud plaintiff must prove

each of these factors by clear and convincing evidence," and if he is unable to do so, then the entire claim fails.  Redmond v. Birkel, 933 F. Supp. 1, 3–4 (D.D.C. 1996).

Armstrong challenges the government's common-law fraud claim on the same grounds as he does its FCA fraud-in-the-inducement theory:  That the government cannot prove as a matter of law that USPS relied upon Armstrong's misrepresentations or fraudulent behavior.  As previously noted, however, the government has offered evidence raising a genuine dispute as to whether USPS officials relied on the defendants' doping denials when making decisions regarding the sponsorship.  See supra Section III.B.2.a.  This material dispute alone saves the government's common-law fraud claim at this stage of proceedings.  The government does not have to show, as Armstrong argues, that it took additional steps to investigate the doping allegations or otherwise confirm the truth of Armstrong's denials.  Therefore, the Court will deny Armstrong summary judgment on the government's common-law fraud claim.

### 5.  Unjust Enrichment

The government also claims, in Count VI of its complaint, that Armstrong was unjustly enriched at the government's expense.  Gov't Compl. Count VI.  The parties agree that to prevail on an unjust enrichment claim, a plaintiff must prove that "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *In re* APA Assessment Fee Litigation v. APA, 766 F.3d 39, 45– 46 (D.C. Cir. 2014).[15]  "Claims of unjust enrichment are heavily fact-dependent, 'for whether there has been unjust enrichment must be determined by the nature of the dealings between the recipient of the benefit and the party seeking restitution, and those dealings will necessarily vary from one

---

[15] Both parties cite federal common law for the elements of unjust enrichment, which is identical in substance to D.C. common law as well as the law of many other jurisdictions.  See *In re* APA Assessment Fee Litigation v. APA, 766 F.3d 39, 46 (D.C. Cir. 2014).

case to the next.'" Chen v. Bell-Smith, 768 F. Supp. 2d 121, 151–52 (D.D.C. 2011) (quoting 4934, Inc. v. D.C. Dep't of Emp't Servs., 605 A.2d 50, 56 (D.C. 1992)).

Armstrong raises multiple challenges to the government's unjust enrichment claim. He first maintains that he could not have been unjustly enriched because he was not a party to the sponsorship agreements and thus not obligated to USPS in the first place. He further contends that he properly earned his salary by training, riding for the team, and appearing at sponsored events. Finally, Armstrong argues that even if he were legally obligated to USPS, the remedy of restitution is unavailable because the government would need first to reimburse Armstrong the value of any benefits it gained from his services, which it cannot do.

As a threshold matter, a number of cases in this district have held that a contractual relationship with the defendant is not necessary for a plaintiff to recover on a claim of unjust enrichment. See, e.g., United States v. Honeywell Int'l Inc., 798 F. Supp. 2d 12, 25–26 (D.D.C. 2011) (permitting an unjust enrichment claim against a company that supplied defective materials to a manufacturer when only the manufacturer had a contract with the government). Armstrong, like the Honeywell supplier, was obligated to USPS because the sponsorship agreements placed restrictions on his behavior and provided the funds for the majority of his salary. See also U.S. ex rel. Roberts v. Aging Care Home Health, Inc., 474 F. Supp. 2d 810, 820 (W.D. La. 2007) (finding a defendant unjustly enriched because her salary was partially derived from government reimbursements for false Medicare claims). Additionally, while USPS does not dispute that Armstrong rode and trained for the team, "[Armstrong] cannot immunize himself from an unjust enrichment claim by performing services that [USPS] never desired in the first place[,]" which includes riding and training while using banned substances. In re APA Assessment Fee Litig., 766 F.3d at 48. Lastly, as previously discussed, the amount USPS benefitted from the sponsorship

agreements remains disputed and does not entitle Armstrong to summary judgment on his unjust enrichment claim.

**IV.    Conclusion**

For the foregoing reasons, the Court will grant the government's Motion for Partial Summary Judgment, will grant in part and deny in part Armstrong's Motion for Summary Judgment, and will grant in part and deny in part the CSE Defendants' Motion for Summary Judgment.  A separate Order accompanies this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>February 13, 2017</u>