IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES *ex rel.* FLOYD LANDIS, | ) ) ) | |
| Plaintiff, | ) ) | No. 10-cv-00976 (CRC) |
| v. | ) ) | |
| TAILWIND SPORTS CORPORATION, *et al.,* | ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' OPPOSITION TO LANCE ARMSTRONG'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF LARRY GERBRANDT, DR. BRIAN TILL, AND DR. JONATHAN WALKER**

# TABLE OF CONTENTS

ARGUMENT ...................................................................................................................... 2

    I.    LEGAL STANDARD ...................................................................................... 2

        A.    The Measure of Damages ..................................................................... 2

        B.    Admissibility of Expert Testimony ...................................................... 5

            i.    The Caselaw Prohibiting Expert "Speculation" ..................... 6

            ii.    Expert Testimony About the "Legal Standards" ..................... 9

    II.    LARRY GERBRANDT ................................................................................. 11

        A.    Background ........................................................................................... 11

        B.    Gerbrandt is Qualified to Serve as an Expert...................................... 12

        C.    Gerbrandt's Analysis is Reliable ......................................................... 15

        D.    Gerbrandt's Testimony is Relevant ..................................................... 18

    III.    DR. BRIAN TILL ......................................................................................... 20

        A.    Background ........................................................................................... 20

        B.    Dr. Till's Analysis is Relevant and Reliable....................................... 23

        C.    Dr. Till's Opinions Help Establish the Fact of Damages.................... 24

        D.    Armstrong's Arguments about the Data Dr. Till Considered goes to Weight, not Admissibility ..................................................................... 25

    IV.    DR. JONATHAN WALKER ......................................................................... 26

        A.    Background ........................................................................................... 26

        B.    Dr. Walker's Opinion Regarding the Market Value of the Tainted Sponsorship Is Relevant, Helpful and Admissible ..................................................... 28

        C.    Dr. Walker's Analysis and Use of Event Studies is Reliable, Relevant and Helpful ......................................................................................... 31

CONCLUSION ................................................................................................................... 34

## TABLE OF AUTHORITIES

Cases

Abraham v. Gendlin, 172 F.2d 881 (D.C. Cir. 1949)                                    8, 19, 25, 30

Ambrosini v. Labarraque, 101 F.3d 129 (D.C. Cir. 1996)                              9, 10

Arias v. DynCorp, 752 F.3d 1011 (D.C. Cir. 2014)                                    23

Armenian Genocide Museum & Mem'l, Inc. v. Cafesjian Family Found., Inc.,
    691 F. Supp. 2d 132 (D.D.C. 2010)                            8, 19

Bigelow v. RKO Radio Pictures, 327 U.S. 251 (1946)                                 7

Burkhart v. Washington Metro. Area Transit Auth., 112 F.3d 1207 (D.C. Cir. 1997)   9

Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993)  11

Etherton v. Owners Ins. Co., 35 F. Supp. 3d 1360 (D. Colo. 2014)                   24

Etherton v. Owners Ins. Co., 829 F.3d 1209 (10th Cir. 2016)                        24

Eureka Inv. Corp., N.V. v. Chicago Title Ins. Co., 530 F. Supp. 1110 (D.D.C. 1982)  8

Eureka Inv. Corp., N.V. v. Chicago Title Ins. Co., 743 F.2d 932 (D.C. Cir. 1984)  8

Grimes v. Nw. Airlines, Inc., No. 98-CV-4794, 1999 WL 527831
    (E.D. Pa. July 22, 1999)                                    8

In re Red Rock Services, Co., 522 B.R. 551 (E.D. Pa. 2014)14

Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549 (D.C. Cir. 1993)6

Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999)                           13

S.E.C. v. First City Fin. Corp., 890 F.2d 1215 (D.C. Cir. 1989)                   7

Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555 (1931)          7

Thomas v. Newton Intern. Enterprises, 42 F.3d 1266 (9th Cir. 1994)                13

U.S. ex rel. Landis v. Tailwind Sports Corp., 51 F. Supp. 3d 9 (D.D.C. 2014)      8, 19

U.S. ex rel. Landis v. Tailwind Sports Corp., --- F. Supp. 3d ---, 96 Fed. R. Serv. 3d 1415,
(Summary Judgment Op.) at *14 (D.D.C. 2017)                                        passim

U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc., 608 F.3d 871 (D.C. Cir. 2010) 7

United States v. Bornstein, 423 U.S. 303 (1976)                                   3

United States v. Caputo, 517 F.3d 935 (7th Cir. 2008)                             10

United States v. Science Applications International Corp. (SAIC),
    26 F.3d 1257 (D.C. Cir. 2010)                               3, 4, 10

Walker v. Soo Line R. Co., 208 F.3d 581 (7th Cir. 2000)                           13

Young v. Burton, 354 F. App'x 432 (D.C. Cir. 2009)                                23

Young v. Burton, 567 F. Supp. 2d 121 (D.D.C. 2008)                                23

Statutes

31 U.S .C. § 3729(a)(1)                                                            3

Other Authorities

S. Rep. 615, 96th Cong., 2d Sess.                                                 3

In order to prove that the USPS was damaged by Armstrong's doping scandal, the government intends to present – among other evidence – the testimony of three expert witnesses, each of whose testimony presents a partial (and complementary) account of the USPS's damages.    Larry Gerbrandt – a media analyst– will show that there was an overwhelming amount of negative publicity that, in words or images, linked Armstrong's doping scandal to the USPS.  Dr. Brian Till – a marketing professor – will testify that there is a general causal relationship between negative publicity and brand harm.  And Dr. Jonathan Walker – a Ph.D. economist – will testify that Armstrong's doping scandal exposed the USPS to millions of dollars of business risk.  Both Walker and Gerbrandt will also testify that the best estimate of the market value of the PED-tainted services on a disclosed basis (*i.e.*, if sponsors had known of Armstrong's doping) is zero, and that the advertising equivalency studies on which Armstrong intends to rely to establish the value of the positive publicity the USPS received from 2001-04, if admissible at all, were inflated.[1]

This Court has stated that "[t]he government may attempt to prove that the positive benefits of the sponsorship were reduced—or even eliminated altogether—by the negative publicity that accompanied the subsequent investigation and disclosure of Armstrong's doping." *U.S. ex rel. Landis v. Tailwind Sports Corp.*, --- F. Supp. 3d ---, 96 Fed. R. Serv. 3d 1415, (Summary Judgment Op.) at *14 (D.D.C. 2017).  This Court also recognized that although the government's expert witnesses do not attempt to perform the sort of "dollars and cents" calculations of brand harm that Armstrong mistakenly claims that the Federal Rules of Evidence demand, nevertheless "this evidence . . . has at least some bearing on how the brand-

---

[1] The Plaintiffs have filed a motion *in limine* to exclude these reports, which constitute unsponsored expert opinions, at best, and are inadmissible hearsay, as well as Armstrong's proffered expert, Douglas Kidder, who is unqualified to provide expert testimony about the subject matter of the reports.

strengthening associations of a 'clean' team may have been offset in the public mind by revelations of a 'dirty' one." *Id.* at \*16. Thus, Armstrong's motion to exclude the government's expert testimony repeats arguments that he made and this Court properly rejected when it denied his motion for summary judgment.

In addition to ignoring this Court's guidance, Armstrong's motion rests on a series of mischaracterizations both of the law and of the government's experts' qualifications and methods. Each of the Government's experts is well-qualified to provide the opinions for which he has been designated, and Armstrong's challenges to those qualifications and opinions goes, at most, to the weight the jury should give those opinions, not to their admissibility. This Court should deny Armstrong's motion and permit the government's experts to testify at trial.

## ARGUMENT

### I.   LEGAL STANDARD

#### A.  The Measure of Damages

The parties continue to disagree about the meaning of "damages" under the FCA.[2] The government's characterization of the law of damages is based on two cases, both of which are binding on this Court. First, in *United States v. Bornstein*, 423 U.S. 303 (1976), the Supreme Court applied a market value measure of damages. Specifically, the Court held that "the Government's actual damages are equal to the difference between the market value of the

---

[2] The False Claims Act provides that any person, like Lance Armstrong, who knowingly causes others to present false claims, is liable for, *inter alia*, "3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1). Congress intended courts to measure FCA damages on a case-by-case basis, "guided only by the principles that the United States' damages should be liberally measured to effectuate the remedial purpose of the Act." S. Rep. 615, 96th Cong., 2d Sess., at 4. We do not address here those aspects of the law of damages that are not in dispute.

[falsely marked electron] tubes it received and retained and the market value that the tubes would have had if they had been of the specified quality." *Id.* at 531 n.13.

In *United States v. Science Applications International Corp. (SAIC)*, 26 F.3d 1257 (D.C. Cir. 2010), the D.C. Circuit extended the *Bornstein* rule to situations like this one, where the government receives tainted services. In *SAIC*, as this Court is well aware, the defendant had an undisclosed financial interest in the outcome of rulemaking it was helping to draft for the Nuclear Regulatory Commission. *Id.* at 1262-63. The services at issue were thus unique, and the government was the only participant in the marketplace for such services. However, even though the defendant maintained that the government received and retained some value as a result of its performance, the District Court instructed the jury that "[y]our calculation of damages should not attempt to account for the value of services, if any, that SAIC conferred upon the Nuclear Regulatory Commission." 26 F.3d at 1278. The D.C. Circuit rejected this instruction, finding that "[t]his *automatic* equation of the government's payments with its damages is mistaken." *Id.* (emphasis added); *see also id.* at 1279 ("the damages instruction essentially required the jury to *assume* that SAIC's service had no value even in the fact of possible evidence to the contrary.") (emphasis added). The D.C. Circuit also held that

> Where a contractor's fraud consists of knowingly submitting nonconforming goods with ascertainable market value, the Supreme Court has instructed that the Government's actual damages are equal to the difference between the market value of the product it received and retained and the market value that the product would have had if it had been of the specified quality . . . Because SAIC's services under its NRC contract had no ascertainable market price, the district court should instruct the jury to calculate the government's damages by determining the amount of money the government paid due to SAIC's false claims over and above what the services the company actually delivered were worth to the government.

*Id.* at 1278–79 (quoting *Bornstein*, internal citation and marks omitted).

The above-quoted language from *SAIC* requires a two-step analysis to determine the value of the tainted services: first, the fact-finder determines whether the market value of the services received is ascertainable, and if so it bases its damages calculation on this market value;[3] if market value is not ascertainable, however, then the jury proceeds to the second-step and considers "what the services the company actually delivered were worth to the government." *Id.* at 1279.[4]

In its opinion denying Armstrong's motion for summary judgment, this Court stated – based on *the summary judgment record* – that "[t]he market value of the cycling team's 'PED-tainted' promotional services is just as 'impossible to determine'—perhaps even more so—as the 'conflict-tainted consulting services and technical advice provided by SAIC.'" 96 Fed. R. Serv. 3d 1415, at *13. Although Armstrong interprets the above-quoted statement as a finding by the Court, the undersigned do not interpret the Court's statement as foreclosing the jury from considering the market value of the tainted services, and ultimately concluding that market value is ascertainable, for four reasons:

- First, neither this Court's summary judgment opinion, nor the corresponding order, states that, as a matter of law, no reasonable jury could ascertain the market value of the tainted services. *See* ECF No. 548 (Summary Judgment Order) (decreeing only that Armstrong's motion was "denied" as to damages);

- Second, even though the summary judgment record was apparently insufficient to overcome this Court's skepticism that the market value of the sponsorship on a disclosed

---

[3] This Court also recognized that market value is the proper measure where market value is ascertainable. 96 Fed. R. Serv. 3d 1415, at *13.

[4] "[T]he government remains free to argue that the value of [defendant's tainted services] was completely compromised[;] . . . however, [the defendant] must also be allowed to offer evidence to the contrary." *Id.* at 1279-80; cf. 96 Fed. R. Serv. 3d 1415, at *16 ("The government here will be . . . entitled to present admissible evidence regarding the negative publicity the Postal Service received following the disclosure of Armstrong's PED use, just as Armstrong will be permitted to present admissible evidence of the sponsorship's positive benefits."); *see also U.S. ex rel. Wall v. Circle C Const., LLC*, 813 F.3d 616, 618 (6th Cir. 2016).

basis could be determined by a preponderance of the evidence, the Court, the jury, or both may well take a different view after hearing the evidence at trial;

- Third, the finder of fact could conclude that the market value of the tainted services is ascertainable because there was *an actual market* for Armstrong's sponsorship services, both before and after he was stripped of his Tour de France titles. Armstrong opportunistically seeks to exclude this evidence, ECF No. 566-1, at 15-17, but when this evidence comes in, it may convince the fact-finder that the market value of "the cycling team's 'PED-tainted' promotional services" is, in fact, capable of being determined by a preponderance of the evidence;

- Fourth, if this Court concludes that the trial evidence does not give the jury a sufficient evidentiary basis to conclude that that market value of the tainted services can be determined, then the proper remedy at that point would be to enter judgment on this issue as a matter of law at the close of Plaintiffs' evidence. *See* Fed. R. Civ. P. 50. This would give the Court of Appeals the benefit of a full record on this issue should an appeal become necessary.

Even if the jury (or the Court) were to conclude that the market value of the team's tainted services was not ascertainable, the opinions of the government's three experts still would be relevant and admissible evidence as to the extent the value (if any) of the benefits the USPS received from the sponsorship were diminished by the torrent of harmful negative publicity concerning Armstrong's cheating and lying.

### B. Admissibility of Expert Testimony

Although the parties agree on the basic principles of the law concerning the admissibility of expert testimony, two specific areas of disagreement exist that should be noted at the outset. First, the parties disagree about the nature of the legal prohibition against "speculative" expert testimony, particularly with regard to damages. Second, the parties disagree about whether Gerbrandt's and Walker's opinions address facts at issue under the correct legal standard.

### i.       The Caselaw Prohibiting Expert "Speculation"

Courts have discretion to exclude expert testimony that is purely speculative in nature. For example, in the case on which Armstrong principally relies, *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549 (D.C. Cir. 1993), the proffered expert predicted that the plaintiff's deceased husband would have changed careers had he lived, and that his new career would have greatly increased his earning potential. *Id.* at 568-70. The Court found that this expert testimony should have been excluded because it was based on "subjective belief or unsupported speculation." *Id.* at 570.

Armstrong attempts to transform this principle that *expert witnesses* should not be allowed to give purely speculative testimony into the quite different (and legally false) proposition that *the jury* should not be permitted to make reasonable inferences based on admissible expert testimony. *See* Armstrong Br. at p.16 ("The government intends to use Mr. Gerbrandt's testimony at trial to ask the jury to ***infer*** that the value of the harm to the USPS outweighed the value of the benefits it received . . .") (emphasis in the original); *see also id.* at 19 & 32. Armstrong's characterization of the law is incorrect.

In the seminal case on the issue, the Supreme Court held that juries should be permitted to make reasonable inferences regarding the amount of damages. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931). Specifically, the Supreme Court stated that

> Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty . . . while the damages may not be determined by mere speculation or guess, *it will be enough if the evidence show the extent of damages as a matter of just and reasonable inference, although the result be only approximate.*

*Id.* at 563 (emphasis added).

Based on the *Story Parchment* decision and its progeny,[5] courts have repeatedly

reaffirmed that "***damages are not speculative merely because the amount cannot be determined***

***with certainty***.  Rather, ***damages are speculative only if the uncertainty surrounding them***

***relates to whether they actually exist***."  *Grimes v. Nw. Airlines, Inc.*, No. 98-CV-4794, 1999 WL

527831, at *1 (E.D. Pa. July 22, 1999) (emphasis added); *see also Armenian Genocide Museum

& Mem'l, Inc. v. Cafesjian Family Found., Inc.*, 691 F. Supp. 2d 132, 153 (D.D.C. 2010)

(damages are "speculative" only when "the uncertainty concerns the fact of damages rather than

the amount").  Not surprisingly, therefore, the D.C. Circuit has held that *all* facts related to

damages must be presented to the jury, and the jury should make the best estimate of damages

that the facts permit.  Specifically, the D.C. Circuit explained that when

---

[5] The holding in *Story Parchment* is simply an application of the general principle that the wrongdoer should bear the risk of uncertainty with regard to damages.  *See Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 265 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."); *U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871, 905 (D.C. Cir. 2010) ("[I]n determining what constitutes a 'reasonable range' for the jury's award, we make allowances for the fact that the defendants' own misconduct has foreclosed any exact calculation of [damages.]"); *S.E.C. v. First City Fin. Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989) ("[T]he line between restitution and penalty is unfortunately blurred, and the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.").  In the present case, this Court has noted that the "task [of determining the extent to which sponsorship value was diminished is] no doubt made difficult by the delay in public awareness of Armstrong's doping caused by his concealment."  96 Fed. R. Serv. 3d 1415, at *16.

> the amount of damages cannot be estimated with certainty . . . **_we_**
> **_can see no objection to placing before the jury all the facts and_**
> **_circumstances of the case, having any tendency to show_**
> **_damages, or their probable amount;_** so as to enable them to make
> the most intelligible and probable estimate which the nature of the
> case will permit.

*Abraham v. Gendlin*, 172 F.2d 881, 883 (D.C. Cir. 1949) (emphasis added); *see also Eureka Inv.*

*Corp., N.V. v. Chicago Title Ins. Co.*, 530 F. Supp. 1110, 1128-29 (D.D.C. 1982) ("Where the

wrongdoing is of such a nature as to preclude the ascertainment of the amount of damages with

certainty, it would be a perversion of fundamental principles of justice to deny all relief to the

injured person, and thereby relieve the wrongdoer from making any amend for his acts."), *aff'd*

*in relevant part*, 743 F.2d 932, 939 (D.C. Cir. 1984).[6]

To summarize:  the law is clear that where – as here – there is evidence that the plaintiff

has suffered harm, then the jury is entitled to rely on all evidence in making a "just and

reasonable inference" as to the amount of damages.  Accordingly, this Court correctly decided

that "the government may attempt to prove that the positive benefits of the sponsorship were

reduced—or even eliminated altogether—by the negative publicity that accompanied the

subsequent investigation and disclosure of Armstrong's doping."  96 Fed. R. Serv. 3d 1415, at

*14; *id.* at *16 ("[t]he government . . . will be . . . entitled to present admissible evidence

regarding the negative publicity the Postal Service received following the disclosure of

Armstrong's PED use.").

---

[6]  As set forth more fully below, the fact of damages is not uncertain here.  Indeed, this Court has
found that "the Postal Service's reputation and goodwill are seriously damaged by an association
with a team that is faster because it cheats . . . the negative publicity associated with doping
defeats the essential purposes of the venture (from the sponsor's perspective)."  51 F. Supp. 3d 9,
57-58 (D.D.C. 2014) (Wilkins, J.).

### ii.    Expert Testimony About the "Legal Standards"

Armstrong's motion to exclude the government's experts also rests in large part on his contention that evidence of the market value of the sponsorship is "based on an incorrect legal standard," and therefore inadmissible.  *See, e.g.,* Armstrong Br. at 18.  Armstrong states that two cases support his contention that expert testimony cannot misstate the law or otherwise apply an incorrect legal standard.  *See* Armstrong Br. at 18 (citing *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207 (D.C. Cir. 1997) and *Ambrosini v. Labarraque*, 101 F.3d 129 (D.C. Cir. 1996)).  However, Armstrong mischaracterizes both of these cases.

In *Burkhart*, the trial court permitted the plaintiff's expert to testify about whether the defendant "had violated the ADA and Rehabilitation Act."  112 F.3d at 1212.  The D.C. Circuit unsurprisingly held that it was error to allow this testimony because "[e]xpert testimony that consists of legal conclusions cannot properly assist the trier of fact."  The Court also observed that "the line between inadmissible legal conclusion and admissible assistance to the trier of fact in understanding the evidence or in determining a fact in issue is not always bright," but that testimony impermissibly expresses legal conclusions when it is expressed in "terms [that] have specialized legal meanings that are inherently beyond the witness' expertise."  *Id.* at 1212-14.

There is no real controversy that expert testimony about the law is inadmissible.  This is because "[t]he only legal expert in a federal courtroom is the judge."  *United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008) (Easterbrook, J.).  But none of the government's experts will testify about what the law requires.  Instead, the testimony to which Armstrong objects concerns precisely what this Court has already acknowledged is proper evidence:  that negative publicity diminished the value of the sponsorship.  *See* 96 Fed. R. Serv. 3d at *16 (finding that market value diminution has some bearing on how the sponsorship benefits may have been offset by the

subsequent scandal). Thus, in concluding that the market value of what the USPS received was less than what it was promised, the government's experts neither "misstate the law," nor do they apply an incorrect legal standard. Instead, the government's expert testimony pertains directly to a disputed issue of fact. *See SAIC*, 26 F.3d at 1278–79 ("[t]he Government's actual damages are equal to the difference between the market value of the product it received and retained and the market value that the product would have had if it had been of the specified quality.") (internal marks omitted).[7]

In short, there is no legal impediment to the government's experts' testimony, and Armstrong's specific challenges to the government's experts' qualifications and methods also lack merit, for the reasons discussed below.

## II.    LARRY GERBRANDT

### A. Background

Larry Gerbrandt has spent his entire three-decade-plus professional career collecting and analyzing media consumption data, including data from traditional media outlets (print, radio, and television) as well as "new" media data (internet, including social media). *See* Finkelstein Decl. Ex. A (Gerbrandt Report) at ¶ 2. Gerbrandt has held senior positions at some of the most

---

[7] *Ambrosini* also lends no support to Armstrong's argument. In *Ambrosini*, the D.C. Circuit held that it was error for the District Court to exclude evidence that the drug Depo-Provera caused birth defects. 101 F.3d 137-41. Judge Henderson disagreed, and stated in dissent that plaintiff's expert testimony was properly excluded because it was scientifically invalid. Specifically, Judge Henderson stated that the expert's testimony was insufficient to establish a general causal relationship between the birth defect and the drug. *Id.* at 145. Neither Judge Henderson, nor Justice Blackmun, whom she quoted in her dissent, suggested that an expert must anticipate the District Court's jury instructions and incorporate those instructions into his or her expert testimony. The language in the *Ambrosini* dissent on which Armstrong relies – that Rule 702 "requires a valid scientific connection to the pertinent inquiry" – is a quote from *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591-92 (1993). But in *Daubert*, the Supreme Court's point was that the expert's testimony must be relevant, not that such testimony should be excluded when it fails to repeat or explicitly apply the District Court's jury instructions. In any event, as noted above, the proposed testimony is entirely consistent with the law.

recognized media companies in the United States, including Nielsen Analytics (where he was a Senior Vice President and member of Nielsen's Research Counsel) and Kagan World Media (a leading media and entertainment research firm that collects and analyses data regarding television advertising). *Id.* at Appx. A (Gerbrandt CV); *see also* Gerbrandt Decl. ¶ 3.[8]

Drawing on his considerable familiarity with media analysis, Gerbrandt searched multiple media archives for stories that connected Armstrong and the USPS in the context of also mentioning "doping," "drugs," "EPO," and related terms. Gerbrandt Report at ¶ 43. Gerbrandt is overwhelmingly qualified to perform this analysis, as described more fully in Section B, below. Further, Gerbrandt's opinions are unquestionably relevant to the issues in this case. Gerbrandt's conclusions are, *inter alia*, that "[t]he revelations of the fact and extent of Mr. Armstrong's doping generated a nearly unprecedented level of media exposure," that this negative publicity greatly reduced the promotional and marketing value of the sponsorship, that the mixture of positive and negative publicity – viewed as a whole – had no market value, and that the harm to the USPS on account of the negative publicity outweighed the value of the the positive benefits during the sponsorship period. Gerbrandt Report at ¶¶ 7(a), 8. These opinions, and the data on which they are based, are relevant because "[t]he government may attempt to prove that the positive benefits of the sponsorship were reduced—or even eliminated altogether—by the negative publicity that accompanied the subsequent investigation and disclosure of Armstrong's doping." 96 Fed. R. Serv. 3d at *28.

---

[8] The Court should disregard Armstrong's disparagement of Gerbrandt's college education simply because the institution later changed its name. As Gerbrant explained during his deposition, his resume accurately reports his degree as issuing from "Regis University formerly Loretto Heights College." *See* Finkelstein Decl. Ex. D (Gerbrandt Depo Excerpts) at 36:18-21. As he further explained, this is because Loretto Heights College was combined with Regis University. *Id.* at 37:6-17.

Notably, Armstrong has failed to identify a qualified expert to analyze the media coverage of the sponsorship (either positive or negative).  Accordingly, Gerbrandt's testimony is not only helpful, within the meaning of Rule 702, but also necessary for the jury to assess the significance of the type of evidence on which both sides intend to rely.

### B.  Gerbrandt is Qualified to Serve as an Expert

Armstrong's challenge to Gerbrandt's expert qualifications is based on the mistaken claim that Gerbrandt has "no experience" analyzing earned media.  Armstrong Br. at 1, 5, 10 & 20.  In fact, Gerbrandt has more than thirty years of professional experience researching and analyzing media assets, including earned media.  *See* Gerbrandt Report, Appx. A (describing Gerbrandt's professional experience as a media analyst).  Nearly all of Gerbrandt's work as a media professional has involved working with the same data sets on which he relies in his expert report.  Gerbrandt Decl. ¶ 2.  Gerbrandt has published original research on the value of media and advertising, and these reports were read and relied upon at the highest levels of the media and entertainment industry.  For example, Gerbrandt has written three Nielsen reports that analyzed impressions and/or advertising value.  Gerbrandt Decl. ¶ 4.  Thus, Armstrong's claim that Gerbrandt first became familiar with earned media valuation through his work in this case, Armstrong Br. at 5, is simply untrue.

Gerbrandt has also has provided expert testimony in ten cases addressing the same sorts of issues on which he opines here, namely the media impressions generated by specific media events, and the value of the promotional publicity associated with those events.[9]  In most of these

---

[9] The cases listed on Gerbrandt's CV in which his testimony was based in whole or in part on an analysis of earned media were *USA v. ASCAP*, *Arclight v. Bob Yari Int'l*, *Wolf v. Walt Disney Enterprises*, *Wolf v. NBC Universal*, *Woodson v. Lisa Beauliu (aka Lisa Marie Presley)*, *WPIX v. Broadcast Music, Inc.*, *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, *Huff Fund Investment Partnership v. CKX, Inc.*, and *Postman v. Spin Master, Ltd.*  Gerbrandt Decl. ¶ 5.

cases Gerbrandt's expert qualifications were not challenged, but in the cases in which his qualifications were challenged courts have explicitly recognized Gerbrandt's expertise as an earned media analyst.[10]

"Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Walker v. Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)); *see also Thomas v. Newton Intern. Enterprises*, 42 F.3d 1266, 1269-70 (9th Cir. 1994) (29 years of experience as a longshore worker qualified the witness to testify regarding customary safety practices aboard vessels); *In re Red Rock Services, Co.*, 522 B.R. 551, 575 (E.D. Pa. 2014) (35 years of experience in construction industry qualified witness to testify about the cost of replacing a subcontractor). Gerbrandt's knowledge and professional experience more than qualifies him to offer his opinions in this case.

Armstrong is also incorrect that Gerbrandt has never before opined on *negative* publicity. Armstrong Br. at 7. Gerbrandt's opinions on, among other things, the economic significance of celebrity scandals have been reported by many of the most well-respected media outlets, including the New York Times[11] and CNBC.[12] In addition to his experience as a media analyst, Gerbrandt also has professional experience both as a buyer and seller of media and advertising. On the "buy side," Gerbrandt has approved advertising budgets and placed ad buys for clients.

---

[10] Specifically, courts overruled objections to Gerbrandt's expert qualifications in *In Re NCAA Student-Athlete Litig.* and *Wolf v. Walt Disney*. To date, no court has excluded Gerbrandt's earned media reports or analyses. Gerbrandt Decl. ¶ 6.

[11] http://www.nytimes.com/1998/08/08/us/testing-of-a-president-the-media-lewinsky-story-feeds-cable-news-networks.html (visited 6/21/17).

[12] http://www.cnbc.com/id/34392450 (visited 6/21/17).

Gerbrandt Decl. ¶ 7.  And on the "sell side," he has sold display advertising for multiple magazines, and he sits on the board of a cable network with over 80 million subscribers.  *Id.* at ¶ 8.  All of this qualifies Gerbrandt to opine on the significance of the mixture of positive and negative earned media associating the USPS brand with Armstrong.

Finally, Armstrong is incorrect when he argues that Gerbrandt is not qualified to criticize the 2001-04 FCB and Campbell Ewald reports.  As set forth in the Government's motion *in limine*, this Court should exclude the FCB and Campbell Ewald reports at trial because they constitute expert opinion and hearsay, but lack an expert sponsor.  *See* ECF No. 567.  But if the jury is permitted to consider these reports or any portion of them, then it certainly should also be permitted to consider Gerbrandt's analysis of the reports' substantial flaws, including the fact that the reports' authors used unreliable samples, incorrect pricing information, and improper "factoring" methodology.  *See* Gerbrandt Report at ¶¶ 26-37.

Armstrong makes two arguments in support of his motion to exclude Gerbrandt's criticisms of the 2001-04 reports:  first, he argues that Gerbrandt "has no firsthand experience with the methodologies used by CE and FCB"; and second, he argues that Gerbrandt's opinions should be excluded because he "made no effort to recalculate the value of the [positive] media that the USPS received as a result of the sponsorship."  *See* Armstrong Br. at 20.  Each of these arguments goes to weight, not admissibility, and each argument is wide of the mark at any rate.  First, since Gerbrandt's opinion is that the FCB and Campbell Ewald reports use arbitrary and non-industry standard methods, it stands to reason that he would not rely on these same methods for his own analysis; and indeed, FCB and Campbell Ewald *themselves* employed materially different methods for estimating the advertising value of the positive media coverage from 2001-04.  *See* ECF No. 567-1 (motion to exclude FCB and Campbell Ewald reports) at pp. 2-3.

Second, Gerbrandt explains in his Rebuttal Report that he did not attempt to calculate the volume of positive publicity concerning the sponsorship because data from 2001-04 is not available. *See* Finkelstein Decl., Ex. B (Gerbrandt Rebuttal Report) ¶ 40. For the data that was available after 2010, Gerbrandt did attempt to count positive media and concluded that "there were next to no positive stories that included Mr. Armstrong and the USPS." Gerbrandt Report at ¶ 45.[13]

### C.  Gerbrandt's Analysis is Reliable

Gerbrandt's opinions are based on reliable methods and are properly applied to the facts of this case. Gerbrandt searched multiple media databases to identify relevant news articles that connected Armstrong's doping scandal to the USPS. As Gerbrandt explains in his rebuttal report, the same "still and audio/video images that vividly associated Mr. Armstrong with the USPS brand . . . [were used eight years later] when the USADA issued its 'Reasoned Decision' in 2012 and again in 2013 when Mr. Armstrong admitted to using performance-enhancing substances." Rebuttal Report ¶ 60. Both Gerbrandt's Report and his Rebuttal Report included a series of Figures display representative examples of the images he counted as "negative impressions."

Armstrong mistakenly states that Gerbrandt provides no explanation for how he calculated negative impressions. Armstrong Br. at 14. In fact, the *only* way of calculating impressions is to count the number of stories that communicate a specific message and the

---

[13] Armstrong also states that Gerbrandt himself is guilty of the same criticisms he makes of the FCB and Campbell Ewald reports. *See* Armstrong Br. at 20. This statement is incorrect, at most goes to the weight of Gerbrandt's opinions regarding the negative media, and is wholly unrelated to Gerbrandt's criticisms of the positive media reports.

consumers that were exposed to those stories.  Gerbrandt Decl. ¶ 9.[14]  Further, Gerbrandt's

report fully describes how he calculated negative impressions:

- For print and internet articles connecting the USPS to Armstrong's doping scandal, Gerbrandt calculated the reach of these articles based on data concerning the unique visitors per month to the website on which the article is posted.  Gerbrandt Report at ¶ 54;

- For television segments connecting the USPS to Armstrong's doping, Gerbrandt calculated impressions based on the stories' Nielsen ratings.  *Id.* at ¶ 59;

- Gerbrandt's report also fully describes how he calculated impressions when complete ratings data was unavailable.  *See, e.g., id.* at ¶¶ 91-93 (describing how he calculated "average listener levels" for NPR broadcasts based on publically available NPR program estimate summaries).[15]

Armstrong also argues that Gerbrandt has "no reliable way to know whether the allegedly

negative publicity swamped anything" because he never made any effort to value the positive

publicity.  Armstrong Br. at 19.  This is incorrect for a number of reasons.  First, the data sources

on which FCB and Campbell Ewald relied in their 2001-04 reports are no longer available.  *See*

Rebuttal Report at ¶ 40.  (Indeed, the authors of the FCB report admit that, even at the time their

2001 report was prepared, they lacked "the ability to pull footage from local [television] stations

across the country", and therefore "we had to *estimate* what percentage of the stations might

carry this developing story [about Armstrong's performance at the Tour] and how much time

---

[14] The databases on which Gerbrandt relied themselves included information about the "impressions" (that is, the number of times a consumer was exposed to a message) that each of the news stories generated, and Armstrong was provided with all the raw data.  Thus, the data underlying Gerbrandt's impression calculations is in Armstrong's own possession.

[15] Gerbrandt also calculated negative impressions for other types of media, including Local TV and radio (the ratings information for which is maintained by Metro Monitor), pay television, the National Geographic Channel, and Books (whose viewership is tracked by Nielsen), motion pictures (sales and rental figures were tracked by Nash Information Services), YouTube (viewership statistics are maintained on the website), and social media (where Gerbrandt's analysis calculated the "primary tweets" (that is, twitter mentions, excluding retweets) referencing Armstrong's doping scandal).  Gerbrandt Report at ¶¶ 69, 73, 78, 85, 92, 96, 101, 112.

they would devote to it in their newcasts." *Finkelstein Decl.*, Ex. C (2001 FCB Report) at p.6 (emphasis added).  Second, because the original data sources were unavailable, Gerbrandt relied on the media exposures and media segments documented in the FCB and Campbell Ewald reports.  *See* Finkelstein Decl. Ex. D (Gerbrandt Depo Excerpts) at 100:19-101:5 (Q . . . In order to perform that analysis, you had to consider the positive exposure, as you testified; right?  A. Correct.  Q.  What positive exposure did you consider?  A.  All four of the CE – of CV [sic.] reports did measure – or at least they counted total number of the media exposures or the media segments, media items.  Q.  Okay.  So --  A.  So I was aware of what they had found in the marketplace.").  Third, where data *was* available, Gerbrandt *did* attempt to estimate the amount of positive publicity, and concluded that after 2010, "there were next to no positive stories that included Mr. Armstrong and the USPS."  Gerbrandt Report at ¶ 45.

Finally, Armstrong argues that Gerbrandt's analysis is unreliable because he (1) didn't take into account the advantages and disadvantages of different types of media, Armstrong Br. at 14, (2) he counted articles that were not about Armstrong, *id.* at 15, and (3) "there is a long and accepted line of academic literature showing that negative publicity . . . can have both positive and negative effects."  *Id.* at 12.  At best, each of these arguments goes to weight and not admissibility.  If Armstrong truly believes that the negative publicity the USPS received had positive effects – a claim that he repeats in in his criticism of Dr. Till's testimony – then this is a theme he can explore in his cross-examination of the government's experts, but it has no bearing on whether or not Mr. Gerbrandt is qualified to provide his own opinions on the matter, based upon his own work and his decades-long experience in the field.

**D.  Gerbrandt's Testimony is Relevant**

Finally, Armstrong argues that Gerbrandt's opinions should be excluded as irrelevant because they invite the jury to *speculate* about the extent to which negative publicity diminished the value of the sponsorship, Armstrong Br. at 16-17, and because Gerbrandt opines on the *market value* of the sponsorship as opposed to the *value to the government*.  Armstrong Br. at 18-19.

As set forth more fully in Section I above, Armstrong's attempt to exclude the government's expert testimony as "speculative" under Rule 403 rests on a wholesale mischaracterization of the law of damages.  Again, damages are "speculative" only when "the uncertainty concerns the fact of damages rather than the amount."  *Armenian Genocide Museum*, 691 F. Supp. 2d at 153.  Here, the fact of damages is not uncertain; the USPS suffered the type of harmful negative publicity that it explicitly sought to avoid through the anti-doping provisions of the sponsorship agreements.  *See* 51 F. Supp. 3d at 58 ("compliance with anti-doping regulations was an core term of the contracts, because the negative publicity associated with doping defeats the essential purpose of the venture (from the sponsor's perspective).").  Further, the jury must consider "*all* the facts and circumstances of the case, having any tendency to show damages, or their probable amount; so as to enable them to make the most intelligible and probable estimate which the nature of the case will permit."  *Abraham v. Gendlin*, 172 F.2d at 883 (emphasis added).  Here, if the jury credits Gerbrandt's testimony – as well as the other evidence that negative publicity about Armstrong's doping scandal decreased the value of its sponsorship of the USPS Team – it could reasonably conclude that the USPS was damaged, and also could make a reasonable estimate of the amount of its damages.  Because such an estimate would be based on admissible evidence, this would not be considered speculation – it would be considered a verdict.

Armstrong is also incorrect that Gerbrandt's testimony would confuse the jury because it is based on an incorrect legal standard. Armstrong Br. at 19. Again, this Court has stated that "[t]he government may attempt to prove that the positive benefits of the sponsorship were reduced—or even eliminated altogether—by the negative publicity that accompanied the subsequent investigation and disclosure of Armstrong's doping." 96 Fed. R. Serv. 3d at *14. Gerbrandt's testimony goes directly to this issue. Gerbrandt concludes that "the negative publicity that the USPS received greatly reduced the promotional value, if any, received by the USPS . . . [and that] viewed as a whole across the time period from 1998 to 2014, this mixture of positive and negative impressions would have no market value . . . [and that] the harm to USPS resulting from such a large volume of negative impressions would necessarily outweigh the value of any benefits received by USPS resulting from positive impressions during the sponsorship period." Gerbrandt Report at ¶ 8.

The Government should be allowed to rely on this testimony as part of its effort to prove both that the market value of the tainted services is ascertainable, and that the negative publicity reduced or eliminated the sponsorship benefits. As noted above, even if this Court concludes that no reasonable jury could find that the market value of the tainted services is ascertainable, evidence of market value diminution "has at least some bearing on how the brand-strengthening associations of a 'clean' team may have been offset in the public mind by revelations of a 'dirty' one." 96 Fed. R. Serv. 3d at *16. Thus, this testimony should go to the jury in any event.

Armstrong argues in the alternative that Gerbrandt's opinion that the mix of negative and positive publicity had no market value – even if relevant – should be excluded as lacking any methodological basis. Armstrong Br. at 19. But here, Gerbrandt's opinion is based on his professional experience, and not theory. Again, Gerbrandt has held senior positions as an

advertising executive.  He has bought advertising for clients, and he has approved advertising

budgets for the companies for which he has worked.  He also sits on the board of a cable

network, whose primary revenue source is advertising.  This professional experience qualifies

him to opine on the advertising value of the mixture of positive and negative publicity

concerning the sponsorship.

### III.    DR. BRIAN TILL

#### A.  Background

Dr. Brian Till is the Dean of the Marquette Business School.  He has 20 years of

experience as a professor of marketing.  *See*

http://business.marquette.edu/faculty/directory/brian-till (visited 6/28/17).  He has also has held

non-academic positions as a manager and branding consultant for international companies such

as AT&T, Energizer, Monsanto, and Purina.  *Id.*  Dr. Till is the co-author of a book on branding,

and he has published seven peer-reviewed articles on the subjects of celebrity endorsement

and/or celebrity sponsorships.  Dr. Till's academic research is relied upon by branding and

marketing professionals, including one of Armstrong's own previously designated (and now

withdrawn) expert witnesses.  *See* Finkelstein Decl. Ex. E (Joachimsthaler Report Excerpt) at pp.

54, 56.[16]

Armstrong has argued that "there's no scientific evidence . . . that negative publicity

about an athlete . . . has any impact on the sponsor."  Finkelstein Decl. Ex. F (11/2/16 Oral

---

[16] Lance Armstrong initially designated Dr. Erich Jochamsthaler as an expert in the field of
branding and marketing, but subsequently withdrew that designation.   Dr. Joachimsthaler's
expert report relied on Dr. Till's research.  Further, because Armstrong has expressed his
intention not to offer Dr. Joachimsthaler's testimony at trial, Dr. Till is the only expert in the
field of branding who could testify in this case.

Argument Tr.) at 17:18-22.[17]  Dr. Till's research contradicts this argument.  In 1998 (the same

year Armstrong joined the USPS Team), Dr. Till published a peer-reviewed article he co-

authored, *Endorsers in Advertising:  The Case of Negative Celebrity Information*, Brian D. Till

and Terence A. Shimp, 27 Journal of Advertising 1 (1998).  *See* Finkelstein Decl. Ex. G (Till

Article).  This article reports the results of a series of experiments testing the hypothesis that

"[g]iven a sufficiently strong associative link between a celebrity and a brand, subsequent

negative information about the celebrity results in lowered evaluations of the brand."  *Id.* at 69.

For each of these experiments, the authors recruited subjects from introductory marketing

courses and told them that an advertising agency was interested in determining their awareness

of recent publicity about a celebrity.  Subjects were then asked to read a series of print

advertisements establishing a link between a celebrity (the example Dr. Till used was a

professional cyclist) and a fictional brand (a bicycle).  Subjects who were placed in the

experimental group were also exposed to a fake *Sports Illustrated* article giving them

information that the bike racer had (1) engaged in steroid use or (2) had multiple driving-under-

the-influence infractions.  *Id.* at 71.  The subjects' evaluations of the fictional bicycle brand were

measured both before and after they were presented with negative information about an athlete

who allegedly endorsed the brand.  These experiments generally show that "attitudes toward [the

fictional brand] declined after the negative information about the endorser," and that "activation

---

[17] Counsel's complete statement was that "there's no scientific evidence.  There's no expert
evidence.  There's no science which would stand for the proposition that negative publicity about
an athlete who competed for a sponsored team which occurs eight years after the end of the
sponsorship has any impact on the sponsor."

of negative information about a celebrity can have an adverse effect—through lowered brand evaluations—on the endorsed brand with which that celebrity is associated." *Id.* at 72.[18]

In addition to summarizing his own research demonstrating the causal connection between negative publicity and brand harm, Dr. Till's expert report analyzes the results of certain third party consumer surveys, including "Q Score" surveys and a 2012 consumer survey measuring consumer perception of the USPS sponsorship of Armstrong's cycling team. Based on all of this evidence, Dr. Till concludes that, "negative information regarding Lance Armstrong is highly likely to have negatively affected perceptions of the USPS." Finkelstein Decl., Ex. H (Till Report) at p.5.

There can be no real doubt that Dr. Till's opinions are relevant, and that he is qualified to offer them. Indeed, Armstrong appears not to challenge Dr. Till's qualifications, and argues instead: first, that Dr. Till's methods fail to connect laboratory results to the real world; second, that his testimony would not help the jury to quantify the amount of damages; and third, that Dr. Till misunderstands the academic literature on "associative learning theory" (including his own research!), and fails to consider certain data that might have influenced his opinions. As set forth below, each of these arguments is without merit.

### B. Dr. Till's Analysis is Relevant and Reliable

Armstrong's principal argument in support of excluding Dr. Till's testimony is that his analysis should be deemed unreliable because it is purely theoretical, and theoretical principles

---

[18] Armstrong attempts to make an issue of the fact that in one of Dr. Till's experiments, subjects were informed that real-life cyclist Greg LeMond endorsed the fictional bicycle brand, and that in this case "[n]egative celebrity information has a somewhat weaker effect than it did in the two studies with the fictitious [athlete endorser.]" *Id.* at 79. But even if negative information "has a somewhat weaker effect" when consumers already know a lot about a celebrity athlete and/or a sponsoring brand, this does not show, as Armstrong appears to claim, that "negative information about a celebrity does not impact a brand which sponsors that celebrity, or can benefit a sponsoring brand." Armstrong Br. at 27.

"cannot be applied to real-world events."  Armstrong Br. at 25.  Armstrong cites no legal authority in support of his claim that testimony about causation is unreliable unless the expert "conduct[s] tests, do[es] research, and gather[s] evidence" specifically related to the real-life events at issue in the case.  *Id.* at 26.  Further, courts that have considered the issue have held that testimony regarding general causation is not only potentially reliable but also *necessary* in cases like this one where the causal relationship between stimulus (i.e. negative publicity) and harm is disputed.  *See Arias v. DynCorp*, 752 F.3d 1011, 1016 (D.C. Cir. 2014) (affirming the dismissal of plaintiff's claims because plaintiff did not provide "expert testimony . . . to determine whether the specific herbicide at issue was capable of causing the specific kinds of injuries complained of.").  *See also Young v. Burton*, 567 F. Supp. 2d 121, 138 (D.D.C. 2008), *aff'd,* 354 F. App'x 432 (D.C. Cir. 2009) ("Satisfying the general causation inquiry in this case requires a showing that the substance plaintiffs were exposed to is capable of causing the illness they experienced."); *Etherton v. Owners Ins. Co.*, 35 F. Supp. 3d 1360, 1366 (D. Colo. 2014), *aff'd*, 829 F.3d 1209 (10th Cir. 2016) (establishing damages requires a showing "both [of] general and specific causation.").

Armstrong is incorrect, in any event, when he states that Dr. Till's opinions in this case "rest[] solely" on his 1998 article.  On the contrary, Dr. Till considered the record evidence in this case, including the measured media reports putatively documenting the positive media coverage between 2001 and 2004, on the basis of which he concluded that this publicity created "a strong link between Lance Armstrong and the USPS."  Till Report at p.3.  Dr. Till also considered Q Score data, which showed a significant increase in negative perception of Armstrong after the scandal, *id.* at p.4, and a 2012 consumer survey, which indicated that consumers who believed Armstrong to be guilty of doping rated the USPS lower on a variety of

brand attributes.  *Id.* at pp. 4-5.  Based on all of this evidence, Dr. Till concluded that negative

information about Armstrong "deprived the USPS of the positive associative benefits [it]

expected," and "is highly likely to have negatively affected perceptions of the USPS." *Id.* at 5.[19]

### C.  Dr. Till's Opinions Help Establish the Fact of Damages

Armstrong also argues that Dr. Till's testimony should be excluded because it would not

help the jury to calculate what Armstrong's services were worth to the USPS.  *See* Armstrong Br.

at 32 (arguing that Dr. Till's testimony should be excluded because it would not "help the jury to

assess what Armstrong's services were worth to the government").  This argument also is

incorrect.  Again, evidence is admissible if it has "*any* tendency to show damages, *or* their

probable amount."  *Abraham v. Gendlin*, 172 F.2d at 883 (emphasis added).  Here, Dr. Till will

testify that there is a general causal relationship between negative publicity about a sponsored

celebrity-athlete and diminished consumer perception of a sponsoring brand.  Because Larry

Gerbrandt will testify that there *was* a great deal of negative publicity, together Till and

Gerbrandt's testimony helps to establish the fact and scale of the USPS's damages.

### D.  Armstrong's Arguments about the Data Dr. Till Considered goes to Weight, not Admissibility

Finally, Armstrong's arguments that Dr. Till misunderstands "associative learning

theory" – *see* Armstrong Br. at 27 ("academic studies that actually have analyzed the real-world

---

[19] Armstrong also argues that Dr. Till's testimony should be deemed unreliable in *this* case because his opinions have been partly excluded in *other* cases.  This argument fails for two reasons:  first, Dr. Till testified about economic principles in those other cases, and he did not address "associative learning theory" or negative publicity, subjects on which he is eminently qualified to testify; second, and more significantly, the fact that Armstrong is able to identify two instances in which courts declined to consider Dr. Till's testimony does not show that Dr. Till's testimony is speculative in *this case*.  Indeed, even the most casual review of Dr. Till's 1998 article shows that his testimony about the general causal relationship between negative publicity and brand harm has a valid scientific foundation, and thus relates to a key factual dispute that the jury will be asked to decide in this case.

impact of negative information suggest that negative information about a celebrity does not impact a brand which sponsors that celebrity, or can benefit a sponsoring brand") – and that Dr. Till failed to consider all the evidence relevant to associative learning theory – *see, e.g., id.* at 28-29 and 31 – goes at best to the weight, and not to the admissibility, of Dr. Till's testimony.  Dr. Till concluded that there was evidence of "a strong associative link between USPS and Armstrong" during the sponsorship period, Till Report at p.3, and that this associative link was later reinforced by the extensive media coverage of Armstrong's PED use.  *Id.* at p.4.

Because Armstrong has expressed his intention not to call as a witness his previously proffered branding expert Dr. Joachimsthaler, no witness testimony will support Armstrong's counsel's theory that the associative link between Armstrong and the USPS was severed based on the passage of time, the existence of "competing stimuli," or the absence of "brand congruence."  Armstrong Br. at 31.  Unlike Armstrong, the government *has* an expert who is qualified to testify about the impact of negative publicity on the USPS brand.  To the extent Armstrong's counsel thinks he understands the academic literature better than the government's expert witnesses, this is a theme he will be able to explore in cross-examination.

## IV.    DR. JONATHAN WALKER

Armstrong does not challenge Dr. Walker's expert qualifications.  Further, although Armstrong asks this Court to exclude Dr. Walker's testimony in its entirety, his arguments relate primarily to his use of certain third-party "event studies."  Armstrong does not suggest any basis to exclude Dr. Walker's opinions about the invalidity of the FCB and Campbell Ewald reports, the impact of Armstrong's scandal on the Livestrong Foundation and on other Tailwind sponsors.

As set forth below, Armstrong's motion to exclude Dr. Walker's testimony should be denied.

### A.  Background

Dr. Walker is an economist whose areas of expertise include sports economics.  *See* Finkelstein Decl. Ex. I (Walker Report) at 2.  Dr. Walker holds a degree in economics from the University of California at Berkley and a doctorate in economics from the Massachusetts Institute of Technology.  *Id*.  He currently is the President and Chief Executive Officer of Economists Incorporated, a consulting firm that provides economic advice to individuals, corporations, non-profit organizations, and governments.  *Id*.  His sports-related clients includes the National Football League, the National Basketball Association, the governing bodies of amateur swimming and basketball in the United States, the operator of the leading men's international tennis tournament (ATP), and NASCAR.  *Id*.

Dr. Walker was engaged in this case to consider the impact Lance Armstrong's drug use and deceit had on the value of the USPS sponsorship.  He expressed the following opinions in his opening and rebuttal reports, as to which he is prepared to testify at trial:

- An extensive review of publicly available information shows that PED scandals generally reduce the value of athletes' sponsorship rights, and Mr. Armstrong's scandal apparently eliminated his value as an endorser entirely, as further evidenced by his loss of sponsors after the release of the USADA Reasoned Decision and his inability to acquire new sponsors.  Walker Report ¶ 8.

- The 2000 Sponsorship Agreement was likely valueless and certainly worth significantly less than the rights fees that USPS paid because "[t]he market for sponsorships is competitive.  Consequently, a sponsorship's fair market value adjusts to reflect changes in net expected benefits to the sponsors. . . . Disclosure to sponsors of historical PED use and planned future PED use would necessarily have driven the sponsorship value down, most likely to zero in light of the evidence discussed in this report."  *Id.* at ¶ 9.

- Event study methodology indicates USPS damages exposure may be at least in the hundreds of millions of dollars.  *Id.* at ¶ 10.

- The "disastrous" financial effects of Mr. Armstrong's scandal on the Livestrong Foundation are further evidence that revelations of Mr. Armstrong's drug use would negatively impact USPS.  *Id.* at ¶ 11.

- The advertising equivalency studies authored by FCB and Campbell Ewald and relied upon by Armstrong are economically invalid, in any event, the reasonably anticipated media exposure that USPS got as a result of its sponsorship, which would reasonably have influenced the contract price, cannot offset unanticipated harm due to the alleged breaches and frauds committed by Armstrong and Tailwind.  *Id.* at ¶¶ 77-84.

In reaching his conclusion that the USPS's sponsorship of the team likely was valueless as a result of Armstrong's and the team's doping and the post-disclosure scandal, Dr. Walker considered a number of factors that are detailed in his report, including but not limited to:  the impact that PED scandals have had on the sponsorship value of other athletes, the value of Armstrong's sponsorship services after the revelations of his doping, general market conditions affecting the amount of fees paid for sponsorships, the financial harm suffered by other sponsors due to their endorsers' scandals, the magnitude of potential risk to the USPS in sponsoring a doping team, and the marketability of other cyclists and cycling teams following doping scandals, and the testimony of USPS and other Tailwind sponsors.

Dr. Walker also wrote a rebuttal report in which he opined that the various conclusions of Armstrong's proposed expert, Douglas G. Kidder, were "inflated and unsound."  *See* Finkelstein Decl. Ex. J. (Walker Rebuttal) at 2.  Specifically, Dr. Walker found that Mr. Kidder's attribution of revenues to the cycling sponsorship lacked any reliable basis to infer causation.  *Id.*  In addition, Dr. Walker opined that Mr. Kidder's pronouncements about the value of media exposure were grossly overstated because they relied on the unsound methodology in the FCB and Campbell Ewald reports.  *Id.*  Dr. Walker's rebuttal report also concluded that the

merchandising benefits cited by Mr. Kidder did not reflect true benefits, in that the figures failed to take account of the cost of goods sold.  *Id*. at 2-3.

## B.  Dr. Walker's Opinion Regarding the Market Value of the Tainted Sponsorship Is Relevant, Helpful and Admissible

This Court has stated that the jury is entitled to consider whether "the positive benefits of the sponsorship were reduced—or even eliminated altogether—by the negative publicity that accompanied the subsequent investigation and disclosure of Armstrong's doping."  96 Fed. R. Serv. 3d at *14.  Here, Dr. Walker's testimony speaks directly to the impact of negative publicity on the value of this sponsorship and the financial consequences to any sponsor if its endorser engages in misconduct.  But even if the Court were to conclude that the market value of the USPS sponsorship is unascertainable, Dr. Walker's testimony is still relevant because it addresses whether the benefits of the sponsorship was diminished by the negative publicity about Armstrong's doping scandal.

Contrary to Armstrong's characterization, Dr. Walker's conclusion does not rest solely on the fact that the USPS "never would have sponsored a 'doping' team."  *Id*.  Rather, Dr. Walker opines that the harm caused to the USPS by the negative publicity generated by Armstrong's transgressions diminished the market value of the sponsorship to zero.  In reaching this conclusion, Dr. Walker considered a number of additional factors, including the impact that PED scandals have had on the sponsorship value of other athletes, Armstrong's (non-existent) sponsorship value following the revelations of his doping, general market conditions affecting the amount of fees paid for sponsorships, the magnitude of potential risk to the USPS in sponsoring a doping team, and the marketability of other cyclists and cycling teams following

doping scandals.  This approach is squarely within the bounds of the Court's summary judgment ruling.

Moreover, even if market value is not the determinative measure of the value of the tainted services received by the USPS, market value is still relevant to determining damages under any alternative measure.  That is, Dr. Walker's work makes clear that the value of sponsoring a doping cycling team is less than the value of sponsoring a clean cycling team.  Specifically, Dr. Walker opines:  "The market for sponsorships is competitive.  Consequently, a sponsorship's fair market value adjusts to reflect changes in net expected benefits to the sponsors. . . . Disclosure to sponsors of historical PED use and planned future PED use would necessarily have driven the sponsorship value down, most likely to zero in light of the evidence discussed in this report."  Walker Report ¶ 9.  As noted above, Larry Gerbrandt will testify that the mix of positive and negative publicity here had no value.  Dr. Walker will similarly testify that the value of the sponsorship itself was diminished by the elimination of the positive publicity benefit that the USPS "reasonably anticipated" when it agreed to pay $31 million for the renewed sponsorship rights in 2000 and the unanticipated harm to USPS by its linkage to the largest PED scandal in history.  Indeed, as this Court has already acknowledged in its opinion on summary judgment, Dr. Walker's analysis "has at least some bearing on how the brand-strengthening associations of a 'clean' team may have been offset in the public mind by revelations of a 'dirty' one."  ECF 547 at 33.  As previously stated, the jury must consider "*all* the facts and circumstances of the case, having any tendency to show damages, or their probable amount; so as to enable them to make the most intelligible and probable estimate which the nature of the case will permit."  *Abraham v. Gendlin*, 172 F.2d at 883 (emphasis added).  Dr. Walker's testimony will help the jury understand the impact on the dollar value of the

sponsorship caused by the negative publicity and associational stigma that followed the disclosure of Armstrong's cheating and lying.  Dr. Walker's testimony is thus relevant and helpful to the jury's ability to find that the USPS was damaged by Armstrong's misconduct, and to make a reasonable estimate of the amount of those damages.

### C.  Dr. Walker's Analysis and Use of Event Studies Is Reliable, Relevant and Helpful

Armstrong argues "[b]ecause Dr. Walker by his own admission was unable to apply the event study methodology he claimed to have used in his report … his testimony is unreliable, and therefore, inadmissible."  Def. Br. at 37.  Dr. Walker did not claim to have performed an event study, however.  The argument reflects Armstrong's fundamental mischaracterization of Dr. Walker's analysis, not a deficiency in that analysis.

In reality, Dr. Walker used previously-published event studies to estimate the magnitude of the harm the USPS was at risk of suffering from Armstrong's doping scandal, and then considered the impact that the risk of such a loss would have had on the market value of the sponsorship as of the time that the sponsorship was entered into.  As the risk has bearing on both the benefit of the bargain evaluated as of the time of the contract and the benefit of the bargain as evaluated as of the time of the trial, it is relevant under both the Government's and Armstrong's theories of damages.

Event studies are common economic tools that Dr. Walker has utilized and reviewed throughout his career as a working economist.  Dr. Walker concluded that he could not perform an event study here because the USPS is not publicly-traded and because the disclosures of Armstrong's PED use slowly leaked into the public over a period of many years.  For this reason, Dr. Walker turned to event studies conducted by other economists, who evaluated the economic

impact of celebrity scandals on corporate sponsors.  As Dr. Walker explains, the available academic literature suggests that publicly-traded companies suffer financial damages equal to 0.77% to 5.30% of their equity value when the celebrities they sponsor are involved in scandals. Walker Report at 18-22.  Armstrong does not raise any questions about the reliability of these studies or their conclusions.

As Dr. Walker acknowledged, the USPS is not publicly-traded.  *Id.* at 22-23.  However, the fact that enterprises are not publicly traded does not mean that they are immune to financial loss of similar magnitude as publicly traded enterprises in the same line of business that suffer the same negative association.  As equity is merely enterprise value minus debt, plus cash, regardless of whether the equity is publicly traded or not, Dr. Walker could estimate the effect of the scandal on the USPS by estimating its enterprise value and subtracting its debt.  Dr. Walker based his estimate of USPS's enterprise value on the ratio of enterprise value to revenue of the USPS's competitors UPS, DHL, and FedEx.  *Id.* at 23-24.  Dr. Walker then estimated that the potential impact to the USPS was $840 million to $5.75 billion, based on the percentage equity losses reflected in the earlier event studies.  *Id.* at 24-25.

Dr. Walker, thus, used published findings in refereed journals in his field of expertise concerning the impact of scandals on businesses' value (event study results) and paired them with a well-accepted methodology within his field of expertise for valuing non-traded enterprises (revenue multiples) to estimate the harm to USPS from public disclosure of Armstrong's PED use.  Armstrong takes issue with his analysis, but offers no valid basis to preclude Dr. Walker's testimony.  Armstrong is, of course, is free to cross-examine him about these matters at trial, and the jury can decide how much weight to give this particular aspect of Dr. Walker's work.  But there is no basis to preclude the testimony.

It is important to note, however, that Dr. Walker did **not** opine that the USPS suffered a loss in any particular amount based upon his application of other event studies to the circumstance in this case.  Rather, his analysis "establishes that USPS unknowingly absorbed significant financial risk by entering into the 2000 Sponsorship Agreement and may have lost hundreds of millions of dollars in profit contributions as a result."  *Id*. at 25.  Dr. Walker explained that "[r]egardless of the *realized* loss, Tailwind's and Mr. Armstrong's conduct exposed USPS to significant *risk* of loss," and Dr. Walker opined that disclosure of that risk to sponsors "would have driven the sponsorship value significantly downward."  *Id*. (emphasis in original).  This conclusion was one of a number of factors informing Dr. Walker's opinion that the scandal diminished the sponsorship value.[20]  The historical loss actually suffered by other sponsors in similar circumstances as reflected in the event studies that Dr. Walker cites, and the corresponding loss that this would imply for USPS, is also relevant under Armstrong's theory that damages should be measured on an ex post basis.

Rather than confront Dr. Walker's actual analysis, Armstrong falsely contends that Dr. Walker attempted to perform an event study, and then attempts to assail Dr. Walker with a series of supposed admissions about his inability to perform an event study under the circumstances.  But Dr. Walker never attempted to perform an event study, and never claimed to have performed an event study.  These supposed admissions are simply acknowledgements by Dr. Walker that he did not do something that he had never claimed to have done.  Armstrong has not identified any basis to conclude that Dr. Walker's estimate of the potential loss, or his

---

[20] As indicated previously, Dr. Walker's valuation opinion considered several factors in addition to the magnitude of potential loss, including the impact that PED scandals have had on the sponsorship value of other athletes, Armstrong's sponsorship value following the revelations of his doping, general market conditions affecting the amount of fees paid for sponsorships, and the marketability of other cyclists and cycling teams following doping scandals.

ultimate valuation opinion, is unreliable.  To the contrary, Dr. Walker's opinions are relevant, reliable and helpful to the jury in their task of determining the government's damages in this case.  Armstrong's motion to exclude Dr. Walker therefore should be denied.

## CONCLUSION

Lance Armstrong's motion to exclude the government's expert testimony – like his motion for summary judgment – is premised on the notion that as a matter of law no reasonable jury could find that the brand harm the USPS suffered after Armstrong's doping scandal diminished the value of the sponsorship.  This Court properly rejected Armstrong's motion for summary judgment.  Armstrong's motion to exclude the government's expert testimony also should be denied in its entirety.

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

CHANNING D. PHILLIPS, D.C. Bar # 415793
United States Attorney

DANIEL F. VAN HORN, D.C. Bar # 924092
Assistant United States Attorney

Darrell C. Valdez (D.C. Bar No. 420232)
U.S. ATTORNEY'S OFFICE
Judiciary Center Building
555 Fourth Street, NW, Civil Division
Washington, DC 20530
(202) 252-2507
darrell.valdez@usdoj.gov

 /s/  David Finkelstein
Michael D. Granston
Tracy L. Hilmer
Robert E. Chandler
David M. Finkelstein
Robert J. McAuliffe
Gregory A. Mason
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
P.O. Box 261
Ben Franklin Station
Washington, DC 20004
(202) 514-6832 – Telephone
(202) 616-3085 - Facsimile
David.M.Finkelstein@usdoj.gov

Attorneys for the United States of America

 /s/   Paul Scott
Paul D. Scott
pdscott@lopds.com
California State Bar No. 145975
Admitted *Pro Hac Vice*

Lani Anne Remick
laremick@lopds.com
California State Bar No. 189889
U.S.D.C. No. PA0045
Jon L. Praed
U.S.D.C. No. 450764
D.C. Bar No. 51665
LAW OFFICES OF PAUL D.
SCOTT, P.C.
Pier 9, Suite 100
San Francisco, California 94111
Tel: (415) 981-1212
Fax: (415) 981-1215

Attorneys for Relator Floyd Landis