# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *ex rel.*
FLOYD LANDIS,

                    Plaintiffs,

     v.

TAILWIND SPORTS CORP., *et al.*,

                    Defendants.

Civil Action No. 1:10-cv-00976-CRC

**ECF**

## DEFENDANT LANCE ARMSTRONG'S REPLY IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF LARRY GERBRANDT, BRIAN TILL, AND JONATHAN WALKER

1177142

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ....................................................................................................1

II.  REPLY IN SUPPORT OF MOTION TO EXCLUDE LARRY GERBRANDT ................6

    A.  Introduction.................................................................................................6

    B.  Argument ....................................................................................................6

        1.  Gerbrandt's opinions regarding alleged harm to the USPS rely only on his own *ipse dixit* and are inadmissible...................................................6

        2.  Gerbrandt is unqualified to opine on the alleged harm to the USPS. ........11

        3.  Gerbrandt is unqualified to opine on the USPS's earned-media reports, and his opinions are not well-reasoned........................................14

        4.  Gerbrandt's opinions are irrelevant and will not assist the trier of fact................................................................................................14

III.  REPLY IN SUPPORT OF MOTION TO EXCLUDE BRIAN TILL ...............................16

    A.  Introduction...............................................................................................16

    B.  Argument ..................................................................................................16

        1.  Till's conclusions are inadmissible because he did not apply his theoretical framework to the facts of this case..........................................16

        2.  Till's opinions are irrelevant and will not assist the trier of fact. ..............19

        3.  Till's failure to reliably apply a methodology goes to the admissibility of his testimony, not the weight. .........................................20

IV.  REPLY IN SUPPORT OF MOTION TO EXCLUDE JONATHAN WALKER..............22

    A.  Introduction...............................................................................................22

    B.  Argument ..................................................................................................22

V.  CONCLUSION......................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abraham v. Gendlin*
   172 F.2d 881 (D.C. Cir. 1949).................................................................................4, 19

*Ambrosini v. Labarraque*
   101 F.3d 129 (1996)..................................................................................................18

*Amorgianos v. Amtrak*
   303 F.3d 256 (2d Cir. 2002) .......................................................................................7

*Arias v. DynCorp*
   752 F.3d 1011 (D.C. Cir. 2014)................................................................................16

*Arias v. DynCorp*
   928 F. Supp. 2d 10 (D.D.C. 2013)............................................................................13

*Armenian Genocide Museum & Memorial, Inc. v. Cafesjian Family Found., Inc.*
   691 F. Supp. 2d 132 (D.D.C. 2010).............................................................................4

*Berk v. St. Vincent's Hosp. & Med. Ctr.*
   380 F. Supp. 2d 334 (S.D.N.Y. 2005) .........................................................................9

*Bigelow v. RKO Radio Pictures*
   327 U.S. 251 (1946)....................................................................................................4

*Brooks v. Outboard Marine Corp.*
   234 F.3d 89 (2d Cir. 2000) .......................................................................................16

*Casey v Merck & Co.*
   653 F 3d 95 (2nd Cir. 2011) .....................................................................................11

*Clark v. Takata Corp.*
   192 F.3d 750 (7th Cir. 1999) ....................................................................................17

*Daubert v Merrill Dow Pharm.*
   509 U.S. 579 (1993).......................................................................................... *passim*

*Estate of Gaither v. District of Columbia*
   831 F. Supp. 2d 56 (D.D.C. 2011).............................................................................23

*Etherton v. Owners Ins. Co.*
   35 F. Supp. 3d 1360 (D. Colo. 2014)........................................................................17

*Eureka Inv. Corp., N.V. v. Chicago Title Ins. Co.*
  743 F.2d 932 (D.C. Cir. 1984)............................................................................................4, 5

*Frosty Treats, Inc. v Sony Comput. Entm't Am., Inc.*
  No. 01-0378-CV-W-SOW, 2004 WL 5500100 (W.D. Mo. Mar. 3, 2004) ...............................18

*General Electric Co. v. Joiner*
  522 U.S. 136 (1997)..................................................................................................................7

*Gilmore v. Palestinian Interim Self-Government Auth.*
  53 F. Supp. 3d 191 (D.D.C. 2014) ......................................................................................21, 25

*Grimes v. Northwest Airlines, Inc.*
  No. CIV. A. 98-CV-4794, 1999 WL 527831 (E.D. Pa. July 22, 1999).....................................4

*Huey v. United Parcel Serv., Inc.*
  165 F.3d 1084 (7th Cir. 1999) ................................................................................................20

*In re Red Rock Services, Co.*
  522 B.R. 551 (E.D. Pa. 2014) ..................................................................................................12

*Kumho Tire Co. v Carmichael*
  526 U.S.137 (1999).............................................................................................................19, 20

*Meister v. Med. Eng'g Corp.*
  267 F.3d 1123 (D.C. Cir. 2001).............................................................................................7, 21

*Mid-State Fertilizer Co. v. Exchange Nat'l Bank*
  877 F.2d 1333 (7th Cir. 1989) ...................................................................................................7

*Player v. Motiva Enters. LLC*
  240 F. App'x 513 (3d Cir. 2007) ................................................................................................7

*Primavera Familienstiftung v. Askin*
  130 F. Supp. 2d 450 (S.D.N.Y. 2001) ..................................................................................11, 12

*Rothe Dev., Inc. v. Dept. of Defense*
  107 F. Supp. 3d 183 (D.D.C. 2015)......................................................................................11, 14

*Story Parchment Co. v. Paterson Parchment Paper Co.*
  282 U.S. 555 (1931)..................................................................................................................3

*Thomas v. Newton Int'l. Enterprises*
  42 F.3d 1266 (9th Cir. 1994) ...................................................................................................12

*U.S. Indus., Inc. v. Blake Const. Co.*
  671 F.2d 539 (D.C. Cir. 1982)...............................................................................................4, 5

iii

1177142

iv

*United States ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Grp., Inc.*
  370 F. Supp. 2d 18 (D.D.C. 2005) ....................................................................................4

*United States v. Libby*
  461 F. Supp. 2d 3 (D.D.C. 2006) ....................................................................................22

*United States v. Sci. Applications Int'l Corp.*
  958 F. Supp. 2d 53 (D.D.C. 2013) ...................................................................................4

*United States v. Science Applications International Corp.*
  626 F.3d 1257 (D.C. Cir. 2010) ..............................................................1, 2, 3, 15, 20

*United States v. Stagliano*
  729 F. Supp. 2d 222 (D.D.C. 2010) ...............................................................................19

*Young v. Burton*
  567 F. Supp. 2d 121 (D.D.C. 2008) ...............................................................................17

**Federal Rules**

Fed. R. Evid. 401 ............................................................................................................20

Fed. R. Evid. 402 ............................................................................................................26

Fed. R. Evid. 403 .................................................................................................. *passim*

Fed. R. Evid. 702 ...................................................................11, 14, 16, 17, 18, 20, 22, 25, 26

iv

1177142

## I.    INTRODUCTION

The government concedes that it intends to present at trial expert testimony that is addressed to a damages standard that, per this Court's summary judgment ruling, does not apply in this case. So the government reinterprets the Court's ruling, challenges it outright, and hints at an appeal. ECF No. 574 ("Opp.") at 4-5. But the government's problem with its damages case did not begin with this Court's ruling on summary judgment. The problem with the damages case presented by the government's experts is that it is impermissible under a published decision of the U.S. Court of Appeals for the District of Columbia Circuit.

In ruling on these motions, it may be helpful to begin with the ground on which the parties agree. The parties agree that the damages standard set forth in *United States v. Science Applications International Corp.* ("*SAIC*") governs "situations like this one, where the government receives tainted services." Opp. at 3 (citing 626 F.3d 1257 (D.C. Cir. 2010)). The parties also agree that "if the value that conforming goods or services would have had is impossible to determine, then the fact-finder bases damages on the amount the government actually paid minus the value of the goods or services the government received or used." *SAIC*, 626 F.3d at 1279 (2010); *see also* Opp. at 4.

But, critically, where the parties disagree is on whether the jury should be instructed to render a finding that the value of conforming services is impossible to determine. The government believes that a "jury could ascertain the market value of the tainted services," and should be instructed to do so. Like the Court, Armstrong and the relator believe that "[i]n the instant case, it is impossible to know with certainty what value the promised sponsorship of a cycling team would have had to the United States . . . ." ECF No. 532 at 22 (Relator's Mem. in Opp to Summ. J.); *see also* ECF No. 547 at 26 (Mem. Op.) ("The market value of the cycling team's 'PED-tainted' promotional services is just as 'impossible to determine'—perhaps even more so—as the 'conflict-tainted' consulting services and technical advice provided by *SAIC*."). Armstrong further believes it is inappropriate to let the jury decide an issue for the Court, *i.e.*,

1

what legal standard governs damages in a tainted services False Claims Act case. No authority cited by the government supports that novel proposition. And the authority on which it relies precludes it.

In *SAIC*, the Court of Appeals ruled that the decision regarding which damages standard applies in False Claims Act case is properly the role of the Court, and that duty is discharged through its jury instructions. The government argues that the jury gets to decide whether tainted services have an ascertainable market price. But in *SAIC*, the D.C. Circuit ruled as a matter of law that the tainted "services . . . had no ascertainable market price." 626 F.3d at 1279. And it ordered "the district court [to] instruct the jury to calculate the government's damages by determining the amount of money the government paid due to SAIC's false claims over and above what the services the company actually delivered were worth to the government." *Id.* at 1279. The government's suggestion that the jury gets to decide the proper damages standard for itself is foreclosed by binding precedent.

The government's argument, and perhaps its misunderstanding, of the relevant damages standard hangs on language in *SAIC* suggesting that the government would be free to argue on remand in that case that the services rendered were so riddled with flaws that they were completely worthless. What the government does not appear to understand is under what conditions such an argument is permissible. While the Court recognized that in certain circumstances the government might be able to recover its payments, it could do so "only ***where the government proves*** that it received no value from the product delivered." *Id.* at 1279 (emphasis added).

The entire problem with the government's proposed expert testimony is that none of its experts attempted to address the value of the services delivered. Although the government argues without any citation to the record that its experts did address this standard, the experts themselves testified under penalty of perjury that they did not. *See* Armstrong's Mot. *in Limine* I at 4, ECF No. 566-1 (citing testimony).

So the government pivots, and argues that the jury can fill in the gaps left by its experts. Although it admits that an expert may not introduce a speculative damages opinion, it argues that the jury may reach a speculative damages award. In particular, the government argues that a speculative damages calculation is permissible so long as the fact of the damage itself is certain. The government's argument leads nowhere. ***First***, as a threshold matter, Armstrong has consistently argued that both the "***fact*** and amount of damages" are speculative. ECF No. 559-1 ("Mot.") at 1 (emphasis added). Indeed, Armstrong has consistently assailed the fact of damages, and argued in his summary judgment motion, *Daubert* motions, and motions *in limine* that there are no damages and the government is restricted to civil penalties. That is so because none of the government's evidence—expert or otherwise—establishes that the Postal Service actually suffered harm. Larry Gerbrandt offers no scientific, methodological, or even logical connection between publicity the Postal Service received and any harm to its brand, or otherwise. Brian Till did not examine any of the publicity the Postal Service received to determine whether it benefited or harmed the Postal Service. And Jonathan Walker and the government both admit that the "USPS[] loss" about which he opined did not actually occur. The government seeks to have the jury infer without any support in the evidence that media about the Postal Service harmed it. Under the government's own characterization of the law, it may not do so.

But, ***second***, and perhaps more importantly, the government is wrong about the law regarding quantification of damages. Plaintiffs cannot seriously contend that the jury is free to speculate as to the *amount* of damages. *But see* Opp. at 6–8. Indeed, the decision upon which they chiefly rely states in no uncertain terms that "damages may not be determined by mere speculation or guess." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931). That a damages award must be supported by a sufficient evidentiary basis is a well-established, uncontroversial proposition. This is so in the specific context of the False Claims Act. *See SAIC*, 626 F.3d at 1279-80 (noting, in discussion of how the jury is to "calculate the government's damages" that "[t]he government . . . bears the burden of proving damages");

3

*United States v. Sci. Applications Int'l Corp.*, 958 F. Supp. 2d 53, 77 (D.D.C. 2013) ("Under the FCA, the government bears the burden of presenting sufficient evidence to allow the jury to determine the amount of damages it is owed."); *United States ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Grp., Inc.*, 370 F. Supp. 2d 18, 55 (D.D.C. 2005) ("Under the False Claims Act, damages must be proven with reasonable certainty. Thus, a relator must establish both that the fact of the damages is certain and that the amount of damages can be reasonably computed."). It is likewise true more generally. *See, e.g.*, *U.S. Indus., Inc. v. Blake Const. Co.*, 671 F.2d 539, 550 (D.C. Cir. 1982) ("sustain[ing] the grant of judgment n.o.v. because, as the district court held, the specific damage figure the jury reached was based not upon the evidence presented to it, but upon conjecture or speculation") (internal quotations omitted). True enough, a jury has some latitude to estimate a damages award, but any estimate must be "just and reasonable" and "based on relevant data." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946).

None of the cases cited by the government hold that the jury may concoct a damages number out of thin air without any basis for that calculation in the record. *Grimes v. Northwest Airlines, Inc.*, an unpublished Eastern District of Pennsylvania case, does not support the government. *See* No. CIV. A. 98-CV-4794, 1999 WL 527831, at *1 (E.D. Pa. July 22, 1999). It ***granted*** the plaintiff's motion *in limine* to exclude damages testimony as speculative. *Id.* The government misrepresents the holding of *Armenian Genocide Museum & Memorial, Inc. v. Cafesjian Family Found., Inc.*, which only governs the standard for proving damages at summary judgment, not at trial. *See* 691 F. Supp. 2d 132, 153 (D.D.C. 2010). *Abraham v. Gendlin*, a sixty-year-old D.C. Circuit authority cited by the government, merely held that the jury could permissibly project future income based on the plaintiff's own quantification of his income for the two years prior. 172 F.2d 881, 882 (D.C. Cir. 1949). Contrary to the government's suggestion—the damages award at issue in *Eureka Investment Corp., N.V. v. Chicago Title Insurance Co.* was not upheld on appeal. Instead, the District of Columbia Circuit remanded the award back to the district court because it was insufficiently quantified. *See*

4

1177142

*Eureka Inv. Corp., N.V. v. Chicago Title Ins. Co.*, 743 F.2d 932, 940 (D.C. Cir. 1984). As the Court explained, "[w]hile damage awards are findings of fact which will not be disturbed unless clearly erroneous, it is essential that the trial court give sufficient indication of how it computed the amount so that the reviewing court can determine whether it is supported by the record." *Id.*

Here, the government seeks to have the jury do what its experts did not—quantify the amount of damages without any ability to do so, any method for doing so, or any evidence of its amount. That would be rank speculation, and the government's own cited authorities prohibit it. Allowing the Court to present its expert testimony, and then invite the jury to perform the calculation its experts did not, threatens the legitimacy of the entire trial. *See U.S. Indus., Inc.*, 671 F.2d at 550.

1177142

## II.    REPLY IN SUPPORT OF MOTION TO EXCLUDE LARRY GERBRANDT

### A.    Introduction

Plaintiffs' opposition makes no attempt to address—let alone defend—the most glaring deficiencies in Mr. Gerbrandt's analysis in this case: his failure to use any kind of reliable methodology to conclude that the USPS was harmed by media coverage of Mr. Armstrong's confession to PED-use, and the resulting analytical gap between the data on which he relies and his conclusions. Instead, Plaintiffs focus on defending Mr. Gerbrandt's qualifications, ECF No. 574 at 12-14 ("Opp."), and argue that the way in which Mr. Gerbrandt counted media impressions was reliable and relevant. Opp. at 15-20. In response, Mr. Armstrong first addresses what Plaintiffs failed to—the methodological and analytical gaps in Mr. Gerbrandt's analysis— and then responds to Plaintiffs' arguments regarding Mr. Gerbrandt's qualifications and the reliability and relevance of his opinions.

### B.    Argument

#### 1.    Gerbrandt's opinions regarding alleged harm to the USPS rely only on his own *ipse dixit* and are inadmissible.

As set forth in Armstrong's moving papers, Mr. Gerbrandt concluded—without relying on any recognized methodology or body of knowledge, and without ever explaining how his experience could have led to these conclusions—that (**1**) the media impressions totted up by an assortment of entities were "negative," that (**2**) those impressions caused harm to the USPS, and indeed, that (**3**) those impressions caused *more* harm to the USPS than the $163.7 million[1]— calculated by the USPS itself—in quantified benefits that the USPS received as a result of the cycling team sponsorship. ECF No. 559-1 at 6, 9 ("Mot."). How Mr. Gerbrandt reached these

---

[1] According to the USPS's own contemporaneous documents and public statements, it received $163.7 million in quantified benefits as a result of the cycling team sponsorship. ECF No. 514 at 23 (Armstrong's MSJ). Mr. Armstrong's expert witness Doug Kidder concluded that the USPS earned, in total, $374 million in quantifiable benefits between 1998 and 2004 as a result of the sponsorship. ECF 557-1 ¶ 11 (Kidder Rpt).

1177142

conclusions is a black box; they are correct, we are asked to believe, simply because he says it is so.

"But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). Indeed, courts regularly exclude expert testimony where there is an analytical gap between the data on which the expert relies and the expert's conclusions. *See, e.g., Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1131-32 (D.C. Cir. 2001) (excluding expert's causation testimony where the "analytical gap between the data and [the expert's] opinion [was] simply too great" (internal citations omitted)); *Amorgianos v. Amtrak*, 303 F.3d 256, 270 (2d Cir. 2002) (expert's opinion was unreliable, and thus inadmissible, where "the analytical gap between the studies on which [the expert] relied and her conclusions was simply too great."); *Player v. Motiva Enters. LLC*, 240 F. App'x 513, 520 (3d Cir. 2007) ("[G]uess work is not a reliable method."). Courts do so because "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989).

Mr. Gerbrandt's conclusions rest entirely on his own rhetoric and are devoid of any recognizable analytical underpinning. He neither followed nor based his conclusions on any generally accepted methodology. He cites to nothing in his experience that dictates this result. He did not even look at the impressions, nor did he attempt to explain how they are negative. And he testified explicitly that he did not consider whether prior impressions of Mr. Armstrong's successes in any way benefited the USPS. ECF No. 559-5 at 98:5-17, 114:25-118:25 (Gerbrandt Depo.). Instead, Mr. Gerbrandt leaps from an "unprecedented level of media exposure" (where the term "unprecedented" has no generally accepted meaning in his field, *id.* at 95:8-14) to "a reasonable degree of scientific certainty the negative publicity . . . greatly reduced the promotional and marketing value, if any, received by the USPS from sponsoring Lance Armstrong and the racing team." ECF No. 559-3 ¶¶ 7, 8 (Gerbrandt Rpt).

Fundamentally, Mr. Gerbrandt simply *assumes* that all post 2012 media was "negative," that it all harmed the USPS, and that the harm exceeded the benefits earned during the sponsorship. Mr. Gerbrandt's work and Plaintiffs' opposition is based on the false premise that the counting exercise performed by Mr. Gerbrandt is somehow as reliable as the industry standard methodology of the earned-media reports prepared by FCB and CE. As Armstrong described in his motion, the earned-media valuations prepared by FCB and CE estimated what it would have cost the USPS to buy the media exposure it actually received during the sponsorship, and then applied a discount factor to conservatively estimate the benefit to the USPS. Because advertising and media exposure is an opportunity to influence an audience, not a guarantee that it will, the benefit earned by the USPS is the amount it would have had to spend to buy the same media exposure. In contrast, neither Mr. Gerbrandt, nor any of Plaintiffs' other experts, opine on a recognized methodology to value so-called "negative" publicity. Simply counting "negative" impressions as Mr. Gerbrandt has tells you nothing. There is no evidence that it actually impacted a target audience or harmed the USPS, and because no entity would ever buy "negative" exposure, it is not evidence of a cost borne by the USPS. That the USPS would not buy the media exposure it received after Mr. Armstrong's admission he doped is not evidence that the media exposure harmed the USPS.

Mr. Gerbrandt's conclusions are not the type that can merely be assumed. Though Plaintiffs mock Mr. Armstrong for citing academic literature showing that negative publicity can have both positive and negative effects, Opp. at 17, Mr. Gerbrandt's own prior statements reveal that he agrees with Mr. Armstrong. Long before Plaintiffs retained Mr. Gerbrandt in this case, Mr. Gerbrandt opined that negative publicity can be beneficial. Mr. Gerbrandt explained that "notoriety" caused by a racially disparaging remark by radio host Don Imus could "push[] up" Mr. Imus' radio show ratings.[2] Further, he concluded that Mr. Imus could "come out ahead" as a

---

[2] http://www.nytimes.com/2007/04/11/business/media/11imus.html.

8

result of the publicity regarding his remark.[3] Yet in spite of Mr. Gerbrandt's acknowledgement that so-called negative media can have positive effects, he here makes no effort to explain how he concluded that the impressions he identified are necessarily negative for the USPS (or what he means by "negative"), how he was able to conclude that the USPS was actually harmed by these allegedly negative impressions, and how that harm in fact outweighed the value of benefits received.

Rather than address the fatal gaps in Mr. Gerbrandt's analysis, Plaintiffs try to focus the Court's attention elsewhere. For example, Plaintiffs argue that Mr. Gerbrandt used a reliable methodology to "calculate[] negative impressions," that he disclosed this methodology in his report, and that Plaintiffs produced the raw data upon which Mr. Gerbrandt relied. Opp. at 15-16. These assertions both miss the point and stretch the truth. For example, setting aside the unsupported assumption that all the impressions were "negative," Mr. Gerbrandt claimed to have counted 115,000 impressions on Twitter. ECF No. 559-3 at 50, Figure 19 (Gerbrandt Rpt.). But rather than produce the "raw data" to support this number, Plaintiffs produced an email between an expert consulting firm and a Twitter sales associate. Ex. 1[4] (US00658771). The email does not include the search terms used on Twitter, nor does it demonstrate how the search was conducted. But it does illustrate that even the expert consulting firm realized that the Twitter search might not be reliable. *See id.* ("I'm not sure we're going to get it exactly right the first time.").[5] This

---

[3] *Id.*

[4] All exhibits referred to herein are attached to the Declaration of Elizabeth K. McCloskey in Support of Armstrong's Replies in Support of Motion to Exclude and Motions *in Limine*, filed currently herewith.

[5] Further, as set forth in Mr. Armstrong's moving papers, to the extent Mr. Gerbrandt did produce data underlying his opinions, much of the data is riddled with errors. In yet another example, Mr. Gerbrandt counted a television impression that included reference to the USPS only because it reported on a postman attacking a yorkshire terrier after the dog allegedly bit him. There can be little question that Mr. Gerbrandt's impression count is not sufficiently reliable to be admissible under *Daubert*. *See, e.g., Berk v. St. Vincent's Hosp. & Med. Ctr.,* 380 F. Supp. 2d 334, 355 (S.D.N.Y. 2005) (finding that expert's analysis "bears none of the hallmarks of reliability necessary for the opinion to be admissible," where the expert's report contained factual errors).

9

hardly suggests that Mr. Gerbrandt's media-impression-count was the product of a reliable methodology. *See also* Mot. at 12-15.

Plaintiffs also contend that Mr. Gerbrandt had a reliable way to know that the "negative" publicity outweighed the positive publicity, Opp. at 16, even though he explicitly conceded at deposition that he did not value the positive publicity. ECF No. 559-5 at 98:12-17 (Gerbrandt Depo.). Plaintiffs' attempt to explain Mr. Gerbrandt's analysis is nonsensical. ***First***, Plaintiffs contend that the "data sources on which FCB and Campwell Ewald relied in their 2001-04 reports are no longer available." Opp. at 16. But the fact that the data sources are not available does not show that Mr. Gerbrandt had a reliable way to know that the "negative" publicity outweighed the positive, as Plaintiffs here are attempting to show. Second, Plaintiffs claim that Mr. Gerbrandt relied on the earned-media reports, but then fail to address Mr. Gerbrandt's admission that he did not consider or calculate whether the USPS received any value at any time from sponsoring the cycling team. ECF No. 559-5 at 98:12-17 (Gerbrandt Depo.). Third, Plaintiffs argue that "where data *was* available, Gerbrandt *did* attempt to estimate the amount of positive publicity," but he concluded that there were next to no positive stories. Opp. at 17 (citing Gerbrandt Rpt. ¶ 45). However, as set forth in his report, what Mr. Gerbrandt actually claimed to have done is attempt "to locate news article and television coverage, ***from 2010 to 2014***, of Mr. Armstrong and his connection to the USPS but not related to the doping scandal (*i.e.*, "positive publicity."). ECF No. 559-3 ¶ 45 (Gerbrandt Rtp. ) (emphasis added).[6] To state the obvious, an attempt to net out the value of the positive and the negative publicity between 2010 and 2014, which fails even to consider publicity received from 1996 (the first year of the sponsorship) to 2010, is not a reliable methodology for answering the question the jury will here be instructed to answer.

---

[6] Plaintiffs make numerous misleading statements in their opposition brief. For example, they claim that Mr. Gerbrandt's declaration states that the "*only* way of calculating impressions is to count the number of stories that communicate a specific message." Opp. at 15 (citing ECF No. 574-1 ¶ 9 (Gerbrandt Decl.)), but that is not what Mr. Gerbrandt's declaration actually says. ECF No. 574-1 ¶ 9.

10

In sum, Mr. Gerbrandt's opinions are exactly the sort of *ipse dixit* testimony that courts regularly exclude. Both Mr. Gerbrandt's media-impression-count and his claim that those impressions caused harm to the USPS resulted from unreliable guess work, absent a recognizable or accepted methodology, and must be excluded. *See Daubert*, 509 U.S. at 597 (1993).

### 2.    Gerbrandt is unqualified to opine on the alleged harm to the USPS.

Plaintiffs' defense of Mr. Gerbrandt's credentials relies on contradicting Mr. Gerbrandt's sworn admissions at deposition and a misleading portrayal of his prior experience.[7] Because Mr. Gerbrandt has already admitted, in plain terms, that he does not have the requisite experience to opine as he plans to, Plaintiffs' efforts to salvage Mr. Gerbrandt are unpersuasive.

First, Plaintiffs argue that the law allows Mr. Gerbrandt to be qualified because of his experience (rather than his formal education or training). Mot. at 9; Opp. at 13, 19-20. But where an expert is qualified because of experience, the expert must make a threshold showing: he "must explain how [his] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note (2000); *Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 530 (S.D.N.Y. 2001) *abrogated on other grounds by Casey v Merck & Co.,* 653 F 3d 95 (2nd Cir. 2011) ("While it is permissible for [an expert] to base his opinion on his own experience, he must do more than aver conclusorily that his experience led to his opinion."); *Rothe Dev., Inc. v. Dept. of Defense*, 107 F. Supp. 3d 183, 196 (D.D.C. 2015) ("[A]s part of its gatekeeping function the court must assess whether a proposed expert possesses 'a reliable basis in the knowledge and

---

[7] Plaintiffs attempt to prove that Mr. Gerbrandt is qualified by citing "three Nielsen reports" he authored. Opp. at 12. Those reports, however, are irrelevant to Mr. Gerbrandt's opinions in this case.  They address: (1) how U.S. households use media, entertainment, and information technologies; (2) financial models supporting on-demand programming; and (3) "moviegoer behavior today, possibilities for tomorrow, and the impact of digital technologies on the movie value chain." *See, e.g.,* http://www.mrweb.com/drno/news4840.htm (last accessed on July 13, 2017); http://www.creativemac.com/article/Nielsen-Unveils-The-Economics-of-On-Demand-Programming-36187; http://deadline.com/2006/06/got-2995-for-nielsens-new-modern-movie-experience-study-404/ (last accessed on July 13, 2017).

11

experience of [the relevant] discipline.'" (quoting *Daubert v Merrill Dow Pharm.*, 509 U.S. 579, 592 (1993))). Mr. Gerbrandt never made this showing.

Instead, Plaintiffs now proclaim that "Gerbrandt's knowledge and professional experience more than qualifies him to offer his opinions in this case." Opp. at 13. In other words, they "aver conclusorily that [Mr. Gerbrandt's] experience led to his opinion[s]." *Primavera Familienstiftung*, 130 F. Supp. 2d at 530. It is hard for Plaintiffs to say much more than this, in light of Mr. Gerbrandt's admission that he has no experience in the valuation of sponsorships and has never done what he purports to do here—value the effect of "negative" publicity on the value of the sponsorship of a sports team. ECF No. 559-5 at 63:16-20 (Gerbrandt Depo.). Plaintiffs do make a cursory attempt to bolster Mr. Gerbrandt's credentials by referencing two articles which contain quote Mr. Gerbrandt. In one, Mr. Gerbrandt suggests that that the Monica Lewinsky scandal would increase viewership of cable news shows (1998), and in the other, Mr. Gerbrandt says that Tiger Woods' break from golf may impact Woods' ability to attract endorsers (2009). Opp. at 13. These two brief quotes do not establish Mr. Gerbrandt's qualifications, nor do they fill the gaps in Mr. Gerbrandt's experience.

Plaintiffs then pivot away from the facts, and instead cite to case law which they claim shows that Mr. Gerbrandt's experience is sufficient. Opp. at 13. But none of it does. In each of Plaintiffs' cited cases, the expert's testimony was admissible because the expert actually had experience directly relevant to the subject of the proposed testimony. For example, in *Thomas v. Newton Int'l. Enterprises*, the expert was allowed to testify about "the working conditions of experienced longshore personnel" where he had worked as a "longshore worker" for 29 years. 42 F.3d 1266, 1269-70 (9th Cir. 1994). Similarly, in *In re Red Rock Services, Co.*, the expert was qualified to testify regarding the engagement of a replacement demolition contractor where he had long worked for a "demolition . . . contractor." 522 B.R. 551, 574-75 (E.D. Pa. 2014). Here, Mr. Gerbrandt does not have any experience directly relevant to the subject matter of his

12

opinions. His claimed experience as a "media professional" does not qualify him to opine on all subjects relating tangentially to "media."[8]

Finally, Plaintiffs contend that Mr. Gerbrandt's experience in *other* cases qualifies him to give expert testimony in *this* case—regardless of whether those opinions relate to the opinions he here asserts. Opp. at 12-13. Based on Mr. Gerbrandt's admissions, this argument is unpersuasive. Plaintiffs first argue generally that Mr. Gerbrandt has previously given testimony "addressing the same sorts of issues on which he opines here." Opp. at 12. But Mr. Gerbrandt already testified that he has no prior experience doing what he purports to do in this case—determine whether negative publicity regarding an individual on a sponsored team harmed the sponsor or quantify the effects of negative publicity on the value of the sponsorship of a sports team. ECF No. 559-5 at 63:16-20, 80:20-23 (Gerbrandt Depo.). Then, Plaintiffs contend more specifically, based on a new declaration submitted by Mr. Gerbrandt, that Mr. Gerbrandt was a litigation consultant in 10 cases relevant to his testimony here. That assertion also contradicts Mr. Gerbrandt's sworn testimony at deposition, where he could only identify two related cases, and by his own explanation, neither was relevant. Ex.2 at 87:19-90:18 (Gerbrandt Depo.). Regardless, an expert cannot be qualified solely based on prior litigation services.

In sum, Mr. Gerbrandt's admissions doom his desire to testify that "negative publicity greatly reduced the promotional and marketing value of the sponsorship" and "the harm to the USPS on account of the negative publicity outweighed the value of the positive benefits during the sponsorship period." Opp. at 11. *See, e.g., Arias v. DynCorp*, 928 F. Supp. 2d 10, 17 (D.D.C. 2013) (expert was not qualified because plaintiffs failed to demonstrate how the expert's "academic and professional experiences ma[d]e him qualified to testify" about the factual

---

[8] Indeed, as Mr. Gerbrandt testified, he most frequently opines on television programming. ECF No. 559-5 at 11:2-12 (Gerbrandt Depo.).  But clearly, an expert qualified to opine on television programming is not necessarily qualified to testify on the effects of negative media on a sponsorship.

13

1177142

questions at issue). Accordingly, Mr. Gerbrandt is unqualified to testify regarding alleged harm to the USPS and should be precluded from doing so.

### 3. Gerbrandt is unqualified to opine on the USPS's earned-media reports, and his opinions are not well-reasoned.

Plaintiffs' cursory defense of Mr. Gerbrandt's opinions regarding CE and FCB's earned-media reports falls flat. ***First***, Plaintiffs contend that the grounds upon which Mr. Armstrong attacks Mr. Gerbrandt's opinions on the earned-media reports all go to weight, not admissibility. Opp. at 14. This is plainly incorrect. For example, Mr. Gerbrandt's lack of experience regarding earned-media reports, and the methodologies used by CE and FCB, is alone sufficient to render his opinions inadmissible. *See, e.g.,* Fed. R. Evid. 702(a); *Rothe Dev., Inc.*, 107 F. Supp. 3d at 196 ("Regardless of the basis on which a witness purports to qualify as an expert, as part of its gatekeeping function the court must assess whether a proposed expert possesses 'a reliable basis in the knowledge and experience of the relevant discipline.'" (quoting *Daubert*, 509 U.S. at 592)). ***Second***, Plaintiffs fail to respond to Mr. Armstrong's argument that Mr. Gerbrandt's critiques of the CE and FCB earned-media reports do not rely on any reliable principles or methods, as is required by Fed. R. Evid. 702(c), and instead based those critiques on his (unrelated) professional experience. Mot. at 20 (citing Gerbrandt Depo. at 182:1-184:5, 201:15-202:14). Accordingly, Plaintiffs implicitly concede that Mr. Gerbrandt's critiques are inadmissible.

For these reasons, and as more fully set forth in Mr. Armstrong's moving papers, Mot. at 19-21, Mr. Gerbrandt's opinion regarding the earned-media reports must be excluded.

### 4. Gerbrandt's opinions are irrelevant and will not assist the trier of fact.

Finally, Plaintiffs contend that Mr. Gerbrandt ought to be allowed to opine on the market value of the sponsorship, as well as to invite the jury to speculate about the extent to which negative publicity diminished the value of the cycling team sponsorship. Opp. at 18-20. Plaintiffs are mistaken. For the reasons set forth more fully above (*see* pages 1-5), Mr. Gerbrandt's

14

testimony is not relevant to damages, the only issue upon which has been offered. The standard governing damages in this action requires Plaintiffs to address the value of the services delivered. *See SAIC*, 626 F.3d 1257, 1279 (2010); ECF No. 547 ("S.J. Order") at 25-28. Yet Mr. Gerbrandt admitted at deposition that he made no attempt to address the value of benefits received. ECF No. 559-5 at 98:12-99:5 (Gerbrandt Depo.). And his conclusion that the market value of the sponsorship is zero addresses the incorrect legal standard, as explained *supra*, pages 1-5.

15

1177142

### III.    REPLY IN SUPPORT OF MOTION TO EXCLUDE BRIAN TILL

#### A.    Introduction

Plaintiffs half-heartedly defend Dr. Till's slapdash, conclusory opinions. ***First***, Plaintiffs contend that Dr. Till may testify about a general theory of causation, even though the law Plaintiffs cite shows that Dr. Till may testify about a general theory only if he has reliably applied that theory to the specific facts at issue (which Dr. Till has failed to do). ***Second,*** Plaintiffs argue that even though Dr. Till's testimony will not help the jury calculate what Mr. Armstrong's services were worth to the USPS—*i.e.*, will not help the jury to understand a fact in issue (Fed. R. Evid. 702(a))—Dr. Till still should be allowed to testify about his general theory. ***And finally,*** Plaintiffs assert that Dr. Till's failure to reliably apply a methodology to the facts of this case merely goes to the weight of his testimony, rather than to its admissibility—contrary to *Daubert* and its progeny.[9] Mr. Armstrong addresses each of Plaintiffs' arguments in turn.

#### B.    Argument

##### 1.    Till's conclusions are inadmissible because he did not apply his theoretical framework to the facts of this case.

Plaintiffs argue that the law allows Dr. Till to testify regarding a general theory of causation, even though Dr. Till failed to apply that theory to the facts of this case. ECF No. 574 ("Opp.") at 22-23. To support this proposition, Plaintiffs cite three cases. But these cases do not show—as Plaintiffs claim they do—that "testimony regarding general causation" is "*necessary* [and therefore admissible] in cases like this one." Opp. at 23 (emphasis in original). In fact, Plaintiffs' cases show the opposite: expert testimony is ***only*** admissible where the expert has reliably applied a general theory of causation to the ***specific facts at issue***.[10] *See, e.g., Arias v.*

---

[9] Plaintiffs also appear to argue that Dr. Till's testimony should be admitted because it contradicts an argument Mr. Armstrong's counsel made at the summary judgment hearing. Opp. at 20-21. First (to state the obvious), that is not a valid basis upon which to admit expert testimony. And second, it's not true. Dr. Till's 1998 article does not prove that "negative publicity about an athlete who competed for a sponsored team which occurs eight years after the end of the sponsorship has any impact on the sponsor." Opp. at 21 n.17 (quoting MSJ hearing).

[10] *See also Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000) (affirming district court's exclusion of expert testimony where the expert had failed to test his theory of causation

1177142

*DynCorp,* 752 F.3d 1011, 1016 (D.C. Cir. 2014) ("The district court required expert testimony not to prove that herbicides kill plants, but to determine whether the specific herbicide at issue was capable of causing the *specific kinds* of injuries complained of." ) (emphasis in original); *Etherton v. Owners Ins. Co.*, 35 F. Supp. 3d 1360, 1366 (D. Colo. 2014), *aff'd*, 829 F.3d 1209 (10th Cir. 2016) ("Reliability is not assessed in a vacuum. Rather, expert testimony is only admissible where it has a valid bearing on the facts of the case. . . . Establishing injury causation requires a showing of both general ***and specific causation***. . . . 'Specific causation' refers to whether a particular accident or substance ***caused the specific injury at issue***.")(emphasis added); *Young v. Burton*, 567 F. Supp. 2d 121, 138 (D.D.C. 2008), aff'd, 354 F. App'x 432 (D.C. Cir. 2009) ("In a toxic tort case, 'the plaintiff must show that the toxicant in question is capable of causing the injury complained of (general causation) ***and must further prove*** that the toxicant in fact did ***cause that injury in the present case*** (specific causation).'") (citations omitted, emphasis added). Here, there is no question—indeed, Dr. Till concedes—that he did not apply his theoretical framework to the facts of this case. *See* ECF No. 559-1 ("Mot.") at 31-32 (citing Dr. Till's deposition testimony).

In fact, Dr. Till wants to do much more than express a theory of "general causation." Opp. at 23. First, Dr. Till intends to testify about general principles relating to associative learning, the nebulous "theoretical framework" on which he purports to rely, ECF No. 559-6 at 2 (Till Rpt.), and second, he intends to express opinions about this case, without having applied any reliable methodology to the facts of this case. *Id.* at 1-2, 4-5. With respect to the first prong, Dr. Till's associative learning framework is so vague that it cannot possibly be helpful to the jury. Fed. R. Evid. 702(a). For example, Dr. Till opines that "[a]t a fundamental level, associative learning is a process by which connections (associative links) are formed in memory" and "positive and negative" meanings can "transfer from [a] sponsored property to [a] sponsored

with the specific facts at issue); *Clark v. Takata Corp.,* 192 F.3d 750, 758-759 (7th Cir. 1999) (same).

17

brand." ECF No. 559-6 at 2-3 (Till Rpt.). But because Dr. Till has conceded that his associative learning theory cannot, in a vacuum, be used to reach conclusions about the real world, ECF No. 559-5 at 218:12-220:8 (Till Depo.), he cannot merely foist his general framework on the jury without also reliably applying it to the facts of this case.

With respect to the second prong, Dr. Till's opinions—that it is "highly likely that information about Armstrong's use of performance-enhancing substances and techniques negatively affected consumer perception of the USPS" and "deprived the USPS of the positive associative benefits expected through their Sponsorship"—are not the product of a reliable methodology, nor do they result from Dr. Till reliably applying any methodology to the facts of this case. *See* Fed. R. Evid. 702(c), (d). To reach his opinions, Dr. Till conducted no tests, did no research, and gathered no evidence regarding this case. Experts in Dr. Till's field do not rely on theoretical frameworks, such as associative learning theory, to reach conclusions about real-life events without conducting tests, doing research, and gathering evidence. As set forth above, Dr. Till conceded that this is true, ECF No. 559-7 at 218:12-220:8, 224:5-21 (Till Depo.), and the academic research on which he relies (including his own) explicitly limits itself to the specific facts tested. *See* Mot. at 26-28 (citing articles). To assess Dr. Till's analysis, we must look to his practice in the field, and not to his practice in the courtroom.[11] *Daubert*, 43 F.3d at 1317 ("[A] scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office"). Because Dr. Till has here failed to apply the "same level of intellectual rigor that characterizes

---

[11] Plaintiffs contend that Dr. Till's testimony in this case cannot be deemed unreliable because his opinions have been excluded in other cases. Opp. at 24 n.19. But it is unquestionably revealing that Dr. Till's expert opinions have been excluded, multiple times, for his failure to do exactly what he failed to do in this case. As in this case, Dr. Till conducted no tests; did no research; and gathered no evidence to support his opinions in *Frosty Treats, Inc. v Sony Comput. Entm't Am., Inc.,* No. 01-0378-CV-W-SOW, 2004 WL 5500100 (W.D. Mo. Mar. 3, 2004). As this Court must do here, the *Frosty Treats* court excluded Dr. Till's testimony, explicitly rejected plaintiff's argument that Dr. Till could make reliable predictions without performing case-specific work. *See Ambrosini v. Labarraque*, 101 F.3d 129, 139 (1996) (noting concern about risk of "gun for hire" testimony).

18

1177142

the practice of an expert in [his] field," his testimony is inadmissible. *Kumho Tire Co. v Carmichael*, 526 U.S.137, 152 (1999).

Plaintiffs' contention that Dr. Till relied on material beyond his 1998 article, including an Ipsos consumer survey, is nothing but a smokescreen. Opp. at 23-24. For example, with respect to the Ipsos study, Dr. Till does not contend, nor does the Ipsos study claim to address the impact of publicity about Mr. Armstrong's PED-use on the USPS (the subject on which Dr. Till here opines). Indeed, the closest data point in the Ipsos study shows that 93.2% of respondents said that the allegations of PED-use either had no effect on their opinion of the USPS or responded N/A. But Dr. Till ignores that statistic. Instead, he cites the Ipsos study to say, for example, that respondents "who believed Armstrong to be guilty of PED use rated him lower on a variety of personal characteristics." ECF No.559-6 at 4 (Till Rpt.); *see also* Mot. at 28-30. To conclude, based on that data point, that the USPS was harmed by media which appeared eight years after the termination of the sponsorship, instead of actually conducting an experiment or a survey of the issue, is the definition of unreliable and inadmissible expert testimony. *See United States v. Stagliano*, 729 F. Supp. 2d 222, 230 (D.D.C. 2010) (excluding expert where her "methodology— what little [could] be gleaned from it—[was] so nebulous, subjective, and lacking in rigor and detail as to cast serious doubt, not only on the reliability of her opinion testimony, but on its usefulness to the jury as well").

### 2.    Till's opinions are irrelevant and will not assist the trier of fact.

Plaintiffs next contend that Dr. Till's testimony is admissible because it has a "tendency to show damages, or their probable amount."[12] Opp. at 24 (quoting *Abraham v. Gendlin*, 172 F.2d at 883). Here again, Plaintiffs are mistaken. The proper measure of damages is "the amount

---

[12] Plaintiffs also contend that Dr. Till's testimony is admissible because he will show that "there is a general causal relationship between negative publicity about a sponsored celebrity-athlete and diminished consumer perception of a sponsoring brand." Opp. at 24. But as set forth above, Dr. Till cannot express a general theory of causation without applying it to the specific facts at issue—which he has admittedly failed to do.

19

the government actually paid minus the value of the goods or services the government received or used." *SAIC*, 626 F.3d at 1279 (2010); *see also* ECF No. 547 at 26-27 (Mem. Op.). But Dr. Till made no effort to determine whether negative information about Mr. Armstrong actually harmed the USPS, nor did he attempt to quantify that harm or compare it to the benefits the USPS received from sponsoring the cycling team. Whether negative publicity *could* harm a sponsor does not assist the jury in determining whether the USPS was *actually* harmed. Accordingly, Dr. Till's testimony is irrelevant and thus inadmissible. Fed. R. Evid. 401, 403, 702(a); *Daubert*, 509 U.S. at 592.

### 3.    Till's failure to reliably apply a methodology goes to the admissibility of his testimony, not the weight.

Finally, Plaintiffs contend that Dr. Till's failure to reliably apply his theoretical framework to the facts of this case merely goes to the weight of his testimony, rather than to its admissibility. Opp. at 24-25.[13] This argument reveals Plaintiffs' fundamental misunderstanding of *Daubert*, *Kumho Tire*, and their progeny. Dr. Till doesn't get to testify in this case merely because he has experience in marketing and his opinions vaguely relate to marketing. Opp. at 20-22. Nor are his opinions admissible solely because he previously published an article on the theoretical framework on which he purports to rely. *Id.* Dr. Till still must meet the requirements of Fed. R. Evid. 702; for the reasons set forth above, he has failed to do so. His opinions in this case are not the product of reliable principles and methods. Fed. R. Evid. 702(c); *Daubert v. Merrill Dow Pharm.*, 509 U.S. 579, 590 (1993) (Expert testimony that rests solely on "subjective belief or unsupported speculation" is not admissible.); *Huey v. United Parcel Serv., Inc.*, 165 F.3d 1084, 1087 (7th Cir. 1999) (An expert must "substantiate his opinion; providing only an ultimate conclusion with no analysis is meaningless.") (citation omitted). And he has failed to reliably apply his theoretical framework to the facts of this case (Mot. at 30-31). Fed. R. Evid.

---

[13] Plaintiffs make almost no effort to show why the deficiencies in Dr. Till's analysis go to weight, not admissibility. Opp. at 24-25. Plaintiffs merely repeat Dr. Till's conclusions, as if this alone is sufficient to show that the conclusions are admissible under *Daubert.*

702(d); *Gilmore v. Palestinian Interim Self-Government Auth.*, 53 F. Supp. 3d 191, 212 (D.D.C. 2014). Plaintiffs, as the proponents of Dr. Till's testimony, have failed to establish the admissibility of his testimony. *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127 n.9 (D.C. Cir. 2001).

For these reasons, and as more fully discussed in Mr. Armstrong's moving papers, the Court should exclude Dr. Till's testimony in its entirety.

1177142

## IV.    REPLY IN SUPPORT OF MOTION TO EXCLUDE JONATHAN WALKER

### A.    Introduction

The dispute over Dr. Walker has narrowed significantly as a result of the briefing on Armstrong's motion to exclude his testimony. The government agrees that Dr. Walker's opinion about the market value of the sponsorship addresses a legal standard that the Court has rejected. And the government also admits that Dr. Walker's (non)event study has nothing to do with actual harm. His opinion is therefore entirely irrelevant to damages, the only issue upon which it is offered. Because Dr. Walker's testimony is little more than an attempt to mislead the jury into converting an irrelevant hypothetical into a multi-billion dollar damages award, it must be excluded.

### B.    Argument

Expert "testimony will only be admissible if it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *United States v. Libby*, 461 F. Supp. 2d 3, 6 (D.D.C. 2006) (quoting Fed. R. Evid. 702). Helpfulness is a test of relevance. *Id.* "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993) (quoting 3 Weinstein & Berger, Weinstein's Federal Evidence P702[02], p. 702-18 (1988)). Irrelevant expert testimony is particularly unhelpful when it relies upon studies whose "reliability . . . as applied to this case is questionable." *Libby*, 461 F. Supp. 2d at 16.

Even where relevant, expert testimony is subject to exclusion under Federal Rule of Evidence 403. *Id.* at 18. Indeed, because of the difficulty involved in evaluating expert testimony, it can be "both powerful and quite misleading" and Rule 403 "exercises more control over experts than lay witnesses." *Daubert*, 509 U.S. at 591 (quoting Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991)). Where "the methodological foundation for [a] proffered opinion . . . is slender, and the danger that the jury would assign such testimony talismanic significance is too great," it should be

22

excluded under Rule 403. *Estate of Gaither v. District of Columbia*, 831 F. Supp. 2d 56, 73 (D.D.C. 2011) (internal quotations and citation omitted).

Dr. Walker's opinion typifies the problems that can arise with irrelevant, unfounded, and misleading expert testimony. The government concedes that Dr. Walker's opinion that the sponsorship is worth zero and his "event study methodology" both address a damages standard that does not apply in this case, the "market value of the USPS sponsorship." ECF No. 574 ("Opp.") at 28 ("Dr. Walker's Opinion Regarding the Market Value of the Tainted Sponsorship").

So the government argues that Dr. Walker's testimony is still relevant "even if the Court were to conclude that the market value of the USPS sponsorship is unascertainable," ECF No. 574 ("Opp.") at 28, as if the Court had not already done so. *See* ECF No. 547 at 26 (S.J. Order) ("The market value of the cycling team's 'PED-tainted' promotional services is just as 'impossible to determine'—perhaps even more so—as the 'conflict-tainted' consulting services and technical advice provided by *SAIC*."). The government's argument is groundless. The government argues that Dr. Walker's opinion is relevant because it allows the jury to subtract the value of negative publicity to the Postal Service from the millions of dollars in benefits it received. Opp. at 28. But Dr. Walker unequivocally testified that he did not "quantify in [his] reports the value of the media impressions the U.S. Postal Service received from publicity as a result of the sponsorship agreement." ECF No. 559-9 at 131:10-14 (Walker Depo.).[14]

The government also argues that Dr. Walker's opinion does not rest "solely" on USPS's after-the-fact attempts to disclaim the sponsorship. Opp. at 28. True enough. Dr. Walker's opinion is not "solely" an attempt to add a veneer of scientific credibility to speculative USPS

---

[14] Indeed, Dr. Walker's primary quibble with the media evaluation studies is that they do not address the irrelevant market value standard he did.  *See* ECF No. 559-8 ¶ 77 (Walker Rpt.) ("Although advertising equivalency is a way to measure advertising exposure and the unit of measurement is called 'dollars,' advertising equivalency values are subjective valuations that do not generally correspond to the true market value of anything.").

1177142

statements about what it would have done in a world that never came to pass. *See* ECF No. 559-8 ¶ 55 (Walker Rpt.) ("[I]f she had known about the team's doping she would not have wanted the Postal Service to sponsor the team."). It also purports to serve as a conduit for inadmissible Rule 403 evidence about the effect of PED use on the personal endorsement contracts of Armstrong and other athletes. *See id.* ¶ 52.[15] Regardless, Dr. Walker's citation of multiple sources for his irrelevant conclusion does not make the conclusion any more relevant. Because Dr. Walker's opinion about the market value of the sponsorship fails the threshold test of relevance, it would not be helpful to a jury, and is inadmissible.

Dr. Walker's opinion is also infected by his unsound "event study methodology," upon which his zero-value opinion relies. *See id.* ¶ 47. The government admits that Dr. Walker did not conduct an event study. Opp. at 30. The government also admits that "Dr. Walker did **not** opine that the USPS suffered a loss in any particular amount based upon the application of other event studies to the circumstances of this case." Opp. at 32. Instead, Dr. Walker purports to address a hypothetical risk of loss to the USPS. Although the government asserts in a heading that Dr. Walker's event study methodology is "relevant," it never explains to what. It is certainly not relevant to damages in a tainted services False Claims Act case, as the government appears to concede. But Dr. Walker has not been offered for any other purpose.

The government half-heartedly defends Dr. Walker's methodology on two grounds. The government claims that Dr. Walker cited publications about event studies. Opp. at 31. But the government admits that Dr. Walker "never attempted to perform an event study." An expert who does "not reliably appl[y] his own methodology to the facts of the case" cannot testify in

---

[15] The government's claim that Armstrong did not challenge Dr. Walker's reliance upon evidence regarding Armstrong's personal sponsors and the sponsors of other athletes is incorrect. That is the subject of Armstrong's fourth motion *in limine*, which specifically cites to Dr. Walker's reliance upon that evidence. *See* Armstrong's Mem. of Law in Supp. of Mots. *in Limine* IV at 15-17, ECF No. 566-1 (citing paragraphs 24-40 of Walker's report).

accordance with Rule 702. *See Gilmore v. Palestinian Interim Self-Government Auth.*, 53 F. Supp. 3d 191, 212 (D.D.C. 2014).

So the government claims, without citation or explanation, that Dr. Walker applied a "well-accepted methodology." Opp. at 31. Dr. Walker used an amalgam of the market values of firms that traded on a stock exchange to compose a fictional equity value for another firm that did not trade on a stock exchange; manufactured a drop in that fictional equity value; and then blamed that drop on an external event. The government offers no evidence that any other expert has attempted such an analysis, much less any evidence that Dr. Walker's methodology is well-accepted in any academic field or in industry. Dr. Walker could not either. Dr. Walker did not cite in his report, nor could he identify at deposition "any peer-reviewed article that conducted a study on publicly-traded companies and applied the results of that study to an estimate of the market value of a nonpublicly traded company." ECF No. 559-9 at 314:14-19 (Walker Depo.). Nor could he identify any other economist who has performed an event study using a fictional market capitalization. *Id.* at 315:10-15. And notwithstanding his numerous engagements as a litigation consultant, he was not aware of any litigation in which a court allowed an expert to testify about an event study of a firm that lacked a stock, saying "I can't think of any, and I doubt there are." *Id.* at 316:15-317:5. He apparently wishes to be the first to do so in this case.

But even if Dr. Walker's opinion had some limited probative value, and was reliable, it would still be inadmissible under Rule 403. The government admits that Dr. Walker addresses a damages standard that does not apply in this case. And it admits that Dr. Walker did not opine about actual harm to the Postal Service. However, Dr. Walker invites the jury to substitute his speculative figures for an actual damages award in this case. Dr. Walker wants to testify that "[e]vent study methodology indicates USPS damages exposure may be in the billions of dollars." ECF No. 559-8 ¶ 10 (Walker Rpt.). In a bastardization of the governing legal standard, he concludes that "[t]he magnitude of potential loss dwarfs the sponsorship fees." *Id.* ¶ 47. And he also hopes to present a table of "estimates of the impact of the Tailwind/Armstrong Scandal on

25

USPS" despite the government's admission that he did not measure actual impact of the Armstrong's disclosures on the USPS. *Id.* at tbl.2. Allowing Dr. Walker testify in the presence of the jury creates an enormous risk that it will substitute his analysis in place of the analysis required by *SAIC*. The government has offered him precisely for that purpose.

Dr. Walker's opinion is irrelevant. His methodology is unsound. And his testimony will prejudice the jury. It is inadmissible under Rules of Evidence 402, 403, and 702. Armstrong respectfully requests that the Court grant his motion to exclude it.

## V.    CONCLUSION

For the forgoing reasons, Armstrong respectfully requests that the Court exclude the reports and testimony of Larry Gerbrandt, Brian Till and Jonathan Walker.

Respectfully submitted,

KEKER, VAN NEST & PETERS LLP

Dated:  July 14, 2017

By:    s/ *Elliot R. Peters*
JOHN W. KEKER (*pro hac vice*)
ELLIOT R. PETERS (*pro hac vice*)
R. JAMES SLAUGHTER (*pro hac vice*)
SHARIF E. JACOB (*pro hac vice*)
ELIZABETH K. McCLOSKEY (*pro hac vice)*
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:   415 397 7188

ROBERT D. LUSKIN (D.C. Bar # 293621)
PAUL HASTINGS LLP
875 15TH St., NW
Washington, DC  20037
Telephone: (202) 551-1966
Facsimile: (202) 551-0466

Attorneys for Defendant
LANCE ARMSTRONG

26

1177142