# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA** *ex rel.*
**FLOYD LANDIS**,

         Plaintiff,

         v.

**TAILWIND SPORTS CORP.**, *et al.*,

         Defendants.

Case No. 10-cv-00976 (CRC)

## MEMORANDUM OPINION AND ORDER

Before the Court are several motions in limine from both parties. In this Memorandum
Opinion and Order, the Court resolves the motions related to expert testimony: namely,
Defendant Lance Armstrong's motion to exclude the testimony of the Government's three
proposed experts (Larry Gerbrandt, Dr. Brian Till, and Dr. Jonathan Walker) (ECF No. 559) and
the Government's motions to exclude the testimony of Armstrong's two experts, Douglas Kidder
(ECF No. 557) and John Gleaves (ECF No. 558).[1]

With respect to the Government's experts, the Court will mostly deny Armstrong's
motion, but will grant it in two respects: (1) the experts cannot testify as to an impermissible
theory of damages that has been previously rejected by the Court, namely that the fair market
value of the promotional services that Armstrong's cycling team rendered to the U.S. Postal
Service ("USPS") is zero, and (2) Gerbrandt cannot offer his unsubstantiated opinion that the
harm resulting to the USPS from the negative publicity it received from coverage of Armstrong's

---

[1] In a separate Order issued today, the Court ruled on the parties' other motions in limine.

use of performance enhancing drugs ("PEDs") necessarily outweighed the value of any benefits received from the sponsorship prior to revelations of Armstrong's PED use.

With respect to Armstrong's experts, the Court will grant in part and deny in part both Government motions. The Court finds Mr. Kidder's testimony admissible except insofar as it discusses the value of USPS's cycling-themed Visa credit-card promotion. And the Court will permit Mr. Gleaves to testify as an expert witness with respect to the widespread nature of PED use in cycling, but will not permit him to testify to the other opinions laid out in his expert report.

## I.   Background

### A.   Government's Experts

The Government intends to call three expert witnesses at trial to testify regarding its alleged damages: Larry Gerbrandt, Dr. Brian Till, and Dr. Jonathan Walker.

#### 1.   *Larry Gerbrandt*

Larry Gerbrandt is the principal of Media Valuation Partners, a firm that has been providing valuation, market research, and litigation support since 2007. Def. Armstrong's Mot. to Exclude Testimony of Gerbrandt, Till, & Walker ("Armstrong MIL"), Ex. 1 ("Gerbrandt Expert Report"), at 1. He also serves as the managing director of Janas Consulting, an investment banking, management consulting, and valuation firm; as an associate with the Analysis Group, a provider of economic, financial, and business strategy consulting; and as a board member of The Inspiration Network, a family-entertainment-oriented television network. Id. Prior to his current positions, Gerbrandt worked as an analyst and executive for several media research companies, including The Nielsen Company, and has spent his career collecting and analyzing data related to pricing, valuation, and consumption across consumer media. Id. He has served as an expert witness more than 90 times on topics involving the economics and

value of network television series, the advertising and license fee revenue generated by broadcasts, and the value of publicity. Id. at 4. According to the Government and Gerbrandt's expert report, he intends to testify about the negative publicity USPS received from the media coverage of Lance Armstrong's PED use. Id. at 5–6; Pls.' Opp'n to Armstrong MIL ("Pls.' Opp'n") at 1, 11.

### 2. Dr. Brian Till

Dr. Brian Till is the Dean of the College of Business and Administration and a Professor of Marketing at Marquette University. Armstrong MIL Ex. 4 ("Till Expert Report") at 1. He has a bachelor's degree in advertising and an MBA from the University of Texas, and a Ph.D. from the University of South Carolina in marketing. Id. His academic research has focused on associative learning, brand equity, and celebrity endorsers, and he has published articles on these topics in several academic journals. Id. Prior to his academic career, he worked as a brand manager at Purina. Id. According to the Government and Dr. Till's expert report, he intends to testify that the USPS cycling sponsorship created an associative link between USPS and Lance Armstrong and that academic literature has shown that negative information about athletes, such as Armstrong's PED use, negatively impacts consumer perception of brands associated with the athlete. Id. at 1–2; Pls.' Opp'n at 1, 20.

### 3. Dr. Jonathan Walker

Dr. Jonathan Walker is the President and Chief Executive Officer of the economic consulting firm Economists Incorporated. Armstrong MIL Ex. 6 ("Walker Expert Report") at 2. He has a bachelor's degree from the University of California at Berkeley and a PhD from the Massachusetts Institute of Technology, both in economics. Id. In addition to his work with Economists Incorporated, he consults regarding damages and economics-related topics in sports

cases and other types of litigation matters.  Id.  According to the Government and Dr. Walker's

expert report, he intends to testify about the possible losses that USPS incurred from the negative

publicity surrounding Armstrong's PED use using event studies performed on scandals involving

similar celebrity athlete endorsers.  Id. at 4; Pls.' Opp'n at 1, 26–27.

     B.  Armstrong's Experts

     Armstrong intends to call two experts at trial: Douglas Kidder and Dr. John Gleaves.

*1.  Douglas Kidder*

     Douglas Kidder is a managing partner with OSKR, LLC, a consulting firm that provides

expert services primarily in intellectual property and antitrust cases.  Pl.'s Mot. Exclude Kidder

Testimony ("Pls.' Kidder MIL") Ex. 1 ("Kidder Expert Report"), at 1.  He also teaches a course

on damages at the Golden Gate University School of Accounting.  Id.  Kidder received a

bachelor's degree in mathematics and English from Amherst College and a master's degree in

naval architecture from the University of California at Berkeley.  Id.; id. Ex. 3 (Kidder Depo.), at

10:12–18.  He has over 25 years of professional experience valuing businesses, both as a

consultant and as a business manager.  Id. at 1–2.  Kidder intends to testify about the benefits

that USPS received from sponsoring the cycling team, and about the difference between the

value of those benefits and what the government paid in sponsorship fees.  Id. at 3–4.  Kidder has

also prepared a rebuttal report responding to Dr. Walker's conclusions.  Id. Ex. 2 (Rebuttal

Report).

*2.  Dr. John Gleaves*

     Dr. John Gleaves is an Associate Professor of Kinesiology at California State University,

Fullerton.  Pl.'s Mot. Exclude Gleaves Testimony ("Pl.'s. Gleaves MIL") Ex. A ("Gleaves

Expert Report"), at 1.  He received a B.A. in philosophy and theology from Carroll College and a

PhD in history and philosophy of sport from Pennsylvania State University.  Id. at 3.  His academic research has focused on the history of doping and performance enhancement in sports, and he has published several articles on this topic.  Id.  Additionally, he serves as the Co-Director of the International Network of Doping Research, a group that seeks to explore and understand the use of PEDs, and of the Center for Sociocultural Sport and Olympic Research, which promotes education on sport and the Olympic Games.  Id. at 5.  According to Armstrong and Dr. Gleaves' expert report, he intends to testify about the history of the use of PEDs in cycling and to USPS's awareness of Armstrong's PED use and any failure to investigate that use.  Id. at 8–9; Armstrong's Opp'n Pls.' Mot. Exclude Gleaves Testimony ("Armstrong Gleaves Opp'n") at 5–6.

## II.    Legal Background

Rule 702 of the Federal Rules of Evidence permits the testimony of a witness as an expert if (1) the witness "is qualified as an expert by knowledge skill, experience, training, or education," (2) the testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," (3) the testimony is "based on sufficient facts or data," (4) the testimony "is the product of reliable principles and methods," and (5) the expert has "reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

If a witness is deemed to be qualified to testify as an expert, the Court then applies the two-part test laid out in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), to determine if the remaining requirements for admissibility under Rule 702 are met.  Under Daubert, the Court must determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."  Id. at 592.  In other words, the proffered expert testimony "must be both reliable and relevant."  United States v. Nwoye, 824 F.3d 1129, 1136 (D.C. Cir. 2016).

In determining reliability, the Court's purpose is to conduct a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue," an analysis focused "solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 592–93, 595. The Supreme Court in Daubert identified four factors to consider in this analysis: "(1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the method's known or potential rate of error; and (4) whether the theory or technique finds general acceptance in the relevant scientific community." Ambrosini v. Labarraque, 101 F.3d 129, 134 (D.C. Cir. 1996) (citing Daubert, 509 U.S. at 593–94). Ultimately, this inquiry is a "flexible one" and "none of the factors discussed is necessarily applicable in every case or dispositive; nor are the four factors exhaustive." Id. (quoting Daubert, 509 U.S. at 594).

In addition to reliability, the proposed testimony must also meet the second prong of Daubert: relevance. This requires the Court to determine "whether the proffered expert testimony 'is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" Id. (quoting Daubert, 509 U.S. at 591). The proponent of the expert testimony bears the burden of showing, by a preponderance of the evidence, that these requirements for admittance are met. See Daubert, 509 U.S. at 592 n.10.

III. **Analysis**

A. Armstrong's Motion (Government's Experts)

Armstrong broadly challenges all three of the Government's expert witness on the ground that their testimony is not relevant. He also raises specific challenges to the qualifications or reliability of the experts individually. The Court will address each issue in turn.

*1. Relevance*

Armstrong challenges all three of the Government's experts' proposed testimony on the ground that it will not help the trier of fact to understand the evidence or determine a fact in issue. First, he argues the testimony is not relevant insofar as the experts are attempting to prove an impermissible theory of damages. Second, he argues the testimony is irrelevant because it will lead the jury to improperly speculate as to the amount of damages. The Court concludes that Armstrong is correct that the Government is seeking to prove damages under an impermissible theory and will prohibit the expert testimony insofar as it relates to that theory; however, the Government's proffered expert testimony is still relevant to a permissible, non-speculative theory of damages and thus, aside from any other ground for exclusion, is admissible.

a. Impermissible Theory of Damages

Armstrong first challenges certain aspects of the testimony of the Government's experts as irrelevant because it relates to an impermissible theory of damages. Specifically, he argues that testimony from Gerbrandt and Dr. Walker that the cycling-team sponsorship had no fair market value is inadmissible because it attempts to prove damages via a theory that the Court prohibited at summary judgment. Armstrong MIL at 18, 35. The Government responds that the Court's summary judgment ruling did not "foreclos[e] the jury from considering the market value of the tainted services, and ultimately concluding that market value is ascertainable." Pls.' Opp'n at 4.

As discussed in more detail in the Court's opinion on summary judgment, the relevant standard for damages in this case is that laid out by the D.C. Circuit's decision in United States v. Science Applications International Corp. ("SAIC"), 626 F.3d 1257 (D.C. Cir. 2010). The Court at summary judgment explained that "[t]he market value of the cycling team's 'PED-

tainted' promotional services is just as 'impossible to determine'" as the services rendered in

SAIC. United States ex rel. Landis v. Tailwind Sports Corp., 234 F. Supp. 3d 180, 200 (D.D.C. 2017). However, the Court held, the Government "may attempt to prove that the positive benefits of the sponsorship were reduced—or even eliminated altogether—by the negative publicity that accompanied the subsequent investigation and disclosure of Armstrong's doping." Id. at 201.

The Court's decision on summary judgment has foreclosed the Government from arguing, as it seeks to do now, that the fair market value of the services rendered—promotional services from an undisclosed tainted team—was zero. This is so because, as the Court held, the fair market value of that service is not readily ascertainable. See id. at 200–01; cf. SAIC, 626 F.3d at 1279 (concluding that services by entity with undisclosed conflicts was not readily ascertainable). To the extent that the Government's proffered experts intend to testify to that theory of damages, their testimony is irrelevant and inadmissible. But to the extent that the Government seeks to prove that the negative impact of the publicity surrounding the disclosure of Armstrong's doping and concealment thereof outweighed any positive benefits received prior, the testimony of the experts is relevant and, if all other conditions are met, admissible. Cf. Landis, 234 F. Supp. 3d at 204 (indicating the expert testimony at issue here is relevant to a proper theory of damages).

b. Speculative Testimony on Damages

Armstrong further argues that even if the Government's experts intend to testify as to the permissible theory of damages here, their testimony is still irrelevant because they fail to provide a sufficiently concrete means by which the jury can calculate damages. He claims that "the government seeks to have the jury do what its experts did not—quantify the amount of damages

without any ability to do so, any method for doing so, or any evidence of its amount." Armstrong's Reply in Supp. of Mot. Exclude Testimony of Gerbrandt, Till, and Walker 5; see also Armstrong MIL at 16–17, 32. The Government responds that damages are not speculative simply because there is uncertainty as to the amount when, as here, there is certainty as to injury. Pls.' Opp'n at 6–8.

The rule on a plaintiff's required proof of damages was laid out by the Supreme Court in Story Parchment Co. v. Paterson Parchment Co., 282 U.S. 555 (1931). See, e.g., Hill v. Republic of Iraq, 328 F.3d 680, 684 (D.C. Cir. 2003) (explaining that Story Parchment "states the American rule on damages"). There, the Supreme Court stated that:

> Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.

Story Parchment, 282 U.S. at 563. In other words, "while a plaintiff seeking to recover . . . must ordinarily prove the fact of injury with reasonable certainty, proof of the amount of damages may be based on a reasonable estimate." Samaritan Inns, Inc. v. District of Columbia, 114 F.3d 1227, 1235 (D.C. Cir. 1997). Essentially, this boils down to a requirement that there be "some reasonable basis on which to estimate damages." Hill, 328 F.3d at 684 (quoting Wood v. Day, 859 F.2d 1490, 1493 (D.C. Cir. 1988)).

Moreover, when considering whether damages are too speculative, courts "make allowances for the fact that the defendants' own misconduct has foreclosed any exact calculation of" damages. United States ex rel. Miller v. Bill Harbert Int'l Const., Inc., 608 F.3d 871, 905 (D.C. Cir. 2010). As the Supreme Court has stated, "where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or

guesswork" but it "may make a just and reasonable estimate of the damage based on relevant data." Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264 (1946). So it is here: As the Court has previously noted, the quantification of damages in this case is "a task no doubt made difficult by the delay in public awareness of Armstrong's doping caused by his concealment." Landis, 234 F. Supp. 3d at 204.

In cases where calculation of the exact measure of damages is not possible with mathematical certainty, the D.C. Circuit has approved of theories of damages that involve expert witnesses testifying to methods a jury can use to estimate damages. For instance, in Miller, the D.C. Circuit affirmed a damages award in a False Claims Act case involving allegations that the defendant had rigged a contract bid, resulting in an inflated price for a government contract. 608 F.3d at 905–07. The court highlighted two of the government's damages theories: first, an expert testified as to a typical profit margin in this type of contract and the government argued that the jury should use actual costs plus that profit margin to estimate the government's losses; and second, the government proposed the jury estimate a competitive bid award using one of two benchmark numbers, including one based on other bid proposals. Id. at 905–06. The D.C. Circuit concluded that both of these were permissible methods to estimate damages. Id.

Similarly, in Tri County Industries, Inc. v. District of Columbia, 200 F.3d 836 (D.C. Cir. 2000), the D.C. Circuit reversed the district court's determination that the award of lost profits stemming from the defendant's failure to approve a building permit was too speculative and remote. Id. at 842. The plaintiff had presented testimony from several witnesses that discussed projections about the planned facility's output and costs. Id. at 841. In addition, an expert witness testified to the general market for the planned facility, offered "a comparison of service rates for similar operations," and "projected the profitability of Tri County's facility." Id. The

D.C. Circuit concluded that in light of this testimony, the award for lost profits was "sufficiently well-founded to avoid characterization as 'mere speculation or guess.'" Id. at 842 (citation omitted); see also United States v. Sci. Applications Int'l Corp., 958 F. Supp. 2d 53, 77–78 (D.D.C. 2013) (holding evidence of damages was not speculative where three witnesses provided non-speculative testimony based on personal experience that the services rendered had less value than what the government paid for them).

As in Miller and Tri County, the testimony that the Government intends to offer here provides grounds beyond "mere speculation or guess" for the jury to calculate an award of damages. Indeed, the Court suggested at summary judgment that the testimony of the experts discussed here was relevant to determining damages. See Landis, 234 F. Supp. 3d at 204. The Government has indicated that Dr. Till will testify "that there is a general causal relationship between negative publicity about a sponsored celebrity-athlete and diminished consumer perception of a sponsoring brand." Pls.' Opp'n at 24. In turn, Gerbrandt will testify "that there was a great deal of negative publicity." Id. And finally, Dr. Walker will "estimate the harm to USPS from public disclosure of Armstrong's PED use." Id. at 31. In tandem, these three experts provide the jury a framework on which to estimate an amount of damages: the linkage of USPS with negative coverage of Armstrong's doping scandal (Gerbrandt) led to a negative impact on USPS's brand (Till), which resulted in an estimated loss amount (Walker). Each witness's testimony here is based on more than mere speculation and is relevant to prove the government's damages in a non-speculative way.

Armstrong's argument throughout his motion appears to assume that this Court should consider each expert witness as walled off from the others when determining relevance, and faults the government for the fact that Till and Gerbrandt will not provide numerical estimates of

11

the damages claimed.  Armstrong MIL at 18–19, 32.  But Armstrong provides no reason why the fact that any single expert, alone, might not fully prove the pathway to damages means that the Court should not look to whether the government can rely on all three working together.  Rather, "i[t] is well established that a court may not exclude an expert's otherwise reliable and relevant testimony simply because, without more, the testimony is insufficient to prove a proponent's *entire* case." <u>Rothe Dev. Inc. v. Dep't of Def.</u>, 107 F. Supp. 3d 183, 198 (D.D.C. 2015); <u>see also</u> <u>Adams v. Ameritech Servs., Inc.</u>, 231 F.3d 414, 425 (7th Cir. 2000) ("[T]he question before us is not whether the [expert] reports proffered by the plaintiffs prove the entire case . . . . No one piece of evidence has to prove every element of the plaintiffs' case . . . .").  Each expert's testimony has a tendency to make the Government's damages more probable, and together they provide a non-speculative framework for the jury to use to analyze damages.

In sum, the three experts that the Government intends to introduce together provide the jury a sufficiently non-speculative framework for determining damages.  That those damages might be somewhat uncertain does not justify excluding the testimony of the experts as too speculative or leading the jury to improperly speculate on damages. Thus, their testimony is relevant, provided the experts adhere to the damages framework adopted by the Court in its summary judgment ruling.

### 2. *Challenges to Gerbrandt*

Moving to Armstrong's specific challenges to each of the Government's experts, the Court begins with Mr. Gerbrandt.

### a. <u>Qualifications</u>

Armstrong first challenges Gerbrandt's qualifications to testify as an expert, contending

that he is not qualified to opine on any harm to USPS.[2]  He contends that since Gerbrandt has no

academic training or publications in the field of negative publicity valuation, he is not qualified

to testify about negative media impressions resulting from Armstrong's PED use.

For a witness to testify as an expert, he must be qualified based on "knowledge, skill,

experience, training, or education."  Fed. R. Evid. 702.  Thus, the absence of formal academic

training or a degree is not fatal to a witness's status as an expert; experience, knowledge, or skill

can also suffice to show qualifications.  Gerbrandt has more than thirty years of experience as a

media and entertainment analyst, including prior experience as an expert witness analyzing the

economics and value of television programming and advertising.  Gerbrandt Expert Report at 3–

4.  He has published reports on the value of media and advertising, including three Nielsen

reports on the impact of new technology on media consumption and advertising pricing and

expenditures.  Pls.' Opp'n Ex. 1 ("Gerbrandt Decl.") ¶ 4.  In light of Gerbrandt's experience in

media and entertainment analysis—both of which are relevant to a discussion of the number of

media impressions viewers receive—the Court concludes he is qualified to testify as to media

coverage of Armstrong's PED use and any associated links to USPS.

## b.  Failure to Apply Reliable Methodology

Armstrong further contends that Gerbrandt's testimony is inadmissible because it is not

the product of reliable scientific methods or principles.  He challenges two particular aspects of

---

[2] Armstrong also argues that Gerbrandt is not qualified to address valuation reports
commissioned by USPS from two marketing firms, Campbell Ewald and FCB.  Armstrong MIL
at 19.  Given that the Court has held the reports are inadmissible, Gerbrandt likely will not be
opining on the reports.  See Pls.' Opp'n at 14.  As such, this issue is likely moot.  To the extent
that there is still a possibility that the Government might ask Gerbrandt about the reports at trial,
the Court will reserve any challenges to his qualifications in this regard until then.

Gerbrandt's testimony: (1) his conclusion that negative publicity harmed USPS, and (2) his media-impression count.

As for the first issue, Armstrong argues that Gerbrandt's conclusion that USPS was harmed by any negative publicity of Armstrong's PED use is not based on any underlying science or methodology. Gerbrandt's expert report does conclude that "the harm to USPS resulting from such a large volume of negative impressions would necessarily outweigh the value of any benefits received by USPS resulting from positive impressions during the sponsorship period." Gerbrandt Expert Report at 6. Yet the bulk of Gerbrandt's analysis is dedicated to calculating the number of negative impressions linking Armstrong, his PED use, and USPS. Id. at 21–49. His expert report simply states that the number of negative impressions *necessarily* outweighs any positive impressions. But nowhere does Gerbrandt discuss the positive impressions that USPS derived from its sponsorship, how the positive impressions compare with the negative impressions, or (alternatively) why he need not calculate positive impressions. As a result, the Court is unsure as to how Gerbrandt determined that the negative impressions outweighed the positive impressions, let alone necessarily so. While Gerbrandt is free to opine that USPS was harmed by the negative publicity and about the extent of that publicity, he cannot testify that the negative impressions outweighed the positive impressions without setting forth a foundation for that opinion, which his report does not do.

Second, Armstrong contends that Gerbrandt's media-impression count is not the product of a reliable methodology. He faults Gerbrandt for "fail[ing] to rely on any methodology" in determining how many media impressions linked negative coverage of Armstrong's PED use and USPS. Armstrong MIL at 14. But Gerbrandt's expert report reveals a method to his calculations. He consulted the "premiere independent sources for marketing, advertising, public

relations, Internet and social media and entertainment decisions and purchases" such as Nielsen

Co. (which tracks television ratings) and Cision (which tracks editorial coverage). Gerbrandt

Expert Report at 25. He examined these sources, surveyed them for media that connected

Armstrong with PED use and that mentioned or referenced USPS in some fashion, and gathered

information on the "reach" of these sources, i.e., the number of viewers. See id. at 26–49. Based

on this research, Gerbrandt totaled the "media impressions" from the individual media types and

sources. Id. at 50.

Armstrong complains that Gerbrandt "merely states that his 41,912 Internet articles

translate into 154.4 billion impressions . . . but provides no meaningful explanation for how he

made those calculations." Armstrong MIL at 14. But Gerbrandt's expert report states that, for

Internet articles, he consulted Cision database—which archives traditional print and digital

media—with "a series of search terms . . . connecting Mr. Armstrong with the use of

performance enhancing drugs and blood doping." Gebrandt Expert Report at 27. The search

was additionally "constrained to only those news items and articles that specifically mentioned

or identified the USPS in some fashion." Id. Cision also provided the "reach" of each article,

which is simply "the unique visitors per month to the website on which the article is posted" for

an online article. Id. Based on this information, Gerbrandt was able to calculate the "media

impressions" by summing the number of articles multiplied by the reach of each article. Id.

Clearly, Gerbrandt *did* provide an explanation of the method he used in reaching the total

impressions for Internet articles and the other forms of media in his report. See generally id. at

26–49. His process has an underlying methodology that is sound and reasonable.

Armstrong's criticisms of this method—such as that impressions may be different

lengths, or that different media has different advantages and disadvantages—are the sort that go

to the weight to give Gerbrandt's testimony, not its admissibility.  See Ambrosini, 101 F.3d at 140 ("[E]fforts to discredit [an expert's] methodology by pointing to the limits of the research he undertook . . . goes to the weight rather than the admissibility of his testimony.").  The Court concludes that Gerbrandt's conclusions on the media-impression count are based on a reliable methodology and therefore admissible.

### 3. Challenges to Dr. Till

To recap, the Government has offered Dr. Till to testify that negative press coverage of Armstrong harmed consumers' impressions of USPS.  Armstrong argues that Till's conclusions should be excluded because they are not the product of reliable principles and methods.  He contends that because Till failed to conduct any particular tests or research on the facts of this case, his conclusions are not the product of a reliable methodology and he has failed to apply any principles or methods to the facts of this case.  The Court disagrees.[3]

For one, Till's general theory of causation—that negative publicity regarding a sponsor athlete tarnishes the brands the athlete has promoted—*has* been subject to testing, publication, and peer review, and appears to enjoy some degree of acceptance in the academic community.  Till himself published an article in a peer-reviewed journal detailing the results of a study indicating that negative information about an endorser is likely to have a negative impact on the associated brand.  See Brian D. Till & Terrence A. Shrimp, *Endorsers in Advertising: The Case of Negative Celebrity Information*, 27 J. ADVERT. 67 (1998).  His expert report indicates that other scholars in the field have also published articles showing that a sponsor's negative information can have a negative impact on the associated brand as well.  See Till Expert Report

---

[3] Armstrong does not challenge Dr. Till's qualifications.

at 3.  As such, the general theory of causation to which Till intends to testify is the product of reliable scientific methods.[4]

Armstrong further contends that Till's testimony is inappropriate because he has not conducted a specific study on the facts of this case that shows any negative impact on the USPS brand.  This argument also misses the mark.  Courts frequently allow the testimony of expert witnesses as to general academic or scientific principles, including general theories of causation.  See, e.g., Ambrosini, 101 F.3d at 135–36 (holding that medical expert's testimony that a drug was generally capable of causing the plaintiff's injury in a product liability case was relevant); Miller v. Holzmann, 563 F. Supp. 2d 54, 96 (D.D.C. 2008) (permitting expert witness to testify to general economic principles related to bid-rigging), aff'd in relevant part, Miller, 608 F.3d at 895.  To the extent that Till's testimony is intended to show "that there is a general causal relationship between negative publicity about a sponsored celebrity-athlete and diminished consumer perception of a sponsoring brand," Pls.' Opp'n at 24, his failure to perform a specific study on the facts of this particular case does not undermine the reliability of his method— relying as it does on a published, peer-reviewed study he previously performed and other academic literature in his field corroborating that study's results.

And to the extent that Till intends to testify about the likelihood that his general theory of causation applies in *this* case, his failure to perform a specific study here is still not fatal.  Till's

---

[4] The case is thus distinguishable from Frosty Treats, Inc. v. Sony Computer Entertainment America, Inc., No. 03-cv-378, 2004 WL 5500100 (W.D. Mo. Mar. 3, 2004), where Dr. Till's testimony was excluded.  There, Dr. Till's theory on "reciprocal spillover effects" "ha[d] not been subjected to peer review or publication" and "appear[ed] to have been developed for use in litigation."  Id. at *3.  In contrast, Dr. Till's general theory of negative brand association *has* been subject to testing as well as peer review and publication and there is no indication he developed his theory—which was published in a 1998 journal article—for use in litigation in this case or any other.

report indicates that he reviewed facts and details about this case and applied principles developed from academic literature to those facts. See Till Expert Report at 1, 4–5. Armstrong provides no reason to believe that this is not a reliable method for an academic in Till's field. He essentially argues that Till should have conducted his own study specifically on Armstrong's PED use, but the fact that Till did not perform the study that Armstrong wanted or use the method Armstrong desired to reach his conclusion does not make the method he did use unreliable.

Finally, Armstrong contends that Till's testimony is unreliable because he did not rely on a survey conducted regarding the impact of Armstrong's PED use on the USPS brand and failed to consider relevant factors in determining whether a brand is damaged by a sponsor's negative publicity. But such "efforts to discredit [Till's] methodology by pointing to the limits of the research he undertook . . . goes to the weight rather than the admissibility of his testimony." Ambrosini, 101 F.3d at 140. Armstrong remains free to raise these issues before the jury on cross-examination and to argue that the jury should give Till's testimony less weight. But these contentions do not necessarily render his testimony unreliable. The Court will therefore allow Till's testimony as long as he refrains from discussing the prohibited theory of damages, as discussed above.

### 4. Challenges to Dr. Walker

Armstrong next turns to Dr. Walker, who, again, intends to testify about the potential monetary impact of the negative coverage of Armstrong's PED use on the USPS. Armstrong argues that Walker's testimony should be excluded because his methodology is "composed

entirely of speculation" and therefore not reliable or reliably applied to the facts of the case. Armstrong MIL at 36–37.[5]

The Court disagrees. Armstrong's argument primarily faults Walker for not running an event study to quantify the financial impact of the negative coverage on USPS in particular. However, Walker could not run an event study specific to USPS because an event study can only be performed on a publicly traded company: an event study "measure[s] the effect that [an] event had on the *stock price of publicly traded companies* impacted by [an] event." Till Expert Report at 18 (emphasis added); see also Pls.' Opp'n at 30. Instead, Walker looked at event studies performed on publicly traded companies that had experienced a similar event to USPS, namely the revelation that a sponsor was engaged in a scandal. Till Expert Report at 20–22. For instance, Walker looked at event studies that calculated the impact of the Tiger Woods scandal on his associated brands. Id. at 22.

Walker then used the results of these event studies to approximate the financial impact of Armstrong's PED use on USPS. Id. at 24. Because USPS is not publicly traded and has no stock values, Walker applied the calculated losses from the other event studies to stock values for similar companies, namely other parcel delivery services with annual revenue similar to USPS. Id. at 23. Based on his application of the event-study-calculated loss rates to the similarly-sized parcel companies, Walker estimated a range of possible financial loss to USPS from the scandal. Id. at 32.

In light of the analysis that he performed, Walker's ultimate conclusion is not based on rank speculation. Armstrong does not dispute that event studies are a reliable methodology used

---

[5] Armstrong does not challenge the qualifications of Dr. Walker.

by experts in Walker's field. Given the impossibility of performing an event study on USPS itself, <u>see</u> <u>id.</u> at 31–32, it seems reasonable to use the results of event studies conducted in similar circumstances to estimate a possible range of losses for USPS. The Court therefore concludes that Walker's testimony is sufficiently reliable to be admissible, again so long as Walker adheres to the Court's limitations as to a permissible theory of damages.

B. <u>Government's Motions (Armstrong's Experts)</u>

The Court now turns to the Government's objections to Armstrong's proposed experts, beginning with Douglas Kidder, who plans to testify regarding economic benefits USPS derived from the cycling sponsorship.

*1. Challenges to Douglas Kidder*

a. <u>Qualifications</u>

At the outset, the Government argues that Kidder is unqualified to testify as an expert because he lacks formal training in business, economics, or finance, and because he has no particular experience in valuing media exposure. The Court, however, does not find that these claimed deficiencies demand excluding Kidder's testimony. Again, witnesses may be qualified as experts based on their practical experience. <u>See</u> Fed. R. Evid. 702 advisory committee's note to 2000 amendment. Courts regularly allow witnesses with general experience in business valuation to provide expert testimony about the value of a specific asset, even where the witness has no particularized expertise on assets of that type. <u>See, e.g.</u>, <u>Popovich v. Sony Music Entm't, Inc.</u>, 508 F.3d 348, 359 (6th Cir. 2007) (witness's experience with business valuation allowed him to testify about value of company's contract right to affix logo to album); <u>cf.</u> <u>Coleman v. Parkline Corp.</u>, 844 F.2d 863, 866 (D.C. Cir. 1988) (witness's experience with investigating industrial accidents allowed him to testify about danger of elevator ceiling). So while Kidder has

no formal education in economics or finance, his 25-plus years of experience valuing businesses, including 13 years advising businesses on whether to acquire "new business interests," Kidder Depo. at 14:22–15:10, establish that he is qualified to testify about the economic value of sponsoring a cycling team.

### b. Failure to Apply Reliable Methodology in Expert Report

The Government also contends that Kidder should be barred from testifying about the economic benefits USPS received from sponsorship because of flaws in his methodology. The Government challenges Kidder's reliability on a slew of grounds, which can be summarized as follows: (1) Kidder's estimate of USPS sales revenue generated by the cycling sponsorship improperly ignores the costs of those new sales; (2) his conclusions about sales revenue and earned media revenue simply adopt USPS data without any interpretation; and (3) his conclusions about new sales and earned media revenue are unduly speculative. With one small exception, the Court disagrees with the Government's contentions and will allow Kidder to testify as an expert about the conclusions contained in his expert report.

*First*, the fact that Kidder's expert report does not expressly consider costs associated with USPS's increased sales does not warrant excluding his testimony. To be sure, the Court's summary judgment ruling explained that the relevant "measure of benefits received by the Postal Service would be net income from the sales in question, not gross revenue." Landis, 234 F. Supp. 3d at 202. USPS's costs are therefore relevant to the issue of damages. But so long as Kidder does not mislead the jury—for example, by suggesting without further explanation or support that USPS had no costs associated with its new sales—he is permitted to testify about a single variable (gross revenue) of the damages equation (gross revenue minus costs). Cf. Rothe Dev., 107 F. Supp. 3d at 198 ("[A] court may not exclude an expert's otherwise reliable and

relevant testimony simply because, without more, the testimony is insufficient to prove a proponent's *entire* case."). Kidder's report does not hide the ball on this point: it indicates that he will testify about "$374 million in quantifiable *gross benefits*," Kidder Report at 4 (emphasis added). And Armstrong makes a reasonable argument that the marginal costs of USPS's increased sales are negligible because, according to USPS's own analysis, the costs associated with USPS's marketing operations were primarily fixed, not variable. See Def.'s Opp. at 8–9; see also Kidder Depo. at 219:15–220:9 (Kidder explaining his consideration of USPS's costs). If the Government disagrees, it is free to put on evidence of costs (beyond the sponsorship fee) associated with that gross revenue.

*Second*, the Court finds no problem with Kidder's reliance on USPS sales data in forming his conclusions. Experts regularly rely on parties' sales data when valuing assets. See, e.g., Ward v. Dixie Nat'l Life Ins. Co., 595 F.3d 164, 181–82 (4th Cir. 2010) (upholding admission of expert testimony on damages that relied in large part on spreadsheets created by defendants). And Kidder's reliance on USPS's data here makes common sense: USPS calculated these sales figures in evaluating whether to extend the cycling sponsorship, and thus had an incentive to accurately estimate new sales attributable to the sponsorship. Moreover, Kidder is not, as the Government contends, merely parroting USPS figures without any use of his expertise. As discussed below, several years of USPS sales data are unavailable, and Kidder has estimated sales for those years using extrapolation and interpolation from sales figures for surrounding years. And, more generally, Kidder's collation, explanation, and summation of USPS's figures strikes the Court as the sort of analysis "customarily relied upon in his industry for the valuation of assets, a subject beyond the experience of most jurors." Elliott v. Kiesewetter, 112 F. App'x 821, 824 (3d Cir. 2004). The approach may not be especially complex, but it is not so obvious as

to render it an inappropriate basis for expert testimony.  See Ward, 595 F.3d at 181 (expert "applied an appropriate interest rate" to parties' data in estimating damages).

*Third*, for the most part, the Court does not find that Kidder's conclusions about sales revenue or earned media are unduly speculative.  Contrary to the Government's argument, Kidder has provided a reliable method of filling in gaps in sales and earned-media figures.  In estimating the value of new sales for 2001–2004, where USPS data was not available, Kidder extrapolated from data for 2000, which he deemed a "conservative" method of filling the gaps because evidence in the record suggests that sales attributable to the sponsorship increased for each year of the sponsorship.  Kidder Report at 9.  Similarly, in estimating the value of earned media, Kidder interpolated data for 1998–2000, which USPS did not track, using figures for 1997 and 2001.  Id. at 15.  He also relied on estimates of domestic earned media exposure to estimate the value of international media exposure in certain years, citing an advertising agency report commissioned by USPS stating that the latter dominated the former.  Id. at 13–14.  While the Government contends that Kidder's uses of interpolation and extrapolation rendered his estimates too speculative, the Court finds that Kidder's resulting estimates are sufficiently reliable to allow introduction of his testimony at trial, where the Government will be free to argue that the estimates should be accorded little weight.

Nor does the Court believe that Kidder's testimony is based on impermissible speculation as to the link between USPS's new sales and earned media, on one hand, and the cycling sponsorship, on the other.  The Government identifies purported flaws in Kidder's approach—for example, that he improperly assumes that USPS's planned sales for 2000 materialized into actual sales.  Pls.' Kidder MIL at 10.  These limited criticisms do not require exclusion of Kidder's testimony, and can instead be directed toward undermining Kidder's conclusions at trial.  See

Ambrosini, 101 F.3d at 140.  Similarly, while the Court in a separate Order issued today ruled that advertising reports produced by Campbell Ewald and FCB are not themselves admissible, Kidder is permitted to rely on those reports in estimating the value of earned revenue attributable to the sponsorship.  See Fed. R. Evid. 703 (allowing expert to rely on inadmissible facts or data in forming opinions so long as experts in that field would reasonably do so).  After all, the reports were commissioned by USPS, and in internal correspondence USPS cited figures from the reports with approval.  See Landis, 234 F. Supp. 3d at 203; Kidder Report at 6–7.

The Court does, however, find that one portion of Kidder's planned testimony is not rooted in a sufficiently reliable methodology.  In estimating new sales attributable to the cycling sponsorship, Kidder counted revenues from USPS's cycling-themed Visa credit card promotion. Kidder Report at 9–11.  This promotion, which USPS ran in 2000, encouraged customers to use Visa cards when purchasing USPS goods by entering Visa users into a sweepstakes for cycling-themed prizes, including a trip to the Tour de France.  Id. at 10.  Kidder cites USPS data suggesting that the promotion generated $39.8 million in new revenue based on increased sales and decreased transaction costs associated with credit-card purchases.  Id.  But unlike with the figures that Kidder relies on to estimate postage and shipping sales generated by the cycling sponsorship, and unlike his use of the advertising reports to estimate earned-media revenue, Kidder's expert report does not provide a reasonable basis for linking revenues generated by the Visa promotion to USPS's sponsorship of the cycling team.

Again, USPS entered the cycling sponsorship with the goal of generating new sales contracts and gaining media exposure.  As Kidder plans to testify, USPS attempted to quantify those benefits in order to justify the cost of the sponsorship, which provides a reasonable basis for attributing those benefits to the sponsorship itself.  Not so with the Visa promotion, which

appears to have been an entirely separate promotional agreement. And Kidder's report lays no independent foundation for attributing revenues from the Visa promotion to the sponsorship of Armstrong's team. Rather, as the Government contends, a cycling-themed promotion might have generated just as much revenue *absent* a cycling sponsorship—customers would be enticed by the prizes even without a prior association between USPS and cycling. In opposing the motion to exclude Kidder's testimony, Armstrong does not respond to the Government's contention on this front. The Court will therefore exclude testimony about revenue from the Visa promotion. Kidder may, however, testify as to the other conclusions contained in his expert report.

### c.  Failure to Apply Reliable Methodology in Rebuttal Report

Finally, the Court finds that Kidder may testify as an expert about the conclusions stated in his rebuttal report, which seek to undermine the conclusions of the Government's expert, Dr. Walker. The report does not, as the Government argues, contain impermissible legal conclusions. Kidder's testimony that Walker's opinion is "irrelevant," for example, does not appear to be statement about legal relevance, but rather is a criticism of Walker's approach as rooted in inapposite anecdotes.[6] See Gov.'s MIL Ex. 2 (Kidder Rebuttal), at 7–8. Nor is Kidder's general approach unreliable. In responding to Walker's conclusion that Armstrong's PED scandal eliminated his value as an endorser, Kidder cites competing scandals that undermine Walker's assertion. In responding to Walker's conclusion about the value of the 2000 sponsorship agreement, Kidder points out temporal concerns with Walker's analysis. And in responding to Walker's use of an event study to estimate USPS's losses caused by the PED

---

[6] The Court will, of course, ensure that at trial neither party's expert is permitted to offer bare legal conclusions.

scandal, Kidder explains why, in his view, event studies are useless for businesses without stock prices. The Court finds that, with each of these responses, Kidder relies on a sufficiently reliable methodology rooted in his business-valuation expertise, and that he is permitted to provide his rebuttal testimony under Rule 702.

### 2. *Challenges to Dr. John Gleaves*

The Government also challenges the testimony of Dr. Gleaves. Armstrong, in reply, contends that Gleaves is primarily offered as a summary witness. The Government indicated in a footnote that it has reserved any challenges to Gleaves' proffered summary testimony under Rule 1006 and that the appropriate time to address those challenges is in the Joint Pretrial Statement. As such, the Court will solely address the Government's challenges to Gleaves' expert testimony and will reserve judgment on any summary witness testimony (and the admissibility of any summary evidence) until then.

According to Armstrong and Gleaves' expert report, Gleaves intends to offer three opinions: (1) that PED use was widespread in cycling; (2) that USPS knew or should have known about Armstrong's PED use; and (3) that USPS failed to investigate any suspected PED use. The Court will admit testimony concerning Gleaves' first opinion but will exclude testimony on the latter two points.

### a. Dr. Gleaves' Conclusion About PED Use in Cycling

The Government first challenges Gleaves' attempt to testify as an expert witness concerning the widespread nature of PED use in cycling.[7] Primarily, the Government argues that

_____

[7] The Government does not challenge Dr. Gleaves's qualifications with respect to this opinion.

any PED use by non-USPS riders is not relevant.  Armstrong counters that this evidence is relevant to three issues: (1) materiality, (2) causation, and (3) Armstrong's statute of limitations defense.

The Court will start with Armstrong's statute of limitations defense.  The key question for this defense is when the government "knew or should have known" the "facts material to the right of action."  See 28 U.S.C. § 2416(c) (tolling provision for non-False Claims Act claims); 31 U.S.C. § 3731(b)(2) (tolling provision for False Claims Act claims).[8]  The widespread use of PEDs by non-USPS riders around the time of the Government's sponsorship agreement raises a possible inference that the Government suspected PED use by its own riders and further helps illuminate whether the Government's actions with respect to investigating any suspected PED use were reasonable.  As such, it is relevant to Armstrong's statute of limitations defense.  The Court concludes, therefore, that Dr. Gleaves' opinion on the widespread nature of PED in cycling is relevant to an issue in the case, namely the statute of limitations defense.

For similar reasons, the Court concludes that Dr. Gleaves' opinion on the widespread nature of PED use in cycling is also relevant to materiality.  Under the False Claims Act, "[a] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must

---

[8] At this juncture, the Court need not address the appropriate legal framework for Armstrong's statute of limitations defense, such as the level of notice required or which officials (i.e., those at USPS or those at the Department of Justice) were required to have this notice. However, the Court will remind the parties that per its prior opinion addressing this topic, the statute of limitations "does not commence upon notice of allegations of impropriety instead, it is when the impropriety *itself* is known or reasonably should have been known by the relevant official that" it commences.  United States ex rel. Landis v. Tailwind Sports Corp., 51 F. Supp. 3d 9, 40 (D.D.C. 2014).  Therefore, USPS's knowledge of allegations of PED use or of PED use by *other* non-USPS riders is by itself insufficient to trigger the statute of limitations; rather "it must be a finding of the doping—not an investigation seeking to determine whether doping occurred—that is a 'fact material' to the government's [] claims."  Id.

be *material* to the Government's payment decision in order to be actionable." Universal Health Servs., Inc. v. United States ex rel. Escobar, 136 S. Ct. 1989, 1996 (2016) (emphasis added). The statute defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Thus, materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." Universal Health, 136 S. Ct. at 2002 (citation omitted) (alteration in original).

Armstrong argues that the evidence of PED-use by non-USPS riders is relevant to materiality, and the Court agrees. As noted above, the widespread nature of PED use in cycling creates a possible inference that the USPS suspected Armstrong's own PED use. A decision by the USPS to enter into a sponsorship agreement with Armstrong while aware of or suspecting his PED use could create a further possible inference that Armstrong's possible PED use did not influence the USPS's payment decisions—in other words, that his PED use was not material to the Government's payment decision. Alternatively, the endemic nature of PED use in cycling creates a possible inference that the Government was aware of the widespread use of PEDs. That, combined with a failure by the Government to take steps to investigate any potential doping by Armstrong before entering into a sponsorship agreement, would similarly raise a possible inference that the USPS did not particularly care about any PED use by Armstrong— again, yielding an inference that PED use was not material to the Government's funding decisions. Given these permissible chains of possible inferences, the widespread nature of PED use is relevant to materiality.

The Court does not find, however, that the widespread nature of PED use is relevant to causation: that is, whether Armstrong *caused* the team to dope and submit false claims. While

evidence that USPS team members used PEDs before Armstrong joined might be relevant to determining Armstrong's role in the team's PED use, the actions of non-USPS members shed no real light on the actions of USPS team members—that everybody else was using PEDs says nothing about Armstrong's role in causing false claims to be presented to the Government. As such, the evidence is not admissible as to causation.

As to the Government's argument that Gleaves' opinion is too vague to be helpful to the jury, such arguments go to the weight, rather than admissibility, of the testimony. <u>See</u> <u>Ambrosini</u>, 101 F.3d at 140. Finally, the Court disagrees with the Government's contention that because the jury could make some analysis of the widespread nature of PED use, Gleaves' argument is inadmissible. In light of Gleaves' academic background, expertise, and familiarity with this area of study, <u>see</u> Gleaves Expert Report at 3–6, his testimony will still be helpful and relevant. The Court will thus allow Gleaves to testify as to his opinions concerning the widespread nature of PED use in cycling.

Before moving on, however, the Court will briefly address the temporal nature of Gleaves' proposed testimony. Gleaves apparently intends to opine at length on the history of PED use in cycling dating back to 1890. <u>See, e.g.</u>, Gleaves Expert Report at 69. But what is most relevant in his testimony is any opinion concerning the widespread nature of PED use in cycling *contemporaneous with* USPS's sponsorship of the cycling team. While Gleaves' opinion that PED use has *always* been widespread, <u>id.</u> at 69–79, may be relevant to what the Government knew or should have known in 2003, it has much less probative value compared to his opinions concerning contemporaneous PED use. Additionally, allowing Gleaves to testify at length on the history of PED use in cycling since 1890 runs a significant risk of creating undue delay or wasting time as well as of prejudice to the Government in the form of the argument that because

everyone was using PEDs, Armstrong should not be held accountable if he has violated the False Claims Act.  See Pls.' Gleaves MIL at 10.  As such, the Court will permit limited discussion of the use of PEDs in cycling during periods of time not contemporaneous with the Government's sponsorship and subsequent developments and will restrict Gleaves' testimony to solely that which is admissible under Rule 403.  See Fed. R. Evid. 403 (excluding relevant evidence if the probative value is substantially outweighed by a danger of unfair prejudice, undue delay, or wasting time).

b.  Dr. Gleaves' Other Opinions

The Government further challenges Gleaves' remaining two opinions—which concern what USPS employees knew and their failure to investigate PED use—as not based on a reliable methodology, not helpful to the jury, and an improper usurpation of the jury's role in determining credibility and findings of fact.

The Court agrees that this part of Gleaves' testimony should be excluded.  Gleaves' methodology for reaching his conclusions as to what USPS officials knew (or should have known) appears to consist entirely of reading the deposition transcripts of USPS employees and summarizing what they said.  In Gleaves' expert report, his summary of his opinions on this point cites almost exclusively to USPS employee deposition testimony.  See Gleaves Expert Report at 79–88.  And during his own deposition, Gleaves described his method as simply that: reviewing the deposition testimony of USPS employees and—to determine if their memories were accurate—comparing it to other public source materials.  See, e.g., Pls.' Gleaves MIL Ex. 2 at 171:2–8 (Q: "What is your basis for saying that Ms. Sonnenberg in fact knew that cyclists on the USPS team were—were using performance-enhancing substances?" A: "I read her testimony . . . . That's my basis.").

This testimony is problematic for at least two reasons. For one, expert testimony typically must concern something beyond the ken of the average juror. See, e.g., United States v. Boney, 977 F.2d 624, 629 (D.C. Cir. 1992) ("[Expert] testimony should ordinarily not extend to matters within the knowledge of laymen."). But the average juror is entirely capable of reviewing the testimony of USPS witnesses and drawing conclusions as to what they knew—or should have known—or did concerning Armstrong's PED use. See United States v. Mitchell, 49 F.3d 769, 780 (D.C. Cir. 1995) (holding that district court did not err in precluding expert testimony on tape recorded conversations because "elucidat[ing] tape recorded conventions" is a "matter[] of general knowledge").

In fact, it is precisely the jury's *function* to review the testimony of witnesses and determine what factual conclusions to draw from that testimony; courts have long recognized that "determining the weight and credibility of [a witness's] testimony" is a duty that "belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men." Aetna Life Ins. Co. v. Ward, 140 U.S. 76, 88 (1891). As such, Gleaves' testimony regarding his second and third opinions "not only involves matters of general knowledge, but is squarely within the traditional province of the jury" and is therefore inappropriate expert witness testimony. Mitchell, 49 F.3d at 780; see also United States v. Johnson, 54 F.3d 1150, 1157–58 (4th Cir. 1995) (holding that testimony involving a chart that simply summarized other witnesses' testimony and that the proffered expert did not use any "specialized knowledge" to prepare was not admissible expert testimony).

Armstrong suggests that it is a common practice for historians to look to materials such as recorded recollections and public source materials to determine what a person knew at a point in time. While this may be true, it is irrelevant here. All of the USPS employees that Gleaves

would testify about can (and likely will) be called as a witness and asked in front of the jury, point blank, what they knew or did and when they knew or did it. And Armstrong is free to probe each employee's knowledge or to try to call the employee's statements into question during examination as permitted by the rules of evidence. The jury is more than capable of drawing its own conclusion as to what any particular USPS employee knew (or should have known) and did at the relevant time period without any assistance from an expert witness, based on any testimony at trial and the other evidence.

Moreover, Gleaves' testimony would veer dangerously close to offering an expert opinion on the credibility of a witness, which is impermissible. See, e.g., Nimely v. City of New York, 414 F.3d 381, 398 (2d Cir. 2005) ("[T]his court, echoed by our sister circuits, has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702."); United States v. Samara, 643 F.2d 701, 705 (10th Cir. 1981) ("An expert 'may not go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility.'" (citation omitted)). Gleaves' methodology of comparing the USPS testimony to publicly available sources and offering his conclusion as to what the USPS employees knew essentially amounts to an argument that that employee and potential witness at trial was telling the truth or lying about her knowledge. This testimony is thus an attack on likely witnesses' credibility and is inadmissible for this reason as well.

## IV.  Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that [559] Defendant Armstrong's Motion to Exclude Testimony of Larry Gerbrandt, Brian Till, and Jonathan Walker is GRANTED IN PART and DENIED IN PART.

None of the experts will be permitted to testify to the prohibited theory of damages.  In addition, Gerbrandt cannot offer his opinion that the negative impressions necessarily outweighed any positive impressions from the sponsorship. Aside from these two limitations, the testimony of Gerbrandt, Dr. Walker, and Dr. Till is admissible.  It is further

ORDERED that [557] the Government's Motion to Exclude Testimony of Dr. Douglas Kidder is GRANTED IN PART and DENIED IN PART.  Kidder's testimony is admissible except insofar as it discusses the value of the Visa credit card promotion.  It is further

ORDERED that [558] the Government's Motion to Exclude Testimony of Dr. John Gleaves is GRANTED IN PART and DENIED IN PART.  The Court will permit Dr. Gleaves to testify concerning his opinion that the use of PEDs was widespread in cycling, but will not permit him to testify as to the other opinions set forth in his expert report.

SO ORDERED.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: November 28, 2017