## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **FLOYD LANDIS** | |
| Plaintiff, | |
| v. | Case No. 10-cv-976 (CRC) |
| **TAILWIND SPORTS CORPORATION** *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

This ruling marks the finish line of a lawsuit brought by Floyd Landis and the federal government to recover money paid by the U.S. Postal Service to sponsor a professional cycling team featuring Lance Armstrong. In 2010, Landis filed suit under the False Claims Act alleging that Armstrong and a host of associates had defrauded the Postal Service by misrepresenting and concealing the team's use of performance enhancing drugs. The United States intervened in the case in early 2013. After more than five years of active litigation, the original peloton of defendants has dwindled to two: the team's owner, Tailwind Sports Corporation, and its erstwhile manager, Johann Bruyneel. Neither has participated in the case since 2014.

The government has moved for a default judgment on its False Claims Act claims against both defendants, which Landis joins, and on a separate common-law claim of unjust enrichment against Bruyneel. Landis has independently moved for an award of False Claims Act damages against both defendants. As explained below, the Court will grant both of the government's motions, impose $369,000 in civil penalties against Tailwind and Bruyneel, and award $1,228,700 in restitution against Mr. Bruyneel on the government's unjust enrichment claim. The Court will deny Landis' motion for an award of damages.

## I.    Background

The Court has fully recounted the factual and legal background of the case in prior rulings.  See, e.g., United States ex rel. Landis v. Tailwind Sports Corp. ("Landis II"), 234 F. Supp. 3d 180, 186–90 (D.D.C. 2017).  It will keep the details brief here.

From 1996 through 2004, the United States Postal Service ("USPS") sponsored a professional cycling team, which was owned by a series of corporate entities culminating with defendant Tailwind Sports Corporation ("Tailwind").  U.S. Compl. ¶ 2.  Johan Bruyneel was the manager (or "directeur sportif") of the team; Lance Armstrong and Floyd Landis were two of the team's riders.  Id. ¶¶ 2, 7, 10.  Under agreements entered into in 1995 and 2000 for the USPS sponsorship, Tailwind (or its predecessors) represented that the riders on the team would adhere to all relevant rules governing professional cycling, including prohibitions on the use of performance enhancing drugs.  Id. ¶¶ 16–18.  In addition, the 2000 agreement specifically included the use of performance enhancing drugs, or any negative publicity associated with such use, as events of default.  Id. ¶ 20.  Over the period of the sponsorship, USPS paid approximately $32 million to Tailwind.  Landis II, 234 F. Supp. 3d at 186.  As is now well known, the riders on the USPS-sponsored team did not in fact adhere to the international rules prohibiting the use of performance enhancing drugs in cycling.  In a 2013 interview with Oprah Winfrey, Armstrong admitted that he had used banned substances, including during the time period that USPS sponsored the team.  U.S. Compl. ¶ 61.

In 2010, Landis filed suit against multiple defendants, including Armstrong, Bruyneel, and Tailwind, on behalf of the United States under the False Claims Act.  Landis II, 234 F. Supp. 3d at 189.  In 2013, the government intervened in the suit against Armstrong, Tailwind, and

Bruyneel.  Id.  The defendants against whom the government did not intervene reached a settlement agreement with Landis, to which the government consented, and were dismissed in June 2017.  See Order (July 5, 2017) [ECF No. 576].  Armstrong himself reached a settlement agreement with the government and Landis on the eve of the scheduled May 2018 trial.  See Order (April 30, 2018) [ECF No. 594].  The only defendants that remain are Bruyneel and Tailwind, both of whom ceased participating in the case after their motions to dismiss were denied in 2014.  The government and Landis now seek default judgments against both.

## II.    Legal Standard

Obtaining a default judgment is a two-step procedure.  See, e.g., Bricklayers & Trowel Trades Int'l Pension Fund v. KAFKA Construction, Inc., 273 F. Supp. 3d 177, 179 (D.D.C. 2017).  First, the plaintiff requests an entry of default from the Clerk of the Court against a party who has "failed to plead or otherwise defend" the suit.  Fed. R. Civ. P. 55(a).  After obtaining an entry of default, the plaintiff seeks a default judgment from the Court.  Fed. R. Civ. P. 55(b).  Granting a default judgment is appropriate "when the adversary process has been halted because of an essentially unresponsive party."  Bricklayers, 273 F. Supp. 3d at 179 (internal quotation omitted).  "Default establishes a defaulting party's liability for the well-pleaded allegations of the complaint."  Boland v. Elite Terrazzo Flooring, Inc., 763 F. Supp. 2d 64, 67 (D.D.C. 2011).  Once liability is established, the Court "must make an independent evaluation of the damages to be awarded and has considerable latitude in determining the amount of damages."  Bricklayers, 273 F. Supp. at 179 (internal quotation omitted).

### III. Analysis

The Court will first address the Clerk's entry of default against Bruyneel and Tailwind, before moving to whether the government and Landis have established liability and damages on the three claims raised against these defendants.

#### A. Entry of default

Defendant Bruyneel received a copy of the complaints and waived formal service of process by the government and Landis.  See ECF No. 45, 62.  Defendant Tailwind was properly served with process in 2013.  See United States ex rel. Landis v. Tailwind Sports Corp. ("Landis I"), 51 F. Supp. 3d 9, 34 (D.D.C. 2014) (holding Tailwind was properly served).  Moreover, both defendants were clearly aware of the suit against them: they filed motions to dismiss in 2013. See id. at 20.  After the Court denied those motions in June 2014, it directed both defendants to file an answer by late July 2014.  See Minute Order (July 2, 2014) (directing Bruyneel to file an answer by July 18, 2014); Minute Order (July 2, 2014) (directing Tailwind to file an answer by July 27, 2014).  Neither did so, and the Clerk of the Court entered default against both defendants in April 2016.  See ECF No. 503.  The defendants have not otherwise appeared in this suit since their motions to dismiss were denied in June 2014.  Given the defendants' failure to respond or otherwise litigate this suit for over four years, default was appropriately entered.

#### B. False Claims Act claims against Bruyneel and Tailwind Sports Corp.

##### 1. Liability: Presentment Claim (Count I)

The government and Landis first seek judgment on Count I of their complaints against both defendants, which assert a false presentment claim.  The False Claims Act establishes liability for anyone who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or

approval." 31 U.S.C. § 3729(a)(1) (1986).  The elements of a false presentment claim are thus

that (1) the defendant submitted or caused to be submitted a claim to the government, (2) the

claim was false or fraudulent, and (3) the defendant acted knowingly.  See, e.g., Landis I, 51 F.

Supp. 3d at 49 (internal citation omitted).  The well-pled factual allegations here establish these

three requirements.

As to the presentment of claims, the Court held at summary judgment that Tailwind

submitted 41 claims for payment to the government.  See id. at 193.  With respect to Bruyneel,

the government contends that he caused false claims to be presented.  This requires that

Bruyneel's conduct "was at least a substantial factor in causing, if not the but-for cause of,

submission of false claims."  United States v. Toyobo Co., 811 F. Supp. 2d 37, 48 (D.D.C. 2011)

(internal quotation omitted).  The factual allegations demonstrate that Bruyneel knew doping was

prohibited under the sponsorship agreement, was nonetheless aware of and encouraged doping,

and made public statements to conceal the doping.  See, e.g., U.S. Compl. ¶¶ 30, 45, 49, 63B,

67B.  His alleged conduct thus contributed substantially to the presentment of false claims.

Second, the well-pled allegations establish that the claims Tailwind submitted (and

Bruyneel caused to be submitted) were false or fraudulent.  The government here relies on the

"implied certification" theory of liability, which provides that a claim can be false or fraudulent

if the defendant "withheld information about its noncompliance with material contractual

requirements" when submitting the claim.  Landis II, 234 F. Supp. 3d at 198 (internal quotation

omitted).  As the Court explained in its dismissal ruling, the complaint "allege[s] that the cycling

team engaged in repeated and rampant doping activity that was prohibited by [cycling's]

governing bodies while submitting claims to the Postal Service under [the sponsorship]

agreements."  Landis I, 51 F. Supp. 3d at 51.  These allegations, the Court held, were "sufficient

to allege there was a false certification of compliance with a material contract term." Id.; see also id. at 57–58 (explaining that compliance with the anti-doping regulations "was a core term" of the agreements).

Finally, the well-pled factual allegations establish that the defendants acted knowingly, which the statute defines as meaning either with actual knowledge, deliberate indifference, or reckless disregard. 31 U.S.C. § 3729(b)(1). Specific intent to defraud is not required. Id. According to the complaints, Bruyneel knew that the riders were using performance enhancing drugs and even took steps to facilitate such conduct. See, e.g., U.S. Compl. ¶ 38 (alleging Bruyneel in 1999 provided performance enhancing drugs to a team rider); id. ¶ 45 (alleging Bruyneel in July 2000 witnessed use of performance enhancing drugs); id. ¶ 49 (alleging Bruyneel in June 2002 instructed Landis to travel with Armstrong to Switzerland to receive performance enhancing drugs). At the same time, Bruyneel knew that the sponsorship agreement prohibited the use of performance enhancing drugs. Id. ¶ 30. He thus—according to the complaints—acted knowingly in causing the submission of false claims.

So, too, did Tailwind. Courts have held in False Claims Act cases that an employee's or agent's knowledge can be imputed to the employer or principal. See, e.g., Grand Union Co. v. United States, 696 F.2d 888, 891 (11th Cir. 1983); Miller v. Holzmann, 563 F. Supp. 2d 54, 100 (D.D.C. 2008), aff'd in part and vacated in part on other grounds sub nom. United States ex rel. Miller v. Bill Harbert International Construction, Inc., 608 F.3d 871 (D.C. Cir. 2010). Bruyneel served as Tailwind's manager, and in the course of his duties allegedly submitted claims he knew were false, to the benefit of Tailwind. See U.S. Compl. ¶ 11, 26. His knowledge is therefore imputed to Tailwind, establishing that it also acted knowingly.

The government and Landis have established, under the well-pled factual allegations in their complaints, that the requirements for a false presentment claim have been met.  The Court will therefore grant them default judgment on Count I.

        *2.  Liability: False Statements Claim (Count II)*

The government and Landis also seek a default judgment on Count II of their complaints, which raise a false statements claim against both defendants.  The False Claims Act also establishes liability for anyone who "knowingly makes . . . a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B) (2009).  To prove such a claim, the government must demonstrate that (1) the defendant made a statement or record, (2) the record or statement was false, and (3) the defendant knew the record or statement was false.  See, e.g., Toyobo Co., 811 F. Supp. 2d at 49.

Here, the government relies on a "fraudulent inducement" theory to prove liability.  This theory allows liability "under a contract which was procured by fraud, even in the absence of evidence that the claims were fraudulent in themselves."  Landis II, 234 F. Supp. 3d at 195 (internal quotation omitted).  As the Court explained in ruling on summary judgment, this theory requires that a defendant "made a material misrepresentation or omission, which [the government] then relied on when entering into the 2000 Sponsorship Agreement."  Id.  The material misrepresentation or omission need not be made by the party that submitted the claim, but "can extend to anyone who knowingly engaged in a fraudulent scheme that induced the government to enter into the contract."  Id.

According to the well-pled factual allegations, in the fall of 2000 before USPS entered into a new sponsorship agreement, Tailwind and Bruyneel falsely denied allegations of doping.  U.S. Compl. ¶ 63.  As discussed above, Tailwind and Bruyneel purportedly knew that these

denials were false.  The natural inference is that they intended USPS to rely on these denials when entering into the sponsorship agreement in 2000.  See id. ¶ 70.  The government and Landis have therefore established liability for the 41 claims submitted under the 2000 Agreement under a fraudulent inducement theory.  The Court will therefore grant default judgment in their favor on Count II.

### 3.  Monetary penalties

Next, the government and Landis seek the imposition of monetary penalties against Bruyneel and Tailwind.  The False Claims Act provides that those who violate its provisions shall be liable for civil penalties of $5,500 to $11,000 for each claim submitted.  See 31 U.S.C. § 3729(a).  The government need not show any actual damages or injury as a precursor to recovering monetary penalties.  See, e.g., United States ex rel. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991).  To determine an appropriate award of civil penalties, the Court considers the totality of the circumstances, focusing on factors such as "the seriousness of the misconduct, the scienter of the defendants, and the amount of damages suffered by the United States as a result of the misconduct."  United States v. Speqtrum, Inc., 2016 WL 5349196, at *4 (D.D.C. Sept. 23, 2016).

While the government and Landis urge the Court to impose the maximum amount of civil penalties—$11,000 for each of the 41 claims submitted—the Court will instead impose an amount closer to the middle of the range.  Admittedly, Bruyneel and Tailwind are alleged to have engaged in egregious conduct: the complaints lay out a sophisticated scheme to use performance enhancing drugs while taking intentional steps—including making false statements—to conceal this behavior from the public, USPS, and international cycling governing bodies.  See U.S. Compl. ¶¶ 35–69.

But the severity of the alleged conduct does not rise to the level found in the cases the government cites where maximum penalties were imposed.  For instance, it does not involve particularly vulnerable victims.  Cf. United States v. FastTrain II Corp., 2017 WL 606346, at *10 (S.D. Fla. Feb. 15, 2017) (awarding maximum amount of civil penalties in case where the defendants intentionally targeted vulnerable young adults who lacked high school diplomas in fraudulent scheme).  And while the government certainly paid Tailwind a lot of money ($32 million), the amount of damages the government suffered, if any, has been hotly disputed.  See, e.g., Landis II, 234 F. Supp. 3d at 203 ("Armstrong indeed makes a persuasive case that USPS received substantial value from the positive media coverage of the team[.]").  Finally, while the defaulting defendants took steps to conceal their conduct, they did not engage in the sort of intricate, complex cover-up present in other cases.  Cf. United States ex rel. Miller v. Bill Harbert International Construction, 501 F. Supp. 2d 51, 56 (D.D.C. 2007) (awarding maximum amount of civil penalties where defendants took "intricate steps . . . to cover up [their] scheme" such as "constant name changing of corporate entities" and making "suspect financial transactions in which illegal profits were shifted and funneled between contracts and companies so as to avoid detection").

The Court by no means sanctions the defaulting defendants' conduct.  But the circumstances here do not rise to the degree warranting the maximum level of civil penalties. The Court will instead award an amount closer to the middle of the range.  It will impose a civil penalty of $9,000 per false claim submitted, for a total penalty of $369,000.

### 4.  *Damages*

Finally, Mr. Landis independently moves for an award of damages under the False Claims Act against Bruyneel and Tailwind.  He advances two arguments to substantiate damages.  Neither is persuasive.

First, Landis contends that because Tailwind and Bruyneel have presented no evidence of benefits received by USPS under the sponsorship agreement, he is entitled to damages equal to the amount paid under the agreements.  But as plaintiff, Landis bears the burden of establishing damages with reasonable certainty.  See United States ex rel. Landis v. Tailwind Sports Corp. ("Landis III"), 2017 WL 5905509, at *4–5 (D.D.C. Nov. 28, 2017).  This remains the case even on a motion for default judgment.  See, e.g., Boland, 736 F. Supp. 2d at 68 ("When moving for default judgment, the plaintiffs must prove that they are entitled to the requested damages.").  Landis seeks to effectively shift his burden to prove damages onto Tailwind and Bruyneel, which the Court will not permit.

In any event, as the Court has already detailed, there *is* evidence in the record indicating that USPS received substantial benefits under the sponsorship agreement.  See, e.g., Landis III, 2017 WL 5905509, at *10–12 (discussing expert witness who planned to testify at trial as to the benefits USPS received under the sponsorship agreement).  Indeed, there was sufficient evidence to preclude summary judgment on this issue.  See Landis II, 234 F. Supp. 3d at 201–04 (discussing evidence presented at summary judgment of benefits to USPS under the agreement).  Without providing sufficient evidence to substantiate the amount of benefits incurred as compared to the amount of loss, Landis has failed to carry his burden of establishing his entitlement to damages.

Second, Landis argues that, as a matter of law, the amount of damages here is equal to the amount paid under the agreement because the value of the services rendered was zero.  The Court has twice confronted this argument and twice rejected it.  See id. at 199–201; Landis III, 2017 WL 5905509, at *4.  As it has explained, the actual value of the services rendered by an undisclosed tainted cycling team is not reasonably ascertainable.  See Landis II, 234 F. Supp. 3d at 200; Landis III, 2017 WL 5905509, at *4.  The Court held that plaintiffs could substantiate damages instead by showing the negative consequences of the agreement outweighed any benefits received by USPS.  Landis II, 234 F. Supp. 3d at 204 ("The question is whether the promotional benefits derived from the four payments outweighed the costs."); Landis III, 2017 WL 5905509, at *4.  Landis has not provided evidence to substantiate damages under that framework.  The Court will thus deny his motion seeking an award of damages under the False Claims Act.

   C.  Unjust enrichment claim against Bruyneel

The government independently moves for a default judgment against Bruyneel on its unjust enrichment claim.  To make out liability for unjust enrichment, the government must show that it (1) conferred a benefit on Bruyneel that (2) Bruyneel retained and (3) under the circumstances his retention of the benefit is unjust.  Landis II, 234 F. Supp. 3d at 205.  No contractual relationship between the parties is necessary to prevail on such a claim.  Id. at 206.

The government has shown that it conferred a benefit on Bruyneel that he retained. Bruyneel's bank records indicate that he was paid $2,047,833 in salary and bonuses during the period of time USPS sponsored the cycling team.  Decl. of Michael J. Pugliese ¶¶ 11–13 [ECF No. 596-3].  USPS financed 60% of Tailwind's expenses, which would include 60% of the salary

and bonuses paid to Bruyneel.  Id. ¶ 6.  Thus, USPS conferred a benefit on Bruyneel, specifically $1,228,700 of salary and bonuses, that Bruyneel has retained.

In addition, the well-pled allegations in the complaint establish that under the circumstances, allowing Bruyneel to retain this benefit would be unjust.  As discussed, Bruyneel is alleged to have been aware that USPS prohibited doping as a condition of its sponsorship and, under the agreement reached in 2000, could terminate the agreement if the team doped.  U.S. Compl. ¶¶ 20–21, 30.  Bruyneel nevertheless encouraged and organized doping activities by the team's riders and made false statements to conceal the team's use of performance enhancing drugs.  See, e.g., id. ¶¶ 39, 43, 50, 63B. USPS allegedly relied on Bruyneel's deception and false statements when it continued to make payments to Tailwind—payments that covered Bruyneel's salary and bonuses.  Id. ¶ 70.  Bruyneel's fraudulent activities leading to USPS's payments make his retention of those payments unjust.

When there has been an unjust enrichment, the appropriate remedy is restitution in the amount of the unjust benefit.  See, e.g., Griffith v. Barnes, 560 F. Supp. 2d 29, 35 (D.D.C. 2008).  Here, the government has substantiated that Bruyneel unjustly received $1,228,700 in benefits.  Decl. of Michael J. Pugliese ¶¶ 6, 11–14 [ECF No. 596-3].  The Court will thus enter judgment for the government against Bruyneel on its unjust enrichment claim and award it $1,228,700 in restitution.

* * *

For the foregoing reasons, the Court will grant the United States' motion for a default judgment against Bruyneel on the unjust enrichment claim and the United States' and Landis' joint motion for a default judgment against Bruyneel and Tailwind on the False Claims Act claims seeking monetary penalties.  However, it will deny Landis' motion for an award of

damages under the False Claims Act.  Separate orders will accompany this Memorandum

Opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  August 22, 2018